1

LEXSEE 2003 U.S. DIST. LEXIS 15981

**CYPRUS AMAX MINERALS COMPANY, a Delaware corporation, Plaintiff, - v - ASARCO INCORPORATED, a New Jersey corporation, Defendants.**

**99 Civ. 11198 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 15981*

**September 11, 2003, Decided
September 11, 2003, Filed**

**PRIOR HISTORY:** *Cyprus Amax Minerals Co. v. Asarco Inc., 2001 U.S. Dist. LEXIS 2666 (S.D.N.Y., Mar. 14, 2001)*

**DISPOSITION:** [*1] Court has considered the parties' correspondence regarding a motion by plaintiff for leave to amend its complaint.

**COUNSEL:** For Cyprus Amax Minerals Company, PLAINTIFF: Steven P Heineman, Bruce E Yannett, John H Hall, Debevoise & Plimpton, New York, NY USA.

For Asarco Incorporated, DEFENDANT: C William Phillips, Peter J Nickles, Covington & Burling, Roger J Hawke, Sidley Austin Brown & Wood LLP, New York, NY USA.

For Asarco Incorporated, COUNTER-CLAIMANT: C William Phillips, Peter J Nickles, Covington & Burling, Roger J Hawke, Sidley Austin Brown & Wood, LLP, New York, NY USA.

For Cyprus Amax Minerals Company, COUNTER-DEFENDANT: Steven P Heineman, Bruce E Yannett, John H Hall, Debevoise & Plimpton, New York, NY USA.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINIONBY:** Lawrence M. McKenna

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

The Court has considered the parties' correspondence regarding a motion by plaintiff for leave to amend its complaint. Following the practice of Judge Martin, to whom this case was previously assigned, the Court will, as suggested by the parties, decide the motion on the correspondence. n1

> n1 The correspondence consists of plaintiff's counsel's letter to Judge Martin of July 11, 2003, defendant's counsels' letter to the undersigned of July 29, 2003, plaintiff's counsel's letter to the undersigned of August 5, 2003, defendant's counsel's letter to the undersigned of August 8, 2003, and plaintiff's counsel's letter to the undersigned of August 13, 2003, the first two letters being accompanied by exhibit booklets.

[*2]

"Leave to file an amended complaint 'shall be freely given when justice so requires,' and should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001)* (quoting *Fed. R. Civ. P. 15(a)*, and citing *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962))*. The Court is not persuaded that any of those impediments to amendment has been demonstrated. n2

> n2 The Court has applied the *Fed. R. Civ. P. 12(b)(6)* standard in considering whether the

2003 U.S. Dist. LEXIS 15981, *

amendment would be futile, rather than the id. *56* standard, because the parties have not "fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact and have [not] presented all relevant evidence in support of their positions." *Milanese, 244 F.3d at 110.*

Plaintiff may serve and file its proposed amended complaint.

SO ORDERED.

Dated: September 11, 2003 [*3]

Lawrence M. McKenna

U.S.D.J.

2

1973 U.S. Dist. LEXIS 13281, *; 7 Fair Empl. Prac. Cas. (BNA) 884;
8 Empl. Prac. Dec. (CCH) P9439

LEXSEE 1973 US DIST LEXIS 13281

**Joseph DeLoraine, Plaintiff v. MEBA Pension Trust et al., Defendants.**

**No.  Civ. 72 4427 HRT.**

**United States District Court for the Southern District of New York.**

*1973 U.S. Dist. LEXIS 13281; 7 Fair Empl. Prac. Cas. (BNA) 884; 8 Empl. Prac. Dec. (CCH) P9439*

**June 8, 1973.**

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Defendants cross-moved to dismiss plaintiff's amended complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* in the event that plaintiff was granted leave to serve and file an amended complaint in a proceeding governed in part by *Fed. R. Civ. P. 15(a)*.

**OVERVIEW:** Defendants' motion for summary judgment was granted, and plaintiff filed a notice of motion to alter or amend the judgment and for leave to serve and file an amended complaint. Thereafter, plaintiff then filed a notice of appeal from the order of dismissal, having in the interim secured an adjournment of his pending motion. In addition to opposing the motion, defendants cross-moved to dismiss the amended complaint in the event that plaintiff's motion was granted. In vacating the judgment granting summary judgment, the court noted that the amended complaint sought to remedy the defects found by court to inhere in the original complaint. The court held that the amended complaint should be allowed because defendants would not be greatly prejudiced, and because the jurisdictional defects noted in the court's previous opinion could conceivably be cured. Further, such relief was placed firmly within the discretion of the court to grant, in that *Fed. R. Civ. P. 15(a)* directed that leave to amend was to be freely given when justice so required.

**OUTCOME:** The judgment was vacated, and leave was granted to plaintiff to amend, after which defendants' motion to dismiss would be considered as a motion for summary judgment.

### LexisNexis(R) Headnotes

*Civil Procedure > Relief From Judgment > Motions to Alter & Amend*
[HN1] A motion to alter or amend a judgment under *Fed. R. Civ. P. 59(e)* that is served not later than 10 days after entry of judgment destroys the finality of the judgment for purposes of appeal.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN2] *Fed. R. Civ. P. 15(a)* directs that leave to amend shall be freely given when justice so requires.

**OPINIONBY:** [*1]

TYLER, D.J.

## OPINION:

TYLER, D.J.: By way of opinion filed February 21, 1973, this court granted defendants' motion for summary judgment, and ordered the above-captioned action dismissed. On March 8, 1973, plaintiff filed a "notice of motion to alter or amend a judgment and for leave to serve and file an amended complaint"; on March 27, plaintiff filed a notice of appeal from the order of dismissal, having in the interim secured an adjournment of his pending motion.  In addition to opposing the motion, defendants have cross-moved to dismiss the amended complaint, pursuant to *Rule 12(b) (6), F.R. Civ. P.*, in the event that it is granted.

1973 U.S. Dist. LEXIS 13281, *; 7 Fair Empl. Prac. Cas. (BNA) 884;
8 Empl. Prac. Dec. (CCH) P9439

Plaintiff's motion is made pursuant to *Rules 15 and 59, F.R. Civ. P.*, "on the ground that justice so requires." As the caption to plaintiff's supporting memorandum indicates, the motion seeks to vacate the judgment, rather than to alter it, so that an amended complaint can be filed. Defendants contend that the motion raises no new issues of fact, and plaintiff does not seriously contest the judgment dismissing the original complaint. Rather, the motion is seemingly grounded on the merits of the amended complaint, which adds the Marine Engineers' Beneficial **[*2]** Association (the Union) as a party defendant, and "contains an expanded and more detailed statement of several theories of action under federal and state law." Memorandum of plaintiff in support of motion, at p. 2. parenthetically, it should be noted that the proposed amended complaint does not include in its caption the Union as a defendant, but I regard this as no more than an oversight or inadvertence.

At the threshold, defendants contend that this court is without jurisdiction to entertain plaintiff's motion because of a pending appeal. This contention is without merit, since [HN1] "motion to alter or amend a judgment under Rule 59(e) that is served not later than 10 days after entry of judgment destroys the finality of the judgment for purposes of appeal." 6A Moore's Federal Practice P59.13[4] at 3887 (2d ed. 1972). Plaintiff has emphasized, moreover, that his appeal is merely precautionary. And as Judge Gurfein has recently ruled, "[the] cautionary filing of an appeal by the plaintiff does not divest jurisdiction." *Sampson v. Ampex Corporation,*

*335 F. Supp. 242, 246 (S.D.N.Y. 1971),* aff'd *463 F.2d 1042 (2d Cir. 1972).*

The amended complaint seeks to remedy the defects found **[*3]** by the undersigned to inhere in the original complaint. I am inclined to grant the motion to vacate the judgment and to permit the amended complaint, if for no other reasons than because defendants would not be greatly prejudiced and because the jurisdictional defects noted in this court's previous opinion might conceivably be cured. Such relief is placed firmly within the discretion of this court to grant. 6A Moore's Federal Practice, supra P 59.12 at 3878-9. And Rule 15(a) [HN2] directs that leave to amend "shall be freely given when justice so requires."

Although there is mixed authority for refusing leave to amend a complaint which is jurisdictionally detective even after the proposed amendment, 3 Moore's Federal Practice, P15.08 at 902-906 (2d ed. 1972), defendants do not raise the issue. And I believe the wiser course is to vacate judgment, grant leave to amend, and then consider defendants' motion to dismiss. Since plaintiff has submitted an additional two pages affidavit, and material outside the pleadings had been previously submitted, defendants' current motion to dismiss under Rule 12(b) (6) shall be treated as one for summary judgment pursuant to *Rule 56, F.R. Civ. P.* **[*4]** The parties shall have 14 days from the filing of this memorandum to tender whatever other submission they care to in respect to the summary judgment motion.

It is so ordered.

3

LEXSEE 1987 U.S. DIST. LEXIS 16803

**DOGAN ENTERPRISES, INC., Plaintiff, -against- STANLEY HUBSHER, Defendant.**

**CV-84-3984**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*1987 U.S. Dist. LEXIS 16803*

**October 20, 1987, Decided**
**November 4, 1987, Filed**

**DISPOSITION:** [*1] Plaintiff's motion to extend discovery deadline granted. Both parties' requests for monetary sanctions denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action for an accounting and recovery of profits, plaintiff partner filed a motion pursuant to Fed. R. Civ. P. 15(a) to amend its complaint. Plaintiff also filed a motion pursuant to Fed. R. Civ. P. 37 for an order compelling defendant partner to produce various corporate records and an order ruling that defendant waived his Fifth Amendment privilege against self-incrimination. Defendant filed a motion for an order dismissing the complaint.

**OVERVIEW:** Defendant's partner in the publication of an automotive journal formed plaintiff to place some of his publishing ventures into corporate ownership and assigned plaintiff his 51 percent partnership interest in the automotive journal. Upon the publisher's death, defendant continued to publish the journal until he decided to publish a new one dealing with the same topics. Plaintiff then instituted a lawsuit against defendant. Defendant filed a motion to dismiss on the ground that a trustee was the real party in interest under Fed. R. Civ. P. 17(a). The court disagreed, finding that plaintiff was the real party in interest for prosecuting a suit for breach of the partnership agreement. Plaintiff argued that defendant's earlier admissions regarding his practice of overstating the circulation of his new journal constituted a waiver of his Fifth Amendment privilege and that defendant should be compelled to answer questions regarding that issue. The court held that defendant's testimony did not constitute a waiver because there was no significant likelihood that the finder of fact would be left with a distorted view of the truth that would prejudice plaintiff's position.

**OUTCOME:** The court denied defendant's motion to dismiss without prejudice to an appropriate application to join the successor trustee or the trust beneficiary. The court granted plaintiff's motion to amend the complaint. The court also granted plaintiff's request for discovery of financial records and reports and documents relating to circulation. The court determined that defendant did not waive his Fifth Amendment privilege.

**LexisNexis(R) Headnotes**

*Civil Procedure > Joinder of Claims & Parties > Capacity of Parties*
[HN1] The effect of Fed. R. Civ. P. 17 is to require that an action is brought by the party to whom the relevant substantive law grants a cause of action.

*Civil Procedure > Joinder of Claims & Parties > Capacity of Parties*
[HN2] The question of who is the real party in interest may be resolved by inquiring into whether a plaintiff has standing to sue under the substantive law.

*Civil Procedure > Justiciability > Standing*
[HN3] Florida law permits a corporation to sue in its own name for injuries it has directly sustained.

1987 U.S. Dist. LEXIS 16803, *

*Civil Procedure > Joinder of Claims & Parties > Joinder of Necessary Parties*
[HN4] See Fed. R. Civ. P. 19(a).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN5] Leave to amend a complaint shall be freely given when justice so requires. Fed. R. Civ. P. 15(a). Assuming the amendment alleges at least colorable grounds for relief, leave should be granted unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN6] With respect to undue delay, mere passage of time will not defeat a motion to amend in the absence of evidence that a plaintiff acted in bad faith or with dilatory motives.

*Civil Procedure > Disclosure & Discovery*
[HN7] Unless a question of privilege is raised, the scope and timing of discovery in a diversity action is to be determined by the Federal Rules of Civil Procedure.

*Trademark Law > Infringement Actions > Remedies > Equitable Relief > Accountings*
*Civil Procedure > Disclosure & Discovery*
[HN8] Discovery relating to both items of account and damages is generally permitted prior to a determination of liability.

*Civil Procedure > Remedies > Damages*
*Civil Procedure > Disclosure & Discovery*
[HN9] In actions at law, pretrial discovery as to damages is generally available since issues of liability and damages normally go to the jury at the same time.

*Civil Procedure > Remedies > Damages*
*Civil Procedure > Disclosure & Discovery*
[HN10] The court may, in appropriate instances, order that discovery as to damages be deferred until after a determination of the right to recover.

*Civil Procedure > Disclosure & Discovery > Relevance*
[HN11] As set forth in Fed. R. Civ. P. 26(b), the scope of permissible discovery is determined by whether the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN12] The privilege against self-incrimination may be asserted in civil litigation, including during the course of a pretrial deposition.

*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN13] Proper use of the privilege against self-incrimination is a matter for the court to decide, and the scope of its protection is confined to instances where the witness has reasonable cause to believe that a direct answer would support a conviction or furnish a link in the chain of evidence needed to prove a crime.

*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN14] A waiver of the privilege may be inferred from a witness's testimony without inquiring into whether the witness consciously chose to waive it. Such "testimonial waiver," however, should be inferred only in the most compelling of circumstances, and the court must indulge every reasonable presumption against finding a testimonial waiver.

*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN15] A court should only infer a waiver of the Fifth Amendment's privilege against self-incrimination from a witness's prior statements if (1) the witness's prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the Fifth Amendment's privilege against self-incrimination.

*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN16] A witness has the requisite reason to know that a waiver might be inferred only if the witness' prior statements were (a) "testimonial," meaning that they were voluntarily made under oath in the context of the judicial proceeding and (b) "incriminating" meaning that they did not merely deal with matters "collateral" to the events surrounding commission of the crime but directly inculpated the witness on the charges at issue.

*Constitutional Law > Procedural Due Process > Self-Incrimination Privilege*
[HN17] With respect to the first prong of the test for determining whether the privilege against self-incrimination was waived, a waiver should be found when the timing of a witness's assertion of the privilege has left the finder of fact with a distorted view of the truth. However, to give effect to the principle that a waiver should be inferred in only the most compelling circumstances, the court has held that the resulting distortion must be such that a failure to find a waiver would prejudice a party to the litigation.

1987 U.S. Dist. LEXIS 16803, *

**JUDGES:** Charles P. Sifton, United States District Judge.

**OPINIONBY:** Charles P. Sifton

**OPINION:**

MEMORANDUM AND ORDER

SIFTON, District Judge

This is an action for an accounting and recovery of profits allegedly owed plaintiff as a partner with defendant in the publication of an automotive trade magazine. Jurisdiction is based on diversity of citizenship. The matter is before the Court on plaintiff's motion for an order pursuant to *Fed.R.Civ.P. 15(a)* permitting plaintiff to amend its complaint. Plaintiff also moves pursuant to *Fed.R.Civ.P. 37* for an order compelling defendant to produce various corporate records, ruling that defendant was not entitled to the protection of the fifth amendment privilege against self-incrimination to avoid answering questions during the course of his deposition, and extending the discovery deadline for a period of sixty days after service of defendant's answer to the amended complaint.

Defendant, in turn, has moved, presumably pursuant to *Fed.R.Civ.P. 12(b)(6)* for an order dismissing the complaint on the ground that it has not been brought by the real [*2] party in interest. n1 Alternatively, defendant seeks an order compelling plaintiff, by Mrs. Yette Dogan, to appear for a deposition.

> n1 Since defendant has submitted affidavits and documentary evidence outside the pleadings, and plaintiff has in turn responded with opposing affidavits and documentary evidence, the Court will treat defendant's motion as one for summary judgment pursuant to *Fed.R.Civ.P. 56.* See *Fed.R.Civ.P. 12(b)*; 2A J. Moore, Federal Practice P12.09[2].

Finally, during the course of presenting their respective applications, both parties, without making a formal motion, have requested the imposition of monetary sanctions pursuant to *Fed.R.Civ.P. 11.*

FACTS

The present controversy arises from a business relationship that was formed between defendant Stanley Hubsher and his brother-in-law, the late William Martin Dogan. The following statement of facts is derived from the pleadings and papers filed in connection with these applications and, except as noted, is essentially undisputed. [*3]

Mr. Dogan, often in partnership with his wife Yetta Dogan, was in the business of publishing trade magazines, newsletters and directories for specialized business audiences. Beginning in 1969, Mr. Dogan invited defendant to join as a partner in several of his trade publications. Defendant had no prior experience in publishing. Sometime in 1970, Mr. Dogan and defendant became partners in the publication of Eastern Automotive Journal, a trade magazine that Mr. Dogan had purchased the year before. Several written partnership agreements were entered into regarding Eastern Automotive Journal, the last dated June 6, 1977. Under the agreement, defendant received a 49% interest in the magazine and Mr. Dogan retained 51%. Defendant was responsible for the magazine's day-to-day operations, while Mr. Dogan continued to assist with the editorial and promotional aspects of the publication. The agreement also sets forth various procedures for the purchase or sale of partnership shares in the event of the retirement or death of one of the partners.

In May, 1978, Mr. & Mrs. Dogan formed plaintiff, Dogan Enterprises, Inc., to place some of their publishing ventures into corporate ownership. [*4] On May 11, 1978, Mr. Dogan assigned to plaintiff his 51% partnership interest in Eastern Automotive Journal. Defendant consented to this assignment. The minutes of plaintiff's first shareholder and board of director's meeting show the election of Mr. and Mrs. Dogan as plaintiff's sole directors. Mr. Dogan was also elected as president and treasurer, and Mrs. Dogan was elected as secretary. At the time of plaintiff's incorporation, William Dogan was the sole owner of all of plaintiff's authorized and issued stock, comprising 500 shares.

On July 26, 1979, Mr. Dogan created a trust in which he placed, inter alia, his 500 shares of Dogan Enterprises. Under the terms of the trust, Mrs. Dogan has a lifetime interest in the income of the trust, and upon her death, the balance of the trust is to be distributed outright to three remaindermen, one of whom is defendant's wife. In the event of Mr. Dogan's death, Sun First National Bank of Palm Beach County is named as successor trustee. The trustee has the power to maintain, settle and release all claims or demands of the estate. The trustee is also afforded broad powers to manage the trust assets, including the power to operate, and [*5] hire and discharge directors and officers of any non-public corporation in which Mr. Dogan owned stock at the time of his death. Shortly after Mr. Dogan's death, the Sun First National Bank resigned as trustee and no successor has ever been appointed.

1987 U.S. Dist. LEXIS 16803, *

The terms of the trust substantially altered Mr. Dogan's prior revocable trust executed just one month earlier. Under that trust, the trustee was to pay the entire trust estate to Mr. Dogan's surviving spouse. In addition, Mrs. Dogan was to be appointed successor trustee under the prior trust, upon her husband's death. In 1986, Mrs. Dogan filed a petition in the Florida probate court to declare the restated trust invalid. On January 9, 1987, the petition was dismissed upon the motion of two remaindermen, including defendant's wife. On March 12, 1987, plaintiff's appeal of this decision was dismissed as untimely.

On March 20, 1980, Mr. Dogan died. Following his death, defendant continued to operate and publish Eastern Automotive Journal with the knowledge and consent of Yetta Dogan.

On August 26, 1981, an attorney for defendant allegedly sent the following letter to an attorney for plaintiff (plaintiff claims that it did not learn [*6] of this letter's existence until shortly before commencement of this action):

"I have attempted to communicate with you both by letter and by telephone in the hopes of arriving at some amicable disposition of Eastern Automotive Journal. Having been frustrated as a result of your failure or refusal to return my telephone calls, or to respond to my communications, my client has instructed me to proceed as herein indicated.

My client has asked me to advise that this shall constitute notice that he will no longer remain connected with Eastern Automotive Journal either as an agent, servant, principal, or employee, and terminates the partnership, effective as herein set forth.

Since the September-October issue is almost ready to go to press, my client will continue to function for the purpose of completing said issue and having said issue duly published. However, he will perform no further services for or on behalf of the partnership.

My client does not feel it is in his best interests to attempt to operate under the circumstances which exist between himself and the Dogan Estate. He has made every effort to come to some understanding with Mrs. Dogan and/or the Dogan Estate, with no [*7] success. My client intends to proceed with the publication of a new journal which will deal with the same general subject matter and cover the same general areas as Eastern Automotive Journal does at this time. Mr. Hubsher will, of course, assume possession of all of the office equipment, furniture, etc., as the ownership of these items is specifically reserved to him under the terms and provisions of the original partnership agreement."

Commencing in January 1982, defendant began publishing a "new" journal entitled Eastern Aftermarket Journal. Defendant conceded at his deposition that the new publication continued the format and volume numbering of Eastern Automotive Journal and relied on the same advertiser and subscriber base. Apart from the name change, defendant admits that the two publications are the same.

Finally, Mrs. Dogan has produced a stock certificate dated July 2, 1984, stating that she is the record owner of 500 shares of plaintiff's stock. Defendant vigorously contests the validity of the certificate, arguing that it was issued in an attempt by Mrs. Dogan to fabricate standing to bring the present action.

I. Real Party in Interest

Defendant seeks [*8] dismissal on the ground that the trustee of the William Dogan Trust is the real party in interest within the meaning of *Fed.R.Civ.P. 17(a)* to any claim for breach of the partnership agreement. In substance, defendant argues that allowing the action to proceed in plaintiff's name would thwart the purpose of Mr. Dogan's amended trust and expose defendant to potential double liability or inconsistent verdicts. In response, plaintiff argues that regardless of the terms of the Trust, Dogan enterprises remains a distinct corporation and Mrs. Dogan, in her capacity as sole director, has duly authorized the present action. In addition, plaintiff contends that dismissal is inappropriate since in the event that a successor trustee is appointed, the trustee would be required to ratify the present action or risk suit himself.

[HN1] The effect of Rule 17 is to require that an action is brought by the party to whom the relevant substantive law, in this case Florida's, grants a cause of action. See, e.g., 6 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1543, at 643. The purpose of the rule is to "protect the defendant against a subsequent action by the party actually entitled [*9] to recover, and to ensure generally that the judgment will have its proper effect as res judicata." *Fed.R.Civ.P. 17* advisory committee's note; accord *U-Haul International, Inc. v. Jartran, 793 F.2d 1034, 1039 (9th Cir. 1986).* As

1987 U.S. Dist. LEXIS 16803, *

a general rule, [HN2] the question of who is the real party in interest may be resolved by inquiring into whether plaintiff has standing to sue under the substantive law. E.g., *Swanson v. Bixler, 750 F.2d 810, 813 (10th Cir. 1984);* Wright, Miller & Kane, § 1542 at 641-2.

[HN3] Florida law permits a corporation to sue in its own name for injuries it has directly sustained, e.g., *Alario v. Miller, 354 So. 2d 925 (Fla. App. 1978),* and the present action has been commenced by Dogan Enterprises on its own behalf as a partner with defendant. Accordingly, plaintiff correctly claims to be the real party in interest for prosecuting a suit for breach of the partnership agreement to which it was a party.

Defendant has, however, raised legitimate concerns arising from the trustee's absence from the present litigation that are more appropriately addressed in the context of Rule 19. Rule 19, which protects many of the same interests protected by Rule 17, see [*10] *U-Haul, supra, 793 F.2d at 1039,* provides in relevent part:

> "(a) [HN4] Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest."

Although the parties' contest the validity of the shares issued in Mrs. Dogan's name, it is undisputed that the trust holds at least half of plaintiff's shares and therefore each beneficiary would appear to have an interest in the instant litigation.

Accordingly, the denial of the motion to dismiss is made without prejudice to an appropriate application under Rule 19 to permit the joinder of a successor trustee or the trust beneficiary.

II. Motion to Amend the [*11] Complaint

Plaintiff seeks leave to amend its complaint to assert an alternative ground for relief based on defendant's alleged breach of the partnership agreement. Additionally, plaintiff seeks to plead a claim that

defendant misappropriated a second publication from plaintiff entitled Who's Who In Meat. Plaintiff also seeks to add a claim for attorneys' fees as provided in the Eastern Automotive Journal Partnership Agreement.

Count one of the amended complaint alleges that defendant's letter of March 21, 1981, constituted his "retirement" from the partnership under the terms of the partnership agreement. Under this theory, plaintiff alleges that defendant ceased to be a partner as of 1981 and was obligated to sell out his 49% interest in the magazine. As a consequence of defendant's continuation of the business, plaintiff claims it is entitled to all of the funds received by defendant during his alleged wrongful publication of the magazine.

Count two of the proposed complaint essentially reiterates the claim for relief alleged in the initial complaint. It seeks a declaration that the partnership has not ended and that plaintiff is entitled to receive its share of the [*12] revenues as provided in the agreement.

Count three alleges that, in addition to their partnership in the publication of Eastern Automotive Journal, the Dogans entered into a partnership agreement with defendant in connection with the bi-annual publication of a directory of people and business in the meat industry known as Who's Who in Meat. The amended complaint alleges that, although the right to publish the directory had to be registered with the Meat Association for each issue, it was the parties' agreement that their venture would be of a continuing nature. The complaint further alleges that Mr. Dogan's interest in Who's Who in Meat was assigned to plaintiff with defendant's consent.

The new count seeks a declaratory judgment that defendant has no right to solicit permission from the Meat Association to publish its directory on the ground that it is a partnership opportunity that defendant has wrongfully appropriated for himself. Additionally, it seeks an accounting of profits that defendant has realized from his alleged misappropriation.

[HN5] Leave to amend a complaint "shall be freely given when justice so requires." *Fed.R.Civ.P. 15(a).* Assuming the amendment alleges [*13] at least colorable grounds for relief, leave should be granted unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962); S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Building I Housing Dev. Fund Co., 608 F.2d 28, 42 (2d Cir. 1979).*

Defendant argues that leave should be denied since plaintiff has waited nearly two years to move for amendment and now attempts to do so after discovery is

1987 U.S. Dist. LEXIS 16803, *

virtually complete. Defendant also attacks the two new counts on the ground that they present meritless claims. Finally, defendant argues that the statute of limitations regarding the additional claim based upon Who's Who in Meat has expired. Since none of these objections, alone or together, constitutes a sufficient basis for denying plaintiff's requested amendments, plaintiff's motion to amend is granted.

[HN6] With respect to undue delay, mere passage of time will not defeat a motion to amend in the absence of evidence that plaintiff acted in bad faith or with dilatory motives. Defendant has provided no such evidence. Indeed, plaintiff's own [*14] counsel states in its affidavit that it showed a draft of the proposed amendments to defendant's counsel shortly after the completion of defendant's deposition, but a formal application was put off in light of settlement negotiations that were proceeding at that time.

Moreover, defendant's claim that it will be prejudiced by the fact that discovery is "virtually complete" is undermined by this Court's decision, hereinafter, to permit plaintiff to discover corporate records that were requested at defendant's deposition. In any event, that additional discovery may be required with regard to the Who's Who in Meat claim is insufficient prejudice to deny leave to amend in light of the discovery that has been completed to date and the proximity of trial. See *S.S. Silberblatt, supra,* 608 F.2d at 42.

Defendant's other objections are easily disposed of. Although defendant attempts to, it cannot be seriously argued that any of the proposed claims fail to state at least colorable grounds for relief. As for the running of the statute of limitations, defendant fails to state which statute of limitations has run or when the limitations period began to run. If defendant has in fact a valid [*15] statute of limitations defense, he may assert it by way of a motion to dismiss or for summary judgment.

Accordingly, plaintiff's motion to amend is granted.

III. Discovery

A. Production of Financial Records

As part of its notice to take defendant's deposition, plaintiff included a detailed request for production of documents relating to financial records and reports of Eastern Automotive Journal and Eastern Aftermarket Journal from 1977 to the present. Defendant objects to these requests on the ground that they involve items of account, which under New York law are not discoverable until it has first been established that a plaintiff has a right to an accounting. See, e.g., *Goldman v. Salzberg,* 45 A.D.2d 680, 45 A.D.2 680, 356 N.Y.S.2d 84 (1st Dept.

1974); *Barnett Robinson Inc. v. V.F. Steel Inc.,* 43 A.D.2d 826, 351 N.Y.S.2d 409 (1st Dep't. 1974).

It is quite clear that defendant's reliance on New York's discovery practice is misplaced. [HN7] Unless a question of privilege is raised, which is not the case here, the scope and timing of discovery in a diversity action is to be determined by the Federal Rules of Civil Procedure. See *Dixon v. 80 Pine Street* [*16] *Corp., 516 F.2d 1278, 1280 (2d Cir. 1975); Keller v. Orion Ins. Co., 285 F. Supp. 906, 908 (D. Minn. 1968).* As it turns out, a rule similar to New York's has been applied in patent and trademark infringement cases where the plaintiff seeks an injunction and an accounting. See, e.g., *Molinaro v. Lafayette Radio Electronics, 62 F.R.D. 464, 466 (E.D. Pa. 1973);* 4 J. Moore, Federal Practice P26.56[5]. This rule, however, has not been followed outside the infringement area, and [HN8] discovery relating to both items of account and damages is generally permitted prior to a determination of liability. See *Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 694-95, 77 L. Ed. 1449, 53 S. Ct. 736 (1933)* [HN9] (In actions at law, pretrial discovery as to damages is generally available since issues of liability and damages normally go to the jury at the same time); *Vollert v. Summa Corp., 389 F. Supp. 1348, 1351 (D. Ha. 1975); Hirshhorn v. Mine Safety Appliances Co., 8 F.R.D. 11 (W.D. Pa. 1948);* 4 J. Moore, at P26.56[5]. While [HN10] the court may, in appropriate instances, order that discovery as to damages be deferred until after a determination of the right to recover, [*17] see *Corbett v. Free Press Assoc., 50 F.R.D. 179, 181 (D. Vt. 1970),* there is no showing of any need to do so here. First, under the allegations of the amended complaint, plaintiff's claim is no longer simply to establish a partnership and for an accounting. Second, there has been no evidence adduced that the suit has been brought without probable cause or that the information sought is of the same nature as a trade secret. See *Sinclair, supra, 289 U.S. at 697; Corbett, supra, 50 F.R.D. at 181.* Accordingly, defendant's arguments for resisting discovery on these grounds must be rejected.

Similarly, defendant's efforts to prevent plaintiff from deposing his accountant on these grounds are also unavailing. Of course, defendant may, if appropriate, seek a protective order on any independent grounds there may be to the taking of his accountant's deposition.

B. Production of Documents Relating to Circulation.

In addition to document request # 15, in which plaintiff seeks subscriber lists for Eastern Automotive Journal, plaintiff requested production of the following items: (1) defendant's media kit, which gives information such as circulation, subscribers and rates, [*18] (2) defendant's printer's bills, which show circulation, and

1987 U.S. Dist. LEXIS 16803, *

(3) records showing the number of copies of Eastern Aftermarket Journal mailed to subscribers. Defendant objects to these requests, arguing that information concerning the circulation of Eastern Automotive Journal is irrelevent to the issue of whether plaintiff is a partner with defendant in the publication. n2

> n2 Defendant further argues that plaintiff seeks this information merely to cover a settlement in light of defendant's admission at his deposition that he purposely overstates subscription rolls to obtain more favorable bulk mailing postage rates. Plaintiff's motives, whatever they may be, however, have no bearing upon whether otherwise discoverable information can be withheld by defendant.

[HN11] As set forth in *Fed.R.Civ.P. 26(b)*, the scope of permissible discovery is determined by whether the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Since these requests meet that test, defendant's arguments [*19] must be rejected.

C. Miscellaneous Requests

During the course of defendant's deposition, plaintiff requested production of the following items which have not yet been produced: (1) defendant's diary entries relevant to the signing of the partnership agreement, (2) other partnership agreements between defendant and Dogan, and (3) copies of correspondence between the parties in addition to that produced before or during deposition. Since these requests are not improper on their face, and defendant has offered no grounds for withholding their production, defendant must comply with these requests as well.

D. Fifth Amendment

During the course of his deposition, defendant made several incriminating admissions with regard to his practice of overstating the circulation of Eastern Aftermarket Journal. Defendant admitted that this was his practice on his other publications as well, because it gave them "a better image." When asked whether he had made false statements to the government respecting circulation in order to secure more favorable mailing permits, defendant asserted his fifth amendment right against compelled self-incrimination and refused to answer. Plaintiff argues that [*20] defendant's earlier admissions constituted a waiver of his fifth amendment privilege and defendant should be directed to answer this question and others along the same lines.

The relevant testimony adduced at the deposition is as follows:

> "Q. I'm going to show you the document that's just been marked and ask you if you recognize this document?
>
> A. There is no date on it. Oh, there is, '83. Yes.
>
> Q. Do you know what that's a photocopy of a page from?
>
> A. Yes, RDS, I guess.
>
> Q. What is that?
>
> A. It's a directory of publications.
>
> Q. The particular page that you have in front of you which has just been marked relates in part to your company; is that correct?
>
> A. Yes.
>
> Q. And would you read it over to yourself and tell us whether the information contained therein was supplied to that publication by you?
>
> A. That's correct.
>
> Q. Is the information as it appears there accurate as of the date published?
>
> A. It's as accurate as I furnished, yes.
>
> Q. Did you furnish them information that was inaccurate?
>
> A. As we had been doing all along.
>
> Q. I'm not sure I understand that.
>
> A. Bill in his wisdom understood these better than [*21] I did. So from day one these references and Beer Wholesaler magazine references, and Bath Products merchandising references was what we put down on paper, which were not completely true statements.
>
> Q. In other words, they overstate circulation?

1987 U.S. Dist. LEXIS 16803, *

A. That's correct, you would overstate circulation, you would overstate -- you would put down names of people so you would look like a bigger organization.

Q. And was that the basis upon which you would

secure advertising from the --

A. It would give you a better image.

Q. And you have continued that same practice of overstating what had been done before?

A. That's correct.

Q. Is that not only in this publication but your other publication as well?

A. That's correct.

Q. Do you obtain a permit to use the mails based upon circulation?

A. Yes.

Q. And do you -- in connection with the permit that you obtained, do you overstate the circulation?

MR. WEBER: Objection. I would rather him not get involved in that.

MR. WILD: Would you please tell us the grounds for the objection? If you want to take the Fifth Amendment, that's okay. I have no objection to that.

MR. WEBER: Yes. I think we will [*22] assert the Fifth Amendment.

A. Okay, I'll do that.

MR. WILD: I think we have waived it before, but I'll raise that later, but I'm not going to debate it with you now.

Q. By the way, in connection with the mail permit, you want a permit that will allow you to mail as a second class rate; is that correct?

A. Correct.

Q. And in order to do that you have to have at least 50 percent of your subscribers or the persons to whom you send your publication be direct request subscribers; is that right?

A. Yes.

Q. A direct request subscriber is a person who asks for your publication whether they pay for it or not; is that right?

A. Correct."

It is well established that [HN12] the privilege against self-incrimination may be asserted in civil litigation, *Kastigar v. United States, 406 U.S. 441, 444, 32 L. Ed. 2d 212, 92 S. Ct. 1653 (1972)*, including during the course of a pretrial deposition. See, e.g., *In re Folding Carton Antitrust Litigation, 609 F.2d 867, 873 (7th Cir. 1979); E.F. Hutton & Co. v. Jupiter Development Corp. Ltd., 91 F.R.D. 110, 114 (S.D.N.Y. 1981).* [HN13] Proper use of the privilege is a matter for the court to decide, and the scope of its [*23] protection is confined to instances where the witness has reasonable cause to believe that a direct answer would support a conviction or furnish a link in the chain of evidence needed to prove a crime. *Hoffman v. United States, 341 U.S. 479, 486, 95 L. Ed. 1118, 71 S. Ct. 814 (1951); United States v. Edgerton, 734 F.2d 913, 921 (2d Cir. 1984).* The court is satisfied that defendant had such reasonable cause when he refused to answer plaintiff's counsel's question. Thus, as plaintiff concedes, the only question is whether defendant waived his fifth amendment privilege by failing to invoke it earlier during the depositions.

It is undisputed that [HN14] a waiver of the privilege may be inferred from a witness' testimony without inquiring into whether the witness consciously chose to waive it. *Klein v. Harris, 667 F.2d 274, 287 (2d Cir. 1981).* Such "testimonial waiver," however, should be inferred only in the most compelling of circumstances and the court must "indulge every reasonable presumption against finding a testimonial waiver." Id. The test in this circuit for determining whether such circumstances exist is as follows:

> [HN15] "[A] court should only infer a waiver of [*24] the fifth amendment's privilege against self-incrimination from a witness' prior statements if (1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distored

1987 U.S. Dist. LEXIS 16803, *

view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination."

Id.

Addressing the second prong first, the Klein court instructs that [HN16] a witness has the requisite reason to know that a waiver might be inferred "only if the witness' prior statements were (a) 'testimonial,' meaning that they were voluntarily made under oath in the context of the ... judicial proceeding ... and (b) 'incriminating' meaning that they did not merely deal with matters 'collateral' to the events surrounding commission of the crime...but directly inculpated the witness on the charges at issue." *Id. at 288* (citations omitted). It is clear on the present facts that the second prong has been satisfied. The defendant's testimony was both under oath and directly inculpatory.

[HN17] With respect to the first prong, Klein states that a waiver should [*25] be found when the timing of a witness' assertion of the privilege has left the finder of fact with a distorted view of the truth. However, to give effect to the principle that a waiver should be inferred in only the most compelling circumstances, the court held that the resulting distortion must be such that a failure to find a waiver would prejudice a party to the litigation. *Id. at 288.* See *Rogers v. United States, 340 U.S. 367, 95 L. Ed. 344, 71 S. Ct. 438 (1951); E.F. Hutton, supra, 91 F.R.D. at 116.*

Upon reviewing the testimony offered prior to defendant's assertion of the privilege, the undersigned fails to see any significant likelihood that the finder of fact will be left with a distorted view of the truth so as to prejudice plaintiff's position in this litigation. Without intending to imply that such a significant likelihood may never be found when the privilege is asserted in the course of pre-trial discovery, this is simply not the same case as if the defendant had taken the stand during the course of the trial and selectively refused to testify. Accordingly, the Court concludes that defendant's testimony did not constitute a complete waiver of his fifth amendment [*26] privilege.

Although a complete waiver as to all discovery cannot be founded on defendant's existing testimony, by revealing his practice of overstating circulation, defendant has waived his privilege insofar as further questions seek the details of the facts as to which he has already testified. See *Rogers, supra, 340 U.S. at 374; Camelot Group, Ltd. v. W.A. Krueger, 486 F. Supp. 1221, 1230 (S.D.N.Y. 1980).* It is clear, however, that

plaintiff's proffered question seeks much more than the details of defendant's prior testimony.

E. Plaintiff's Deposition

Defendant seeks to compel the deposition of plaintiff's witness, Yetta Dogan. Defendant requests that the deposition take place at its offices in New York. Alternatively, defendant requests that, if the deposition is to take place in Florida, where Mrs. Dogan now lives, plaintiff should be required to bear the cost of attendance for both defendant's counsel and his associate, plus the counsel fees of at least one attorney. Defendant cites Local Rule 15(a) as authority for the payment of such expenses.

This is not the first time that the issue of Mrs. Dogan's deposition has come before the Court. In October 1985, by way [*27] of letter motion, the parties joined issue on where and when Mrs. Dogan's deposition ought to occur. At the time, Mrs. Dogan argued that she was too ill to make the trip to New York before the proposed discovery deadline. The Court ruled that, if Mrs. Dogan was unable to appear for a deposition in New York, defendant was entitled to depose her in Florida, with plaintiff bearing the cost of airfare and the reasonable expenses of an overnight stay.

Following the Court's ruling, Mrs. Dogan's deposition was scheduled to take place in Florida on January 6, 1986. In an affidavit submitted to the Court dated January 29, 1986, counsel for plaintiff stated that on January 3rd defendant's attorney cancelled the deposition. At that time or shortly thereafter the parties agreed to take Mrs. Dogan's deposition in New York ten days prior to trial of the action. The parties entered into a stipulation to this effect which was so ordered by this Court on January 31, 1986.

Defendant now seeks to avoid the terms of this stipulation based upon a letter dated October 1, 1986, from plaintiff's counsel in which plaintiff's counsel stated: "I anticipate serving the motion to amend this week. I believe that [*28] you will have to depose Mrs. Dogan in Florida. Please suggest same [sic] dates." In response, plaintiff's counsel asserts that his letter was intended only as a courtesy to defendant. That is, despite the existence of the stipulation, plaintiff was willing to be deposed in Florida, but only at defendant's expense. Plaintiff's counsel now demands that, if the deposition is to occur in Florida, defendant should be required to pay for his expenses as well.

Defendant's attempt to avoid the terms of its agreement must be rejected. Although perhaps not the clearest expression of intent, plaintiff's counsel's letter of October 1, 1986, did not abrogate the parties prior arrangement. If defendant now wishes to depose Mrs.

1987 U.S. Dist. LEXIS 16803, *

Dogan earlier than ten days prior to trial and plaintiff states that she is willing to appear at an earlier date, then defendant may do so at its own expense. In addition, since plaintiff has stated its willingness to appear for a deposition in Florida, it also must arrange for representation by counsel at its own expense.

In light of the amended complaint, plaintiff's motion to extend the discovery deadline is granted.

Finally, the court denies both parties' requests [*29] for monetary sanctions. These requests, not made by formal motion, seem intended merely to serve as rhetorical devices to emphasize other points made in the briefs and, in any event, fail to meet the standards set forth in Rule 11.

SO ORDERED.

Dated: Brooklyn, New York

Oct. 20, 1987

Charles P. Sifton

United States District Judge

**4**

LEXSEE 1998 U.S. DIST. LEXIS 8850

**HARVEY H. SEIPLE, JR., Plaintiff, v. COMMUNITY HOSPITAL OF LANCASTER and NORMAN AXELROD, DO, Defendants.**

**CIVIL ACTION NO. 97-CV-8107**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1998 U.S. Dist. LEXIS 8850*

**June 15, 1998, Decided**
**June 16, 1998, Filed, Entered**

**PRIOR HISTORY:** Original Opinion of April 14, 1998, Reported at: *1998 U.S. Dist. LEXIS 5093.*

**DISPOSITION:** [*1] Plaintiff's motion to amend GRANTED. Plaintiff's motion for reconsideration GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff individual filed motions to amend and for reconsideration of the court's prior order that granted a motion for partial dismissal by defendants, a hospital and a doctor, related to the individual's breach of contract claim arising from the individual's employment-related complaint. The individual sought to amend the complaint to add the allegations the court had previously found lacking.

**OVERVIEW:** The court had granted Defendants' motion for partial dismissal, concluding that because the individual failed to allege that adherence to a certain human resources policy was to be a binding term of his at-will employment, he had not stated a claim for breach of contract. The individual sought to amend the complaint to add the allegations that were lacking. In light of those amendments, the individual also requested reconsideration of the ruling dismissing his breach of contract claim. Despite the clear evidentiary limitations of *Fed. R. Civ. P. 12(b)6, 15(a)*, in response to this request, defendants submitted a copy of the policy. Nonetheless, the court chose not to exclude defendants' submission, as consideration of the policy appeared to finally resolve the issue of whether an implied employment contract existed between the parties. Consequently, the court reviewed its initial dismissal of the claim pursuant to *Fed. R. Civ. P. 56* governing summary judgment rather than *Fed. R. Civ. P. 12(b)(6)*. Accordingly, defendants' initial motion for dismissal and present response, along with attached exhibits were converted into a motion for summary judgment on the breach of contract claim.

**OUTCOME:** The court granted the individual's motion to amend his complaint, granted the individual's motion for reconsideration, converted defendants' submission into a motion for summary judgment on the individual's breach of contract claim, and allowed the individual to submit a brief in opposition along with any other pertinent material.

**COUNSEL:** For HARVEY H. SEIPLE, JR., PLAINTIFF: NINA B. SHAPIRO, LANCASTER, PA USA.

For COMMUNITY HOSPITAL OF LANCASTER, NORMAN AXELROD, DO., DEFENDANTS: VINCENT CANDIELLO, MORGAN, LEWIS & BOCKIUS, HARRISBURG, PA USA.

**JUDGES:** RONALD L. BUCKWALTER, J.

**OPINIONBY:** RONALD L. BUCKWALTER

**OPINION:**

**MEMORANDUM**

1998 U.S. Dist. LEXIS 8850, *

BUCKWALTER, J.

June 15, 1998

On April 15, 1998 this Court granted Defendants' motion for partial dismissal, and, among other claims, dismissed Plaintiff's breach of contract claim (Docket No. 7). I concluded that because Plaintiff failed to allege "that adherence to policy number H.R. 2.4.02 was to be a binding term of his at-will employment. . . ." he had not stated a claim for breach of contract. Presently, Plaintiff seeks to amend the complaint to add the allegations I found lacking. I grant this request.

In light of these amendments, Plaintiff also requests reconsideration of my ruling dismissing his breach of contract claim. Despite the clear evidentiary limitations of rules 12(b)6 and 15(a), in response to this request, Defendants submit a copy of policy number H.R. 1.1.02. Nonetheless, I choose not to [*2] exclude Defendants' submission, as consideration of H.R. 1.1.02 appears to finally resolve the issue of whether an implied employment contract existed between the parties. Consequently, I grant Plaintiff's motion for reconsideration, but review my initial dismissal of the claim pursuant to Rule 56 governing summary judgment rather than Rule 12(b)(6). See *Fed. R. Civ. P. 12(b)(6); Rose v. Bartle, 871 F.2d 331, 342 (3d Cir. 1989)*. Accordingly, Defendants' initial motion for dismissal

(Docket No. 4) and present response, along with attached exhibits (Docket No. 10) are converted into a motion for summary judgment on Plaintiff's breach of contract claim. Id. Plaintiff may submit an opposing brief along with any pertinent materials.

An appropriate Order follows.

**ORDER**

AND NOW, on this 15th day of June, 1998, upon consideration of Plaintiff's motion to amend and for reconsideration (Docket No. 8) and Defendants' response (Docket No. 10), the following is hereby ordered:

1) Plaintiff's motion to amend is **GRANTED**;

2) Plaintiff's motion for reconsideration is **GRANTED**;

3) Defendants' submissions, Docket nos. 4 and 10, are converted into a motion for summary [*3] judgment on Plaintiff's breach of contract claim; and

4) Plaintiff may submit within ten days from the date of this Order a brief in opposition along with any other pertinent material.

BY THE COURT:

RONALD L. BUCKWALTER, J.

5

LEXSEE 2002 U.S. DIST. LEXIS 20191

**NICHOLAS TARTAGLIONE, Plaintiff, -v- JOSEPH PUGLIESE et al., Defendants.**

**01 Civ. 9874 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 20191*

**October 22, 2002, Decided**
**October 23, 2002, Filed**

**SUBSEQUENT HISTORY:** *Affirmed by Tartaglione v. Pugliese, 2004 U.S. App. LEXIS 4696 (2d Cir. N.Y., Mar. 11, 2004)*

**DISPOSITION:** [*1] Defendants' Rule 12(b)(6) motion converted into Rule 56(c) motion was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former police officer filed suit pursuant to *42 U.S.C.S. § § 1983,* 1985, 1986, and 1988 against defendants, police officers and investigators, village police department, and an assistant district attorney (ADA). The officers, the department, the village, and the ADA filed a motion to dismiss. The individual's motion to amend his complaint was granted. The court converted the motion to dismiss into a motion for summary judgment.

**OVERVIEW:** The former officer signed a driving while under the influence offense report for a motorist and indicated that the motorist was advised of his rights concerning a refusal to submit to a chemical test. Because the motorist was a friend, the former officer suggested to the department chief, in a taped telephone conversation, that he might attempt to circumvent the refusal rights question at the administrative hearing. At the hearing, the former officer withheld the fact that he had given the motorist refusal warnings. The former officer was arrested and charged with perjury and official misconduct. The officer was acquitted of the criminal charges. The court found that the former officer failed to make out a *42 U.S.C.S. § 1983* claim for either false arrest or malicious prosecution because the ADA had

probable cause both to arrest and to prosecute the former officer for perjury based on the taped phone conversation and his signature on the offense report. The § 1983 claim for false arrest and malicious prosecution could not be sustained against the officers, the police department, and the village since they neither effectuated the arrest nor prosecuted the former officer for perjury.

**OUTCOME:** The defendants' motion to dismiss, having been converted by the court into a motion for summary judgment, was granted, and the clerk of the court was instructed to remove the case from the docket along with any outstanding motions.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] In a motion for summary judgment, the burden is on the moving party to establish that no genuine issues of material fact are in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The court resolves all ambiguities and draws all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide.

*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Coverage*
*Torts > Intentional Torts > False Imprisonment*
[HN2] A claim for false arrest under *42 U.S.C.S. § 1983* is substantially the same as a claim for false arrest

brought pursuant to New York law. Under New York law, a plaintiff alleging false arrest must demonstrate that the defendant intentionally confined him without his consent and without justification. While not an element of false arrest, probable cause constitutes an absolute defense to a claim for false arrest. In other words, a claim for false arrest must fail if either probable cause to arrest existed and/or if the plaintiff fails to demonstrate that the defendant acted intentionally and without justification. Probable cause is deemed to exist under New York law when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.

### Torts > Intentional Torts > Abuse of Process & Malicious Prosecution
### Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Coverage

[HN3] In order to prevail on a claim under *42 U.S.C.S. § 1983* against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law. To establish a malicious prosecution claim under New York law, a plaintiff must show that a proceeding was commenced or continued against him, with malice and without probable cause, and was terminated in his favor.

### Torts > Defamation & Invasion of Privacy > Absolute Privileges

[HN4] It is well-settled that government officials acting in their judicial or prosecutorial capacity are entitled to absolute immunity for those actions that occur within the scope of their official duties on initiating and pursuing a criminal prosecution. In determining whether prosecutorial actions are entitled to absolute immunity, courts apply a functional approach and examine whether those actions are part of a prosecutor's traditional functions. Within that framework, a prosecutorial decision to commence a prosecution is entitled to absolute immunity. Courts in the Second Circuit have consistently stated that prosecutors are absolutely immune from *42 U.S.C.S. § 1983* liability for their conduct before a grand jury.

### Constitutional Law > Civil Rights Enforcement > Immunity > Public Officials
### Torts > Defamation & Invasion of Privacy > Absolute Privileges

[HN5] In the absence of absolute immunity, government officials who perform discretionary duties outside of their official functions are still entitled to qualified immunity if their actions could have reasonably been thought to be consistent with the rights that they

allegedly violated. As a general rule, government officials, including police officers are entitled to qualified immunity if: (1) their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe their acts did not violate those rights.

### Torts > Defamation & Invasion of Privacy > Absolute Privileges

[HN6] Prosecutors are shielded from liability for damages with respect to acts performed within the scope of their duties when pursuing a criminal prosecution.

### Constitutional Law > Civil Rights Enforcement > Civil Rights Generally

[HN7] In order to state a claim under *42 U.S.C.S. § 1985,* a plaintiff is required to allege with at least some degree of particularity, overt acts which the defendants engaged in which were reasonably related to the claimed conspiracy.

**COUNSEL:** For Nicholas Tartaglione, PLAINTIFF: Donald J Feerick, Jr, Donald J Feerick, Jr, New City, NY USA.

For Joseph Pugliese, Ronald Trainham, Lawrence Adamitis, The Village of Briarcliff Manor, Police Department, Village of Briarcliff Manor, NY, DEFENDANTS: Michael A Miranda, Miranda & Sokoloff, LLP, Mineola, NY USA.

For Michael Alan Hughes, DEFENDANT: Hillary Jacobs Raimondi, Westchester County Department of Law, White Plains, NY USA.

**JUDGES:** Harold Baer, Jr., U.S.D.J.

**OPINIONBY:** Harold Baer, Jr.

**OPINION:**

### OPINION & ORDER

### Hon. HAROLD BAER, JR., District Judge:

Nicholas Tartaglione ("plaintiff") brings this action pursuant to *42 U.S.C. Sections 1983,* 1985, 1986, and 1988 against police officers and investigators employed by the Village of Briarcliff Manor Police Department in Westchester, New York ("officers"); the Village of Briarcliff Manor Police Department ("department") as well as the Village of Briarcliff Manor ("village") [collectively, "Briarcliff defendants"]; Westchester County District Attorney Jeanine Pirro ("Pirro") and Assistant District Attorney Michael [*2] Hughes ("Hughes"); the District Attorney's Office of Westchester

County ("DA's office"); and Westchester County ("County") [collectively, "County defendants"]. Following oral argument on the County defendants' motion to dismiss pursuant to *Fed. R. Civ. P. ("FRCP") 12(b)(6)*, I dismissed the complaint against all defendants except Hughes and the Briarcliff defendants on April 8, 2002. By letter dated April 9, 2002, the Briarcliff defendants joined in Hughes' motion to dismiss. Plaintiff has cross-moved to serve a second amended complaint pursuant to *FRCP 15(a)* and/or for permission to provide a more definite statement pursuant to *FRCP 12(e)*. On May 20, 2002, plaintiff filed a declaration in opposition to the remaining defendants' motion to dismiss and in further support of his cross-motion to serve a second amended complaint. By order dated October 2, 2002, I granted plaintiff's motion to amend his complaint pursuant to *FRCP 15(a)*, notified the parties that I planned to convert defendants' motion to dismiss into a motion for summary judgment pursuant to *FRCP 56(c)*, and permitted supplementation of the record. For the reasons detailed more fully below, defendants' motion to dismiss [*3] pursuant to *FRCP 12(b)(6)*, converted by the Court into a motion for summary judgment pursuant to *FRCP 56(c)*, is granted. n1

> n1 Further, pursuant to *28 U.S.C. § 1367*(c)(3), the court declines to exercise supplemental jurisdiction over the asserted pendent state claims against defendants. Accordingly, plaintiff's pendent state claims -- including the claim for negligent supervision -- against all defendants are dismissed as well.

### BACKGROUND

Plaintiff, a former police officer employed by the department, was assigned on May 2, 1999 to patrol the east side of the municipality. (Second Amended Compl. P6). That night, plaintiff made a routine traffic stop of a motorist, suspected that the motorist was driving under the influence of alcohol, and administered a roadside alco-sensor test. (Id. PP19, 20). Shortly thereafter, plaintiff advised a fellow officer and his "partner" that evening, Officer Adamitis ("Adamitis"), that he was to meet plaintiff and the motorist at police headquarters [*4] in order to administer a chemical test in furtherance of the police investigation. (Id. P21). At police headquarters, the motorist remained at all times with Officer Pugliese ("Pugliese"),who was assigned to desk duty that evening. Pugliese claims that he told the motorist that he might lose his license should he refuse the chemical test. (Id. PP22-26; Pl's supplemental declaration Ex. A). Pursuant to department policy, a motorist, upon being arrested, must be warned that

"refusal to submit to a chemical test, or any portion thereof, will result in the immediate suspension and subsequent revocation of your license or operating privilege whether or not you are found guilty of the charge for which you are arrested." (Pl's supplemental declaration Ex. A). When the motorist refused to submit to the test at police headquarters, plaintiff placed him under arrest and charged him with driving under the influence of alcohol as well as with a DMV administrative violation for refusal to submit to the test. (Second Amended Compl. P27). At that point, plaintiff completed written statements indicating that the motorist was being arrested for driving while under the influence of alcohol. [*5] (Id.). Specifically, plaintiff completed a report of refusal to submit to a chemical test in which plaintiff noted that he -- plaintiff -- had read the motorist the refusal warnings at police headquarters. (Raimondi Reply Declaration Ex. A). Plaintiff also signed a DWI offense report in which he indicated that the motorist "was advised of his rights concerning a refusal." (Id. Ex. C).

On May 18, 1999, plaintiff was informed that he would be required to attend a DMV administrative hearing, to be held the following day, relative to the DWI charges against the motorist. (Second Amended Compl. P30). That same day, plaintiff informed Ronald Trainham ("Trainham"), Chief of the department, by telephone -- a transcript of which appears as an exhibit to the Raimondi Reply Declaration -- that he was friends with an individual who was himself a friend of the motorist whom he arrested. During that conversation, plaintiff questioned Trainham whether it would be possible for him to avoid the hearing altogether because he had read the motorist his refusal rights and wanted to help out his friend, and even suggested that he might attempt to circumvent the question at the administrative hearing. [*6] (Raimondi Reply Declaration Ex. B). Because I find that the taped conversation overwhelmingly suggests that plaintiff committed perjury at the administrative hearing by withholding the fact that he had given the motorist refusal warnings, I quote from the transcript of that conversation almost in its entirety:

> NT: n2 Hey Chief, Nick
> CT: Hey.
> NT: Um . . . I just got a call ah . . . I want to cl . . . make sure its [*sic*] alright with you first. Ah . . . I got a refusal hearing tomorrow.
> CT: Hmm, hmm.
> NT: And it turns out that this guy's buddies of ah . . . actually a lot of guys I know even, some from Mount Vernon

some from . . . you know this kind of (inaudible) team and everything.

**CT:** Who, the guy that refused?

**NT:** Yeah. Um . . . he didn't know that refusing . . . you . . . even though I read him his rights, he didn't know that license is suspended blah . . .blah . . . blah. Ah . . . so they're wondering if I could kinda let go on the refusal. I just wanted . . . make [*sic*] sure that that was all right with you first.

**CT:** I would take it easy. I would take it ea . . . you mean, not go?

**NT:** Yeah.

 [*7] **CT:** No, I would not . . . I would not, not go. I might say that maybe he didn't understand what I was saying to him or something at the fe . . . at the refusal hearing or something.

**NT:** All right.

**CT:** You know I would never . . . I mean . . . I would never . . .

**NT:** Okay.

**CT:** You know, look I mean, its [*sic*] all done now, you know what I'm saying?

**NT:** All right, right, okay. But if I could just . . . not show up cause I mean I got a dentist [*sic*] tomorrow any way.

**CT:** Well, that's no reason not to show up when you say I had a dentist appointment?

**NT:** Ah.

**CT:** That's part of your . . . you know.

**NT:** Yeah, all right. I'll just go there and see if I can . . .

**CT:** See if you can . . . you know . . . see what ha . . . what arises there for you to work with.

**NT:** Right. Ok. . .

**CT:** You know. I mean if nothing does . .

**NT:** All right.

**CT:** Hey.

**NT:** Huh.

**CT:** Ah. . . I know you like to help other guys out but, I . . . I wouldn't jeopardize your job for that.

**NT:** Right. Okay.

**CT:** That's what I'm saying.

**NT:** All right.

**CT:** Okay.

**NT:** [*8] I'll go and just ah . . . (inaudible) get O.T. then.

**CT:** Hemm?

**NT:** I'm expecting to get overtime in.

**CT:** Yeah, well I . . . I . . . you know I can't not tell you not to go so you don't make overtime.

**NT:** No . . . no . . . no I know . . . I understood . . . no . . . no I just want . . . you know, something like this . . .

**CT:** Yeah.

**NT:** I'm always gonna check with you first on.

**CT:** Yeah. No, I would never do that.

**NT:** All right.

**CT:** You know. Okay.

**NT:** All right, thanks Chief.

**CT:** Bye.

**NT:** Bye. (Raimondi Reply Declaration Ex. B).

Whereas Trainham advised plaintiff that he might testify that the motorist "didn't understand what [plaintiff] was saying to him," he also suggested that he would "never" lie on the stand and that he would never jeopardize his job to help out a friend. (Id. Ex. B, at 2). Although plaintiff attended that hearing on May 19, he "forgot" to bring his administrative file, which contained explicit documentation of the refusal warnings that he had administered to the motorist on May 2, and consequently testified under oath that he was unable to recall whether he or his [*9] "partner," Adamitis, administered the refusal warnings -- *despite* the fact that plaintiff expressly told Trainham that he had given the motorist the warnings ("Um . . . he [the motorist] didn't know that refusing . . . you . . . even though I read him his rights, he didn't know that license is suspended blah . . . blah . . . blah") as well as the fact that plaintiff signed his name to reports in which he indicated that he gave the motorist refusal warnings at police headquarters. Specifically, plaintiff testified, under oath, that

> the defendant [motorist] did refuse [to take the test]. However, your Honor, upon further investigation, I mistakenly believed that my partner [Adamitis] read the Defendant [motorist] his D.W.I./Miranda warning. He mistakenly thought I did. I really cannot recall accurately if I did or not. So therefore, in the interest of justice, I request that this refusal be dismissed. (Id. Ex. E).

At the conclusion of the hearing, the administrative charges were dismissed against the motorist on the ground that he had not properly received refusal warnings.

2002 U.S. Dist. LEXIS 20191, *

n2 According to the transcript of the taped conversation, "NT" designates the plaintiff and "CT" designates Trainham.

[*10]

After investigating the veracity of plaintiff's testimony at the administrative hearing, the Briarcliff defendants concluded that plaintiff had lied under oath and reported him to the Westchester County District Attorney's Office ("DA"). n3 Plaintiff alleges that the Briarcliff defendants' conclusion was based on their erroneous belief that (1) plaintiff did not have a "partner" the night of May 2, 1999, and therefore lied under oath at the administrative hearing when he testified that he "mistakenly believed that [his] partner read the Defendant his D.W.I./Miranda warning"; and that (2) plaintiff administered the refusal warnings prior to entering police headquarters yet testified at the DMV hearing that he did not remember if it was him or his "partner" who administered the warnings. More specifically, plaintiff claims that he used the term "partner" as that term is used in common practice, that is, to refer to the officer patrolling the opposite end of town -- in this case, Adamitis. In other words, plaintiff now claims that he believed that Adamitis had read the motorist his refusal warnings at police headquarters, and that it was for this reason that he testified at the administrative [*11] hearing that he was unsure whether he or his "partner" had administered the warnings.

n3 The parties' papers do not indicate the exact date on which the Briarcliff defendants reported plaintiff to the DA.

On July 20, 1999, Trainham assigned the case to the Special Investigations Unit ("unit") for further investigation -- which investigation was in fact undertaken by Pugliese. (Ferrick Declaration II, Ex. C). On August 27, 1999, plaintiff was arrested and charged with perjury and official misconduct; plaintiff was suspended from the department without pay and benefits following his arrest and arraignment. Although the grand jury indicted plaintiff for perjury stemming from his testimony at the DMV hearing, plaintiff was acquitted of the criminal charges following a bench trial on November 8, 2000. Plaintiff claims that the Briarcliff defendants conspired in a malicious, wanton, and reckless way to conduct an improper and biased investigation of the veracity of his testimony at the DMV hearing. Furthermore, plaintiff [*12] claims that ADA Hughes participated in the biased investigation of the perjury and official misconduct charges, as well as in the fabrication of evidence that gave rise to the wrongful and

illegal arrest, charge, and prosecution. In addition, plaintiff contends that Hughes "conspired" with the Briarcliff defendants in mid-July 1999 by agreeing to prosecute plaintiff for lying under oath in order to remove him from active duty. Specifically, plaintiff claims that Hughes and Pugliese allegedly made an "agreement" whereby the latter would spearhead an internal affairs investigation against plaintiff despite the fact that Pugliese himself was directly involved the night of the motorist's arrest. (Pl's memorandum of law at 7-8). In addition, plaintiff also alleges that the Briarcliff defendants were attempting to remove him from active service because he was the subject of a civil rights investigation that was being conducted at that time by the FBI. (Id. at 8). For this reason, plaintiff claims, although fails to substantiate, that both Pugliese and Hughes were "predisposed" to remove him and hence fabricated the crime of perjury. Finally, with respect to the DA's actions specifically, [*13] plaintiff maintains that Hughes withheld exculpatory evidence from the grand jury -- specifically, testimony with respect to the common use of the word "partner" -- that would, in plaintiff's view, have provided a complete defense to the charge of perjury.

Although plaintiff was acquitted on November 8, 2000, the department has since refused to allow him to return to work. (Second Amended Compl. P76). Whereas this fact may be worth noting in the context of this case, it is not relevant to the resolution of this motion.

## DISCUSSION

### I. Rule 56(c) Motion for Summary Judgment

[HN1] In a motion for summary judgment, the burden is on the moving party to establish that no genuine issues of material fact are in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Fed. R. Civ. P. 56(c)*. A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992)* (quoting *Anderson, 477 U.S. at 248,* [*14] cert. denied, *506 U.S. 965, 121 L. Ed. 2d 359, 113 S. Ct. 440 (1992)*). The court resolves all ambiguities and draws all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide. *Aldrich, 963 F.2d at 523.*

### A. Section 1983 Claim

As a preliminary matter, I agree with the Briarcliff defendants' contention that plaintiff's § 1983 claim for false arrest and malicious prosecution cannot be sustained against them since they neither effectuated the

arrest nor prosecuted plaintiff for perjury. (See Briarcliff defendants' April 9, 2002 letter). However, even if plaintiff's § 1983 claim did apply to the Briarcliff defendants, I find that the doctrine of qualified immunity protects their actions for the same reasons, as detailed infra, that it protects the actions of Hughes.

[HN2] A § 1983 claim for false arrest is substantially the same as a claim for false arrest brought pursuant to New York law. *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).* Under New York law, a plaintiff alleging false arrest must demonstrate that "'the defendant intentionally confined him without his consent [*15] and without justification.'" *Thompson v. Sweet, 194 F. Supp. 2d 97, 101 (N.D.N.Y. 2002)* (quoting *Weyant, 101 F.3d at 852)).* While not an element of false arrest, probable cause constitutes an absolute defense to a claim for false arrest. *194 F. Supp. 2d 97.* (quotations omitted). In other words, a claim for false arrest must fail if either probable cause to arrest existed and/or if the plaintiff fails to demonstrate that the defendant acted intentionally and without justification. Probable cause is deemed to exist under New York law "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Brown v. City of New York, 2001 U.S. Dist. LEXIS 4629, 2001 WL 477279 (E.D.N.Y. Feb. 15, 2001).*

Similarly, [HN3] in order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, see, e.g., *Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997),* cert. denied, *522 U.S. 1115, 140 L. Ed. 2d 114, 118 S. Ct. 1051 (1998),* [*16] and establish the elements of a malicious prosecution claim under state law, see, e.g., *Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002).* To establish a malicious prosecution claim under New York law, a plaintiff must show that a proceeding was commenced or continued against him, with malice and without probable cause, and was terminated in his favor. See *Fulton, 289 F.3d at 195.*

In this case, plaintiff claims that he has satisfied the elements of false arrest and malicious prosecution under § 1983. Specifically, although he fails to say so in his opposition papers, it appears that plaintiff is arguing that Hughes made the arrest and prosecuted him for allegedly perjuring himself during the administrative hearing intentionally and in the absence of probable cause. Hughes, by contrast, asserts the defense of probable cause, and adverts in particular to the taped phone conversation that took place between Trainham and plaintiff on May 18, 1999 -- during which plaintiff not only suggested that he wanted to avoid testifying against

the motorist, a friend of a friend, at the administrative hearing the next day but also openly admitted that he had [*17] indeed read the motorist his refusal warnings. (Defs' reply memorandum at 8).

I agree with Hughes that plaintiff has failed to make out a § 1983 claim for either false arrest or malicious prosecution on the ground that Hughes had probable cause both to arrest and to prosecute. With respect to the perjury, probable cause included: 1) the taped phone conversation between plaintiff and Trainham which strongly suggested that plaintiff had not only read the refusal warnings but also had thought not to testify that he read the motorist his refusal warnings because he wanted to help a friend out; 2) the fact that plaintiff testified under oath at the administrative hearing that he did not know who read the warnings; and 3) the fact that plaintiff's signature on the forms indicates that he had read the warnings to the motorist.

Had I failed to find probable cause, Hughes would still be protected for his actions by absolute and qualified immunity. [HN4] It is well-settled that government officials acting in their judicial or prosecutorial capacity are entitled to absolute immunity for those actions that occur within the scope of their official duties on initiating and pursuing a criminal prosecution. [*18] *Buckley v. Fitzsimmons, 509 U.S. 259, 125 L. Ed. 2d 209, 113 S. Ct. 2606 (1993).* In determining whether prosecutorial actions are entitled to absolute immunity, courts apply a "functional approach" and examine whether "those actions are part of a prosecutor's traditional functions." *Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996).* Within this framework, a prosecutorial decision to commence a prosecution is entitled to absolute immunity. See *Imbler v. Pachtman, 424 U.S. 409, 431, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976);* see also *DiBlasio v. Novello, 2002 U.S. Dist. LEXIS 18424, 2002 WL 31190139,* at * 11 (S.D.N.Y. Sept. 30, 2002) (stating that the "function of initiating and pursuing administrative charges is afforded absolute immunity, as is the decision whether or not to bring those charges"); *Ying Jing Gan v. City of New York, 996 F.2d 522, 530 (2d Cir. 1993)* ("A prosecutor thus has absolute immunity in connection with the decision whether or not to commence a prosecution"). Moreover, courts in this Circuit have consistently stated that prosecutors are absolutely immune from § 1983 liability for their conduct before a grand [*19] jury. See *Smith v. Gribetz, 958 F. Supp. 145, 153 (S.D.N.Y. 1997);* see also *Powers v. Coe, 728 F.2d 97, 104 (2d Cir. 1984)* ("We believe that a prosecutor must be permitted to work with a grand jury totally free of the threat of civil suit"); *Fine v. City of New York, 529 F.2d 70, 74 (2d Cir. 1975)* ("It is clear that the presentation of evidence to grand juries is precisely the sort of prosecutorial function, often

2002 U.S. Dist. LEXIS 20191, *

requiring 'principled and fearless decision making,' that the immunity rule is designed to promote") (citation omitted).

[HN5] In the absence of absolute immunity, government officials who perform discretionary duties outside of their official functions are still entitled to qualified immunity if their actions could have reasonably been thought to be consistent with the rights that they allegedly violated. "As a general rule, [government officials, including police officers] are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir. 1994),* [*20] cert. denied, *513 U.S. 1076, 130 L. Ed. 2d 627, 115 S. Ct. 721, 115 S. Ct. 722 (1995);* see also *Warren v. Keane, 196 F.3d 330, 332 (2d Cir. 1999)* (citations omitted). Plaintiff argues that neither absolute nor qualified immunity applies to Hughes' actions because he was acting outside of his official duties prior to arresting plaintiff; that his conduct violated plaintiff's constitutional rights; and that it was not objectively reasonable for Hughes to believe that his actions did not violate those rights.

I disagree. First, with respect to absolute immunity, I find that all of Hughes' actions with the department were preliminary to the initiation of prosecution, and, as such, are entitled to absolute immunity. Although plaintiff contends that Hughes' actions were investigative rather than prosecutorial -- in particular, his July, 20 1999 meeting with Pugliese that predated plaintiff's arrest -- it was well within Hughes' official duties to confer with a member of the department that reported plaintiff in the first place prior to commencing proceedings against plaintiff. Indeed, as the Second Circuit stated in [HN6] *Parkinson v. Cozzolino,* "prosecutors are *'shielded from liability for damages with respect to acts performed within the scope of [their] duties when pursuing a criminal prosecution.'" 238 F.3d 145, 150 (2d Cir. 2001 )* [*21] (quoting *Doe, 81 F.3d at 1209).* In addition, I find plaintiff's argument that Hughes' actions before the grand jury do not entitle him to absolute immunity similarly unavailing; indeed, the Smith court makes clear that, in all but few instances, prosecutors are absolutely immune from § 1983 liability for their conduct before the grand jury. However, even if I were to find that

Hughes' actions were outside the scope of his official duties, which I do not, I still find that it was perfectly reasonable for Hughes as well as the Briarcliff defendants to believe that plaintiff had committed perjury at the administrative hearing for the reasons detailed supra, and that their actions are for this reason protected by qualified immunity. Defendants' motion for summary judgment with respect to plaintiff's § 1983 claim is granted.

**B. Section 1985, 1986 & 1988**

As with plaintiff's § 1983 claim, I find that his § § 1985, 1986, and 1988 claims against all defendants must be dismissed. First, [HN7] in order to state a claim under § 1985, a plaintiff is required to allege "with at least some degree of particularity, overt acts which defendants engaged in which [*22] were reasonably related to the claimed conspiracy." *Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999).* Clearly plaintiff has failed to state a claim for conspiracy against defendants in this case, or to adduce any facts in support of such a claim. However, even if he did adduce sufficient facts to establish a claim of conspiracy against defendants, I find that defendants' actions are protected by absolute immunity as well as qualified immunity since they took place as part of the initiation and prosecution of a criminal matter. Because plaintiff's § 1985 claim cannot be sustained, his § 1986 claim must fail as well. See *Rivera v. Goord, 119 F. Supp. 2d 327, 345 (S.D.N.Y. 2000).*

**CONCLUSION**

For the foregoing reasons, defendants' Rule 12(b)(6) motion, having been converted by the Court into a Rule 56(c) motion, is granted, and the Clerk of the Court is instructed to remove this case from my docket along with any outstanding motions.

**IT IS SO ORDERED.**

**New York, New York**

**October 22, 2002**

    Harold Baer, Jr.

    **U.S.D.J.**