# YOUNG CONAWAY STARGATT & TAYLOR, LLP

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

JOHN W. SHAW
DIRECT DIAL: (302) 571-6689
DIRECT FAX: (302) 576-3334
jshaw@ycst.com

(302) 571-6600
(302) 571-1253 FAX
(800) 253-2234 (DE ONLY)
www.youngconaway.com

October 5, 2005

**BY CM/ECF**

The Honorable Kent A. Jordan
United States District Court
844 North King Street
Wilmington, DE 19801

**Redacted Version -
Publicly Filed**

Re:    <u>Cryovac, Inc. v. Pechiney Plastic Packaging, Inc., C.A. No. 04-1278-KAJ</u>

Dear Judge Jordan:

This is plaintiff Cryovac, Inc.'s response to defendant Pechiney Plastic Packaging, Inc.'s discovery dispute letter (D.I. 176).

This is a patent infringement and tortious interference case. The Scheduling Order required that all discovery be initiated so that it could be completed by August 19, 2005. Pechiney admits that it served the five document requests and four interrogatories at issue on August 19, 2005, and attempts to justify its failure to timely seek discovery by claiming it just learned of the relevance of the disputed requests days before the close of discovery.

Pechiney's asserted justification is simply not true. In fact, as explained below, Pechiney now wants to reopen broad ranging discovery into contract interpretation issues that have been at the forefront of the litigation since at least March 2005.

I.    Pechiney Abandoned Earlier Attempts to Discover the Information It Now
      <u>Wants Because of the Marginal Relevance of Allegedly "Similar" Contracts.</u>

The terms of contracts between other parties are not relevant to interpreting the contracts at issue in this case. <u>See, e.g.</u>, <u>Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.</u>, 1996 Del. Ch. LEXIS 39, at *14-*15 (Del. Ch. Mar. 15, 1996) (rejecting argument that agreements entered into by plaintiff with other shareholders, that may contain similar terms, were relevant) (Exhibit A); <u>Inspiration Leasing, Inc. v. US West Fin. Serv., Inc.</u>, 1988 U.S. Dist. LEXIS 6272, at *2 (S.D.N.Y. June 24, 1988) ("The parties' rights and obligations arise out of the four corners of the contract at issue. It seems to me very doubtful that defendant's calculations in respect of unrelated transactions would lead to the discovery of evidence admissible in this litigation.") (Exhibit B); <u>MII Exports, Inc. v. Leyden Shipping Corp.</u>, 1989 U.S. Dist. LEXIS 5970, at *2 (S.D.N.Y. May 31, 1989) (holding defendant's dealings with customers other than plaintiff have no bearing on the questions at issue in the case) (Exhibit C). The reason is straightforward – much more than the written word is often necessary to construe and characterize contracts for the sale of goods, and discovery on the meaning of other contracts accordingly must reach far further than the written documents. <u>See, e.g.</u>, UCC 2-208 cmt. 2 ("Under this section a course of performance is always relevant to determine the meaning of an agreement.").

YOUNG CONAWAY STARGATT & TAYLOR, LLP

The Honorable Kent A. Jordan
October 5, 2005
Page 2

Because of the minimal relevance and high burden involved with this type of discovery, Cryovac did not seek discovery of Pechiney's contracts, even though we have no doubt that Pechiney has similar contracts that Pechiney treats as binding. For the same reasons, Cryovac objected on relevance grounds when Pechiney sought information about other Cryovac contracts. (See Response to Pechiney's Interrogatory No. 24, dated June 10, 2005, at page 5) (Exhibit D). After a meet and confer, Pechiney stopped pursuing this discovery and accepted the objection. If, however, the Court agrees that such discovery is "highly relevant" as Pechiney now contends and Pechiney is allowed to reverse its position and seek such discovery, Cryovac should be allowed to seek the same discovery, including new depositions of Pechiney personnel and customers – a course Cryovac could have undertaken had Pechiney timely served its discovery and raised this dispute.

II.     Pechiney Had Every Opportunity to Inquire about other Contracts Long before the Discovery Cut-Off, But Deliberately or Through Oversight Failed To Do So.

Pechiney has asserted for months that Cryovac never had a binding contract with National Beef. Nothing new came up in Jim Mize's deposition to suddenly alert Pechiney that it might want discovery on whether or not Cryovac's contract was binding. Rather, the Mize deposition was apparently the first time that Pechiney thought to ask any Cryovac witness about a document produced months before that referred to "binding" agreements. In short, Pechiney either engineered the questions at Mr. Mize's deposition to create an excuse to serve its late discovery or it simply failed to focus its discovery on issues already identified and now seeks the Court's assistance to correct its error. This is illustrated in at least four ways:

First, the real evidentiary material relied on by Pechiney is not the testimony of Mr. Mize,

REDACTED                              REDACTED

does not mention the Cryovac/National Beef contract at all, was produced on May 18, 2005, and
Nothing prevented Pechiney from serving its discovery immediately after reviewing this e-mail, particularly if it believed that the types of agreements mentioned in the e-mail "could scarcely be of greater relevance." (D.I. 176 at 2).

Second, Pechiney has from the outset defended Cryovac's tortious interference with contract claims by contending that the signed writing between Cryovac and National Beef did not require National Beef to make any purchases. It defies plausibility for Pechiney to claim (and leaves unexplained Pechiney's earlier, dropped discovery) that it only realized in the last three days of discovery that it might want to look at other Cryovac contracts.

Third, Pechiney wrongly asserts that Cryovac blocked Mr. Mize's deposition until the last minute. Pechiney noticed Mr. Mize's deposition (and that of ten other witnesses) for a date weeks before either party had produced a single document (see Exhibit F), including the Gardner e-mail in question, and before Pechiney had even agreed to proceed with fact discovery on Cryovac's tortious interference claims (Exhibit G). As a result, we do not believe that Pechiney had any intent to

YOUNG CONAWAY STARGATT & TAYLOR, LLP

The Honorable Kent A. Jordan
October 5, 2005
Page 3

proceed with Mr. Mize's deposition on April 14.  After document production was substantially complete, the parties met and conferred as to deposition dates convenient to the witnesses and counsel, and no witness was deposed before that time.  In any event, Pechiney never pressed for Mr. Mize's deposition to occur earlier than August 17.

Finally, Pechiney's reference to Cryovac's discovery requests is a red herring.  Those requests were in fact tied to late-breaking events that Pechiney created.  For example, less than four weeks before the discovery cut-off and after Cryovac had already deposed most of Pechiney's witnesses, Pechiney waived privilege and produced an opinion of counsel, apparently to establish good faith conduct as a defense against the tortious interference claims.  Cryovac then requested all other communications about the opinion.  Similarly, Pechiney served a third damages expert report four days before the discovery cut-off.

a REDACTED

REDACTED

Further, Pechiney objected to these requests as late but voluntarily produced documents over that objection, perhaps recognizing that the requests resulted from its failure to timely waive privilege or to disclose the new opinions.

III.    Pechiney's Discovery Is Not Limited in Scope.

While Pechiney's motion turns on allegedly new testimony equating a price agreement with a non-binding agreement, Pechiney's actual discovery is far broader.  For example, only one of the five document requests mentions price agreements, and even then – contrary to the impression given in Pechiney's letter – the request does not focus on price or pricing agreements.  See, e.g., Request No. 79 (seeking "non-binding Cryovac agreements, or "price agreement[s]") (D.I. 176 Exh. 1).  Pechiney's interrogatories, likewise, seek information about a wide range of contracts other than "price agreements." (Id. Exh. 2).  The breadth of these requests will require Cryovac to review multiple contracts with all of its many past and present customers.

Respectfully submitted,

John W. Shaw

JWS:pt
Attachments
cc:    Clerk of the Court
       N. Richard Powers, Esquire (via hand delivery and CM/ECF)
       Steven R. Trybus, Esquire (via e-mail)
       Ford F. Farabow, Esquire (via e-mail)
       Joann Neth, Esquire (via e-mail)

# EXHIBIT A

LEXSEE 1996 DEL CH LEXIS 39

**CARLTON INVESTMENTS, derivatively on behalf of TLC Beatrice International Holdings, Inc., Plaintiff, v. TLC BEATRICE INTERNATIONAL HOLDINGS, INC., et al., Defendants.**

Civil Action No. 13950

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1996 Del. Ch. LEXIS 39*

**March 15, 1996, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Four motions to compel discovery under Del. Ch. Ct. R. Civ. P. 37 were filed in a stockholders' derivative action. One motion was brought by plaintiff stockholder. The others were brought by one or more of the defendant directors and corporations. The suit challenged the propriety of a $ 22.1 million compensation package to a deceased defendant director, arguing that the payments triggered a right to proportionate payments to the stockholder.

**OVERVIEW:** The complaint alleged, among other things, that fiduciary duties were breached to minority stockholders, and corporate assets were misappropriated and wasted. The court held (1) the minority stockholder demonstrated good cause for overriding the attorney-client privilege and was entitled to the production of documents, (2) the stockholder was not obligated to examine the files of its former general partners nor of its current and former limited partners, (3) interrogatories of the stockholder was not the appropriate method of getting information from entities or people who were not agents of the stockholder or within its control for purposes of discovery, (4) the stockholder was required to supplement its answers to the interrogatories asking for a statement of facts supporting the allegations in its complaint, and (5) in its response to a request to admit, the stockholder was not deemed to admit the requests when it failed to initially allege that it had made a reasonable inquiry to obtain information not within its control, then subsequently acknowledged this error and supplemented its responses to describe its reasonable inquiry.

**OUTCOME:** The court ruled on various motions to compel discovery and threatened to impose sanctions if the parties behavior fell below the high standards for discovery conduct expected by the Delaware courts.

**CORE TERMS:** partner, interrogatory, discovery, privileged, memorandum, deposition, entity, admit, log, advice, notice, motion to compel, stockholder, good cause, knowledgeable, indirect, withheld, asking, attorney-client, disclosing, designee, production of documents, reasonable inquiry, former counsel, reimbursement, obligated, scheduled, complains, advisor, facts underlying

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery Methods > Interrogatories*
*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Legal Ethics > Client Relations > Attorney-Client Privilege*
[HN1] Documents as well as advice given by counsel may qualify for protection from discovery as privileged, but the attorney-client privilege may not properly be invoked in a shareholder derivative action if the shareholders demonstrate good cause not to do so.

*Civil Procedure > Discovery Methods > Interrogatories*
[HN2] Contention interrogatories are specifically permitted by Del. Ch. Ct. R. Civ. P. 30(b) and serve the useful purpose of narrowing issues for trial. Such interrogatories, courts held that these interrogatories are an appropriate means for obtaining a specification of the facts upon which a claim is founded.

*Civil Procedure > Discovery Methods > Interrogatories*

[HN3] A party should not be precluded from presenting a claim at trial because that party could not set forth facts underlying such a claim in response to a contention interrogatory served upon that party before he has had a chance to conduct his own discovery to determine the facts. Thus, Del. Ch. Ct. R. Civ. P. 30(b) specifically permits the court to defer the answer to such an interrogatory until sufficient discovery has been completed. A court might also permit a party to answer such an interrogatory based only upon its present knowledge.

### Legal Ethics > Client Relations > Attorney-Client Privilege
[HN4] Communications with accountants who were working with a plaintiff's attorneys and occurred after the commencement of the litigation are protected by the work product doctrine.

### Civil Procedure > Discovery Methods > Requests for Admission
[HN5] In its response to a Request to Admit, a party that fails to initially allege that it has made a reasonable inquiry, then subsequently acknowledges this error and supplements its responses to describe its reasonable inquiry, is not deemed to admit the requests.

### Civil Procedure > Sanctions > Discovery Misconduct
[HN6] The standards for discovery conduct expected by the Delaware courts are high and in the proper circumstances the court will not hesitate to impose sanctions, including non-monetary sanctions. Counsels' obligations of zealous protection of clients' interests does not relieve them of their professional obligations to the court and to the judicial system.

**JUDGES:** William T. Allen, Chancellor

**OPINIONBY:** William T. Allen

**OPINION:**

MEMORANDUM OPINION AND ORDER

I am here required to call the balls and strikes of multiple discovery disputes in an apparently hard-fought litigation. Presented for decision are four motions to compel discovery under Rule 37 of our rules. One motion is brought by plaintiff, Carlton Investments. The others are brought by one or more of the defendants. All four motions along with Carlton's motion to amend the complaint were presented on March 11, 1996. This memorandum opinion and order reports my decision on the pending discovery motions. I continue to reserve decision on plaintiff's motion to amend.

I. Background

Carlton Investments, which allegedly owns approximately 22 percent of the outstanding common stock of TLC Beatrice, filed this stockholders' derivative action on January 4, 1995, seeking recovery of amounts allegedly paid by TLC Beatrice to or on behalf of the late Reginald Lewis, who is alleged to have been a controlling shareholder of TLC Beatrice. The defendants are the Estate of Reginald Lewis; various [*2] individuals who serve or served as directors of TLC Beatrice; TLC Transport, Inc., a wholly owned subsidiary of TLC Beatrice; several companies owned by Lewis but alleged to have participated in or benefitted from the misappropriation and waste; and TLC Beatrice, the beneficiary of the action.

The complaint alleges, among other things, that Lewis breached his fiduciary duties to TLC Beatrice and its minority stockholders, and misappropriated and wasted corporate assets by causing the company to enter into certain transactions between 1988 and 1992. As alleged, these transactions include causing the company to:

(1) pay him, weeks before his death from a known but undisclosed brain tumor, $ 22.1 million, which included the reimbursement of $ 2.6 million for legal fees incurred by Lewis in an action unrelated to TLC Beatrice;

(2) pay him millions of dollars in undocumented "living expenses";

(3) make improper payments to TLC Group, L.P., a limited partnership owned by Lewis and his daughters' trust, including the payment of salaries, bonuses, and severances for employees of TLC Group, L.P., the reimbursement of TLC Group, L.P. for various expenses, including payments [*3] of taxes and governmental levies for other Lewis-owned entities, payments to trusts for the benefit of Lewis' daughters, payments to affiliated law firms on matters unrelated to TLC Beatrice, and payments to McCall Pattern Holdings;

(4) pay rent for office facilities for Lewis-owned entities;

(5) lease, purchase, and maintain a corporate jet largely for the personal use of Lewis; and

(6) redeem the company's preferred stock
so Lewis could cash out his shares.

This suit follows Carlton's filing of an individual action in the state of New York against TLC Beatrice and the Lewis Estate that sought recovery of approximately $ 11 million for alleged breaches of a stockholder agreement signed by Lewis, Carlton, and TLC Beatrice. In particular, Carlton challenged, in that suit, the propriety of the $ 22.1 million compensation package, arguing that under the stockholders' agreement the payments to Lewis trigger a right to proportionate payments to Carlton.

Shortly after this Delaware litigation was initiated, TLC Beatrice filed a motion to dismiss or stay the litigation and to stay discovery on several grounds, including the existence of the prior pending New York suit. [*4] Defendants' motion to stay discovery was granted only in part and Carlton continued his discovery efforts. On November 21, 1995, the court issued an opinion denying defendants' motion to dismiss or stay and shortly thereafter defendants began their discovery.

II. Carlton's motion to compel

On December 21, 1995, plaintiff Carlton filed a motion to compel discovery. First, plaintiff seeks to compel TLC Beatrice and the Lewis Estate to produce certain documents that TLC Beatrice identified on its privilege logs as withheld on the grounds of privilege. Second, plaintiff seeks an order overruling defendants' objection to certain questions asked of Thomas Lamia, former counsel for defendants TLC Beatrice and Reginald Lewis, on lawyer-client privilege grounds. Specifically, plaintiffs want Mr. Lamia to answer questions regarding any advice he or his law firm gave to TLC Beatrice concerning: (i) the Stockholders' Agreement between Lewis, Carlton, and TLC Beatrice; (ii) Lewis' compensation; (iii) reimbursement of Lewis' expenses in the McCall litigation; and (iv) the stock appreciation rights awarded to TLC Beatrice's directors.

Carlton concedes that most of the requested [HN1] documents as well [*5] as the advice given by Mr. Lamia qualify for protection as privileged at the behest of TLC Beatrice, but claims that TLC Beatrice's attorney-client privilege may not properly be invoked in this derivative action as plaintiff has demonstrated good cause not to do so. See Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970), cert. denied, 401 U.S. 974 (1971); Valente v. Pepsico, Inc., 68 F.R.D. 361 (D. Del. 1975); Deutsch v. Cogan, Del. Ch., 580 A.2d 100 (1990). In the event the court determines that there is not good cause to overcome the attorney-client privilege, Carlton suggests that by selectively disclosing some of the advice they received from counsel, the defendants waived the privilege with respect to all advice received regarding the compensation of Lewis.

As an initial matter, with respect to Mr. Lamia's advice, defendants claim that Mr. Lamia represented TLC Group, L.P., not TLC Beatrice, at the time the Stockholder's Agreement was negotiated. Also, at argument the Estate of Lewis argued that some of Lamia's communications with Lewis may have been made in connection with his personal representation of Lewis. To the extent that either of these situations [*6] may have been the case, defendants say that Carlton cannot argue good cause to invade a privilege not belonging to TLC Beatrice.

Nonetheless, the record indicates that Lamia did not represent Lewis as an individual after 1980. Moreover, during the time of the alleged transactions it is not clear which exact entities Mr. Lamia was representing and which entities were paying him at what times. His retention agreement was with TLC Beatrice. I cannot conclude that any advice Lamia gave during the time period of the acquisition of the international assets of Beatrice was presumptively as advisor to TLC Group.

In comparison to the uncertainty as to who, other than TLC Beatrice, Lamia might have been representing, the shareholders of TLC Beatrice, on whose behalf this action was brought, have a legitimate interest in access to the information sought here. Consideration of the factors spelled out in Garner v. Wolfinbarger convince me that it is not appropriate to preclude Mr. Lamia from disclosing relevant information; Carlton owns approximately 22% of TLC Beatrice's stock; at least its main claim appears colorable; the discovery it seeks does not relate to advice concerning the [*7] litigation itself; the information is not available from other sources; and there is no risk that trade secrets or other proprietary business information would be revealed. Thus, defendants' objection to certain questions asked of Mr. Lamia on privilege grounds is overruled. Likewise, Carlton has shown good cause for overriding the attorney-client privilege in this derivative litigation with respect to the documents it has requested on TLC Beatrice's privilege log and is entitled to the production of those documents. n1

n1 Some of these documents reflect business dealings of TLC Transport, Inc., a wholly-owned subsidiary of TLC Beatrice, and therefore arguably the privilege could run to TLC Transport rather than TLC Beatrice. However, defendants have made no claim that these documents are privileged documents of any entity other than TLC Beatrice. It is also questionable whether these documents could even be subject to a privilege of TLC Transport because to the extent these documents reflect privileged communications they are communications to or from Kevin

Wright, counsel to TLC Beatrice. For these purposes, and without addressing whether TLC Beatrice's maintenance of these documents could constitute a waiver of the privilege, I simply note that, even if some of these documents could be considered privileged documents of TLC Transport, the Garner factors as applied to the particulars of this case convince me that it would be appropriate to allow Carlton access to such documents.

[*8]

III. Defendants' first motion to compel

On February 13, 1996, defendant TLC Beatrice filed a motion to compel seeking: 1) to compel Carlton to supplement its responses to TLC Beatrice's First Set of Interrogatories; 2) to compel Carlton to produce all non-privileged documents responsive to TLC's First Request for Production of Documents; 3) to deem as admitted Request Nos. 15, 19, 20, 21 and 28 of TLC Beatrice's First Request to Admit; and 4) to compel Carlton to provide a log of documents withheld on the basis of privilege. Carlton's privilege log was subsequently provided to the defendants, but some of the documents listed are now the subject of a subsequent motion to compel discussed in Part V.

*1. The responses to TLC Beatrice's interrogatories*

Through interrogatories served upon Carlton on December 8, 1995, TLC Beatrice sought to determine, *inter alia:* (1) the basis and factual support for Carlton's claims; (2) when and to what extent Carlton and its partners had knowledge of the challenged transactions; (3) the basis for Carlton's claimed ownership interest in TLC Beatrice; and (4) what oral and written communications transpired between the partners of Carlton, [*9] Carlton, and Mr. Lewis related to the challenged transactions.

First, TLC Beatrice claims that Carlton's responses to these interrogatories were inadequate because they did not even purport to set forth facts within the knowledge of *Carlton's former general partners* and *its current and former limited partners* relating to the issues in the lawsuit. Some of Carlton's former general partners, it is claimed, are now on the board of directors of Carlton's current general partner, CS Manager, Corp. Defendant TLC Beatrice surmises that Carlton "made no effort whatsoever to examine the files of its former general partners (most of whom are now limited partners or on the Board of Directors of CS Manager) or the files of its current and former limited partners, or to consult those individuals regarding its responses to the Interrogatories."

It is acknowledged that Carlton has searched its files and the files of its sole general partner, CS Manager, and has provided TLC Beatrice with all the information within the knowledge of CS Manager. In my opinion, Carlton is not obligated to examine the files of its *former* general partners nor of its current and former limited partners. These [*10] entities or people are simply not agents of Carlton or within the control of Carlton for purposes of discovery--even if some of them are directors on the board of CS Manager. Under these circumstances, asking interrogatories of Carlton is not the appropriate method of getting this information, there are other direct processes available and, in fact, defendants have already noticed these former general partners for depositions.

TLC Beatrice next claims that Carlton's responses to certain interrogatories (interrogatories asking about the factual bases for Carlton's claims and the oral communications that took place between Carlton, its partners, and Lewis) were inadequate because, in lieu of providing specific answers, the responses referred TLC Beatrice indiscriminately to the entire production of documents as well as to depositions taken and to be taken.

With respect to the factual bases underlying the allegations of the complaint, Carlton says that its complaint specifies which documents pertain to which claims. TLC Beatrice, on the other hand, admits that it is familiar with the universe of documents, but contends that the documents contain no information responsive to the interrogatories. [*11]

This is therefore not a situation, as contemplated in Rule 30(c), in which one party would be burdened with sifting through a mass of documentation when the other party could easily direct them to particular documents. Rather, defendants here admit familiarity with the documents but contend there is no support for Carlton's allegations in those documents. In these circumstances, these interrogatories are the equivalent of contention interrogatories to which a blanket reference to the documents produced is not sufficient. [HN2] Contention interrogatories are specifically permitted by Court of Chancery Rule 30(b) and serve the useful purpose of narrowing issues for trial. Even before the Federal Rules of Civil Procedure were amended in 1970 to specifically allow such interrogatories, courts held that these interrogatories were "an appropriate means for obtaining a specification of the facts upon which a claim . . . is founded." *See Hartsfield v. Gulf Oil Corp., 29 F.R.D. 163, 164 (D.C. Pa. 1962).* The only problems normally associated with answering these types of interrogatories relate to their timing and the effect given to the answer. That is, [HN3] a party should not be precluded from presenting [*12] a claim at trial because that party could not set forth facts underlying such a claim in response to a contention inter-

rogatory served upon that party before he has had a chance to conduct his own discovery to determine the facts. *See 8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure* § 2167 (1994). Thus, Rule 30(b) specifically permits the court to defer the answer to such an interrogatory until sufficient discovery has been completed. A court might also permit a party to answer such an interrogatory based only upon its present knowledge.

Here, Carlton has apparently completed more than twenty depositions and has had an opportunity to ascertain whether there are indeed facts supporting the allegations in its complaint. Carlton therefore must supplement its answers to the interrogatories asking for a statement of such facts.

As to its interrogatories asking for identification of all oral communications between Carlton, its affiliates, and TLC Beatrice which relate to the challenged transactions, defendant complains that Carlton only identified three such oral communications and stated that any relevant information with respect to other oral communications [*13] was contained in the documents already produced and in the depositions taken and scheduled to be taken.

To the extent the *officers and employees of Carlton and CS Manager* have personal information of the oral communications that defendant has requested, the answers to the interrogatories should identify such communications, even if those officers are scheduled for future depositions. If Carlton's current answers do not reflect all such information it must supplement its answers. However, Carlton is not required to make inquiry of its former general partners and limited partners to elicit such information. Thus, to the extent it is these former general partners which have knowledge of the bulk of these communications, TLC Beatrice will have to obtain that information by deposing those persons.

Lastly, in relation to Carlton's answers to interrogatories, TLC Beatrice asserts that Carlton's refusal to respond to Interrogatory No. 37 on privilege grounds is not justified. That interrogatory asked Carlton to identify the parties to, or the substance of, its communications with its accountants concerning the challenged transactions.

In its brief, Carlton represented that each such [*14] communication was with accountants who were working with Carlton's attorneys and each such communication occurred after the commencement of this litigation and was made for purposes of this litigation. Accepting this representation, [HN4] I find that these communications are protected by the work product doctrine.

*2. Non-privileged documents Carlton has withheld on grounds of relevance*

TLC Beatrice contends that in response to its Request for Production on December 8, 1995, Carlton unjustly withheld certain categories of documents on relevancy grounds. Those categories include all documents concerning: 1) Carlton's non-TLC Beatrice investments and business dealings, 2) the identity of the beneficial owners of entities that are limited partners of Carlton, and 3) the relationship between Carlton and its financial advisors, Drexel, Burnham, Lambert.

With respect to documents concerning Carlton's non-TLC Beatrice investments, TLC Beatrice suggests that such documents are relevant because evidence of other shareholder agreements entered into by Carlton, particularly if those agreements contain similar terms to the agreement between Carlton, Lewis, and TLC Beatrice, may shed light [*15] on the parties' intent as to similar provisions here. I find this argument simply too strained. In my judgment such documents are not relevant and not reasonably calculated to lead to admissible evidence.

I do not reach the same conclusion, however, for the identification of the indirect limited partners of Carlton. TLC Beatrice asserts that discovery of the indirect limited partners of Carlton may be relevant to its defenses of acquiescence, waiver, and estoppel. It speculates that these people may have had knowledge of the challenged transactions from their inception or shortly thereafter.

Carlton, on the other hand, claims that the identity of these people is irrelevant because legally if any such people had knowledge it could not be imputed to Carlton. I do not consider this Rule 26 context an appropriate context, however, in which to determine the substantive legal issue of whether knowledge on the part of a limited partner could be imputed to Carlton. Moreover, although the identity of these persons may only be marginally relevant, counsel for Carlton represented at argument that Carlton had a list of these limited partners and indirect limited partners and therefore the burden [*16] of producing this information is minimal. Carlton must therefore identify its direct and indirect limited partners.

Finally, as to the documents concerning Carlton's relationship with Drexel. TLC Beatrice seeks these documents for two reasons. First, it suggests that there is evidence that Drexel may have been the original owner of the shares of TLC Beatrice common stock that Carlton now claims to own. Thus, discovery of this information is said to be directly relevant to Carlton's standing to pursue its claims. Carlton has indicated to the court that it has already produced all documents in its possession related to its acquisition of TLC Beatrice common stock.

Second, TLC Beatrice contends that Carlton may have been an "affiliate" of Drexel's and that because most of Carlton's partners at the time were employees of

Drexel, notice to Drexel employees of the facts underlying the challenged transactions constitutes notice to Carlton, as Carlton and Drexel were functioning as a single entity. Thus, the relevancy of TLC Beatrice's request for production of documents concerning Carlton's relationship with Drexel goes to TLC Beatrice's theory that Carlton and Drexel were so intertwined [*17] that they were in reality a single entity. This is a large inquiry to undertake and perhaps a time-consuming matter to try with so modest a claim to legal relevance. Indeed in requiring the disclosure of the names of investors and officers, etc., the court affords defendants the opportunity to establish, if it is the case, that some of these persons had notice of some of these acts and to establish the relationship of such persons to the Carlton entity. This is sufficient in my judgment.

### 3. The requests to admit

TLC Beatrice has requested that an order be entered deeming as admitted Request Nos. 15, 19, 20, 21, & 28 of TLC Beatrice's First Request to Admit. [HN5] In its response to the Request to Admit, Carlton stated that it could neither admit nor deny these requests because the information required to do so was not in its possession. While Carlton did not initially allege that it had made a reasonable inquiry, it subsequently acknowledged this error and supplemented its responses to describe its reasonable inquiry. Nonetheless, TLC Beatrice suggests that Canton's initial failure to allege reasonable inquiry is grounds to deem these requests as admitted. Carlton should not be [*18] given leave to amend, it says, because Carlton has come forward with no evidence contrary to the assertions in these requests and all available information supports the truth of the requests.

Carlton is not obligated to admit the truth of these facts, in my opinion. These requests are largely based on facts within the exclusive control of TLC Beatrice and the evidence of the truth of such matters is dependant upon defendant's witnesses. The motion for an order deeming these requests admitted is denied.

### IV. Defendants' second motion to compel

On December 8, 1995, TLC Beatrice served Rule 30(b)(6) deposition notices on Carlton requesting that it designate for deposition the "partner(s), agent(s), or representative(s) most knowledgeable about the allegations in [Carlton's complaint] and the relationship between TLC Beatrice International Holdings, Inc., Reginald F. Lewis, and Carlton." On that same date, TLC Beatrice served a similar notice on CS Manager, requesting that it designate for deposition "the officer(s), director(s) or managing agent(s) most knowledgeable about the allegations" in Carlton's complaint and the relationship between Carlton, Lewis, and TLC Beatrice. Both Carlton

[*19] and CS Manager designated Kevin Madigan, Secretary, Treasurer, and General Counsel of CS Manager since March 1992.

On February 26, 1996, defendants TLC Beatrice and TLC Transport, Inc. moved this court for an order compelling Carlton to redesignate other individuals who, they surmise, would have more knowledge than Mr. Madigan of the matters identified in their Rule 30(b)(6) deposition notices. TLC Beatrice complains that Madigan was not affiliated with Carlton prior to March 1992 and has no firsthand knowledge of the allegations in the complaint. It also complains that what little knowledge Madigan has about the allegations was gained from communications with Carlton's counsel and privileged communications with former general partners of Carlton or the board of directors of CS Manager. Apparently, TLC Beatrice believes that certain *former general partners* of Carlton, one of whom is now a director of CS Manager, are more knowledgeable and should have been designated instead.

At least with respect to former general partners of Carlton who do not serve on the board of CS Manager, they are simply not proper 30(b)(6) designees of Carlton or CS Manager. As for Peter Ackerman, a director [*20] of CS Manager and former general partner of Carlton, TLC Beatrice and Carlton dispute whether he has more or less comprehensive knowledge of the relationship between TLC Beatrice, Lewis, and Carlton than Mr. Madigan. I of course do not know whether Mr. Madigan has more or less knowledge than Mr. Ackerman but in any event Carlton is not rigidly obligated to produce the "most knowledgeable" person. *See Hoechst Celanese Corp. v. National Union Fire Ins. Co., Del. Super., 623 A.2d 1099, 1113 (1991).* n2 I also note that, as with much of the other discovery defendants seek directly from Carlton, any information within the knowledge of these former general partners can be obtained directly from them in their depositions, which defendants have already scheduled. Defendants' motion to have Carlton redesignate is therefore denied.

n2 TLC Beatrice also alleges that Carlton and CS Manager did not adequately prepare Mr. Madigan to testify on the subject areas requested. However, it is apparent that the current officers and personnel of Carlton and CS Manger were not present during the time periods in which most of the challenged transactions took place. In preparing a 30(b)(6) designee, Carlton is not required to inquire of its former general partners and limited partners. Understandably, the defendants would like to discover this information through a Carlton designee so that it might be

treated as an admission, but Carlton has no such obligation.

[*21]

## V. Defendants' third motion to compel

On February 26, 1996, after receiving Carlton's log of privileged documents, certain defendants filed a motion seeking to compel Carlton to produce four categories of documents which they claim Carlton wrongfully withheld on privilege grounds. I address each of these categories of documents seriatim.

### 1. 1990 and 1991 memorandums prepared by former counsel

The defendants first object to various memorandums prepared in 1990 and 1991 by Catherine Taylor and David Losito, Carlton's former counsel, "regarding [their] analysis of TLC Beatrice's Company performance." Defendants suspect that these memorandums may be business analysis rather than legal advice.

An in camera inspection of these memorandums reveals that, in fact, these communications were solely business related. Not every document created by an attorney is privileged and here the documents appear to be communications regarding solely business matters from one business person to another through an attorney. Defendants' motion to compel the production of these memorandums is granted with the exception that the last sentence of the last paragraph of the April 4, 1991 memorandum, [*22] which arguably constitutes legal analysis, may be redacted by Carlton.

### 2. Memorandum from Harch Capital to CS Manager

Also identified on Carlton's privilege log was a document sent from Harch Capital to CS Manager in June of 1993 regarding unspecified negotiations with TLC Beatrice. Because Harch Capital is obviously not a law firm, the defendants contend that this document cannot be privileged.

In its brief, Carlton states that Harch Capital was employed by Carlton and functioned as an agent of Carlton's attorneys in connection with certain negotiations with TLC Beatrice. It also says that the document was drafted in connection with work performed by Carlton's legal counsel concerning potential litigation with TLC Beatrice.

For these purposes I assume that Harch Capital was part of Carlton's team of advisors with respect to litigation with TLC Beatrice. The document reflects that Harch Capital was serving as a conduit from Carlton's outside counsel to Carlton in this instance on matters related to the legal representation. As such, Carlton had a legitimate expectation of confidentiality. On the assumption I make here, the document is privileged and Carlton is not required [*23] to produce it.

### 3. Documents sent from Carlton to Michael Lewitt, attorney for Harch Capital

Defendants next argue that Carlton should be compelled to produce all of the documents on Carlton's privilege log that were sent or copied to Michael Lewitt, an attorney who worked for Harch Capital. By disclosing documents to Mr. Lewitt, whether privileged or not, defendants' say that Carlton has waived any claims of privilege it may have had. This contention again rests on defendants' conclusion that Lewitt was serving as a financial advisor to Carlton. Again I assume for these purposes that Harch Capital was part of Carlton's advisory team with respect to the litigation against TLC Beatrice. A review of these documents confirms this view and all of these documents are privileged with one exception; a March 18, 1994 memorandum to Carlton from Anne Sargent, whose role is not known to me. Assuming that Anne Sargent is an attorney for Carlton, this document is also privileged.

### 4. Communication to Carlton concerning a conversation with Carl Brody

The final document on Carlton's privileged log which the defendants seek is a memorandum from an unidentified individual to Carlton [*24] concerning a telephone conversation with Carl Brody, Carlton's senior tax advisor in 1991. Carlton admits that it does not know the origin of this memorandum but argues that because it bears a stamp indicating it is "confidential" and "attorney work product" it should not have to produce the document.

Carlton has not adequately shown that this document should be privileged. The memorandum itself appears to be solely business information and even if it was prepared by an attorney one cannot know who may have seen it. Carlton must therefore produce this document.

Finally, I briefly address Carlton's December 21, 1995 motion for an order governing discovery conduct. Although I will decline to act at this time, I caution counsel that [HN6] the standards expected by the Delaware courts are high and that in the proper circumstances I will not hesitate in this case henceforward to impose sanctions, including non-monetary sanctions. It is not necessary to remind counsel that their obligations of zealous protection of clients' interests does not relieve them of their professional obligations to the court [*25] and to the judicial system.

William T. Allen

1996 Del. Ch. LEXIS 39, *

Chancellor

March 15, 1996

# EXHIBIT B

LEXSEE 1988 US DIST LEXIS 6272

**Inspiration Leasing, Inc., Plaintiff, v. US West Financial Services, Inc. Successor by merger to US West Capital Corporation, Defendant**

**No. 86 Civ. 6287 (CSH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1988 U.S. Dist. LEXIS 6272*

**June 24, 1988, Decided; June 27, 1988, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a motion to compel production of documents.

**OVERVIEW:** Plaintiff sought discovery of certain documents. Defendant resisted. Plaintiff filed a motion to compel, which the court granted in part. The court ruled that insofar as the requested documents specifically related to, and were generated by, the transaction at issue, they were discoverable under *Fed. R. Civ. P. 26(b)(1)*. The limitations defendant sought to place on the relevance of its net economic return calculations were not realistic. Nor were they mandated by the court's prior memorandum rejecting plaintiff's motion for summary judgment. The court ruled that plaintiff was not entitled to discovery of documents relating to transactions other than the one at bar. The transaction was discrete. The court found that it was doubtful that defendant's calculations in respect of unrelated transactions would lead to the discovery of evidence admissible in the current litigation. The court directed the parties to negotiate in good faith with respect to the terms and conditions of a confidentiality order.

**OUTCOME:** The court granted the motion in part.

**CORE TERMS:** discovery, calculations, relevance, unrelated, confidentiality, completion, scheduling

**OPINIONBY:** [*1]

HAIGHT

**OPINION:**

MEMORANDUM OPINION AND ORDER

CHARLES S. HAIGHT, JR. U.S.D.J.

This Memorandum Opinion resolves plaintiff's motion to compel production of certain documents. It also deals with requests contained in the most recent correspondence of counsel with respect to deadlines contained in the initial scheduling order. There is also a Rule 11 application lurking in the background. As to that, decision will be deferred until the completion of the case.

Plaintiff's motion for production of documents is granted in part. I address the merits of the issue, rejecting the plaintiff's threshold argument that defendant lacks standing to complain because it did not make a motion for a protective order under *Rule 26(c), F.R.Civ.P.* Penthouse *International, Ltd., v. Playboy Enterprises, 663 F.2d 371 (2d Cir. 1981),* upon which plaintiff relies, speaks to motions for protective orders in respect of concededly relevant documents. But the present defendant's initial objection is one of relevance, which may be made by timely written objection under Rule 34(b). See also 4 Moore's Federal Practice (2nd ed. 1987) at 26-430.

I agree with plaintiff that insofar as the requested documents [*2] specifically relate to, and were generated by, the transaction at issue, they are discoverable under Rule 26(b)(1). The limitations defendant seeks to place upon the relevance of its " net economic return" calculations are not realistic; nor are they mandated by this Court's prior memorandum rejecting plaintiff's motion for summary judgment.

However, I am not satisfied that plaintiff is entitled to discovery of documents of this nature relating to transactions other than the one at bar. This was a discrete transaction. Under the order I make today, defendant's

documentation relating to that transaction will be disclosed. The parties' rights and obligations arise out of the four corners of the contract at issue. It seems to me very doubtful that defendant's calculations in respect of unrelated transactions would lead to the discovery of evidence admissible in this litigation. At least, I decline to order such discovery on the present record. The case plaintiff relies upon, *Leucadia, Inc. v. Reliance Insurance Company, 101 F.R.D. 674 (S.D.N.Y. 1983)*, was an entirely different sort of case. Plaintiff claimed against an insurance company which allegedly covered plaintiff against losses [*3] resulting from dishonestly and fraud on the part of a former employee. A series of investigations by the corporation and outside counsel had been conducted; Judge Leval held that one of those reports, although not directly concerning the transactions at issue, "may be relevant to show the practice of plaintiff in other transactions and the results of an earlier investigation." *Id. at 677.* The facts of Judge Leval's case do not support broad disclosure of the present defendant's calculations or policies in unrelated transactions.

Accordingly I strike plaintiff's demands 6 and 7 to the extent that they seek to reach documents relating to transactions other than the one at issue. With those ex-

ceptions, defendant's objects are overruled and discovery is directed.

After completion of the transaction-related document discovery directed herein, plaintiff may if so advised move to expand it. But plaintiff will bear a heavy burden of persuasion.

I accept that defendant is entitled to an order of confidentiality. I do not accept defendant's contention that no such order will suffice. Counsel are directed to negotiate in good faith with respect to the terms and conditions of a confidentiality [*4] order. If they cannot agree, cross-orders may be settled on notice and the Court will resolve the issue.

As for further scheduling, I grant plaintiff's letter application of May 25, 1988. Accordingly discovery and the filing of discovery related motions must be completed by September 28, 1988; motions to join parties or to amend pleadings must be made by August 31, 1988; and motions not related to discovery, joinder of parties or amendment of pleadings must be made by October 19, 1988.

The foregoing is SO ORDERED.

Dated: New York, New York June 24, 1988

# EXHIBIT C

LEXSEE 1989 US DIST LEXIS 5970

**MII EXPORTS, INC., Plaintiff, v. LEYDEN SHIPPING CORP., Defendant**

No. 87 Civ 3352 (LBS)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1989 U.S. Dist. LEXIS 5970*

**May 31, 1989, Decided and Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff exporter sued defendant freight forwarder for breach of contract. The exporter moved to compel the forwarder to disclose certain customers' identity and to modify the court's prior order restricting discovery and investigation concerning service contracts involving nonparties. The matter had been referred to a magistrate.

**OVERVIEW:** The exporter contracted with the forwarder for its services. It then sued the forwarder for breach of contract. The forwarder had previously moved for summary judgment, although that motion had not been resolved. The exporter moved under Fed. R. Civ. P. 37(a) to compel the forwarder to disclose the identity of certain customers and to modify a prior order restricting discovery and investigation relating to service contracts. The matter was referred to a magistrate, who denied the motion. The magistrate held that the forwarder's dealings with other companies had no bearing on whether there was a contractual or a legal duty by the forwarder to advise the exporter concerning service contracts. The exporter was inexperienced with shipping; the basis of its complaint was that the forwarder was supposed to give it business advice. The discovery was intended to find out whether the forwarder had helped other customers. The magistrate found no basis for a finding that the exporter's motion was substantially justified and was prepared to award expenses and attorneys' fees to the forwarder under Fed. R. Civ. P. 37(a)(4). She gave the exporter a chance to request a hearing to prove otherwise.

**OUTCOME:** The magistrate denied the motion to compel discovery. She indicated that she would award costs, including attorneys' fees, to the forwarder, finding that the exporter's motion was not substantially justified, but

gave the exporter the chance to ask for a hearing to prove its justification.

**CORE TERMS:** discovery, customers, ocean, summary judgment, carriers, substantially justified, unjust, freight forwarder, instant motion, recommendation, contractual, competitors, non-party, shipments, sworn

**LexisNexis(R) Headnotes**

*Civil Procedure > Sanctions > Discovery Misconduct*
*Civil Procedure > Costs & Attorney Fees > Litigation Costs*
[HN1] Fed. R. Civ. P. 37(a)(4) requires an award of expenses, including reasonable attorneys' fees, after opportunity for hearing unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

**OPINIONBY:** [*1]

LEE, Magistrate

**OPINION:**

MEMORANDUM OPINION AND ORDER

BARBARA A. LEE, UNITED STATES MAGISTRATE

This is a diversity action for breach of contract by an exporter of scrap metal against a freight forwarder. It was referred to me for pretrial supervision by the Hon. Leonard B. Sand by Order of Reference entered March 30, 1988. By separate Order of Reference entered July 18, 1988, defendant's motion for summary judgment was referred for report and recommendation. Presently before me is plaintiff's motion pursuant to Rule 37(a), Fed. R. Civ. P., to compel defendant to disclose the identity of certain of its customers and to modify a prior order re-

stricting discovery and investigation relating to "service contracts." For the reasons hereinafter stated, plaintiff's motion is denied and defendant is awarded its reasonable costs and expenses, including attorneys' fees, pursuant to Rule 37(a)(4).

The background of the matter, and the procedural history to date, are discussed in my Report and Recommendation, dated May 31, 1989 pursuant to the July 11 Order of Reference, familiarity with which is assumed. With the consent of plaintiff, defendant's papers in opposition to the instant motion have been [*2] deferred pending decision on defendant's motion for summary judgment. Because plaintiff has failed to demonstrate that the discovery sought on this motion is relevant to the subject matter of this action within the meaning of Rule 26(b), Fed. R. Civ. P., there is no need for further papers.

Although plaintiff in its Amended Complaint has asserted four alternative theories of liability arising out of the same facts, they all turn on a single key issue: did plaintiff and defendant have a relationship that gave rise to a duty (either contractual or legal) on defendant's part to advise plaintiff concerning "service contracts" and/or obtain the "lowest possible rates" for plaintiff's export shipments? Whether there was a contractual duty depends solely upon the terms of the contract between plaintiff and defendant. Whether there was a duty arising by operation of law likewise depends upon the nature of the relationship between plaintiff and defendant. Defendant's dealings with its other customers have no bearing on either of those questions. The terms of non-party customers' "service contracts" with ocean carriers are even more remote.

The affidavit of plaintiff's attorney submitted in [*3] support of the instant motion is entirely conclusory with respect to the relevance of the discovery sought. It alleges that plaintiff "needs" to examine its competitors who are defendant's customers on such questions as "Why did Leyden assist these customers and competitors of MII in obtaining advantageous freight rates and not MII? What were the relationships and dealings between Leyden and these parties which resulted in the Service Contracts?" (Affidavit of Donald F. Mooney sworn to June 24, 1988, p. 6.). Plaintiff also seeks broad document discovery from the non-party ocean carriers ("any communications, drafts, negotiations, etc.") on the general theory that they "would bear on Leyden's knowledge of Service Contracts, their availability, etc." (Id., p. 7.)

Plaintiff's president admitted upon his deposition that he "wasn't aware of shipping contracts" until he had been dealing with defendant for more than three years (Ex. C to Affidavit of Brian Leyden sworn to June 30, 1988, pp. 66-67 submitted in support of defendant's motion for summary judgment) and plaintiff's traffic manager seems to have been a complete neophyte with respect to ocean shipments (see Ex. G to Mooney [*4] Aff.) Having failed to negotiate a contract by which the freight forwarder agreed to arrange "service contracts" on plaintiff's behalf, plaintiff now complains that defendant should have volunteered business advice that plaintiff never requested and that defendant was under no contractual or legal obligation to give. On this untenable foundation, plaintiff seeks to conduct a wide-ranging inquiry into the use and profitability of "service contracts" by shippers and ocean carriers who have no connection with this case. What plaintiff is trying to do is to use the discovery rules to do the business investigation it should have undertaken before entering into the transactions sued upon. That it may not do. The motion is denied.

Rule 37(a)(4), Fed. R. Civ. P., [HN1] requires an award of expenses, including reasonable attorneys' fees, after opportunity for hearing "unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust." There is no basis, on this record, for a finding that the motion was "substantially justified." If plaintiff contends that other circumstances make an award of expenses unjust, it may request [*5] a hearing. Defendant may serve and file affidavits evidencing its expenses by June 15, 1989. Attorneys' fees will not be awarded unless documented in accordance with the requirements of *New York State Ass'n for Retarded Children v. Carey, 711 F. 2d 1136, 1147-48 (2d Cir. 1983).* Plaintiff may serve and file opposing papers, including a written request for a hearing, by June 30, 1989. If a hearing is requested, plaintiff must specify the disputed issues of fact to be heard.

It is so ordered.

The foregoing determination is made pursuant to *28 U.S.C. § 636*(b)(1)(A). Any party may object to this determination by filing written objections in accordance with the procedure specified in *Fed. R. Civ. P. 72(a)* and Rule 7 of the local Rules for Proceedings before Magistrates.

Dated: New York, New York
May 31, 1989

# EXHIBIT D

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYOVAC, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1278-KAJ |
| | ) | |
| PECHINEY PLASTIC PACKAGING INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## CRYOVAC, INC.'S RESPONSES TO PECHINEY PLASTIC PACKAGING INC.'S THIRD SET OF INTERROGATORIES (NOS. 20-31)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, plaintiff Cryovac, Inc.

("Cryovac") objects and responds to the Third Set of Interrogatories ("Interrogatories") by

defendant Pechiney Plastic Packaging, Inc. ("Pechiney" or "PPPI").

### GENERAL OBJECTIONS

R.     Cryovac adopts and incorporates its General Objections stated in

Cryovac's Response to Pechiney's First Set of Interrogatories.

S.     Cryovac objects to each and every interrogatory as seeking information

protected by the attorney-client privilege and/or work product immunity to the extent that the

interrogatories seek identification of persons who participated in or contributed to the responding

to these interrogatories.  Where such information is requested, Cryovac will identify persons

with knowledge of the facts described in the interrogatory responses.

### INTERROGATORY NO. 20:

Identify each and every one of Cryovac's supply agreements with National Beef and supply

agreements in force between Cryovac and National Beef for any part of the period from January

1, 1999 to the present for various food packaging products, including: (a) the names of the

Cryovac and National Beef employees involved in negotiating the agreement, (b) the title of each agreement, (c) the date of each agreement, (d) the terms of each agreement, (e) the products and product volume to be supplied, (f) the price terms, (g) the details of any rights to terminate the agreement(s), (h) whether each agreement identified is or was oral or written, (i) if written, whether each agreement is or was reflected in one document or multiple documents, and (j) identify each and every such document allegedly compromising or evidencing the agreement(s).

## RESPONSE TO INTERROGATORY NO. 20:

Cryovac objects to this Interrogatory as overly broad and unduly burdensome, at least since it requests "All documents relating to each and every one . . . ." Cryovac's agreements with National Beef "at anytime between January 1, 1999 and the present . . . ." Cryovac further objects to this Interrogatory to the extent it seeks the production of information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence

Cryovac entered into supply agreements with National Beef for TBG bags and other products on the following dates that covered time periods between January 1, 1999 through January 14, 2004:

> January 21, 1998
>
> January 25, 2000, as amended July 19, 2001
>
> March 25, 2003, as amended on June 11, 2003
>
> January 14, 2004

Pursuant to Federal Rule of Civil Procedure 33(d), Cryovac states that the information sought in sub-paragraphs (a)-(j) is contained in the written agreements having the above dates and that the burden of eliciting such information would be the same for the Pechiney as it would for Cryovac. In addition, the January 14 e-mails by Terry Wilkerson and Jeffrey Gardner comprise and evidence the January 14, 2004 agreement. Also, in addition to the persons who signed the above agreements, Anthony York was involved in negotiating at least the January 14, 2004 agreement.

**INTERROGATORY NO. 21:**

Set forth the details of Cryovac's alleged supply agreement negotiations with National Beef that took place in December 2003 and January 2004 as alleged in Paragraph 14 of Cryovac's Amended Complaint for Patent Infringement, including the names of all participants present for these negotiations, where and how the negotiations took place and on what precise dates and times, and identify what was discussed during each such negotiation session.

**RESPONSE TO INTERROGATORY NO. 21:**

Pursuant to Federal Rule of Civil Procedure 33(d), Cryovac states that the information sought in this Interrogatory is contained in documents that have been or will be produced in this litigation and that the burden of providing the requested information would be the same for Pechiney as it would for Cryovac. In addition to the foregoing, Cryovac and National Beef began to discuss in November 2004 amending their existing supply agreement for a four year period commencing January 1, 2004. Among other terms discussed were new pricing commitments, new minimum purchase requirements, a new provision obligating Cryovac to assist National Beef on process and packaging improvements, and a new renegotiation provision due to price changes and new technology availability. These discussions continued through December, 2003 and into January, 2004. After January 14, 2004, when Pechiney induced National Beef to repudiate its January 14 agreement with Cryovac, these discussions continued, with additional pricing terms discussed. Karl Deily, Jim Mize, Jeffrey Gardner, and Anthony York participated directly or indirectly in these negotiations for Cryovac. Terry Wilkerson participated in these discussions for National Beef.

**INTERROGATORY NO. 22:**

Identify Cryovac's "written four-year supply agreement" with National Beef dated on or about January 14, 2004 as alleged in Paragraphs 14 and 23 of Cryovac's Amended Complaint for Patent Infringement including: (a) the names of the Cryovac and National Beef employees involved in negotiating the agreement, (b) the title of the agreement, (c) the date of the agreement, (d) the terms of the agreement, (e) the products and product volume to be supplied, (f) the price terms, (g) the details of any rights to terminate the agreement, (h) whether the

agreement is or was oral or written, (i) if written, whether the agreement is or was reflected in one document or multiple documents, and (j) identify each and every such document allegedly comprising or evidencing the agreement.

## RESPONSE TO INTERROGATORY NO. 22:

Cryovac objects to this interrogatory as duplicative of Interrogatory No. 20.

Cryovac respectfully refers Pechiney to its objections and response to Interrogatory No. 20.

## INTERROGATORY NO. 23:

State whether any of the agreements identified in Cryovac's response to Interrogatory Nos. 21 and 22 above included either: (1) a "state-of-the-art" clause permitting National Beef to terminate its agreement with Cryovac to purchase products from other suppliers based on those suppliers superior and/or "state of the art" products or technology, (2) a "lowest price" clause permitting National Beef to terminate its agreement with Cryovac if National Beef can obtain a better price from third-party suppliers, or (3) both a "State-of-the-art" and a "lowest price" clause. If so, state in detail: (a) the title of the agreement in which such clause(s) appear, (b) the date of the agreement, and (c) the language of the clause.

## RESPONSE TO INTERROGATORY NO. 23:

The March 25, 2003, agreement between Cryovac and National Beef did not permit National Beef to terminate upon either condition identified in Interrogatory No. 23. The parties' agreement did, however, contain the following provision related to new technologies:

> Furthermore, in the event new technology or other factors related to packaging create a competitive disadvantage in the market for National Beef, Cryovac will have ninety days to identify an acceptable solution or will release National Beef from the portion of the supply agreement affected by the new technology.

The January 14, 2004, agreement between Cryovac and National Beef did not permit National Beef to terminate upon either condition identified in Interrogatory No. 23. The parties' agreement did, however, contain the following provision permitting National Beef to ask to renegotiate pricing under two conditions:

> During the first two years of this agreement, there will be no negotiations in response to competitive price issues. At the beginning of the third year, National Beef may, at their option, ask

to renegotiate pricing only if they have a competitive pricing proposal representing packaging cost savings exceeding $.50 per head. If no such proposal has been made to National Beef, the remainder of the agreement period will be closed to negotiations due to competitive price issues. At any time, National Beef may renegotiate this agreement should new technologies arise that create a competitive disadvantage for National Beef due to the superior performance of these materials.

## INTERROGATORY NO. 24:

Other than the agreements identified in Cryovac's response to Interrogatory No. 23, state whether Cryovac has ever entered into an agreement that included either: (1) a "state-of-the-art" clause permitting a purchaser of Cryovac products to terminate its agreement with Cryovac to purchase products from other suppliers based on those suppliers superior and/or "state of the art" products or technology, (2) a "lowest price" clause permitting a purchaser of Cryovac products to terminate its agreement with Cryovac if the purchaser identified can obtain a better price from third-party suppliers, or (3) both a "state-of-the-art" and a "lowest price" clause. If so, state in detail: (a) the title of the agreement in which such clause(s) appear, (b) the parties to the agreement, (c) the date of the agreement, and (d) the language of the clause.

## RESPONSE TO INTERROGATORY NO. 24:

Cryovac objects to Interrogatory No. 24 as seeking the production of information

that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence

because the existence of "state-of-the-art" or "lowest price" clauses in contracts between

Cryovac and other parties has no bearing or relationship to Pechiney's tortious interference with

Cryovac's contract with National Beef.

## INTERROGATORY NO. 25:

State in detail all of the bases for Cryovac's contention that "[a]fter National Beef and Cryovac formed their agreement, Pechiney induced National Beef to breach its agreement with Cryovac and to enter into a four-year supply agreement with Pechiney instead" as alleged in Paragraph 16 of Cryovac's Amended Complaint for Patent Infringement and identify the names of the Cryovac employee(s) who provided the factual basis for this contention and identify all documents relating to same.

**RESPONSE TO INTERROGATORY NO. 25:**

After National Beef and Cryovac agreed to the terms for a new four-year contractual relationship on January 14, 2004, Cryovac understands that Pechiney learned of this new agreement through communications with National Beef employees and that Pechiney learned that National Beef would not be entering into an agreement with Pechiney for the sale of Pechiney's infringing ClearShield products and other Pechiney products. After learning about the Cryovac agreement, Pechiney offered to provide additional monetary and other concessions to National Beef over its previous offers to induce National Beef to repudiate its agreement with Cryovac. To the extent Pechiney contends that Cryovac and National Beef did not enter into a supply agreement on January 14, 2004, Cryovac notes that its January 25, 2003 supply agreement with National Beef would have remained in force.

The documents relevant to this contention include an e-mail from Terry Wilkerson to Anthony York dated January 14, 2004. The Cryovac employees with knowledge of the facts contained in this response are Jeffrey Gardner, Jim Mize, and Anthony York.

**INTERROGATORY NO. 26:**

State in detail the bases for Cryovac's contention that "Cryovac had a reasonable expectation that National Beef would enter into a four-year supply agreement for various food packaging products as of January 14, 2004, and as of the date that Pechiney induced National Beef to enter into a four-year supply agreement with Pechiney instead of Cryovac" as alleged in Paragraph 23 of Cryovac's Amended Complaint for Patent Infringement and identify the names of the Cryovac employee(s) who provided the factual basis for this contention and identify all documents relating to same.

**RESPONSE TO INTERROGATORY NO. 26:**

Cryovac's reasonable expectation that National Beef would enter into a four-year supply agreement as of January 14, 2004 is based on the prior course of dealing between the parties, conversations between National Beef and Cryovac and upon National Beef's statement

to Cryovac on January 14, 2004 that National Beef had agreed to terms with Cryovac and that

National Beef intended to formally execute the written agreement. The Cryovac employees with

knowledge of the facts contained in this response are Jeffrey Gardner, Jim Mize, and Anthony

York.

## INTERROGATORY NO. 27:

State in detail the bases for Cryovac's contention that "Pechiney was aware of the existence of
the claims of the '419 patent when it made its offer to National Beef" as alleged in Paragraphs 18
and 25 of Cryovac's Amended Complaint for Patent Infringement including, but not limited to,
the names of the Cryovac employee(s) who provided the factual basis for this allegation and
identify all documents relating to same.

## RESPONSE TO INTERROGATORY NO. 27:

Pechiney patent, U.S. No. 6,893,672 to Ingraham (the "'672 patent"), references

the '419 patent. The '672 patent issued from an application filed on December 6, 2001, and a

provisional filed September 7, 2001. Based on this, Pechiney was aware of the '419 patent at

least as early as September 7, 2001, when the provisional was filed.

Additionally, Jack Wasatonic was informed by Donald Seberger, Pechiney Vice

President and Group Counsel that Pechiney had received an opinion concerning the '419 patent.

The following documents produced by Pechiney also evidence that Pechiney was aware of a

Cryovac patent for a 7 layer structure: PPPI002968; PPPI008232; and PPPI008242.

## INTERROGATORY NO. 28:

State in detail the bases for Cryovac's contention that "Pechiney knew about Cryovac's
negotiations and four-year supply contract with National Beef and intentionally induced National
Beef to breach its contract with Cryovac" and "Pechiney knew about Cryovac's negotiations and
potential four-year supply contract with National Beef and intentionally interfered with
Cryovac's opportunity for a business relationship with National Beef" as alleged in Paragraphs
19 and 26 of Cryovac's Amended Complaint for Patent Infringement including, but not limited
to, identifying (a) which Pechiney employee(s) knew about Cryovac's negotiations and four year
supply contract, (b) when the Pechiney employee(s) identified first learned about Cryovac's
negotiations and four year supply contract, (c) the names of the Cryovac employee(s) who
provided the factual basis for this allegation, and (d) and identify all documents relating to same.

**RESPONSE TO INTERROGATORY NO. 28:**

National Beef informed Cryovac that Pechiney had been told that National Beef

had reached a supply agreement with Cryovac on or about January 14, 2004. It is not known at

this time what specific Pechiney employees received this information. The Cryovac employees

with knowledge of the facts contained in this response are Jeffrey Gardner, Jim Mize, and

Anthony York.

**INTERROGATORY NO. 29:**

State in detail whether Cryovac has ever contended or alleged that Cryovac had a contract, or
prospective business or contractual relations, with any Cryovac customer that any third-party
took away from Cryovac. If so, identify the third-party and state in detail whether Cryovac filed
a lawsuit against that third-party alleging tortious interference with contract, or tortious
interference with prospective business or contractual relations. If not, state in detail why not.

**RESPONSE TO INTERROGATORY NO. 29:**

Cryovac objects to Interrogatory No. 29 as oppressive, harassing, and seeking the

production of information that is neither relevant nor reasonably calculated to lead to the

discovery of admissible evidence in connection with Pechiney's tortious interference with

Cryovac's contract with National Beef.

**INTERROGATORY NO. 30:**

State when and how Cryovac first became aware that "National Beef ... enter[ed] into a four-
year supply agreement with Pechiney" as alleged in Paragraph 16 of Cryovac's Amended
Complaint for Patent Infringement and identify the names of the Cryovac employee(s) that
provided the factual basis for this allegation and identify all documents relating to same.

**RESPONSE TO INTERROGATORY NO. 30:**

After National Beef told Cryovac that it would not, contrary to its January 14,

2004 acceptance, enter into the supply agreement with Cryovac that the parties had negotiated,

Cryovac learned that Pechiney was offering additional monetary and other concessions to

National Beef to induce National Beef to change its supply arrangement from Cryovac to

Pechiney. Ultimately, National Beef informed Cryovac that it was entering into an agreement with Pechiney instead of signing a four-year agreement with Cryovac. These events occurred between January 14, 2004 and late February 2004. The Cryovac employees with knowledge of the factual bases of this response are Jeffrey Gardner, Jim Mize, and Anthony York.

## INTERROGATORY NO. 31:

Identify the details of any discussions and/or communications, whether oral or in writing, between Cryovac or any of its representatives on the one hand and National Beef or its representatives on the other hand, from the time when Cryovac first because aware that "National Beef ... enter[ed] into a four-year supply agreement with Pechiney" to the present regarding: (1) the alleged agreement between National Beef and Pechiney, (2) the alleged agreement between National Beef and Cryovac, or (3) the prospective business relationship between National Beef and Cryovac, including, but not limited to, any discussions and/or communications in which Cryovac attempted to convince National Beef to honor the alleged agreement between National Beef and Cryovac rather than dealing with Pechiney and identify the Cryovac employee(s) and National Beef employee(s) involved in the discussions and/or communications identified.

## RESPONSE TO INTERROGATORY NO. 31:

Cryovac objects to Interrogatory No. 31 as seeking the production of information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence to the extent it is seeking information not already requested in response to Interrogatory Nos. 25 and 30.

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600

Of Counsel:

Ford F. Farabow, Jr.
Joann M. Neth
Michael J. Flibbert
Courtney B. Meeker
Mark J. Feldstein
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, D.C. 20001-4413
(202) 408-4000

Attorneys for Plaintiff Cryovac, Inc.

Dated: June 10, 2005

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on June 10, 2005, copies of the foregoing

document were caused to be served upon the following:

### BY HAND DELIVERY

       N. Richard Powers Esquire
       Connolly Bove Lodge & Hutz LLP
       The Nemours Building
       1007 North Orange Street
       P. O. Box 2207
       Wilmington, DE  19899

### BY FEDERAL EXPRESS

       Steven R. Trybus, Esquire
       Jenner & Block LLP
       One IBM Plaza
       Chicago, IL  60611-7603

_____
/John W. Shaw (No. 3362)

# EXHIBIT E

# EXHIBIT E

# REDACTED IN ITS ENTIRETY

# EXHIBIT F

## Pechiney's Production

| Date | Range |
|------|-------|
| 4/14/04 | PPPI 000001 – 000094<br>PPPI 000293 – 008379 |
| 5/17/05 | PPPI 008380 – 008675 |
| 5/19/05 | PPPI 008676 – 008938 |
| 5/31/05 | PPPI 008939 – 008946<br>PPPI 008947 – 008949 |
| 6/1/05 | PPPI-E 000001 – 054267 |
| 6/3/05 | PPPI 000095 – 000292<br>PPPI 008950 – 010218 |
| 6/16/05 | PPPI 010219 – 010405 |
| 6/21/05 | PPPI 010406 – 011283 |
| 6/24/05 | PPPI 011284 – 011301 |
| 7/5/05 | PPPI-E 054268 – 058121<br>PPPI 011302 – 012473 |
| 7/7/05 | PPPI-E 058122 – 090284 |
| 7/9/05 | PPPI-E 090285 – 107166 |
| 7/13/05 | PPPI-E 107167 to 110632<br>PPPI 012474 to 012696 |
| 7/22/05 | PPPI-E 110633 to 111178<br>PPPI 012697 to 013228 |
| 7/27/05 | PPPI 013229 to 013472 |
| 8/02/05 | PPPI 013473 to 013482 |
| 8/03/05 | PPPI 011284 to 013472 |
| 8/04/05 | PPPI 013483 to 013488 |
| 8/15/05 | PPPI 013494 to 013545 |
| 8/17/05 | PPPI 013546 to 013592 |
| 8/18/05 | PPPI 013593 to 013834 |
| 9/01/05 | PPPI 013835 to 013944 |
| 9/02/05 | PPPI 013945 to 013950 |

# EXHIBIT G

From:          Joann Neth [joann.neth@finnegan.com]
Sent:          Wednesday, April 20, 2005 5:08 PM
To:            STrybus@jenner.com
Cc:            Ford Farabow; Mark Feldstein; Shaw, John
Subject:       Cryovac v. Pechiney

Dear Steve:

     Thank you for your email of April 19, 2005 concerning Pechiney's Opposition to
Cryovac's Motion to Amend its complaint to add Counts II and III.  Putting aside the
parties' apparent differing views as to the content and import of Pechiney's Opposition,
your proposal that discovery go forward on Counts II and III, beginning May 1, 2005, is
acceptable to Cryovac.  Your proposal that the parties agree that no timing/premature
objection to such discovery shall be made based solely on the pendency of the motion to
amend is also acceptable, as are your proposed reservation as to other objections, and
your suggested withdrawal of any discovery impacted by a denial of the motion by the
court, in whole or in part.

     In response to your query concerning document production, as you know we did produce
approximately 14,000 pages last Friday.  We anticipate producing another 4,700 pages this
week, and our production will continue on a rolling basis.  Given the breadth of
Pechiney's document requests, we expect to continue our production over the next several
weeks.  We are investigating with people at Cryovac as to the extent of the remaining
production, and will provide further information as soon as we can.  We are also checking
with the individuals whose depositions you have noticed to see what dates they may have
available at the end of May/beginning of June.  If you would like to discuss rescheduling
of these depositions further, please let me know.

     We received approximately 8,200 pages of documents from Pechiney last Friday. Can you
let us know if and when we can expect to receive further documents from Pechiney, and
roughly how many more documents Pechiney expects to produce?

Yours truly,

Joann