# UNPUBLISHED CASES

# Part 1 of 2

LEXSEE 2004 US DIST LEXIS 21059

**COLLEGENET, INC., a Delaware corporation, Plaintiff, v. XAP CORPORATION, a Delaware corporation, Defendant.**

### No. CV-03-1229-HU

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON

### *2004 U.S. Dist. LEXIS 21059*

### October 12, 2004, Decided

**SUBSEQUENT HISTORY:** Magistrate's recommendation at *Collegenet, Inc. v. XAP Corp., 2004 U.S. Dist. LEXIS 22370 (D. Or., Oct. 29, 2004)*

**PRIOR HISTORY:** *CollegeNET, Inc. v. XAP Corp., 2004 U.S. Dist. LEXIS 13983 (D. Or., July 14, 2004)*

**DISPOSITION:** Magistrate's recommendation that the defendant's motion to dismiss be granted, and that the plaintiff's motion to dismiss be granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent owner sued defendant competitor, alleging claims of patent infringement. The patent owner also brought claims of unfair competition under § 43(a) *(15 U.S.C.S. § 1125*(a)) of the Lanham Act, and common law unfair competition. The competitor moved to dismiss both unfair competition claims. It raised counterclaims which the patent owner moved to dismiss. The matter was before a magistrate judge for a report and recommendation.

**OVERVIEW:** The patent owner accused the competitor of knowingly and intentionally engaging in a pattern or practice of misleading and deceiving colleges and universities about the competitor's handling of confidential student data in an attempt to obtain institutional customers. The basic thrust of the competitor's motion was that the patent owner's claims sounded in fraud and thus, had to satisfy *Fed. R. Civ. P. 9(b)*. The court determined that the unfair competition claims were "grounded in fraud," Rule 9 applied, and the allegations failed to meet the Rule's heightened pleading requirements. It recommended that the patent owner's unfair competition claims be dismissed without prejudice. It then turned to the competitor's three unfair competition claims. It recommended that the patent owner's motion to dismiss be

granted as to all the unfair competition claims to the extent those claims were premised on the filing of patent litigation. It further recommend that the motion be granted as to the claim under *Cal. Bus. & Prof. Code § 17200*. It recommended that the motion be denied as to remaining unfair competition claims to the extent they were based on marketplace communications to customers.

**OUTCOME:** It was recommended that the competitor's motion to dismiss be granted and that the patent owner's motion to dismiss the counterclaims be granted in part and denied in part.

**CORE TERMS:** patent, unfair competition, marketplace, Lanham Act, misrepresentation, baseless, objectively, patent infringement, infringer, misleading, customer, false advertising, unfair competition claim, state law, motion to dismiss, pre-litigation, infringement, recommend, competitor, counterclaim, inequitable conduct, mislead, choice of law, patentee, holder, studied, fraudulent conduct, statutory claim, common law, particularity

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] On a *Fed. R. Civ. P. 12 (b)(6)* motion to dismiss, a court must review the sufficiency of the complaint. A court should construe the complaint most favorably to the pleader: In appraising the sufficiency of the complaint, a court follows the accepted rule that the complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The allegations of material fact must be taken as true.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN2] See *Fed. R. Civ. P. 9(b).*

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN3] If fraud is not a necessary element of a claim, a plaintiff nevertheless may choose to allege that a defendant engaged in fraudulent conduct. If a plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim, the claim is "grounded in fraud" or "sounds in fraud" and the pleading of that claim as a whole must satisfy the particularity requirement *Fed. R. Civ. P. 9(b).* If a plaintiff instead alleges some fraudulent and some non-fraudulent conduct to support a claim, only the allegations of fraud are subject to *Fed. R. Civ. P. 9(b).* The allegations of non-fraudulent conduct must satisfy only the *Fed. R. Civ. P. 8* notice pleading standards.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN4] Fraud elements under Oregon law are: (1) false representation of a material fact:; (2) knowingly made or made with an insufficient basis for asserting its truth; (3) with the intent to induce one to act or refrain from acting; (4) justifiable reliance on the misrepresentation; and (5) resultant damage.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN5] Labeling a claim as something other than "fraud" does not shield a plaintiff from *Fed. R. Civ. P. 9(b)'s* requirements. Rule 9(b)'s heightened pleading standard will apply if the allegations are such that a plaintiff is alleging a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of the claim. If so, the claim is "grounded in fraud."

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN6] Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged. Under *Fed. R. Civ. P. 9(b),* a complaint must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation. Additionally, the plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading. The plaintiff must also show that the statement complained of was false or misleading at the time it was made.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN7] The general naming of an entire corporation, along with unnamed institutions throughout three states and unnamed applicants who could potentially come from anywhere in the world, is insufficient to comply with *Fed. R. Civ. P. 9(b).*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN8] Dismissals for failure to comply with *Fed. R. Civ. P. 9(b)* should ordinarily be without prejudice.

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*
*Trademark Law > Federal Unfair Competition Law > Federal Preemption*
[HN9] Technically, preemption applies only to the preemption of a state law by a federal law.

*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
*Antitrust & Trade Law > Trade Practices & Unfair Competition*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct*
[HN10] Obtaining a patent through inequitable conduct does not violate § 43(a) *(15 U.S.C.S. § 1125(a))* of the Lanham Act. There is no legal basis for a holding that inequitable conduct, or the assertion of a patent procured through inequitable conduct, constitutes unfair competition. Rather, the established remedy for inequitable conduct is unenforceability of the patent.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct*
*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
*Antitrust & Trade Law > Trade Practices & Unfair Competition*
[HN11] The Pro-Mold decision must be understood in the context of general patent law. A patent procured through inequitable conduct is not invalidated thereby, but the courts refuse to enforce such a patent as a matter of equitable principle. Pro-Mold tells that the remedy under federal law available to a defendant who is made the subject of an infringement suit, when the defendant alleges that the suit is based on a patent procured through inequitable conduct in dealing with the Patent Office, is the traditional remedy of having the patent adjudged unenforceable, or perhaps, in appropriate circumstances, holding the patentee liable for an antitrust violation. The

remedy for such an insupportable patent suit is not a suit for unfair trade practices under the Lanham Act.

**Patent Law > Inequitable Conduct > Anticompetitive Conduct**
**Antitrust & Trade Law > Trade Practices & Unfair Competition**
[HN12] When the state law unfair competition claim parallels the federal claim and is based on the same facts, no reason is seen to distinguish the reasoning of Pro-Mold: allegations of inequitable conduct cannot be pursued through an unfair competition counterclaim but rather need to be addressed in the patent litigation itself.

**Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action**
[HN13] A district judge may generally consider a document outside the complaint when deciding a motion to dismiss if the complaint specifically refers to the document and if its authenticity is not questioned.

**Antitrust & Trade Law > Trade Practices & Unfair Competition**
**Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview**
**Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements**
[HN14] The initiation of an infringement suit is clearly not covered by the text of § 43(a) (15 U.S.C.S. § 1125(a)) of the Lanham Act, while a communication to the customers of the accused infringer, in certain circumstances, may be.

**Antitrust & Trade Law > Trade Practices & Unfair Competition**
**Patent Law > Inequitable Conduct > General Overview**
**Patent Law > Infringement Actions > General Overview**
[HN15] Before a patentee may be held liable under § 43(a) (15 U.S.C.S. § 1125(a)) of the Lanham Act for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith. This prerequisite is a function of the interaction between the Lanham Act and patent law, and is in addition to the elements required by § 1125(a) itself, as § 1125(a) alone does not require bad faith. This holding applies to two separate types of marketplace statements: (1) those alleging that an alleged infringer's product infringes the patentee's patents; and (2) those alleging that the alleged infringer could not manufacture a noninfringing product. Both types of statements, if made in bad faith, are damaging to compe-

tition and are not the type of statements protected by the patent laws.

**Patent Law > Inequitable Conduct > Anticompetitive Conduct**
**Torts > Business & Employment Torts > Interference With a Contract**
[HN16] Bad faith is a prerequisite to a state law tortious interference claim based on an unfair competition theory caused by a patentee's marketplace statements. Thus, a defendant must allege, and later prove, that the plaintiff's marketplace statements to potential customers were made in bad faith. Failure to do so results in the preemption of the state unfair competition claims and the preclusion of the federal unfair competition claim.

**Torts > Procedure > Preemption**
[HN17] Federal patent law preempts state law that punishes merely publicizing a patent in the marketplace, unless the plaintiff can show that the patentholder acted in bad faith.

**Civil Procedure > State & Federal Interrelationships > Federal Common Law**
**Antitrust & Trade Law > Trade Practices & Unfair Competition**
[HN18] The Zenith Electronics decision requires that any state or federal unfair competition claims based on marketplace statements made by a plaintiff, be preempted (state claims) or precluded (federal claim) unless defendant alleges that such statements were made in bad faith. The Globetrotter decision's objectively baseless standard does not apply to marketplace conduct and the objectively baseless standard should not be extended beyond pre-litigation communications to an alleged infringer.

**Civil Procedure > State & Federal Interrelationships > Choice of Law**
[HN19] A district court sitting in diversity generally must apply the choice of law rules for the state in which it sits.

**Civil Procedure > State & Federal Interrelationships > Choice of Law**
[HN20] Oregon courts first look to whether there is a material difference between Oregon substantive law and the law of the other forum. If there is no material difference between the substantive law of Oregon and the law of other forum, there is a "false conflict" for purposes of the choice of law. In such cases, Oregon law applies. If a true conflict exists, Oregon proceeds with a conflicts of law analysis guided by the Restatement (Second) of Conflict of Laws. Oregon has adopted the choice of law rules of Restatement (Second) of Conflict of Laws § 6 and the "most significant relationship" test for tort choice of law

set forth in *Restatement (Second) of Conflict of Laws §
145* for tort claims.

**Civil Procedure > State & Federal Interrelationships >
Choice of Law**

[HN21] The *Restatement (Second) of Conflict of Laws §
145* states that (1) The rights and liabilities of the parties
with respect to an issue in tort are determined by the lo-
cal law of the state which, with respect to that issue, has
the most significant relationship to the occurrence and
the parties under the principles stated in *Restatement
(Second) of Conflict of Laws § 6*. (2) Contacts to be
taken into account in applying the principles of § 6 to
determine the law applicable to an issue include: (a) the
place where the injury occurred, (b) the place where the
conduct causing the injury occurred, (c) the domicile,
residence, nationality, place of incorporation and place of
business of the parties, and (d) the place where the rela-
tionship, if any, between the parties is centered. These
contacts are to be evaluated according to their relative
importance with respect to the particular issue.

**Civil Procedure > State & Federal Interrelationships >
Choice of Law**

[HN22] The *Restatement (Second) of Conflict of Laws §
6* provides: (1) A court, subject to constitutional restric-
tions, will follow a statutory directive of its own state on
choice of law. (2) When there is no such directive, the
factors relevant to the choice of the applicable rule of
law include (a) the needs of the interstate and interna-
tional systems, (b) the relevant policies of the forum, (c)
the relevant policies of other interested states and the
relative interests of those states in the determination of
the particular issue, (d) the protection of justified expec-
tations, (e) the basic policies underlying the particular
field of law, (f) certainty, predictability and uniformity of
result, and (g) ease in the determination and application
of the law to be applied.

**Civil Procedure > State & Federal Interrelationships >
Choice of Law**

[HN23] The *Restatement (Second) of Conflict of Laws §
301* cmt., states that a corporation's rights and duties un-
der a contract are determined by the law selected by ap-
plication of the rules of the *Restatement (Second) of Con-
flict of Laws § § 187,188*. If an agent of a corporation,
while acting in the course of his employment, commits a
tort, the law selected by application of the rules of the
*Restatement (Second) of Conflict of Laws § § 145, 174*
determines whether the corporation is liable for the tort
and the extent to which it is liable in damages. Likewise,
the validity of a transfer by a corporation, or to a corpo-
ration, of an interest in land or in a chattel is determined
by the law selected by application of the rules of the *Re-
statement (Second) of Conflict of Laws § § 223, 244*.

**Civil Procedure > State & Federal Interrelationships >
Choice of Law**
**Trademark Law > Federal Unfair Competition Law >
False Advertising > General Overview**

[HN24] The place of injury is less significant in the case
of fraudulent misrepresentations and of such unfair com-
petition as consists of false advertising and the misap-
propriation of trade values.

**Civil Procedure > State & Federal Interrelationships >
Choice of Law**

[HN25] The place of injury does not play so important a
role for choice-of-law purposes in the case of false ad-
vertising and the misappropriation of trade values as in
the case of other kinds of torts. Instead, the principal
location of the defendant's conduct is the contact that will
usually be given the greatest weight in determining the
state whose local law determines the rights and liabilities
that arise from false advertising and the misappropriation
of trade values.

**COUNSEL:** [*1]  For CollegeNET, Inc., a Delaware
corporation, Plaintiff: John D. Vandenberg, Klarquist
Sparkman, LLP, Portland, OR; Kristin L. Cleveland,
Klarquist Sparkman Campbell Leigh, Portland, OR; Mi-
chael N. Zachary, Klarquist Sparkman LLP, Portland,
OR; Robert A Shlachter, Stoll Stoll Berne Lokting &
Shlachter, P.C., Portland, OR; Scott E. Davis, Klarquist
Sparkman, L.L.P., Portland, OR.

For Xap Corporation, a California corporation, Defen-
dant: Alexander C. Johnson, Jr., Marger Johnson &
McCollom, PC, Portland, OR; Brenda M. Simon, Fen-
wick & West, LLP, Mountain View, CA; Daniel John-
son, Jr., Fenwick & West, LLP, Mountain View, CA;
Henry C. Su, Fenwick & West LLP, Mountain View,
CA; Stephen Scott Ford, Marger Johnson & McCollom,
PC, Portland, OR.

For Xap Corporation, a California corporation, Counter
Claimant: Henry C. Su, Fenwick & West LLP, Mountain
View, CA.

Attorneys for Plaintiff: Kristin L. Cleveland, Scott E.
Davis, Jared S. Goff, Michael N. Zachary, KLARQUIST
SPARKMAN, LLP, Portland, Oregon.

Attorneys for Defendant: Alexander C. Johnson, Stephen
S. Ford, MARGER, JOHNSON & McCOLLUM, P.C.,
Portland, Oregon; Daniel Johnson, Jr., Henry C. Su,
FENWICK & WEST LLP, Mountain [*2] View, Cali-
fornia.

2004 U.S. Dist. LEXIS 21059, *

**JUDGES:** Dennis James Hubel, United States Magistrate Judge.

**OPINIONBY:** Dennis James Hubel

**OPINION:**

FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff CollegeNET, Inc. brings this patent infringement action against its competitor Xap Corporation. In addition to claims of patent infringement based on two patents owned by plaintiff, plaintiff brings claims of unfair competition under the section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*, and common law unfair competition. Defendant moves to dismiss both unfair competition claims.

Defendant, in addition to raising counterclaims of noninfringement, invalidity, and unenforceability directed at plaintiff's two patents, also brings counterclaims for unfair competition under the Lanham Act, common law unfair competition, and a third unfair competition claim under *section 17200* of the California Business and Professions Code. Plaintiff moves to dismiss defendant's unfair competition claims.

For the reasons explained below, I recommend that defendant's motion to dismiss be granted and that plaintiff's motion to dismiss be granted in part and denied in part.

STANDARDS

Both parties bring their [*3] motions pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. [HN1] On a *Rule 12(b)(6)* motion to dismiss, the court must review the sufficiency of the complaint. *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*. The court should construe the complaint most favorably to the pleader:

> In appraising the sufficiency of the complaint, we follow, of course, the accepted rule that the complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); American Family Ass'n, Inc. v. City & County of San Francisco, 277 F.3d 1114, 1120 (9th Cir. 2002)*, cert. denied, *537 U.S. 886, 154 L. Ed. 2d 146, 123*

*S. Ct. 129 (2002)*. The allegations of material fact must be taken as true. *Moyo v. Gomez, 40 F.3d 982, 984 (9th Cir. 1994)*.

DISCUSSION

I. Defendant's Motion to Dismiss

The basic thrust of defendant's motion is that plaintiff's claims sound in fraud and thus, they must meet the requirements of *Federal Rule of Civil Procedure 9(b)*. Because, defendant contends, the allegations [*4] do not meet the *Rule 9(b)* threshold, the claims must be dismissed.

A. Applicability of *Rule 9(b)* to Plaintiff's Claims

*Rule 9(b)* provides:

> [HN2] In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

*Fed. R. Civ. P. 9(b)*.

While plaintiff brings both a federal Lanham Act claim and a common law unfair competition claim, they are based on the same facts. The parties appear to agree, at least for the purposes of this motion, that plaintiff's common law claim arises under Oregon law. The parties also appear to agree that Oregon common law unfair competition claims follow Lanham Act case law and thus, the common law claim survives or dies with the Lanham Act claim. See *CollegeNET, Inc. v. Embark.com, Inc., 230 F. Supp. 2d 1167, 1177 (D. Or. 2001)* (court noted that statements of "puffery" were not actionable in a false advertising claim under the Lanham Act and that "because Oregon courts follow Lanham Act case law, similar statements also cannot form the basis of an Oregon common law unfair competition [*5] claim"); Plf's Resp. at p. 1, n.1 (the "issues raised by XAP's motion to dismiss are the same for each of CollegeNET's unfair competition claims."). Accordingly, I do not separately address the common law unfair competition claim.

No United States Circuit Court has held that as a general rule, all false advertising Lanham Act claims under *15 U.S.C. § 1125(a)* are subject to *Rule 9(b)*. Lower courts have noted, however, that some Lanham Act claims may be subject to *Rule 9* rather than the more general pleading requirements in *Federal Rule of Civil Procedure 8*. *Volunteer Firemen's Ins. Servs., Inc. v. McNeil & Co., Inc., 221 F.R.D. 388, 393 (W.D.N.Y.*

2004 U.S. Dist. LEXIS 21059, *

*2004*) ("While the law in this Circuit may be unclear as to whether or not claims for false advertising must be pled with particularity generally, the Court finds that such a heightened pleading requirement is appropriate in this case, since the counterclaim is essentially a claim for fraud."); *Sanderson v. Brugman, 2001 U.S. Dist. LEXIS 8309, No. IPOO-459-C-H/G, 2001 WL 699876 at *8 (S. D. Ind. May 29, 2001)* (applying *Rule 9(b)* to false advertising Lanham Act claim); *Max Daetwyler Corp. v. Input Graphics, Inc., 608 F. Supp. 1549, 1556 (E.D. Pa. 1985)* [*6] (while Lanham Act claims may not be categorically subject to the particularity requirement of *Rule 9(b)*, "the policies which underlie *Rule 9*'s requirement that the nature of an alleged misrepresentation be pleaded with specificity are equally applicable to the type of misrepresentation claims presented in plaintiffs' Lanham Act claim."); *see also Johannsen v. Brown, 797 F. Supp. 835, 839-40 (D. Or. 1991)* (using Oregon's two-year tort statute of limitations in a false advertising Lanham Act claim because such Lanham Act claims "are most comparable to claims brought for fraud[.]").

A recent Ninth Circuit case elaborated on the *Rule 8* versus *Rule 9(b)* pleading standards, although not in the context of a Lanham Act false advertising claim. *Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097 (9th Cir. 2003)*. Nonetheless, the court's analysis is helpful here. In *Vess*, the plaintiff alleged that the defendants illegally conspired to increase sales of a drug by fraudulently representing that the diagnostic criteria for a disorder were scientifically reliable. The court noted that [HN3] if fraud is not a necessary element of a claim, a plaintiff nevertheless may [*7] choose to allege that a defendant engaged in fraudulent conduct. *Id. at 1103.*

If a plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim, the claim is "grounded in fraud" or "sounds in fraud" and the pleading of that claim as a whole must satisfy the particularity requirement *Rule 9(b). Id. at 1103-04.* If a plaintiff instead alleges some fraudulent and some non-fraudulent conduct to support a claim, only the allegations of fraud are subject to *Rule 9(b). Id. at 1104.* The allegations of non-fraudulent conduct must satisfy only the *Rule 8* notice pleading standards. *Id. at 1105.*

If the averments of fraud do not meet *Rule 9(b)*'s standards, those allegations are stripped from the claim. The court should then determine if the remaining allegations state a claim. *Id. at 1105.*

Defendant contends that the allegations in plaintiff's unfair competition claims are based on a "unified course of fraudulent conduct" and thus, are "grounded in fraud" and are subject to *Rule 9 (b)*'s requirements. In particular, defendant points to the following [*8] allegations:

This Third Cause of Action arises as a result of Defendant XAP [sic] studied efforts to mislead colleges and college-bound students about the privacy of student data entrusted to XAP in its capacity as a vendor processing online applications for colleges and universities throughout the United States . . . To convince these colleges to use XAP's services, XAP has made and continues to make false and misleading statements assuring them of the confidentiality of student data.

Sec. Am. Compl. at P 47 (emphasis added).

Moreover, on information and belief, XAP has made actionable false and/or misleading statements to individuals and entities located in Oregon.

Id. at P 7 (emphasis added).

On information and belief, XAP's representations about how XAP treats personal student data are false and/or misleading in that XAP has a pervasive practice of selling personal student data without the students' express or informed consent or direction to Lenders and others.

Id. at P 63 (emphasis added).

XAP's false and/or misleading representations about how it treats personal student data give the false [*9] impression that XAP (a) respects the privacy of students, (b) maintains student data in confidence, (c) only provides the student data to third parties with the express consent of the students, and (d) does not derive revenue from disclosing personal student data to third parties.

Id. at P 64 (emphasis added).

On information and belief, XAP's repre-
sentations about how XAP treats personal
student data are materially misleading and
cause institutions of higher learning to
participate in Mentor programs. On in-
formation and belief, such institutions
would refuse to participate in XAP's Men-
tor systems if they knew that XAP pro-
vided the student data to Lenders.

Id. at P 65 (emphasis added).

On information and belief, XAP has made
other material misrepresentations to the
market regarding its position in the mar-
ketplace relative to its competitors, and
regarding its policies and procedures with
respect to the privacy of student data.

Id. at P 66 (emphasis added).

XAP has misrepresented and continues to
misrepresent the nature, characteristics,
and/or qualities of XAP's services and/or
commercial activities by using false [*10]
and/or misleading statements in interstate
commerce.

Id. at P 69 (emphasis added).

XAP's misrepresentations have caused
and are likely to cause confusion, decep-
tion and mistake among institutions of
higher education[.]

Id. at P 70 (emphasis added).

On information and belief, the confusion,
deception and mistake caused by XAP's
misrepresentations are material, in that
they have influenced and are likely to
continue to influence the decisions of
educational institutions as to whether they
will utilize XAP's or CollegeNET's online
college application services.

Id. at P 71 (emphasis added).

XAP's misrepresentations violate the
Lanham Act, including at least *15 U.S.C.
§ 1125(a)*.

Id. at P 73 (emphasis added).

XAP's misrepresentations and the result-
ing damage to CollegeNET are actionable
under the applicable common law tort of
unfair competition.

Id. at P 77 (emphasis added).

A fair reading of these allegations shows that plain-
tiff accuses defendant of knowingly and intentionally
engaging in a pattern or practice of misleading and de-
ceiving colleges and [*11] universities about defendant's
handling of confidential student data in an attempt to
obtain institutional customers. I agree with defendant
that these allegations may be easily linked to elements of
an Oregon common law fraud claim, further establishing
that plaintiff's false advertising claims are essentially
fraud claims:

[HN4] (1) false representation of a material fact:
("false and/or misleading representations about how it
treats personal student data"), ("materially misleading"),
("other material misrepresentations);

(2) knowingly made or made with an insufficient ba-
sis for asserting its truth: ("studied efforts to mislead"),
("pervasive practice");

(3) with the intent to induce one to act or refrain
from acting: ("to convince these colleges to use XAP's
services"), ("have influenced and are likely to continue to
influence the decisions of educational institutions");

(4) justifiable reliance on the misrepresentation:
("such institutions would refuse to participate in XAP's
mentor system if they knew that XAP provided the stu-
dent data to Lenders"); and

(5) resultant damage: ("CollegeNET has been in-
jured"), ("CollegeNET has suffered and is suffering
monetary damage"), ("resulting [*12] damage to Col-
legeNET").

*Maitland v. Mitchell, 44 F.3d 1431, 1438-39 (9th Cir.
1995)* (listing fraud elements under Oregon law).

Plaintiff argues that its claims are based on allega-
tions that XAP made misrepresentations in the market-

place, not on averments that XAP acted with fraudulent scienter. Plaintiff suggests that in each of the eleven paragraphs singled out by defendant to support its argument of "unified course of fraudulent conduct," plaintiff has characterized the alleged misrepresentations by defendant as "merely false and/or misleading, not fraudulent." Pltf's Resp. at pp. 5-6. Plaintiff notes that its Second Amended Complaint does not contain the word "fraud," and it does not assert that the false advertising claims are based on any fraudulent conduct.

Plaintiff points to the fact that defendant finds allegations of fraudulent scienter in only three paragraphs of the Second Amended Complaint. Plaintiff notes that the first allegation, "studied efforts to mislead," appears in the introductory paragraph and is not an allegation of specific conduct. Moreover, plaintiff contends, "studied" efforts that are misleading are not tantamount to "fraudulent" [*13] intentions to deceive.

I agree with defendant that the two cases from this Court cited by plaintiff are distinguishable and that the allegations effectively amount to a fraud claim. In a 1997 case, Judge Marsh applied *Rule 8*'s requirements to a Lanham Act claim, but applied *Rule 9(b)* to a fraud claim. *Top Producer Sys., Inc. v. Software Sciences, Ltd., 1997 U.S. Dist. LEXIS 12368, No. CV-97-415-MA, 1997 WL 723049, at *3-4 (D. Or. July 21, 1997)*. Judge Marsh gives absolutely no indication that he was requested to analyze the Lanham Act allegations under anything but *Rule 8*. Thus, his opinion is of little assistance here.

In a 2003 case, Judge King was asked to apply the heightened pleading standards of *Rule 9(b)* to pending *ERISA* claims, even though the plaintiffs did not expressly plead fraud. *In re Louisiana-Pacific Corp., 2003 U.S. Dist. LEXIS 7645, No. CV-02-1023-KI, 2003 WL 21087593, at *7-8 (D. Or. Apr. 24, 2003)*. However, like the Top Producer opinion by Judge Marsh, Judge King's opinion is also of limited value. First, it was not a Lanham Act case. Second, Judge King noted that allegations that were not averments of fraud (permitting a percentage of the plans' assets to be invested in LP stock, [*14] failing to adequately investigate and monitor the merits of the plans' investments in LP stock, and restricting plaintiffs' investments in LP stock), were sufficient to state a breach of fiduciary duty claim under ERISA. *2003 U.S. Dist. LEXIS 7645, [WL] at *8*. Thus, because he found sufficient non-fraudulent allegations in support of the claim asserted, he did not need to consider *Rule 9(b)*.

A reading of plaintiff's entire third claim shows that plaintiff does not assert or imply that defendant mistakenly or innocently provided false or misleading information. As defendant notes, plaintiff's claims allege that defendant advertised the exact opposite of the actions it

was carrying out. The claims do not allege that this was the result of some mistake or error on defendant's part, and they further allege that defendant misleads colleges and universities regarding its handling and use of confidential student data so that colleges and universities will use defendant's services. Implicit in these claims is that defendant engaged in false advertising knowingly, with the calculated intent to mislead and deceive.

Additionally, as to knowledge, the phrase "studied efforts to mislead colleges and college-bound students [*15] about the privacy of student data entrusted to XAP," is easily understood as suggesting that defendant has a "conscious design" to mislead higher education institutions, implying that defendant knows its representations are false. Additionally, other allegations demonstrate that as whole, the claims allege that defendant had knowledge of the falsity of the alleged misrepresentations. E.g., Sec. Am. Compl. at PP 62, 63 ("XAP has represented . . . that it does not disclose personal student data obtained through Mentor sites to any third parties without the express or informed consent and direction of the student"; "XAP has a pervasive practice of selling personal student data without the students' express or informed consent or direction to Lenders and others."). With these allegations, plaintiff alleges that defendant represents one thing (not disclosing), while taking actions diametrically opposed to those statements (selling the personal data without consent). The unmistakable inference is that plaintiff alleges that defendant is doing the opposite of what it claims.

As the cases make clear, [HN5] labeling the claim as something other than "fraud" does not shield plaintiff from [*16] *Rule 9(b)*'s requirements. Under *Vess*, *Rule 9(b)*'s heightened pleading standard will apply if the allegations are such that plaintiff is alleging a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of the claim. If so, the claim is "grounded in fraud."

I conclude that such is the case with plaintiff's unfair competition claims when the allegations are read as a whole. As such, *Rule 9(b)* applies to plaintiff's unfair competition claims.

### B. Disregarding Certain Allegations

Plaintiff argues that to the extent its claims can be construed to imply the knowledge and intent elements of fraud, those elements can be disregarded and the remaining allegations are still sufficient to state false advertising claims. The only phrase plaintiff singles out for excision is the "studied efforts to mislead" phrase in the introductory paragraph to the claims. Plaintiff contends that this language can be disregarded without affecting the viability of the two claims.

Defendant contends that simply removing this inflammatory language does not change the knowledge or intent elements that appear throughout the other allegations and which ground the complaint [*17] in fraud. I agree with defendant. Even if the "studied" phrase is removed, the implication from the remaining allegations read together remains the same and *Rule 9(b)* applies.

### C. Applying *Rule 9(b)*

As noted in Vess, [HN6] "averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess, 317 F.3d at 1106* (internal quotation omitted). Under *Rule 9(b),* a complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Alan Neuman Prods., Inc. v. Albright, 862 F.2d 1388, 1392-92 (9th Cir. 1989).* Additionally, "the plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 42 F.3d 1541, 1548 (9th Cir. 1994).* The plaintiff must also show that the statement complained of was false or misleading at the time it was made. *Id. at 1548-49.*

Plaintiff's claims fail to (1) identify any of the [*18] alleged misrepresentations by their specific content and medium; (2) identify any of the specific parties receiving any given misrepresentations; (3) identify a particular author or speaker within the corporation; (4) identify where in a given Internet website the alleged misrepresentations were made; (5) identify precisely when the misrepresentations were made; and (6) identify the specifics of the relevant terms of defendant's agreements with the lenders.

[HN7] The general naming of an entire corporation, along with unnamed institutions throughout three states and unnamed applicants who could potentially come from anywhere in the world, is insufficient to comply with *Rule 9(b).* See *Segal Co. v. Amazon.com, 280 F. Supp. 2d 1229, 1231 (W.D. Wash. 2003)* (complaint's reference to certain "representatives" of defendant is too vague to sufficiently identify the alleged perpetrators); *Silicon Knights v. Crystal Dynamics, 983 F. Supp. 1303, 1315 (N.D. Cal. 1997)* (general allegation against all defendants insufficient to satisfy particularity requirement).

Additionally, plaintiff's identification of the subject of the alleged misrepresentations ("the confidential [*19] use of personal information collected from college applicants") is an insufficient conclusory allegation under *Rule 9(b).* Furthermore, general assertions of the time the alleged misrepresentations were made ("during the op-

eration of the Internet sites maintained under agreements with [the three Lenders]"), are also insufficient under *Rule 9(b). In re Stac Elecs. Secs. Litig., 89 F.3d 1399, 1410 (9th Cir. 1996).*

In sum, plaintiff's allegations fail to meet the heightened pleading requirements of *Rule 9(b).* The claims should be dismissed.

### D. With or Without Prejudice

[HN8] Dismissals for failure to comply with *Rule 9(b)* should ordinarily be without prejudice. *Vess, 317 F.3d at 1108.* Defendant argues that plaintiff's claims should be dismissed with prejudice and without leave to amend. Defendant notes that in this particular case, plaintiff's claims were first filed in a separate case and defendant moved against them for the reason articulated in the present motion. However, that case was dismissed and the claims therein were brought as newly added claims in the patent case. This occurred before defendant's motion to dismiss was considered. Nonetheless, [*20] defendant contends that because plaintiff had the benefit of reviewing the motion to dismiss before refiling these claims as part of the patent case, I should view the claims at issue here as plaintiff's second attempt to plead them with particularity.

I disagree. While plaintiff may have seen defendant's argument before re-filing these claims in this patent case, defendant's argument has not previously been considered by the Court. In such a case, it is inappropriate to dismiss with prejudice. I recommend that plaintiff's unfair competition claims be dismissed without prejudice and with leave to amend in compliance with *Rule 9(b).*

### II. Plaintiff's Motion to Dismiss

As noted above, defendant has three unfair competition claims. Generally, defendant contends that plaintiff has competed unfairly by (1) filing this patent infringement action against defendant and two previous actions in this court against ApplyYourself, Inc., another competitor; and (2) making statements in the marketplace regarding plaintiff's patent rights to the Oklahoma State Regents for Higher Education. Plaintiff contends that defendant's claims are barred by the *First Amendment* and federal patent law. Additionally, [*21] plaintiff claims that the California statutory claim should be dismissed because Oregon law, not California law, applies to plaintiff's alleged conduct.

### A. Preclusion/Preemption Argument n1

n1 [HN9] Technically, preemption applies only to the preemption of a state law by a federal law. *Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d*

*1340, 1346-47 (Fed. Cir. 1999).* The issue with respect to the federal *section 43(a) Lanham Act* claim is more properly considered one of potential conflict between federal statutes and does not implicate the issue of preemption. Id. In the context of this motion, the analysis is indistinguishable.

### 1. Allegations Regarding Patent Litigation

Defendant alleges that plaintiff has enforced its patents against defendant and other competitors in "bad faith" because plaintiff, allegedly knowing its patents to be unenforceable in view of plaintiff's "inequitable conduct," and invalid in view of the prior art, has brought this case against defendant and previously brought patent [*22] infringement claims in this Court against ApplyYourself, Inc. Ans. to Sec. Am. Compl. at P 127.

[HN10] Obtaining a patent through inequitable conduct does not violate *section 43(a) of the Lanham Act. Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1575 (Fed. Cir. 1996).* In Pro-Mold, the defendant in a patent infringement case counterclaimed with an allegation that the plaintiff had engaged in unfair competition by filing the complaint against the defendant knowing that the patent was unenforceable. The court explained that "there is no legal basis for a holding that inequitable conduct, or the assertion of a patent procured through inequitable conduct, constitutes unfair competition." Id. Rather, "the established remedy for inequitable conduct is unenforceability of the patent." Id.

As then later explained in Zenith Electronics:

[HN11] Pro-Mold must be understood in the context of general patent law. A patent procured through inequitable conduct is not invalidated thereby, but the courts refuse to enforce such a patent as a matter of equitable principle. Pro-Mold tells us that the remedy under federal law available to a defendant [*23] who is made the subject of an infringement suit, when the defendant alleges that the suit is based on a patent procured through inequitable conduct in dealing with the Patent Office, is the traditional remedy of having the patent adjudged unenforceable, or perhaps, in appropriate circumstances, holding the patentee liable for an antitrust violation. The remedy for such an insupportable patent suit is not a suit for unfair trade practices under the Lanham Act.

*Zenith Electronics, 182 F.3d at 1349.*

Defendant cites no cases in support of its position that its Lanham Act claim may be based on an alleged bad faith filing of a patent infringement action against it or against ApplyYourself. Thus, to the extent defendant's Lanham Act claim is based on the filing of patent infringement actions, I recommend granting plaintiff's motion to dismiss.

As to the state law claims, plaintiff argues that the Federal Circuit, if presented with the issue, would similarly hold that a state law unfair competition claim based on the filing of a patent infringement action is not viable for the reasons articulated in Pro-Mold. In support, plaintiff cites to *Abbott Laboratories v. Brennan, 952 F.2d 1346, 1355 (Fed. Cir. 1991),* [*24] where the court held that a state tort action for abuse of process cannot "be invoked as a remedy for inequitable or other unsavory conduct of parties to proceedings in the Patent and Trademark Office."

Defendant argues that Abbott Laboratories is distinguishable because the court there considered only a state law abuse of process claim, not a state law unfair competition claim. However, I agree with plaintiff. [HN12] When the state law unfair competition claim parallels the federal claim and is based on the same facts, I see no reason to distinguish the reasoning of *Pro-Mold*: allegations of inequitable conduct cannot be pursued through an unfair competition counterclaim but rather need to be addressed in the patent litigation itself. Thus, to the extent any of defendant's unfair competition claims, state or federal, are based on the filing of patent infringement actions, they should be dismissed.

### 2. Allegations Regarding Marketplace Statements

Defendant contends that plaintiff made false statements in a February 2004 proposal to the Oklahoma State Regents for Higher Education that "exaggerate the scope of its patents and create the misleading impression that CollegeNET is the [*25] exclusive legal source of online applications and the only source endorsed by a federal government agency." Id. at P 133 n.1.

The statements regarding patent rights made in the Oklahoma proposal are as follows:

**Proprietary Technology**

As discussed above, CollegeNET was the early leader in internet admissions services. The U.S. Patent Office recognized this in awarding patents to CollegeNET. These patents, *U.S. Patent Number*

6,345,278 (the "'278 Patent"), and another closely-related patent, *U.S. Patent Number 6,460,042* (the "'042 Patent"), were both granted in 2002. CollegeNET has moved to protect these patents against infringers. In a recent case againt [sic] ApplyYourself, Inc., the defendant ceased operating its data sharing feature conforming to an injunction barring infringement of the '278 Patent. The jury in that case found that the defendant had willfully infringed the '278 Patent, and calculated damages in CollegeNET's favor based in part on the previously operating data sharing feature.

CollegeNET recently filed suit against XAP, in part based on the continued use by XAP of the data sharing feature in on-line admissions applications. Another ground [*26] for the suit was the testimony delivered by Xap's CEO, Mr. Allen Firstenberg, in open court at the ApplyYourself trial. During that trial, CollegeNET's lawyer asked Mr. Firstenberg a number of questions while he was on the witness stand, under oath. Two questions, and their answers follow:

Question (CollegeNET's lawyer): And, therefore, you understand that if these patents are upheld, your company may be found to have infringed the patents. Is that right?

Answer (Mr. Firstenberg): That's a possibility.

Question (CollegeNET's lawyer): And, therefore, your company has an interest in having these patents invalidated, if you can help that happen. Isn't that right?

Answer (Mr. Firstenberg): That's right.

The jury upheld CollegeNET's patents, which, according to Mr. Firstenberg, cre-

ates a "possibility" that XAP has infringed CollegeNET's patents. One can assume that the possibility is more than theoretical, seeing as Mr. Firstenberg took the time to testify at trial and admitted that XAP had an interest in having the CollegeNET Patents invalidated. CollegeNET is confident that another federal jury will find that operating a data sharing [*27] feature in an on-line admissions application is an infringement of the CollegeNET patents.

Invention and innovation create intellectual property rights for both universities and vendors. CollegeNET's goal is to provide the benefits of this innovation to the state of Oklahoma in away [sic] that is consistent with the insights described earlier and in a way that ensures intellectual property security and non-infringement for all participants.

Exh. A to Pltf's Memo, in. Sup. of Pltf's Mtn to Dismiss at p. CNA22805. n2

n2 Because plaintiff designated the proposal document as Highly Confidential -- Outside Counsel's Eyes Only in its document production to defendant, defendant did not quote or paraphrase the document, or attach it, in the public filing of its Answer. However, plaintiff attaches the document as an exhibit to its motion to dismiss and argues that it should be considered in resolving the motion. *Inlandboatmens Union of the Pac. v. Dutra Group, 279 F.3d 1075, 1083 (9th Cir. 2002)* [HN13] ("a district judge may generally consider a document outside the complaint when deciding a motion to dismiss if the complaint specifically refers to the document and if its authenticity is not questioned."). I agree with plaintiff and defendant makes no objection to my considering the document.

[*28]

As noted in *Zenith Electronics*, while Pro-Mold addressed the preclusive effect of the patent laws in regard to federal unfair competition Lanham Act claims based on the filing of an allegedly baseless patent infringement action, claims based on "alleged marketplace statements," stand in contrast and *Pro-Mold* does not dictate the analysis. *Zenith Electronics, 182 F.3d at 1349.* In Zenith Electronics, the counterclaim against the patentee

which had brought the patent infringement action was based on marketplace statements -- statements made by the patentee to the alleged infringer's potential customers that the alleged infringer's product was infringing and that the alleged infringer was unable to design around the patents. Id. In discussing the distinction, the Zenith Electronics court observed: "The difference, however, is that [HN14] the initiation of an infringement suit is clearly not covered by the text of § 43(a) [of the Lanham Act], while a communication to the customers of the accused infringer, in certain circumstances, may be. Id.

After a lengthy discussion, the Zenith Electronics court concluded that

> [HN15] before a patentee [*29] may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith. This prerequisite is a function of the interaction between the Lanham Act and patent law, and is in addition to the elements required by § 43(a) itself, as § 43(a) alone does not require bad faith[.]

Id. at 1353. The court then made clear that its holding applied to two separate types of marketplace statements: (1) those alleging that an alleged infringer's product infringes the patentee's patents; and (2) those alleging that the alleged infringer could not manufacture a noninfringing product. Id. at 1354. The court noted that "both types of statements, if made in bad faith, are damaging to competition and are not the type of statements protected by the patent laws." Id.

The Zenith Electronics court also expressly held that consistent with its analysis for a federal Lanham Act claim, and consistent with its analysis in earlier cases, [HN16] bad faith is also a prerequisite to a state law tortious [*30] interference claim based on an unfair competition theory caused by a patentee's marketplace statements. Id. at 1355. Thus, here, under Zenith Electronics, defendant must allege, and later prove, that plaintiff's marketplace statements to potential customers were made in bad faith. Failure to do so results in the preemption of the state unfair competition claims and the preclusion of the federal unfair competition claim.

Plaintiff contends, however, that defendant's allegations of bad faith are not enough. Rather, plaintiff argues, defendant must allege and prove that plaintiff's state-

ments are "objectively baseless." Plaintiff relies on a March 2004 Federal Circuit opinion which held that to survive preemption, a state law unfair competition claim based on statements made by a patent holder to an alleged infringer, required proof that the statements were objectively baseless. Globetrotter Software, Inc. v. Elan Computer Group, Inc., 362 F.3d 1367 (Fed. Cir. 2004).

In Globetrotter, the defendant asserted counterclaims of state law tortious interference with prospective economic advantage and unfair competition based on the plaintiff having [*31] sent emails and letters to the defendant and to a third party that was in negotiations to purchase defendant, accusing defendant of patent infringement. The court first noted the present, governing law: "federal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." Id. at 1374. Such state law claims "can survive federal preemption only to the extent that those claims are based on a showing of bad faith' action in asserting infringement." Id. To avoid preemption, "bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." Id. (internal quotation omitted).

The court then noted that while the defendant argued that the plaintiff had engaged in bad faith, he endeavored to show it at summary judgment "only through attempts to demonstrate subjective bad faith." Id. at 1375. Thus, the question on appeal was whether the bad faith standard discussed in Zenith Electronics could be satisfied in the absence of a showing that the claims asserted were objectively baseless. [*32] Id. The court concluded that it could not. The court held that the "objectively baseless" standard applies to state-law claims based on communications alleging patent infringement such as those presented in the case. Id. at 1377.

While the Globetrotter court phrased the question at issue as whether the bad faith standard in Zenith Electronics required a showing of objective baselessness, the court expressly limited the application of the objectively baseless standard to pre-litigation statements regarding patent infringement made to an alleged infringer. Id. As noted above, the facts in Globetrotter were that the patent holder communicated with defendant, the alleged infringer, and the putative purchaser of defendant who would stand in defendant's shoes, about the alleged infringement. These were not statements in the marketplace to potential customers as were at issue in Zenith Electronics.

The court described the statements in Zenith Electronics as "statements made in cease-and-desist letters by a patentee asserting its patent rights." Id. It then held that the objectively baseless standard applied to state law

claims "based on communications [*33] alleging patent infringement such as those in this case." Id. (emphasis added). It also stated that an allegation that a patent holder has engaged in wrongful conduct based on communications by the patent holder alleging patent infringement, must meet the objectively baseless standard. Id.

Finally, and in the most direct expression of the limitation of its holding, the court specifically distinguished statements made in the marketplace:

> We have also held that [HN17] federal patent law preempts state law that punishes merely "publicizing a patent in the marketplace, unless the plaintiff can show that the patentholder acted in bad faith." *Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1336 (Fed. Cir. 1998)* (overruled in part on other grounds by *Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1359*). We need not decide in this case whether the objectively baseless standard applies in the context of publicizing a patent through means other than pre-litigation communications.

*Id. at 1377 n.9* (emphasis added).

Thus, *Globetrotter* does not control this case. The allegations forming the basis of defendant's unfair competition [*34] claims, both state and federal, are that plaintiff made false and exaggerated statements in the marketplace, to potential customers. This falls squarely into the question left open by the Globetrotter court in footnote nine.

Plaintiff argues that the objectively baseless standard should apply to marketplace conduct directed at potential customers. Plaintiff contends that the marketplace should be treated no differently than the relationship between the patent holder and its alleged infringing competitor. I disagree.

As explained in Globetrotter, the objectively baseless standard comes from *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993)*. In cases before Professional Real Estate, the Court had recognized an exception to antitrust liability for activities directed toward influencing government action. *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 135-36, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961)*. The Court held that the *Sherman Act* did not reach such

activities. *Id. at 136-38*. However, the Court noted that immunity would not exist if the accused activity, although "ostensibly directed [*35] toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id. at 144*.

Following Noerr, which involved only "mere attempts to influence the passage or enforcement of laws," *id. at 135*, the Court extended the Noerr immunity to attempts to petition the government for redress through litigation in the courts. *Calif. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972)*. These previous decisions however, as noted in Globetrotter, did not resolve the question "'whether litigation may be sham merely because a subjective expectation of success does not motivate the litigant.'" *Globetrotter, 362 F.2d at 1375* (quoting *Prof'l Real Estate, 508 U.S. at 57*).

Professional Real Estate answered that question, holding that "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent." *Prof. Real. Estate, 508 U.S. at 57*. The Court explained:

> The lawsuit must be objectively baseless in the sense that no reasonable [*36] litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail.

*Id. at 60*. If the challenged litigation is objectively baseless, the court then examines the litigant's subjective motivation. *Id. at 57*.

The Globetrotter case addressed the question noted above -- whether the bad faith standard for pre-litigation communications required a showing of objective baselessness. But, in borrowing the objectively baseless standard from Professional Real Estate, the Globetrotter court acknowledged that the Supreme Court had not previously addressed the question whether the Professional Real Estate objectively baseless standard applied outside the context of actual litigation. *Globetrotter, 362 F.3d at 1376*.

The court noted that its sister circuits, "almost without exception," have applied the Noerr protections to pre-litigation communications. *Id*. It cited cases from other circuits which noted that "'given [*37] that petitioning

immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation.'" Id. (quoting *Coastal States Mktg, Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983)). The Globetrotter court relied on these cases to conclude that an extension of Noerr, along with the objectively baseless standard of Professional Real Estate, to pre-litigation communications directed from the patent holder to an alleged infringer, was warranted.

This explanation of the basis for the Globetrotter court's holding is relevant to the question of whether that holding should be further extended to marketplace conduct. An examination of the antecedents of the Globetrotter holding shows that the roots of the Noerr immunity and its recognized "bad faith" or "sham" exception are grounded in activities directed toward influencing government action and in attempts to petition the government for redress through litigation in the courts. The reasoning in Globetrotter for extending the immunity to pre-litigation activities is sound: " The litigator should not be protected [*38] only when he strikes without warning.'" *Id. at 1376* (quoting *Coastal States, 694 F.2d at 1367*).

But, given that the doctrine upon which *Globetrotter* is based is so squarely rooted in litigation activities, there is no basis for an extension of it into non-litigation marketplace conduct. Based on the prior cases supporting Globetrotter's holding, it would be inappropriate to stray from the litigation or pre-litigation context in which the Noerr immunity and its bad faith or sham, and now objectively baseless, exception, has been applied.

Furthermore, aside from the litigation genesis of the doctrine, it is important to note another basis for distinguishing between pre-litigation statements made to an alleged infringer and statements made to potential customers in the marketplace. Presumably, the marketplace statements are intended to frighten potential customers away from doing business with the alleged infringer and to bring them on as a customer of the patent holder. Typically, upon reading the marketplace communications, a customer would not retain legal counsel to evaluate the possible infringement of one supplier or another.

In contrast, [*39] the alleged competitor infringer would arguably obtain counsel as a result of the pre-litigation communications threatening it with infringement and litigation. Thus, to better protect the potential customer, who will likely not hire counsel to analyze the relative merits of competing suppliers' patent infringement allegations, the law should make it easier to litigate whether misleading or false statements were made in the marketplace. While the bad faith standard clearly applies in that context under Zenith Electronics, this distinction

between a potential customer and an alleged infringer merits restricting the additional hurdle commanded by the objectively baseless standard to pre-litigation communications directed at the alleged infringer.

In sum, I conclude that[HN18] *Zenith Electronics* requires that any state or federal unfair competition claims based on marketplace statements made by plaintiff, be preempted (state claims) or precluded (federal claim) unless defendant alleges that such statements were made in bad faith. *Globetrotter's* objectively baseless standard does not apply to marketplace conduct and for the reasons articulated above, the objectively baseless standard [*40] should not be extended beyond pre-litigation communications to an alleged infringer and so, does not apply to the marketplace statements alleged here. Accordingly, because defendant alleges that plaintiff acted in bad faith and thus, its pleading meets the Zenith Electronics standard, I recommend that plaintiff's motion to dismiss the unfair competition claims, to the extent they are based on marketplace statements to potential customers, be denied. I further note that as a result of my conclusion, I need not address defendant's argument that the objectively baseless standard applies only at the summary judgment stage, not the pleading stage. While my decision would likely resolve this issue against defendant, I do not analyze it here.

### B. California Statutory Claim

Plaintiff contends that even if the unfair competitions claims are not preempted or precluded, the California statutory claim should be dismissed because California law does not apply to plaintiff's Oregon conduct. I agree with plaintiff.

[HN19] A district court sitting in diversity generally must apply the choice of law rules for the state in which it sits. *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 661 (9th Cir. 1999); [*41] *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) (in diversity case, when deciding conflict of law questions based on state law claims the district court applies the conflict of law principles of the forum state).

[HN20] Oregon courts first look to whether there is a material difference between Oregon substantive law and the law of the other forum. *Angelini v. Delaney*, 156 Or. App. 293, 299, 966 P.2d 223, 227 (1998). If there is no material difference between the substantive law of Oregon and the law of other forum, there is a "false conflict" for purposes of the choice of law. Id. In such cases, Oregon law applies. *Sy v. United Parcel Serv. Gen. Servs. Co.*, 1998 U.S. Dist. LEXIS 3453, No. CV-94-1464-FR, 1998 WL 126870, at *6 (D. Or. Mar. 17, 1998).

If a true conflict exists, Oregon proceeds with a conflicts of law analysis guided by the Restatement of Conflicts. See *Portland Trailer & Equip., Inc. v. A-1 Freeman Moving & Storage, Inc., 182 Ore. App. 347, 358, 49 P.3d 803, 809 (2002)* (Oregon has adopted the choice of law rules of *Restatement (Second) of Conflicts § 6* and the "most significant relationship" test for tort choice of law set forth [*42] in *Restatement § 145* for tort claims); *Manz v. Continental American Life Ins. Co., 117 Or. App. 78, 82, 843 P.2d 480, 482 (1992)* (Oregon courts look to *section 188 of the Restatement of Conflicts* for guidance in resolving choice-of-law issues in contractual disputes).

Plaintiff first analyzes the choice of law issue in regard to the statutory unfair competition claim to the extent it is based on the filing of patent infringement actions. Because I recommend that this portion of defendant's unfair competition claims be dismissed, I need not address this argument.

Next, plaintiff offers a choice of law analysis for the statutory unfair competition claim to the extent it is based on plaintiff's marketplace statements. The parties appear to agree that a true conflict exists because Oregon does not have a similar statute or common law cause of action. *Sy, 1998 U.S. Dist. LEXIS 3453, 1998 WL 126870, at *6* (conflict of laws found where Oregon did not have a similar statute and parties could not cite an Oregon case establishing similar law).

Defendant states that while *Oregon Revised Statute § (O.R.S.) 646.608* appears similar to *California Business & Professions Code Section 17200*, [*43] *O.R.S. 646.608* apparently does not provide a cause of action for a competitor. *Embark.com, 230 F. Supp. 2d at 1174* (Oregon's trade practices statute provides a cause of action only for consumers). And, defendant represents there does not appear to be common law cause of action based on similar legal principles. Thus, because there is no applicable Oregon statute or Oregon common law cause of action similar to the claim defendant asserts under *section 17200*, there is an actual conflict of law.

Plaintiff contends that to the extent defendant's claim is based on alleged marketplace misrepresentations, *section 145 of the Restatement (Second) of Conflicts*, which addresses tort claims, applies. [HN21] *Section 145* states:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence

and the parties under the principles stated in § 6.

> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

>> (a) the place where the injury occurred,

>> (b) [*44] the place where the conduct causing the injury occurred,

>> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

>> (d) the place where the relationship, if any, between the parties is centered.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Restatement (Second) of Conflicts § 145.*

[HN22] *Section 6 of the Restatement* provides:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

>> (a) the needs of the interstate and international systems,

>> (b) the relevant policies of the forum,

>> (c) the relevant policies of other interested states and the relative interests of those states in the determi-

nation of the particular is-
sue,

(d) the protection of justi-
fied expectations,

(e) the basic policies un-
derlying the particular field
of law,

(f) certainty, predictability
and uniformity of result,
and

(g) ease in the determina-
tion and application [*45]
of the law to be applied.

*Restatement (Second) of Conflicts § 6.*

Defendant contends that the relevant conflicts analy-
sis begins with *section 301*, not *section 145. Section 301*,
a provision applicable to corporate entities, states that
"the rights and liabilities of a corporation with respect to
a third person that arise from a corporate act of a sort that
can likewise be done by an individual are determined by
the same choice-of-law principles as are applicable to
non-corporate parties." *Restatement (Second) of Conflicts
section 301.*

The commentary indicates that when *section 301*
applies, the applicable conflicts rule depends on the type
of conduct at issue:

[HN23] A corporation's rights and duties
under a contract are determined by the
law selected by application of the rules of
*§ § 187-188.* If an agent of a corporation,
while acting in the course of his employ-
ment, commits a tort, the law selected by
application of the rules of *§ § 145 and
174* determines whether the corporation is
liable for the tort and the extent to which
it is liable in damages. Likewise, the va-
lidity of a transfer by a corporation, or to
a corporation, of an interest in land or in a
chattel is determined [*46] by the law se-
lected by application of the rules of *§ §
223 and 244.*

*Id., comment b.* Although defendant cites a Fifth Circuit
case which applied the factors in *section 6* of the Re-
statement without considering the factors in *section 145,*

it appears that the court in that case failed to take note of
the commentary. *Askanase v. Fatjo, 130 F.3d 657, 670-
71 (5th Cir. 1997)* (under *section 301*, when corporation
acts in a way that an individual can, the chose of law
principles in section that apply to non-corporate parties
in *section 6*, apply to the corporation). When the com-
mentary is considered, *section 301* directs the court to
*section 145* for tort claims, the appropriate analog in this
case for defendant's statutory unfair competition claim.
*Section 145*, which ultimately directs the court to con-
sider the principles stated in *section 6*, provides its own
factors to consider in addition to those articulated in *sec-
tion 6.* Thus, the analysis begins with *section 145.*

Plaintiff concedes that the place of injury is Califor-
nia because defendant is located there. But, plaintiff
notes, the comments to *section 145* suggest that the place
of alleged conduct, not the place [*47] of injury, carries
more weight in false advertising and unfair competition
claims. *Comment f* states:

The relative importance of the contacts
mentioned above varies somewhat with
the nature of the tort involved. Thus, the
place of injury is of particular importance
in the case of personal injuries and of in-
juries to tangible things (see § § 146-
147). The same is true in the case of false
imprisonment and of malicious prosecu-
tion and abuse of process (see § 155). On
the other hand, [HN24] the place of injury
is less significant in the case of fraudulent
misrepresentations (see § 148) and of
such unfair competition as consists of
false advertising and the misappropriation
of trade values. The injury suffered
through false advertising is the loss of
customers or of trade. Such customers or
trade will frequently be lost in two or
more states. The effect of the loss, which
is pecuniary in its nature, will normally be
felt most severely at the plaintiff's head-
quarters or principal place of business.
But this place may have only a slight rela-
tionship to the defendant's activities and
to the plaintiff's loss of customers or
trade. The situation is essentially the same
when misappropriation [*48] of the
plaintiff's trade values is involved, except
that the plaintiff may have suffered no pe-
cuniary loss but the defendant rather may
have obtained an unfair profit. For all
these reasons, [HN25] the place of injury
does not play so important a role for
choice-of-law purposes in the case of

false advertising and the misappropriation of trade values as in the case of other kinds of torts. Instead, the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from false advertising and the misappropriation of trade values.

*Restatement (Second) of Conflicts § 145, comment f.*

I agree with plaintiff that while the place of injury is in California, the commentary indicates that Oregon, the place where the offending conduct was generated, is more relevant in this unfair competition claim. The third factor in *section 145*, the place of business and incorporation of the parties, favors neither California nor Oregon law because plaintiff's principal place of business is in Oregon, defendant's is in California, and both are incorporated in Delaware. [*49]

Finally, *section 145*'s fourth factor looks to the place where the relationship between the parties is centered. Plaintiff contends that Oregon is favored because plaintiff's relationship with defendant is centered around this lawsuit in Oregon. The better argument is that there is no particular place that the relationship is centered because other than being opposing litigants in a case, these two entities compete in a national or even international market. Overall, I agree with plaintiff that under the four factors in *section 145*, Oregon law would apply to the conduct forming the basis of defendant's statutory unfair competition claim to the extent it is based on plaintiff's marketplace communications.

Under the factors of *section 6*, I agree with plaintiff that nothing about the needs of the interstate and international systems favor applying California or Oregon law. I agree with defendant that under the next factor, the relevant policy of the forum is one of consumer protection. *Embark.com, 230 F. Supp. 2d at 1174*. The relevant policy of California, the other interested state, is also one of consumer protection. Defendant contends that when examining the relative [*50] interests of the two states in the determination of the issue at hand, California law should apply because it best achieves the policy of protecting consumers by allowing competitors, as well as consumers, to bring this type of claim.

I disagree. Oregon has a greater interest than California because the alleged marketplace statements were made in Oregon and directed to Oklahoma. While some California residents could be affected by these statements if I accept defendant's theory that plaintiff is attempting to establish a monopoly in the field of on-line admissions

applications by its bad faith conduct and then will unilaterally raise prices for consumers, at this point any interest California may have in protecting its consumers from communications generated in Oregon and directed at Oklahoma, is remote at best.

Under the factor of justified expectations, defendant argues that applying California law does not interfere with the reasonable expectations of the parties. Defendant argues that because plaintiff does business in California with California residents, it can reasonably expect to be haled into a California court and be subject to California's unfair competition law. Defendant [*51] further argues that allowing it to proceed with its *section 17200* counterclaim protects its expectations of being able to prevent unfair competition against itself in California.

I conclude that defendant's expectation of bringing a California statutory claim against plaintiff in Oregon for a statement made in Oregon and not expressly directed at California residents, is not justified. Additionally, while plaintiff may have an expectation that it could be haled into a California court and sued there, California law may not necessarily apply to the particular act at issue. Plaintiff's justified expectations are that it may assert its patents in Oregon courts and may make statements from Oregon without being subject to a California statutory claim that has no Oregon counterpart.

Finally, applying Oregon law to Oregon conduct advances certainty, predictability, and uniformity to those who bring suits in Oregon or otherwise engage in conduct within Oregon and the application of Oregon law is easier for this Court given its familiarity with Oregon law compared with California law. While defendant suggests that application of Oregon law will encourage forum shopping, I reject this argument. [*52] Defendant contends that if it had brought this claim against plaintiff in a California state court, plaintiff would have sought to dismiss it or transfer to Oregon, arguing that it is a compulsory counterclaim to the pending Oregon patent action. Thus, to prevent plaintiff from shopping for a forum more favorable for the adjudication of its commercial conduct, California law should apply.

Defendant's argument is premised on an assumption that the California claim would be considered a compulsory counterclaim, an assumption that may or may not be valid. Additionally, there is no reason to conclude that plaintiff filed its patent infringement claims in Oregon in an effort to forum shop for a putative unfair competition counterclaim against plaintiff. This action was filed in Oregon because plaintiff is located in Oregon. Defendant's argument is unpersuasive.

On balance, an analysis of the factors of *section 145* and *section 6* lead me to conclude that Oregon law should apply to plaintiff's conduct challenged in defen-

2004 U.S. Dist. LEXIS 21059, *

dant's unfair competition claims and thus, I recommend that plaintiff's motion to dismiss the *section 17200* California statutory claim, be granted.

CONCLUSION

I recommend [*53] that defendant's motion to dismiss (# 52) be granted. I recommend that plaintiff's motion to dismiss (# 64) be granted as to all the unfair competition claims to the extent those claims are premised on the filing of patent litigation. I further recommend that plaintiff's motion be granted as to the California statutory claim under *section 17200*. Finally, I recommend that plaintiff's motion be denied as to the remaining unfair competition claims to the extent they are based on marketplace communications to customers.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due October 27, 2004. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due November 10, 2004, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this 12th day of October, 2004.

Dennis James Hubel

United States Magistrate Judge

1 of 1 DOCUMENT

DIMENSIONAL COMMUNICATIONS, INC. v. OZ OPTICS, LTD., Appellant

No. 04-1817

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*2005 U.S. App. LEXIS 17111*

May 10, 2005, Submitted Under Third Circuit LAR 34.1(a)
August 12, 2005, Opinion Filed

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 01-cv-4893). District Judge: Honorable William G. Bassler.

*Dimensional Communs., Inc. v. OZ Optics Ltd., 218 F. Supp. 2d 653, 2002 U.S. Dist. LEXIS 20702 (D.N.J., 2002)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellee New Jersey corporation filed an action against appellant Canadian corporation, based on diversity of citizenship, asserting claims for breach of contract, book account, and quantum meruit. The United States District Court for the District of New Jersey entered judgment confirming a jury's verdict awarding the New Jersey corporation $ 492,766 in damages, and the Canadian corporation appealed.

**OVERVIEW:** The New Jersey corporation claimed that it designed and constructed a trade-show booth for the Canadian corporation, that it transported the booth to four trade-shows and performed maintenance and setup activities at each show, and that the Canadian corporation breached the parties' contract when it refused to pay maintenance and setup costs the New Jersey corporation billed. The New Jersey corporation kept the booth and electronic equipment that belonged to the Canadian corporation and sued the Canadian corporation for damages. The court of appeals held that (1) the district court did not commit error when it upheld a magistrate judge's decision denying a motion the Canadian corporation filed five months after the deadline the magistrate set for amending the pleadings, that sought leave to assert a counterclaim for conversion; (2) evidence presented at trial supported the jury's verdict that the parties had a contract which the Canadian corporation breached, and the district court did not err when it denied the Canadian corporation's motion for judgment as a matter of law; and (3) the district court did not err when it denied the Canadian corporation's motion for a new trial.

**OUTCOME:** The district court's judgment was affirmed.

**CORE TERMS:** matter of law, booth, new trial, motion to amend, jury verdict, good cause, ancillary, counterclaim, trade-show, deadline, self-help, handling, abuse of discretion, breach of contract, post-trial, dilatory, motive, amend, recoupment, electronic, undue delay, permissibility, prejudicial, evidenced, objected, seizure, undue, principal place of business, jury instruction, equipment used

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

2005 U.S. App. LEXIS 17111, *

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN1] An appellate court reviews a district court's denial of leave to amend a pleading for abuse of discretion. An abuse of discretion occurs when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Civil Procedure > Trials > Judgment as Matter of Law*
[HN2] An appellate court exercises plenary review over a district court's denial of a motion, pursuant to *Fed. R. Civ. P. 50(b)*, for judgment as a matter of law.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Relief From Judgment > Motions for New Trial*
[HN3] An appellate court reviews a district court's denial of a new trial motion for abuse of discretion.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN4] Where a party seeks to amend a pleading after a responsive pleading has been served, it may do so only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. *Fed. R. Civ. P. 15(a)*. Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility. In addition, a court's schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge. *Fed. R. Civ. P. 16(b)*.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence*
*Civil Procedure > Trials > Judgment as Matter of Law*
[HN5] A denial of a posttrial motion for judgment as a matter of law shall be affirmed where there is sufficient evidence to support the verdict, drawing all reasonable inferences in favor of the verdict winner.

*Civil Procedure > Appeals > Reviewability > Preservation for Review*
*Civil Procedure > Jury Trials > Jury Instructions*
*Evidence > Procedural Considerations > Objections & Offers of Proof*
[HN6] An appellate court will not consider trial errors involving alleged deficiencies in jury instructions to which no objection was made.

*Civil Procedure > Appeals > Reviewability > Preservation for Review*
*Civil Procedure > Trials > Judicial Discretion*
*Civil Procedure > Trials > Special Verdicts & Interrogatories*
[HN7] It is well established that a federal district court may exercise broad discretion in determining whether to use a general verdict or the procedures described in *Fed. R. Civ. P. 49*. Further, when a party does not object to a jury verdict form which a district court uses, its failure to do so bars it from raising that objection before an appellate court.

**COUNSEL:** For DIMENSIONAL COMM INC, Appellee: Timothy J. O'Neill, Windels, Marx, Lane & Mittendorf, Princeton, NJ.

For OZ OPTICS LTD, Appellant: Peter A. Ouda, Somerville, NJ.

**JUDGES:** Before: SLOVITER and FISHER, Circuit Judges and POLLAK, * District Judge.

* Honorable Louis H. Pollak, Senior District Judge for the United States District Court of the Eastern District of Pennsylvania, sitting by designation.

**OPINIONBY:** Louis H. Pollak

**OPINION:**

OPINION OF THE COURT

2005 U.S. App. LEXIS 17111, *

POLLAK, District Judge.

This diversity case arises out of a contract dispute between Dimensional Communications, Inc., ("DCI"), and Oz Optics, Ltd. ("Oz"). n1 Oz, a manufacturer of optical fiber communications equipment, had a jury verdict entered against it on a breach of contract claim brought by DCI, a corporation that designs, manufactures, and installs trade-show booths. Oz appeals from the District [*2] Court's orders (1) denying Oz's motion for leave to file a counterclaim, and (2) denying Oz's post-trial motion for judgment as a matter of law or, in the alternative, for a new trial. The District Court exercised jurisdiction over this suit under *28 U.S.C. § 1332(a)(2)*, n2 and this court has appellate jurisdiction under *28 U.S.C. § 1291*. For the reasons which follow, we will affirm.

> n1 Oz has been alternately referred to as "Oz" or "OZ" in the parties' submissions and in the District Court docket. For the sake of uniformity, we will use only "Oz" here.

> n2 Oz is a Canadian corporation with its principal place of business in Ontario; DCI is a New Jersey corporation with its principal place of business in Northvale, New Jersey.

I.

Inasmuch as we write chiefly for the parties it is not necessary to recite the facts of this case in detail. Oz and DCI had entered into a contract according to which DCI was to design and construct a trade-show booth for Oz. [*3] After the booth was completed, DCI coordinated the transportation of the booth to four trade-shows, and performed maintenance and set-up activities at each show. DCI billed Oz separately for the maintenance and set-up costs, and Oz refused to pay for any of these ancillary charges on the ground that it had not authorized them. While Oz had most of the electronic equipment used in its booth shipped back to its New Jersey facility, DCI retained the booth itself and some of the electronic equipment pending Oz's payment of the outstanding invoices. On October 22, 2001, DCI filed its complaint in the United States District Court for the District of New Jersey, asserting claims for breach of contract, book account, and quantum meruit. Oz's answer asserted the affirmative defense of setoff/recoupment, but it contained no counterclaims.

On November 12, 2002, Magistrate Judge Madeline Cox Arleo entered a Pretrial Scheduling Order that, *inter alia*, set December 31, 2002, as the deadline for filing motions to amend the pleadings. On May 16, 2003, Oz filed a motion to amend its answer to assert a counterclaim for conversion for the seizure of the trade-show booth and other property. After [*4] briefing and argument, Magistrate Judge Arleo denied Oz's motion, finding, pursuant to *Fed. R. Civ. Proc. 16(b)*, that Oz had not shown good cause for its failure to comply with the Pretrial Scheduling Order. Magistrate Judge Arleo further found that Oz's actions constituted undue delay and evidenced dilatory motive, such that Oz could not meet the liberal amendment provisions of *Fed. R. Civ. Proc. 15(a)*. Oz appealed Magistrate Judge Arleo's denial of its motion to amend, and the District Court affirmed the denial. This affirmance is the first subject of this appeal.

The case was tried before a jury in December, 2003. The jury rendered a verdict in favor of DCI in the amount of $ 492,766.01. The jury also found that Oz was not entitled to any recoupment or setoff. On January 13, 2004, Oz filed a motion for judgment as a matter of law or, in the alternative, a new trial. The District Court denied that motion, finding that Oz was entitled neither to judgment as a matter of law nor to a new trial. The District Court's denial of this post-trial motion gives rise to Oz's second and third grounds of appeal.

II. [*5]

[HN1] We review a district court's denial of leave to amend a pleading for abuse of discretion. *See Arab African Int'l Bank v. Epstein, 10 F.3d 168, 174 (3d Cir. 1993)*. "An abuse of discretion occurs when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Montgomery County v. Microvote Corp., 320 F.3d 440, 445 (3d Cir. 2003)* (citation and quotation marks omitted).

[HN2] We exercise plenary review over a district court's denial of a *Rule 50(b)* motion for judgment as a matter of law. *See, e.g., Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 200 (3d Cir. 1996)*.

2005 U.S. App. LEXIS 17111, *

[HN3] We review a district court's denial of a new trial motion for abuse of discretion. *Honeywell, Inc. v. American Standards Testing Bureau, Inc., 851 F.2d 652, 655 (3d Cir. 1988).*

III.

A. Motion to Amend

[HN4] Where, as here, a party seeks to amend a pleading after a responsive pleading has been served, it may do so "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Fed. R. Civ. Proc. 15(a)* [*6] . "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).* In addition, a court's "schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." *Fed. R. Civ. Proc. 16(b).*

Magistrate Judge Arleo found that Oz could not satisfy *Rule 16(b)*'s good cause requirement because Oz was in possession of the facts underlying its proposed counterclaim well before the amendment deadline. The Magistrate Judge found further that *Rule 15(a)*'s liberal amendment provision did not extend to Oz because Oz's delay was undue and prejudicial, and because it evidenced a dilatory motive. The District Court agreed with the Magistrate Judge's findings, and concluded that the Magistrate Judge's denial of Oz's motion to amend did not constitute clear error.

Oz now argues that the Third Circuit has not adopted a "good cause" requirement in determining the propriety of a motion to amend a pleading after [*7] the deadline has elapsed, and that the District Court thus abused its discretion in denying the motion to amend. We disagree. In *Eastern Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 340 (3d Cir. 2000)* -- a case with a similar procedural history -- this court approved the district court's determination that a failure to satisfy *Rule 16(b)*'s "good cause" requirement was sufficient to deny a motion to amend filed six months after the deadline for amendments to pleadings. Further, we find no error in the Magistrate Judge's finding, which the District Court approved, that Oz could not satisfy even the liberal amendment provisions of *Rule 15(a)* because Oz's delay was undue and its requested amendment would be prejudicial to DCI. In short, there is no ground for disturbing the District Court's order.

B. Motion for Judgment As a Matter of Law

[HN5] A denial of a post-trial motion for judgment as a matter of law shall be affirmed where "there is sufficient evidence to support the verdict, drawing all reasonable inferences in favor of the verdict winner." *Blum v. Witco Chemical Corp., 829 F.2d 367, 372 (3d Cir. 1987).*

Oz contests two elements of the verdict [*8] on the ground that there was, Oz contends, no rational basis for them. First, Oz asserts that the jury erred in finding that Oz had authorized ancillary charges, which included markups for subcontractor work, and freight, handling, refurbishing and storage charges. n3 Yet the jury could reasonably have inferred that Oz had authorized the ancillary charges. For example, the jury heard testimony that a sub-contractor of DCI had overheard Oz's president approve the markups; that a DCI employee had explained to Oz's president that there would be handling charges; and that Oz's president had been quoted a per-show estimate of refurbishment costs. Further, as the District Court found, there was evidence of an oral agreement for storage charges. This testimony formed a legitimate basis for the jury's finding that Oz had authorized the charges. Thus, Oz's first claim of error is baseless.

---

n3 As a subsidiary element of its claim that the jury erred in finding that Oz had approved the ancillary charges, Oz argues that the jury erred further in adopting DCI's calculation of the handling charges inasmuch as DCI, so Oz contends, relied upon a "mysterious," "undisclosed mathematical equation" to arrive at this calculation. As the District Court found, however, DCI presented testimony describing how it arrived at the handling charges. The jury thus had a reasonable basis upon which to conclude that Oz did in fact owe DCI money in the asserted amount.

---

[*9]

Second, Oz contends that the jury erred in failing to reduce its verdict by the monies that Oz lost as a result of DCI's seizure of Oz's booth and some of the electronic equipment used in that booth. Yet having found that Oz had authorized the ancillary charges and hence was unjustified in refusing to pay for them, and having heard testimony from

2005 U.S. App. LEXIS 17111, *

DCI stating that it would have returned the retained property upon receipt of payment from Oz, the jury could have reasonably concluded that Oz was not entitled to a set-off. Accordingly, Oz's claim that the jury erred in rejecting its recoupment/set-off defense is also baseless.

In sum, because sufficient evidence supported the jury's verdict, the District Court did not err in denying Oz's motion for judgment as a matter of law.

C. Motion for a New Trial

Oz argues that three grounds supported its motion for a new trial. First, Oz contends that, even though neither party requested a jury instruction on whether DCI was entitled to use self-help, the District Court should have issued *sua sponte* an instruction disapproving the use of self-help. Second, the District Court should have provided a jury verdict sheet that itemized the [*10] charges Oz would be found to have owed DCI since, without such itemization and in light of the jury's verdict that Oz owed less than DCI claimed it did, the parties cannot determine which charges the jury in fact found that Oz was obligated to pay. Finally, Oz charges that the District Court should have found, as a matter of law, that DCI breached the contract with Oz, and instructed the jury accordingly.

Oz's charge that the District Court erred in failing to instruct on the permissibility of the use of self-help is unavailing. [HN6] "An appellate court will not consider trial errors [involving alleged deficiencies in jury instructions] to which no objection was made." *Hoffman v. Sterling Drug, Inc., 485 F.2d 132, 138 (3d Cir. 1973)*. Before the District Court, Oz neither requested a jury instruction on the permissibility of self-help nor objected to the omission of such an instruction. We will not entertain Oz's objection to the jury instructions now.

Oz's claim that the judge ought to have furnished the jury with an itemized jury verdict form is no more meritorious. [HN7] "It is well established that the trial court may exercise broad discretion in determining whether to [*11] use a general verdict or the procedures described in *Rule 49 of the Federal Rules of Civil Procedure*." *Kazan v. Wolinski, 721 F.2d 911, 915 (3d Cir. 1983)*. Further, there is no evidence in the record that Oz objected below to the jury verdict form, and its failure to do so before the District Court bars it from raising that objection before this court. Accordingly, we decline to find that the District Court erred in constructing the jury verdict form as it did.

For similar reasons, we find no merit in Oz's claim that the District Court should have found, as a matter of law, that DCI breached the contract with Oz, and instructed the jury accordingly. The District Court judge properly determined that the parties had adduced evidence sufficient to create an issue of fact on this matter. Further, Oz did not at trial raise any objections to the judge's asserted failure to instruct the jury on the alleged breach of contract, and so we will not consider these objections now.

In sum, we find that the District Court did not abuse its discretion in denying Oz's motion for a new trial.

IV.

For the foregoing reasons, we do not find [*12] merit in any of Oz's claims of error. Accordingly, the challenged orders of the District Court will be affirmed.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HONEYWELL INTERNATIONAL INC., and          )
HONEYWELL INTELLECTUAL PROPERTIES          )
INC.,                                       )
                                            )
                    Plaintiffs,             )          Civil Action No. 04-1337-KAJ
                                            )             (Consolidated)
            v.                              )
                                            )
AUDIOVOX COMMUNICATIONS CORP.,              )
AUDIOVOX ELECTRONICS CORPORATION,          )
NIKON CORPORATION, NIKON, INC., NOKIA       )
CORPORATION; NOKIA INC., SANYO              )
ELECTRIC CO., LTD., and SANYO NORTH         )
AMERICA CORPORATION,                        )
                                            )
                    Defendants.             )
                                            )
SEIKO EPSON CORPORATION,                    )
                                            )
                    Intervenor.             )
_____      )
                                            )
HONEYWELL INTERNATIONAL INC., and          )
HONEYWELL INTELLECTUAL PROPERTIES          )
INC.,                                       )
                                            )
                    Plaintiffs,             )
                                            )          Civil Action No. 04-1338-KAJ
            v.                              )
                                            )
APPLE COMPUTER, INC.; ARGUS A/K/A           )
HARTFORD COMPUTER GROUP, INC.;              )
CASIO COMPUTER CO., LTD.; CASIO, INC.;      )
CONCORD CAMERAS; DELL INC.; EASTMAN         )
KODAK COMPANY; FUJI PHOTO FILM CO.,         )
LTD.; FUJI PHOTO FILM U.S.A., INC.;         )
FUJITSU LIMITED; FUJITSU AMERICA, INC.;     )
FUJITSU COMPUTER PRODUCTS OF                )
AMERICA, INC.; KYOCERA WIRELESS             )
CORP.; MATSUSHITA ELECTRICAL                )
INDUSTRIAL CO.; MATSUSHITA                  )
ELECTRICAL CORPORATION OF AMERICA;          )
NAVMAN NZ LIMITED; NAVMAN U.S.A. INC.;      )
OLYMPUS CORPORATION; OLYMPUS                )

AMERICA, INC.; PENTAX CORPORATION;        )
PENTAX U.S.A., INC.; SONY CORPORATION;    )
SONY CORPORATION OF AMERICA; SONY         )
ERICSSON MOBILE COMMUNICATIONS AB;        )
SONY ERICSSON MOBILE                      )
COMMUNICATIONS (USA) INC.; TOSHIBA        )
CORPORATION; and TOSHIBA AMERICA,         )
INC.,                                     )
                                          )
              Defendants.                   )
                                          )
SEIKO EPSON CORPORATION,                  )
                                          )
              Intervenor.                   )
                                          )
_____   )

OPTREX AMERICA, INC.,                     )
                                          )
              Plaintiff,                    )
                                          )
        v.                                )        Civil Action No. 04-1536-KAJ
                                          )
HONEYWELL INTERNATIONAL INC., and         )
HONEYWELL INTELLECTUAL PROPERTIES         )
INC.,                                     )
                                          )
              Defendants.                   )

## MEMORANDUM ORDER

In these consolidated cases, Honeywell International, Inc. and Honeywell

Intellectual Properties, Inc. (collectively "Honeywell") have sued 35 defendants, C.A.

Nos. 04-1338-KAJ and 04-1337-KAJ, and have been sued in turn, C.A. No. 04-1536-

KAJ. Several third-party defendants have also been brought into the fray. In all of the

cases, the underlying issue is whether Liquid Crystal Display ("LCD") modules

incorporated into consumer electronics products infringe Honeywell's U.S. Patent No.

5,280,371 (the "'371 patent" or "patent-in-suit"). The extraordinary number of

defendants includes many who are retailers of products that incorporate LCD modules, or are consumer device manufacturers that only acquire LCD modules from other manufacturers, rather than being manufacturers of the modules themselves.[1] Given that number and variety of defendants, I have attempted for several months to bring the parties to a consensus position on how best to organize the cases so that the litigation can proceed on an efficient and appropriate basis, with suit proceeding against the Manufacturers in the first instance. (See D.I. 119 in C.A. 04-1337-KAJ.)

Among other things, on May 18, 2005, I issued a Memorandum Order stating that "large-scale litigation like this requires the business and strategic legal interests of the plaintiff to cede some ground to case management imperatives." (Id. at 7.) I ruled that dealing first with the Manufacturers "is the fairest and most efficient way to proceed." (Id. at 8.) To that end, I stayed the cases against the Non-manufacturer Defendants, with the exception of permitting Honeywell to take some limited discovery to determine the identity of Manufacturers whom it may wish to sue as infringers. I ordered the parties "to confer and provide me with proposed language respecting permissible discovery activities directed at the non-manufacturer defendants during the stay." Unfortunately, despite two in-person conferences with counsel, which involved literally dozens of attorneys, and despite the direction given in the Memorandum Order

---

[1]For ease of reference, I will refer herein to the manufacturers of LCD modules as the "Manufacturers," and to the retailers and the consumer device manufacturers as the "Non-manufacturer Defendants". These definitions do not pertain to third-party defendants. For case organization and scheduling purposes, those defendants who are both consumer device manufacturers and manufacturers of LCD modules shall be treated as Non-manufacturer Defendants only to the extent that they do not manufacture LCD modules in certain of their products; otherwise they shall be treated as Manufacturers, unless otherwise ordered.

in May, these cases are still not progressing. It is apparent that I have not been

sufficiently clear in previous statements to guide the parties toward a mutually

acceptable resolution of the allowable discovery against the Non-manufacturer

Defendants. I now have a request from Honeywell seeking yet another in-person

conference of the parties and the court. (D.I. 139.) Because I do not believe further

discussion will be productive and will only increase the substantial costs associated with

these cases, I will not again convene the platoons of attorneys involved. Instead, I am

providing the following direction[2] and schedule for discovery against the Non-

manufacturer Defendants.

IT IS HEREBY ORDERED that:

---

[2]The directions given here are consistent with what I have previously told the parties. During the last conference with the counsel, I stated:

I said in the order that I put out last May that Honeywell was required to specifically identify accused products. And that's what I meant. Not that Honeywell was entitled to say, you know, we think all your cellular phones infringe so we want you to tell us everything about all your cellular phones. What I mean is if you've got a basis for believing that a manufacturer's cellular phones are infringing, and I mean you can say we've done this tear-down on these specific products and these things appear to us to infringe, well, then you are absolutely entitled to conduct additional discovery with respect to those products, that is, were earlier generations than the one you tore down. Also, have they come out with subsequent generations of that same model which could also be infringing?

But what you are not entitled to do is to say you manufacture 15 different kinds of cell phones. We tore down three. Tell us about your other 12. Because I agree with the defendants that now what you are doing is you are telling manufacturers, you know what? You got one or two things that are bad. We want to you do an analysis of everything you make and tell us whether you are guilty on those fronts, too; and that is not what the law requires, and it's not what I'm going to require them to do.

If you want to go out, you want to buy them, you want to do the tear-downs, you want to get information that prompts you to be able to say "now I know that this specific model also infringes," then you can certainly do that. And then you would be in an area where you could be requiring additional discovery from them. But to ask them to come forward in the first instance, which is what it really comes down to, is not right. (Transcript of September 9, 2005 Conference, at pp. 27-29.)

4

1. Within 21 days, each Non-manufacturer Defendant shall provide to Honeywell the identity of the Manufacturers of LCDs incorporated into that Defendant's products and product lines which have been identified by Honeywell with specificity (e.g., by make and model number). To the extent Honeywell identifies the products in which the so-called "unknown" modules are incorporated, as referred to in Honeywell's May 27, 2005 letter proposal to defense counsel (see D.I. 135 at p. 3, ¶ 2; D.I. 138 at p. 1, ¶ 1), the Non-manufacturer Defendants shall also identify the Manufacturers of those modules. The information to be provided to Honeywell shall include the following: (a) an identification of the supplier and LCD module number for the products Honeywell has specifically identified as infringing the patent-in-suit; (b) an identification of other versions (i.e., earlier or later generations) of the specifically identified products that utilize the same LCD module as in the specifically identified products, or other versions of the same LCD module, if any; and (c) an identification of other versions of the identified products that include other LCD modules with substantially the same structure as the LCD module or modules contained in the specifically identified products, if any. To the extent a Non-manufacturer Defendant and Honeywell have already reached a mutually agreeable basis for the exchange of information about Manufacturers, this paragraph 1 shall not apply to that Non-manufacturer Defendant.

2. Within 30 days, Honeywell shall file an amended complaint, or a new complaint to be added to these consolidated cases, in which, consistent with the obligations imposed by the Federal Rules of Civil Procedure, Honeywell names as defendants any Manufacturers it wishes to accuse of infringing the patent-in-suit.

3. Except for the Non-manufacturer Defendants that have resolved their disagreements with Honeywell concerning information exchange, within 7 days after receipt of a service copy of an amended or new complaint as referenced above, each Non-manufacturer Defendant shall forward a copy of such amended or new complaint to the newly sued Manufacturers who supply LCD modules to that defendant. At the same time, such Non-manufacturer Defendants shall forward the contact information for Honeywell's attorneys of record in these consolidated cases and provide to the Manufacturers copies of this Memorandum Order and the May 18, 2005 Memorandum Order, emphasizing the public interest in having Honeywell's infringement claims tested first in litigation against the LCD module Manufacturers. The Non-manufacturer Defendants shall use reasonable, good-faith efforts to persuade the Manufacturers that supply them with allegedly infringing LCD modules to waive formal service of process and to accept service of the amended or new complaint directly from Honeywell's attorneys of record. Any Manufacturer that waives formal service and accepts such service shall have 90 days to answer, move, or otherwise plead, as provided in Federal Rule of Civil Procedure 12(a)(1)(B).

4. Upon compliance with sections 1 through 3 above, the suits against the Non-manufacturer Defendants shall be entirely stayed. The stay shall be without prejudice to Honeywell's seeking an order for further discovery from the Non-manufacturer Defendants, subject to any agreement Honeywell may have with any such defendant concerning discovery.

5. Upon appearance of all Manufacturers named in the amended or new complaints, or such earlier time as agreed upon by Honeywell, Optrex America, Inc.,

6

and Seiko Epson Corporation, those Manufacturers who have appeared as defendants in the consolidated cases, shall promptly meet with Honeywell, Optrex America, Inc., and Seiko Epson Corporation to discuss a schedule for remaining pretrial activities and shall report to the court with a joint proposed scheduling order to govern the remaining pretrial activities with respect to those parties.

6. In any event, a report on progress toward establishing a schedule for bringing to trial claims against Manufacturers shall be submitted no later than January 9, 2006.

UNITED STATES DISTRICT JUDGE

October 7, 2005
Wilmington, Delaware

7

LEXSEE 2000 US APP LEXIS 33926

**JEFFREY CHAIN, L.P., doing business as JEFFREY CHAIN CORPORATION, Plaintiff-Appellee, Cross-Appellant, v. TROPODYNE CORPORATION, Defendant-Appellant, Cross-Appellee.**

Nos. 99-6268, 99-6269

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*2000 U.S. App. LEXIS 33926*

December 20, 2000, Filed

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *2000 U.S. App. LEXIS 36168.* Certiorari Denied June 25, 2001, Reported at: *2001 U.S. LEXIS 4746.* Subsequent appeal at *Jeffrey Chain, L.P. v. Tropodyne Corp., 2004 U.S. App. LEXIS 6455* (6th Cir. Tenn., Mar. 31, 2004)

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Tennessee. 96-00546. T.G. Hull. 8-6-99. *Jeffrey Chain, L.P. v. Tennessee, Tropodyne Corp., 2000 U.S. App. LEXIS 34684* (6th Cir., May 23, 2000)
*Jeffrey Chain, L.P. v. Tropodyne Corp., 238 F.3d 421, 2000 U.S. App. LEXIS 36168* (6th Cir. Tenn., 2000)

**DISPOSITION:** Jury verdict against Tropodyne VACATED and judgment entered in favor of Tropodyne on Jeffrey Chain's claim for damages. District court's order denying Jeffrey Chain's motion to alter or amend judgment to add treble damages and attorney fees AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant appealed the judgment of the United States District Court for the Eastern District of Tennessee, entered upon a jury verdict, on the ground that the award of damages to plaintiff for trademark infringement was based on speculative evidence; plaintiff cross-appealed the order denying plaintiff awards of treble damages and attorney fees.

**OVERVIEW:** Plaintiff and defendant used the same trademark to identify chains and related products, and both parties were awarded damages after the court determined that plaintiff's trademark covered metallic chains and defendant's trademark covered plastic chains. Defendant asserted that plaintiff's damages were not supported by the evidence, and plaintiff argued that it was entitled to awards of treble damages and attorney fees. The appellate court held that plaintiff was not entitled to damages since plaintiff made no showing that defendant's infringement was the certain cause of any of plaintiff's alleged damage. There was no evidence that plaintiff's drop in sales was caused exclusively by defendant's conduct or that plaintiff lost a single project to defendant, and thus plaintiff's assertion that defendant caused plaintiff's economic losses was simply conjecture. In view of the finding that plaintiff was not entitled to damages, the denial of treble damages and attorney fees was proper.

**OUTCOME:** Judgment was vacated, and judgment was entered in favor of defendant, because plaintiff's failure to show any damage specifically caused by defendant's trademark infringement precluded any award of damages to plaintiff; the order denying plaintiff treble damages and attorney fees was thus affirmed.

**CORE TERMS:** chain, plastic, matter of law, trademark, treble damages, sewage, Lanham Act, bid, compensatory damages, infringing, metallic, consumer, trademark infringement, permanent injunction, unfair competition, punitive damages, jury verdict, licensed, causation, failed to prove, new trial, exceptional, favorable, vacated, movant, per curiam, entitled to judgment, license agreement, summary judgment, speculative

2000 U.S. App. LEXIS 33926, *

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN1] See *Fed. R. Civ. P. 50(b)*.

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN2] *Fed. R. Civ. P. 50(b)* is understood to mean that a party who fails to move for judgment as a matter of law at the close of all the evidence forfeits the opportunity to do so after judgment has been entered upon a verdict. It is also understood, however, that technical deviation from Rule 50(b)'s command is not fatal. In light of the liberal spirit imbuing the Federal Rules of Civil Procedure, technical non-compliance with Rule 50(b)'s requirements will not preclude consideration of a judgment as a matter of law motion so long as the purposes of the rule have been served. Those purposes are to provide the opposing party an opportunity to cure any defects in proof and to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant.

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN3] Judgment as a matter of law is proper where there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party on that issue, and where the claim cannot under the controlling law be maintained without a favorable finding on that issue. *Fed. R. Civ. P. 50(a)*.

*Civil Procedure > Appeals > Standards of Review*
[HN4] In a federal question case, the standard of review for a *Fed. R. Civ. P. 50* motion based on the sufficiency of the evidence is identical to the standard that governs the district court's review. The evidence should not be weighed. The credibility of the witnesses should not be questioned. The judgment of the court should not be substituted for that of the jury. Instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant.

*Trademark Law > Federal Unfair Competition Law > General Overview*
*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
[HN5] Damages in Lanham Act trademark infringement actions are governed by the law of damages of tort actions. Under general tort principles, the infringer-tortfeasor is liable for all injuries caused to plaintiff by the wrongful act, whether or not actually anticipated or contemplated by the defendant when it performed the acts of infringement.

*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
[HN6] In trademark cases courts draw a sharp distinction between proof of the fact of damage and proof of the amount of damage. To be entitled to damages the plaintiff must prove that some damages were the certain result of the wrong. Damages are precluded where the damage claimed is not the certain result of the wrong. The plaintiff is held to a lower standard of proof in ascertaining the exact amount of damages. Once the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
[HN7] The Tennessee Consumer Protection Act (Act) provides for the discretionary award of treble damages if the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of the Act. *Tenn. Code Ann. § 47-18-109(a)(3)*.

*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
[HN8] The Lanham Act provides that the court in exceptional cases may award reasonable attorney fees to the prevailing party. *15 U.S.C.S. § 1117*(a).

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
[HN9] The Tennessee Consumer Protection Act provides that in determining whether treble damages should be awarded, the trial court may consider, among other things: (A) the competence of the consumer or other person; (B) the nature of the deception or coercion practiced upon the consumer or other person; (C) the damage to the consumer or other person; and (D) the good faith of the person found to have violated the provisions of this part. *Tenn. Code Ann. § 47-18-109(4)*.

**COUNSEL:** For JEFFREY CHAIN, Plaintiff - Appellee, Cross-Appellant (99-6268, 99-6269): Stephen G. Anderson, Baker, Donelson, Bearman & Caldwell, Knoxville, TN.

For TROPODYNE CORPORATION, Defendant - Appellant, Cross-Appellee (99-6268, 99-6269): Joseph Diamante, Darren W. Saunders, Alison G. Naidech, Pennie & Edmonds, New York, NY.

For TROPODYNE CORPORATION, Defendant - Appellant, Cross-Appellee (99-6268, 99-6269): Tony R. Dalton, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN. [*2]

JUDGES: BEFORE: MERRITT, and GILMAN, Circuit Judges; BELL, District Judge. *

   * The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

OPINION:

   PER CURIAM. Defendant Tropodyne Corporation appeals the jury verdict and the partial summary judgments in this action for trademark infringement and unfair competition under the Lanham Act. Plaintiff Jeffrey Chain, L.P., cross-appeals the denial of attorney fees and treble damages. For the reasons that follow we reverse the damage award in favor of Jeffrey Chain and affirm the denial of attorney fees and treble damages.

I.

   Plaintiff-Appellee and Cross-Appellant Jeffrey Chain Corporation ("Jeffrey Chain") is a 300-employee corporation with a manufacturing plant in Morristown, Tennessee. Jeffrey Chain is in the business of manufacturing assorted mechanical parts, including chains, which are used in various industries, including wastewater treatment. Jeffrey Chain was formed in 1985 when Dresser Industries, Inc. ("Dresser") sold its Jeffrey Division to Jeffrey Chain. The spinoff was a sale of assets codified in an Asset Purchase Agreement. Pursuant to [*3] this agreement, Dresser granted Jeffrey Chain the right to use the name "Jeffrey Chain" as its corporate name. n1 Jeffrey Chain's use of the trademarks "Jeffrey" and "J" were the subject of a separate license agreement incorporated in the Asset Purchase Agreement. n2 Dresser expressly excluded plastic chain and chain parts from its grant of an exclusive license to Jeffrey Chain because Dresser wanted to continue manufacturing and selling its Jeffrey Thermoplastic Link Sludge Collector Component product line. In 1992 Dresser spun-off its plastic sewage chain division to Indresco, Inc. ("Indresco"). As part of the spinoff, Dresser assigned Indresco its interest in the "Jeffrey" and "J" trademarks.

   n1 Paragraph 14 of the Asset Purchase Agreement provides in pertinent part:

   Use of Jeffrey Name. Seller will license Buyer to use the name Jeffrey Chain in connection with the sale of chain products. Buyer shall not be entitled to use the name "Dresser" or any name implying that Buyer is associated with Dresser, or to use the name "Jeffrey" except when immediately followed by "Chain," as in Jeffrey Chain. . . . The use of the Jeffrey name and trademark is the subject of a license agreement . . . a copy of which is attached as Exhibit D hereto.

[*4]

   n2 The license agreement between Dresser and Jeffrey Chain provides, in pertinent part:

   A. LICENSOR grants to LICENSEE the right to use the mark "Jeffrey," but only when coupled with the word "Chain," in its corporate or business name.

   B. LICENSOR hereby grants to LICENSEE the sole, perpetual, and exclusive right and license to manufacture, use, and sell metallic and non-metallic chains and parts and components thereof, *other than plastic chains and chain parts and components to be used in the sewage industry*, throughout the world under the trademarks "Jeffrey" and/or "J" as hereinabove described (herein, the "LICENSED MARKS") subject, however, to the following:

      (i) LICENSEE may use the LICENSED MARKS only when the LICENSED MARKS are associated with the word "Chain". . . .

   C. LICENSOR also expressly reserves the sole and exclusive ownership of the trademarks "Jeffrey" and "J" and LICENSEE agrees not to use the same except as specifically provided herein.

2000 U.S. App. LEXIS 33926, *

(emphasis added).

In 1989, Jeffrey Chain hired Paul VanDeMark to develop its own line of plastic chain for sale to [*5] the sewage industry. In April 1993, Jeffrey Chain registered the trademark "Jeffrey Chain" for engineering class chain, which includes all types of metallic and plastic chain at issue in this case. Jeffrey Chain then began selling its own plastic chain under that trademark.

In January 1995, VanDeMark left Jeffrey Chain and joined Tropodyne Corporation, a new corporation with five employees. Tropodyne is involved in the business of selling waste water treatment systems. In October 1995, Tropodyne purchased the molds used to make the Jeffrey Thermoplastic Link Sludge Collector Components, plus inventory and a few pieces of equipment. Tropodyne also acquired Indresco's rights to use the "Jeffrey" and "J" trademarks in marketing plastic sewage chain. Thereafter, Tropodyne began using the "Jeffrey" name to sell both plastic and metallic chain used in sewage treatment plants.

In December 1996, Jeffrey Chain commenced this action alleging that Tropodyne's use of the "Jeffrey" name in connection with metallic chain, sprockets and chain products sold to the sewage treatment industry constitutes trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1114 [*6] and 1125(a), the Tennessee Consumer Protection Act ("TCPA"), and the common law. Tropodyne counterclaimed, alleging that Jeffrey Chain's use of the "Jeffrey" name in the sale of plastic sewage chain constitutes false designation of origin in violation of the Lanham Act. Tropodyne also alleged tortious interference with business relations and violation of the TCPA.

On July 13, 1998, the district court granted the parties' cross-motions for summary judgment on the liability issues. The district court found that Jeffrey Chain holds the exclusive license to sell metallic chain and chain products under the name "Jeffrey" and its registered trademark "Jeffrey Chain," and that to the extent Tropodyne sells metallic chain and chain products under the name Jeffrey, and/or mimics Jeffrey Chain's literature or product designs, it violates the Lanham Act and infringes Jeffrey Chain's mark. The district court further held that, while Jeffrey Chain is free to manufacture and sell plastic chain products for use in the sewage industry, it is not licensed to identify them by using the name "Jeffrey" or "Jeffrey Chain."

The district court held that Tropodyne has exclusive right to use the name "Jeffrey" [*7] in connection with plastic chain and related component parts for use in the sewage industry and, to the extent that Jeffrey Chain is using that mark to sell plastic products, it is liable for trademark infringement and unfair competition.

Jeffrey Chain continued to market plastic sewage chain with its registered trademark "Jeffrey Chain" embossed on the chain. Tropodyne moved for a permanent injunction on the basis that Jeffrey Chain violated the summary judgment order. In an order dated November 6, 1998, the district court found that Jeffrey Chain "knowingly and willfully" infringed on Tropodyne's rights to the "Jeffrey" trademark as determined in the court's summary judgment order. The court enjoined Jeffrey Chain from using the designation "Jeffrey," alone or in combination with other words, in connection with plastic chain and/or plastic components for use in the wastewater treatment industry or in connection with the advertising, distribution, or sale of any such products. Jeffrey Chain filed a notice of interlocutory appeal as to the permanent injunction.

A jury trial was conducted August 3-6, 1999, limited to the issue of damages. The jury returned a verdict in favor of Jeffrey [*8] Chain in the amount of $ 1,485,000 in compensatory damages and $ 423,750 in punitive damages. The jury returned a verdict in favor of Tropodyne on its counterclaim in the amount of $ 685,000 in compensatory damages. The district court declined to award either side additional, statutory damages under the Lanham Act. The court also denied Jeffrey Chain's requests for treble damages under Tennessee law and for attorney fees. Tropodyne appealed and Jeffrey Chain cross-appealed the jury's verdict.

On Jeffrey Chain's interlocutory appeal of the permanent injunction, this Court vacated the permanent injunction and jury verdict against Jeffrey Chain and remanded for proceedings consistent with the opinion. Jeffrey Chain v. Tropodyne Corp., 2000 U.S. App. LEXIS 34684, No. 98-6685, 2000 WL 712379 (6th Cir. May 23, 2000) (per curiam).

II.

Tropodyne contends the trial court's denial of its motion to exclude Jeffrey Chain's damage theory was erroneous because the damage theory was not only unsupported but directly contradicted by the evidentiary record.

As a preliminary matter, Jeffrey Chain contends that because Tropodyne did not renew the motion after the close of all the evidence, or after the [*9] verdict on punitive damages, and because Tropodyne did not file a motion for a new trial under FED. R. CIV. P. 59, Tropodyne failed to preserve the issue of the sufficiency of the evidence for appeal, and the issue should be reviewed only for plain error.

2000 U.S. App. LEXIS 33926, *

A week before the trial Tropodyne filed a written motion to exclude Jeffrey Chain's damage theory on the grounds that it was considered to be speculative and had no evidentiary support. On August 5, 1999, at the close of Jeffrey Chain's proofs on damages, Tropodyne made an oral motion for judgment as a matter of law on Jeffrey Chain's claim for damages. The district trial court over-ruled the motion, suggested that Tropodyne bring it up again at the conclusion of the testimony, and requested a brief on the issue. Tropodyne filed the requested brief on the last day of trial, but before the close of all the proofs. Tropodyne renewed the motion after the verdict on com-pensatory damages, but before the verdict on punitive damages.

[HN1] Rule 50(b) provides in pertinent part:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action [*10] to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may re-new its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment-- and may al-ternatively request a new trial or join a motion for a new trial under Rule 59.

*FED. R. CIV. P. 50(b).*

[HN2] Rule 50(b) has long been understood to mean that a party who fails to move for judgment as a matter of law at the close of all the evidence forfeits the oppor-tunity to do so after judgment has been entered upon a verdict. *Gutzwiller v. Fenik, 860 F.2d 1317, 1330 (6th Cir. 1988).* It has also been understood, however, that technical deviation from Rule 50(b)'s command is not fatal. *Riverview Investments, Inc. v. Ottawa Cmty. Im-provement Corp., 899 F.2d 474, 477 (6th Cir. 1990); Boynton v. TRW, Inc., 858 F.2d 1178, 1185-86 (6th Cir. 1988).* In light of the liberal spirit imbuing the Federal Rules of Civil Procedure, technical non-compliance with Rule 50(b)'s requirements will not preclude consideration of a JNOV motion (now known as a judgment as a mat-ter of law) so long as the purposes of the rule [*11] have been served. *Gutzwiller, 860 F.2d at 1331.* Those pur-poses are to provide the opposing party an opportunity to cure any defects in proof and to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant. *Id.* (quoting *Bohrer v. Hanes Corp., 715 F.2d 213, 216 (5th Cir. 1983)).*

In this case the asserted violations of Rule 50(b) were minor. We are satisfied that the purposes of Rule 50(b) were served by Tropodyne's filing of the initial Rule 50(a) motion for judgment as a matter of law at the close of Jeffrey Chain's proofs, by the filing of a written brief in support of the motion on the last day of trial, and by the renewal of that motion after the verdict as to com-pensatory damages was rendered. Jeffrey Chain was alerted to the issue of the sufficiency of the proofs, and the court was given an opportunity after the verdict on compensatory damages was entered to re-examine the question. There was no prejudice stemming from Tropodyne's renewal of the motion for directed verdict on the morning of the last day of trial testimony rather than a couple hours [*12] later at the close of all of the evidence. Nor was there any prejudice stemming from Tropodyne's failure to raise the motion yet again after the verdict on punitive damages was rendered, as the evi-dence at issue pertained to the compensatory damages award. Accordingly, we find that Tropodyne adequately preserved for appeal the issue of the sufficiency of the evidence as to damages.

**III.**

Tropodyne appeals the district court's adverse ruling on Tropodyne's Rule 50(a) motion for judgment as a matter of law. [HN3] Judgment as a matter of law is proper where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party on that issue," and where the claim "cannot under the controlling law be maintained . . . without a favorable finding on that issue." *Fed. R. Civ. P. 50(a).* [HN4] In a federal question case such as this, the standard of review for a Rule 50 motion based on the sufficiency of the evi-dence is identical to the standard that governs the district court's review. *Brickers v. Cleveland Bd. of Educ., 145 F.3d 846, 849 (6th Cir. 1998).*

> The evidence should not be weighed. The credibility of the witnesses should not [*13] be questioned. The judgment of this court should not be substituted for that of the jury. Instead, the evidence should be viewed in the light most favor-able to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant.

*K & T Enterprises, Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175-76 (6th Cir. 1996).

Tropodyne contends it was entitled to judgment as a matter of law on Jeffrey Chain's damages claim on the basis that Jeffrey Chain failed to put forth any evidence from which the jury could conclude that Tropodyne's sale of $ 210,355 of metal sewage chain caused Jeffrey Chain $ 1.7 million in damages. Tropodyne also contends the amount of Jeffrey Chain's damages is based entirely on speculation.

[HN5] Damages in Lanham Act trademark infringement actions are governed by the law of damages of tort actions. *Broan Mfg. Co., Inc. v. Associated Distributors, Inc.*, 923 F.2d 1232, 1235 (6th Cir. 1991). Under general tort principles "the infringer-tortfeasor is [*14] liable for all injuries caused to plaintiff by the wrongful act, whether or not actually anticipated or contemplated by the defendant when it performed the acts of infringement." *Id.* (quoting 2 J.T. McCarthy, *Trademarks and Unfair Competition* § 30:27 at 509 (2d ed. 1984)). [HN6] In trademark cases courts draw a sharp distinction between proof of the fact of damage and proof of the amount of damage. *Id.* To be entitled to damages the plaintiff must prove that "some damages were the certain result of the wrong." *Id.* (quoting *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 745 (7th Cir. 1985)). Damages are precluded where the damage claimed is not the certain result of the wrong. *Id.* (quoting *Grantham and Mann, Inc. v. American Safety Prods.*, 831 F.2d 596, 601-02 (6th Cir. 1987). The plaintiff is held to a lower standard of proof in ascertaining the exact amount of damages. *Id.* 923 F.2d at 1236. "Once the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages. [*15] " *Id.* (quoting *Grantham and Mann*, 831 F.2d at 602).

At trial Jeffrey Chain sought damages of $ 1,771,010. Jeffrey Chain's damage theory was comprised of two components: lost sales and lost growth opportunities. Jeffrey Chain produced only two witnesses in support of its damages claim: its vice-president, Doug McDonald, and its president, Gerd Krohn. In calculating lost sales McDonald took Jeffrey Chain's average annual sales of environmental products from 1996-1998, the period of infringing activity, and subtracted it from the average annual sales from 1991 to 1995, to arrive at an average annual lost profit of $ 481,200 per year, or $ 1,443,600 for the three years. JA 473. McDonald calculated lost growth opportunities of $ 238,750 based on his assumption that the market for wastewater equipment grew at 4% per year during the relevant time period and

that Jeffrey Chain's market share would have at least remained constant but for the infringing activity.

Jeffrey Chain's damage theory assumes that its decline in sales was caused exclusively by Tropodyne's actions. The assumption of causation, however, was not supported by the trial record. Jeffrey Chain's own sales [*16] figures demonstrated that in 1995 Jeffrey Chain's sales plummeted by 50%. Tropodyne did not begin using the Jeffrey name for metal chain until October 1995. In 1996 Jeffrey Chain's sales continued to decrease, but at a lower rate of 15%. In 1997, Jeffrey Chain's sales increased by approximately 30%.

The dramatic drop in Jeffrey Chain's sales before Tropodyne's allegedly infringing activity began, and its increase in sales during the heart of the allegedly infringing activity, tend to negate any inference that Tropodyne's activities caused Jeffrey Chain's alleged damages. Furthermore, Jeffrey Chain's damages calculation did not take into consideration any relevant factors other than Tropodyne's allegedly infringing activity that might have accounted for its lost sales, such as the consolidation of competitors, the activities of its competitors, the trend in the industry for chain manufacturers to form alliances with municipalities, Jeffrey Chain's lack of such a municipal alliance, and Jeffrey Chain's own failure to obtain orders of steel chain from the City of New York following product defects on the Hunt Point job.

Jeffrey Chain produced no direct evidence that its lost profits [*17] were attributable to Tropodyne. Neither did it produce any direct evidence of consumer confusion. The only testimony regarding confusion was conjecture by Jeffrey Chain's officers. There was no testimony of confusion from customers or others in the marketplace.

Jeffrey Chain did not present evidence of a single job lost to Tropodyne. With regard to the three bids Jeffrey Chain claims it lost to Tropodyne, it does not know how many companies bid the projects, or where Jeffrey Chain fell in the bids. Accordingly, there was no evidence that Jeffrey Chain lost any one of these jobs to Tropodyne. McDonald testified that because it never had the opportunity to bid on the Chicago job, he does not know whether Jeffrey Chain would have been the low bidder. As to the San Diego job, Jeffrey Chain's bid was higher than Tropodyne's, but McDonald did not know where its bid stood in regard to the other bidders, or whether it would have received the bid but for Tropodyne. As to the Indianapolis job, Tropodyne was bidding an entire systems job, which would include not only chain, but also the design of an entire system. Because Jeffrey Chain is a components manufacturer, and does not sell systems, [*18] at the Indianapolis job Jef-

frey Chain was bidding through a contractor, Envirex. Accordingly, it was not in direct competition with Tropodyne in Indianapolis.

In *Otis Clapp & Son, Inc. v. Filmore Vitamin Co., 754 F.2d 738 (7th Cir. 1985)*, the trial court determined that the plaintiff had failed to prove that the defendant's activities caused the plaintiff to fail to reach its projected or anticipated growth. The court noted that the plaintiff's growth rate during the infringing period was double that of the previous rate, and that the plaintiff's growth rate declined after the unfair practices had ceased. *Id. at 745*. The Seventh Circuit upheld the district court's factual finding that the plaintiff had failed to prove causation. It observed that the fundamental flaw in the plaintiff's case was its inability to prove a single lost sale. *Id. at 746*.

Jeffrey Chain's evidence of causation was even more speculative than that found insufficient in *Otis Clapp*. Because Jeffrey Chain was unable to show loss of a single sale caused by Tropodyne, it cannot validly attribute any of its losses to Tropodyne, much less all of its losses. Jeffrey [*19] Chain made no showing that its damages were "the certain result" of Tropodyne's alleged wrong. *See Broan Mfg., 923 F.2d at 1235*. Far from being certain, the evidence indicates that the cause of the damages was nothing more than conjecture.

Even viewing the evidence in the light most favorable to Jeffrey Chain, the evidence was not sufficient to create an issue of fact as to damages for the jury. The trial record reveals that the damages Jeffrey Chain attributed to Tropodyne were purely speculative. Such evidence was insufficient as a matter of law to support a finding of causation. In the absence of proof of causation, Tropodyne was entitled to judgment as a matter of law on Jeffrey Chain's damages claim. The district court's denial of Tropodyne's Rule 50 motion is accordingly reversed.

**IV.**

In light of the determination above that Tropodyne is entitled to judgment as a matter of law on Jeffrey Chain's claim for damages, Tropodyne's remaining arguments regarding the admission of Jeffrey Chain's summary exhibit of damage calculations or the determination that certain technical product descriptions of industrial chain used by Tropodyne in its catalog infringed [*20] Jeffrey Chain's trademark are rendered moot. Accordingly, these issues will not be addressed by this Court.

**V.**

In its cross-appeal Jeffrey Chain contends that the district court erred by admitting evidence of Tropodyne's damages and by admitting the expert opinion of Abraham Studnick on corrective advertising. In light of the fact that the jury verdict in favor of Tropodyne has been

vacated, n3 these issues are moot and will not be addressed by this Court.

n3 *Jeffrey Chain v. Tropodyne Corp., 2000 U.S. App. LEXIS 8465*, No. 98-6685, Amended per curiam opinion, May 23, 2000.

Jeffrey Chain also appeals the district court's denial of its motion to alter or amend judgment to grant treble damages under state law and to award attorney fees.

[HN7] The Tennessee Consumer Protection Act, *Tenn. Code Ann. § 47-18-109*, provides for the discretionary award of treble damages if the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of the Act. *Tenn. Code Ann. § 47-18-109(a)(3)*. [*21] n4 [HN8] The Lanham Act provides that the court "in exceptional cases" may award reasonable attorney fees to the prevailing party. *15 U.S.C. § 1117(a)*. n5

n4 [HN9] The Act provides that in determining whether treble damages should be awarded, the trial court may consider, among other things:

(A) The competence of the consumer or other person;
(B) The nature of the deception or coercion practiced upon the consumer or other person;
(C) The damage to the consumer or other person; and
(D) The good faith of the person found to have violated the provisions of this part.

*Tenn. Code Ann. § 47-18-109(4)*.

n5 "Although the precise definition of the term 'exceptional cases' is uncertain, the legislative history clearly suggests that it would involve cases in which the infringement was malicious, fraudulent, willful, or deliberate." *Hindu Incense v. Meadows, 692 F.2d 1048, 1051 (6th Cir. 1982)* (cited with approval in *Frisch's Restaurants v. Elby's Big Boy, 849 F.2d 1012, 1017 (6th Cir. 1988)*).

[*22]

Because both the ruling as to treble damages and the ruling as to attorney fees are statutorily left to the trial

2000 U.S. App. LEXIS 33926, *

court's discretion, these rulings are reviewed for abuse of discretion. In denying Jeffrey Chain's motion to alter or amend judgment the district court did not engage in a discussion of the relevant factors. Rather, it summarily concluded that it did not find this an appropriate case for an award of treble damages, and that this was not the kind of "exceptional" case that would justify an award of attorney fees to either party. Despite the lack of specificity in the trial court's order, in light of our determination above that Jeffrey Chain failed to prove that it suffered any damages whatsoever as a result of Tropodyne's con-duct, we find no abuse of discretion in the denial of treble damages and attorney fees.

**VI.**

For the foregoing reasons the jury verdict against Tropodyne is VACATED and judgment is entered in favor of Tropodyne on Jeffrey Chain's claim for damages. The district court's order denying Jeffrey Chain's motion to alter or amend judgment to add treble damages and attorney fees is AFFIRMED.