# UNPUBLISHED CASES

## Part 2 of 2

LEXSEE 2001 US DIST LEXIS 7535

NAKAJIMA ALL CO. LTD., Plaintiff, v. SL VENTURES, CORP. and STEPHEN LOWY, Defendants. SL VENTURES, CORP., Counter-plaintiff and Counter-defendant v. CAROLINA WHOLESALE OFFICE MACHINE CO., INC., Counter-defendant and Counter-plaintiff

No. 00 C 6594

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2001 U.S. Dist. LEXIS 7535*

May 31, 2001, Decided

**DISPOSITION:** [*1] Defendants' motion to dismiss denied as to count I and granted without prejudice as to counts II, III and IV.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Third party defendant (counterplaintiff) counterclaimed against defendants, alleging violation of the Lanham Act, common-law unfair competition, violation of the Illinois Consumer Fraud and Deceptive Practices Act (Fraud Act), *815 Ill. Comp. Stat. 505/1* et seq., and violation of the Uniform Deceptive Trade Practices Act (DPA), *815 Ill. Comp. Stat. 510/1* et seq. Defendants moved to dismiss the counterclaims, under *Fed. R. Civ. P. 12(b)(6), 9(b)*.

**OVERVIEW:** Defendants argued that counterplaintiff lacked standing to bring any of its claims pursuant to the terms of a distribution and licensing agreement with plaintiff. Defendants also argued that counterplaintiff failed to state a claim under the Fraud Act. Finally, defendants argued that the common law, Fraud Act, and DPA claims were not alleged with the particularity required by Rule 9(b). The court denied the motion as to the Lanham Act claim. The court granted the motion without prejudice as to the other claims. As to standing, plaintiff authorized counterplaintiff to initiate claims regarding infringement or improper use of plaintiff's marks. As to the Fraud Act, the allegations that counterplaintiff relied on to support its pleading of a consumer protection nexus were not incorporated into counterplaintiff's Fraud Act claim; in any event, counterplaintiff had not pleaded a sufficient consumer protection nexus. As to Rule 9(b), counterplaintiff's allegations sounded in fraud or mistake; further, allegations on "on information and belief" appeared to be the sort of fishing expedition that the rule was meant to prevent.

**OUTCOME:** The motion was granted and denied in part.

**CORE TERMS:** Consumer Fraud Act, consumer, distributor, misrepresentation, counterclaim, customers, particularity, nexus, disparagement, consumer protection, unfair competition, motion to dismiss, license, pleaded, Lanham Act, common law, misrepresented, reputation, misrepresenting, implicate, Carolina's Consumer Fraud Act, unfair competition claim, standing to bring, et seq, wholesale, machine, non-consumer, wrongdoing, licensing

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] In ruling on a motion to dismiss for failure to state a claim, the court considers whether relief is possible under any set of facts that could be established consistent with the allegations. A claim may be dismissed only if it is beyond doubt that under no set of facts would the claimant's allegations entitle him to relief. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN2] The Illinois Consumer Fraud and Deceptive Practices Act (Consumer Fraud Act), *815 Ill. Comp. Stat. 505/1* et seq., prohibits the employment of any deception, fraud, false pretense, false promise, misrepresentation or

the concealment, suppression or omission of any material fact in the conduct of any trade or commerce. *815 Ill. Comp. Stat. 505/2.* As its name indicates, the Consumer Fraud Act is primarily concerned with protecting consumers. Under the Consumer Fraud Act, a consumer is defined as one who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household. 815 Ill. Comp. Stat. 501/1(e). Those bringing Consumer Fraud Act claims need not be consumers, however. *815 Ill. Comp. Stat. 505/10(a)*; *815 Ill. Comp. Stat. 505/1(c).* The Consumer Fraud Act also protects business persons from fraud and unfair competition.

### *Torts > Business & Employment Torts > Deceit & Fraud*

[HN3] Where a plaintiff does not meet the definition of a "consumer" under the Illinois Consumer Fraud and Deceptive Practices Act (Consumer Fraud Act), *815 Ill. Comp. Stat. 505/1* et seq., the plaintiff must establish a nexus to consumer protection concerns in pleading its claim under the Consumer Fraud Act. This is because the Consumer Fraud Act does not authorize a suit by a non-consumer where there is no injury to consumers.

### *Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*

[HN4] See *Fed. R. Civ. P. 9(b).*

### *Torts > Business & Employment Torts > Deceit & Fraud*

[HN5] A violation of the Illinois Consumer Fraud and Deceptive Practices Act, *815 Ill. Comp. Stat. 505/1* et seq., based on misrepresentation or fraud must be plead with the particularity of *Fed. R. Civ. P. 9(b).*

### *Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*

[HN6] A party may be excused from *Fed. R. Civ. P. 9(b)*'s requirement of pleading with particularity if the information that he is required to plead rests exclusively within the defendants' control or is otherwise unavailable to him.

### *Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*

[HN7] Where allegations sound in fraud or mistake, *Fed. R. Civ. P. 9(b)* requires a plaintiff to state at minimum the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated.

**COUNSEL:** For NAKAJIMA ALL CO., LTD., plaintiff: J. Michael Williams, Cornelius P. Brown, Cohon, Raizes & Regal, Chicago, IL.

For SL VENTURES, CORP., STEPHEN L LOWY, defendants: Theodore Michaelson Becker, Charles Benjamin Leuin, Jenkens & Gilchrist, Chicago, IL.

For NAKAJIMA ALL CO., LTD., counter-defendant: J. Michael Williams, Cornelius P. Brown, Cohon, Raizes & Regal, Chicago, IL.

For CAROLINA WHOLESALE OFFICE MACHINE CO., INC., counter-defendant: Oscar L. Alcantara, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Michael Patrick Mullins, Schiff, Hardin & Waite, Chicago, IL.

**JUDGES:** Robert W. Gettleman, United States District Judge.

**OPINIONBY:** Robert W. Gettleman

**OPINION:**

### MEMORANDUM OPINION AND ORDER

In the course of being sued by Nakajima All Co., Ltd. ("Nakajima"), defendants SL Ventures, Corp. ("SL") and Stephen Lowy ("Lowy"), SL's president and principal shareholder, filed a third party claim against Carolina Wholesale Office Machine Co., Inc. ("Carolina"), which then filed counterclaims against both defendants alleging violations of § 43(a) of the Lanham [*2] Act, *15 U.S.C. § 1125*(a) (Count I), common law unfair competition (Count II), the Illinois Consumer Fraud and Deceptive Practices Act ("Consumer Fraud Act"), *815 ILCS 505/1 et seq.* (Count III), and the Uniform Deceptive Trade Practices Act ("UDTPA"), *815 ILCS 510/1 et seq.* (Count IV). SL and Lowy (together, "defendants") have moved to dismiss Carolina's counterclaims pursuant to *Fed. R. Civ. P. 9(b)* and *12(b)(6).* For the reasons set forth below, the motion is denied in part and granted in part.

### FACTS

For purposes of a motion to dismiss, the court accepts the factual allegations of the counterclaim as true and draws all reasonable inferences in favor of Carolina. See *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).*

Nakajima manufactures and sells typewriters equipped with word processing and spell checking capabilities, along with the parts and accessories for those machines. Since 1989, Nakajima has marketed and sold those products in the United States and elsewhere using

distinctive marks, which have been registered with the United States Patent and Trademark Office.

According [*3] to Carolina, Nakajima entered into distribution and license agreements with SL and Lowy in 1994, giving SL the exclusive right to distribute Nakajima products in the United States. On June 30, 2000, Nakajima advised SL that as of July 31, 2000, Nakajima was terminating its prior agreements with SL. Accordingly, Nakajima demanded that SL cease using Nakajima's marks and cease holding itself out as the exclusive Nakajima distributor in the United States as of that date.

On or about August 3, 2000, and November 8, 2000, respectively, Carolina entered into distribution and license agreements with Nakajima, making Carolina the exclusive United States and Caribbean distributor of Nakajima products and the only company licensed to use Nakajima's marks within that area. Carolina alleges "on information and belief" that "since July 31, 2000," SL has "continued to use" Nakajima's marks and has "continued to misrepresent to customers that SL . . . is the exclusive distributor and/or an authorized distributor of products bearing" Nakajima's marks. Likewise, Carolina alleges "on information and belief" that Lowy "has been personally misrepresenting to customers that SL . . . is the exclusive distributor [*4] and/or authorized distributor of the products and licensee [sic] of [Nakajima's marks] since July 31, 2000." Further, Carolina claims that: "As the true exclusive distributor of the products since August 3, 2000, Carolina Wholesale has been damaged" by defendants' actions.

### LEGAL STANDARD

[HN1] In ruling on a motion to dismiss for failure to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." *Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992).* A claim may be dismissed only if it is beyond doubt that under no set of facts would the claimant's allegations entitle him to relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Travel All Over the World, 73 F.3d at 1429-30.* The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. See *Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).*

### DISCUSSION

Defendants raise three major contentions in arguing that Carolina's counterclaims should be dismissed. First, they argue [*5] that Carolina lacks standing to bring any of its claims pursuant to the terms of the distribution and licensing agreements it signed with Nakajima. Defendants also argue that Count III fails to state a claim because Carolina has not alleged a sufficient consumer

nexus to allow it to bring suit under the Consumer Fraud Act. Finally, defendants argue that Counts II, III, and IV are not alleged with the particularity required by *Fed. R. Civ. P. 9(b).* The court will address each of defendants' arguments in turn.

### I. Standing under the Lanham Act

According to defendants, Carolina lacks standing to bring a claim under the Lanham Act because the distribution and licensing agreements it signed with Nakajima provide that Nakajima alone is authorized to initiate claims with regard to any infringement or improper use of Nakajima's marks. See *Finance Inv. Co. (Bermuda) v. Geberit AG, 165 F.3d 526, 531-32 (7th Cir. 1998)* (affirming summary judgment against plaintiff licensees where "the express terms of the [plaintiffs'] license prohibited any of them from bringing suit in their own capacity") ("Because the license is the sole source giving the plaintiffs any interest [*6] in the . . . mark, that same license's refusal to give them the right to sue under these circumstances strips them of the right to raise a § 43(a) claim.")

The court need not address defendants' argument, however, because even if they are correct about the ramifications of *Finance Investment* on Carolina's claims, Nakajima and Carolina have represented to the court that Carolina received permission from Nakajima prior to filing its counterclaims, pursuant to the license agreement between the two. n1 Thus, defendants' motion to dismiss the counterclaims on this basis is denied.

---

n1 For the sake of expediency and convenience, the court obtained these assurances from counsel for both Nakajima and Carolina during a status hearing with all parties present on May 16, 2001, and agreed to rule accordingly to prevent the need for Carolina to file an amended counterclaim on this basis.

---

### II. Consumer Nexus under the Consumer Fraud Act

Defendants' next contention is that Carolina has failed to allege a sufficient [*7] consumer nexus to sustain a claim under the Consumer Fraud Act.

[HN2] The Consumer Fraud Act prohibits the "employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact . . . in the conduct of any trade or commerce." *815 ILCS § 505/2.* "As its name indicates, the Consumer Fraud Act is primarily concerned with protecting consumers." *Industrial Spe-*

*cialty Chems. v. Cummins Engine Co., 902 F. Supp. 805, 811 (N.D. Ill. 1995).* Under the Act, a "consumer" is defined as one "who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." *815 ILCS 505/1(e).*

Those bringing Consumer Fraud Act claims need not be consumers, however. See *815 ILCS 505/10(a); 815 ILCS 505/1(c); Industrial Speciality Chems., 902 F. Supp. at 811; D.K. Heating Sys. v. Warmly Yours.com, Inc., 2000 U.S. Dist. LEXIS 610,* *13-14, *2000 WL 97283,* *5 (N.D. Ill. Jan. 25, 2000). "The Consumer Fraud Act also protects business persons from fraud and unfair competition." [*8] *Mitsubishi Elec. Corp. v. IMS Tech., 1997 U.S. Dist. LEXIS 15350,* *26, *1997 WL 630187,* *9 (N.D. Ill. Sept. 30, 1997) (citing *Law Offices of William J. Stogsdill v. Cragin Fed. Bank for Sav., 268 Ill. App. 3d 433, 645 N.E.2d 564, 565, 206 Ill. Dec. 559 (Ill. App. Ct. 1995)).*

[HN3] In the instant case, Carolina, a wholesale distributor of Nakajima products, does not meet the definition of a "consumer" under the Consumer Fraud Act. n2 Thus, Carolina must establish a nexus to consumer protection concerns in pleading its claim under the Consumer Fraud Act. *Anchor Mortg. Corp. v. Certified Credit Reporting, Inc., 2000 U.S. Dist. LEXIS 16867,* *5, *2000 WL 1700147,* *2 (N.D. Ill. Nov. 8, 2000) (holding that "a nexus to consumer protection is required only if the plaintiff is not a 'consumer'") n3; see also *J.C. Whitney & Co. v. Renaissance Software Corp., 2000 U.S. Dist. LEXIS 6180,* *55, *2000 WL 556610,* *16 (N.D. Ill. Apr. 19, 2000), adopted in relevant part, *Whitney & Co. v. Renaissance Software Corp., 98 F. Supp. 2d 981 (N.D. Ill. 2000).* This is because the Consumer Fraud [*9] Act, "does not authorize a suit by a non-consumer where there is no injury to consumers." *Learning Curve Toys, L.P. v. PlayWood Toys, Inc., 2000 U.S. Dist. LEXIS 5130,* *7, *2000 WL 343497,* *2 (N.D. Ill. Mar. 31, 2000) (internal quotations and citations omitted).

n2 Carolina does not claim that it is a consumer for purposes of the statute. Instead, Carolina maintains that it "has made allegations sufficient to implicate consumer concerns under Illinois law and the pleading standards of this court."

n3 Judge Plunkett's holding in Anchor Mortgage is narrower than that previously expressed by the Seventh Circuit. See *Athey Products Corp. v. Harris Bank Roselle, 89 F.3d 430, 436-37 (7th Cir. 1996)* ("[Illinois intermediate appellate courts] and federal district courts in Illinois have uniformly held that claims under the Act must meet the consumer nexus test by alleging that the conduct involves trade practices directed to the market generally or otherwise implicates consumer protection concerns."). According to Judge Plunkett, the Athey court's statement is "far too broad" given the fact that "many state and federal courts have decided that the consumer nexus requirement applies only to plaintiffs that are not consumers." See *Anchor Mortgage, 2000 U.S. Dist. LEXIS 16867,* at *8 n.1, and at *5-8, WESTLAW CITE (listing cases). Judge Plunkett further notes that the Athey court's statement was supported by cases that "involved business-plaintiffs that were not consumers."

The court agrees with Judge Plunkett's assessment of the statement in Athey. See *Duchossois Indus. v. Crawford & Co., 2001 U.S. Dist. LEXIS 444,* *9, *2001 WL 59031,* *3-4 (N.D. Ill. Jan. 12, 2001); *Peter v. Stone Park Enters., L.L.C., 1999 U.S. Dist. LEXIS 11385,* *17-18, *1999 WL 543210,* *6 (N.D. Ill. July 22, 1999).

[*10]

Carolina maintains that it has pleaded a sufficient consumer nexus. According to Carolina, it has alleged that defendants' misrepresentations (that SL is the exclusive distributor and/or an authorized distributor of Nakajima products) "are likely to cause confusion or to cause mistake or to deceive as to the affiliation, connection, or association of SL . . . and Nakajima." Further, Carolina claims, it has also alleged that defendants made these misrepresentations "willfully and with intent to mislead customers, and to create a likelihood of public confusion or misunderstanding."

There are two problems with Carolina's arguments, however. First, the counterclaim paragraphs that Carolina cites as containing the above allegations are neither part of, nor incorporated into, Carolina's Consumer Fraud Claim. Second, as defendants point out, the alleged "customers" to which Carolina refers above are not identified as consumers, at least as that term is defined by the Consumer Fraud Act. Defendants assert that the customers of distributors such as Carolina and defendants "purchase goods for resale, which plainly makes them non-consumers" under the Consumer Fraud Act. See *815 ILCS 505/1(e).* [*11] If defendants are correct, n4 Carolina cannot maintain their Consumer Fraud Act claim because it cannot allege a consumer nexus. If defendants are incorrect, Carolina should allege (in the appropriate count or by incorporation) that defendants' misrepresentations were made to consumers.

n4 The court has scoured Carolina's counterclaim and can find no allegation contradicting de-

fendants' assertion. Carolina does claim that it is "primarily engaged in the business of the sale of office machines, equipment, accessories, parts and supplies," but it does not say to whom those sales are made. Carolina does, however, identify itself as a wholesale distributor, which means that it presumably sells Nakajima products to retailers. Moreover, Carolina makes no reference whatever to "consumers" in its counterclaims. (Despite this fact, however, Carolina incorrectly asserts in its response brief that its counterclaim alleges that defendants "used Nakajima's trademarks in a manner that is likely to lead *consumers* to be confused regarding its status as an exclusive distributor.")

[*12]

In conclusion, because the allegations that Carolina relies on to support its pleading of a consumer protection nexus are not incorporated into Carolina's Consumer Fraud Act claim, and because even if they were Carolina still has not pleaded a sufficient consumer protection nexus, the court dismisses Count III. As Count III now reads, Carolina is merely asserting that defendants have been misrepresenting to "customers" that SL is "the exclusive distributor and/or an authorized distributor" of Nakajima products and that, as a result, "Carolina [the true exclusive distributor of Nakajima products]. . . has been or is likely to be substantially injured in its business . . . resulting in lost revenues and profits, and diminished goodwill and reputation." As Judge Grady explained in *Republic Tobacco, L.P. v. North Atl. Trading Co., 1999 U.S. Dist. LEXIS 6098,* *27-28, *1999 WL 261712,* *9 (N.D. Ill. Apr. 9, 1999),* "alleged statements to distributors and retailers do not constitute the required connection to consumers." Further, claims that such statements "implicate consumer protection concerns by wrongfully diverting sales from [Carolina]," are simply "far [*13] too indirect to satisfy the consumer nexus requirements." Id. Like Republic Tobacco, however, the court dismisses Count III without prejudice since it may be that Carolina can cure the defects explained above. n5

n5 In so holding, the court does not reach the additional standing argument raised by defendants in a footnote of their reply brief. Carolina is advised to monitor the progress of the case of *Oliveira v. Amoco Oil Co., 311 Ill. App. 3d 886, 726 N.E.2d 51, 60-62, 244 Ill. Dec. 455 (Ill. App. Ct. 4th Dist. 2000),* appeal allowed, *734 N.E.2d 895 (2000).*

## III. Rule 9(b) Particularity Requirement

Defendants next contend that Carolina has failed to meet the pleading requirement of *Fed. R. Civ. P. 9(b),* which provides that allegations of fraud or mistake are to be pleaded with particularity, with respect to Counts II, n6 III n7 and IV. Carolina argues that these counts do not sound in fraud and are therefore not subject to the requirements of Rule 9(b).

n6 As an initial matter, the court disposes of Carolina's claim that "there is nothing whatsoever within the text of Rule 9(b) or any of the authority interpreting the Rule to indicate that a claim brought under the common law of unfair competition falls within the purview of the Rule." As defendants point out, the UDTPA is simply a codification of common law unfair competition. *Mars, Inc., v. Curtiss Candy Co., 8 Ill. App. 3d 338, 290 N.E.2d 701, 704 (Ill. App. Ct. 1st Dist. 1972).* Also, as discussed below, Carolina's unfair competition claim relies on the same allegation of defendants' supposed wrongdoing as do its UDTPA and Consumer Fraud Act claims. Thus, the court sees no reason why Carolina's unfair competition claim should not be assessed under the same standard as its claim under the UDTPA. [*14]

n7 Although Count III is dismissed on other grounds, the court determines whether Rule 9(b) applies to that claim because Carolina may file an amended Consumer Fraud Act counterclaim.

The court finds that because Counts II, III, and IV sound in either fraud or mistake, they are covered by Rule 9(b). The *only* allegation of defendants' wrongdoing in these counts is Carolina's contention, "on information and belief," that "since July 31, 2000," defendants have "misrepresented" to "customers" that SL "is the exclusive distributor and/or an authorized distributor" of Nakajima products. This alleges one of two things: either defendants knew they were no longer the exclusive distributor and/or an authorized distributor of Nakajima products and they lied by misrepresenting their status, or, at the very least, defendants did not know they were no longer the exclusive Nakajima distributor and/or an authorized distributor and they mistakenly misrepresented their status accordingly. Regardless, Rule 9(b) applies because it provides: [HN4] "In all averments of fraud or mistake, the circumstances constituting [*15] fraud or mistake shall be stated with particularity. Malice, intent, knowl-

edge and other condition of mind of a person may be averred generally." See *B. Sanfield, Inc., v. J.C. Penney Co., Inc., 1993 U.S. Dist. LEXIS 11703, *7-11, 1993 WL 515863, *2-3* (N.D. Ill. Dec. 13, 1993) (applying Rule 9(b) to Consumer Fraud Act and UDTPA claims involving allegations of pricing misrepresentations made to customers).

This finding is supported by Rule 9(b)'s purpose of protecting defendants' reputations, preventing fishing expeditions, and providing adequate notice of Carolina's claims to defendants. See *Vicom, Inc. v. Harbridge Merchant Servs., Inc., 20 F.3d 771, 777* (7th Cir. 1994). In the instant case, Carolina alleges that defendants misrepresented their distributorship status with Nakajima to "customers." This accusation certainly threatens defendants' reputations among the "customers" (whomever they may be). Further, by making these allegations "on information and belief," Carolina appears to be engaging in just the sort of fishing expedition Rule 9(b) was enacted to prevent. And, finally, Carolina's vague references to the individuals [*16] to whom defendants allegedly made these representations and the dates on which they were supposedly made--to "customers" and "since July 31, 2000"--are insufficient to put defendants on notice of the claims against them. Thus, applying Rule 9(b) to the instant case is not only appropriate under the unambiguous language of the rule itself, doing so also serves the purposes for which the rule was enacted.

Carolina quotes *Gaddy v. Galarza Motor Sport L.T.D., 2000 U.S. Dist. LEXIS 13881, *9, 2000 WL 1364451, *4* (N.D. Ill. Sept. 20, 2000), for the proposition that the Consumer Fraud Act "prohibits not only fraud, but a broad array of unfair practices." True, but the court finds that Carolina's allegations in the instant case sound in fraud or mistake and are therefore subject to the Rule 9(b) particularity requirement. [HN5] "A violation of the [Consumer Fraud Act] based on misrepresentation or fraud must be plead with the particularity of *Rule 9(b) of the Federal Rules of Civil Procedure.*" *Appraisers Coalition v. Appraisal Inst., 845 F. Supp. 592, 608-09* (N.D. Ill. 1994) (citing *Ramson v. Layne, 668 F. Supp. 1162, 1170* (N.D. Ill. 1987)); [*17] see also *Petri v. Gatlin, 997 F. Supp. 956, 973* (N.D. Ill. 1997); *Azimi v. Ford Motor Co., 977 F. Supp. 847, 852-53* (N.D. Ill. 1996); *Karpowicz v. GMC, 1997 U.S. Dist. LEXIS 10604, *16* (N.D. Ill. July 17, 1997) (finding that Rule 9(b) "applies to claims for common-law fraud, as well as to claims under the ICFA") (citing *Appraisers Coalition v. Appraisal Inst., 845 F. Supp. 592, 609* (N.D. Ill. 1994) (applying 9(b) to claims of defamation and commercial disparagement).

Carolina also cites *Recreation Servs. v. Odyssey Fun World, 952 F. Supp. 594* (N.D. Ill. 1997), a case in which the plaintiff, who owned the marks "GREAT ODYSSEY

FAMILY FUN CENTERS" and "THE GREAT ODYSSEY Family Fun Centers and Design," sued the defendant under the Consumer Fraud Act for using the mark "ODYSSEY FUN WORLD," which the plaintiff alleged caused actual confusion as well as posing the likelihood of further confusion among consumers. *Id. at 596.* Judge Shadur assumed (without deciding) that the plaintiff's allegations sounded in fraud and concluded that the particularity requirements under 9(b) were met [*18] "by the Complaint's straightforward allegations as to [defendant's] conduct of the self-same type of business as [plaintiff] under a confusingly similar name." *Id. at 598.* Thus, Recreation Services is inapposite.

Finally, Carolina cites several cases holding that Rule 9(b) does not apply to the trade disparagement claims made in those cases under § 2(8) of the UDTPA or to the Consumer Fraud Act claims that rely on those same allegations. See *Mitsubishi, 1997 U.S. Dist. LEXIS 15350, at *18-20, 26-31, 1997 WL at *7, *10-11; Hoffman v. Szyszko, 1995 U.S. Dist. LEXIS 12680, *13-17, 1995 WL 519815, *4-5* (N.D. Ill. Aug. 29, 1995); *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc., 657 F. Supp. 1486, 1494-95 (N.D. Ill. 1987);* see also *Floorcoverings Int'l, Ltd. v. Swan, 2000 U.S. Dist. LEXIS 5855, *12, 2000 WL 528480, *4-5* (N.D. Ill. Apr. 25, 2000) (involving claim under UDTPA only). To begin, these cases are distinguished because Carolina is not alleging trade disparagement under the UDTPA in the instant case; instead, Carolina's UDTPA claim alleges that defendants' misrepresentations [*19] "represent their efforts to pass off [SL's] goods and services as those of another and to create a likelihood of public confusion or misunderstanding"--allegations that track the language of § § 2(1) and (2) of the UDTPA, and that the court finds sound in fraud or mistake. n8

n8 In addition, Carolina did not incorporate its UDTPA claim into its Consumer Fraud Act claim. Thus, even if Carolina had alleged trade disparagement under § 2(8) of the UDTPA, and even if the court found that that allegation did not sound in fraud or mistake (see below), the court would still apply Rule 9(b) to Carolina's Consumer Fraud Act claim.

In addition, to the extent the cases cited by Carolina conclude that allegations of trade disparagement under § 2(8) of the UDTPA do not aver fraud or mistake under Rule 9(b), this court respectfully disagrees. According to § 2(8) of the UDTPA, a person commits trade disparagement when he "disparages the goods, services or business of another by *false or misleading* representation of fact. [*20] " (emphasis added). Given that definition,

Rule 9(b) should apply to such trade disparagement claims under the UDTPA because, as is true in the instant case, allegations of false or misleading statements tend to sound in fraud or mistake. Simply calling a claim "trade disparagement" does not exempt it from averring fraud or mistake.

Moreover, Carolina's argument based on Mitsubishi, Hoffman, Pain Prevention, and Floorcoverings simply does not follow. According to Carolina, these cases support the conclusion that Carolina's claims "differ fundamentally from fraud claims" because in fraud cases "the defendant personally makes misrepresentations to the plaintiff, so the plaintiff should be able to describe those misinterpretations with particularity in the complaint." Conversely, Carolina asserts, in "trade disparagement/unfair competition cases . . . the defendant makes misrepresentations to third parties or to the consuming public generally speaking, and the plaintiff may be unable to allege those statements with particularity." "Thus," Carolina concludes, "Rule 9(b)'s requirements do not apply to such claims." Nonsense. The court will not conclude that Carolina's claims do [*21] not sound in fraud or mistake based on the fact that defendants' alleged misrepresentations were not made to Carolina directly.

Two distinct inquiries must be made under Rule 9(b) in the instant case. The first is whether Carolina's UDTPA and Consumer Fraud Act claims sound in fraud or mistake. The second (which arises only if the court determines that the claims do sound in fraud or mistake) is whether Rule 9(b) has been met and, if it has not, whether the exception to Rule 9(b) should apply because the facts Carolina needs to allege with particularity are under the defendant's exclusive control. See *Yates v. Newell Rubbermaid Inc. (In re Newell Rubbermaid Sec. Litig.), 2000 U.S. Dist. LEXIS 15190, *33 (N.D. Ill. Oct. 2, 2000)* ("It is well established in this Circuit that [HN6] a party may be excused from Rule 9(b)'s requirement of pleading with particularity if the information that he is required to plead rests exclusively within the defendants' control or is otherwise unavailable to him.") (citing *Corley v. Rosewood Care Center, Inc., 142 F.3d 1041, 1051 (7th Cir. 1998); Goren v. New Vision Int'l, Inc., 156 F.3d 721, 729 n. 6 (7th Cir. 1998)*). [*22]

The court has determined that Carolina's allegations sound in fraud or mistake, making Rule 9(b) applicable. [HN7] That rule requires Carolina to state at minimum,

"the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990).* Carolina's allegations do not meet these specifications. Accordingly, the court next determines whether the exception to Rule 9(b) applies in the instant case.

In that regard, the court finds that while it is true that defendants' alleged misrepresentations were made to "customers" and not to Carolina directly, there is no reason to apply the exception to the 9(b) particularity requirement in the instant case because the substance of those misrepresentations is not under defendants' exclusive control. See *Jepson v. Makita Corp., 34 F.3d 1321, 1328 (7th Cir. 1994)* (finding that "the plaintiffs cannot . . . complain of an inability to ascertain the details of . . . communications [because] . . . they have as much access as the defendants to the customers who can flesh [*23] out the circumstances of the . . . [misrepresentations] involved"); cf. *B. Sanfield, Inc. v. J.C. Penney Co., 1993 U.S. Dist. LEXIS 17703, at *9-10, 1993 WL at *3* (noting that where medium for disseminating alleged misrepresentations is "extremely broad, if not absolutely public," the exception to pleading with particularity is "strikingly inappropriate"). Moreover, even if the exception to Rule 9(b) did apply in the instant case, Carolina should have alleged its grounds for the suspicions it avers "on information and belief." See *Uni\* Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 924 (7th Cir. 1992).* Carolina has failed in this regard as well.

Thus, Counts II, III and IV are insufficiently pleaded and therefore dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is denied with respect to Count I but granted without prejudice with respect to Counts II, III, and IV. Carolina is given leave to file an amended counterclaim consistent with this opinion on or before June 19, 2001. SL and Lowy shall respond thereto on or before July 9, 2001. The status report by all parties is continued from June 16, 2001, to July 11, 2001, at [*24] 9:00a.m.

**ENTER: May 31, 2001**

    **Robert W. Gettleman**

    **United States District Judge**

LEXSEE 1992 US DIST LEXIS 2464

**SAMICK MUSIC CORP., a California corporation, Plaintiff, v. DELAWARE MUSIC INDUSTRIES, INC., et al., Defendants.**

**Civil Action 91-23 - CMW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1992 U.S. Dist. LEXIS 2464*

**February 12, 1992, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff music corporation filed an action against defendant music company for breach of contract, and against defendant individuals, as guaranties for the company, pertaining to the sale of pianos. The company filed a motion to amend its answer to include counterclaims involving the corporation's alleged fraud in representations made regarding the construction of the pianos.

**OVERVIEW:** The corporation filed a breach of contract action against the company. After the company filed an answer, the court entered a scheduling order, which set a cutoff date for discovery. The parties twice stipulated to an extension of the scheduling order's cutoff date. After all of the discovery had been completed, the company filed a motion for leave to amend its answer to assert a counterclaim against the corporation for their misrepresentations regarding their piano keyboards. The company maintained that the Federal Rules of Civil Procedure favored granting leave to amend, and that the corporation would not be substantially prejudiced by allowing the amendment. The corporation opposed the motion because of the company's undue delay in filing it and contended that an amendment would prejudice the corporation and be futile. The court found that the company failed to provide sufficient justification for failing to file a counterclaim prior to the close of discovery, that the corporation would suffer prejudice, and that the counterclaim was not compulsory.

**OUTCOME:** The court denied the company's motion for leave to amend.

**CORE TERMS:** counterclaim, discovery, misrepresentation, motion to amend, soundboard, deposition, piano, compulsory, scheduling, good cause, composition, spruce, prejudiced, compulsory counterclaim, movant,

re-opened, undue delay, prejudicial, allowance, dilatory, logical, freely, judicial economy, essential facts, memorandum, advertising, personnel, pretrial, answered, re-opened

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN1] *Fed. R. Civ. P. 15* states that amendment by leave of the court shall be freely given when justice requires.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN2] Amendment of a complaint is generally not permitted when there is evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN3] Whether leave to amend a pleading is to be permitted is within the sound discretion of the court.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN4] The test for permitting amendment to a pleading under *Fed. R. Civ. P. 15(a)* is that in the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should, as the rules require, be freely given. Of course, the grant or denial of an opportunity to amend is within the discretion of the court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exer-

1992 U.S. Dist. LEXIS 2464, *

cise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*

[HN5] In a motion to amend a pleading, initially it is the movant's burden to articulate some satisfactory explanation why amendment should be permitted when leave of the court is required.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims & Cross-Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*

[HN6] If a counterclaim is compulsory in nature, amendment is further encouraged.

*Civil Procedure > Preclusion & Effect of Judgments > Res Judicata*
*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims & Cross-Claims*

[HN7] The operative question in determining if a claim is a compulsory counterclaim is whether it bears a logical relationship to an opposing party's claim. A counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and of economy requires that the counterclaimant be permitted to maintain his cause of action. Indeed the doctrine of res judicata compels the counterclaimant to assert his claim in the same suit for it would be barred if asserted separately, subsequently. Thus, a detailed analysis must be made to determine whether the claims involve: (1) many of the same factual issues; (2) the same factual and legal issues; or (3) off-shoots of the same basic controversy between the parties.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims & Cross-Claims*

[HN8] In order to determine whether such a relationship exists to find something to be a compulsory counter-claim, the following questions must to be answered: (1) Is there a logical relationship between the two claims? (2) Are the issues of fact and law raised by the claim and counterclaim largely the same? (3) Would res judicata bar a subsequent suit on the counterclaim if the court were not to take jurisdiction? (4) Would substantially the same evidence support or refute both the claim and the counterclaim? If these questions can be answered affirmatively then the court can conclude that a compulsory counterclaim is present.

**COUNSEL:** [*1] Allen M. Terrell, Jr., Esquire and David L. Zicherman, Esquire of Richards, Layton & Finger, Wilmington, Delaware. Attorneys for Plaintiff.

Roger A. Akin, Esquire and Christopher J. Curtin, Esquire of Sawyer & Akin, Wilmington, Delaware. Attorneys for Defendants.

**JUDGES:** Wright

**OPINIONBY:** CALEB M. WRIGHT

**OPINION:**

*OPINION*

Wilmington, Delaware

Wright, Senior Judge.

This action was commenced on January 14, 1991 by Samick Music Corporation ("Samick") against Delaware Music Industries, Inc. ("DMI") and four individual defendants. In essence, the complaint alleges that DMI is liable for breach of contract and the individual defendants are liable as they signed guaranty agreements, in their personal capacities, to obtain the floor plan financing which was allegedly breached. (Docket Item 1). DMI and the individual defendants filed a joint answer on March 13, 1991. (Docket Item 9).

Presently before the Court is the defendants' motion to amend their answer to include numerous counter-claims not previously raised. The defendants' motion to amend was filed on January 6, 1992 and, while the motion was a "talking motion", no opening brief was filed by the defendants. (Docket Item 35). On January 21, 1992 the plaintiff [*2] filed its answering brief and appendix. (Docket Item 36). On January 28, 1992, by way of letter, the defendants replied to the plaintiff's brief. n1 (Docket Item 38). On January 30, 1992 plaintiff wrote the Court to "address several of the more outrageous misstatements made in defendants' Reply Memorandum." (Docket Item 39). For the reasons stated below, the defendants' motion to amend their answer is denied.

> n1 The Court notes that while the letter memorandum did not comply with the local rules of this Court, the letter was accepted by the Court and made part of the record. (Docket Item 38). Further, the plaintiff, by way of letter, indicated that they would not file a motion to strike although the letter memorandum did not comply with local rules and contained information that

1992 U.S. Dist. LEXIS 2464, *

should have been included in the opposition's opening brief. (Docket Item 39).

I. Factual and Procedural Background

As previously noted, this action was commenced on January 14, 1991. (Docket Item 1). An answer was filed by the defendants [*3] on March 13, 1991 (Docket Item 9) and a scheduling order was entered on April 4, 1991. (Docket Item 11). Pursuant to the scheduling order discovery was to end on September 13, 1991. (Docket Item 11). Discovery was undertaken by the parties but they failed to complete it by the cutoff date and thus, on September 13, 1991 a stipulation and proposed order to amend the Rule 16(b) dates was submitted to the Court. (Docket Item 22). The Court granted the extension of the scheduling order which provided for discovery to end on November 22, 1991 and dispositive motions to be filed by December 3, 1991.

The parties continued with discovery until it became apparent that they would not be able to secure the deposition of one person within the time allotted for discovery. As a result, the parties submitted a stipulation and proposed order to extend discovery until January 30, 1992 for the sole purpose of deposing this one individual, all other discovery having been completed by the November 22, 1991 date. (Docket Item 34). The Court granted this motion on November 25, 1991. The order indicated that other dates would be extended in a like manner. Thus, as the Court understood it, the deadline for [*4] filing dispositive motions was extended until February 13, 1992. Therefore, at the time the motion to amend was filed, all discovery was completed with the exception of deposing the one person for which the extension was granted. Because of the nature of the motion and the arguments made by the parties, the Court finds it appropriate to briefly summarize the parties positions on this motion.

According to DMI, the motion to amend is for the purpose of adding a counterclaim n2 which seeks injunctive and declaratory relief as well as damages concerning "another aspect of the relationship between the parties." (Docket Item 35, para. 3). The counterclaim is based on the defendants' allegations that the plaintiff, while representing that the soundboard of the pianos they sold were made entirely of "spruce" or "Alaskan Sitka Spruce," actually Samick was manufacturing and selling pianos that had a soundboard made of a thin spruce veneer over a philippine mahogany core. (Docket Item 35, paras. 11, 12, 15). As a result of this action by Samick the defendants contend they may be liable to their customers to whom they sold these pianos for Consumer Fraud pursu-

ant to *6 Del. C. § 2513(a)* and § [*5] 2543(a) and thus seek injunctive and declaratory relief. (Docket Item 35, Proposed Amended Answer, Fourth Counterclaim).

n2 Although reference throughout the motion to amend is to "a counterclaim" in fact five counterclaims based on the same operative facts are sought to be added by DMI.

Further, defendant DMI seeks damages from Samick for allegedly violating the following: (1) *6 Del. C. § 2513(a)* relating to consumer fraud, (2) *6 Del. C. § 2532(a)*, (2), (4), (5), (7), (9) and (12) which bars the use of deceptive trade practices, (3) for breach of an express warranty, and (4) *15 U.S.C. § 2310*(d), commonly referred to as the Magnuson-Moss Act. According to the defendants, Samick is in violation of the above for intentionally or with reckless disregard for the truth, misrepresenting the composition of the soundboard of its pianos in connection with their sale and advertisement to DMI and the public. (Docket Item 35, Proposed Amended Answer).

According to the defendants' motion, the motion should be granted on the grounds [*6] of judicial economy. (Docket Item 35, para. 6). In support thereof, DMI states that the action is not time barred, that the parties have included this issue in all depositions to date, that the issue should be part of the trial as it may bear on the credibility of the plaintiff and that having trial on this issue in conjunction with the original complaint will not materially affect the length of the trial. (Docket Item 35, paras. 6(a) - 6(d)). Thus, according to DMI, Samick will not be prejudiced by permitting amendment. (Docket Item 35, para. 7).

Finally, the motion indicates "that this would be a compulsory counterclaim, since the facts arise from the same core of operative facts, eg. the sale of pianos to DMI by Samick." (Docket Item 35, para. 8). Thus, according to the defendant the Federal Rules of Civil Procedure would encourage amendment. n3 Finally, the defendant cites [HN1] *Rule 15 of the Federal Rules of Civil Procedure* and emphasizes that amendment by leave of the Court shall be freely given when justice requires. (Docket Item 35, para. 9).

n3 The defendant refers to Rule 12 in the motion, however counterclaims are governed by Rule 13 and the language quoted by the defendant comes from Rule 13.

[*7]

In response, the plaintiff argues that while leave to amend should be freely given, this does not mandate the Court to permit amendment in every case. (Docket Item 36, p. 10). [HN2] Amendment of a complaint is generally not permitted when there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, etc." (Docket Item 36, p. 10 citing *Foman v. Davis, 371 U.S. 178, 182 (1962)).* Thus, the plaintiff contends that the motion to amend should be denied for at least three reasons: (1) the defendants have unduly delayed the filing of the motion, (2) permitting amendment at this late date will be highly prejudicial to Samick, and (3) the amendment would prove futile. (Docket Item 36, p. 11).

As the first ground against permitting amendment the plaintiff argues that Rule 16(b) scheduling orders are at the heart of case management and without a specific showing of good cause should not be disregarded. (Docket Item 36, p. 12). Thus, in accord with the scheduling order, any amendments to the pleadings necessarily had to be made by June 14, 1991 [*8] and the plaintiffs failure to provide any good cause reason for failure to abide by this date should necessarily cause their motion to be denied. (Docket Item 36, pp. 12-13).

Further in support of its argument that the motion is untimely and thus should be denied, Samick contends that the defendant is met with the same burden of showing good cause pursuant to *Rule 15(a) of the Federal Rules of Civil Procedure.* (Docket Item 36, p. 13). Samick contends, and the Court must agree, that the defendants failed to provide any explanation for their failure to file the proposed counterclaims at an earlier date. As a result, Samick alleges that the motion must be denied because the defendants have wholly failed to meet their burden to show good cause or to provide explanations as to why justice requires permitting the amendment. (Docket Item 36, p. 14).

Finally on this point, Samick contends that the defendants will be unable to make a showing of good cause and thus denial of the motion is appropriate. In so contending, Samick proposes that the purpose of Rule 15(a) is to permit amendment when the matters that are to be included were not known at the time the original pleading was filed and that [*9] is not the case here. (Docket Item 36, p. 15). According to Samick, the defendants knew of the essential facts in April of 1990, eight months before the filing of the complaint and one year before the filing of the original answer. (Docket Item 36, pp. 16-20). Thus, because the defendants failed to act on the knowledge they possessed until seven months beyond the date provided for amending pleadings in the Rule 16(b) scheduling order and two months after discovery had

essentially ended, the Court should not permit amendment on the grounds of bad faith and dilatory tactics or failure to meet their burden of showing good cause in the delay of filing the amendment. (Docket Item 36, pp. 20-21).

Samick also contends that to permit amendment would result in prejudice to Samick and prejudice to the non-moving party is "the touchstone for the denial of a motion for leave to amend." (Docket Item 36, p.22). In support thereof, Samick contends that the original complaint and answer allege a "simple debt collection action" with issues that are "simple and straightforward." (Docket Item 36, p.22). Now, according to Samick, the defendants wish to introduce five counterclaims relating to alleged [*10] misrepresentations and fraudulent conduct on the part of Samick. (Docket Item 36, p. 23). Thus, what was once a simple action will now become a convoluted trial requiring evaluation of technical information through expert testimony and consideration of numerous state and federal statutes, not previously part of this case, will be required. (Docket Item 36, pp. 23-24). Samick urges, consistent with courts of other jurisdictions, that the Court deny the motion as it will introduce many new issues and enlarge the scope and complexity of the case after discovery has closed. (Docket Item 36, pp. 24-25).

Further, Samick contends that because discovery has ended the introduction of these issues at this time will be unduly prejudicial to Samick as discovery on these issues was not pursued and it no longer has the right to conduct discovery. (Docket Item 36, pp. 26-27). Finally, with respect to discovery, Samick contends that if discovery is reopened in order to permit them an opportunity to defend these additional counterclaims they again will be prejudiced. (Docket Item 36, p. 29). In support of this argument Samick points to the additional discovery and the burden of this discovery that [*11] will result.

Further, and more compelling in the Court's view, Samick indicates that the original case is currently in pretrial stages, discovery having ended and can proceed rapidly; if discovery is to be re-opened delay of a year or more may result. Thus, according to Samick, this simple debt collection action will be unnecessarily delayed by a substantial amount of time. (Docket Item 36, p. 32). All in all, Samick contends that the above factors all lead to the conclusion that Samick will be unduly prejudiced if the amendment is permitted. (Docket Item 36, pp. 33-36).

Samick also contends that the defendants' proposed counterclaims are futile and thus denial of the amendment is appropriate. (Docket Item 36, p. 37). Because the Court finds that the motion should be denied on other

grounds previously mentioned, the specifics of this contention will not be addressed.

The reply memorandum of DMI indicates that the counterclaims should be permitted because all counterclaims, old and new are based on alleged misrepresentations by Samick and all claims should be resolved in one suit. (Docket Item 38, p. 1). Thus, defendant concludes, these issues should be permitted in the trial on the [*12] original complaint because "misrepresentation is part of this lawsuit and the evidence of the misrepresentations in the soundboard is consistent with the pattern of misrepresentation which the debt action is being defended upon." (Docket Item 38, p.3).

Further, DMI argues that Samick is not prejudiced by permitting amendment of the answer at this stage. In so arguing DMI states:

It is ridiculous for Samick to complain that it is prejudice [sic] by this amendment. Samick knew of the existence of the problem of its misrepresentations concerning its soundboards, first, because its product literature is inconsistent with its manufacturing (the facts of which it must have known) and secondly because DMI notified them of the existence and importance of this issue prior to the onset of the litigation. The necessary documents, production, drafting of advertising documents and knowledgeable personnel are all within Samick's custody and control.

In fact, Samick opened the door to the issue in this litigation by affirmatively questioning DMI personnel about it in the first two depositions taken in the case. That it is prejudicial to Samick's case does not mean that it is prejudicial [*13] to allowance of the amendment. Samick has not lost the ability to take discovery nor will Samick be held to answer a claim that is no longer within the period of limitations. Samick has had knowledge of the existence of the allegations as long as the defendants and since the evidence is in its possession, custody and control, have had greater access to it than defendants.

Finally, discovery is not complete in any event. Discovery can be re-opened when justice requires despite the existence of a pre-trial order and justice so requires in this case.

(Docket Item 38, p. 3, as in the original).

Finally, DMI indicates that justice requires permitting amendment of the answer and allowing discovery to be reopened. n4 In support of this contention DMI states the following:

n4 The heading of DMI's response is "Justice requires amendment of the complaint and allowing discovery to be reopened." Further, in the text of this section the defendants state that given the facts justice would require permitting amendment of the complaint. The Court notes that the use of the word complaint by the defendants throughout this section was erroneous as the motion is to amend the answer. The Court has taken the argument presented as though requesting leave to amend the answer.

[*14]
The facts of the grotesque nature of Samick's fraud in misrepresenting the composition of the most crucial component of the pianos it manufactures and sells, a component, the composition of which is a material factor in the decision to even buy one piano versus another and to pay the additional price required of a solid spruce or all spruce soundboard as advertised in Samick literature to the hundreds of Delawareans who purchased pianos through Samick and the thousands who have purchased Samick on the same misrepresentations throughout the United States should be sufficient in justice to require allowing the amendment to the complaint.

The liability that Samick's actions have exposed DMI to should in justice allow amendment to the complaint. The threats and denials from Samick when challenged with this allegation before suit was filed should in justice justify amendment of the complaint. Samick's denials continuing through this litigation until Mr. Brand's acknowledgement of the fraud perpetrated throughout the United States should, in justice, require amendment of the complaint.

In addition, Samick has known of the fraud since it perpetrated it through misrepresentations [*15] in Samick's catalogs and through its manufacture and distribution of products that it knew did not conform to those advertising representations. Its knowledge and intentional concealment should, in justice, justify amendment of the complaint.

Moreover, all depositions taken to date have included the allegations concerning the soundboards. This includes those taken by Samick's attorneys, which were the first depositions taken in the case. It was not until November 20, 1991 that Jack Brand, a Samick employee, the Regional Sales Representative for the New York Region made any confirmation of the existence of the misrepresentation, and his knowledge of it and the fact that it occurred for a period measured in years, at the minimum. Exhibit 6.

Finally, discovery is not complete. Since Mr. Visceglie's deposition is still being scheduled and he is yet another Samick employee (former) with important information concerning all of the issues in the complaint and the answer and counterclaims as well as the amended answer and counterclaims and Samick professed inability to have its former employee consent to cooperative depositions when in fact DMI has now secured that agreement, there [*16] will be no prejudice to Samick.

There is, furthermore, no prejudice to Samick on its debt count since, Delaware law provides for prejudgment and post-judgment interest on claims. Samick's brief attempts to thrust all responsibility for discovery delays on the defendants when in fact, some of the delays were necessitated by the availability of Samick personnel and counsel and the inability of either party to locate a former Samick employee.

(Docket Item 38, pp. 4-5, as in the original). Thus, concludes DMI:

Whether or not there is liability in view of and the defense based on misrepresentation by Samick concerning the documents which were signed based on misrepresentation goes to the heart of the case and should include these additional issues as well in the interest of judicial economy.

For the foregoing reasons, DMI's motion for leave to amend the complaint should be granted and discovery should be re-opened to cure any of Samick's complaints of prejudice as a consequence of the pre-trial order. n5

(Docket Item 38, p.5, as in the original).

> n5 The Court assumes that any reference to a pre-trial order is actually meant to be a reference to the Rule 16(b) scheduling order as no pretrial order has yet been filed in this case.

[*17]
II. Discussion

Pursuant to Rule 13(f) and *Rule 15 of the Federal Rules of Civil Procedure* the defendants have requested leave to amend their answer to add five additional counterclaims. As a preliminary matter, the Court notes that [HN3] whether leave to amend a pleading is to be permitted is within the sound discretion of the Court. *Zenith Radio Corp. v. Hazeltine, 401 U.S. 321, 330 (1971); Foman v. Davis, 371 U.S. 178, 182 (1962); Cornell &*

*Co., Inc. v. Occupational Safety and Health Review Comm'n, 573 F.2d 820, 823 (3d Cir. 1978); Arch. Coatings Assoc. v. Applied Coatings Intern, 103 F.R.D. 442, 444 (E.D. Pa. 1984).*

The United States Supreme Court in Foman v. Davis articulated the [HN4] test for permitting amendment to a pleading under Rule 15(a) as follows:

In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should, as the rules [*18] require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman, 371 U.S. at 182.* Thus, it is incumbent on the Court to determine, under the specific circumstances of this case, whether amendment of the answer is appropriate.

[HN5] Initially it is the movant's burden to articulate some satisfactory explanation why amendment should be permitted when leave of the Court is required. *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking, 93 F.R.D. 858, 865 (D.C. Del. 1982)* ("In the instant case it is not necessary for the Court to find that plaintiff has acted in bad faith in seeking the amendment. It is clear that plaintiff has provided no satisfactory explanation for its long delay in filing its motion to amend. Undue delay which is not satisfactorily explained is equivalent to bad faith."). In this case, the Court finds that the movant has been wholly unable [*19] to provide an adequate justification for failing to raise the counterclaims earlier.

The essential facts for any potential counterclaim based on misrepresentations of the soundboard composition were known to the defendants no later than December 10, 1990 as evidenced by a letter from a DMI representative (and defendant in this suit) to Samick regarding this issue. (Docket Item 37, A-186). Further, the Court finds that the essential facts underlying these allegations were probably known to the defendants much earlier. In April, 1990 DMI received notice from the United States Department of Agriculture that the sample provided them was not spruce as Samick's literature claimed. (Docket Item 38, Exhibit 4). Therefore, insofar as the counterclaims are based on the assertion that the literature claimed one thing and the product contained another,

DMI has been unable to show this Court why they failed to raise the proposed counterclaims until such a late date.

Further, Samick's allegation that a Samick employee did not confirm the misrepresentation until November 20, 1991 is unavailing. (Docket Item 38, p.4). The Court finds that the facts essential to bring the counterclaim were known, [*20] as stated above, sometime between April and December, 1990. The Court finds that DMI would not need, nor would normally have, any admission by Samick regarding the alleged discrepancy in composition and advertising representations in order to bring a counterclaim. This would be a fact that, if ever, would normally arise during discovery. The Court finds that undue delay in bringing this counterclaim is present and the defendants have failed to provide the Court with any reasonable explanation for the delay.

As a further basis for denying this motion to amend the Court finds that substantial prejudice to Samick would result. Unlike the issues presented in the original complaint which are based on a breach of contract and collection of debt, the issues sought to be added at this stage are much more involved. The issues in the original complaint are nearing the trial stage and to interject issues dealing with fraud and misrepresentation of a very different character at this stage would be prejudicial to the plaintiff.

Although DMI aggressively argues that discovery on the issues in the proposed counterclaims has been undertaken throughout the discovery phase the Court cannot agree. During [*21] some depositions references were made to the alleged discrepancies in the soundboard material and the representations in the sales literature but this does not in any way constitute discovery on these issues. The Court finds that mere inquiry into some of these issues would not, by any standards, comprise discovery of the outstanding issues.

DMI further tries to convince the Court that Samick cannot claim prejudice because they knew of the purported fraud and made inquiry during depositions on these issues. This is contrary to basic logic. Even if the Court accepts DMI's position that Samick knew of the alleged misrepresentations and they inquired during some depositions into these matters, one cannot make a leap then that they would not be prejudiced (even if discovery were re-opened) by the need to defend a lawsuit they did not know would be forthcoming. The prejudice is obvious in the protraction of time to have their claims heard and the need for extensive discovery on these issues. Although Samick may be entitled for pre and post-judgment interest this cannot act to compensate them for the time it would take to get their claims before the Court.

Finally, the Court is mindful [*22] that [HN6] if a counterclaim is compulsory in nature, amendment is further encouraged. The only indication that this counterclaim is compulsory is DMI's bald assertion to that effect. (See Docket Item 35, para. 8 wherein the defendants state: "This would be a compulsory counterclaim, since the facts arise from the same core of operative facts, eg. the sale of pianos to DMI by Samick." See also Docket Item 38, p.1 wherein the defendants, in citing Miller & Kane, Federal Practice and Procedure: Civil 2d § 1430, state: "Policy favors resolution of all claims in one suit; amendment allowed even after judgment; compulsory counterclaims are especially favored."). Again, the Court cannot agree.

The Court of Appeals for the Third Circuit has articulated the following test for determining if a counterclaims is compulsory or merely permissive:

*Great Lakes Rubber Corp. v. Herbert Cooper Co., 286 F.2d 631, 634 (3d Cir. 1961),* established the [HN7] the operative question in determining if a claim is a compulsory counterclaim is whether it bears a logical relationship to an opposing party's claim.
[A] counterclaim is logically related to the opposing party's claim where separate [*23] trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and of economy requires that the counterclaimant be permitted to maintain his cause of action. Indeed the doctrine of res judicata compels the counterclaimant to assert his claim in the same suit for it would be barred if asserted separately, subsequently.
Thus, a detailed analysis must be made to determine whether the claims involve: (1) many of the same factual issues; (2) the same factual and legal issues; or (3) offshoots of the same basic controversy between the parties. The Great Lakes analysis has been generally used by several federal courts as was noted by the Supreme Court in *Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 469, 94 S.Ct. 2504, 2506, n.1, 41 L.Ed.2d 243 (1974).*

*Xerox Corp. v. SCM Corp., 576 F.2d 1057, 1059 (3d Cir. 1978).*

The Sixth Circuit [*24] Court of Appeals has posited the test in a slightly different light. [HN8] In order to determine whether such a relationship exists to find something to be a compulsory counterclaim that Court instructed the following questions to be answered:

1992 U.S. Dist. LEXIS 2464, *

(1) Is there a logical relationship between the two claims?

(2) Are the issues of fact and law raised by the claim and counterclaim largely the same?

(3) Would res judicata bar a subsequent suit on the counterclaim if the court were not to take jurisdiction?

(4) Would substantially the same evidence support or refute both the claim and the counterclaim?

*In re Rebel Coal Company, Inc.*, 944 F.2d 320, 322 (6th Cir. 1991) (citing *Maddox v. Kentucky Fin. Co., Inc.*, 736 F.2d 380, 382 (6th Cir. 1984)). If these questions could be answered affirmatively then the Court can conclude that a compulsory counterclaim is present. Id.

Regardless of the test applied in this case, the Court does not find the proposed claims to be compulsory in nature. The basic issues are completely separate, the facts to support each of the claims are separate, evidence that would need to be shown are dissimilar, res judicata would [*25] not bar a second suit on the proposed counterclaims and the only relationship between the two sets of claims is that they involve the same parties. There appears to be no logical relationship between the claims, facts, legal theories, or evidence thus, the Court concludes that the proposed counterclaims are not compulsory in nature and to deny the motion will not work an injustice on the defendants. n6

n6 The defendants indicate in their opening papers that the action is not time barred. (Docket Item 35, para. 6(a)). Further, by letter to opposing counsel dated December 17, 1991 seeking agreement to this motion to amend, the defendants stated the following:

I am writing to request your agreement to the enclosed amendment to the answer and counterclaims filed in this case. As you can see, it brings the soundboard issue directly to bear in the litigation. I believe the Court would permit this amendment in the interest of judicial economy under Rules 13(f) and 15(a). Moreover, in the event a separate suit is necessary, I believe it could be consolidated with this action due to the discovery taken in this case.

Finally, a separate action would probably be brought as a class-action. In view of these reasons, please let me know your position concerning the proposed amendment within one week of the date of this letter.

(Docket Item 35, p. 8). Therefore, the Court concludes that the defendants have provided the Court with the clearest reasoning as to why denying this motion will not create an injustice. The statute of limitations has not run, they can bring a separate action and likely will do so as a class action. Thus, the Court concludes that, under these circumstances, the interests of justice do not require permitting amendment of the answer.

[*26]
## III. Conclusion

For the foregoing reasons, defendants' motion to amend the answer will be denied. An appropriate order will be answered.

LEXSEE 2001 US DIST LEXIS 8309

CHARLES H. SANDERSON, Plaintiff, v. HELMUT H. BRUGMAN, SURTECH CORP., INDIANA SOFT WATER SERVICES, INC. d/b/a CULLIGAN, and CULLIGAN INTERNATIONAL COMPANY, Defendants.

CAUSE NO. IP 00-459-C H/G

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION

*2001 U.S. Dist. LEXIS 8309; 2001-2 Trade Cas. (CCH) P73,429*

**May 29, 2001, Decided**

**DISPOSITION:** [*1] Defendants' motions to dismiss granted with respect to plaintiff's Sherman Act claims without leave to replead, and granted with respect to plaintiff's Lanham Act claims with leave to replead no later than June 28, 2001. Plaintiff's motion for leave to file his second amended complaint granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff water treatment provider sued defendant competitors, alleging that the competitors conspired to discredit and malign the provider's treatment method in violation of the Sherman Act, the Lanham Act, and state law. The competitors moved to dismiss the complaint.

**OVERVIEW:** The provider alleged that the competitors falsely criticized his magnetic water treatment, and lobbied for government investigations of the provider, in an attempt to restrict trade to the competitors' methods of chemical water treatment. The court first held that the provider failed to allege any conduct which amounted to an actionable restraint of trade. Even if the competitor's criticisms were deliberately false, no antitrust violation was shown in the absence of any coercive measures by the competitors that prevented the sale of the provider's products. Similarly, the provider's inability to obtain a trade association recommendation or access to its shows did not restrain trade, since there was no coercion to purchase only recommended products, and access to the shows was not essential to competition. Also, the competitors were entitled to seek government investigations of the provider, in the absence of evidence that the competitors did not want the investigations to go forward or to succeed. Finally, while the competitors' false advertising claims, the provider failed to allege any specific false or deceptive communications.

**OUTCOME:** The competitors' motion to dismiss was granted with prejudice with regard to the antitrust claims, and the motion to dismiss was granted with regard to the false advertising claims, with leave to amend. No action was taken on the motion to dismiss with regard to the state law claims.

**CORE TERMS:** competitor, Lanham Act, Sherman Act, antitrust, affirming, misleading, advertising, restraint of trade, magnetic, sham, antitrust claim, water treatment, actionable, customer, conspiracy, failure to state a claim, motion to dismiss, summary judgment, sham exception, keratotomy, heightened, radial, invoke, motions to dismiss, First Amendment, leave to replead, antitrust case, state law, misrepresentation, investigate

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] A defendant's motions to dismiss challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Fed. R. Civ. P. 12(b)(6).* In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any inferences reasonably drawn from the alleged facts in the light most favorable to the plaintiff. Dismissal is warranted only if the plaintiff can prove no set of facts consistent with his complaint that would entitle him to relief. When a plaintiff provides the specifics of his claims in the complaint, however, it is possible for him to plead himself out of court where the specifics show he cannot be entitled to relief.

2001 U.S. Dist. LEXIS 8309, *; 2001-2 Trade Cas. (CCH) P73,429

*Antitrust & Trade Law > Sherman Act*
[HN2] See *15 U.S.C.S. § 1.*

*Antitrust & Trade Law > Sherman Act*
[HN3] A party injured by a violation of the Sherman Act, specifically *15 U.S.C.S. § 1,* may assert a civil claim pursuant to *15 U.S.C.S. § 15.* To assert such a claim for a violation of *15 U.S.C.S. § 1,* plaintiff must allege (1) a contract, combination, or conspiracy; (2) resulting in an unreasonable restraint of trade in the relevant market; (3) an accompanying antitrust injury; and (4) a direct link between the antitrust violation and the antitrust injury.

*Antitrust & Trade Law > Sherman Act*
[HN4] Warfare among suppliers and their different products is competition. Antitrust law does not compel a competitor to praise a rival's product or sponsor a rival's work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law. Unless one group of suppliers diminishes another's ability to peddle its wares (technically, reduces rivals' elasticity of supply), there is not even the beginning of an antitrust case, and no reason to investigate further to determine whether the restraint is reasonable.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN5] *Fed. R. Civ. P. 8(a)* requires a complaint to contain a short and plain statement of the claim showing that the pleader is entitled to relief.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN6] Where it is clear that the conduct alleged is not actionable, the action can and should be dismissed without any need to rely on any heightened pleading standard.

*Antitrust & Trade Law > Private Actions > Injuries & Damages*
[HN7] When a trade association provides information but does not constrain others to follow its recommendations, it does not violate the antitrust laws. If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech, i.e., the marketplace of ideas.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine*
[HN8] The Noerr-Pennington doctrine recognizes that the Sherman Act does not make unlawful activity that is protected by the First Amendment right to petition the government for redress of grievances. This is true even if the petitions are motivated by a desire to harm a competitor or otherwise to gain an unfair competitive advantage.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine*
[HN9] Asking government officials to investigate a competitor for possible violations of the law, i.e., asking the executive branch to execute the laws, falls well within the scope of the Noerr-Pennington doctrine. Pursuant to the Noerr-Pennington doctrine, mere solicitation of governmental action with respect to the passage and enforcement of laws is lawful conduct outside the scope of Sherman Act liability. The Noerr-Pennington doctrine shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine*
[HN10] The "sham" exception to the Noerr-Pennington doctrine encompasses situations in which persons use the governmental process, as opposed to the outcome of that process, as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. A sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means.

*Antitrust & Trade Law > Consumer Protection > False Advertising*
*Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview*
*Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview*
[HN11] See *15 U.S.C.S. § 1125*(a).

COUNSEL: For SANDERSON, CHARLES H., plaintiff: ROBERT HENDREN, CAMPBELL & HENDREN, INDIANAPOLIS, IN.

For BRUGMAN, HELMUT H., SURTECH CORP., defendants: NORMAN T FUNK, HILL FULWIDER MCDOWELL FUNK & MATTHEWS, INDIANAPOLIS, IN.

For INDIANA SOFT WATER SERVICES, INC, CULLIGAN INTERNATIONAL COMPANY, defendants: WILLIAM C BARNARD, SOMMER & BARNARD, INDIANPOLIS, IN.

2001 U.S. Dist. LEXIS 8309, *; 2001-2 Trade Cas. (CCH) P73,429

**JUDGES:** DAVID F. HAMILTON, JUDGE, United States District Court, Southern District of Indiana.

**OPINIONBY:** DAVID F. HAMILTON

**OPINION:**

ENTRY ON DEFENDANTS' MOTIONS TO DISMISS AND RELATED MATTERS

Plaintiff Charles H. Sanderson has sued Helmut H. Brugman, Surtech Corp., Indiana Soft Water Services, Inc., and Culligan International Company in this action. Sanderson's First Amended Complaint attempts to allege violations of Section 1 of the Sherman Act, *15 U.S.C. § 1*, and the Lanham Act, *15 U.S.C. § 1125*. Sanderson [*2] also alleges claims under state law within this court's supplemental jurisdiction. Defendants have moved to dismiss the First Amended Complaint for failure to state a claim upon which relief can be granted. As explained below, defendants' motion is granted, but Sanderson will have an opportunity to replead his Lanham Act claim with greater specificity.

### I. *Plaintiff's Complaint*

The operative complaint at this stage is the First Amended Complaint. n1 Plaintiff Charles H. Sanderson alleges that he provides "magnetic water treatment and devices" in interstate commerce. He contends that his treatment and devices provide a means of treating hard water to control lime scale in a way that does not require the use of toxic chemicals. At the core of his complaint, Sanderson alleges a widespread conspiracy in a worldwide market beginning in the 1970's "to discredit and malign magnetic water treatment." First Am. Cplt. P 38. At the center of the alleged conspiracy is the Water Quality Association (WQA), a trade association.

n1 Sanderson has moved for leave to file a Second Amended Complaint that differs from the First Amended Complaint only by deleting references to certain alleged "co-conspirators" who have settled their differences with Sanderson. The motion for leave to file the Second Amended Complaint is hereby granted, but the ruling on the defendants' motions to dismiss shall also apply to the Second Amended Complaint, which defendants need not answer.

[*3]

Sanderson alleges that the WQA and others have conspired to restrain trade by means including:

Improper use of various studies and reports derogatory to magnetic water treatment and devices, including studies commissioned by the Water Quality Association and conducted at Purdue University, and the South Dakota School of Mines, such use including interstate and international publication and sale of these studies, while knowing that the information contained therein was not accurate, or acting with reckless disregard of the truth or accuracy of the conclusions reached in these studies.

Distribution of negative position papers and policy statements regarding magnetic water treatment.

Banning the display of magnetic treatment devices at the trade shows sponsored by the Water Quality Association.

The instigation of investigations by various public officials, including various state attorneys general, the Federal Trade Commission, the Better Business Bureau, such investigations prompted by an improper motive, to-wit, the restraint of trade and harassment of a competitor.

Placement of letters and other articles of misinformation in the trade press.

Direct [*4] contact with customers and potential customers of Plaintiff to discredit Plaintiff's products [and] processes.

Appearances at trade shows and other public forums to distribute information negative to magnetic water treatment.

First Am. Cplt. P 40.

### II. *Standard for Dismissal Under Rule 12(b)(6)*

[HN1] Defendants' motions to dismiss challenge the sufficiency of the complaint for failure to state a claim upon which relief may be granted. See *Fed. R. Civ. P. 12(b)(6)*. In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any inferences reasonably drawn from the alleged facts in the light most favorable to the plaintiff. See *Caldwell v. City of Elwood, 959 F.2d 670, 671 (7th Cir. 1992)*. Dismissal is warranted only if the plaintiff can prove no set of facts consistent with his complaint that would entitle him to

Case 1:04-cv-01278-KAJ    Document 191-20    Filed 10/18/2005    Page 22 of 43

Page 4

2001 U.S. Dist. LEXIS 8309, *; 2001-2 Trade Cas. (CCH) P73,429

relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* When a plaintiff provides the specifics of his claims in the complaint, however, it is possible for him to plead himself out of court where the specifics show he cannot be entitled to relief. See, e.g., *Khuans v. School Dist. 110, 123 F.3d 1010, 1016 (7th Cir.1997)* [*5]  (affirming dismissal of First Amendment claim); *Lanigan v. Village of East Hazel Crest, 110 F.3d 467, 474 (7th Cir. 1997)* (affirming dismissal of civil rights claim). Such specifics may serve the salutary purpose of avoiding prolonged litigation that is destined as a matter of law not to succeed. See *Zehner v. Trigg, 952 F. Supp. 1318, 1322 n.2 (S.D. Ind. 1997)* (plaintiffs' candor in complaint and briefing avoided waste of time), aff'd, 133 F.3d 459 (7th Cir. 1997).

III. *Sherman Act Claims*

[HN2] Section 1 of the Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." *15 U.S.C. § 1.* [HN3] A party injured by a violation of Section 1 may assert a civil claim pursuant to *15 U.S.C. § 15.* To assert such a claim for a violation of Section 1, Sanderson must allege (1) a contract, combination, or conspiracy; (2) resulting in an unreasonable restraint of trade in the relevant market; (3) an accompanying antitrust injury; and [*6] (4) a direct link between the antitrust violation and the antitrust injury. See, e.g., *Greater Rockford Energy & Technology Corp. v. Shell Oil Co., 998 F.2d 391, 395-97 (7th Cir. 1993)* (identifying elements and affirming summary judgment for defendants). Sanderson has failed to allege a viable claim for relief under the Sherman Act.

A. *Competitors' Criticism of Plaintiff's Products*

Much of Sanderson's antitrust claim is built upon his allegations that defendants and other competitors criticized his products and their effectiveness. Sanderson alleges that those criticisms are deliberately or recklessly false and that scientific studies carried out to support those criticisms were not competent or honest. This branch of Sanderson's antitrust claim fails at the pleading stage for failure to identify any conduct that could be actionable as a restraint of trade.

In *Schachar v. American Academy of Ophthalmology, Inc., 870 F.2d 397 (7th Cir. 1989),* the Seventh Circuit explained the governing principles here. In *Schachar,* several ophthalmologists sued a professional association and some of its members alleging a conspiracy to restraint trade by labeling [*7] a surgical technique (radial keratotomy) as "experimental," with the effect of depressing demand for plaintiffs' services in providing the surgery. The Seventh Circuit affirmed a

jury verdict in favor of the defendants, but its opinion stated in no uncertain terms that the case should never have been allowed to go to trial because there was no evidence of any restraint of trade:

> Mulling over the jury instructions would be pointless, however, for this case should not have gone to the jury; indeed it should not have gone to trial. *All* the Academy did is state as its position that radial keratotomy was "experimental" and issue a press release with a call for research. It did not require its members to desist from performing the operation or associating with those who do. It did not expel or discipline or even scowl at members who performed radial keratotomies. It did not induce hospitals to withhold permission to perform the procedure, or insurers to withhold payment; it has no authority over hospitals, insurers, state medical societies or licensing boards, and other persons who might be able to govern the performance of surgery.

*870 F.2d at 398* (emphasis [*8] in original).

Similarly here, Sanderson has not alleged that defendants imposed any restraints of trade, such as boycotts or other coercive measures, that prevented customers or others from dealing with him or prevented him from selling his products to any willing buyer. Cf. *Wilk v. American Medical Ass'n, 895 F.2d 352, 356 (7th Cir. 1990)* (distinguishing between AMA membership's earlier boycott on chiropractors and the AMA's later position that medical physicians could decide individually whether to associate professionally with chiropractors).

All Sanderson alleges is that defendants have joined together to criticize plaintiff and his products falsely. Writing for the Seventh Circuit in *Schachar,* Judge Easterbrook explained that such joint criticism is not enough to establish an antitrust violation even if it could be proven:

> [HN4]
> Warfare among suppliers and their different products is competition. Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law. [*Indiana Grocery,*

Case 1:04-cv-01278-KAJ    Document 191-20    Filed 10/18/2005    Page 23 of 43

Page 5

2001 U.S. Dist. LEXIS 8309, *; 2001-2 Trade Cas. (CCH) P73,429

*Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1413-14 (7th Cir. 1989);* [*9] *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1338-39 (7th Cir. 1986)].* Unless one group of suppliers diminishes another's ability to peddle its wares (technically, reduces rivals' elasticity of supply), there is not even the beginning of an antitrust case, no reason to investigate further to determine whether the restraint is "reasonable".

*870 F.2d at 399* (emphasis in original). As for the claim that defendants were making deliberately false or misleading statements about plaintiff's products, the *Schachar* court made clear that antitrust law is not the source of relief: "If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech -- the marketplace of ideas." *Id. at 400.* n2

> n2 Sanderson relies on *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 72 L. Ed. 2d 330, 102 S. Ct. 1935 (1982),* which affirmed an antitrust verdict against a professional association for adopting standards that excluded plaintiff's product. On this issue, the critical fact in *Hydrolevel* was that the defendant-association's standards, while advisory, had "a powerful influence: federal regulations have incorporated many of them by reference, as have the laws of most States, the ordinances of major cities, and the laws of all the Provinces of Canada." *456 U.S. at 559.* In this case, Sanderson has not alleged or argued that the WQA's standards have been incorporated into applicable law so as to impose legal barriers for his products. See also *Consolidated Metal Products, Inc. v. American Petroleum Institute, 846 F.2d 284, 296 n.43 (5th Cir. 1988)* (distinguishing *Hydrolevel* on precisely this basis).

[*10]

Sanderson points out correctly that *Schachar* was not decided on a motion to dismiss and that his Sherman Act claim is not subject to any heightened pleading standard. *E.g., Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 778 (7th Cir. 1994)* (reversing dismissal of antitrust claim). Nevertheless, [HN5] *Rule 8(a) of the Federal Rules of Civil Procedure* requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Sanderson's lengthy complaint identifies the alleged conduct in restraint of

trade, and it is possible for a party to plead himself out of court. See, *e.g., Hammes, 33 F.3d at 782.*

The Seventh Circuit's opinion in *Schachar* shows as a matter of law that the types of conduct Sanderson has identified simply are not actionable as restraints of trade. His attachment of the conclusory label "restraint of trade" does not entitle him to subject the defendants to the burden and expense of discovery in the hope that he might find evidence to support some other claim.

[HN6] Where it is clear that the conduct alleged is not actionable, the action can and should be dismissed without any need to [*11] rely on any heightened pleading standard. See, *e.g., Generac Corp. v. Caterpillar Inc., 172 F.3d 971, 976-78 (7th Cir. 1999)* (affirming dismissal of antitrust claim); *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994)* (same); *BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n, 36 F.3d 664, 668-69 (7th Cir. 1994)* (same); *Banks v. NCAA, 977 F.2d 1081, 1093 (7th Cir. 1992)* (same); accord, *Foundation for Interior Design Education Research v. Savannah College of Art & Design, 244 F.3d 521, 531-32 (6th Cir. 2001)* (affirming dismissal of antitrust claims based on refusal to accredit college's program); *Patel v. American Bd. of Psychiatry & Neurology, Inc., 1989 U.S. Dist. LEXIS 14011, No. 89 C 1751, 1989 WL 152816, at *3 (N.D. Ill. Nov. 21, 1989)* (granting motion to dismiss in antitrust case based on refusal to accredit psychiatrist).

B. *Denial of the "Gold Seal"*

Sanderson also alleges that defendants and others established something called the "Gold Seal Program," urging customers (and urging Better Business Bureaus to urge customers) to purchase water purification [*12] products only if the products have the WQA "Gold Seal" of approval. The WQA did not have any protocol for granting a "Gold Seal" to magnetic water treatment, so Sanderson could not obtain a "Gold Seal." There is no allegation that anyone was coerced to buy only "Gold Seal" products.

The allegations about the "Gold Seal Program" fail to state an antitrust claim for essentially the same reasons that Sanderson's allegations about competitor criticism failed. Again in *Schachar,* the Seventh Circuit addressed an essentially identical question:

> *Consolidated Metal Products, Inc. v. American Petroleum Institute, 846 F.2d 284 (5th Cir. 1988),* holds that [HN7] when a trade association provides information (there, *gives a seal of approval*) but does not constrain others to follow its

Case 1:04-cv-01278-KAJ    Document 191-20    Filed 10/18/2005    Page 24 of 43

Page 6

2001 U.S. Dist. LEXIS 8309, *; 2001-2 Trade Cas. (CCH) P73,429

recommendations, it does not violate the antitrust laws. See also *Clamp-All Corp. v. Cast Iron Soil Pipe Institute, 851 F.2d 478, 486-89 (1st Cir. 1988). We agree.* An organization's towering reputation does not reduce its freedom to speak out. Speech informed, hence affected, demand for radial keratotomy, but the plaintiffs had no entitlement to consumers' favor. The [*13] Academy's declaration affected only the demand side of the market, and then only by appealing to consumers' (and third-party payors') better judgment. If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech -- the marketplace of ideas.

*870 F.2d at 399-400* (emphasis added); accord, *Greater Rockford Energy, 998 F.2d at 396-97* (affirming summary judgment for defendants: "the failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1").

The Supreme Court's decision in *Hydrolevel* does not help Sanderson on this score because there is no allegation or indication that the standards of the Gold Seal program were incorporated into applicable law. See *456 U.S. at 559; Consolidated Metal Products, 846 F.2d at 296 n.43* (distinguishing *Hydrolevel* on this basis). Sanderson was free to develop and use other means to reassure customers about the quality and efficacy of his products, such as publicizing the independent research he relies upon here. See *Consolidated Metal Products, 846 F.2d at 296.* [*14] The Sherman Act does not offer him relief on this theory.

### C. Lack of Access to WQA Shows

Sanderson also alleges he was barred from displaying his products and processes at WQA trade shows. Unless Sanderson can meet the heavy burden of showing that such access is an "essential facility" in the industry, this allegation fails to establish an actionable restraint of trade.

The essential facility doctrine arose from a case involving a facility that was physically essential -- access by railroads to limited facilities for crossing the Mississippi River at St. Louis, which new competitors could not duplicated. See *United States v. Terminal Railroad Ass'n of St. Louis, 224 U.S. 383, 396-97, 56 L. Ed. 810, 32 S. Ct. 507 (1912).* Although the concept has been broadened over the years, the courts have taken care to police a line between facilities (and channels of distribu-

tion and advertising) that are only helpful or advantageous on one side, and those that are truly essential for competition on the other side. See, *e.g., Paddock Publications, Inc. v. Chicago Tribune Co., 103 F.3d 42, 44-45 (7th Cir. 1996)* (affirming dismissal of "essential facility" [*15] claim based on exclusive terms in contracts for use of syndicated newspaper features); *Olympia Equipment Leasing Co. v. Western Union Telephone Co., 797 F.2d 370, 376-77 (7th Cir. 1986)* (defendant's sales force was not an essential facility; plaintiff not entitled to force defendant to allow plaintiff to use its sales force); accord, *Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 543-45 (9th Cir. 1991)* (computerized reservation systems not an essential facility); *Twin Laboratories, Inc. v. Weider Health & Fitness, 900 F.2d 566, 568-69 (2d Cir. 1990)* (advertising channel not an essential facility).

The allegations in the complaint provide no indication that displays at WQA shows could possibly meet the standard of an essential facility.

### D. Lobbying for Official Investigations

Sanderson also alleges that defendants violated Section 1 of the Sherman Act by acting jointly to induce various governmental officials -- state attorneys general and the FTC are mentioned -- to investigate plaintiff and his products. Defendants invoke [HN8] the *Noerr-Pennington* doctrine, which recognizes that the Sherman Act does not make unlawful [*16] activity that is protected by the First Amendment right to petition the government for redress of grievances. This is true even if the petitions are motivated by a desire to harm a competitor or otherwise to gain an (unfair) competitive advantage. See *United Mine Workers v. Pennington, 381 U.S. 657, 669-70, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136-40, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961);* see also *City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 379, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991)* ("it is obviously peculiar in a democracy, and perhaps in derogation of the constitutional right 'to petition the Government for a redress of grievances,' U.S. Const., Amdt. 1, to establish a category of lawful state action that citizens are not permitted to urge").

[HN9] Asking government officials to investigate a competitor for possible violations of the law -- *i.e.*, asking the executive branch to execute the laws -- falls well within the scope of the *Noerr-Pennington* doctrine. Pursuant to *Noerr-Pennington*, "mere solicitation of governmental [*17] action with respect to the passage and enforcement of laws" is lawful conduct outside the scope of Sherman Act liability. *Noerr, 365 U.S. at 138;* see also *Pennington, 381 U.S. at 670* ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.").

Case 1:04-cv-01278-KAJ    Document 191-20    Filed 10/18/2005    Page 25 of 43

Page 7

2001 U.S. Dist. LEXIS 8309, *; 2001-2 Trade Cas. (CCH) P73,429

There is a "sham" exception to the *Noerr-Pennington* doctrine, and Sanderson attempts to rely on that exception to avoid dismissal of these portions of his antitrust claims. The sham exception, however, is narrow, especially outside the context of litigation in courts:

> [HN10]
> The "sham" exception to *Noerr* encompasses situations in which persons use the governmental *process* -- as opposed to the *outcome* of that process -- as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. See *California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972).* A "sham" situation involves a defendant whose activities [*18] are "not genuinely aimed at procuring favorable government action" at all, *Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. [492], 500, n. 4 (1988),* not one "who 'genuinely seeks to achieve his governmental result, but does so *through improper means,'" id., at 508, n. 10 (quoting *Sessions Tank Liners, Inc. v. Joor Mfg., Inc., 827 F.2d 458, 465, n. 5 (CA9 1987)).*

*Omni Outdoor Advertising, 499 U.S. at 380* (emphasis in original).

The sham exception does not depend on a defendant's alleged motive to harm one competitor in particular or all competition in general. See, *e.g., King v. Idaho Funeral Service Ass'n, 862 F.2d 744, 745-46 (9th Cir. 1988)* (affirming summary judgment and award of sanctions in antitrust case; defendants' actions to start official investigation of plaintiffs were protected despite "underlying anticompetitive motives").

Sanderson argues that he is entitled to develop the facts to show that the repeated investigations of his products required him to devote "precious resources to the responses, regardless of the eventual outcome." Pl. Br. at 11. If allegations or [*19] evidence of the plaintiff's own expenses and distractions were enough to establish the sham exception, then the exception would swallow the *Noerr-Pennington* doctrine nearly whole. Sanderson has not alleged facts that would support application of the "sham" exception to the *Noerr-Pennington* doctrine. He does not allege or contend that defendants did not want the investigations to go forward or to succeed.

As the Seventh Circuit explained in the gasohol case: "Here, the plaintiffs do not allege that the lobbying efforts were not intended to get legislative results. In fact, the plaintiffs assert that the efforts achieved their desired legislative effect. Hence, these activities are protected and do not violate the Sherman Act." *Greater Rockford Energy, 998 F.2d at 397* (affirming summary judgment for defendants). Similarly here, Sanderson cannot rely on the sham exception to avoid dismissal of his antitrust claims. See *A&M Records, Inc. v. A.L.W., Ltd., 855 F.2d 368, 370-71 (7th Cir. 1988)* (antitrust allegations based on testifying before and lobbying Congress failed to state a claim); *Metro Cable Co. v. CATV of Rockford, Inc., 516 F.2d 220, 228-33 (7th Cir. 1975)* [*20] (affirming dismissal of antitrust claim based on *Noerr-Pennington* doctrine); accord, *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital, 185 F.3d 154, 158-60 (3d Cir. 1999)* (same, despite plaintiff's attempt to invoke "sham" exception); *Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1063-64 (9th Cir. 1998)* (same, despite plaintiff's attempt to invoke "sham" exception, and applying heightened pleading standard in light of First Amendment concerns). n3

> n3 The court also agrees with defendants that Sanderson has failed to allege antitrust injury in this case. See generally *Banks v. NCAA, 977 F.2d at 1087-89 & n.9.* The court has not relied on defendants' argument that the complaint should be dismissed for failure to allege defendants' market share.

Thus, Sanderson has failed to allege a viable Sherman Act claim under any of the theories he has embraced. The Sherman Act count is dismissed for failure to state a claim upon which relief can [*21] be granted.

IV. *Lanham Act Claim*

[HN11] Section 43(a) of the Lanham Act provides in relevant part:

> (1) Any person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> * * *
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his

Case 1:04-cv-01278-KAJ    Document 191-20    Filed 10/18/2005    Page 26 of 43

Page 8

2001 U.S. Dist. LEXIS 8309, *; 2001-2 Trade Cas. (CCH) P73,429

or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*15 U.S.C. § 1125*(a). The language regarding false or misleading statements about another person's goods, services, or commercial activities was enacted in 1988. Since that amendment took effect, this provision of the Lanham Act has become the principal legal vehicle for one competitor to challenge another's advertising as false, misleading, and/or deceptive.

For some reason, Sanderson's First Amended Complaint does not mention the Lanham Act by name but cites it only in the jurisdictional allegations. [*22] Nevertheless, defendants anticipated the argument, and Sanderson's brief makes clear that he contends the alleged activities of defendants are actionable under *15 U.S.C. § 1125*(a). Because legal labels are not required in pleadings, the argument in the brief to the effect that the complaint's allegations support relief under the Lanham Act is sufficient to present the issue.

Defendants argue that the Lanham Act claims should be dismissed for failure to state a claim because Sanderson has failed to identify any specific false or misleading statements in particular advertisements, essentially applying to the Lanham Act claim the heightened pleading standard of *Rule 9(b) of the Federal Rules of Civil Procedure* that requires claims for fraud or mistake to be pled "with particularity." See *Max Daetwyler Corp. v. Input Graphics Inc., 608 F. Supp. 1549, 1556 (E.D. Pa. 1985)* (applying such standard to limit scope of Lanham Act complaint); accord, *In re Century 21-RE/MAX Real Estate Advertising Claims Litigation, 882 F. Supp. 915, 927 (C.D. Cal. 1994)* (same); *Barr Laboratories, Inc. v. Quantum Pharmics, Inc., 827 F. Supp. 111, 117-18 (E.D.N.Y. 1993)* [*23] (requiring plaintiff to state the content of the alleged misrepresentations, but granting plaintiff leave to replead to specify alleged falsehoods or misrepresentations); *Sanderson v. Spectrum Labs, Inc.,* No. 1:99cv371, slip op. at 8-10 (N.D. Ind. Jan. 12, 2000) (dismissing Sanderson's similar Lanham Act claims against another competitor), *aff'd mem., 248 F.3d 1159, 2000 WL 1909678 (7th Cir. 2000).*

Application of the Rule 9(b) particularity standard to claims of false or deceptive statements about a competitor's products is a reasonable interpretation of the term "fraud" in Rule 9(b), and specification of the allegedly false or misleading communications is important in such cases. Section 43(a) is not so broad as to include "all statements made by one competitor about its or another competitor's product." *Gillette Co. v. Norelco Consumer Products Co., 946 F. Supp. 115, 134 (D. Mass. 1996);* accord, *Garland Co. v. Ecology Roof Systems Corp., 895 F. Supp. 274, 279 (D. Kan. 1995)* ("This court has found no indication that Congress, through its use of the language 'commercial advertising or promotion,' intended to extend Lanham Act coverage [*24] to every isolated alleged misrepresentation made to a potential customer by a business competitor."); *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc., 820 F. Supp. 1072, 1078 (N.D. Ill. 1993)* (refusing to read § 43(a) so broadly so as to "sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction"). In other words, Section 43(a) did not wholly federalize the common law of commercial slander and libel. In addition, since this complaint's allegations cover more than twenty years, it is necessary to identify specific communications to determine whether the applicable statute of limitations has passed.

Accordingly, plaintiff Sanderson needs to identify in the complaint any specific false or deceptive communications in "commercial advertising or promotion" that he claims are actionable. The First Amended Complaint does not do so. Because Lanham Act claims do not fall squarely within the language of Rule 9(b), however, the court concludes that Sanderson is entitled to an opportunity to identify such communications if he is able to do so. The Lanham Act claims are dismissed without prejudice to repleading within [*25] 30 days.

## V. *State Law Claims*

Whether the court will exercise supplemental jurisdiction over any state law claims will be decided once a final resolution is reached on the federal claims. Plaintiff suggests that the complaint alleges sufficient damages to invoke the court's diversity jurisdiction. See Pl. Br. at 13. The suggestion misses the mark. The First Amended Complaint identifies plaintiff Sanderson as an Indiana resident (and presumably citizen) and at least two defendants as Indiana citizens. Diversity jurisdiction is not available.

## VI. *Conclusion*

Defendants' motions to dismiss are granted with respect to plaintiff's Sherman Act claims without leave to replead, and granted with respect to plaintiff's Lanham Act claims with leave to replead no later than **June 28, 2001,** consistent with this entry. The court takes no action at this time on the motions to dismiss as applied to plaintiff's state law claims. Plaintiff's motion for leave to file his second amended complaint is hereby granted. The Second Amended Complaint shall be deemed filed this date, and dismissed this date for the reasons set forth above. Discovery has been stayed pending resolution of

2001 U.S. Dist. LEXIS 8309, *; 2001-2 Trade Cas. (CCH) P73,429

[*26] the motion to dismiss and the related appeal before the Seventh Circuit in *Sanderson v. Spectrum Labs, Inc., 248 F.3d 1159, 2000 WL 1909678 (7th Cir. 2000).* Plaintiff has moved to resume discovery and to establish a trial date and case management schedule. The motion is denied without prejudice to renewal in the event that plaintiff sufficiently repleads his Lanham Act claims so as to specify the advertising and promotional statements in question.

So ordered.

Date: May 29, 2001

DAVID F. HAMILTON, JUDGE

United States District Court

Southern District of Indiana

LEXSEE 1993 US DIST LEXIS 17703

**B. SANFIELD, INC., Plaintiff, v. J.C. PENNEY COMPANY, INC., Defendants.**

**Case No. 93 C 20150**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

*1993 U.S. Dist. LEXIS 17703*

**December 13, 1993, Decided**

**NOTICE: [*1]** NOT FOR PUBLICATION

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff competitor brought an action against defendant store that alleged claims under various state and federal statutes. The store filed a motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted and for failure to comply with the particularity requirements established by Fed. R. Civ. P. 9(b) for claims that alleged fraud.

**OVERVIEW:** The competitor maintained that the store advertised a regular price for jewelry that had not been previously placed upon the items. It alleged that the practice violated the Lanham Act, *15 U.S.C.S. § 1051* et seq., the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C.S. § 1961* et seq., and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 et seq. The store filed a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b). The court dismissed the competitor's complaint without prejudice. Leave was granted to file an amended complaint that complied with Rule 9(b). That provision required that allegations of fraud or mistake be pleaded with particularity. Rule 9(b) required the plaintiff to state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated. Because the complaint simply alleged that various advertisements constituted fraud, it failed to identify specific instances that would result in liability under either the federal or state statutes as was required by Rule 9(b).

**OUTCOME:** The court dismissed the complaint without prejudice. The competitor was granted leave to file an amended complaint within 21 days that complied with the heightened pleading requirements that governed claims that alleged fraud.

**CORE TERMS:** Lanham Act, particularity, misrepresentation, advertisements, Deceptive Business Practices Act, allegations of fraud, et seq, jewelry, advertised, vague, deceptive, regularly, discounts, plead, income derived, mail fraud, inappropriate, inaccessible, merchandise, misleading, peculiarly, predicate, regular, pricing, pleaded, listing, invoke, medium, mail

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true all facts alleged, together with all reasonable inferences which may be derived from those facts. Dismissal is proper only if it appears beyond a doubt that a plaintiff can prove no set of facts that would entitle it to the relief requested.

*Torts > Business & Employment Torts > Deceit & Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN2] Fed. R. Civ. P. 9(b) requires allegations of fraud be pleaded with particularity, a more stringent requirement than what is otherwise generally sufficient under Fed. R. Civ. P. 8. Because allegations of fraud can do serious damage to the goodwill of a business firm, plaintiffs should be discouraged from tossing such accusations into complaints for improper purposes. Fed. R. Civ. P. 9(b) does that.

Case 1:04-cv-01278-KAJ    Document 191-20    Filed 10/18/2005    Page 30 of 43

Page 2
1993 U.S. Dist. LEXIS 17703, *

*Torts > Business & Employment Torts > Deceit & Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN3] Under Fed. R. Civ. P. 9(b), a plaintiff must at minimum state, the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated.

*Torts > Business & Employment Torts > Deceit & Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN4] The plaintiff must plead the "who, what, when, and where" of the alleged fraud.

*Civil Procedure > Sanctions > Baseless Filings*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN5] Allegations based upon "information and belief" may not satisfy the requirements of Fed. R. Civ. P 11. They definitely do not satisfy the requirements of Fed. R. Civ. P. 9(b).

*Torts > Business & Employment Torts > Deceit & Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN6] An exception to Fed. R. Civ. P. 9(b)'s particularity requirement for pleading fraud exists for facts inaccessible to the plaintiff and peculiarly within the knowledge of the defendant.

COUNSEL: FOR PLAINTIFF: Brian D. Shore, Guyer & Enichen, Rockford, IL.

FOR DEFENDANT: Thomas R. Reidenbach, Hinshaw & Culbertson, Rockford, IL. John B. Rizo, Sr., J.C. Penney Company, Inc., Legal Department -- 1122, Plano, TX.

JUDGES: REINHARD

OPINIONBY: PHILIP G. REINHARD

OPINION:

ORDER

INTRODUCTION

Plaintiff B. Sanfield, Inc. brought its four-count complaint against defendant J.C. Penney Company, Inc. ("Penney") and a companion complaint in case no. 93 C 20149 against Finlay Fine Jewelry Corporation, alleging civil liability under two federal statutes, the Lanham Act,

15 U.S.C. § 1051, et seq., and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., and in addition, in two counts invoking this court's supplemental jurisdiction, under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq. J.C. Penney moves to dismiss for failure to state a claim upon which relief can be granted and for failure to plead a claim of fraud with sufficient particularity.

Count I alleges J.C. Penney "regularly caused to be advertised to the public the [*2] claim that certain items of fine jewelry on sale at Penney Department Stores were regularly priced at certain levels and were then reduced in price representing discounts at or about 50% savings." According to Count I, defendant had "not regularly held for sale the advertised merchandise for the advertised regular price for any substantial period of time with a good faith intention to sell the merchandise at such price." This practice was alleged to have persisted for three years prior to the filing of the complaint, to have influenced purchasing decisions, unfairly drawing customers from B. Sanfield to J.C. Penney, and thus to have financially injured B. Sanfield. Because this practice "constituted a misleading description of fact . . . likely to cause [and having caused] confusion," it allegedly violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Count II alleges that by engaging in this practice, "in stating as a regular price, a price which has not been previously placed upon the product for substantial periods of time with the good faith intent to sell, constituted a false or fraudulent pretense or representation," J.C. Penney had [*3] violated section 1962(a) of RICO, 18 U.S.C. § 1962(a). According to Count II, J.C. Penney had used "the postal service by depositing mail which advertised the misleading discounts in a post office for delivery" on more than two occasions, acts of mail fraud assertedly indictable under 18 U.S.C. § 1341, had used the income derived from this practice in its corporate operations, and had thus over the prior four years injured its competitor, B. Sanfield.

Counts III & IV allege that this practice was deceptive and thus violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq.

CONTENTIONS

J.C. Penney contends that B. Sanfield's allegations are based on fraud and therefore must meet the Fed.R.Civ.P. 9(b) particularity requirement for pleading fraud. J.C. Penney contends that this requirement has not been met, both in that the complaint is too vague and, by its own terms, is based only upon "information and belief." In addition to its challenge to the formal adequacy

of the complaint, J.C. Penney also challenges whether B. Sanfield has met the elements of a claim under [*4] the Lanham Act and under RICO. In regard to RICO, J.C. Penney contends B. Sanfield has not alleged J.C. Penney proximately caused injury to B. Sanfield through the use or investment of income derived from racketeering activity. J.C. Penney also contends RICO does not provide injunctive relief, which B. Sanfield requests. In regard to the Lanham Act, J.C. Penney contends that its coverage of deceptive marketing practices does not extend to pricing but only to misrepresentations concerning the inherent qualities of goods.

In response, B. Sanfield contends that its pleadings give J.C. Penney fair notice of the allegations against it and that where the pleadings fail to meet *Fed.R.Civ.P. 9(b)*'s particularity requirement for pleading fraud, they come within the exception to that rule where the facts are inaccessible to a plaintiff and peculiarly within the knowledge of a defendant. In regard to its RICO claim, B. Sanfield contends it has satisfied the elements of the statute. B. Sanfield claims to have alleged a pattern of racketeering activity, including more than two predicate acts and the requisite continuity and relationship among those acts. B. Sanfield claims that it has properly [*5] identified the enterprise, which is one and the same as the defendant. B. Sanfield further contends that, under the law as it stands today, its injury need not have been caused by investment of racketeering proceeds. In regard to its Lanham Act claim, B. Sanfield contends that the Act extends to deceptive pricing practices.

## DISCUSSION

[HN1] In deciding a motion to dismiss under *Fed.R.Civ.P. 12(b)(6)*, the court must accept as true all facts alleged, together with all reasonable inferences which may be derived from those facts. *Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Perkins v. Silverstein, 939 F.2d 463, 466 (7th Cir. 1991)*. Dismissal is proper only if it appears beyond a doubt that a plaintiff can prove no set of facts that would entitle it to the relief requested. *Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Prince v. Rescorp Realty, 940 F.2d 1104, 1106 (7th Cir. 1991)*.

[HN2] *Fed.R.Civ.P. 9(b)* requires allegations of fraud be pleaded with particularity, a more stringent requirement than what is otherwise generally sufficient under *Fed.R.Civ.P. 8*. Because "allegations [*6] of fraud can do serious damage to the goodwill of a business firm," plaintiffs should be "discouraged from tossing such accusations into complaints" for improper purposes. *Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992);* see also *Beck v. Cantor, Fitzgerald & Co., Inc., 621 F. Supp. 1547, 1552-53 (N.D. Ill. 1985)*. "Rule 9(b) does that." *Bankers Trust, 959 F.2d at 683*.

There are varying degrees of authority for applying Rule 9(b) to the statutes underlying B. Sanfield's claims. See, e.g., Uni* *Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992)* (applying Rule 9(b) to RICO allegations); *Barr Lab., Inc. v. Quantum Pharmics, Inc., 327 F. Supp. 111, 117-18 (E.D.N.Y. 1993)* (listing cases applying and refusing to apply Rule 9(b) to claims under various Lanham Act sections); *Textile Deliveries, Inc. v. Stagno, 1990 U.S. Dist. LEXIS 13309* at *17-19, No. 90 Civ. 2020 (S.D.N.Y. 1990)* (applying Rule 9(b) analysis to claim under section 43(a) of Lanham Act); *Ramson v. Layne, 668 F. Supp. 1162, 1170-71 (N.D. Ill. 1987)* [*7] (holding Rule 9(b) applies to Illinois Consumer Fraud and Deceptive Business Practices Act claim brought in federal court); and *Spengler v. V & R Marathon, Inc., 162 Ill. App. 3d 715, 114 Ill. Dec. 632, 634 (1st Dist. 1987)* (requiring fraud underlying Illinois Consumer Fraud and Deceptive Business Practices Act claim be pleaded with particularity). In any event, it is sufficient to say that Rule 9(b), which states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" (emphasis added), applies to the allegations B. Sanfield makes in its complaint.

[HN3] Under Rule 9(b), a plaintiff must at minimum state, "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." Id. (quoting *Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990))*. In its complaint, B. Sanfield has essentially failed to provide any one of these required pieces of information. The complaint simply alleges "advertisements" stated that items of jewelry had [*8] been marked down a specific percentage from their original price. The complaint alleges that these advertisements constituted fraud because the items of jewelry had never actually been offered for sale at the so-called original price. It can be inferred from B. Sanfield's invocation of the mail fraud statute as the predicate violation for RICO liability that at least some of the allegations refer to advertisements by mail, but that is about as specific as the complaint gets.

This is far too vague for allegations of fraud. Leaving aside the issue of whether such allegations would satisfy the elements of the federal and state statutes B. Sanfield seeks to invoke, in order to comply with Rule 9(b)'s particularity requirement for allegations of fraud, B. Sanfield must provide greater specificity in pleading. It must identify the medium in which the advertisements were conveyed, the particular items or types of jewelry involved, the original prices and discounts involved, and the approximate dates when the advertisements were made public. To put it plainly, B. Sanfield should identify specific instances of alleged fraud which would cre-

1993 U.S. Dist. LEXIS 17703, *

ate liability on the part of J.C. Penney, rather than [*9] simply a vague and indefinite allegation of some misrepresentations over a period of several years in regard to unidentified goods. "In other words, [HN4] the plaintiff must plead the 'who, what, when, and where' of the alleged fraud." Uni* Quality, 974 F.2d at 923.

In addition, B. Sanfield bases at least some of its allegations upon "information and belief." Such [HN5] allegations may not satisfy the requirements of Fed.R.Civ.P 11. See Bankers Trust, 959 F.2d at 683-84 (listing cases). They definitely do not satisfy the requirements of Rule 9(b). Id. at 684.

B. Sanfield attempts to invoke [HN6] the exception to Rule 9(b)'s particularity requirement for pleading fraud for facts inaccessible to the plaintiff and peculiarly within the knowledge of the defendant. See id. at 684. The alleged fraud in the present case, however, makes such an exception to pleading with particularity strikingly inappropriate. B. Sanfield alleges that the misrepresentation occurred through advertising. Although the complaint is unclear about the precise details, for B. Sanfield to have been injured as [*10] it claims, the medium for disseminating these alleged misrepresentations must have been extremely broad, if not absolutely public.

In regard to J.C. Penney's other contentions, that the complaint does not sufficiently plead a cause of action under RICO or the Lanham Act, the court finds comment at this time to be inappropriate. To decide important questions of law such as the breadth of RICO and the Lanham Act in the present procedural context of vague and unspecific allegations would not lead to sound decision-making. Let it suffice that B. Sanfield is admonished that if it files an amended complaint, the allegations therein, containing the particularized factual foundation required by Rule 9(b) and based upon the reasonable investigation required by Rule 11, must satisfy all relevant elements of the statutes invoked.

## CONCLUSION

For the reasons stated above, the complaint is dismissed without prejudice. Leave is granted to B. Sanfield to file an amended complaint within 21 days, which complaint must comply with the requirements of Fed.R.Civ.P. 9(b). The failure to file an amended complaint within the time allotted will result in a final order of dismissal with prejudice without [*11] further notice.

ENTER:

PHILIP G. REINHARD, JUDGE
UNITED STATES DISTRICT COURT

DATED: December 13, 1993

LEXSEE 2005 US APP LEXIS 19698

TRUSTMARK INSURANCE COMPANY, Plaintiff-Appellant, v. GENERAL &
COLOGNE LIFE RE OF AMERICA, formerly known as COLOGNE LIFE
REINSURANCE COMPANY, Defendant-Appellee.

No. 04-3216

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

*2005 U.S. App. LEXIS 19698*

February 7, 2005, Argued
September 13, 2005, Decided

**PRIOR HISTORY:** [*1] Appeal from the United States District Court for the Northern District of Illinois, Eastern
Division. No. 00 C 1926. Blanche M. Manning, Judge. *Trustmark Ins. Co. v. Gen. Cologne Life Ins. Co. of Am., 2004
U.S. Dist. LEXIS 14888 (N.D. Ill., July 29, 2004)*
*Trustmark Ins. Co. v. General Cologne Life Reinsurance of Am., 2001 U.S. Dist. LEXIS 17212 (N.D. Ill., Oct. 15, 2001)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, an insurance company, brought suit against defendant, another insurance com-
pany, over an alleged reinsurance deal that was not committed to writing. Plaintiff alleged various theories, including
promissory estoppel. The United States District Court for the Northern District of Illinois, Eastern Division, granted
partial summary judgment, and after a bench trial entered final judgment, in favor of defendant. Plaintiff appealed.

**OVERVIEW:** Plaintiff's first theory was that it had established a joint venture with defendant. The documents that re-
lated to the establishment of the alleged joint venture revealed that defendant merely investigated a business opportunity
and approved terms as a preliminary understanding of that opportunity's contours. The district court found that because
defendant's alleged promise to reinsure could not have been performed within one year, the statute of frauds applied.
Plaintiff's claim that a letter from defendant to a third party satisfied the writing requirement failed because the letter did
not state any terms of the purported contract, did not affirm the existence of a contract, and, at best, indicated that nego-
tiations were in the preliminary agreement stage. Finally, plaintiff's attempt to invoke the doctrine of partial perform-
ance failed because plaintiff failed to establish entitlement to equitable relief - that it had no adequate remedy at law.
Contrary to its arguments regarding the hopeless uncertainty of future damages was the trial testimony of plaintiff's own
damages and actuarial sciences expert.

**OUTCOME:** The appellate court affirmed the decision of the district court.

**CORE TERMS:** joint-venture, promissory estoppel, block, summary judgment, mutual, partial performance, letter of
intent, acquisition, reinsurance agreement, partial, proffered, adequate remedy, involvement, actuarial, reinsure, deposi-
tion, equitable estoppel, equitable relief, good cause, diligence, equitable, sufficient to satisfy, subsidiary, valuation,
breach of fiduciary duty, breach of contract, negotiations, invoke, reinsurance, finalized

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards of Review*
[HN1] An appellate court reviews a district court's decision to grant a motion for summary judgment de novo, constru-
ing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party.

2005 U.S. App. LEXIS 19698, *

**Civil Procedure > Summary Judgment > Summary Judgment Standard**
[HN2] Summary judgment is properly granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

**Business & Corporate Entities > Joint Ventures**
[HN3] To establish a joint-venture under governing Illinois law, a party must prove: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill, or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) provision for joint sharing of profits and losses.

**Contracts Law > Formation > Formation Generally**
[HN4] Illinois allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics.

**Business & Corporate Entities > Joint Ventures**
[HN5] Herst does not stand for the proposition that mutual control exists wherever parties divide responsibilities along functional lines. Rather, the case merely notes that the fact that one party was not involved in every aspect of an enterprise does not preclude the finding of a joint-venture. Nothing in Herst holds that mutual control could exist notwithstanding the inability of either party to exercise control over the other toward achieving the object of the alleged joint-venture.

**Contracts Law > Statutes of Frauds**
[HN6] See *740 Ill. Comp. Stat. 80/1.*

**Contracts Law > Consideration > Promissory Estoppel**
**Contracts Law > Statutes of Frauds**
[HN7] Under Illinois law, the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel. Promissory estoppel does not bar the application of the statute of frauds in Illinois.

**Contracts Law > Statutes of Frauds**
[HN8] Under Illinois law, writing sufficient to satisfy the statute of frauds need not itself be a valid contract, but only evidence of one. Indeed, a sufficient memorandum may be composed of multiple documents of varying forms. for multiple writings to satisfy the statute, all the essential terms of the contract must be in writing, and there must be an express reference to the other writings or such a connection between the documents, physical or otherwise, as to demonstrate that they relate to the same contract.

**Contracts Law > Statutes of Frauds**
[HN9] Under Illinois law, letters addressed to a third party, stating and affirming a contract, may be used against the writer as a memorandum of it.

**Contracts Law > Statutes of Frauds**
[HN10] A deposition may qualify as a signed writing for statute of frauds purposes.

**Contracts Law > Statutes of Frauds**
[HN11] When there is particularly compelling evidence of the contract's existence, the strictures of the statute of frauds can safely be relaxed, for example in the case of an admission. However, under Illinois law the admission must be "unequivocal" to constitute waiver of a statute of frauds defense.

**Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review**
**Civil Procedure > Appeals > Standards of Review > De Novo Review**
[HN12] In reviewing a bench trial, conclusions of law are subject to de novo review, while findings of fact are subject to the deferential clearly erroneous standard.

*Contracts Law > Performance > Part Performance*
*Contracts Law > Statutes of Frauds*
[HN13] The doctrine of part performance is an equitable doctrine. As such, the doctrine excepts only those actions seeking equitable relief from the writing requirement of the statute of frauds, to the exclusion of those claims where there exists an adequate remedy at law. Although acts of partial performance are typically sufficient to take an oral agreement out from under the operation of the statute of frauds in an action at equity, such acts do not take an action at law outside the operation of the statute of frauds. Illinois courts further limit the scope of the exception, holding that part performance will avoid application of the statute of frauds only where a party is seeking the equitable remedy of specific enforcement.

*Contracts Law > Remedies > Equitable Relief*
*Contracts Law > Statutes of Frauds*
[HN14] The party seeking the application of equitable principles to defeat the interposition of the statute of frauds must establish that the promisee cannot be made whole by damages or by another adequate remedy at law.

*Contracts Law > Remedies > Compensatory Damages*
*Contracts Law > Remedies > Foreseeable Damages*
[HN15] Under Illinois law, damages cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can damages be based on speculation or conjecture.

*Contracts Law > Remedies > Compensatory Damages*
*Contracts Law > Remedies > Foreseeable Damages*
[HN16] The law only requires there be an adequate basis in the record for the court's determination of damages, and absolute certainty is unnecessary. Certainty as to the amount of damages goes no further than to require a basis for a reasoned conclusion. In Illinois, the evidence need only tend to show a basis for the computation of damages with a fair degree of probability.

*Contracts Law > Remedies > Foreseeable Damages*
[HN17] Actuarial models are not only well accepted in courts throughout the land, but also staples of the insurance industry.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN18] An appellate court reviews a denial of a motion for leave to amend a complaint for abuse of discretion.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
*Civil Procedure > Trials > Pretrial Conferences*
[HN19] To amend a pleading after the expiration of a trial court's scheduling order deadline to amend pleadings, the moving party must show "good cause." *Fed. R. Civ. P. 16(b)*. As the United States Court of Appeals for the Ninth Circuit has succinctly stated, Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking amendment.

**COUNSEL:** For TRUSTMARK INSURANCE COMPANY, Plaintiff-Appellant: Antony S. Burt, SCHIFF, HARDIN & WAITE, Chicago, IL USA.

For GENERAL & COLOGNE LIFE RE OF AMERICA, formerly known as Cologne Life Reinsurance Company, Defendant-Appellee: Michael R. Hassan, LORD BISSELL & BROOK, Chicago, IL USA.

**JUDGES:** Before ROVNER, WILLIAMS, and SYKES, Circuit Judges.

**OPINIONBY:** WILLIAMS

**OPINION:**

     WILLIAMS, *Circuit Judge*. Surely, if there is any moral to this story, it is to "get it in writing." It is astounding in this day and age to find it necessary to repeat this admonition, but no less so than to find a sophisticated party willing to

leverage an agreement involving multiple years and millions of dollars solely on the enforceability of a simple hand-shake. Yet that is precisely what has happened in this case. Plaintiff Trustmark Insurance Company ("Trustmark") brought suit against defendant General & Cologne Life Re of America ("Cologne"), another insurance company, over an alleged reinsurance deal that was not committed to writing.

Nonetheless, Trustmark presses its [*2] claims under theories of breach of contract, breach of fiduciary duty, and promissory estoppel, alleging that Cologne breached an unwritten joint-venture agreement and amorphous promises to acquire a block of individual disability insurance ("IDI") policies. The district court granted partial summary judgment in Cologne's favor on the breach of contract and breach of fiduciary duty claims, finding no joint-venture because the parties did not exercise mutual control over a joint enterprise. The court further found, in entering final judgment in favor of Cologne after a subsequent bench trial, that plaintiff's promissory estoppel claim was barred by the statute of frauds. Because we find that plaintiff has failed to proffer sufficient evidence of mutual control over a joint-venture, and that the availability of an adequate remedy at law precludes Trustmark from invoking the partial performance exception to the statute of frauds, we affirm both rulings.

## I. BACKGROUND

In early 1998, Trustmark and Cologne jointly investigated, with a view toward acquiring, a block of 7000 IDI poli-cies offered for sale by Hartford Life Insurance Co. (hereinafter, "the Hartford Block" or "the Block"). [*3] In the course of their investigation, the record suggests that these parties talked about a lot of things that would happen in the event of a successful purchase of the Block. They talked about sharing profits and the risk of loss. They even talked about Trustmark taking on the responsibility for administering claims on the purchased policies, as Cologne lacked the capacity to do so itself. The problem is, none of this talk was committed to writing.

Despite having no written agreement--even as to how this investigation itself would proceed--the parties together performed the actuarial work and due diligence necessary to determine a purchase price for the proposed acquisition. Negotiations over the purchase, however, took place solely between Trustmark and Hartford. These negotiations bore fruit on October 28, 1998, when, after some back and forth, Trustmark and Hartford signed a letter of intent on the sale of the Block. Although Cologne had reviewed, commented on, and approved this letter of intent, it did not sign the letter and its name is not mentioned anywhere. On its face, the letter sets forth a relationship solely between Trustmark and Hartford.

In conjunction with the letter [*4] of intent, Trustmark also entered into a separate claims-administration agree-ment with Hartford, immediately conferring upon Trustmark the responsibility for administering claims on the pur-chased policies after signing the letter of intent. Trustmark did not consult Cologne regarding the terms of this separate agreement, nor did it seek the defendant's approval of the document prior to its execution. This separate agreement makes no mention of Cologne whatsoever.

Notwithstanding Cologne's omission from the operative paperwork, over the next ten months while the final pur-chase documents were being drafted, representatives of Cologne and Trustmark continued to speak as if the defendant was still a part of the deal. For example, in sales pitch letters to third parties dated December 30, 1998, and February 9, 1999, Andrew Perkins, Senior Vice President of Cologne's Individual Health Group, referred to the Cologne and Trust-mark as "successful partners" in the purchase of the Hartford Block. On February 23, 1999, Perkins sent a draft of the Coinsurance/Assumption Reinsurance Agreement between Trustmark and Hartford to his assistant with a handwritten note stating "we'll end up with a retro [*5] n1 to us from Trustmark, following this language." In addition, Cologne made several reassurances to Trustmark between February and July 1999--in the face of mounting losses on the Hart-ford acquisition--that it remained committed to sharing the risk on the Hartford Block. But, throughout all this, the final purchase agreement with Hartford had yet to be finalized and signed, and Cologne's name had yet to appear formally on paper.

n1 Referring to a "retrocession," which is a transfer of risks assumed by one reinsurer to a second reinsurer.

On September 3, 1999, after learning of additional and substantial losses on the Block, but prior to final consumma-tion of the acquisition, Cologne informed Trustmark that it would not go forward with the purchase. Cologne claims that its decision to renege was based on Trustmark's poor ability to administer policy claims; the failure of the parties to agree upon or even discuss Trustmark's compensation for administering claims (a figure that would determine how much premium [*6] Cologne would receive on the back end); and the delay of Trustmark and Hartford, by the terms of

their own letter of intent, in entering into a "definitive agreement" on the Block purchase. Each of these items, according to Cologne, were understood conditions to its involvement in the deal. Trustmark claims the decision to renege came upon Cologne's discovery that Hartford Block was losing a lot of money. Whatever the reason, Cologne was out, and Trustmark was unhappy. Notwithstanding this abandonment, Trustmark went on to finalize the purchase from Hartford on December 28, 1999.

In February 2000, Trustmark brought suit against Cologne under five counts. Under Count I, Trustmark sought a declaratory judgment that Cologne was obliged to reinsure Trustmark on the Hartford Block in accordance with an alleged joint-venture agreement. Count II sought specific performance on this alleged joint-venture agreement. Count III sought damages for breach of the alleged joint-venture agreement, while Count IV sought damages for breach of fiduciary duty. Count V claimed damages under a theory of promissory estoppel. In October 2001, the district court granted the defendant's motion for summary judgment [*7] as to Counts I through IV, rejecting those counts premised on the existence of a joint-venture agreement as a matter of law. In particular, the court found that Trustmark had failed to show that the parties had maintained joint control over an IDI policy purchasing enterprise. The court also denied a motion by Trustmark to amend its complaint to add a claim of "equitable estoppel," finding that the plaintiff failed to show good cause to add the claim more than nine months after the deadline for amending pleadings, and that such a late amendment would prejudice the defendant by necessitating additional discovery.

This left Trustmark with only its promissory estoppel claim, which survived Cologne's statute of frauds challenge at summary judgment only by virtue of the potential applicability of the doctrine of partial performance. Otherwise, the district court determined that the statute of frauds applied to the alleged joint-venture promise at the heart of Trustmark's promissory estoppel claim, and there was no writing to satisfy the statute's prescriptions. With the statute of frauds bar so avoided, however, the district court found that Trustmark had created a genuine issue of fact [*8] as to whether Trustmark entered into the letter of intent with Hartford in reliance on Cologne's alleged promise to join in the purchase of the Block.

In June 2002, however, Cologne requested that the district court reconsider its October 2001 order with respect to Trustmark's promissory estoppel claim. In particular, the defendant noted that the doctrine of partial performance, upon which the plaintiff's only surviving claim relied, is an equitable doctrine. Trustmark's promissory estoppel claim, in contrast, explicitly sought damages. Though the court agreed that the doctrine of partial performance could not save Trustmark's promissory estoppel claim to the extent it sought monetary damages, it found the claim could nonetheless survive because it had incorporated the requests for equitable relief sought in the other (dismissed) counts--namely the declaratory judgment and specific performance sought in Counts I and II, respectively. Accordingly, the promissory estoppel claim received a bench trial in April 2003.

After the bench trial, the district court entered final judgment in favor of Cologne on August 3, 2004, finding that the ability to quantify the extent of Trustmark's loss [*9] on the Hartford Block left the plaintiff with an adequate remedy at law--thereby precluding equitable relief and reliance on the equitable doctrine of partial performance to preserve the promissory estoppel claim. Trustmark appeals both this final entry of judgment, and the prior grant of partial summary judgment.

## II. ANALYSIS

### A. Cologne and Trustmark Did Not Exercise Sufficient Mutual Control to Establish a Joint-Venture

Trustmark first challenges the district court's entry of partial summary judgment on its joint-venture claims (Counts I through IV). [HN1] "We review a district court's decision to grant a motion for summary judgment de novo, construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party." *Telemark Dev. Group, Inc. v. Mengelt, 313 F.3d 972, 976 (7th Cir. 2002).* [HN2] Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)* [*10] ; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

In granting partial summary judgment, the court found that the parties were not engaged in a joint-venture when they worked in concert to acquire the Hartford Block. [HN3] To establish a joint-venture under governing Illinois law, a party must prove:

(1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill, or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) provision for joint sharing of profits and losses.

*Minyo v. Minyo, 220 Ill. App. 3d 746, 581 N.E.2d 170, 173, 163 Ill. Dec. 219 (Ill. App. Ct. 1991)* (citing *Ambuul v. Swanson, 162 Ill. App. 3d 1065, 516 N.E.2d 427, 114 Ill. Dec. 272 (Ill. App. Ct. 1987))*. Here, the controversy centers around the fourth element--mutual control over a joint enterprise.

As a threshold matter, there is some discrepancy as to the scope of the enterprise over which [*11] the parties allegedly exerted control. Trustmark insists that the joint-venture at the heart of its claim extended only to the purchase of the Hartford Block, and not, as the district court reasoned, to the purchase of IDI policies *in general*. Indeed, the size of the enterprise may bear on a plaintiff's burden in establishing the control element, for the bigger the enterprise, the more sweeping the requisite control; and the more sweeping the control, the more the plaintiff would have to establish to survive summary judgment. Thus, Trustmark argues that the district court erred when it grounded its dismissal of the breach of contract claim in part on the parties' inability to control each other's activities in pursuing IDI policies in general. This argument, however, belies the allegations of Trustmark's own complaint, which by its own terms describes the joint-venture as existing "for the purpose of acquiring large blocks of IDI policies from *various* insurance companies." Compl. at 3 (emphasis added). In any event, how great or small the scope of the averred enterprise is of little consequence here, for, whether the enterprise's end be IDI policies in general or merely the [*12] Hartford acquisition in particular, the record remains devoid of any evidence of mutual control.

Trustmark's only hope to establish a genuine issue of material fact regarding mutual control rests on Cologne's involvement in drafting the letter of intent that bound Trustmark to proceed with the acquisition of the Hartford Block. Cologne was unquestionably involved in the letter's drafting: the company reviewed, commented on, and ultimately approved the terms reflected in the letter of intent, and its subsidiary, JHA, is credited with determining the purchase price for the block provided in the letter. But this involvement does not, as Trustmark contends, exhibit Cologne's control over the purchase of the Block. Cologne's asserted involvement here occurred well before Trustmark entered into the final purchase agreement with Hartford, during the preliminary stages of the purchase negotiations. Indeed, [HN4] "Illinois . . . allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics." *Empro Mfg. Co. v. Ball-Co. Mfg., Inc., 870 F.2d 423, 426 (7th Cir. 1989).* Cologne's [*13] consultations and involvement at this stage, while not insignificant, remain best characterized as its thorough investigation of a business opportunity, and its approval of terms as a preliminary understanding of that opportunity's contours. Review and comment on documents that shape preliminary understandings of deals yet to be finalized do not amount to an exercise of control.

Trustmark next cites *Herst v. Chark, 219 Ill. App. 3d 690, 579 N.E.2d 990, 162 Ill. Dec. 176 (Ill. App. Ct. 1991)* for the proposition that mutual control necessary to establish a joint-venture will be found where the parties divide responsibilities along functional lines. Reading *Herst* so, Trustmark argues that such responsibility divisions were made here-- with Cologne performing due diligence on the underwriting of the Hartford Block; Cologne's subsidiary (JHA) determining the acquisition's purchase price; Trustmark and JHA undertaking due diligence on Hartford's claims handling; and Trustmark taking sole responsibility for claims administration upon consummation of the purchase. With this division of responsibilities in mind, the plaintiff insists that a factual issue remains as to mutual [*14] control.

Even assuming this division of responsibilities to be accurate, however, Trustmark fundamentally misconstrues the holding of *Herst*. [HN5] The case does not stand for the proposition that mutual control exists wherever parties divide responsibilities along functional lines. Rather, the case merely notes that the fact that one party was not involved in every aspect of an enterprise does not preclude the finding of a joint-venture. *Id. at 993-94.* Nothing in *Herst* holds that mutual control could exist notwithstanding the inability of either party to exercise control over the other toward achieving the object of the alleged joint-venture.

In the final analysis, neither Trustmark nor Cologne could force the other party to enter into an IDI policy purchase- -be it in general or merely for the Hartford Block--nor could they compel the use of each other's employees or resources toward such ends. These parties could not exercise any control over each other's operations or policies whatsoever, and therefore we affirm the district court's grant of partial summary judgment on the joint-venture claims for lack of mutual control.

2005 U.S. App. LEXIS 19698, *

### B. Trustmark Proffers no Writings that Could [*15] Satisfy the Statute of Frauds

Turning to its promissory estoppel claim, the plaintiff next contends that the district court erred in finding that it had proffered no document to satisfy the writing requirement of the statute of frauds. Because the court made this finding in its October 22, 2001, partial summary judgment ruling, which tied the fate of Trustmark's promissory estoppel claim to the applicability of the doctrine of partial performance, our review is *de novo. Telemark, 313 F.3d at 976.*

The Illinois statute of frauds provides that

[HN6] no action shall be brought . . . upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

*740 ILCS 80/1.* It is undisputed that Trustmark and Cologne have not entered into a written contract. Furthermore, Trustmark does not dispute the district court's finding that Cologne's alleged promise to reinsure the [*16] Hartford Block cannot be performed within one year. And it is clear that [HN7] "under Illinois law, the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel." *Fischer v. First Chicago Capital Mkts., Inc., 195 F.3d 279, 284 (7th Cir. 1999)* (citing *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc., 58 F.3d 1227, 1231 (7th Cir. 1995)); McInerney v. Charter Golf, Inc., 176 Ill. 2d 482, 680 N.E.2d 1347, 1352, 223 Ill. Dec. 911 (Ill. 1997)* ("Promissory estoppel does not bar the application of the statute of frauds in Illinois."). Thus, the issue here is whether Trustmark has proffered a writing sufficient to satisfy the statute of frauds.

[HN8] "A writing sufficient to satisfy the Statute of Frauds need not itself be a valid contract, but only evidence of one." *Crawley v. Hathaway, 309 Ill. App. 3d 486, 721 N.E.2d 1208, 1211, 242 Ill. Dec. 677 (Ill. App. Ct. 1999)* (quoting *Melrose Park Nat'l Bank v. Carr, 249 Ill. App. 3d 9, 618 N.E.2d 839, 843, 188 Ill. Dec. 269 (Ill. App. Ct. 1993)).* Indeed, a sufficient memorandum may be composed of multiple [*17] documents of varying forms. *Am. Coll. of Surgeons v. Lumbermens Mut. Cas. Co., 142 Ill. App. 3d 680, 491 N.E.2d 1179, 1192, 96 Ill. Dec. 719 (Ill. App. Ct. 1986).* Toward that end, Trustmark has adduced several writings in an effort to satisfy the statute's prescriptions. That said, for multiple writings to satisfy the statute, "all the essential terms [of the contract] must be in writing, and there must be an express reference to the other writings or such a connection between the documents, physical or otherwise, as to demonstrate that they relate to the same contract." *Dickens v. Quincy Coll., 245 Ill. App. 3d 1055, 615 N.E.2d 381, 384, 185 Ill. Dec. 822 (Ill. App. Ct. 1993)* (citing cases). It is here that the multiple documents proffered by Trustmark fall short, for they neither state essential terms, refer expressly to each other, nor connect in such a way as to reflect relation to a particular contract.

Trustmark first cites the sales pitch letter written by Perkins of Cologne to a third party (Lincoln National Insurance) stating "Cologne and Trustmark have been working jointly in pursuit of non-cancellable disability opportunities and were [*18] successful partners in the . . . Hartford acquisition." The plaintiff rightly notes that [HN9] "letters addressed to a third party, stating and affirming a contract, may be used against the writer as a memorandum of it." *Gaines v. McAdam, 79 Ill. App. 201 (1898).* However, here the letter to Lincoln National neither states any terms of the purported contract between Trustmark and Cologne (let alone all of them); nor does it affirm the existence of a contract, as it makes explicitly clear that the Hartford deal was still "impending." At best, this letter indicates that Trustmark and Cologne were still in the non-binding, preliminary agreement stage of their negotiations on the Hartford acquisition, at that time merely exploring the possibility of a joint-venture on the Block. And even employees of Trustmark who were intimately involved in the acquisition--such as Leonard Koloms, Trustmark's Corporate Actuary, and Rowen Bell, Trustmark's point man on the letter of intent with Hartford--admit that their own use of the term "partner" was not intended to have any operative legal connotation.

Trustmark also cites the handwritten note penned by Perkins on a draft of the Coinsurance/Assumption [*19] Reinsurance Agreement between Trustmark and Hartford. The note states, "We'll end up with a retro to us from Trustmark, following this language." First, the words "we'll end up with" themselves suggest that Cologne had not yet agreed to reinsure Trustmark on the Hartford deal. And, again, the attached draft agreement between Trustmark and Hartford omits several terms that would be essential to a reinsurance deal between Cologne and Trustmark--terms such as Trustmark's share of incoming premium to cover the expense of its administration of policy claims (and in turn that share of

2005 U.S. App. LEXIS 19698, *

premiums Cologne could expect to receive on the back end), or the percentage of risk that Cologne would assume on the Hartford Block.

Cologne's "percentage of risk assumed" would certainly be an essential term in this alleged joint-venture, and, toward that end, Trustmark cites the deposition testimony of Perkins in an attempt to lock down that term in writing. [HN10] "A deposition may qualify as a signed writing for statute of frauds purposes." *Bower v. Jones, 978 F.2d 1004, 1009 (7th Cir. 1992)*. In his deposition, Perkins testified that "it was [his] expectation that Cologne would reinsure 50 [*20] percent of this business from Trustmark." However, he immediately qualified this statement by stating that "Trustmark intended to reinsure [50 percent of] the business with [Cologne] *if the transaction went forward as had been intended*." (emphasis added). Clearly, Perkins's testimony does not provide, as Trustmark argues, an unconditional commitment to a percentage. To the contrary, it serves as yet further evidence that the purported deal between the parties was not consummated. The same may be said of the July 14, 1999 draft report prepared by Cologne's outside actuaries, Tillinghast-Towers Perrin. While this report does muse that Cologne "is 50% retrocessionaire from Trustmark who has the other 50% as the administrator," it is also littered with terms revealing that a reinsurance agreement between Cologne and Trustmark on the Hartford deal had yet to be finalized (stating that the "reinsurance contracts are not signed yet," and that the "parties are renegotiating").

As for the July 28, 1999, letter from Perkins to Trustmark, forwarding JHA's proposal for the subsidiary's possible involvement in managing claims on the Hartford Block, this writing fails to memorialize [*21] a single term that would be essential to a reinsurance agreement. This letter states, "It is critical that significant additional resource [sic] be brought to bear as soon as possible in order to limit our potential losses on this deal." While this letter has everything to do with potential claims management, it has little (if anything) to do with a reinsurance agreement between Trustmark and Cologne. Indeed, there are no reinsurance agreement terms--let alone essential terms--to mine from this document, and it is thus of no use to Trustmark in its efforts to overcome the statute of frauds.

At best, these writings proffered by Trustmark uniformly reveal a reinsurance agreement between the parties yet to be finalized--a deal contemplated, though not necessarily consummated. n2 Between all these writings, there is only one essential term arguably suggested, and its validity is dubious at best. These documents fall far short of providing all requisite essential terms for a reinsurance agreement, to say nothing of the fact that each fails to reference or connect to the others in a manner that might confirm relation to a common contract.

n2 We pause briefly to address Trustmark's contention that Cologne has waived its statute of frauds defense by admitting to the existence and terms of the purported agreement. [HN11] "When . . .there is particularly compelling evidence of the contract's existence, the strictures of the statute of frauds can safely be relaxed, for example in the case of an admission." *Consolidation Servs., Inc. v. Keybank Nat'l Ass'n, 185 F.3d 817, 821 (7th Cir. 1999)*. Toward that end, Trustmark cites those same writings proffered herein to satisfy the statute of frauds. However, under Illinois law the admission must be "unequivocal" to constitute waiver of a statute of frauds defense. *See Derby Meadows Util. Co. v. Inter-Continental Real Estate, 202 Ill. App. 3d 345, 559 N.E.2d 986, 989, 991, 147 Ill. Dec. 646 (Ill. App. Ct. 1990)*. Because these writings express at best an expectancy to reinsure Trustmark on the Hartford Block, not an unequivocal admission that it was contractually bound, or had promised, to do so, we find that Cologne's statute of frauds defense has not been waived.

[*22]

Together, these documents proffered by Trustmark do make one thing clear: the plaintiff is grasping at straws. How it came to be in this unfortunate predicament--a predicament in which it must cobble together a sufficient writing where none exists--is clear as well. It put itself there. As Trustmark's counsel informed us at oral argument, "reinsurance is something that is often done on a handshake, . . . perhaps resulting in more litigation than it should these days." We may be shocked by the former, but we see first hand the veracity of the latter. Indeed, we dare say, it is quite the understatement. Accordingly, like all those before it, we affirm the district court's finding where a plaintiff has again failed to adduce written evidence sufficient to satisfy the requirements of the statute of frauds.

## C. Trustmark Cannot Invoke the Doctrine of Partial Performance

Despite Trustmark's inability to adduce a writing or writings sufficient to satisfy the statute of frauds, there are several exceptions to the statute's writing requirement. One such exception, invoked by the plaintiff here in an effort to save its promissory estoppel claim, is the equitable doctrine of partial [*23] performance. In its post-bench trial entry of

judgment, however, the district court found that Trustmark could not invoke this doctrine because it had an available remedy at law. Trustmark challenges this finding on appeal, arguing that it cannot be adequately compensated by monetary damages. [HN12] In reviewing a bench trial, conclusions of law are subject to *de novo* review, while findings of fact are subject to the deferential clearly erroneous standard. *Spurgin-Dienst v. United States, 359 F.3d 451, 453 (7th Cir. 2004).*

[HN13] The doctrine of part performance is an equitable doctrine. *Dickens v. Quincy College Corp., 245 Ill. App. 3d 1055, 615 N.E.2d 381, 385, 185 Ill. Dec. 822 (Ill. App. Ct. 1993).* As such, the doctrine excepts only those actions seeking equitable relief from the writing requirement of the statute of frauds, to the exclusion of those claims where there exists an adequate remedy at law. *See Sjogren v. Maybrooks, Inc., 214 Ill. App. 3d 888, 573 N.E.2d 1367, 1368, 158 Ill. Dec. 182 (Ill. App. Ct. 1991)* ("Although acts of partial performance are typically sufficient to take an oral agreement out from under the operation of [*24] the Statute of Frauds in an action at equity, such acts do not take an action at law outside the operation of the Statute of Frauds.") (citing cases); *Gibbons v. Stillwell, 149 Ill. App. 3d 411, 500 N.E.2d 965, 969, 102 Ill. Dec. 864 (Ill. App. Ct. 1986).* Illinois courts further limit the scope of the exception, holding that "part performance will avoid application of [the Statute of Frauds] only where a party is seeking the equitable remedy of *specific enforcement*." *Doherty v. Kahn, 289 Ill. App. 3d 544, 682 N.E.2d 163, 175, 224 Ill. Dec. 602 (Ill. App. Ct. 1997)* (citing *Phillips v. Britton, 162 Ill. App. 3d 774, 516 N.E.2d 692, 697, 114 Ill. Dec. 537 (Ill. App. Ct. 1987))* (emphasis added), *abrogated on other grounds by Byung Moo Soh v. Target Mktg. Sys., Inc., 353 Ill. App. 3d 126, 817 N.E.2d 1105, 1109, 288 Ill. Dec. 455 (Ill. App. Ct. 2004).*

Here, in order for the plaintiff to invoke the doctrine of partial performance, it must first establish entitlement to equitable relief. And to be entitled to equitable relief, Trustmark must show that it has no adequate remedy at law. *John O. Schofield, Inc. v. Nikkel, 314 Ill. App. 3d 771, 731 N.E.2d 915, 925, 247 Ill. Dec. 142 (Ill. App. Ct. 2000)* [*25] ([HN14] "The party seeking the application of equitable principles to defeat the interposition of the statute of frauds must establish that the promisee cannot be made whole by damages or by another adequate remedy at law.").

[HN15] Under Illinois law, "damages cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can damages be based on speculation or conjecture." *Platinum Tech, Inc. v. Fed. Ins. Co., 282 F.3d 927, 933 (7th Cir. 2002).* Trustmark insists that money damages would be inadequate here because its future loss on the Hartford Block cannot be calculated with requisite certainty considering (1) the volatility of the policies of the Block, (2) the extended period of time covered by those policies, and (3) putative legal barriers that ostensibly prohibit that award of future damages on contracts of indemnity (to which Trustmark contends its reinsurance agreement to be akin).

Contrary to its arguments regarding the hopeless uncertainty of future damages, however, is the trial testimony of Trustmark's own damages and actuarial sciences expert. This expert testified that "a best estimate of the actual losses on the Hartford block at some [*26] point in the future" could be calculated by using a "gross premium valuation." This testimony went uncontested. And though the testimony suggests the availability of nothing better than a "best estimate," [HN16] "the law only requires there be an adequate basis in the record for the court's determination of [damages], and absolute certainty is unnecessary." *Moniuszko v. Moniuszko, 238 Ill. App. 3d 523, 606 N.E.2d 468, 474, 179 Ill. Dec. 636 (Ill. App. Ct. 1992); see also SNA Nut Co. v. The Haagen-Dazs Co., Inc., 302 F.3d 725, 733 (7th Cir. 2002)* ("Certainty as to the amount of damages goes no further than to require a basis for a reasoned conclusion."); *Jabat, Inc. v. Smith, 201 F.3d 852, 857 (7th Cir. 2000)* ("In Illinois, the evidence need only tend to show a basis for the computation of damages with a fair degree of probability.").

Nor should the plaintiff take umbrage with the propriety of using an actuarial model--such as the gross premium valuation--to calculate future damages. [HN17] Such models are not only well accepted in courts throughout the land, but also staples of the plaintiff's own industry. *Peoples Security Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141, 148 (4th Cir. 1993)* [*27] ("Actuarial tables are the life's blood of the life insurance industry. It is disingenuous for [the defendant] to question the accuracy of the very methodology employed by the industry in issuing its policies simply because actuarial tables were used to determine [an adverse award]."); *MacGregor Yacht Corp. v. State Compensation Ins. Fund, 63 Cal. App. 4th 448, 460, 74 Cal. Rptr. 2d 473 (1998)* ("There was nothing speculative about the actuary's damage analysis. He used the same formulas used by the insurance industry . . . ."). It is odd--or, in the very least, counter-intuitive--considering the nature of the business, to find an insurance company complain of the speculative nature of actuarial tables, or to learn that an insurer of risk believes future loss cannot be reliably predicted. In any event, it suffices to say that Trustmark's damages could be calculated with requisite certainty under Illinois law, and for that reason the company could avail itself of an adequate remedy at law. Accordingly, Trustmark cannot invoke the doctrine of part performance to avoid the preclusive bite of the statute of frauds, and thus its promissory estoppel claim must fail.

2005 U.S. App. LEXIS 19698, *

**D. District Court [*28]  Did Not Abuse its Discretion in Denying Motion to Amend Complaint**

Finally, we address Trustmark's appeal of the district court's denial of its motion for leave to amend its complaint to add a claim of equitable estoppel. [HN18] We review such rulings for abuse of discretion. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. United States, 367 F.3d 650, 668 (7th Cir. 2004).* [HN19] To amend a pleading after the expiration of the trial court's Scheduling Order deadline to amend pleadings, the moving party must show "good cause." *Fed. R. Civ. P. 16(b).* As our sister circuit succinctly stated, "*Rule 16(b)*'s 'good cause' standard primarily considers the diligence of the party seeking amendment." *Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992).* Here, nine months after the prescribed deadline of June 30, 2000, Trustmark sought leave to amend its complaint to add a claim of equitable estoppel based on allegations that Cologne, through its subsidiary (JHA), failed to perform adequate due diligence on the Hartford Block, resulting in an overvaluation of the policies. In an effort to show [*29]  good cause for the amendment, the plaintiff contends that it did not confirm its suspicions of this misrepresentation--and thus the facts supporting its equitable estoppel claim--until April 26, 2001, when the depositions of both a JHA employee involved in the valuation (DeMarco) and Cologne's actuarial experts were completed.

However, Trustmark concedes that it harbored suspicions that JHA had misrepresented the value of the Hartford Block prior to these depositions, and in fact the deposition testimony of Trustmark's actuarial (Daniel Winslow) reveals that the company was concerned about the quality of DeMarco's valuation work as early as the end of 1999--months before the plaintiff filed its original complaint against Cologne. Based on this testimony, the district court found that Trustmark failed to show good cause for its failure to amend its complaint in a timely manner, finding that Trustmark was, or should have been, aware of the facts underlying its equitable estoppel claim as early as 1999. In so doing, the court did not abuse its discretion, and we affirm the denial of leave to amend accordingly.

**III. CONCLUSION**

For the foregoing reasons, we AFFIRM the district [*30]  court's grant of partial summary judgment in Cologne's favor on Trustmark's breach of contract and breach of fiduciary duty claims, its denial of Trustmark's motion for leave to amend its complaint, and its entry of final judgment on the promissory estoppel claim.