# A

LEXSEE 2004 DEL. CH. LEXIS 116

**ALL PRO MAIDS, INC., Plaintiff, v. SUSAN LAYTON, as an individual and MAMA'S MAIDS, LLC, a Delaware Limited Liability Company, Defendants.**

Civil Action No. 058-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2004 Del. Ch. LEXIS 116*

**April 15, 2004, Submitted
August 9, 2004, Decided**

**SUBSEQUENT HISTORY:** [*1]

As Revised August 10, 2004. Costs and fees proceeding at *All Pro Maids, Inc. v. Layton*, 2004 Del. Ch. LEXIS 192 *(Del. Ch., Dec. 20, 2004)*
Affirmed by *Layton v. All Pro Maids, Inc.*, 2005 Del. LEXIS 283 *(Del., July 22, 2005)*

**DISPOSITION:** Judgment for plaintiffs; damages and attorney fees and court costs awarded.

**LexisNexis(R) Headnotes**

**COUNSEL:** Chase T. Brockstedt, Esquire of MURPHY, SPADARO, & LANDON, Wilmington, Delaware, Attorney for Plaintiff.

David R. Hackett, Esquire of GRIFFIN & HACKETT, P.A., Georgetown, Delaware, Attorney for Defendants.

**JUDGES:** PARSONS, Vice Chancellor.

**OPINIONBY:** PARSONS

**OPINION:**

### MEMORANDUM OPINION

**PARSONS, Vice Chancellor**

All Pro Maids, Inc. ("APM") brought this action against Susan Layton ("Layton"), a former employee of APM, and Mama's Maids, LLC ("MM"), a company formed by Layton and another former APM employee. APM alleges breach of contract and tortious interference with contract and prospective business relations. APM seeks damages and injunctive relief, including specific performance of a covenant not to compete. This matter was tried on March 1, 2004. The parties completed post-trial briefing on April 15, 2004. This Memorandum Opinion reflects the Court's post-trial findings of fact and conclusions of law.

In this opinion, the Court concludes that the Agreement is valid and enforceable and was breached by Layton, that Layton and MM tortiously interfered with APM's contracts and prospective business relations, that Layton and MM are jointly and [*2] severally liable for damages in the amount of $51,433, but no injunctive relief is appropriate, and that Layton is liable to APM for its reasonable attorneys' fees and expenses in pursuing enforcement of its rights under the Agreement.

### I. FACTUAL BACKGROUND

APM is a Delaware corporation with its principal place of business in Lewes, Delaware. James and Michele Sprinkle founded APM, which provides cleaning services for commercial and residential properties. The Sprinkles spent five to seven years "knocking on doors" to acquire clients and establish their business. n1

---

n1 Trial transcript ("Tr.") at 136.

---

In October 1997, APM hired Layton as office manager. Her duties included hiring, supervising, and firing cleaning staff, preparing contracts for new customers, scheduling services for customers, handling customer complaints, and billing. Layton had the primary responsibility for interacting with clients to ensure that APM met their cleaning needs.

On October 22, 1997, Layton signed a written document [*3] entitled "Employment Agreement" (the "Agreement") with APM. n2 The Agreement contains a covenant not to compete. The provisions relating to that covenant are as follows:

> 1. An employee who decides to terminate service with the company must give seven (7) days notice.

2. During the time of your employment with All Pro Maids, Inc., you shall not, in the home or commercial cleaning field, directly or indirectly solicit business from, contract with, or take employment with any customer or former customer of the ALL PRO MAIDS, INC. or any other cleaning company or individual where you have

A. Worked physically upon a customer's premises;

B. Acted in a supervisory capacity for the ALL PRO MAIDS, INC.;

C. Acted as a salesperson for the ALL PRO MAIDS, INC.;

3. Employee agrees that, in the event this Agreement terminates, regardless of the reason for the termination or the party terminating the Agreement, Employee will not, directly or indirectly, either as an individual or as a partner or joint venturer or as an employee or agent of any person, or as an officer, director, or as a shareholder or otherwise, for a period of one (1) year from the termination of the Agreement in the home [*4] or commercial cleaning field *work, solicit, contract or take employment for any current or former customer of* the ALL PRO MAIDS where Employee was engaged as described in the paragraph 2(a), (b), and (c) or in the territories covered by the following zip codes: [21 zip codes all in Sussex County, DE].

4. In the event or [sic: of] a breach or threat of breach by an Employee of the terms of this Agreement, the parties agree that ALL PRO MAIDS remedy at law will be inadequate and that ALL PRO MAIDS will be entitled, in addition to any other remedies available by law, to appropriate injunctive and other equitable relief in order to get a Court Order to stop the Employee from violating the Agreement. Employee will be responsible for all court costs and attorney's fees necessary to enforce this Agreement. n3

APM's policy is that all employees — including cleaners, supervisors and managers — must sign this Agreement.

n2 PTX 3.
n3 *Id.*

In the spring of 2003, Layton's relationship [*5] with APM soured and she decided to resign. Before Layton resigned, Rebecca Truitt ("Truitt"), another employee of APM, approached her about starting a cleaning business. Layton told Truitt that she had signed a covenant not to compete with APM, and therefore might be unable to join the new business. Layton testified that she then asked her attorney, Larry Fifer ("Fifer"), to review the Agreement and that he advised her orally that it was unenforceable. n4 On May 16, 2003, Layton submitted a letter of resignation to APM, stating an intention to leave on May 30, 2003. Upon receiving the letter, James Sprinkle asked Layton to leave APM's employ immediately.

n4 Tr. at 40-41. Layton did not pay Fifer anything for his advice.

On May 22, 2003, Layton and Truitt filed a Certificate of Formation with the State of Delaware for Mama's Maids, LLC, a commercial cleaning service. On May 29, 2003, MM cleaned for Quality Roofing, which up to that time had been a client of APM. By the fall of 2003, MM was servicing eleven [*6] of APM's clients, having a total of over twenty locations.

During the summer of 2003, APM became aware that it was losing clients to MM. In September 2003, after Delaware National Bank, one of APM's largest clients, switched to MM, APM began contacting attorneys to pursue the possibility of legal action against Layton and MM (collectively "Defendants"). APM filed this action on November 12, 2003. n5

n5 Additional facts relevant to specific issues presented at trial are discussed below in connection with the analysis of those issues.

## II. PROCEDURAL HISTORY

APM's Complaint alleged breach of the Agreement, tortious interference with contractual relations and prospective business relations, and violations of *Delaware's Deceptive Trade Practices Act* and *Trade Secrets Act*. APM sought equitable and injunctive relief, damages, attorney's fees and costs. The requested relief included a temporary restraining order and preliminary injunction to enjoin Defendants' breach of the Agreement and tortious interference. [*7]

The Court denied APM's request for a TRO on November 19, 2003, and entered an Order for expedited proceedings.

On January 9, 2004, Defendants answered the

Complaint and also moved to dismiss. In support of its motion, Defendants argued that the Agreement is not valid or enforceable because it lacked consideration and mutual assent, and that APM failed to plead sufficient facts to support its claims for tortious interference and violations of the Deceptive Trade Practices and Trade Secrets Acts. Defendants also asserted that APM failed to state a claim against MM, because there was no privity of contract between APM and MM, and that APM's claim for equitable relief is barred by the doctrine of laches.

APM responded to the motion to dismiss on February 19, 2004. As part of that response, APM withdrew its request for a preliminary injunction and its deceptive trade practices and trade secrets claims. The Court later declined to dismiss the remaining claims and conducted a trial on the merits on March 1, 2004.

The issues presented at trial included: whether the Agreement is valid and enforceable; whether MM is an appropriate defendant; whether Defendants should be enjoined from further [*8] breach of the Agreement and from tortious interference with existing or prospective contracts; and whether damages and other remedies are appropriate.

### III. ARGUMENTS AND ANALYSIS

#### A. Breach of Contract

The most prominent issue in this case is the validity and enforceability of the covenant not to compete. The Court must first determine whether APM had an enforceable contract with Layton and, if so, whether it was breached. If the Agreement is valid and breached, the Court must determine whether specific performance or some other remedy is appropriate under the circumstances. n6

> n6 "Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened." *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987).

#### 1. Validity

The Agreement between Layton and APM satisfies the requirements of a valid contract. Those requirements are mutual assent and [*9] consideration. n7 APM offered Layton employment and contemporaneously presented to her the Agreement, which included a covenant not to compete. Layton and APM executed the Agreement in consideration of her employment and continued employment, thereby forming a valid contract. Because many of Defendants' arguments center on the validity of the Agreement, the Court addresses these elements in more detail below.

> n7 *See Research & Trading Corp. v. Pfuhl*, 1992 Del. Ch. LEXIS 234, at *16 (Nov. 19, 1992); *Delaware Express Shuttle, Inc. v. Older*, 2002 Del. Ch. LEXIS 124, at *40 (Oct. 23, 2002).

Layton testified that she was given an employment application and other materials to sign at the same time as the Agreement. James Sprinkle explained the Agreement to her, and told her that she would not be employed if she refused to sign it. Both Layton and Sprinkle signed the document, signifying their mutual assent. n8 Layton testified that she understood the document to mean that people [*10] could not go out and start a business, and that she agreed to it by signing it. n9 That is, Layton promised to abide by specific terms of the Agreement that effectively prevented her from conducting business with APM's clients in competition with APM for one year in a specifically delineated geographic area.

> n8 *See Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977) ("Defendant's act of signing the letter provided written confirmation of his agreement not to compete...")
> n9 Tr. at 25.

In consideration for her promise, APM employed Layton. Because Layton did not have a contract for a specified term, she was an "at-will employee." APM employed Layton for almost six years after she signed the Agreement. In Delaware, employment or continued employment may serve as consideration for an at-will employee's agreement to a restrictive covenant. n10 The Agreement therefore is supported by consideration and meets the requirements of a valid contract.

> n10 *Research & Trading Corp. v. Powell*, 468 A.2d 1301, 1305 (Del. Ch. 1983) ("Our courts have held that continued employment of an employee whose position is terminable at will constitutes sufficient consideration to support an enforceable contract."); *see also Pfuhl*, 1992 Del. Ch. LEXIS 234, at *23 (retention of an employee at will, in exchange for a covenant not to compete, constitutes adequate consideration).

[*11]

Defendants make a tortured argument that the Statute of Frauds precludes enforcement of the noncompete

agreement against Layton. The Statute of Frauds requires certain contracts to be evidenced by a writing. n11 Assuming that the Statute of Frauds applies to the Agreement, it is satisfied. The *written* Agreement contains the terms that APM seeks to enforce in this action. Defendants have failed to present any persuasive authority or argument for their novel contention that the Statute of Frauds should bar the *written* terms of the Agreement simply because other terms of the employment arrangement with Layton were not memorialized in a writing.

n11 6 *Del. C.* § 2714.

Defendants argue that Layton and APM entered into an *oral* employment contract, but that APM is trying to enforce a different contract. That contract includes the covenant not to compete and is embodied in the Agreement, which bears the title "Employment Agreement." According to Defendants, the Agreement [*12] by its terms cannot be performed within the space of one year after it was made. They therefore contend that the employment arrangement of which the covenant not to compete in the Agreement is only a part must be reduced to writing to satisfy the Statute of Frauds. n12 Defendants further argue that the Agreement fails to satisfy the writing requirement, because it omits terms of the oral employment contract, such as salary. Hence, they contend the Agreement is not enforceable under the Statute of Frauds.

n12 The Statute of Frauds, 6 *Del. C.* § 2714(a), provides in relevant part:

> No action shall be brought to charge any person ... upon any agreement that is not to be performed within the space of one year from the making thereof, ... unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith.

Contrary to Defendants' position, Plaintiff argues that the Employment Agreement can be performed within one year. Plaintiffs Post-Trial Reply Brief ("PRB"; the parties' post-trial opening and reply briefs are designated herein as POB, DOB, PRB and DRB, respectively) at 6. Having concluded that the Statute of Frauds defense lacks merit on other grounds, the Court need not address this issue.

[*13]

Interestingly, Defendants elsewhere concede, as they must, that "at will" employment contracts do not need to be in writing. n13 If one were to accept Defendants' argument, however, no employer could enter into a written covenant not to compete having a duration of one year or more with an at-will employee without reducing to writing all the other terms of their employment arrangement. There could not be a separate agreement that focused primarily on the covenant not to compete. The Court is not aware of any authority that requires such a result. n14

n13 DOB at 13.
n14 Defendants' reliance on *Enloe v. Gorkin*, 1990 Del. Super. LEXIS 477, 1990 WL 263563 (Del. Super. Dec. 26, 1990), is misplaced. In *Enloe*, the plaintiff tried to enforce a doctor's note regarding a patient's condition as a contract. The court ruled the writing was a note, not a contract. *1990 Del. Super. LEXIS 477, [WL] at *2*. In contrast, this Court has held that the writing at issue here is a valid contract.

Defendants' sole basis for invoking the Statute [*14] of Frauds is the duration of the covenant not to compete. That covenant, however, is memorialized in the *written* Agreement, and it includes all the material terms of the covenant. As demonstrated above, the parties assented to the Agreement and it is supported by consideration. Thus, the Court rejects Defendants' Statute of Frauds defense.

In another tortured argument, Defendants contend that the parole evidence rule bars APM from relying upon extrinsic evidence of what Defendants characterize as the missing terms of mutual assent and consideration in an effort to supplement the written Agreement and thereby satisfy the Statute of Frauds and other requirements for a valid contract. Since the Court has concluded that the Agreement is supported by mutual assent and consideration and that it complies with the Statute of Frauds, there is no merit to Defendants' parole evidence argument. As explained in *Taylor v. Jones*:

> The Parole Evidence Rule is a principle of substantive law that prevents the use of extrinsic evidence of an oral agreement to vary a fully integrated agreement that the parties have reduced to writing. n15

Contrary to Defendants' argument, the [*15] parole evidence rule provides no basis to bar the introduction of the *written* Agreement. Instead, it bars extrinsic evidence of oral agreements to vary fully integrated agreements that are reduced to writing. n16 The Rule does not preclude the use of extrinsic evidence of the elements necessary to

form a contract that does not contradict the writing itself, such as the consideration reflected in APM's continued employment of Layton. n17

> n15 *2002 Del. Ch. LEXIS 152, at \*10-11 (Dec. 17, 2002)*.
> n16 *Id.*
> n17 *See Equitable Trust Co. v. Gallagher, 34 Del. Ch. 249, 102 A.2d 538 (Del. 1954); Benz v. Wilmington Trust Co., 333 A.2d 169 (Del. 1975)*.

The Agreement between APM and Layton is valid as a matter of contract law. Defendants' arguments to the contrary are wholly without merit.

### 2. Breach

Layton in concert with MM acquired eleven of APM's clients within four months of her resignation. Defendants have admitted that the Agreement [*16] was breached if it was valid. n18 Layton is therefore individually liable to APM for her breach of the Agreement. n19

> n18 DOB at 22.
> n19 MM was not in privity of contract with APM. Nor has APM asserted any claim against MM or Truitt for breach of contract or for contributing to Layton's breach of her contract with APM. MM is accused, however, of tortious interference with APM's client contracts and prospective business relations, discussed *infra*.

### 3. Enforceability

To be enforceable, a covenant not to compete must (1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities. n20 When seeking specific performance of a covenant not to compete, the plaintiff has the burden of establishing her case by clear and convincing evidence. n21

> n20 *Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124 at \*40*.

[*17]

> n21 *TriState Courier & Carriage, Inc. v. Berryman, 2004 Del. Ch. LEXIS 43, at \*35 (Apr. 15, 2004)*.

As noted above, the Agreement meets general contract law requirements.

The restrictive covenant in the Agreement is limited to one year and an area defined by specific zip codes where the majority of APM's clients are located. n22 Defendants conceded that if the covenant not to compete is valid, it is reasonable as to time and geography. n23

> n22 PTX 3. The language of the Agreement (P3) arguably could be construed in the disjunctive to prohibit Layton, in the home or commercial cleaning field, from working, soliciting, contracting or taking employment (1) for any current or former customer of APM with which she had had contact on behalf of APM *or* (2) in the territories covered by 21 specified zip codes in Sussex County. Both sides, however, have construed the prohibition in the conjunctive to apply only to entities that were current or former customers of APM *and* located in the defined territory. Accordingly, the Court has adopted that construction for purposes of this opinion.

[*18]

> n23 DRB at 6. Noncompete agreements covering limited areas for two or fewer years generally have been held to be reasonable. *See Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124 at \*54* (finding three years unreasonable because of rapid customer turnover, and reducing duration of covenant to two years); *COPI of Delaware, Inc. v. Kelly, 1996 Del. Ch. LEXIS 136, at \*12 (Oct. 25, 1996)* (two year restriction reasonable for company officers and sales personnel); *Pfuhl, 1992 Del. Ch. LEXIS 234 at \*31* (one year restriction reasonable for company's vice president).

Courts recognize protection of an employer's goodwill as a legitimate economic interest for a restrictive covenant. n24 "An employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." n25 This is particularly true where, as here, the evidence demonstrates the importance of personal contacts to the success [*19] of a company. n26

> n24 *RHIS, Inc. v. Boyce, 2001 Del. Ch. LEXIS 118, at \*20 (Sept. 26, 2001)*.
> n25 *Pfuhl, 1992 Del. Ch. LEXIS 234, 1992 WL 345465 at \*12; TriState, 2004 Del. Ch. LEXIS 43 \*42, C.A. No. 20574*.

n26 *TriState*, 2004 Del. Ch. LEXIS 43 *42, C.A. No. 20574.

As office manager, Layton had the opportunity to develop economically valuable relationships with APM's customers. James Sprinkle testified that Layton held the most important position at APM and was its most important person. n27 She hired and supervised all of the cleaners and their supervisors, bid on prospective clients, prepared contracts for new clients, scheduled cleaning services for clients, and handled complaints. Layton testified that she ran the business. n28 As a result, Layton knew all the clients, what services they needed and how much they paid for the services. She easily could put this knowledge and experience to her own use and to the detriment of APM. The Agreement serves a legitimate purpose in protecting [*20] APM's goodwill, confidentiality, and established contracts. n29

> n27 Tr. at 151.
> n28 *Id.* at 27.
> n29 Defendants concede that, "The Restrictive Covenant is designed to protect a legitimate business interest of APM." DRB at 6.

The balance of the equities favors specific enforcement of the Agreement. On the one hand, APM required Layton to sign a covenant not to compete as a condition of employment. Sprinkle explained the Agreement to Layton and she understood it. The Agreement served to protect APM's valuable business relationships with its customers — relationships that would be vulnerable to misappropriation by an employee in Layton's position. Failing to enforce the Agreement would deprive APM of the benefit of its bargain. On the other hand, specific enforcement of the Agreement would preclude Layton from soliciting APM's customers for a reasonable period of time and in a limited area. Layton has been and is free to pursue clients that were not associated with APM before she [*21] left. Upon expiration of the Agreement and any injunction imposed by this Court, Layton would be free to pursue any clients she wishes. With Layton having enjoyed the benefits of almost six years of employment with APM, the Court fails to see any undue hardship to Layton from enforcement of the Agreement.

The Court further finds that the Agreement is enforceable in equity. The noncompetition clause, however, expired by its own terms on May 16, 2004, one year after Layton left APM. The consequences of that expiration are discussed under "Remedies," *infra*.

**4. Prior Material Breach**

Defendants contend for the first time in their post-trial brief that even if the Agreement is valid, APM cannot enforce it because APM committed a prior material breach. n30 According to Defendants, APM breached the Agreement by asking Layton to leave APM on the day she submitted her resignation without providing her with seven days notice or paying her for those days. Notwithstanding the belated assertion of this defense, the Court will address Defendants' arguments.

> n30 DOB at 27-29.

[*22]

Defendants failed to identify the source of this purported obligation to provide an at-will employee with notice or compensation for the notice period. The Court can only speculate that it stems from the Agreement. n31 Yet, nothing in the Agreement required APM to pay Layton after she submitted her resignation. The Agreement states that the *employee* must give seven days notice before leaving. It does *not* impose any obligations on the employer once the employee resigns or gives notice. n32 Defendants also failed to present any evidence of an oral contract requiring notice to Layton. An employer may terminate an at-will employee, like Layton, at any time, subject to the implied covenant of good faith and fair dealing. n33

> n31 *See* DOB at 27, citing *Dickinson Medical Group v. Foote*, 1989 Del. Super. LEXIS 156 (Mar. 23, 1989)(holding that medical group's failure to compensate a physician for services as delineated in her contract was a material breach, which excused her continued performance, where doctor had an employment contract for a defined term). Unlike the doctor in *Dickinson*, Layton was an at-will employee.

[*23]

> n32 *See* PTX 3. Moreover, Layton presented no evidence that she ever requested payment for those days.
> n33 *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 103 (Del. 1992) (Employer has "freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons."); *see also E.I. du Pont de Nemours & Co. v. Pressman*, 679 A.2d 436, 437 (Del. 1996) (Employment-at-will doctrine "generally permits the dismissal of employees without cause and regardless of motive.").

Not surprisingly, Defendants argue that by asking Layton to leave APM on the day she submitted her resignation, rather than the later date Layton unilaterally offered, APM violated the implied covenant of good faith and fair dealing. Such an implied covenant accompanies every employment contract. n34 Defendants presented no evidence, however, that even suggests that APM hired Layton or terminated her employment in bad faith. In fact, Layton voluntarily chose to resign even after Sprinkle assured her that her job was not in danger. APM acted [*24] within its rights in asking Layton, an at-will employee, to leave the same day she submitted her resignation. n35

> n34 *Comely v. Hartco, Inc.*, 1994 Del. Ch. LEXIS 5, at *6 (Jan. 27, 1994) ("An implied covenant of good faith and fair dealing is included in every employment contract made under the laws of Delaware.").
> n35 Even if APM's failure to pay Layton for seven days after her resignation did constitute a breach, it would not be sufficiently material to render the entire Agreement unenforceable. *See McCann*, 611 A.2d at 3 ("a *material* breach of the other party excuses performance") (emphasis added).

The Court therefore finds that APM did not commit a prior material breach that would preclude enforcement of its Agreement with Layton.

### B. Tortious Interference with Existing and Prospective Business Relations

APM asserts that Defendants tortiously interfered with its existing contracts and prospective business relations. The torts of interference with [*25] contracts and interference with prospective business relationships are closely related. n36 For each of the torts, APM must prove respectively: (1) the existence of either a valid contract or reasonable probability of a business expectancy; (2) the interferer's knowledge of the contract or expectancy; (3) intentional interference that induces or causes a breach or a termination of the business expectancy; and (4) damages. n37 In addition, for interference with business expectancies, the Court must also consider Defendants' right to interfere with APM's expectancies within the limits of fair competition. n38 APM must prove the elements of these torts by a preponderance of the evidence. n39

> n36 *Delaware Express Shuttle*, 2002 Del. Ch. LEXIS 124 at *88.
> n37 *Id.; see also DeBonaventura v. Nationwide Mutual Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980). In some cases, the court has also noted that defendants interference must be without justification. *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987); *CPM Indus., Inc. v. Fayda Chems. & Minerals, Inc.*, 1997 Del. Ch. LEXIS 175, at *23-24 (Nov. 26, 1997). Defendants failed to demonstrate a valid justification for their actions in this case.

[*26]

> n38 *Id.; see also DeBonaventura*, 419 A.2d at 947.
> n39 *See Pfuhl*, 1992 Del. Ch. LEXIS 234 at *38.

APM had valid contracts or business relationships with at least eleven of MM's clients. n40 Those clients had been long-term customers of APM, and APM reasonably expected to continue servicing them.

> n40 In its opening brief, APM argued that twelve of MM's fourteen commercial clients were former APM clients. POB at 7. The twelfth client is Tanger Outlets (formerly known as Rehoboth Outlets), which MM began working for after January 1, 2004. Rehoboth Outlets had been a client of APM at one point, but was using another cleaning service when it switched to MM. Since APM did not seriously pursue any claims for relief as to Tanger Outlets at trial or in its post-trial briefing and the evidence regarding it is incomplete, the Court has not considered Tanger Outlets for purposes of this opinion.

[*27]

Layton testified that she knew about all the APM contracts entered into during her employment. n41

> n41 Tr. at 27-28.

Defendants began servicing APM clients shortly after Layton left APM, notwithstanding their knowledge of the Agreement. By the time of trial (March 1, 2004), eleven former APM clients had hired MM to perform cleaning services for them. Contracting with these clients and servicing them constitute intentional acts of Layton and MM. Under the circumstances of this case, those acts are sufficient to support a claim of tortious interference. Based on the evidence presented at trial, the Court finds that Layton or Truitt (or persons acting on MM's behalf) had contacts with each of these eleven clients that facilitated their switch from APM to MM.

APM identified five clients who breached their con-

tracts with APM by failing to give thirty days notice before terminating APM's services. They are: Quality Roofing, Thorogoods, Century 21, Sussex Eye Center, and Ferguson. Each of these clients left [*28] APM and became a client of MM. Layton herself testified that, at least, Quality Roofing, Thorogoods, and Century 21, had contracts with APM that included thirty-day notice provisions. APM presented evidence that Sussex Eye Center and Ferguson also had contracts with APM with thirty-day notice provisions when they switched to MM. The evidence further showed that each of those five clients terminated their relationship with APM without providing the requisite notice.

APM had long term business relationships with all eleven clients and a reasonable expectancy that those relationships would continue. Layton knew about those relationships as a result of her employment at APM, and she and MM intentionally interfered with them. APM lost the profits that it otherwise would have made had Defendants not interfered.

Layton was not privileged to interfere with APM's prospective business relationships because she was prohibited from working, soliciting, contracting or taking employment for any current or former clients of APM under the Agreement. Layton's actions, even under a mistaken understanding of the enforceability of the Agreement, were at her own risk.

MM also was not privileged to compete [*29] with APM under the circumstances. MM is a distinct corporate entity from Layton. The Court recognizes that fact and that MM was not a party to the covenant not to compete with APM. Layton, however, is a principal and employee of MM. The privilege to compete is circumscribed by the limits of fair competition. n42 MM's status as a separate business entity does not provide it with a privilege to compete beyond the limits of fair competition. MM did not have a privilege to take advantage of the information and goodwill that Layton had obtained during her employment with APM when Layton's participation in the challenged activities was both a breach of contract and tortious. Furthermore, MM would be vicariously liable for Layton's torts under the doctrine of respondeat superior. n43

n42 *Delaware Express Shuttle*, 2002 Del. Ch. LEXIS 124 at *88. The other partner in MM, Rebecca Truitt, sought out Layton's participation to take advantage of her expertise and contacts as APM's office manager. Truitt also knew about Layton's covenant not to compete with APM from the time she and Layton formed MM. Therefore, the Court concludes that the conduct of MM through Truitt was not privileged.
[*30]

n43 *Restatement (Second) of Agency* §§ 219, 220 cmt. a (2004).

The Court finds that APM proved that Defendants are liable for tortious interference with APM's contracts with each of the five clients identified above as having failed to provide thirty days notice. The Court also finds Layton and MM liable for tortious interference with APM's prospective business relations with respect to all eleven clients, because they were not privileged to compete due to Layton's Agreement with APM and MM's acquisition of those clients in contravention of Layton's obligations to APM.

### C. Defenses

### 1. Laches

Defendants argue that APM's claim for injunctive relief is barred by the doctrine of laches. Laches will bar a claim if the claimant had actual or constructive knowledge of the claim and unreasonably delayed in bringing it, and the delay caused prejudice to the Defendants. n44 Defendants argue that APM knew about Layton's breach of the Agreement in early June, but waited until November to file suit, and has put forth no valid reason for the delay. Defendants [*31] also claim prejudice by the delay because they incurred costs in organizing a new business, spent the time arranging to work for former APM clients, not suspecting that the restrictive covenant would be enforced, and now must bear the costs of defending this action.

n44 *E.g., Fike v. Ruger*, 752 A.2d 112, 113 (Del. 2000); *Kerns v. Dukes*, 2004 Del. Ch. LEXIS 36, *26, C.A. No. 1999-S (Del. Ch. Apr. 2, 2004).

Defendants' arguments are not persuasive. For laches to apply, the claimant's delay must be unreasonable. When Layton resigned, she did not advise APM that she planned to start a competing cleaning business with Truitt. Likewise, there is no evidence that APM or the Sprinkles obtained contemporaneous knowledge of that fact from any other source. In the succeeding months, James Sprinkle contacted each client who terminated and asked what cleaning services they were using. Except for Quality Roofing, no one told him that it was Defendants. n45 Sprinkle testified that APM clients transferred to MM [*32] one-by-one over time, and APM hesitated to take on the financial burden of a lawsuit over the loss of one

or two clients. Moreover, as soon as Sprinkle learned that Quality Roofing had begun using the Truitts, he had his attorney send them a warning letter. n46 When Sprinkle realized that Defendants were causing serious financial harm to APM he began consulting with attorneys about the problem, and filed suit as soon as he found an attorney to accept the case. n47

> n45 In June 2003, Thorogoods and Fergusons said they would do cleaning "in house," Tr. at 156, 175-76; in July 2003, Sussex Eye Center said it was using Dee's Cleaning in Georgetown, Tr. at 144; and in August 2003, Century 21 said it was using another service but did not give a name, Tr. at 181.
> n46 Tr. at 168, 187; DTX 9. Both Rebecca Truitt and her husband worked for APM until May 2003. Although he was not an owner of MM, Mr. Truitt worked with his wife in providing cleaning services to MM's clients.
> n47 Sprinkle first consulted an attorney in Georgetown in September 2003. After two or three attorneys were unable to take the case, Sprinkle contacted Mr. Brockstedt, who agreed to represent APM.

[*33]

The Court finds that APM's alleged "delay" in filing suit was not unreasonable under the circumstances. Moreover, it was well within the time period prescribed by the legal statute of limitations, which provides a presumptive time period for application of the equitable doctrine of laches. n48

> n48 See, e.g., Kerns, 2004 Del. Ch. LEXIS 36 *13, C.A. No. 1999-S; U.S. Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc., 677 A.2d 497, 502 (Del. 1996); Kahn v. Seaboard Corp., 625 A.2d 269, 277 (Del. Ch. 1993).

Defendants incurred the costs of organization and start-up almost immediately after Layton left APM. APM's alleged delay in taking action against Defendants had no effect on those start-up costs. Defendants also determined to solicit APM clients despite the risk that the restrictive covenant might be enforced against them. Any prejudice to Defendants is a result of their own doing. APM's action is not barred by laches.

### 2. Equitable Estoppel

Defendants contend that APM [*34] is equitably estopped from enforcing the Agreement against them. The doctrine of equitable estoppel may provide a defense "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." n49 To establish equitable estoppel, the party claiming the estoppel must show that it: (1) lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (2) relied on the conduct of the party against whom equitable estoppel is claimed; and (3) suffered a prejudicial change of position as a result of its reliance. n50

> n49 Wilson v. American Ins. Co., 58 Del. 394, 209 A.2d 902, 903-04, 8 Storey 394 (Del. 1965).
> n50 Waggoner v. Laster, 581 A.2d 1127, 1136 (Del. 1990); Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124 at *37.

Defendants allege that APM led Layton to believe that the Agreement was unenforceable, and she reasonably relied on APM's representations and [*35] conduct to her detriment. Specifically, Defendants assert that Sprinkle told Layton the Agreement was unenforceable and never tried to enforce comparable agreements against four other employees who were in breach. n51

> n51 DOB at 24-25.

Layton testified, however, that she did not rely on APM's representations, but rather on those of her own attorney in concluding that the Agreement was unenforceable. n52 In fact, she told Truitt that she could not join her in a competing business until she had her attorney look at the Agreement. n53 Therefore, Layton not only had, but also utilized, other means for obtaining knowledge of whether the Agreement was enforceable.

> n52 Tr. at 228. To the extent Layton tried at trial to back away from her deposition testimony and suggest that she also relied in part on Sprinkle's statement, the Court finds her deposition more credible. At the deposition, Layton testified unequivocally that she relied on her attorney, Mr. Fifer, and not Sprinkle, in starting MM. See Tr. at 226-27.

[*36]

> n53 Id. at 207.

Moreover, both Layton and Sprinkle testified that APM *did* try to assert the Agreement against other employees. Sometime between 2000 and 2002, two of APM's cleaners cleaned a few houses in breach of the restrictive

covenant. Layton testified that Sprinkle called his attorney who advised him that the covenant could not be enforced against the cleaners. While Layton was in the room during the call, she did not hear the entire conversation. Sprinkle told Layton "there was nothing that could be done," but did not tell her why. n54 Nevertheless, Sprinkle still had his attorney send warning letters to the cleaners and they discontinued the offending activities. As to third employee, Layton could not say that Sprinkle had any knowledge of her alleged violations. Finally, with respect to the fourth employee, all Layton could say was that Sprinkle called and "kind of harassed [her] a little bit to try to scare her, but it didn't work." n55

n54 *Id.* at 225-226.
[*37]

n55 *Id.* at 204.

Sprinkle's actions show that he thought the restrictive covenant could be used to protect APM and that he attempted to use it for that purpose. The fact that APM did not sue these other employees may mean only that the economics of those situations did not justifying incurring the expense of legal action. Layton knew that Sprinkle had tried to use the covenant to protect APM's interest. The fact that on one occasion Sprinkle told her nothing could be done is inconclusive. There are many reasons why it might not be practicable to pursue enforcement of a restrictive covenant in a particular instance. The positions of the offending parties could differ, for example. Layton was a manager, not a cleaner. While it may not have made sense to attempt to enforce a restrictive covenant against two cleaners, who were not privy to APM's business policies, the situation could be quite different with a manager like Layton. n56 In these circumstances, the Court finds that Layton could not reasonably have relied on Sprinkle's comments or conduct as meaning that the Agreement could [*38] not be enforced against her. Consequently, APM is not equitably estopped from enforcing the Agreement against Defendants.

n56 *See McCann*, 611 A.2d at 4 ("Where valuable trade secret or other proprietary information has been learned by the defendant and, therefore, his competition with plaintiffs business may be particularly effective and unfair, the contractual provision not to compete is more likely to be specifically enforced.").

**D. Remedies**

**1. Damages**

The proper measure of damages for breach of a covenant not to compete is APM's lost profits. n57 APM contends that it should receive five years of projected lost profits because the eleven clients it lost to MM had been clients of APM for an average of five years. If Layton had not breached the Agreement, however, Defendants could have competed legitimately for that business after May 16, 2004. APM's clients could terminate their service contracts with APM at any time provided they give thirty days notice. Because the Truitts [*39] cleaned for many of those clients and Layton was their contact person, APM might have lost some or all of those clients to MM through valid competition within a relatively short time after May 16, 2004. The Court, therefore, finds that APM has not proven that it is entitled to recover five years of lost profits.

n57 *See RHIS*, 2001 Del. Ch. LEXIS 118 at *24 (awarding damages based on plaintiffs historical profit margin); *cf. Delaware Express Shuttle*, 2002 Del. Ch. LEXIS 124 at *60-61 (awarding plaintiff the defendants' profits instead of plaintiffs lost profits, where plaintiff did not prove its lost profits).

APM's damages should be based on a shorter time period. APM's expert, Andrew C. Verzilli ("Verzilli"), testified that, in his opinion, APM's lost profits from May 2003 through May 2004 would have been $31,000, and through May 2005 would have been $56,600. n58 These figures take into account the normal 5% attrition rate of APM's clients. They also reflect Verzilli's [*40] conservative assumption of no growth in the annual revenues from the lost customers during the period from May 2004 to May 2005 and his discounting of the revenues for that period to present value using a discount rate of 15% to account for market and risk conditions. This two-year projection of lost profits accounts for APM's likely eventual loss of the clients in issue due to permissible competition from Defendants, but also assumes that those clients, on average, would have remained with APM through May 2005, absent Layton's breach and Defendants' tortious conduct during the term of the Agreement.

n58 PTX 38; Tr. at 99.

Defendants contend the Court should not award damages because APM failed to prove Defendants proximately caused any damage. Specifically, Defendants contend that the eleven clients left either because they wanted to continue receiving services from the Truitts or they

were dissatisfied with APM. The Truitts had been with APM since 1992 and serviced almost all of the clients who switched [*41] to MM.

The Court finds this argument unpersuasive. The evidence showed that APM clients dealt with Layton more than anyone else at APM. Sprinkle testified that Layton "had all the knowledge, what we charged, how often we went there, what kind of supplies they got, the dates, the cleaning, the contacts, the phone numbers, the cell phones. She knew everybody." n59 It is therefore reasonable to infer that Layton contributed to MM's success in obtaining APM's former clients. Defendants' argument might well have merit if the Truitts had started a competing cleaning business on their own, but they chose not to do so. Instead, they joined with Layton to form MM. The Court finds that the evidence fully supports an award of damages against Defendants for the eleven clients at issue. n60

> n59 Tr. at 159-60.
> n60 Defendants rely heavily on *Total Care Physicians, P.A. v. O'Hara*, 2003 Del. Super. LEXIS 261, 2003 WL 21733023 (Del. Super. July 10, 2003). The *Total Care* case involved claims for misappropriation of trade secrets; APM did not pursue any trade secrets claim at trial. In any case, the proofs presented in this case satisfy APM's burden on causation, assuming it is as stated in *Total Care.*

[*42]

Defendants also contend that only Layton, and not MM, can be held liable for breach of the Agreement, because only Layton is bound by the Agreement. The Court agrees that MM is not bound by the Agreement. Therefore, it is not liable for the damages caused by Layton's breach. MM is liable, however, for the damages caused by their tortious interference with five of APM's contracts and with APM's prospective business relations with the eleven clients it lost to MM.

In addition, Defendants challenge the methods Verzilli used to calculate damages. Specifically, Defendants criticize Verzilli's treatment of fixed costs, taxes and the starting point for his first year damages. n61 Notably, Defendants did not proffer a damages expert of their own.

> n61 DOB at 38, 40.

Verzilli explained at trial that he did not deduct fixed costs because APM had to pay the fixed costs for its existing clients notwithstanding the loss of eleven clients to MM. The amount of these costs, therefore, was not affected by the breach [*43] and tortious interference. The federal district court for Delaware has held that "fixed overhead is not to be charged against Plaintiffs damages." n62 Based on the evidence presented, and the absence of any competing expert testimony from Defendants, the Court will not charge fixed costs against Plaintiffs damages. The Court finds that APM's expert properly did not deduct fixed costs in calculating lost profits.

> n62 *W.L. Gore & Assoc., Inc. v. Carlisle Corp.*, 1978 U.S. Dist. LEXIS 17698, at *39 (D. Del. May 17, 1978); *see also Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795, 799, 6 V.I. 166 (3d Cir. 1967) (holding that overhead should not be deducted from lost profits because overhead remained constant and was unaffected by the contract); *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 23 (Fed. Cir. 1984) ("Thus fixed costs ... are excluded when determining profits.").

Defendants further challenge Verzilli's failure to deduct taxes from his calculation [*44] of lost profits. Verzilli admitted being uncertain whether this was a requirement in Delaware. Awards of lost profits are considered taxable income by the IRS and, as a result, by the State of Delaware. n63 Deducting taxes from the lost profits calculation would result in a double tax on the award. Thus, the Court concludes that Verzilli's calculation was proper.

> n63 *See* Internal Revenue Service Pub. 525, 2003; 30 Del. C. § 1105.

Finally, Defendants contest Verzilli's estimate that APM's lost profits for the first year, ending May 16, 2004, was $31,000, because he did not make any adjustment "for the fact that clients left at various times during the one-year term of the Restrictive Covenant." n64 In another case involving an award of damages for tortious interference and breach of a restrictive covenant, this Court stated: n65

> The law does not require certainty in the award of damages when a wrong has been proven and injury established. Responsible estimates [*45] that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages.

The evidence here shows that the eleven clients began using MM at various times from May 29 to September 2, 2003. Defendants argue that Verzilli improperly estimated lost profits for the first year from May 2003 to May 2004. They also argue that Verzilli should have presented his data on a client by client basis, instead of in the aggregate, as he did.

> n64 DOB at 39.
> n65 *Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124 at \*60*, quoting *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc., 1992 Del. Ch. LEXIS 224, 1992 WL 251380 at \*7 (Del. Ch. Sept. 29, 1992).*

The Court finds the aggregate numbers are sufficient, but agrees with Defendants that they should be adjusted somewhat because the clients left after May. The evidence indicates that the average time after May 16, 2003, that the eleven clients switched to MM was two months. [*46] Accordingly, the Court will reduce Verzilli's estimate of lost profits for the first year ($ 31,000) by one sixth or $5,167.

The Court will award APM damages on its claims for breach of contract and tortious interference equal to APM's projected lost profits for the period through May 16, 2005, in the amount of $51,433 ($ 56,600 - $5,167). Layton and MM are jointly and severally liable for that amount.

### 2. Equitable Relief

APM requested specific enforcement of the Agreement and a permanent injunction barring Defendants from interfering with APM's current and prospective customers. The Court has concluded that the Agreement is enforceable. By its own terms, however, the Agreement expired on May 16, 2004. Thus the Agreement cannot be specifically enforced as written. Subject to the uncertainties created by this litigation, MM was privileged to compete at the expiration of the agreement. Consequently, there has been no showing that tortious interference with prospective business relations is likely to continue in the future. If that were to occur, APM could seek appropriate remedies at that time.

APM requested that the Court craft an equitable remedy enjoining Defendants from [*47] competing with APM for a year from the date of judgment. Having determined to award APM money damages that reflect the impact of the noncompetition agreement, the Court concludes that APM's request would, in effect, extend the restriction imposed by the Agreement for another year. n66 That would not be appropriate in the circumstances of this case.

> n66 *See TriState, 2004 Del. Ch. LEXIS 43 \*59 n.152, C.A. No. 20574-N* (noting that the non-compete agreement provides "the most appropriate caliper for measuring and defining an appropriate remedy.")

Moreover, the harm has already occurred. The Court cannot order the clients to return to APM. It would be detrimental to the clients, and not particularly helpful to APM, if the Court were to enjoin MM from servicing those clients without forcing them to return to APM. n67 Therefore, MM will be permitted to retain the eleven clients and the Court will compensate APM for the loss of those clients with an award of money damages. The remedy at law, money damages, is adequate [*48] in this action.

> n67 In apparent recognition of these difficulties, APM does not seek to preclude Defendants from continuing to serve the eleven former APM clients in question. PRB at 17.

### 3. Fees and Costs

APM has requested costs and reasonable attorneys fees as specified by the Agreement. The Agreement provides: "employee will be responsible for all court costs and attorneys fees necessary to enforce this agreement." Former Chancellor Allen addressed such a request in the employment context. He stated:

> With respect to contracts it is settled that a provision by which one party undertakes to pay counsel fees of the other in the event of his own breach is not void as against public policy. While no Delaware case has been found in which a fee shifting provision in an employment contract has been directed against an employee, cases in other jurisdictions have enforced such provisions in this way. n68

Chancellor Allen noted certain public policy concerns when the fee shifting provision [*49] is part of an employment contract because of concerns over disparities in bargaining power but found that those concerns were not implicated with respect to the business savvy parties before him.

> n68 *Pfuhl, 1992 Del. Ch. LEXIS 234, 1992 WL*

*345465 at \*14; see also Knight v. Grinnage, 1997 Del. Ch. LEXIS 133, 1997 WL 633299 (Del. Ch. Oct. 7, 1997)*(Steele, V.C.)

Those public policy concerns are not implicated in this case for other reasons. APM is not a large corporation with enormous bargaining power. It is a small family owned business in Sussex County, Delaware, serving local clients. The evidence shows that Layton was a very important employee of APM. In addition, the fee shifting provision does not relate to a breach of any term of the general employment relationship, but rather to Layton's knowing and intentional conduct after resigning from APM in violation of a covenant not to compete. The Court will award APM court costs and attorneys fees against Layton in accordance with the Agreement.

The record does not demonstrate [\*50] the amount or the reasonableness of fees incurred by APM. Thus, the Court's holding is limited to establishing APM's right to fees and costs, taking into account that APM abandoned certain of its initial claims. Determination of the proper amount of those fees and costs must await appropriate supplementation of the record. Within ten days of the date of this Memorandum Opinion, APM's counsel shall submit an affidavit and appropriate documentation showing the amount and reasonableness of the attorneys fees and costs they claim. Defendants may file any opposition to APM's application within ten days after the date of that submission.

## CONCLUSION

For the foregoing reasons, Layton is liable for breach of the Agreement. Layton and MM are liable for tortious interference with APM's contractual and prospective business relations. Layton and MM are jointly and severally liable for damages in the amount of $51,433. APM's claim for injunctive relief is denied. APM shall supplement the record to demonstrate the amount and reasonableness of their requested attorneys fees and court costs.

Counsel shall promptly confer and submit a stipulated or proposed form of judgment in accordance with [\*51] this opinion and *10 Del. C. § 4734*.

IT IS SO ORDERED.