# B

Not Reported in F.Supp.2d                                                                                       Page 1
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)
**(Cite as: 2002 WL 32332751 (D.Del.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
ASSOCIATED/ACC INTERNATIONAL, LTD.,
Plaintiff/Counterclaim Defendant,
v.
DUPONT FLOORING SYSTEMS FRANCHISE CO.,
INC., et al., Defendant/Counterclaim
Plaintiff.
No. Civ.A. 99-803-JJF.

March 28, 2002.

Edmond D. Johnson, and Ashley B. Stitzer, of the Bayard Firm, Wilmington, Delaware, John T. Morin, of Wormser, Kiely, Galef & Jacobs LLP, New York, New York, for Plaintiff, of counsel.

Richard L. Horwitz, Kevin R. Shannon, and James M. Kron, of Potter Anderson & Corroon, LLP, Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Presently before the Court is Defendants' Motion for Summary Judgment (D.I.89). For the reasons stated below, the Court will grant the motion.

BACKGROUND

Plaintiff Associated/ACC International, Ltd. ("Plaintiff"), is a New York Corporation with its principal place of business located in New York City. Plaintiff is primarily involved in selling commercial flooring products to national chains of specialty retail stores ("the National Retail Market"). The three Defendants, DuPont Flooring Systems Franchise Company, Inc. ("DFSFC"), DuPont Commercial Flooring Systems, Inc. ("DCFS"), and DuPont Flooring Systems, Inc. ("DFS") (collectively "Defendants"), are corporations involved in the commercial flooring business with their principal places of business in Kennesaw, Georgia. [FN1] DFSFC and DCFS are operating subsidiaries of DFS, which is a holding company. DFSFC's business primarily involves granting DFS franchises to independent companies ("Franchisees") in the commercial flooring industry. DCFS directly owns numerous companies involved in the commercial flooring industry ("Owned Operations") (Franchisees and Owned Operations are collectively referred to as "the DuPont Network"). All three Defendants are affiliates of E.I. DuPont de Nemours & Co. ("DuPont").

> FN1. DFSFC and DFS are Delaware corporations, while DCFS is a California corporation. (D.I. 12 at 12).

After months of negotiations, Plaintiff and DFSFC entered into a contract in September of 1998 ("the Contract"). The Contract consisted of two sections: the Franchise Agreement, which is the standard agreement offered by DFSFC to potential Franchisees, and the Special Stipulations, which are negotiated modifications to the Franchise Agreement. The Special Stipulations provide that Plaintiff would be designated as DFS's "National Retail Store Account specialist." (D.I. 92 at A-222).

In the months following the September 1998 agreement, the relationship between Plaintiff and Defendants deteriorated, and on November 23, 1999, Plaintiff filed the instant lawsuit against Defendants. In its Amended Complaint, Plaintiff alleges that (1) Defendants made fraudulent and/or negligent misrepresentations during and prior to the Contract negotiations, (2) DFSFC breached the Contract, (3) DFS and DCFS tortiously interfered with the Contract, and (4) DFS defamed Plaintiff by making certain statements to Perstorp AB ("Perstorp"), a Swedish manufacturer of floor coverings. [FN2] (D.I.8). In their Answer, Defendants deny Plaintiff's allegations, assert counterclaims against Plaintiff for defamation and breach of contract, and seek to have the Contract terminated. [FN3] (D.I.12).

> FN2. By way of a distribution agreement with Perstorp, the DuPont Network had the exclusive right to sell commercial flooring products manufactured by Perstorp ("Pergo Products").

> FN3. The parties executed a Termination Agreement in January 2000, terminating the Contract effective as of December 31, 1999. (D.I. 92 at A-326 to A-330).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)
**(Cite as: 2002 WL 32332751 (D.Del.))**

Defendants filed the instant motion for summary judgment on February 1, 2001. Briefing was completed on February 27, 2001. Below is the Court's decision on Defendants' motion.

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. [FN4] *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). However, to defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:

> FN4. To properly consider all of the evidence without making credibility determinations or weighing the evidence, a "court should give credence to the evidence favoring the [non-movant] as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." ' *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000).

*2 do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). Thus, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

### DISCUSSION
I. Plaintiff's Breach of Contract Claim

Defendants contend that they are entitled to summary judgment on Plaintiff's breach of contract claim. (D.I. 90 at 14). Plaintiff's Amended Complaint alleges that DFSFC breached paragraph 4(a) of the Special Stipulations by failing to provide certain business "leads" to Plaintiff. The relevant portion of the Special Stipulations reads:

> 4. HANDLING OF BUSINESS LEADS--Recognizing that special skills are needed to adequately service certain segments of the commercial flooring market, in particular the retail store and the corporate end-use segments, [Plaintiff] and [DFSFC] shall, as set forth below, share leads that they uncover to business in these market segments. It is not intended or expected that [Plaintiff] or Owned Operation shall forgo or refrain from bidding on any business they feel competent to handle; rather, the purpose of this exchange of leads is to insure that each client receives the best possible service from [DFS] and its franchise members.
>
> (a) All Owned Operations locations will be informed of [Plaintiff's] status as a National Retail Store Specialist and will be *encouraged* to inform [Plaintiff] of leads that they uncover involving business in this segment, with the exception of business involving relationships strategic to its business. These leads will be in the form of headquarters locations and/or key personnel involved in the decision making process, along with any other information they might have that could assist [Plaintiff] in the development of prospective business.

(D.I. 92 at A-223--A-224) (emphasis added). Defendants contend that Plaintiff's breach of contract claim is premised on the theory that the word "encouraged," as used above, "required" or "directed" the Owned Operations to inform Plaintiff of leads relating to the National Retail Market. (D.I. 90 at 14). Defendants argue that Plaintiff's interpretation of "encouraged" contradicts its plain meaning, and thus, should not be adopted by the Court. (D.I. 90 at 14-15). Plaintiff responds that, in the context of the Special Stipulations, the word "encouraged" is ambiguous and the Court can consider Plaintiff's extrinsic evidence that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)
**(Cite as: 2002 WL 32332751 (D.Del.))**

suggests the parties intended "encouraged" to mean "very close to the same as 'directing' Owned Operations to provide leads." (D.I. 96 at 8-9, 16). Accordingly, the Court must first determine whether the word "encouraged" is ambiguous.

*3 Under Delaware law, [FN5] the interpretation of contract language is a question of law. *O'Brien v. Progressive N. Ins. Co.,* 2000 WL 33113833, at *4 (Del.Super.Ct. Dec. 18, 2000) (citing *Rhone-Polenc Basis Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992)). The use of extrinsic evidence to interpret "clear and unambiguous language" in a contract is not permitted. *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* 711 A.2d 45, 56 (Del.Super.Ct.1995), *modified on other grounds,* 1996 WL 769627 (Del.Super.Ct. Dec. 24, 1996). The parties' intent is dispositive when a court construes a contract; however, when the language is unambiguous and has "an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *Id.* (citing *Citadel Holding Corp. v.. Roven,* 603 A.2d 818, 822 (Del.1992); *E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del.1985)). *See also Fox v. Rodel, Inc.,* 1999 WL 803885, at *8 n. 14 (D.Del. Sept. 13, 1999). Unambiguous contract language must be construed in accordance with how it would be understood by "an objective reasonable third party." *Sanders v. Wang,* 1999 WL 1044880, at *6 (Del. Ch. Nov. 8, 1999). Contract language is not unambiguous, however, if the language is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings ." *Rhone-Poulenc,* 616 A.2d at 1196.

> FN5. The Franchise Agreement specifically provides that all disputes regarding the Contract are to be governed by Delaware law. (D.I. 92 at A-212).

The Court concludes that the word "encouraged" is unambiguous. In the Court's view, "encouraged" does not create an obligation on Defendants to "direct" or "require" Owned Operations to provide business leads, nor does it create a contractual guarantee that leads would be provided to Plaintiff. The Court agrees with Defendants that "encouraged" means "to spur on" or "to stimulate" someone to do something. (D.I. 90 at 15 (citing MERIAM WEBSTER'S COLLEGIATE DICTIONARY, at 381 (10th ed.)); D.I. 92 at A-173). As used in the Special Stipulations, "encouraged" describes DFSFC's conduct towards Owned Operations. Accordingly, the Court concludes that Plaintiff's proffered interpretation, which focuses on Owned Operations' conduct towards Plaintiff, should be considered. As a result, all of Plaintiff's proffered extrinsic evidence supporting its interpretation of "encouraged" will be disregarded by the Court.

Plaintiff nonetheless contends that there are different degrees of encouragement that DFSFC could have provided to Owned Operations, and this fact should be sufficient to defeat Defendants' motion for summary judgment. (D.I. 96 at 10-14). The Court agrees that encouragement may be provided in varying degrees, however, this does not change the focus of the Court's inquiry, which is whether or not DFSFC "encouraged" Owned Operations to provide leads to Plaintiff. [FN6]

> FN6. Plaintiff advances a number of additional contentions in support of its interpretation of "encouraged," and its "result driven" focus, all of which the Court concludes are irrelevant to the issue of whether Defendants encouraged Owned Operation to provide leads to Plaintiff. First, Plaintiff contends that the "strategic" leads exception in Paragraph 4(a) is unnecessary if "encouraged" does not mean "required," and that therefore, the Court should adopt Plaintiff's interpretation. (D.I. 96 at 12). However, the Court fails to see Plaintiff's logic. What the exception states is that DFSFC need not "encourage" Owned Operations to provide strategic leads to Plaintiff, while DFSFC was obligated to "encourage" Owned Operations to provide non-strategic leads to Plaintiff.
> Plaintiff also contends that the sentence in Paragraph 4(a) immediately following the disputed language supports its interpretation of "encouraged" because it describes in detail the form of these leads. Plaintiff contends that such a detailed description would not be included if these leads were not "required" to be provided to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01278-KAJ   Document 214-3   Filed 10/19/2005   Page 5 of 11

Westlaw

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)
**(Cite as: 2002 WL 32332751 (D.Del.))**

Plaintiff. (D.I. 96 at 13-14). Again, Plaintiff's contention does not make sense. The mere fact that Paragraph 4(a) describes the form of these leads in detail does not support the inference that these leads were required to be provided; rather, the description is included in the event that Owned Operations agree to provide leads after DFSFC encouraged them to do so. Any other interpretation would contradict the plain meaning of the word "encouraged."

In order to avoid summary judgment, Paintiff must come forward with sufficient evidence that Defendants did not "encourage" Owned Operations to provide leads as required by Paragraph 4(a) of the Special Stipulations. On the record before it, the Court concludes that Plaintiff has failed to do so.

*4 Plaintiff's first contention in support of its position that DFSFC failed to sufficiently "encourage" Owned Operations is that any encouragement provided by DFSFC to Owned Operations would not result in Plaintiff actually receiving any leads because the assignment of leads was determined by the Pergo database logic. (D.I. 96 at 25) (citing D.I. 92 at A-71 to A-73). This contention focuses on the lack of leads actually received by Plaintiff, not the encouragement provided by DFSFC. Thus, the Court finds this contention to be irrelevant.

Plaintiff's second contention is that there is no evidence that DFSFC ever encouraged Owned Operations to provide leads, and further, that there is hardly any evidence that DFSFC even informed Owned Operations of Plaintiff's status as National Retail Store Account specialist. (D.I. 96 at 25). The Court concludes that this contention is not supported by the evidence.

Plaintiff argues that: (1) DFSFC never explained to the Owned Operations, in writing, what benefits they would receive if they were to provide leads to Plaintiff, (D.I. 96 at 26), and (2) Plaintiff was not identified in the operations manual that was given to Owned Operations and Franchisees, even though said manual contained a section on national accounts that identified Defendants' other "national account specialists," and instructed Owned Operations how to develop their own national retail store business without involving Plaintiff. (D.I. 96 at 26).

The Court concludes that Plaintiff's contentions are insufficient to meet its burden of proof. First, in its brief, Plaintiff fails to cite evidence of record supporting the above contentions. (D.I. 96 at 26). Second, nowhere in its brief does Plaintiff cite evidence which suggests that Defendants were required to present in writing the potential benefits for Owned Operations if it provided leads to Plaintiff. Third, Plaintiff has not produced any evidence that the above-mentioned operations manual was required to identify Plaintiff as its National Retail Store Account specialist. Fourth, Defendants have produced evidence that they did encourage Owned Operations to provide leads to Plaintiff in various ways, including but not limited to: (1) issuing press releases and announcements to Franchisees and Owned Operations and sending letters to "aligned suppliers," that announced Plaintiff as Defendants' National Retail Store Account Specialist, (2) having the President of DFSFC, Ron Rose, give interviews in which he discussed the expected benefits to both parties as a result of the Contract, (3) publishing information concerning Plaintiff in the DFS Newsletter, (4) offering Plaintiff an opportunity to speak at various meetings, some of which were attended by Defendants' "entire network," in order for Plaintiff to communicate the financial benefits to Owned Operations if they informed Plaintiff of leads and if they included Plaintiff in business dealings involving accounts in the National Retail Market. (D.I. 99 at 7) (citing D.I. 92 at A-84 to A-86).

*5 Based on this record, the Court concludes that Plaintiff has failed to produce sufficient evidence in support of its contention that Defendants failed to adequately "encourage" Owned Operations to provide leads to Plaintiff. Accordingly, Defendants' motion for summary judgment on Plaintiff's breach of contract claim will be granted. [FN7]

> FN7. Defendants also contend that they are entitled to summary judgment on Plaintiff's breach of contract claim because: (1) only DFSFC was a party to the Franchise Agreement, (2) Plaintiff waived the right to bring its breach of contract claim, and (3) Plaintiff has failed to produce any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01278-KAJ    Document 214-3    Filed 10/19/2005    Page 6 of 11

Not Reported in F.Supp.2d                                                                                         Page 5
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)
(Cite as: 2002 WL 32332751 (D.Del.))

evidence that it suffered damages as a result of the alleged breach. (D.I. 90 at 19-21). Because of the decision reached, the Court will not address the additional contention offered by Defendants.

II. Plaintiff's Fraud Claim

Defendants contend that they are entitled to summary judgment on Plaintiff's claim of fraudulent inducement and/or fraudulent misrepresentation. (D.I. 90 at 21). Under Delaware law, the elements of fraud are:

1) a false representation, usually one of fact, made by the defendant;
2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
3) an intent to induce the plaintiff to act or to refrain from acting;
4) the plaintiff's action or inaction [was] taken in justifiable reliance upon the representation; and
5) damage to the plaintiff as a result of such reliance.

*Lord v. Souder,* 748 A.2d 393, 402 (Del.2000).

Defendants contend that Plaintiff has failed to produce sufficient evidence to support its fraud claim. Plaintiff relies on four alleged statements and/or omissions in opposition to Defendants' motion. First, Mr. Rose made certain statements during negotiations regarding the meaning of the word "encouraged." (D.I. 96 at 35). Second, Mr. Rose stated during negotiations that he did not want all of the words in the Contract to have "legal significance in the sense of contractually binding language." (D.I. 96 at 35-36). Third, Defendants failed to inform Plaintiff that under Defendants' contract with Perstorp, all members of the DuPont Network were obligated to sell only Pergo products in Pergo's market system. (D.I. 96 at 36). Fourth, Defendants fraudulently claimed that, "if it were successful in meeting its goals for the [DuPont] Network it was establishing, no carpet contractors outside the [DuPont Network] would have access to carpet made from Antron fiber. (D.I. 96 at 36). The Court will address each alleged instance of fraud in turn.

1. Meaning of the Word "Encouraged"

The Court concludes that no reasonable jury could conclude that Plaintiff justifiably relied on Mr. Rose's alleged statements regarding his interpretation of the word encouraged. If Mr. Rose intended for Paragraph 4(a) to mean "very close to the same as 'directing' " Owned Operations to provide leads to Plaintiff, and if this interpretation was acceptable to Plaintiff, specific language should have been included providing as such. Negotiations over the Franchise Agreement and Special Stipulations lasted for many months, and the Special Stipulations were of critical importance to Plaintiff due to its opinion that executing the standard Franchise Agreement by itself was not a viable option. It was unreasonable for Plaintiff to have simply accepted Mr. Rose's alleged representations as to the meaning of "encouraged," when such interpretation contradicts the meaning that an ordinary person would ascribe to it. The unreasonableness of this reliance is underscored when considering that the Franchise Agreement contains a comprehensive integration clause. [FN8] As a result, the Court concludes that any reliance by Plaintiff on these representations was not justifiable, and that, therefore, these representations cannot sustain Plaintiff's fraud claim.

> FN8. The Integration Clause reads in relevant part:
> (a) [The Contract] undertakes all the terms and conditions of [the parties' agreement]. This [Contract] contains all oral and written agreements, representations and arrangements between the parties hereto ...
> (b) [Plaintiff] has no knowledge of any representations by [Defendants] about the business contemplated by this [Contract] that are contrary to the terms of this agreement or the documents incorporated herein....
> (j) [Plaintiff] acknowledges that this [Contract] constitutes the entire agreement of the parties ... and supersedes any prior agreement between the parties concerning the same subject matter.
> (D.I. 92 at A-213 to A-215).

2. Avoiding Legally Significant Contract Language

*6 The Court concludes that any reliance by Plaintiff on Mr. Rose's alleged statement that he did not want Plaintiff to worry about inclusion of the word "encouraged" because he

Not Reported in F.Supp.2d                                                                                              Page 6
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)
**(Cite as: 2002 WL 32332751 (D.Del.))**

did not intend "to make every word ... legally significant and create clear contractually binding language," was unjustifiable. (D.I. 96 at 37) (citing D.I. 92 at A-173). As noted above, the Contract was extensively negotiated for many months by sophisticated businesses that had retained legal counsel, [FN9] and it is unlikely that the parties did not intend for "encouraged" to have a binding effect in a "strict legal way." (D.I. 96 at 37). The Court therefore concludes that it was not justifiable for Plaintiff to rely on Mr. Rose's statement that he did not intend "encouraged" to have any "legal significance."

> FN9. Plaintiff contends that Mr. Rose lied when he stated that Defendants' lawyers did not suggest using the word "encouraged." (D.I. 96 at 37-38). However, this fact is irrelevant to the issue of whether Plaintiff's reliance on this statement was justifiable. At the time, Plaintiff believed that Mr. Rose had not gotten this idea from Defendants' lawyers, and the Court has already concluded that reliance under those conditions was unreasonable.

3. Omissions Regarding the Perstorp Agreement

Plaintiff contends that under Defendants' contract with Perstorp ("the Perstorp Agreement"), the entire DuPont Network was required to sell only Pergo products in the Pergo market system. (D.I. 96 at 38-39) (citing D.I. 97 at B-172). The Special Stipulations, however, do not limit Plaintiff in such a manner. (D.I. 96 at 38) (citing D.I. 92 at A-223 to A-227). By failing to disclose this exclusivity provision regarding Pergo products, Plaintiff contends that Defendants misled Plaintiff regarding Defendants' authority to enter into the Special Stipulations. (D.I. 96 at 38).

A defendant commits fraud if he "fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading. *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983). *See also Snyder v. Butcher & Co.,* 1992 WL 240344, at *3 (Del.Super.Ct. Sept. 15, 1992). The Court concludes, however, that Plaintiff has failed to offer sufficient evidence that the Perstorp Agreement's exclusivity provision applies to Plaintiff.

The Perstorp Agreement specifically prohibits DFSFC, DFS, and DCFS from "directly or indirectly" selling non-Pergo products. (D.I. 97 at B-170 to B-172). The Perstorp Agreement separately defines franchises of DFSFC, such as Plaintiff, as "Franchisees." (D.I. 97 at B-172). Since Franchisees are not specifically precluded from selling non-Pergo products, the Court concludes that, absent any evidence to the contrary, the Perstorp Agreement's exclusivity provision did not extend to Plaintiff. [FN10]

> FN10. It is conceivable that DFSFC or DFS would "indirectly" be selling non-Pergo products if one of its Franchisees sold non-Pergo products. However, Plaintiff has failed to adduce any evidence supporting this position, and the Court finds that such an interpretation is unlikely to represent the contracting parties' intent when considering that Franchisees are separately defined and distinguished from DFSFC and DFS. Thus, the Court concludes that Plaintiff has failed to meet its burden to show that the Perstorp Agreement's exclusivity provision applied to Franchisees.

Thus, Plaintiff's only viable contention of fraud is that Defendants were required to inform Plaintiff that, if Defendants fulfilled the terms of the Special Stipulations, this would necessarily place Defendants in breach of the Perstorp Agreement. However, Plaintiff fails to cite authority that requires such a disclosure. In fact, even if DFSFC knew when it entered into the Special Stipulations that the terms would put it in breach of the Perstorp Agreement and that, therefore, it knew that it would not fulfill its obligations under the Special Stipulations, this still would not amount to fraud. *See Diamond Elec. Inc. v. Delaware Solid Waste Auth.,* 1999 WL 160161, at *7 (Del. Ch. March 15, 1999) ("a breach of contract claim cannot be turned into a fraud claim simply by alleging that the other party never intended to perform"); *IOTEX Communications, Inc. v. DeFries,* 1998 WL 914265, at *5-6 (Del. Ch. Dec. 21, 1998) (same). Therefore, the Court concludes that Defendants' alleged omission regarding the Perstorp Agreement does not amount to fraud.

4. Statements Regarding Future Goals for the DuPont

Network

*7 Lastly, Plaintiff offers evidence that Defendants made statements at a 1996 meeting in Scottsdale, Arizona. These statements expressed Defendants' intent to develop a network of Owned Operations and Franchisees that would dominate the commercial market for carpets made of synthetic fibers, and that all carpet contractors that refused to join the DuPont Network would not have access to a DuPont fiber, Antron, that was used in "the vast majority of the carpet sold by Plaintiff." (D.I. 96 at 40) (citing D.I. 97 at B-3 to B-5). These statements led Plaintiff to believe that if it did not join the DuPont Network, it would eventually be forced out of business. (D.I. 97 at B-4--B-5). In reliance on these statements, Plaintiff contends that it incurred various expenses in order to prepare for its becoming a Franchisee. [FN11] (D.I. 96 at 40-41).

> FN11. Plaintiff seeks to recover damages for numerous expenses it incurred prior to entering into the Contract, including: (1) an upgrade of its computer system and software, (2) leasing of a larger office space, (3) the hiring of a new chief financial officer, (4) an increase in marketing and advertising expenditures, and (5) the hiring of more employees. (D.I. 8 at ¶ 41; D.I. 92 at A-106 to A-107).

Defendants admit that they failed to develop the DuPont Network and failed to achieve the market domination to the extent predicted. (D.I. 99 at 18). However, the Court concludes that this failure to reach expectations is insufficient to support Plaintiff's fraud claim.

First, there is no evidence suggesting that Defendants made these statements with the intent to induce Plaintiff into incurring these expenses. The Court finds that, because Defendants never requested Plaintiff to incur these expenses, and because the statements were made in the Spring of 1996, (D.I. 97 at B-4), which was more than two years before the parties entered into the Contract, no reasonable jury could conclude that Defendants intended to induce Plaintiff to incur these expenses. (D.I. 90 at 24-25).

Plaintiff's own contentions support this conclusion. Plaintiff admits that it found Defendants' standard Franchise Agreement objectionable. As a result, Plaintiff sought to enhance its attractiveness to Defendants and to increase its bargaining position in order to better negotiate modifications to the Franchise Agreement. (D.I. 96 at 40). Plaintiff contends that incurring these expenses in advance was necessary to achieve these goals and to show its good faith to Defendants. (D.I. 96 at 40) (D.I. 93 at A-440 to A-441). The Court concludes that it is unreasonable to suggest that Defendants intended to induce Plaintiff to incur expenses that put Plaintiff in an enhanced bargaining position to the detriment of Defendants.

Plaintiff further contends that even if it had not incurred these expenses in advance, it would have incurred them subsequent to its entering into the Contract. (D.I. 96 at 40-41). This contention, however, is irrelevant. It was Plaintiff who sought to become Defendants' National Retail Store Account specialist rather than a normal Franchisee. Without these advance expenditures, it is unlikely that Plaintiff would have entered into the DuPont Network due to Plaintiff's objections to the standard Franchise Agreement. Thus, absent any evidence contemporaneous to the 1996 Scottsdale, Arizona meeting that Defendants intended to induce Plaintiff to become their National Retail Store Account specialist or to incur all of the above expenses, the Court concludes that Defendants' motion for summary judgment should be granted on this issue.

*8 Even if the Court were to conclude that Defendants intended to induce Plaintiff to incur all of these expenses, the Court nonetheless concludes that Plaintiff did not justifiable rely on the Scottsdale, Arizona representations in incurring these expenses. Plaintiff concedes that the statements were declarations of what Defendants "hoped" to achieve, and that Defendants' predicted market domination would only come to fruition if Defendants "were successful in [its] goal" of developing the DuPont Network to the extent desired. (D.I. 96 at 39-40) (citing D.I. 97 at B-3 & B-49 to B-53). As a result, the Court concludes that it was not justifiable for Plaintiff to incur these expenses in reliance on statements of future predictions, when Defendants in no way guaranteed that these plans would come to fruition.

Not Reported in F.Supp.2d                                                                                      Page 8
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)
**(Cite as: 2002 WL 32332751 (D.Del.))**

In addition, it was unreasonable for Plaintiff to incur these expenses over two years before it ever agreed to enter into the DuPont Network. (D.I. 97 at B-4; D.I. 92 at A-181). Plaintiff admits that it did not intend to become a regular Franchisee of DFSFC unless it was able to negotiate modifications to the standard Franchise Agreement. (D.I. 93 at A-426). Thus, Plaintiff incurred all of these expenses in advance, based on representations about what the DuPont Network might become, and based on the possibility that Plaintiff might eventually become a Franchisee. Considering the speculative nature of these alleged inducements and considering how far in advance these expenses were made, the Court concludes that Plaintiff's reliance on these inducements was not justifiable. Thus, the Court concludes that the 1996 Scottsdale, Arizona statements are insufficient to sustain Plaintiff's fraud claim.

In sum, none of the alleged statements or omissions relied upon by Plaintiff in support of its fraud claim satisfy the elements of a fraud claim. Therefore, the Court concludes that Defendants' motion for summary judgment on Plaintiff's fraud claim must be granted. [FN12]

> FN12. Defendants also contend that Plaintiff's fraud claim must be dismissed: (1) pursuant to the collateral promise rule, (2) because it is barred by the Franchise Agreement's integration clause, and (3) because Plaintiff has produced no evidence that it suffered any damages as a result of the alleged fraud. (D.I. 90 at 26-31). Due to the conclusion above, these contentions are moot.

III. Plaintiff's Negligent Misrepresentation Claim

Defendants also contend that they are entitled to summary judgment on Plaintiff's negligent misrepresentation claim. (D.I. 90 at 32). The elements of a negligent misrepresentation claim are essentially the same as for a fraudulent misrepresentation claim, except that there is no state of mind requirement; rather, the defendant merely must have made the representation without exercising reasonable care to determine its accuracy. *Darnell v. Myers,* 1998 WL 294012, at *5 (Del. Ch. May 27, 1998). Since the Court dismissed Plaintiff's fraud claim in its entirety, and because this dismissal was not dependent on Defendants' intent, the reasons for dismissing Plaintiff's fraud claim are equally applicable here. Thus, the Court concludes that Defendants' motion for summary judgment as to Plaintiff's negligent misrepresentation claim must also be granted.

IV. Plaintiff's Tortious Interference Claim

Defendants also contend that they are entitled to summary judgment on Plaintiff's tortious interference claim, which asserts that DCFS and DFS tortiously interfered with the Contract. (D.I. 8 at ¶ 90-98). To state a claim for tortious interference, a plaintiff must prove that: (1) a valid contract existed, (2) the defendants knew of the contract, (3) the defendants undertook an intentional act that was a significant factor in causing a breach of the contract, (4) a lack of justification for the defendant's action, and (5) injury as a result of the intentional act. *Cantor Fitzgerald, L.P. v. Cantor,* 2000 WL 307370, at *24 (Del. Ch. March 13, 2000).

*9 The Court concluded above that Defendants did not breach the Contract. Therefore, Plaintiff has failed to satisfy the third element of tortious interference. As a result, the Court will grant Defendants' motion for summary judgment as to Plaintiff's tortious interference claim.

V. Plaintiff's Defamation Claim

Defendants also contend that they are entitled to summary judgment on Plaintiff's defamation claim asserted against DFS. (D.I. 90 at 33). Under Delaware law, a plaintiff asserting a claim of defamation must establish: (1) a defamatory communication about the plaintiff, (2) publication, (3) a third party's understanding of the defamatory character of the communication, and (4) injury. *Bloss v. Kershner,* 2000 WL 303342, at *6 (Del.Super.Ct. March 9, 2000).

Plaintiff's defamation claim is based on an alleged statement made to Perstorp by J.C. Brunache, DFS's vice-president of the national accounts marketing team, that: "[Plaintiff] did not have enough salespeople on staff, and did not have the resources or expertise to 'execute' transactions and to follow projects through to completion." (D.I. 8 at ¶ 50). Defendants contend that Plaintiff has failed to offer any admissible

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)  
**(Cite as: 2002 WL 32332751 (D.Del.))**

Page 9

evidence that the alleged defamatory statement was ever made. (D.I. 90 at 35).

The only evidence that this statement was made is Plaintiff's response to Defendants' interrogatory; however, this response is vague and provides little information in addition to that already contained in Plaintiff's Amended Complaint. (D.I. 92 at A-28 to A-29). Plaintiff fails to cite any evidence adduced from either the speaker or persons who heard the alleged statement attesting that the statement was actually made. (D.I. 96 at 44-45). Furthermore, Plaintiff admitted in its interrogatory response that it did not know "when or where" the statement was made. (D.I. 92 at A-29). Based on this record, the Court concludes that Plaintiff has not adduced sufficient evidence for a reasonable jury to render a verdict in favor of Plaintiff on its defamation claim, and that Defendants' motion for summary judgment must be granted as to this claim. [FN13]

> FN13. Because of the above conclusion, the Court need not address Defendants' other contentions in support of their motion regarding Plaintiff's defamation claim.

VI. Defendants' Defamation Counterclaim

Defendants contend that they are entitled to summary judgment on their defamation counterclaim. (D.I. 90 at 35). In their counterclaim, Defendants allege that Plaintiff committed defamation by widely disseminating a press release accusing Defendants of fraud. (D.I. 12 at ¶ 14).

Plaintiff responds by first claiming that Defendant did defraud Plaintiff, and thus, Defendants' defamation counterclaim necessarily fails. (D.I. 96 at 45). However, the Court's conclusion above that Defendants are entitled to summary judgment on Plaintiff's fraud claim renders this contention moot.

Plaintiff also contends that the press release is privileged. (D.I. 96 at 46). Specifically, Plaintiff contends that the press release explains that Plaintiff had filed a lawsuit against Defendants and describes the particular allegations in the lawsuit. (D.I. 96 at 35). The press release is careful to preface the allegations with statements such as: "according to the suit," "[the] lawsuit claims that," or "the lawsuit says." (D.I. 92 at A-321 to A-323). As a result, Plaintiff contends that it cannot be liable for disseminating the press release. (D.I. 96 at 35). In the alternative, Plaintiff contends that it is entitled to "a limited privilege for fair reports on public actions such as judicial proceedings." (D.I. 96 at 46) (citing *Read v. News Journal Co.*, 474 A.2d 119, 120 (Del.1984).

*10 Under Delaware law, Plaintiff cannot be held liable for defamation for the allegations contained in its Amended Complaint due to Delaware's absolute privilege for statements made in the course of judicial proceedings. *Barker v. Huang*, 610 A.2d 1341, 1345 (Del.1992); *Read v. Carpenter*, 1995 WL 945544, at *3 (Del.Super. Ct. June 8, 1995). However, statements made by a litigant, outside the course of judicial proceedings, about the pending judicial proceeding are not afforded the protection of the absolute privilege. *Barker*, 610 A.2d at 1345. Accordingly, Plaintiff's statements are not entitled to an absolute privilege. Further, the Court is not persuaded that the limited privilege to publish fair and accurate reports of judicial proceedings, referred to as the "fair report privilege," is applicable. *Read v. News-Journal Co.*, 474 A.2d 119, 120 (Del.1984). In *Read*, the Supreme Court of Delaware held that a newspaper was privileged in printing a story that fairly and accurately summarized a court decision. The fair report privilege has been exclusively extended to the media, not a litigant acting as its own media. Therefore the Court believes that the Delaware Supreme Court would not extend the limited privilege in *Read* to include a litigant's statements, prepared for media publication, regarding a judicial proceeding in which it is involved.

Because Plaintiff's press release is not privileged, the Court must examine the elements of a defamation claim. As discussed previously, under Delaware law, a plaintiff asserting a claim of defamation must establish: (1) a defamatory communication about the plaintiff, (2) publication, (3) a third party's understanding of the defamatory character of the communication, and (4) injury. *Bloss v. Kershner*, 2000 WL 303342, at *6 (Del.Super.Ct. March 9, 2000). First, the press release is a defamatory communication about Defendants that would tend to harm the reputation of Defendants or would discourage third

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10
Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)
**(Cite as: 2002 WL 32332751 (D.Del.))**

parties from associating with Defendants. *Stevens v. Independent Newspapers Inc.,* 1988 WL 25377, at *2 (Del.Super.Ct. March 10, 1988). [FN14] Second, it is not disputed that the press release was published to several newspapers and business associates of Defendants. (D.I. 93 at A-511 to A-517). As for the third element, after reviewing the record, the Court concludes that Defendant has not adduced evidence, establishing that the third parties who received the press release understood the defamatory character of the communication. Further, the Court cannot conclude as a matter of law that a third party would understand the defamatory nature of the press release. In fact, a third party might simply understand the press release to be a discussion of a recently filed civil action. Therefore, because Defendant fails to establish all the elements of defamation, the motion for summary judgment will be denied.

> FN14. Statements of opinion, as opposed to statements of fact, generally are not defamatory unless the opinion implies the existence of undisclosed facts that are ultimately determined to be untrue. *Kanaga v. Gannett Co., Inc.,* 687 A.2d 173, 174 (Del.1996). The press release makes some statements of fact and also makes some conclusory allegations of fraud without stating the underlying facts. To the extent that the press release can be construed as an expression of Plaintiff's opinion, it clearly implies the existence of undisclosed facts that the Court concluded are untrue. Accordingly, the press release is a defamatory statement.

VII. Defendants' Breach of Contract Counterclaim

*11 Defendants contend that they are entitled to summary judgment on their breach of contract counterclaim in which they seek $19,654.94 for Pergo products that DFS supplied to Plaintiff. (D.I. 90 at 36-37; D.I. 12 at ¶ 24- 28). Plaintiff admits that it owes DFS this money, but states that "it is holding this [money] as a set-off against what is owed by [Defendants] for [their] breach of contract." (D.I. 96 at 46). Since there is no dispute that Plaintiff owes this money, the Court will grant Defendants' motion as to the breach of contract counterclaim.

VIII. Defendants' Counterclaim for Franchise Fees

Defendants contend that they are entitled to summary judgment on their counterclaim for $7,500 in franchise fees owed by Plaintiff pursuant to paragraph # 5 of the Franchise Agreement--$2,500 a month for October, November, and December of 1999. (D.I. 90 at 37-38). Plaintiff contends that DFSFC breached the Contract in August 1999, and that this breach relieved Plaintiff of its obligation to pay franchise fees. Since the Court concluded above that Defendants did not breach the Contract, Defendants are entitled to summary judgment on this counterclaim.

CONCLUSION

For the reasons discussed, the Court will grant Defendants' motion for summary judgment, in all respects, except as it pertains to Defendants' defamation counterclaim.

An appropriate Order will be entered.

*ORDER*

At Wilmington this *28th* day of March 2002, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (D.I.89) is *GRANTED* in all respects, except as it pertains to Defendants' defamation counterclaim.

Not Reported in F.Supp.2d, 2002 WL 32332751 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.