# E

LEXSEE 2002 DEL. CH. LEXIS 124

**DELAWARE EXPRESS SHUTTLE, INC., a Delaware corporation, Plaintiff, v. ROBERT M. OLDER and CREATIVE TRAVEL, INC., a Delaware corporation, d/b/a RAINBOW CHARTER SERVICE, Defendants.**

**C.A. No. 19596**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2002 Del. Ch. LEXIS 124*

**August 26, 2002, Submitted**
**October 23, 2002, Decided**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at *Del. Express Shuttle, Inc. v. Older, 2003 Del. Ch. LEXIS 37* (Del. Ch., Apr. 9, 2003)

**DISPOSITION:** Court issued injunction and awarded Plaintiff damages.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] Michael A. Weidinger, Esquire and Thomas E. Hanson, Jr., Esquire of Morris James Hitchens & Williams LLP, Wilmington, Delaware, Attorneys for Plaintiff.

James J. Haley, Jr., Esquire and Antonia S. Bevis, Esquire of Ferrara, Haley, Bevis & Solomon, Wilmington, Delaware, Attorneys for Defendants.

**JUDGES:** John W. Noble, Vice Chancellor.

**OPINIONBY:** John W. Noble

**OPINION:**

### MEMORANDUM OPINION

NOBLE, Vice Chancellor

Plaintiff Delaware Express Shuttle, Inc. ("Delaware Express" or the "Plaintiff") complains of actions undertaken by Defendant Robert M. Older ("Older"), a former employee, and Older's business venture, Defendant Creative Travel, Inc. ("Creative Travel"), which does business as Rainbow Charter Service ("Rainbow Charter") (collectively, the "Defendants"), in alleged violation of a non-competition agreement entered into by Delaware Express and Older when he resigned on March 9, 2001 (the "Non-Competition Agreement" or the "Agreement"). n1 Delaware Express alleges that Older's subsequent purchase, through Creative Travel, and operation of Rainbow Charter, a competing company, violated the terms of the Non-Competition Agreement. Additionally, Delaware Express accuses Older of misappropriating [*2] trade secrets, in the form of a Delaware Express customer list, in violation of the Delaware Uniform Trade Secrets Act, *6 Del. C. § 2001, et seq.*, Older's alleged fiduciary duties as an employee and former employee, and another agreement also executed at the time of his resignation. Furthermore, the Plaintiff asserts that Older defamed Delaware Express and that his conduct constituted tortious interference with existing and prospective business relationships.

n1 Pl.'s Ex. 14

The Defendants argue that the Non-Competition Agreement does not prohibit the actions undertaken by Older and, therefore, he has not violated the Agreement. The Defendants also deny that Older misappropriated any trade secrets of Delaware Express, insisting that Older created his customer list from publicly available information. Moreover, the Defendants contend that Older neither defamed Delaware Express nor tortiously interfered with any of its business relationships.

In this post-trial memorandum opinion, [*3] I conclude that Older violated the unambiguous terms of the Non-Competition Agreement, and thus he and those persons acting in concert with him, including Rainbow Charter and Creative Travel, should be enjoined from competing with Delaware Express for a reasonable period in the areas of Elkton, Maryland and that portion of New Castle County, Delaware, which lies north of the Chesapeake & Delaware Canal. I find that Delaware Express was indeed harmed as the result of Older's breach of the Non-Competition Agreement but that Delaware Express was able to establish damages of only $6,000. I

also find that Older misappropriated a Delaware Express customer list in breach his contractual obligations to Delaware Express. However, I am unable to find that the Delaware Express customer list qualifies as a "trade secret" for purposes of the Delaware Uniform Trade Secrets Act (the "Delaware Trade Secrets Act" or the "Act"), n2 and, therefore, Older's misappropriation did not violate the statute. Finally, I accept Plaintiff's claim that Older defamed Delaware Express by asserting that Delaware Express was headed into bankruptcy and award nominal damages. I reject all of Plaintiff's other allegations [*4] of defamation and all claims of tortious interference with existing and prospective business relationships.

n2 *6 Del. C. §§ 2001, et seq.*

## I. FACTUAL FINDINGS n3

n3 While most of the findings of fact are set forth under this heading, some are made, for purposes of context or convenience, during the analysis of the various issues.

### A. Older's Relationship to Delaware Express

Delaware Express, a Delaware corporation located in Newark, Delaware, was founded in 1984 by its current President and Chief Executive Officer Gerard J. Frenze ("Frenze"). It provides four lines of ground transportation services: bus operations, airport shuttle services, sedan operations, and limousine services. The business segment at issue in this case, that of bus operations, can be subdivided into charter bus services [*5] and tour bus services.

During the events leading to this litigation, though ranking second in terms of generating Delaware Express' revenue, the bus operations segment was first in terms of expectations. With the growth of its primary revenue base, airport shuttle services, slowing, Delaware Express had identified its bus operations as having the greatest potential for future expansion. It was into this business atmosphere that Older was hired in 1998 to serve as the sales and marketing manager for Delaware Express.

Before his employment as the sales and marketing manager of Delaware Express, Older had worked in several different businesses, including the catering and restaurant business. "Burned out by the food industry" in late 1995, Older pursued a publishing venture in which he worked until 1998. n4 Also in 1995, Older started Creative Travel, initially in order to travel at discounted rates, but he did not put much time or effort into its development.

n4 Tr. 396-97.

Older sought employment with Delaware [*6] Express in a letter, dated May 14, 1998, in which he declared, "I have NO desire to have my own [company], [sic] I want to help make the best even better." n5 He was hired the next day to serve as the sales and marketing manager. In that capacity, Older formulated and implemented various marketing strategies, supervised approximately fifteen employees, and had a major role in managing Delaware Express' bus operations. Additionally, Older developed professional and personal relationships with contact persons at Delaware Express clientele. n6 Significantly, Older also was responsible for the development and maintenance of the customer database for Delaware Express.

n5 Pl.'s Ex. 6 (emphasis in original).

n6 The Plaintiff has noted that "Older personally serviced the following corporate charter bus accounts: 1) Sanford School; 2) Elkton Parks and Recreation; (3) Wilmington Blue Rocks; (4) Unique Lives; (5) WRDX Radio; (6) Chesapeake Brass Band; (7) WILM NewsRadio; (8) University of Delaware; (9) Bristol-Myers Squibb; and (10) Ciba Specialty Chemicals." Pl.'s Opening Post-Trial Br. at 5.

[*7]

Delaware Express maintains a list of existing and prospective customers in the ACT computer program (the "ACT List"). n7 The ACT List is comprised of individual and corporate customers (the "Delaware Express Corporate Customer List" or "Corporate Customer List"). In compiling the information entered into the database, several publicly available resources were utilized, including lists from the New Castle County Chamber of Commerce, the Book of Lists, and The News-Journal. Data from certain contests organized by Delaware Express that generated marketing leads augmented the individual customer list. Among the various arrays of information recorded in the database, the Corporate Customer List identified the appropriate contact people who were responsible for decisions on hiring a ground transportation company. Older input and supervised the entry of names into the database. While the list was regularly maintained only at Plaintiff's place of business, where Older had access, Older, on at least one occasion, was in possession away from the Delaware Express office of a diskette containing selected parts of the ACT List in order to deliver it to a printing house.

n7 Pl.'s Ex. 19. Delaware Express also main-

tains a customer list in its Quick Books program.

[*8]

### B. *Older's Departure from Delaware Express*

However, while the sales of Delaware Express increased, the relationship between Older and Frenze gradually soured. Older also experienced friction with coworkers. In February 2001, Delaware Express engaged the consulting services of International Profit Associates, Inc. Its senior consultant responsible for the Delaware Express account was Roland C. Eyears ("Eyears"); upon completing his review, Eyears recommended the termination of Older. The deterioration in the relationship between Older and Frenze culminated at a March 9, 2001 meeting (the "Meeting"), attended by Older, Frenze, and Eyears, at which Older's employment with Delaware Express ended. n8 During this conference, Older was presented with, and ultimately agreed to, a resignation agreement (the "Resignation Agreement") n9 and the Non-Competition Agreement.

> n8 It is unclear whether Frenze terminated Older or whether Older first voluntarily resigned. However, this nuance is unimportant to the issues at hand.

> n9 Pl.'s Ex. 13.

[*9]

After agreeing over an internal electronic instant messaging system to pay three months severance ($ 8,500) for Older's departure, Frenze invited Older to the Meeting. Approximately thirty minutes later, Frenze and Eyears presented to Older drafts of the Resignation Agreement and the Non-Competition Agreement. In its pertinent parts, the Resignation Agreement provided:

> 4. Any sales, marketing, financial, or operating information acquired by Mr. Older during the course of his employment will be considered proprietary, and as such, may not be reproduced or communicated to any other person or entity, whether directly or indirectly.

> * * *

> 6. Mr. Older agrees to execute a standard three-year non-compete agreement which will not hinder his operation of a full-service travel agency.

The relevant terms of the Non-Competition Agreement, as originally presented to Older, were:

> 1. The Employee agrees that he/she will not, while this agreement remains in effect, or at any time within a period of three years from the date of termination of employment:

>> A. Directly or indirectly, either for himself/herself or for any other person, firm, association, or corporation, [*10] engage in a business similar or competitive to that of the Company.

>> B. Enter into the employ or personally engage in, or otherwise directly or indirectly render shuttle, limousine, motor coach, or bus services to any person, firm, association, or corporation which at any time within one year prior to the termination of this agreement was a customer or an affiliated company of the customer of the Company.

> 2. The Employee further agrees that he/she will not, while this agreement remains in effect, or at any time after his/her termination of employment:

>> A. Directly or indirectly disclose, or in any manner reveal to any person, firm, association, or corporation, any of the data, information, trade secrets, or methods of doing business used or possessed by the Company or any of the information, data, or records of any client obtained by or disclosed to employee as a result of his/her employment by the Company.

>> * * *

> 3. If Employee shall violate the terms of this agreement, the Company shall be entitled to an injunction to be issued by any court of competent jurisdiction, enjoining and restraining Employee and each and every person or party concerned therewith [*11] from the continuance of such violation of the terms of this agreement, and in addition thereto, Employee shall pay to the Company all dam-

ages, including reasonable attorney's fees, sustained by the Company by reason of the violation of the terms of this agreement. In the event that the remedy of injunctions is not available for any infraction or violation of the terms of this agreement, then the liquidated damages shall be deemed to be the sum of $100,000.00. n10

Included in Paragraph 1(B) was a restriction upon providing "motor coach or bus services." Older voiced concern regarding such a restriction; he felt that "it would hinder him in his operation of his travel agency [Creative Travel], because one of his specialties was marketing and booking tours, which involved buses." n11 In response, Paragraph 1(B) was revised by eliminating the reference to "motor coach or bus services," thus now precluding Older only from:

> entering into the employ or personally engaging in, or otherwise directly or indirectly rendering shuttle or limousine services to any person, firm, association, or corporation which at any time within one year prior to the termination of this agreement [*12] was a customer or an affiliated company of the customer of the Company. n12

Along with the deletion of the problematic language in Paragraph 1(B), Eyears, to allay further Older's fears, inserted a new Paragraph 4, which stated:

> 4. Nothing contained herein shall hinder Mr. Older's operation of a full-service travel agency which may include the marketing of tours involving ground transportation. In such cases, Mr. Older may hire the services of other motor coach operators at his sole discretion. n13

Thus, the new Paragraph 4 expressly allows Older to operate a full-service travel agency and to exercise his full discretion in selecting suppliers of motor coach services. With these modifications to the Agreement, Older and Frenze, on behalf of Delaware Express, executed both the Resignation Agreement and the Non-Competition Agreement. n14

n10 Defs.' Ex. 1.

n11 Tr. 18.

n12 Pl.'s Ex. 14.

n13 *Id.* Similar language appears in Paragraph

6 of the Resignation Agreement.

n14 The Defendants did not establish that the Agreement was the product of mistake or misunderstanding.

[*13]

## C. The Subsequent Actions of Older and Frenze

Following the termination of his employment with the Plaintiff, Older began to expend more time and energy in building Creative Travel. His development of a customer list for Creative Travel and his February 2002 purchase, and subsequent operation, of Rainbow Charter are primarily responsible for the pending dispute.

The parties differ on the means employed by Older to create the customer database for Creative Travel. Delaware Express posits that Older took the list from Delaware Express' ACT database. In support of its theory, the Plaintiff points to numerous misspellings and typographical errors common to the lists of both Delaware Express and Creative Travel. In response, Defendants claim Older compiled the list from publicly available sources. They seek to explain the uniformity of errors from the use of the same, publicly available, sources by both Delaware Express and Creative Travel; the errors in the publicly available lists are said to account for the errors present in both lists.

Initially, Creative Travel rented buses from others to provide transportation for the tours it had booked. n15 By the summer 2001, Frenze [*14] had hired a private investigator to look into whether Older had misappropriated Delaware Express' mailing list and any other violations of the Non-Competition Agreement. Sometime before November 2001, rumors began to circulate that Older was going to purchase Rainbow Charter, a competitor of Delaware Express, owned and managed by Stephen Gehouskey ("Gehouskey"). On November 12, the private investigator delivered a report to Frenze regarding Older's criminal history, a history that included theft and forgery relating to the issuance of some bad checks. n16 The following day, Frenze instructed the private investigator to explore the possible purchase of Rainbow Charter by Older.

n15 In April 2001, Older reincorporated Creative Travel.

n16 Pl.'s Ex. 27.

In January 2002, Frenze spoke with Gehouskey about the rumors of Older's acquisition of Rainbow Charter. While Gehouskey avoided answering Frenze's questions,

Frenze was more than willing to inform Gehouskey of his opinion of Older's reputation and faxed to [*15] Gehouskey a copy of Older's criminal history. Frenze, however, made no mention of the Non-Competition Agreement as an impediment to either the sale or Older's operation of the business. Later that month, Frenze went skiing with a former employee, Jose Bergna ("Bergna"). When Bergna inquired about the rumor that Older was purchasing Rainbow Charter, Frenze, noting Older's lack of funds, expressed disbelief. Again, Frenze did not refer to the Non-Competition Agreement.

Creative Travel's purchase of Rainbow Charter closed on February 2, 2002. Gehouskey, who also had doubted that Older had the financial resources to close the deal, had remained silent until shortly before then. Older purchased Rainbow Charter for a total price of $427,000, including a down payment of $25,000, with the balance payable in various installments. n17 Older did not purchase any buses but, instead, leased them from Gehouskey.

> n17 Pl.'s Ex. 24.

On April 12, Frenze sent a letter to Older complaining of Older's business tactics and refusing [*16] to engage in business with a known convicted criminal. n18 Cryptically, the letter ended: "In the meantime, we look forward to competing against your company." n19 Once again, there was no mention of the existence of the Non-Competition Agreement, or any violation thereof.

> n18 Defs.' Ex. 4.
>
> n19 Id.

Older did not remain silent either. In speaking with Delaware Express employee Louis Roca ("Roca"), Older called Frenze a "shyster" n20 and accused Frenze of being "on cocaine." n21 Furthermore, Older warned Roca that Delaware Express "would most undoubtedly go into bankruptcy." n22 Older also told Chris Kemple ("Kemple"), the general manager of the Wilmington Blue Rocks, another Delaware Express customer, that Frenze was going to experience legal and financial problems and that these problems were going to be highlighted in a forthcoming News-Journal article. n23 To E.B. Hawkins ("Hawkins"), President of WILM Newsradio, with which Delaware Express had outstanding business relationships, Older cautioned that [*17] Delaware Express had a "tax problem" that would produce a "bad circumstance for the company." n24 Older also warned that the survival of Delaware Express was at risk, but Hawkins did not think that this information was credible. n25 Older's comments did not materially alter the relationships that Roca, Kemple and Hawkins had with Delaware Express.

> n20 Pl.'s Ex. 15.
>
> n21 Tr. 138.
>
> n22 Id.
>
> n23 Tr. 115.
>
> n24 Tr. 122-23.
>
> n25 Tr. 122, 127-28.

After the purchase of Rainbow Charter, Creative Travel moved its operations to Rainbow Charter's place of business. n26 It has since sold no airline or train tickets, "not a lot at all" of hotel stays (not counting tours), and only a "few" travel packages. n27 Creative Travel has cancelled its AMADEUS reservation system, n28 has no employees dedicated to handling "travel-agency-type services," n29 and has no IATAN or ARC numbers. n30 However, between February 2 and May 10, 2002, the Defendants conducted 273 charter bus trips. n31 Creative Travel has [*18] received $102,964 in gross revenue from former Delaware Express customers. n32

> n26 Tr. 262.
>
> n27 Tr. 260-61.
>
> n28 Tr. 262. The AMADEUS reservation system allows a travel agent or user to review airline schedules and fares. Also, it permits the agent to book cars, hotels, cruise lines, and tour companies.
>
> n29 Tr. 261-62.
>
> n30 Tr. 264-65. IATAN, an acronym for International Airlines Travel Agent Network, accredits full-service travel agencies. ARC, an acronym for Airline Reporting Commission, is a system that allows travel agents to issue airline tickets in their offices.
>
> n31 Pl.'s Ex. 3.
>
> n32 Id.

## II. ANALYSIS

### A. The Non-Competition Agreement

#### 1. Breach

Delaware Express argues that the language of the Non-Competition Agreement unambiguously prohibits Older's purchase and operation of Rainbow Charter. Furthermore, the Plaintiff contends that even if the Agreement's language is deemed ambiguous, the extrin-

sic evidence establishes that the Agreement was breached [*19] by Older's subsequent conduct. The Defendants respond that the Non-Competition Agreement expressly and unambiguously permits Older to purchase and operate a bus service such as Rainbow Charter. The Defendants also reason that the Agreement is ambiguous, and that the extrinsic evidence offered requires an interpretation that allows Older's ensuing business activities. For the following reasons, I find that the contract unambiguously precludes Older from acquiring and operating Rainbow Charter. Moreover, even if an ambiguity is assumed to exist, the parties' negotiations and the business circumstances surrounding the execution of the Agreement lead to the conclusion that Older's conduct breached the Agreement.

The analysis necessarily focuses upon the following sections of the Non-Competition Agreement:

> 1. The Employee agrees that he/she will not, while this agreement remains in effect, or at any time within a period of three years from the date of termination of employment:
>
>> A. Directly or indirectly, either for himself/herself or for any other person, firm, association, or corporation, engage in a business similar or competitive to that of the Company.
>>
>> B. Enter [*20] into the employ or personally engage in, or otherwise directly or indirectly render shuttle or limousine services to any person, firm, association, or corporation which at any time within one year prior to the termination of this agreement was a customer or an affiliated company of the customer of the Company.
>
> * * *
>
> 4. Nothing contained herein shall hinder Mr. Older's operation of a full-service travel agency which may include the marketing of tours involving ground transportation. In such cases, Mr. Older may hire the services of other motor coach operators at his sole discretion.

In determining whether Older breached the terms of the Non-Competition Agreement, I am guided by general principles of contract interpretation. First, the Court "reviews the language of the contract to determine if the intent of the parties can be ascertained from the express words chosen by the parties or whether the terms of the contract are ambiguous." n33 An ambiguity exists only if the language at issue is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." n34 "If a contract is unambiguous, extrinsic evidence may not be used to interpret [*21] the intent of the parties, to vary the terms of the contract or to create an ambiguity." n35 It is only after an ambiguity has been found to exist that the Court may consider all objective extrinsic evidence, which may include statements and conduct of the parties, business circumstances surrounding the execution of the contract, any course of dealing between the parties, and any usage of trade or industry custom. n36 Ultimately, the Court should, where possible, avoid an interpretation that would render any provision illusory or meaningless. n37 Applying these principles, I find that the Non-Competition Agreement unambiguously prohibits Older's purchase and operation of Rainbow Charter.

> n33 *In re Explorer Pipeline Co., 781 A.2d 705, 713 (Del. Ch. 2001); see also Supermex Trading Co. v. Strategic Solutions Group, Inc., 1998 Del. Ch. LEXIS 66, 1998 WL 229530* at *3 (Del. Ch. May 1, 1998).

> n34 *In re Explorer Pipeline Co., 781 A.2d at 714* (quoting *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992)*).

> n35 *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997)* (citations omitted).

[*22]

> n36 *In re Explorer Pipeline Co., 781 A.2d at 714* (citing *Bell Atl. Meridian Sys. v. Octel Comm. Corp., 1995 Del. Ch. LEXIS 156, 1995 WL 707916* at *6 (Del. Ch. Nov. 28, 1995)).

> n37 *Sonitrol Hldg. Co. v. Marceau Investissements, 607 A.2d 1177, 1183 (Del. 1992)* (citing *Seabreak Homeowners Ass'n, Inc. v. Gresser, 517 A.2d 263, 269 (Del. Ch. 1986), aff'd, 538 A.2d 1113 (Del. 1988)); Karish v. SI Int'l, Inc., 2002 Del. Ch. LEXIS 77, 2002 WL 1402303* at *3 (Del. Ch. June 24, 2002).

Paragraph 1(A) very broadly defines the prohibited conduct as "directly or indirectly... engaging in a busi-

ness similar or competitive to that of the [Plaintiff]." Clearly, the purchase and operation of Rainbow Charter, an acknowledged member of that small group of competing charter bus operators in the general area of northern New Castle County, Delaware, would constitute engaging in a business similar or competitive to that of Delaware Express. However, this does not fully answer the question of whether Older breached the Non-Competition Agreement, for the Defendants [*23] claim that Paragraphs 1(B) and (4), by modifying the broad restrictions of Paragraph 1(A), save Older from running afoul of the Agreement's strictures. Thus, I must construe Paragraphs 1(B) and 4 in accordance with general contract principles in order to determine if the purchase and operation of Rainbow Charter were carved out from the universe of prohibited conduct.

The Defendants contend that the absence of "motor coach or bus services" from the more specifically enumerated activities of Paragraph 1(B) unambiguously permits Older's purchase and operation of Rainbow Charter. However, the Defendants fail to explain how Paragraph 1(B), which bars Older from rendering shuttle or limousine services to certain customers of Delaware Express, supersedes the unambiguous and sweeping language of Paragraph 1(A) that forbids Older from engaging in a business that is "similar or competitive to" the business of Delaware Express. Nor does Paragraph 1(B) create an ambiguity as Defendants suggest. The question of why the language "motor coach, or bus services" was first enumerated and then deleted during the drafting of Paragraph 1(B) is a question of extrinsic evidence, and extrinsic evidence [*24] cannot be used to create ambiguities. When the Agreement is read in the form accepted by the parties, there is no language at issue susceptible of two reasonable and different interpretations. Thus, Paragraph 1(B) does not unambiguously allow Older's subsequent conduct or otherwise limit the scope of Paragraph 1(A). n38 The Defendants must seek refuge under another section of the Agreement to escape the restrictions of Paragraph 1(A).

n38 I acknowledge that little, if any, substance is accorded to Paragraph 1(B). It is difficult to ascertain what conduct the parties intended for Paragraph 1(B) to prohibit that was not already prohibited by Paragraph 1(A). I am satisfied that Paragraph 1(B) can best be understood as a supplemental effort to define certain conduct covered by the Agreement. I view it not as a limitation on Paragraph 1(A), but as a partial repetition of some of the conduct subject to the Agreement. As agreed upon, Paragraph 1(B) does not address bus services. Thus, while my reading of the Agreement as a whole might result in the

failure to give meaning to Paragraph 1(B) if airport shuttle services, for example, were at issue, there is no failure to give meaning to Paragraph 1(B) in this analytical effort because Paragraph 1(B), in its final form, does not encompass bus services. In short, I reject any reading that leads to the conclusion that bus operations are exempt from the scope of the Agreement. As set forth, *infra*, such a reading would then deprive Paragraph 4 of any purpose in the context of the issues raised in this action.

[*25]

The Defendants' reliance on Paragraph 4 is also unavailing. Paragraph 4 allows Older to operate a "full-service travel agency." Though the exact contours of what services a "full-service travel agency" typically offers are unclear, n39 this confusion does not preclude in this context an unambiguous reading of the contract. If I am to seek to avoid a result that would render any provision illusory or meaningless, then a "full-service travel agency" cannot merely be a bus company in substance. To interpret Paragraph 4 to allow Older to operate what essentially is a bus company would be to render Paragraph 1(A) void. n40 Older's purchase and operation of Rainbow Charter under the guise of Creative Travel therefore breaches the unambiguous terms of the Agreement. The evidence depicts Creative Travel as merely Rainbow Charter under a different name. Though not dispositive, it is significant that Creative Travel has discontinued utilizing the AMADEUS reservation system, n41 and Creative Travel has no IATAN or ARC numbers, thereby restricting its operations as a travel agency. Older also moved Creative Travel's operations to Rainbow Charter's location. Furthermore, it should be noted that [*26] Older has admitted that since the time he acquired Rainbow Charter, he (or Creative Travel) has sold no airline tickets, no train tickets, and "not a lot at all" of hotel stays (excluding tours), and has no employees devoted to accepting reservations and accomplishing specifically "travel-agency-type services." Meanwhile, between February 2, 2002, and May 10, 2002, the Defendants conducted 273 charter bus trips and thirty tours. "A rose is a rose by any other name," n42 and so too is a bus company. Therefore, the Non-Competition Agreement unambiguously bars the subsequent conduct of Older.

n39 The expert testimony addressing the question of whether a "full-service travel agency" would operate its own fleet of buses was not especially helpful. I am, however, satisfied that while the "typical" "full-service travel agency" does not operate its own bus fleet, there is nothing inherent in the notion of a "full-service travel agency" that pre-

cludes bus operations. More importantly, I am sat- isfied that a business devoted almost exclusively to bus operations cannot, even in the rapidly chang- ing travel business, be considered a "full–service travel agency." Conversely, I also cannot conclude that the right to operate a full–service travel agency also entitled Older to engage almost exclusively in bus operations simply because it is conceivable that a full–service travel agency might also provide bus services directly.

[*27]

n40 Paragraph 4 deals expressly with tours (not charter services) and authorizes the "hiring of other motor coach operators," not the direct delivery of such services.

n41 It was the opinion of the Plaintiff's ex- pert that the lack of an IATAN and ARC numbers "would indicate... that [Creative Travel] is not a real full–service travel agency." Tr. 279.

n42 *Compare* WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2 ("What's in a name? that which we call a rose / By any other name would smell as sweet.") *with* GERTRUDE STEIN, Sacred Emily (1913) ("Rose is a rose is a rose is a rose."), in GEOGRAPHY AND PLAYS 178, 187 (1922).

Even if I were to assume that the Non-Competition Agreement presents an ambiguity and accordingly al- lows for consideration of extrinsic evidence, the extrinsic evidence before me supports the conclusion that Older breached the terms of the Agreement and the under- standing of the parties at the time of execution of the Agreement. The Defendants strenuously argue that the omission of "motor coach or bus services" from the prohi- bitions of Paragraph 1(B) not only [*28] creates an ambi- guity, but also requires the interpretation of the Agreement in their favor. Previously, I rejected the argument that the absence of this phrase from Paragraph 1(B) created an ambiguity. Even assuming an ambiguity somehow exists, this extrinsic evidence fails to support the Defendants' po- sition that Paragraph 1(B) should be interpreted to permit Older to purchase and operate Rainbow Charter.

This is not a well–drafted agreement, n43 and Paragraph 1(B), though not presenting an ambiguity, can best be understood in light of the extrinsic evidence con- cerning the parties' negotiations. When originally pro- posed, Paragraph 1(B) provided that Older could not

enter into the employ or personally engage

in, or otherwise directly or indirectly render shuttle, limousine, motor coach, or bus ser- vices to any person, firm, association, or cor- poration which at any time within one year prior to the termination of this agreement was a customer or an affiliated company of the customer of the Company.

As the result of the ensuing negotiations, Older and Frenze agreed that Older could continue to operate Creative Travel's tour business as it then existed. Older voiced con- cern [*29] that Paragraph 1(B), then drafted to preclude Older from engaging in "motor coach or bus services," could hinder his expansion of Creative Travel's existing business. Hence, the words "motor coach or bus services" were removed from the enumerated activities forbidden by Paragraph 1(B). Eyears subsequently added Paragraph 4, which expressly allowed Older to "hire the services of other motor coach operators at his sole discretion," to al- lay Older's remaining qualms. No one, including Older by his own admission, considered the possibility of Older's owning his buses; n44 all were focussed upon which com- pany Older would rent buses from in operating his travel agency and packaging tours. n45

n43 The documents governing Older's depar- ture were prepared by Eyears, the business consul- tant who used "standard form" agreements stored in his personal computer. This approach seriously jeopardized Delaware Express' interests.

n44 Given Older's perceived financial condi- tion, and the fact that two-thirds of Delaware Express' capital investment was devoted to owning buses, it was fair for Frenze to assume that Older would not own buses any time soon. What no one anticipated was that shortly thereafter Older would find so willing a seller in Gehouskey, who would agree to owner-financing of the sale of Rainbow Charter.

[*30]

n45 Indeed, the details of from whom Older could rent buses were discussed at length, includ- ing a possible discount from Delaware Express and permission for Older to obtain "sweetheart" deals from other companies if he could do so.

In determining the true intent of the parties, this pro- cess of revision outweighs the Defendants' rote appli- cation of an assortment of canons of interpretation (*e.g.*, added or deleted language prevails over general language, *expressio unius est exclusio alterius*). The sequence of

the modifications appearing in Paragraphs 1(B) and 4 demonstrates that the deletion of the words "motor coach, or bus services" was intended to facilitate Older's operation of a "full-service travel agency," not to remove completely such activity from the broad scope of the restrictions of Paragraph 1(A). Therefore, while the removal of the phrase "motor coach, or bus services" may reflect on Older's ability to rent buses for tours booked in carrying on a "full-service travel agency," it does not speak to the operation of a charter bus company.

Additional extrinsic evidence reinforces [*31] my interpretation of Paragraph 1(B). Older's skill and experience lay in the bus operations segment of Delaware Express's various business lines. If Paragraph 1(B) is interpreted as somehow carving out bus services from the broad prohibitions of Paragraph 1(A), then the principal paragraph of the Agreement merely prohibits Older from competing in the other three lines of business offered by Delaware Express. This reading is strained. Older's expertise, and thus the area in which he would most likely effectively compete against Delaware Express, was in the bus services segment. Moreover, both parties knew at the time of the Agreement's execution that the bus operations segment was the main area for growth. n46

> n46 I also reject Defendants' effort to invoke the doctrine of *contra proferentum*. *Contra proferentum* is not simply applied against the party who is the scrivener. Nor is it merely raised in favor of a party with lesser bargaining power. "Where a contract is the result of the joint efforts of attorneys or negotiators, then it is not to be construed against either party." *Spatz v. Nascone, 368 F. Supp. 352, 354 (W.D. Pa. 1973)* (citations omitted), *cited in E.I. du Pont de Nemours and Co. v. Shell Oil Co., 498 A.2d., 1108, 1114 (Del. 1985).* Here, the evidence shows that Older was not presented with a "take it or leave it" offer, with terms he had no part in shaping. Instead, Older bargained over the very paragraph which he now seeks to interpret with the help of the doctrine of *contra proferentum.* As such, it is not appropriate to apply *contra proferentum* to find the correct interpretation of the Agreement.

[*32]

The Defendants argue that Frenze's silence when he knew of Older's impending purchase of Rainbow Charter evidences that, by the Plaintiff's own interpretation, Older did not breach the Agreement. This argument, however, ignores that Frenze never believed the rumors of an impending transaction. Frenze was skeptical that Older had the financial resources to buy Rainbow Charter. n47 It was only through the unique financial structure of the

transaction (owner-financing with only a $25,000 down payment) that Older could unexpectedly acquire Rainbow Charter. Within three months from when the deal closed and no doubts remained, Frenze brought suit. n48

> n47 Indeed, not even Gehouskey thought Older had the financial wherewithal to close the deal.

> n48 If the parties' conduct following the execution of the Agreement aids in interpreting the terms of the Agreement, Older's actions for more than ten months after March 9, 2001, presumably in compliance with the contract, suggest that the Plaintiff's offered interpretation may be correct.

[*33]

The most puzzling piece of extrinsic evidence is Frenze's April 12, 2002, letter welcoming the prospect of competing with Older. By this time, the acquisition of Rainbow Charter had been completed; Frenze could entertain no doubts regarding Older's ability to purchase Rainbow Charter. However, one anomalous letter cannot overcome the significant amount of extrinsic evidence supporting a different interpretation. Thus, although I recognize the existence of this correspondence, I cannot agree that it leads to the conclusion that Defendants seek.

In sum, I conclude that the extrinsic evidence is consistent with my reading of the non-competition provision and that Older breached the Agreement.

### 2. Equitable Defenses

The Defendants also contend that even if Older's subsequent actions violated the terms of the Non-Competition Agreement, the Plaintiff is barred from relief under any one of the equitable defenses of laches, waiver, or equitable estoppel. I reject all three defenses.

The Defendants' argument of laches is unavailing. "The doctrine of laches acts as a bar to an action in equity if the defendant carries the burden of persuasion that two conditions have been satisfied: [*34] (1) the plaintiff waited an unreasonable length of time before bringing the suit and (2) the delay unfairly prejudices the defendant." n49 The decision of what constitutes an unreasonable delay by the party seeking relief must be made in light of the totality of the circumstances. n50 In this case, the totality of the circumstances does not indicate any unreasonable delay by Delaware Express. The starting point to measure the Plaintiff's possible delay is at or near the close of the Rainbow Charter acquisition. The evidence demonstrates that Frenze, until then, remained highly skeptical that Older had the financial resources to purchase Rainbow Charter. Thus, less than three months

passed from the time of closing until Plaintiff filed suit. That Older went forward and consummated his purchase of Rainbow Charter does not bolster his defense. By proceeding in the face of the Non–Competition Agreement, Older acted at his own peril, and it was his assumption of the risk, and not any unreasonable delay by the Plaintiff, which led to any injury that he may suffer. Nor were the Defendants unfairly prejudiced. No evidence was lost during those three months. Moreover, Older suffered no adverse [*35] economic effects from the passage of time after he closed on his purchase of Rainbow Charter. Thus, a three–month delay from when Frenze realized Older had acquired Rainbow Charter, during and because of which Older was not adversely affected economically or in his ability to mount a legal defense, does not support a defense of laches.

> n49 *Hudak v. Procek, 806 A.2d 140, 2002 WL 1337663,* *9 (Del. 2002) (citations omitted); *Steele v. Ratledge, 2002 Del. Ch. LEXIS 118, 2002 WL 31260990* at *2 (Del. Ch. Sept. 20, 2002).*

> n50 *Hudak v. Procek, 727 A.2d 841, 843 (Del. 1999); see also Adams v. Jankouskas, 452 A.2d 148 (Del. 1982).*

In addition, neither the Plaintiff's failure to bring immediate suit upon hearing rumors of Older's impending purchase of Rainbow Charter nor Frenze's April 12, 2002 letter welcoming Older's competition constitutes a waiver of Delaware Express' rights under the Non–Competition Agreement. "Waiver is the voluntary relinquishment of a known right or conduct [*36] such as to warrant an inference to that effect. It implies knowledge of all material facts and of one's rights, together with a willingness to refrain from enforcing those rights." n51 A plaintiff need not react to every hint of a possible injury in order to avoid waiving a cause of action. Frenze reasonably did not believe Older could purchase Rainbow Charter. Thus, the absence of a challenge by Delaware Express before Older closed on the Rainbow Charter acquisition cannot be the basis for a finding of waiver. The post–closing period is similarly devoid of any evidence of waiver, with one possible exception. On April 12, 2002, Frenze wrote to Older and, among the vitriol, reflected that he looked forward to their competition. Older argues that a statement by Frenze about their future competition without any assertion of the limitations of the Non–Competition Agreement constitutes a waiver of the right to enforce that agreement. I do not, however, read the April 12 letter as constituting a relinquishment of any rights. Instead, it simply acknowledges the fact that Delaware Express and Older are in competition. Unless and until Older's activities cease, that competition will continue. [*37] In short,

competing in the interim and enforcing a covenant not to compete are not inherently inconsistent efforts. Thus, Delaware Express did not voluntarily relinquish any rights arising under the Agreement.

> n51 *Klein v. American Luggage Works, Inc., 52 Del. 406, 158 A.2d 814, 818, 2 Storey 406 (Del. 1960) (citations omitted); In re Givans Estate, 1993 Del. Ch. LEXIS 31, 1993 WL 50316* at *1 (Del. Ch. Feb. 1, 1993).*

Finally, I reject the defense of equitable estoppel.

> To establish [equitable] estoppel, it must appear that the party claiming the estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; relied on the conduct of the party against whom [equitable] estoppel is claimed; and suffered a prejudicial change of position as a result of his reliance. n52

In this case, the Defendants have not relied on the conduct or statements of Delaware Express or Frenze. Older did not demonstrate that he relied upon Frenze's silence before the acquisition of [*38] Rainbow Charter. Additionally, Older could not have relied upon the letter of April 12, 2002, in which Frenze acknowledged Older's competition, because the letter was written after Older had closed on the transaction on February 2, 2002. Therefore, the Plaintiff is not precluded from relief based upon any equitable defense asserted by Defendants.

> n52 *Waggoner v. Laster, 581 A.2d 1127, 1136 (Del. 1990) (citing Wilson v. American Ins. Co., 58 Del. 394, 209 A.2d 902, 904, 8 Storey 394 (Del. 1965)).*

### 3. Enforceability

Because I have found that Older breached the Non–Competition Agreement and that the Defendants cannot successfully interject an affirmative defense, I must turn to whether the Agreement should be enforced and, if so, how it should be enforced. Delaware Express asserts that it is entitled to an injunction enjoining Defendants' continuing competition and an award of monetary damages equal to the amount of Defendants' unjust gain. In the event that such relief is not granted, the [*39] Plaintiff requests that the Court enforce Paragraph 3 of the Agreement establishing $100,000 as liquidated damages. The Defendants respond that the Court should not enforce the Agreement because it is too broad and too vague to preclude Older from

pursuing his livelihood. Alternatively, if the Agreement is to be enforced, the Defendants maintain the duration of the enforcement should be shortened to one year, commencing on the date of the Agreement's execution (March 9, 2001); thus, Defendants suggest that Older's current conduct should be beyond the reach of the Agreement. Additionally, the Defendants assert that the Plaintiff has not adequately proven any damages.

Put succinctly, "covenants not to compete when contained in employment agreements are not mechanically enforced." n53 The Chancellor further explained:

> Because the specific enforcement of [non–competition] covenants involves important interests of commercial enterprises and of individuals seeking to support themselves and their families financially, and because, in that setting, the court is asked to exercise its distinctively equitable powers, each such case requires a careful evaluation of the specific facts [*40] and circumstances presented. n54

In deciding to enforce specifically a contract, the Court must grapple with two sets of issues. First, the Court must determine whether the covenant sued upon is valid. This involves issues typical of any contract action, such as whether a promise was made, whether there was consideration given, and whether one party's breach excused the other's performance. n55 Additionally, covenants restricting future employment must be determined to be reasonably limited with respect to both geography and time; they must as well advance a legitimate economic interest of the employer. n56 Second, "assuming that there is a valid covenant, the request for specific performance raises other issues that do not focus upon the time of contracting, but upon the time of enforcement." n57 Thus, equity may decline to grant specific enforcement if the interests that the employer seeks to protect are ephemeral in contrast to the grave harm to the employee resulting from enforcing the restriction. n58

n53 *McCann Surveyors, Inc. v. Evans, 611 A.2d 1, 3 (Del. Ch. 1987).* The parties have looked to our traditional case law interpreting and applying covenants in the employment context. Although I follow their lead, I do so with some hesitation. This is not the typical situation where, as a practical matter, the employee is faced with the choice of accepting a covenant not to compete or losing (or not initially obtaining) a job. Here, by contrast, Older's termination was underway and both sides understood that the termination would occur during that day and that the restrictions of the covenant not

to compete would commence that day. Thus, the precise language of the restrictions was negotiated (an exchange does not regularly occur) in a setting where there was no doubt as to when or if the restrictions would ever come into effect. In short, under these circumstances, it is far from clear that the principles developed to protect employees from suffering unreasonable conditions on their continued employment or unreasonable and, to some extent, unforeseeable limitations on subsequent employment, should apply in full force. Nevertheless, I will proceed to use the analytical framework accepted by both employer and employee and apply our traditional view (or at least my understanding of it) to the covenant which Delaware Express seeks to enforce against Older.

[*41]

n54 *Id.*

n55 *Bernard Personnel Consultants, Inc. v. Mazarella, 1990 Del. Ch. LEXIS 137, 1990 WL 124969 at *3 (Del. Ch. Aug. 28, 1990).*

n56 *McCann, 611 A.2d at 3* (citing *Knowles-Zeswitz Music, Inc. v. Cara, 260 A.2d 171 (Del. Ch. 1969)).*

n57 *Bernard Personnel Consultants, Inc., 1990 Del. Ch. LEXIS 137, 1990 WL 124969* at *3 (The Court further noted that, especially regarding the enforcement of non–competition agreements in the employment context, "these issues... reflect the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering."); *see also LewMor, Inc. v. Fleming, 1986 Del. Ch. LEXIS 359, 1986 WL 1244* at *2 (Del. Ch. Jan. 29, 1986) (noting that a restrictive covenant may be reasonably limited at the time of drafting yet not be specifically enforceable given the circumstances at the time of enforcement).

n58 *LewMor, Inc., 1986 Del. Ch LEXIS 359, 1986 WL 1244* at *2 (citing *Burris Foods, Inc. v. Razzano, 1984 Del. Ch. LEXIS 593, 1984 WL 8230* (Del. Ch. July 18, 1984) ).

In this case valid and sufficient [*42] consideration was given, as Older was paid $8,500, equal to three months severance, for, *inter alia*, his promise not to compete with Delaware Express in accordance with the terms of the Non-Competition Agreement. Furthermore, the Defendants do not allege any breach of the Agreement

by the Plaintiff that would excuse their nonperformance. Nevertheless, a Court of equity will not enforce a non-competition agreement in the employment context beyond the scope of the legitimate economic interests of the employer. Therefore, I now consider the temporal and geographical restrictions (or lack thereof) in the Non-Competition Agreement and whether that Agreement reasonably serves the legitimate economic interests of Delaware Express.

What may be unusual here, in contrast to other agreements not to compete, and perhaps is an expected by-product of its hurried and non-expert drafting, is that the Agreement has no express geographical scope. Paragraph 1(A), the paragraph that unambiguously prohibits Older's purchase and operation of Rainbow Charter, expansively forbids Older from "engaging in a business similar or competitive to that of [Delaware Express]" for a period of three years from [*43] the termination of his employment. Read literally, Older would be in violation of the Agreement if he operated a bus company in Tierra del Fuego before March 9, 2004. Yet, the prohibition of motor coach services in South America was neither what the parties intended nor within the legitimate economic interests of Delaware Express.

In determining the extent to which the Agreement may be enforced, or whether to enforce it at all, the Court is guided by three cases. In *Norton Petroleum Corp. v. Cameron*, n59 the defendant signed a non-competition agreement promising, *inter alia*, not to "participate in or be connected in any manner with any business in competition with, *or similar to* the type of business conducted by, the [plaintiff employer]" for a period of three years after termination, within a 100-mile radius of Newark, Delaware. n60 In deciding whether to grant a permanent injunction, the Court refused to enjoin the defendant from working for a company engaged in a business "similar to" the plaintiff's business. "Such a broad, vague and unwieldy restriction given the nature of the industry would work an undue hardship to [the employee] and is not supported by [the [*44] employer's] legitimate business interests." n61 Thus, regardless of the presence of reasonably limited geographical and temporal restrictions, the spectrum of activities prohibited by an agreement not to compete may be vague or overly broad and, therefore, not enforceable. n62

n59 *1998 Del. Ch. LEXIS 32, 1998 WL 118198* (Del. Ch. Mar. 5, 1998).

n60 *1998 Del. Ch. LEXIS 32*, [WL]. at *1 (emphasis added).

n61 *1998 Del. Ch. LEXIS 32*, [WL]. at *3. For example, any transportation business, whether offering taxi services or rail transportation, could be considered "similar to" the business of Delaware Express in some sense.

n62 In *Norton Petroleum Corp.*, while refusing to enforce the "similar to" provision, the Court limited the extent of the geographical restriction, reducing the geographic scope from a 100-mile radius to a 20-mile radius, and then enjoined the employee from engaging in "any business in competition with" the plaintiff-employer for a period of three years.

While the contract in *Norton Petroleum Corp.*, as is typical of most litigated [*45] covenants not to compete, contained an express geographic limitation, that covered territory was ultimately deemed to be too extensive. Few cases, however, have involved agreements with no express geographic range. In *Gas-Oil Products, Inc. of Delaware v. Kabino*, n63 the defendant could not, for a period of three years after termination, "(1) either directly or indirectly solicit the business of any [of the employer's] customers, or, (2) make available to anyone for any reason any information concerning [the employer's] customers, rate schedules or operating policies or procedures." n64 In granting a preliminary injunction, the Court noted that there appeared to be no prior Delaware decisions concerning the enforceability of covenants with no express geographical limitation. However, based upon practices in other jurisdictions, the Court concluded that

the absence of a geographical limitation does not render the restrictive covenant unenforceable per se... I am satisfied that [the employer] has established a reasonable probability of success on the contested legal issue as to the enforceability of a restrictive covenant that does not expressly contain any geographical [*46] limitation. n65

Thus, the Court may, in the appropriate circumstances, enforce an agreement without express territorial scope and establish a reasonable geographical limitation where there is none in the Non-Competition Agreement. n66

n63 *1987 Del. Ch. LEXIS 497, 1987 WL 18432* (Del. Ch. Oct. 13, 1987).

n64 *1987 Del. Ch. LEXIS 497*, [WL]. at *1.

n65 *1987 Del. Ch. LEXIS 497*, [WL]. at *2 (citing *Medtronic, Inc. v. Benda, 689 F.2d 645 (7th Cir. 1982)* (covenant relating to the solicitation of customers); *Field v. Alexander and Alexander of Ind., Inc., 503 N.E.2d 627 (Ind. Ct. App. 1987)* (contract

that denies an employee the opportunity to "solicit, sell, service, divert, accept or receive" certain forms of business from customers previously serviced by the employee); *Hillis v. Waukesha Title Co.*, 576 F. Supp. 1103 (E. D. Wis. 1983) (agreement not to aid a competitor for two years); *Renzema v. Nichols*, 83 Ore. App. 322, 731 P.2d 1048 (Or. App. 1987)).

Various jurisdictions take differing views of the enforceability of a non-competition agreement that lacks a geographic restriction. For example, in *Giller v. Harcourt Brace & Co.*, 166 Misc. 2d 599, 634 N.Y.S.2d 646 (N.Y. Sup. Ct. 1995), the court refused to invalidate a non-competition agreement "simply because the parties neglected to include a geographic restriction." *634 N.Y.S.2d at 648*. Instead, the court looked to the intent of the parties and, as "warranted by equity," established a geographic limit for the non-competition agreement. *See also*, *Sears Termite and Pest Control, Inc. v. Arnold*, 745 So.2d 485, 486 (Fla. App. 1999)* ("When a [non-competition] agreement is otherwise valid but lacks a geographic restriction, the courts should supply a reasonable restriction.") Other jurisdictions view non-competition agreements that lack a geographic limitation as vague and unenforceable. *See, e.g.*, *New Atlantic Ear, Nose & Throat Assocs., P.C. v. Pratt*, 253 Ga. App. 681, 560 S.E.2d 268, 273 (Ga. App. 2002). Still others are guided by statutory requirements. *See, e.g.*, *Equity Enters., Inc. v. Milosch*, 2001 WI App 186, 633 N.W.2d 662, 669, 247 Wis. 2d 172 (Wisc. App. 2001).

[*47]

n66 A covenant not to solicit, with no express geographic limitation, was also at issue in *Research & Trading Corp. v. Pfuhl*, 1992 Del. Ch. LEXIS 234, 1992 WL 345465 (Del. Ch. Nov. 18, 1992). There, the Court concluded that, given the widespread goodwill of the plaintiff, and the limited nature of relief sought by the plaintiff, the covenant was reasonable as written (without any geographical restriction). Therefore, the court refrained from restricting the agreement's geographic scope.

However, in *Caras v. American Original Corp.*, n67 the Court granted a preliminary injunction to a plaintiff-employee seeking relief from the threatened enforcement of a non-competition agreement. Two agreements prevented the employee for eighteen months from "engaging in the business of buying, selling or processing products bought, sold and processed by [the employer]," and for

five years from being "interested directly or indirectly, in any manner, as a partner, officer, director, stockholder, advisor, employee or in any other capacity in any other business similar to the employer's business or any allied trade. [*48] " n68 The Court noted that the absence of any "geographical limitation set forth in the two purported agreements... alone is sufficient to convince me, at least at this stage of the proceedings, that there is a reasonable probability that [the] plaintiff will eventually prevail in this litigation." n69 Therefore, circumstances exist where the lack of a geographical restriction may prove fatal to the enforceability of an agreement not to compete. n70

n67 *1987 Del. Ch. LEXIS 467, 1987 WL 15553* (Del. Ch. July 31, 1987) .

n68 *1987 Del. Ch. LEXIS 467*, [WL]. at *1.

n69 *1987 Del. Ch. LEXIS 467*, [WL]. at *2.

n70 It has been suggested that *Gas-Oil Products* and *Caras* cannot be harmonized. *Passwaters v. Conaway, 1987 Del. Super. LEXIS 1343, 1987 WL 19729 *3 n.2* (Del. Super. Nov. 5, 1987) (expressing doubt as to the enforceability of a covenant not to complete that does not set forth a geographic limitation).

These three cases provide guidance for determining whether the Non-Competition Agreement may be enforced against Older and the entities that he controls. As in [*49] *Norton Petroleum Corp.*, the vague and broad language of Paragraph 1(A) barring Older from engaging in business activities "similar to" those of Delaware Express exceeds any legitimate economic interests of Delaware Express and would work an undue hardship on Older. Prohibitions against engaging in conduct "similar to" that of the employer (or dealing with the same products as the employer) without any geographic restriction, as in *Caras*, encompass an unduly expansive range of activities, including conduct that has no relation to the legitimate economic interests of the employer. n71 Thus, the Agreement, if it only restricted conduct that is "similar to" that of the employer and was without territorial limits, would be unenforceable. Accordingly, I will not prevent the Defendants from engaging in the Rainbow Charter business because those efforts are similar to those of the Plaintiff.

n71 *See C. Edgar Wood, Inc. v. Clark, 1986 Del. Ch. LEXIS 517, 1986 WL 1160* at *4 (Del. Ch. Jan. 21, 1986) ("As to the argument that the restriction on solicitation is not reasonably restricted geographically and thus is invalid, the record suggests that plaintiff's clients (to whom the restriction

would apply) are largely and perhaps exclusively residents of Kent and Sussex Counties. Thus, as a practical matter, the impact of that restriction is limited to those counties.").

[*50]

When the focus shifts, however, to those activities "competitive with" Delaware Express as contrasted with those "similar to" its business activities, the Court has a more specific standard to evaluate. Restrictions that disallow activities that are "in competition with" or involve "soliciting" customers of the employer, such as those in *Gas-Oil Products* and *Norton Petroleum Corp.*, inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant not to compete, even if no geographic limitation is expressly set forth in the agreement. Therefore, by ascertaining the area where competition may occur, as reasonably understood by the parties when they executed the Agreement, I may enforce the Non-Competition Agreement by imposing a reasonable geographical restriction, designed to protect the legitimate economic interests of Delaware Express, without unreasonably burdening the interests of the Defendants. n72

> n72 That the absence of an express geographical limitation does not make the restrictive covenant in this case unenforceable does not necessarily lead to the conclusion that the absence of a geographical limitation will never be fatal. *See Caras, 1987 Del. Ch. LEXIS 467, 1987 WL 15553.* Inquiries of this nature are peculiarly fact-type intensive and may turn not only upon the nature of the restriction but also on the characteristics of the enterprise at issue and the former employee's position. For example, here, the territorial expanse of a charter bus business is, by its very nature, self-limiting.

[*51]

Thus, the question becomes what is a reasonable geographical limit? The reasonableness of the geographical limitation should not be judged merely in terms of absolute physical distances. The purpose of such a covenant is to protect an employer's goodwill in a given market.

> If this market, or more accurately, the employer's customer base, extends throughout the nation, or indeed even internationally, and the employee would *gain from the employment* some advantage in any part of that market, then it is appropriate that an em-

ployee subject to a non-competition agreement be prohibited from soliciting those customers on behalf of a competitor regardless of their geographic location. n73

Here, however, the territory served by Delaware Express is limited by the scope of the market that Delaware Express can and does serve from its Newark, Delaware facility. Accordingly, I conclude that the reasonable geographical limit to be imposed in this case includes that portion of New Castle County, Delaware which lies north of the Chesapeake and Delaware Canal, and the City of Elkton, Maryland, as the record establishes that the almost all of the Plaintiff's customers are located [*52] in this area. Thus, barring Older from competing with Delaware Express in this geographic area protects the legitimate economic interests of the Plaintiff but appropriately limits the geographical scope of the Non-Competition Agreement.

> n73 *Research & Trading Corp. v. Pfuhl, 1992 Del. Ch. LEXIS 234, 1992 WL 345465* at *12 (emphasis in the original).

In addition to establishing a reasonable geographical limitation in relation to the legitimate economic interests of the employer, a court must also review the reasonableness of any temporal restriction set forth in a non-competition agreement. The Defendants argue that the market for charter bus services resembles the fluid market for home inspection services described in *RHIS, Inc. v. Boyce,* n74 in which the Court decided that a two-year prohibition from soliciting the employer's referral sources was unreasonable and reduced the covenant's temporal extent to one year. Plaintiff, on the other hand, contends that Older was a key employee, with access to proprietary information, [*53] and therefore a three-year restriction is not unreasonable. I conclude that the three-year limitation is not reasonable and that a two-year duration is appropriate for enforcement. n75

> n74 *2001 Del. Ch. LEXIS 118, 2001 WL 1192203* (Del. Ch. Sept. 26, 2001).

> n75 Older complied at least to a significant extent, from the date of his resignation, March 9, 2001, until his acquisition of Rainbow Charter on February 2, 2002. Thus, he discharged his responsibilities under the Non-Competition Agreement for a period of almost eleven months. This period of compliance will be credited against the two-year period, leaving the duration of the injunction at one year, one month, and seven days.

Reasonableness of duration must be determined based upon the nature of the employee's position and the context of a particular industry. The demand for charter bus services may be characterized as fairly price elastic. When selecting a charter bus company, price is the predominant, but not exclusive, factor. Other considerations include the identity [*54] of the bus driver and any prior dealings with a particular company. Older held a key position in Delaware Express. In essence, he ran the bus operations and, because of his business development responsibilities, he was able to build personal relationships with many of Delaware Express' major customers. Delaware Express had a reasonable basis to preclude Older from benefiting from these personal contacts which were established through the use of its goodwill. These relationships, particularly when coupled with Older's intimate knowledge of Delaware Express' business operations, are significantly more sensitive than those at issue in *Boyce*. On the other hand, I am also satisfied that a duration of three years is unreasonable. In that period, there will be customer turnover and business plans will change. Because, in this industry, price is the most important factor in preserving a customer base, Delaware Express' legitimate business interest can be protected with a limitation on competition of less than three years. Thus, I find, based on the foregoing, that a two-year duration is reasonable and that the Non-Competition Agreement should be adjusted accordingly. n76 Having determined [*55] the reasonable limits on any restrictions on Older's right to compete against Delaware Express, I now turn to whether the Agreement should be enforced through injunctive relief in these circumstances.

> n76 It should be noted that, although not dispositive, this Court has imposed reasonable time restrictions of two years or greater on agreements not to compete in the employment context. *See Knowles-Zeswitz Music, Inc., 260 A.2d at 175-76* (enjoining for two years an employee from supplying former customers he serviced while in the employ of the plaintiff); *but see Gas-Oil Products, 1987 Del. Ch. LEXIS 497, 1987 WL 18432* (enjoining an employee from soliciting an employer's customers or divulging certain information for three years); *Norton Petroleum Corp., 1998 Del. Ch. LEXIS 32, 1998 WL 118198* (prohibiting an employee from competing with his former employer for three years).

### 4. Injunctive Relief

"To merit a permanent injunction, a plaintiff must show: (1) actual success on the merits, (2) irreparable harm, [*56] and (3) the harm resulting from a failure to issue an injunction outweighs the harm to the opposing party if the court issues the injunction." n77 In deciding whether to enforce specifically a non-competition agreement in the employment context, "a central aspect of the analysis is a balancing of the harms that are threatened to plaintiff and the consequences of specific enforcement to the defendant." n78 Therefore, I must weigh, as they exist at this time, the interests that Delaware Express seeks to protect against the harm to the Defendants resulting from enforcing the restriction.

> n77 *COPI of Del., Inc. v. Kelly, 1996 Del. Ch. LEXIS 136, 1996 WL 633302* at *4 (Del. Ch. Oct. 25, 1996) (citing *Draper Communications, Inc. v. Delaware Valley Broadcasters, L.P., 505 A.2d 1283, 1288 (Del. Ch. 1985)*).

> n78 *Gamble v. Walker, 1994 Del. Ch. LEXIS 118, 1994 WL 384617* at *2 (Del. Ch. July 18, 1994). As set forth above, Delaware Express has achieved actual success on the merits. I am also convinced that the harm which it suffers from Older's continuing breach is irreparable.

[*57]

The Plaintiff has demonstrated that Older was a "key employee" and had access to proprietary information. Although the proprietary information may have limited independent value, n79 Older, nonetheless, developed extensive personal contacts with Delaware Express clientele through his employment with Delaware Express. As the person in charge of Delaware Express' bus operations and the expansion of that business, he gained critical insights into Delaware Express' plans for future business expansion. Thus, Delaware Express has a significant and legitimate interest in seeking to limit Older's competition with it. In short, Older's continued competition with Delaware Express represents a substantial and continuing threat to it. On the other hand, Older made a major commitment by investing in Rainbow Charter. His ability to meet his obligations to Gehouskey, to develop the business to which he has devoted substantial resources and, indeed, to earn a livelihood will be seriously impaired or, perhaps, defeated, at least in the near term, with the entry of an injunction. n80 In sum, on balance, the absence of permanent injunctive relief, which would deny not only Delaware Express the benefit [*58] of its bargain with Older but would also result in a continuing irreparable harm, outweighs any cognizable harm that Older may suffer.

> n79 *See infra* pp. 56-57.

> n80 This harm, of course, flows from Older's

breach of his Non-Competition Agreement.

Accordingly, Older and those acting in concert with him, including Creative Travel and Rainbow Charter, will be enjoined from competing with Delaware Express in that area consisting of New Castle County, Delaware, north of the Chesapeake & Delaware Canal, and Elkton, Maryland for a period of two years, less Older's period of compliance with the Non-Competition Agreement from March 9, 2001, until February 2, 2002.

5. *Damages*

Delaware Express may also recover monetary damages pursuant to Paragraph 3 of the Non-Competition Agreement. Paragraph 3 of the Agreement provides in part:

> If Employee shall violate the terms of this agreement, the Company shall be entitled to an injunction to be issued by any court of competent jurisdiction, enjoining and restraining [*59] Employee and each and every person or party concerned therewith from the continuance of such violation of the terms of this agreement, *and in addition thereto, Employee shall pay to the Company all damages, including reasonable attorney's fees, sustained by the Company by reason of the violation of the terms of this agreement.* n81

The Plaintiff is thus entitled, as "damages... sustained by [Delaware Express] by reason of the violation of the terms of [the Agreement]," to any profits earned by the Defendants that may be attributed to the breach of the Non-Competition Agreement. n82

n81 Emphasis added.

n82 I am satisfied that Delaware Express, in asserting a claim of unjust enrichment, has not demonstrated any right with respect to profits unjustly obtained by the defendants that are separate from, or in addition to, damages which I am awarding because of Older's breach of the Non-Competition Agreement.

"The law does not require certainty in the award of damages where a wrong has been proven [*60] and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages. Speculation is an insufficient basis, however." n83 Delaware Express first looks to Defendants' revenues, but

the Defendants were not enriched to the amount which it seeks of $102,964 (and Plaintiff was not damaged to that extent), for this figure represents gross revenue derived from former Delaware Express clients. The Defendants' profits, not their revenues, are the correct measure of their unjust enrichment and of Delaware Express' damages. n84 The Plaintiff, focusing on services provided to one former customer, argues that entries of $47,134 (revenue) and $27,440 (cost) in the Defendants' ledger for Bristol-Myers Squibb Company ("BMS"), a former Delaware Express customer, prove at a minimum profits (and thus, unjust enrichment) to the amount of $19,694. n85 The Defendants, however, established that the $47,134 entry in the Creative Travel ledger was for a bank deposit that consisted of revenue from several sources. n86 Thus, I am unable to determine from these entries in the Creative Travel ledger the amount [*61] of gross revenue (or net income) Creative Travel collected from BMS. Additionally, these entries do not prove that the Defendants earned a profit of $19,694, as no evidence has been presented to show what elements are included in the cost figure of $27,400. For example, does the $27,440 include allowances for overhead as properly allocated to this customer? Older, however, admitted that he "made just about $6,000.00 for our services [to BMS]." n87 Therefore, because the Plaintiff has proven the Defendants profited to the extent of $6,000.00 from business conducted with former (or potential) Delaware Express customers, I will award monetary damages of $6,000.00. n88

n83 *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Productions, Inc., 1992 Del. Ch. LEXIS 224, 1992 WL 251380 *7* (Del. Ch. Sept. 29, 1992).

n84 Delaware Express made no effort to prove the profits which it would have realized from the business which Defendants obtained in violation of the Agreement.

n85 Pl.'s Ex. 18; Tr. 254–56.

n86 Tr. 254–256

n87 Tr. 256.

n88 I reject, in this context, Plaintiff's argument that any uncertainties must be resolved against the Defendants as wrongdoers.

[*62]

Finally, Delaware Express asks that if the requested relief (injunction plus an award of monetary damages equal to the Defendants' unjust gain) is not granted, then the Court should enforce Paragraph 3 of the Non-Competition Agreement stipulating $100,000 as liqui-

dated damages. Paragraph 3 of the Agreement provides, *inter alia*:

> In the event that the remedy of injunctions is not available for any infraction or violation of the terms of this agreement, then the liquidated damages shall be deemed to be the sum of $100,000.00.

Because I have granted injunctive relief to remedy Older's breach of the Non-Competition Agreement, the condition to trigger the liquidated damages provision remains unfulfilled. Therefore, without passing on the validity of the provision, n89 I will not award liquidated damages.

> n89 In enforcing a liquidated damages provision, the Court must distinguish between a valid liquidated damages provision and an invalid penalty clause. "Where the damages are uncertain and the amount agreed upon is reasonable, such an agreement will not be disturbed." *Lee Builders, Inc. v. Wells, 34 Del. Ch. 307, 103 A.2d 918, 919 (Del. Ch. 1954)* (citation omitted). I seriously doubt that, if put to the test, this provision would qualify as a valid liquidated damages clause. While damages are uncertain, the Plaintiff provides no basis establishing $100,000 as a reasonable forecast of the harm. *See e.g., Faw, Casson & Co., L.L.P. v. Halpen, 2001 Del. Super. LEXIS 324, 2001 WL 985104 (Del. Super. Aug. 7, 2001)* (holding that, in an accountant's employment contract with a restrictive employment covenant, a liquidated damages provision based upon a percentage of billings was not a penalty clause). Plaintiff argues that the reasonableness of the $100,000 in liquidated damages is proven by the difference of slightly under $3,000 between the liquidated amount and its view of "actual harm" (*i.e.*, gross revenues of slightly less than $103,000). However, this argument fails, just as it did before, because revenues are not a reliable estimate of injury.

[*63]

## B. *Misappropriation of Trade Secrets*

Delaware Express further alleges that Older misappropriated proprietary information, in the form of the Delaware Express Corporate Customer List, and used that information to create a customer list for Creative Travel and to solicit customers of Delaware Express. Thus, Plaintiff contends, Older violated the Delaware Trade Secrets Act, the Resignation Agreement, the Non-Competition Agreement, and his fiduciary duties as an agent, and it is entitled to the appropriate remedies. The

Defendants deny that Older misappropriated the Delaware Express Corporate Customer List. I find that, although Older misappropriated the Corporate Customer List, the list does not qualify as a trade secret, and as such its misappropriation is not a violation of the Delaware Trade Secrets Act. However, Older did breach the Resignation Agreement and the Non-Competition Agreement by using the Delaware Express Corporate Customer List for his benefit. n90

> n90 Delaware Express, in its post-trial briefing, has not advanced its contention that Older violated fiduciary duties by converting the Customer List. In light of my conclusion that he violated the Resignation Agreement through this conduct, I need not engage in separate consideration of whether he owed any other duties to Delaware Express or if he breached any such duties.

[*64]

Analytically, there are four issues to be decided when determining if a party misappropriated a trade secret: (1) whether a trade secret exists; (2) whether the secret was communicated by the plaintiff to the defendant; (3) whether such communication was accompanied by an express or implied understanding that its secrecy would be respected; and (4) whether the trade secret has been improperly used or disclosed by the defendant to the plaintiff's injury. n91 My inquiry focuses on the first of these criteria.

> n91 *Wilmington Trust Co. v. Consistent Asset Management Co., 1987 Del. Ch. LEXIS 409, 1987 WL 8459 at *3–4 (Del. Ch. Mar. 18, 1997)* (citation omitted); *6 Del. C. § 2001*.

I start with a more detailed description of the allegedly misappropriated list (or lists). The ACT List maintained by Delaware Express is comprised of 5,000 individuals and corporations who may be either existing or prospective customers. The Delaware Express Corporate Customer List, that portion of the ACT List containing [*65] the names of existing and prospective corporate customers, catalogs alphabetically companies and contains fields for each of the following classes of information: the name of the company, a contact person, mailing address, and industry classification. n92 The data for the list have been gathered from a variety of publicly available sources, including, most notably, the New Castle Chamber of Commerce list. Additionally, the names of contact people, data not derived from any publicly available source but instead generated from past business dealings, are set forth for some companies. There are no

fields for the recording of information concerning prices charged or revenue generated. n93

n92 Not every field is completed for each entry.

n93 Pl.'s Ex. 19. When asked whether he considered the second half of the ACT List, the Corporate Customer List) proprietary information, Frenze noted that the list contained "the contacts and the decision makers, their phone numbers, their fax numbers, their e-mail address, [and] how much money they have spent with us." Tr. 43. It appears that Frenze has somehow confused another document containing records of past revenues derived from corporate customers, set forth in Plaintiff's Exhibit 29, with the Delaware Express Corporate Customer List. I do not understand it to be part of the Delaware Express Corporate Customer List, and apparently neither does the Plaintiff. Pl.'s Opening Post-Trial Br. at 4.

[*66]

Meanwhile, the Creative Travel customer list contains less information than the Delaware Express ACT List. n94 Its 1,000 entries of individuals and corporations only contain fields for the customer's name and the city. n95 Additionally, for corporate customers, a contact person is identified for certain companies listed. The parties have focussed their arguments upon the corporate customers on both lists.

n94 Pl.'s Ex. 20.

n95 The Creative Travel customer list also can be divided into two lists, one of individuals and another of corporate customers.

The parties have spent much effort debating whether Older derived Creative Travel's corporate customer list from publicly available sources or from the Delaware Express Corporate Customer List. Delaware Express argues that the evidence overwhelmingly establishes that Older obtained the Creative Travel list from his use of the Delaware Express Corporate Customer List. Older had access to the list. More telling are the numerous spelling and typographical errors [*67] that exist on both the Delaware Express and Creative Travel lists. The Defendants explain this commonality of error with the contention that both Delaware Express and Creative Travel derived their lists from the same publicly available sources, such as, particularly, the New Castle County Chamber of Commerce list. The Defendants additionally argue that the misspellings and other errors not present on the New Castle County Chamber of Commerce list may be attributed to errors

present on the computer disks used to download the list. Finally, the Defendants point to the length of the lists. The Delaware Express ACT List has 5,000 entries, while the Creative Travel customer list only has 1,000.

It is important to remember that the burden to be met by the Plaintiff is one of a preponderance of the evidence. "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." n96 Thus, the Plaintiff is not required to prove with exacting certainty that Creative Travel's corporate customer list [*68] was misappropriated by Older from Delaware Express. I am satisfied that Delaware Express has met its burden. There are simply too many coincidental errors, unexplained by the argument of common sources of publicly available lists, to decide in the Defendants' favor. Though the Defendants allude to the existence of other publicly available lists to explain these remaining errors, such as a list of church groups, they did not produce such lists. Similarly, while hypothesizing that the misspellings and other errors not present on the New Castle County Chamber of Commerce list might be attributed to errors present on the computer disks used to download the lists, the Defendants failed to produce the disks. Therefore, despite Older's testimony to the contrary, I conclude that the Plaintiff has proved by a preponderance of the evidence that Older misappropriated the Delaware Express Corporate Customer List. n97

n96 Del. P.J.I. Civ. § 4.1 (2000).

n97 Delaware Express has sought to impeach Older's testimony through proof that he was convicted in the early 1980s of misdemeanor crimes of theft and forgery involving the issuance of bad checks, crimes which involve dishonesty. Because those convictions are more than ten years old, evidence of conviction may not be considered "unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." D.R.E. 609(b). I reject Older's view of how he acquired the customer list because of my assessment of his testimony and the other evidence which sheds light on whether his testimony is credible. Because I do not rely upon evidence of his conviction in my consideration of the credibility of his testimony, I need not engage in the analysis of the various factors required by D.R.E. 609(b).

[*69]

The Plaintiff seeks relief in the form of an injunction, damages, punitive damages, and an award of attorneys' fees pursuant to various provisions of the Delaware Trade Secrets Act. I find, however, that the Delaware Express Corporate Customer List does not qualify as a "trade secret" for purposes of the Act. Therefore, I am unable to conclude that the Defendants have violated the Act and that the Plaintiff is entitled to any statutory remedy under the Act.

Delaware Express bears the burden of proving the existence of the trade secret. n98 The Act defines a "trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. n99

The list was not generally accessible, and reasonable efforts were made to maintain its secrecy. Furthermore, the customer list represents a compilation [*70] of information under the Act. n100 However, these factors alone do not establish the Corporate Customer List as a trade secret.

n98 *Miles, Inc. v. Cookson Am., Inc., 1994 Del. Ch. LEXIS 221, 1994 WL 676761* at *9 (Del. Ch. Nov. 15, 1994) (citations omitted).

n99 *6 Del. C. § 2001(4)*

n100 *See Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043 (Del. Super. 2001)* (patient lists and rolodex are compilations of information); *see also Dionisi v. DeCampli, 1995 Del. Ch. LEXIS 88, 1995 WL 398536* (Del. Ch. June 28, 1995) (Rolodex containing clients' names and addresses deemed a compilation of information), *amended by 1996 Del. Ch. LEXIS 5, 1996 WL 39680* (Del. Ch. Jan. 23, 1996).

To qualify as a protectable trade secret under the Act, the list must "[derive] independent economic value, actual or potential, from not being generally known to, and not

being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." n101

> An [*71] alleged trade secret derives actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money. This requirement of [*6 Del. C. § 2001(4)(a)*] involves the notion of competitive advantage. It focuses on whether a plaintiff would lose value and market share if a competitor could enter the market without substantial development expense. n102

I find that the Delaware Express Corporate Customer List does not qualify as a protected trade secret under the Act because it is readily reproducible from sources already in the public domain. n103

n101 *6 Del. C. § 2001(4)*

n102 *Miles, Inc., 1994 Del. Ch. LEXIS 221, 1994 WL 676761* at *10 (citing *Electro-Craft Corp. v. Controlled Motion Inc., 332 N.W.2d 890, 900-01 (Minn. 1983)*).

n103 I further note that the list has little, if any, independent economic significance.

As the statutory language of *6 Del. C. § 2001(4)(a)* [*72] provides, a trade secret derives its independent economic value from not being easily ascertained by proper means by competitors. Thus, in the context of customer lists,

> where customers in a particular industry can be easily identified, their identity is less likely to be a trade secret, even if the seller makes efforts to maintain the confidentiality of the information relating to their identity. But where the customers' identities as potential buyers of the defendant's products is [sic] not readily ascertainable from publicly available information, their identity may constitute a trade secret. n104

Put another way, no competitive advantage would be gained by a competitor who appropriates public information, as no substantial expense would be incurred if he had developed the information on his own. n105

n104 *Franklin Fibre-Lamitex Corp. v. Marvec Mfg., Inc., 1997 Del. Ch. LEXIS 42, 1997 WL*

153825 at *2 (Del. Ch. Mar. 26, 1997) (citing *Wilmington Trust Co.,* 1987 Del. Ch. LEXIS 409, 1987 WL 8459 at *7-8, ).

n105 *See RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 42* cmt. f ("A customer list is not protectable as a trade secret... unless it is sufficiently valuable and secret to afford an economic advantage to a person who has access to the list.").

[*73]

In *Town & Country House & Home Service, Inc. v. Newbery,* n106 a customer list developed from "cold calling" the "white pages" of the telephone directory qualified as a trade secret because the customers' identities, so derived, were not readily ascertainable public information. n107 In contrast, this Court in *Dionisi v. DeCampli* n108 decided that a Rolodex from a graphic design business with clients' names and addresses did not constitute a trade secret because the clients were easily identified. The clients were "well known in the community," and, furthermore, "the majority of the names on the Rolodex are generally known throughout the graphic arts services market as purchasers or suppliers of graphic arts services." n109 In light of these precedents, the Delaware Express Corporate Customer List does not qualify as a trade secret. Most of the Corporate Customer List is simply an alphabetical reorganization of the data originally found in publicly available sources. n110 The list contains no price information, no record of business conducted, and not even telephone numbers for the contact people. n111 The Plaintiff contends that the identities of certain internal contact [*74] people were not available publicly and, thus, constitute valuable proprietary information. Yet, the Plaintiff failed to prove that this information was not available publicly; for example, could not one simply call the number of the company and discover the names of these contact people without significant burden or expense? n112 Because the data on the list can be duplicated from publicly available sources, the list does not carry independent economic value, and as such fails to qualify as a protectable trade secret.

n106 *3 N.Y.2d 554, 147 N.E.2d 724, 170 N.Y.S.2d 328 (N.Y. 1957), cited in Wilmington Trust Co.,* 1987 Del. Ch. LEXIS 409, 1987 WL 8459 at *7, and *Franklin Fibre-Lamitex Corp.,* 1997 Del. Ch. LEXIS 42, 1997 WL 153825 at 3.

n107 *Town & Country House & Home Service, Inc., 147 N.E.2d at 726* ("The customers of plaintiff were not and could not be obtained merely by looking up their names in the telephone or city directory or by going to any advertised locations, but had to be screened from among many other housewives who did not wish services such as respondent and appellants were equipped to render.")

n108 *1995 Del. Ch. LEXIS 88, 1995 WL 398536.*

[*75]

n109 *1995 Del. Ch. LEXIS 88,* [WL]. at *11.

n110 Pl.'s Ex. 33. Indeed, many of the customers mentioned by Delaware Express in these proceedings are well-known in the community.

n111 *Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1054 (Del. Super. 2001)* (determining that patient bills qualified as trade secrets as they "contain the sort of proprietary information which courts in Delaware have concluded justify 'trade secret' status and protection. Specifically, they compile patient addresses, medical diagnoses and treatment codes, and specific patient insurance information, all of which are valuable data in the commercial operation of a medical practice, and all of which are generally unavailable in the public domain."); *see also Abbott Lab. v. Norse Chem. Corp., 33 Wis. 2d 445, 147 N.W.2d 529, 539 (Wis. 1967)* (noting, besides not having a company policy of confidentiality, that a customer list that "contained only the names and addresses of the customers and the individual to be contacted" was not a trade secret).

n112 *See Total Care Physicians, P.A., 798 A.2d at 1055* (noting that a Rolodex that contained "only the names of insurance companies, HMO's and contacts within these organizations" was not a trade secret because the plaintiff "had not indicated how this information is not available elsewhere, e.g., a telephone call (from a number obtained in the phone book or directory assistance) to the carriers or HMO's themselves").

[*76]

It is not determinative, for purposes of the Delaware Trade Secrets Act, that Paragraph 4 of the Resignation Agreement expressly declared that "any sales, marketing, financial, or operating information acquired by Mr. Older during the course of his employment will be considered proprietary." "An agreement between the parties that characterizes specific information as a 'trade secret' can be an important although not necessarily conclusive factor in determining whether the information qualifies

for protection as a trade secret." n113 A stipulation in a form contract, signed at a meeting terminating the employment relationship, cannot make proprietary what is publicly available information.

> n113 *RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39* cmt. d.

My decision that the Delaware Express Corporate Customer List is not protected as a trade secret under the Act must be considered in the context of enforcing the Resignation Agreement and the Non-Competition Agreement. "If the customer list or related information [*77] does not qualify for protection as a trade secret, the former employer should ordinarily be limited to the protection available through a reasonable covenant not to compete." n114 Older, however, by misappropriating the Delaware Express customer list, violated the terms of both the Resignation Agreement and the Non-Competition Agreement. Paragraph 4 of the Resignation Agreement stipulates:

> 4. Any sales, marketing, financial, or operating information acquired by Mr. Older during the course of his employment will be considered proprietary, and as such, may not be reproduced or communicated to any other person or entity, whether directly or indirectly.

The Non-Competition Agreement also provides:

> 2. The Employee further agrees that he/she will not, while this agreement remains in effect, or at any time after his/her termination of employment:

>> A. Directly or indirectly disclose, or in any manner reveal to any person, firm association, or corporation, any of the data, information, trade secrets, or methods of doing business used or possessed by the Company or any of the information, data, or records of any client obtained by or disclosed to employee as a [*78] result of his/her employment by the Company.

The Delaware Express Corporate Customer List constitutes "sales, marketing, [and] operating information" for purposes of Paragraph 4 of the Resignation Agreement, and thus also constitutes "information" for purposes of

Paragraph 2(A) of the Non-Competition Agreement. Because I have found, by a preponderance of the evidence, that Older took the Corporate Customer List from Delaware Express, Older, thus, violated the terms of both agreements.

> n114 *RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 42* cmt. f (citing *RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 41* cmt. d).

The proper remedy for the breach of the two agreements is to permanently enjoin Older from using the Creative Travel customer list as it presently exists and any Delaware Express customer list. In addition to concluding that the Plaintiff succeeded on the merits, before granting the Plaintiff a permanent injunction, I must find irreparable harm to the Plaintiff and that the balance of harms resulting [*79] from enjoining the Defendants, as compared with not enjoining the Defendants, favors the Plaintiff. n115 Delaware Express will be irreparably harmed if Older is allowed to exploit its established goodwill for the Defendants' benefit. Furthermore, I find that burdens imposed by enjoining Older from using the current Creative Travel customer list, instead of declining to enforce the Resignation Agreement and Non-Competition Agreement, balance in favor of the Plaintiff. Older is free, subject to any constraints imposed by the reasonable enforcement of the Non-Competition Agreement, to create a new customer list for Creative Travel from publicly available sources. If Creative Travel's list is in fact as easily derived from such sources as Defendants claim, then it can hardly be contended that the burden on Older outweighs the harm to Delaware Express caused by a failure to issue an injunction. Therefore, I will permanently enjoin Older from using the presently existing Creative Travel customer list and any Delaware Express customer list. n116

> n115 *See supra* pp. 42–43.

> n116 In addition, Defendants will be directed to return any Delaware Express list, in whatever form. To the extent that Delaware Express seeks separate damages on account of Older's conversion of its customer list, it has not proved them. Any claim for punitive damages is beyond this Court's jurisdiction. *See RHIS, Inc., 2001 Del. Ch. LEXIS 118, 2001 WL 1192203* at *3 n.1.

[*80]

### C. *Defamatory Remarks*

Delaware Express contends that Older's remarks on

several occasions, embracing a variety of topics from Frenze's alleged drug abuse to the short-term viability of Delaware Express, constituted defamatory statements, actionable as slander *per se*. For the following reasons, I resolve all allegations of slander *per se*, except for those involving Older's comments concerning Delaware Express' impending bankruptcy, in favor of the Defendants.

The tort of defamation is composed of two torts: libel and slander. n117 "Generally, the elements of defamation are: (1) defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury." n118 Although oral defamation claims generally require proof of special damages, n119 in Delaware four categories of slander (maligning a person in his or her trade or business, imputing a crime of moral turpitude, implying a person suffers from a loathsome disease, and imputing unchastity to a woman) require no such proof, and as such are slander *per se*. n120 These four categories historically have been [*81] afforded special treatment because of their tendency to isolate the object of the defamatory speech from society, for "one who is defamed in one of these ways might never know the extent of a lost opportunity to relate to and associate with others, because he could be avoided without knowing the reason and without having the chance to rebut the defamation." n121 Once a prima facie case has been established by the plaintiff, the defendant may plead the truth of the alleged defamatory statements as a defense. n122 With these elements in mind, I turn to the allegations before me. n123

n117 *Spence v. Funk, 396 A.2d 967, 970 (Del. 1978)*.

n118 *Bloss v. Kershner, 2000 Del. Super. LEXIS 90, 2000 WL 303342* at *6 (Del. Super. Mar. 9, 2000), *aff'd, 793 A.2d 1249 (Del. 2001)* (Table); (*Read v. Carpenter, 1995 Del. Super. LEXIS 251, 1995 WL 945544* at *2 (Del. Super. June 8, 1995), *aff'd, 670 A.2d 1340 (Del. 1975)* (Table).

n119 *Read v. Carpenter, 1995 Del. Super. LEXIS 251, 1995 WL 945544* at *2 (citation omitted).

n120 *Spence, 396 A.2d at 970* (citations omitted).

[*82]

n121 *Id.*

n122 *DeBonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1155 (Del. 1981)* ("It is hornbook law that truth is an absolute defense to a defamation action.")

n123 The Defendants contend that they are entitled to a heightened scrutiny analysis because Delaware Express is a public figure, given its heavy use of the media and its daily access to radio through its exclusive relationship with a radio station. Plaintiff asserts that it is a private figure. There are two types of public figures, general purpose and limited purpose. *Q-Tone Broadcasting Co. v. MusicRadio of Md., Inc., 1995 Del. Super. LEXIS 598, 1995 WL 875438* at *5 (Del. Super. Dec. 22, 1995) (citing *Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)*). "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. *In either case such persons assume special prominence in the resolution of public questions.*" *Gertz, 418 U.S. at 351* (emphasis added). Delaware Express fits neither category. Merely because a company advertises on a radio station to which it provides exclusive bus services does not mean that somehow it has assumed special prominence in the resolution of public questions.

[*83]

Plaintiff Delaware Express claims it was defamed when Older remarked to Roca that Frenze was a drug addict and a "shyster," and when Older told Gehouskey a message of similar import. The Plaintiff also notes that Older told Kemple that Frenze was going to experience some legal and financial problems. While such statements may be defamatory, they are not defamatory of *this* plaintiff. It is true that defamatory statements made concerning a corporation's leading executive officer may constitute slander of the corporation. n124 However, a corporation is defamed by defamatory communications of its officers and directors only if those statements "also reflect discredit upon the method by which the corporation conducts its business." n125 For example, the statements at issue are distinguishable from one set of statements deemed actionable by the corporation in *Q-Tone Broadcasting*. In *Q-Tone Broadcasting*, the statements did not merely address the executive officer's sexual practices, but, more specifically, they recited that he approached the firm's clients. n126 Thus, the allegations were deemed to discredit the plaintiff corporation in the method by which it conducted its business, [*84] thereby making the statements actionable by the corporation. Here, the allegations

concerning Frenze, of being a drug addict, or a shyster, or in financial and legal difficulty, did not discredit Delaware Express in the manner in which it conducted its business. Therefore, although these statements may have been actionable by Frenze as a plaintiff, they are not for Delaware Express to pursue. n127

n124 *See Q-Tone Broadcasting Co. v. MusicRadio of Md., Inc., 1996 Del. Super. LEXIS 182, 1996 WL 494177* (Del. Super. Apr. 22, 1996) (awarding damages to the plaintiff corporation for remarks uttered by the defendant concerning the corporation's executive officer).

n125 *RESTATEMENT (SECOND) OF TORTS § 561* cmt. b.

n126 *Q-Tone Broadcasting Co., 1996 Del. Super. LEXIS 182, 1996 WL 494177.*

n127 It should also be noted that the allegation that Frenze is a "shyster" also would not be actionable because it is merely non-actionable name-calling. "A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more." *Q-Tone Broadcasting Co. v. MusicRadio of Md., Inc., 1994 Del. Super. LEXIS 453, 1994 WL 555391* at *4–5 (Del. Super. Aug. 22, 1994) (citing *RESTATEMENT (SECOND) OF TORTS § 566* cmt. e). Older's remarks that Frenze was a "shyster" could only be reasonably interpreted as such.

[*85]

Delaware Express also claims that it was defamed by Older's assertions that the company had "some problems regarding their licensing of buses," and that it had a "tax problem" which would result in a "bad circumstance for the company." In this instance, the Plaintiff may have established a *prima facie* case for slander *per se.* However, the Defendants have established the truth of these statements to a preponderance of the evidence, and therefore enjoy an absolute defense. n128

n128 *Bennum v. Coursey, 23 Del. 74, 7 Penne. 74, 76 A. 53, 54 (Del. Super. 1908)* (further noting that such burden of proof is on the defendant).

It is the Plaintiff's final claim that has given me pause. Delaware Express argues that it was defamed by Older's statements to Roca that it would "undoubtedly go into bankruptcy" and other statements to Hawkins

to that effect. Delaware apparently permits recovery for such statements as slander, *per se.* n129 Therefore, the claim that Delaware Express would "undoubtedly go into bankruptcy" [*86] qualifies as a defamatory communication. As communicated to Roca and Hawkins, there was publication of the defamatory communication to parties who understood its defamatory character. The statements clearly referred to Delaware Express. That Hawkins did not believe (and Roca was not materially affected by) Older's claims regarding the viability of Delaware Express does not mean an element of the tort of defamation has not been established n130 or no damages are to be awarded. As Older's comments qualify as slander *per se,* n131 I conclude that Delaware Express is entitled to nominal damages. n132 Thus, I award nominal damages in the amount of $2.00. n133

n129 *See Q-Tone Broadcasting Co., 1996 Del. Super. LEXIS 182, 1996 WL 494177* (awarding damages for statements that the plaintiff corporation was on the verge of bankruptcy).

n130 I also note that there is no evidence from which I could conclude that Older's comments were true (or even that he believed them to be true).

n131 The statements regarding Delaware Express' imminent bankruptcy constitute maligning a person in its trade or business.

[*87]

n132 *Bennum, 76 A. at 54* (noting that in an action for slander *per se* "it is not necessary to show that [the plaintiff] has sustained any actual or special damage," and awarding a judgment of six cents to the plaintiff). In awarding nominal damages, the extent to which Delaware Express' reputation was harmed is irrelevant, and thus so too is Hawkin's disbelief. *RESTATEMENT (SECOND) OF TORTS § 620* ("Nominal damages are awarded when the insignificant character of the defamatory matter, or the plaintiff's bad character, leads the jury to believe that no substantial harm has been done to his reputation, and there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation.").

n133 Plaintiff has failed to prove any actual damages resulting from Older's defamatory comments.

## D.  *Tortious  Interference  with  Business Relationships*

Delaware Express finally alleges that Older tortiously interfered with existing and prospective contractual relationships between Delaware Express and its corporate charter bus clients. [*88] Specifically, Delaware Express focuses on three clients: WRDX Radio, Sanford School, and Unique Lives. The Defendants offer several arguments in their defense: that the conduct was not tortious; that they did not solicit the clients, but instead the clients sought out the services of Creative Travel; that the tortious interference, if any, was not the cause of any damages; and that the Plaintiff failed to prove any damages.

The torts of interfering with existing contracts and interfering with prospective contracts are closely related both historically and in their required elements. n134

The elements of [tortious interference with existing contractual or prospective contractual relations] are: (1) the existence of a valid business relation or expectancy; (2) the interferer's knowledge of the relationship or expectancy; (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted. n135

There is, however, a distinction between the two torts, that "being the availability to the defendant of a privilege to interfere within [*89] the limits of fair competition with prospective business opportunities." n136 Thus, in determining whether Older interfered with Delaware Express' prospective contractual relations, each element "must be considered in light of [the Defendants'] privilege to compete or protect [their] business interests in a fair and lawful manner." n137

n134 *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980).

n135 *In re Frederick's of Hollywood, Inc.*, 1998 Del. Ch. LEXIS 111, 1998 WL 398244 at *5 (Del. Ch. July 9, 1998) (citation omitted).

n136 *DeBonaventura*, 419 A.2d at 947.

n137 *Id.*

Delaware Express seeks to impose tort liability upon Defendants because of their knowing and intentional competition with Delaware Express for Delaware Express' existing and prospective customers. n138 Critical to Delaware Express' position is its view that Defendants cannot compete "fairly" or "lawfully" because their right

to compete is precluded by the covenant-not-to-compete [*90] in the Non-Competition Agreement. Thus, it is Plaintiff's implicit view that a breach of contract action based on a covenant not to compete will typically carry with it a large subset of claims characterized as the companion tort of interference with contractual rights. n139 I find, however, that Delaware Express has failed to prove that it has a claim against Defendants for the tortious interference with its contractual rights, either existing or prospective.

n138 Although Older successfully competed with Delaware Express by soliciting Delaware Express' ongoing customers. I do not find that Older took any business away from Delaware Express which had been expressly agreed upon by both Delaware Express and its customers. Instead, Older acquired business which, because the customers had historically used Delaware Express for their charter bus needs, Delaware Express anticipated that it would continue to provide.

n139 The conduct for which Delaware Express seeks to impose tort liability will, by definition, be in breach of the covenant not to compete because it is the covenant that, according to Delaware Express, deprives Defendants of their fair competition privilege which otherwise limits the scope of the tort of interference of business relationships. On the other hand, there will be breaches of the covenant that do not constitute tortious interference with business relationships. For example, solicitation within the territorial limits of the covenant for customers who were neither existing nor prospective customers of Delaware Express would not constitute the tort of interference with business relationships but would still be a violation of the covenant.

[*91]

Delaware Express' proof fails as to all claims of tortious interference with contract, except for the BMS relationship, because no damages were proved. It undoubtedly lost business to Defendants from customers with which it had existing or prospective relationships but it did not prove how it was damaged — either in terms of profits that it would have achieved or in terms of profits that Defendants unjustly obtained. As noted above, n140 the Court cannot on this record merely rely on Defendants' revenue from certain customers to make any rational conclusion as to the profits obtained or lost from those jobs. Thus, the critical element of damages has not been proved. n141

n140 *See supra* pp. 45–47.

n141 Delaware Express points to a promotional trip organized each year by WRDX Radio to a University of Delaware away football game. Michael Klezaras, the sales manager for WRDX Radio, testified to the reason why Creative Travel, and not Delaware Express, was selected for the WRDX 2002 University of Delaware football trip contract. Very simply, Creative Travel was the only party to submit a bid; Delaware Express failed to submit a bid for the project even after a week's extension by Mr. Klezaras of the deadline date. WRDX had also contracted with Delaware Express to supply buses for certain ski trips in the past. However, the only evidence as to why it was not chosen this year was that Delaware Express failed to approach WRDX about this year's ski trip. WRDX had also previously contracted with Delaware Express to supply buses for a trip to see "42nd Street" in New York. No evidence was presented as to why WRDX had switched this year's New York trip to Creative Travel. Delaware Express has no one to blame but itself for losing these "lucrative" contracts.

With respect to many customers that changed from Delaware Express to Creative Travel/Rainbow Charter, such as, for example, Sanford School and Unique Lives, Delaware Express, in general, demonstrated that, at least until someone agreed to provide satisfactory bus service at a cheaper price, Delaware Express had a reasonable expectation of continuing with that business, that Older knew of the Delaware Express relationship with those customers and intentionally sought to gain the business for his own benefit and that, as a result of Older's efforts, Delaware Express lost the business. Mere loss of business, of course, by itself, does not establish damages. I also note that much of the Sanford School's bus needs were met by yet another competitor, Gregg's Bus Service. (Tr. 389–92).

[*92]

Delaware Express did prove damages resulting from the loss of the work that the Defendants performed for BMS. As set forth above, Older admitted to receiving a profit of $6,000 from that account and that amount has been awarded as damages for breach of contract. Although Delaware Express cannot collect twice (*i.e.*, in contract and in tort) for the same harm calculated in the came way, the question remains as to whether it has established the liability of Defendants in tort as well. In order to be liable for interference with a business relationship,

Older must have known, when he (or Creative Travel) obtained the BMS job, that he was "interfering" with a business relationship or business expectancy of Delaware Express. I find that he had no such knowledge at the time he agreed to perform the work. The services for BMS were not secured by BMS. Instead, the business services were obtained by a consulting firm, McGettigan Partners ("McGettigan"), from Philadelphia, Pennsylvania, working on behalf of BMS. Older did not solicit McGettigan's interest; McGettigan contacted B's Shuttle to provide the services. Because B's Shuttle could not meet McGettigan's needs, it referred McGettigan [*93] to Older. n142 Thus, at least based on the record before me, Older did not know that the McGettigan work was for BMS, and Older had no knowledge that he was interfering with a Delaware Express expectancy. n143 Accordingly, although Older breached the covenant not to compete when he provided services to BMS in northern New Castle County and Defendants are liable for the damages determined to have resulted from that breach, Defendants are not liable to Delaware Express for tortious interference with any business relationship.

n142 That McGettigan was "shopping" for the services also raises a doubt as to whether Delaware Express had an expectancy to obtain this work.

n143 There is nothing in the record from which the inference can be drawn that Delaware Express had a business relationship or expectancy with McGettigan.

### E. *Attorneys' Fees*

Delaware Express maintains that it is entitled to recover its attorneys' fees, under either the Delaware Trade Secrets Act or the Non-Competition Agreement. n144 [*94]

n144 Because Older did not violate the Act, there is no statutory ground for an award of attorneys' fees to Plaintiff. *6 Del. C. § 2004.*

Although the so-called American Rule generally requires each party to bear its own attorney's fees, the parties may, of course, by contract shift that burden. n145 Paragraph 3 of the Non-Competition Agreement provides, *inter alia*, that Older "shall pay to [Delaware Express] all damages, including reasonable attorney's fees, sustained by [Delaware Express] by reason of the violation of the terms of this agreement." Therefore, in accordance with the agreement that Older made with Delaware Express, Delaware Express is entitled to recover from Older its attorneys' fees reasonably incurred

in pursuing the relief obtained because of Older's breach of the Non-Competition Agreement. n146

n145 *Seinfeld v. Coker, 2000 Del. Ch. LEXIS 172, 2000 WL 1800214* at *4 (Del. Ch. Dec. 4, 2000).

[*95]

n146 *See Research & Trading Corp. v. Pfuhl, 1993 Del. Ch. LEXIS 45, 1993 WL 93369* at *1 (Del. Ch. Feb. 26, 1993) (reluctantly "enforcing a term of an employment contract that subjects an employee to a potentially large award of counsel fees for violating a covenant restricting his or her ability to compete with the employer"); *see also Faw, Casson & Co., L.L.P. v. Halpen, 2001 Del. Super. LEXIS 324, 2001 WL 985104* (awarding to the plaintiff reasonable attorneys' fees pursuant to a provision in an employment contract that contained a non-competition covenant).

## III. CONCLUSION

For the foregoing reasons, Older, and those acting in concert with him, shall be enjoined from (1) competing with Delaware Express in that market area defined as Elkton, Maryland and that portion of New Castle County, Delaware, north of the Chesapeake and Delaware Canal for a period two years, reduced by the period between March 9, 2001 and February 2, 2002, and (2) using in any manner Delaware Express' corporate customer lists. I award to the Plaintiff monetary damages in the amount of $6,000.00 for breach of the Non-Competition [*96] Agreement; nominal damages in the amount of $2.00 for Older's defamatory comments are also awarded. Plaintiff may apply for its attorneys' fees reasonably incurred in prosecution of its claim of breach of the Non-Competition Agreement. Otherwise, Plaintiff's claims are dismissed.

Counsel shall confer and submit within 10 days a proposed form of final order to implement this Memorandum Opinion.

John W. Noble

Vice Chancellor