**F**

Case 1:04-cv-01278-KAJ   Document 214-7   Filed 10/19/2005   Page 1 of 13

LEXSEE 1992 DEL. CH. LEXIS 234

**RESEARCH & TRADING CORPORATION, Plaintiff, v. HENRY PFUHL, JR., WILLIAM N. CLARK, and MICHAEL J. LOZANOFF, Defendants.**

Civil Action No. 12527

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1992 Del. Ch. LEXIS 234*

**October 8, 1992, Submitted
November 18, 1992, Decided
November 19, 1992, Filed**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1]

M. Duncan Grant, Esquire and David Fournier, Esquire, of PEPPER, HAMILTON & SCHEETZ, Wilmington, Delaware; Philip H. Lebowitz, Esquire and Christopher M. Arfaa, Esquire, of PEPPER, HAMILTON & SCHEETZ, Philadelphia, Pennsylvania; Attorneys for Plaintiff.

James F. Maher, Esquire and Teresa C. Fariss, Esquire, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; Attorneys for Defendants.

**JUDGES:** ALLEN

**OPINIONBY:** ALLEN

**OPINION:**

MEMORANDUM OPINION

ALLEN, Chancellor

Research & Trading Corporation ("RTC") has sued three of its former senior officers seeking specific enforcement of covenants restricting their ability, for a period of one year following their separation from RTC, to deal with RTC customers on behalf of any RTC business competitor. The defendants are Henry Pfuhl, Jr., the former president of RTC; Michael J. Lozanoff, the former head of sales and marketing of the firm and William N. Clark, the former chief financial officer of the Company. The central allegation is that the defendants left RTC in early 1992 and established a firm, [*2] Safety Technology & Systems, Inc. ("STSI"), that competes directly with RTC and, more particularly, solicits business directly from RTC customers and suppliers, with whom the defendants had dealt regularly as senior officers of RTC.

Defendants do not deny that they have solicited RTC customers in circumstances that would seem to violate the covenants contained in RTC's standard employment contract. Rather they assert a number of positions designed to show that the restriction of such a covenant does not bind any of them because either (1) they never signed a contract containing such a restriction (Mr. Clark's position); (2) the contract that they signed had been terminated and the new legal relationship contained no such covenant (Mr. Pfuhl); or (3) RTC had breached its obligation in a number of respects, thus destroying the relationship and excusing compliance with the covenant (all defendants). Beyond these points defendants assert that these covenants ought not to be specifically enforced by a court of equity in these circumstances. They say their business is a new one not capable of inflicting substantial damage upon plaintiff who already faces competition from a large number [*3] of sources.

The case has been through a four day trial. For the reasons that follow I conclude that the covenants are valid, binding and enforceable; that plaintiff did not violate the employment agreements in a way that excused defendants from compliance with the agreed upon covenants; and that specifically enforcing them to the extent now sought, is more consistent with equity in the circumstances than would be a refusal to do so.

I.

RTC is a small firm engaged in the business of manufacturing and marketing safety devices and systems designed to protect persons required to work at heights,

from accidental falls. Products marketed by RTC include so called "soft goods," such as harnesses, body belts and shock absorbing lanyards, and "devices," such as retracting lifelines, horizontal systems, confined entry systems and vertical climbing equipment. Its annual sales are approximately $3.2 million, which comprises 5-6% of the total U.S. market for fall protection equipment.

RTC is controlled by its sole shareholder, Dr. J. Nigel Ellis, Ph.D., who founded RTC in 1971. Ellis is an expert in the fall protection field. Through another company he started, Ellis provides consulting services [*4] to companies interested in using his expertise to abate fall hazards. RTC sells its products nationally largely through a network of independent agents. Approximately 70% of its goods are sold to distributors, 10% to various other resellers and 20% to end users. RTC's largest single customer is Vallen Corporation which is one of the three largest distributors of fall protection equipment in the United States and accounts for 45% of RTC's total sales.

Mr. Pfuhl was trained as an engineer and had spent his working life in a series of manufacturing process assignments in various industries. He was hired by RTC in December of 1988 as vice president of operations, but was soon named President of the Company. Pfuhl personally participated and supervised RTC's negotiations with suppliers and customers, including Vallen Corporation. Pfuhl, at the insistence of Ellis, signed a non-competition agreement on January 10, 1989.

Michael Lozanoff strikes me as an energetic and ambitious businessman. He too had been trained as an engineer, but his field is sales and marketing. Lozanoff was hired as vice-president of sales and marketing in December of 1989. In this position, he of course had access to RTC's suppliers' identities and products, and other information concerning each customer, supplier and product. He had personal dealings with many of RTC's best customers including Vallen. Lozanoff signed a non-competition agreement on December 27, 1989.

Mr. Clark, an accountant, was hired as Chief Financial Officer on July 18, 1991. Clark had access to the following information: RTC's customers' identities and requirements, RTC product specifications, RTC's suppliers' identities and products, and other information concerning each customer, supplier and product. Although there is conflicting evidence on the issue, as explained below, I find that Clark signed a non-competition agreement. The covenant in issue provides, in part, as follows:

(1) To protect [RTC's] valuable trade secrets, proprietary information and confidential information, Employee agrees that while Employee is employed by RTC and for a period of twelve months after the termination of his employment with RTC, for any reason whatsoever, Employee: (i) shall not, on his own behalf or on behalf of any competitor of RTC, directly or indirectly, engage in the business of selling, soliciting, purchasing or promoting the sale of any products which compete with RTC's products to or from any person, firm, partnership, corporation, or institution of any kind, which Employee had dealt with, called upon, solicited, sold to, or purchased from, either personally or through co-employees that he supervised and (ii) shall not, on his own behalf or on behalf of any competitor of RTC, directly or indirectly, sell, purchase, or promote any products which he, either personally or through employees he supervised, sold, purchased, or promoted for RTC at any time during employee's employment with RTC. (emphasis added) n1

(PX 133). The agreement contains [*5] the following remedy provisions:

(3) In the event of a violation of this Agreement by the Employee, RTC shall be entitled to seek such relief as may be appropriate including but not limited to the right of injunction and monetary damages.

(4) In the event of a violation of this Agreement by the Employee, the term of all covenants and restrictions contained in this Agreement shall be automatically extended for a period of one year from and after the latter of (i) the date on which the employee permanently ceases such violation, or (ii) the date of entry by a court of any order or judgment enforcing such covenant or restriction.

(PX 133).

n1 The Lozanoff covenant was modified slightly, as discussed below.

Lastly, the agreement requires the employee to pay RTC's counsel fees if legal action enforcing it results in vindication of the Company's rights. All three of the defendants signed this form of agreement, although Lozanoff, as indicated (note 1), altered his agreement with an interlineation before signing [*6] it.

* * *

The relationship between Mr. Ellis, the Owner, and the three senior managers of RTC seems to have never been satisfactory. Mr. Pfuhl, the first of the three to arrive, rapidly grew dissatisfied. Mr. Lozanoff too became frustrated by the business situation of the firm and Mr. Clark, the most recent arrival, seems to have fallen rather quickly into an adversarial relationship with Ellis. A series of specific problems arose, but most basically, the officers

saw their opportunities as being tied to the financial performance of the Company and saw that performance as being limited by inadequate capitalization, the diversion (as they saw it) of funds from RTC to Ellis and another firm he owned, and by poor management decisions forced by Ellis. Thus, while they had no ownership interest in RTC, the defendants felt aggrieved by what they saw as Dr. Ellis' mismanagement of RTC. These frustrations ultimately led to their separation from RTC. One of the core issues in this case is whether the sources of this frustration — Mr. Ellis' conduct towards RTC and them — constitutes a legal basis to release them from the effects of the covenants contained in their employment contracts, [*7] which I conclude are otherwise valid and binding.

\* \* \*

After working at RTC only six months, Mr. Pfuhl grew dissatisfied with his position, feeling that he was asked to bear the responsibilities of a corporate president, while being regarded as a vice president. On June 26, 1989, Pfuhl submitted a resignation stating that he would cease performing his duties on July 7, 1989. Mr. Ellis discussed Pfuhl's problems with him, and the two reached an accommodation providing that Pfuhl would be promoted to President and provided with increased compensation. No new written agreement was entered at that time.

When he began his employment with RTC, Mr. Pfuhl had been promised by Mr. Ellis that he would have the opportunity to purchase equity in RTC, as part of his compensation, "after one year's successful service, using the book share value audited for the end of 1988." (PX 8 at 2) Some discussions between Pfuhl, Ellis, and his attorney, William Scari, Esquire, were held regarding the purchase of RTC stock by Pfuhl. It is undisputed, however, that no plan for stock participation by management was presented to the board and Pfuhl never in fact received any equity in RTC.

Lozanoff also [*8] received, upon the late 1989 commencement of his employment, a promise from Pfuhl, as President of RTC, that he would receive an opportunity to purchase equity in RTC. Lozanoff also never received any equity in the company. Pfuhl and Lozanoff, however, never extended any offers to purchase equity in RTC, other than a management leveraged buy-out proposal for 100% of the RTC stock, discussed below. This proposal, which Ellis rejected, differed radically from the transaction envisioned by RTC's promise to the defendants to sell them stock.

One of the numerous conflicts between the defendants Ellis concerned Pfuhl's objections to the relationship between RTC and Dynamic Scientific Controls, ("DSC") a consulting company also owned by Ellis. Pfuhl objected to practices by which RTC was providing facilities to DSC to conduct seminars, as well as the services of RTC employees, at no cost to DSC, while RTC also paid certain DSC expenses. In addition, RTC was paying DSC for services it provided to RTC. Mr. Ellis explained these payments as appropriate on the view that RTC's connection with DSC, and the expertise in safety technology and techniques that it possesses, gives RTC an advantage [*9] over its competitors, who merely supply safety equipment, by enabling it to market itself as the creator of solutions to safety problems.

Since all of the common stock of these entities was owned by Ellis, any alleged unfairness to RTC in its dealings with DSC did not harm any minority stockholders to whom Ellis, Pfuhl or the other defendants owed fiduciary duties. Assuming, nevertheless, for the sake of argument only that, by virtue of their positions as senior officers, the defendants have legal standing to object to these transactions, they have not borne their burden of showing any harm to RTC (and thus to their own future prospects as employees). Ellis maintains that DSC's relationship with RTC has been and continues to be very beneficial to RTC. I cannot conclude on the evidence that this relationship adversely effected RTC.

Ellis was also at odds with Pfuhl and Clark with regard to the need to alter RTC's financial structure. In 1990, RTC experienced financial difficulties that ultimately resulted in a breach of some of the covenants in its loan agreement with Mellon Bank. Pfuhl informed the bank that RTC would begin seeking an infusion of equity capital to bring it into [*10] conformance with the covenants. Ellis did not allow Pfuhl to do so, however. Ellis sought instead to avoid the dilution of his control over RTC by pursuing a "bootstrap" budget, designed to resolve RTC's financial difficulties without bringing in additional equity investors.

Clark and Pfuhl opposed this approach and Pfuhl argued that it would result in a sharp decline in RTC's sales. In response to Ellis' refusal to raise additional equity, on November 11, 1991, all three of the defendants proposed a leveraged buy-out of RTC through which they would acquire all of RTC's common stock from Ellis. In the proposal Ellis would give up all of his stock in RTC in exchange for unguaranteed notes of RTC and no cash. Ellis immediately and flatly rejected the offer, stating that he would not sell his company for less than $20 million (which on the evidence appears to be an absurdly high price). About this same point in time, the file containing the non-competition agreements for RTC employees disappeared.

Additional conflicts arose between Ellis and his managers in October 1991 when a judgment of $900,000 was

rendered against RTC in a personal injury case in New Jersey. Clark and Pfuhl stated [*11] that RTC was obligated to inform Mellon Bank because the judgment would be considered an unusual event. By late November, Clark refused to continue to give information to Mellon without also disclosing the judgment. Ellis thought the judgment could be settled while the case was on appeal. In addition, over the protests of Clark and Pfuhl, Ellis granted a request by Mellon for a third mortgage on RTC's building, in apparent violation of an order issued in the personal injury litigation prohibiting RTC from transferring its assets. n2 According to his personal notes from this point in time, Ellis began to view Clark as a loose cannon and a malicious person.

> n2 The judgment was finally disclosed to Mellon in late December or early January after it had been settled.

Meanwhile, Ellis' relationship with Lozanoff was also deteriorating as the two clashed over the proper approach for RTC's sales efforts. Lozanoff opposed Ellis' initiative to increase RTC's efforts to expand its base of end user customers, at the expense, [*12] in Lozanoff's view, of efforts to expand sales to distributors. Lozanoff also believed that he was entitled to certain bonuses which were not paid to him. In addition, it was Lozanoff who presented the idea of a management buy-out to Ellis, and Ellis may have resented the proposal.

By November 1991, Ellis began formulating plans to replace Pfuhl and Clark, and contacted a management recruiter to find replacements. On January 31, 1992, Ellis fired Clark. Shortly thereafter, Pfuhl and Lozanoff resigned their positions with RTC.

* * *

On March 6, 1992, approximately 5 weeks after Ellis terminated Clark's employment with RTC, defendants founded STSI. Pfuhl was appointed STSI's President; Clark became Chief Financial Officer and Lozanoff became Vice President for Sales and Marketing. STSI sells the same type of products as those RTC markets.

On March 30, 1992, the defendants sent a letter to between 200 and 300 potential distributors and customers, including approximately 35 customers of RTC and RTC's largest customer, Vallen. Lozanoff, or employees of RTC supervised by Lozanoff, had personal responsibility for handling these 35 customers. In addition, Pfuhl contacted North Safety [*13] Products, a distributor of RTC products in Canada with whom Pfuhl worked closely, while he was employed at RTC. The purpose of Pfuhl's contact with North Safety was to secure them, not as a distributor, but rather as a supplier, and STSI has in fact purchased inventory from North Safety.

Lozanoff and Pfuhl have communicated with some of RTC's suppliers and customers and conveyed information which may reflect negatively upon RTC. Specifically, the defendants have informed RTC's suppliers and customers that RTC is planning to change its marketing orientation from directing its efforts to serve distributors to attempting to serve end users. Also, the defendants have informed other companies that RTC is in a weak financial condition.

Finally, Pfuhl has approached IKAR Gmbh, a German supplier with whom RTC has a exclusive distributorship. Pfuhl himself negotiated RTC's distributorship with IKAR when he was serving as a senior officer of RTC. IKAR, in response to Pfuhl's recent inquiries on behalf of STSI, has provided STSI with some sample items of safety equipment.

II.

This suit was filed on April 14, 1992. In it RTC originally sought damages as well as a injunction preventing the [*14] defendants: (1) from soliciting any RTC customers or suppliers, with whom the defendants, or those under their supervision, had contact during their employment with RTC, and (2) from tortiously interfering with each other's obligation to refrain from doing so. Following trial, however, RTC narrowed its request for injunctive relief on these claims to a subset of customers ad suppliers that it claims are essential to its continued successful operation. Nevertheless, RTC continues to seek monetary damages in the form of a accounting with regard to the defendant's solicitation of other RTC customers not on the shorter list, but with whom the defendants dealt while they were at RTC. n3 In addition, RTC seeks injunctive relief to prevent the defendants from continuing to solicit IKAR Gmbh. Finally, RTC originally asserted a claim under the Delaware Uniform Trade Secrets Act, *6 Del. C. §§ 2001 - 2009* (1990 Supp.), alleging that the defendants had misappropriated trade secrets of RTC. RTC has since abandoned this claim after trial.

> n3 No evidence upon which a damage award could be predicated was presented at trial. Plaintiff had available the procedures contemplated by the Rules of the Court of Chancery which are wholly adequate to uncover such evidence as may exist of sales made by STSI to any customer that RTC might claim is covered by its covenant. See note 9 infra.

[*15]

The defendants have counterclaimed alleging that

RTC has breached its employment contracts with each of them and seeking damages, including lost wages. In addition, the defendants have counterclaimed under the Trade Secret Act seeking attorneys' fees on the grounds that RTC pressed its trade secret claim in bad faith. There is no persuasive evidence of that assertion in the record, however, and that claim will hereby be dismissed.

III.

Under early English common law, courts were hostile to employee covenants not to compete and regarded them as contrary to public policy. See *Colgate v. Bacheler,* 78 Eng. Rep. 1097 (1596) (holding it unlawful "to restrain any [person] to use a lawful trade at any time or at any place"). See also Note, Enforceability of Contracts Not to Compete After a Term of Employment, 28 Col. L. Rev. 81, 82-83, n. 19 (1928). As Chancellor Wolcott noted in *Capital Bakers v. Leahy,* Del. Ch., 20 Del. Ch. 407, 178 A. 648 (1935), however, by the early twentieth century it was "too well settled to be disputed" that an employee's non-competition agreement was "not void as against public [*16] policy, when the purpose of the agreement and its reasonable operation [was] to protect his employer from injury . . ." 178 A. at 649. The conditions on the enforceability of employee covenants not to compete which are applicable today have evolved and been refined from this basic principle.

In my view a request to specifically enforce an employee's covenant not to compete requires a two-step analysis. First, the court must determine whether the non-competition agreement is itself valid and enforceable as a matter of contract law. This determination initially involves the typical issues presented in any action for breach of contract such as "whether the promise was in fact made, whether it was supported by consideration . . . [and] whether a material breach of the other party excuses performance. *McCann Surveyors, Inc. v. Evans,* Del. Ch., 611 A.2d 1, 3 (1987). Assuming the covenant is valid under ordinary contract principles, an agreement restricting competition will still be unenforceable, even at law, unless (1) its duration is reasonably limited temporally, (2) its scope is reasonably limited geographically, (3) its [*17] purpose is to protect legitimate interests of the employer, and (4) its operation is such as to reasonably protect those interests. *McCann Surveyors* at 3; *Knowles-Zeswitz Music, Inc. v. Cara,* Del. Ch., 260 A.2d 171 (1969).

If, after this first step is completed, the court concludes that the non-competition provision is valid, the covenant may be enforced by injunction, only if it meets certain additional conditions. "Covenants not to compete, when contained in employment agreements, will not be mechanically or automatically specifically enforced."

*McCann Surveyors,* at 5. The courts have recognized that a non-competition agreement may be valid,

"but yet may not be specifically enforceable in the circumstances presented at the time of the application for enforcement. Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened.

*611 A.2d at 3.* This second step requires the court to balance the equities to the end that,

if it appears that the interests the employer seeks to protect are slight or ephemeral while the [*18] consequences of specific enforcement to the employee are grave, equity may well leave the plaintiff to pursue his legal remedies and decline to grant the special remedy of injunction.

*Lewmor Inc. v. Fleming,* 1986 Del. Ch. LEXIS 359, *6, Del. Ch., C.A. No. 8355, Allen, C. (Jan. 29, 1986), citing, *Burris Foods v. Razzano,* 1984 Del. Ch. LEXIS 593, Del. Ch., C.A. No. 1077, Walsh, V.C. (July 18, 1984). n4

> n4 See also *Take-A-Break Coffee Service, Inc. v. Grose,* 1990 Del. Ch. LEXIS 62, Del. Ch., C.A. No. 11217, Jacobs, V.C. (May 14, 1990); *Merrill Lynch Pierce, Fenner & Smith v. Price,* 1989 Del. Ch. LEXIS 115, Del. Ch., C.A. No. 11097, Allen, C. (Sept. 13, 1989).

Plaintiff, of course, claims that all of those tests are satisfied in the evidence adduced at trial. Defendants, on the other hand, advance a variety of arguments in support of their position that RTC should be denied enforcement of the non-competition agreements. First, each of the defendants argues that their individual agreement is not a valid contract and cannot be enforced in the manner sought by RTC. Pfuhl maintains that his [*19] agreement has terminated by its own terms. Lozanoff takes the position that his agreement contains terms which allow the activities RTC seeks to have enjoined. Clark claims that he never entered into any agreement. See infra. Part IV-A. Secondly, defendants maintain that RTC cannot enforce these agreements because it has materially breached them: (1) with regard to Pfuhl and Lozanoff, by failing to grant them an opportunity to purchase equity in RTC; (2) with regard to Lozanoff, by failing to pay promised bonuses; (3) with regard to all defendants, by breaching the implied covenant of good faith and fair dealing contained in all three agreements, by discharging them for wrongful reasons. See infra. Part IV-B. Thirdly, defendants argue that the agreements are unenforceable because they are

not reasonably limited in time, geographic scope, and in the type of activities which they restrict. See infra. Part V. Finally, the defendants maintain that RTC cannot enforce any of these agreements by means of an injunction because such enforcement is inequitable in that the defendants' activities pose little threat to RTC while they provide an income for the defendants. See Infra. [*20] Part VI. I turn now to a detailed discussion of each of the defendants' positions.

IV.

A. The Validity of the Agreements Under General Contract Law

I find that each of the defendants is a party to a non-competition agreement that is a valid contractual obligation. These restrictive covenants are reasonably fitted in terms of the duration and extent of the restriction to protect a valuable interest of the employer. All three agreements are identical with the exception of the amendment made by Lozanoff to his agreement.

(1) Henry Pfuhl asserts that a alleged resignation from his position as a vice president, in June of 1989, terminated his original employment contract, and thus terminated his obligations under the non-competition agreement he signed when he joined RTC. I find that although Pfuhl did tender his resignation, he never actually terminated his employment with RTC and in fact was promoted. The modified terms of his employment were not put in writing until later, but at all times the parties acted on the understanding that the non-modified terms of the employment contract remained in place. The later signing of the agreement containing the restrictive covenant demonstrates [*21] that fact.

(2) Mr. Lozanoff concedes that he signed a valid contract not to compete with RTC. He argues, however, that RTC has materially breached that contract and that he has not violated its terms, because of the amendment he inserted in the agreement before signing it.

Before signing his non-competition agreement, Mr. Lozanoff inserted additional language, underlined below, into paragraph 1, which as modified reads:

To protect valuable trade secrets, proprietary information and confidential information, . . . Employee: (i) shall not, on his own behalf or on behalf of any competitor of RTC, directly or indirectly, engage in the business of selling, soliciting, purchasing or promoting the sale of any products which compete with RTC's products at time of termination to or from any person, firm, partnership, corporation, or institution of any kind, which employee had dealt with, called upon, solicited, sold to, or purchased from, either personally or through employees that he supervised . . . .

(PX 135). Lozanoff maintains that the language he inserted means that he is free to compete with RTC by selling new products that by definition, did not compete with RTC at the [*22] time of termination. Moreover, he says much of STSI's product line is made up of such new products. I need not decide whether STSI's product line is new in this sense, since I do not interpret this interlineation in the way that Mr. Lozanoff suggests. Rather, the contract plainly means that he is restricted from dealing with RTC customers in conjunction with any RTC "products [existing] at the time of [his] termination." The proscribed competition may be from a new product or an old product, the contract does not distinguish.

(3) Mr. Clark denies ever signing any non-competition agreement. There is, however, substantial evidence to support the conclusion that in fact he did sign one. Clark's job offer letter from RTC states that he must sign a non-competition agreement upon the commencement of his employment. Edie Hazeltine, Ellis' administrative assistant at that time and an RTC employee, testified that in October 1991 she received a copy of the agreement signed by Clark for Ellis' signature.

A cover memorandum written by Ms. Hazeltine to Dee Sawicz, another RTC employee, and dated October 8, 1991, states:

I am returning the attached non-competition form that was completed [*23] by William . . . . Please see that two additional non-compete agreements are signed by Bill as soon as possible.

(PX 87). The recipient of this memorandum, Dee Sawicz, testified at trial that she never saw an agreement signed by Clark. However, Ms. Sawicz responded to the memorandum purporting to transmit the non-competition agreement without questioning Ms. Hazeltine regarding the whereabouts of the Clark agreement it describes. After weighing the conflicting evidence, I conclude that RTC has proven by the preponderance of the evidence that Clark did sign a non-competition agreement on the standard form used by RTC for this purpose.

All three of these non-competition agreements were assented to by the three defendants, and supported by adequate consideration in the form of the employment or continued employment the defendants received from RTC. All three of the defendants were at will employees. It appears to be the law that the retention of an employee at will, in exchange for a covenant not to compete with the employer, constitutes consideration sufficient to support contractual obligations. *Research & Trading Corp. v. Powell, Del. Ch., 468 A.2d 1301, 1305 (1983).* [*24]

B. Affirmative Contract Defenses

All three defendants argue that RTC cannot now seek enforcement of the non-competition agreements because it has materially breached their employment contracts. These alleged breaches fall into two broad categories: (1) breaches of express promises in each defendant's contract of employment and (2) conduct by RTC and Ellis which defendants argue amounts to a breach of the implied covenant of good faith and fair dealing.

1. Alleged Breaches of Express Contractual Obligations

(a) Stock purchase rights

Defendants received, from Ellis and RTC, representations that they would be afforded opportunities to purchase RTC stock after they had worked at the Company for a period of time. In the case of Mr. Clark, for example, that representation came in a letter inducing him to accept employment:

As the Chief Financial Officer you will be given a chance for city and the terms will be detailed when the opportunity arises. This usually occurs after one year's service for this position.

It is undisputed that no program to facilitate stock ownership was put in place by the time the defendants left RTC. The record indicates that the defendants, Ellis, and [*25] Ellis' lawyer Mr. Scari, engaged in discussions concerning equity ownership for the defendants by means of a vesting mechanism, and that the defendants expressed a desire to obtain stock without paying cash.

I cannot conclude, however, that in these circumstances, this delay in putting into effect an employee stock ownership plan as envisioned by the parties constitutes a material breach of the defendants' employment contracts. Pfuhl worked at RTC for approximately three years and Lozanoff for approximately two years. Both were told that they would have the opportunity to purchase equity, at book value, n5 after being employed by RTC for 12 months. They were not promised an opportunity to be given stock. The details of a plan that would provide an opportunity to buy stock were left for future negotiation.

n5 The price for Pfuhl was to be book value as of the end of 1988 and for Lozanoff the book value at the end of 1989. (DTX 53, 63).

The record is unclear and contradicted concerning why the efforts to negotiate [*26] the terms of an employee incentive stock ownership plan were not completed. Defendants did not want to expend cash for the acquisition of RTC stock, nor did they want any plan that would result in a current tax liability for them in connection with any acquisition of RTC stock RTC's lawyer was assigned the task to try to propose a plan. After he met with Pfuhl & Lozanoff, the project moved slowly. The lawyer asserted that it did so because he was awaiting the development of performance criteria by Mr. Pfuhl.

The evidence will not support the conclusion, in my opinion, that Ellis was proceeding in bad faith in pursuing this open item nor that he misrepresented his present intention at the time of contracting. The parties had not yet come to agreement on this point. In this respect at least, I conclude that RTC's failure to arrange a program permitting defendant to buy stock did not constitute a material breach of the employment contract that excused compliance with the non-competition provision.

(b) Bonuses for Lozanoff

Defendant Lozanoff alleges that RTC has breached its employment contract with him by failing to pay him bonuses in 1990 and 1991 which he was promised when he accepted [*27] a position with RTC. RTC contends that it promised to pay a bonus to Lozanoff in 1990 alone, and only if RTC achieved certain performance criteria. RTC maintains that Lozanoff did not receive a bonus because the performance criteria were not met.

Lozanoff claims that these performance criteria were in fact set during a discussion that he had with Pfuhl sometime during the first four weeks of his employment at RTC. No document, however, records the establishment of the alleged performance criteria. Neither the Board nor Dr. Ellis was ever informed of any such discussion between defendants. Bonuses for RTC employees were, however, discussed at a meeting of the RTC board on February 27, 1990. Pfuhl attended that meeting. At that time the Board resolved that no bonuses would be paid for that year unless RTC's net income exceeded $200,000. Since this performance goal was not met, no bonuses were paid to RTC personnel for Services rendered in 1990. Thus, I conclude that the fact that no bonus was paid to Lozanoff in 1990 was not a breach of his employment contract.

2. Alleged Breaches of the Implied Covenant of Good Faith

The defendants allege that Ellis fired Clark, and forced [*28] Pfuhl and Lozanoff to resign, because they refused to cooperate with an allegedly fraudulent scheme to deceive Mellon Bank concerning the financial condition of RTC, and the diversion of RTC revenue to DSC. In Delaware it appears to be the case that an employee at will is subject to termination with or without cause. *Gaines v. Wilmington Trust Co., 1991 Del. Super. LEXIS 207*, Del. Super., C.A. No. 90C-MR-135, Del Pesco, J., slip op. at 3 (June 3, 1991), citing, *Heideck v. Kent General Hosp.,*

*Inc., Del. Super., 446 A.2d 1095 (1982).* All defendants in this action were at will employees and therefore, standing alone, their termination does not constitute a breach of their employment contracts.

Nevertheless, even an at will employment contract contains an implied covenant of good faith and fair dealing. Lee *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 101 (1992).* Therefore, the termination of an at will employee, in violation of an obligation of good faith and fair dealing, will constitute a breach of the employee's employment contract, and may entitle the employee to damages. n6 Plainly the circumstances in which an at will employee [*29] is terminated may have a vital bearing upon the question whether a covenant against future competition will be specifically enforced.

> n6 See, e.g., *Magnan v. Anaconda Industries, Inc., Conn. Super., 37 Conn. Supp. 38, 429 A.2d 492 (1980),* rev'd. on other grounds, *Conn. Supr., 193 Conn. 558, 479 A.2d 781 (1984)*(firing employee in retaliation for refusal to sign untrue statement concerning a theft violated good faith); *Fortune v. National Cash Register Co., Mass. Supr., 373 Mass. 96, 364 N.E.2d 1251 (1977)* (firing salesman to prevent him from receiving earned commissions violated good faith); *Monge v. Beebe Rubber Co., N.H. Supr., 114 N.H. 130, 316 A.2d 549 (1974)* (firing employee for resisting sexual harassment violated good faith).

In this case, however, the defendants have failed to prove that Ellis fired Clark in retaliation for his refusal to make misrepresentations to Mellon Bank. The record amply reflects Ellis' general dissatisfaction with Clark [*30] and their numerous clashes. While some of these clashes surrounded what disclosures should properly have been made to Mellon Bank, I conclude, based on the record evidence, that Ellis' dismissal of Clark was not motivated by any improper purpose, but represented the termination of an employee whose relationship with Mr. Ellis had degenerated beyond repair. As such, Ellis' discharge of Clark did not violate Clark's employment agreement.

Pfuhl and Lozanoff resigned voluntarily, but these defendants have alleged that in fact they were constructively discharged by Ellis for wrongful reasons. This allegation is not supported by the record evidence. The evidence demonstrates that Ellis was at odds with Pfuhl and Lozanoff repeatedly during their tenure at RTC. The evidence leads me to conclude that the defendants resigned because they believed that Ellis was on the verge of either firing them or taking other unfavorable action. In fact he probably was on the verge of such action. The effort to remove Ellis from the company with no cash payment was itself either a symptom or conclusive evidence of a complete breakdown in that degree of mutual respect among senior employees that seems essential [*31] for success in a small enterprise. Ellis' motivations do not appear to me to have been improper and thus his actions violated no implied covenant of good faith and fair dealing. Therefore, I conclude that the firing of Clark and the actions taken or threatened by Ellis, which may have induced Lozanoff and Pfuhl to resign, did not amount to a breach of RTC's employment contracts with the defendants.

V.

Reasonableness Of The Restrictions On Competition

Although the non-competition agreements are valid contracts, they will not be enforceable unless the following requirements are met: (1) their duration is reasonably limited temporally, (2) their scope is reasonably limited geographically, (3) their purpose is to protect legitimate interests of the employer, (4) their operation is such as to reasonably protect those interests. McCann Surveyors at 3; *Knowles-Zeswitz, supra.*

1. Time

The non-competition agreement is only of one year duration. This is plainly reasonable in the circumstances. n7

> n7 See, e.g., *Knowles-Zeswitz,* at 175; *Faw, Casson & Co. v. Cranston, Del. Ch., 375 A.2d 463 (1977)* (enjoining employee defendants from competing for in excess of one year); *Hammermill Paper Co. v. Palese, 1983 Del. Ch. LEXIS 400,* Del. Ch., C.A. No. 7128, Longobardi, V.C. (June 14, 1983); Merrill Lynch; (upholding one year bars against competition).

[*32]

2. Geographic extent

A non-competition agreement will only be enforced over a geographic area that is reasonable under the circumstances Thus, in Knowles-Zeswitz, a case involving a local music store, the court limited the enforcement of an employee's non-competition agreement, which, as written, prohibited the employee from competing within 100 miles of Wilmington, Delaware, to bar the defendant only from soliciting his former customers within the much smaller area of New Castle County, Delaware. *Knowles-Zeswitz, 260 A.2d at 175-76.*

While most judicial opinions regarding the reasonableness of the geographic extent of employee non-

competition agreements speak in terms of physical distances, the reality is that it is the employer's goodwill in a particular market which is entitled to protection. If this market, or more accurately, the employer's customer base, extends throughout the nation, or indeed even internationally, and the employee would gain from the employment some advantage in any part of that market, then it is appropriate that an employee subject to a non-competition agreement be prohibited from soliciting those customers on behalf of a competitor regardless of their geographic location.

The employment agreements in issue contain no geographic limitation on the obligation of the defendants not to solicit customers and suppliers of RTC with whom they or their subordinates had contact. Given the broad distribution of RTC's customers geographically, however, and the limited nature of relief sought by RTC, it is not unreasonable to restrict defendants from dealing with RTC's customers wherever located. *Weiss & Assoc., Inc. v. Wiederlight,* Conn. Supr., 208 Conn. 525, 546 A.2d 216, 220-21 (1988) (finding a bar on soliciting a former employer's customers to be reasonable despite lack of geographic limitation), citing, *Tuttle v. Riggs-Warfield-Roloson, Inc.,* Md. Supr., 251 Md. 45, 246 A.2d 588 (1968), see also *Chapman & Drake v. Harrington,* Me. Supr., 545 A.2d 645, 648 (1988); Restatement (Second) of Contracts § 188 (1981) (Illustration 11).

### 3. Purpose and Operation

A non-competition agreement will only be enforced to protect the legitimate economic interests of the employer. Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse. The former of these interests is principally implicated in this case.

Courts have long recognized that an employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs. In Knowles-Zeswitz, this Court noted that:

reasonable protection for an owner of a decentralized business is necessary because the former employee has had an opportunity to develop economically valuable relationships with [*33] his former employer's customers . . .

*Knowles-Zeswitz,* 260 A.2d at 175. In recognition of the employer's right to preserve its customer relationships from misappropriation, this court has repeatedly enjoined former employees from dealing with the customers of their former employers with whom the employee had contact. n8

 n8 See, e.g., Hammermill, at 16; *Wood v. Clark,* 1986 Del. Ch. LEXIS 517, Del. Ch., C. A. No. 883-K, Allen, C. (Jan. 21, 1986); *John Roane, Inc. v. Tweed,* Del. Supr. 33 Del. Ch. 4, 89 A.2d 548 (1952) (applying Maryland law); Faw Casson & Co; *Custom Video v. N.A. Video,* 1987 Del. Ch. LEXIS 488, Del. Ch., C.A. No. 9261, Hartnett, V.C. (Sept. 25, 1987) (applying New Jersey law); (all granting injunctions ordering employees not to solicit the business of their former employer's customers).

In this case, RTC has a legitimate interest in protecting from misappropriation the goodwill that, through its employees, it has created. The relief that RTC has requested (that the defendants be enjoined from [*34] dealing with a list of key RTC customers) is no broader than necessary to protect these interests.

The granting of this relief would leave the defendants free to solicit any of the other potential purchasers in the country, including two of the top three distributors of fall hazard abatement equipment in the U.S. Thus, the operation of this agreement is such as to protect the legitimate interests of RTC without placing unreasonable restrictions on the defendants. The non-competition agreements therefore satisfy the requirements for validity in that they operate reasonably to protect the legitimate interests of the plaintiffs.

### VI.

Equitable Considerations

Having concluded that the non-competition agreements are valid, I now turn to an examination of equitable considerations raised by the request to specifically enforce these provisions. This analysis involves balancing the interests sought to be protected by plaintiff, RTC, against the injury that injunctive relief would cause to the individual defendants.

Plaintiff is seeking narrow injunctive relief: to prevent defendants from soliciting identified, important customers, with whom defendants have had contact. The granting of [*35] this relief would leave the defendants free to solicit much of the relevant market. The defendants' marketing activities threaten valuable customer relationships which the defendants cultivated for RTC while in its employ. This court recognizes that such relationships should be protected from interference by the former employees who created them. Hammermill, slip op. at 11-12.

Defendants urge that their enterprise, STSI, is quite small and thus poses little threat to RTC. They assert that the relief would afford plaintiff little but could put STSI out of business. I accept neither element of this assertion. The requested injunctive relief would not bar the defendants from the industry, but would instead leave them free to pursue any potential customers who were not serviced by them or their subordinates while they were employed by RTC. Included among those whom the defendants would be free to solicit are two of the three largest distributors of fall hazard abatement equipment in the U.S. n9

> n9 Moreover, even if the relief were fatal to STSI, defendants all have general business skills and were previously employed in various businesses prior to their employment with RTC. Therefore, this not a case in which the granting of the requested injunctive relief will make it difficult or impossible for the defendants to earn a livelihood by pursuing their professions.

[*36]

Thus, I find that the employer's interests in this case, rather than being "slight or ephemeral" are, on the contrary, weighty and worthy of the court's protection. In addition, the harm which granting the requested injunctive relief would do to the defendants is far from grave.

Therefore, a balancing of the equities in this case reveals no reason why the plaintiff should be denied the narrow injunctive relief which it has requested. The requested relief protects the legitimate rights of the plaintiff without unduly harming the defendants and their new enterprise.

The defendants claim that RTC is guilty of inequitable behavior, and thus should be denied injunctive relief in keeping with the ancient maxim that "He who seeks equity must come into court with clean hands." *Cook v. Fusselman*, Del. Ch., 300 A.2d 246, 251 (1972), citing, Pomeroy on Equity Jurisprudence, (Fifth Ed.) § 400. While it is true that equity may decline to assist a party seeking to enforce a contract that is unconscionable and the result of sharp and predatory practices, *Ryan v. Weiner*, Del. Ch., 610 A.2d 1377 (1992), the record in this case [*37] discloses no fraud, overreaching, or other inequitable conduct on the part of RTC. RTC is seeking enforcement of its agreements only to a limited extent necessary to protect its interests and not to the full letter of the contracts. RTC ought not be denied suitable relief on the basis of this defense. n10

> n10 Plaintiff seeks to have the court retain jurisdiction to enforce possible future actions in which damages from the breach proven might be shown. I decline to do so. One trial has been held. Broad discovery rights were afforded to plaintiff, it was in a position to prove any damages that may have occurred at least up to the filing of the complaint. It has not attempted to do so. Other courts may have to decide the res judicata affect of the judgment, but I will not retain jurisdiction in this matter and postpone indefinitely the entry of a final judgment.

VII.

Tortious Interference With Contractual Relations Claims

A. Each Defendant with each other defendant's contract

The elements of the cause of action [*38] for tortious interference are: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, Del. Ch., 532 A.2d 983, 992 (1987), citing, *Pennzoil Oil Co. v. Getty Oil Co.*, 1984 Del. Ch. LEXIS 418, *51, Del. Ch., C.A. No. 7425, Brown, C. (Feb. 6, 1984). Plaintiff has not shown by a preponderance of the evidence that any act by one of the defendants was a significant factor in occasioning the breach of covenant by any other defendant. That is, one cannot say that the complained of conduct of any one defendant would not have happened but for the actions of any other of them. Therefore this claim is dismissed.

B. IKAR Gmbh

RTC also asserts claims for tortious interference with its exclusive distributorship with IKAR Gmbh.

RTC has established that it has a contract for an exclusive distributorship with its German supplier IKAR Gmbh. The defendants were aware of this contract through their previous employment with RTC. The defendants admit that they have attempted to induce IKAR to violate [*39] this contract by becoming a supplier to their new venture, STSI. The defendants have failed to provide any satisfactory justification for their actions. RTC, however, has not shown any special injury from this conduct.

The defendants have stated that they intend to refrain from further dealings with IKAR until the term of their non-competition agreement has expired. Nevertheless, where the defendants have already once induced IKAR to violate its exclusive distributorship, it is appropriate for the court to hold defendants to their word through the

device of an injunction. The defendants will therefore be ordered to refrain from seeking to become a distributor of IKAR until a date one year after the effective date of the order entered on this opinion.

VIII.

Plaintiff's Claim for Attorneys' fees

Plaintiff claims the right, under its contracts with defendants, to be reimbursed for the reasonable costs of prosecuting this action, particularly attorneys' fees. Each contract contains the following provision:

It is hereby expressly agreed that if any . . . suit is brought against Employee . . . by RTC to enforce this agreement and if RTC shall recover a judgment in any sum or obtain [*40] an injunction of any kind against Employee, RTC shall recover its reasonable counsel fees from Employee.

Generally, of course, the practice in this country is for each side to bear its own litigation costs. The rule, however, is not universal and it is recognized that such fees may be shifted by statute, by contract or, in some circumstances, pursuant to Court rule. With respect to contracts it is settled that a provision by which one party undertakes to pay counsel fees of the other in the event of his own breach is not void as against public policy. *In re Ebert*, 140 F. Supp. 597 (D. Del. 1956) citing, *Petition of Warrington*, Del. Supr., 37 Del. 19, 179 A. 505 (1935); *Clark v. Equitable Life Assurance Soc.*, Del. Supr., 316 A.2d 554, 555 (1974). While no Delaware case has been found in which a fee shifting provision in an employment contract has been directed against an employee, n11 cases in other jurisdictions have enforced such provisions in this way. See *Hilb, Rogal & Hamilton Agency, Inc. v. Reynolds*, Ohio App., 81 Ohio App. 3d 330, 610 N.E.2d 1102, 1992 Ohio App. LEXIS 2952 (1992); *Townsend v. Collard*, Tex. Civ. App., 575 S.W.2d 422 (1978). [*41]

> n11 See *Lasher v. Intercontinental Biologics, Inc.*, 1984 Del. Ch. LEXIS 435, Del. Ch., C.A. No. 950, Brown, C. (June 14, 1984) (employee liable for plaintiffs legal fees). Compare 25 Del. C. § 6102 (1991) (declaring unenforceable, agreements and leases under which a residential tenant undertakes to pay a landlord's attorney's fees).

The special context of an employment contract may be thought to raise special concerns. Employees as a class may be thought to lack bargaining power vis a vis their employers and thus the enforcement of a provision shifting legal fees in an employment contract may, at least in some cases, offend the policy of the law that has sought to permit necessitous persons to avoid oppressive bargains that were forced upon them. n12

> n12 See, e.g., *Henningsen v. Bloomfield Motors, Inc.*, N.J. Supr., 32 N.J. 358, 161 A.2d 69 (1960) (refusing to enforce contract under which automobile dealer sought to avoid warranty liability for defective car, where purchaser due to vastly inferior bargaining power, had no true choice); *Williams v. Walker-Thomas Furniture Co.*, 121 U.S. App. D.C. 315, 350 F.2d 445 (D.C. Cir. 1965) (refusing to enforce unconscionable installment purchase contract under which no property purchased from seller over a period of years was considered fully paid unless, all amounts on all items were fully paid).

[*42]

This case, however, does not involve unsophisticated or especially necessitous workers, but educated business managers. Their employment contract contains a valid provision with respect to counsel fees; no legal principle has been advanced by them that would, in the circumstances, justify the non-enforcement of that provision. In so concluding, I assume that defendants subjectively believed themselves free to solicit business from RTC customers with whom they had dealt on RTC's behalf. Thus, I do not suppose that their actions were taken in bad faith. But while malicious infliction of competitive injury may itself justify the recovery of legal fees as damages (see 2 Callmann Unfair Competition, Trademarks and Monopolies § 9.20 (4th ed. 1992)) a valid contract provision contemplating the conditional shifting of counsel fees is not defeated by the fact that the losing and thus liable party was proceeding under a colorable theory of law or fact.

The record does not permit a determination of the amount of legal fees that would be reasonable in this instance. Nor could it since those costs continue to accrue with the proceeding. Thus, it is possible now to rule only on the question [*43] of legal entitlement. Entry of a final order will thus have to await supplementation of the record on this point. n13

> n13 I will, however, not permit supplementation of the record with respect to damages otherwise than with respect to attorneys' fees.

Given the apparently limited resources of defendants, it is with reluctance that I conclude that they are liable for plaintiff's reasonable counsel fees. But the sentiments of the court do not present a basis to deny to plaintiff its contracted for right where, as it appears here, plaintiff itself

has acted reasonably and not oppressively in bringing the suit and the clause sought to be enforced creates a legal and not an equitable remedy.

IX.

Defendants' Counterclaims for Breach of Contract and for Attorneys' fees Under *6 Del. C. § 2004*

The defendants have advanced counterclaims against RTC for alleged breaches of their employment contract with RTC, and seeking damages in the form of lost wages and benefits which the defendants would have earned had they not [*44] been constructively discharged. In light of the conclusions stated above, namely that RTC has not materially breached its employment contracts with the defendants, these counterclaims for breach of contract are hereby dismissed.

RTC has pursued, throughout this litigation until the end of trial, a claim against the defendants for alleged violation of the Delaware Uniform Trade Secret Act *6 Del. C. §§ 2001 - 2009* (Supp. 1990). However, after trial was concluded, RTC dropped this claim. The defendants now seek, pursuant to *6 Del. C. § 2004*, an award of the attorneys' fees they were required to pay in defense of the Trade Secret Act claim. Section 2004 states, in relevant part, that "if a claim of misappropriation is made in bad faith . . . the court may award reasonable attorneys' fees to the prevailing party." *6 Del. C. § 2004*.

The record in this case reveals that, although RTC abandoned its trade secret claims after the end of trial, it was in fact a colorable claim. There is nothing in the record, other than the bare allegation made by the defendant, to support the finding that this claim was made in bad faith. In light of the technical nature of the plaintiff's business [*45] and its dependance upon intellectual property, the trade secret claims had some force and were not in my opinion advanced in bad faith. In any case, the Trade Secret Act leaves the issue of whether to award attorneys' fees to the sound discretion of the court. I find that this is not a case in which such an award of fees would be appropriate. The defendants' counterclaim is therefore dismissed.

* * *

It is not possible now to enter a final decree with respect to all elements of the case. Specifically the amount of plaintiff's reasonable attorneys' fees cannot be determined on this record. The entry of a preliminary injunction precluding defendants from dealing with identified RTC customers protects the central rights of plaintiff, in the meantime. The question of attorneys' fees may be resolved by the filing in this case of a petition for the award of attorneys' fees together with an affidavit describing the basis for the application made. Defendants may then move for such discovery falling within the test of Rule 26(b) they deem advisable, and may thereafter, in all events, submit such writing opposing the application as they wish, including an application for an evidentiary hearing [*46] if one appears necessary to determine whether plaintiff's legal actions were reasonable at each stage of the proceeding.