# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYOVAC, INC.,                              )
                                           )
    Plaintiff/Counter-Defendant.       )    Civil Action No. 04-1278-KAJ
                                           )
            vs.               )   Hon. Kent A. Jordan
                                           )
PECHINEY PLASTIC PACKAGING, INC.,           )    **REDACTED**
                                           )
    Defendant/Counter-Plaintiff.        )
                                           )

## MEMORANDUM IN SUPPORT OF PECHINEY'S
## MOTION FOR PARTIAL SUMMARY JUDGEMENT ON
## TORTIOUS INTERFERENCE CLAIMS

N. Richard Powers (#494)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: (302) 888-6266

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350

Dated: October 19, 2005

# TABLE OF CONTENTS

I.   NATURE AND STAGE OF THE PROCEEDINGS ................................................1

II.  SUMMARY OF ARGUMENT ...............................................................................1

III. CONCISE STATEMENT OF FACTS ........................................................................2

    A.  The                      from Cryovac to National Beef...................................2

    B.  National Beef's Understanding of the             ...................................4

    C.  Cryovac's Multiple Theories as to the Location and Substance of the Missing
        Quantity Term ...........................................................................................6

    D.  Cryovac's                             ...........................................10

    E.  Pechiney's Good Faith .........................................................................10

IV.  STANDARD OF REVIEW ........................................................................................12

V.   ARGUMENT ........................................................................................................13

    A.  Cryovac's Tortious Interference Claims Must be Dismissed Because They Are
        Pre-empted by Applicable Federal Patent Law. ...............................................14

        1.  General Preemption Principles .........................................................14

        2.  Cryovac's Tortious Interference Claims Are Conflict Preempted Because
            Cryovac's Sole Liability Allegations Are Based Entirely On Patent Questions .........16

    B.  The Undisputed Facts Show That Cryovac Cannot Establish Essential Elements of
        Its Claims. ........................................................................................19

        1.  The alleged agreement did not contain a quantity term and, therefore, as a
            matter of law, Cryovac did not have a contract with National Beef............................20

            a.                   from Cryovac to National Beef is not a
                binding contract because it does not contain a quantity term. ...............................20

            b.                   is identical
                .................................................................................23

            c.  Cryovac cannot use course of dealing, trade usage or course of
                performance to transform a                   into a binding
                contract...............................................................................24

2.   There is no contract between National Beef and Cryovac

...........................................................................................................27

3.   Even if There Had Been a Contract Between Cryovac and National Beef, It is
     Undisputed that Pechiney Did Not Know About It and Could Not Have
     Known About It. ......................................................................................28

     a.   :

     ...................................................................................................29

     b.

     ...................................................................................................30

     c.   Cryovac's own witnesses' uncertainty as to what constitutes the alleged
          contract demonstrates that Pechiney's belief that no contract existed was
          reasonable. ...............................................................................31

C.   Pechiney Is Entitled to Summary Judgment on Cryovac's Tortious Interference
     with Prospective Contractual Relations Claim Because Cryovac Cannot Show
     Pechiney Used "Improper" or "Wrongful" Means. ...........................................31

VI. CONCLUSION....................................................................................................33

# TABLE OF AUTHORITIES

## Cases

*Advent Systems, Ltd. v. Unisys Corp.,*
   925 F.2d 670 (3d Cir. 1991) ........................................................................ 21

*Alaska Ind. Fishermen's Mkt. Assoc. v. New England Fish Co.,*
   548 P.2d 348 (Wash. Ct. App. 1976).......................................................... 25

*All Pro Maids, Inc. v. Layton,*
   2004 Del. Ch. 116, *25 (Aug. 9, 2004) ..................................................... 16

*Assoc./ACC Int'l, Ltd. v. DuPont Flooring Sys. Franchises,*
   No. 99-803-JJF, 2002 WL 32332751 (D. Del. Mar. 28, 2002) ................. 13

*Ball Corp. v. Xidex Corp.,*
   967 F.2d 1440 (10th Cir. 1992) ................................................................. 31

*Briner Elec. Co. v. Sachs Elec. Co.,*
   680 S.W.2d 737 (Mo. Ct. App. 1984).................................................:....... 14

*Buxton v. Harsh,*
   631 S.W.2d 95 (Mo. Ct. App. 1982)........................................................... 25

*Cipollone v. Liggett Group, Inc.*
   505 U.S. 504 (1992)................................................................................... 15

*CLI Corp. v. Ludowici USA,*
   2001 U.S. Dist. LEXIS 23374 (W.D. Pa. Nov. 14, 2001) ................... passim

*Commerce Nat'l Ins. Servs., Inc. v. Buchler,*
   No. 02-037-SLR, 2003 WL 22953225 (D. Del. Dec. 10, 2003)................ 13

*Cord v. Reliance Std. Life Ins.,*
   362 F. Supp. 2d 480 (D. Del. 2005)........................................................... 12

*DeBerry v. McCain,*
   274 S.E.2d 293 (S.C. 1981) ....................................................................... 13

*Dow Chem. Co v. Exxon Corp.,*
   139 F. 3d 1470 (Fed. Cir. 1998) ................................................................ 17

*DPT-Tek, Inc. v. AT&T Global Information Solutions Co.,*
   891 F. Supp. 1510 (D. Kan. 1995).......................................... 13, 14, 27, 28

*Enzo Life Sciences, Inc. v. Digene Corp.,*
   295 F. Supp. 424 (D. Del. 2003)......................................................... 14, 16

*Geier v. American Honda Motor Co.,*
   529 U.S. 861 (2000)................................................................................... 15

*Gill v. Delaware Park, LLC,*
   294 F. Supp. 2d 638 (D. Del. 2003)...................................................... 13, 16

iii

*Ginsu Prods., Inc. v. Dart Indus., Inc.*,
   786 F.2d 260 (7th Cir. 1986) ............................................................... 27

*Hines v. Davidowitz*,
   312 U.S. 52 (1941)............................................................................... 15

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
   153 F.3d 1318 (Fed. Cir. 1998) .................................................... passim

*Kline, Inc. v. Lorillard, Inc.*,
   878 F.2d 791 (4th Cir. 1989) ............................................................... 26

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001)............................................................................. 15

*Love v. Gamble*,
   448 S.E.2d 876 (S.C. Ct. App. 1994)................................................... 25

*Lucent Info. Mgmt., Inc. v. Lucent Techs. Inc.*,
   5 F. Supp. 2d 238 (D. Del. 1998) ................................................. 14, 16

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat) 316 (1819) ............................................................. 15

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)............................................................................. 15

*Merritt-Campbell, Inc. v. RxP Prods., Inc.*,
   164 F.3d 957 (5th Cir. 1999) ............................................................... 21

*Monsanto Co. v. Aventis Cropscience SA*,
   226 F. Supp. 2d. 531 (D. Del. 2002).................................................... 12

*Omega Eng'g, Inc. v. Eastman Kodak Co.*,
   908 F. Supp. 1084 (D. Conn. 1995)..................................................... 25

*Orchard Group, Inc. v. Konica Med. Corp.*,
   135 F.3d 421 (6th Cir. 1998) ............................................................... 21

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983)............................................................................. 15

*Phillips v. AWH, Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ..................................................... 12, 32

*Preston v. Preston*,
   823 S.W.2d 48 (Mo. Ct. App. 1991).............................. 13, 28, 29, 31

*Rodime PLC v. Seagate Technology, Inc.*,
   174 F.3d 1294 (Fed. Cir. 1999) ........................................................... 17

*SAB Harmon Indus., Inc. v. All State Building Sys., Inc.*,
   733 S.W.2d 476 (Mo. Ct. App. 1987).................................................. 25

*Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc.*,
   270 F.3d 723 (8th Cir. 2001) ................................................... 21, 25, 26

*Travelers Indem. Co. v. Lake,*
    594 A.2d 38 (Del. 1991) ............................................................................ 13

*Trimble v. Coleman Co.,*
    437 P.2d 219 (Kan. 1968) ......................................................................... 25

*Waldrep Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co., Inc.,*
    992 F.2d 59 (4th Cir. 1993) ...................................................................... 14

**Statutes**

35 U.S.C. § 281 ................................................................................................ 16

Fed. R. Civ. P. 56(c) ....................................................................................... 12

K.S.A. § 84-2-201, cmt. 2 (Kansas) ................................................................. 20

S.C. Code § 36-2-201, cmt. 1 ................................................................... 20, 27

V.A.M.S. § 400.2-201, cmt. 1 (Missouri) ......................................................... 20

**Other Authorities**

Restatement 2d (Torts) § 766c. ........................................................................ 32

Restatement 2d (Torts) § 768 .......................................................................... 14

U.C.C. § 2-201 ................................................................................................. 20

U.S.C. § 2-306 ................................................................................................. 26

**Constitutional Provisions**

Art. VI, cl. 2 ..................................................................................................... 14

Pursuant to Federal Rule of Civil Procedure 56, Defendant/Counter-plaintiff Pechiney Plastic Packaging, Inc. ("Pechiney") respectfully submits this memorandum of law in support of its Motion for Partial Summary Judgment with respect to Cryovac, Inc.'s ("Cryovac") Tortious Interference Claims.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

A complete description of the nature and stage of the proceedings is set for in the Memorandum in Support of Pechiney's Motion for Summary Judgment on Patent Issues, also filed today.

## II.    SUMMARY OF ARGUMENT

There are multiple independent bases for partial summary judgment on Cryovac's tortious interference claims.

1.    First, both Cryovac's tortious interference with contract and tortious interference with prospective contractual relations claims are pre-empted by federal patent law. *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed. Cir. 1998); *CLI Corp. v. Ludowici USA*, 2001 U.S. Dist. LEXIS 23374 (W.D. Pa. Nov. 14, 2001).[1]

2.    Second, the undisputed facts demonstrate that Cryovac and National Beef never had an enforceable contract. Cryovac cannot establish an enforceable contract because the alleged contract fails to contain the written quantity term required for enforceability under Section 2-201 of the Uniform Commercial Code ("U.C.C."). In addition to this failure to provide a written quantity term, National Beef and Cryovac did not have a binding contract because both parties understood that National Beef did not intend to be bound. For these

---

1    Any unreported cases cited herein accompany this brief in a compendium of unreported cases.

reasons, Pechiney is entitled to summary judgment on Cryovac's tortious interference with contract claim.

3.    Third, even assuming that Cryovac and National Beef had formed a binding agreement, Cryovac would not be able to satisfy its burden of showing that Pechiney had knowledge of any enforceable contract between National Beef and Cryovac. Therefore, Pechiney is entitled to summary judgment on Cryovac's tortious interference with contract claim for this reason as well.

4.    Finally, Pechiney is entitled to summary judgment on Cryovac's tortious interference with prospective contractual relations claim because Cryovac cannot establish that Pechiney used wrongful or improper means in selling ClearShield$^{TM}$ to National Beef.

## III.    CONCISE STATEMENT OF FACTS

On March 15, 2005, Cryovac moved to amend its patent infringement Complaint against Pechiney to add claims of tortious interference with contract and tortious interference with a prospective contract. The key factual allegation underlying Cryovac's claim of tortious interference with contract was its claim that "[i]n December 2003 and January 2004, Cryovac negotiated a written four-year supply agreement with one of its customers, National Beef, and formed a binding four-year supply agreement with National Beef for various food packaging products on January 14, 2004." (A62, Ex. 4, D.I. 47, ¶14.) The undisputed facts establish that that key allegation is false. Additionally, the undisputed facts demonstrate that Pechiney acted in good faith, to avoid infringing any existing patents when developing ClearShield™ products.

### A.    The    REDACTED    from Cryovac to National Beef

Cryovac's witnesses have repeatedly admitted that the alleged January 14, 2004, four-year supply agreement with National Beef    REDACTED    (A1774-

77, Ex. 113,

**REDACTED**

(A2314, Ex. 152)

from Mr. Wilkerson to Cryovac.  For example, when Cryovac filed its reply brief in support of

its Motion asking this Court for leave to add the tortious interference claims, it submitted a

supporting declaration from Jeffery Gardner, its Vice President of Sales for North America.  In

his declaration, Mr. Gardner swore that, as of January 14, 2004, Cryovac and National Beef:

**REDACTED**

(A359, Ex. 29, D.I. 58, Declaration of Jeffery Gardner, ¶¶1-2.) (emphasis added).  Although he

did not identify that document in his declaration,

**REDACTED**

(A5022, Ex. 204, Deposition Transcript of Mr. Jeffery Gardner, pg. 32, ln. 15 -

pg. 33, ln. 2.)  Mr. Gardner

**REDACTED**

(A5025, Ex. 204, Gardner Dep. Tr., pg. 63, ln. 19 - pg. 64, ln. 15.)

**REDACTED**

Critically, for purposes of this motion, the                          contains no written quantity

term requiring National Beef to buy any product from Cryovac, a fact apparent from the

unambiguous language of the document

(*See* A5023-24, Ex. 204, Gardner Dep. Tr., pg. 57, ln. 16 - pg. 58, ln. 14.)

**REDACTED**

3

REDACTED

(A5024, Ex. 204, Gardner Dep. Tr., pg. 58, lns. 13-14.)

Instead,

REDACTED

- REDACTED

(A1774-77, Ex. 113,

- REDACTED

- REDACTED

Mr. James Mize, Cryovac's Vice President of New Business Development,

REDACTED

(A5052, Ex. 209, Deposition Transcript of Mr. James

Mize, pg. 58, ln. 20 - pg. 59, ln. 1.)

**B.    National Beef's Understanding of**    REDACTED

In addition to

REDACTED

**REDACTED**

(A5078, Ex. 215, Deposition

Transcript of Terry Wilkerson, pg. 80, lns. 12-14; *see also* A5073, Ex. 215, Wilkerson Dep. Tr.,

pg. 45, lns. 12-23.)

Moreover, National Beef not only believed

**REDACTED**

(A5072, Ex. 215, Wilkerson Dep. Tr., pg. 39,

lns. 12-22.)  To that end,

**REDACTED**

(A5072, Ex. 215, Wilkerson Dep. Tr., pg. 39, lns. 22-25.)

Applying this general business practice to National Beef's relationship with Cryovac,

Terry Wilkerson explained:

**REDACTED**

(A5073, Ex. 215, Wilkerson Dep. Tr., pg. 43, lns. 19-23.)

5

**REDACTED**

(A5073, Ex.

215, Wilkerson Dep. Tr., pg. 45, lns. 12-18.)

      Significantly,

**REDACTED**

(A5092-93, Ex. 217, Deposition Transcript of

Anthony York,  pg. 285, ln. 22 - pg. 286, ln. 2.)  Mr. York added that

**REDACTED**

(A5094, Ex.

217, York Dep. Tr., pg. 300, lns. 3-8.)

    C.    **Cryovac's Multiple Theories as to the Location and Substance of the Missing Quantity Term**

    Cryovac's witnesses have presented multiple inconsistent theories as to the possible

location and substance of the quantity term         **REDACTED**

    The first Cryovac fact witness deposed, Jeffery Gardner,

**REDACTED**

(A5024, Ex. 204, Gardner Dep. Tr., pg. 58, lns. 8-14.)  Cryovac's James Mize

(A5052, Ex. 209, Mize Dep. Tr., pg. 58, ln. 20 - pg. 59, ln. 1.)

By contrast, Anthony York testified

**REDACTED**

(A5090-91, Ex. 217, York Dep. Tr., pgs. 103 -106.)  The source for Mr.

York's conclusion was language

**REDACTED**

(A5090-91, Ex. 217, York Dep. Tr., pg. 105, ln. 21 - pg. 106,

ln. 4; A1774-77, Ex. 113,                    Significantly, this is the same language

**REDACTED**

(*See* A5023-24, Ex. 204, Gardner Dep. Tr., pg.

57, ln. 16 - pg. 58, ln. 14; A5052, Ex. 209, Mize Dep. Tr. pgs. 58-59.)

Cryovac witnesses James Mize and Karl Deily

**REDACTED**

(A5053-54, Ex. 209, Mize Dep. Tr., pgs. 71-74; A5005-06, Ex.

201, Deposition Transcript of Karl Deily, pgs. 169-73.)[2]  In that

**REDACTED**

---

2   Mr. Deily also testified

**REDACTED**

(*See* A5002-14, Ex. 201, Deily Dep. Tr.,

pgs. 158-202.)

**REDACTED**

(A1778, Ex. 114.)

Mr. Wilkerson

**REDACTED**

(A5076, 5080, Ex. 215, Wilkerson Dep.

Tr., pg. 63, lns. 4-6, pg. 143, lns. 21-23, pg. 145, lns. 4-21.)  Steve James, the Vice President and

General Manager for National Beef, also testified

**REDACTED**

(A5033, Ex. 206, Deposition Transcript of Steven

James, pg. 9.)

In addition, there is no evidence even remotely suggesting

Instead, three months later,

**REDACTED**

(A1779-80, Ex. 115.)  Nothing in that

**REDACTED**

(*See id.*)

Moreover, to the extent that Cryovac relies

**REDACTED**

Thus, the Pechiney witnesses responsible for

negotiating with National Beef have indicated

**REDACTED**        Bob Taylor, Pechiney's Vice

President and General Manager for the Meat and Dairy Group, was asked

**REDACTED**                                    Mr. Taylor

responded stating:          **REDACTED**          (A5070, Ex. 214, Deposition

Transcript of Robert Taylor, pg. 188, lns. 15-16.)  Mr. Taylor also confirmed

**REDACTED**

(A5070, Ex. 214, Taylor Dep. Tr.,

pgs. 188-89.)

Tom Grabowski, Pechiney's Sales Director for the Meat and Dairy Group

**REDACTED**

(A5030, Ex. 205, Deposition Transcript of Tom Grabowski, pg. 195,

ln. 15 - pg. 196, ln. 1.)  Mr. Grabowski testified

**REDACTED**

(A5025-30,

Ex. 205, Grabowski Dep. Tr., pgs. 181-82, 194-96.)

It is undisputed

**REDACTED**

For example, Mr. Wilkerson said that Pechiney

**REDACTED**

(A5073, Ex. 215, Wilkerson Dep. Tr., pg. 43, ln. 19 - 45, ln. 9.)

**D.    Cryovac's**    **REDACTED**

Finally, the undisputed facts establish that the

**REDACTED**

As Mr. Mize testified,

**REDACTED**                    When asked to define the

characteristics

**REDACTED**

(A5055, Ex. 209, Mize Dep. Tr., pg. 240,

lns. 13-16.)  Mr. Mize testified          **REDACTED**

(A5055-56, Ex. 209, Mize Dep. Tr., pg. 240, ln. 22 - pg. 241, ln. 1.)

Finally, Mr. Mize stated          **REDACTED**

(A5056, Ex. 209, Mize Dep.

Tr., pg. 242, ln. 16 - pg. 243, ln. 6.)  Significantly, each of these key characteristics is also found

**REDACTED**

**E.    Pechiney's Good Faith**

During the development phase of ClearShield,

**REDACTED**

(A1782-83, Ex. 117; A1785, Ex. 118.)  In fact, throughout the development

of ClearShield,          **REDACTED**

(A5058-59, Ex. 210, Deposition Transcript of Chad Mueller, pgs. 99-

---

3    *See supra*, pgs. 4-6.

10

103.) During the course of these discussions,

**REDACTED**

(A5016-18, Ex. 202,

Deposition Transcript of Mike Douglas, pgs. 205-10.)

Specifically, one of the discussions

**REDACTED**

(A1782-83, Ex. 117; A1785, Ex. 118.) The minutes of the October 10, 2002 meeting

**REDACTED**

(A1783, Ex. 117.) Finally,

(*See* A1785, Ex. 118 (stating

In April 2003,

(A2316, Ex. 153.)

The process

**REDACTED**

(*See* A1788

**REDACTED**

. (A1793-

95, Ex. 119,

**REDACTED**

(A2316, Ex. 153.)

In January of 2005,

**REDACTED**

REDACTED

(*See* A1862-87, Ex. 120, January 14, 2005 Non-

Infringement Opinion.)  Furthermore,

REDACTED

(*See* A1888-90, Ex. 121, July 20,

2005 Non-Infringement Opinion.)

## IV.    STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *Monsanto Co. v. Aventis Cropscience SA*, 226 F. Supp. 2d

531, 538 (D. Del. 2002).

Once the moving party has established that there is no genuine issue of material fact, "the

non-moving party must set forth specific facts showing that there is a genuine issue for trial."

*Cord v. Reliance Std. Life Ins.*, 362 F. Supp. 2d 480, 484 (D. Del. 2005) (quoting Fed. R. Civ. P.

56(c)).  Therefore, the non-moving party must "do more than simply show that there is some

metaphysical doubt as to the material facts." *Id.* (quotation omitted).  "Accordingly, a mere

scintilla of evidence in support of the non-moving party is insufficient for a court to deny

summary judgment." *Id.* (citation omitted).

Based on this standard, courts consistently grant motions for summary judgment when no genuine issues of material fact exist as to a plaintiff's inability to establish an element of a tortious interference claim. *See, e.g., Commerce Nat'l Ins. Servs., Inc. v. Buchler,* No. 02-037-SLR, 2003 WL 22953225, *5 (D. Del. Dec. 10, 2003) (granting summary judgment on the plaintiff's tortious interference with contract and prospective economic advantage claims); *Assoc./ACC Int'l, Ltd. v. DuPont Flooring Sys. Franchises,* No. 99-803-JJF, 2002 WL 32332751, *8 (D. Del. Mar. 28, 2002) (granting summary judgment on tortious interference with contract claim where there was no breach of contract).

## V.     ARGUMENT

A plaintiff bringing a claim for tortious interference must prove: (1) a valid contract; (2) about which the defendant has knowledge; (3) an intentional act by the defendant that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury. *Gill v. Delaware Park, LLC*, 294 F. Supp. 2d 638, 645 (D. Del. 2003).[4] Similarly, to establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been

---

4   Under Delaware law, the law of the state with the most significant relationship to the occurrence and parties governs with respect to tort claims. *See, e.g., Travelers Indem. Co. v. Lake*, 594 A.2d 38 (Del. 1991). However, the relevant law of tortious interference with contract is essentially the same in any of the potential states having the "most significant relationship" to the occurrence and parties, namely Kansas (location of National Beef's plants), Missouri (location of National Beef's offices), or South Carolina (Cryovac's place of business). *See, e.g., DP-Tek, Inc. v. AT&T Global Info. Solutions Co.*, 891 F. Supp. 1510, 1516 (D. Kan. 1995); *Preston v. Preston*, 823 S.W.2d 48, 49 (Mo. Ct. App. 1991); *DeBerry v. McCain*, 274 S.E.2d 293, 296 (S.C. 1981). Accordingly, the resolution of this motion for partial summary judgment does not depend upon a choice of law determination.

disrupted." *Enzo Life Sciences, Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 429 (D. Del. 2003); *Lucent Info. Mgmt., Inc. v. Lucent Techs. Inc.*, 5 F. Supp. 2d 238, 243 (D. Del. 1998).

Cryovac's state-law based tortious interference claims must be dismissed because they are pre-empted by applicable Federal law, as represented in this case by Cryovac's patent infringement claims. Even if Cryovac's tortious interference with contract claim were not pre-empted by applicable Federal law, it would fail, because the undisputed facts demonstrate that Cryovac cannot establish elements (1) or (2) of that claim.[5] Finally, Cryovac's tortious interference with prospective contractual relations fails because there is a competitive privilege such that there is no liability for tortious interference with prospective contractual relations so long as the defendant does not use "wrongful means." Restatement 2d (Torts) § 768.[6] Even if it had a valid patent infringement claim, which it does not, Cryovac cannot, as a matter of law, establish that Pechiney's innocent or, at worst, negligent, infringement constitutes wrongful or improper means that support its claim for tortious interference.

### A.    Cryovac's Tortious Interference Claims Must be Dismissed Because They Are Pre-empted by Applicable Federal Patent Law.

#### 1.    General Preemption Principles

The United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. It has been settled law for nearly two centuries that "state law

---

5    Because the third element of tortious interference requires the breach of a valid contract, Cryovac cannot establish that element for the same reasons it cannot establish the first element.

6    The relevant jurisdictions all recognize the competitive privilege as defined by the Restatement. *DP-Tek, Inc. v. AT&T Global Info. Solutions Co.*, 100 F.3d 828, 831-33 (10th Cir. 1996) (applying Kansas law); *Briner Elec. Co. v. Sachs Elec. Co.*, 680 S.W.2d 737, 743 (Mo. Ct. App. 1984); *Waldrep Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co., Inc.*, 992 F.2d 59, 63 (4th Cir. 1993) (applying South Carolina law).

14

that conflicts with federal law is without effect." *Cipollone v. Liggett Group, Inc.* 505 U.S. 504, 516 (1992) (internal quotations omitted); *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 427 (1819) ("It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments.").

A Supremacy Clause analysis must be guided by two principles. First, because "the States are independent sovereigns in our federal system," courts must presume that Congress does not "cavalierly" preempt state law causes of action. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). The second guiding principle is the "oft-repeated principle that the purpose of Congress is the ultimate touchstone." *Id.* at 485 (internal quotations omitted).

A state law may be preempted by federal law in three ways: explicit preemption, field preemption and conflict preemption. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 540-41 (2001). Cryovac's tortious interference claims are barred by the principles of conflict preemption.

Conflict preemption occurs where state law actually conflicts with federal law. *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869-70 (2000); *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983). There is conflict preemption when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). To determine whether a state law tort claim is in conflict with federal patent law, a defendant's allegedly tortious conduct must be assessed. *Hunter Douglas v. Harmonic Design, Inc.*, 153 F.3d 1318, 1335 (Fed. Cir. 1998). "If a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, which must be preempted for conflict with federal patent law." *Id.; see also CLI Corp. v. Ludowici*

15

*USA*, 2001 U.S. Dist. LEXIS 23374, *3 (W.D. Pa. Nov. 14, 2001) (granting motion to dismiss because state tortious interference with existing and prospective contractual relations claim was preempted by federal patent law).

> ### 2.    Cryovac's Tortious Interference Claims Are Conflict Preempted Because Cryovac's Sole Liability Allegations Are Based Entirely On Patent Questions

The federal patent statute preempts Cryovac's state-law tortious interference claims because those state-law claims are entirely dependent upon the identical conduct (*i.e.*, Pechiney's allegedly willful patent infringement) as Cryovac's federal patent infringement claim, a claim which is governed exclusively by federal law. *See* 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent.").

Both tortious interference with contract and tortious interference with prospective business relations require that Pechiney's allegedly interfering conduct be legally unjustified.[7] Significantly, for purposes of this pre-emption analysis, the *only* "interfering act" alleged by Cryovac is that Pechiney infringed claim 11 of Cryovac's '419 patent when it sold its ClearShield film to National Beef.  A determination of the propriety of Pechiney's sales of ClearShield film to National Beef therefore depends *exclusively* on federal patent law, namely Pechiney's alleged willful infringement of the '419 patent.  In accordance with the Federal Circuit's holding in *Hunter Douglas*, because Cryovac's state law tortious interference claims

---

7    Thus, a claim for tortious interference with a contract requires proof, among other things, that the defendant intentionally interfered with the contract of another and that it did so without justification. *Gill v. Delaware Park*, LLC, 294 F. Supp. 2d 638, 645 (D. Del. 2003). Similarly, in order to establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove, among other things, that the defendant intentionally interfered with a valid business relationship or expectancy. *Enzo Life Sciences, Inc. v. Digene Corp.*, 295 F. Supp. 2d, 424, 429 (D. Del. 2003); *Lucent Info. Management, Inc. v. Lucent Techs. Inc.*, 5 F. Supp. 2d 238, 243 (D. Del. 1998).  In addition, "the court must also consider the defendants' right to interfere with plaintiff's expectancies within the limits of fair competition." *All Pro Maids, Inc. v. Layton*, 2004 Del. Ch. 116, *25 (Aug. 9, 2004).

are derived entirely and exclusively from the identical conduct that is governed by federal patent law, those claims are preempted.[8]

For example, in *CLI Corp. v. Ludowici USA*, the court dismissed a claim of tortious interference with existing and prospective business advantage predicated solely on patent infringement. *CLI Corp. v. Ludowici USA*, 2001 U.S. Dist. LEXIS 23374, *3 (W.D. Pa. Nov. 14, 2001). In that case, plaintiff CLI had asserted both patent infringement and tortious interference with existing and prospective business advantage. *Id.* at *1. Following the Federal Circuit's analysis in *Hunter Douglas*, the court stated that the "absence of privilege or justification prong of the [tortious interference] test will require resolution of the patent infringement issue. If defendant did not breach the patent, it was privileged and justified in marketing its products." *Id.* at *3. Because the state law tortious interference claim was based

---

[8]    The court's decision in *Rodime PLC v. Seagate Technology, Inc.,* 174 F.3d 1294 (Fed. Cir. 1999) holding that the tortious interference and unfair competition claims of the plaintiff in that case were not preempted by Federal patent claims is readily distinguishable. *Id.* at 1306. In *Rodime*, the alleged tortious behavior was *not* patent infringement by the defendant, but rather the defendant's wrongful disparagement of plaintiff. In particular, the alleged wrongful conduct was defendant's false claims that buyers shouldn't seek a license from plaintiff because (defendant falsely claimed) plaintiff's patent was *invalid*. Thus, in *Rodime,* the tortious conduct did *not* arise out of infringement by defendant of plaintiff's patent, but rather out of defendant's wrongful disparagement of plaintiff. The fact that the disparagement in *Rodime* was a false claim that plaintiff's patent was invalid was beside the point. A false claim that plaintiff's products were defective or that its service was shoddy would have served equally well in establishing the wrongful conduct necessary to prove tortious interference. As a result, the Court in *Rodime* found that the claims were not preempted because "they include[d] additional elements not found in the federal patent law [*i.e.,* disparagement]. . . ." *Id.* at 1306; *see also Dow Chem. Co v. Exxon Corp.,* 139 F. 3d 1470, 1476-77 (Fed. Cir. 1998) (observing that the alleged behavior relevant to an inequitable conduct claim under patent law was different than the alleged behavior supporting tortious interference claims). Here, by contrast, Cryovac's tortious interference claims are entirely dependent upon a finding that Pechiney willfully infringed Cryovac's '419 patent. No other *type* of wrongful conduct has been alleged and proof of willful infringement is the lynchpin to Cryovac's tortious interference claims. Cryovac's tortious interference claims are therefore entirely subsumed within its patent infringement claims and are, therefore, preempted, under either the *Hunter Douglas* rationale or the *Rodime* rationale.

on the same conduct that is governed by federal patent law the *CLI* court held that the plaintiff's tortious interference claim was conflict preempted. *Id.* The present case presents the identical situation as the *CLI* case. If Pechiney is found to not infringe the '419 patent-in-suit, Cryovac's tortious interference claims would necessarily fail.

In addition, even if Pechiney were found to have willfully infringed the '419 patent, Cryovac's tortious interference claims would still be preempted by the Patent Act under the *Hunter Douglas* analysis because those state-law claims are in direct conflict with 35 U.S.C. § 284 and, therefore, pose insurmountable obstacles to the accomplishment and execution of the full purposes and objectives of Congress under federal patent law.

Section 284 of Title 35 is the federal statutory provision that provides for the recovery of damages in patent cases. *See* 35 U.S.C. § 284. Cryovac's state law tortious interference claims predicated solely on the tortious conduct of patent infringement conflict with 35 U.S.C. § 284 for at least four reasons:

- First, permitting Cryovac to recover damages in excess of a reasonable royalty under either of its tortious interference theories would permit a prevailing patent owner to circumvent 35 U.S.C. § 284 and the well-settled law of federal patent "lost profits" damages under *Panduit* because proving damages under either tortious interference theory requires Cryovac to prove only one (i.e., the amount of profits lost) of the four factors set forth in *Panduit. See, e.g., Delaware Express Shuttle, Inc. v. Older*, 2002 Del. Ch. LEXIS 124, *91 (Oct. 23, 2002); *Panduit v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

- Second, permitting Cryovac to recover uncapped, punitive damages under either of its tortious interference theories would contravene the ceiling of treble damages for willful patent infringement decided by a federal judge as expressly set by Congress in 35 U.S.C. § 284.

- Third, permitting Cryovac to recover uncapped, punitive damages under either of its tortious interference theories would eviscerate well-established Federal Circuit law on the necessity of proving willful infringement by "clear and convincing" evidence

18

because Cryovac need only prove each of the elements of its
tortious interference claims by a "preponderance of the evidence"
in contravention of 35 U.S.C. § 284. *See, e.g., BIC Leisure Prods.,
Inc. v. Windsurfing Int'l Inc.*, 1 F.3d 1214, 1222 (Fed. Cir. 1993);
*see, e.g., All Pro Maids, Inc. v. Layton*, 2004 Del. Ch. 116, *25
(Aug. 9, 2004); *see also Research & Trading Corp. v. Pfuhl*, 1992
Del. Ch. LEXIS 234, *38 (Nov. 18, 1992).

●     Fourth, allowing Cryovac to recover damages under one of
its state law theories of tortious interference and its federal patent
infringement claim would constitute an impermissible double
recovery for the same unlawful conduct in contravention of 35
U.S.C. § 284.

Accordingly, Cryovac should not be permitted to simply recast its patent infringement

claim and present it in the form of a common law action for tortious interference with contractual

relations or its companion claim, tortious interference with prospective contractual relations.  As

the court in the *CLI* case concluded, this is too great an encroachment on the federal patent

system to be permitted under applicable principles of federal preemption.  If Pechiney did

anything wrong (which it did not), then it will be liable under the federal Patent Act, and not

under conflicting state law of tortious interference

### B.     The Undisputed Facts Show That Cryovac Cannot Establish Essential Elements of Its Claims.

Pechiney is entitled to summary judgment on Cryovac's tortious interference claims for

the additional reason that the undisputed facts demonstrate that Cryovac cannot establish

essential elements of its claims.  First, the undisputed facts show that Cryovac and National Beef

did not have a contract.  Second, even if Cryovac and National Beef, had successfully entered

into a binding contract, there is no evidence that Pechiney knew of any contract, and all the

evidence that is in the record demonstrates that Pechiney did not know of any contract and had

no reason to know of any contract.  Cryovac's inability to demonstrate either the existence of a

contract or Pechiney's knowledge of a contract are fatal to Cryovac's tortious-interference-with-

19

contract claim. Finally, Pechiney acted in good faith in developing ClearShield and made a concerted effort to prevent infringing any existing patents. Therefore, Pechiney's sale of ClearShield to National Beef was privileged and cannot serve as the basis for Cryovac's tortious-interference-with-prospective-contractual-relations claim.

     1.    **The alleged agreement did not contain a quantity term and, therefore, as a matter of law, Cryovac did not have a contract with National Beef.**

In order to form a binding contract for the sale of goods under Article 2 of the U.C.C., the parties *must* include a written term expressing the quantity of goods the buyer is required to purchase from the seller. U.C.C. § 2-201. While other terms may be supplied by parol evidence or the U.C.C.'s "gap-fillers" (such as the parties' course of performance or usage of trade), the quantity term is the one term that must appear in the parties' written agreement. Both Cryovac and National Beef agree that the document that serves as the basis for Cryovac's tortious-interference-with-contract claim *contains no quantity term* requiring National Beef to purchase a single bag from Cryovac.

**REDACTED**

    a.    **not a binding contract because it does not contain a quantity term.**

Contracts for the sale of goods must contain a written quantity term. U.C.C. § 2-201, cmt. 1 (stating that one of the three "definite requirements" of a contract is that it "must specify a quantity").[9] Although the necessary quantity term may be satisfied by a written requirement that the buyer purchase all of its requirements of that good from the seller, that promise is normally characterized by the buyer's promise to buy exclusively from that seller. *See, e.g., Merritt-*

---

9    The law is the same in all of the states with a relationship to this issue. See K.S.A. § 84-2-201, cmt. 2 (Kansas); V.A.M.S. § 400.2-201, cmt. 1 (Missouri); S.C. Code § 36-2-201, cmt. 1 and Reporter's cmts. (South Carolina).

*Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 963 (5th Cir. 1999) ("An essential element of a requirements contract is the promise of the buyer to purchase exclusively from the seller either the buyer's entire requirements or up to a specified amount."); *Orchard Group, Inc. v. Konica Med. Corp.*, 135 F.3d 421, 429-30 (6th Cir. 1998) (finding that a letter did not create a requirements contract because it did not "create an exclusive relationship" or "require a specific numeric term" related to the buyer's requirements); *Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc.*, 270 F.3d 723, 726-27 (8th Cir. 2001) (applying both Kansas and Missouri law and holding that an alleged requirements contract was not binding because it "was silent as to any quantity terms").[10] There is no genuine of issue of material fact that the "agreement" upon which Cryovac's tortious interference with contract claim depends does not contain a quantity term of any kind -- fixed, requirements or otherwise.

---

10  In *Advent Systems, Ltd. v. Unisys Corp.*, 925 F.2d 670 (3d Cir. 1991), the court found that the parties had formed the equivalent of an "exclusive dealing" requirements contract, even though the agreement stated that it was "non-exclusive." Id. at 678-79.  Unlike the situation in the case at bar, the agreement in *Advent Systems* contained a clear provision requiring the purchaser to buy product from the seller: "[the buyer] agrees to buy from Advent the products listed in Schedule A." *Id.* at 674.  As the court noted, this provision required the buyer "to buy from [the seller] on stated terms the specified products necessary to engage in that venture." Id. 678.  By contrast, the

Second, although the Agreement in *Advent Systems* contained language permitting enforcement of a "non-exclusive" requirements contract, it is clear from a reading of the agreement at issue that this language merely allowed the *seller* to sell its products to other customers.  *Advent Sys., Ltd.*, 925 F.2d at 674 (quoting the language from the agreement that "[buyer] desires to purchase, and [seller] desires to sell, on a non-exclusive basis, certain of [seller's] hardware products. . . .").  Therefore, this language has no impact on the rule that "[a]n essential element of a requirements contract is the promise of the buyer to purchase exclusively from the seller either the buyer's entire requirements or up to a specified amount." *Merritt-Campbell, Inc.*, 164 F.3d at 963 (emphasis added).  Finally, *Advent Systems* has been as interpreted as requiring "exclusivity because the parties contemplated a continuing relationship that resembled a joint venture or distributorship." *Orchard Group, Inc.*, 135 F.3d at 429 (citing *Advent Sys., Ltd.*, 925 F.2d at 678-79).

The allegations in Cryovac's Second Amended Complaint, the statements in the declaration Cryovac submitted to this Court in support of its motion for leave to amend its original Complaint and the deposition testimony of Cryovac's declarant are all consistent in claiming that all of the essential terms of Cryovac's alleged contract with a National Beef are to be found                    REDACTED                    For example, Cryovac's Second Amended Complaint alleges that it formed "a binding four-year supply agreement with National Beef for various food packaging products on January 14, 2004." (A62, Ex. 4, D.I. 47, ¶14.) Additionally, Cryovac's declaration in support of its Motion for Leave to Amend asserted that Cryovac and National Beef                    REDACTED

(A359, Ex. 29, D.I. 58, Gardner Decl., ¶¶1-2.)

(emphasis added).  At his deposition, Cryovac's declarant testified                    REDACTED

(A5022, Ex. 204, Gardner Dep. Tr., pg. 32, ln. 15 - pg. 33, ln. 2.)

The plain language


                    REDACTED


(*See* A1774-77, Ex. 113,

This unambiguous language of                    was confirmed by Cryovac's own witnesses,

                    REDACTED

(A5024, Ex. 204, Gardner Dep. Tr., pg. 58, lns. 8-14 (testifying

                    REDACTED

'; A5052, Ex. 209, Mize Dep. Tr., pg. 58, ln. 20 -

pg. 59 ln. 1 (identifying

**REDACTED**

The testimony of Cryovac witnesses

**REDACTED**

For instance, National Beef's

Terry Wilkerson testified

**REDACTED**

(A5072, Ex. 215, Wilkerson Dep. Tr., pg. 39, lns. 12-22.)  Therefore,

**REDACTED**

*(Id.)*

Quantity is the single term that *must* be present in writing to create a contract under the

U.C.C.  Because an agreement for the sale of goods requires a written quantity requirement, and

because it is undisputed that     **REDACTED**     lacks any written quantity requirement, there

can be no genuine dispute that National Beef and Cryovac did not have a binding contract.

> **b.**     **REDACTED**     **is identical to Cryovac's**

The undisputed facts establish that the real reason why     **REDACTED**     contained

neither a fixed-quantity term nor a requirements-quantity term is that it was not a binding

contract to begin with.  Rather,     **REDACTED**

As Mr. Mize testified, Cryovac .     **REDACTED**

---

11  Mr. York's     **REDACTED**

23

REDACTED

(A5055, Ex. 209, Mize Dep. Tr., pgs. 239, ln. 18 - 240, ln. 8.)  Moreover, like

REDACTED

(A5055, Ex. 209, Mize Dep. Tr., pg. 240, ln. 13-16.)  Also, again                REDACTED

Mr. Mize testified that Cryovac's                            REDACTED

(A5055-56, Ex. 209, Mize Dep. Tr., pgs. 240, ln. 22 - 241, ln. 1.)  Finally,

Mr. Mize testified

REDACTED

(A5056, Ex. 209, Mize Dep. Tr., pgs. 242, ln. 16 - 243, ln. 6.)  Therefore, Mr. Mize's description

REDACTED

c.    **Cryovac cannot use course of dealing, trade usage or course of performance to transform into a binding contract.**

Realizing that the absence of a quantity term in the        REDACTED        is fatal to its

tortious-interference-with-contract claim, Cryovac has recently asserted that a quantity term

**REDACTED**                              should be read into

the agreement by way of course of dealing, trade usage or course of performance.  (*See* A1893,

Ex. 122, Cryovac's Third Supplemental Response to Pechiney's Third Set of Interrogatories

("Interrogatory Response"), No. 20.)  Cryovac's argument violates the established rules of

contract formation and interpretation.

24

It is well established that evidence of course of dealing, course of performance or trade usage cannot be used to create a contract where no contract was ever formed. *See, e.g., Trimble v. Coleman Co.*, 437 P.2d 219, 223 (Kan. 1968) ("Evidence of custom, usage and usual business practice . . . may not be received to make a contract where the parties have made none."); *SAB Harmon Indus., Inc. v. All State Bldg. Sys., Inc.*, 733 S.W.2d 476, 486 (Mo. Ct. App. 1987) ("The precondition for the admission of evidence of *course of dealing*, therefore, is an agreement already made and subsistent. 'Before evidence as to the course of dealing is admissible, there must be evidence that there was in fact an agreement which is to be interpreted in the light of such course of dealing. *A course of dealing only gives meaning to or supplements an existing agreement but cannot be relied upon as constituting the agreement of the parties.*); *Buxton v. Harsh,* 631 S.W.2d 95, 97-98 (Mo. Ct. App. 1982) ("The doctrine [of custom and usage] cannot be employed to create a contract where none exists.); *Love v. Gamble,* 448 S.E.2d 876, 880 (S.C. Ct. App. 1994) ("[W]e know of no authority for the proposition that custom and usage alone can create a contract and give rise to a meeting of the minds on all essential terms of the contract.").

Even more significantly for purposes of the present motion, course of dealing, course of performance and trade usage may not be used to supply a quantity term when the contract is silent as to quantity. *Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc.,* 270 F.3d 723, 726-27 (8th Cir. 2001) (interpreting both Kansas and Missouri law); *see also Omega Eng'g, Inc. v. Eastman Kodak Co.,* 908 F. Supp. 1084, 1091 (D. Conn. 1995) (finding that the plaintiff "cannot cure the lack of a written, requirements-related quantity term by reference to parol evidence of the parties' course of dealing"); *Alaska Ind. Fishermen's Mkt. Assoc. v. New England Fish Co.,* 548 P.2d 348, 352 (Wash. Ct. App. 1976) (holding that "where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the

missing quantity term"). Therefore, "[p]arol evidence cannot create quantity out of thin air, where the writing relied upon to form the contract is silent as to quantity." *Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 795 (4th Cir. 1989).

Like Cryovac, the plaintiff in *Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc.* attempted to assert that the parties' course of dealing demonstrated that a document devoid of any quantity term was really an "output" or "requirements" contract under § 2-306 of the U.C.C. 270 F.3d at 726-27. The plaintiff argued that since the parties had previously entered into output and requirements contracts, the most recent correspondence between the two parties should be construed as an output or requirements contract. *Id.* The court rejected this argument and stated:

> Most significantly, the fax [alleged to be the contract] was silent as to any quantity terms (output requirements, or otherwise) for the years 1999 and 2000. As a result, the district court declined Simmons's invitation to consider parol evidence of the parties' course of dealing. So must we. '*Where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term.*'

*Id.* (citations omitted) (emphasis added.)

The rule forbidding the use of course of dealing, trade usage or course of performance to create an otherwise non-existent quantity term serves the purpose of the statute of frauds, which "was enacted to avoid the potential injustice" that could occur if a party could be held liable for a breach when "there is a lack of something, anything, in the writing that might evidence the quantity dimension. . . ." *Kline, Inc.,* 878 F.2d at 795. Commentators have described the type of potential injustice prevented by the requirement of a *written* quantity term as follows: "[T]here is some danger that if the quantity term is omitted or if a greater quantity than is stated could be proved by parol evidence, the buyer or seller might establish an increase or decrease in the quantity other than that actually agreed upon as market conditions change making the contract more favorable to one party. Unlike other terms of the contract, there would be no objective

26

standards with which to control this possible abuse." S.C. Code § 36-2-201, Reporter's

Comments (adopting the U.C.C.'s quantity requirement into the South Carolina Code).

Because    **REDACTED**    was silent as to any quantity term or requirements

obligation, it did not create a contract between National Beef and Cryovac. Therefore, Cryovac

may not use course of dealing, trade usage or course of performance to create a requirements

obligation and, as a result, a contract.

### 2.    There is no contract between National Beef and Cryovac
### REDACTED

Even if    **REDACTED**    did contain a quantity requirement, which it does not,

National Beef and Cryovac do not have a binding agreement because National Beef never

intended to be bound. Although the U.C.C. relaxes some of the formalities required for the

formation of binding contracts for the sale of goods, "Article 2 . . . does not eliminate the

requirement that the parties must have intended to enter into a binding agreement and that there

be a mutual manifestation of assent on . . . material point[s.]" *DP-Tek, Inc. v. AT&T Global Info.*

*Solutions Co.,* 891 F. Supp. 1510, 1517 (D. Kan. 1995) (granting defendant's motion for

summary judgment on plaintiff's tortious interference with contract claim); *see also Ginsu*

*Prods., Inc. v. Dart Indus., Inc.,* 786 F.2d 260, 265 (7th Cir. 1986) (holding that in cases

involving a sale of goods, "a court must still make the threshold factual finding that an intent to

contract existed"). Here, the material facts are not in dispute, as both parties agree that National

Beef did not intend to enter into a binding contract on January 14, 2003.

It is undisputed    **REDACTED**

As National Beef's Mr. Wilkerson testified,

**REDACTED**

27

REDACTED

(A5078, Ex. 215,

Wilkerson Dep. Tr., pg. 80, lns. 12-14.)  Indeed,

REDACTED

(A5094, Ex. 217, York Dep. Tr., pg. 300, ln. 3-8.)

Because it is undisputed                          **REDACTED**

the parties did not form a contract, and thus, Cryovac's tortious

interference with contract claim fails as a matter of law.

> **3.    Even if There Had Been a Contract Between Cryovac and National Beef, It is Undisputed that Pechiney Did Not Know About It and Could Not Have Known About It.**

Courts will grant summary judgment for the defendant on a tortious-interference-with-

contract claim if the undisputed facts demonstrate that the defendant was not aware of the

plaintiff's contract with a third party.  *DP-Tek, Inc. v. AT&T Global Info. Solutions Co.,* 891 F.

Supp. 1510, 1519-20 (D. Kan. 1995) ("[I]n order to sustain a cause of action for tortious

interference with a contract, [plaintiff] must show that [defendant] was aware of the contract.");

*Preston v. Preston,* 823 S.W.2d 48, 49-50 (Mo. Ct. App. 1991) (same).  Specifically, courts grant

summary judgment when there are no facts to support a plausible explanation that the defendant

had knowledge of a contract.  *DP-Tek, Inc.,* 891 F. Supp. at 1519-20 (holding that plaintiff's

announcement predating the formation of the actual contract could not have put defendant on

notice of the contract).  Furthermore, *summary judgment is appropriate when a plaintiff does not*

refute the defendant's sworn statement that the defendant "had no knowledge of the existence of

28

any contract." *Preston,* 823 S.W.2d at 49-50.  Because Cryovac cannot establish a plausible

story explaining how Pechiney would have become aware of the contract and cannot refute

Pechiney's sworn testimony that Pechiney had no knowledge of a contract, Cryovac's tortious

interference claim fails as a matter of law.

In this case, several factors lead to the undisputable conclusion that Pechiney did not

have any knowledge of a binding agreement between Cryovac and National Beef.  First, the

undisputed testimony

**REDACTED**

Finally,

**REDACTED**

**a.**                    **REDACTED**

According to National Beef,

**REDACTED**

(A5072-74, 5078, Ex. 215, Wilkerson

Dep. Tr., pgs. 39-46, 79-81.)  Moreover,

**REDACTED**

(A1903-04, Ex. 123,     **REDACTED**

A5078, Ex. 215, Wilkerson Dep. Tr., pgs. 79-81.)  Based on National

Beef's                   **REDACTED**

REDACTED

(A5094, Ex. 217, York Dep. Tr.,

pg. 300, lns. 3-8.)  Because Cryovac admits

REDACTED

In fact, National Beef explicitly

REDACTED

(A5073, Ex. 215, Wilkerson Dep. Tr., pg. 43, ln.

19 - pg. 45, ln. 9.)  Thus, the undisputed evidence shows that

REDACTED

b.     REDACTED

The sworn statements

REDACTED

Pechiney's Bob Taylor testified                REDACTED

(A5070, Ex. 214, Taylor Dep. Tr., pg. 188, lns. 15-16; pg. 189,  lns. 7-9.)  Mr. Taylor

also confirmed          REDACTED

(A5070, Ex. 214, Taylor Dep. Tr., pg. 188, lns. 20-22.)

Additionally,          REDACTED

between National Beef and Cryovac, Pechiney's Tom Grabowski testified

REDACTED                (A5025-30, Ex. 205,

Grabowski Dep. Tr., pg. 195, ln. 20 - pg. 196, ln. 12.)  Furthermore, Mr. Grabowski testified

30

REDACTED

(*Id.*)

The

REDACTED

Because Cryovac cannot offer any evidence to refute this sworn testimony,

Pechiney is entitled to summary judgment. *See Preston*, 823 S.W.2d at 49-50.

        c.    **Cryovac's own witnesses' uncertainty as to what constitutes the alleged contract demonstrates that Pechiney's belief that no contract existed was reasonable.**

Cryovac's own multiple and inconsistent theories regarding the formation of the alleged

agreement at issue, as well as         REDACTED

        all demonstrate that Pechiney had no reason to believe that National Beef had

any obligation to purchase bags from Cryovac. Specifically, Pechiney could not be expected to

have knowledge of a

        REDACTED

        This is especially

true given, as discussed above,

        REDACTED

    **C.**    **Pechiney Is Entitled to Summary Judgment on Cryovac's Tortious Interference with Prospective Contractual Relations Claim Because Cryovac Cannot Show Pechiney Used "Improper" or "Wrongful" Means.**

A claim for tortious interference with prospective business relations cannot be established

by mere proof of good-faith, albeit negligent, conduct. *See, e.g., Ball Corp. v. Xidex Corp.*, 967

F.2d 1440, 1446 (10th Cir. 1992) (finding that the plaintiff could not bring a tortious interference

with prospective business relations claim where the defendant had a "reasonable support" for his

allegedly false statement pertaining to the plaintiff's patent); *see also* Restatement. 2d (Torts) §

31

766c.  Because Pechiney acted in good faith in attempting to avoid infringing any existing

patents with ClearShield, it has not engaged in "improper" or "wrongful" interference.

　　　Before bringing ClearShield to the marketplace,

**REDACTED**

(A5058-59, Ex.

210, Mueller Dep. Tr., pgs. 99-103; A1782-83, Ex. 117.)  In these discussions,

**REDACTED**

(A5016-18, Ex. 202, **Douglas**

Dep. Tr., pgs. 205-09; A1782-83, Ex. 117; A1785, Ex. 118.)

**REDACTED**          (*See* sources

cited *id.*)

**REDACTED**

(*See* A1793-95, Ex. 119,

**REDACTED**

(A1882-87, Ex. 120,

**REDACTED**

**REDACTED**                                   (A1888-90, Ex. 121, July 20,

As a result of Pechiney's good faith development and sale of its ClearShield bags, even if

Cryovac had a valid patent infringement claim, which it does not, Pechiney's innocent or

negligent infringement cannot constitute "wrongful" or "improper" means.  Therefore,

Pechiney's selling of ClearShield to National Beef is privileged and cannot, as a matter of law,

cannot serve as the basis for a tortious interference with prospective contractual relations claim.

*See* Restatement 2d (Torts) § 768.

**VI.     CONCLUSION**

For all the reasons discussed above, Pechiney this Court should grant summary judgment

on Cryovac's tortious interference with contract and tortious interference with prospective

business relations claims.

Respectfully submitted,

PECHINEY PLASTIC PACKAGING, INC.

Dated:  October 19, 2005

By:  *N. Richard Powers*
     N. Richard Powers (#494)

N. Richard Powers (#494)
Rudolf E. Hutz (#484)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: (302)888-6266

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312)222-9350

## CERTIFICATE OF SERVICE

I hereby certify that I caused true and correct copies of Pechiney's Motion for **Partial**

Summary Judgment on Tortious Interference Claims to be served as follows:

### VIA HAND DELIVERY
John W. Shaw, Esq.
Karen E. Keller, Esq.
YOUNG, CONAWAY, STARGATT,
  & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
Fax: (302) 576-3334

### VIA FEDERAL EXPRESS
Ford F. Farabow, Esq.
Joann M. Neth, Esq.
Michael J. Flibbert, Esq.
Courtney B. Meeker, Esq.
FINNEGAN, HENDERSON, FARABOW,
  & GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Fax: (202) 408-4400

This 19th day of October, 2005.

N. Richard Powers (#494)

11