# Unreported Cases

LEXSEE 2005 US DIST LEXIS 5803

ADVANCED MEDICAL OPTICS, INC., a Delaware corporation, Plaintiff, v.
ALCON INC., a Swiss corporation, and ALCON LABORATORIES,
INCORPORATED, a Delaware corporation, Defendants.

Civil Action No. 03-1095-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 5803

April 7, 2005, Decided

**PRIOR HISTORY:** *Advanced Med. Optics, Inc. v. Alcon Inc., 361 F. Supp. 2d 404, 2005 U.S. Dist. LEXIS 4897 (D. Del., Mar. 29, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In this patent infringement action, defendant filed two Daubert motions seeking to exclude the testimony of two experts offered by plaintiff pursuant to *Fed. R. Evid. 702*.

**OVERVIEW:** Regarding the first witness, the court found that because the doctor lacked expertise in the analysis of sales and market trends for phacoemulsification machines, he would be precluded from testifying on this topic. Additionally, the court found that the doctor's opinion regarding the general preferences of other surgeons was speculative and not supported by reliable data. However, the doctor would be permitted to testify about his own preferences for certain features in phacoemulsification machines and what he considered advantageous from his perspective, based on his many years of experience using such machines in the performance of cataract surgery, to the extent such opinions were disclosed in his expert report. Regarding the second witness, the court found that the witness would be precluded from testifying on the issue of commercial success. The court reasoned that the witness could not disclaim expertise in an area and then opinion on it. Additionally, the court found that the witness would be precluded from testifying with regard to the achievement of an aspiration level of 500 mmHg while maintaining chamber stability.

**OUTCOME:** The motion to exclude the testimony of the first witness was granted in part, to the extent the witness was not permitted to offer testimony on the analysis of sales and market trends for phacoemulsification machines, and infringement by defendants of the patents. The motion to exclude the testimony of the second witness was granted in part, to the extent the witness was not permitted to offer testimony on the issue of commercial success.

**CORE TERMS:** phacoemulsification, patent, surgeon, occlusion, machine, cataract, infringement, testifying, deposition, surgery, expert testimony, expertise, reliable, admit, aspiration, stability, chamber, invention, thermal, wound, safer, burn, motion to exclude, training, offering, expert report, fluidics, technology, enabled, afraid

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Trials > Judicial Discretion*
*Evidence > Procedural Considerations > Rulings on Evidence*
[HN1] Motions to exclude evidence are committed to the court's discretion. When the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment, the Court of Appeals will give those rulings a hard look to determine if a district court has abused its discretion in excluding evidence as unreliable.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
*Evidence > Procedural Considerations > Rulings on Evidence*
[HN2] The United States Court of Appeals for the Federal Circuit applies the law of the regional circuit in reviewing decisions on whether to admit expert testimony.

*Evidence > Procedural Considerations > Burdens of Proof*
*Evidence > Witnesses > Expert Testimony*

Case 1:04-cv-01278-KAJ   Document 225-6   Filed 10/26/2005   Page 3 of 16

Page 2
2005 U.S. Dist. LEXIS 5803, *

[HN3] *Fed. R. Evid. 702* obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. Rule 702 provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The party offering the expert testimony has the burden of proving admissibility. The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. Further, Rule 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a valid scientific connection to the pertinent inquiry.

*Evidence > Witnesses > Expert Testimony*
[HN4] In determining whether an expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact, the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts at issue. As part of that inquiry, the court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.

*Evidence > Witnesses > Expert Testimony*
[HN5] Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field. Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Expert Witness Discovery*
[HN6] See *Fed. R. Civ. P. 26(a)(2)(B)*.

*Evidence > Witnesses > Expert Testimony*
[HN7] The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.

*Evidence > Witnesses > Expert Testimony*
[HN8] The Federal Rules of Evidence do not permit an expert's blanket adoption of reports prepared by counsel.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Expert Witness Discovery*
[HN9] *Fed. R. Evid. 26(a)(2)(B)* requires that an expert's report contain a complete statement of all opinions to be expressed and the basis and reasons thereof.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
*Civil Procedure > Discovery Methods > Expert Witness Discovery*
[HN10] Under *Fed. R. Evid. 26(a)(2)(B)*, an expert's report must contain "the basis and reasons" for the expert's opinions.

*Evidence > Witnesses > Expert Testimony*
[HN11] An expert's testimony may be unreliable if the expert relied almost exclusively on information from one source who was clearly biased.

**COUNSEL:** [*1] Richard L. Horowitz, Esq. and David E. Moore, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, for Plaintiff. Of Counsel: A. James Isbester, Esq. and Gillian W. Thackray, Esq., Isbester & Associates, Berkeley, California.

Josy W. Ingersoll, Esq. and Melanie K. Sharp, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Defendants. Of Counsel: Robert G. Krupka, Esq. and Erica S. Olson, Esq., Kirkland & Ellis, LLP, Los Angeles, California.

**JUDGES:** JORDAN, District Judge.

**OPINIONBY:** Kent Jordan

**OPINION:**

MEMORANDUM OPINION

Wilmington, Delaware
April 7, 2005

**JORDAN, District Judge**

I. INTRODUCTION

This is a patent infringement case. Presently before me are two *Daubert* motions n1 filed by defendants Alcon Laboratories, Inc. and Alcon Manufacturing, Ltd. (collectively, "Alcon") seeking to exclude the testimony of two experts, Dr. Randall Olson (*see* Docket Item ["D.I."] 156) and Mr. Harold Walbrink (*see* D.I. 160), offered by Advanced Medical Optics, Inc. ("AMO") pursuant to *Federal Rule of Evidence 702*. Jurisdiction is proper under *28 U.S.C. § § 1331* and *1338*. For the rea-

sons [*2] that follow, Alcon's motions will be granted in part and denied in part.

n1 The motions are based upon *Federal Rule of Evidence 702* and the Supreme Court's direction in *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, and later cases that district court judges are to perform a "gatekeeping" function when considering the admissibility of expert testimony. (D.I. 156; 160.)

## II. BACKGROUND

The background related to the patents in suit is set forth in the Opinion construing the disputed claim terms. (D.I. 238 at 1-5.)

## III. STANDARD OF REVIEW

[HN1] Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 749 (3d Cir. 1994)* (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). n2 [*3] "When the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id. at 750*.

n2 [HN2] The Federal Circuit applies the law of the regional circuit in reviewing decisions on whether to admit expert testimony, and, therefore, the Third Circuit's holdings on the issue are binding precedent. *Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003)* ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we ... [apply] the law of the regional circuit....").

## IV. DISCUSSION

[HN3] *Federal Rule of Evidence 702* obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*. [*4] *Rule 702* provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...." The party offering the expert testimony has the burden of proving admissibility. *See Daubert, 509 U.S. at 592 n. 10* (citation omitted). The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id. at 589-90*. Further, *Rule 702* requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id. at 591-92*.

[HN4] In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts at issue. *Id. at 592-93*. [*5] As part of that inquiry, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999)*.

[HN5] Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field. *See Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir. 1997)* (metallurgist not qualified to testify about industry standards for safes); *Barrett v. Atl. Richfield Co., 95 F.3d 375, 382 (5th Cir. 1996)* (expert not qualified to testify about correlation of chemical effects on rats and on humans). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the factfinder. *See McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir. 1987)* (expert permitted to testify as to the customary duty of factory representatives in the air compressor industry, but should [*6] not have been permitted to opine on breach of such duty because the jury was equally qualified to make that determination); *S.E.C. v. Lipson, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998)* ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

### A. Dr. Olson

Pursuant to *Federal Rule of Evidence 702*, Alcon seeks to preclude Dr. Olson from testifying in regard to

four categories of issues (D.I. 156), each of which will be discussed in turn.

1. General sales and market analysis

Alcon seeks to preclude Dr. Olson from testifying in regards to a general sales and market analysis of phacoemulsification devices. (D.I. 157 at 7-11.) Specifically, Alcon notes four opinions rendered by Dr. Olson on this topic:

> (1) "In regards to companies selling phacoemulsification equipment, I believe there is a competitive disadvantage for any company that does not have Occlusion Mode on its equipment. (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.)
>
> (2) "I think that [if] that information [on Occlusion Mode were] out there and appropriately marketed [*7] [it] would produce a huge competitive advantage for whoever had occlusion mode." (D.I. 158, Ex. 3 at A172, Dep. of Dr. Olson at 58:14-17, Oct. 11, 2004.)
>
> (3) "Fluidics drives sales, because removing the air reduces the post-occlusion surge and therefore allows high aspiration levels to be used safely." (D.I. 158, Ex. 1 at A022, Dr. Olson's Revised Expert Disclosure at 21.)
>
> (4) General comments on Alcon's financial size and market strength. For example, "they're the 800 pound gorilla," (D.I. 158, Ex. 3 at A134, Dep. of Dr. Olson at 8:25, Oct. 11, 2004 ), "they're the biggest. They're the strongest." (Id. at A138, 12:12.)

(D.I. 157 at 8.) Alcon asserts that "these opinions venture outside Dr. Olson's general area of cataract surgery because they require specific knowledge about how the phacoemulsification market has responded to Occlusion Mode and the '765 patent, and should be excluded for that reason." (Id.) In support of its position, Alcon argues that Dr. Olson admitted during his deposition that he lacks specialized training in analyzing sales or market trends for phacoemulsification machines:

> Q. You don't claim to have any special knowledge or [*8] training in the analysis of sales and market trends for phacoemulsification machines, right?
>
> A. *I'm not in sales and marketing,* but I do see sales and marketing figures. ... I think I have an interest, *but I don't claim any special expertise.*

(D.I. 158, Ex. 3 at A206-07, Dep. of Dr. Olson at 173:21-174:4, Oct. 11, 2004 (emphasis added).)

In response, AMO argues that Dr. Olson, as an "expert consumer" of phacoemulsification products, should be permitted to address the jury in regards to the competitive advantage that a phacoemulsification machine having the invention of each of the two patents in suit would have in the market. (D.I. 185 at 6.) For support, AMO asserts that Dr. Olson is a sophisticated consumer of phacoemulsification machines because he is familiar with various phacoemulsification machines, has been performing cataract surgery for thirty years, and because he approves all purchases by his department at the Moran Eye Center. (Id.) Additionally, AMO asserts that Dr. Olson provided four reasons why he believes Occlusion Mode offers a competitive advantage:

> 1) Alcon would not have added it to its systems if Alcon did not believe it was important [*9] to do so, 2) his conversations and interactions with leading surgeons such as Bruce Wallace and Howard Fine led him to conclude that some surgeons would not purchase equipment that did not have occlusion mode, ... 3) [his] review of the trade literature regarding occlusion mode suggests that occlusion mode is an important feature to a number of leading surgeons, and 4) [his] own study of the problem of thermal injury leads him to conclude that the use of occlusion mode can reduce thermal injury eight fold.

(Id. at 8-9.)

Because Dr. Olson lacks expertise in the analysis of sales and market trends for phacoemulsification machines, he will be precluded from testifying on this topic. He has admitted that he has no expertise in this particular area. Being an "expert consumer," as AMO puts it, does not remedy this deficiency. Further, the "main basis" for

Dr. Olson's opinions are "the fact that Alcon decided to put occlusion mode on its latest equipment." (D.I. 158, Ex. 3 at A169, Dep. of Dr. Olson at 55:12, 1-2, Oct. 11, 2004.) That reason, as AMO admits, is "more a matter of plain common sense than special expertise." (*See* D.I. 185 at 9.)

Additionally, Dr. Olson's [*10] opinion regarding the general preferences of other surgeons is speculative and not supported by reliable data. The basis for his opinion on this point is that two of his collegues have preferences for devices with Occlusion Mode, and even as to them, he testified that he could only be certain one of them would actually insist on buying a machine with Occlusion Mode. Dr. Olson testified during his deposition as follows:

> Q. Is there any other basis for your statement?
>
> A. I do feel there are people out there who use occlusion mode and feel its important, and I think that they -- I mean, the Alcon people know. You could ask them, but I'm sure they have surveys. And I'm sure there are people who would not buy the equipment without it, so I think that that's got to be it as well. But my main basis is the fact that Alcon put it in their equipment.
>
> Q. You say that you're sure that there were people who would not buy the equipment without it having occlusion mode. *Why are you sure that there are people who would not buy a phacoemulsification system if it didn't have occlusion mode?*
>
> A. Because there are people talking about occlusion mode and how you should have it. [*11] There are many names listed there, Bruce Wallace most recently in the meeting I was just at, *so I know one, Bruce Wallace.* I mean, from what he said, I don't think Bruce Wallace would buy anything without an occlusion mode. He talked about the fact that occlusion-mode phaco was important. *So there have to be others. If there were none, why would Alcon add it to their equipment in face of a patent? It makes no sense.*
>
> Q. Other than Bruce Wallace, can you identify anyone else who you believe would not purchase a phacoemulsification system if it didn't have occlusion mode?
>
> A. *Not without talking to them.* There's others, who talk about it here, but I -- the only one I'm aware who's talked to very recently is Bruce Wallace. Whether Howard Fine still thinks it's important or not, he certainly in there will say he feels it's very important.
>
> Q. And when you're saying in there, you're referring to the articles that Ms. Thackray sent to you, right?
>
> A. Yes, that you now have, yes.

(D.I. 158, Ex. 3 at A169-70, Dep. of Dr. Olson at 55:6-56:13, Oct. 11, 2004 (emphasis added).)

In that testimony, Dr. Olson admits that he has not talked to any other surgeons, [*12] besides Bruce Wallace, about whether they would only buy machines with Occlusion Mode. The articles to which he refers do not support his opinion in this regard either, because as he admits, he cannot tell without talking to those surgeons whether they would only buy machines with the occlusion mode feature. His comments also reveal that he does not know whether other surgeons agree with Bruce Wallace's view, nor has he conducted a survey to find out. Thus, his testimony on the viewpoints of other surgeons is purely speculative.

Lastly, Dr. Olson testified that his opinion on the sales and marketing aspects of Occlusion Mode were based on extrapolations from a survey he conducted on wound burns. That survey, however, which was unpublished and not peer reviewed, did not ask its respondents whether Occlusion Mode was enabled during the surgery, and did not even mention the Occlusion Mode feature. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; *see* D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004 ("Q. Now, the survey didn't ask whether the occlusion mode feature was active, correct? A. [It] did not. Q. So it could be that occlusion mode was [*13] enabled during some of the wound burns that the ... study found? A. It's possible.").) Thus, it is not a reliable basis from which an opinion on the general market and physician preferences could be based.

Therefore, because Dr. Olson does not have sufficient expertise in the sales and marketing of phacoemulsification devices, and his opinion on such matters is not supported by reliable bases, he will be precluded from testifying to any sales and market analysis of phacoemul-

sification devices, including testimony addressing the economic advantages of phacoemulsification devices incorporating Occlusion Mode and the '765 patent as they pertain to the market. Dr. Olson will be permitted, however, to testify about his own preferences for certain features in phacoemulsification machines and what he considers advantageous from his perspective, based on his many years of experience using such machines in the performance of cataract surgery, to the extent such opinions were disclosed in his expert report.

2. Infringement by Alcon of the '240 or '765 patent

Alcon seeks to preclude Dr. Olson from offering testimony relating to whether Alcon infringes either the '240 patent or the '765 patent. [*14] (D.I. 157 at 11-12.) According to Alcon, "Dr. Olson implied at numerous times throughout his deposition that Alcon's phacoemulsification systems infringed the '240 and '765 patents, and that Alcon's alleged infringement was knowing and deliberate." (Id. at 11.) Alcon argues that Dr. Olson "lacks the expertise that would enable him to perform a claim construction analysis of the patents to determine whether they are infringed by the Infiniti system ... [because he] admitted that he lacks specialized training in engineering and patents." (Id. (citing D.I. 158, Ex. 3 at A141, Dep. of Dr. Olson at 18:11-13, Oct. 11, 2004.))

AMO asserts that "Dr. Olson has not done an element-by-element analysis of the patents against the accused products and AMO has no intention of asking him to do so... ." (D.I. 185 at 9.) Rather, AMO argues that Dr. Olson's view that Alcon's device is so similar to AMO's device that it appears to have been copied is both competent and pertinent. (Id. at 10.)

Dr. Olson will not be permitted to testify in regards to infringement of either patent. *Federal Rule of Civil Procedure 26(a)(2)(B)* states, in relevant part, [*15] that [HN6] "the [expert] report shall contain a complete statement of all opinions to be expressed... ." Dr. Olson did not disclose an opinion on infringement of either patent in his expert report, and as such he may not offer one at trial. *See Fed. R. Civ. P. 26(a)(2)(B)*. Additionally, in its Answering Brief in Opposition to Alcon's Motion, AMO lists six things upon which Dr. Olson has been asked to opine, not one of which concerns infringement or copying. n3 (*See* D.I. 185 at 3.) Thus, it is clear that Dr. Olson may not properly offer an opinion on infringement, and it is equally clear that AMO did not intend for him to do so. Therefore, Dr. Olson will not be permitted to offer testimony relating to whether Alcon infringes either patent in suit.

---

n3 AMO asserts that it asked Dr. Olson to provide expert testimony in the following six areas: "(i) a tutorial into the physiology and treatment of cataracts; (ii) the importance, from the surgeon's point of view, of each of the patents in suit; (iii) the problem of thermal injury; (iv) the difficulty in manual detection of occlusion; (v) the increased safety of the automatic response to occlusion of the system described in the '240 patent; and (vi) the inapplicability of the Shimizu reference to [the] invention of the '240 patent." (D.I. 185 at 3.)

---

[*16]

3. Occlusion Mode and Safety of Phacoemulsification

Alcon seeks to preclude Dr. Olson from offering testimony "relating to his opinion that Occlusion Mode made phacoemulsification safer, and consequently a mainstream procedure in cataract surgery because it enabled surgeons to rely on the Occlusion Mode feature to prevent the occurrence of thermal injury to the eye." (D.I. 156 at 1.) More specifically, Alcon objects to five opinions on this topic offered in Dr. Olson's report: (i) that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level" (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17); (ii) that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment" (id. at A019); (iii) that "the overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream (id. at A018); and, in the same vein, (iv) that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification [*17] widely available and used by most cataract surgeons in the United States today" (id. at A019); and again (v) that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients" (id.).

Alcon asserts that these opinions rendered by Dr. Olson are "inadmissible because they lack adequate foundation, and therefore fail to 'assist the trier of fact.'" (D.I. 157 at 13.) Specifically, Alcon asserts that they are based in large part on "(1) biased information supplied almost exclusively by AMO attorneys, (2) materials that Dr. Olson himself labels as 'scanty,' (3) a partial analysis of an unpublished survey, and (4) unsupported assumptions that are speculative at best." (Id.)

AMO argues in response that Dr. Olson reviewed whatever publications were available, not merely those provided by AMO, concerning the use of Occlusion

Mode in phacoemulsification, and that "Dr. Olson did not rely on peer-reviewed articles on occlusion mode because none existed." (D.I. 185 at 10, 12.) AMO asserts that reliance on peer-reviewed journals is not a prerequisite [*18] to admissibility and that the articles on which Dr. Olson relied were "written by respected and well-known practitioners in the field." (*Id.*) Further, AMO argues that "Dr. Olson is well qualified to survey fellow practitioners on the incidence of wound burn, and to opine on the value of occlusion mode in reducing it." (*Id.*)

[HN7] "The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *Fed. R. Evid. 702* advisory committee's note. The main issue raised by Alcon is the reliability of the opinions offered by Dr. Olson. Alcon does not challenge Dr. Olson's expertise to offer such opinions, but rather challenges the bases upon which he relies to render them. (See D.I. 207 at 5.) Each challenged opinion is discussed below.

a. That the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level"

Alcon challenges Dr. Olson's opinion that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically [*19] shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level." (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson testified at his deposition that "occlusion mode *could* dramatically decrease wound burn... ." (D.I. 158, Ex. 3 at A183, Dep. of Dr. Olson at 77:5-6, Oct. 11, 2004 (emphasis added).) In his report, Dr. Olson was more emphatic, stating that Occlusion Mode actually did have that effect. (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson indicated that his opinion in this regard is largely based upon his survey. (*See* D.I. 158, Ex. 3 at A182-83, Dep. of Dr. Olson at 76:21-77:6, Oct. 11, 2004.) As discussed earlier, however, *see supra* Part IV.A.1., Dr. Olson's survey did not inquire whether Occlusion Mode was enabled during the procedures being reported, nor did it mention Occlusion Mode at all. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; *see* D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004.) Thus, it is not a reliable basis of support for the type of definitive conclusion rendered in Dr. Olson's report. Dr. Olson will [*20] be permitted to testify as to whether he thinks Occlusion Mode "could" decrease wound burn, based on his years of experience n4 and the various articles he has reviewed, but he cannot testify that Occlusion Mode in fact decreases instances of wound burn because his survey does not provide a reliable basis for such a conclusion, and because, as he admits, "there's basically no studies on this subject or anything." (D.I. 158, Ex. 3 at A145, Dep. of Dr. Olson at 26:24-25, Oct. 11, 2004.)

> n4 Dr. Olson's experience with Occlusion Mode is apparently limited, however, because, as he admits, he does not use Occlusion Mode himself. (D.I. 158, Ex. 3 at A173-74, Dep. of Dr. Olson at 59:25-60:2, Oct. 11, 2004.)

b. "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment."

Alcon challenges Dr. Olson's opinion that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment." (D.I. 158, Ex. 1 at A019, [*21] Dr. Olson's Revised Expert Disclosure at 18.) Alcon asserts that Dr. Olson lacks a reliable basis to conclude what "many" feel about modern phacoemulsification equipment. (D.I. 157 at 18.) At his deposition, however, Dr. Olson testified that he based his opinion on the articles he reviewed in which various experts have stated preferences for Occlusion Mode. Although Dr. Olson has testified that he considers these articles to be "throw-away" articles, in that "you usually look at them, and [then] you throw them away" (D.I. 158, Ex. 3 at A146, Dep. of Dr. Olson at 27:11-12, Oct. 11, 2004), they do provide an adequate basis for this specific opinion. Alcon's citation to *Tuman v. Genesis Associates, 935 F. Supp. 1375, 1385 (E.D. Pa. 1996)*, is unavailing because, as that court held, the expert's opinion was not "fundamentally unsupported." Neither is Dr. Olson's in this instance, and, as such, Alcon's objections go to the weight of Dr. Olson's opinion, not its admissibility.

c. "The overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream."

Alcon's next challenge is to Dr. Olson's [*22] opinions that "the overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Alcon's main objection is that this particular conclusion is misleading "because he overstates his propositions." (D.I. 157 at 18.)

I agree with Alcon that, in light of his deposition testimony, Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and

used by most cataract surgeons in the United States today, Dr. Olson replied, "I think its one of the steps that has made the procedure safer. *There's others,* but in totality, *all of those different steps are the reason why it's the predominant procedure today.*" (D.I. 158, Ex. 3 at A167, Dep. of Dr. Olson at 53:10-13, Oct. 11, 2004 (emphasis added).) Dr. Olson clarifies that it is the totality of "all of those different steps" that has led to phacoemulsification being the predominant procedure today, not just Occlusion Mode.

In light of that [*23] qualification, I do not believe that his testimony will mislead the jury. He will be subject to cross-examination by Alcon, whose efforts will no doubt highlight the limitations Dr. Olson admitted on this point in his deposition. Alcon has not demonstrated that this opinion is inadmissible under *Federal Rule of Evidence 702* and, therefore, he will not be precluded from giving it at trial.

d. "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today."

Alcon makes the same challenge to Dr. Olson's opinion that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Again, I agree with Alcon that Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode made phacoemulsification safer and put the technology in the hands of surgeons who were previously afraid of using phacoemulsification, Dr. Olson replied that ". [*24] .. it is *one of many* features that have made phaco safer... ." (D.I. 158, Ex. 3 at A165, Dep. of Dr. Olson at 51:11-12, Oct. 11, 2004 (emphasis added).) Dr. Olson's testimony indicates that there are other features which contributed to the safety of phacoemulsification as well. However, for the same reasons discussed, *supra* Part IV.A.3.c., Alcon has not demonstrated that this opinion is inadmissible under *Federal Rule of Evidence 702* and, therefore, he will not be precluded from giving it at trial.

e. "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients."

Dr. Olson also opined that Occlusion Mode "put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) When asked whether he was aware of any surgeons who were previously afraid of using phacoemulsification before they could use occlusion mode, Dr. [*25] Olson relied: "I don't have any survey. There's no study or published [sic], so this was just my opinion. I don't have anything other specifically than my opinion for that statement ... if there was scientific literature, if we had studies, if we had -- we don't. I mean, all we have is a few opinions, so therefore, when you have nothing else to depend upon, then you can only use your opinion." (D.I. 158, Ex. 3 at A166-67, Dep. of Dr. Olson at 52:12-53:3, Oct. 11, 2004.) Furthermore, Dr. Olson testified that he believes Occlusion Mode is not used by most surgeons (*id.* at A167, 53:20), but that, in fact, he doesn't "know how many use it and how many do not" (*id.* at A168, 54:17-18). Thus, Dr. Olson admits that he has no reliable basis for this opinion, and, he will be precluded from testifying to it at trial.

4. Maximizing Air Removal

Alcon seeks to preclude Dr. Olson from offering testimony "related to his opinion that [the '765 patent] disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg [*26] or higher while maintaining chamber stability." (D.I. 156 at 2.) Alcon asserts that Dr. Olson's opinions on the '765 patent are based on unsupported suppositions as opposed to facts (D.I. 157 at 19), and that he lacks the necessary experience to offer expert testimony on fluidics devices (D.I. 207 at 10-11).

In response, AMO asserts that Dr. Olson's opinions are based on his knowledge and experience of using phacoemulsification devices in the field of opthalmological surgery. (D.I. 185 at 12-13.) Thus, AMO argues that Dr. Olson's testimony meets the threshold of admissibility. (*Id.* at 13.)

In *Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 324 (3d Cir. 2003)*, the Third Circuit noted that although a proffered expert has "extensive experience with jet skis," his testimony on the safety of an accelerating mechanism was properly excluded because the expert "had no education or experience in product design of jet skis or accelerating mechanisms; nor did he provide scientific, statistical or other evidence evaluating the relative safety of different jet ski models or the accelerating mechanisms." Similarly, Dr. Olson's qualifications as a renowned ophthalmologist [*27] are not questioned, but he is not qualified to render an opinion on fluidics systems or chamber stability. He is not an engineer and has not conducted any studies to analyze whether different systems can achieve an aspiration level of 500 mmHg while maintaining excellent chamber stability. (D.I. 158, Ex. 3 at A203, Dep. of Dr. Olson at 136:15, Oct. 11,

2004.) Thus, like the expert in *Calhoun*, Dr. Olson would be outside his area of expertise if permitted to testify in this regard. Accordingly, he will be precluded from so testifying. "While [his] . . . background, education, and training may provide [him] with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun, 350 F.3d at 322.*

B. Mr. Walbrink

Alcon seeks to exclude three discrete areas of testimony by Mr. Walbrink. (D.I. 160.)

1. Infringement Opinions

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on infringement of the '240 and '765 patents by Alcon's phacoemulsification systems, the Legacy with Advantec and the Infiniti. (D.I. 160 at 1.) Alcon argues that Mr. Walbrink's testimony contravenes *Rule* [*28] *702* because his opinions on infringement "are pulled directly from litigation positions crafted by AMO's attorneys, as opposed to conclusions drawn from his own independent assessment of the claims at issue." (D.I. 161 at 6.)

In response, AMO asserts that *Federal Rule of Civil Procedure 26(a)(2)(B)* "does not preclude counsel from providing assistance to experts in preparing [the expert's] report." (D.I. 186 at 4 (quoting *Fed. R. Civ. P. 26(a)(2)(B)* advisory committee's note).) Furthermore, AMO argues that Mr. Walbrink did not merely adopt the opinions of AMO's counsel, but rather "engaged in extensive telephone conversations with AMO counsel regarding claim interpretation" (*id.* at 13) and "participated in the compilation, drafting, editing, and organization of his report" (*id.* at 15).

Alcon's position is untenable. It admits that *Rule 26* does not preclude counsel from assisting an expert in preparing a report, but it argues that Mr. Walbrink's report merely represents the substantive conclusions of counsel. (D.I. 161 at 5-6.) Alcon's citations to cases in which expert reports were excluded are [*29] distinguishable from the facts of this case because Mr. Walbrink did contribute his expertise to the drafting of the report. *See Crowley v. Chait, 322 F. Supp. 2d 530, 543 (D.N.J. 2004)* (noting that counsel may not draft the entire report without prior "substantive input" from the expert); *Stein v. Foamex Int'l, Inc., 2001 U.S. Dist. LEXIS 12211, No. CIV A. 00-2356, 2001 WL 936566, at *5 (E.D. Pa. Aug. 15, 2001)* [HN8] (the rules do not permit "blanket adoption of reports prepared by counsel") (internal citation omitted). Mr. Walbrink testified at his deposition as follows:

Q. Would you describe for me the process that you went through to develop the report that we've marked as Exhibit 179. . .

A. First, we discussed the issues at hand.

Q. And when you say "we," you mean you and Ms. Thackray?

A. And Jamie Isbester, as well, collectively. *I drafted some of it, worked on claim construction with one of their other associates* -- I believe his name is Bob -- then met with Gillian, Ms. Thackray, and Jamie Isbester at their facility in Berkeley, and worked for a day, I think, further drafting and pulling it together. And then over the course of several days after that, [*30] there were multiple drafts and revisions, and then we submitted it.

Q. Now, you said you drafted some of it. What parts did you draft?

A. That would be hard because, I mean, *I was involved in most of it.* The claim construction was primarily done by -- I believe it was Bob. But as far as the content of the body of the report, it was a collaborative effort. It would be hard to single out what I did versus someone else.

(D.I. 162, Ex. 3 at A131-32, Dep. of Mr. Walbrink at 22:8-23:5, Oct. 19, 2004 (emphasis added).) The foregoing testimony supports AMO's contention that Mr. Walbrink collaborated with AMO's counsel and was involved in the creation of his expert report. Thus, Mr. Walbrink's testimony on infringement cannot be excluded as simply reflecting the opinions or work product of AMO's counsel.

2. Commercial success of AMO's systems

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on the commercial success of AMO's two phacoemulsification systems, the Diplomax and the Sovereign, because his opinion is based solely on what AMO's counsel has told him and is therefore unreliable. (D.I. 161 at 9.) Further, Alcon argues that [HN9] *Rule 26(a)(2)(B)* [*31] requires that an expert's report "contain a complete statement of all opinions to be expressed *and the basis and reasons thereof.*" (D.I. 208 at 9 (quoting *Fed. R. Civ. P. 26(a)(2)(B)*) (emphasis added).) Thus, Alcon asserts that the four new bases for his opinion identified in the declaration he submitted after his

Case 1:04-cv-01278-KAJ    Document 225-6    Filed 10/26/2005    Page 11 of 16

Page 10
2005 U.S. Dist. LEXIS 5803, *

deposition and after the close of discovery should not be considered because those reasons were not presented in his Rebuttal Report. (*Id.* at 9.)

In response, AMO asserts that "counsel for Alcon failed to develop further testimony regarding the content of Mr. Walbrink's discussions with AMO's counsel and failed to acknowledge the further bases set forth in Mr. Walbrink's Rebuttal Report... ." (D.I. 186 at 17.) AMO points to Mr. Walbrink's statement in his Rebuttal Report that "it would appear to me, as discussed in my opening report on infringement, that the Advantec upgrade to Alcon's Legacy model and the Infinity model of phacoemulsification machines have adopted the exact same technology" (D.I. 162, Ex. 2 at A99-100, Rebuttal Report of Mr. Walbrink at 14-15) as a basis for his opinion on commercial success. (D.I. 186 at [*32] 17-18.) Additionally, AMO notes that Mr. Walbrink's declaration further discusses the bases for his opinion. (*Id.* at 18.)

[HN10] Under *Rule 26(a)(2)(B)*, an expert's report must contain "the basis and reasons" for the expert's opinions. It is clear that none of Mr. Walbrink's Reports submitted during discovery contains the challenged reasons on which he now seeks to rely for his opinion on commercial success attributable to Occlusion Mode. Thus, based on *Rule 26(a)(2)(B)*, Mr. Walbrink's Rebuttal Report is critically deficient in this regard. At his deposition, Mr. Walbrink testified as follows:

> Q. Sure. It's at the bottom of page 14. You say, "it is my understanding that the occlusion mode has been an important feature of two successful phacoemulsification machines sold by AMO, the Diplomax line and the Sovereign line." Did I read that correctly?
>
> A. Yes.
>
> Q. What is the basis for that statement?
>
> A. *Discussions with counsel. And I can't tell you what else may have been considered in that.*
>
> Q. So the only basis, as you sit here today, that you can identify is that AMO's counsel told you that, right?
>
> A. *That's all I can identify today, yes.*

(D. [*33] I. 162, Ex. 3 at A163-64, Dep. of Mr. Walbrink at 197:19-198:7, Oct. 19, 2004 (emphasis added).)

The foregoing shows that the only disclosed basis Mr. Walbrink had for this opinion was the "discussions [he had] with [AMO's] counsel." (*See id.*) Therefore, Mr. Walbrink's deposition cannot cure the deficiency of his Rebuttal Report. n5 If there were other bases for Mr. Walbrink's opinion, they were not disclosed as required. Simply claiming to have an understanding, without providing the bases for that understanding, fails to meet the disclosure requirements of the Federal Rules of Civil Procedure.

> n5 This is not meant to say that if Mr. Walbrink had testified to other bases, such testimony would necessarily have been sufficient under *Rule 26(a)(2)(B)* to remedy his deficient expert report.

Mr. Walbrink's last ditch declaration (D.I. 189) does not remedy this deficiency, for at least two reasons. First, it was submitted long after the close of discovery, as an exhibit to AMO's Answering Brief on this motion. [*34] (D.I. 186.) I agree with Alcon that acceptance of such a late submission would be unfairly prejudicial and would make "a mockery of the Rules' requirements for discovery and expert disclosure." (See D.I. 208 at 9.) Second, Mr. Walbrink has admitted that he is "not versed in the financial aspects of these products," yet he purports to offer four reasons for his opinion, each of which relate to the financial aspects of AMO's products. He cannot disclaim expertise in an area and then opinion on it. Thus, for these independent reasons, Mr. Walbrink will be precluded from testifying on the issue of commercial success.

3. The '765 patent and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability

Alcon asserts that Mr. Walbrink should be precluded from testifying that "the Sovereign fluidics system, incorporating the invention of the '765 patent, was the first phacoemulsification system to achieve the 500 mg [sic] Hg aspiration level while maintaining excellent chamber stability" because his opinion is based solely on AMO's brochures and promotional materials and Dr. Olson's opinion. (D.I. 161 at 9-10.)

In response, AMO asserts that Mr. Walbrink's opinion [*35] was based on his review of product brochures and promotional materials, the expert report of Dr. Olson, his background and experience, many hours of deliberation, and his examination of Alcon's Infiniti system. (D.I. 186 at 19.) AMO argues that these matters are the proper subject of cross-examination before the jury, not "the basis for a motion to exclude." (*Id.* at 21.) I disagree.

First, Alcon correctly notes that Mr. Walbrink's opinion is directed to AMO's Sovereign system, not Alcon's Infiniti system, and that Mr. Walbrink's examination of the Infiniti system does not provide a reliable basis for his conclusions regarding the Sovereign system. Second, Mr. Walbrink admitted in his deposition testimony that he "has not used the Sovereign." (D.I. 162, Ex. 3 at A154, Dep. of Mr. Walbrink at 142:6, Oct. 19, 2004.) Third, he testified that he only has "incidental knowledge" of the Sovereign system, which he gained by reading Dr. Olson's expert report and "brochures or promotional materials" provided exclusively by AMO. (*Id.* at A154, 142:13, 19.) But as earlier discussed, *supra* Part IV.A.4., Dr. Olson will be precluded from testifying about the invention in the '765 patent [*36] achieving an aspiration level of 500 mmHg while maintaining chamber stability. Thus, all that remains as Mr. Walbrink's basis for his opinion are the brochures or promotional materials provided exclusively by AMO. As noted in *Tuman*, [HN11] an expert's testimony may be unreliable if the expert "relied almost exclusively on information from one source who was clearly biased." *Tuman, 935 F. Supp. at 1385* (internal citations omitted). This is such a case. The only remaining basis for this opinion from Mr. Walbrink is information that was provided exclusively by AMO, a party to the case. Thus, Mr. Walbrink will be precluded from testifying with regard to the achievement of an aspiration level of 500 mmHg while maintaining chamber stability.

## V. CONCLUSION

Based on the foregoing reasons and authorities, Alcon's motion to exclude the testimony of Dr. Olson (D.I. 156) will be granted in part and denied in part, and Alcon's motion to exclude the testimony of Mr. Walbrink (D.I. 160) will be granted in part and denied in part. An appropriate order will follow.

## ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED [*37] that the Defendants' motion to exclude the testimony of Dr. Olson (D.I. 156) is GRANTED IN PART, to the extent that Dr. Olson will not be permitted to offer testimony on the analysis of sales and market trends for phacoemulsification machines, infringement by Defendants of the '240 or '765 patent, that Occlusion Mode in fact decreases instances of wound burn, that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients," and that the '765 patent disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg or higher while maintaining chamber stability, and DENIED IN PART, as to the remainder of Dr. Olson's opinions which have been challenged by Defendants.

Further, IT IS ORDERED THAT Defendants' motion to exclude the testimony of Mr. Walbrink (D.I. 160) is GRANTED IN PART, to the extent that Mr. Walbrink will not be permitted to offer testimony on the issue of commercial [*38] success and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability, and DENIED IN PART, as to the remainder of Mr. Walbrink's opinions which have been challenged by Defendants.

Kent Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
April 7, 2005

LEXSEE 1997 US DIST LEXIS 8016

SUSAN ALLEN, GEORGE P. ALLEN, and PATRICIA MATHIS, Plaintiffs, v. INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.

Civil Action No. 94-264-LON

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1997 U.S. Dist. LEXIS 8016

May 19, 1997, Decided

**DISPOSITION:** [*1] Defendant's motion to exclude plaintiffs' experts GRANTED in part and DENIED in part. Defendant's motion for summary judgment GRANTED. Plaintiffs' entire action DISMISSED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant manufacturer sought both to exclude plaintiff injured parties' expert witnesses as well as summary judgment with respect to injured parties' products liability action, in which they asserted claims of negligence, strict liability, loss of consortium, and punitive damages regarding the wrist injuries they suffered allegedly as the sole result of typing on computer keyboards produced by manufacturer.

**OVERVIEW:** The court partially approved manufacturer's motion to exclude the expert witnesses to the extent that the witnesses failed to meet the Daubert/Paoli standards. The court specifically excluded the industrial engineer and the human factors psychologist, noting the lack of connection between the scientific research or test to be presented and the particular disputed factual issues in the case. The court further noted that expert testimony was properly admissible where it was based on facts, rather than premised on unsupported assumptions and speculation. The court then held that an individual injured party's claim was properly subject to summary judgment because it was time-barred, as the statute of limitations had been triggered on the date of that individual's first manifestation of plan. The court concluded that dismissal of the entire action was appropriate where manufacturer was entitled to summary judgment on the design defect and duty to warn claims, noting that injured parties failed to show the existence of a defect in the keyboards that caused their wrist injuries or that the product was inherently dangerous, such that manufacturer had a legal duty to warn.

**OUTCOME:** Although the court granted the motion to exclude the industrial engineering expert and the human factors psychology expert, the court denied the motion to exclude with respect to the other experts. Nevertheless, the court granted summary judgment as to an individual claim for being time-barred under the applicable statute of limitations, and as to the claims of design defect and duty to warn, with the result that the entire action was dismissed.

**CORE TERMS:** keyboard, warning, disorder, causation, methodology, musculoskeletal, symptom, carpal tunnel syndrome, scientific, manufacturer, disease, typing, repetitive, exposure, ergonomic, admissibility, duty to warn, occupational, cumulative, proffered testimony, trauma, doctor, design defect, measurement, expert testimony, reliable, epidemiologist, summary judgment, reliability, proffered

LexisNexis(R) Headnotes

*Torts > Damages > Consortium Damages*
*Torts > Damages > Punitive Damages*
[HN1] Claims for loss of consortium and punitive damages are dependent upon the survival of the negligence claim.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN2] Fed. R. Civ. P. 56(c) provides that a party is entitled to summary judgment where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*

[HN3] Although the party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, papers and documents on file, including affidavits, which demonstrate the absence of a genuine issue of material fact, where the non-moving party opposing summary judgment has the burden of proof at trial on the issue for which summary judgment is sought, he must then make a showing sufficient to establish the existence of an element essential to his case. In other words, that there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. If the non-moving party fails to make such a showing, then the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN4] Factual disputes that are irrelevant or unnecessary will not be counted. The mere existence of a scintilla of evidence in support of the non-moving party will not prevent the grant of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on that issue. Mere speculation or conjecture by the non-moving party clearly cannot preclude the granting of summary judgment. Thus, a court may render summary judgment as a matter of law only in those instances where there are no issues of fact and no conflicting inferences.

*Evidence > Witnesses > Expert Testimony*
[HN5] The district court's role with respect to the admissibility of expert testimony is that of "gatekeeper," ensuring that the methodology upon which the expert opinion is based is reliable; that is, that the expert's conclusion is premised upon the methods and principles of science.

*Evidence > Procedural Considerations > Preliminary Questions*
*Evidence > Witnesses > Expert Testimony*
[HN6] Fed. R. Evid. 702, which governs testimony by experts, requires that: (1) the proffered witness must be an expert (qualified); (2) the expert must testify to scientific, technical or specialized knowledge (reliable); and (3) the expert's testimony must assist the trier of fact (relevance). Fed. R. Evid. 104(a) mandates that district courts make preliminary determinations concerning the qualification of a person to be a witness, and the admissibility of evidence. Thus, a district court faced with a proffer of expert testimony must make a preliminary determination of all of the aforementioned elements of Fed. R. Evid. 702, in an effort to ensure both the reliability and relevance of the expert testimony.

*Evidence > Witnesses > Expert Testimony*
[HN7] Fed. R. Evid. 702 specifically provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Requisite one of Fed. R. Evid. 702, that the proposed witness be an expert, is construed liberally by the Third Circuit. In fact, the Third Circuit holds that a broad range of knowledge, skills, and training qualify an expert as such," and has "eschewed imposing overly rigorous requirements of expertise. However, the level of expertise may affect the reliability of an expert's opinions under the second and third elements of Fed. R. Evid. 702.

*Evidence > Procedural Considerations > Preliminary Questions*
*Evidence > Witnesses > Expert Testimony*
[HN8] Fed. R. Evid. 702's second requirement, that the expert testify to scientific, technical or other specialized knowledge, is designed to ensure the trustworthiness or reliability of the expert's testimony. Under Daubert, a district court presented with a proffer of expert "scientific" testimony must make a preliminary assessment of whether the reasoning or methodology of the underlying testimony is scientifically valid by considering all factors related to the proffered testimony's reliability. If an expert has "good grounds" for his testimony, thus basing his opinion on the methods and procedures of science rather than on subjected belief or unsupported speculation, that scientific evidence is deemed sufficiently reliable. The Third Circuit specifically admonishes against applying the reliability requirement too strictly, explaining that the requirement must not be used as a tool by which the court excludes all questionably reliable evidence. The ultimate touchstone of admissibility is helpfulness to the trier of fact.

*Evidence > Procedural Considerations > Preliminary Questions*
*Evidence > Witnesses > Expert Testimony*
[HN9] Several factors are to be considered in the preliminary determination of the reliability of scientific testimony, including, but not limited to: (1) whether the method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the

expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Evidence > Witnesses > Expert Testimony*
[HN10] The final requirement of Fed. R. Evid. 702 addresses the relevancy of the evidence, ensuring that the evidence "fits" under the facts of the case -- i.e., that there is a valid connection between the scientific research or test result to be presented (expertise) and the particular disputed factual issues in the case. Therefore, to satisfy the helpfulness standard under Rule 702, a valid scientific bridge must exist under this pertinent inquiry as a precondition for the evidence to be admissible. The fit standard requires more than bare relevance -- a prima facie showing that the technique is reliable is insufficient. To meet this requirement, the party introducing the proffered testimony must demonstrate by a preponderance of the evidence that its experts' opinions are reliable. In other words, that they are based on "good grounds." Therefore, the Daubert analysis focuses solely on the principles and methodology, and not on the conclusions generated.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Witnesses > Expert Testimony*
[HN11] Although evidence may meet the parameters of Fed. R. Evid. 702, it still must satisfy Fed. R. Evid. 403, which mandates that a district court consider whether the admission of proffered testimony might confuse or overwhelm the jury. As a result, the balancing test of probative versus judicial value of evidence under Fed. R. Evid. 403 is particularly significant when evaluating expert testimony. A district court cannot exclude a scientific technique as too confusing and overwhelming simply based on its conclusion that scientific techniques by their very nature confuse and overwhelm the jury. There must be something about the particular scientific technique such as its posture of mythic infallibility that makes it especially overwhelming. Consequently, in order for a district court to exclude scientific evidence, there must be something particularly confusing about the scientific evidence at issue.

*Evidence > Witnesses > Expert Testimony*
[HN12] Although a court's gatekeeping role is the primary focus of Fed. R. Evid. 702, this purpose permeates the other Federal Rules of Evidence. Therefore, when a trial judge is required to analyze whether an expert's data is the kind upon which other experts would reasonably rely, to satisfy Fed. R. Evid. 703 the court now must assess whether there are good grounds to rely on this data to draw the conclusion reached by the testifying expert. Whether experts in the field rely on this type of data will simply continue to be part of the judge's analysis. Therefore, the dichotomy of admissibility between Fed. R. Evid. 702 and 703 has been eliminated.

*Torts > Procedure > Statutes of Limitations*
[HN13] According to Del. Code Ann. tit. 10, § 8119, the statute addressing time limitations for the filing of personal injury claims, no action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of two years from the date upon which it is claimed that such alleged injuries were sustained; subject, however, to the provisions of Del. Code Ann. tit. 10, § 8127.

*Torts > Procedure > Statutes of Limitations*
[HN14] A plaintiff's first manifestation of pain -- rather than the date of a definitive diagnosis -- triggers the statute of limitations clock.

*Torts > Procedure > Statutes of Limitations*
[HN15] Commencement of the running of the statute does not depend on when a diagnosis is made or a "cure" effected. If it did, the statute would never start in some cases. The statute starts, rather, when a harmful effect first manifests itself and becomes physically ascertainable. In short, manifestation of the problem, not its cure, is the test under Layton.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
[HN16] Fed. R. Evid. 403 is rarely appropriate for pretrial exclusion, because a judge cannot ascertain potential relevance until that judge has a virtual surrogate for a trial record.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Civil Procedure > Trials > Motions In Limine*
*Evidence > Witnesses > Expert Testimony*
[HN17] For exclusion of scientific evidence under Fed. R. Evid. 403, there must be something particularly confusing about the scientific evidence at issue, with "that something" being more than the complexity of such scientific evidence in general. Consequently, to the extent that the balancing "helpfulness" test of Fed. R. Evid. 702 and 403 overlap, when that test is employed under Fed. R. Evid. 702, as with under Fed. R. Evid. 403, it would appear that an in limine hearing is required.

*Evidence > Witnesses > Expert Testimony*
[HN18] Daubert's standards are clear: the expert must testify to scientific knowledge -- conclusions supported by good grounds for each step in the analysis -- meaning that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inad-