LEXSEE 2005 US DIST LEXIS 15718

**LOEFFEL STEEL PRODUCTS, INC., Plaintiff, vs. DELTA BRANDS, INC., d/b/a DBI; and SAMUEL F. SAVARIEGO, individually, Defendants.**

No. 01 C 9389

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2005 U.S. Dist. LEXIS 15718*

**July 22, 2005, Decided**
**July 22, 2005, Filed**

**SUBSEQUENT HISTORY:** Partial summary judgment denied by, Motion to strike denied by *Loeffel Steel Prods. v. Delta Brands, Inc., 2005 U.S. Dist. LEXIS 15278 (N.D. Ill., July 28, 2005)*

**PRIOR HISTORY:** *Loeffel Steel Prods. v. Delta Brands, 372 F. Supp. 2d 1104, 2005 U.S. Dist. LEXIS 11601 (N.D. Ill., 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a motion to bar the testimony of the defendants' damages expert.

**OVERVIEW:** Plaintiff challenged the expert's qualifications to offer expert opinion on economic loss and his methodology and definition of economic loss. Plaintiff also contended that the expert should not be allowed to testify because of his unquestioning reliance on the defendants' theory that the deficiencies in the Line could be cured by the addition of extra workers and additional shifts. Lastly, the plaintiff contended that the expert should not be allowed to testify about plaintiff's damages expert's analysis, because his critique did not comply with *Fed. R. Civ. P. 26(a)(2)(B)*. The court found that the expert's damage model and calculation of economic loss suffered because they violated of *Fed. R. Evid. 703*. The court reasoned that it was undisputed that neither the expert nor his assistants had any expertise in blanking machines and were incapable of assessing the validity of the information provided by the defendants. Finally, the court found that Rule 26(a)(2)(B) was violated where the expert failed to disclose that the Analysis of Economic Loss was based entirely upon a theory given to him by the defendants.

**OUTCOME:** Plaintiff's motion was granted.

**CORE TERMS:** steel, economic loss, metal, deposition, customer, machine, processing, expertise, expert testimony, reliability, comparable, methodology, declaration, calculation, expert witness, valuation, reliable, certified public accountant, coil, economist, steel industry, deposition testimony, publicly traded, appraiser, automotive, qualification, geographic, supplied, financial data, gauge

LexisNexis(R) Headnotes

*Evidence > Procedural Considerations > Preliminary Questions*
*Evidence > Witnesses > Expert Testimony*
[HN1] In the context of determining the admissibility of expert testimony, the United States Supreme Court stressed the trial judge's obligation to act as a gatekeeper to ensure that expert testimony is reliable. The insistence on reliability helps to ensure the integrity of the judicial process. That goal is of such obvious and transcendent importance that judges can act sua sponte to prohibit testimony that does not pass muster under the Daubert standard.

*Evidence > Procedural Considerations > Preliminary Questions*
*Evidence > Witnesses > Examination & Presentation of Evidence*
*Evidence > Witnesses > Expert Testimony*
[HN2] In the context of determining the admissibility of expert testimony, while Daubert reaffirmed the value of the adversary system generally and the capability of juries to understand scientific evidence and weigh the credibility of the competing experts, with their often absolutist and clashing conclusions, it also made clear that in those cases in which the proponent of an expert could not demonstrate the reliability of the methodology em-

ployed by the expert, the court was required to disallow the testimony. The opportunity for vigorous cross examination and the presentation of contrary evidence - the traditional and appropriate means of attacking shaky but admissible evidence, is not a basis for allowing otherwise inadmissible testimony to be admitted.

*Evidence > Witnesses > Expert Testimony*
[HN3] In the context of determining the admissibility of expert testimony, the Daubert factors are not applicable, semper ubique et ab omnibus. They need only be considered when doing so will aid in the determination of the testimony's reliability. The inquiry is always, and of necessity, highly fact- specific, and no one factor, even when applicable, is outcome-determinative.

*Evidence > Witnesses > Expert Testimony*
[HN4] In the context of determining the admissibility of expert testimony, Daubert cautions judges assessing a proffer of expert testimony under *Fed. R. Evid. 702* to be mindful of other applicable rules, such as *Fed. R. Evid. 703*, which permits an expert to base an opinion on information that need not itself be admissible, so long as it is the kind of information relied on by other experts in the field.

*Evidence > Witnesses > Expert Testimony*
[HN5] In the context of determining the admissibility of expert testimony, overemphasis on qualifications over testimonial reliability reflects a pre-Daubert sensibility.

*Evidence > Witnesses > Expert Testimony*
[HN6] In the context of determining the admissibility of expert testimony, no case holds that only a certified public accountant has the necessary expertise to testify about economic loss. In fact, being a certified public accountant does not ensure admissibility of testimony.

*Evidence > Witnesses > Expert Testimony*
[HN7] Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.

*Evidence > Witnesses > Expert Testimony*
[HN8] While the Daubert factors apply to valuation testimony, whether offered by certified public accountants or economists, the Daubert factors are not to be rigidly applied in this or any other context. In some context, they may not be applicable at all or may have diminished utility as measures of reliability. Some courts have held they do not conform easily to an analysis of economic theory. In determining the admissibility of expert testimony with respect to future lost profits, a trial judge has considerable leeway in determining the testimony's reliability.

*Commercial Law (UCC) > Sales (Article 2) > Remedies Contracts Law > Remedies > Foreseeable Damages*
[HN9] Both contract law and the Uniform Commercial Code provide the appropriate remedy for "economic loss" occasioned by diminished commercial expectations, not coupled with injury to person or property. Generally speaking, a defective product can cause three types of injury: personal injury, property damage, and economic loss. "Economic loss" has been defined as damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits - without any claim of personal injury or damage to other property as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN10] The Uniform Commercial Code provides that the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. *810 Ill. Comp. Stat. 5/2-714(2)*. In addition, a party may also recover incidental and consequential damages, *810 Ill. Comp. Stat. 5/2-715*, including lost profits.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN11] The victim of a fraudulent misrepresentation is entitled to recover as damages those losses caused by the misrepresentation, including the difference between the value of what he has received in the transaction, and its purchase price or other value given for it.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN12] The benefit of the bargain rule provides that the measure of damages is the difference between the actual value of what plaintiff received and its value had the representations been true.

*Evidence > Witnesses > Expert Testimony*
[HN13] Expert opinions that are contrary to law are inadmissible. They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact.

*Legal Ethics > Client Relations > Effective Representation*
[HN14] There is more in membership in the Bar than a license to sign a brief or intone a prosy argument. Justice is not a game, and zealous advocacy does not entitle a

lawyer to hoodwink a judge or an opponent who is not overwise.

*Evidence > Witnesses > Expert Testimony*
[HN15] See *Fed. R. Evid. 703.*

*Evidence > Witnesses > Expert Testimony*
[HN16] *Fed. R. Evid. 703*'s relaxation of the usual requirement of firsthand knowledge - a rule which represents a pervasive manifestation of the common law's insistence upon the most reliable sources of information - was premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

*Evidence > Witnesses > Expert Testimony*
[HN17] While *Fed. R. Evid. 703* was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.

*Evidence > Witnesses > Expert Testimony*
[HN18] Under *Fed. R. Evid. 703*, an expert may rely on hearsay in formulating his opinion - provided the requirements of *Fed. R. Evid. 702* are met - but the evidence is not admissible for the truth of the matters asserted.

*Evidence > Witnesses > Expert Testimony*
[HN19] *Fed. R. Evid. 703* was never intended to allow oblique evasions of the hearsay rule. The United States Court of Appeals for the Seventh Circuit acknowledged that it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert.

*Evidence > Witnesses > Expert Testimony*
[HN20] A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science. An expert's "professional knowledge and ability" must be adequate to evaluate calculations and opinions upon which he based his opinion.

*Evidence > Witnesses > Expert Testimony*
[HN21] The rationale of *Fed. R. Evid. 703* is certainly not satisfied where the expert fails to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to

be an expert who had a financial interest in making an accurate prediction.

*Evidence > Witnesses > Expert Testimony*
[HN22] In the context of determining the admissibility of expert testimony, in calculating lost future profits or lost business, the measure of damages is guided by analysis of comparable businesses in the area. The business used as a standard must be as nearly identical to the plaintiff's as possible. This is often referred to as the "yardstick approach." Absent the requisite showing of comparability, a damage model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural. Of course, exact correlation is not necessary but the samples must be fair congeners. If they are not, the comparison is manifestly unreliable and cannot logically advance a material aspect of the proposing party's case. The United States Supreme Court refers to this second prong of the Daubert analysis as the fit requirement.

*Antitrust & Trade Law > Market Definition*
[HN23] In antitrust cases, proof of the relevant product and geographic market is absolutely essential. A determination of the geographic market must entail an analysis of several factors including the location of competitors and price data.

*Evidence > Witnesses > Expert Testimony*
[HN24] It cannot be too often repeated or too strongly emphasized that nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Evidence > Witnesses > Expert Testimony*
[HN25] In the context of determining the admissibility of expert testimony, spending a few minutes on the internet does not make one an expert on any "industry" or on any topic.

*Evidence > Witnesses > Expert Testimony*
[HN26] In the context of determining the admissibility of expert testimony, even where a witness is an expert in the relevant field, the evidentiary reliability demanded by Daubert is not present when his or her opinion is speculative or rests on an unsound basis.

*Evidence > Witnesses > Expert Testimony*
[HN27] Daubert requires that trial judges must ensure that any and all expert testimony is not only relevant, but reliable. To that end, a judge must undertake a preliminary assessment of whether the reasoning or methodol-

ogy underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. The judge must look behind the expert's ultimate conclusion and analyze the adequacy of its foundation. Expert opinion that is speculative is inadmissible.

*Evidence > Witnesses > Expert Testimony*
[HN28] Courts should be particularly wary of unfounded expert opinion when causation is the issue.

*Evidence > Witnesses > Expert Testimony*
[HN29] To be admissible, expert testimony must be not only reliable, but relevant. Testimony is relevant if it assists the trier of fact in understanding the evidence or in determining a fact at issue. An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
[HN30] *Fed. R. Civ. P. 26(a)(2)(B)*, requires that an expert report must disclose a complete statement of all opinions to be expressed and the basis and reasons therefor.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
[HN31] See *Fed. R. Civ. P. 26(a)(2)(B)*.

*Evidence > Witnesses > Expert Testimony*
[HN32] In the context of determining the admissibility of expert testimony, expertise is a rational process, and a rational process implies express reasons for judgment. An expert's opinion full of assertion but empty of reasons has no value and is devoid of persuasiveness and legal significance.

*Evidence > Witnesses > Expert Testimony*
[HN33] An expert witness must demonstrate in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*
[HN34] *Fed. R. Civ. P. 26(a)(2)(B)* requires the disclosure of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years. The report must be detailed and complete. Thus, the cases have generally defined the "listing of cases" requirement to include the name of the court, the name of the parties, the case number, and whether the testimony was given at deposition or trial.

**COUNSEL:** [*1] For Loeffel Steel Products, Inc., Plaintiff: Michael P. Connelly, Matthew Patrick Connelly, William Edward Snyder, Connelly, Roberts & McGivney, Chicago, IL.

For Delta Brands, Inc., Defendant: George N. Vurdelja, Jr., Griswold L. Ware, John M. Heaphy, Vurdelja & Heaphy, Chicago, IL; Randall Edmund Server, Tucker Bower Robin & Romanek, Chicago, IL.

For Samuel F Savariego individually, Defendant: H. N. Cunningham, III, Roberts, Cunningham & Stripling, Dallas, TX; George N. Vurdelja, Jr., Griswold L. Ware, John M. Heaphy, Vurdelja & Heaphy, Chicago, IL; Randall Edmund Server, Tucker Bower Robin & Romanek, Chicago, IL.

For Delta Brands, Inc., Counter Claimant: George N. Vurdelja, Jr., Griswold L. Ware, John M. Heaphy, Vurdelja & Heaphy, Chicago, IL; Randall Edmund Server, Tucker Bower Robin & Romanek, Chicago, IL.

For Loeffel Steel Products, Inc., Counter Defendant: Michael P. Connelly, Matthew Patrick Connelly, William Edward Snyder, Connelly, Roberts & McGivney, Chicago, IL.

For Delta Brands, Inc., ThirdParty Plaintiff: George N. Vurdelja, Jr., Griswold L. Ware, John M. Heaphy, Vurdelja & Heaphy, Chicago, IL; Randall Edmund Server, Tucker Bower Robin & Romanek, [*2] Chicago, IL.

For Samuel F Savariego, ThirdParty Plaintiff: H. N. Cunningham, III, James C. Baker, Roberts, Cunningham & Stripling, Dallas, TX; George N. Vurdelja, Jr., Griswold L. Ware, John M. Heaphy, Vurdelja & Heaphy, Chicago, IL; Randall Edmund Server, Tucker Bower Robin & Romanek, Chicago, IL.

For Industrial Magnetics Inc, Third Party Defendant: Charles J. Risch, John Scott Monical, Paul Michael Weltlich, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, IL.

**JUDGES:** Magistrate Judge Jeffrey Cole.

**OPINIONBY:** Jeffrey Cole

**OPINION:**

### MEMORANDUM OPINION AND ORDER

### INTRODUCTION

On June 9, 2005, I denied the Defendants' Motion to Bar the testimony of Loeffel Steel Products' expert liability witness, Mr. Rudolph Toczyl. *See Loeffel Steel Prod-*

ucts v. Delta Brands, 372 F. Supp. 2d 1104, 2005 WL 1388076 (N.D.Ill. 2005). The history of the parties' dispute is discussed in that opinion and need not be repeated. I address here the plaintiff's motion to bar the testimony of the defendants' damages expert, Mr. Robert Dohmeyer and Dohmeyer Valuation Corporation ("DVC").

Like Gaul, Mr. Dohmeyer's expert opinion and report may be divided into three parts. The first is a "preliminary critique" [*3] of the report of Loeffel's damage expert, William Wiersema, contained in a letter dated February 27, 2004. The second and third components are contained in a separate, 41 (unnumbered) page document captioned, "Analysis of Economic Loss." ("the Analysis"). It, too, was dated February 27th.

The Analysis was a compendium of spreadsheets, reflecting 1) Mr. Dohmeyer's calculations of the $ 248,000 economic loss he concluded was suffered by Loeffel, and 2) charts and graphs reflecting financial data for the period 1999 - 2002 for Loeffel and for eight, large, publicly traded companies, which were supposed to depict the economic conditions in the steel industry at that time.

Loeffel's present motion challenges Mr. Dohmeyer's qualifications to offer expert opinion on economic loss and his methodology and definition of economic loss, which Loeffel argues did not comply with the four, nondefinitive factors that Daubert said a court could use in determining testimonial reliability. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). Loeffel also contends that Mr. Dohmeyer should not be allowed to testify because of his unquestioning reliance on the defendants' [*4] theory that the deficiencies in the Line could be cured by the addition of extra workers and additional shifts. n1 Lastly, the motion contends that Mr. Dohmeyer should not be allowed to testify about Mr. Wiersema's damage analysis, because his critique of February 27, 2004 did not comply with Rule 26(a)(2)(B).

n1 Literally every facet of this labor-added theory and every bit of information regarding alleviation of the Line's problems - as well as information regarding prior claimed fixes - came from the defendants' employees. (Dohmeyer Dep., at 26-39, 42-45, 55-57, 61-63, 109). The Line is the Rotary Shear Multi-blanking machine that Loeffel purchased from Delta Brands.

I

FACTUAL BACKGROUND

Prior to preparing his February 27th "preliminary critique" and his Analysis, Mr. Dohmeyer (and/or his two assistants at DVC) reviewed Loeffel's financial statements for the fiscal years ending November 30, 1999 through November 30, 2002, reviewed the deposition testimony of Loeffel's president, Maurice Loeffel [*5] and that of Mr. Wiersema, compiled financial data from annual 10k reports and Standard & Poor's Stock Reports on eight large publicly traded companies in what Mr. Dohmeyer categorized as the "(steel) metals industry," and interviewed the defendants' employees. n2 As we shall see, these interviews would play a pivotal role in Mr. Dohmeyer's analysis of Loeffel's "economic loss."

n2 Although its title suggested that a more comprehensive and edifying analysis was to come, the "preliminary critique" underwent not a single change.

The Analysis concluded that Loeffel had damages prior to August of 2003 of $ 280,000, damages thereafter of $ 142,339, and lost profits of $ 50,000. The Analysis itself has no textual elaboration or explanation, and the reader is left to divine its meaning from the headings, captions, and the figures on its charts and spreadsheets. A meaningful understanding can only be gained by reference to Mr. Dohmeyer's deposition testimony. The Analysis's damage spreadsheets differentiated between pre- [*6] and post-August 2003 because, as Mr. Dohmeyer later explained, he assumed - based upon what he had been told by the defendants' employees - that the trouble with the magnets in the stacker had been alleviated or nearly so. (Dohmeyer Dep., at 39, 42-43). The Analysis then discounted the figures by $ 225,000, which represented the amount of the purchase price held back by Loeffel.

The Analysis's second and core assumption was provided by defendants' employees, who assured Mr. Dohmeyer that the various deficiencies in the Line could be offset by adding two additional workers to production runs and increasing the number of shifts. Using this methodology, and based on his conclusions about "industry" conditions between 1999 and 2002 - as reflected by the financial data of eight publicly traded companies - Mr. Dohmeyer concluded that Loeffel's lost profits could not exceed $ 50,000.

The Analysis begins with an estimate of the hourly wages of the two additional workers, based upon the rates in Texas, where the defendants were located. Adjusting those rates - $ 13.00 for an operator and $ 7.50 for a helper - to what would be comparable in the Chicago area, Mr. Dohmeyer arrived at a total [*7] of $ 26.65 for both positions. Factoring in benefits left the

combined rate at $ 39.98, which Mr. Dohmeyer arbitrarily increased to $ 50.00 per hour. Over the 702 days Loeffel ran the machine prior to August of 2003, based upon one eight-hour shift per day, Mr. Dohmeyer arrived at a maximum "economic loss" figure of $ 280,000, the amount that would compensate the two additional workers for the relevant period. (Analysis at 2; Dohmeyer Deposition at 26, 30, 33).

Mr. Dohmeyer then calculated future damages over a ten-year life of the Line, beginning in August of 2003. He began with the assumption, again based on what he was told by the defendants' employees, that Loeffel could process ten coils of steel on the Line every eight- hour shift. The "economic loss" figure was based on the defendants' assessment of the processing time. (Dohmeyer Deposition at 63-64). For this period, he was told by the defendants that an additional five minutes of labor per coil would alleviate any problems remaining with the Line during that period. n3 Once again this was based on the twin assumptions that the problems with the stacker's magnets had been responsible for the vast majority of the deficiencies, [*8] and that these problems had been rectified by August, 2003. (Dohmeyer Dep., at 39, 42-43).

          n3 Each coil of steel weighs as much as 60,000 lbs.

The five-minute estimate was a product of the defendants' assurances that the remaining problem - leveling the steel - could be corrected manually in 30 seconds to one minute per coil, which Mr. Dohmeyer rounded up to five minutes to be "conservative." (Dohmeyer Deposition at 62-63). This amounted to fifty minutes of labor per shift which he rounded up to an hour. This figure was then multiplied by 468 shifts per year over the ten-year period. Discounting the resulting sum to account for present value, cost of capital, and inflation, Mr. Dohmeyer arrived at $ 142,339 for future damages. (Analysis at unnumbered p. 3).

The lost profits calculations are a bit more difficult to discern, as the Analysis simply says under the captioned "Lost Business (Max)":

          Lost Business (Economic Profits - August 2003 > .10 Gauge $ 50,000 60" Inch Line Sold in February 2003

(Analysis [*9] at unnumbered page 5). The footnote after the $ 50,000 figure says "Expected Value of Economic Profits - Max - See Industry Analysis." However,

referring to the 1 1/2 page portion of the Analysis captioned "Industry Analysis" is a hopelessly uninformative exercise. All this part of the Analysis did was to summarize some unilluminating generalizations about the steel industry that Mr. Dohmeyer's DVC assistant had gotten off the internet.

At his deposition, Mr. Dohmeyer explained that the $ 50,000 figure was drawn from his analysis for processing "high gauge" steel or "toll processing." (Dohmeyer Dep., at 104, 106). The problems processing "high gauge" steel or "toll processing" could not be corrected by additional labor - that business was lost. (Dohmeyer Dep., at 70-71, 102-104). Although it is unclear from the Analysis, this was apparently a new business that Loeffel hoped to get into by virtue of the Line, but could not due to the Line's shortcomings. (Dohmeyer Dep. at 106). In reaching the $ 50,000 figure, Mr. Dohmeyer also considered his review of Loeffel's performance between 1999 and 2002, as well as the performance of the eight publicly traded companies selected as the sampling [*10] against which Loeffel's prospects in that period were to be measured. (Analysis at unnumbered pp. 6-11; Dohmeyer Dep. at 116-128).

II.

## THE ANALYTICAL FRAMEWORK FOR DETERMINING ADMISSIBILITY

*Loeffel Steel Products v. Delta Brands, 372 F. Supp. 2d 1104, 2005 WL 1388076 (N.D.Ill. 2005)* discussed the analytical backdrop of motions to bar the testimony of an expert, and that discussion is incorporated by reference. To it, the following should be added. [HN1] The Supreme Court in *Daubert* stressed the trial judge's obligation to act as a gatekeeper to ensure that expert testimony is reliable. The insistence on reliability helps to ensure the integrity of the judicial process. *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago, 877 F.2d 1333, 1340 (7th Cir. 1989)*. That goal is of such obvious and transcendent importance that judges can act *sua sponte* to prohibit testimony that does not pass muster under *Daubert. O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1094 (7th Cir. 1994)*.

[HN2] While *Daubert* reaffirmed the value of the adversary system generally and the capability of juries to understand scientific evidence and weigh the credibility [*11] of the competing experts, with their often absolutist and clashing conclusions, it also made clear that in those cases in which the proponent of an expert could not demonstrate the reliability of the methodology employed by the expert, the court was required to disallow the testimony. The opportunity for vigorous cross examination and the presentation of contrary evidence - the traditional and appropriate means of attacking shaky but admissible evidence, *Daubert, 509 U.S. at 596* - is not a basis for

allowing otherwise inadmissible testimony to be admitted.

*Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)* reaffirmed the teachings of *Daubert*, but emphasized that [HN3] the *Daubert* factors were not applicable, *semper ubique et ab omnibus*. They need only be considered when doing so will aid in the determination of the testimony's reliability. *Id. at 142, 150*. The inquiry is always, and of necessity, highly fact- specific, and no one factor, even when applicable, is outcome-determinative.

[HN4] *Daubert* also cautioned judges assessing a proffer of expert testimony under *Rule 702* to be mindful of other applicable rules, such as [*12] *Rule 703*, which permits an expert to base an opinion on information that need not itself be admissible, so long as it is the kind of information relied on by other experts in the field. *509 U.S. at 595*.

**A**

**Evaluation of Reliability of Mr. Dohmeyer's Testimony**

**I**

**Qualifications of Mr. Dohmeyer and his Firm**

Mr. Dohmeyer has a bachelor's degree in finance and is an accredited senior appraiser with the American Society of Appraisers ("ASA"). That accreditation was, according to Mr. Dohmeyer, the equivalent of a CPA for valuation and financial analysts. (Dohmeyer Dep., at 13). n4 He has lectured on the valuation of privately held businesses, and he has given expert testimony in 32 cases involving "economic loss." (*See* Analysis, Qualifications of Principal Appraisers). At his deposition, Mr. Dohmeyer testified that DVC was primarily in the business of appraising privately held businesses and analyzing economic loss, which, Mr. Dohmeyer conceded could include the loss of profits due to poorly manufactured products. Mr. Dohmeyer estimated that perhaps one in ten of the economic loss cases he had handled involved equipment that failed to perform as [*13] the seller had promised. (Dohmeyer Dep., at 8-12).

---

n4  The requirements for accreditation are completion of five years' experience in business appraisals, passing three technical exams, an ethics and the Uniform Standards of Professional Appraisal Practice ("USPAP") exam, and the submission of two appraisals for evaluation. (Dohmeyer Dep., at 13).

---

Mr. Dohmeyer was assisted in his analysis by Kevin Morrison and Sontwa Sinkala. Mr. Morrison has a bachelor's degree in business administration, accounting, and finance. Sontwa Sinkala has a master's degree in business administration, specializing in corporate finance, and a doctorate in economics and geography. Nonetheless, Loeffel contends that all three are unqualified to testify in this case since none is a certified public accountant, none has any expertise in the steel industry, none has experience in cases dealing with lost profits due to faulty machinery, and the USPAP guidelines were not followed in preparing the Analysis of Economic Loss. (Pl.Mem., at 6-9). [*14]

The argument that only a CPA with expertise in the steel industry -- preferably, with regard to multi-blanking machines and a prior history of expert testimony in a case involving lost profits due to a poorly performing piece of machinery - is inconsistent with the liberal approach to expert witness qualification taken by *Rule 702*. *See Holbrook v. Lykes Brothers Steam Ship, 80 F.3d 777, 782 (3rd Cir. 1996); Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990)*. [HN5] Overemphasis on qualifications over testimonial reliability reflects a pre-*Daubert* sensibility. *Rushing v. Kansas City Southern Ry. Co., 185 F.3d 496, 507 (5th Cir. 1999)*.

Mr. Dohmeyer's and his colleagues' educational background and experience qualify Mr. Dohmeyer and his colleagues to testify about, at least, certain of the matters presented in this case. Characterizing them as "appraisers" does not advance analysis. Even appraisers can have sufficient expertise to rebut the testimony of certified public accountants in appropriate cases. *See, e.g., Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 186-87 (7th Cir. 1993)*(district court erred [*15] in precluding a real estate appraiser to rebut a CPA's opinion about real estate values in financial statement).

[HN6] No case of which we are aware remotely suggests, let alone holds, that only a certified public accountant has the necessary expertise to testify about economic loss. In fact, being a certified public accountant does not ensure admissibility of testimony. *See e.g., Frymire-Brinati, 2 F.3d at 186-87* (under *Daubert*, expert testimony of certified public accountant should not have been admitted); *SEC v. Lipson, 46 F.Supp.2d 758, 762 (N.D.Ill. 1999)* (applying *Daubert* to bar testimony of certified public accountant on reliability grounds); *De Jager Construction, Inc. v. Schleininger, 938 F.Supp. 446, 449-455 (W.D.Mich. 1996)* (excluding certified public accountant expert opinion testimony that blurred the distinction between substantive liability and a calculation of damages); *Lithuanian Commerce Corp Ltd. v. Sara Lee Hosiery, 179 F.R.D. 450 (D.N.J. 1998)* (excluding certified public accountant's damage calculations

because they relied on speculative and unsupported assumptions).

In *Tuf Racing Products, Inc. v. American Suzuki Motor Corp., 223 F.3d 585 (7th Cir. 2000)*, [*16] the court rejected as unsound the notion that *Daubert* required particular credentials for an expert witness, finding that [HN7] "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Id. at 591.* Thus, Mr. Dohmeyer's admitted lack of specific experience with multi-blanking machines is not a disqualifying factor. *See Loeffel Steel Products v. Delta Brands, 372 F. Supp. 2d 1104, 2005 WL 1388076 at *7.* n5

> n5 *See also Maiz v. Virani, 253 F.3d 641 (11th Cir. 2001)* (allowing economist with no real estate development experience to testify about expected returns from real estate investment); *Quinton v. Farmland Industries, 928 F.2d 335, 336 (10th Cir. 1991)* (veterinarian need not be a specialist in toxicology to testify on toxic effect of a substance on cows); *Ashland Oil, Inc. v. Delta Oil Prods. Corp., 685 F.2d 175, 178 (7th Cir. 1982), cert. denied, 460 U.S. 1081, 76 L. Ed. 2d 343, 103 S. Ct. 1769 (1983)* (trial court properly relied on testimony of expert in chemistry despite lack of expertise in polyurethane chemistry).

[*17]

We turn then to the second prong of the inquiry, namely the reliability of the method that Mr. Dohmeyer and his associates employed to arrive at their damage figures.

## 2

**The Methodology Underlying The Analysis of Economic Loss**

There are two aspects to Mr. Dohmeyer's methodology that trouble Loeffel. The first is Mr. Dohmeyer's use of a definition of "economic loss" that he devised, and the second is his reliance on the defendants' employees for the theory and supporting information that any deficiencies in the Line can be rectified by additional labor and extra shifts.

### a

**Mr. Dohmeyer's Definition Of Economic Loss**

The Analysis defined "economic loss" as: "the dollar sum, exclusive of prejudgment interest and professional fees, required as payment in full necessary to make the damaged party equal on an economic basis." The definition, at least semantically, seems straightforward and consistent with the general Uniform Commercial Code ("UCC") and contract damage theory that the fundamental purpose of any damage award is to place the plaintiff in the position it would have been in had there been no breach, but not to place it in a better position or provide [*18] it with a windfall. *Platinum Technology, Inc. v. Federal Insurance Co., 282 F.3d 927, 932 (7th Cir. 2002).* n6

> n6 *Accord 810 ILCS 5/2-106(1)*(UCC remedies "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed."); *Dynamic Recycling Services, Inc. v. Shred Pax Corp., 210 Ill.App.3d 602, 615, 569 N.E.2d 570, 578, 155 Ill. Dec. 389 (1st Dist. 1991).*

This apparent consonance was delusive, however, for Mr. Dohmeyer boasted in his deposition that "many years ago" he and his boss devised the definition: "this is *our* definition of what *we believe* the question is, what answer *we* are giving." (Dohmeyer Dep., at 19) (Emphasis supplied). If this definition of economic loss were faithful to basic damage theory, there would have been no need for Mr. Dohmeyer to have devised and employed his own definition. *Cf. Schenck v. United States, 249 U.S. 47,48, 63 L. Ed. 470, 39 S. Ct. 247, 17 Ohio L. Rep. 26, 17 Ohio L. Rep. 149 (1919)*(Holmes, [*19] J.)("Of course the document would not have been sent unless it had been intended to have some effect. . . ."); *United States v. Ladish Malting Co., 135 F.3d 484, 490 (7th Cir. 1998)*("The prosecutor must have thought that the instruction mattered; why else so vigorously oppose Ladish's request for an actual-knowledge instruction").

Mr. Dohmeyer's admissions about the origin and uniqueness of his definition - he conceded the definition was not to be found anywhere else (Dohmeyer Dep., at 18-19) - would seem to trigger the principle that the opinion of an expert need not be accepted when based on nothing more than personal opinion or belief instead of an understandable scientific basis. *Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349, 1360 (6th Cir.), cert. denied 506 U.S. 826, 121 L. Ed. 2d 47, 113 S. Ct. 84 (1992); Thomas v. FAG Bearings Corp., 846 F.Supp. 1382, 1393 (W.D.Mo. 1994).* But this is only the beginning.

Mr. Dohmeyer's definition was the basis for a damage theory and calculation that is impermissible as a matter of law. It is not merely that the definition was not peer reviewed, not tested, and not generally accepted, as

Loeffel [*20]    correctly argues. n7 In addition, Mr. Dohmeyer's theory and methodology led him to exclude as a component of "economic loss" any amount attributable to the diminished value of the Line, itself.

n7 [HN8] While *Daubert* applies to valuation testimony, whether offered by people like Mr. Dohmeyer, certified public accountants, or economists, *Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183 (7th Cir. 1993)*, the *Daubert* factors are not to be rigidly applied in this or any other context. In some context, they may not be applicable at all or may have diminished utility as measures of reliability. *Loeffel Steel Products v. Delta Brands, 372 F. Supp. 2d 1104, 2005 WL 1388076 at *6*. Some courts have held they "do not conform easily to an analysis of economic theory." *Bailey v. Allgas. Inc., 148 F.Supp.2d 1222, 1235 (N.D.Ala. 2000)*. In determining the admissibility of expert testimony with respect to future lost profits, a trial judge has considerable leeway in determining the testimony's reliability. *ID Security Systems Canada. Inc. v. Checkpoint Systems, Inc., 249 F.Supp.2d 622, 690 (E.D.Pa. 2003)*.

[*21]

[HN9] Both contract law and the UCC provide the appropriate remedy for "economic loss" occasioned by diminished commercial expectations, not coupled with injury to person or property. *See In re Chicago Flood Litigation, 176 Ill.2d 179, 200, 680 N.E.2d 265, 275, 223 Ill. Dec. 532 (1997); Mars, Inc. v. Heritage Builders of Effingham, Inc., 327 Ill.App.3d 346, 351, 763 N.E.2d 428, 434, 261 Ill. Dec. 458 (4th Dist. 2002)*.

"Generally speaking, a defective product can cause three types of injury: personal injury, property damage, and economic loss." *Trans States Airlines v. Pratt & Whitney Canada, Inc., 177 Ill.2d 21, 27, 682 N.E.2d 45, 48, 224 Ill. Dec. 484 (1997)*. In *Moorman Mfg. Co. v. National Tank Co., 91 Ill.2d 69, 82, 435 N.E.2d 443, 449, 61 Ill. Dec. 746 (1982)*, the Illinois Supreme Court held that "economic loss"

"has been defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits - without any claim of personal injury or damage to other property' (Note, Economic Loss in Products Liability Jurisprudence, *66 Colum. L.Rev. 917, 918 (1966)*(economic loss))

as well as 'the diminution in the value of the [*22]    product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'"

*91 Ill.2d at 82, 435 N.E.2d at 449 (Emphasis supplied)*(Parentheses in original).

In their Response to Loeffel's motion, the defendants have "changed positions as nimbly as if dancing a quadrille." *Orloff v. Willoughby, 345 U.S. 83, 87, 97 L. Ed. 842, 73 S. Ct. 534 (1953)*, for they now insist that Mr. Dohmeyer's definition is "entirely consistent" with traditional breach of contract damages theory, as expressed in *Moorman*. However, the Response ignores Mr. Dohmeyer's testimony in which he said that he created the definition years ago, and that it was to be found nowhere else. Nor does it attempt to explain why he would have insisted on using such a definition if it was consistent with the traditional and legal definition. (Response at 10).

In quoting from *Moorman*, the Response placed a period after the word "property," and ended the quote, thus conveying to the reader the impression that there was nothing further in the sentence. Omitted was the reference to the Columbia Law Review article and this critical phrase:

"'. . . as well [*23]    as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'"

[HN10] The UCC provides that "the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *810 ILCS 5/2-714(2)*. In addition, a party may also recover incidental and consequential damages, *810 ILCS 5/2-715*, including lost profits. *See Arcor, Inc. v. Textron, Inc., 960 F.2d 710, 713-14 (7th Cir. 1992)* (buyer of a machine that failed to live up to its warranty was entitled to not only the difference between the value of the machine as warranted and its actual value, but lost profits as well); *Mercer v. Long Mfg., N.C., Inc., 665 F.2d 61, 69 (5th Cir. 1982)* (in case involving faulty combine, economic loss consists of difference in value between combine as warranted and as received and any lost profits on crops resulting [*24]    from inability to use combine for

harvesting); *Cognitest Corp. v. Riverside Pub. Co., 107 F.3d 493, 496 (7th Cir. 1997)*. n8

n8 In a lengthy "Declaration" belatedly submitted by the defendants in response to the present motion, Mr. Dohmeyer insisted that there is no authoritative text regarding the calculations of damages due to a machine that operates at a rate below its specifications. (*Defendant's Response to Plaintiff's Motion to Bar*, Ex. A, P19). The controlling legal definitions of economic loss and the measure of damages available under Illinois law - which the defendants concede controls this case - would have been a starting point.

The measure of damages under Loeffel's fraud claim (Count V) is the same. [HN11] The victim of a fraudulent misrepresentation is entitled to recover as damages those losses caused by the misrepresentation, "including (a) the difference between the value of what he has received in the transaction, and its purchase price or other value given for it. . . ." *Restatement (2d) Torts § 549* [*25] (1977). *Accord DiRose v. PK Management Corp., 691 F.2d 628, 631 (2nd Cir. 1982); FDIC v. Palermo, 815 F.2d 1329, 1341 (10th Cir. 1987); Four S Alliance Inc .v. American National Bank, 104 Ill. App.3d 636, 432 N.E.2d 1213, 60 Ill. Dec. 314 (1st Dist. 1982);* Dobbs, Remedies, § 9.2 at 594-95 (1973)("If a plaintiff has been induced to buy a house because of an intentional false representation that it is free from termites, the plaintiff is entitled to recover the difference between the value of the house as it actually exists and the value it would have had if it had not had termites. This rule puts him in the same financial position as if the fraudulent representations had been true.").

An examination of Mr. Dohmeyer's deposition testimony reveals the likely reason for the omission from the *Moorman* quotation. He testified that his assessment of economic loss necessarily omitted any consideration of the difference between the value of the Line as warranted and its diminished value resulting from the Line's flaws. He attempted to illustrate the point with the following hypotheticals.

A: Well, if you paid - if you bargain to buy a machine for [*26] $ 10 and you allege once you got it you only paid nine because you hold back a dollar until it works right, but you say, hey, this machine doesn't work right; in fact, the damages on the machine the way it doesn't work are $ 2.00. So pay me the two. Well,

he's going to go, I'm not going to pay you the two, I'll pay you one, because you already owe me one.

Q: Right. But couldn't I also take the position in your analogy that, hey, I paid you a million two hundred fifty thousand in the purchase price and a million five and the line I got isn't worth $ 100,000.

A: No, because you'd be double-counting . . . you can only get your damages.

(Dohmeyer Dep., at 133; see also *id.* at 134).

Mr. Dohmeyer's second hypothetical is even more convoluted. He posited a machine sold for four dollars that was warranted to print one dollar every year for five years. (Dohmeyer Dep., at 135). Then he continued:

A: All right. So it doesn't print-it doesn't even print the dollars for you. Okay? So you say, I want my $ 5.00, because the machine is defective, it didn't print money like you said it does. You want the machine back, too. That doesn't make any sense.

Q: I - I - [*27] what I'm saying is, I'm not disagreeing with your contention. There's no way I can say, hey, I have lost profits, and I can't say, I needed the machine to create the profits I lost. I understand this. What I'm saying is, you're - you're assuming in your analogy, that because we didn't pay the other two hundred and fifty grand, the machine must have been worth a[sic] million two hundred and fifty, and that's the part I'm disagreeing with.

A: Absolutely, it's worth that because your damages get you whole to make it worth that.

By its selective misquotation, the Response allowed the defendants to argue that Mr. Dohmeyer's definition of economic loss was "consistent" with basic damage theory, without simultaneously revealing that it wasn't and without thereby revealing the unreliability of his methodology and his deposition testimony.

In his belatedly filed Declaration, Mr. Dohmeyer claimed what he had never claimed at his deposition, namely that his analysis of economic loss relied on a

"benefit of the bargain theory," which he defined this way: "'But for' the defendant's allegedly defective machine, Loeffel would have had a faster machine, (one capable of producing at the [*28] rates provided in the contract specifications." (Parenthesis in original). Mr. Dohmeyer's newly claimed allegiance to the benefit of the bargain rule, is belied by and incompatible with his conclusion that diminution in value of a faulty piece of equipment and lost profits are mutually exclusive. [HN12] The benefit of the bargain rule provides that the measure of damages is the difference between the actual value of what plaintiff received and its value had the representations been true. *See Gerill Corp. v. Jack L. Hargrove Builders. Inc., 128 Ill.2d 179, 538 N.E.2d 530, 537-38, 131 Ill. Dec. 155, cert. denied 493 U.S. 894, 107 L. Ed. 2d 193, 110 S. Ct. 243 (1989); Out of Pocket or Benefit of the Bargain As Proper Rule of Damages for Fraudulent Representations Inducing Contract for the Transfer of Property, 13 A.L.R. 3d 875 (1967)*(collecting cases).

[HN13] Expert opinions that are contrary to law are inadmissible. *Langehennig v. Sofamor, Inc., 1999 U.S. Dist. LEXIS 19120, 1999 WL 1129683 at n.6 (D.Kan. 1999); Bailey v. Allgas. Inc., 148 F.Supp.2d 1222, 1245-46 (N.D.Ala. 2000).* They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact. Indeed, "it is not an 'expert' [*29] opinion, but rather a personal opinion about what [damages Mr. Dohmeyer] believes should apply" in this case. *In re Diet Drugs Products Liability Litigation, 2001 U.S. Dist. LEXIS 1174, 2001 WL 454586 at *18 (E.D.Pa. 2001).*

Whatever the motivation for the Response's misquotation or *Moorman*, it is deeply troubling. *Loeffel Steel Products, 372 F. Supp. 2d 1104, 2005 WL 1388076 at *11* [HN14] "There is more in membership in the Bar than a license to sign a brief or intone a prosy argument." Cardozo, Law and Literature, 145-46 (1931). Justice is not a game, and zealous advocacy does not entitle a lawyer to "'hoodwink a judge [or an opponent] who is not overwise.'" *United States v. Paglia, 190 F.2d 445, 448 (2nd Cir. 1951)*(L. Hand, J.). n9

n9 A similar kind of manipulation is found in the defendants' rendition of *Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183 (7th Cir. 1993).* The discussion in the Response brief makes it appear as though the plaintiff's expert, a real estate appraiser, was improperly forbidden to testify that the plaintiff's expert, a certified public accountant, "bungled" his "valuation of damages." (Response at 16). "Similarly," the defendants say, they proffer "Mr. Dohmeyer, an economist, as its expert." *Id.* Mr. Dohmeyer isn't

an economist, and the two cases are not similar. In *Brinati,* the chairman of the real estate committee of the American Institute of Certified Public Accountants, *not* the appraiser, testified that the plaintiff's CPA had "bungled" by using historical rather than projected future income in his cash flow analysis. *2 F.3d at 187.* It was in an effort to "move from theory to concrete valuation" that the appraiser was to testify thereafter about the accuracy of property values in the financial statements.

[*30]

b

**The Reliability Of Mr. Dohmeyer's "Labor-Added" Methodology**

Mr. Dohmeyer's damage model and calculation of economic loss suffer from the further flaw that they violate of *Rule 703 of the Federal Rules of Evidence.* n10

n10 *Rule 703* provides:

[HN15] Bases of Opinion Testimony by Experts The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissable shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

[*31]

Mr. Dohmeyer's calculation of economic loss is based on the assumption that the addition of extra labor and shifts would allow the Line to yield the same productivity as it would have running at faster speeds with

fewer shifts. The theory and the precise number of traditional workers and shifts needed came from the defendants' employees, on whom Mr. Dohmeyer uncritically relied. It is undisputed that neither Mr. Dohmeyer nor his assistants at DVC had any expertise in blanking machines and were incapable of assessing the validity of the information provided by the defendants. (Dohmeyer deposition at 26, 33-38, 89). *Cf. Bailey v. Allgas, 148 F.Supp.2d 1222, 1240 (N.D.Ala. 2000)*(unquestioning reliance on opinions expressed by plaintiff's counsel not proper).

Proceeding from this "unquestioning reliance," *Gentieu v. Tony Stone Images/Chicago, Inc., 214 F.Supp.2d 849, 853 (N.D.Ill. 2002)*(Shadur, J.), Mr. Dohmeyer calculated the amount it would cost Loeffel to pay the additional workers in order to produce as much finished steel as would have been produced had the Line operated properly. Mr. Dohmeyer's difficulty in explaining how the additional workers [*32] would cure the situation demonstrates dramatically that he brought no expertise to bear on the underlying assumptions on which his economic loss theory was based:

> Sure, just by having, you know, the kinds of things, you know - you have to, I guess, re - recalibrate the machine every time you put a new roll on it where it should have been automatic, you can have a guy standing there, you know, doing that kind of thing. You know, once again, I don't know the technical parts of it, and I understood them a lot better when I did the interview and when I prepared for this deposition last time, but I haven't gone back to re-talk to them about those specifics again for today's deposition . . . . (Dohmeyer Dep. at 37).

Yet, [HN16] *Rule 703*'s relaxation of the usual requirement of firsthand knowledge - a rule which represents a pervasive manifestation of the common law's insistence upon the most reliable sources of information - was premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. *Daubert, 509 U.S. at 592.* When pressed, Mr. Dohmeyer could not even say whether the additional labor would solve the [*33] alleged problems and raise the level of production. For that information, one would, he said, have to check with Messrs. Barron, King and DaClue. (*Id.* at 37-38, 45, 89). Referring to his damage figure, he said:

> All it really assumes is with the addition of this expense. And it would probably be labor, you know. . . It says with this much

money thrown at the problem, probably - probably, in terms of labor, you can solve the production problems that are alleged. (Dohmeyer Dep. at 44-45).

It is no answer to say that since *Rule 703* allows an expert to base an opinion on inadmissible evidence, Mr. Dohmeyer must be allowed to testify, even though the basis of the information on which he relied came from the defendants. First, the defendants have made no effort to carry their burden of proving by a preponderance of the evidence that the kind of information given to Mr. Dohmeyer is the kind "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. . . ." The argument is thus forfeited. *United States v. Baretz, 411 F.3d 867 (7th Cir. 2005).*

Second, and more importantly, [HN17] while *Rule 703* was intended to liberalize [*34] the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion. *See, e.g., Dura Automotive Systems of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 613 (7th Cir. 2002); TK-7 Corp. v. The Estate of Barbouti, 993 F.2d 722, 731-34 (10th Cir. 1993); In re: James Wilson Associates, 965 F.2d 160, 173 (7th Cir. 1992).*

[HN18] Under *Rule 703*, an expert may rely on hearsay in formulating his opinion - provided the requirements of *Rule 702* are met - but the evidence is not admissible for the truth of the matters asserted. *United States v. Gonzales, 307 F.3d 906, 910 (9th Cir. 2002); TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 734 (10th Cir. 1993)*("'the hearsay is admitted for the limited purpose of informing the jury of the basis of the expert's opinion and not for proving the truth of the matter asserted.'"). *Cf. Gregory v. Oliver, 2002 U.S. Dist. LEXIS 24730, 2002 WL 31972165 at *3 (N.D.Ill. Dec. 27, 2002)*(Shadur, [*35] J.).

[HN19] *Rule 703* was never intended to allow oblique evasions of the hearsay rule. In *Dura Automotive,* the Seventh Circuit acknowledged that it "is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *285 F.3d at 613.* For example, as the Committee Notes to the 1972 Proposed *Rule 703* observed, a physician, though not an expert in radiology, may rely for a diagnosis on an x-ray. *Id.* The Seventh Circuit extrapolated from there to make its point:

> We too do not believe that the leader of a clinical medical team must be qualified as