an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions. But suppose the soundness of the underlying expert judgment is in issue. Suppose a thoracic surgeon gave expert evidence in a medical malpractice case that the plaintiff's decedent had died because the defendant, a radiologist, had negligently failed to diagnose the decedent's lung cancer until it was too advanced for surgery. The surgeon would be competent to testify that the cancer was too advanced for [*36] surgery, but in offering the additional and critical judgment that the radiologist should have discovered the cancer sooner he would be, at best, just parroting the opinion of an expert in radiology competent to testify that the defendant had x-rayed the decedent carelessly.

*Id.* The problem, then, is that the expert is vouching for the truth of what another expert told him - he is merely that expert's spokesman. But, [HN20] "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science." *Id. at 614. See also Grant v. Chemrex, Inc., 1997 U.S. Dist. LEXIS 6058, No. 93 C 0350, 1997 WL 223071, *8 (N.D.Ill. Apr. 28, 1997)* (expert's "professional knowledge and ability" were not adequate to evaluate calculations and opinions upon which he based his opinion). n11

   n11 By way of example, the court in *Dura Automotive* said that a theoretical economist, who relied on the findings of an econometric study conducted by another economist, would not be allowed to testify if he lacked expertise in econometrics, and the study raised questions that only an econometrician could answer. *285 F.3d at 614.* Even Judge Wood, who dissented, agreed with this example. *Id. at 620. See also TK-7 Corp., 993 F.2d at 732* [HN21] (the rationale of Rule 703 "is certainly not satisfied in this case where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.").

[*37]

That is precisely the situation here: If allowed to testify, Mr. Dohmeyer would be "hiding behind" Messrs. Barron, King and DaClue and acting as their "mouthpiece." *Id. at 615.* He would, in effect, be vouching for their labor-added methodology, when he has absolutely no knowledge of whether the theory is valid and reliable. *See also TK-7 Corp., 993 F.2d 722.* Thus, Mr. Dohmeyer's testimony cannot be used to prove that additional labor and shifts were in fact the medicament for the Line's ills. *In re James Wilson Associates, 965 F.2d 160, 173 (7th Cir. 1992)*(Posner, J.)

The example posed by Judge Posner in *James Wilson Associates* demonstrates the problem with Mr. Dohmeyer's testimony:

> "If, for example, the expert witness (call him A) bases his opinion in part on a fact (call it X) that the parties lawyer told him, the lawyer cannot, in closing argument, tell the jury, 'see we proved X through our expert witness. A.'"

*Id. at 173. (Parenthesis in original).*

This was the kind of hand-off attempted in *James Wilson Associates,* where an architect attempted to testify to the value of a building based upon a report [*38] provided to him by a consulting engineer, who had examined the building. The Seventh Circuit held that the trial judge "was entitled to exclude the architect's evidence as hearsay." *Id. at 172.* The issue was the state of the building, and the expert who had evaluated that state - the consulting engineer - was the one who should have testified. The architect could use what the engineer told him to offer an opinion *within the architect's domain of expertise,* but he could not testify for the purpose of vouching for the truth of what the engineer told him - "of becoming in short the engineer's spokesman." *Id. at 173.* It "is improper to use an expert witness as a screen against cross-examination (though the other side could always call him as an adverse witness, and cross-examine him)." *Id.* (Parenthesis in original).

Yet, without the testimony of Messrs. Barron, King and DaClue explaining and justifying their labor-added theory, Mr. Dohmeyer's testimony will "rest[] on air." *Dura Automotive, 285 F.3d at 615.* If the underlying assumptions cannot be proven by admissible, competent evidence, the very nature of which would appear [*39] to require expert testimony, Mr. Dohmeyer's analysis of economic loss would have no evidentiary support and would be irrelevant. *See Rule 402, Federal Rules of Evidence.* Yet, the only expert disclosure in the case on the

defendants' side is Mr. Dohmeyer's. Messrs. Barron, King and DaClue have not been designated as experts. Hence, it would appear that Mr. Dohmeyer's testimony, even if initially allowed, would ultimately have to be stricken.

The instant case is analytically congruent with *Dura Automotive*. There, the court held that the expert could have testified that the well field was contaminated by volatile organic compounds and that *if* the defendant's plastics plant was within the well field's capture zone, some of the contamination may have come from that plant. It did not follow, however, that he could testify that the plant *was* within the well field's capture zone. *285 F.3d at 613-614*.

The defendant moved to bar the hydrogeologist's testimony and to dismiss Dura's claim. Dura responded with affidavits from the four employees who had prepared the models on which the hydrogeologist was basing his conclusions. The [*40] defendant moved to strike the affidavits on the ground that the disclosure of additional expert witness was untimely. The district court granted the motion and held that without the affidavits, there was insufficient evidence of the reliability of the models, and the hydrogeologist's testimony could not prove that accuracy. The court barred the testimony and concluded that without it, Dura had no case. *285 F.3d at 612*.

The Court of Appeals affirmed. It held that to the extent the affidavits contained evidence that would have to be presented at trial by an expert witness or witnesses other than the hydrogeologist in order for Dura to withstand a motion of judgment as a matter of law, Dura's failure to have made timely disclosure of their experts' opinions invited application of *Rule 37(c)(1)* to bar the authors of the affidavits (or any other expert for that matter) from testifying. In the instant case, denying the motion to prohibit Mr. Dohmeyer's testimony and allowing him to testify when there will be no competent evidence to prove the truth of the underlying assumptions would result in allowing testimony that would have to be stricken as irrelevant. The law never requires [*41] an idle thing to be done. *Brooklyn Life Insurance Co. v. Dutcher, 95 U.S. 269, 272, 24 L. Ed. 410 (1877)*.

*TK-7 Corp. v. Estate of Barbouti* is also instructive. n12 To support the plaintiff's claim and to calculate the amount of damages, the plaintiffs presented testimony from Dr. Boswell, a financial economist and professor of finance. Dr. Boswell predicated his calculations of lost profits on sales projections of one Werber. The district court initially allowed the testimony, but ultimately directed a verdict against the plaintiff, based on insufficiency of the evidence of damages. Mr. Werber was not called to testify, and the district court held that in order to prevail, the plaintiff had to present affirmative evidence on the projections that Dr. Boswell had assumed to be true. *Accord International Adhesive Coating Co. v. Bolton Emerson International, 851 F.2d 540, 546*. Since there was no such evidence, the plaintiff failed to carry its burden of proof. In affirming, the Tenth Circuit pointed out that Dr. Boswell had no familiarity with methods or reasoning used by Mr. Werber in arriving at his projections. In the instant case, Mr. Dohmeyer conceded a similar [*42] lack of understanding or familiarity of the models crafted by Messrs. Barron, King and DaClue.

n12 *Barbouti* was cited approvingly in *Dura Automotive. 285 F.3d at 613*.

c

**The Unreliability of The Methodology Underlying Mr. Dohmeyer's Conclusions Regarding Loeffel's Claim For Future Lost Profits And Business**

The third aspect of Mr. Dohmeyer's proposed expert testimony focuses on the Loeffel's claim for lost profits and business resulting from deficiencies in the Line. The Analysis of Economic Loss was accompanied by a letter of transmittal containing a 1 1/2 page discussion of the "(steel) metals industry," under the caption, "Industry Discussion." (Parenthesis in original). It summarized isolated bits of information that Mr. Dohmeyer or one of his colleagues had read on "money.msn.com and cnnfn.com." (*See* letter of February 27, 2004). As one would expect given Mr. Dohmeyer's admitted lack of expertise in the steel/metals industry and the sources of the information on which [*43] he relied, the 1 1/2 page discussion is superficial, generalized, and inexpert.

The discussion began by noting that the steel industry is made up of three tiers: primary metals producers, metals processors and/or service centers, and end users. The primary producers are the source of steel for the service centers, which "undertake value-adding services such as precision design and other pre-production processing as may be required by specific customers." These service centers, according to DVC, were formerly mostly distribution centers performing little processing. By the 1980s, however, they began to add processing capabilities that allowed them to add a broad range of value-added services.

Concurrently, the primary metals producers began concentrating on high volume production. As these industry changes continued, the discussion explained, many service centers found themselves unable to obtain processed products and had to begin outsourcing their customized metal processing to service centers with

Case 1:04-cv-01278-KAJ    Document 225-11    Filed 10/26/2005    Page 3 of 15

Page 15
2005 U.S. Dist. LEXIS 15718, *

value-added capabilities. Recent challenges in the industry include the recession and frequent, unpredictable increases in domestic steel prices.

The Analysis of Economic Loss contained [*44] 12 pages of graphs and charts reflecting financial data about 8 companies: A.M. Castle & Co.; Friedman Industries Inc.; Gibraltar Steel Corp.; Olympic Steel Inc.; Reliance Steel & Aluminum Co.; Ryerson Tull, Inc.; Steel Technologies Inc.; and Worthington Industries, Inc. The information was obtained from 10k's and Standard & Poor's reports. Mr. Dohmeyer could not explain how the companies were selected for inclusion in the sampling. This is the best he could say:

> I *think* one of the guys did a search on *one* company that was - that had a *similar description* to the description for this kind of business, what they do.

(Dohmeyer's Dep. at 121)(Emphasis supplied). How the other seven were selected remains unexplained.

The charts reflected the total sales, gross profit margins, net income, equity, return on equity, stock price, book value, and market to book value of the 8 companies for the period 1999 - 2002. According to Mr. Dohmeyer, the financial history of the eight companies during that period was relevant in evaluating Loeffel's potential for acquiring new business with the Line. (Dohmeyer Dep., at 119-121). But what that new business was to be, Mr. Dohmeyer [*45] wasn't sure. He referred to it, variously, as "toll processing, [] heavier gauge or wider gauge or both, I don't know." (Dohmeyer Dep., at 126). Whatever it was to be, Mr. Dohmeyer explained, its net present value was a function of the competitive environment of the "industry," as reflected by the eight corporations that been chosen. (Dohmeyer Dep., at 126).

He testified that since the 8 companies had experienced financial difficulties between 1999 and 2002, Loeffel could not have hoped to do any better. (Dohmeyer Dep., at 120-122). The figures showed, among other things, *declines* in median total sales for the 8 companies from 2001 to 2002. But Loeffel had a 5.3% *increase* in 2002, while the 8 companies had a median loss of 2.2%. Similarly, while the median *decline* from 2000 to 2001 in gross profit margins of the 8 companies was 5.8%, Loeffel had a 1.4% *increase*. From 2001 to 2002, there was a median increase in gross profit margin of the 8 companies of 6.7%, while Loeffel's increased 23.9%.

In order for the sampling chosen by DVC comparison to have the requisite predictive capacity and the reliability *Daubert* demands, Mr. Dohmeyer had to "select samples that [*46] are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Donnelly v. Rhode Island Board of Governors for Higher Education*, 929 F.Supp 583, 591 (D.R.I. 1996).

[HN22] In calculating lost future profits or lost business, the measure of damages is guided by analysis of "comparable businesses *in the area.*" *Cates v. Morgan Portable Bldg. Corp.*, 591 F.2d 17, 21 n.7 (7th Cir. 1979)(Emphasis supplied). "The business used as a standard must be as nearly identical to the plaintiff's as possible." *Lehrman v. Gulf Oil*, 500 F.2d 659, 667 (5th Cir. 1974), cert. denied, 420 U.S. 929, 43 L. Ed. 2d 400, 95 S. Ct. 1128 (1975). Accord *In re James O'Connell Co. Inc.*, 799 F.2d 1258, 1259 (9th Cir. 1986); *National Farmers' Organization, Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1292 (8th Cir. 1989). This is often referred to as the "yardstick approach." Absent the requisite showing of comparability, a damage model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural. [*47] Cf. *Home Placement Svc., Inc. v. The Providence Journal Co.*, 819 F.2d 1199, 1209 (1st Cir. 1987); ABA Section of Antitrust Law, Antitrust Law Developments, 877-879 (5th ed. 2002)(and cases cited).

Of course, exact correlation is not necessary but the samples must be fair congeners. If they are not, the comparison is manifestly unreliable and cannot "'logically advance[] a material aspect of the proposing party's case. The Supreme Court [in *Daubert*] referred to this second prong of the analysis as the fit requirement.'" *Loeffel Steel Products v. Delta Brands*, 372 F. Supp. 2d 1104, 2005 WL 1388076 at *16 (quoting Judge Kozinski's opinion on remand from the Supreme Court . *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir.), cert. denied, 516 U.S. 869, 133 L. Ed. 2d 126, 116 S. Ct. 189 (1995)).

Undiscriminatingly labeling all nine companies "steel service centers," Mr. Dohmeyer tacitly assumed that they are necessarily monolithic, that they necessarily compete for the same customers, and thus the past financial profile of the eight is a reasonable predictor of how Loeffel would have performed. Stated more simply, Mr. Dohmeyer's argument [*48] runs this way: 1) Loeffel and the eight companies are in the same "industry;" 2) all participants in "an industry" are necessarily competitors; 3) therefore, the financial performance of the eight companies in 1999-2002 is relevant to determining Loeffel's prospect for new business had the Line performed properly. n13 (Dohmeyer Dep., at 124). Here as always, "we must think things, not words, or at least we must constantly translate our words into facts for which they

stand, if we are to keep to the real and the true." Holmes, Law In Science and Science In Law, *12 Harv.L.Rev. 443, 460 (1889).*

n13 When asked at his deposition how, since he knew nothing about the customer base of Loeffel or the eight publicly traded companies, he could have concluded that Loeffel served the same customer market as the eight other service centers, Mr. Dohmeyer said:

> Oh they have to. I mean it's -- you're in that industry, you're competing. You can't help -- once you're in an industry, you can't help but compete with other people in your industry. (Dohmeyer Dep., at 124).

[*49]

Mr. Dohmeyer's inexpert conclusion that each participant in "an industry" necessarily competes with every other participant in the industry is demonstrably false, as Dohmeyer's own report shows. He claimed that the "steels/metals industry" was comprised of three tiers. But as his report noted, the three categories of industry participants were not competitors, but enjoyed a symbiotic relationship. Bentleys and Kias are in the same "industry," but obviously don't compete for the same customers. Arnold Schwarzenegger and Anthony Hopkins never competed for the same roles, although they were both in the "movie industry."

Of course, these are matters of public knowledge. The inquiry becomes more difficult, when the "industry" is more complicated and less obvious. Perhaps, all "steel service centers" do compete; perhaps they don't, or perhaps they do only to an exceedingly limited degree, measured by the extent of the products and services they offer in common, and their geographic location. But only an expert in the field is qualified to say, and neither Mr. Dohmeyer nor his colleagues even begin to qualify. *Cf. Gentieu, 214 F.Supp.2d at 851.* (What controls the admissibility [*50] of an expert's opinion evidence, "depends on whether his claimed expertise qualifies him to opine on the specific matters that he seeks to address.").

A moment's reflection demonstrates the error in Mr. Dohmeyer's facile, and under-inclusive methodology. Suppose the eight companies selected by DVC had, as does Loeffel, blanking operations, but, in addition, offered a very large number of other diversified products and services, not offered by Loeffel. Assume further that unlike Loeffel with its localized customer base in the Midwest, the eight companies had nationwide or worldwide operations. In that event, the companies could scarcely be said to be comparable, and comparing their undifferentiated sales and income figures to those of Loeffel, would prove absolutely nothing. *Cf. Bailey v. Allgas, Inc., 148 F.Supp.2d 1222, 1232 (N.D.Ala. 2000).* n14

n14 [HN23] In antitrust cases, proof of the relevant product and geographic market is absolutely essential. The relevant geographic market is generally defined as the area of effective competition, that is the area in which the product or its reasonably interchangeable substitutes are traded. A determination of the geographic market must entail an analysis of several factors including the location of competitors and price data. *Id.* Although this case presents different issues, for purposes of determining comparability, the analysis is much the same.

[*51]

Mr. Dohmeyer at his deposition admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability. *See Home Placement Svc., Inc. v. The Providence Journal Co., 819 F.2d 1199, 1206 (1st Cir. 1987).* And the charts he compiled do not break out financial data by product or services. Hence, the raw financial data does not tell anything about the performance of the eight companies as to those products and services that they had in common with Loeffel. And it is only with respect to those products that they would be competitors -- at least for the purposes relevant to this case.

Even in cases involving far more comparability than is apparent here, courts have refused to allow the seemingly comparable companies to be used as a yardstick. In *Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc., 213 F.3d 198 (5th Cir. 2000),* the plaintiff owned indoor soccer arenas. The court rejected soccer arenas in general as comparable businesses where there was no evidence offered regarding geographical location, [*52] size or attractiveness of those facilities, the size and type of the market that they served, the relative costs of operation, the amounts charged, or the number years the facility was run. *Id.* at 208. The Fifth Circuit stressed that employing such a broad category was like "arguing that because McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average." *Id. at 208-09. See also, Kinesoft Development Corp. v. Softbank Holdings Inc., 139 F.Supp.2d 869, 910*

*(N.D.Ill. 2001)* (rejecting damages calculation where expert gave no consideration to any analysis of a comparable company selling comparable products).

[HN24] It cannot be too often repeated or too strongly emphasized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Kumho Tire, 526 U.S. at 157.* That caution applies with singular force to Mr. Dohmeyer's conclusion that [*53] the eight publicly traded companies were comparable to Loeffel for purposes of assessing lost future business and profits.

Mr. Dohmeyer lacked the qualifications to conclude that merely because all nine companies could be classified as "service centers," they necessarily competed with Loeffel or that they were comparable. [HN25] Spending a few minutes on the internet does not make one an expert on any "industry" or on any topic. *Cf Charter National Bank & Trust v. Charter One Financial, Inc., 2001 U.S. Dist. LEXIS 13919, 2001 WL 1035721 at *6 (N.D.Ill. September 4, 2001)*(assistant professor of law at the University of Chicago and a fellow in economics and public policy was not qualified as an expert on trademark law despite his extensive reading of trademark cases). n15

    n15 The defendants have taken a somewhat inconsistent position on the question of Mr. Dohmeyer's expertise in the steel industry. First, they say that that expertise is "inconsequential." (Response at 9). Then, as an afterthought, they say that Mr. Dohmeyer "perform[ed] thorough research on the steel industry." Of course he did no such thing and saying it doesn't make it so. Finally, they say he consulted with the defendants' personnel, who have extensive experience in the steel industry. *Id.* There is nothing to support the claim that the defendants' employees are experts, and Mr. Dohmeyer never claimed that they imparted information beyond their labor-added theory. In any event, even if they had, that would not begin to satisfy the requirements of *Rule 702* or *703*.

[*54]

The eight congeners selected by DVC were large to massive, publicly traded companies. According to Mr. Dohmeyer's charts, their average *median* total sales for the period 1999 - 2002 was $ 640 million, while Loeffel's was $ 19 million. n16 Perhaps this alone is not enough to tip the balance. But, what does is Mr. Dohmeyer's inexplicable failure to have considered such critical factors as what services the companies provided, their customer base, the products they sold, the geographic markets in which they operated, their prices and other critical aspects of the businesses. In fact, Mr. Dohmeyer admitted at his deposition that neither he nor his colleagues researched Loeffel or the eight comparative companies' customer bases. Yet, unless Loeffel's customer base and the services and products it offered approximated those of the eight companies, they were not "comparable," and the latters' economic fortunes would not be a "reliable" predictor of how Loeffel would have fared in the period 1999-2002.

    n16 In 2002, the actual sales for the eight companies ranged from $ 99 million to $ 2.296 billion. There was a similar range in gross profit margins ranging from a low of 6% to a high of 29.8% in 2002.

[*55]

The internet reveals the manifest unreliability of Mr. Dohmeyer's assumption about the uniformity of steel service centers -- an assumption that is the lynchpin in his theory of comparability. It also reveals the "fundamentally unsound basis [and] fatally deficient amount of data" on which Mr. Dohmeyer based his conclusion that the eight companies and Loeffel were comparable. *Thomas v. FAG Bearings Corp., 846 F.Supp. 1382 (W.D.Mo. 1994).* n17

    n17 [HN26] Even where a witness is an expert in the relevant field, the evidentiary reliability demanded by *Daubert* is not present when his or her opinion is speculative or rests on an unsound basis. *See American Bearing Co. v. Litton Industries, Inc., 540 F.Supp. 1163, 1173 (E.D.Pa. 1982), aff'd on other grounds, 729 F.2d 943 (3rd Cir.), cert. denied 469 U.S. 854, 83 L. Ed. 2d 112, 105 S. Ct. 178 (1984); Lithuanian Commerce Corp Ltd. v. Sara Lee Hosiery, 179 F.R.D. 450 (D.N.J. 1998)*(assumptions of a certified public accountant with several advanced degrees).

[*56]

Even a cursory search reveals that steel service centers are *not* monolithic and offer an extraordinary array of services and products, most of which are not offered by Loeffel, but are offered by the eight companies DVC selected.

In addition to cutting and slitting, coil processing, decoiling, bending, (and perhaps blade decambering) --

Case 1:04-cv-01278-KAJ   Document 225-11   Filed 10/26/2005   Page 6 of 15

Page 18
2005 U.S. Dist. LEXIS 15718, *

the services offered by Loeffel -- service centers also offer many services that Loeffel does not, such as: polishing, plasma profiling, grinding, gun drilling, tempering, stress relieving, annealing, heat treating, burning, abrasive and carbide blade sawing, computerized plasma cutting and automatic splice welding, piercing, notching, edging, ribbon and oscillate winding, punching, drilling, flame cutting, beam splitting. *See* www.steelvillage.com. Similarly, the same internet site reveals a varied array of products offered by service centers, but not offered by Loeffel, including: pipe, rod, bar, aluminum, brass, bronze, tubing, carbon, alloy, high speed steels, alloy heat treated, abrasion resistant, high strength, HSLA plate, valves, fitting and flanges. *Id.*

Further dissimilarities abound. Loeffel is a small company with offices in [*57] the greater Chicago area. It employs 70 people, and its customer base is largely in the Midwest. It is in the business of slitting and cutting raw steel into lengths and thicknesses according to customer specifications. Its customers include various industries, from filing cabinet manufacturers to metal building products and stock containers. (*Complaint*, P 1; www.loeffel.com).

A.M. Castle & Co., specializes in the distribution of carbon, alloy and stainless steels; nickel alloys; aluminum; titanium; and brass and copper in a variety of product forms, including bar, plate, tube, sheet and coil. It operates a subsidiary, Total Plastics, Inc., through which it distributes a broad range of value-added industrial plastics. Through another subsidiary, Oliver Steel Plate, it has a market position in alloy and heavy gauge carbon plate products. Along with its affiliated companies, Castle has facilities in over 40 locations throughout North America. Its customer base includes numerous Fortune 500 companies as well as thousands of medium and smaller-sized firms spread across a wide spectrum of industries. (www.amcastle.com).

Friedman Industries, Inc. is in the flat roll sheet and plate [*58] steel processing and distribution business. It operates two plants, in Texas and Arkansas, each capable of cutting-to-length, leveling, and temper passing hot roll steel coils. It operates a division selling excess prime, secondary, and transition steel coils, and a division that rolls and welds pipe for use in the water well industry, steel building columns, steel pipe piling, water and air lines, and many structural applications. (www.friedmanindistries.com).

Gibraltar Steel Corp.'s core business is producing value-added, high-margin steel products and services. It has expanded into the metal processing, building products, and commercial heat-treating markets, and is now the second-largest commercial heat-treater in North America and is a major supplier of metal building products. These operations utilize any one or a combination of more than 25 different processes and services to manufacture and deliver a variety of high-quality steel products and services. Gibraltar has expanded its customer base through the acquisition of 22 businesses and the investment of more than $ 200 million in capital expenditures and now has 72 facilities in 26 states, Mexico, and Canada serving more [*59] than 10,000 customers in a variety of industries. These customers are both domestic and international, including manufacturers and distributors and, to a lesser extent, end-users for a wide range of applications, and consumers through hardware and building products distributors and mass merchandisers. Gibraltar's major commercial markets include the automotive, automotive supply, building and construction, steel, machinery, and general manufacturing industries. (www.gibraltar1.complaint).

Olympic Steel is a domestic steel service center with a primary focus on the direct sale and distribution of large volumes of processed carbon, coated and stainless flat-rolled sheet, coil and plate steel products. Its processing services include both traditional service center processes of cutting-to-length, slitting, and shearing and higher value-added processes of blanking, tempering, plate burning, laser welding, and precision machining of steel parts. Olympic operates 12 processing and distribution facilities in Connecticut, Georgia, Illinois, Iowa, Michigan, Minnesota, Ohio, and Pennsylvania, with over 800 employees. It participates in two joint ventures in Michigan that primarily service [*60] the automotive market in the Detroit area. Its customers include both regional concerns and larger national and multi-location accounts, located throughout the midwestern, eastern and southern United States. (www.olysteel.com).

Reliance Steel & Aluminum Co., which is traded on the New York Stock Exchange, is one of the largest metals service center companies in the United States. It operates a network of more than 100 locations in 30 states, Belgium, France and South Korea, providing value-added metals processing services. It distributes a full line of more than 90,000 metal products, including galvanized, hot-rolled and cold-finished steel, stainless steel, aluminum, brass, copper, titanium, and alloy steel. Reliance boasts more than 95,000 customers in a broad range of industries. (www.rsac.com).

Ryerson Tull, Inc. is a leading North American distributor and processor of metals with annual sales of over $ 2.2 billion. With over 5,000 employees, it operates a network of service centers across the United States and Canada, has investments in additional service centers in Mexico and Asia, and maintains metal trading capabilities around the world. Recently, it acquired Integris Metals, [*61] Inc., North America's fourth largest metals service center with 2004 revenues of $ 2 billion. Ryerson

Tull processes stainless steel, aluminum, copper alloys, and industrial plastics, and maintains inventories over more than 100,000 metal and plastic items in a wide variety of grades, shapes, and sizes. (www.ryersontull.com).

Steel Technologies, Inc. is one of the largest independent steel processors in North America, and operates a network of 20 facilities throughout the eastern half of the United States and Mexico. It processes precision flat-rolled products for various industries, including the automotive, appliance, lawn and garden, agricultural, office equipment and railcar industries. Steel Technologies employs over 1,000 people. (www.steeltechnologies.com).

Finally, Worthington Industries, is a global company that processes steel for use in the automotive, construction, hardware, aerospace and many other industries. With some 8,000 employees, Worthington operates 65 facilities in 10 countries across North America and Europe. It manufactures metal products such as metal framing, pressure cylinders, automotive past model service stampings, metal ceiling grid systems and laser [*62] welded blanks. Worthington's metal framing subsidiary produces steel studs, floor joists, roof trusses, and other metal accessories for wholesale distributors and commercial and residential building contractors. Its pressure cylinder business caters to customers in the liquified petroleum gas and refrigeration industries, and manufactures cylinders to hold everything from acetylene for welding to oxygen for breathing. (www.worthingtonindustries.com).

[HN27] *Daubert* requires that trial judges must ensure that any and all expert testimony is not only relevant, but reliable. To that end, a judge must undertake a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. *Frymire-Brinati, 2 F.3d at 186*. The judge must look behind the expert's ultimate conclusion and analyze the adequacy of its foundation. *Mid-State Fertilizer, 877 F.2d at 1339*. Expert opinion that is speculative is inadmissible. *Cf. Target Market Pub., Inc. v. ADVO, Inc., 136 F.3d 1139, 1143 (7th Cir. 1998)*.

Mr. Dohmeyer's opinion [*63] that the financial performance of the eight companies in the period 1999-2002 can be used in evaluating Loeffel's lost profits or business in that period is unreliable and speculative. The defendants' use the phrase, "junk science," to refer to Mr. Toczyl's expert opinion. It was inappropriate there. *Loeffel Steel Products, supra*. It is, however, appropriately applied to the sampling of supposedly comparable companies compiled by DVC. Mr. Dohmeyer's testimony will not be allowed. The oft-repeated caution that [HN28] courts should be particularly wary of unfounded expert opinion when causation is the issue applies here. *See In re Agent Orange Product Litigation, 611 F.Supp. 1223, 1249 (E.D.N.Y. 1985), aff'd, 818 F.2d 187 (2nd Cir. 1987), cert. denied sub nom., Lombardi v. Dow Chemical Co., 487 U.S. 1234, 101 L. Ed. 2d 932, 108 S. Ct. 2898 (1988); Thomas v. FAG Bearings, 846 F.Supp. 1382, 1394 (W.D.Mo. 1994)*.

B

Assessment of Relevance

[HN29] To be admissible, expert testimony must be not only reliable, but relevant. *Daubert, 509 U.S. at 597; United States v. Allen, 390 F.3d 944, 949 (7th Cir. 2004)*. Testimony [*64] is relevant if it assists the trier of fact in understanding the evidence or in determining a fact at issue. An expert, who, like Mr. Dohmeyer, supplies nothing but a bottom line supplies nothing of value to the judicial process. *Minasian v. Standard Chartered Bank, PLC, 109 F.3d 1212, 1216 (7th Cir. 1997)*.

III

MR. DOHMEYER'S REPORT CRITIQUING MR. WIERSEMA'S ANALYSIS VIOLATED *RULE 26(a)(2)*

We come then to the argument that the defendants' failure to comply with the requirements of *Rule 26(a)(2)(B), Federal Rules of Civil Procedure*, requires barring testimony by Mr. Dohmeyer critical of Mr. Wiersema's conclusions. Recognizing that secrecy is not congenial to truth seeking, [HN30] the Rule requires that an expert report must disclose "a complete statement of all opinions to be expressed *and* the basis and reasons therefor . . ." n18 *Hoffman v. Caterpillar, Inc., 368 F.3d 709, 714 (7th Cir. 2004)*(Emphasis supplied). n19

 n18 *Rule 26(a)(2)(B)* provides, in pertinent part:

> [HN31] Except as otherwise stipulated or directed by the court, this disclosure *shall*, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report *shall contain a complete statement of all*

*opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions;. . . .* (Emphasis supplied).

[*65]

n19 Mr. Wiersema's report referred to approximately 1800 pages of exhibits, detailing expenses Loeffel claims to have incurred as a result of the Line's malfunctioning and the damages from claimed losses of current and prospective customers.

Mr. Dohmeyer's critique of Mr. Wiersema's report is his one page letter of February 27, 2004. Despite the clarity of *Rule 26*, and the fact that Mr. Dohmeyer was engaged specifically to analyze Mr. Wiersema's conclusions (Defendants' Response at 2), his report consisted of but five unadorned conclusions, set forth in bullet-point format:

. the Report's model has multiple incorrect premises of damages;

. The Report's model fails to incorporate risk/cost of capital procedures;

. The Report's model adds the alleged lost profits of the equipment as represented and the cost of the machine;

. The Report's model's methodology; and

. The Report's model has [sic] other assumptive and methodological errors.

The letter concludes: "As a result of the foregoing, Mr. Wiersema's model and related opinions are not reliable."

At his [*66] deposition, Mr. Dohmeyer conceded that his criticisms of Mr. Wiersema's report offered no explanation, no written opinions, no details, no analysis. (Dohmeyer Dep., at 76, 78). [HN32] Expertise is a rational process, and a rational process implies express reasons for judgment. *Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 627, 88 L. Ed. 333, 64 S. Ct. 281 (1944)*(Frankfurter, J. dissenting). An expert's opinion full of assertion but empty of reasons has no value and is devoid of persuasiveness and legal significance.

[HN33] An expert must demonstrate in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire, 526 U.S. at 152*. At his deposition, Mr. Dohmeyer spoke of the rigorous standards for admission into the American Society of Appraisers. (Dohmeyer Dep., at 13). He would never have gained admission to the ASA had he submitted an appraisal for evaluation as devoid of explanation and reasoning as was the "preliminary critique" of Mr. Wiersema's report. "Why should a court rely on the sort of exposition [a responsible member of the ASA] would not tolerate in his professional life." *Mid-State Fertilizer Co., 877 F.2d at 1339*. [*67]

What Judge Shadur wrote in *Gregory, 2002 U.S. Dist. LEXIS 24730, 2002 WL 31972165 at *1*, applies equally here: "There is frankly no justification that would permit any 'expert' witness, or any lawyer dealing with one, to tender a report that is so patently deficient in every one of those [things required by *Rule 26*] as the one that is at issue here." The deficiencies in the February 27th letter -- which was never supplemented -- are all the more inexcusable in light of Mr. Dohmeyer's involvement in hundreds of cases as an expert and the defendants' lawyers' experience and skill. n20

n20 To emphasize the extent of his experience as an expert witness, Mr. Dohmeyer's Declaration says that he has provided "expert witness testimony and analysis for over 15 years in hundreds of cases." *2002 U.S. Dist. LEXIS 24730, [WL] at 2*.

The second aspect of Mr. Dohmeyer's report is the "Analysis of Economic Loss," to which was attached Mr. Dohmeyer's curriculum vitae. It contains the heading, "EXPERT WITNESS TESTIMONY."[HN34] *Rule 26(a)(2)(B)* requires the disclosure [*68] of "any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years." The report must be "'detailed and complete.'" *Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 741 n.6 (7th Cir. 1998)*(quoting Advisory Committee's note). Thus, the cases have generally defined the "listing of cases" requirement to include the name of the court, the name of the parties, the case number, and whether the testimony was given at deposition or trial. *Id. Accord Zollinger v. Owens-Brockway Glass Container, Inc., 233 F.Supp.2d 349, 356 (N.D.N.Y. 2002); Coleman v. Dydula, 190 F.R.D. 316, 318 (W.D.N.Y. 1999); Hilt v. SFC Inc., 170 F.R.D. 182, 185 (D.Kan. 1997); Giladi v.

*Strauch*, 2001 U.S. Dist. LEXIS 4645, No. 94 Civ. 3976, 2001 WL 388052, at *3 (S.D.N.Y. Apr. 16, 2001). n21

> n21 The Rule requires the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

[*69]

In nearly every instance, Mr. Dohmeyer's description of the cases in which he previously had been involved was uninformative. Here are 2 examples: "Breach of Contract -- Analysis of Economic Loss to an Oil & Gas Concern," and "Economic Loss -- Injury -- Jay Gueck, Esq. (August, 2002)." As to the 33 entries that topically were relevant to Mr. Dohmeyer's testimony, involving as they did, "economic loss," the only case name listed was *Ellis v. Walker*. (Qualifications of Principal Appraisers, at 1-6). The others are listed as "Analysis of Economic Loss" or "Economic Loss," followed by the kind of business involved: a restaurant franchise, a weekly newspaper, a mobile home park, an aircraft maintenance facility, medical industry, residential building company, real estate agent, law firm, printing company, software developer, retail dress shop, real estate developer, and so on. As to these entries, their format made impossible, any meaningful investigation of Mr. Dohmeyer's background as an expert witness. n22

> n22 Only a handful of the entries contain the designation "trial" or "deposition." Even as to those that did, it was impossible to tell anything about the engagement or Mr. Dohmeyer's testimony since the entry did not contain sufficient information to enable Loeffel to conduct an appropriate inquiry.

[*70]

Significantly, Mr. Dohmeyer did not list *In Matter of Dunham*, 110 F.3d 286 (5th Cir. 1997). n23 There, Mr. Dohmeyer was engaged to testify regarding the value of an insurance agency's book of business. He concluded that the value was $ 26,000; his opposite number in the case, Mr. Phillips, concluded the figure was closer to $ 200,000. The district court held that Mr. Dohmeyer was not only inexperienced in the insurance industry, but his computations rested on the "erroneous assumption" that no non-competition agreements had been executed. *110 F.3d at 288*. The district court did not find Mr. Dohmeyer's assessment credible. The Fifth Circuit agreed that the district court was right in attributing little or no probative value to the Mr. Dohmeyer's appraisal. *Id. at 289*.

> n23 The only conceivable reference to the *Dunham* case in the *curriculum vitae* is the terse entry, "Bankruptcy -- Valuation of an insurance agency," which was buried in the middle of the 116 entries.

[*71]

I need not decide why the *curriculum vitae* failed, with but two exceptions, to list the names of the 116 cases. Whatever the reason, given Mr. Dohmeyer's extensive experience and the defendants' lawyer's sophistication, the skeletal format employed was indefensible and severely compromised Loeffel's ability to investigate Mr. Dohmeyer's involvement in any but a handful of the 116 matters he listed.

But this omission is insignificant compared to Mr. Dohmeyer's failure to disclose that the Analysis of Economic Loss was based entirely upon a theory given to him by the defendants, namely that the claimed deficiencies with the Line could be cured by the simple expedient of adding two additional workers and running the Line longer. While the *theory*, itself, might be deducible from the content of the arithmetic schedules that comprise the Analysis of Economic Loss Report, the *source* of the theory was not. Nothing in the "Limiting Conditions," which purported to state the "general assumptions and general limiting conditions" on which the "value opinion report has been prepared," hinted that the core assumptions on which all of Mr. Dohmeyer's endeavors were predicated came from [*72] his employers. Indeed, Mr. Dohmeyer's report conveyed precisely the opposite impression.

In the "Appraisal Certification" attached to his report, Mr. Dohmeyer "certified that, to the best of our knowledge and belief," the "reported analyses, opinions, and conclusions are limited *only* by the *reported assumptions* and limiting conditions, and are *our personal*, unbiased professional analyses, opinions, and conclusions." He went on to say that "*no one* provided significant professional assistance to the person signing this report." (Emphasis supplied). This was untrue: the defendants' employees had provided the salient "assumption" on which the Analysis Of Economic Loss was based, and nothing played a more "significant" role in that analysis.

Mr. Dohmeyer attempted at his deposition to distance himself from the "Statement of Limiting Condi-

tions" by claiming that the attachment was "boilerplate that we use in . . . all of our assignments," and that the Appraisal Certification wasn't particularly meaningful since his report was not a business appraisal, but an economic loss analysis. (Dohmeyer deposition at 21, 15-17). In his belatedly filed Declaration, he said that the [*73] appraisal certification was attached in error to the Analysis. *Id.* at 2.

Some six months after the deposition, Loeffel filed the instant motion and raised the issue of the non-compliance with *Rule 26(a)(2)(B)*. In response, the defendants filed a nine-page declaration from Mr. Dohmeyer and a paragraph from a book on valuation by Sharron Pratt. The breezy squib cites no authority, either scholarly or legal for its conclusion. Ms. Pratt, according to her internet site, is the owner of Business Valuation Resources, a company dedicated to "high-quality valuation related resources" for all manner of professionals. n24

> n24 The defendants' Response calls Ms. Pratt a "highly regarded economist," but does not identify the basis for the representation. (Response at 7). An internet search reveals that she writes on valuation of businesses. www.bvresources.com. Ms. Pratt is apparently in the same field as Mr. Dohmeyer.

The Declaration echoed much of Mr. Dohmeyer's deposition testimony. But it went substantially beyond [*74] that and attempted to make the case against Mr. Wiersema that the February 27th "critique" did not. Not surprisingly, Loeffel objects to the Declaration and to the squib from Ms. Pratt's book.

The Declaration contended that, as a certified public accountant, Mr. Wiersema lacked "valuation expertise" and thus, wrongly concluded that Loeffel's economic loss exceeded the pre-damaged value of the company. (Declaration, P 9). This opinion appeared nowhere in the February 27, 2004 letter. Ms. Pratt apparently agrees, but the one paragraph excerpt relied on by Mr. Dohmeyer, contains no citation of authority and nothing beyond her *ipse dixit* that "it is axiomatic that the present value of lost future profits can be equal to but not greater than, the total value of the enterprise had the damaging event not occurred." However, there immediately follows this sentence, which *supports* Mr. Wiersema's position: "however, I have seen 'experts' testify to damage sums many times any reasonable value for the entire entity." Apparently some judges have admitted as proper expert opinion the conclusion denounced by Mr. Dohmeyer.

He again repeated in his Declaration that there was no authoritative [*75] test for assessing damages when a machine operated at a level below specifications. (Declaration, P 19). This opinion seems at odds with the defendants' Response, which insists that the measure of damages is properly set forth in *Moorman*. More importantly, Mr. Dohmeyer contradicted his deposition testimony by claiming that the Analysis of Economic Loss relied upon a "benefit of the bargain" theory and took into account the production rates provided by the contract specifications. (Declaration, P 23). To say this contradicts his previous position is an understatement; he testified that the specifications were "inherently not relevant" and that he "didn't consider them one way or another." (Dohmeyer Dep., at 35, 83).

The defendants do not attempt to justify the omissions and deficiencies in the February 27th critique or in Mr. Dohmeyer's curriculum vitae; nor do they attempt to argue that the omissions are harmless. Instead, they say that Mr. Dohmeyer has "satisfied all the requirements of *Rule 26*," and that Loeffel's only objection relates to the "format" of the February 27th letter. (Response at 17). Any argument of harmlessness is therefore forfeited. See *Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 869 (7th Cir. 2005)*; [*76] *Musser v. Gentiva Health Servs., 356 F.3d 751, 758 (7th Cir. 2004)*; *Rule 37(c)(1). Federal Rules of Civil Procedure*. To the extent the Declaration repeats Mr. Dohmeyer's deposition testimony, it is irrelevant. To the extent it seeks to explain the basis for his opinions either in his deposition or in his reports, it is improper and untimely and will not be considered. *Bailey v. Allgas, 148 F.Supp.2d at 1236*. *Cf. Dura Automotive*.

IV

CONCLUSION

The plaintiff's motion to bar the testimony of Mr. Dohmeyer [77] is GRANTED, and the plaintiff's motion to strike exhibits A and C to the Response [93] is also GRANTED. The defendants' unamplified request for a "full *Daubert* hearing to determine the admissibility of Mr. Dohmeyer's testimony," made in the last sentence of their Response brief, is denied. I have before me the deposition of Mr. Dohmeyer and his reports. No more is needed to determine reliability. *Kumho Tire, 526 U.S. at 152*; *Group Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 761 n..3 (8th Cir. 2003)*; *Oddi v. Ford Motor Co., 234 F.3d 136, 153-154 (3rd Cir.),* [*77] *cert. denied 532 U.S. 921, 149 L. Ed. 2d 287, 121 S. Ct. 1357 (2000)*; *In re Handford Nuclear Reservation Litigation, 292 F.3d 1124, 1138-39 (9th Cir. 2002)*; *Kirstein v. Parks Corp., 159 F.3d 1065, 1067 (7th Cir. 1998)*. They will not be permitted to "return to the drawing board" to

Case 1:04-cv-01278-KAJ   Document 225-11   Filed 10/26/2005   Page 11 of 15

Page 23
2005 U.S. Dist. LEXIS 15718, *

restructure Mr. Dohmeyer's testimony. *Gregory, 2002 U.S. Dist. LEXIS 24730, 2002 WL 31972165 at *3.*

DATE: July 22, 2005

ENTERED:

Jeffery Cole

**UNITED STATES MAGISTRATE JUDGE**

LEXSEE 1999 US DIST LEXIS 16035

MEDIA SPORT & ARTS s.r.l. and FEDERATION INTERNATIONALE DE BASKETBALL, Plaintiffs, - against - KINNEY SHOE CORPORATION., Defendant.

95 Civ. 3901 (PKL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1999 U.S. Dist. LEXIS 16035; 52 Fed. R. Evid. Serv. (Callaghan) 1338

October 18, 1999, Decided
October 19, 1999, Filed

DISPOSITION: [*1] Plaintiffs' motions GRANTED in their entirety; defendant's first motion DENIED; defendant's second motion DENIED without prejudice to its renewal upon objection at trial; defendant's third motion HELD IN ABEYANCE.

CASE SUMMARY:

PROCEDURAL POSTURE: In a dispute over contract negotiations, plaintiff moved to exclude defendant's expert's testimony, and to preclude the issue of plaintiff's breach of its duties. Defendant moved to exclude evidence regarding certain accounting irregularities, managerial changes, and other legal matters, and to exclude testimony of plaintiff's expert.

OVERVIEW: Plaintiff moved to exclude testimony of defendant's sports marketing and licensing expert, contending the testimony consisted almost entirely of legal conclusions that went to whether a contract was formed. Plaintiffs moved to preclude the issue of plaintiff's breach of its duties, arguing it was prejudicial, and would have caused plaintiffs undue harm and delay. Defendant moved to exclude evidence regarding certain relevant accounting irregularities and managerial changes that occurred at defendant's parent. The court granted plaintiffs' motion to exclude defendant's expert, and limited testimony to industry customs and intent of the parties to be bound by the contract. Plaintiff's motion to exclude breach of duty issues was granted because there was no reason defendant's claims were late, and allowing the issue would have resulted in undue harm. Since accusations of accounting irregularities went to the ultimate issue, they were relevant for jury consideration, and defendant's motion was denied.

OUTCOME: Plaintiffs' motions granted; defendant's motion to exclude evidence regarding certain accounting irregularities and managerial changes denied; defendant's motion to exclude testimony of legal matters denied without prejudice to its renewal upon objection at trial; defendant's motion to exclude testimony held in abeyance until defendant objects to plaintiff's expert's testimony.

CORE TERMS: negotiations, managerial, breached, expert testimony, accounting, sport, counterclaim, amend, customs, irregularities, marketing, personal knowledge, expert witness, prejudicial, jurors, opine, undue, discovery, renewal, notice, opinion testimony, business decision, termination, admissible, deposition, exclusion of evidence, affirmative defense, ultimate issue, motion to exclude evidence, specialized knowledge

LexisNexis(R) Headnotes

*Evidence > Witnesses > Opinion on Ultimate Issue*
*Evidence > Witnesses > Expert Testimony*
[HN1] Fed. R. Evid. 702 provides that an expert witness may testify, in the form of an opinion or otherwise, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. An expert witness may even testify to the ultimate issue of fact in the case, but such opinions may not be phrased in terms of inadequately explored legal criteria. Fed. R. Evid. 704(a).

*Evidence > Witnesses > Expert Testimony*
[HN2] Testimony concerning the ordinary practices of lawyers and others engaged in a particular business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning

Case 1:04-cv-01278-KAJ   Document 225-11   Filed 10/26/2005   Page 14 of 15

Page 2
1999 U.S. Dist. LEXIS 16035, *; 52 Fed. R. Evid. Serv. (Callaghan) 1338

other trade customers: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry. However, it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. The special legal knowledge of the judge makes the witness's testimony superfluous. Although an expert may opine on the ultimate issue of fact, she may not give testimony stating ultimate legal conclusions based on those facts.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
*Evidence > Witnesses > Expert Testimony*
[HN3] It is the responsibility of the court to circumscribe the expert witness's testimony to ensure that the witness does not usurp the function of the judge. The trial judge has great discretion in deciding whether to admit expert testimony, and his decision will not be set aside unless it is manifestly erroneous. District court judges should not allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law, because it would be very confusing for jurors to be faced with opposing legal opinions admitted into evidence from both sides.

*Evidence > Witnesses > Expert Testimony*
[HN4] While expert testimony on the function of a particular type of document in industry practice may be relevant, such testimony cannot include any comment or opinion on the requirements of contract formation under state law or the application of state law to the facts of this case.

*Evidence > Witnesses > Opinion on Ultimate Issue*
*Evidence > Witnesses > Expert Testimony*
[HN5] Even if expert testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case. Issues of contract formation involve quintessential common law jury questions and do not present the jury with any new or more demanding task than what juries have always done.

*Evidence > Relevance > Relevant Evidence*
[HN6] Under Fed. R. Evid. 401, relevant evidence is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
[HN7] Evidence is prejudicial under Fed. R. Evid. 403 if it involves some adverse effect beyond tending to prove the fact or issue that justified its admission into evidence.

The court will exclude such evidence if it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. Fed. R. Evid. 403.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
[HN8] Exclusion under Fed. R. Evid. 403 is an extraordinary remedy that must be used sparingly.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Procedural Considerations > Limited Admissibility*
[HN9] If the court does perceive any undue prejudice under Fed. R. Evid. 403, such prejudice may be cured by defendant preparing a proposed limiting instruction for submission to the jury.

COUNSEL: For Plaintiffs: Richard G. Tashjian, Esq., of counsel, TASHJIAN & PADIAN, New York, NY.

For Defendant: Robert M. Leonard, Esq., of counsel, Jeffrey S. Lipkin, Esq., of counsel, SHANLEY & FISHER, P.C., Morristown, NJ.

JUDGES: Peter K. Leisure, U.S.D.J.

OPINIONBY: Peter K. Leisure

OPINION:

OPINION AND ORDER

LEISURE, District Judge:

Before the Court are various motions *in limine*. For the following reasons, plaintiffs' motions are granted in their entirety; defendant's first motion is denied; defendant's second motion is denied without prejudice to its renewal upon objection at trial; and defendant's third motion shall be held in abeyance.

I. Plaintiffs' Motions In Limine

A. Exclusion of Defendant's Proposed Expert Testimony

Defendant seeks to offer the expert testimony of Frank Vuono of Integrated Sports International ("ISI"). Mr. Vuono, a sports marketing and licensing expert, will testify as to certain negotiations that occurred [*2] between plaintiff Federation Internationale de Basketball ("FIBA") and the Foot Locker division of defendant Kinney Shoe Corporation ("Foot Locker"), as well as the commercial significance of certain issues, including the rights of first refusal. Plaintiffs object, contending that

Case 1:04-cv-01278-KAJ    Document 225-11    Filed 10/26/2005    Page 15 of 15

Page 3
1999 U.S. Dist. LEXIS 16035, *; 52 Fed. R. Evid. Serv. (Callaghan) 1338

Mr. Vuono's testimony consists almost entirely of legal conclusions that go to the ultimate issue in the case: whether a contract was formed.

Mr. Vuono's report sets forth what he believes to be the relevant chronological history and interpretation of the contract negotiations as well as his view of the meaning and import of the underlying documents and correspondence. See Expert Rep. at 4-15. He then offers his "opinion" on the termination of the negotiations, concluding, inter alia, that "all negotiations between FIBA and [Media Sport & Arts s.r.l. ("MSA")] were not final," id. at 15, that "there can be no doubt that the cause for the termination of the negotiations was the issue of the Rights of 1st Refusal held by ISL and EBU," id., that the "side letter agreement was never accepted by Foot Locker," id., that "FIBA's unacceptable resolution of the 1st Refusal Rights issue was and [*3] should have been a deal breaker," id. at 18, and that "it is the considered opinion of ISI that Foot Locker's legal counsel and . . . senior management made a correct, prudent and sound business decision terminating the negotiations with FIBA," id. His report concludes that "it is ISI's opinion that the business decision made by Foot Locker's Board of Directors and legal advisers was sound. Foot Locker should not be found liable for any damages." Id. at 35. Plaintiffs assert that such testimony would exceed the bounds of admissibility under *Federal Rules of Evidence 702-704* and *401-403*.

[HN1] *Federal Rule of Evidence 702* provides that an expert witness may testify, in the form of an opinion or otherwise, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." An expert witness may even testify to the "ultimate issue" of fact in the case, *Fed. R. Evid. 704(a)*, but such opinions may not be "phrased in terms of inadequately explored legal criteria," id., Adv. Comm. Notes.

As such, [HN2] testimony concerning the ordinary practices of lawyers and others engaged in a particular business is [*4] admissible "under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customers: to enable the jury to evaluate the conduct of the parties against the *standards of ordinary practice in the industry.*" *Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509 (2d Cir. 1977)* (emphasis added) (citing 7 Wigmore on Evidence, § 1949, at 66 (3d ed. 1940)). However, "it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. . . . The special legal knowledge of the judge makes the witness'[s] testimony superfluous." *Id. at 509-10*. Although an expert may opine on the ultimate issue of fact, she "may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991)*.

Accordingly, [HN3] it is the responsibility of the Court to circumscribe the expert witness's testimony to ensure that the witness does not "usurp the function of the judge." *Marx & Co., 550 F.2d at 512*. The trial judge has great discretion in deciding whether to admit expert testimony, and his decision [*5] will not be set aside unless it is "manifestly erroneous." *United States v. Duncan, 42 F.3d 97, 100 (2d Cir. 1994);* see also Fed. R. Evid. 702; *Hamling v. United States, 418 U.S. 87, 108, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974)*. The Second Circuit has cautioned that district court judges should "not allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law," *Marx & Co., 550 F.2d at 511*, because it would be "very confusing" for jurors to be faced with opposing legal opinions admitted into evidence from both sides, *United States v. Ingredient Tech. Corp., 698 F.2d 88, 97 (2d Cir. 1983)*.

On this issue, *Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509 (2d Cir. 1977)*, is particularly instructive. In Marx & Co., the Second Circuit reversed the district court in part where the trial judge had allowed a securities lawyer to testify regarding the practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC. See id. The Second Circuit held that the expert witness [*6] had impermissibly construed the contract for the jury and had inappropriately drawn conclusions regarding the legal significance of various facts adduced at trial:

> In the case at bar, however, [the expert's] objectionable testimony did *not* concern only the customary practices of a trade or business. Rather, he gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed [defendant's] conduct. He testified not so much as to common practice as to what was necessary 'to fulfill the covenant [of the contract].'

*Id. at 509* (emphasis in original); see also *Duncan, 42 F.3d at 101* ("When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's role for that of the jury."); *Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992)* (refusing to permit expert testimony where the witness "merely told the jury what result to reach"); *Bilzerian, 926 F.2d at 1295* ("Although testimony concerning the ordinary practices in the securities