an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions. But suppose the soundness of the underlying expert judgment is in issue. Suppose a thoracic surgeon gave expert evidence in a medical malpractice case that the plaintiff's decedent had died because the defendant, a radiologist, had negligently failed to diagnose the decedent's lung cancer until it was too advanced for surgery. The surgeon would be competent to testify that the cancer was too advanced for [*36] surgery, but in offering the additional and critical judgment that the radiologist should have discovered the cancer sooner he would be, at best, just parroting the opinion of an expert in radiology competent to testify that the defendant had x-rayed the decedent carelessly.

*Id.* The problem, then, is that the expert is vouching for the truth of what another expert told him - he is merely that expert's spokesman. But, [HN20] "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science." *Id.* at 614. See also *Grant v. Chemrex, Inc., 1997 U.S. Dist. LEXIS 6058, No. 93 C 0350, 1997 WL 223071, *8 (N.D.Ill. Apr. 28, 1997)* (expert's "professional knowledge and ability" were not adequate to evaluate calculations and opinions upon which he based his opinion). n11

n11 By way of example, the court in *Dura Automotive* said that a theoretical economist, who relied on the findings of an econometric study conducted by another economist, would not be allowed to testify if he lacked expertise in econometrics, and the study raised questions that only an econometrician could answer. *285 F.3d at 614.* Even Judge Wood, who dissented, agreed with this example. *Id.* at 620. See also *TK-7 Corp., 993 F.2d at 732* [HN21] (the rationale of *Rule 703* "is certainly not satisfied in this case where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.").

[*37]

That is precisely the situation here: If allowed to testify, Mr. Dohmeyer would be "hiding behind" Messrs. Barron, King and DaClue and acting as their "mouthpiece." *Id.* at 615. He would, in effect, be vouching for their labor-added methodology, when he has absolutely no knowledge of whether the theory is valid and reliable. See also *TK-7 Corp., 993 F.2d 722.* Thus, Mr. Dohmeyer's testimony cannot be used to prove that additional labor and shifts were in fact the medicament for the Line's ills. *In re James Wilson Associates, 965 F.2d 160, 173 (7th Cir. 1992)(Posner, J.)*

The example posed by Judge Posner in *James Wilson Associates* demonstrates the problem with Mr. Dohmeyer's testimony:

"If, for example, the expert witness (call him A) bases his opinion in part on a fact (call it X) that the parties lawyer told him, the lawyer cannot, in closing argument, tell the jury, 'see we proved X through our expert witness. A.'"

*Id.* at 173. (Parenthesis in original).

This was the kind of hand-off attempted in *James Wilson Associates,* where an architect attempted to testify to the value of a building based upon a report [*38] provided to him by a consulting engineer, who had examined the building. The Seventh Circuit held that the trial judge "was entitled to exclude the architect's evidence as hearsay." *Id.* at 172. The issue was the state of the building, and the expert who had evaluated that state - the consulting engineer - was the one who should have testified. The architect could use what the engineer told him to offer an opinion *within the architect's domain of expertise,* but he could not testify for the purpose of vouching for the truth of what the engineer told him - "of becoming in short the engineer's spokesman." *Id.* at 173. It "is improper to use an expert witness as a screen against cross-examination (though the other side could always call him as an adverse witness, and cross-examine him)." *Id* (Parenthesis in original).

Yet, without the testimony of Messrs. Barron, King and DaClue explaining and justifying their labor-added theory, Mr. Dohmeyer's testimony will "rest[] on air." *Dura Automotive, 285 F.3d at 615.* If the underlying assumptions cannot be proven by admissible, competent evidence, the very nature of which would appear [*39] to require expert testimony, Mr. Dohmeyer's analysis of economic loss would have no evidentiary support and would be irrelevant. See *Rule 402, Federal Rules of Evidence.* Yet, the only expert disclosure in the case on the

defendants' side is Mr. Dohmeyer's. Messrs. Barron, King and DaClue have not been designated as experts. Hence, it would appear that Mr. Dohmeyer's testimony, even if initially allowed, would ultimately have to be stricken.

The instant case is analytically congruent with *Dura Automotive*. There, the court held that the expert could have testified that the well field was contaminated by volatile organic compounds and that *if* the defendant's plastics plant was within the well field's capture zone, some of the contamination may have come from that plant. It did not follow, however, that he could testify that the plant *was* within the well field's capture zone. *285 F.3d at 613-614*.

The defendant moved to bar the hydrogeologist's testimony and to dismiss Dura's claim. Dura responded with affidavits from the four employees who had prepared the models on which the hydrogeologist was basing his conclusions. The [*40] defendant moved to strike the affidavits on the ground that the disclosure of additional expert witness was untimely. The district court granted the motion and held that without the affidavits, there was insufficient evidence of the reliability of the models, and the hydrogeologist's testimony could not prove that accuracy. The court barred the testimony and concluded that without it, Dura had no case. *285 F.3d at 612*.

The Court of Appeals affirmed. It held that to the extent the affidavits contained evidence that would have to be presented at trial by an expert witness or witnesses other than the hydrogeologist in order for Dura to withstand a motion of judgment as a matter of law, Dura's failure to have made timely disclosure of their experts' opinions invited application of *Rule 37(c)(1)* to bar the authors of the affidavits (or any other expert for that matter) from testifying. In the instant case, denying the motion to prohibit Mr. Dohmeyer's testimony and allowing him to testify when there will be no competent evidence to prove the truth of the underlying assumptions would result in allowing testimony that would have to be stricken as irrelevant. The law never requires [*41] an idle thing to be done. *Brooklyn Life Insurance Co. v. Dutcher, 95 U.S. 269, 272, 24 L. Ed. 410 (1877)*.

*TK-7 Corp. v. Estate of Barbouti* is also instructive. n12 To support the plaintiff's claim and to calculate the amount of damages, the plaintiffs presented testimony from Dr. Boswell, a financial economist and professor of finance. Dr. Boswell predicated his calculations of lost profits on sales projections of one Werber. The district court initially allowed the testimony, but ultimately directed a verdict against the plaintiff, based on insufficiency of the evidence of damages. Mr. Werber was not called to testify, and the district court held that in order

to prevail, the plaintiff had to present affirmative evidence on the projections that Dr. Boswell had assumed to be true. *Accord International Adhesive Coating Co. v. Bolton Emerson International, 851 F.2d 540, 546*. Since there was no such evidence, the plaintiff failed to carry its burden of proof. In affirming, the Tenth Circuit pointed out that Dr. Boswell had no familiarity with methods or reasoning used by Mr. Werber in arriving at his projections. In the instant case, Mr. Dohmeyer conceded a similar [*42] lack of understanding or familiarity of the models crafted by Messrs. Barron, King and DaClue.

n12 *Barbouti* was cited approvingly in *Dura Automotive. 285 F.3d at 613*.

c

**The Unreliability of The Methodology Underlying Mr. Dohmeyer's Conclusions Regarding Loeffel's Claim For Future Lost Profits And Business**

The third aspect of Mr. Dohmeyer's proposed expert testimony focuses on the Loeffel's claim for lost profits and business resulting from deficiencies in the Line. The Analysis of Economic Loss was accompanied by a letter of transmittal containing a 1 1/2 page discussion of the "(steel) metals industry," under the caption, "Industry Discussion." (Parenthesis in original). It summarized isolated bits of information that Mr. Dohmeyer or one of his colleagues had read on "money.msn.com and cnnfn.com." (*See* letter of February 27, 2004). As one would expect given Mr. Dohmeyer's admitted lack of expertise in the steel/metals industry and the sources of the information on which [*43] he relied, the 1 1/2 page discussion is superficial, generalized, and inexpert.

The discussion began by noting that the steel industry is made up of three tiers: primary metals producers, metals processors and/or service centers, and end users. The primary producers are the source of steel for the service centers, which "undertake value-adding services such as precision design and other pre-production processing as may be required by specific customers." These service centers, according to DVC, were formerly mostly distribution centers performing little processing. By the 1980s, however, they began to add processing capabilities that allowed them to add a broad range of value-added services.

Concurrently, the primary metals producers began concentrating on high volume production. As these industry changes continued, the discussion explained, many service centers found themselves unable to obtain processed products and had to begin outsourcing their customized metal processing to service centers with

value-added capabilities. Recent challenges in the industry include the recession and frequent, unpredictable increases in domestic steel prices.

The Analysis of Economic Loss contained [*44] 12 pages of graphs and charts reflecting financial data about 8 companies: A.M. Castle & Co.; Friedman Industries Inc.; Gibraltar Steel Corp.; Olympic Steel Inc.; Reliance Steel & Aluminum Co.; Ryerson Tull, Inc.; Steel Technologies Inc.; and Worthington Industries, Inc. The information was obtained from 10k's and Standard & Poor's reports. Mr. Dohmeyer could not explain how the companies were selected for inclusion in the sampling. This is the best he could say:

> I *think* one of the guys did a search on *one* company that was - that had a *similar description* to the description for this kind of business, what they do.

(Dohmeyer's Dep. at 121)(Emphasis supplied). How the other seven were selected remains unexplained.

The charts reflected the total sales, gross profit margins, net income, equity, return on equity, stock price, book value, and market to book value of the 8 companies for the period 1999 - 2002. According to Mr. Dohmeyer, the financial history of the eight companies during that period was relevant in evaluating Loeffel's potential for acquiring new business with the Line. (Dohmeyer Dep., at 119-121). But what that new business was to be, Mr. Dohmeyer [*45] wasn't sure. He referred to it, variously, as "toll processing, [] heavier gauge or wider gauge or both, I don't know." (Dohmeyer Dep., at 126). Whatever it was to be, Mr. Dohmeyer explained, its net present value was a function of the competitive environment of the "industry," as reflected by the eight corporations that had been chosen. (Dohmeyer Dep., at 126).

He testified that since the 8 companies had experienced financial difficulties between 1999 and 2002, Loeffel could not have hoped to do any better. (Dohmeyer Dep., at 120-122). The figures showed, among other things, *declines* in median total sales for the 8 companies from 2001 to 2002. But Loeffel had a 5.3% *increase* in 2002, while the 8 companies had a median loss of 2.2%. Similarly, while the median *decline* from 2000 to 2001 in gross profit margins of the 8 companies was 5.8%, Loeffel had a 1.4% *increase*. From 2001 to 2002, there was a median increase in gross profit margin of the 8 companies of 6.7%, while Loeffel's increased 23.9%.

In order for the sampling chosen by DVC comparison to have the requisite predictive capacity and the reliability *Daubert* demands, Mr. Dohmeyer had to "select samples that [*46] are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Donnelly v. Rhode Island Board of Governors for Higher Education, 929 F.Supp 583, 591 (D.R.I. 1996).*

[HN22] In calculating lost future profits or lost business, the measure of damages is guided by analysis of "comparable businesses *in the area.*" *Cates v. Morgan Portable Bldg. Corp., 591 F.2d 17, 21 n.7 (7th Cir. 1979)*(Emphasis supplied). "The business used as a standard must be as nearly identical to the plaintiff's as possible." *Lehrman v. Gulf Oil, 500 F.2d 659, 667 (5th Cir. 1974), cert. denied, 420 U.S. 929, 43 L. Ed. 2d 400, 95 S. Ct. 1128 (1975). Accord In re James O'Connell Co. Inc., 799 F.2d 1258, 1259 (9th Cir. 1986); National Farmers' Organization, Inc. v. Associated Milk Producers, Inc., 850 F.2d 1286, 1292 (8th Cir. 1989).* This is often referred to as the "yardstick approach." Absent the requisite showing of comparability, a damage model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural. [*47] *Cf. Home Placement Svc., Inc. v. The Providence Journal Co., 819 F.2d 1199, 1209 (1st Cir. 1987);* ABA Section of Antitrust Law, Antitrust Law Developments, 877-879 (5th ed. 2002)(and cases cited).

Of course, exact correlation is not necessary but the samples must be fair congeners. If they are not, the comparison is manifestly unreliable and cannot "'logically advance[] a material aspect of the proposing party's case. The Supreme Court [in *Daubert*] referred to this second prong of the analysis as the fit requirement.'" *Loeffel Steel Products v. Delta Brands, 372 F. Supp. 2d 1104, 2005 WL 1388076 at *16 (quoting Judge Kozinski's opinion on remand from the Supreme Court . Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1315 (9th Cir.), cert. denied, 516 U.S. 869, 133 L. Ed 2d 126, 116 S. Ct. 189 (1995)).*

Undiscriminatingly labeling all nine companies "steel service centers," Mr. Dohmeyer tacitly assumed that they are necessarily monolithic, that they necessarily compete for the same customers, and thus the past financial profile of the eight is a reasonable predictor of how Loeffel would have performed. Stated more simply, Mr. Dohmeyer's argument [*48] runs this way: 1) Loeffel and the eight companies are in the same "industry;" 2) all participants in "an industry" are necessarily competitors; 3) therefore, the financial performance of the eight companies in 1999-2002 is relevant to determining Loeffel's prospect for new business had the Line performed properly. n13 (Dohmeyer Dep., at 124). Here as always, "we must think things, not words, or at least we must constantly translate our words into facts for which they

stand, if we are to keep to the real and the true." Holmes, Law In Science and Science In Law, *12 Harv.L.Rev. 443, 460 (1889)*.

n13 When asked at his deposition how, since he knew nothing about the customer base of Loeffel or the eight publicly traded companies, he could have concluded that Loeffel served the same customer market as the eight other service centers, Mr. Dohmeyer said:

Oh they have to. I mean it's -- you're in that industry, you're competing. You can't help -- once you're in an industry, you can't help but compete with other people in your industry. (Dohmeyer Dep., at 124).

[*49]

Mr. Dohmeyer's inexpert conclusion that each participant in "an industry" necessarily competes with every other participant in the industry is demonstrably false, as Dohmeyer's own report shows. He claimed that the "steels/metals industry" was comprised of three tiers. But as his report noted, the three categories of industry participants were not competitors, but enjoyed a symbiotic relationship. Bentleys and Kias are in the same "industry," but obviously don't compete for the same customers. Arnold Schwarzenegger and Anthony Hopkins never competed for the same roles, although they were both in the "movie industry."

Of course, these are matters of public knowledge. The inquiry becomes more difficult, when the "industry" is more complicated and less obvious. Perhaps, all "steel service centers" do compete; perhaps they don't, or perhaps they do only to an exceedingly limited degree, measured by the extent of the products and services they offer in common, and their geographic location. But only an expert in the field is qualified to say, and neither Mr. Dohmeyer nor his colleagues even begin to qualify. *Cf. Gentieu, 214 F.Supp.2d at 851.* (What controls the admissibility [*50] of an expert's opinion evidence, "depends on whether his claimed expertise qualifies him to opine on the specific matters that he seeks to address.").

A moment's reflection demonstrates the error in Mr. Dohmeyer's facile, and under-inclusive methodology. Suppose the eight companies selected by DVC had, as does Loeffel, blanking operations, but, in addition, offered a very large number of other diversified products and services, not offered by Loeffel. Assume further that unlike Loeffel with its localized customer base in the

Midwest, the eight companies had nationwide or worldwide operations. In that event, the companies could scarcely be said to be comparable, and comparing their undifferentiated sales and income figures to those of Loeffel, would prove absolutely nothing. *Cf. Bailey v. Allgas, Inc., 148 F.Supp.2d 1222, 1232 (N.D.Ala. 2000).* n14

n14 [HN23] In antitrust cases, proof of the relevant product and geographic market is absolutely essential. The relevant geographic market is generally defined as the area of effective competition, that is the area in which the product or its reasonably interchangeable substitutes are traded. A determination of the geographic market must entail an analysis of several factors including the location of competitors and price data. *Id.* Although this case presents different issues, for purposes of determining comparability, the analysis is much the same.

[*51]

Mr. Dohmeyer at his deposition admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability. *See Home Placement Svc., Inc. v. The Providence Journal Co., 819 F.2d 1199, 1206 (1st Cir. 1987).* And the charts he compiled do not break out financial data by product or services. Hence, the raw financial data does not tell anything about the performance of the eight companies as to those products and services that they had in common with Loeffel. And it is only with respect to those products that they would be competitors -- at least for the purposes relevant to this case.

Even in cases involving far more comparability than is apparent here, courts have refused to allow the seemingly comparable companies to be used as a yardstick. In *Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc., 213 F.3d 198 (5th Cir. 2000)*, the plaintiff owned indoor soccer arenas. The court rejected soccer arenas in general as comparable businesses where there was no evidence offered regarding geographical location, [*52] size or attractiveness of those facilities, the size and type of the market that they served, the relative costs of operation, the amounts charged, or the number years the facility was run. *Id. at 208.* The Fifth Circuit stressed that employing such a broad category was like "arguing that because McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average." *Id. at 208-09. See also, Kinesoft Development Corp. v. Softbank Holdings Inc., 139 F.Supp.2d 869, 910*

*(N.D.Ill. 2001)* (rejecting damages calculation where expert gave no consideration to any analysis of a comparable company selling comparable products).

[HN24] It cannot be too often repeated or too strongly emphasized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Kumho Tire, 526 U.S. at 157.* That caution applies with singular force to Mr. Dohmeyer's conclusion that [*53] the eight publicly traded companies were comparable to Loeffel for purposes of assessing lost future business and profits.

Mr. Dohmeyer lacked the qualifications to conclude that merely because all nine companies could be classified as "service centers," they necessarily competed with Loeffel or that they were comparable. [HN25] Spending a few minutes on the internet does not make one an expert on any "industry" or on any topic. *Cf Charter National Bank & Trust v. Charter One Financial, Inc., 2001 U.S. Dist. LEXIS 13919, 2001 WL 1035721 at *6 (N.D.Ill. September 4, 2001)*(assistant professor of law at the University of Chicago and a fellow in economics and public policy was not qualified as an expert on trademark law despite his extensive reading of trademark cases). n15

> n15 The defendants have taken a somewhat inconsistent position on the question of Mr. Dohmeyer's expertise in the steel industry. First, they say that that expertise is "inconsequential." (Response at 9). Then, as an afterthought, they say that Mr. Dohmeyer "perform[ed] thorough research on the steel industry." Of course he did no such thing and saying it doesn't make it so. Finally, they say he consulted with the defendants' personnel, who have extensive experience in the steel industry. *Id.* There is nothing to support the claim that the defendants' employees are experts, and Mr. Dohmeyer never claimed that they imparted information beyond their labor-added theory. In any event, even if they had, that would not begin to satisfy the requirements of *Rule 702* or *703.*

[*54]

The eight congeners selected by DVC were large to massive, publicly traded companies. According to Mr. Dohmeyer's charts, their average *median* total sales for the period 1999 - 2002 was $ 640 million, while Loeffel's was $ 19 million. n16 Perhaps this alone is not enough to tip the balance. But, what does Mr. Dohmeyer's inex-

plicable failure to have considered such critical factors as what services the companies provided, their customer base, the products they sold, the geographic markets in which they operated, their prices and other critical aspects of the businesses. In fact, Mr. Dohmeyer admitted at his deposition that neither he nor his colleagues researched Loeffel or the eight comparative companies' customer bases. Yet, unless Loeffel's customer base and the services and products it offered approximated those of the eight companies, they were not "comparable," and the latters' economic fortunes would not be a "reliable" predictor of how Loeffel would have fared in the period 1999-2002.

> n16 In 2002, the actual sales for the eight companies ranged from $ 99 million to $ 2.296 billion. There was a similar range in gross profit margins ranging from a low of 6% to a high of 29.8% in 2002.

[*55]

The internet reveals the manifest unreliability of Mr. Dohmeyer's assumption about the uniformity of steel service centers -- an assumption that is the lynchpin in his theory of comparability. It also reveals the "fundamentally unsound basis [and] fatally deficient amount of data" on which Mr. Dohmeyer based his conclusion that the eight companies and Loeffel were comparable. *Thomas v. FAG Bearings Corp., 846 F.Supp. 1382 (W.D.Mo. 1994).* n17

> n17 [HN26] Even where a witness is an expert in the relevant field, the evidentiary reliability demanded by *Daubert* is not present when his or her opinion is speculative or rests on an unsound basis. *See American Bearing Co. v. Litton Industries, Inc., 540 F.Supp. 1163, 1173 (E.D.Pa. 1982), aff'd on other grounds, 729 F.2d 943 (3rd Cir.), cert. denied 469 U.S. 854, 83 L. Ed. 2d 112, 105 S. Ct. 178 (1984); Lithuanian Commerce Corp Ltd. v. Sara Lee Hosiery, 179 F.R.D. 450 (D.N.J. 1998)*(assumptions of a certified public accountant with several advanced degrees).

[*56]

Even a cursory search reveals that steel service centers are *not* monolithic and offer an extraordinary array of services and products, most of which are not offered by Loeffel, but are offered by the eight companies DVC selected.

In addition to cutting and slitting, coil processing, decoiling, bending, (and perhaps blade decambering) —

the services offered by Loeffel -- service centers also offer many services that Loeffel does not, such as: polishing, plasma profiling, grinding, gun drilling, tempering, stress relieving, annealing, heat treating, burning, abrasive and carbide blade sawing, computerized plasma cutting and automatic splice welding, piercing, notching, edging, ribbon and oscillate winding, punching, drilling, flame cutting, beam splitting. *See* www.steelvillage.com. Similarly, the same internet site reveals a varied array of products offered by service centers, but not offered by Loeffel, including: pipe, rod, bar, aluminum, brass, bronze, tubing, carbon, alloy, high speed steels, alloy heat treated, abrasion resistant, high strength, HSLA plate, valves, fitting and flanges. *Id.*

Further dissimilarities abound. Loeffel is a small company with offices in [*57] the greater Chicago area. It employs 70 people, and its customer base is largely in the Midwest. It is in the business of slitting and cutting raw steel into lengths and thicknesses according to customer specifications. Its customers include various industries, from filing cabinet manufacturers to metal building products and stock containers. (*Complaint,* P 1; www.loeffel.com).

A.M. Castle & Co., specializes in the distribution of carbon, alloy and stainless steels; nickel alloys; aluminum; titanium; and brass and copper in a variety of product forms, including bar, plate, tube, sheet and coil. It operates a subsidiary, Total Plastics, Inc., through which it distributes a broad range of value-added industrial plastics. Through another subsidiary, Oliver Steel Plate, it has a market position in alloy and heavy gauge carbon plate products. Along with its affiliated companies, Castle has facilities in over 40 locations throughout North America. Its customer base includes numerous Fortune 500 companies as well as thousands of medium and smaller-sized firms spread across a wide spectrum of industries. (www.amcastle.com).

Friedman Industries, Inc. is in the flat roll sheet and plate [*58] steel processing and distribution business. It operates two plants, in Texas and Arkansas, each capable of cutting-to-length, leveling, and temper passing hot roll steel coils. It operates a division selling excess prime, secondary, and transition steel coils, and a division that rolls and welds pipe for use in the water well industry, steel building columns, steel pipe piling, water and air lines, and many structural applications. (www.friedmanindistries.com).

Gibraltar Steel Corp.'s core business is producing value-added, high-margin steel products and services. It has expanded into the metal processing, building products, and commercial heat-treating markets, and is now the second-largest commercial heat-treater in North America and is a major supplier of metal building prod-

ucts. These operations utilize any one or a combination of more than 25 different processes and services to manufacture and deliver a variety of high-quality steel products and services. Gibraltar has expanded its customer base through the acquisition of 22 businesses and the investment of more than $ 200 million in capital expenditures and now has 72 facilities in 26 states, Mexico, and Canada serving more [*59] than 10,000 customers in a variety of industries. These customers are both domestic and international, including manufacturers and distributors and, to a lesser extent, end-users for a wide range of applications, and consumers through hardware and building products distributors and mass merchandisers. Gibraltar's major commercial markets include the automotive, automotive supply, building and construction, steel, machinery, and general manufacturing industries. (www.gibraltar1 .complaint).

Olympic Steel is a domestic steel service center with a primary focus on the direct sale and distribution of large volumes of processed carbon, coated and stainless flat-rolled steel, coil and plate steel products. Its processing services include both traditional service center processes of cutting-to-length, slitting, and shearing and higher value-added processes of blanking, tempering, plate burning, laser welding, and precision machining of steel parts. Olympic operates 12 processing and distribution facilities in Connecticut, Georgia, Illinois, Iowa, Michigan, Minnesota, Ohio, and Pennsylvania, with over 800 employees. It participates in two joint ventures in Michigan that primarily service [*60] the automotive market in the Detroit area. Its customers include both regional concerns and larger national and multi-location accounts, located throughout the midwestern, eastern and southern United States. (www.olysteel.com).

Reliance Steel & Aluminum Co., which is traded on the New York Stock Exchange, is one of the largest metals service center companies in the United States. It operates a network of more than 100 locations in 30 states, Belgium, France and South Korea, providing value-added metals processing services. It distributes a full line of more than 90,000 metal products, including galvanized, hot-rolled and cold-finished steel, stainless steel, aluminum, brass, copper, titanium, and alloy steel. Reliance boasts more than 95,000 customers in a broad range of industries. (www.rsac.com).

Ryerson Tull, Inc. is a leading North American distributor and processor of metals with annual sales of over $ 2.2 billion. With over 5,000 employees, it operates a network of service centers across the United States and Canada, has investments in additional service centers in Mexico and Asia, and maintains metal trading capabilities around the world. Recently, it acquired Integris Metals, [*61] Inc., North America's fourth largest metals service center with 2004 revenues of $ 2 billion. Ryerson

Tull processes stainless steel, aluminum, copper alloys, and industrial plastics, and maintains inventories over more than 100,000 metal and plastic items in a wide variety of grades, shapes, and sizes. (www.ryersontull.com).

Steel Technologies, Inc. is one of the largest independent steel processors in North America, and operates a network of 20 facilities throughout the eastern half of the United States and Mexico. It processes precision flat-trolled products for various industries, including the automotive, appliance, lawn and garden, agricultural, office equipment and railcar industries. Steel Technologies employs over 1,000 people. (www.steeltechnologies.com).

Finally, Worthington Industries, is a global company that processes steel for use in the automotive, construction, hardware, aerospace and many other industries. With some 8,000 employees, Worthington operates 65 facilities in 10 countries across North America and Europe. It manufactures metal products such as metal framing, pressure cylinders, automotive past model service stampings, metal ceiling grid systems and laser [*62] welded blanks. Worthington's metal framing subsidiary produces steel studs, floor joists, roof trusses, and other metal accessories for wholesale distributors and commercial and residential building contractors. Its pressure cylinder business caters to customers in the liquified petroleum gas and refrigeration industries, and manufactures cylinders to hold everything from acetylene for welding to oxygen for breathing. (www.worthingtonindustries.com).

[HN27] *Daubert* requires that trial judges must ensure that any and all expert testimony is not only relevant, but reliable. To that end, a judge must undertake a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning of methodology properly can be applied to the facts at issue. *Frymire-Brinati, 2 F.3d at 186.* The judge must look behind the expert's ultimate conclusion and analyze the adequacy of its foundation. *Mid-State Fertilizer, 877 F.2d at 1339.* Expert opinion that is speculative is inadmissible. *Cf. Target Market Pub., Inc. v. ADVO, Inc., 136 F.3d 1139, 1143 (7th Cir. 1998).*

Mr. Dohmeyer's opinion [*63] that the financial performance of the eight companies in the period 1999-2002 can be used in evaluating Loeffel's lost profits or business in that period is unreliable and speculative. The defendants' use the phrase, "junk science," to refer to Mr. Toczyl's expert opinion. It was inappropriate there. *Loeffel Steel Products, supra.* It is, however, appropriately applied to the sampling of supposedly comparable companies compiled by DVC. Mr. Dohmeyer's testimony

will not be allowed. The oft-repeated caution that [HN28] courts should be particularly wary of unfounded expert opinion when causation is the issue applies here. *See In re Agent Orange Product Litigation, 611 F.Supp. 1223, 1249 (E.D.N.Y. 1985), aff'd, 818 F.2d 187 (2nd Cir. 1987), cert. denied sub nom., Lombardi v. Dow Chemical Co., 487 U.S. 1234, 101 L. Ed. 2d 932, 108 S. Ct. 2898 (1988); Thomas v. FAG Bearings, 846 F.Supp. 1382, 1394 (W.D.Mo. 1994).*

**B**

**Assessment of Relevance**

[HN29] To be admissible, expert testimony must be not only reliable, but relevant. *Daubert, 509 U.S. at 597; United States v. Allen, 390 F.3d 944, 949 (7th Cir. 2004).* Testimony [*64] is relevant if it assists the trier of fact in understanding the evidence or in determining a fact at issue. An expert, who, like Mr. Dohmeyer, supplies nothing but a bottom line supplies nothing of value to the judicial process. *Minasian v. Standard Chartered Bank, PLC, 109 F.3d 1212, 1216 (7th Cir. 1997).*

**III**

**MR. DOHMEYER'S REPORT CRITIQUING MR. WIERSEMA'S ANALYSIS VIOLATED *RULE 26(a)(2)***

We come then to the argument that the defendants' failure to comply with the requirements of *Rule 26(a)(2)(B), Federal Rules of Civil Procedure,* requires barring testimony by Mr. Dohmeyer critical of Mr. Wiersema's conclusions. Recognizing that secrecy is not congenial to truth seeking, [HN30] the Rule requires that an expert report must disclose "a complete statement of all opinions to be expressed *and* the basis and reasons therefor . . ." n18 *Hoffman v. Caterpillar, Inc., 368 F.3d 709, 714 (7th Cir. 2004)*(Emphasis supplied). n19

> n18 *Rule 26(a)(2)(B)* provides, in pertinent part:
>
> > [HN31] Except as otherwise stipulated or directed by the court, this disclosure *shall,* with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report *shall contain a complete statement of all*

*opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions;* [and] *any exhibits to be used as a summary of or support for the opinions;. . . . (Emphasis supplied).*

[*65]

n19 Mr. Wiersema's report referred to approximately 1800 pages of exhibits, detailing expenses Loeffel claims to have incurred as a result of the Line's malfunctioning and the damages from claimed losses of current and prospective customers.

Mr. Dohmeyer's critique of Mr. Wiersema's report is his one page letter of February 27, 2004. Despite the clarity of *Rule 26*, and the fact that Mr. Dohmeyer was engaged specifically to analyze Mr. Wiersema's conclusions (Defendants' Response at 2), his report consisted of but five unadorned conclusions, set forth in bullet- point format:

. the Report's model has multiple incorrect premises of damages;

. The Report's model fails to incorporate risk/cost of capital procedures;

. The Report's model adds the alleged lost profits of the equipment as represented and the cost of the machine;-

. The Report's model's methodology; and

. The Report's model has [sic] other assumptive and methodological errors.

The letter concludes: "As a result of the foregoing, Mr. Wiersema's model and related opinions are not reliable."

At his [*66] deposition, Mr. Dohmeyer conceded that his criticisms of Mr. Wiersema's report offered no explanation, no written opinions, no details, no analysis. (Dohmeyer Dep., at 76, 78). [HN32] Expertise is a rational process, and a rational process implies express reasons for judgment. *Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 627, 88 L. Ed. 333, 64 S. Ct. 281 (1944)*(Frankfurter, J. dissenting). An ex-

pert's opinion full of assertion but empty of reasons has no value and is devoid of persuasiveness and legal significance.

[HN33] An expert must demonstrate in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire, 526 U.S. at 152.* At his deposition, Mr. Dohmeyer spoke of the rigorous standards for admission into the American Society of Appraisers. (Dohmeyer Dep., at 13). He would never have gained admission to the ASA had he submitted an appraisal for evaluation as devoid of explanation and reasoning as was the "preliminary critique" of Mr. Wiersema's report. "Why should a court rely on the sort of exposition [a responsible member of the ASA] would not tolerate in his professional life." *Mid-State Fertilizer Co., 877 F.2d at 1339.* [*67]

What Judge Shadur wrote in *Gregory, 2002 U.S. Dist. LEXIS 24730, 2002 WL 31972165 at *1*, applies equally here: "There is frankly no justification that would permit any 'expert' witness, or any lawyer dealing with one, to tender a report that is so patently deficient in every one of those [things required by *Rule 26*] as the one that is at issue here." The deficiencies in the February 27th letter -- which was never supplemented -- are all the more inexcusable in light of Mr. Dohmeyer's involvement in hundreds of cases as an expert and the defendants' lawyers' experience and skill. n20

n20 To emphasize the extent of his experience as an expert witness, Mr. Dohmeyer's Declaration says that he has provided "expert witness testimony and analysis for over 15 years in hundreds of cases." *2002 U.S. Dist. LEXIS 24730, [WL] at 2.*

The second aspect of Mr. Dohmeyer's report is the "Analysis of Economic Loss," to which was attached Mr. Dohmeyer's curriculum vitae. It contains the heading, "EXPERT WITNESS TESTIMONY."[HN34] *Rule 26(a)(2)(B)* requires the disclosure [*68] of "any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years." The report must be "'detailed and complete.'" *Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 741 n.6 (7th Cir. 1998)*(quoting Advisory Committee's note). Thus, the cases have generally defined the "listing of cases" requirement to include the name of the court, the name of the parties, the case number, and whether the testimony was given at deposition or trial. *Id. Accord Zollinger v. Owens-Brockway Glass Container, Inc., 233 F.Supp.2d 349, 356 (N.D.N.Y. 2002); Coleman v. Dydula, 190 F.R.D. 316, 318 (W.D.N.Y. 1999); Hilt v. SFC Inc., 170 F.R.D. 182, 185 (D.Kan. 1997); Giladi v.*

*Strauch, 2001 U.S. Dist. LEXIS 4645, No. 94 Civ. 3976, 2001 WL 388052, at \*3 (S.D.N.Y. Apr. 16, 2001).* n21

> n21 The Rule requires the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

[*69]

In nearly every instance, Mr. Dohmeyer's description of the cases in which he previously had been involved was uninformative. Here are 2 examples: "Breach of Contract -- Analysis of Economic Loss to an Oil & Gas Concern," and "Economic Loss -- Injury -- Jay Gueck, Esq. (August, 2002)." As to the 33 entries that topically were relevant to Mr. Dohmeyer's testimony, involving as they did, "economic loss," the only case name listed was *Ellis v. Walker.* (Qualifications of Principal Appraisers, at 1-6). The others are listed as "Analysis of Economic Loss" or "Economic Loss," followed by the kind of business involved: a restaurant franchise, a weekly newspaper, a mobile home park, an aircraft maintenance facility, medical industry, residential building company, real estate agent, law firm, printing company, software developer, retail dress shop, real estate developer, and so on. As to these entries, their format made impossible, any meaningful investigation of Mr. Dohmeyer's background as an expert witness. n22

> n22 Only a handful of the entries contain the designation "trial" or "deposition." Even as to those that did, it was impossible to tell anything about the engagement or Mr. Dohmeyer's testimony since the entry did not contain sufficient information to enable Loeffel to conduct an appropriate inquiry.

[*70]

Significantly, Mr. Dohmeyer did not list *In Matter of Dunham, 110 F.3d 286 (5th Cir. 1997).* n23 There, Mr. Dohmeyer was engaged to testify regarding the value of an insurance agency's book of business. He concluded that the value was $ 26,000; his opposite number in the case, Mr. Phillips, concluded the figure was closer to $ 200,000. The district court held that Mr. Dohmeyer was not only inexperienced in the insurance industry, but his computations rested on the "erroneous assumption" that no non-competition agreements had been executed. *110*

*F.3d at 288.* The district court did not find Mr. Dohmeyer's assessment credible. The Fifth Circuit agreed that the district court was right in attributing little or no probative value to the Mr. Dohmeyer's appraisal. *Id. at 289.*

> n23 The only conceivable reference to the *Dunham* case in the *curriculum vitae* is the terse entry, "Bankruptcy -- Valuation of an insurance agency," which was buried in the middle of the 116 entries.

[*71]

I need not decide why the *curriculum vitae* failed, with but two exceptions, to list the names of the 116 cases. Whatever the reason, given Mr. Dohmeyer's extensive experience and the defendants' lawyer's sophistication, the skeletal format employed was indefensible and severely compromised Loeffel's ability to investigate Mr. Dohmeyer's involvement in any but a handful of the 116 matters he listed.

But this omission is insignificant compared to Mr. Dohmeyer's failure to disclose that the Analysis of Economic Loss was based entirely upon a theory given to him by the defendants, namely that the claimed deficiencies with the Line could be cured by the simple expedient of adding two additional workers and running the Line longer. While the *theory,* itself, might be deducible from the content of the arithmetic schedules that comprise the Analysis of Economic Loss Report, the *source* of the theory was not. Nothing in the "Limiting Conditions," which purported to state the "general assumptions and general limiting conditions" on which the "value opinion report has been prepared," hinted that the core assumptions on which all of Mr. Dohmeyer's endeavors were predicated came from [*72] his employers. Indeed, Mr. Dohmeyer's report conveyed precisely the opposite impression.

In the "Appraisal Certification" attached to his report, Mr. Dohmeyer "certified that, to the best of our knowledge and belief," the "reported analyses, opinions, and conclusions are limited *only* by the *reported assumptions* and limiting conditions, and are *our personal,* unbiased professional analyses, opinions, and conclusions." He went on to say that "*no one* provided significant professional assistance to the person signing this report." (Emphasis supplied). This was untrue: the defendants' employees had provided the salient "assumption" on which the Analysis Of Economic Loss was based, and nothing played a more "significant" role in that analysis.

Mr. Dohmeyer attempted at his deposition to distance himself from the "Statement of Limiting Condi-

tions" by claiming that the attachment was "boilerplate that we use in . . . all of our assignments," and that the Appraisal Certification wasn't particularly meaningful since his report was not a business appraisal, but an economic loss analysis. (Dohmeyer deposition at 21, 15-17). In his belatedly filed Declaration, he said that the [*73] appraisal certification was attached in error to the Analysis. *Id.* at 2.

Some six months after the deposition, Loeffel filed the instant motion and raised the issue of the noncompliance with *Rule 26(a)(2)(B)*. In response, the defendants filed a nine-page declaration from Mr. Dohmeyer and a paragraph from a book on valuation by Sharron Pratt. The breezy squib cites no authority, either scholarly or legal for its conclusion. Ms. Pratt, according to her internet site, is the owner of Business Valuation Resources, a company dedicated to "high-quality valuation related resources" for all manner of professionals. n24

> n24 The defendants' Response calls Ms. Pratt a "highly regarded economist," but does not identify the basis for the representation. (Response at 7). An internet search reveals that she writes on valuation of businesses. www.bvresources.com. Ms. Pratt is apparently in the same field as Mr. Dohmeyer.

The Declaration echoed much of Mr. Dohmeyer's deposition testimony. But it went substantially beyond [*74] that and attempted to make the case against Mr. Wiersema that the February 27th "critique" did not. Not surprisingly, Loeffel objects to the Declaration and to the squib from Ms. Pratt's book.

The Declaration contended that, as a certified public accountant, Mr. Wiersema lacked "valuation expertise" and thus, wrongly concluded that Loeffel's economic loss exceeded the pre-damaged value of the company. (Declaration, P 9). This opinion appeared nowhere in the February 27, 2004 letter. Ms. Pratt apparently agrees, but the one paragraph excerpt relied on by Mr. Dohmeyer, contains no citation of authority and nothing beyond her *ipse dixit* that "it is axiomatic that the present value of lost future profits can be equal to but not greater than, the total value of the enterprise had the damaging event not occurred." However, there immediately follows this sentence, which *supports* Mr. Wiersema's position: "however, I have seen 'experts' testify to damage sums many times any reasonable value for the entire entity." Apparently some judges have admitted as proper expert opinion the conclusion denounced by Mr. Dohmeyer.

He again repeated in his Declaration that there was no authoritative [*75] test for assessing damages when a machine operated at a level below specifications. (Declaration, P 19). This opinion seems at odds with the defendants' Response, which insists that the measure of damages is properly set forth in *Moorman*. More importantly, Mr. Dohmeyer contradicted his deposition testimony by claiming that the Analysis of Economic Loss relied upon a "benefit of the bargain" theory and took into account the production rates provided by the contract specifications. (Declaration, P 23). To say this contradicts his previous position is an understatement; he testified that the specifications were "inherently not relevant" and that he "didn't consider them one way or another." (Dohmeyer Dep., at 35, 83).

The defendants do not attempt to justify the omissions and deficiencies in the February 27th critique or in Mr. Dohmeyer's curriculum vitae; nor do they attempt to argue that the omissions are harmless. Instead, they say that Mr. Dohmeyer has "satisfied all the requirements of *Rule 26*," and that Loeffel's only objection relates to the "format" of the February 27th letter. (Response at 17). Any argument of harmlessness is therefore forfeited. *See Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 869 (7th Cir. 2005)*; [*76] *Musser v. Gentiva Health Servs., 356 F.3d 751, 758 (7th Cir. 2004)*; *Rule 37(c)(1)*. Federal Rules of Civil Procedure. To the extent the Declaration repeats Mr. Dohmeyer's deposition testimony, it is irrelevant. To the extent it seeks to explain the basis for his opinions either in his deposition or in his reports, it is improper and untimely and will not be considered. *Bailey v. Allgas, 148 F.Supp.2d at 1236. Cf. Dura Automotive.*

## IV

## CONCLUSION

The plaintiff's motion to bar the testimony of Mr. Dohmeyer [77] is GRANTED, and the plaintiff's motion to strike exhibits A and C to the Response [93] is also GRANTED. The defendants' unamplified request for a "full *Daubert* hearing to determine the admissibility of Mr. Dohmeyer's testimony," made in the last sentence of their Response brief, is denied. I have before me the deposition of Mr. Dohmeyer and his reports. No more is needed to determine reliability. *Kumho Tire, 526 U.S. at 152; Group Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 761 n..3 (8th Cir. 2003); Oddi v. Ford Motor Co., 234 F.3d 136, 153-154 (3rd Cir.),* [*77] *cert. denied 532 U.S. 921, 149 L. Ed. 2d 287, 121 S. Ct. 1357 (2000); In re Handford Nuclear Reservation Litigation, 292 F.3d 1124, 1138-39 (9th Cir. 2002); Kirstein v. Parks Corp., 159 F.3d 1065, 1067 (7th Cir. 1998).* They will not be permitted to "return to the drawing board" to

2005 U.S. Dist. LEXIS 15718, *

restructure Mr. Dohmeyer's testimony. *Gregory, 2002 U.S. Dist. LEXIS 24730, 2002 WL 31972165 at *3.*

**DATE: July 22, 2005**

ENTERED:

Jeffery Cole

**UNITED STATES MAGISTRATE JUDGE**

LEXSEE 1999 US DIST LEXIS 16035

**MEDIA SPORT & ARTS s.r.l. and FEDERATION INTERNATIONALE DE BASKETBALL, Plaintiffs, - against - KINNEY SHOE CORPORATION., Defendant.**

95 Civ. 3901 (PKL)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 16035; 52 Fed. R. Evid. Serv. (Callaghan) 1338*

October 18, 1999, Decided
October 19, 1999, Filed

**DISPOSITION:** [*1] Plaintiffs' motions GRANTED in their entirety; defendant's first motion DENIED; defendant's second motion DENIED without prejudice to its renewal upon objection at trial; defendant's third motion HELD IN ABEYANCE.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a dispute over contract negotiations, plaintiff moved to exclude defendant's expert's testimony, and to preclude the issue of plaintiff's breach of its duties. Defendant moved to exclude evidence regarding certain accounting irregularities, managerial changes, and other legal matters, and to exclude testimony of plaintiff's expert.

**OVERVIEW:** Plaintiff moved to exclude testimony of defendant's sports marketing and licensing expert, contending the testimony consisted almost entirely of legal conclusions that went to whether a contract was formed. Plaintiffs moved to preclude the issue of plaintiff's breach of its duties, arguing it was prejudicial, and would have caused plaintiffs undue harm and delay. Defendant moved to exclude evidence regarding certain relevant accounting irregularities and managerial changes that occurred at defendant's parent. The court granted plaintiffs' motion to exclude defendant's expert, and limited testimony to industry customs and intent of the parties to be bound by the contract. Plaintiff's motion to exclude breach of duty issues was granted because there was no reason defendant's claims were late, and allowing the issue would have resulted in undue harm. Since accusations of accounting irregularities went to the ultimate issue, they were relevant for jury consideration, and defendant's motion was denied.

**OUTCOME:** Plaintiffs' motions granted; defendant's motion to exclude evidence regarding certain accounting irregularities and managerial changes denied; defendant's motion to exclude testimony of legal matters denied without prejudice to its renewal upon objection at trial; defendant's motion to exclude testimony held in abeyance until defendant objects to plaintiff's expert's testimony.

**CORE TERMS:** negotiations, managerial, breached, expert testimony, accounting, sport, counterclaim, amend, customs, irregularities, marketing, personal knowledge, expert witness, prejudicial, jurors, opine, undue, discovery, renewal, notice, opinion testimony, business decision, termination, admissible, deposition, exclusion of evidence, affirmative defense, ultimate issue, motion to exclude evidence, specialized knowledge

**LexisNexis(R) Headnotes**

*Evidence > Witnesses > Opinion on Ultimate Issue*
*Evidence > Witnesses > Expert Testimony*
[HN1] Fed. R. Evid. 702 provides that an expert witness may testify, in the form of an opinion or otherwise, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. An expert witness may even testify to the ultimate issue of fact in the case, but such opinions may not be phrased in terms of inadequately explored legal criteria. Fed. R. Evid. 704(a).

*Evidence > Witnesses > Expert Testimony*
[HN2] Testimony concerning the ordinary practices of lawyers and others engaged in a particular business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning

1999 U.S. Dist. LEXIS 16035, *; 52 Fed. R. Evid. Serv. (Callaghan) 1338

other trade customers: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry. However, it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. The special legal knowledge of the judge makes the witness's testimony superfluous. Although an expert may opine on the ultimate issue of fact, she may not give testimony stating ultimate legal conclusions based on those facts.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
*Evidence > Witnesses > Expert Testimony*
[HN3] It is the responsibility of the court to circumscribe the expert witness's testimony to ensure that the witness does not usurp the function of the judge. The trial judge has great discretion in deciding whether to admit expert testimony, and his decision will not be set aside unless it is manifestly erroneous. District court judges should not allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law, because it would be very confusing for jurors to be faced with opposing legal opinions admitted into evidence from both sides.

*Evidence > Witnesses > Expert Testimony*
[HN4] While expert testimony on the function of a particular type of document in industry practice may be relevant, such testimony cannot include any comment or opinion on the requirements of contract formation under state law or the application of state law to the facts of this case.

*Evidence > Witnesses > Opinion on Ultimate Issue*
*Evidence > Witnesses > Expert Testimony*
[HN5] Even if expert testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case. Issues of contract formation involve quintessential common law jury questions and do not present the jury with any new or more demanding task than what juries have always done.

*Evidence > Relevance > Relevant Evidence*
[HN6] Under Fed. R. Evid. 401, relevant evidence is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
[HN7] Evidence is prejudicial under Fed. R. Evid. 403 if it involves some adverse effect beyond tending to prove the fact or issue that justified its admission into evidence.

The court will exclude such evidence if it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. Fed. R. Evid. 403.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
[HN8] Exclusion under Fed. R. Evid. 403 is an extraordinary remedy that must be used sparingly.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Procedural Considerations > Limited Admissibility*
[HN9] If the court does perceive any undue prejudice under Fed. R. Evid. 403, such prejudice may be cured by defendant preparing a proposed limiting instruction for submission to the jury.

COUNSEL: For Plaintiffs: Richard G. Tashjian, Esq., of counsel, TASHJIAN & PADIAN, New York, NY.

For Defendant: Robert M. Leonard, Esq., of counsel, Jeffrey S. Lipkin, Esq., of counsel, SHANLEY & FISHER, P.C., Morristown, NJ.

JUDGES: Peter K. Leisure, U.S.D.J.

OPINIONBY: Peter K. Leisure

OPINION:

OPINION AND ORDER

LEISURE, District Judge:

Before the Court are various motions *in limine*. For the following reasons, plaintiffs' motions are granted in their entirety; defendant's first motion is denied; defendant's second motion is denied without prejudice to its renewal upon objection at trial; and defendant's third motion shall be held in abeyance.

I. Plaintiffs' Motions In Limine

A. Exclusion of Defendant's Proposed Expert Testimony

Defendant seeks to offer the expert testimony of Frank Vuono of Integrated Sports International ("ISI"). Mr. Vuono, a sports marketing and licensing expert, will testify as to certain negotiations that occurred [*2] between plaintiff Federation Internationale de Basketball ("FIBA") and the Foot Locker division of defendant Kinney Shoe Corporation ("Foot Locker"), as well as the commercial significance of certain issues, including the rights of first refusal. Plaintiffs object, contending that

Mr. Vuono's testimony consists almost entirely of legal conclusions that go to the ultimate issue in the case: whether a contract was formed.

Mr. Vuono's report sets forth what he believes to be the relevant chronological history and interpretation of the contract negotiations as well as his view of the meaning and import of the underlying documents and correspondence. See Expert Rep. at 4-15. He then offers his "opinion" on the termination of the negotiations, concluding, *inter alia*, that "all negotiations between FIBA and [Media Sport & Arts s.r.l. ("MSA")] were not final," id. at 15, that "there can be no doubt that the cause for the termination of the negotiations was the issue of the Rights of 1st Refusal held by ISL and EBU," id., that the "side letter agreement was never accepted by Foot Locker," id., that "FIBA's unacceptable resolution of the 1st Refusal Rights issue was and [*3] should have been a deal breaker," id. at 18, and that "it is the considered opinion of ISI that Foot Locker's legal counsel and . . . senior management made a correct, prudent and sound business decision terminating the negotiations with FIBA," id. His report concludes that "it is ISI's opinion that the business decision made by Foot Locker's Board of Directors and legal advisers was sound. Foot Locker should not be found liable for any damages." Id. at 35. Plaintiffs assert that such testimony would exceed the bounds of admissibility under *Federal Rules of Evidence 702-704* and *401-403*.

[HN1] *Federal Rule of Evidence 702* provides that an expert witness may testify, in the form of an opinion or otherwise, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." An expert witness may even testify to the "ultimate issue" of fact in the case, *Fed. R. Evid. 704(a)*, but such opinions may not be "phrased in terms of inadequately explored legal criteria," id., Adv. Comm. Notes.

As such, [HN2] testimony concerning the ordinary practices of lawyers and others engaged in a particular business is [*4] admissible "under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customers: to enable the jury to evaluate the conduct of the parties against the *standards of ordinary practice in the industry*." *Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509 (2d Cir. 1977)* (emphasis added) (citing 7 Wigmore on Evidence, § 1949, at 66 (3d ed. 1940)). However, "it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. . . . The special legal knowledge of the judge makes the witness'[s] testimony superfluous." *Id. at 509-10*. Although an expert may opine on the ultimate issue of fact, she "may not give testimony stating ultimate legal conclusions based on those facts."

*United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).*

Accordingly, [HN3] it is the responsibility of the Court to circumscribe the expert witness's testimony to ensure that the witness does not "usurp the function of the judge." *Marx & Co., 550 F.2d at 512*. The trial judge has great discretion in deciding whether to admit expert testimony, and his decision [*5] will not be set aside unless it is "manifestly erroneous." *United States v. Duncan, 42 F.3d 97, 100 (2d Cir. 1994)*; see also *Fed. R. Evid. 702*; *Hamling v. United States, 418 U.S. 87, 108, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974)*. The Second Circuit has cautioned that district court judges should "not allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law," *Marx & Co., 550 F.2d at 511*, because it would be "very confusing" for jurors to be faced with opposing legal opinions admitted into evidence from both sides, *United States v. Ingredient Tech. Corp., 698 F.2d 88, 97 (2d Cir. 1983)*.

On this issue, *Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509 (2d Cir. 1977)*, is particularly instructive. In *Marx & Co.*, the Second Circuit reversed the district court in part where the trial judge had allowed a securities lawyer to testify regarding the practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC. See id. The Second Circuit held that the expert witness [*6] had impermissibly construed the contract for the jury and had inappropriately drawn conclusions regarding the legal significance of various facts adduced at trial:

> In the case at bar, however, [the expert's] objectionable testimony did *not* concern only the customary practices of a trade or business. Rather, he gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed [defendant's] conduct. He testified not so much as to common practice as to what was necessary 'to fulfill the covenant [of the contract].'

*Id. at 509* (emphasis in original); see also *Duncan, 42 F.3d at 101* ("When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's role for that of the jury."); *Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992)* (refusing to permit expert testimony where the witness "merely told the jury what result to reach"); *Bilzerian, 926 F.2d at 1295* ("Although testimony concerning the ordinary practices in the securities

industry may be received [*7] to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, testimony encompassing an ultimate legal conclusion based on the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice.") (citation omitted); *United States v. Scop, 846 F.2d 135, 140 (2d Cir. 1988)* (precluding expert testimony where the expert failed to couch his opinion testimony in factual statements but rather "drew directly upon the language of the statute and accompanying regulations"); *F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1258 (2d Cir. 1987)* (excluding testimony concluding that contracts were unenforceable for lack of essential terms); *United States v. Bronston, 658 F.2d 920, 930 (2d Cir. 1981)* (excluding testimony where witness sought to opine "regarding the ultimate question of whether [defendant's] conduct amounted to a breach of fiduciary"); *Radiofone, Inc. v. Pricellular Corp., 1992 U.S. Dist. LEXIS 19383, *15, Civ. A. No. 91-4306, 1992 WL 395207* (E.D. La. Dec. 11, 1992) ("While [HN4] expert testimony on the function of [a particular type of] document in 'industry [*8] practice' may be relevant, . . . such testimony cannot include any comment or opinion on the requirements of contract formation under [state] law or the application of [state] law to the facts of this case.").

Defendant maintains that Mr. Vuono's testimony will discuss customs and practices unique to the sports marketing industry. This "specialized knowledge," it argues, will be helpful to a jury responsible for determining whether the parties intended to be bound to a contract. See Def. Opp. Mem. at 3; see also Expert Rep. at 15 ("As is standard in the sports marketing industry, agreements are always in writing and are never final until signed by all parties."). However, this is but one of the many issues addressed by Mr. Vuono's report. To the extent to which Vuono's testimony is limited to a *factual* discussion regarding the customs and industries of the sports industry, an analysis of whether the conduct of the parties in this action conformed to those customs, and whether such behavior evidences the parties' intent to be bound by contract, the testimony will be admissible. See, e.g., *Antilles Steamship Co. v. Members of the American Hull Ins. Syndicate, 733 F.2d 195, 199 (2d Cir. 1984)* [*9] ("The expert witness . . . testified concerning customs and practices of the marine insurance industry. We examine this proof as it bears on the intent of the parties. . . ."); *W.H. Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc., 1992 U.S. Dist. LEXIS 11651, *5, No. 90 C 4993, 1992 WL 1888378, at *2* (N.D. Ill. July 28, 1992) ("It is well established that the court may use expert testimony 'to ascertain the intent of the parties with respect to the contract terms.'") (quoting *In re Marriage of Goldman, 196 Ill. App. 3d 785, 554 N.E.2d 1016, 1022, 143 Ill. Dec. 944 (Ill. 1st Dist. 1990))*, aff'd, 25

F.3d 422 (7th Cir. 1994); *Angel Music, Inc. v. ABC Sports, Inc., 631 F. Supp. 429, 433 (S.D.N.Y. 1986)* (suggesting that testimony from music industry experts would shed light on the intent of the parties with respect the scope and the meaning of the category of rights created by their agreement).

For the most part, however, Mr. Vuono's testimony does not concern practices in the sports marketing industry, on which he is qualified as an expert, but rather constitutes "legal opinions as to the meaning of the contract terms at issue." Id. For example, [*10] his conclusions that the negotiations were not final, that the side letter was never accepted by Foot Locker, and that Foot Locker should not be found liable all impermissibly invade the province of the jury. [HN5] Even if his testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case. See *Bilzerian, 926 F.2d at 1295.* Issues of contract formation involve "quintessential common law jury question[s]" and do not present the jury with any "new or more demanding task than what juries have always done." *Kidder, Peabody & Co. v. IAG Int'l Acceptance Group, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998).*

Moreover, Mr. Vuono's testimony is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties. Compare *Duncan, 42 F.3d at 102* (allowing testimony based on personal knowledge), with *Scop, 846 F.2d at 142* (holding that testimony by an investigator without personal knowledge of the facts encroached on exclusive province of the jury), and *Kidder, 14 F. Supp. 2d at 399* (precluding [*11] opinion testimony by a law professor in part because he had no personal knowledge of the facts at issue). Mr. Vuono's testimony may not take the place of that of the individuals who actually negotiated the deal. Indeed, defendant's chief negotiator, David Goldberg, has testified that he has negotiated hundreds of contracts in his career. See Tasjian Rep. Aff. at 6; Goldberg Dep. at 8-9. Mr. Goldberg's testimony would be far more appropriate on this subject and renders Mr. Vuono's secondhand knowledge unnecessary for the edification of the jury.

Therefore, to the extent that Mr. Vuono would seek to opine on whether a contract was formed, he would inevitably have to discuss issues of contract law. Such testimony would usurp the role of the judge in instructing the jury on the law, as well as the role of the jury in determining whether Foot Locker breached any legal or contractual obligation. As such, Mr. Vuono's opinion testimony concerns matters outside his area of expertise, and is therefore inadmissible. See *Duncan, 42 F.3d at 102.* The Court thus grants plaintiffs' motion to exclude Mr. Vuono's testimony regarding the contract negotiations,

Case 1:04-cv-01278-KAJ    Document 225-12    Filed 10/26/2005    Page 17 of 24

Page 5

1999 U.S. Dist. LEXIS 16035, *; 52 Fed. R. Evid. Serv. (Callaghan) 1338

except to the extent [*12] that such testimony is limited to an analysis of whether the parties' behavior conformed with industry customs and practices and whether this evidences the intent of the parties to be bound by contract. Finally, the Court adds that Mr. Vuono shall be allowed to testify regarding his calculation of damages, as plaintiffs have not raised any objection to that portion of his expert report. See Expert Rep. at 19-34.

## B. Exclusion of Evidence Concerning MSA's Alleged Breach of Obligations

In its "Contentions of the Parties" section of the Pretrial Order, defendant alleges that "MSA breached its duties to its principal [i.e., Foot Locker]" by failing to disclose information to Foot locker in a timely manner. PTO at 11, 12. Plaintiffs contend that defendant should be precluded from introducing any evidence at trial, or making any corresponding arguments to the jury, concerning this issue because (a) the evidence is irrelevant and prejudicial under Fed. R. Evid. 402 and 403, and (b) allowing defendant to pursue this claim would cause plaintiffs undue harm and delay.

As an initial matter, this Court observes that defendant had the opportunity to move to amend its answer [*13] to assert counterclaims against MSA based on these facts, yet failed to do so. In an October 24, 1997 pretrial conference, counsel for defendant represented that it was contemplating such a motion. See Tasjian Aff. at P 13. The Court responded that any such motion must be filed within thirty days. See id. However, no such motion was ever made.

Defendant maintains that because these issues were "fully explored" throughout discovery, Def. Opp. Mem. at 5, it should come as "no surprise" to plaintiffs that defendant wishes to raise this issue, id. at 6. Yet although defendant claims the issue has been "raised from the start and has been the subject of considerable discovery," id., its counsel fails to point to any pleading or correspondence that would put plaintiffs on notice of its contention that MSA breached obligations it owed to it. Instead, defendant accuses plaintiffs of "exalting form over substance" for insisting that defendant raise the issue as an affirmative defense or counterclaim.

The purpose of the pleading and notice requirements of the Federal Rules of Civil Procedure is to put the parties on notice of the claims and defenses involved in the particular [*14] case so as to allow them to prepare for trial. See Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988). Perhaps certain applications of the Rules exalt form over substance, but that is clearly not the case in the instant controversy. The appropriate way for defendant to raise this issue would have been to amend its answer

two years ago to include a counterclaim or an affirmative defense. Defendant raised the specter of moving to amend its answer, but apparently decided against it after receiving defendant's counsel's articulate letter explaining his opposition in light of the relevant case law. See Tashjian Rep. Aff. at Ex. C. Plaintiffs have legitimate justifications for opposing defendant's motion to amend, and defendant cannot avoid these legal pitfalls by pursuing this "back door" route to amend its answer. This Court is unwilling to condone such a strategy.

Regardless, even if defendant had sought to amend its complaint to assert such a counterclaim or affirmative defense, such an amendment would not be appropriate. First, the assertion of a counterclaim against MSA would create a conflict of interest [*15] with the potential to require either FIBA or MSA to retain separate counsel. See Atchinson v. District Columbia, 315 U.S. App. D.C. 318, 73 F.3d 418, 427 (D.C. Cir. 1996); Knapp v. Whitaker, 757 F.2d 827, 848-49 (7th Cir. 1985); see also Doe v. Columbia Univ., 165 F.R.D. 394, 396 (S.D.N.Y. 1996) (recognizing that "that prejudice such as this must be considered in ruling on a motion to amend," but ruling that the prejudice was not undue). Second, allowing new counterclaims at this stage would cause undue harm and delay, as discovery has been completed and this case is on the eve of trial. See Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir. 1985). Plaintiffs never had the opportunity to fully cross-examine deposition witnesses about these issues. There is no reason why these claims could not have been brought from the outset, and the fact that they were not suggests they are improper at this time. See Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990) ("The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay . . . ."). [*16]

Defendant has offered no explanation for its failure to raise this issue formally earlier in this litigation. Defendant's sole argument in opposition to plaintiffs' motion is that plaintiffs were on notice of this claim because certain witnesses were questioned concerning its claim that MSA breached its duties. However, these excerpts neither support defendant's position that plaintiffs were ever adequately informed of defendant's intention to raise this defense, nor its contention that no further discovery is necessary to probe this issue.

Because MSA's conduct was never raised as an issue in defendant's pleadings, any such evidence is irrelevant to the main issues in this action. Moreover, even where such evidence relevant, it would surely be more prejudicial than probative, as the jury might be confused into thinking that allegations of wrongdoing by MSA excuse defendant from liability. See Fed. R. Evid. 403; Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 709-10 (2d Cir. 1983) (affirming exclusion of evidence of

Case 1:04-cv-01278-KAJ    Document 225-12    Filed 10/26/2005    Page 18 of 24

Page 6

1999 U.S. Dist. LEXIS 16035, *; 52 Fed. R. Evid. Serv. (Callaghan) 1338

bribery in a price discrimination case as unfairly prejudicial because the charges were "inflammatory" and unrelated to any claim or defense). [*17] Therefore, plaintiffs' motion to exclude evidence concerning MSA's alleged breach of duty to defendant is hereby granted.

## II. Defendant's Motions In Limine

### A. Exclusion of Evidence Concerning Woolworth's Accounting Irregularities and Management Changes

Defendant has moved to exclude evidence regarding certain accounting irregularities and managerial changes that occurred at Woolworth Corporation ("Woolworth"), the parent of defendant, during the time of and subsequent to the events relevant to this action. Defendant objects to this line of evidence on the grounds that it is irrelevant to the issues to be decided in this case.

[HN6] Under *Fed. R. Evid. 401*, "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Plaintiff contends that this evidence is relevant because it shows that the true reason for Foot Locker's sudden decision to not to sign the final draft of the agreement did not result from concerns regarding unresolved contractual issues, but rather was based on Foot Locker's concerns [*18] about these financial problems and managerial changes, which were precipitated by the accounting irregularities. See Media Sport & Arts s.r.l. v. *Kinney Shoe Corp., 1997 U.S. Dist. LEXIS 12394, No. 95 Civ. 3901, 1997 WL 473968*, at *6-*7 (S.D.N.Y. Aug. 20, 1997). Plaintiffs point to a letter from Foot Locker's chief negotiator, David Goldberg, which states that the contract had not been signed because of management changes. See Pl. Opp. Mem. at 4. Defendant maintains that there is no evidence connecting the accounting irregularities or financial problems with Foot Locker's decision. See Def. Rep. Mem. at 2. As for the managerial changes, defendant argues that because Mr. Goldberg had no authority to bind Woolworth to the contract, his statements carry little weight. Moreover, it states, Goldberg's acknowledgment of managerial changes refers to a change in management at Kinney, not the managerial changes at Woolworth to which plaintiffs refer, and such managerial changes at Woolworth had no relevance to the decision to terminate negotiations. See id. at 2-3.

This Court has already found that a triable issue of facts exists regarding whether the parties manifested an intent to bind themselves [*19] to a preliminary agreement. See *Media Sport, 1997 WL 473968*, at *10. Therefore, the key issues to be tried before the jury are: whether a contract was ever formed, and, if so, whether Foot Locker breached the contract. Ordinarily, the issue

of *why* a party breached, as opposed to *whether* it breached, would not be considered relevant. However, the basis for Foot Locker's decision *is* relevant because it also bears on whether Foot Locker intended to be bound in the absence of a formal, final contract. In the Pretrial Order, defendant offers its argument that no contract was formed because the parties failed to resolve various issues central to the agreement, see PTO at 13, PP 1-m, and states that negotiations over these issues ceased because FIBA misrepresented the nature of and failed to disclose the actual terms of the rights of first refusal, see PTO at 14, PP n-r. Plaintiffs' allegations regarding the accounting irregularities and managerial changes represent an alternative explanation for the discontinuation of negotiations, which, plaintiffs claim, contradicts defendant's assertion that the parties had already consummated an agreement.

Accordingly, [*20] this evidence is relevant for jury consideration, if only because defendant has opened the door by proffering its own reasons for the termination of negotiations. Were the Court to disallow this evidence, the jurors would hear only one side of the story. Although defendant characterizes plaintiff's theory "nothing more than speculation," Def. Rep. Mem. at 2, issues of causation need not be proved or disproved with absolute certainty, see, e.g., *Madison Consultants v. FDIC, 710 F.2d 57, 65 (2d Cir. 1983)*, and hence the jury can decide for itself how much weight each side's explanation deserves.

Defendant maintains that, even if the evidence is relevant, it should be excluded under *Fed. R. Evid. 403* because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." [HN7] Evidence is prejudicial under Rule 403 if it "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995)*. The Court will exclude such evidence if it has "an undue tendency to suggest decision on [*21] an improper basis, commonly, though not necessarily, an emotional one." *Fed. R. Evid. 403*, Adv. Comm. Notes. According to defendant, this evidence of accounting irregularities and managerial changes "is likely to taint the jurors' views toward Woolworth and its employees," Def. Mem. at 3, and might cause them to disbelieve defendant's witnesses, see id..

As plaintiff correctly points out, however, defendant has failed to demonstrate "why or how the jury would consider and use the evidence other than for its intended purpose of showing the motivation behind [defendant's] business decision." Pl. Opp. Mem. at 6. Specifically, it has not shown that the accounting irregularities are outrageous enough to tend to poison the minds of the jurors

1999 U.S. Dist. LEXIS 16035, *; 52 Fed. R. Evid. Serv. (Callaghan) 1338

against defendant. Moreover, there is no reason to think that evidence of mere managerial changes would have the effect defendant claims. Therefore, because [HN8] exclusion under Rule 403 is an "extraordinary remedy that must be used sparingly," *George v. Celotex Corp., 914 F.2d 26, 31 (2d Cir. 1990),* this Court will not prevent the jury from hearing relevant evidence.

Finally, [HN9] if this Court does perceive any undue prejudice, such [*22] prejudice may be cured by defendant preparing a proposed limiting instruction for submission to the jury. See e.g., *United States Football League v. NFL, 842 F.2d 1335, 1370 & n.23 (2d Cir. 1988);* see also *United States v. Siegel, 717 F.2d 9, 18 (2d Cir. 1983).*

For these reasons, defendant's motion to exclude evidence is denied.

**B. Exclusion of Testimony Regarding Legal Matters**

For the same reasons that have prompted this Court to exclude testimony from defendant's expert, Mr. Vuono, see supra at 1-7, defendant's objection to potential questions that elicit opinions regarding conclusions of law is a legitimate concern. However, defendant has not specified which witnesses, other than David Goldberg, it expects will impinge on the exclusive province of the jury, nor which statements of Goldberg or any other witnesses it believes will be inappropriate. Defendant did not cite even a single excerpt from a deposition in which a witness inappropriately opined on matters of law.

Accordingly, although defendant is correct that neither expert nor lay witnesses may testify as to conclusions of law, this motion is premature. Cf. *Violette v. Armonk Assocs., L.P., 849 F. Supp. 923, 930-31 (S.D.N.Y. 1994)* [*23] (denying plaintiff's in limine motion without prejudice to its renewal on the ground that the circumstances under which such evidence would be introduced were unknown); *United States v. Feola, 651 F. Supp. 1068, 1129 (S.D.N.Y. 1987)* ("It would be improper for this Court to speculate as to the circumstances that might surround the introduction of this evidence at trial, specifically, the adequacy of the foundation . . ., the probative value weighed against the potential prejudicial impact in light of the evidence presented, and the pur-

pose for which such a statement will be introduced at the time."), aff'd, *875 F.2d 857 (2d Cir. 1989).* Defendant can protect the record at trial by timely objection, when and if it appears that the testimony of any witness is sought that would improperly draw such legal conclusions. For this reason, defendant's motion is denied without prejudice to its renewal upon objection at trial.

**C. Exclusion of Certain Testimony from Plaintiffs' Expert**

Defendant has moved to exclude testimony from plaintiffs' expert, Ms. Sally Hoffman, on the ground that Ms. Hoffman "has no experience in the realm of sports marketing. [*24] " Def. Mem. at 6. It contends that her "lack of experience and familiarity with the types of contracts at issue" preclude her from having a "reliable basis in the knowledge and experience" of the appropriate discipline. *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 592, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).*

However, defendant's reply brief concedes that "plaintiffs' point that this issue is premature is well taken." Def. Rep. Mem. at 5. Because defendant "simply wants to preserve its right at trial to challenge Ms. Hoffman's competency to render certain opinions," id., this motion shall be held in abeyance until defendant objects to Ms. Hoffman's testimony.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motions are HEREBY GRANTED in their entirety; defendant's first motion is HEREBY DENIED; defendant's second motion is HEREBY DENIED without prejudice to its renewal upon objection at trial; and defendant's third motion shall be HELD IN ABEYANCE.

**SO ORDERED.**

New York, New York
October 18, 1999

Peter K. Leisure

U.S.D.J.

LEXSEE 1995 DEL SUPER LEXIS 340

NORTH AMERICAN PHILIPS CORPORATION, a corporation of the State of
Delaware, Plaintiff, v. AETNA CASUALTY AND SURETY, COMPANY, et al., De-
fendants.

C.A. No. 88C-JA-155

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*1995 Del. Super. LEXIS 340*

**April 4, 1995, Submitted**
**April 22, 1995, Decided**

**NOTICE:** [*1]   THIS OPINION HAS NOT BEEN
RELEASED   FOR   PUBLICATION.   UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

**DISPOSITION:**

Certain Defendants' Motion in Limine to Bar Expert
Testimony by Insurance Experts: DENIED. Plaintiff's
Motion in Limine to Bifurcate the Testimony of Richard
Stewart: GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant insurance
companies filed a motion in limine, seeking to bar the
testimony of insurance expert witnesses for plaintiff, a
corporation of the State of Delaware, in an action regard-
ing insurance coverage. The corporation filed a motion in
limine and sought to bifurcate the expert witness testi-
mony.

**OVERVIEW:** In an action concerning insurance cover-
age, the insurance companies argued that because the
terms of the policies were unambiguous, extrinsic evi-
dence concerning the meaning of such terms was inad-
missible. The court held that both it and the jury would
benefit from expert testimony as to the contract termi-
nology and the context from which the contracts derived,
and the alleged danger of prejudice and confusion did not
substantially outweigh the probative value of enabling
the jury to evaluate the insurers' conduct against industry
standards. The court also granted the corporation's mo-
tion to bifurcate the expert testimony, holding that there
was no prejudice to the insurers because they had prior
notice of the bifurcation and would have ample opportu-
nity to cross-examine the experts as to all of their testi-

mony. The court was also satisfied that the two segments
of testimony would enhance the presentation of the evi-
dence and the jury's ability to apply the law to facts of
the case.

**OUTCOME:** The court denied the insurers' motion to
bar the expert testimony and granted the corporation's
motion to bifurcate the testimony.

**CORE TERMS:** expert testimony, extrinsic evidence,
comprehensive general liability, inadmissible, expert
witness, unfair, insurance industry, insurance policies,
motion in limine, presentation, coverage, legal conclu-
sion, unambiguous, Delaware Uniform Rules of Evi-
dence, Federal Rules of Evidence, probative value, trier
of fact, factfinder, industry-related, bifurcate, confuse,
mislead, segments, pertain, custom, duty, contract inter-
pretation, legal opinion, evidentiary, speculations

**LexisNexis(R) Headnotes**

*Evidence > Procedural Considerations > Limited Ad-
missibility*
[HN1] The general rule concerning admissibility of evi-
dence is that the law of the forum prevails.

*Evidence > Procedural Considerations > Limited Ad-
missibility*
*Contracts Law > Contract Interpretation > Parol Evi-
dence Rule*
[HN2] While it is true that extrinsic evidence may not be
introduced in order to search for ambiguities, it is also
true that in interpreting an integrated agreement, atten-
tion is directed to the meaning of the written terms in
light of the surrounding circumstances.

*Evidence > Witnesses > Expert Testimony*

[HN3] If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, an expert may testify thereto in the form of an opinion or otherwise. Del. R. Evid. 702.

*Evidence > Witnesses > Expert Testimony*
[HN4] Particularly in a complex insurance commercial insurance coverage case, the testimony of industry experts can be of great assistance in providing the necessary foundation for the jury. Expert testimony can be considered because of the specialized-nature of the language in the insurance contracts and the fact that these are not "plain English" policies. Industry-related testimony would provide the court and the jury with a factual basis of knowledge from which the contracts at issue could be intelligently construed. Industry-related testimony, including customs and practices, is also relevant because it enables the jury to evaluate conduct of parties against industry standards.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Witnesses > Expert Testimony*
[HN5] Both Delaware and New York require exclusion of expert testimony that expresses a legal conclusion. Although the rule against legal opinions from experts is clear, it is also clear that an expert may testify as to subject matter which precedes a legal conclusion. In Delaware, the Advisory Committee Notes to the Federal Rules of Evidence should be considered and a court should refer to these materials in construing these rules. Under *Fed. R. Evid. 701* and *702*, opinions must be helpful to the trier of fact, and *Fed. R. Evid. 403* provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

*Evidence > Witnesses > Examination & Presentation of Evidence*
*Evidence > Witnesses > Expert Testimony*
[HN6] *Fed. R. Evid. 704* prohibits questions calling for legal opinions but allows the examiner to explore the legal criteria for forming such an opinion.

*Evidence > Witnesses > Expert Testimony*
[HN7] The proper scope of expert testimony intersects with the law of contract interpretation, which firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract. Such testimony is reversible error and is not repaired by cross-examination.

*Evidence > Witnesses > Expert Testimony*
[HN8] Experts may not merely tell the jury what result to reach. *Fed. R. Evid. 704(a)*. The scope of expert testimony is restricted by the principle of contract law which prohibits an expert witness to testify as to legal duties of defendants under the contracts at issue, or make any other legal conclusions. However, the prohibition against legal opinion testimony does not warrant exclusion of the expert witness but rather serves as a guide to admissible testimony.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Witnesses > Expert Testimony*
[HN9] If expert testimony is found to be admissible under *Fed. R. Evid. 702* and *703*, an independent means of exclusion is provided for in *Fed. R. Evid. 403*.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
[HN10] Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. *Fed. R. Evid. 403*. This rule requires the court to assess the probative value of the proffered evidence and to weigh that value against the negative consequences of admitting the evidence, including the risk of unfair prejudice and jury confusion. The determination of unfair prejudice is a matter within the bounds of discretion of the trial court. To justify exclusion under Rule 403 at the pretrial stage, the court must have before it a record complete enough on the point at issue to be considered a virtual surrogate for a trial record.

*Evidence > Witnesses > Examination & Presentation of Evidence*
[HN11] In a case which involves a complex industry and highly specialized evidence, and which also promises to last for several months, the efficient presentation of evidence is a critical tactical issue for both sides. Unless there is danger of prejudice to the opposition, counsel controls the presentation of its case. When a dispute arises, the Court is to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth, avoid needless consumption of time, and protect witnesses from harassment or undue embarrassment. Del. R. Evid. 611(a).

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

1995 Del. Super. LEXIS 340, *

*Evidence > Procedural Considerations > Rulings on Evidence*

[HN12] Abuse of discretion is likely to arise only if opportunity is completely denied to present evidence, impeach witnesses, support the credibility of impeached witnesses, or refute new points raised by the opponent.

*Evidence > Witnesses > Examination & Presentation of Evidence*
*Civil Procedure > Discovery Methods > Oral Depositions*

[HN13] Del. Super. Ct. R. Civ. P. 30(d)(1) implicitly acknowledges that attorney/witness consultations during an interim of five days or more is presumptively proper and will not cause prejudice to the opposition.

COUNSEL:

Richard E. Poole, Esq. and John E. James, Esq. of Potter Anderson & Corroon, Wilmington, Delaware and Jerold Oshinsky, Esq., Mark H. Kolman, Esq., Robin L. Cohen, Esq. and Barry J. Fleishman, Esq. of Anderson, Kill, Olick & Oshinsky, Washington, D.C. for plaintiff North American Philips Corporation.

Robert J. Katzenstein, Esq. of Smith, Katzenstein & Furlow, Wilmington, Delaware, coordinating counsel for defendants.

JUDGES: Judge Vincent A. Bifferato

OPINIONBY: Vincent A. Bifferato

OPINION:

MEMORANDUM OPINION

BIFFERATO, Judge

This is the Court's decision on two motions in limine which pertain to the testimony of insurance experts designated by Plaintiff North American Philips Corporation (NAPC). Certain Defendants n1 (Defendants) have filed a motion in limine to bar the testimony of NAPC's insurance experts Richard Stewart and Michael Jackson. The motion to bar the expert testimony is [*2] **DENIED.** NAPC has filed a motion in limine to bifurcate the testimony of Richard Stewart. The motion to bifurcate is **GRANTED.**

n1 The defendants who have joined in this motion are Aetna Casualty and Surety Company; Allstate Insurance Company (as successor to Northbrook Excess and Surplus Insurance Company), Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies

("London Defendants"); and Prudential Reinsurance Company.

## I. DEFENDANTS' MOTION TO BAR EXPERT TESTIMONY

### A. Introduction

NAPC has designated Richard Stewart and Michael Jackson to provide expert testimony on the domestic and London insurance markets, respectively. NAPC asserts that the testimony of these experts will organize and address important subjects relating to the policies at issue. The major topics to be addressed by the experts include (1) the nature and purpose of liability insurance; (2) the custom and practice in the insurance industry for the use and application of the standard-form comprehensive [*3] general liability insurance policies; (3) accepted meanings for terms of art peculiar to the industry such as "comprehensive general liability," "number of occurrences," "trigger of coverage," "allocation," "excess insurance," "standard form language," "primary insurance," "follow-form," "duty to defend," and "duty to indemnify"; (4) the reasons for adopting standard-form language; (5) the evolution and regulatory filings of the standard form language in comprehensive general liability policies; (6) customary underwriting and claims-handling practices in the insurance industry; and (7) the interplay of primary, umbrella and excess general liability insurance.

Defendants argue for complete exclusion of the proffered testimony for the following reasons: (1) it is extrinsic evidence; (2) it does not relate factually to the policies in issue and is therefore inadmissible; (3) it involves legal opinions; (4) it will not assist the Court or the jury since the salient issues have already been decided by New York courts; and (5) it is unfairly prejudicial and will mislead and confuse the jury. Plaintiff counters each of these contentions and asserts that New York and Delaware law permit the [*4] use of insurance experts in complex insurance coverage cases.

This Court has ruled that New York law applies to this action. North American Philips Corp. v. Aetna Casualty & Surety Co., Del. Super., C.A. No. 88C-JA-155-1-CV, Bifferato, J. (Sept. 2, 1994) (Mem.Op.). [HN1] The general rule concerning admissibility of evidence is that the law of the forum prevails. Restatement (Second) Conflict of Laws § 1381 (1981).

### B. Discussion

**1. Extrinsic Evidence.** Defendants argue that the testimony of both Stewart and Jackson is extrinsic and "because the terms of the policies issued to NAPC are unambiguous, extrinsic evidence concerning the meaning of these terms is inadmissible." This argument

fails for two reasons. First, Defendants' assertion that the policies are unambiguous is insufficient grounds for contending that all extrinsic evidence is inadmissible since there has been no blanket ruling from the Court that the policies are unambiguous. Second, [HN2] while it is true that extrinsic evidence may not be introduced in order to search for ambiguities, North American Philips Corp. v. Aetna Casualty & Surety Company, Del. Super., C.A. No. 88C-JA-155, Bifferato, J. (March [*5]   10, 1995) (Mem.Op.), it is also true that "in interpreting an integrated agreement, attention is directed to the meaning of the written terms in light of the surrounding circumstances." *Klair v. Reese, Del. Supr., 531 A.2d 219, 223 (1987)* (citing *Restatement (Second) of Contracts, § 212(1)* (1981)).

Furthermore, the exclusion of extrinsic evidence to search for ambiguities does not necessitate a complete bar to the testimony of these experts. Rather, the scope of the experts' testimony will be guided by counsel in compliance with the Court's rulings, and Defendants will have the opportunity to object when appropriate.

**2. Industry-Related Background as an Aid to the Factfinder.** Defendants also argue that because the proffered expert testimony is general insurance industry background it cannot assist the factfinder and is therefore inadmissible. As the federal Supreme Court has stated, the "primary locus" of the trial court's obligation in regard to expert testimony is Rule 702 n2 . Delaware's counterpart to the federal rule provides in part:

> [HN3]
> If scientific, technical or other specialized knowledge will assist the trier of fact to **understand the evidence** [*6]   or to determine a fact in issue, . . . an expert. . . may testify thereto in the form of an opinion or otherwise.

D.R.E. 702 (emphasis added). See also *Hines v. Consolidated Rail Corp., 926 F.2d 262, 272 (3d Cir. 1991)* ("expert testimony must be helpful to the fact finder by providing an adequate factual foundation").

> n2 In its Prefatory Note to the Delaware Uniform Rules of Evidence, the Delaware Study Committee stated its decision "to follow the Federal Rules of Evidence wherever possible." Delaware Uniform Rules of Evidence, Del.Rules Ann. (1995) at 1037. In all ways relevant to the motions at bar, the Delaware Uniform Rules of Evidence track the language of the Federal Rules of Evidence.

[HN4]

Particularly in a complex insurance commercial insurance coverage case, the testimony of industry experts can be of great assistance in providing the necessary foundation for the jury. In *Playtex FP, Inc. v. Columbia Cas. Co., Del. Super., 622 A.2d 1074, 1077 n. 5 (1992),* the Court, sitting as factfinder, [*7]   heard extensive expert testimony about excess insurance policies. "Because of the specialized-nature of the language in the insurance contracts at issue and the fact that these are not 'plain English' policies, the court considered expert testimony." *Id. at 1076-1077.* Similarly, in Hoechst Celanese Corp. v. National Union Fire Ins. Co., Del. Super., C.A. No. 89C-SE-35, Gebelein, J. (April 13, 1994) (Mem.Op. & Order), the Court held that industry-related testimony would provide the Court and the jury with a factual basis of knowledge from which the contracts at issue could be intelligently construed.

Industry-related testimony, including customs and practices, is also relevant because it "enables the jury to evaluate conduct of parties against industry standards." *Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509 (2d Cir. 1977),* (citing VII Wigmore on Evidence §  1949, at 66 (3d ed. 1940)).

In the case at bar, the contracts are complex commercial insurance policies which are not written in a layperson's 'plain English' and which have evolved from a highly specialized commercial environment. Thus both the Court and the jury will benefit from expert testimony as to [*8]   the contract terminology and the context from which the contracts derive. The Court concludes that the testimony of Plaintiff's insurance experts is relevant under D.R.E. 401 and that it will help the jury understand the evidence, as required by D.R.E. 702.

**3. Legal Opinions.** Defendants also argue for exclusion because expert witnesses are not permitted to render legal opinions. NAPC asserts that its experts will not offer legal opinions but rather will testify about comprehensive general liability insurance policies, based on their years of experience in the insurance industry.

Although Defendants discuss evidentiary rules regarding expert testimony and substantive law regarding contract interpretation without distinction, these topics must be viewed as different although overlapping areas of law. In regard to the scope of expert testimony, Delaware law governs the case, yet the law of [HN5] both Delaware and New York requires "exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992).* See also *Szewczyk v. Doubet, Del. Supr., 354 A.2d 426 (1976);*