IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYOVAC, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No.: 04-1278 (KAJ) |
| | ) | |
| PECHINEY PLASTIC PACKAGING, | ) | **Redacted Version -** |
| INC., | ) | **Publicly Filed** |
| | ) | |
| Defendant/Counter-Plaintiff. | | |

## <u>CRYOVAC'S INITIAL BRIEF ON CLAIM CONSTRUCTION</u>

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Michele Sherretta (No. 4651)
YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

Of Counsel:

Ford F. Farabow, Jr.
Joann M. Neth
Courtney B. Meeker
Mark J. Feldstein
Rebecca D. Hess
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, D.C.  20001-4413
(202) 408-4000

Attorneys for Plaintiff Cryovac, Inc.

Dated:  October 19, 2005

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... iii

I.      NATURE AND STAGE OF THE PROCEEDINGS ............................................ 1

II.     SUMMARY OF ARGUMENT ............................................................................ 1

III.    STATEMENT OF FACTS .................................................................................. 2

        A.      The Specification of the Shah '419 Patent ............................................. 2

        B.      The Prosecution History of the Shah '419 Patent .................................. 6

IV.     CLAIM CONSTRUCTION PRINCIPLES ......................................................... 7

        A.      Claims are Interpreted Based on the Specification and Other
                Intrinsic Evidence .................................................................................. 8

        B.      Improper to "Read In" Modifiers ........................................................... 9

        C.      Claims are Construed to Encompass, but are not Limited to,
                Preferred Embodiments .......................................................................... 9

        D.      Claim Limitations are Construed in Context, Not as Isolated
                Words .................................................................................................... 10

V.      CONSTRUCTION OF TERMS ......................................................................... 11

        A.      "Oriented" and "Oriented Coextruded Film" ....................................... 11

                1.      The Specification Expressly Defines and Exemplifies
                        "Oriented" ................................................................................. 11

                2.      The Prosecution History Disclaims Broader
                        Constructions ........................................................................... 13

                3.      Pechiney's Construction is Inconsistent with the
                        Specification and Would Impermissibly Cover Materials
                        Expressly Distinguished in Prosecution .................................. 16

        B.      "Film" .................................................................................................... 18

                1.      "Films" are Thin ....................................................................... 18

                2.      "Films" are Flexible ................................................................. 19

                3.      "Films" are Packaging Materials .............................................. 19

4.    Pechiney's Proposed Construction is Vague and Inaccurate .................................................. 20

C.    "Coextruded Film" ................................................................ 21

D.    "Layer(s)" ............................................................................ 22

E.    "At Least Seven Layers" ..................................................... 23

F.    "Arranged Symmetrically" and "At Least Seven Layers Arranged Symmetrically" ..................................................... 24

1.    Based on Context and Grammar, "Symmetrically" Modifies "Arranged" and the Phrase "at Least Seven Layers Arranged Symmetrically" Addresses Only the Ordering of Layers (a), (b), (c), and (d) .................................... 25

2.    The Intrinsic Record Requires a Construction Encompassing Layer Pairs Arranged Symmetrically Having Differing Thicknesses and Compositions ................................... 26

G.    "Comprising" ...................................................................... 31

H.    "Layer Comprising" or "Layers Each Comprising" or "Layers, Each Comprising" ................................................................ 31

I.    "(a) A Core Layer Comprising an Ethylene Vinyl Alcohol Copolymer" ........................................................................... 32

J.    "(b) Two Intermediate Layers Each Comprising a Polyamide;" ......................... 34

K.    "(c) Two Outer Layers Each Comprising a Polymeric Material or Blend of Polymeric Materials;" ............................................. 35

L.    "(d) Two Layers, Each Comprising an Adhesive Polymeric Material, Which Adhere Each of Said Intermediate Layers to a Respective Outer Layer." ..................................................... 37

VI.    CONCLUSION ............................................................................ 38

# TABLE OF AUTHORITIES

*ACCO Brands, Inc. v. Micro Security Devices, Inc.*,
346 F.3d 1075 (Fed. Cir. 2003) ........................................................................................ 8

*ADE Corp. v. KLA-Tencor Corp.*,
252 F. Supp. 2d 40 (D. Del. 2003) .................................................................................... 9

*Abbott Laboratories v. Syntron Bioresearch, Inc.*,
334 F.3d 1343 (Fed. Cir. 2003) ...................................................................................... 10

*Autogiro Co. of America v. United States*,
384 F.2d 391 (Ct. Cl. 1967)............................................................................................... 8

*Control Resources, Inc. v. Delta Electric, Inc.*,
133 F. Supp. 2d 121 (D. Mass. 2001)......................................................................... 20, 22

*Credle v. Bond*,
25 F.3d 1566 (Fed. Cir. 1994) ................................................................................... 10, 26

*Genentech Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997) ........................................................................................ 31

*Hockerson Halberstadt, Inc. v. Avia Group International, Inc.*,
222 F.3d 951 (Fed. Cir. 2000) ........................................................................................ 28

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
183 F.3d 1369 (Fed. Cir. 1999) ...................................................................................... 10

*Hoechst Celanese Corp. v. BP Chemicals Ltd.*,
78 F.3d 1575 (Fed. Cir. 1996) ........................................................................................ 10

*In re Hyatt*,
708 F.2d 712 (Fed. Cir. 1983) ............................................................................. 10, 17, 26

*Inverness Medical Switzerland v. Princeton Biomeditech Corp.*,
309 F.3d 1365 (Fed. Cir. 2002) ........................................................................................ 9

*Johnson Worldwide Associates, Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) .................................................................................... 9, 25

*Maritimes, Inc. v. H.J. Heinz Co., L.P.*,
377 F.3d 1369 (Fed. Cir. 2004) ...................................................................................... 31

*Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings*,
370 F.3d 1354 (Fed. Cir. 2004) ............................................................................. 23, 24, 25

*North American Container, Inc. v. Plastipak Packaging, Inc.*,
415 F.3d 1335 (Fed. Cir. 2005) ................................................................................. 28, 29

*Pause Technology LLC v. TiVo Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005) ................................................................. 10, 21, 23, 26, 34

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ..................................................... 1, 2, 8, 9, 10,
                                                                                                17, 18, 26, 27, 34

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ................................................................. 2, 10, 17, 19, 21

*Research Plastics, Inc. v. Federal Packaging Corp.*,
    421 F.3d 1290 (Fed. Cir. 2005) ................................................................................ 34, 37

*S3, Inc. v. Nvidia Corp.*,
    259 F.3d 1364 (Fed. Cir. 2001) ................................................................................ 29, 30

*Sulzer Textil A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004) ................................................................................ 20, 22

*Teleflex, Inc. v. Ficosa N. America Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ......................................................................... 8, 9, 13, 14

*In re Thrift*,
    298 F.3d 1357 (Fed. Cir. 2002) ...................................................................................... 9

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .......................................................................... 2, 10, 28

*Vivid Technologies, Inc. v. America Science & Engineering, Inc.*,
    200 F.3d 795, 53 USPQ2d 1289 (Fed. Cir. 1999) ......................................................... 34, 37

*Waner v. Ford Motor Co.*,
    331 F.3d 851 (Fed. Cir. 2003) ...................................................................................... 7

## I.    NATURE AND STAGE OF THE PROCEEDINGS

In this action, plaintiff Cryovac, Inc. ("Cryovac") has asserted, *inter alia*, that defendant Pechiney Plastic Packaging, Inc. ("Pechiney") has infringed claim 11 of the U.S. Patent No. 4,755,419 ("Shah '419 patent," Ex. 1).[1]  Relevant discovery has been completed and the issue of claim construction is before the Court.  Pursuant to paragraph 12 of the Scheduling Order (DI-22), Cryovac submits this initial brief in support of its proposed claim construction.

## II.   SUMMARY OF ARGUMENT

Claim terms must be construed in context in light of the intrinsic evidence provided by the patent specification and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*).  The term "oriented" is used in claim 11 of the Shah '419 patent as part of the phrase "oriented coextruded film" and should be interpreted in that context to mean: "A film formed by coextrusion that is then heated to its orientation temperature range and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process."  This definition comes from the specification and is consistent with the prosecution history and the cited references that make up the intrinsic record.  In contrast, the construction urged by Pechiney crops the specification definition (*i.e.*, by leaving out the words "this stretching accomplished by a racking or blown bubble process") and would impermissibly cover materials expressly distinguished in the prosecution history as being "unoriented."

Similarly, the term "arranged symmetrically" is used in the claim as part of the phrase "at least seven layers arranged symmetrically."  The context, grammar, specification, and prosecution history together indicate that this phrase means that corresponding pairs of layers defined in the body of the claim are arranged in a symmetric order on opposite sides of the core layer.  That is, the claimed layers are arranged such that one layer (b), one layer (c) and one layer (d) are in the same order on each of the opposite sides of the core layer (a).  Beyond the required arrangement

---

[1] References to "Ex. __" refer to the appended exhibits.

or ordering of the claimed layers, the phrase does not provide any further implied or express limitations. Specifically, the phrase does not require the added limitations proposed by Pechiney that "the geometrical center line of the core layer is the geometrical center line of the film," that "there is a correspondence in the size (thickness)… of layers on opposite sides of the core," and that "there is a correspondence in the… composition of layers on opposite sides of the core…" To the contrary, the patent specification and prosecution history make clear that this is not required. Indeed, if this were required, the claim would exclude the inventor's preferred embodiments, a construction the Federal Circuit has characterized as "rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

As the Federal Circuit has instructed, the patent specification is "the single best guide to the meaning of a disputed term." *Phillips,* 415 F.3d at 1315. Here the claim constructions proposed by Cryovac are derived from the Shah '419 patent specification. In contrast, Pechiney's proposed constructions are not. Because Cryovac's claim constructions "stay[] true to the claim language and most naturally align[] with the patent's description of the invention," they should be adopted by the Court. *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1998).

## III.    STATEMENT OF FACTS

### A.    The Specification of the Shah '419 Patent

The invention of the Shah '419 patent "relates to oriented thermoplastic films for packaging applications, and more particularly relates to coextruded multilayer, oriented film having good strength and oxygen barrier characteristics." (Ex. 1, col. 1, lns. 5-8.) Shah's invention provides numerous advantages, including good heat seal properties, abuse resistance, and utility for food and non-food packaging. (Ex. 1, col. 8, lns. 35-39.) Useful odor barrier properties are also reported as likely resulting from the combined use of the EVOH[2] containing

---

[2] "EVOH" indicates "ethylene vinyl alcohol copolymer." (Ex. 1, col. 3, lns. 53-62.)

core and the polyamide (nylon) containing intermediate layers. (Ex. 1, col. 7, lns. 62-64.) The orientation of the multilayer films according to the Shah '419 patent "provides toughness and improved resistance to oxygen permeability, in addition to the advantages of a shrink film which may be heat shrunk about a product to be packaged." (Ex. 1, col. 8, lns. 39-43.) In sum, the invention of the Shah '419 patent provides "[a] multilayer film with a combination of oxygen barrier properties, toughness, shrinkability, and good optical properties... " (Ex. 1, Abstract.)

The specification includes detailed context for the invention, addressing the disclosure of eleven different references in this regard. (Ex. 1, col. 1, ln. 48 - col. 3, ln. 5.) Many of these references are said to disclose multilayer films (e.g., Ex. 1, col. 1, lns. 60-63 ("Of interest is U.S. Pat. No. 4,457,960 issued to Newsome, disclosing a multilayer film having a core layer of a barrier material such as EVOH and EVOH blends."), and some are particularly called out as disclosing "oriented" films (e.g., Ex. 1, col. 2, lns. 62-63 ("U.S. Pat. No. 4,501,797 issued to Super et al, discloses an unbalanced oriented multiple layer film including a first layer of polypropylene, a second layer of an anhydride modified polypropylene, and a third layer of ethylene vinyl alcohol copolymer.")). The general layer structures and compositions of multilayer films according to each of the references are also addressed. (Ex. 1, col. 1, ln. 48 - col. 3, ln. 5.) Layer thicknesses in the cited prior art references are not addressed in the background section as being of interest or otherwise relevant. (Id.) Similarly, minor components and other additives in the film layers of the prior art are not discussed as being important to the background or context of the Shah '419 patent's invention. (Id.)

In view of the background discussion concerning the layering of prior multilayer films, the Shah '419 patent outlines the objectives of its invention, including

> "to provide a relatively thin thermoplastic multilayer film having superior toughness and abrasion resistance;" and

> "to provide a coextruded thermoplastic multilayer film which may be totally coextruded and then oriented to provide a shrinkable film with good oxygen barrier properties."

(Ex. 1, col. 3, lns. 6-19.) These objectives are achieved by an oriented multilayer film having at least seven layers arranged in the following order:

> polymeric material/adhesive/polyamide/EVOH/polyamide/adhesive/polymeric
> material.

(Ex. 1, col. 3, lns. 22-29, col. 4, ln. 60 - col. 6, ln. 64.) The EVOH containing layer, designated as the core layer, is arranged between a pair of polyamide containing layers, which are referred to as the "intermediate layers." (*Id.*) Each of the polyamide containing intermediate layers is in turn adhered via an adhesive layer to a polymeric outer layer. (*Id.*) The Shah '419 patent provides that such films are formed by [a] coextrusion of the polymer layers; "[b] rapidly cooling the coextruded film; [c] collapsing the cooled film; [d] heating the collapsed film to its orientation temperature range; and [e] stretching and orienting the heated film." (Ex. 1, col. 3, lns. 30-39.)

The Shah '419 patent includes a section identified as "Definitions" to expressly provide the meanings of several terms used in the specification and claims. (Ex. 1, col. 3, lns. 41 - col. 4, ln. 40.) Among the terms addressed is "oriented," which is defined as

> a polymeric material which has been heated and stretched to
> realign the molecular configuration, this stretching accomplished
> by a racking or blown bubble process.

(Ex. 1, col. 3, lns. 45-49.) The term "racking," referenced in the definition of oriented, is further defined as "a well-known process for stretching coextruded and reheated multilayer film by means of tenterframing or blown bubble processes." (Ex. 1, col. 3, lns. 63-66.) "Blown bubble" is later characterized as entailing a process where "the coextruded and cooled tube is heated to its orientation temperature range to orient the film." (Ex. 1, col. 8, lns. 60-62.) The blown bubble process is also explained in the context of the detailed Example 1, where a solid tube formed by the cooling of a melt-state multilayer coextrusion was heated to a temperature below its melting point and "blown into a bubble" to stretch it about 3.3 times its original dimension in one direction, and about 3.5 times in the perpendicular direction. (Ex. 1, col. 7, lns. 14-26; Expert Report of Garth L. Wilkes, June 17, 2005 ("Wilkes Rep.," Ex. 2) at 9.) In all cases, "oriented" is

disclosed as entailing the reheating of a previously coextruded and cooled solid film, and the stretching of the reheated film.

Thicknesses of the various layers are addressed within the specification, and several preferred embodiments are discussed. For instance, the specification provides a range of thicknesses for each of the outer layers, stating that "preferably each comprise from about 20% to 40%" of the total film thickness. (Ex. 1, col. 5, ln. 42-45.) The two intermediate polyamide containing layers are disclosed as each being between 5% and 25% of the total film thickness (Ex. 1, col. 5, lns. 20-22), and the adhesive layers are likewise disclosed as each being between about 5% and about 15% of the total film thickness (Ex. 1, col. 6, lns. 65-68). The preferred thickness of the EVOH containing core layer is defined in terms of absolute thickness, and is preferably between about 0.05 and 1 mils[3] thick. (Ex. 1, col. 4, lns. 60-62.) EVOH-core layer thicknesses less than 0.05 mils are said to be problematic, due to the formation of voids resulting from variations in the layer thickness, and thicknesses of greater than about 1 mil are said to be both increasingly difficult to orient and expensive. (Ex. 1, col. 4, ln. 63 - col. 5, ln. 2.)

The Shah '419 patent also provides detailed guidance concerning possible polymer components for the various layers, including the identification of several commercially available materials for each. (Ex. 1, col. 5, ln. 6 - col. 6, ln. 64.) In addition to the polymer components, the inclusion of additives, such as slip and antiblock agents, are also disclosed. (*E.g.*, Ex. 1, col. 5, lns. 35-40; col. 6, lns. 3-14.)

Two examples of films according to the Shah '419 patent are provided in the specification, and each includes specific layer compositions and detailed formation methods. (Ex. 1, col. 7, ln 1 - col. 8, ln. 34.) Provided, together with other details concerning composition and formation, are the temperature and stretch conditions used to orient the previously coextruded and cooled multilayer films. (Ex. 1, col. 7, lns. 14-23.) The results of physical testing of the

---

[3] 1 "mil" equals 1/1000[th] of an inch, or 25.4 microns (μm).

films, including their strength, flexibility, shrink properties, optical properties, and oxygen transmission, are also reported. (Ex. 1, col. 7, lns. 35 - 58, col. 8, lns. 18-31.)

**B.    The Prosecution History of the Shah '419 Patent**

The Shah '419 patent issued from the United States Patent and Trademark Office ("PTO") on July 5, 1988, based on Application Serial No. 06/842,600, filed March 21, 1986. The sole inventor is Gautum P. Shah. The Shah '419 patent was originally assigned to W.R. Grace & Co., Cryovac Div. and is now assigned to Cryovac, Inc.

The application for the Shah '419 patent was filed with a total of twenty eight claims, including twenty three directed to oriented multilayer film products (prosecution claims 1-23) and five (prosecution claims 24-28) directed towards methods of making an oriented multilayer film. (Certified file history of U.S. Patent No. 4,755,419, Ex. 3, CR056-000020 to 26.) Independent claim 1, as filed, recited "[a]n oriented multilayer film comprising" five expressly recited layers ("a) a core layer... b) two intermediate layers... c) two outer layers") and two implicitly recited adhesive layers ("each of said intermediate layers adheres to a respective outer layer by a layer of an adhesive polymeric material"). (Ex. 3, CR056-000020.) Independent method claim 24 recited a method of making an oriented multilayer film comprising:  a) coextruding the at least seven layers; "b) rapidly cooling the coextruded film; c) collapsing the cooled film; d) heating the collapsed film to its orientation temperature range; and e) stretching and orienting the heated film." (Ex. 3, CR0056-000022, 26.)  Prosecution claim 1 was renumbered by the PTO at the close of prosecution as claim 11 for the issued patent (Ex. 3, CR056-000152), and method claims 24-28 were cancelled in response to a Restriction Requirement. (Ex. 3, CR056-000042 to 45, CR056-000159.)

Among the materials brought to the attention of the PTO by the Applicant was information about a certain seven layer film (the "Fant film"), which was distinguished as being an "unoriented" film having a structure of:

90% LLDPE,[4] 10% antiblock/ LLDPE-based tie/ nylon 6/
EVOH/ nylon 6 /LLDPE-based tie /90% LLDPE, 10% antiblock,

(Ex. 3, Supplemental Information Disclosure Statement ("IDS"), CR056-000160 to 161.)  The

Fant film was further explained as being the subject matter of copending U.S. Patent Application

Serial No. 834,694, filed February 28, 1986 (now U.S. Patent No. 4,746,562, Ex. 4).  (*Id.*)

In response to a rejection based on U.S. Patent No. 4,284,674 to Sheptak ("Sheptak," Ex.

5; Ex. 3, CR056-000142 to 144), prosecution claim 1 was amended to the wording of present

claim 11.  In particular, the preamble was amended to recite "having at least seven layers

arranged symmetrically" and the body of the claim was amended to affirmatively recite that the

film included "two layers, each comprising an adhesive polymeric material, which adhere each of

said intermediate layers to a respective outer layer."  (Ex. 3, CR056-000152 to 153.)[5]  At the

same time prosecution claim 1 was amended to delete a limitation in the body of the claim stating

"said layers of the multilayer films forming a symmetrical heat-shrinkable structure."  (*Id.*)[6]

Applicant explained that these amendments were to clarify that "(1) at least seven layers are

claimed, and that (2) these layers are symmetrically arranged."  (Ex. 3, CR056-000155.)  No

references or representations were made during prosecution concerning the thickness or exact

composition of any layer of the claimed film or those of the cited prior art.

## IV.    CLAIM CONSTRUCTION PRINCIPLES

The objective of claim construction is to determine the meaning that those of ordinary

skill in the art would apply to the terms in the patent claims.  *Waner v. Ford Motor Co.* 331 F.3d

---

[4] "LLDPE" is one abbreviation for linear low density polyethylene copolymers. (Ex. 1, col. 4, lns. 3-5.)

[5] Pursuant to PTO convention, this added limitation to the preamble of the claim is underscored.

[6] Pursuant to PTO convention, this limitation deleted from paragraph d) of the claim is in brackets.

851, 854 (Fed. Cir. 2003) (citations omitted). The relevant considerations to achieving this objective are outlined below.

A.   **Claims are Interpreted Based on the Specification and Other Intrinsic Evidence**

The primacy of the patent specification and other intrinsic evidence for claim construction over dictionaries and other extrinsic evidence is now beyond question. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-17 (Fed. Cir. 2005) (*en banc*). The specification in particular is "the single best guide to the meaning of the disputed term," and should be relied upon heavily. *Phillips,* 415 F.3d at 1315-16 (citations and quotations omitted).

The prosecution history or "file wrapper," which consists of the complete proceeding before the PTO including the prior art cited during prosecution, is also part of the intrinsic record and likewise may be considered for claim construction. *Phillips,* 415 F.3d at 1317, citing *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 399 (Ct. Cl. 1967) ("[The file wrapper can be used], like the specifications and drawings, to determine the scope of the claims. For example, the prior art cited in the file wrapper is used in this manner." (footnote omitted)). The prosecution history is especially pertinent to claim construction where an applicant has disclaimed or disavowed certain meanings, such as distinguishing the claimed invention from the prior art. *ACCO Brands, Inc. v. Micro Security Devices, Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003) ("Statements made during prosecution which clearly disclaim a particular claim interpretation will limit the scope of the claims."); *Teleflex, Inc. v. Ficosa N. America Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002). The doctrine of prosecution disclaimer attaches in such cases, and narrows the construction of the claims consistent with the scope of the surrender, such as avoiding the reference distinguished during prosecution. *Teleflex,* 299 F.3d at 1326.

While claims are properly construed in view of the intrinsic record, extrinsic evidence may be consulted by the court to understand the underlying technology. *Phillips,* 415 F.3d at 1317-1319. However, extrinsic evidence at odds with the construction mandated by the intrinsic

record should be discounted. *Id.* A recognized problem with relying on extrinsic evidence such as dictionary definitions "is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Phillips,* 415 F.3d at 1321; *ADE Corp. v. KLA-Tencor Corp.*, 252 F. Supp. 2d 40, 58 (D. Del. 2003) ("A dictionary, encyclopedia, or treatise may also contain several definitions for the same word. In short, context is critical, and the import of the intrinsic record cannot be ignored.") (citations omitted).

### B.    Improper to "Read In" Modifiers

When construing claims, "[g]eneral descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." *Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (claim term "coupled" would not be restricted to a mechanical or physical coupling based on an inference from the written description); *In re Thrift*, 298 F.3d 1357, 1364 (Fed. Cir. 2002) ("Because claim 1 uses the general term 'speech user agent' without any modifiers, appellants' limiting interpretation of this phrase is inappropriate..."); *Inverness Medical Switzerland v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1370-73 (Fed. Cir. 2002) (district court erred in reading in a time requirement to phrase "mobility... is facilitated" where the plain meaning of mobility did not require such a time restriction and the prosecution history did not show that the inventor clearly disclaimed coverage of facilitating mobility during transit).

### C.    Claims are Construed to Encompass, but are not Limited to, Preferred Embodiments

In addition to being improper to read in additional limiting modifiers generally, it has been widely recognized as particularly improper to read limitations from preferred embodiments into the claims. *Teleflex,* 299 F.3d at 1327 (the presumption of ordinary meaning for claim terms cannot be overcome "simply by pointing to the preferred embodiment"). On the other hand, claims are generally construed to encompass the preferred embodiments. Indeed, a claim interpretation that excludes the inventor's device or a preferred embodiment from the scope of the

claim "is rarely, if ever, correct." *Vitronics* 90 F.3d at 1583; *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) ("[I]t is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way.") (citations omitted).

### D.     Claim Limitations are Construed in Context, Not as Isolated Words

Claim limitations must be construed in context, and claim constructions that seek to parse or isolate individual terms to arrive at an interpretation contrary to the interpretation arrived at by considering the terms in the context of the entire claim should be rejected. *Phillips,* 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."); *Pause Technology LLC v. TiVo Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) ("[P]roper claim construction demands... interpretation of the entire claim in context, not a single element in isolation... There is no basis for us to ignore that language [appearing later in the claim] in properly construing the claim language in dispute.") (citations omitted); *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1350-51 (Fed. Cir. 2003) ("The usage of the disputed claim terms in the context of the claims as a whole also informs the proper construction of the terms."); *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction, however, demands interpretation of the entire claim in context, not a single element in isolation."); *Renishaw,* 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (internal citations omitted). Construing claim terms based on context is further guided by reference to grammatical structure and syntax. *Credle v. Bond*, 25 F.3d 1566, 1571 (Fed. Cir. 1994); *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983) ("A claim must be read in accordance with the precepts of English grammar.")

V.    **CONSTRUCTION OF TERMS**

   A.    **"Oriented" and "Oriented Coextruded Film"**

   <u>Proposed Definition</u>:  **The term "oriented" is used in the claim as part of the phrase "oriented coextruded film," and should be interpreted in that context to mean:**

   **A film formed by coextrusion that is then heated to its orientation temperature range and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process.**

   1.    **The Specification Expressly Defines and Exemplifies "Oriented"**

The specification expressly provides the definition that "[t]he term 'oriented' and the like is used herein to define a polymeric material which has been heated and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process." (Ex. 1, col. 3, lns. 45-49, 63-66.)  The term "racking" is then defined as a "process for stretching coextruded and reheated multilayer film by means of tenterframing or blown bubble processes" (Ex. 1, col. 3, lns. 63-66), and blown bubble is further explained as entailing a process where "the coextruded and cooled tube is heated to its orientation temperature range to orient the film" (Ex. 1, col. 8, lns. 60-62).

Based on these express definitions, an "oriented coextruded film" denotes a product (coextruded film) that is previously formed, cooled to a solid, and then subsequently treated by processes (heating and stretching accomplished by a racking of blown bubble process) to yield a new product (oriented coextruded film) where the molecular configuration has been realigned. Logically and temporally, there must first be a coextruded film that is then oriented by heating and a racking or blown bubble process.

The specification further clarifies that the film is *first* coextruded and *then*, after the coextrusion process is completed such that a solidified film has been formed, the two steps of the orientation process (*i.e.,* (1) heating and (2) stretching to realign the molecular configuration, accomplished by a racking or blown bubble process) are subsequently performed.   This is

expressed first as one of the objects of the invention: "to provide a coextruded thermoplastic multilayer film which may be totally coextruded and *then oriented* to provide a shrinkable film with good oxygen barrier properties." (Ex. 1, col. 3, lns. 15-19 (emphasis added).) Similarly, the definitions of "racking" and "blown bubble" also refer to processes where the fully formed coextruded film is reheated (*i.e.,* not merely still hot from coextrusion) to its orientation temperature range and then stretched. (Ex. 1, col. 3, lns. 63-66, col. 8, lns. 60-62.)

The Shah '419 patent provides an example of the "blown bubble" process and its use to form an oriented coextruded film. (Ex. 1, col. 7, lns. 14-34; Cryrovac's Rule 26(a)(2) Rebuttal Expert Report of Dr. Robert M. Kimmel ("Kimmel Reb.," Ex. 6) at 11-12; Ex. 2, Wilkes Rep. at 9-10.) In the example, the heating and stretching required to form an "oriented coextruded film" are distinct from and occur after the coextrusion process is complete. As a first step, to form a "coextruded film," the polymer components, in a molten or melt state, are coextruded, then cooled into a solid multilayer film. (Ex. 1, col. 7, lns. 14-17 ("The polymer melts were coextruded through a multilayer coextrusion die and then cooled and cast into a solid tube... ").) The cooled, solid, coextruded film at this stage is identified as being "[b]efore orientation." (Ex. 1, col. 7, ln. 27.) Second, to orient the previously formed solid coextruded multilayer film, the tube is reheated to its orientation temperature range and stretched using the blown bubble process. (Ex. 1, at col. 7, lns. 17-21 ("The tube was then heated to about 110°C in an oven and then blown into a bubble. The bubble was expanded... in the machine (longitudinal) direction, and... transverse direction..."); col. 8, lns. 60-64.)

Thus, the specification consistently provides that the term "orientation" in the context of an "oriented coextruded film" refers to a separate orientation step that is performed after coextrusion and after solidification of the extruded material. In all cases, coextrusion occurs first and is completed with a solidified product *before* the heating and stretching steps of the orientation process.

2.    **The Prosecution History Disclaims Broader Constructions**

The several components of the prosecution history also provide, by express definition, example, or context, that an "oriented coextruded film" is a film formed by coextrusion that is then heated to its orientation temperature range and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process. Specifically, the heating (reheating) and stretching are applied to the coextruded film after it has been fully formed and cooled to solid.

a.    **"Orienting" is Applied to Cooled Films According to Original Method Claims**

The originally filed claim set included method claims directed towards preparing an oriented multilayer film consistent with the film of claim 11, where the film is totally coextruded and cooled into a solid, and then subsequently heated to its orientation temperature range and stretched. In particular, as-filed claim 24 recited the steps of a) coextruding seven layers; "b) rapidly cooling the coextruded film; c) collapsing the cooled film; d) heating the collapsed film to its orientation temperature range; and e) stretching and orienting the heated film." (Ex. 3, CR0056-000022, 26.) The heating step d and stretching and orienting step e both clearly occur *after* the coextruded film has been fully formed according to steps a - c, including being cooled in step b.

b.    **Melt State Stretching was Disclaimed**

In view of the prosecution history, an "oriented coextruded film" simply cannot be read to encompass a film formed by coextrusion where the material is merely stretched while still molten. *E.g., Teleflex*, 299 F.3d at 1326. During prosecution, the PTO, and ultimately the public, were advised that samples of a certain seven layer film (the Fant film) were "unoriented" films tested at third party facilities prior to the filing date of the Shah '419 application. (Ex. 3, CR056-000160 to 161.) The Fant film was further explained as being the subject matter of copending,

U.S. Patent Application Serial No. 834,694 to Ennis Fant, filed February 28, 1986, now U.S. Patent No. 4,746,562 to Ennis Fant ("Fant patent," Ex. 4). (*Id.*)

As exemplified in the Fant patent, the films of that invention are coextruded in tubular form with no disclosure of any further processing (*e.g.*, heating or stretching) after the cooling of the coextruded film. (Ex. 4, col. 5, lns. 3-22; Ex. 6 at 18-19.). Instead of being oriented by reheating and stretching, Pechiney's expert, Dr. Mount, has opined that, in preparing a film according to the Fant patent, stretching during the coextrusion process *with the extruded material still in the molten state* (*i.e.,* before solidification) yielded molecular orientation. (E. Mount Deposition Transcript (August 4, 2005), Ex. 7 at 40:3-19 ("I believe that the polymers were heated, melted and coextruded and then drawn from the face of the die so that there was some molecular orientation induced in the region between the die lip and the place where the polymer was solidified.").

Since the prosecution history shows that the Fant film was disclaimed and distinguished as "unoriented," the definition of "oriented coextruded film" in claim 11 of the Shah '419 patent cannot be construed so broadly as to encompass the Fant film. *E.g., Teleflex*, 299 F.3d at 1327. It cannot be construed, therefore, to encompass "molecular orientation" (Ex. 7 at 40:3-19) resulting from drawing or stretching of a hot melt before the coextruded polymers are solidified.

### c. The Cited References Uniformly Construe "Oriented" to be the Heating and Stretching of Non-Molten Films

The references cited during prosecution that make up the remainder of the prosecution history further demonstrate that an "oriented coextruded film" is a film formed by coextrusion that is then heated to its orientation temperature range and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process. The cited references make particularly clear that the stretching, accomplished by a racking or blown bubble process as claimed in the Shah '419 patent, does not include stretching that occurs only with molten polymers, *i.e.*, polymers that are still above their melting point, as is the case with the pre-

heated coextruded material exiting the coextrusion die. (Ex. 6, Kimmel Reb. at 11-12; Ex. 2, Wilkes Rep. at 11-12.) The cited references further distinguish, and expressly exclude, processes such as thermoforming and blow molding from the context of "oriented."

For example, U.S. Patent No. 4,561,920 to Foster ("Foster," Ex. 8) was cited in the prosecution history as disclosing an "oriented" film, in particular "a biaxially oriented barrier film." (Ex. 3, CR056-000147). Foster explains the formation of a coextruded biaxially oriented structure in detail, and specifically distinguishes the orientation step from the coextrusion step. According to Foster, orientation does not occur until after the coextruded material is cooled to form a solid film. (Ex. 8, col. 3, lns. 14-50.) Then, after cooling, the multilayer film is heated and stretched to provide orientation. (Ex. 8, col. 3, lns. 41-65.)

Another reference, U.S. Patent No. 4,514,465 to Schoenberg ("Schoenberg," Ex. 9),[7] explains that oriented films are formed after the extruded polymers are cooled, where the cooled film is then "reheated to a temperature within its orientation temperature range and stretched to orient or align the crystallites and/or molecules of the material." (Ex. 9, col. 1, lns. 33-44; col. 1, ln. 55 - col. 2, ln. 8.) Concerning the orientation temperature range, *i.e.,* the temperature range where an orientable material may be effectively oriented, Schoenberg explains that this is generally the temperature range below the crystalline melting point and above the so-called "glass transition point." (Ex. 9, col. 1, lns. 44-54.) The stretching, according to Schoenberg, may be accomplished by the "blown bubble" technique or "tenter framing," which are

> well known to those in the art and refer to orientation procedures whereby the material is stretched in the cross or transverse direction (TD) and/or in the longitudinal or machine direction (MD). After being stretched, the film is quickly quenched while substantially retaining its stretched dimensions to rapidly cool the film and thus set or lock-in the oriented (aligned) molecular configuration.

---

[7] Schoenberg was cited by the Applicant during prosecution (Ex. 3, CR056-000037) and is referenced in the Shah '419 patent specification (Ex. 1, col. 2, lns. 10-15).

(Ex. 9, col. 2, lns. 15-26.) Schoenberg expressly distinguishes films formed by a "hot blown" process where the molten extruded material is stretched without cooling as being unoriented. (Ex. 9, col. 2, lns. 27-42 ("Those of skill in the art are well familiar with this process and the fact that the resulting film has substantially unoriented characteristics.").)

U.S. Patent No. 4,532,189 to Mueller ("Mueller," Ex. 10), cited by the Examiner during prosecution, (Ex. 3, Form PTO-892, April, 6, 1986, CR056-000123), succinctly explains that "oriented" refers to the product resulting from the stretching of a polymeric material that has been previously cooled and then stretched after being reheated to its orientation temperature range. (Ex. 10, col. 1, lns. 34-68.) Mueller also identifies the blown bubble technique and tenter framing as the procedures for this orientation. (*Id.*)

Consistent with the other references characterized as showing "oriented" films, the disclosure of European Patent Application No. 0,149,321 to Ohya et al. (Ex. 11)[8] provides that after the molten state extrusion of polymer, the material is cooled, then reheated and stretched to form the final film. (Ex. 11, pg. 3, 11-12). U.S. Patent No. 4,501,798 to Koschak et al. ("Koschak," Ex. 12)[9], provides a similar definition of oriented, and further excludes processes such as blow molding from the meaning of "oriented." (Ex. 12, col. 5, lns. 13-20, col. 6, ln. 46 - col. 7, ln. 7.)

### 3. Pechiney's Construction is Inconsistent with the Specification and Would Impermissibly Cover Materials Expressly Distinguished in Prosecution

Pechiney seeks to define "oriented" as being "[a] polymeric material which has been heated and stretched to realign the molecular configuration" and "oriented coextruded film" as "[a]n oriented film formed by coextrusion." (Ex. 13 at 2.) By cropping the express definitions of

---

[8] European Patent Application No. 0,149,321 to Ohya et al. was submitted by the Applicant (Ex. 3, CR056-000134) and characterized by the Examiner as showing an oriented coextruded multilayer film (Ex. 3, CR056-000144).

[9] Koschak was cited by Applicant in an IDS (Ex. 3, CR056-000036) and referenced in the specification (Ex. 1, Shah '419 patent, col. 2, ln. 67 - col. 3, ln. 5).

"oriented" from the Shah '419 patent specification to exclude the reference to processes by which orientation occurs ("this stretching accomplished by a racking or blown bubble process" (Ex. 1, col. 3, lns. 47-49)) and by further ignoring the context of the intrinsic record as a whole, Pechiney seeks to broaden the term "oriented" to include films that have only been coextruded and stretched while still in the heated, molten state resulting from the coextrusion process.

Pechiney also apparently seeks to reverse, or at least ignore, the grammatical order and construction of the phrase "oriented coextruded film" by implying that a coextrusion process forms an oriented film (*i.e.*, "[a]n oriented film *formed by* coextrusion" (Ex. 13 at 2) (emphasis added)), rather than the orientation being an additional process property added to a previously coextruded film as provided by the intrinsic record. Based on the grammar and context, however, "oriented" modifies "coextruded film" by defining a particular set of processes applied to the coextruded film. *Hyatt,* 708 F.2d at 714 (stating that "[a] claim must be read in accordance with the precepts of English grammar").



Pechiney's overbroad construction ignores the full definition according to the specification, is inconsistent with the context of the specification and the intrinsic record taken as a whole, reverses the express disclaimer in the prosecution history, and is therefore improper for at least these reasons. *Phillips,* 415 F.3d at 1314-17; *Renishaw* at 1250. Accordingly, Pechiney's

unrestricted construction of "oriented" and imprecise construction of "oriented coextruded film" should both be rejected.

**B.    "Film"**

**Proposed Definition:  A thin, flexible, packaging material.**

**1.    "Films" are  Thin**

"Films" according to the specification of the Shah '419 patent are thin.  Indeed, it is express "object of the present invention to provide a relatively *thin* thermoplastic multilayer film having superior toughness and abrasion resistance." (Ex. 1, Shah '419 patent, col. 3, lns. 12-14 (emphasis added).)

The extrinsic evidence supports this definition, showing that the term "film" in the Shah '419 patent is used consistent with its ordinary meaning in the art.  *Phillips,* 415 F.3d at 1312-1313 ("[T]he words of a claim are generally given their ordinary and customary meaning…  the meaning that the term would have to a person of ordinary skill in the art…") (citations and quotations omitted).  For example, even a general dictionary defines a film as, *inter alia*, "a thin flexible transparent sheet (as of plastic) used as a wrapping." (Webster's Ninth New Collegiate Dictionary (1991), Ex. 17 at 463.)  Technical references in the polymer science field more precisely provide that "films" are "planar forms of plastic, thick enough to be self-supporting but thin enough to be flexed, folded, or creased without cracking."  (Encyclopedia of Polymer Science and Engineering, Vol. 7 (1987), Ex. 18 at 73.)

Addressing the distinction between films and so-called "sheets," the Wiley Encyclopedia of Packaging Technology (1986) explains that, while a completely bright line distinction is difficult, "[a]t one time anything up to [10 mils] was generally recognized by the plastics industry as film...  Other proposed upper limits have included [3-6 mils] depending on the stiffness of the plastic itself." (Ex. 19 at 329.)  This general distinction between films, which are relatively thinner, and sheets, which are relatively thicker, is also consistent with the deposition testimony

of the inventor, Mr. Shah, that a film is a flexible material not more than 10 mils thick, and that sheets are more than 10 mils thick. (Ex. 20 at 19:10 - 20:8.)

### 2. "Films" are Flexible

The flexibility of the films according to the Shah '419 patent is generally presupposed and implied by their thinness and use as packaging materials to wrap products (see Section 3 below), and is consistent with the ordinary understanding and use of "film." For example, the property of being flexible is well reflected in contemporaneous technical definitions, such as that films are "thin enough to be flexed..." (Ex. 18.)

That flexibility is a property of films according to the Shah '419 patent is further evidenced by repeated references to "*flexible* wrapping material" and package films for wrapping as being pertinent to the field of the Shah '419 patent. (Ex. 1, col. 1, lns. 44-52 (emphasis added).) *Renishaw*, 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."). The specification also provides the physical properties of examples of specific films according to the invention, showing that the exemplary films are thin and flexible. (Ex. 1, col. 7, lns. 33-39, col. 8, lns. 10, 11, 17-21.) The prior art cited during prosecution similarly indicates that the relevant film packing materials are flexible. (*E.g.,* U.K. Patent App. 2,139,948 A to Dobbie et al, pg. 2, lns. 12-15 ("Films, especially for use in packaging liquids,... are required to be tough and flexible...") (Ex. 3, CR056-000119).) Dr. Mount, Pechiney's expert, similarly considered flexibility pertinent in the context of the Shah '419 patent. (*E.g.,* Expert Report of E. Mount, May 19, 2005 ("Mount Rep."), Ex. 22 at 11-13.)

### 3. "Films" are Packaging Materials

That "films" according to claim 11 of the Shah '419 patent are packaging materials, and not another type of film, such as a photographic film, is evident from the very first statement in the Background of the Invention: "This invention relates to oriented thermoplastic films *for packaging applications*..." (Ex. 1, col. 1, lns. 5-6 (emphasis added).) The Background of the

Invention provides additional context that the nature of the relevant films are packaging materials. For example, references directed to "flexible wrapping material" are identified as being of interest to the field of the Shah '419 patent. (Ex. 1, col. 1, lns. 48-52.)

Consistent with the intrinsic evidence, Pechiney's technical expert, Dr. Mount, has offered the opinion that "a person of ordinary skill in the art would have understood that the films [of the Shah '419 patent] are intended for the packaging of objects..." (Ex. 22 at 4.) Cryovac's experts, Drs. Wilkes and Kimmel, likewise understand the films of the Shah '419 patent to be relevant to packaging applications. (Ex. 2 at 3; Ex. 6 at 4.)

### 4.    Pechiney's Proposed Construction is Vague and Inaccurate

Pechiney's proposed construction for a "film" according to claim 11 of the Shah '419 patent is "[a] web of material(s), often plastic." (Ex. 13 at 2.) The use of an even less common term "web" within the definition of film will provide no useful guidance, and therefore is not appropriate. *E.g.*, *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("The meaning and scope of patent claim terms, as determined by a district court's claim construction rulings, are legal issues central to most patent cases. Thus, the district court normally will need to provide the jury in a patent case with instructions adequate to ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims."); *Control Resources, Inc. v. Delta Elec., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass. 2001) ("Although claim construction is [a] matter of law, and thus lies within the sole province of a judge, this Court is cognizant of the eventual involvement of a jury.  In the end, claim construction must result in a phraseology that can be taught to a jury of lay people.  It is not enough simply to construe the claims so that one skilled in the art will have a definitive meaning. The claims must be translated into plain English so that a jury will understand.") The fact that Pechiney's definition further recites that a film is "often plastic" also demonstrates its inaccuracy, given the evident failure to consider the term in context of the claim and record as a whole where the films necessarily comprise polymers (*e.g.*, Ex. 1, col. 1, lns. 5-6 ("This invention relates to

oriented thermoplastic films for packaging applications..."). *Pause Technology,* 419 F.3d at 1331; *Renishaw,* 158 F.3d at 1250.

Because Pechiney's proposed definition of a film as being "[a] web of material(s), often plastic" is both vague and inaccurate, it should be rejected.

### C.    "Coextruded Film"

**Proposed Definition: A film formed by coextrusion in which the layers of the film are extruded together simultaneously.**

Consistent with the patent specification, a "coextruded film," according to Cryovac's proposed definition, is a film formed by coextrusion in which the layers of the film are extruded together simultaneously. For example, the method of forming a film according to the patent entails coextruding all the layers in a single step. (Ex. 1, col. 3, lns. 30-39; Ex.3, CR0056-000022, 26.) Consistent with this disclosure, Example 1 of the Shah '419 patent explains that "[t]he polymer melts [of these components] were coextruded through a multi-layer die and then cooled and cast into a solid tube..." (Ex. 1, col. 7, lns. 3-17.)

A coextruded film, where all the layers are extruded together simultaneously, can be contrasted with films formed by other methods, such as lamination, where at least some layers are formed separately and then subsequently joined together. (*E.g.*, Ex. 1, col. 1, lns. 48-59 (citing U.S. Patent No. 4,421,823 to Theisen et al. ("Theisen," Ex. 21), characterized as being directed to an extrusion laminate where various materials are bonded to a substrate; Ex. 21, col. 2, lns. 19-28 ("The laminate material is prepared in a two-part operation. [First, an] outer surface layer of biaxially oriented polymer is extrusion-laminated with an intermediate layer of polymeric material to a su[b]strate... [Second, a] layer of heat-sealable polymeric material is then extrusion-coated onto the special polymer surface of the material obtained in the final operation.").)

The inventor, Mr. Shah, provided testimony concerning the meaning of a "coextruded film" consistent with the meaning provided in the intrinsic record. As explained by Mr. Shah, "[t]he understanding [of coextruded as of the March 21, 1986, filing date of the Shah '419 patent]

was that when two or more materials are brought together in a melt form and extruded together and formed into a desired product, [that product] could be called a coextruded product." (Ex. 20 at 17:18 - 18:9.)  Both sides' experts similarly agreed that a coextruded film is one formed by coextrusion where all the layers of the film are extruded together simultaneously.  (Mount Rep., Ex. 22 at 5 ("[T]he polymer [layer] combinations [in coextruded films] were produced in a single operation rather than by combining materials produced in multiple operations..."); Robert Kimmel Deposition Transcript (July 13, 2005), Ex. 23 at 35:19 - 36:3 ("[T]here are various ways of assembling a multilayer film.  Coextrusion is one of those ways in which, as described in my report and in Dr. Mount's report, and it involves extruding all of the material simultaneously.").)

Pechiney's circular definition of a "coextruded film" as being "[a] film formed by coextrusion" (Ex. 13 at 2), is imprecise and unhelpful.  *Sulzer Textil*, 358 F.3d at 1366; *Control Resources*, 133 F. Supp. 2d at 127.  It does not properly distinguish between films formed only partially by coextrusion where some, and not all, of the layers are extruded together simultaneously.  That is, it would encompass films such as the laminated films of Thiesen (Ex. 21, col. 2, lns. 19-28) where some of the layers are coextruded together and other layers are subsequently added by lamination in an overall two-step process.  Accordingly, Pechiney's proposed definition should be rejected.

D.    "Layer(s)"

**Proposed Definition:  A thickness of material adhered to another thickness of material.**

Cryovac's proposed definition of "layer(s)" tracks the express definitions in the Shah '419 patent specification, which states that "'[i]ntermediate layer', 'interior layer', and the like are used herein to define a layer in a multilayer film *adhered* on both sides to other layers."  (Ex. 1, Shah '419 patent, col. 3, lns. 42-44 (emphasis added).)  Based on this express definition, Cryovac's proposed definition provides that "layer" means "[a] thickness of material *adhered* to another thickness of material," such that one layer is adhered to another.

In contrast, Pechiney's proposed definition, "[o]ne thickness of material *laid or lying over or under* another" (Ex. 13 at 2 (emphasis added)), fails to provide that layers are actually adhered to one another, and not merely "laid or lying over or under another." Elsewhere, however, Pechiney contends that a "layer" is *adhered* to other layers. In particular, Pechiney's proposed definition for the "core layer" is "[a] central layer that is *adhered* on both sides to other layers and whose composition includes an ethylene vinyl alcohol copolymer but may also include other material(s)." (Ex. 13 at 7 (emphasis added).) Accordingly, at least because it is inconsistent with the specification, as well as being internally inconsistent, Pechiney's proposed definition for "layer(s)" should be rejected.

E.     **"At Least Seven Layers"**

**Proposed Definition:  At least the seven layers recited in subparagraphs (a), (b), (c) and (d) of claim 11.**

As explained by the Federal Circuit, "proper claim construction demands interpretation of the entire claim in context, not a single element in isolation... There is no basis for us to ignore that language [appearing later in the claim] in properly construing the claim language in dispute." *Pause Technology,* 419 F.3d at 1331 (citations omitted). The Federal Circuit has further explained that "[a] preamble may provide context for claim construction..." *Metabolite Labs., Inc. v. Laboratory Corp. of Am. Holdings,* 370 F.3d 1354, 1362 (Fed. Cir. 2004). Cryovac's proposed definition of the clause "at least seven layers," which appears in the preamble of claim 11, follows these principles by construing the clause in context of the claim as a whole. Based on this context, it is clear that the "at least seven layers" are not arbitrary or undefined layers. Rather, they are specifically the layers recited in subparagraphs (a), (b), (c) and (d) of claim 11.

To construe this clause otherwise, or merely in the abstract without reference to the layers defined in the body of the claim, as proposed by Pechiney (Ex. 13 at 3 ("Seven or more layers")), provides a meaningless and inconsistent construction. Accordingly, Pechiney's proposed definition should be rejected.

F. **"Arranged Symmetrically" and "At Least Seven Layers Arranged Symmetrically"**

**Proposed Definition: The term "arranged symmetrically" is used in the claim as part of the phrase "at least seven layers arranged symmetrically" and should be interpreted in that context to mean:**

**At least the seven layers recited in subparagraphs (a), (b), (c) and (d) of claim 11 arranged such that one layer (b), one layer (c) and one layer (d) are in the same order on each of the opposite sides of the core layer (a), for example, c/d/b/a/b/d/c. This claim phrase limits the arrangement of the layers. It does not limit the thickness of the layers. Nor does it limit the amounts of recited components or additives that may be included in the layers.**

The context, grammar, specification, and prosecution history of claim 11 of the Shah '419 patent together indicate that the phrase "at least seven layers arranged symmetrically" means that corresponding pairs of layers, as they are defined in the body of the claim, are arranged in a symmetric *order* on opposite sides of the core layer. That is, the claimed layers are arranged such that one layer (b), one layer (c) and one layer (d) are in the same order on each of the opposite sides of the core layer (a), for example, c/d/b/a/b/d/c. Beyond the required arrangement or ordering of the claimed layers, the clause does not provide any further implied or express limitations.

Pechiney urges the Court to read in additional limitations to the meaning of "arranged symmetrically" and "at least seven layers arranged symmetrically." (Ex. 13 at 3-4.) First, Pechiney seeks to add a requirement that "the geometrical center line of the core layer is in the geometrical center line of the film." (*Id.*) Second, Pechiney seeks to add an unstated requirement that "there is a correspondence in size (thickness)" of layers on opposite sides of the core layer, such that they are a mirror image of each other with respect to thickness. (*Id.*) Next, Pechiney seeks the Court to read in a limitation that "there is a correspondence in... composition of layers on opposite sides of the core layer," such that they are a mirror image of each other with respect to composition. (*Id.*) In essence, Pechiney seeks for the Court to read in a "mirror image" or "absolute symmetry" requirement that is both unstated and inconsistent with the intrinsic record.

A construction requiring "absolute symmetry" would further be contrary to the cannons of claim construction that prohibit reading in narrowing modifiers and limitations from preferred embodiments. *Johnson*, 175 F.3d at 989.

1. **Based on Context and Grammar, "Symmetrically" Modifies "Arranged" and the Phrase "at Least Seven Layers Arranged Symmetrically" Addresses Only the Ordering of Layers (a), (b), (c), and (d)**

The phrase "at least seven layers arranged symmetrically" is presented in the preamble of claim 11 of the Shah '419 patent. As part of the preamble, it should be understood to generally provide context to the claimed subject matter as more specifically set forth in the body of the claim. *Metabolite*, 370 F.3d at 1362. Indeed, in claim 11 the compositions of the at least seven layers arranged symmetrically are specifically defined in the body of the claim, paragraphs (a) - (d). Thus, the preamble itself does not define specific properties of the respective layers, which, as noted, are defined in the body of the claim. (See Sections H-L, below.)

Based on this context, the requirement of the phrase "at least seven layers arranged symmetrically" is clearly directed solely to the "arrange[ment]" or ordering of the at least seven layers, as those layers are subsequently defined. The preamble does not, for example, require any identity in color of corresponding layers. Similarly, it does not limit or otherwise define the thicknesses, geometric center, compositions, or any other possible unspecified property of the layers. Accordingly, it would be improper to rely on the preamble to read in such unstated narrowing limitations. *E.g,. Johnson*, 175 F.3d at 989.

Grammatically, the word "symmetrically" is an adverb that modifies the word "arranged." The relevant meaning of "arrange" is "to put in proper order; to sort systematically; to classify." (Webster's New Twentieth Century Dictionary, 2nd ed. (1983), Ex. 24 at 103.) Thus, based on the grammar and ordinary meaning, "arranged symmetrically" in the clause "at least seven layers arranged symmetrically" means that the layers are arranged, or put, in a symmetric order; it does not mean that the layers are themselves symmetric. (F. David Stringer Deposition

Transcript (August 19, 2005), Ex. 33 at 126:21 - 127:17.) *E.g. Credle,* 25 F.3d at 1571; *Hyatt,* 708 F.2d at 714. In other words the layers recited in subparagraphs (a)-(d) in claim 11 are arranged such that one layer (b), one layer (c) and one layer (d) are in the same order on each of the opposite sides of the core layer (a), for example c / d / b / a / b / d / c.

This construction of "at least seven layers arranged symmetrically" is consistent with the Federal Circuit's holding in the *Phillips* case, noting that where "the claim... refers to 'steel baffles,' [this] strongly implies that the term 'baffles' does not inherently mean objects made of steel." 415 F.3d at 1314. Just as "baffles" should not be interpreted out of context to ignore the word "steel," so to "symmetrically" should not be interpreted out of context to ignore the word "arranged" and its meaning of being put in order. Rather, in both cases, the entire context of the claim phrase must be given meaning. *See also Pause Tech.,* 419 F.3d at 1331 ("[P]roper claim construction demands... interpretation of the entire claim in context, not a single element in isolation...").

### 2. The Intrinsic Record Requires a Construction Encompassing Layer Pairs Arranged Symmetrically Having Differing Thicknesses and Compositions

The absence of an "absolute symmetry" requirement, *i.e.,* one that requires opposite layers to be identical in all respects, is clearly evidenced by the intrinsic record. For instance, the specification of the Shah '419 patent teaches that the thickness of opposite pairs of layers may vary independently. The outer layers "preferably *each* comprise from about 20% to about 40% and more preferably from about 25% to about 25% of the total thickness of the multilayer film." (Ex. 1, col. 5, lns. 42-45 (emphasis added).) The definition of "each," used in its common sense without specialized technical meaning or disclaimer, is "every one of two or more *considered individually.*" (Webster's New Twentieth Century Dictionary, 2nd ed. (1983), Ex. 24 at 568 (emphasis added).) Thus, the plain meaning of the intrinsic disclosure is that, according to a preferred embodiment, the thickness of each of the two outer layers may vary *individually.*

When discussing the thicknesses of the two intermediate polyamide layers, the Shah '419 patent also distinguishes in its references and grammar between the thickness of the layers considered together (*e.g.*, "*total thickness* of the polyamide layers may vary widely" (Ex. 1, col. 5, lns. 19-20) (emphasis added)) and thicknesses of the individual layers, where each may individually vary within the exemplary range (*e.g.*, "*each layer* can form between 5% and 25% of the total thickness of the multilayer film" (Ex. 1, col. 5, lns. 20-22 (emphasis added)). This distinction in the specification further reinforces the absence of any requirement that each layer in a pair have identical thicknesses or any other unstated "absolute symmetry" requirement. *Phillips,* 415 F.3d at 1315, 1317 (stating that the specification is "the single best guide to the meaning of a disputed term," and should be relied upon heavily).

Furthermore, as noted above, under certain preferences the outer layers may each comprise from about 20% to about 40% of the total thickness of the multilayer film. (Ex. 1, col. 5, lns. 42-45.) If, as Pechiney contends, both layers *must* be the same thickness, then the combined total thickness of the two outer layers may be as high as 80%. However, requiring pairs of layers to always have the same thickness would yield an impossible situation. As disclosed in the specification, the two intermediate polyamide layers each can be between 5% and 35% of the total thickness of the multilayer film (Ex. 1, col. 5, lns. 20-22), yielding a combined minimum thickness of at least 10%, and the two adhesive layers each can comprise from about 5% to about 15% of the total thickness of the multilayer film (Ex. 1, col. 6, lns. 65-67), for a combined minimum thickness of another at least 10%. In total, if the two outer layers are necessarily the same thickness and are both 40%, these six layers will then account for 100% of the thickness of the multilayer film, yielding an impossible structure where no thickness is allowed for the EVOH containing core layer.

Importantly, it is generally not possible to get perfectly identical thicknesses. (Cryovac's Rule 26(a)(2) Expert Report of Dr. Robert Kimmel (May 19, 2005), Ex. 25 at 11; Ex. 33 at 116:4-117:3.) In fact, exemplary films of Examples 1 and 2 of the Shah '419 patent did not have

identical thicknesses or a geometric centerline corresponding to the geometric center of the core. (Ex. 20 at 150:3-15 (films FDX1570 and FDX1572 are the example films of the Shah '419 patent); Ex. 26, CR013-000091.) Accordingly, a requirement, as proposed by Pechiney, for identical thickness of opposite layers, would improperly exclude preferred embodiments.

Similarly, Pechiney's proposed requirement that "the geometrical center line of the core layer is the geometrical center line of the film," would exclude preferred embodiments recited in the Shah '419 specification, *e.g.* where one outer layer comprises 40% of the total thickness and the other outer layer comprises 20% of the total thickness. (Ex. 1, col. 5, lns. 41-45; *see also* Ex. 26, CR013-000091.) A requirement of "absolute symmetry," including requiring either identical thicknesses of opposite layers or a geometric center line in the geometric center of the core layer would, therefore, improperly ignore the Federal Circuit's advice that claims should not be construed to exclude the inventor's preferred embodiments. *Vitronics*, 90 F.3d at 1583.

A requirement of "absolute symmetry" also cannot be based on the figure in the Shah '419 patent. Although the structure is generally depicted with layers of equal thickness, patent figures cannot be relied upon as scale drawings to add limitations to the claims. *Hockerson Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("Under our precedent... it is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue."); *North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348-49 (Fed. Cir. 2005) ("The court erroneously imported the specification's recommended dimensions for a commercial embodiment of the bottle shown in figure 12 into the claims.") (emphasis omitted).

The discussion in the background section of the Shah '419 patent further demonstrates that no importance was placed upon or implied concerning the thicknesses, geometric center, or compositional identity of layer pairs. In discussing eleven different prior art references, not once were the subjects of layer thickness, geometric centers, or compositional identity raised as being

important or even relevant. (Ex. 1, col. 1, ln. 48 - col. 3, ln. 5.) Rather, the issues addressed are the *general* compositions and ordering of the layers. (*Id.*) For example, the Shah '419 patent specification describes the import of U.S. Patent No. 4,514,465 to Schoenberg as disclosing a five layer thermoplastic film having surface layers comprising a blend of four classes of components, without reference to Schoenberg's teachings that the two surface layers may contain different specific components within each of the four classes. (Ex. 1, col. 2, lns. 10-15; Ex. 9, col. 16, lns. 29-44.)

Reading in an "absolute symmetry" limitation requiring mirror image compositions also would be inconsistent with the intrinsic record. As explained in Sections G-L, below, consistent with the specification, the layer pairs are required to have a common recited component (*e.g.*, the same polymeric component in both layers (c)) but each may contain additional components as well. Thus, each layer may contain different types or amounts of additional components. The additional components expressly identified in the specification include, for example, slip and antiblock additives in the outer layers. (Ex. 1, col. 5, lns. 29-30.)

In fact, as explained by Dr. Mount, at the time the application for the Shah '419 patent was filed, one of ordinary skill in the art would have already and independently understood that the two outer layers of a multilayer film will generally have different levels of slip and antiblock to provide the different properties necessary for processing. (Ex. 7 at 242:4 - 245:12 (referring to the outer layers as an "inner" and "outer" surfaces).) Thus, even without the disclosure in the specification, one of ordinary skill in the art would have already understood that layer pairs may, and in some cases must, differ in terms of composition, particularly with respect to slip and antiblock agents. *S3, Inc. v. Nvidia Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001) ("The law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention. To hold otherwise would require every patent document to include a technical treatise for the unskilled reader") (citations omitted).

The prosecution history also lacks any clear disclaimer from which to read-in a narrowing construction of "arranged symmetrically." Indeed, layer thickness, geometric centers, and compositional identity were never raised during prosecution, including when the rejections based on Sheptak (Ex. 5) and Mueller (Ex. 10) were addressed. Rather, Sheptak was distinguished because "it only teaches five layers, symmetrically arranged (14) and the overall eight layer structure (S) of the reference is <u>asymmetric.</u>" without regard to the thickness, geometric center, or precise composition of any layer. (Ex. 3, CR0056-000155.)

Instead of a disclaimer, the prosecution history evidences that the claims were clarified to delete a limitation in the body of the claim stating "said layers of the multilayer films forming a symmetrical heat-shrinkable structure." (Ex 3, CR0056-000152 to 153.) At the same time, the preamble was amended to include the present phrase "at least seven layers arranged symmetrically." (*Id.*) This amendment clarifies the claim to avoid any requirement for absolute symmetry or identity in opposing layers. (Ex. 3, CR056-000155; M. Quatt Deposition Transcript (August 12, 2005), Ex. 27 at 126:2 - 128:3.) And again, rather than distinguishing the claims based on thicknesses, geometric centerline, or identity of compositions, the amendment to claim 11 that added the clause "at least some layers arranged symmetrically" was explained as clarifying that "(1) at least seven layers are claimed, and that (2) these layers are symmetrically arranged." (Ex. 3, CR056-000155.)

Even the prior art analysis of Pechiney's expert, Dr. Mount, is inconsistent with defining "arranged symmetrically" to require "absolute symmetry." For example, Dr. Mount opined that U.S. Patent 4,511,610 to Yazaki ("Yazaki," Ex. 28) discloses seven layer structures having layers arranged symmetrically. (Ex. 22 at 26.) However, as Dr. Mount admits, Yazaki expressly states "[t]he thickness of each layer is not particularly critical in the multi-layer vessel." (Ex. 28, col. 7, lns. 26-27; Ex. 7 at 76:9-77:4.) Similarly, citing the compositions of the layers and a figure, U.S. Patent No. 4,572,854 to Dallman ("Dallman," Ex. 29), Dr. Mount alleges that Dallman discloses

layers "arranged symmetrically." (Ex. 22 at 28.) However, Dallman also allows the outer layers to have different thicknesses and compositions. (Ex. 29, col. 5, lns. 45-47.)

Therefore, for at least the reasons that Pechiney's proposed definition seeks to read in additional limiting modifications that are inconsistent with the record as a whole and would exclude preferred embodiments of the invention, Pechiney's proposed definition should be rejected.

G.    "Comprising"

> **Proposed Definition:** "'Comprising' is a term of art used in [patent] claim language which means that the named elements are essential, but other elements may be added and still form a [product] within the scope of the claim." *Genentech Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997).

Cryovac's definition above is based on the well settled meaning of "comprising" as a term of art in patent claims. *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004) ("'[C]omprising'… is open-ended and does not exclude additional, unrecited elements or method steps.") (quoting MPEP, 8th ed., rev. 1 § 2111.03 (2003) (citing *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)). Pechiney does not disagree with Cryovac's proposed construction. (Ex. 13 at 5.)

H.    "Layer Comprising" or "Layers Each Comprising" or "Layers, Each Comprising"

> **Proposed Definition:** These are open transition phrases that require the presence of the named elements and permit the inclusion of additional unnamed components in each of the layers recited in subparagraphs (a), (b), (c) and (d) of claim 11.

In addition to being based on the undisputed meaning of "comprising" as a term of art in patent claim language as an open transition term, the intrinsic record further shows that a "layer comprising" or "layers each comprising" or "layers, each comprising" require the presence of the named elements and permit the inclusion of additional unnamed components in each of the layers recited in subparagraphs (a), (b), (c) and (d) of claim 11. For instance, in reference to an exemplary polymer blend used for outer layers, the Shah '419 patent provides that "[t]his blend

will typically contain small amounts of slip and antiblock additives." (Ex. 1, col. 5, lns. 29-30.) As another example, the Shah '419 patent further provides for the inclusion of additional components with a polymer (polypropylene) identified for use in the outer layers. Specifically, "[t]he polypropylene may be preblended with about 4% by weight of a silica-containing antiblock agent, about 5% by weight of amide waxes, and about 1% of a lubricating agent. The amide waxes and lubricating agent are well-known in the art as slip agents." (Ex. 1, col. 6, lns. 5-10.)

Pechiney appears to generally agree with Cryovac's proposed constructions. For example, Pechiney proposes that "[t]he phrase 'layer comprising' as used in subparagraph (a) 'a core layer comprising an ethylene vinyl alcohol copolymer' means that the core layer includes ethylene vinyl alcohol copolymer but may also include other material(s)." (Ex. 13 at 6.) Similarly, Pechiney agrees that "[t]he phrase 'layers each comprising' as used in subparagraph (b) 'two intermediate layers each comprising a polyamide' means each intermediate layer includes a polyamide but may also include other material(s)."[10] (Id.)

I.    **"(a) A Core Layer Comprising an Ethylene Vinyl Alcohol Copolymer"**

> **Proposed Definition:  A layer that must contain ethylene vinyl alcohol copolymer but may also contain other components, which is located between the two intermediate layers (b) of claim 11.**

As provided in the specification, the core layer is the EVOH containing layer located between two intermediate layers containing a polyamide. For example, "[c]ore layer 10 is adhered on both surfaces to an intermediate layer 12 and 14 respectively, which comprise polyamide, and more preferably, a copolymer of nylon 6 and nylon 12.") (Ex. 1, col. 5, ln. 6-9.) The relationship of the core layer 10 being the layer located between the two intermediate polyamide layers 12, 14 is also illustrated in Fig. 1 of the Shah '419 patent. (Ex. 1, pg. 2.)

---

[10] Elsewhere, however, Pechiney inconsistently contends that opposite pairs of layers may comprise completely different components and still be within the scope of "each layer comprising" the recited component. See Section V.J .

Throughout prosecution, the term "core" was similarly used to refer to the layer in a multilayer film surrounded by an equal number of layers on both sides. For example, U.S. Patent No. 4,457,960 to Newsome ("Newsome," Ex. 30) is characterized in Applicant's July 1, 1986, IDS as appearing "to disclose a multilayer film having a core layer of a barrier material such as EVOH and EVOH blends." (Ex. 3, CR056-000036.) Newsome expressly refers to a "core layer" as the layer located between two other layers in a 3-layer structure. (Ex. 30, col. 5, lns. 26-40.) The total thickness of this 3-layer film according to Newsome was 2.25 mils thick, with the three layers having the following thickness and composition: 1.45 mils sealant layer / 0.4 mil core layer / 0.4 mil outer layer. (*Id.*) Newsome thus uses the designation "core layer" based solely on the ordering of the layers, without regard to the thickness of the various layers or geometric center of the multilayer film.

U.S. Patent No. 4,495,249 to Ohya ("Ohya," Ex. 31) is also characterized in Applicant's July 1, 1986, IDS as having a core layer. (Ex. 3, CR056-000036.) And, again, Ohya uses the designation "core" based solely on the ordering of layers, without regard to layer thicknesses. Ohya, in fact, reports on ten different 5-layer films that were actually constructed. The third layer of each film is referred to as the "core," even though, in each and every case, the outermost layers (layers 1 and 5) have differing thicknesses. (Ex. 31, col. 7-8, Table 2-1.) Similarly, U.S. Patent No. 4,514,465 (Schoenberg) provides that core "refers to an interior layer of a multi-layer film having an odd number of layers wherein the same number of layers is present on either side of the core layer" (Ex. 9, col. 8, lns 4-7; *see also* Ex. 10, col. 3, lns. 46-48 ("The term core or core layer as used herein means a layer in a multi-layer film which is enclosed on both sides by additional layers.").)

The composition of the core layer as containing an ethylene vinyl alcohol copolymer and possibly other components follows from the meanings of the above-defined term of art "comprising" and phrase "layer comprising." It is also consistent with the definitions of additional layers (b), (c), and (d), and their usage in the intrinsic record. Pechiney appears to

agree that the core layer "includes an ethylene vinyl alcohol copolymer but may also include other material(s)." (Ex. 13 at 7.)

Pechiney's proposed construction is "a central layer that is adhered on both sides to other layers and whose composition includes an ethylene vinyl alcohol copolymer but may also include other material(s)." (Ex. 13 at 7.) Pechiney improperly ignores the context of the claim as a whole by failing to note that the core layer is located between the intermediate layers (*e.g., Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."); *Pause Tech.*, 419 F.3d at 1331 ("[P]roper claim construction demands... interpretation of the entire claim in context, not a single element in isolation...")). Accordingly, Pechiney's proposed definition should be rejected to the extent it fails to recognize the position of the layer as being between intermediate polyamide layers (b) and requires that it be "central" if that means precisely on a center line as opposed to merely being between other layers which may have the same or different thicknesses.

J.    **"(b)    Two Intermediate Layers Each Comprising a Polyamide;"**

> **Proposed Definition: Two layers in a multilayer film, each adhered on both sides to other layers. Each must contain a common polyamide component but each may also contain other components as well.**

Plaintiff Cryovac does not know of any issue in this case that would depend on the construction of this limitation, and therefore does not believe that the Court needs to construe it for purposes of this case. *Vivid Technologies, Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 803, 53 USPQ2d 1289, 1294-95 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent *necessary* to resolve the controversy"). However, should the Court decide to determine a construction, Cryovac believes the definition proposed above is appropriate based on the plain meaning and intrinsic record, consistent with the context of the claim as a whole and the constructions of clauses (c) and (d), below. *Research Plastics, Inc. v. Federal Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005) ("claim terms are presumed to be used consistently throughout the patent").

Specifically, the clause "(b) two intermediate layers each comprising a polyamide" requires that each of the two intermediate layers must contain a common polyamide[11] component but each may also contain other components as well. In other words, they must each commonly contain the recited component (polyamide) but may also contain other components as well. This definition is based on the ordinary and legal meanings of "comprising" and the indefinite article "a" that precedes the recited component (polyamide), as discussed further in Section K, below.

In addition, the specification defines an "intermediate layer" as "a layer in a multilayer film adhered on both sides to other layers." (Ex. 1, col. 3, lns. 42-44.) Accordingly, the first component of Cryovac's proposed definition, *i.e.,* "[t]wo layers in a multilayer film, each adhered on both sides to other layers," is expressly based on the intrinsic record, which is unequivocal in this regard.

K.    **"(c)    Two Outer Layers Each Comprising a Polymeric Material or Blend of Polymeric Materials;"**

**Proposed Definition: The two outer layers of a multilayer film. Each must contain a common polymeric component but each may also contain other components as well.**

The clause "two outer layers each comprising a polymeric material or blend of polymeric materials" should be construed to require that each of the two outer layers must contain a common polymeric component but each may also contain other components as well. Pertinent to the requirement of a common polymeric component in each of the outer layers, the dictionary explains that "a" is "[u]sed before nouns and noun phrases that denote *a single* but unspecified person or thing." (Ex. 32, American Heritage College Dictionary, 3rd ed. (2000) (emphasis added).) Pechiney's contrary definition should be rejected.

---

[11] According to the Shah '419 patent specification, "[t]he term 'polyamide' refers to high molecular weight polymers having amide linkages along the molecular chain, and refers more specifically to synthetic polyamide such as various nylons. This term also refers to copolymers of polyamides such as nylon 6 and nylon 12." (Ex. 1, col. 4, lns. 32-37.)

The requirement for a common polymeric component in each of the outer layers based on the phrase "comprising a polymeric material or blend of polymeric materials" is also consistent with the Shah '419 specification, where the indefinite article "a" is used consistent with its ordinary meaning. For example, the specification states that for the outer layers "A suitable LLDPE resin is Dowlex 2045...," and clearly uses "a" to refer to a single commercial polymer. (Ex. 1, col. 5, lns. 47-50.) Similarly, in the context of layer compositions, "a" is used to denote *a single* polymer component, and not multiple optional components. (*E.g.,* Ex. 1, col. 3, lns. 22-25 ("The present invention relates to oriented multilayer film comprising... two intermediate polyamide layers each comprising a polyamide..."); col. 5, lns. 6-9 ("intermediate layer 12 and 14 respectively, which comprise... more preferably a copolymer of nylon 6 and nylon 12"); col. 7, ln. 66 - col. 8, ln. 3 ("A second sample film was made by the same method... except a blend of ethylene propylene copolymer and propylene was used for the outer layers 16 and 18 of the film.").)

In contrast, Pechiney contends that "[t]he polymeric material or blend of polymeric materials in the first layer need not be the same as the polymeric material or blend of polymeric materials in the second layer." (Ex. 13 at 7.) Pechiney's construction proposes, in effect, to read out the word "a" from the claim and construe "two outer layers *each* comprising *a* polymeric material or blend of polymeric materials" (emphasis added) as "two outer layers each comprising *any* polymeric material or blend of polymeric materials." This proposal is inconsistent with the ordinary and legal meanings of "a" and is inconsistent with the intrinsic record. Accordingly, for at least these reasons, Pechiney's proposed constructions are improper and should be rejected.

Additionally, although the definition section of the Shah '419 patent does not recite an express definition for "outer layers," the term is being used in its ordinary sense and Pechiney appears to agree that each of two outer layers are the outside layers of a multilayer film. (Ex. 13 at 7.) During prosecution, the PTO examiner similarly used the term "outer layers" to refer to the

outside layers of a multilayer film. (*E.g.,* Ex. 3, CR056-000046 ("With Mueller further showing multilayer film structures having outer layers of polyolefin blends…").)

**L.    "(d)    Two Layers, Each Comprising an Adhesive Polymeric Material, Which Adhere Each of Said Intermediate Layers to a Respective Outer Layer."**

**Proposed Definition: Two layers of a multilayer film, which each adhere one of the intermediate layers to a respective outer layer. Each must contain a common adhesive polymeric material but each may also contain other components as well.**

Plaintiff Cryovac does not know of any issue in this case that would depend on the construction of this limitation, and therefore does not believe that the Court needs to construe it for purposes of this case. *E.g., Vivid,* 200 F.3d at 803. However, should the Court decide to determine a construction, Cryovac believes the definition proposed above is appropriate based on the plain meaning and intrinsic record, consistent with the context of the claim as a whole and the constructions of clauses (b) and (c).

Based on their common words and construction, with each reciting "two [] layers" that "each compris[e]" a recited component, limitations  (b), (c), and (d) should be construed in a consistent manner. *Research Plastics,* 421 F.3d at 1295 ("[C]laim terms are presumed to be used consistently throughout the patent..."). Accordingly, as provided in Section K above, clause (d), "two layers, each comprising an adhesive polymeric material" should be construed to require that each of the two layers must contain a common adhesive polymeric material but each may also contain other components as well. Pechiney's contrary definition should be rejected.

Concerning the location and function of the two layers (d), Pechiney appears to generally agree that one layer (d) adhere one of a first intermediate layers to a first outer layer and that the other layer (d) adhere one of a second intermediate layers to a second outer layer. (Ex. 13 at 8.) In other words, but more precisely tracking the language of the claim and taking into consideration the layer structure of the film, clause (d) should be construed to define "two layers

of a multilayer film, which each adhere one of the intermediate layers to a respective outer layer," as stated in Cryovac's proposed definition above.

## VI.    CONCLUSION

For the reasons set forth here, the Court should construe claim 11 of the Shah '419 patent according to Cryovac's proposed definitions and should, accordingly, reject Pechiney's inconsistent proposals.

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Michele Sherretta (No. 4651)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

Of Counsel:

Ford F. Farabow, Jr.
Joann M. Neth
Courtney B. Meeker
Mark J. Feldstein
Rebecca D. Hess
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, D.C.  20001-4413
(202) 408-4000

Attorneys for Plaintiff Cryovac, Inc.

Dated:  October 19, 2005

Exhibit List - **NOT FOR FILING**

1       U.S. Patent No. 4,755,419 to Shah

2       ███████████████████████████

3       Certified file history of U.S. Patent No. 4,755,419 (CR056-000001 to CR056-00167)

4       U.S. Patent No. 4,746,562 to Fant

5       U.S. Patent No. 4,284,674 to Sheptak

6       ████████████████████████

7       Eldridge Mount Deposition Transcript, August 4, 2005

8       U.S. Patent No. 4,561,920 to Foster

9       U.S. Patent No. 4,514,465 to Schoenberg

10      U.S. Patent No. 4,532,189 to Mueller

11      European Patent Application No. 0,149,321 to Ohya et al.

12      U.S. Patent No. 4,501,798 to Koschak et al.

13      Pechiney September 30, 2005, letter and redlined chart

14      ██████████

15      ███████████████

16      ██████████████████████

17      Webster's Ninth New Collegiate Dictionary (1991)

18      Encyclopedia of Polymer Science and Engineering (1987)

19      Wiley Encyclopedia of Packaging Technology (1986)

20      ███████████████████████

21      U.S. Patent No. 4,421,823 to Theisen et al.

22      Mount initial Report, May 19, 2005

23      ~~Robert Kimmel Deposition Transcript, July 13, 2005.~~  *Redacted*

24      Webster's New Twentieth Century Dictionary, 2nd ed. (1983)

25      ██████████████████████████████

26     Shah Depo. Ex. 13, CR013-000086 to 101

27     ██████████████████████████████████

28     U.S. Patent No. 4,511,610 to Yazaki

29     U.S. Patent No. 4,572,854 to Dallman

30     No. 4,457,960 to Newsome

31     U.S. Patent No. 4,495,249 to Ohya

32     American Heritage College Dictionary, 3rd ed. (2000)

33.     ██████████████████████████████████

## CERTIFICATE OF SERVICE

I, Michele Sherretta, hereby certify that on October 26, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such document is available for viewing and downloading to the following counsel of record:

> N. Richard Powers, Esquire
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> P. O. Box 2207
> Wilmington, DE  19899

I further certify that on October 26, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY FEDERAL EXPRESS**

> Steven R. Trybus, Esquire
> Jenner & Block LLP
> One IBM Plaza
> Chicago, IL  60611-7603

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

> *Michele Sherretta*

> John W. Shaw (No. 3362)
> *jshaw@ycst.com*
> Karen E. Keller (No. 4489)
> *kkeller@ycst.com*
> Michele Sherretta (No. 4651)
> *msherretta@ycst.com*
> Andrew A. Lundgren (No. 4429)
> *alundgren@ycst.com*
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600

> Attorneys for Plaintiff Cryovac, Inc.