# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CRYOVAC, INC.,                            )
                                         )
            Plaintiff/Counter-Defendant,  )          Civil Action No. 04-1278
                                         )
                    vs.                   )          Hon. Kent A. Jordan
                                         )
PECHINEY PLASTIC PACKAGING,               )
INC.,                                     )          **REDACTED**
                                         )
            Defendant/Counter-Plaintiff.  )


## PECHINEY'S RESPONSIVE MEMORANDUM
## ON CLAIM CONSTRUCTION


N. Richard Powers (#494)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: (302) 888-6266

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350


Dated: November 18, 2005

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................5

II. SUMMARY OF ARGUMENT ..............................................................................5

III. CLAIM CONSTRUCTION ....................................................................................7

    A. "arranged symmetrically" or "at least seven layers arranged symmetrically" ...................7

        1. Cryovac And Pechiney Agree That Grammar, Content, And Ordinary Meaning Apply ...................................................................................................8

        2. Grammar And Context Confirm Pechiney's Proposed Construction ............................9

        3. Pechiney Is Not Reading In Additional Limitations ....................................................10

        4. The Descriptions Of Layer Thicknesses In The Specification Do Not Help Cryovac ..............................................................................................11

        5. It Is Not Impossible For The Layer Thicknesses To Be The Same ............................12

        6. Pechiney Has Never Argued For A Construction Requiring "Perfectly Identical Thickness".................................................................................13

        7. Non-Public Information About The Examples Is Not Relevant ...................................14

        8. Any Ambiguities Should Be Construed Against Cryovac ...........................................15

    B. "oriented" or "oriented coextruded film" ........................................................................16

        1. The Process Language Describes Orientation Broadly ...............................................17

        2. Orientation Processes Include Melt Orientation .........................................................18

        3. One Of Skill In The Art Knew That There Were At Least Two Different Blown Bubble Processes.................................................................................19

        4. The Definition In The Specification Would Have Been Understood To Include Melt Blown Processes.................................................................................22

        5. The Original Method Claims Do Not Support Cryovac's Proposed Construction Of "Oriented".................................................................................23

        6. Neither The Distinction Of Fant Nor The Prior Art Requires The Court To Redefine "Oriented".................................................................................24

    C. "film" ...............................................................................................................................25

D. "coextruded film"............................................................................................26

E. "(c) two outer layers each comprising a polymeric material or blend of polymeric materials"..................................................................................................................27

F. "(a) a core layer comprising an ethylene vinyl alcohol copolymer" ...................29

G. "at least seven layers" ........................................................................................30

IV. CONCLUSION..............................................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Armament Sys. & Producers, Inc. v. Maradnock Lifetime Prods., Inc.*,
  No. 97-1174 U.S. App. LEXIS 20818,
  (Fed. Cir. Aug. 7, 1998) ............................................................................... 20

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
  216 F.3d 1042 (Fed. Cir. 2000) .................................................................... 21

*Callicrate v. Wadsworth Mfg.*,
  No. 04-597, 2005 U.S. App. LEXIS 23531,
  (Fed. Cir. Oct. 31, 2005) ..................................................................... 9, 15, 18

*Control Res., Inc. v. Delta Elecs., Inc.*,
  133 F. Supp. 2d 121 (D. Mass. 2001) ........................................................... 25

*Credel v. Bond*,
  25 F.3d 1566 (Fed. Cir. 1994) ........................................................................ 4

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005) .................................................................... 20

*Cruciferous Sprout Litig., In re*
  301 F.3d 1343 (Fed. Cir. 2002) ...................................................................... 8

*Ekchian v. Home Depot*,
  104 F.3d 1299 (Fed. Cir. 1997) .................................................................... 12

*Hyatt, In re*
  708 F.2d 712 (Fed. Cir. 1983) ........................................................................ 4

*JVW Enters. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005) ...................................................................... 9

*Mannington Mills, Inc. v. Armstrong World Indus., Inc.*,
  218 F. Supp. 2d 594 (D. Del. 2002) ............................................................. 12

*Medtronic Minimed, Inc. v. Smiths Med. MD, Inc.*,
  No. 03-776-KAJ, 2005 U.S.Dist. Lexis 10583
  (D. Del., June 1, 2005) .................................................................................. 12

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) .................................................................. 7, 8

*Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd.*,
  215 F.3d 1281 (Fed. Cir. 2000) .................................................................... 21

*Novo Nordisk v. Genentech*,
  77 F.3d 1364 (Fed. Cir. 1996) ........................................................................ 8

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................. passim

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
    927 F.2d 1565 (Fed. Cir. 1991) ................................................................................................ 12

*SulzerTextil AG v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004) ............................................................................................... 25

*Syngenta Seeds, Inc. v. Monsanto Co.*,
    No. 02-1331 SLR, 2004 U.S. Dist. Lexis 24253,
    (D. Del., November 19, 2004) ................................................................................................ 12

*Vivid Technologies, Inc. v. American Science & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ................................................................................................... 1

## I. INTRODUCTION

Pechiney Plastic Packaging, Inc. ("Pechiney") submits this memorandum in response to the Initial Brief on Claim Construction by Cryovac, Inc. ("Cryovac") and in further support of Pechiney's proposed construction of the disputed claim terms and phrases in claim 11 of the '419 patent.

As an initial matter, although the parties do not agree on the construction of lettered paragraphs (b) and (d) of claim 11, the parties now seem to be in agreement[1] that the construction of these terms does not affect any issue in the case and that, therefore, the Court need not construe these limitations. *Vivid Technologies, Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

In addition, Pechiney remains unaware of any issues that turn on the construction of the terms "layers" or "layers comprising." The parties have agreed on the definition of "comprising." Thus, in this brief, Pechiney will not address the construction of lettered subparagraphs (b) or (d), or the terms "layers," "comprising," or "layers comprising." Rather, Pechiney will address only construction of the terms and phrases that are disputed and do potentially affect issues in the case: "arranged symmetrically," "oriented," "film," "coextruded film," subparagraphs (a) and (c), and "at least seven layers."

## II. SUMMARY OF ARGUMENT

Cryovac has twisted the meaning of claim 11 and its terms like a nose of wax, rendering the claim barely recognizable to one of ordinary skill in the art. If Cryovac's proposed claim

---

[1] Cryovac has now, for the first time, agreed that subparagraphs (b), (c) and (d) are to be construed consistently. With that concession by Cryovac, Pechiney agrees with Cryovac that subparagraphs (b) and (d) do not need to be construed by the Court. (Cryovac's Initial Brief on Claim Construction, D.I. 203, at 34 and 37, hereinafter "CB at ___".)

constructions were adopted, claim 11 of the '419 patent would not be a simple product claim to a multilayer film. Rather, Cryovac's construction of claim 11 would require specific knowledge of the methods of manufacturing and the intended use of the products and would cover only thin, flexible, packaging materials that have seven, and only seven, layers (listed in subparagraphs (a), (b), (c), and (d)) in c/d/b/a/b/d/c order. Such materials would not be covered unless made by a process in which the seven layers are coextruded together "simultaneously," and then cooled, reheated and oriented by a racking process.

On the other hand, if Pechiney's claim construction is adopted, claim 11 of the '419 patent will have the scope that one of ordinary skill in the art would have understood it to have: a multilayer film having seven or more layers (with seven of the layers being those listed in subparagraphs (a), (b), (c) and (d)) in which the symmetrical arrangement of the layers means that corresponding layers on opposite sides of the centerline of the film are the same in composition and thickness. The film itself would reveal whether it was formed by coextrusion and whether its molecules were realigned by stretching. Thus, no detailed information about the process of manufacture or intended use is needed under Pechiney's construction.

Cryovac's proposed claim construction is not supported by the intrinsic evidence or by the evidence of how one of ordinary skill in the art would have understood claim 11. Indeed, Cryovac's proposed claim construction is a result-oriented proposition in which Cryovac has expanded or narrowed claim limitations as needed in order to: 1) attempt to distinguish claim 11 from the close prior art that both renders the subject matter obvious and, indeed, anticipates claim 11 while 2) still attempting to cover the new and very different ClearShield[TM] products. Cryovac feels free to twist the meaning of its claim, at least in part, no doubt, because the '419

patent expires shortly, on March 21, 2006, and so has no benefit for Cryovac aside from its

attempt to collect damages from Pechiney in the present litigation.

## III.    CLAIM CONSTRUCTION

Pechiney now addresses the issues highlighted by Cryovac's Initial Brief by addressing

the disputed claim terms in the same order as they were addressed in Pechiney's Brief in Support

of Its Proposed Claim Construction (D.I. 204, hereinafter "PB").

### A.    "arranged symmetrically" or "at least seven layers arranged symmetrically"

Cryovac has read the "arranged symmetrically" limitation out of claim 11 by contending

that it only means that the seven layers required by subparagraphs (a), (b), (c) and (d) must be

ordered as c/d/b/a/b/d/c. That order is already established by the language of subparagraphs (a),

(b), (c) and (d) themselves, without the need for the "arranged symmetrically" limitation. Thus,

Cryovac's proposed construction improperly renders "arranged symmetrically" superfluous. As

demonstrated in Pechiney's Opening Brief, the "arranged symmetrically" limitation is much

more than just c/d/b/a/b/d/c and requires that all of the layers that are present (whether seven or

more than seven) be arranged so that, when the film is viewed in cross-section, there is

correspondence in both thickness and in composition of layers on opposite sides of the central

core layer resulting in mirror images.

Cryovac has not pointed to one piece of intrinsic evidence that simultaneously supports

Cryovac's proposed construction and contradicts Pechiney's proposed construction of "arranged

symmetrically." It is true that some of the intrinsic evidence is equally compatible with either

party's proposed construction of "arranged symmetrically." However, as shown in Pechiney's

Opening Brief, only Pechiney's proposed construction of "arranged symmetrically" is fully

consistent with the intrinsic evidence and the ordinary meaning. And, Pechiney's proposed

construction does not make "arranged symmetrically" superfluous, as Cryovac's proposed construction does.

###        1.        Cryovac And Pechiney Agree That Grammar, Content, And Ordinary Meaning Apply

Cryovac and Pechiney agree on the first principles underlying a proper grammatical construction of the claim term, "arranged symmetrically." However, Pechiney applies those principles and follows them to their logical conclusion. Cryovac only pays them lip service and then departs from them to reach a litigation-driven result.

For example, Cryovac and Pechiney agree that English grammar and context are valuable aids in claim construction. (CB at 10, 26); *Credel v. Bond,* 25 F.3d 1566, 1571 (Fed. Cir. 1994); *In re Hyatt,* 708 F.2d 712, 714 (Fed. Cir. 1983). Cryovac and Pechiney also agree that the term "arranged symmetrically" should not be interpreted "out of context" to ignore the surrounding claim language such as "arranged" and "layers." (CB at 26.) Finally, Cryovac and Pechiney agree that the proper construction of the claim term "arranged symmetrically" necessarily requires incorporation of the definition of the word "symmetric":

> The context, grammar, specification, and prosecution history together indicate that ["at least seven layers arranged symmetrically"] means that **corresponding pairs of layers** defined in the body of the claim **are arranged in a symmetric order** on opposite sides of the core layer.

(CB at 1, *see also* CB at 24)(emphasis added).

The parties therefore agree that the proper construction of "arranged symmetrically" requires applying the ordinary meaning of "symmetric," to the claim language "layers arranged symmetrically." That ordinary meaning, as shown by the dictionary definition, bears repeating (PB at 17-18), and is as follows:

> **sym·met·ri·cal** ... or **sym·met·ric** ... *adj* ... **1** : having or
> involving symmetry : exhibiting symmetry : exhibiting
> correspondence in size and shape of parts...

(A0185, Ex. 13; A0210, Ex. 14; A0214, Ex. 15.)  "Symmetry" is defined in relevant part as:

> **2** : correspondence in size, shape, and relative position of parts that
> are on opposite sides of a dividing line or median plane or that are
> distributed about a center or axis....

(A0185, Ex. 13; A0210, Ex. 14; A0214, Ex. 15.)  Thus, the ordinary English language meaning

of arranged symmetrically requires the layers to be put in order so that corresponding layers on

the opposite sides of the center line of the film exhibit correspondence of "size and shape," i.e.,

the characteristics that define the thing that is being arranged.  Here, size is the layer thickness

and, rather than shape, its corollary here, composition, an attribute that defines the layers.

Pechiney's proposed claim construction faithfully follows all of the grammatical

construction rules upon which the parties profess agreement.  By contrast, Cryovac substitutes a

definition that certainly serves its litigation purposes, but only at the cost of ignoring the canons

of construction that it professes to follow.

### 2.    Grammar And Context Confirm Pechiney's Proposed Construction

Cryovac offers the ungrammatical and counter-intuitive proposition that the result of

arranging the layers symmetrically is a film structure that is <u>not</u> symmetric:

> Thus, based on the grammar and ordinary meaning, "arranged
> symmetrically" in the clause "at least seven layers arranged
> symmetrically" means that ***the layers are arranged, or put, in a
> symmetric order***; it does not mean that the layers are themselves
> symmetric.

(CB at 25.)  In support of this point, Cryovac relies on neither the grammar nor the ordinary

meaning of the words.  Rather, Cryovac cites one piece of extrinsic evidence:  the deposition

testimony of F. David Stringer,

**REDACTED**

9

**REDACTED**

Mr. Stringer's lay opinion should be afforded no weight at all.  In addition to being extrinsic personal opinion (in and of itself sufficient reason to discount the testimony, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005)),

**REDACTED**

Thus, Mr. Stringer's opinion is irrelevant and immaterial to the task at hand, the construction of "arranged symmetrically" as it would have been understood by one of ordinary skill in the art.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  Aside from Mr. Stringer's personal opinion, Cryovac provides no other support for its idea that the grammar and ordinary meaning of the "arranged symmetrically" limitation means that arranging the layers symmetrically does not result in a symmetric film structure.  Cryovac's position is simply untenable.  Cryovac proposes to determine if layers in a multilayer film are arranged symmetrically while ignoring symmetry in the multilayer film.

### 3.    Pechiney Is Not Reading In Additional Limitations

Contrary to Cryovac's assertions, Pechiney is not trying to "read in additional limitations" to claim 11 by properly defining "arranged symmetrically" as including

correspondence in thickness and composition. (CB at 24.) These ideas come directly from the ordinary dictionary meaning of "symmetrical": "correspondence in size and shape…"

Pechiney's proposed construction then, gives full effect to the claim limitation "layers arranged symmetrically" which must mean something in addition to "c/d/b/a/b/d/c" because that language was specifically added in prosecution to overcome prior art. The arrangement of the labels in c/d/b/a/b/d/c order was already required by the (a), (b), (c) and (d) subparagraphs themselves. (PB at 14-17.) Thus, because Cryovac added, and the PTO relied on, the "arranged symmetrically" limitation to overcome the prior art, it must mean more than what was already in the claim.

### 4.    The Descriptions Of Layer Thicknesses In The Specification Do Not Help Cryovac

Cryovac also attempts to justify its departure from ordinary meaning and well-accepted grammatical rules of construction by referring to language in the specification that the outer layers "preferably each comprise from about 20% to about 40% and more preferably from about 25% to about 35% of the total thickness of the multilayer film." Cryovac reads this portion of the specification as mandating a variation in the outer layer thicknesses in a single film. However, this language is not sufficiently clear, nor sufficiently clearly tied to "arranged symmetrically," to indicate that the Cryovac intended to serve as its own lexicographer and to depart from the ordinary meaning of "symmetric." *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1371 (Fed. Cir. 2005). This is particularly true here, because the thickness range language quoted by Cryovac equally supports Pechiney's and Cryovac's proposed constructions. The quoted language is equally consistent with descriptions of *different* films where the variation in thickness is from the outer layers of one film to another, rather than different thicknesses within a single film. Where Pechiney's proposed construction is consistent with the ordinary

meaning, and Cryovac's is inconsistent with that definition, ambiguous language from the specification cannot be used to prefer Cryovac's novel construction over Pechiney's "ordinary meaning" construction. *Id.*

Further, there is no indication whatsoever that the thickness ranges described in the specification are necessarily directed to films with "layers arranged symmetrically" or that they were meant to define "layers arranged symmetrically." *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002). Cryovac assumes that all of the films described in the specification are films with "layers arranged symmetrically." But, Cryovac has no proof and offers no reason to suspect that is this so. Indeed, the prosecution history of the '419 patent indicates to the contrary.

The specification was necessarily drafted to support the claims as originally filed. Those original claims were significantly broader than claim 11 *and were not limited to films in which the layers were arranged symmetrically.* This therefore appears to be a case in which Cryovac had written a broad disclosure but ultimately protected only a preferred embodiment, the symmetrical embodiment. *See, e.g., Novo Nordisk v. Genentech*, 77 F.3d 1364, 1370 (Fed. Cir. 1996). Therefore, even if the '419 patent clearly disclosed an embodiment with corresponding layers that had different thicknesses (or different compositions), which it does not, there would need to also be some clear indication that such an embodiment was considered to have its "layers arranged symmetrically" before it could be concluded that Cryovac had intended to depart from the ordinary meaning of arranged symmetrically.

### 5.    It Is Not Impossible For The Layer Thicknesses To Be The Same

Cryovac next argues that Pechiney's proposed construction cannot be correct because, if corresponding layers must have the same thickness in order to be arranged symmetrically, it "yield[s] an impossible situation." (CB at 27.) Cryovac reaches this conclusion by positing a

hypothetical embodiment which assumes that the outer layers each comprise 40%, (the upper limit of the preferred thickness range for the outer layers (A0145, Ex. 10, col. 5, lines 41-45)) for a total of 80%. Cryovac then assumes, without any factual or legal support of this latter assumption, that each of the two intermediate polyamide layers cannot be thinner than 5%. In support, Cryovac cites the exemplary language in col. 5, lines 20-21, "*For example*, each [intermediate] layer *can* form between 5% and 25%..." (CB at 27) (emphasis added.) Cryovac also assumes that the adhesive layers likewise cannot be thinner than 5%. Cryovac next reasons that, because 40%+40%+5%+5%+5%+5%=100%, there can be no EVOH core layer and thus reaches its "impossible situation."

Cryovac's reasoning fails because, the examples and preferences in the specification do not limit the intermediate polyamide layers or adhesive layers to a thickness of 5% or greater. *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005); *Callicrate v. Wadsworth Mfg.*, No. 04-597, 2005 U.S. App. LEXIS 23531, (Fed. Cir. Oct. 31, 2005). Thus, it would be perfectly permissible to have outer layers of 40% each with the other five layers, including an EVOH core layer, totaling 20% of the overall thickness. For example, the nylon layers could each be 3%, the adhesive layers each be 2% and the EVOH core layer would be 10%.

### 6.    Pechiney Has Never Argued For A Construction Requiring "Perfectly Identical Thickness"

Cryovac also argues that "is generally not possible to get perfectly identical thicknesses," (CB at 27) and that this fact is fatal to Pechiney's proposed construction. Cryovac misunderstands Pechiney's proposed claim construction which relies upon what one of ordinary skill in the art would have understood about the ordinary meaning of same thickness and same composition.

One of ordinary skill in the art would have understood that the "same" thickness and "same" composition for corresponding layers was something that could be achieved even if they were not "perfectly identical." That is, one of ordinary skill in the art would have understood that whether layers are the "same" thickness is judged by looking at average thicknesses and/or target thicknesses. A determination of whether layers are the same is not an absolute comparison of layers at any given point in the film. (Declaration of Eldridge M. Mount III in Support of Pechiney's Responsive Memorandum on Claim Construction, Pechiney's Memorandum In Opposition to Cryovac's Motion for Summary Judgment, and Pechiney's Brief in Opposition to Cryovac's Motion to Exclude Expert Testimony at ¶ 31, hereinafter "Second Mount Decl. ¶ __"; Fant Tr. 57:14-17; B5098, Ex. 219.)

REDACTED

**7.    Non-Public Information About The Examples Is Not Relevant**

REDACTED

**REDACTED**

One of skill in the art would not find any disclosure in the '419 patent of a film said to have layers arranged symmetrically but with corresponding layers of different thicknesses.

**REDACTED**                                                                In spite of this, Cryovac now tries to say that one "preferred embodiment" of the '419 patent is an embodiment where one outer layer comprises 40% thickness and the other comprises 20% thickness. (CB at 28.) There is, in fact, no such embodiment disclosed.[2] None of the preferred embodiments that were actually disclosed in the '419 patent would be excluded by Pechiney's claim construction.

**8.      Any Ambiguities Should Be Construed Against Cryovac**

In the end, it is Cryovac that was responsible for the written description in the specification of the '419 patent and responsible for the current claim language. To the extent that the '419 patent does not, for example, clearly identify disclosures such as the layer thickness

---

[2]  The specification says that the outer layers "preferably each comprise from about 20% to about 40%," but that is obviously far different from specifically disclosing a single preferred embodiment in which one outer layer comprises 40% thickness and the other outer layer comprises 20% thickness.

with the definition of "layers arranged symmetrically," Cryovac has no one to blame but itself.

Likewise, the claim language was chosen by Cryovac and, to the extent that there are remaining

ambiguities about the meaning of the claim language, including "layers arranged symmetrically,"

Cryovac, not Pechiney and the public, should bear the burden of that uncertainty. *Phillips*, 415

F.3d at 1318. The common meaning of "arranged symmetrically" is what persons of ordinary

skill in the art would have understood and what Pechiney now proposes for the construction of

"arranged symmetrically." That is the construction that should be adopted here.

    **B.**    **"oriented" or "oriented coextruded film"**

    The parties agree that the specification explicitly provides a definition of "oriented". The

difference between the parties, as set forth in Pechiney's opening brief (PB at 21-22), is that

Pechiney's proposal recognizes that under the applicable legal standards, product claims like

claim 11 are not to be limited by process language. *See, e.g., Ekchian v. Home Depot*, 104 F.3d

1299, 1303 (Fed. Cir. 1997); *Medtronic Minimed, Inc. v. Smiths Med. MD, Inc.*, No. 03-776-

KAJ, 2005 U.S.Dist. Lexis 10583 at *72 (D. Del., June 1, 2005); *Scripps Clinic & Research*

*Found. v. Genentech, Inc.*, 927 F.2d 1565, 1583 (Fed. Cir. 1991); *Mannington Mills, Inc. v.*

*Armstrong World Indus., Inc.*, 218 F. Supp. 2d 594, 598-99 (D. Del. 2002); *Syngenta Seeds, Inc.*

*v. Monsanto Co.*, No. 02-1331 SLR, 2004 U.S. Dist. Lexis 24253, at *9 (D. Del., November 19,

2004).

    Thus, the appropriate construction of "oriented" is, as set forth in Pechiney's Opening

Brief, "a polymeric material which has been heated and stretched to realign the molecular

configuration." (PB at 20.)

**REDACTED**

No information

regarding the process of manufacture is necessary to determine whether the film is oriented under this definition.

Cryovac contends that the process language in column 3 – the "stretching accomplished by a racking or blown bubble process" – must be included in the construction of "oriented." Cryovac also contends that that process language should be construed very narrowly, requiring that orientation take place only after the coextrusion process is complete and the film is cooled (and then reheated before orientation takes place). (CB at 11.) Cryovac's reasoning for this proposition is the word order in the claim term, "oriented coextruded film." Based on this word order alone, Cryovac argues that "logically and temporally, there must first be a coextruded film that is then oriented by heating and by a racking or blown bubble process." (CB at 11.) However, Cryovac provides no evidence why one of skill in the art would not consider a film to be "oriented coextruded film" if the orientation is accomplished in a melt state orientation after the film exits the coextrusion die, but before cooling, while it is still hot from the coextrusion process.

Solely in the event that the Court does determine to include process language in the definition of "oriented," Pechiney provides the following analysis of how that process language would have been understood by one of ordinary skill in the art.

### 1.    The Process Language Describes Orientation Broadly

The process language describing "oriented" recites that the stretching is to be done in one of two ways, namely, in "a racking or blown bubble process." (A0144, Ex. 10, Col. 3, lines 47-49.) The specification of the '419 patent explicitly define the word "racking" as follows:

> The term "racking" is used herein to define a well-known process
> for stretching coextruded and reheated multilayer film by means of
> tenterframing or blown bubble processes.

(A0144, Ex. 10, Col. 3, lines 63-66.) Thus, if the process limitation is included, combining the

definition of "racking" into the definition of "oriented" yields the following overall definition

from the specification:

> The term "oriented" and the like is used herein to define a
> polymeric material which has been heated and stretched to realign
> the molecular configuration,
>
> this stretching accomplished by a
>
> [1] well-known process for stretching coextruded and reheated
> multilayer film by means of
>
>> [a] tenterframing or
>>
>> [b] blown bubble processes or
>
> [2] blown bubble process.

(reference numbers added, definition of "racking" underlined). The definition uses the

terminology "blown bubble process" twice, once in the "racking" portion of the definition [1b]

and again in the latter part [2] of the definition. Cryovac essentially contends that there is a

redundancy in this definition and that there is only one blown bubble process, the one referred to

as a racking process. However, one of skill in the art would have understood that there was a

difference between blown bubble process [1b] and blown bubble process [2] not that there was a

redundancy.

### 2.    Orientation Processes Include Melt Orientation

Cryovac argues that the '419 patent defines a "blown bubble process" "as entailing a

process where 'the coextruded and cooled tube is heated to its orientation temperature range to

orient the film.'" (CB at 11, citing '419 patent, col. 8, ll. 60-62.) However, the quoted language

is from an example in column 8 of the patent and is not an explicit definition of "blown bubble

process." The language from column 8 upon which Cryovac relies reads as follows:

> **Generally**, the coextruded and cooled tube is heated to its
> orientation temperature range to orient the film in **e.g.** a blown
> bubble process.

(A0146, Ex. 10, the '419 patent at col. 8, ll. 60-62) (emphasis added.)  In its brief, Cryovac

misleadingly omits the words "generally" and "e.g." in an attempt to try to manufacture an

explicit definition of "blown bubble process" that supports its position that a "blown bubble

process" is only a racking process that involves reheating a cooled tube.  Pechiney does not

disagree that one blown bubble process is a "racking" process, that is, one that orients film that

has been previously cooled and is reheated and then stretched.  However, nothing in the '419

patent, nor within the ordinary meaning of blown bubble to one of ordinary skill in the art limits

the blown bubble process to only that process.  This language is exemplary only and is not

provided in the specification as a definition of "blown bubble process."  *JVW Enters.*, 424 F.3d

at 1335; *Callicrate*, 2005 U.S. App. LEXIS 23531, at *15-16.

### 3.    One Of Skill In The Art Knew That There Were At Least Two Different Blown Bubble Processes

Those of skill in the art knew that two general types of processes were used to orient

polymeric materials:  melt orientation processes and solid state orientation processes.  Melt

orientation processes, as the name implies, are orientation processes that realign the molecular

configuration by stretching heated polymeric material while it is in the melt state.  Solid state

orientation processes, on the other hand, are processes in which the polymeric material is cooled

from the melt state that exists when it exits the coextrusion die to the solid state, and then

realigns the molecular configuration by reheating the material to an orientation temperature

(generally below the melt temperature) and stretching the reheated material.

To one of skill in the art, the term "blown bubble process" can be applied to either of

these two quite different film formation processes.  The melt orientation process is sometimes

referred to as a melt-blown bubble process. The solid state blown bubble process is sometimes

referred to as a double blown bubble process. The second bubble is blown after the reheating

step. The melt blown bubble process stretches the material after it has been extruded (or

coextruded) but before it is ever cooled and so stretches heated, but not reheated, material. This

melt blown bubble process was described for example, in 1968 in a book entitled "The Science

and Technology of Polymer Films" edited by Orville J Sweeting. (A0311-17, Ex. 24.) That

book refers to this process as "bubble process," and described it as:

> The gas is entrapped between a set of nip rolls and the extrusion
> die as shown in Figure 2. As a result, the gas remains in a constant
> position and the extruded tube is actually forced over it. ... The
> nip rolls, in addition to containing the trapped gas, are used to draw
> off the tube at a rate of speed necessary to impart the desired
> orientation in the machine direction. Orientation in the transverse
> direction is controlled by the quantity and pressure of the gas
> confined within the tube.

(A0313-14, Ex. 24.) Figure 2, reproduced below, is captioned "[t]ubular process for biaxial

orientation of film."



Fig. 2. Tubular process for biaxial orientation of film.

The blown bubble process described above, the melt blown bubble process, does not fit

the definition of "racking" because there is no reheating step. However, the other blown bubble

process, the double bubble process, does have such a step.  In the double blown bubble process, the film is chilled after being extruded and is later reheated and stretched (in the second bubble).[3] Thus, double-blown-bubble processes include a reheating step and are described in the '419 patent as "racking."

REDACTED

---

[3]  Likewise, in the other "racking" method—tenterframing—the film is initially formed by, for example, coextrusion, and then is chilled.  In the tenterframing process the chilled film is reheated and stretched by the tenterframe.

REDACTED

REDACTED

The '419 patent contains an additional indication that it is not limited to processes in which the orientation is achieved by reheating and stretching film that had been previously cooled after exiting the coextrusion die. At column 8, lines 60-68, the very part of the patent that Cryovac relies upon, the '419 patent expresses general conditions and preferences for orientation and, in doing so, implies the existence of non-preferred or atypical conditions that are still encompassed within the patent. Specifically, the '419 patent states:

> *Generally*, the coextruded and cooled tube is heated to its orientation temperature range to orient the film in e.g. a blown bubble process. Orientation temperature ranges are well known for most polymeric materials, and are generally below the melting point of the film.
>
> *Preferably*, films made in accordance with the present invention are heated to between about 90°C and 140°C, and more preferably between 105°C and 115°C.

(A0146, Ex. 10, Column 8, lines 60-68) (emphasis added). These general and preferred teachings clearly imply that they are not the only process for orientation. (Second Mount Decl., ¶ 32); *JVW Enters.*, 424 F.3d at 1335; *Callicrate*, 2005 U.S. App LEXIS 23531, at *15-16.

### 4.    The Definition In The Specification Would Have Been Understood To Include Melt Blown Processes

There is no redundancy in the definition set forth in column 3. Rather, one of ordinary skill in the art would have understood that "oriented" in the '419 patent refers to a polymeric material which has been heated and stretched to realign the molecular configuration and that stretching could accomplished by a melt blown bubble tenterframing process of a double blown bubble process.

Thus, the definition in column 3, to one of ordinary skill in the art, reads as follows:

> The term "oriented" and the like is used herein to define a
> polymeric material which has been heated and stretched to realign
> the molecular configuration, this stretching accomplished by a
> tenterframing process or a double blown bubble processes or the
> melt blown bubble process.

Rearranging the words for clarity:

> A polymeric material which has been heated and stretched to
> realign the molecular configuration, this stretching accomplished
> by a melt blown bubble process or by a process in which
> multilayer film is coextruded, chilled, reheated and then stretched
> by means of tenterframing or a double blown bubble process.

As discussed previously, "oriented" is fully defined by the first portion of its definition,

namely, a polymeric material which has been heated and stretched to realign the molecular

configuration. However, to the extent that the processes by which such heating and stretching is

accomplished are incorporated, those processes include melt blown bubble process, a double

blown bubble process and tenterframing and should be defined as such.

**5.    The Original Method Claims Do Not Support
Cryovac's Proposed Construction Of "Oriented"**

Cryovac notes that, as originally filed, the application that resulted in the '419 patent

contained method claims directed to processes for preparing an oriented multilayer film. (CB at

13.) While Cryovac is right about the fact that the originally filed application had such method

claims, and generally is correct in its description of the subject matter of the original method

claims, Cryovac is wrong when it indicates that the presence of the cooling, collapsing,

reheating, and stretching limitations in the original method claims that were withdrawn should be

applied to determining the meaning of "oriented" in claim 11, which is, of course, a product

claim not a method claim.

First, it is a general rule that the limitations applicable to a process claim are not read into

a product claim in the same patent. *Armament Sys. & Producers, Inc. v. Maradnock Lifetime*

*Prods., Inc.,* No. 97-1174, 1998 U.S. App. LEXIS 20818, at *10 (Fed. Cir. Aug. 7, 1998).

Second, while Cryovac now contends that method claim 24 as filed was directed to making an oriented multilayer film "consistent with the film of claim 11," there simply is nothing in the application as filed that indicates that the method of claim 24 was in any way related to the product of claim 11 (then application claim 1). Indeed, as filed, the original product claims did not even require, as did method claim 24, that the film be made by coextrusion. The process of claim 24 simply was not the only process for making the claimed film.

**6.    Neither The Distinction Of Fant Nor The Prior Art Requires The Court To Redefine "Oriented"**

Cryovac also argues that because, during the prosecution, it distinguished the Fant film as "unoriented," it disclaimed films made by a process according to the Fant patent and that "oriented" must now be limited to exclude such films. (CB at 13-14.) In so arguing, Cryovac conveniently ignores the position that it has taken before and throughout this litigation that the Fant film was, in fact, unoriented even under Pechiney's definition of oriented. (Mount Tr. 38:19-59:19, B5115A-5115F, Ex. 221.) Now that Pechiney, through the testimony of its expert Dr. Mount, has apparently convinced Cryovac that the Fant film was oriented (in the sense that it was stretched while hot and therefore the molecular configuration was realigned), Cryovac argues that "oriented" in claim 11 cannot be construed to cover such orientation in Fant.

Cryovac has correctly concluded that the Fant film anticipates claim 11 because it meets all of the limitations of claim 11 including "oriented" as it is correctly construed. However, proof of that is for another day. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1304 (Fed. Cir. 2005) (citing *Phillips,* 415 F.3d at 1327) (rejecting argument to consider validity "because the other claim construction tools unambiguously resolve the claim construction dispute"). The current point is that Cryovac's distinction over the Fant film during

prosecution is not the type of clear disclaimer that results in the modification of the explicit definition in the specification of the term "oriented." *Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1293-94 (Fed. Cir. 2000). Having failed to draft claim 11 narrowly enough to avoid the Fant film, Cryovac must live with the consequences of that failure.

Likewise, Cryovac's argument regarding the disclosures of various cited prior art references also does not require limiting "oriented" to solid state orientation. The prior art can be evidence of the common meaning of "oriented." *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000). However, because there is an explicit definition in the specification, the Court need not look for the ordinary meaning of the term "oriented." Rather, it should simply apply the definition explicitly set forth in the specification. Usage of the term "oriented" in the prior art does not change Cryovac's explicit definition in the '419 patent.

### C.     "film"

Cryovac's reasoning with regard to how the disclosure of the '419 patent affects the definition of the term "film" is directly contrary to applicable law and common sense. As Cryovac itself notes (CB at 18), the specification of the '419 patent indicates that one object of the invention is to "provide a *relatively thin thermoplastic multi-layer* film." If, as Cryovac suggests, a film is by definition thin, there would be no point to describing the object of the invention as creating a thin film.

In *Phillips v. AWH*, 415 F.3d at 1314 (Fed. Cir. 2005), the Federal Circuit recognized that the terminology "steel baffles" implied that a baffle is not inherently steel. So too, here, the '419 patent's description of a thin thermoplastic multi-layer film implies that film is not inherently thin (nor inherently thermoplastic nor multi-layer). The references in the '419 patent to using the film as a "flexible wrapping material" likewise imply that flexibility is also not an inherent feature of film. And, because the '419 patent indicates that these films are for "packaging

applications" (CB at 19-20, PB at 22-23), films are also not inherently used only in packaging applications. Thus, it would be improper to define a film as thin, flexible, packaging material as Cryovac suggests when not one of those attributes is defining of film.

**D.    "coextruded film"**

The parties agree on the initial part of the definition, namely, that a "coextruded film" is "a film formed by coextrusion." Whether this is so can usually be determined by examining the film itself. (Second Mount Decl. ¶ 33.) Cryovac, however, contends that the definition of "coextruded film" also requires that "the layers of the film are extruded together simultaneously." In the first instance, Cryovac does not explain what it means by "simultaneously" or how one of ordinary skill can determine if a film meets that limitation.

In support of its proposed construction, Cryovac cites to col. 3, lines 30-39 in the '419 patent, which generally describe a method of making multilayer film:

> In another aspect of the invention, a method of making a oriented multilayer film comprises the steps of coextruding a core layer of an ethylene vinyl alcohol copolymer, two intermediate layers of a polyamide, two layers of an adhesive polymeric material, and two outer layers of a polymeric material or blended polymeric materials; rapidly cooling the coextruded film; collapsing the cooled film; heating the collapsed film into its orientation temperature range; and stretching and orienting the heated film.

This quotation does not support Cryovac's proposed construction as it does not use the terminology "extruded together simultaneously" nor does it describe in any detail such a process in a way that would have one skilled in the art recognizing that the materials were being "extruded together simultaneously." Cryovac also cites a portion of example 1 of the '419 patent at col. 7, lines 3-17 which, in relevant part, says no more than "the polymer melts were coextruded through a multi-layer coextrusion die..." Once again, this does not indicate anything

about the simultaneous (or not) nature of the coextrusion and does not provide any support for Cryovac's use of "extruded together simultaneously."

As set forth by both parties at the technical tutorial, the process of coextrusion begins with the materials being melted in extruders, then being brought together in a coextrusion die. In the coextrusion die, the various layers of the multilayer film are brought together in some fashion and then exit the die together. If "extruded together simultaneously" is meant to cover no more than leaving the coextrusion die at the same time, this is inherently a part of the coextrusion process and need not be stated. If, on the other hand, the "extruded together simultaneously" language is intended to mean that all of the layers in the claimed multilayer film must come together at precisely the same moment within the coextrusion die (rather than, for example being built by first bringing together the core layer and the intermediate layers, then adding the adhesive layers and then finally the outer layers), there is no evidence that the ordinary meaning of "coextruded film" encompasses that.[5] Nor is there any reason to import such process language into a product claim.

### E.    "(c) two outer layers each comprising a polymeric material or blend of polymeric materials"

Cryovac proposes that subparagraph (c) requires "a common polymeric component" in each of the two outer layers but does not propose any definite way to determine whether there is "a common polymeric component." Nor does Cryovac indicate how this language is to be read when there is a blend of polymeric materials, as contemplated by the claim.

---

**REDACTED**

Polymeric materials are complex materials that are themselves, essentially, blends of different polymer molecules. (Second Mount Decl. ¶ 52.) Properties of any given polymer depend upon the properties of the various polymer molecules that form the polymer. (*Id.*, ¶¶ 53-54.) The '419 patent describes various different types of polymers such as polyamide, ethylene vinyl alcohol, ethylene propylene copolymer, "linear low density polyethylene" ("LLDPE"), and "linear medium density polyethylene" ("LMDPE"). (A0144, Ex. 10, '419 Patent, Col. 3, line 67 - Col. 4, line 38.) Cryovac does not indicate whether the "common polymeric component" requirement that it seeks to impose on subparagraph (c) is satisfied merely if the name given a polymer is the same, or whether something else needs to be satisfied in order for two materials to have "a common polymeric component."

For example, the '419 patent categorizes LLDPE as materials having a density in the range of from about 0.916 gm/cm to about 0.925 gm/cm (A0144, Ex. 10, '419 patent Col. 4, lines 3-17.) The '419 patent also describes LMDPE as having a density in the range of about 0.926 gm/cm to about 0.941 gm/cm. (A0144, Ex. 10, '419 patent Col., lines 18-22.) However, neither the '419 patent nor Cryovac makes clear whether a polymer that is called LMDPE with a density of 0.926 has "a common polymeric component" with another polymer called LMDPE with a density of 0.941 because they have the same name, although significantly different density. Nor is it clear if the "common polymeric component" test is satisfied by an LLDPE with a density of 0.925 and an LMDPE with a density of 0.926 because they have different names, and thus very similar densities. Moreover, there are many other characteristics of polymers, in addition to density, such as molecular weight, method of manufacture, etc., that determine the type of polymer and the overall polymer properties.

There simply is no indication how one of ordinary skill in the art would or would not take into account these various properties in determining what is "a common polymer component." Cryovac's proposed construction is therefore hopelessly indefinite, provides no guidance to the jury and should be rejected. *Sulzer Textil AG v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004); *Control Res., Inc. v. Delta Elecs., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass. 2001).

Moreover, Cryovac's reliance upon the disclosures in the specification (CB at 36), to support the idea that there must be a common polymeric component is misplaced. If those teachings support a construction of subparagraph (c) more limited that that proposed by Pechiney, they support a construction that the layers be compositionally identical (because in all of the descriptions the corresponding layers are compositionally identical), not just that they contain a common polymeric component.

### F.    "(a) a core layer comprising an ethylene vinyl alcohol copolymer"

Cryovac contends that the core layer (a) "is located between the two intermediate layers (b)." Pechiney understands the terminology "between" as used by Cryovac to mean that core layer (a) is located somewhere between the two intermediate layers (b) and not that it must be located immediately adjacent to or directly adhered to either or both of the intermediate layers (b). With that understanding, core layer (a) will inherently be located between the two intermediate layers (b) by virtue of the interplay of the limitations in subparagraphs (b), (c) and (d). However, Cryovac has not provided any support for the idea that the definition of core layer in subparagraph (a) requires the layer to be between the two intermediate layers (b).

Pechiney does not intend by its proposed construction of core layer as being a "central" layer to indicate that it believes that the subparagraph (a) limitation itself requires the layer to be precisely on the centerline of the film when viewed in cross-section. That is not the ordinary

meaning of core layer nor has Pechiney ever contended that it is. However, as set forth in Pechiney's proposed construction of the "arranged symmetrically" limitation, the necessary result of the proper construction of that language is that, in the claimed film, the core layer is located on the centerline of the film. This is, however, a result of the "arranged symmetrically limitation," not a definition of core layer (a).

### G.    "at least seven layers"

Cryovac proposes to construe this language to be limited to the layers discussed in subparagraphs (a), (b), (c) and (d) of Claim 11. It is certainly true that if a film has one layer (a), two layers (b), two layers (c), and two layers (d), as required by those limitations the film will have seven layers. However, properly construed, claim 11 also reads on films of more than seven layers. Otherwise, the phrase "at least" would be read out of the claim entirely. Cryovac's proposed construction of "at least seven layers," like its construction of "arranged symmetrically," fails in part because if only the seven layers recited in (a), (b), (c) and (d) must be arranged symmetrically, the claim provides no guidance at all about whether layers in addition to the seven recited layers have to be arranged symmetrically. (*See infra* pg. 3). This is improper and so "at least seven layers" should be simply construed to mean seven *or more* layers.

## IV.    CONCLUSION

For the foregoing reasons, as well as for the reasons set forth in the Memorandum In Support Of Pechiney's Proposed Construction Of The Disputed Claim Terms And Phrases filed October 19, 2005, (D.I. 204), Pechiney respectfully requests that the Court adopt Pechiney's proposed construction of the claim terms and phrases.

Dated:  November 18, 2005                    Respectfully submitted,

By:    /s/ N. Richard Powers

N. Richard Powers (#494)
Rudolf E. Hutz (#484)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: 302.888.6266

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: 312 222-9350

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2005 I electronically filed a copy of

the foregoing with the Clerk of the Court using CM/ECF and served the following individuals in

the manner indicated:

### BY HAND DELIVERY

John W. Shaw, Esquire
Karen E. Keller, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801

### BY ELECTRONIC MAIL AND FIRST CLASS MAIL

Ford F. Farabow, Jr., Esquire
Mark J. Feldstein, Esquire
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
Mark.feldstein@finnegan.com
Martin.fuchs@finnegan.com


                    /s/ N. Richard Powers
                    N. Richard Powers