IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYOVAC, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | Civil Action No. 04-1278-KAJ |
| | ) | |
| vs. | ) | Hon. Kent A. Jordan |
| | ) | |
| PECHINEY PLASTIC PACKAGING, INC., | ) | REDACTED |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**PECHINEY'S MEMORANDUM IN OPPOSITION TO CRYOVAC'S
MOTION TO EXCLUDE EXPERT TESTIMONY**

N. Richard Powers (#494)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: (302) 888-6266

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350

REDACTED VERSION
FILED 11/28/05

Dated: November 18, 2005

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     SUMMARY OF ARGUMENT ..............................................................................2

III.    ARGUMENT.........................................................................................................2

    A.    The Legal Standards On The Admissibility Of Expert Testimony.................................2

        1.    Federal Rule of Evidence 702................................................................3

        2.    Federal Rule of Evidence 703................................................................5

        3.    Federal Rule of Evidence 403 ...............................................................5

    B.    Dr. Mount's Opinion On The Invalidity Of The '419 Patent Based On The
       Allied Film Is Admissible...............................................................................6

    C.    Dr. Mount's Opinion On The Allied Film Was Derived By Scientific Methods
       And Procedures...............................................................................................7

    D.    Dr. Mount Based His Opinion On Information Reasonably Relied Upon By
       Experts In His Field......................................................................................12

    E.    Dr. Mount's Opinion Is Objectively Verifiable............................................14

    F.    Dr. Mount's Opinion Will Assist The Trier Of Fact ....................................15

    G.    Dr. Mount's Opinion On The Allied Film Will Not Be Prejudicial To Cryovac
       Nor Confusing To The Jury. .........................................................................17

        1.    Dr. Mount's Opinion On The Allied Film Is Not Unfairly Prejudicial To
          Cryovac. ................................................................................................17

        2.    Dr. Mount's Testimony Would Not Confuse The Jury .........................19

    H.    Dr. Mount's Opinion On Non-Infringing Alternatives Is Admissible..........20

    I.    Larry Evans's Opinions On Patent Damages Are Admissible .....................24

        1.    Mr. Evans's Patent Damages Opinion Is Supported By The Evidence.................25

        2.    Damages Experts Can Provide Opinions On Lost Profits Damages In
          Patent Cases Without Having All The Expertise Required To Opine On
          The Technical Acceptability Of Non-Infringing Alternatives..............................27

        3.    There Is No Unfair Prejudice To Cryovac That Would Justify Barring Mr.
          Evans's Reasonable Royalty Opinion.................................................................31

J.      Mr. Evans's Reports Do Not Contain Improper Patent Law Opinions .......................32

K.      Mr. Evans's Reports Do Not Contain Improper Contract Law Opinions...................34

IV.     CONCLUSION...........................................................................................................37

# TABLE OF AUTHORITIES

**Cases**

*American Universal Ins. Co. v. Falzone,*
  644 F.2d 65 (1st Cir. 1981)..............................................................................................29

*Bunzl Pulp & Paper Sales, Inc. v. Golder,*
  1990 U.S. Dist. LEXIS 16355 (E.D. Pa. Dec. 4, 1990)............................................19

*Chemipal Ltd. v. Slim-fast Nutritional Int'l Inc.,*
  350 F. Supp. 2d 582 (D. Del. 2004)..........................................................................14

*Coleman v. Home Depot, Inc.,*
  306 F.3d 1333 (3d Cir. 2002) ..............................................................................5, 6

*Daubert v. Merrel Dow Pharm., Inc.,*
  509 U.S. 579 (1993)...................................................................................................2

*DSU Med. Corp. v. JMS Co., Ltd.,*
  296 F. Supp. 2d 1140 (N.D. Cal. 2003) ....................................................................28

*Dunn v. HOVIC,*
  1 F.3d 1362 (3d Cir. 1993) .......................................................................................3

*Elcock v. Kmart Corp.,*
  233 F.3d 734 (3d Cir. 2000) .....................................................................................3

*Ferrara & DiMercurio v. St. Paul Mercury,*
  240 F.3d 1 (1st Cir. 2001).......................................................................................29

*Frazier v. Roessel Cine Photo Tech., Inc.,*
  417 F.3d 1230 (Fed. Cir. 2005) ................................................................................8

*Georgia-Pacific Corp. v. U.S. Plywood Corp.,*
  318 F. Supp. 1116 (S.D.N.Y. 1970) ..................................................................32, 33

*Grain Processing Corp. v. American Maize-Products Co.,*
  185 F.3d 1341 (Fed. Cir. 1999) ...............................................................................30

*Gussack Realty Co. v. Xerox Corp.,*
  224 F.3d 85 (2d Cir. 2000) .......................................................................................29

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.,*
  315 F. Supp. 2d 589 (D. Del. 2004).......................................................................3, 4

*Lewis v. Rego Co.,*
  757 F.2d 66 (3d Cir.1985) ........................................................................................29

*Minco Inc. v. Combustion Eng'g, Inc.,*
  95 F.3d 1109 (Fed. Cir. 1996) .................................................................................30

*Nelco Corp. v. Slater Elec., Inc.,*
  80 F.R.D. 411 (E.D.N.Y. 1978)................................................................................19

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) ........................................................................................ 4

*Oxford Gene Tech. Ltd. v. Mergen, Ltd.*,
    345 F. Supp. 2d 431 (D. Del. 2004)........................................................................ 2, 27

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
    575 F.2d 1152 (6th Cir. 1978) ............................................................................... 25, 33

*Paoli R.R. Yard PCB Litig., In re*
    35 F.3d 717 (3d Cir. 1994) ........................................................................... 2, 4, 5, 14

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.*,
    No. 02-148-GMS, 2004 U.S. Dist. LEXIS 18638 (D. Del. Sept. 15, 2004)............................. 8

*Price v. Symsek*,
    988 F.2d 1187 (Fed. Cir. 1993) .................................................................................. 12

*Ratliff v. Schiber Truck Co., Inc.*,
    150 F.3d 949 (8th Cir. 1998) ....................................................................................... 5

*Revlon Consumer Prods. Corp. v. L'Oreal S.A.*,
    No. 96-192 MMS, 1997 U.S. Dist. LEXIS 4117 (D. Del. Mar. 26, 1997)............................... 33

*Rite-Hite Corp. v. Kelly Co., Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995) .................................................................................... 24

*Sandt Tech., Ltd. v. Resco Metal*,
    264 F.3d 1344 (Fed. Cir. 2001) .................................................................................. 13

*Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*,
    926 F.2d 1161 (Fed. Cir. 1991) .................................................................................. 25

*Stecyk v. Bell Helicopter-Textron, Inc.*,
    295 F.3d 408 (3d Cir. 2002) ........................................................................................ 5

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) .................................................................................. 19

*TMI Litig., In re*
    193 F.3d 613 (3d Cir. 1999) ...................................................................................... 13

*Toucet v. Maritime Overseas Corp.*,
    991 F.2d 5 (1st Cir. 1993)............................................................................................ 5

*Trintec Indus., Inc. v. Top-U.S.A. Corp.*,
    295 F.3d 1292 (Fed. Cir. 2002) ................................................................................... 8

*United States v. Krenzelok*,
    874 F.2d 480 (7th Cir. 1989) ....................................................................................... 6

*Waldorf v. Shuta*,
    142 F.3d 602 (3d Cir. 1998) ....................................................................................... 4

*Watkins v. New Castle County*,
    374 F. Supp. 2d 379 (D. Del. 2005)............................................................................. 28

*Zenith Controls v. Automatic Switch Co.*,
648 F. Supp. 1497 (N.D. Ill. 1986) ........................................................................................ 8

**Statutes**

35 U.S.C. § 284 .................................................................................................................... 26

**Rules**

Federal Rule of Evidence 403 ..................................................................................... 3, 5, 6, 19

Federal Rule of Evidence 702 .......................................................................................... passim

Federal Rule of Evidence 703 .......................................................................................... passim

I.     **INTRODUCTION**

Plaintiff Cryovac, Inc. ("Cryovac"), argues that the Court should bar testimony of both of the experts who have submitted reports on behalf of Pechiney Plastic Packaging, Inc. ("Pechiney"). Specifically, Cryovac asks the Court to exclude portions of the expert reports on invalidity and non-infringing alternatives that were submitted by Dr. Eldridge M. Mount, III, and the entire expert opinion on patent damages and tortious interference damages that was rendered by Larry W. Evans.

Cryovac seeks to exclude Dr. Mount's invalidity opinion with respect to a particular prior art reference, the "Allied" film, on the grounds that the evidence supporting this opinion is unreliable, that this evidence does not support his opinion, and that his opinion is prejudicial to Cryovac. Cryovac also claims that Dr. Mount's opinion is inadmissible with respect to a particular non-infringing alternative to Pechiney's ClearShield™ product on the grounds that the evidence does not support Dr. Mount's opinion on the acceptability of this alternative.

Similarly, Cryovac attempts to bar the entire opinion of Pechiney's damages expert, Mr. Evans, based on his testimony regarding just one of the non-infringing alternatives as it relates to lost profits, and on his discussion of the legal factors that must be addressed to reach an opinion on lost profits and reasonable royalties in patent cases. Cryovac also seeks to bar Mr. Evans's testimony concerning Cryovac's claim for tortious interference damages on the grounds that Mr. Evans's references to the terms of the alleged contract giving rise to this claim constitute impermissible legal conclusions.

Far from raising proper *Daubert* issues, Cryovac is really using its motion to argue the merits of the case, raising "cross-examination" attacks that, at most, go to the weight of the testimony and not its admissibility. As this Court has previously recognized, when the movant's arguments go to the weight, rather than the admissibility, of the expert's testimony, "vigorous

1

cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof are the traditional and appropriate means" for attacking expert testimony, rather than exclusion of the testimony through a *Daubert* motion. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *see also Oxford Gene Tech. Ltd. v. Mergen, Ltd.*, 345 F. Supp. 2d 431, 442 (D. Del. 2004)(motion to exclude expert opinions was denied when movant's arguments went to weight to be given opinion, not its admissibility, and opinion met the FRE 702 "helpfulness standard and also contain[ed] the basis and reasons" for the opinion).

## II.    SUMMARY OF ARGUMENT

1.    Cryovac's motion to exclude portions of Dr. Mount's opinion on invalidity and non-infringing alternatives should be denied because Cryovac's arguments go to the weight, not the admissibility, of these opinions. In addition, Cryovac had ample opportunity to take discovery relating to Dr. Mount's opinion on a particular prior art reference, and Cryovac's attempt to exclude this opinion as unduly prejudicial is without merit.

2.    Cryovac's motion to exclude *all* of the opinions of Mr. Evans's damages opinions, including his reasonable royalty opinions, should be denied because none of Cryovac's arguments go to the admissibility of these opinions, only to their weight. Nor is there any merit to Cryovac's claim that Mr. Evans cannot give his damages opinions because they include conclusions of law. Mr. Evans, like Cryovac's own damages expert, James Nawrocki, refers to legal standards to explain his methods and procedures for reaching his opinions, and this practice certainly does not support excluding his testimony under *Daubert*.

## III.    ARGUMENT

### A.    The Legal Standards On The Admissibility Of Expert Testimony

Motions to exclude evidence are committed to the court's discretion. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994). Close calls on the admission of

2

expert testimony are to be resolved in favor of admissibility. *Dunn v. HOVIC*, 1 F.3d 1362, 1367 (3d Cir. 1993). The legal standards for admissibility under Rule 702, Rule 703 and Rule 403 of the Federal Rules of Evidence are discussed below.

### 1.    Federal Rule of Evidence 702

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court stated that an expert's "[p]roposed testimony must be supported by appropriate validation -- *i.e., 'good grounds,'* based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590 (emphasis original). The Supreme Court further held that Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* at 591.

In accordance with the Supreme Court's *Daubert* teachings, the Third Circuit has construed Rule 702 as embodying "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). *See also Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 600 (D. Del. 2004). The first restriction involves a determination of whether the expert is

3

qualified. As explained by the Third Circuit in *Waldorf v. Shuta*, 142 F.3d 602 (3d Cir. 1998), to qualify as an expert under Rule 702, a witness must have:

> specialized knowledge regarding the area of testimony. The basis of this specialized knowledge can be practical experience as well as academic training and credentials. We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony extends to the substantive as well as the formal qualification of experts. However, at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman.

*Id.* at 625 (internal quotations and citations omitted).

Under the second *Daubert* factor, the reliability of an expert's opinion must be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli*, 35 F.3d at 742 (*quoting Daubert*, 509 U.S. at 589). Rule 702 further requires "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92.

Under the third factor, expert testimony must fit the issues in the case. "In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Izumi Prods. Co.*, 315 F. Supp. 2d at 601.

As the Third Circuit held in *Oddi v. Ford Motor Co.*, "This standard is not intended to be a high one, nor it is to be applied in a manner that requires the plaintiffs to prove their case twice -- they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (internal quotations omitted).

### 2.    Federal Rule of Evidence 703

Under Rule 703 of the Federal Rules of Evidence, "experts may rely on facts from firsthand knowledge or observation, information learned at the hearing or trial, and facts learned out of court." *Stecyk v. Bell Helicopter-Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002). Where an expert relies on facts "reasonably relied upon" by experts in his or her field in forming opinions, the facts need not be independently admissible in evidence. Fed. R. Evid. 703. *See also Stecyk*, 295 F.3d at 414; *In re Paoli*, 35 F.3d at 747.

Once an expert meets this foundational requirement, the burden shifts to the opposing party to explore any deficiencies in the expert's sources. *Stecyk*, 295 F.3d at 414. "A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." *Id.* at 415 (*citing Ratliff v. Schiber Truck Co., Inc.*, 150 F.3d 949, 955 (8th Cir. 1998)). *See also, Daubert*, 509 U.S. at 596; *Toucet v. Maritime Overseas Corp.*, 991 F.2d 5, 10 (1st Cir. 1993).

### 3.    Federal Rule of Evidence 403

Generally, all evidence is admissible if it is relevant, i.e., if it tends to make the existence or nonexistence of a disputed material fact more probable than it would be without that evidence. *See* Fed. R. Evid. 403. Nonetheless, Federal Rule of Evidence 403 states that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, jury confusion, undue delay, or waste of time. *Id.* As the Third Circuit has explained, "Rule 403 necessarily requires that the District Court engage in balancing to determine whether the probative value of the evidence is substantially outweighed by the negative factors" listed above. *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344 (3d Cir. 2002). "Unfair prejudice" is

5

"an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Rule 403 Advisory Comm. Notes.

There is a strong presumption that relevant evidence should be admitted. *Coleman*, 306 F.3d at 1343. In particular, evidence that is highly probative is extremely difficult to exclude. *See, e.g., United States v. Krenzelok*, 874 F.2d 480, 482 (7th Cir. 1989)("Its probative value was . . . great. Its prejudicial effect may well have been great too. But when the trial judge is in doubt, Rule 403 requires admission (this is the force of 'substantially outweighed')").

**B.    Dr. Mount's Opinion On The Invalidity Of The
'419 Patent Based On The Allied Film Is Admissible**

Dr. Mount has formulated an expert opinion in this case that the "Allied" or "Hatley" film developed in the early 1980's constitutes prior art that invalidates the '419 patent. (*See* Mount Decl., Tab A, Mount Report; Tab D, Mount Second Supp. Report) Dr. Mount based his opinion on peer-reviewed scientific articles describing the results of studies on the film and on the sworn declaration of Dr. Seymour Gilbert, the scientist who was in charge of those studies. At the time Dr. Gilbert was serving as Professor in the Food Science Department at Rutgers University, he directed[1] two studies commissioned by Allied Chemicals on packaging films. (Gilbert Decl. ¶¶ 4, 7.) The second of these studies included a film having the structure HDPE/TIE/NYLON/EVOH/NYLON/ TIE/HDPE ("Allied's film C" or "film C"). (*Id.* ¶ 9.)

The results of this study were described in at least three publications:

> 1) an article entitled "Nylon Film Effective Packaging" in the December 14, 1984 Journal of Commerce (the "Journal of Commerce Article" (A230-33, Ex. 18);

---

[1]    Dr. Gilbert's role in directing these studies was confirmed in an article published in the Journal of Commerce and in an the Allied news release. (A223-29, Ex. 17; A230-39, Ex. 18.)

2) the Allied Engineered Plastics News Release entitled "Rutgers Study Confirms Nylon Barrier Properties for Food and Other Sensitive Packaging" (the "Allied News Release") presented by Earl Hatley at the COEXTRUSION III conference held on September 5-6, 1985 (A215-22, Ex. 16, A223-29, Ex. 17); and

3) an article entitled "Odor Barrier Properties of Multi-Layer Packaging Film at Different Relative Humidities" by E. Hatzidimitriu, S.G. Gilbert and G. Loukakis in the March-April 1997 issue of Journal of Food Science (the "Journal of Food Science Article") (A234-38, Ex. 19.)

(Gilbert Decl. ¶ 9; Dimas Decl. ¶ 7.)

In its attempt to bar Dr. Mount from testifying that the Allied film C invalidates claim 11 of the '419 patent, Cryovac argues that: 1) Dr. Mount's opinion was not derived by scientific methods or procedures; 2) Dr. Mount did not rely on information reasonably relied upon by experts in his field; 3) his opinion is not objectively verifiable; 4) his opinion will not assist the trier of fact; and 5) his opinion is untimely and therefore unduly prejudicial. ( Cryovac's Opening Brief In Support of Its Motion to Exclude Expert Testimony, at 16-21, D.I. 200, hereinafter "CB.") None of these claims have merit.

C.    Dr. Mount's Opinion On The Allied Film
      Was Derived By Scientific Methods And Procedures

Cryovac does not contest that the studies Dr. Mount relied upon were based on scientific methods and procedures, or that the analysis of the film that Dr. Gilbert described in his declaration was based on scientific methods and procedures. Cryovac's only grounds for its assertion that Dr. Mount's opinion was not based on scientific methods are its unfounded claims that (a) it was improper to rely on Dr. Gilbert's "twenty year old recollection" of the studies Dr. Gilbert directed at Rutgers University; (b) Dr. Mount did not "review or analyze any data;" and (c) Dr. Gilbert's statement that the film was oriented is unreliable because it is inconsistent with the Allied News Release. (CB at 16.) None of these assertions are accurate.

7

First, because the application for the '419 patent was filed on March 21, 1986, it should be obvious that any prior art to this patent must *necessarily* have been available for twenty years or more. The fact that information and insights provided by the individuals involved in developing and testing the prior art will be based on their recollection does not make reliance on this information "unscientific," and Cryovac has offered no authority to suggest otherwise. Cryovac's claim that Dr. Mount's opinion is inadmissible because he did not "review and analyze any data" is unfounded. Dr. Mount did not rely solely on Dr. Gilbert's declaration, but reviewed and analyzed the data concerning the Allied film C that was reported in peer reviewed scientific articles. There is nothing "unscientific" about relying on reports concerning prior art from scientific journals, especially when the data itself is unavailable, and Cryovac has offered no authority to suggest otherwise.[2] *See, e.g., Daubert*, 509 U.S. at 594 (publication in peer reviewed journal is relevant "in assessing the scientific validity of a particular technique or methodology on which an opinion is premised").

Second, Cryovac argues that Dr. Mount's opinion should be barred because he failed to review any raw data from the studies on Allied film C, but Cryovac has not provided a shred of evidence that there any were technical records or samples of the films from 1984 that were available for Dr. Mount to review. As a result, the claim that Dr. Mount's opinion is inadmissible because he did not review any data is insupportable.

---

[2]  Cryovac's one case in support of this point, *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, No. 02-148-GMS, 2004 U.S. Dist. LEXIS 18638 (D. Del. Sept. 15, 2004), is inapposite. The expert in *Pharmastem* based her infringement opinion solely on an analysis of the defendant's marketing literature without ever considering any available data. Furthermore, to the extent that Dr. Mount relied on the Allied News Release in forming his invalidity opinion, such marketing literature can constitute prior art under the Patent Act. *See, e.g., Frazier v. Roessel Cine Photo Tech., Inc.*, 417 F.3d 1230 (Fed. Cir. 2005)(advertisement prior art); *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292 (Fed. Cir. 2002) (catalogue prior art); *Zenith Controls v. Automatic Switch Co.*, 648 F. Supp. 1497, 1502-503 (N.D. Ill. 1986) (letter promoting product prior art). Accordingly, *Pharmastem* is inapplicable.

8

Third, Cryovac claims that Dr. Mount's opinion is not based on scientific methods because Dr. Gilbert stated in his declaration that the film was oriented, while the Allied News Release "indicates that the film was not." (CB at 16.) Cryovac's only basis for claiming that the film was not oriented is that the Allied News Release uses the term "(Oriented) PP" for film F but not for film C so Cryovac assumes, without evidence, that it was not oriented. (*Id.* at 4.) Nothing in the Allied News Release states that film C is not oriented. In addition, Cryovac's argument overlooks the fact that "(Oriented) PP," "Oriented polypropylene," and "OPP" are synonymous terms that are often used by persons skilled in the art to describe a layer of *polypropylene* in a film structure which has been solid state oriented.[3] (B5116, Ex. 221, Mount Tr. 184:9-21; Declaration of Eldridge M. Mount III in Support of Pechiney's Responsive Memorandum on Claim Construction, Pechiney's Memorandum in Opposition to Cryovac's Motion for Summary Judgment of Infringement, and Pechiney's Brief in Opposition to Cryovac's Motion to Exclude Expert Testimony, ¶ 34, hereinafter "Mount Decl. ¶ ___".) The term "(Oriented) PP" would not have been used for film C because this film did not have a layer of polypropylene. (A223-29, Ex. 17, Tables 1, 2, 4.) The outer layers of film C are formed of high density polyethylene (HDPE). (*Id.*) Unlike the term "(Oriented) polypropylene" ("OPP") which was generally adopted by and frequently used by those skilled in the art, "Oriented polyethylene" was not commonly used as a term of art in the 1980's, when the Allied News

---

[3]  A solid state oriented film structure is a film structure that has been oriented by one of two general types of processes for orientation, the solid state orientation processes and the melt orientation processes.

**REDACTED**          *See* Pechiney's Responsive

Memorandum on Claim Construction at 15-18.

Release was presented. (Second Mount Decl. ¶ 36);[4] (A0236, Ex. 19, Table 1.) Thus, there is no

term of art similar to the term "Oriented PP" that would have been used to refer to film C.

Dr. Mount's expert opinion that film C was oriented is also corroborated by scientific

articles he discussed in his reports. The Journal of Commerce Article and the Journal of Food

Science Article[5] disclose that during the test process the films were Gelbo flexed[5] to simulate

shipping and handling conditions. (A0232-33, Ex. 18, Journal of Commerce Article; A0236, Ex.

19, Journal of Food Science Article, at 472.) As Dr. Gilbert explains, the degree of orientation

of the polymers is one of the factors to consider in achieving the properties required for a film to

withstand the rigors of this Gelbo flexing. (Gilbert Decl. ¶¶ 13-14.) Therefore, to properly

interpret the results of the Gelbo flexing tests, it was necessary for Dr. Gilbert to first determine

the degree of orientation for each film, including film C. In short, Cryovac is wrong when it

claims that there is no corroboration of Dr. Gilbert's statement that the results of the tests

conducted on Allied film C showed that the film was oriented. (CB at 6.)

---

4    In the Journal of Food Science Article, the term "OPP" used for film F is defined as
"Oriented polypropylene," and the term HDPE for Film C is defined as "high density
polyethylene." (A234-38, Ex. 19, Table 1.) In addition, one of the exhibits to the
Memorandum in Support of Pechiney's Motion for Summary Judgment on Patent Issues,
Exhibit 23, contrasts the terms "OPP," the polymer used for film F, with "HDPE," the
polymer used for film C, as follows: "The incentive is that opaque OPP is lower in cost than
HDPE and metalized OPP is 5% less costly than PET or nylon." (A0292-93, Ex. 23.)

5    In his declaration, Dr. Gilbert provides the following explanation for the "Gelbo flexing"
test: "Two main protocols were used for these two studies for Allied. The first was for
physical properties which uses a preliminary conditioning under various environmental stress
conditions of temperature and humidity followed by a severe physical stressing. We used an
apparatus developed by Gelbo which used the cylindrical test films suspended between two
mandrels and a motor which applied both rotation and twisting to severely stress both
machine and transverse directions as related to the manufacturing process. The test is
particularly useful in multilayer films held together by tie layers as it applies stress to the
structure as might be applied during package formation and shipping." (Gilbert Decl. ¶ 13.)

10

Dr. Gilbert's statements that film C was oriented are also corroborated by the permeation rates of the film identified as "C" that are reported in the Allied News Release and the Journal of Food Science Article. (A223-29, Ex. 17, Table 1; A2134-38, Ex. 19, Tables 2 and 3.) These permeation rates are consistent with permeation rates of an oriented multilayer film exhibiting high barrier properties. (Gilbert Decl. ¶¶ 16, 18.)

Cryovac also claims that there is no corroboration that Dr. Gilbert received Allied film C prior to March 21, 1986. (CB at 5.) In fact, the Journal of Commerce Article and the Allied News Release disclosed, as early as December 14, 1984, that Dr. Gilbert had directed two research projects on the Allied films at Rutgers University, the second of which involved Allied film C. (A230-33, Ex. 18; A223-29, Ex. 17.)[6] While the Allied News Release is undated, this release was presented by Mr. Hatley of Allied Corporation at the COEXTRUSION III Conference on September 5-6, 1985, as indicated by the table of contents of the conference. (A0215-22, Ex. 16, COEX III Table of Contents.) The date when Dr. Gilbert directed the studies on Allied film C is also corroborated by the sworn testimony of Dr. Stratos Dimas, who states in his declaration that he conducted the tests on the Allied films with Dr. Gilbert at Rutgers University between 1982 and 1985, and that he co-authored the 1987 Journal of Food Science article concerning these tests, which was submitted for publication in 1986. (Dimas Decl. ¶¶ 5-7.)

---

6  Thus, Cryovac's claim that the Journal of Commerce Article does not describe the structure of specific films (CB at 4-5) because Dr. Mount did not rely on this article for the layer structure but for the timing of the second study and the use of the Gelbo test in this study. As Dr. Mount pointed out in his report, the second study must have been conducted before December 14, 1984, because the study is discussed in the Journal of Commerce Article published on this date, and the article discusses the use of the Gelbo test in this study. (Mount Decl., Tab D, Mount Second Supp. Report at 3.)

### D.  Dr. Mount Based His Opinion On Information Reasonably Relied Upon By Experts In His Field

Cryovac alleges that Dr. Mount cannot reasonably rely on Dr. Gilbert's declaration under Fed. R. Evid. 703 because "Mr. Gilbert's hearsay statement is not the type of data reasonably relied upon by experts in Dr. Mount's field." (CB at 18.)  In addition to its hearsay objection, Cryovac argues that (a) it was improper for Dr. Mount to rely on Dr. Gilbert's "twenty year old recollection"; (b) this recollection is uncorroborated; (c) Dr. Gilbert's statement that film C was oriented is inconsistent with the Allied News Release; and (d) Dr. Gilbert does not know how film C made.  As shown below, none of these claims have merit.

First, Cryovac's hearsay objection is unfounded because Rule 703 expressly provides that experts may rely on evidence that is not admissible "if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." Fed. R. Evid. 703.

Second, it is frivolous to fault Dr. Mount for relying on Dr. Gilbert's recollection of test results of Allied film C at the time it was developed, since these are obviously the relevant test results for a twenty-year old patent.  Test results on film that did not post-date the patent filing obviously would not be relevant as such a film would not constitute prior art.

Third, Cryovac's claim that Dr. Gilbert's declaration was not corroborated is also frivolous.  A "rule of reason" analysis is applied to determine whether an oral testimony of prior invention has been corroborated. *See, e.g., Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993).  In applying the "rule of reason" test, "*all* pertinent evidence" is considered. *Id.*  Here, Dr. Gilbert had first hand knowledge of film C and his knowledge that the film was oriented is corroborated by a web of documentary evidence including:  (a) the Journal of Commerce Article; (b) the Allied News Release; (c) the Journal of Food Science Article; and (d) the sworn

declaration of his research assistant, Dr. Dimas.[7] This cohesive web of evidence, when viewed as a whole, is more than sufficient to corroborate Dr. Gilbert's declaration. *See, e.g., Sandt Tech., Ltd. v. Resco Metal*, 264 F.3d 1344, 1351 (Fed. Cir. 2001) (testimony concerning prior art was sufficiently corroborated by physical records that were made contemporaneously with the invention).

As discussed above, the use of the term "(Oriented) PP" in the Allied News Release is not inconsistent with Dr. Gilbert's finding that Allied film C was oriented. Finally, because Dr. Gilbert interprets the term "oriented" in the same way that Pechiney does, and as do persons of ordinary skill in the art, knowledge of the process by which Allied film C was made is unnecessary and irrelevant to his determination that the film was oriented. (Pechiney's Responsive Memorandum on Claim Construction at 12.)

Cryovac's only additional point is that Dr. Mount should not have relied on Dr. Gilbert because Dr. Gilbert was Pechiney's retained consultant. This argument is without merit, for two reasons. First, the findings from Dr. Gilbert's studies were reported twenty years before this litigation was ever commenced. Second Cryovac was free to depose Dr. Gilbert on any work he did from the time the prior art was developed to the present, excluding only consulting work he

---

7    Dr. Mount's reliance on Dr. Gilbert's firsthand knowledge and the corroboration of that knowledge by *independent* sources distinguishes this case from *In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) (CB at 18-19.) In *In re TMI*, the plaintiffs' expert relied *solely* on summaries of interviews conducted by employees of the plaintiffs' attorney in preparation for litigation in determining the cause of the plaintiffs' illness. *Id.* at 697. Additionally, the court in *In re TMI* confined its holding to the narrow issue of the information typically relied upon in a physician's diagnosis of a patient, finding that "a physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply to determine that a patient is ill and what illness that patient has contracted." *Id.* at 698. Therefore, the case has no bearing on whether Dr. Mount properly relied Dr. Gilbert and the corroborating sources.

did for Pechiney. The fact that Cryovac chose not to depose Dr. Gilbert cannot be used against Pechiney.

As a result, Cryovac's reliance on *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994), to exclude Dr. Mount's testimony under Fed. R. Evid. 703 is misplaced. Unlike *In re Paoli*, where the plaintiff's expert relied solely on the self-report of the plaintiff of illness in preparing his opinion for the litigation, Dr. Gilbert is not a party to this case, and he directed the studies of the prior art long before this litigation began.

In sum, Dr. Gilbert's first-hand, corroborated declaration is the type of evidence that is reasonably relied on by experts in giving on invalidity opinions based on prior art, and Cryovac's attempt to exclude Dr. Mounts' opinion under Fed. R. Evid. 703 should be rejected. Rule 703 permits Dr. Mount to rely on Dr. Gilbert's corroborated declaration.

### E.    Dr. Mount's Opinion Is Objectively Verifiable

Dr. Mount's opinion on the Allied film is objectively verifiable because another expert could examine the sources he relied on -- the articles describing the test studies that were conducted on the film and the statements of Dr. Gilbert -- and could test Dr. Mount's opinion against these sources. There is thus no merit, and no authority,[8] for Cryovac's contention that Dr. Mount's opinion was not objectively verifiable "because neither the film nor the record of the test data still exist." (CB at 17.) Physical samples of the prior art and copies of the raw test

---

[8]    The only case Cryovac cites to support its claim that Dr. Mount's opinion was not objectively verifiable is *Chemipal Ltd. v. Slim-fast Nutritional Int'l Inc.*, 350 F. Supp. 2d 582 (D. Del. 2004), a case involving expert testimony relating to damages in a breach of contract case. *Chemipal Ltd.* is inapposite, however, because in that case the expert who determined plaintiff's growth rate for lost sales "conducted no calculations to arrive at this growth rate, did not base the growth rates on any experience with growth in the diet products industry, and did not base his growth rates on any 'specific growth rate of a product in another industry.'" *Id.* at 592-93. Furthermore, the court found that the expert's projections were "untested" and that the expert did not even understand the methodology used to collect the information upon which he was relying. *Id.* at 592. No such comment could be made in connection with Dr. Mount's opinion.

14

data are often unavailable for examination when the invalidity question arises in patent suits, especially when, as in this case, the patent in suit is about to expire (on March 21, 2006) and the prior art is therefore at least 20 years old.

Dr. Mount's opinion that the film described by Dr. Gilbert meets the "oriented" claim element, as construed by Pechiney, could be objectively verified by anyone, including Dr. Kimmel, who understands the Instron tester and Cross-polarization tester. (B5100-03, Ex. 220, Kimmel Tr. At 25:3-35:11.) Finally, Dr. Mount's opinion on invalidity is admissible under Rule 702 because his opinion is "based upon sufficient facts or data," and is "the product of reliable principles and methods," and because he "applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

### F.    Dr. Mount's Opinion Will Assist The Trier Of Fact

Cryovac claims that Dr. Mount's expert opinion on Allied film C will not assist the trier of fact because it is not clear whether Dr. Mount was using Cryovac's construction of the term "oriented" or Pechiney's construction of that term. (CB at 17.) To support its claim, Cryovac mischaracterizes Pechiney's claim construction by asserting that both parties construe the term "oriented" according to the process by which the film is made. (*Id.* at 17-18.) Cryovac contends that because Dr. Gilbert examined only the properties of the prior art film, rather than the process by which it was made, Dr. Gilbert could not have determined that the film was "oriented" under either Pechiney's or Cryovac's proposed construction of the term. (*Id.*)

As disclosed in its claim construction brief, Cryovac construes "oriented" to require that the film be oriented by "a racking or blown bubble process." (Cryovac's Initial Brief on Claim Construction. D.I. 203, at 11.) Unlike Cryovac, Pechiney construes the term "oriented" in a way that requires only an understanding of the physical properties of the film and not an understanding of the process by which a film was oriented. That is, under Pechiney's proposed

15

construction, the term "oriented" refers to polymeric material which has certain physical properties that are created when the material has been heated and stretched. Specifically, a film is "oriented" if it has the physical and mechanical properties associated with realigned molecular configuration created by heating and stretching the polymeric material.

**REDACTED**

The process used to orient the film, whether by tenterframing, double blown bubble, melt blown bubble or some other orientation process, is completely irrelevant for determining whether the film was oriented under Pechiney's proposed construction.

**REDACTED**

To test whether Allied's film C was oriented, Dr. Gilbert used (1) an Instron Tester, which provides stress data relating to orientation and (2) Cross Polarization to visualize orientation. (Gilbert Decl. ¶ 15.) These test methods were well known and widely accepted by those skilled in the art at the time. (Mount Decl. at Tab D, Mount Second Supp. Report at 5.) Hence, it is clear that Dr. Gilbert is declaring that Allied's film C is oriented under Pechiney's proposed construction of the term "oriented" and as understood by persons of ordinary skill in the art.

In sum, when Dr. Gilbert states that Allied Film C was oriented based on tests that determine whether the molecular configuration of the material has been realigned, but does not determine whether the film has been made by a racking or blown bubble process, it is clear that Dr. Gilbert is using Pechiney's construction of the term "oriented" rather than Cryovac's.

16

G.    **Dr. Mount's Opinion On The Allied Film Will
      Not Be Prejudicial To Cryovac Nor Confusing To The Jury.**

1.    **Dr. Mount's Opinion On The Allied Film Is Not Unfairly Prejudicial
      To Cryovac.**

Cryovac claims that Dr. Mount's expert opinion on the Allied film creates unfair prejudice to Cryovac because it was submitted too late for Cryovac to obtain discovery from Allied or Dr. Gilbert. Not only is this claim untrue, but it has no place in a *Daubert* motion. If Cryovac thought it needed an opportunity to obtain discovery from Allied and Dr. Gilbert, Cryovac should have raised this issue before November 10, 2005, when the last deposition was taken in this case.

In his May 19, 2005 report, Dr. Mount referenced the Journal of Commerce Article, the Allied News Release and the Allied's film C. (Mount Decl., Tab A, Mount Report at 30-31.) Based in part on these articles, Dr. Mount opined that "[t]he thickness of the Hatley film and the relative ratings of barrier protection would have indicated to one of ordinary skill in the art that the film was oriented." (*Id.* at 31.) In his expert report, Dr. Mount also states "I am informed that more information about the Hatley film is being sought and may be obtained during discovery. I reserve the right to supplement my description of the Hatley film as additional information becomes available." (*Id.* at 30.) Therefore, as early as May 19, 2005, well before the close of discovery in this case, Cryovac was aware that Pechiney was seeking additional information about Allied's film C which could be the subject of a supplemental report.

In the Second Amended Initial Disclosures that Pechiney served on Cryovac on July 29, 2005, Pechiney disclosed that Dr. Gilbert, Stratos Dimas, and Earl Hatley were individuals likely to have discoverable information that Pechiney may use in this action, in particular with respect to "prior art to patent-in-suit." (B369-71, Ex. 31.) This disclosure provided the phone numbers

17

of Dr. Dimas and Mr. Hatley and disclosed that contact with Dr. Gilbert could be made in care of

Jenner & Block, LLP. (*Id.*)

On August 1, 2005, Cryovac requested that Pechiney produce or identify the bates ranges

of:

> Documents related to or correspondence with Stratos Dimas,
> Seymour Gilbert, and/or Earl Hatley, who were identified in
> Pechiney's Second Amended Initial Disclosure as having
> discoverable information on the subject of "Prior art to patent-in-
> suit." These documents fall within the scope of Cryovac's
> documents requests, such as Request Nos. 23 and 24.

The very next day, on August 2, 2005, Pechiney supplied Cryovac with the bates ranges of the

documents related to Dr. Gilbert, Dr. Dimas, and/or Mr. Hatley. These documents include an

article listing Drs. Dimas and Gilbert as co-authors, an article listing Dr. Gilbert as one of the co-

authors  (B377-85, Ex. 32; B386-94, Ex. 33); the Journal of Commerce Article (A230-33, Ex.

18); the Proceeding of COEXTRUSION III, including the Allied News Release, which listed

Earl Hatley as the presenter (A215-22, Ex. 16; A223-29, Ex. 17); and the Journal of Food

Article, co-authored by Drs. Dimas and Gilbert (A234-38, Ex. 19.)

Dr. Gilbert's declaration, signed on August 16, 2005, along with Dr. Dimas's declaration

("Dimas Decl."), were produced to Cryovac on August 19, 2005.  On September 13, 2005,

Pechiney served Cryovac with Dr. Mount's second supplemental report.

Accordingly, well before the final deposition was taken in this case, Cryovac knew that

Dr. Gilbert, Dr. Dimas and Mr. Hatley all had personal knowledge concerning Allied's film C.

Cryovac did not, however, take any steps to depose them, or even to contact them informally,

despite the fact that Pechiney had given Cryovac their contact information.[9]

---

[9]  Pechiney is in contact with Dr. Dimas, now with Welch's, and Mr. Hatley, now with
Honeywell, Allied's successor, and is seeking documents from Honeywell, which will be
produced to Cryovac.

18

While Dr. Gilbert is not required to disclose his opinions formulated or knowledge gained as a consulting expert for Pechiney,[10] there was no reason Cryovac could not have deposed Dr. Gilbert in his capacity as a fact witness concerning film C. *Nelco Corp. v. Slater Elec., Inc.*, 80 F.R.D. 411, 414 (E.D.N.Y. 1978); *see also Bunzl Pulp & Paper Sales, Inc. v. Golder*, 1990 U.S. Dist. LEXIS 16355 (E.D. Pa. Dec. 4, 1990).

Accordingly, any limitation on Cryovac's ability to rebut Dr. Mount's opinion concerning the Allied film is based solely on Cryovac's own failure to depose or interview Dr. Gilbert, Dr. Dimas, or Mr. Hatley.

### 2. Dr. Mount's Testimony Would Not Confuse The Jury

Cryovac further alleges that Dr. Gilbert's declaration would be insufficient as a matter of law to establish invalidity because the declaration is uncorroborated and because it would be confusing to the jury to let Dr. Mount to testify based on this declaration. Cryovac cites *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1218 (Fed. Cir. 2002) as support for its position. *Texas Digital* is not directed to the exclusion of expert testimony, however, but is instead directed to the exclusion of fact testimony by one who could not recall the details necessary to establish a particular date of public use. Therefore, *Texas Digital* is not applicable to a *Daubert* analysis.

Furthermore, as provided above, Dr. Gilbert's declaration is corroborated by at least the Journal of Commerce Article, the Allied News Report, the Journal of Food Science Article and Dr. Dimas's declaration. Accordingly, Fed. R. Evid. 403 does not support excluding Dr. Mount's opinion relating to Allied film C.

---

[10] Dr. Gilbert has consulted with Pechiney on matters other than the studies for Allied chemicals. (Gilbert Decl. ¶ 19.)

19

For all these reasons there is no merit to Cryovac's claim that Dr. Mount's opinion on Allied Film C is inadmissible, and its motion to exclude this opinion should be denied.

**H.    Dr. Mount's Opinion On Non-Infringing Alternatives Is Admissible**

In his rebuttal report, Dr. Mount disclosed his expert opinions on a long list of non-infringing alternatives that were available at the time of the alleged infringement. He found that (a) these alternatives do not infringe claim 11 of the '419 patent even under Cryovac's construction of the term "arranged symmetrically;" (b) that the substitute materials or layer configurations for these alternatives were available at the time that Pechiney first made a ClearShield film; and (c) that the alternative films would "simply replace[] the current ClearShield film while maintaining acceptable packaging performance." (Mount Decl. at Tab B, Mount Rebuttal Report at 31-32.)

Cryovac does not challenge the admissibility of Dr. Mount's opinion that these alternatives do not infringe the asserted patent claim, or his opinion that these alternatives were available at the time of the alleged infringement.

REDACTED

Despite these concessions, Cryovac nevertheless seeks to exclude Dr. Mount's opinion concerning the performance of the non-infringing alternatives on the grounds that the two documents Dr. Mount allegedly relied on do not support his opinion.

Specifically, Cryovac argues that Dr. Mount's opinion on non-infringing alternatives is inadmissible because (1) Dr. Mount only identified two documents to support his opinion that the available non-infringing alternatives would have had acceptable performance; and (2) Dr. Mount admitted at his deposition that these documents indicated that one of the non-infringing alternatives was deficient in stiffness and tear resistance and that the testing data did not reflect

20

the humidity conditions in one customer's meat-packing operations. (CB at 22.) Neither argument has merit.

First, Cryovac claims that Dr. Mount was asked at his deposition to identify the evidence he relied on for his opinion that the non-infringing alternatives listed in his report would have been acceptable, and that he pointed to only two documents. (CB at 7, 22.)

**REDACTED**

As to all the other non-infringing alternatives, Dr. Mount's opinion is supported not only by his experience with the relevant materials and structures, but by documents in Cryovac's own

21

files. These documents show that non-infringing alternatives meet the packaging requirements and are acceptable to customers. For example, one of the many non-infringing alternatives identified by Dr. Mount, but not addressed by Cryovac, involves the addition of an eighth layer to the current ClearShield seven-layer film. (Mount Decl. at Tab B, Mount Rebuttal Report at 32.)

**REDACTED**

22

**REDACTED**

**REDACTED**

In sum, there are no valid grounds for any of Cryovac's arguments that Dr. Mounts opinion on non-infringing alternatives are inadmissible, and its motion to exclude this opinion should be denied.

## I.     Larry Evans's Opinions On Patent Damages Are Admissible

In an attempt to cripple Pechiney's defense of its damages allegations, Cryovac seeks to exclude as inadmissible the entire damages opinion rendered by Larry Evans, a nationally renowned expert on royalty rates and patent licensing. Cryovac's attempt to deprive Pechiney of its damages expert is baseless, and should be denied, for all the reasons set forth below.

Beginning with his first report, submitted on June 24, 2005, Mr. Evans disclosed his expert opinion on the appropriate royalty rate to use in calculating damages, assuming Cryovac was to prevail on the merits of its patent infringement claim. (A1912-1941, Ex. 125.) Mr. Evans also rebutted the May 19, 2005, expert report of Cryovac's damages expert, James J. Nawrocki, by opining that Cryovac could not establish the "but-for" causation required to justify an award of lost profits. (A1925-26, Ex. 125 at ¶ 29.) Using the well-accepted *Panduit* methodology for proving lost profits – the same methodology used by Cryovac's damages expert Mr. Nawrocki (A2293-96, Ex. 150 at 13-16) – Mr. Evans opined that Cryovac was foreclosed from recovering lost profits because Cryovac could not establish the absence of non-infringing alternatives. (A1925-27, Ex. 125 at ¶¶ 29-32.)

To recover lost profits damages, the patent owner bears the burden of establishing by a "reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) *(en banc)*. The predominant method of showing "but for" causation is the four-factor *Panduit*

24

test. *Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1165-67 (Fed. Cir. 1991); *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978). One of the factors that the patent owner must prove under *Panduit* to recover lost profits damages is the absence of acceptable non-infringing alternatives. (*Id.*)

In its motion, Cryovac seeks to reverse this burden of proof and require Pechiney to prove there were non-infringing alternatives in order to limit damages to royalties, or even to introduce expert evidence of what those damages would be. Cryovac argues that Mr. Evans's opinion on reasonable royalty patent damages is inadmissible for the following reasons:

> 1) Mr. Evans's "entire damages opinion is premised on the unsupported assumption that acceptable non-infringing alternatives exist;"
>
> 2) Mr. Evans does not possess the technical expertise necessary to render an opinion on non-infringing alternatives;
>
> 3) The information provided to Mr. Evans by Pechiney's director of marketing for meat & dairy flexible packaging, Frank Kitchel, on the acceptability of one non-infringing alternative was not the kind of evidence reasonably relied on by experts in his field; and
>
> 4) Cryovac will be unduly prejudiced because it did not have an opportunity to depose Mr. Kitchel about the information he provided to Mr. Evans.

(CB at 22-26.) None of these contentions provide any support for barring Mr. Evans's damages opinion.

### 1. Mr. Evans's Patent Damages Opinion Is Supported By The Evidence

Cryovac claims that "Mr. Evans' opinions should be excluded in their entirety," on the grounds that (a) there is no support for his assumption that acceptable non-infringing alternatives exist; (b) Pechiney has not produced any "factual evidence," or "valid expert opinion" that such alternatives exist; and (c) Mr. Evans has not provided an opinion on what lost profits damages

25

would be if there were no non-infringing alternatives. (CB at 25.)  None of these contentions are accurate, and Cryovac has not presented any valid basis for excluding Mr. Evans's damages opinions.[11]

Most importantly, it is Cryovac's burden to prove the absence of acceptable non-infringing alternatives that were available at the time ClearShield was being sold. If Cryovac does not meet this burden, it is not entitled to recover lost profits damages. Thus, when Cryovac's expert, Mr. Nawrocki, submitted a report stating that Cryovac is entitled to lost profits, Mr. Evans could have rebutted this opinion based solely on Cryovac's failure to submit any evidence to satisfy its burden of proof as to non-infringing alternatives.  Mr. Evans went further, however, and identified overwhelming evidence that there were in fact non-infringing alternatives.

In claiming that there is no "factual evidence" or "valid expert opinions" that non-infringing alternatives exist, Cryovac ignores almost all the evidence Mr. Evans relied on for his opinion on lost profits damages.  Apart from the information Mr. Evans received from Mr. Kitchel, Mr. Evans relied, in his very first report, on evidence that (1) Cryovac's competitor, Curwood, sells non-infringing alternative packaging for this market and has done so for many years:

REDACTED

(4) Cryovac began using a non-infringing plastic lid product for

---

11  To the extent Cryovac challenges the use of experts to opine on damages issues that are unique to patent law, it should be noted that, unlike experts on other patent issues, the patent laws expressly provide for patent damages experts.  See 35 U.S.C. § 284 ("The court may receive expert testimony as an aid to determination of damages or of what royalty would be reasonable under the circumstances.").

this market in 2003; and (5) Dr. Mount described numerous non-infringing alternatives in his June 17, 2005, report. (A1925-27, Ex. 125 at ¶¶ 29-31.)

In addition to relying on Cryovac's own documents and the expertise of Dr. Mount, Mr. Evans also obtained additional facts in support of his opinion on the acceptability of the non-infringing alternatives through conversations with engineers from both Pechiney and the German manufacturer of Pechiney's co-extrusion line, Kuhne GmbH. (A1923-24, Ex. 125 at ¶ 26.)

Finally, the fact that Mr. Evans did not provide an opinion on the amount of lost profits Cryovac should be awarded if it could prove there were no non-infringing alternatives is hardly grounds for excluding Mr. Evans's damages opinions. As with its arguments seeking to strike Dr. Mount's opinions, Cryovac's argument against Mr. Evans's opinions go to their weight, and not to their admissibility. *See, e.g., Oxford Gene Tech. Ltd. v. Mergen, Ltd.*, 345 F. Supp. 2d 431, 442 (D. Del. 2004).

>        2.    **Damages Experts Can Provide Opinions On Lost Profits Damages In Patent Cases Without Having All The Expertise Required To Opine On The Technical Acceptability Of Non-Infringing Alternatives**

Cryovac also claims that Mr. Evans's lost profits damages opinions should be barred because Mr. Evans "has no qualifications to testify on technical matters such as whether a given product is an acceptable non-infringing alternative to ClearShield," but nevertheless opined on "the technical merit and availability" of these alternatives. (CB at 23.) Cryovac also argues that, because Mr. Evans has no experience in the red meat industry, he lacks the qualifications to determine whether a non-infringing alternative is acceptable in this industry. (*Id.*) These arguments are misplaced.

First, there is no support for Cryovac's position that a damages expert cannot opine on lost profits without having, in addition to patent and technology licensing experience, the *technical* qualifications to determine (a) whether the alternative designs infringe the patent in

27

suit; (b) whether these alternatives were available at the time of the alleged infringement; and (c) whether they would provide acceptable performance; as well as the *industry* qualifications to determine whether the particular design would be acceptable to customers in the relevant market.[12] In a similar case, *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1149-50 (N.D. Cal. 2003), the court held that plaintiff's patent damages expert, a CPA with a Doctorate in Finance, was qualified to testify on the absence of acceptable non-infringing alternatives. While Cryovac claims that Mr. Evans must possess all of these qualifications to address the non-infringing alternatives factor of lost profits, Cryovac does not dispute Mr. Evans's qualifications to testify concerning patent damages, or the relevance of non-infringing alternatives to his rebuttal of Mr. Nawrocki's lost profits opinion.

The law is well established that an expert may rely on the opinions of other experts under Fed. R. Evid. 702. The Advisory Committee Notes to Rule 702 explained that "[t]he term 'data' is intended to encompass the reliable opinions of other experts." Fed. R. Evid. Advisory Committee Notes, 2000 Amendments at 431. In support of this statement, the Advisory Comm. relied on the original Advisory Committee Note to Rule 703. (*Id.*) That Note explained the type of facts or data upon which an expert may rely by giving the example of a physician who, "in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including . . . *reports and opinions from nurses, technicians and other doctors.* . . ." Advisory Comm. Notes to 1972 Proposed Rules, Fed. R. Evid. 703, at 432. (emphasis added).

---

12  The only case Cryovac cites in this section of its brief, *Watkins v. New Castle County*, 374 F. Supp. 2d 379 (D. Del. 2005), is inapposite. This case which did not involve an expert who relied on documents and other experts as a basis for one factor in his own opinion, but held only that the plaintiff's expert was qualified to testify on all the subjects he addressed in his report except his legal conclusions. These legal conclusions were that the defendants violated the plaintiff's constitutional rights and that the defendants' conduct was recklessly, willfully, indifferent."

28

Because there is no relevant distinction between this example and Mr. Evans's reliance upon the reports of Dr. Mount, there is no basis under Rule 702 or Rule 703 for excluding Mr. Evans's opinion on the grounds that he relies on the reports of Dr. Mount.

Courts have also recognized that an expert can rely on the opinions of other experts, especially in different areas of expertise. *See, e.g., American Universal Ins. Co. v. Falzone*, 644 F.2d 65, 66 (1st Cir. 1981) (reasonable for one state fire marshal to rely on contemporaneous and on-the-scene opinions of other investigators on his team as to portion of investigation that they carried out within their area of competence); *Ferrara & DiMercurio v. St. Paul Mercury*, 240 F.3d 1, 8-9 (1st Cir. 2001) (expert fire analyst could examine another (now deceased) expert's report, as well as fire department report, in the course of forming his own opinion on cause and origin of fire in question); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) (testimony properly admitted from expert who relied on data provided by opponent's expert and third party); *Lewis v. Rego Co.*, 757 F.2d 66, 74 (3d Cir.1985) (error not to allow one expert witness to testify as to his conversation with another expert); *United States v. 1014.16 Acres of Land*, 558 F. Supp. 1238, 1242 (W.D. Mo. 1983), *aff'd*, 739 F.2d 1371 (8th Cir. 1984) (expert allowed to rely on, among other things, opinions of other experts).

Second, the aspect of Mr. Evans's lost profits opinion that deals with non-infringing alternatives to ClearShield is also based on information supplied by engineers from Pechiney and the German equipment manufacturer, Kuhne GmbH, all individuals who had ample qualifications to determine the "technical merit and availability" of the non-infringing alternatives. (A1923-24, A1926-27, Ex. 125 at ¶¶ 26, 31.) Furthermore, Cryovac cannot complain that there is no qualified expert testimony in this case to support Mr. Evans's lost profits opinion when Cryovac concedes that the alternatives listed in Dr. Mount's reports do not

29

infringe the '419 patent, that non-infringing alternatives identified by Dr. Mount were available when ClearShield was being sold (B2351-52, Ex. 160 at ¶ 8), and that Dr. Mount is qualified to judge the performance of non-infringing alternatives.

Third, on the question of the acceptability of non-infringing alternatives to customers, Mr. Evans also relied on information from Mr. Kitchel, the Pechiney marketing executive who spent years dealing directly with customers in this industry (A1935, Ex. 125 at ¶ 47; B2361-62, Ex. 161 at ¶¶ 4-8), and Cryovac does not challenge Mr. Kitchel's qualifications to assess the acceptability of packaging products to customers.

Finally, and perhaps most significantly, Mr. Evans relied on the undeniable fact that Curwood was successfully selling its non-infringing packaging alternative to customers. The law is clear that actual sales of non-infringing alternatives presumptively establishes the acceptability of those alternatives. *See, e.g., Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999) (market sales alone are sufficient to "defeat a case for lost profits"); *see also Minco Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109 (Fed. Cir. 1996). In any event, as Mr. Evans opined, Cryovac's own documents show that the Curwood alternative was acceptable to customers. (A1925-26, Ex. 125 at ¶ 29.)

Accordingly, there is no merit to Cryovac's argument that Mr. Evans's testimony regarding lost profits should be excluded based on his alleged lack of expertise on technical and marketing issues relating to non-infringing alternatives.[13]

---

13  Cryovac asserts these same grounds for excluding Mr. Evans's opinions under Federal Rule of Evidence 703. Cryovac's Rule 703 arguments should be rejected for the same reasons discussed.

### 3.    There Is No Unfair Prejudice To Cryovac That Would Justify Barring Mr. Evans's Reasonable Royalty Opinion

Cryovac argues that it will be unfairly prejudiced by Mr. Evans's damages opinion because Cryovac had no opportunity to depose Mr. Kitchel on the information he provided to Mr. Evans. This argument should be rejected for two reasons.

First, Cryovac received Mr. Evans's report discussing his conversations with Mr. Kitchel on August 5, 2005, *two weeks before* the August 19, 2005, close of discovery, and Cryovac's lead attorney deposed Mr. Evans on this very subject on August 11, 2005. (B2355, Ex. 160 at ¶ 15; B5096-5096A, Ex. 218 at 43-48.)  Yet Cryovac did nothing to seek a deposition of Mr. Kitchel regarding these conversations.  While Cryovac argues that fact discovery has now closed, they ignore the fact that they had from August 5, 2005, when they received Mr. Evans's report, to November 10, 2005, when the last deposition was taken, to seek a second deposition of Mr. Kitchel.[14]

Second, on August 16, 2005, the day after Mr. Evans submitted his third expert report, Cryovac served ten additional document requests directed at Mr. Evans's opinions in his August 15th report. (B395-99, Ex. 34.)[15]  Despite serving these document requests just three days before the close of discovery, Cryovac did not seek to depose Mr. Kitchel, either through a deposition notice or an informal request.  Accordingly, any limitation on Cryovac's ability to

---

14  This Court permitted the parties to take seven depositions after the close of discovery, including a second deposition of Mr. Nawrocki. Pechiney executive Richard Company was deposed on August 23, 2005. National Beef executives Terry Wilkerson and Steven James were deposed on August 24, 2005 and September 7, 2005, respectively.  Cryovac expert James J. Nawrocki, was deposed a second time on September 1, 2005. Finally, Cryovac executives Stuart Prosser and Jay Wilson were deposed on September 14, 2005 and November 3, 2005, respectively, and Pechiney executive, Robert Taylor was deposed for a second time on November 10, 2005.

15  Documents responsive to these requests have been produced.

31

rebut Mr. Evans's opinion is a result of Cryovac's own inaction in seeking additional discovery, and does not provide any grounds for excluding Mr. Evans's damages opinions.

**J.    Mr. Evans's Reports Do Not Contain Improper Patent Law Opinions**

In his expert reports on reasonable royalty damages, Mr. Evans sets forth the standards and methods that have been established in the leading patent damages cases that should be followed to determine the appropriate reasonable royalty damages in patent infringement cases. (A1920-21, Ex. 125 at ¶¶ 19-22.) Far from being grounds for barring his opinions, his citation to these authorities demonstrates that his "testimony is the product of reliable principles and methods," as required under Fed. R. Evid. 702.

For example, in his first report, Mr. Evans states that he will testify as to the "'willingly-negotiated' reasonable royalty that would be adequate to compensate plaintiffs for PPPI's alleged infringement of Cryovac's '419 patent." (A1920, Ex. 125 at ¶ 19.) In providing the definition of the term "willingly-negotiated" as used in his opinion, Mr. Evans refers to the definition of this term in the leading case on determining reasonable royalties, *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and affirmed*, 446 F.2d 295 (2d Cir. 1971). (*Id.*) This is just one example of the "opinions on patent law" that Cryovac seeks to bar in its motion. (CB at 26.)

Cryovac also contends that the next paragraph of Mr. Evans's report should be stricken as an improper patent opinion:

**REDACTED**

32

**REDACTED**          Likewise, the next two paragraphs contain no "legal opinion" of any sort, and were apparently chosen simply because they contain the case name, "*Georgia-Pacific.*" (A1921, Ex. 125 at ¶¶ 21-22.) In other sections of his report, Mr. Evans explains that he is utilizing methods and standards for determining lost profits damages that were established in *Panduit Corp. v. Stahlin Brothers Fibre Works*, 575 F.2d 1152 (6th Cir. 1978). (Ex. 125 at ¶ 29.) Indeed, Cryovac's own damages expert, James Nawrocki, cites to *Georgia-Pacific* and *Panduit* when explaining his methodology. (A2293-94, A2299-300, A3002, Ex. 150 at 13-14, 19-20, 22.)

Most tellingly, Cryovac seeks to bar Mr. Evans from commenting on the opinion submitted by Mr. Nawrocki. Mr. Evans criticizes Mr. Nawrocki's erroneous application of the damages factors set forth in *Panduit*, a case on which Mr. Nawrocki relies in his report. (CB at 26) (A2293-94, Ex. 150 at 13-14.) And in each of Cryovac's references to alleged patent law opinions in Mr. Evans's August 5, 2005, report, Mr. Evans is merely explaining why Mr. Nawrocki has misconstrued legal standards that Mr. Nawrocki is relying on for his own damages opinion. (*Id.*) If it is permissible for Mr. Nawrocki to cite and interpret *Panduit* in his opinions, it cannot at the same time be impermissible for Mr. Evans to explain the defects in Mr. Nawrocki's application of the *Panduit* factors to the facts of this case.

As shown by these examples, Cryovac's argument borders on the frivolous, and should be rejected for what it is -- an unfounded attempt to prevent Pechiney from introducing its own patent damages evidence and from criticizing the patent damages opinion of Cryovac's expert.[16]

---

16  Cryovac relies on a single case, *Revlon Consumer Prods. Corp. v. L'Oreal S.A.*, No. 96-192 MMS, 1997 U.S. Dist. LEXIS 4117 (D. Del. Mar. 26, 1997), but the court in that case held only that the defendant's patent law expert could not go beyond testifying as to the practice and procedure of the Patent and Trademark Office, testimony which is permitted, to opine on a "wide range" of substantive patent law issues.

**K.    Mr. Evans's Reports Do Not Contain Improper Contract Law Opinions**

Cryovac also seeks to exclude those sections of Mr. Evans's reports that refer to the alleged contract between National Beef and Cryovac on the grounds that these references constitute legal conclusions on issues of contract law. The alleged "National Beef" agreement forms the basis for Cryovac's tortious interference claims and is thus critical to Cryovac's lost profit claims. Cryovac's own expert, Mr. Nawrocki, certainly discussed his understanding of the terms of the alleged National Beef contract at length. (A2305-06, Ex. 150 at pp. 25-26.) If it is appropriate for Mr. Nawrocki to discuss that contract, it cannot simultaneously be inappropriate for Mr. Evans to discuss the same document in connection with his opinion on Cryovac's claim for lost profits under this agreement. As shown below, Cryovac's arguments are without merit, and its motion to bar Mr. Evans from discussing his understanding of the terms of the alleged contract that are relevant to assessing lost profits damages should be denied.

In the six pages of the brief that Cryovac devotes to this issue, Cryovac identifies only three sentences in Mr. Evans's reports that it finds objectionable as legal conclusions. By taking only three sentences out of two of Mr. Evans's damages reports, and omitting the context and purpose of these statements, Cryovac attempts to show that Mr. Evans has opined on issues of contract law. Cryovac has misstated both the purpose and effect of Mr. Evans's reports in making this claim.

For example, in his June 24, 2005, damages report, Mr. Evans addressed Mr. Nawrocki's opinion that Cryovac is entitled to lost profits based on Pechiney's alleged tortious interference with a supply agreement between Cryovac and National Beef. (A1924-25, A1936, Ex. 125 at ¶¶ 27-28, 50.) Mr. Evans concluded that it is impossible to calculate Cryovac's lost profits for tortious interference because Cryovac's alleged contract with National Beef does not contain a quantity term. (A1924-25, A1936, Ex. 125 at ¶¶ 27, 50; B2356-57, B2358, Ex. 160 at ¶¶ 17, 20.)

34

It is both obvious and indisputable that a quantity term is necessary to calculate lost profits, because lost profits are calculated by multiplying the quantity of foregone sales by the profit per unit. As Mr. Evans explained in his initial report:

**REDACTED**

Mr. Nawrocki provided no evidence, in the language of the contract, in the parties' prior dealings, or in the usage in the trade, for his assumption that National Beef had agreed to buy the same quantity of packaging products it had purchased from Cryovac in the four years before the contract. Instead, Mr. Nawrocki simply repeated the refrain, "it is my understanding," as the basis for his interpretation of the terms of the National Beef contract.

35

Because Mr. Nawrocki had no basis for using historical sales to calculate lost profits under the alleged contract with National Beef, Mr. Evans found that Mr. Nawrocki's opinion was inaccurate. In explaining his disagreement with Mr. Nawrocki, Mr. Evans states:

**REDACTED**

In sum, there is no basis for excluding the references in Mr. Evans's report to the terms of Cryovac's alleged agreement with National Beef. This testimony is necessary for Mr. Evans's to explain his own opinion concerning the calculation of tortious interference damages in this case, and to explain why he believes Mr. Nawrocki's opinion on the calculation of these damages is wrong.

## IV.     CONCLUSION

For all the reasons stated herein, Pechiney Plastic Packaging, Inc. requests that this Court

deny Cryovac's Motion to Exclude Expert Testimony Pursuant To Principles Announced in

*Daubert*, in its entirety.

Dated:  November 18, 2005                          Respectfully submitted,
 REDACTED VERSION
 FILED 11/28/05                                    By:  /s/ N. Richard Powers

N. Richard Powers (#494)
Rudolf E. Hutz (#484)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: (302)888-6266

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350

37

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2005 I electronically filed a copy of the foregoing with the Clerk of the Court using CM/ECF and served the following individuals in the manner indicated:

### BY HAND DELIVERY

John W. Shaw, Esquire
Karen E. Keller, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

### BY ELECTRONIC MAIL AND FIRST CLASS MAIL

Ford F. Farabow, Jr., Esquire
Mark J. Feldstein, Esquire
Finnegan, Henderson, Farabow,
    Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
Mark.feldstein@finnegan.com
Martin.fuchs@finnegan.com

/s/ N. Richard Powers
N. Richard Powers