IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CRYOVAC, INC.,                                    )
                                                  )
      Plaintiff/Counter-Defendant,           )
                                                  )
    v.                                          )      Civil Action No. 04-1278-KAJ
                                                  )
PECHINEY PLASTIC PACKAGING INC.,                  )      **REDACTED**
                                                  )
      Defendant/Counter-Plaintiff.           )


## CRYOVAC, INC.'S ANSWERING BRIEF IN OPPOSITION TO PECHINEY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON TORTIOUS INTERFERENCE CLAIMS

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Michele Sherretta (No. 4651)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for Cryovac, Inc.

Of Counsel:

Ford F. Farabow, Jr.
Joann M. Neth
Mark J. Feldstein
Courtney B. Meeker
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, D.C. 20001-4413
(202) 408-4000

Dated: November 18, 2005

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. i

NATURE AND STAGE OF THE PROCEEDINGS ....................................................... 1

SUMMARY OF ARGUMENT .......................................................................................... 2

COUNTER-STATEMENT OF THE FACTS .................................................................... 3

    A.    The Parties ........................................................................................................ 3

    B.    The Fresh Red Meat Flexible Packaging Market ....................................... 4

    C.    Cryovac's Requirements Contract with National Beef ............................. 5

    D.    Pechiney's Tortious Interference ................................................................. 6

ARGUMENT ........................................................................................................................ 9

    I.    FEDERAL PATENT LAW DOES NOT PREEMPT CRYOVAC'S
        TORTIOUS INTERFERENCE CLAIMS ...................................................... 9

        A.    Cryovac's State Law Tortious Interference Claims Contain
            Additional Elements of Proof Not Found in Federal Patent Law ............. 9

        B.    Cryovac's State Law Tortious Interference Claims Are Not Obstacles
            to the Purposes and Objectives of the Federal Patent Law ..................... 11

    II.    PECHINEY LACKS STANDING TO RAISE A STATUTE OF
        FRAUDS-BASED DEFENSE ....................................................................... 13

    III.    PECHINEY IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE
        IT CANNOT SHOW AS A MATTER OF LAW THAT THE MARCH 2003
        AND JANUARY 2004 REQUIREMENTS CONTRACTS ARE
        UNAMBIGUOUSLY NOT REQUIREMENTS CONTRACTS ....................... 14

        A.    Cryovac and National Beef Intended to Enter Into a Contract ................ 16

        B.    The Written National Beef/Cryovac Agreements are Alone
            Sufficient to Establish That National Beef Agreed to Purchase
            its Requirements of the Identified Goods .................................................. 17

        C.    Pechiney's Analysis of the Parties' Negotiations, Course of
            Dealing and Course of Performance Evidence is Legally and
            Factually Wrong ............................................................................................ 24

            1.    Pechiney Proposes a Rule that Reads UCC § 2-202 Out
                of Existence ........................................................................................ 24

2.    Course of Dealing, Course of Performance, Usage of Trade, and Parol Evidence Create a Genuine Issue of Material Fact as to the Existence of a Requirements Contract .........................................27

a.    Competent Evidence form the Parties' Negotiations Demonstrates the Existence of a Requirements Contract...............27

b.    Course of Dealing Facts Demonstrate the Existence Requirement Contract ....................................................................29

c.    Course of Performance Facts that Demonstrate the Existence of a Requirements Contract............................................................31

d.    Trade Usage Evidence Demonstrates that the Agreements Were Requirements Contracts ...................................32

D.    Pechiney's Contention that Neither National Beef Nor Cryovac Intended to Enter into a Contract Ignores the Law and Ignores Substantial Evidence ...................................................................................32

IV.    A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER PECHINEY HAD KNOWLEDGE OF CRYOVAC'S CONTRACTS AND/OR PROSPECTIVE CONTRACTUAL RELATIONS WITH NATIONAL BEEF ...........................................................................35

A.    The Requisite Level of Knowledge Is Low.............................................35

B.    More Than Sufficient Facts Exist from Which a Jury Could Find That Pechiney Knew About Cryovac's Contracts and/or Prospective Contractual Relations with National Beef...........................................35

V.    PECHINEY'S ALLEGED GOOD FAITH IS NOT RELEVANT TO WHETHER IT ACTED WRONGFULLY .......................................................................37

CONCLUSION ...............................................................................................................................40

TABLE OF AUTHORITIES

Page(s)

Cases

Abbott Labs. v. Brennan,
   952 F.2d 1346 (Fed. Cir. 1991)................................................................ 10

Acierno v. Worthy Bros. Pipeline Corp.,
   693 A.2d 1066 (Del. 1997) ...................................................................... 33

Advanced Med. Optics, Inc. v. Alcon Inc.,
   361 F. Supp. 2d 404 (D. Del. 2005)........................................................ 13

Alaska Ind. Fishermen's Mkt. Assoc. v. New England Fish Co.,
   548 P.2d 348 (Wash. Ct. App. 1976)...................................................... 27

Alvord-Polk, Inc. v. F. Schumacher & Co.,
   37 F.3d 996 (3d Cir. 1994)...................................................................... 37

Am. Original Corp. v. Legend, Inc.,
   652 F. Supp. 962 (D. Del. 1986)........................................................ 15, 16

Aspen Advisors LLC v. UA Theatre Co.,
   861 A.2d 1251 (Del. 2004) ....................................................................... 9

Bannon v. Knauss,
   320 S.E.2d 470 (S.C. Ct. App. 1984)..................................................... 32

Bell v. May Dep't Stores Co.,
   1998 Mo. App. LEXIS 1510 (Mo. Ct. App. 1998) ............................ 11, 38

Bowers v. Baystate Techs., Inc.,
   320 F.3d 1317 (Fed. Cir. 2003)............................................................... 13

Briner Elec. Co. v. Sachs Elec. Co.,
   680 S.W.2d 7374 (Mo. Ct. App. 1984)................................................... 38

Caniglia v. Nigro Corp.,
   441 S.W.2d 703 (Mo. 1969). ................................................................... 16

Carter v. St. John's Reg'l Med. Ctr.,
   88 S.W. 3d 1 (Mo. Ct. App. 2002)......................................................... 10

Ceredo Mortuary Chapel v. United States,
   29 Fed. Cl. 346 (Ct. Cl. 1993)............................................................... 19

Clements v. Withers,
   437 S.W.2d 818 (Tex. 1969).................................................................. 14

CLI Corp. v. Ludowici USA,
   2001 U.S. Dist. LEXIS 23374 (W.D. Pa. Nov. 14, 2001),............................................................ 10, 11

In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,
   538 F.2d 180 (8th Cir. 1976)................................................................................................... 39

Crown Laundry & Dry Cleaners, Inc. v. United States,
   29 Fed. Cl. 506 (Fed. Cl. 1993), ........................................................................................ 19, 20

Cyril Bath Co. v. Winters Indus.,
   892 F.2d 465 (6th Cir. 1989)..................................................................................................... 18

D56, Inc. v. Berry's Inc.,
   955 F. Supp. 908 (N.D. Ill. 1997) ............................................................................................. 35

DeBerry v. McCain,
   274 S.E. 2d 293 (S.C. 1981) ..................................................................................................... 38

Demetree v. Commonwealth Trust Co.,
   1996 Del. Ch. LEXIS 112 (Aug. 27, 1996) ........................................................................... 16, 21

Don King Equip. Co. v. Double D Tractor Parts,
   115 S.W.3d 363 (Mo. Ct. App. 2003) ....................................................................................... 33

Dow Chem. Co. v. Exxon Corp.,
   139 F.3d 1470 (Fed. Cir. 1998)....................................................................................9, 10, 11, 12

Essco Geometric v. Harvard Indus.,
   46 F.3d 718 (8th Cir. 1995)................................................................................................... 17, 18

Gestetner Corp. v. Case Equipment Co.,
   815 F.2d 806 1st Cir. 1987) ................................................................................................. 27, 31

Gibson v. Mayor & Council of Wilmington,
   355 F.3d 215 (3d Cir. 2004)...................................................................................................... 20

Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,
   406 N.E.2d 445 (N.Y. 1980)...................................................................................................... 35

Howard v. Youngman,
   81 S.W.3d 101 (Mo. Ct. App. 2002) .......................................................................................... 35

Hunter Douglas v. Harmonic Design, Inc.,
   153 F.3d 1318 (Fed. Cir. 1998)............................................................................................... 9, 10

Impossible Elecs. Techniques, Inc. v. Wackenhut Protection Sys., Inc.,
   669 F.2d 1026 (5th Cir. 1982),.................................................................................................. 15

Jurgens v. CBK, Ltd.,
   80 F.3d 1566 (Fed. Cir. 1996).................................................................................................... 9

Kansas Power & Light Co. v. Burlington N. R. Co.,
    740 F.2d 780 (10th Cir. 1984)....................................................................................... passim

Kline, Inc. v. Lorillard, Inc.,
    878 F.2d 791 (4th Cir. 1989)..................................................................................... 15, 22, 27

Layfield v. Beebe Med. Ctr.,
    1997 Del. Super. LEXIS 472 (Del. Super. Ct. 1997).................................................... 38, 39

McHugh v. Bd. Of Educ.,
    100 F. Supp. 2d 231 (D. Del. 2000) ................................................................................... 10

Merritt-Campbell, Inc. v. RxP Prods., Inc.,
    164 F.3d 57 (5th Cir. 1999)................................................................................................ 24

Nanakuli Paving & Rock Co. v. Shell Oil Co.,
    664 F.2d 772 (9th Cir. 1981).............................................................................................. 14

Nitrogen Corp. v. Royster Co.,
    451 F.2d 3 (4th Cir. 1971).................................................................................................. 26

O.N. Jonas Co. v. Badische Corp.,
    706 F.2d 1161 11th Cir. 1983).................................................................................... passim

Omega Eng'g, Inc. v. Eastman Kodak Co.,
    908 F. Supp. 1084 (D. Conn. 1995) .................................................................................. 27

Orchard Group, Inc. v. Konica Med. Corp.,
    135 F.3d 421 (6th Cir. 1998)........................................................................................ 24, 29

Pepsi-Cola Co. v. Steak 'N Shake, Inc.,
    981 F. Supp. 1149 (S.D. Ind. 1997) .................................................................................. 22

PMC Corp. v. Houston Wire & Cable Co.,
    797 A.2d 125 (N.H. 2002) ........................................................................................... 23, 27

Porous Media Corp. v. Midland Brake, Inc.,
    220 F.3d 954 (8th Cir. 2000)........................................................................................ 19, 20

Powell v. Leon,
    239 P.2d 974 (Kan. 1952) .................................................................................................. 13

Riegel Fiber Corp. v. Anderson Gin Co.,
    512 F.2d 784 (5th Cir. 1975).................................................................................15, 26, 27, 32

Rodime PLC v. Seagate Tech., Inc.,
    174 F.3d 1294 (Fed. Cir. 1999).................................................................................... 9, 11

Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.,
    204 F.3d 1368 (Fed. Cir. 2000)......................................................................................... 10

Simmons Foods, Inc. v. Hill's Pet Nutrition. Inc.,
   270 F.3d 723 (8th Cir. 2001)............................................................................ 24, 27

Tri-Continental Leasin Co. v. Neidhardt,
   540 S.W.2d 210 (Mo. Ct. App. 1976) ................................................................. 9

Trimble v. Coleman Co.,
   437 P.2d 219 (Kan. 1968) .................................................................................. 26

UFE Inc. v. Methode Elecs.. Inc.,
   808 F. Supp. 1407 (D. Minn. 1992) .................................................................... 20

Universal Power Sys., Inc. v. Godfather's Pizza, Inc.,
   818 F.2d 667 (8th Cir. 1987)..............................................................17, 23, 24, 29

Upsher-Smith Lab. v. Mylan Lab.,
   944 F. Supp. 1411 (D. Minn. 1996) .................................................................... 22

WMS Gaming Inc. v. Int'l Game Tech.,
   184 F.3d 1339 (Fed. Cir. 1999)........................................................................... 13

Young v. Pottinger,
   340 So. 2d 518 (Ct. App. Fl. 1976)..................................................................... 13

Zemco Mfg., Inc. v. Navistar Int'l Trans. Corp.,
   186 F.3d 815 (7th Cir. 1999)........................................................................ passim

Statutes

35 U.S.C. § 284 ............................................................................................................. 12

UCC § 1-201(11)............................................................................................................. 14

UCC § 1-201(3).................................................................................................... 2, 14, 27

UCC § 1-205(1)............................................................................................................... 29

UCC § 2-201 ........................................................................................................... passim

UCC § 2-202 ........................................................................................................... passim

UCC § 2-204(3)................................................................................................................. 3

UCC § 2-208(1)............................................................................................................... 31

Other Authorities

LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE
§ 2-201:26 at 337 (3d ed. 2004) ................................................................................................. 13

MURRAY ON CONTRACTS,
§ 79(B) (4th ed. 2001) ............................................................................................... 14, 32

PROSSER AND KEETON ON THE LAW OF TORTS § 129 at 995 (5th ed. 1984) ........................................... 14

RESTATEMENT (SECOND) OF CONTRACTS,
§ 17 cmt. c (1981) ................................................................................... 9, 14, 32, 38

RESTATEMENT (SECOND) OF TORTS § 766 .......................................................................................... 9

RESTATEMENT (SECOND) OF TORTS,
§ 767 cmt. c (1979) ................................................................................................. 38

WEINSTEIN'S FEDERAL EVIDENCE
§ 611.06[3] (2d ed. 1997) ........................................................................................... 33, 34

White & Summers,
UNIFORM COMMERCIAL CODE § 3-3 (4th ed. 1995) ................................................................. 25, 26

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff Cryovac, Inc. ("Cryovac") and defendant Pechiney Plastic Packaging, Inc. ("Pechiney") compete in the food packaging industry. Pechiney is the larger company and the market leader in many industry market segments. This dispute, however, involves one of the market segments in which Cryovac is the market leader – plastic packaging for fresh red meat. The claims in this lawsuit – patent infringement, tortious interference with contractual relations, and tortious interference with prospective contractual relations – stem from Pechiney's unlawful attempts to capture Cryovac's fresh red meat packaging business by making, selling and offering to sell ClearShield-brand bone-in fresh red meat packaging products.

The summary judgment record demonstrates that before it developed ClearShield, Pechiney could not effectively compete with Cryovac. This was because Pechiney lacked a bone-in packaging product. Potential customers like long-time Cryovac customer National Beef Packing, LLC ("National Beef") had, for example, told Pechiney that they would only deal with manufacturers (like Cryovac) who could supply a full line of packaging products, including a bone-in fresh red meat packaging product. The record demonstrates that . Pechiney eventually concluded that the only way to capture market share from Cryovac was to develop a bone-in product.

While developing its bone-in product, Pechiney learned about the patent in suit. The record shows that Pechiney grew concerned it might infringe Cryovac's patents if it commercialized its product, but nonetheless decided to fund commercialization of ClearShield after determining that the

REDACTED        Around the same time, Pechiney faced significant layoffs in its boneless packaging manufacturing plant. Following its strategy to capture share in the fresh red meat packaging market segment by using a bone-in product to sell its boneless packaging products, Pechiney stepped-up the development of ClearShield and aggressively pursued exclusive supply contracts with several Cryovac customers in hopes of avoiding the expected layoffs. When it finally landed the National Beef account, Pechiney had not only found a customer for its new bone-in packaging product, but had found a customer to fill its boneless packaging manufacturing capacity. In so doing, however, Pechiney infringed Cryovac's '419

patent and tortiously interfered with Cryovac's contractual relations and prospective contractual relations with National Beef. This lawsuit followed.

Pechiney now moves for partial summary judgment on Cryovac's tortious interference claims, D.I. 197. Pechiney asserts four theories in defense of these claims, none of which is supported by applicable law or the record. Because the record contains more than sufficient evidence from which a jury could find that Pechiney committed tortious interference, Pechiney's motion for partial summary judgment should be denied.

## SUMMARY OF ARGUMENT

1.      Pechiney's preemption argument is premised on a fundamentally flawed view of conflict preemption. There is no conflict preemption here: Cryovac's tortious interference claims require different elements of proof than does its patent infringement claim. The tortious interference claims, moreover, are not an attempt to offer patent-like protection to subject matters addressed by federal law and do not stand as obstacles to the accomplishment and execution of the full purposes and objectives of the federal patent laws.

2.      Pechiney next argues that it cannot be liable for tortious interference because the record is devoid of proof of any contract between Cryovac and National Beef. According to Pechiney, any evidence of such contracts should be barred by UCC § 2-201, the UCC statute of frauds. Pechiney, however, lacks standing to raise a statute of frauds defense to Cryovac's contracts with National Beef. Well-settled Uniform Commercial Code and common law expressly prohibit third parties from relying on the statute of frauds to defend against claims for tortious interference. Pechiney also never pled the statute of frauds as an affirmative defense, a defect that is in itself fatal.

3.      Substantively, a statute of frauds defense can succeed only if Pechiney establishes as a matter of law that Cryovac's two contracts with National Beef are not requirements contracts. This it cannot do, based on the record evidence and well-settled rules used to interpret contracts for the sale of goods. Under these rules, any agreement can be proved to be a requirements contract either (i) expressly or by implication from the written words used by the parties to express their agreement or (ii) through extrinsic evidence, including course of dealing, usage of trade, course of performance, and, unless expressly and unambiguously prohibited by the parties' writings, parol evidence. See UCC § 1-201(3) (definitions of contract and

2

agreement), § 2-202 (interplay between written terms and course of dealing, trade usage, course of performance, and parol evidence), and § 2-204(3) (formation in general). Contrary to Pechiney's argument, these well-settled rules are not discarded when the statute of frauds is raised or when a requirements contract is at issue. And any writing signed by National Beef can be used to demonstrate compliance with the statute of frauds.

The record evidence – the written agreements, other contemporaneous writings, extensive course of dealing, course of performance, and usage of trade evidence – is more than sufficient to satisfy the statute of frauds and to allow a reasonable fact finder to conclude that National Beef entered into enforceable requirements contracts with Cryovac. In sum, because Pechiney cannot demonstrate, as a matter of law, that Cryovac did not have any requirements contracts with National Beef, Pechiney is not entitled to summary judgment on Cryovac's tortious interference claims.

4.    Pechiney has also failed to demonstrate as a matter of law that it lacked knowledge of Cryovac's contracts with National Beef. To show knowledge in a tortious interference claim, the plaintiff need only prove constructive or inquiry notice. Here, more than sufficient evidence exists from which a reasonable jury could conclude that Pechiney had at least constructive, if not actual, knowledge of Cryovac's contracts with National Beef.

5.    Pechiney finally fails to demonstrate that its purported "good faith" in attempting to avoid infringing Cryovac's patent somehow shields it from liability for tortious interference. There is ample record evidence upon which a reasonable fact finder could conclude that Pechiney acted wrongfully and without justification. Moreover, where the conduct that constitutes the interference was in violation of a statute – here, the federal patent law – that violation in and of itself is enough to constitute wrongful interference.

## COUNTER-STATEMENT OF FACTS

### A.    The Parties.

Cryovac is a subsidiary of Sealed Air Corporation, a company operating internationally with $3.8 billion net sales in 2004. Cryovac's primary business is manufacturing and selling flexible packaging,

3

including shrink bag and film products, laminated films, and packaging systems, for a broad range of perishable foods. Cryovac's 2004 net sales internationally exceeded $1.5 billion.

Pechiney Plastic Packaging, Inc. is a wholly-owned subsidiary of Alcan Inc. Pechiney's net sales exceeded $2 billion in 2003, its last year of independent reporting before being acquired by Alcan. It is believed that Pechiney's net sales in the food industry exceeded $3.6 billion in 2004.

B.    The Fresh Red Meat Flexible Packaging Market.

Cryovac and Pechiney compete in many market segments. Pechiney is the market leader in many of those market segments, but in the fresh red meat market segment Cryovac is the market leader.

REDACTED                          '. The

fresh red meat market segment primarily consists of five product lines – flexible packaging for bone-in cuts of meat, flexible packaging for boneless cuts of meat, laminate packaging for ground beef, and trays and case-ready lidding films. When Pechiney embarked on the development of its infringing ClearShield product in 2001,

REDACTED

4

C.    Cryovac's Requirements Contract with National Beef.

Cryovac's tortious interference claims stem from Pechiney's intentional interference with Cryovac's lengthy and ongoing contractual relationship with third-party customer National Beef. National Beef is a beef-packer with plants in Dodge City and Liberal, Kansas, along with executive offices in Kansas City, Missouri. National Beef processes thousands of cattle every day in its two plants, and to support its operations National Beef purchases a variety of packaging materials, including flexible packaging for bone-in cuts of meat, flexible packaging for boneless cuts of meat, and laminate packaging for ground beef. National Beef also purchases trays and case-ready lidding films for use at its case-ready packaging plants.

In the late 1990s, National Beef approached Cryovac about becoming the sole supplier for all of National Beef's bone-in and boneless flexible packaging requirements, and Cryovac and National Beef entered into four written requirements contracts, plus several amendments to those agreements, over the next six years.

REDACTED

Pechiney tortiously interfered with two of those contracts – a contract entered into on March 20, 2003 (the "March 2003 Requirements Contract") and a contract entered into on January 14, 2004 (the "January 2004 Requirements Contract").[1]  The March 2003 Requirements Contract had a three year term – from January 1, 2003 through December 31, 2005; the January 2004 Requirements Contract was intended to replace the March 2003 Requirements Contract, it had a four year term – from January 1, 2004 through December 31, 2007. Cryovac seeks damages for Pechiney's tortious interference with each requirements contract.[2]

---

[1]    The March 2003 and January 2004 Requirements Contracts are appended to this brief. We note that Pechiney's motion does not contend that the January 2004 Requirements Contract is unenforceable because it is unsigned.

[2]    Pechiney's brief focuses solely on the January 2004 Requirement Contract. Cryovac's damages expert, however, opined on damages from both contracts, and Pechiney took discovery on both contracts and their terms. See, e.g., Deposition of Carl Deily ("Deily Dep.") at 137-159, 297-98.

5

Both the March 2003 and January 2004 Requirements Contracts contained express written terms showing that National Beef agreed to purchase the listed products exclusively from Cryovac. For example, the March 2003 Requirements Contract states:

REDACTED

(emphasis added). This provision and similar provisions in the January 2004 Requirements Contract expressly prohibit National Beef from purchasing the identified goods from other sources unless specifically released from the agreements. The January 2004 Requirement Contract, moreover, expressly states that it

REDACTED

Extensive negotiations, course of dealings, and a lengthy period of exclusive course of performance also objectively manifest National Beef's intent to enter into requirements contracts with Cryovac. For example, while negotiating the March 2003 Requirements Contract National Beef talked to Cryovac about

REDACTED

. National Beef conceded that this and similar e-mails were designed to

REDACTED

### D.   Pechiney's Tortious Interference.

As set forth above, Pechiney viewed bone-in packaging products as necessary to

REDACTED

6

REDACTED

Pechiney discovered claim 11 of Cryovac's '419 patent

REDACTED

When it came time to approve the

capital expenditures necessary to commercialize Pechiney's new product,

REDACTED

. At the same time, however, Pechiney

REDACTED

Pechiney then decided to obtain a non-infringement opinion to shield its activities, and Pechiney's

outside counsel delivered a two page non-infringement opinion on the '419 patent.    REDACTED

. The record evidence shows that such opinion was insufficient on its face. For example, the opinion

REDACTED

7

In any event, armed with its opinion Pechiney committed over

REDACTED

By late summer-2003

Pechiney was searching for a customer for its new product. Around that same time Pechiney

REDACTED

In the fall of 2003, as Pechiney struggled to avoid layoffs,

REDACTED

. Becoming more and more desperate to land a

large account, Pechiney proposed

REDACTED

. At this point, Pechiney's deal became too good for National Beef to turn down. The infringing

ClearShield product had finally given Pechiney the ability to "effectively compete" against Cryovac.

8

## ARGUMENT

### I.    FEDERAL PATENT LAW DOES NOT PREEMPT CRYOVAC'S TORTIOUS INTERFERENCE CLAIMS.

Pechiney's preemption arguments are premised on a flawed understanding of the doctrine of conflict preemption and a misreading of the applicable caselaw. For the doctrine of conflict preemption to apply, state law must <u>actually conflict</u> with federal law. <u>Hunter Douglas v. Harmonic Design, Inc.,</u> 153 F.3d 1318, 1332 (Fed. Cir. 1998). There is no such conflict here.

### A.    Cryovac's State Law Tortious Interference Claims Contain Additional Elements of Proof Not Found in Federal Patent Law.

If state law claims contain additional elements of proof beyond those in the federal patent law, and if such claims are not an attempt "to offer patent-like protection to subject matters addressed by federal law," there is no conflict preemption. <u>Dow Chem. Co. v. Exxon Corp.,</u> 139 F.3d 1470, 1473 (Fed. Cir. 1998) (ruling tortious interference claims not preempted by federal patent law). <u>See also Rodime PLC v. Seagate Tech., Inc.,</u> 174 F.3d 1294, 1306 (Fed. Cir. 1999) (same). This is true "even if the state law claim requires the court to adjudicate a question of federal patent law." <u>Dow Chem.,</u> 139 F.3d at 1473.

Cryovac's tortious interference claims require different and additional elements than those which are necessary to establish its patent infringement claim. Patent infringement is a "strict liability offense" in which "a court must award damages adequate to compensate for infringement, regardless of the intent, culpability or motivation of the infringer." <u>Jurgens v. CBK, Ltd.,</u> 80 F.3d 1566, 1570 n.2 (Fed. Cir. 1996). In contrast, a claim for tortious interference lies when a person "<u>intentionally and improperly interferes</u> with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract." RESTATEMENT (SECOND) OF TORTS § 766 (emphasis added).

Specifically, to establish a claim for tortious interference with contractual relations, a plaintiff must establish the existence of (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury. <u>Aspen Advisors LLC v. UA Theatre Co.,</u> 861 A.2d 1251, 1265 (Del. 2004); <u>Tri-Cont'l Leasing Co. v. Neidhardt,</u> 540 S.W.2d 210, 212 (Mo. Ct. App. 1976) (stating the same elements under Missouri law).

9

Similarly, the elements of a claim for tortious interference with prospective contractual relations are
(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or
expectancy on the part of the interferer, (3) intentional interference which induces or causes a breach or
termination of the relationship or expectancy, (4) without justification, and (5) resulting in damages to the
party whose relationship or expectancy has been disrupted. McHugh v. Bd. of Educ., 100 F. Supp. 2d 231,
247 (D. Del. 2000); Carter v. St. John's Reg'l Med. Ctr., 88 S.W. 3d 1, 13 (Mo. Ct. App. 2002) (stating the
same elements under Missouri law).

Both causes of action contain additional elements beyond those in the federal patent law. To hold
Pechiney liable for patent infringement, for example, it is not necessary, as it is for the tortious interference
claims, to establish that Cryovac was selling or had an expectation of selling any product, that Pechiney had
any knowledge of those sales or expectations, that Pechiney acted with intent while interfering with
Cryovac's existing or expected business, or that Pechiney acted wrongfully or lacked justification for the
conduct. The elements of proof for state law claims of tortious interference with contract and prospective
contractual relations are therefore "markedly different" than a claim for patent infringement and are not
preempted by federal patent law. Cf. Dow Chem., 139 F.3d at 1478 ("that the source of proof of bad faith,
just one element of the tort, was purported inequitable conduct before the PTO, does not make this tort a
patent issue preempted by federal law.").[3]

Pechiney's reliance on CLI Corp. v. Ludowici USA, 2001 U.S. Dist. LEXIS 23374 (W.D. Pa. Nov.
14, 2001), a four paragraph order that cites only to Hunter Douglas and provides no analysis or explanation as
to the result reached, is misplaced because the order contradicts Federal Circuit precedent. The district court

---

[3]    In contrast, courts have found state law causes of action to be preempted where the state statute as
pleaded did not contain as a necessary element of the offense any act beyond that necessary to
establish liability under federal patent law. See, e.g., Semiconductor Energy Lab. Co. v. Samsung
Elecs. Co., 204 F.3d 1368, 1381-82 (Fed. Cir. 2000) (state law RICO claim preempted by federal
patent law because state statute as pleaded did not contain as necessary elements of the offense any
acts beyond those necessary to establish federal patent inequitable conduct claim); Abbott Labs. v.
Brennan, 952 F.2d 1346, 1357 (Fed. Cir. 1991) (state law abuse of process claim preempted by
federal patent law because the elements of the abuse of process claim were the same as inequitable
conduct claim).

10

held in <u>CLI Corp.</u> that a state law tortious interference claim was preempted by federal patent law merely because "the 'absence of privilege or justification' prong of the [tortious interference] test will require resolution of the patent infringement issue." <u>CLI</u>, 2001 U.S. Dist. LEXIS 23374, at *3. But the Federal Circuit requires the question to be asked in the other direction: <u>if a valid claim for patent infringement would exist under the facts as pleaded, is a claim for tortious interference also established without proof of additional elements</u>? Because the answer to that question is "no," Pechiney's claim of preemption should fail. <u>Dow Chem.</u>, 139 F.3d at 1473.

Finally, Pechiney's attempt to distinguish <u>Rodime PLC v. Seagate Tech., Inc.</u>, 174 F.3d 1294 (Fed. Cir. 1999), fails. Pechiney asserts that Cryovac's tortious interference claims are different than those at issue in <u>Rodime</u> because they are "entirely dependent upon a finding that Pechiney willfully infringed Cryovac's '419 patent . . . [and] are therefore entirely subsumed within [Cryovac's] patent infringement claims." D.I. 198 at 17 n.8. Pechiney, however, ignores the clear language in <u>Rodime</u> that reaffirms the ruling in <u>Dow Chemical</u>, e.g. claims are not preempted where they "include additional elements not found in the federal patent law." <u>Rodime</u>, 174 F.3d at 1306. There are many such elements here, including the existence of the National Beef contracts and Cryovac's business expectancies, Pechiney's knowledge of the contracts and of Cryovac's business expectancies, and Pechiney's intentional acts in taking National Beef business from Cryovac. Moreover, the intent element in a tortious interference claim does not go to the wrongful conduct (here, patent infringement), but rather goes to the element of interference. <u>See</u> <u>Bell v. May Dep't Stores Co.</u>, 1998 Mo. App. LEXIS 1510, at *24 (Mo. Ct. App. 1998) ("The element of 'intentional interference' may also be found if the actor knows that the interference is certain or substantially certain to occur as a result of its action."); <u>see generally</u> <em>infra</em> at Argument V.

### B. Cryovac's State Law Tortious Interference Claims Are Not Obstacles To The Purposes And Objectives Of The Federal Patent Law.

Pechiney separately asserts that the tortious interference claims should be preempted because they are "insurmountable obstacles to the accomplishment and execution of the full purposes and objectives of Congress under federal patent law." D.I. 198 at 18. However, the purposes and objectives of the patent law are not in any way impeded by the assertion of tortious interference and patent infringement claims against an

11

alleged infringer where both claims are based on a common – but not coextensive – underlying act. Indeed, Pechiney fails to even identify the "purposes and objectives" of the patent law, much less explain how state law tortious interference claims are insurmountable obstacles to those purposes and objectives.

As discussed above, in Dow Chemical, the Federal Circuit specifically ruled that state law causes of action for tortious interference with existing or prospective contracts were not preempted by federal patent law precisely because they did not have "any discernible effect" on the purposes and objectives of the federal patent laws, namely, the incentive to invent, the full disclosure of ideas, or the principle that ideas in the public domain remain in the public domain. Dow Chem., 139 F.3d at 1474. This is particularly the case because these state law torts are devoted to an entirely different purpose – "the protection of the integrity of commercial contracts." Dow Chem., 139 F.3d at 1475. Such a purpose is, as the United States Supreme Court has noted, "traditionally [within] the domain of state law," and state law claims protecting such matters are not to be casually tossed aside merely because they relate to intellectual property which may or may not be patentable, so long as those claims are not inconsistent with federal law. Aronson, 440 U.S. __, 262 (1979); Dow Chem., 139 F.3d at 1474.

Pechiney's reasons as to why Cryovac's tortious interference claims pose "insurmountable obstacles to the accomplishment and execution of the full purposes and objectives of Congress under federal patent law" have no legal support. First, Pechiney's argument that permitting Cryovac to recover damages "in excess of a reasonable royalty" would somehow circumvent 35 U.S.C. § 284 is without merit, since under the clear language of the statute a reasonable royalty is only the minimum measure of recovery. See 35 U.S.C. § 284. Second, Pechiney's argument that permitting Cryovac to recover punitive damages would conflict with Federal Circuit law regarding the burden of proof or the amount of damages for willful infringement not only fails to cite to a single case (the cases Pechiney cites only identify the burdens of proof), but also rests on Pechiney's continuing and erroneous attempt to link Cryovac's tortious interference claims to the willful infringement aspect of its patent claim, while the validity of the tortious interference claims do not depend on a finding of willful infringement (see infra at Argument V).

Finally, Pechiney cannot support its argument that Cryovac's tortious interference claims pose an insurmountable obstacle to the purposes and objectives of the federal patent law because of the possibility of a

12

double recovery of damages. "The law is clear that the jury may award separate damages for each claim, leaving it to the judge to make appropriate adjustments to avoid double recovery." Bowers v. Baystate Techs., Inc., 320 F.3d 1317, 1327 (Fed. Cir. 2003) (citations omitted).[4] For all these reasons, Pechiney's motion for summary judgment on the ground of conflict preemption should be denied.

## II. PECHINEY LACKS STANDING TO RAISE A STATUTE OF FRAUDS-BASED DEFENSE.

Before the Court can address Pechiney's statute of frauds argument, Pechiney must establish that it has standing to raise this defense. Pechiney cannot establish standing because it was not a party to the National Beef contract. Comment 4 to the UCC statute of frauds expressly refers to tortious interference claims and provides that third parties are not entitled to raise the statute of frauds:

> Nor would the Statute of Frauds provisions of this section be a defense to a third person who wrongfully induces a party to refuse to perform an oral contract, even though the injured party cannot maintain an action for damages against the party so refusing to perform.

UCC § 2-201, cmt 4. See generally 2 Larry Lawrence, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2-201:26 at 337 (3d ed. 2004) ("The defense of the statute of frauds cannot be raised by third persons, tortfeasors, or creditors.").

The common law is the same. Powell v. Leon, 239 P.2d 974, 978 (Kan. 1952) ("In this state the fact a contract must be in writing in order to be enforceable, as between the parties, is of no concern to a third and intermeddling party and cannot be invoked by him for his benefit. Third parties whose intermeddling is the sole cause of frustrating the consummation of such oral contract are liable in damages to an injured party.") (internal citations omitted); Young v. Pottinger, 340 So. 2d 518, 519-20 (Ct. App. Fl. 1976) ("[Defendants] are not in a position to raise the defense of the statute of frauds against this suit for tortious interference. It is

---

[4]    Pechiney continues to misstate the standard for recovery of lost profits in a patent case. Contrary to Pechiney's assertions, Panduit is not the exclusive standard for determining lost profits and this its argument that Cryovac's tortious interference claims somehow circumvent Panduit are nothing more than very large red herrings. WMS Gaming Inc. v. Int'l Game Tech., 184 F.3d 1339, 1361 (Fed. Cir. 1999) (stating that "[t]he district court's methodology for computing damages is discretionary") (affirming the court's award of lost profits based on a market share approach); Advanced Med. Optics, Inc. v. Alcon Inc., 361 F. Supp. 2d 404 at 418 (D. Del. 2005) (the four factor Panduit test is only "[o]ne acceptable means" to establish entitlement to lost profit damages") (emphasis added).

irrelevant to this suit whether the Sandbergs could have successfully raised the defense of the statute of frauds had the plaintiffs chosen to sue them."); Clements v. Withers, 437 S.W.2d 818, 821 (Tex. 1969); see generally W. Page Keeton, et al., PROSSER AND KEETON ON THE LAW OF TORTS § 129 at 995 (5th ed. 1984).

Second, Federal Rule of Civil Procedure 8(c) requires parties to "set forth affirmatively" the "statute of frauds" as a defense. Pechiney did not plead this defense, even in its answer to the Second Amended Complaint filed on October 24, 2005. See D.I. 217. Failure to plead the defense is fatal. John Edward Murray, Jr., MURRAY ON CONTRACTS, § 79(B) (4th ed. 2001) (The statute of frauds "must be pleaded as an affirmative defense and failure to do so amounts to a waiver of the defense.").

III.    PECHINEY IS NOT ENTITLED TO SUMMARY JUDGMENT
        BECAUSE IT CANNOT SHOW AS A MATTER OF LAW THAT THE
        MARCH 2003 AND JANUARY 2004 REQUIREMENTS CONTRACTS
        ARE UNAMBIGUOUSLY NOT REQUIREMENTS CONTRACTS.

Pechiney asserts that the undisputed facts demonstrate Cryovac and National Beef never had an enforceable contract because "the alleged contract fails to contain the written quantity term required for enforceability under Section 2-201 of the UCC." This argument incorrectly conflates the role of § 2-201 and other, equally important UCC provisions,[5] and it also misconstrues the factual record in this case. In fact, correct application of the UCC establishes that the record in this case satisfies the statute of frauds and contains more than sufficient evidence of binding requirements contracts between Cryovac and National Beef. At a minimum, the record contains genuine disputes as to whether such agreements existed.

Under the UCC as it is meant to be applied, a contract is "the total legal obligation which results from the parties' agreement," and the agreement is "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." UCC § 1-201(3) & (11) (emphasis added). The UCC thus modifies the common law and makes course of dealing, usage of trade, and course of performance part of every contract. Nanakuli Paving & Rock Co. v. Shell Oil Co., 664 F.2d 772, 795 (9th Cir. 1981).

---

[5]    Cryovac agrees with Pechiney that, for purposes of this motion, a final decision on choice of law is not required, although we note that Delaware law also may govern the Cryovac/National Beef contractual relationship. See RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 6(g), § 188(2)(e).

14

Next, the existence and terms of a contract are determined by UCC §§ 2-202 and 2-204, not the UCC statute of frauds, § 2-201. Zemco Mfg., 186 F.3d at 817-18 (evaluating formation and compliance with statute of frauds separately); O.N. Jonas Co. v. Badische Corp., 706 F.2d 1161, 1165 (11th Cir. 1983) (same). Section 2-204(3), titled "Formation in general," holds that every contract for the sale of goods is enforceable if "the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." After making this determination, § 2-202 provides the tools to identify the specific terms of the parties' agreement. Section 2-202, in a change from the common law of contracts, expressly incorporates into the terms of the parties' writing (a) all course of dealing and course of performance that does not contradict the writing, and (b) parol evidence unless expressly agreed to the contrary by the parties.

Finally, an unambiguous expression of quantity is not needed to satisfy the statute of frauds. In the words of one of the principal cases relied upon by Pechiney, all that is required is "something, anything, in the writing that might evidence the quantity dimension of [plaintiff's] claim." Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 795 (4th Cir. 1989). The "something, anything" standard stems from the purpose of the statute of frauds – corroborating that an alleged oral contract in fact exists. As a result, an "adequate memorandum can be in almost any form," Impossible Elecs. Techniques, Inc. v. Wackenhut Protection Sys., Inc., 669 F.2d 1026, 1033-34 (5th Cir. 1982), and all of the tools provided in § 2-202 can be used to explain why a writing reflects an agreement on quantity and thereby satisfy the statute of frauds. See, e.g., Zemco Mfg., 186 F.3d at 821; O.N. Jonas, 707 F.2d at 1165; Riegel Fiber Corp. v. Anderson Gin Co., 512 F.2d 784, 788-89 (5th Cir. 1975); Am. Original Corp. v. Legend, Inc., 652 F. Supp. 962, 965-68 (D. Del. 1986).

Thus, the proper UCC analysis has three steps:

1.    Decide whether the parties did, in fact, enter into a contract;

2.    Identify the terms the parties agreed to; and

3.    Determine, if applicable, whether a writing reflects the parties agreement as to quantity, thereby making the agreement enforceable under the statute of frauds.

In sum, Pechiney is entitled to summary judgment on the non-existence of an agreement between Cryovac and National Beef only if it can be said, as a matter of law, based on all of the record evidence, that the contract unambiguously is not a requirements contract and that no writing reflects the quantity agreed by

15

the parties. See, e.g., Zemco Mfg., Inc. v. Navistar Int'l Trans. Corp., 186 F.3d 815, 818, 821 (7th Cir. 1999) (reversing grant of summary judgment because text of contract language ("buyer may purchase") ambiguous and because exclusive historical course of dealing crated a "genuine issue of triable fact").

### A.    Cryovac and National Beef Intended to Enter into a Contract.

The first question is whether the parties intended to enter into a contract. This inquiry should be conducted from the vantage point of an objectively reasonable person in the position of the contracting parties. See Demetree v. Commonwealth Trust Co., 1996 Del. Ch. LEXIS 112, at *11 Del. Ch. (Aug. 27, 1996) ("the contract's construction should be that which would be understood by an objective reasonable third party"); Caniglia v. Nigro Corp., 441 S.W.2d 703, 712 (Mo. 1969). Under this test, there should be no question that National Beef and Cryovac intended to enter into a contract.

For example, the March 2003 Requirements Contract describes itself as

REDACTED

Objectively reasonable people in the position of the contracting parties would understand from this language that National Beef and Cryovac intended to enter into a contract. In fact, this court relied on similar "words of commitment and legal terms of art" to reject a claim that "the parties intended [their] agreement to be only an 'arrangement' that either party could repudiate at will." Am. Original Corp. v. Legend, Inc., 652 F. Supp. 962, 965 (D. Del. 1986). See also Universal Power Sys., Inc. v. Godfather's Pizza, Inc., 818 F.2d

16

667, 671 (8th Cir. 1987) (use of words "confirm" and "intention" sufficient to enable a reasonable factfinder to conclude that "a contract had been reached between the parties") (applying Missouri law).

Second, National Beef's conduct while negotiating the March 2003 and January 2004 Requirements Contracts objectively manifests its intent to enter into a binding agreement. For example,

- 

- 

REDACTED

- 

- 

- 

Compare Kansas Power & Light Co. v. Burlington N. R. Co., 740 F.2d 780, 789 (10th Cir. 1984) (internal memorandum stating that it would be performing and estimating revenue under the agreement held sufficient to objectively demonstrate the existence of a contract) (applying Kansas law).

**B.    The Written National Beef/Cryovac Agreements Are Alone Sufficient to Establish that National Beef Agreed to Purchase Its Requirements of the Identified Goods.**

The test for a requirements contract is straightforward – does the parties' agreement objectively demonstrate that the buyer committed to purchase all or some portion of its requirements of the identified goods from the seller? Essco Geometric v. Harvard Indus., 46 F.3d 718, 728 (8th Cir. 1995) (Missouri law); Kansas Power & Light Co. v. Burlington N. R. Co., 740 F.2d 780, 789 (10th Cir. 1984) ("The agreement need

---

6    See also

REDACTED

Compare UCC § 2-201(2) (between merchants statute of frauds satisfied by obligee not objecting to writing in 10 days).

17

not specifically require the buyer to forego other supply sources if the practical effect is the same.") (applying Kansas law); see also D.I. 198 at 20 (acknowledging that quantity terms in requirements contracts are "normally characterized by the buyer's promise to buy exclusively from that seller").

"The promise to purchase exclusively from one supplier may be either implicit or explicit." Cyril Bath Co. v. Winters Indus., 892 F.2d 465, 467 (6th Cir. 1989). Moreover, "the UCC does not require certain particular words to enforce a requirements contract." Essco Geometric, 46 F.3d at 728. Any writing that shows a requirements contract will also satisfy the statue of frauds. See, e.g. Kansas Power & Light, 740 F.2d at 789; see generally *infra* at 22-23.

The first place to look for the required exclusivity is in the written memorial of the parties' agreement. Both the March 2003 and January 2004 Requirements Contracts contain express contractual provisions that objectively demonstrate National Beef committed to purchase its requirements of the identified products exclusively from Cryovac. For example, the March 2003 Requirements Contract provides that:

REDACTED

(emphasis added). The January 2004 Requirements Contract has a similar new technology provision:

REDACTED

The January 2004 Requirements Contract also provided National Beef with the right to

REDACTED

Id. (emphasis added).

18

Courts have found the exclusivity needed to form a requirements contract from written contract terms just like these. For example, the contract in <u>Crown Laundry & Dry Cleaners. Inc. v. United States,</u> 29 Fed. Cl. 506 (Fed. Cl. 1993), contained the following release provision:

> <u>If</u>, for any reason, <u>the Contractor fails to perform</u> any services covered by this contract, <u>the Government may</u>, if the Contracting Officer determines that the mission . . . may be adversely impacted, perform or <u>supplement performance of such contract services with</u> the Government personnel or by <u>separate contract with another contractor</u>. Such performance shall not constitute a breach of contract by the Government.

29 Fed. Cl. at 519 (emphasis added). According to the Court of Claims, there would have been no need to give the Government permission to enter into a separate contract for the same services unless the "contract was for requirements." <u>Id.</u> Indeed, according to the court, under any other interpretation of the contract this provision would be "rendered meaningless." <u>Id.</u> The court then examined the parol evidence and the parties' course of dealing, found them to objectively manifest intent to enter into a requirements contract consistent with this provision, and held as a matter of law that the parties had in fact formed a requirements contract. <u>Id.</u>

The Eighth Circuit reached a similar result in <u>Porous Media Corp. v. Midland Brake, Inc.,</u> 220 F.3d 954 (8th Cir. 2000), under Minnesota law. Faced with the appeal of a jury verdict and the denial of a motion for judgment as a matter of law, the court examined a contract provision stating:

> <u>MIDLAND reserves the right</u> to resource SPIN-ON DESICCANT CANISTERS or COALESCERS that do not use POROUS MEDIA proprietary design <u>if POROUS MEDIA fails to produce [products]</u> to original or mutually agreed upon quality levels <u>[or if Porous is late for delivery]</u>.

<u>Id.</u> at 959 (emphasis added) (other alterations in original). The court held that "a reasonable jury could have found that [this paragraph] was a requirements contract." <u>Id.</u> at 960. According to the court:

> [This paragraph] gave Midland the right to "resource" *only* if Porous supplied low-quality items or if Porous was late for a delivery or series of deliveries. The likely and reasonable interpretation of this clause is that, absent one of the specified failures by Porous, Midland was required to purchase all the canisters and coalescers it needed from Porous.

<u>Id.</u> (emphasis in original). <u>See also</u> <u>Ceredo Mortuary Chapel v. United States,</u> 29 Fed. Cl. 346, 351-52 (Ct. Cl. 1993) (relying on release provision, among other facts, to find requirements contract).

As stated by the Tenth Circuit applying Kansas law, "[t]he agreement need not specifically require the buyer to forego other supply sources if the practical effect is the same." <u>Kansas Power & Light Co. v. Bur-</u>

19

lington N. R. Co., 740 F.2d 780, 789 (10th Cir. 1984). Here, as in Crown Laundry and Porous Media, there is

nothing in the March 2003 Requirements Contract    REDACTED    ' unless

National Beef had committed to exclusively purchase from Cryovac. Likewise, there was no need in the Jan-

uary 2004 Requirements Contract for National Beef·    REDACTED

       unless National Beef had committed to exclusively purchase from Cryovac. And,

there was no need in the January 2004 Requirements Contract to give National Beef

REDACTED    ꞇ

       unless National Beef had committed to exclusively purchase from Cryovac. Indeed, there was no

need to    REDACTED    ' unless National Beef had

committed to exclusively purchase from Cryovac.[7]

      Where the writing is sufficient to show a requirements contract, the writing also satisfies the statute of

frauds See, e.g., O.N. Jonas Co. v. Badische Corp., 706 F.2d 1161, 1165 (11th Cir. 1983) (relying in part on

trademark licensing agreement for the goods, "which was to remain in effect subject to cancellation by either

party on ninety days notice[,]" to satisfy the statute of frauds); Kansas Power & Light, 740 F.2d at 789; UFE

Inc. v. Methode Elecs.. Inc., 808 F. Supp. 1407, 1412 (D. Minn. 1992) (holding that language stating

customer will purchase from supplier for as long as supplier "perform[s] to mutually agreed ... standards"

sufficient to satisfy statute of frauds).

      These are not the only written provisions that prevent Pechiney from meeting its burden. For

example, the two contracts require Cryovac to

REDACTED

---

[7]    If the Court finds this analysis persuasive, the Court is permitted to *sua sponte* declare that these
agreements are requirements contracts. See, e.g., Gibson v. Mayor & Council of Wilmington, 355
F.3d 215, 224 (3d Cir. 2004).

[8]    REDACTED

20

REDACTED                          Objective, reasonable

persons in the position of the contracting parties would therefore understand this provision to reflect National

Beef's agreement to        REDACTED        , if not all of its requirements, per year from

Cryovac. Demetree, 1996 Del. Ch. LEXIS 112, at *11.

    Other parts of the agreements also objectively demonstrate that National Beef had at least obligated

itself to significant minimum annual purchases that approximated National Beef's expected annual

requirements. For example, the January 2004 Requirements Contract states in the introductory paragraph that

REDACTED

, coupled with parol evidence and course of

dealing, are sufficient to establish the existence of an enforceable requirements contract under Kansas law.

See Kansas Power & Light, 740 F.2d at 789.

    The introductory paragraph of the January 2004 Requirements Contract further states that

REDACTED

                                              Similarly, the March 2003

Requirements Contract states that

REDACTED

    They should more than suffice to satisfy the statute of frauds.

Pechiney may attempt to argue that these numerical terms are merely

REDACTED        This is a factual argument that cannot be resolved on

summary judgment, however. Moreover, the statute of frauds does not require a precise quantity term, just

some indication of quantity. UCC § 2-201 cmt. 1 ("All that is required is that the writing afford a basis for

21

believing that the offered oral evidence rests on a real transaction",); see, e.g., Kline. Inc. v. Lorillard. Inc.,
878 F.2d 791, 795 (4th Cir. 1989) (statute of frauds satisfied if "there is ... something, anything, in the writing
that might evidence the quantity dimension of [plaintiff's] claim") (cited on page 26 of Pechiney's brief);
Upsher-Smith Lab. v. Mylan Lab., 944 F. Supp. 1411, 1426, 1427 (D. Minn. 1996) ("A writing, which
confirms a requirements contract, comports with the Statute of Frauds when there is some language present
'which indicates that the quantity to be delivered under the contract is a party's requirements or output.'")
(emphasis added) (citations omitted).

Because so little is required, many courts have found the statute of frauds satisfied and permitted
juries to decide whether contract language sufficed to constitute requirements contracts on much flimsier
writings than the writings that exist here. For example, in O.N. Jonas Co. v. Badische Corp., 706 F.2d 1161
(11th Cir. 1983), "in the context of the business dealings" between the parties, the following internal
memorandum "suffice[d] to meet the statute of frauds requirement for a signed memorandum evidencing a
sale of a specified quantity of goods:"

> A potential program utilizing our yarn was discussed in 1977 and we indicated that we
> would supply the yarn if we were provided a Heller guaranty on *our* form.

Id. at 1164, 1165. In Zemco Mfg.. Inc. v. Navistar Int'l Trans. Corp., 186 F.3d 815 (7th Cir. 1999), the statute
of frauds was satisfied where an internal memorandum reflected renewal of a previous requirements contract,
even though the memorandum did not contain any quantity term at all. Id. at 821.

In Pepsi-Cola Co. v. Steak 'N Shake. Inc., 981 F. Supp. 1149 (S.D. Ind. 1997), the court held that the
following language satisfied the statute of frauds where the agreement was alleged to be a requirements
contract:

> Steak 'N Shake "may direct in writing payment of all or any part of the said funds to its
> former soft drink distributor," which the court concluded "indicates that Steak 'N Shake
> would not have multiple suppliers of soft drinks;"
>
> Steak 'N Shake was required to have at least four Pepsi products and had "the option to add
> other Pepsi-Cola products," which the court concluded gave Steak 'N Shake the option "to
> add only other *Pepsi* products;" and
>
> Pepsi was to use best efforts to have soft-drink dispensing equipment and to provide
> maintenance free of charge.

22

Id. at 1158-59. The writings "viewed as an integrated whole, provide written evidence that a reasonable jury could find that the Contract was a requirements contract. Accordingly, the Statute of Frauds' requirement that the Contract's quantity be in writing is satisfied." Id.

In PMC Corp. v. Houston Wire & Cable Co., 797 A.2d 125 (N.H. 2002), the New Hampshire Supreme Court analyzed a writing that referred only to the buyer's expectation to purchase only a "major share" of the goods if the seller provided "competitive pricing, service, delivery, and the above rebate." Id. at 127. The court found that this language satisfied the statute of frauds, could be used by a jury to find a requirements contract, and affirmed use of parol evidence by the trial court to explain what the parties had intended by their writing. Id. at 128. The court reached this result even though "there was testimony that the letter was not intended by Houston to create a commitment to purchase a certain amount of its thermocouple products." Id. at 131.

Finally, in Universal Power Sys.. Inc. v. Godfather's Pizza, Inc., 818 F.2d 667 (8th Cir. 1987), the Eighth Circuit applied Missouri law and found that the following writing constituted a requirements contract based on the words "confirm" and "intention" and three plus years of exclusive course of dealing:

> This letter is to confirm Godfather's Pizza, Inc.'s intention to purchase the following products:
>
> 1. Godfather's pizza dish – 14 inch
>
> 2. Godfather's pizza dish – 12 inch
>
> 3. Godfather's pizza dish – 10 inch
>
> We are also looking at prototype samples of spatulas and service trays submitted by Universal Power Systems, Inc.
>
> Godfather's Pizza plans to use the pizza dishes in all company units providing the concept of pan pizza reaches final approval. Additionally, price competitiveness and consumer acceptability will be monitored. The above products can be made available for purchase by all franchise holders of Godfather's Pizza.[9]

---

[9]    The court also relied on an exclusive course of dealing to reach this conclusion. Id. ("Further, even if the instant contract was somewhat ambiguous as to exclusivity, the uncontroverted prior course of dealings between Universal and Godfather's showed that Universal had been Godfather's sole and exclusive supplier of thin crust pans for three and one-half years."). In this case, National Beef and Cryovac had engaged in exclusive dealing for six years.

23

Id. at 671. Although not a statute of frauds case, <u>Universal Power</u> shows how little is required to submit the requirements contract question to a jury, and, by implication, to satisfy the statute of frauds.

Finally, Pechiney's brief invites error by contending that the promise of exclusivity must be express, unequivocal and clear from the parties' writing itself. While Cryovac meets this standard, the contention is not supported even by the cases cited by Pechiney. For example, the <u>Merritt-Campbell, Inc.</u> court (applying Texas law) acknowledges that the "quantity term . . . need not be numerically stated" and that requirements contracts at their essence simply "prohibit[] the buyer from purchasing from another seller." 164 F.3d at 963. In contrast to the cases discussed above, the <u>Merritt-Campbell</u> and <u>Orchard Group</u> courts found no requirements contract because there was nothing at all in the writing to suggest that the buyer agreed to purchase exclusively from the seller. <u>Id.</u>; <u>Orchard Group</u>, 135 F.3d at 429-30. The <u>Simmons</u> court similarly looked to earlier contracts between the parties and contrasted those agreements, which had express quantity terms (either in terms of the buyer's requirements or the seller's output), with the writing at issue, which had none. 723 F.2d at 726.

In any event, Pechiney's own Rule 30(b)(6) witness on contract interpretation testified that

REDACTED

C.    **Pechiney's Analysis of the Parties' Negotiations, Course of Dealing and Course of Performance Evidence Is Legally and Factually Wrong.**

1.    **Pechiney Proposes a Rule that Reads UCC § 2-202 Out of Existence.**

Pechiney claims that parol evidence and evidence of course of dealing, usage of trade, and course of performance cannot be used to establish the definiteness needed to satisfy the statute of frauds. D.I. 198 at 24-26. Contrary to Pechiney's claims, under § 2-202(a) course of dealing and course of performance are <u>always</u> available to explain and supplement any writing of the parties, and under § 2-202(b) parol evidence (e.g, evidence of the parties' negotiations and discussions leading up to the contract) is available to explain

24

and supplement any writing of the parties <u>unless</u> the parties' writing evidences intent that the writing be the complete and exclusive memorial of the terms of their agreement.

The correct analysis starts with the text of § 2-202:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement <u>but may be explained or supplemented</u>
>
> (a) by course of dealing or usage of trade (Section 1-205) or by course of performance (Section 2-208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The Official Comments further state:

> 1. <u>This section definitely rejects</u>:
>
> \*        \*        \*
>
> (b) The premise that the language used has the meaning attributable to such language by rules of construction existing in the law rather than the meaning which arises out of the commercial context in which it was used; and
>
> (c) <u>The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous.</u>
>
> 2. Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. <u>Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased.</u> Unless carefully negated they have become an element of the meaning of the words used. <u>Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.</u>
>
> 3. Under paragraph (b) consistent additional terms, not reduced to writing, may be proved unless the court finds that the writing was intended by both parties as a complete and exclusive statement of all the terms. If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact.

(emphasis added).

According to White & Summers:

25

[C]ourse of dealing, usage of trade, or course of performance may give particular meaning to the language of the agreement. <u>Thus each may contradict, supersede or confirm the ordinary language of words used in an agreement.</u> If the parties contract with reference to a trade usage that imports a meaning different from the ordinary lay meaning of words used, so much the worse for the lay meaning.

1 White & Summers, UNIFORM COMMERCIAL CODE § 3-3 (4th ed. 1995). <u>See also</u> <u>Columbia Nitrogen Corp.</u> <u>v. Royster Co.</u>, 451 F.2d 3 (4th Cir. 1971) ("contracts are to be read on the assumption that [course of dealing and usage of trade] were taken for granted when the document was phrased").

From these basics, the statute of frauds caselaw uniformly utilizes evidence of course of dealing, course of performance, and the parties' negotiations and communications to illuminate and explain the parties' written expressions of quantity. Thus, for example, in <u>Zemco Mfg., Inc. v. Navistar Int'l Trans.</u> <u>Corp.</u>, 186 F.3d 815, 821 (7th Cir. 1999), the Seventh Circuit reversed a grant of summary judgment and found a triable issue of fact where the contract <u>did not clearly preclude</u> finding a requirements contract and the parties had a history of an exclusive supply relationship. Similarly, the court in <u>O.N. Jonas Co. v. Badische</u> <u>Corp.</u>, 706 F.2d 1161, 1165 (11th Cir. 1983), relied on parol evidence to conclude that ambiguous writings satisfied the statute of frauds. In <u>Riegel Fiber Corp. v. Anderson Gin Co.</u>, 512 F.2d 784, 790 (5th Cir. 1975), the court looked to whether language proposed to be the quantity term "was acceptable [as a statement of quantity] to the majority of buyers and sellers in the trade, " e.g. it relied on evidence of usage of trade.

Pechiney's cases on use of extrinsic evidence are not in conflict. For example, <u>Trimble</u> was a negligence action and not a case decided under the UCC. <u>SAB Harmon</u> did not involve a requirements contract, and the plaintiff wanted to use course of dealing evidence to contradict, not explain, the express words of the contract; in that case the contract expressly stated that the contracting parties were A and B, but the plaintiff wanted to use course of dealing evidence to show that the parties were really A and C. Nothing of the sort is proposed here. <u>Buxton</u> involved a real estate contract and did not address the changes to the law of sales of goods under the UCC. <u>Love</u> stated that evidence of custom was sufficient to establish the existence of a contract, but then evaluated the parties' course of dealing to determine whether a requirements contract was formed. 488 S.E.2d at 880.

26

Pechiney's citations to <u>Simmons Foods</u>, <u>Omega Engineering</u>, <u>Alaska Independent</u>, and <u>Kline</u> are closer, but equally unhelpful to its cause. These cases stem from situations where the writings were "totally silent" as to quantity, but they also recognize that course of dealing, course of performance, and the parties' negotiations can be used (consistent with the § 1-201(3) definition of agreement) to illuminate the parties' intent and to explain the meaning of written terms that could refer to the exclusive nature of the writing at issue. <u>See, e.g., Alaska Independent</u>, 548 P.2d at 352 (citing <u>Riegel Fiber</u> for proposition that evidence beyond the writing is admissible when quantity is "not precisely stated" in the writing but rejecting use of this evidence because the writing was totally silent as to quantity). In fact, the <u>Kline</u> court would have used course of dealing and course of performance evidence to explain the parties' writing if there had been "something, anything, in the writing that might evidence the quantity dimension of [plaintiff's] claim." 878 F.2d at 795.

Finally, it bears noting that Pechiney's Rule 30(b)(6) witness on contract interpretation testified extensively that

REDACTED

> 2.  **Course of Dealing, Course of Performance, Usage of Trade, and Parol Evidence Create a Genuine Issue of Material Fact as to the Existence of a Requirements Contract.**
>
>> a.  **Competent Evidence from the Parties' Negotiations Demonstrates the Existence of a Requirements Contract.**

The courts often examine evidence of the parties' negotiation history to satisfy the statute of frauds and to demonstrate the existence of a requirements contract. <u>See, e.g., Gestetner Corp. v. Case Equipment Co.</u>, 815 F.2d 806, 812 (1st Cir. 1987) (evaluating parol and course of dealing evidence and concluding that this evidence "ineluctably" led to the conclusion that the relationship was exclusive); <u>PMC Corp. v. Houston</u>

27

Wire & Cable Co., 797 A.2d 125, 129 (N.H. 2002) (parol evidence admissible to explain meaning of ambiguous indications of quantity in written agreement).

During the negotiations leading up the March 2003 Requirements Contract, National Beef repeatedly told Cryovac

REDACTED

28

All the statute of frauds requires is something that evidences quantity, and that something need not be in the agreement itself. National Beef's e-mails clearly confirm that it was intending to enter into a requirements contract and independently satisfies the statute of frauds.

### b. Course of Dealing Facts Demonstrate the Existence of a Requirements Contract.

Course of dealing is:

> a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

UCC § 1-205(1). Course of dealing is frequently used to determine whether a requirements contract exists and whether the statute of frauds is satisfied. See Zemco Mfg., Inc. v. Navistar Int'l Trans. Corp., 186 F.3d 815, 821 (7th Cir. 1999); Orchard Group, 135 F.3d at 421, 428-30 (evaluating course of dealing evidence to determine whether contract was exclusive) (cited by Pechiney); Universal Power Systems, Inc. v. Godfather's Pizza, Inc., 818 F.2d 667, 671 (8th Cir. 1987) (affirming district court's denial of motion for judgment as a matter of law and affirming existence of a requirements contract based on an ambiguous written exclusivity provision and 3½ years of exclusive course of dealing) (applying Missouri law).

The course of dealing evidence starts with

REDACTED

Compare O.N. Jonas Co. v. Badische Corp., 706 F.2d 1161, 1165 (11th Cir. 1983) (relying in part on 90 day cancellation provision in trademark license agreement for the goods to satisfy statute of frauds). The writing also memorialized

REDACTED

29

REDACTED

These internal

writings alone satisfy the statute of frauds. O.N. Jonas Co., 706 F.2d at 1163-65 (reversing trial court and

holding statute of frauds established by internal memo stating "we will supply" where course of dealing

evidence showed existence of a requirements contract under settled UCC rules of contract construction).

REDACTED

Because National Beef and Cryovac are

merchants, these writings satisfy the statute of frauds under § 2-201(2).

REDACTED

National Beef's conduct in the period leading up to the January 2004 Requirements Contract likewise

demonstrates that the Cryovac contracts were exclusive requirements contracts. For example,

30

REDACTED

. These writings make no sense unless National Beef intended to enter

into an agreement with <u>someone</u> for all of its packaging needs.

c.    **Course of Performance Facts that Demonstrate
the Existence of a Requirements Contract.**

Course of performance is:

> Where the contract for sale involves repeated occasions for performance by either party
> with knowledge of the nature of the performance and opportunity for objection to it by
> the other, any course of performance accepted or acquiesced in without objection shall
> be relevant to determine the meaning of the agreement.

UCC § 2-208(1). Course of performance evidence can establish the existence of a requirements contract and

satisfy the statute of frauds. <u>See, e.g.</u>, <u>Gestetner Corp. v. Case Equip. Co.</u>, 815 F.2d 806, 812 (1st Cir. 1987)

(rejecting statute of frauds defense and holding as a matter of law that relationship was exclusive based on

letter suggesting relationship was exclusive as confirmed by the parties' exclusive course of performance for

one year under the contract).

The most telling course of performance evidence is National Beef's performance immediately before

breaching the March 2003 Requirements Contract and January 2004 Requirements Contract. According to

Pechiney, National Beef was free at any time to change suppliers, but.

REDACTED

31

#### d.    Trade Usage Evidence Demonstrates that the Agreements Were Requirements Contracts.

Trade usage is the meaning given in an industry to a particular term of practice and may be used to interpret written language to determine if that language satisfies the statute of frauds. Riegel Fiber Corp. v. Anderson Gin Co., 512 F.2d 784, 790 (5th Cir. 1975) (reversing dismissal at close of plaintiff's evidence because trial court failed to consider usage of trade evidence).

In the industry at issue here,

REDACTED

i. This evidence also bars summary judgment in favor of Pechiney.

### D.    Pechiney's Contention that Neither National Beef Nor Cryovac Intended to Enter into a Contract Ignores the Law and Ignores Substantial Evidence.

Pechiney next contends that the subjective views of the parties prove that no contracts existed. The parties' subjective intent, however, is neither relevant nor admissible in determining whether parties intended to be bound by a contract. Thus, "a mental reservation of a party to a bargain does not impair the obligation he purports to undertake." RESTATEMENT (SECOND) OF CONTRACTS, § 17 cmt. c (1981). Indeed, "[a] legion of cases support the view that the outward manifestations of the parties -- their expressions -- will be viewed as the exclusive evidence of the parties' intentions rather than assertions of their subjective intention." John Edward Murray, Jr., MURRAY ON CONTRACTS, § 30 (4th ed. 2001). See generally Bannon v. Knauss, 320 S.E.2d 470, 472 (S.C. Ct. App. 1984) ("Interpretation of the contract is governed by the objective manifestation of the parties' assent at the time the contract was made. It does not depend on the subjective,

32

after the fact meaning one party assigns to it.") (internal citations omitted); <u>Don King Equip. Co. v. Double D Tractor Parts</u>, 115 S.W.3d 363, 369 (Mo. Ct. App. 2003) ("In Missouri, courts look to the parties' objective manifestations of intent to determine whether there was a 'meeting of the minds.' A person's subjective intent is irrelevant. It is the actions, and not the intentions or suppositions, of the parties that determine whether or not there is a contract and the terms of the contract.") (internal citations omitted); <u>Acierno v. Worthy Bros. Pipeline Corp.</u>, 693 A.2d 1066, 1070 (Del. 1997) ("An overt manifestation of assent, not a subjective intent, controls the formation of a contract. The unexpressed subjective intention of a party is therefore not relevant.").

National Beef's objective manifestations can be seen in the writings of the parties described above, as well as their course of dealing, course of performance, trade usage, and negotiations. The alleged undisputed 'facts' cited by Pechiney are in contrast purely subjective views. For example,

REDACTED

The caselaw clearly permits a jury to find that National Beef did in fact enter into a four year bag purchase agreement with Cryovac on this evidence.

Likewise, Mr. York's testimony does not warrant entry of judgment against Cryovac. He testified numerous times that

REDACTED

---

10    Implicit in Cryovac's claims against Pechiney is the assertion that National Beef breached its contracts with Cryovac and is purchasing infringing ClearShield products. REDACTED and its testimony should be viewed as adverse to Cryovac. See 4 Jack B. Weinstein, et al., WEINSTEIN'S FEDERAL EVIDENCE § 611.06[3] (2d ed. 1997) (treating as automatically adverse a party that "could have been sued, either instead of the named defendant or as a co-defendant").

33

REDACTED

From the terms of the writings, course of dealings, course of performance, and

REDACTED                              more than substantial evidence exists

from which a jury could find that either National entered into the January 2004 Requirements Contract or that

Cryovac had a reasonable expectation of          REDACTED                with National

Beef. B126 (App. Exh. K). See also

REDACTED

---

11    National Beef's statements to Mr. York are not hearsay because they have independent legal
      significance. See, e.g., 5 Jack B. Weinstein et al., WEINSTEIN'S FEDERAL EVIDENCE § 801.11[3] (2d
      ed. 2005) ("[T]he hearsay rule does not exclude relevant evidence as to what the contracting parties
      said or wrote with respect to the making or the terms of an agreement.").

34

IV.    **A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER PECHINEY HAD KNOWLEDGE OF CRYOVAC'S CONTRACTS AND/OR PROSPECTIVE CONTRACTUAL RELATIONS WITH NATIONAL BEEF.**

A.    The Requisite Level of Knowledge Is Low.

Cryovac is not required to demonstrate that Pechiney had actual knowledge of every term of Cryovac's agreements with National Beef. Rather, Cryovac need establish only that Pechiney had constructive, or inquiry notice, of Cryovac's contractual relationship. Put another way, Cryovac can prove Pechiney's knowledge of Cryovac's contractual arrangements with National Beef if sufficient evidence exists to allow a reasonable jury to conclude that Pechiney knew or should have known that some kind agreement existed, "regardless of whether defendants received a copy of the agreement or their subjective belief regarding the effect of such an agreement." D56. Inc. v. Berry's Inc., 955 F. Supp. 908, 916 (N.D. Ill. 1997). See also Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 406 N.E.2d 445, 450 (N.Y. 1980) ("While it must be established, as a threshold predicate for any claim of tortious interference, that the alleged tortfeasor knew that his competitor had a contract with the third party, as a practical matter he will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract (as distinguished, perhaps, from its economic or operational aspects). He will seldom if ever know whether the third party has a right to terminate or is entitled to avoid the contract."); Howard v. Youngman, 81 S.W.3d 101, 114 (Mo. Ct. App. 2002) (reversing summary judgment for defendants on tortious interference claim, where there were disputed issues of fact regarding defendants' claimed lack of knowledge of contracts).

B.    More Than Sufficient Facts Exist from Which a Jury Could Find That Pechiney Knew About Cryovac's Contracts and/or Prospective Contractual Relations with National Beef.

At least a genuine issue of material fact exists as to whether Pechiney knew that Cryovac had an existing contract with National Beef that required National Beef to purchase its requirements from Cryovac. This evidence comes from multiple sources. For example, Robert Taylor, Pechiney's Vice President of Meat & Dairy Packaging,    REDACTED

35

063527.1001

REDACTED

The Pechiney sales director who developed Pechiney's relationship with National Beef also testified that

REDACTED

These conversations resulted in a letter from Pechiney to National Beef that

REDACTED

36

REDACTED

REDACTED

This evidence creates at least a genuine issue of material fact as to whether Pechiney knew or should have known that Cryovac had a contract with National Beef for "100% supply" or a reasonable expectation of entering into such a contract with National Beef but for Pechiney's wrongful offer to sell its infringing ClearShield product.

## V.    PECHINEY'S ALLEGED GOOD FAITH IS NOT RELEVANT TO WHETHER IT ACTED WRONGFULLY.

Pechiney contends that Cryovac cannot show that Pechiney's interference with the National Beef contract was improper because Pechiney acted in good faith in attempting to avoid infringing the '419 patent. This argument confuses the elements of this cause of action and misinterprets the law.

"To establish a claim of tortious interference with existing contracts, plaintiffs must prove that the defendants intentionally and improperly interfered with their performance of contracts with third persons." Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1014-15 (3d Cir. 1994). Stated another way, a

---

12

REDACTED

37

063527.1001

defendant must (1) intentionally interfere; and (2) improperly interfere with a third party's performance of its contract with plaintiff. Pechiney would have the Court interpret this requirement a different way – with "intentionally" modifying "improperly." D.I. 198 at 33 ("Pechiney's innocent or negligent infringement cannot constitute 'wrongful' or 'improper' means.").

Pechiney is wrong. Tortious interference is "intentional, in the sense that the defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially certain to be produced by his conduct." RESTATEMENT (SECOND) OF TORTS, Introduction to Chapter 37. See also Bell v. May Dep't Stores Co., 1998 Mo. App. LEXIS 1510, at *24 (Mo. Ct. App. 1998) ("The element of 'intentional interference' may also be found if the actor knows that the interference is certain or substantially certain to occur as a result of its action."); DeBerry v. McCain, 274 S.E. 2d 293, 296 (S.C. 1981) ("As an element of its cause of action, plaintiff must prove the "intentional procurement of [the contract's] breach."); Layfield v. Beebe Med. Ctr., 1997 Del. Super. LEXIS 472 at * 15 (Del. Super. Ct. 1997) ("A defendant acts intentionally by desiring his act to cause the breach or by being substantially certain that the act will result in a breach.").

The RESTATEMENT also clearly states that it is not necessary for the impropriety of a defendant's conduct to be intentional: "Under some circumstances the interference is improper even though innocent means are employed." RESTATEMENT (SECOND) OF TORTS, § 767 cmt. c (1979) (emphasis added). For example, "[c]onduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper." Id. (emphasis added). A Missouri case cited by Pechiney, Briner, concurs. Briner Elec. Co. v. Sachs Elec. Co., 680 S.W. 2d 737, 743 (Ct. App. Mo. 1984) ("[w]rongful means would generally entail either an illegal act or an act that is actionable in and of itself."). Accordingly, where, as here, the conduct that constitutes the interference is independently wrongful – e.g. in violation of federal patent law – that in and of itself is enough to constitute wrongful interference.

Even if Cryovac is required to show that Pechiney's infringement of the '419 patent was intentional, it certainly has set forth enough facts to do so. Pechiney's opinions of counsel clearly show that

38

REDACTED

This record presents a genuine issue for the jury to decide. "Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.: In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions, 538 F.2d 180, 185 (8th Cir. 1976). "As a general rule, when an ultimate fact to be determined is one of intention, summary judgment is inappropriate." Layfield, 1997 Del. Super. LEXIS 472, at *15.

---

13

REDACTED

14    See Cryovac's Motion for Leave to File Second Amended Complaint, filed on July 29, 2005, and Cryovac's Reply Brief in Support of Its Motion for Leave to File Second Amended Complaint, filed on August 26, 2005, for a complete discussion of the basis for Cryovac's claim the Pechiney wilfully infringed the '419 patent.

39

## CONCLUSION

For the above reasons, plaintiff Cryovac, Inc. respectfully requests the Court to enter an order denying in its entirety defendant's motion for partial summary judgment.

Respectfully submitted,

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Michele Sherretta (No. 4651)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
  Attorneys for Cryovac, Inc.

Of Counsel:
Ford F. Farabow, Jr.
Joann M. Neth
Mark J. Feldstein
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, D.C. 20001-4413
(202) 408-4000

Dated: November 18, 2005

40

## CERTIFICATE OF SERVICE

I, Michele Sherretta, hereby certify that on November 29, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such document is available for viewing and downloading to the following counsel of record:

> N. Richard Powers, Esquire
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> P. O. Box 2207
> Wilmington, DE  19899

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Michele Sherretta*

John W. Shaw (No. 3362)
jshaw@ycst.com
Michele Sherretta (No. 4651)
msherretta@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

Attorneys for Plaintiff Cryovac, Inc.