# MARCH 2003 AGREEMENT

# REDACTED

# JANUARY 2004 AGREEMENT

# REDACTED

UNPUBLISHED CASES

LEXSEE 1998 MO APP LEXIS 1510

**JOHN E. BELL, Plaintiff/Appellant, v. THE MAY DEPARTMENT STORES COMPANY, d/b/a FAMOUS-BARR COMPANY, a corporation, Defendant/Respondent.**

No. 72983

**COURT OF APPEALS OF MISSOURI, EASTERN DISTRICT, DIVISION THREE**

*1998 Mo. App. LEXIS 1510*

August 11, 1998, Filed

**SUBSEQUENT HISTORY:** As Corrected August 25, 1998.

**PRIOR HISTORY:** [*1] Appeal from the Circuit Court of the City of St. Louis. Hon. Robert H. Dierker.

**DISPOSITION:** AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff purchaser appealed the summary judgment entered by the Circuit Court of St. Louis (Missouri) in favor of defendant store in an action that sought punitive damages and alleged violations of the Truth in Lending Act, *15 U.S.C.S. § 1601* et seq., *12 C.F.R. § 226.13*, and tortious interference with credit expectancy arising out of a recission, pursuant to *Mo. Rev. Stat. § 400.2-602(2)*, of the sale of a defective fan.

**OVERVIEW:** After the purchaser bought a fan financed through a store credit card, he discovered the fan was defective and attempted rescission of the purchase. Despite assurances from the store, the purchaser's failure to pay for the fan resulted in damaged credit. He filed an action for punitive damages, which alleged violations of various federal laws and tortious interference with credit expectancy. The trial court granted the store's motion for summary judgment, and the purchaser appealed. The court reversed the summary judgment on the federal statutory claims, holding that factual disputes existed regarding whether the purchaser rescinded the contract as set forth in *§ 400.2-602(2)* and whether the purchaser exercised his statutory rights under *12 C.F.R. § 226.13* in bad faith. However, the court affirmed the summary judgment on the tort claim because there was no showing of affirmative steps to induce a breach or interfere with

the purchaser's chance to obtain credit. Further the purchaser was not entitled to punitive damages because there was no showing of that the store engaged in a wanton, willful, or outrageous act or reckless disregard.

**OUTCOME:** The court reversed the summary judgment in favor of the store on the statutory violation claims, and it affirmed the summary judgment in favor of the store on the tort and punitive damage claims.

**CORE TERMS:** fan, reporting, billing, buyer, summary judgment, punitive damages, seller, expectancy, derogatory, trier of fact, reasonable time, matter of law, ceiling, interfere, installation, contacted, consumer, rescind, genuine, credit rating, replacement, finance, manager, intentional interference, granting summary judgment, credit card, delinquent, favorable, delivery, notice

**LexisNexis(R) Headnotes**

*Evidence > Procedural Considerations > Inferences & Presumptions*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] On appeal, the Court of Appeals of Missouri tests the propriety of summary judgment using the same criteria that the trial court employed to determine the propriety of sustaining the motion initially. Summary judgment is appropriate where there are no genuine issues of material fact and as a matter of law, the moving party is entitled to judgment. Mo. R. Civ. P. 74.04(c). The moving party bears the burden of establishing a right to judgment as a matter of law on the record as submitted. The non-moving party is entitled to the benefit of all reasonable inferences to be drawn from the record. A genuine dis-

pute exists if the moving party requires an inference to establish its right to judgment as a matter of law.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*
[HN2] 12 C.F.R. § 226.13(a)(3) defines a "billing error" as a reflection on or with a periodic statement of an extension of credit for property or services not accepted by the consumer or the consumer's designee, or not delivered to the consumer or the consumer's designee as agreed. The Official Staff Interpretations of Regulation Z, prepared by the Federal Reserve Board, clarify the provision, stating that § 226.13(a)(3) does not apply to a dispute relating to the quality of property or services that the consumer accepts.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
[HN3] Absent a specific provision in the contract, a buyer has a reasonable time after delivery of goods to determine if the goods conform to the requirements of the contract. If the goods fail in any respect to conform to the contract, the buyer may accept the goods or rescind by rejecting the goods. A buyer choosing to rescind must make the rescission known to the seller within a reasonable time after discovery of a defect or after a defect is discoverable. After rejection, the buyer's continued use of the goods as the buyer's own and in a manner inconsistent with the rights of the seller nullifies the rescission and acts as an acceptance of the goods, requiring payment of the contract price. *Mo. Rev. Stat. § 400.2-606(1)(c)*. If the buyer does not use the goods as his own, but rescinds the contract and holds the merchandise as bailee for the seller, the buyer is not liable for the sale price, assuming the rejection was justified.

*Civil Procedure > Jury Trials > Province of Court & Jury*
*Commercial Law (UCC) > General Provisions (Article 1) > Reasonableness*
[HN4] The time in which to provide notice of rejection is not quantified by the Uniform Commercial Code. "A reasonable time" under the UCC depends upon the nature, purpose, and circumstances of the action to be taken. *Mo. Rev. Stat. § 400.1-204*. The question of what is a reasonable time for rejecting defective goods is a question of fact for the jury to decide when fair-minded persons could disagree.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
[HN5] *Mo. Rev. Stat. § 400.2-602* sets forth the manner and effect of a rightful rejection. *Section 400.2-602* does not explicitly require that a rejection notice be in writing. Verbal notice may be adequate. Had the Missouri Legis-

lature intended notice of rejection to be in writing, it could have so provided.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
[HN6] Where a buyer complains about defects in the goods and the seller persuades him to keep the goods while the seller attempts to remedy the defects, the reasonable time within which to rescind the contract is extended.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
[HN7] A buyer that rescinds the contract and holds the merchandise as bailee for the seller is not liable for the sale price, assuming the rejection was justified. *Mo. Rev. Stat. § 400.2-602(2)*. A buyer has no further obligations with regard to goods it has rejected. The seller bears the cost of return delivery.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
*Commercial Law (UCC) > Sales (Article 2) > Performance*
[HN8] Continued possession by a buyer following a seller's instructions and the seller's failure to effect a return of the goods cannot constitute an acceptance, unless the buyer uses the goods as his own and in a manner inconsistent with the rights of the seller.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN9] Under the provisions of the Uniform Commercial Code, use no longer bars rejection or revocation of acceptance as a matter of law.

*Torts > Business & Employment Torts > Interference With a Contract*
*Torts > Business & Employment Torts > Interference With Prospective Advantage*
[HN10] The tort of intentional interference with contract or business expectancy contains the following five elements: (1) a contract, a valid business relationship, or an expectancy; (2) the defendant's knowledge of the contract, valid business relationship, or expectancy; (3) the defendant's intentional interference inducing or causing a breach of the contract or relationship; (4) the lack of justification for defendant's actions; and (5) the damages resulting from defendant's conduct.

*Evidence > Procedural Considerations > Inferences & Presumptions*
*Torts > Intentional Torts*

[HN11] Proof of intent requires proof defendants intended to commit an act which is ascertained to be wrongful and defendants knew was wrongful at the time the act was committed.

### Torts > Damages > Punitive Damages
[HN12] Punitive damages are imposed for the purpose of punishment and deterrence.

### Evidence > Procedural Considerations > Inferences & Presumptions
### Torts > Damages > Punitive Damages
[HN13] Punitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard from which evil motive is inferred for an act's consequences. Missouri requires the evidence to meet the clear and convincing standard of proof.

### Torts > Damages > Punitive Damages
[HN14] Neither 15 U.S.C.S. § 1640, nor 15 U.S.C.S. § 1666(e) appears to allow recovery for punitive damages.

### Torts > Damages > Punitive Damages
[HN15] To the extent that several federal cases discuss punitive damage claims in the context of technical violations subjecting defendants to damages under 15 U.S.C.S. § 1640, such cases articulate a test for punitive damages similar to that of the State of Missouri. Punitive damages will not lie unless a defendant acts in a wanton, malicious or oppressive manner or in reckless disregard of the requirements of the law.

### Torts > Damages > Punitive Damages
[HN16] Punitive damages will not lie unless a defendant acts in a wanton, malicious or oppressive manner or in reckless disregard of the requirements of the law.

COUNSEL: Charles W. Bobinette, 906 Olive St., Suite 300, Richard B. Blanke, St. Louis, MO 63101, for appellant.

etty Thorne Tierney, 611 Olive St., Suite 1750, David R. Levy, St. Louis, MO 63101, for respondent.

JUDGES: CLIFFORD H. AHRENS, Presiding Judge. William H. Crandall, Jr., J., concurs. Kent E. Karohl, J., concurs.

OPINIONBY: CLIFFORD H. AHRENS.

### OPINION:

John Bell appeals from summary judgment entered on April 14, 1997 against him and in favor of respondent, the May Department Stores Company, d/b/a Famous Barr Company (Famous Barr), on Count I of his

petition for violation of the Truth in Lending and Fair Credit Billing Acts, 15 U.S.C. Sec. 1601, et seq., and Regulation Z, specifically 12 C.F.R. Sec. 226.13, and on Count II of his petition for tortious interference with credit expectancy. We affirm in part and reverse and remand in part.

[HN1] On appeal, we test the propriety of summary judgment using the same criteria that the trial court employed to determine the propriety of sustaining the motion initially. Summary judgment is appropriate where there [*2] are no genuine issues of material fact and as a matter of law, the moving party is entitled to judgment. Rule 74.04(c); ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). Famous Barr bears the burden of establishing a right to judgment as a matter of law on the record as submitted. Bell is entitled to the benefit of all reasonable inferences to be drawn from the record. A genuine dispute exists if Famous Barr requires an inference to establish its right to judgment as a matter of law. ITT Commercial Fin. Corp., 854 S.W.2d at 376.

Review of the record reveals the following facts in the light most favorable to Bell and reasonably supported inferences in Bell's favor: Bell purchased a ceiling fan on August 2, 1992 at the Famous Barr located in the Galleria Shopping Mall. Planning to place the fan in his bedroom, Bell tested the available models and selected a quiet fan. Bell charged the purchase price of S 132.16 to his Famous Barr account. Famous Barr had the fan delivered. Bell had the fan installed within several weeks of delivery. Bell alleges that after assembly and installation the fan made an unacceptable level of noise at [*3] all speeds, interfering with his sleep. Bell attempted to adjust the brackets, but determined the noise emanated from the fan itself.

Famous Barr billed Bell for the cost of the fan on September 1, 1992, with payment due on September 25. On or about September 23, 1992, Bell reported the problem to Famous Barr's credit office. Bell told the Famous Barr representative that he received a defective fan and did not intend to pay for it. The representative stated the problem would be noted and suggested that Bell contact the manager of the electric appliance department. Bell paid the undisputed amount shown on his September 1, 1992 Famous Barr statement, but withheld payment in the amount of S 132.16. Bell attempted, but failed, to contact the manager of the electric appliance department.

Bell sent Famous Barr a letter, dated October 27, 1992. The letter stated the fan was defective because it made too much noise. Bell also wrote that he did not intend to pay for the fan, the cost of removing it, or the cost of reinstalling a new one. Additionally, Bell made a general reference to "Regulation Z" in his letter. Bell

alleges he followed the directives on the back of his Famous Barr billing [*4] statement, which summarized a credit card user's billing rights. n1

> n1 The reverse side of the billing statement provides, in pertinent part:
>
> If you think your bill is wrong . . ., write us on a separate sheet of paper and mail it to the address below as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared . . .
>
> You do not have to pay any amount in question which we are investigating, but you are still obligated to pay the parts of you bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount in question . . .
>
> If you have a problem with the quality of goods . . . that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods . . .

Ms. Milton, who worked with "billing errors" for Famous Barr, sent Bell a reply letter within several [*5] days, acknowledging receipt and stating that a manager from the Famous Barr Galleria store would contact him in the near future. In November, 1992, Christopher Thau, Divisional Sales Manager at the Famous Barr Galleria store, contacted Bell and agreed to locate a replacement fan, which was of the same make and model as the defective fan. Thau also agreed to reimburse Bell for the installation cost. Thau and Bell never discussed the details regarding removal of the defective fan, the installation of the replacement fan, or the method for paying the cost of installation. Moreover, they never agreed that Bell should pay the purchase price for the defective fan.

Thau sent Bell to the Famous Barr located at the West County Shopping Mall to exchange the fan. The West County store did not have a replacement fan. Bell informed Thau of the situation. Thau stated there might be a delay in locating the fan.

In January, 1993, Thau contacted Bell to inform Bell that he was leaving his position and that Ms. Velk would be handling the ceiling fan situation. Bell waited for Velk to contact him. Bell did not recall hearing from Velk.

Beginning with the October, 1992 statement, Famous Barr [*6] claimed the cost of the fan as an amount

due and added finance charges to Bell's statement. On Bell's November 1, 1992 statement, Famous Barr claimed Bell's account was past due. Bell contacted Famous Barr's credit department. A Famous Barr representative assured Bell that Famous Barr had simply made a mistake. In May, 1993, the billing statement showed a late fee and accruing finance charges as well as the price of the defective fan and the past due notice.

On May 4, 1993, Famous Barr informed Bell that it was sending his account to three credit reporting agencies and that this information may have an affect on his ability to obtain credit elsewhere. Again, Bell contacted the credit department and explained the dispute. A Famous Barr representative told Bell no further action would be taken to collect the disputed amount and the matter would not affect his credit rating.

Bell continued to receive statements containing late fees and finance charges, restrictions on his account preventing further purchases, threats to send his account to the collection department, and threats to report a derogatory rating of "R9" to credit reporting agencies. "R9" is the worst credit rating a person [*7] can receive. In the spring of 1993, Bell contacted the billing/collection office multiple times regarding the statements. On each occasion, a representative assured him that Famous Barr would correct the errors and he need not pay for the fan until resolution of the dispute.

In August, 1993, Famous Barr's automated system reported Bell 120 days delinquent to the credit reporting agencies. On or about August 18, 1993 the parties reached a provisional agreement. Famous Barr had been unsuccessful in locating a replacement fan. Famous Barr agreed to credit Bell's account with all finance and late fee charges and reinstate his credit line. Bell agreed to pay the original sale price if a Famous Barr representative would send a letter confirming the agreement that Famous Barr would allow the buyer of Bell's house an additional thirty days from the date of closing to exchange the fan. Despite the agreement, on September 1, 1993, Famous Barr assessed late fees and finance charges for nonpayment, closed Bell's account, and reported this information to the credit reporting agencies.

On September 13, 1993, Bell drafted a letter to Famous Barr setting out the agreement. Bell received a handwritten [*8] note from a Famous Barr representative, saying Famous Barr would "delete all derogatory information". On October 4, 1993, Bell re-dated the September 13, 1993 letter and mailed it with a check in the sum of $ 132.16 to cover the cost of the fan.

On October 16, 1993, Bell attempted to make a purchase at Famous Barr with his charge card. Famous Barr had closed his line of credit due to "poor prior payment history". On October 19, 1993, Bell wrote to Famous

Barr, quoting the pertinent sections of Regulation Z and demanding the deletion of all adverse or derogatory credit history from his file. On November 19, 1993, Famous Barr wrote to Bell, informing him that it had requested that the credit reporting agencies delete any derogatory credit information from their files and reflect a credit rating of R1, the most favorable credit rating available. The letter also stated that Famous Barr reinstated Bell's account with Famous Barr.

Bell contacted Trans Union, one of the credit reporting agencies who Famous Bar provided derogatory information. Bell learned that Trans Union had deleted his entire credit history with Famous Barr, meaning it appeared as if Bell never had an account with Famous [*9] Barr. Sometime in the late spring or early summer of 1994, Bell applied to the European American Bank ("EAB") for a TWA credit card, hoping to earn frequent flyer miles with his purchases. EAB refused to extend a credit line based upon a report from TRW Information Services. The TRW report contained information provided by Famous Barr after November 4, 1993. The parties later discovered that the corrective letters sent by Famous Barr to the credit reporting agencies contained the wrong account number.

On August 12, 1994, Bell filed suit against Famous Barr. On January 27, 1997, Famous Barr filed its motion for summary judgment on both counts of the petition. On April 14, 1997, the trial court granted Famous Barr's motion for summary judgment on both counts of the petition, relying primarily upon its finding that the "evidence in the record shows that Mr. Bell used the fan during the time in which he was allegedly rejecting it." The court also found as a matter of law that Bell "resisted (Famous Barr's) attempt at cure and reasonable attempts to resolve the dispute over a substantial period of time." On July 21, 1997, the trial court denied Bell's motion for reconsideration. On August [*10] 21, 1997, the court entered final judgment against Bell.

Bell initially contends the trial court erred in granting summary judgment on Count I because the defective quality of the fan is a "billing error" under Regulation Z, there is a genuine dispute as to whether or not Famous Barr acted in compliance with Regulation Z, and there is a genuine dispute that Bell properly rejected the fan and did not act in bad faith. We agree.

Famous Barr argues the evidence is undisputed that Bell accepted the ceiling fan or that a rejection was revoked by Bell's inaction. Famous Barr contends none of the definitions of "billing error" set out in *12 C.F.R. Sec. 226.13* are applicable in the instant case. n2 However, [HN2] Section 226.13(a)(3) defines a "billing error" as: "A reflection on or with a periodic statement of an extension of credit for property or services not accepted by the

consumer or the consumer's designee, or not delivered to the consumer or the consumer's designee as agreed." n3 The Official Staff Interpretations of Regulation Z, prepared by the Federal Reserve Board, clarify the provision, stating that "section 226.13(a)(3) does not apply to a dispute relating to the quality of property [*11] or services that the consumer accepts." If Bell accepted the ceiling fan then Sec. 226.13(a)(3) does not apply and Famous Barr did not make a "billing error". We apply state law to determine if Bell accepted the ceiling fan. See Official Staff Interpretations to *12 C.F.R. Sec. 226.13(a)(3)*. Judged in a light most favorable to Bell, the record does not establish as a matter of law that Bell accepted the fan, failed to properly reject the fan, revoked his rejection, or failed to provide proper notice under Regulation Z.

n2 *12 C.F.R. Sec. 226.13* (also known as part of Regulation Z) is a section of The Truth in Lending Act which is a federal regulation requiring certain actions and disclosures in credit transactions.

n3 A similar definition of "billing error" is found at *15 U.S.C. Sec. 1666*(b)(3).

[HN3] Absent a specific provision in the contract, the buyer has a reasonable time after delivery of goods to determine if the goods conform to the requirements of the contract. *Stephens Industries, Inc. v. American Exp. Co.,* [*12] *471 S.W.2d 501, 504 (Mo. App. 1971).* If the goods fail in any respect to conform to the contract, the buyer may accept the goods or rescind by rejecting the goods. Id. A buyer choosing to rescind must make the rescission known to the seller within a reasonable time after discovery of a defect or after a defect is discoverable. Id. After rejection, the buyer's continued use of the goods as the buyer's own and in a manner inconsistent with the rights of the seller nullifies the rescission and acts as an acceptance of the goods, requiring payment of the contract price. *Sec. 400.2-606(1)(c)* n4; *Paramount Sales Co., Inc. v. Stark, 690 S.W.2d 500, 504 (Mo. App. 1985).* "If the buyer does not use the goods as his own, but rescinds the contract and holds the merchandise as bailee for the seller, the buyer is not liable for the sale price (assuming the rejection was justified)." *Paramount Sales Co., 690 S.W.2d at 504-05.*

n4 All Missouri statutory references are to RSMo 1994, unless otherwise indicated.

[*13]

Bell purchased the fan on August 2, 1992. Famous Barr had the fan delivered. Bell did not discover the defect until he had the fan assembled and installed. After installation, Bell noticed an unacceptable level of noise. He took steps to inspect and test the product. Bell told a Famous Barr representative on or about September 23, 1992 that he received a defective fan and did not intend to pay for it.

[HN4] The time in which to provide notice of rejection is not quantified by the Uniform Commerical Code ("UCC"). "A reasonable time" under the UCC depends upon the nature, purpose, and circumstances of the action to be taken. *Sec. 400.1-204.* The question of what is a reasonable time for rejecting defective goods is a question of fact for the jury to decide when fair-minded persons could disagree. *Grus v. Patton, 790 S.W.2d 936, 940 (Mo. App. 1990).* Fair-minded persons could disagree upon the question of whether a rejection of a ceiling fan less than two months after delivery is reasonable.

Famous Barr argues rejection did not occur, if at all, until Bell provided a written rejection on October 27, 1992, approximately two and one-half months after installation. [HN5] *Sec. 400.2-602* [*14] sets forth the manner and effect of a rightful rejection. This section does not explicitly require that a rejection notice be in writing. Verbal notice may be adequate. See, *Polar Trading, Inc. v. Amboy Closeouts, Inc., 899 S.W.2d 577 (Mo. App. 1995); Paramount Sales Co., Inc. v. Stark, 690 S.W.2d 500 (Mo. App. 1985).* Had the Missouri Legislature intended notice of rejection to be in writing, it could have so provided.

Famous Barr argues that both Regulation Z and the agreement governing a Famous Barr credit card user's billing rights require written notice within sixty days after the creditor transmits the periodic statement first reflecting the alleged error. See *12 C.F.R. Sec. 226.13(b)(1).* Famous Barr first billed Bell for the defective fan on a September 1, 1992 periodic statement. Within sixty days thereafter, on October 27, 1992, Bell provided the requisite written notice of the billing error to Famous Barr. Famous Barr contends it could not have committed a billing error on the September statement in that it had no knowledge that the fan may have been defective. This argument is without merit. A trier of fact could find Bell rejected the fan on September 23, [*15] 1992, that Famous Bar erred in billing Bell for the fan on his October 1, 1992 billing statement, and that Bell provided written notice of the error within sixty days, complying with the contract and preserving his right under Regulation Z.

The October 27, 1992 letter satisfied the requirements of *12 C.F.R. Sec. 226.13(b)* in that the letter provided Bell's

name and account number. The letter indicated the fan did not conform to the contract because it was defective. Bell attached a copy of the September 1, 1992 billing statement to the letter. This billing statement made clear the date and the amount of the error. Moreover, the letter stated that Bell's concerns fell under Regulation Z. The letter sufficiently identified the "billing error".

Regardless of whether notice of rejection occurred on September 23rd or October 27th, the trier of fact could find that the notice occurred within a reasonable time. The cases cited by Famous Barr are not persuasive authority that a delayed rejection of approximately three months is so long that reasonable people could not differ on its reasonableness, forcing the question to become one of law. See *Burton v Auffenberg, 357 S.W.2d 218,* [*16] *222 (Mo. App. 1962); Fitzgerald v. Don Darr Ford, Inc., 729 S.W.2d 256, 257 (Mo. App. 1987);* and *Grus, 790 S.W.2d 936.* Moreover, the actions of the parties may affect what constitutes reasonable time. *Stephens Industries, Inc., 471 S.W.2d at 504.* [HN6] Where a buyer complains about defects in the goods and the seller persuades him to keep the goods while the seller attempts to remedy the defects, the reasonable time within which to rescind the contract is extended. Id.

Additionally, Famous Barr argues that Bell did not properly reject the fan because he did not return it or tender it back to Famous Barr. This argument fails. The cases cited by Famous Barr do not support the proposition that the buyer must return the defective goods after rejection. n5 [HN7] A buyer that rescinds the contract and holds the merchandise as bailee for the seller is not liable for the sale price (assuming the rejection was justified). *Sec. 400.2-602(2); Stephens, 471 S.W.2d at 504-505.* A buyer has no further obligations with regard to goods it has rejected. *Polar Trading, 899 S.W.2d at 580,* citing *Sec. 400.2-602(2) RSMo. 1994.* The seller bears the cost of return delivery. Id. Matthews, [*17] Burton, and Foam-Tex rely upon the common law, which predates Missouri's enactment of the Uniform Commercial Code in 1963. The facts in Polar Trading and Paramount Sales differ from those in the instant case because the buyers used the goods as their own and in a manner inconsistent with rights of the seller when they attempted to sell the delivered goods.

> n5 Famous Barr cites the following cases in support of this argument: *Polar Trading, 899 S.W.2d at 581; Paramount Sales, 690 S.W.2d at 504; Burton v. Auffenberg, 357 S.W.2d 218, 222 (Mo. App. 1962); Matthews v. Truxton Parts, Inc., 327 S.W.2d 28, 37 (Mo. App. 1959); Foam-Tex Indus., Inc. v. Relaxaway Corp., 358 F. Supp. 8, 13 (E.D. Mo. 1973).*

The summary judgment facts do not show that Bell refused to permit Famous Barr to remove and recover the defective fan after notice of rejection. There is no evidence in the record that Famous Barr demanded or took any action to remove the fan. To the contrary, a trier of fact could [*18] have determined that the October 27, 1992 rejection letter and Bell's testimony indicate Bell never intended to keep the defective fan and would have allowed Famous Barr to remove the fan from his ceiling. Bell simply refused to take responsibility for the return of the fan. The evidence further indicates a trier of fact could have determined Famous Barr acquiesced in Bell's continued possession of the fan, agreeing the defective fan would be exchanged when Famous Barr found a duplicate fan. [HN8] Continued possession by a buyer following a seller's instructions and the seller's failure to effect a return of the goods cannot constitute an acceptance, unless the buyer uses the goods as his own and in a manner inconsistent with the rights of the seller.

Famous Barr argues Bell's continued use of the fan constituted an acceptance, citing *Chancellor v. Development Co. v. Brand, 896 S.W.2d 672 (Mo. App. 1995)*. Unlike the buyers in Chancelor, Polar Trading, or Paramount Sales, Bell did not attempt to sell or solicit the aid of another to sell the fan. Bell's mere possession cannot constitute "an exercise of ownership" because Bell had a duty to "hold" the rejected goods. *Sec.* [*19] *400.2-602(2)(b)*.

The trial court found Bell accepted the fan because he used the fan after he rejected it. Specifically, the trial court relied on the testimony of Ms. Klorer, one of Bell's "house guests", who testified the fan was in use when she stayed at the house. Klorer never testified that she observed the fan in use after rejection. She may have testified regarding the use of the fan prior to rejection. The record does not support a prima facie showing that Bell continued to use the fan after he rejected it. Famous Barr's failure to make a prima facie showing of use eliminated Bell's need to respond. See Rule 74.04(e). Had Famous Barr alleged in it motion that it was beyond dispute that Bell used the fan while or after he rejected it, Bell could have denied such a statement and included such a denial in his reply affidavit and attached portions of his deposition testimony that traverse this contention. Additionally, [HN9] under the provisions of the UCC, use no longer bars rejection or revocation of acceptance as a matter of law. *Lawrence v. Modern Mobile Homes, Inc., 562 S.W.2d 729 (Mo. App. 1978)*.

Viewing the facts in the light most favorable to Bell, it cannot be [*20] determined, as a matter of law, that Bell exercised his statutory rights in bad faith. We cannot determine if Bell "resisted" Famous Barr's attempts to cure and resolve the dispute. A trier of fact could reasonably find that Famous Barr agreed to exchange the defective fan when it located the same make and model. In the interim, Bell may not have been under an obligation to pay for the defective fan. Famous Barr could not locate a replacement fan. In August, 1993, the parties agreed that Bell would pay for the defective fan. Bell paid after receipt of the letter. The issue of Bell's bad faith presents a jury question in this case, making summary judgment improper. See, *Brown v. P.N. Hirsch & Co. Stores, Inc., 661 S.W.2d 587, 590 (Mo. App. 1983)*. Bell's Count I, alleging statutory violations, was sufficient to withstand a motion for summary judgment. n6 We reverse and remand the trial court's grant of summary judgment as to Count I.

> n6 Sections *15 U.S.C. 1640* and 1666(e) establish liability for violations of "Part D-Credit Billing" of the Truth and Lending Act and Regulation Z. A cause of action for defamation or invasion of privacy, under Count I or II, would fail: Bell did not produce sufficient summary judgment facts to indicate Famous Barr furnished false information to the credit reporting agencies with malice or willful intent to injure. See *15 U.S.C. 1681h(e)*.

[*21]

The trial court did not err in granting Famous Barr's motion for summary judgment on Count II. Count II of the petition attempted to state a cause of action for the tort of intentional interference with contract or business expectancy. n7 [HN10] This tort contains the following five elements: (1) a contract, a valid business relationship, or an expectancy; (2) the defendant's knowledge of the contract, valid business relationship, or expectancy; (3) the defendant's intentional interference inducing or causing a breach of the contract or relationship; (4) the lack of justification for defendant's actions; and (5) the damages resulting from defendant's conduct. *Tri-County Retreading, Inc. v. Bandag, Inc., 851 S.W.2d 780, 785 (Mo. App. 1993)*, citing *Honigmann v. Hunter Group, Inc., 733 S.W.2d 799, 806-07 (Mo. App. 1987)*. Famous Barr must have shown facts that negate any one of these elements, that Bell after an adequate period of discovery failed to produce or would not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of these elements, or that there is no genuine dispute as to the existence of each of the facts necessary to support [*22] Famous Barr's properly

pleaded affirmative defense. *ITT Commercial Fin. Corp., 854 S.W.2d at 381.* Famous Barr made such a showing. Famous Barr contends that Bell would not be able to produce sufficient evidence to allow a trier of fact to find the existence of elements one, three, or four. We agree that Bell failed to show he could produce sufficient evidence to allow a trier of fact to find the existence of "intentional interference". We need not consider the sufficiency regarding the other elements of the tort.

n7 We need not decide whether *15 U.S.C. 1681h*(e) would apply to this intentional tort.

To make a submissible case, Bell must offer facts to support findings that Famous Barr actively and affirmatively took steps to induce a breach or interfere with Bell's chance to obtain credit. *Tri-Continental Leasing Co. v. Neidhardt, 540 S.W.2d 210, 216-17 (Mo. App. 1976).* The primary purpose of Famous Barr's actions was not to interfere with Bell's credit expectancy. See *Francisco v. Kansas City Star* [*23] *Co., 629 S.W.2d 524, 530 (Mo. App. 1981).* To the contrary, a manager at Famous Barr testified that each month Famous Barr turned over magnetic tapes, containing all the activities on its accounts, to the various credit reporting agencies; the credit reporting agencies extracted the information they needed from the magnetic tapes to create reports; and Famous Barr had no way to override its automatic monthly reporting of derogatory information.

If Famous Barr had any purpose in reporting the derogatory information, it was to induce payment for the fan. Acting for such a purpose may be sufficient if it is coupled with a desire to interfere in Bell's credit expectancy. *Franciso, 629 S.W.2d at 530.* Bell failed to show he could produce evidence indicating a desire to interfere. The manager at Famous Barr testified that Famous Barr usually rectified the problem of improper reporting by sending letters to the credit reporting agencies requesting removal of the derogatory statements. After Bell brought the improper reporting to Famous Barr's attention, Famous Barr sent letters to the credit reporting agencies regarding Bell's Famous Barr account. Famous Barr's employees testified [*24] that they believed that they had addressed Bell's concerns. Bell failed to show he could prove that Famous Barr had any desire to prevent him from receiving credit.

Bell admitted that the Famous Barr representatives he dealt with were neither nasty, rude or disrespectful. Bell admitted in his deposition that Famous Barr employees acted courteously and attempted to help him resolve the

dispute. After discovering the mistake, Famous Barr gave Bell a $ 100.00 gift certificate, removed all late fees and interest, and reinstated Bell's account with a credit limit of twice its original amount. These acts certainly would not preclude a finding of intent to interfere. They are, however, unrepresentative of a party acting with a desire to interfere with a customer's credit expectancy. There were no summary judgment facts to support a finding that Famous Barr harbored "ill-will" or had a desire to prevent Bell from receiving credit.

The element of "intentional interference" may also be found if the actor knows that the interference is certain or substantially certain to occur as a result of its action. Id. Denial of credit was not a necessary consequence of Famous Barr's improper [*25] reporting. Famous Barr indicated the problem of improper reporting is usually easily corrected. Famous Barr's automated system reported Bell 120 days delinquent to the credit reporting agencies in August, 1993. Bell complained about the derogatory statements to Famous Barr in October, 1993. On November, 19, 1993, Famous Barr's Vice-President, Credit Manager sent letters to the credit reporting agencies directing them to delete any derogatory credit information from their files and to reflect a credit rating of R-1. Bell failed to show Famous Barr knew the automated reporting system would show Bell's account was delinquent, resulting in derogatory credit reports prepared by the credit reporting agencies, and that Famous Barr did not know it could not easily correct the error to eliminate the possibility of interference with credit expectancy. There were no summary judgment facts to support a finding that Famous Barr intended to cause the consequences of its acts, or that it believed that the consequences were substantially certain to result from its acts. Id.

Moreover, [HN11] "proof of intent requires proof defendants intended to commit an act which is ascertained to be wrongful and [*26] defendants knew was wrongful at the time the act was committed." *Forkin v. Container Recovery Corp., 835 S.W.2d 500, 503 (Mo. App. 1992); Francisco, 629 S.W.2d at 530.* Bell did not show he could produce evidence that Famous Barr knew its acts were improper. The only evidence plaintiff presented regarding intent was his own conclusory testimony. Bell failed to preserve a factual dispute on the requisite element of intentional interference. The trial court did not err in granting summary judgment on Count II, for tortious interference with a business expectancy.

Similarly, the trial court did not err in granting summary judgment in favor of Famous Barr on Bell's claims for punitive damages. Bell requested reasonable punitive damages in both Count I and Count II. [HN12] Punitive damages are imposed for the purpose of punishment and

deterrence. *Vaughan v. Taft Broadcasting Co., 708 S.W.2d 656, 660* (Mo. banc 1986).

As stated above, the trial court did not err in granting summary judgment on Count II, the state law tort claim for interference with a business expectancy. Therefore, Bell could not have been awarded punitive damages based on Count II. Moreover, [HN13] "punitive damages [*27] require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard (from which evil motive is inferred) for an act's consequences." *Burnett v. Griffith, 769 S.W.2d 780, 787* (Mo. banc 1989). Missouri requires the evidence to meet the clear and convincing standard of proof. *Rodriguez v. Suzuki Motor Corp., 936 S.W.2d 104, 111* (Mo. banc 1996). Bell failed to show he could produce clear and convincing evidence that Famous Barr acted with malice.

Count I alleges statutory violations. The applicable civil liability sections corresponding to such statutory violations are *15 U.S.C. 1640* and *15 U.S.C. 1666*(e). [HN14] Neither section appears to allow recovery for punitive damages. Cf. *15 U.S.C. 1681o* (allowing punitive damages for failure to comply with requirements of the Fair Credit Reporting Act); *15 U.S.C. 1691*(b) (allowing punitive damages for failure to comply with any requirement imposed under the Equal Credit Opportunity Act). We presume the disparate statutory inclusion and exclusion of punitive damages was done intentionally and purposefully. *Field v. Mans, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d* [*28] *351 (1995)*. Therefore, Bell's re-

quest for punitive damages under Count I was improper. [HN15] To the extent that several federal cases n8 have discussed punitive damage claims in the context of technical violations subjecting defendants to damages under Section 1640, such cases articulate a test for punitive damages similar to that of the State of Missouri. [HN16] Punitive damages will not lie unless a defendant acts in a wanton, malicious or oppressive manner or in reckless disregard of the requirements of the law. See *Smith v. Capital Roofing Co. of Jackson, Inc., 622 F. Supp. 191, 196 (S.D.Miss. 1985)*. Bell failed to make a showing that he could prove Famous Barr acted in such a manner.

> n8 See *Smith v. Capital Roofing Co. of Jackson, Inc., 622 F. Supp. 191, 195-96 (S.D.Miss. 1985); Engle v. Shapert Const. Co., 443 F. Supp. 1383, 1389 (M.D.Penn. 1978)*.

We affirm the trial court's grant of summary judgment on Count II and on the issue of punitive damages on Counts I and II. We reverse the summary judgment on [*29] Count I and remand for further proceedings.

CLIFFORD H. AHRENS, Presiding Judge

William H. Crandall, Jr., J., concurs.

Kent E. Karohl, J., concurs.

LEXSEE 2001 US DIST LEXIS 23374

CLI CORPORATION, Plaintiff, v. LUDOWICI USA, LUDOWICI MINERAL
PROCESSING EQUIPMENT, INC., Defendants.

Civil Action No. 01-801

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

*2001 U.S. Dist. LEXIS 23374; 61 U.S.P.Q.2D (BNA) 1288*

November 14, 2001, Decided

**DISPOSITION:** [*1] Defendant's motion to dismiss count V of the complaint was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringement case, defendant infringing party filed a motion to dismiss a count of plaintiff patent holder's claim that alleged tortious interference with existing and prospective business advantage.

**OVERVIEW:** The patent holder alleged that the infringing party improperly sought to capitalize upon the market for magnetic separators created by the patent holder by selling the separators, which infringed upon a patent held by the patent holder. The infringing party argued that this claim was preempted by federal patent law. In order to make out a claim of tortious interference with business and professional relationships, the patent holder had to plead, in part, purposeful action on the part of the infringing party and the absence of privilege or justification on the part of the infringing party. The absence of privilege prong of the test required resolution of the patent infringement issue. If the infringing party did not breach the patent, it was justified in marketing its products. The state tort claim was based on the same conduct that was governed by federal patent law and was preempted.

**OUTCOME:** The motion to dismiss was granted.

**CORE TERMS:** federal patent, preempted, state law, tortious interference, patent infringement, motion to dismiss, patent

LexisNexis(R) Headnotes

*Constitutional Law > Supremacy Clause*
*Torts > Business & Employment Torts > Interference With Prospective Advantage*
[HN1] For conflict preemption, a court considers whether the state law actions frustrate the accomplishment and execution of the full purposes and objectives of Congress. To determine whether a state law prohibiting tortious interference with existing and prospective business advantage is in conflict with federal patent law and accordingly preempted, a court assesses a defendant's allegedly tortious conduct. If a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, which must be preempted for conflict with federal patent law.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*
[HN2] Four elements must be pleaded to make out a claim of tortious interference with business and professional relationships: (1) the existence of a contractual, or prospective contractual relation between a complainant and a third party; (2) purposeful action on the part of a defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

**COUNSEL:** For CLI CORPORATION, plaintiff: Eric P. Reif, Bryan K. Shreckengost, Pietragallo, Bosick & Gordon, Pittsburgh, PA.

For LUDOWICI USA, LUDOWICI MINERAL PROCESSING EQUIPMENT, INC., defendants: James A. Mercolini, David W. Snyder, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA. Joseph Lucci, David R. Bailey, Woodcock, Washburn, Kurtz, Mackiewicz & Norris, Philadelphia, PA.

2001 U.S. Dist. LEXIS 23374, *; 61 U.S.P.Q.2D (BNA) 1288

JUDGES: ROBERT J. CINDRICH, United States District Judge.

OPINIONBY: ROBERT J. CINDRICH

OPINION:

### MEMORANDUM ORDER

Pending in this patent infringement case is defendant Ludowici Mineral Processing Equipment, Inc.'s ("LMP") motion to dismiss count V of the complaint, which alleges tortious interference with existing and prospective business advantage. LMP argues that this claim is preempted by federal patent law. We agree.

[HN1] "For conflict preemption, we consider whether the state law actions frustrate the accomplishment and execution of the full purposes and objectives of Congress." *Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318 (Fed. Cir.1998).* "To determine whether these state law torts are in conflict [*2] with federal patent law and accordingly preempted, we assess a defendant's allegedly tortious conduct. If a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, which must be preempted for conflict with federal patent law." Id.

[HN2] Four elements must be pleaded to make out a claim of tortious interference with business and professional relationships: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Pawlowski v. Smorto, 403 Pa. Super. 71, 588 A.2d 36, 39-40 (Pa. Super. 1991); Advent Sys., Ltd. v. Unisys Corp., 925 F.2d 670, 672 (3d Cir.1991).* The complaint in this case avers that "LMP has improperly sought to capitalize upon the market for magnetic separators created by [*3] CLI by offering for sale, and selling, the LM Separators which infringe the 597 Patent." Paragraph 43.

As the complaint makes clear, the "absence of privilege or justification" prong of the test will require resolution of the patent infringement issue. If defendant did not breach the patent, it was privileged and justified in marketing its products. Thus, the state tort claim is based on the same conduct that is governed by federal patent law. Accordingly, it is preempted.

In accordance with the above, defendant's motion to dismiss count V of the complaint, Doc. No. 14, is GRANTED.

SO ORDERED this 14 day of November, 2001.

ROBERT J. CINDRICH

United States District Judge

LEXSEE 1996 DEL CH LEXIS 112

**WILLIAM C. DEMETREE and JACK C. DEMETREE, Plaintiffs, v.
COMMONWEALTH TRUST CO., Trustee of Trust 896 U/A dated November 29,
1962, Defendant.**

Civil Action No. 14354

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1996 Del. Ch. LEXIS 112*

August 13, 1996, Date Submitted
August 27, 1996, Date Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court September 20, 1996.

**DISPOSITION:**

Demetrees entitled to summary judgment as matter of law and order granting above stated appropriate specific performance.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sublessees and defendant lessor cross-appealed for summary judgment in plaintiff's action for specific performance of a contract for the continued lease of defendant's property.

**OVERVIEW:** Plaintiff sublessees subleased property from a third party lessee and entered into a triparty agreement with defendant lessor and the third party under which plaintiffs had a conditional right to enter into a direct lease with defendant if the third party terminated its prime lease with defendant. The third party eventually filed for bankruptcy and terminated its renewal rights with defendant, without informing plaintiffs. When defendant notified plaintiffs that both the prime lease and sublease would terminate, plaintiffs sought to renew and filed an action seeking specific performance when defendant refused. The court granted plaintiffs' motion for summary judgment and denied defendant's motion. The court held that the triparty agreement obligated defendant to enter into a direct lease with plaintiffs, as provided by the terms of the sublease. The interpretation of a provision in the sublease was subjectively shared by the parties and was well within the bounds of a commercially reasonable agreement. Therefore, specific performance was an appropriate remedy for enforcement.

**OUTCOME:** The court granted plaintiff sublessees' motion for summary judgment and denied defendant lessors' motion for summary judgment, because specific performance was the proper remedy to enforce a term of the parties' agreement that permitted plaintiffs to renew their lease with defendant.

**CORE TERMS:** lease, sublease, prime, new lease, option to renew, renewal, terminated, renew, right to enter, terminate, specific performance, motel, year term, renewal option, lessee, lessor, default, extrinsic evidence, plain meaning, expiration, execute, notice, set forth, renewed, italics, parol evidence rule, legal obligation, unambiguous, subjective, termination date

LexisNexis(R) Headnotes

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN1] The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN2] Under the plain meaning rule of contract construction, if a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words. Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the

1996 Del. Ch. LEXIS 112, *

words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

### Contracts Law > Contract Interpretation > Parol Evidence Rule

[HN3] In cases where the language of a contract is clear and unambiguous, the court may not consider parol evidence to interpret the intent of the parties. Deviation from this rule is only required where a literal reading of a contractual provision would be clearly unreasonable and yield an arbitrary result. The parol evidence rule is based on the principle that the clear meaning of the language of a written agreement most accurately reflects the understanding of the parties at the time, of their contract; extrinsic evidence reflecting a different potential meaning should not be considered.

### Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem

[HN4] If there is uncertainty concerning the meaning of contractual language, the court should consider the context and circumstances in which the words were used in order to determine the intended meaning. When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

### Contracts Law > Remedies > Specific Performance

[HN5] Specific performance is appropriate where a clear and definite agreement can be enforced without requiring the court to supply essential additional or inconsistent contractual terms.

### COUNSEL:

Richard A. Levine, Esquire, Richard H. Morse, Esquire and Janet Z. Charlton, Esquire, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; Attorneys for Plaintiffs.

Richard P. Beck, Esquire and Barbara MacDonald, Esquire, of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware; Attorneys for Defendant.

JUDGES: ALLEN, Chancellor

OPINIONBY: ALLEN

OPINION:

MEMORANDUM OPINION

ALLEN, Chancellor

Pending are cross-motions for summary judgment in this action for specific performance of a contract. The determination of these motions requires an interpretation of two contracts executed contemporaneously on July 22, 1966. Summary judgment has been requested on the basis of those contracts and other documents executed by and between the parties, as well as affidavits and deposition testimony.

The first contract ("Sublease"), entered into between plaintiffs, William C. Demetree and Jack C. Demetree ("Demetrees"), and Horne's Enterprises, Inc. ("Horne's"), granted the Demetrees a Sublease for a portion [*2] of a parcel of land leased by Horne's from defendant, Commonwealth Trust Co. ("Commonwealth"), in a prior contract ("Prime Lease"). The Prime Lease provided for an initial term of fifteen years and granted Horne's an option to renew for four additional successive ten year periods. As contemplated under the Prime Lease, the subsequent Sublease required the Demetrees to construct a motel on the premises and granted a conditional option to renew the Sublease in the event that the Prime Lease had been renewed as well.

The second contract ("Triparty Agreement"), executed contemporaneously by the Demetrees, Horne's, and Commonwealth, both extended the initial termination date of the Prime Lease from 1981 to 1985, and granted the Demetrees a conditional right to enter into a direct lease with Commonwealth if the Prime Lease were terminated by Horne's "prior to the expiration of the four renewal periods" provided for in the Prime Lease. An interpretation of this right to enter into a new direct lease "on the same terms, provisions, and conditions" as the Sublease is the subject of this dispute.

In 1985 the original term of the Prime Lease expired and the Prime Lease was extended until [*3] 1995. In 1990 Horne's sought protection of the bankruptcy court and in that connection entered into a release with Commonwealth in which it waived its right to extend the Prime Lease. The Demetrees did not learn of this at the time; they continued to occupy the premises pursuant to their Sublease. On May 18, 1995, the Demetrees received notice that both the Prime Lease and Sublease would terminate on December 31, 1995. Commonwealth informed the Demetrees that, in its view, the Demetrees had no right to renew the Sublease or require Commonwealth to enter into a new direct contract.

The Demetrees disagree and here seek specific performance compelling Commonwealth to enter into a new lease term which the Demetrees contend is required by the Triparty Agreement. According to the Demetrees'

1996 Del. Ch. LEXIS 112, *

interpretation of the Triparty Agreement, Commonwealth is contractually obligated to enter into a direct lease for a term ending December 31, 2005, with an option to renew for two additional ten year terms.

For the following reasons, I conclude that the Triparty Agreement did not create a legal obligation for Commonwealth to enter into the demanded new direct lease. The Triparty Agreement, however, [*4] obligates Commonwealth to enter into a direct lease with the Demetrees for a single seventeen year term, without an option to renew, as provided by the terms of the Sublease. n1 The Demetrees' motion for summary judgment should be granted as a matter of law pursuant to Court of Chancery Rule 56 since there is no dispute as to the material facts set forth below. *See Moore v. Sizemore, 405 A.2d 679, 680 (Del. 1979).* Commonwealth's motion for summary judgment is denied because the Demetrees are entitled to the above stated specific performance.

> n1 Although neither of the parties argued that the contracts entitle the Demetrees to a direct lease with a seventeen year non-renewal term, as will be discussed below, this is the most objectively reasonable construction of the literal meaning of the contractual language used by the parties.

## I. FACTS

### 1. THE PRIME LEASE

On September 3, 1963, Commonwealth, a Delaware corporation and trustee of Trust 896, leased then undeveloped trust property along [*5] Route 896, in Newark, Delaware, to Horne's to be used as the site of a motel and restaurant. The Prime Lease provided for an initial term of fifteen years, commencing January 1, 1964, and an option to renew for four successive ten year terms under the same terms and conditions.

### 2. THE SUBLEASE

On July 22, 1966, with Commonwealth's consent, Horne's subleased a portion of the property to the Demetrees for an initial seventeen year term, ending December 31, 1985, on the condition that Demetree construct and operate a Horne's Franchise Motor lodge on the subleased premises. n2 The Sublease granted the Demetrees a right to renew the Sublease upon the same terms and conditions only if the Prime Lease was renewed for such period. Under the Sublease, Horne's was under no legal obligation to renew the Prime Lease. Section 18 of the Sublease stated that:

> in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term . . . [the] Sublease shall terminate at the end of the then existing term, notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option.

The Sublease [*6] specified rents payable for the initial period and four renewal periods.

> n2 Construction of the motel was to be completed within eighteen months. At the time of this contract, the Demetrees planned to sub-sublease the property to Scott-Douglas Corporation to operate the motel once it was constructed.

### 3. THE TRIPARTY AGREEMENT

Contemporaneously, on July 22, 1966, Commonwealth, Horne's, and the Demetrees entered into the Triparty Agreement. n3 The Triparty Agreement extended the initial term of the Prime Lease to twenty-two years so that it would end on the same day as the Sublease, December 31, 1985, unless renewed. In addition, paragraphs 4 and 5 of the Triparty Agreement granted the Demetrees a right to enter into a direct lease with Commonwealth if the Prime Lease were terminated under specified circumstances.

> n3 Benjamin Vinton, Jr., Commonwealth's president at the time of the Triparty Agreement, signed the contract on behalf of Commonwealth, but it appears from his January 3, 1996 deposition testimony that he was not involved in the negotiations or drafting of the clause at issue.

[*7]

Paragraph 4 of the Triparty Agreement provided that Commonwealth would notify the Demetrees of "any default or breach" by Horne's. In the event of such a default or breach, the Demetrees would be entitled either to cure such default or breach to avoid termination of the Prime Lease by Commonwealth or enter into a new direct lease with Commonwealth on specified terms. Paragraph 4 stated that "in event said Prime Lease is terminated for any reason" the Demetrees have the right to:

execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable, and except that the terms of paragraph 3(a) of [the Triparty Agreement] shall be incorporated in any new lease. (italics added)

Paragraph 5 provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees have a right to:

execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease,* except that [*8] all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. n4 (italics added)

n4 According to Jack Demetree's Affidavit, when he signed the Triparty Agreement he understood this paragraph to gave the Demetrees a "right to lease the property through 2025, whether or not Horne's continued to lease the property from Commonwealth."

Paragraph 3(a) of the Triparty Agreement, referred to above, stipulated conditions concerning the execution of a mortgage on the subleased premises. Among other things, the Demetrees agreed that any mortgage on the premises would have a final maturity date not exceeding December 31, 1985, the termination date for the initial term of the Sublease. On October 11, 1966, Chase Manhattan Bank extended a $ 500,000 loan to the Demetrees to construct the motel on the premises. In addition to the $ 500,000 loan, the Demetrees invested approximately $ 275,000 for the construction of the motel.

n5 The loan had an "interest only" clause applicable to the eighteen month motel construction period, to be followed by a fifteen year term to pay down the principal and interest together. The Triparty Agreement extended the initial term of the Prime Lease, preventing it from expiring during the term of the Demetrees' construction loan. After such extension, the loan would be paid off

approximately three years before the end of the initial term of the Prime Lease and Sublease.

An assignment of the sub-sublease agreement with Scott-Douglas Corporation, dated July 29, 1966, was accepted as collateral to secure such loan. After Scott-Douglas defaulted in 1969, the Demetrees entered into a new sub-sublease agreement with Albright and Chason Motels of Delaware, Inc., with an initial term of five years and options for renewal terms expiring December 31, 1985.

[*9]

4. *SUBSEQUENT EVENTS*

On March 25, 1977, Horne's assigned its interest in the Prime Lease and Sublease to Wayanne, Inc., ("Wayanne"), a Delaware corporation. Wayanne subsequently exercised its option to renew the Prime Lease for an additional ten year term, and the Demetrees did the same, extending the termination date of both the Prime Lease and Sublease to December 31, 1995.

On March 10, 1990, Wayanne and Commonwealth entered into an agreement of "Release, Accord and Satisfaction" to resolve issues in connection with Wayanne's alleged default under the Prime Lease. The agreement released both parties from potential claims arising out of the Prime Lease and included a statement by Wayanne that it would not exercise the renewal option for a second ten year term, which would cause the Prime Lease to expire on December 31, 1995. The Demetrees were not informed about this agreement until May 18, 1995. n6 During this time period, there were other communications between the parties concerning the property. n7

n6    Commonwealth's    attorney    asked Wayanne's attorney to "maintain confidentiality" concerning the agreement, despite Demetree's right to receive notice of termination of the Prime Lease. According to Commonwealth, confidentiality concerning the agreement was required due to ongoing litigation to quiet title on the property. Title was cleared March 2, 1994. *Commonwealth Trust Co. v. Ferry,* C.A. No. 12714 (Del.Ch. Mar. 2, 1994) Judgment Order).

[*10]

n7 In 1991, the Demetrees discussed the property with Vinton during a telephone conversation. According to them, Vinton suggested joint redevelopment of the property since they would be "in it for a long time." Vinton denies ever hav-

ing made that statement. As will become clear, however, neither this fictual dispute nor the notice issue is relevant to the determination of this contract construction action.

In June 1992, the Demetrees executed an Agreement of Non-Disturbance and Entitlement with a subtenant Marinor Corp., Marinor's subtenant, MSL Motel Corporation, and Commonwealth. The agreement provided that if the Demetrees' Sublease were terminated by Commonwealth or the Demetrees or should "expire prior to December 31, 2025," for reasons other than MSL's default, then Commonwealth and the Demetrees agreed MSL's possession, use and enjoyment would not be disturbed.

On May 18, 1995, Commonwealth gave the Demetrees notice for the first time that the Prime Lease and Sublease would expire on December 31, 1995. Subsequent to receiving this notice, the Demetrees initiated this action requesting [*11] specific performance of paragraphs of the Triparty Agreement, construed by the Demetrees to provide a right to enter into a new lease directly with Commonwealth.

## II RULES OF CONTRACT CONSTRUCTION

[HN1] The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. *See* CORBIN ON CONTRACTS § 1 (1960); *Bell Atlantic Meridian Systems v. Octel Communications Corp., 1995 Del. Ch. LEXIS 156*, C.A. No. 14348 (Del.Ch. Nov. 28, 1995), Mem. Op. at 12. This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time. *See* WILLISTON ON CONTRACTS § 601 (1961); *RESTATEMENT (SECOND) OF CONTRACTS § 201* cmt. c (1981); *Burge v. Fidelity Bond & Mortgage Co., 648 A.2d 414, 420 (Del. 1994); Klair v. Reese, 531 A.2d 219, 223 (Del. 1987).*

[HN2] Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear, literal meaning of the words. *See Myers v. Myers, 408 A.2d 279, 281 (Del. 1979).* Where parties have entered into an unambiguous integrated written contract, the contract's construction should [*12] be that which would be understood by an objective reasonable third party. *See City Investing Co. v. Continental Cas. Co., 624 A.2d 1191, 1198 (Del. 1993); US West, Inc. v. Time Warner Inc., 1996 Del. Ch. LEXIS 55,* C.A. No. 14555 (Del.Ch. May 6, 1996), Mem. Op. at 21. An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are

sufficiently clear to prevent reasonable persons from disagreeing as to their meaning. *See Bell Atlantic,* Mem. Op. at 13, n.4.

[HN3] In cases where the language of a contract is clear and unambiguous, this Court may not consider parol evidence to interpret the intent of the parties. n8 *Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992); Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991).* Deviation from this rule is only required where a literal reading of a contractual provision would be "clearly unreasonable and yield an arbitrary result." *Citadel Holding, 603 A.2d at 822.* The parol evidence rule is based on the principle that the clear meaning of the language of a written agreement most accurately reflects the understanding of the parties at [*13] the time, of their contract; extrinsic evidence reflecting a different potential meaning should not be considered. *See Mesa Partners v. Phillips Petroleum Co., 488 A.2d 107, 113 (Del.Ch. 1984).* The theoretical underpinnings of the parol evidence rule are particularly applicable in cases such as this one where a very long period has passed since the execution of the contract, making oral testimony concerning expectations of the parties at the time potentially less reliable. *See* 32A C.J.S., EVIDENCE § 851, p.216 (1964) (the parol evidence rule is founded on the maxim that "written evidence is so much more certain and accurate than that which rests in fleeting memory only, that it would be unsafe, when parties have expressed the terms of their contract in writing, to permit weaker evidence to control").

> n8 A preliminary assessment of extrinsic evidence may be necessary in certain cases in order to determine whether any ambiguities exist. *See U.S. West* at n.10; *Bell Atlantic* at n.5; WILLISTON ON CONTRACTS § 601 (1961).

[*14]

Of course, [HN4] if there is uncertainty concerning the meaning of contractual language, the Court should consider the context and circumstances in which the words were used in order to determine the intended meaning. *Klair, 531 A.2d at 223.* n9 When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the:

> one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the in-

terpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

*Holland v. National Automotive Fibres, 194 A. 123, 127 (Del. Ch. 1937).* As will be discussed below, however, this is not such a case because the Triparty Agreement is capable of a literal and sensible interpretation, even if there remains doubt that it is an interpretation that the parties subjectively shared. That interpretation, which is well within the bounds of a commercially reasonable agreement, should be enforced.

> n9 Relevant extrinsic evidence could include statements made during negotiations of the contract, prior dealing evidence, or relevant trade or industry practices. In this action, the depositions and affidavits presented to this Court did not contain any statements made at the time of negotiations. Instead, the submitted evidence merely contained recent testimony concerning memories of what the subjective expectations of the parties were at the time the contract was executed in 1966. Even if extrinsic evidence were considered in this action, these statements would not aid the Court in construing a reasonable objective meaning of the contract.

[*15]

## III. PLAIN MEANING ANALYSIS

The Triparty Agreement can be read in conjunction with the Sublease to have one clear, unambiguous meaning. Consequently, none of the extrinsic evidence offered by the parties need be analyzed to interpret the contracts. Since Wayanne terminated the Prime Lease as of December 31, 1995, instead of extending the Prime Lease by exercising its option to renew, paragraph 5 is the principal relevant provision of the Triparty Agreement. As stated above, paragraph 5 of the Triparty Agreement provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees would have a right to:

> execute a new lease with Lessor on the *same terms, provisions and conditions as set forth in said sublease,* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. (italics added)

As the prime lessee did, by its waiver, terminate its rights under the prime lease "prior to the expiration of the four renewal periods," the literal command of Section 5 is that by reason of that fact, [*16] the Demetrees have a right "to execute a new lease with lessor." What are the terms of the new lease to which they are entitled? They are, again literally, "the same terms, provisions and conditions as set forth in said Sublease." As to term, the Sublease referred to *seventeen* "remaining years" of rental payments under the Sublease. In light of that fact and the fact that the Sublease did not contain any other provisions that could be construed as providing the Demetrees an independent right to renew the lease, it is not possible to conclude that the Demetrees have a right to a new lease with renewal rights. The plain meaning of the Sublease was that it would terminate at the end of the seventeen year term unless the Prime Lease had been renewed. Thus, paragraph 5 provided the Demetrees in the event that Horne's lease terminated at any time prior to expiration of the four renewal period with a right to enter into a direct lease with Commonwealth for a non-renewable seventeen year lease term. n10 If the parties had wanted the Demetrees to have the alleged renewal option, it could have been easily written into the contract. n11

> n10 Paragraph 4 granted the Demetrees a similar right to enter into a direct lease with Commonwealth in the event that Commonwealth, not Wayanne, terminated the Prime Lease prematurely due to default, breach, or any other reason. This construction of the two paragraphs does not cause them to be redundant, as argued by the Demetrees, because they are applicable under different circumstances.

[*17]

> n11 Paragraph 5 only refers to the four renewal periods in the context of when the Prime Lease might he terminated by the prime lessee. This provision recognizes that the Prime Lease had an option to renew. Paragraphs, however, does not create a right to enter into a direct lease with a right to renew. The Demetrees have a right to a direct lease on the same terms as the Sublease, not the Prime Lease.

In resisting any claimed right to a further lease under paragraph 5, Commonwealth asserts that paragraph 18 of the Sublease specifically precludes such a right. Section 18 provided that:

1996 Del. Ch. LEXIS 112, *

in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term . . . *[the] Sublease shall terminate at the end of the then existing term,* notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option. (italics added)

This argument is not sound however. The right created by paragraph 5 of the Triparty Agreement is a right to a new lease on terms of the Sublease. That new lease itself will contain [*18] a provision in the form of Section 18. (That such a provision will be surplusage at this stage creates no legal difficulty). But as the right to the new lease does not arise out of the Sublease, the provision of the Sublease that terminates it is not fatal to the right to get a new lease on the terms reflected in paragraph 5.

An option to renew for forty years is a material term that reasonable parties would spell out clearly in such an agreement if it were an intended, agreed upon term. n12 It would be inappropriate for this Court to read in such a term to this contract which can be interpreted in accord with its plain meaning. If the parties had intended to create such an option to renew, it would have been objectively unreasonable for paragraphs to state that the lease would be on the same terms as the Sublease which contains no such right. Since paragraph 5 does not grant the Demetrees a right to enter into a direct lease with an option to renew for future terms, this Court will not create such a right.

n12 Demetree cites *Wilgus v. Salt Pond Inv. Co.* for the proposition that a requirement that a contract be on the 'same terms and conditions' requires only that it be upon 'the same material terms and conditions.' *498 A.2d 151, 159 (1985).* While this may be true, it does not help Demetree in this matter because the renewal option would

appear to be a highly material term in this context.

[*19]

Similarly, it would be incorrect for this Court to ignore the plain language of paragraph 5 affording the Demetrees a right to a direct lease on substantially the same terms as the Sublease in the event that the Prime Lease was terminated prior to the four renewal periods. The material sections of the Sublease set out a seventeen year term lease with no option to renew. This is exactly what the Demetrees are entitled to demand from Commonwealth at this time and Commonwealth is obligated to grant. The public policy interest in commercial certainty will be best served by adhering to the plain meaning of the agreement entered into between the parties, even if the parties' differing subjective expectations at the time were different, as may have been true in this action.

## IV. CONCLUSION

The Demetrees are not entitled to their requested specific performance because there is no legal obligation for Commonwealth to enter into a ten year direct lease with a right to renew for two successive ten year periods according to the plain meaning of the Triparty Agreement. Nonetheless, the Triparty Agreement, read in conjunction with the Sublease, entitles the Demetrees to specific [*20] performance requiring Commonwealth to enter into a direct lease for a seventeen year term, with no renewal option. [HN5] Specific performance is appropriate in this type of action where a clear and definite agreement can be enforced without requiring the Court to supply essential additional or inconsistent contractual terms. *MF v. F, 172 A.2d 274, 176 (Del. Ch. 1961).* Since there are no disputes as to material facts controlling the resolution of this action, the Demetrees are entitled to summary judgment as a matter of law and an order granting the above stated appropriate specific performance.

LEXSEE 1997 DEL SUPER LEXIS 472

CHERYL LAYFIELD, PLAINTIFF, v. BEEBE MEDICAL CENTER, INC., ET AL., DEFENDANT.

CIVIL ACTION NO. 95C-12-007

SUPERIOR COURT OF DELAWARE, SUSSEX

*1997 Del. Super. LEXIS 472; 13 I.E.R. Cas. (BNA) 933*

July 15, 1997, Date Submitted
July 18, 1997, Date of Decision

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court November 18, 1997.

**DISPOSITION:**

Beebe's summary judgment on Plaintiff's claims for breach of implied covenant of good faith and fair dealing and defamation granted. Dr. Allen's summary judgment on Plaintiff's claim for defamation granted. Dr. Allen's summary judgment on Plaintiff's claim for intentional interference with a contract denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants hospital and doctor filed motions for summary judgment on plaintiff employee's claims for breach of implied covenant of good faith and fair dealing, defamation, and intentional interference with a contract.

**OVERVIEW:** The employee contended that the hospital violated the implied covenant of good faith and fair dealing by terminating her employment and defamed her, and that the doctor intentionally interfered with her employment and defamed her. The hospital and doctor filed motions for summary judgment. The court granted the hospital and doctor's motion for summary judgment on the employee's claims for breach of implied covenant of good faith and fair dealing and defamation but denied the doctor's motion on the claim for intentional interference with a contract. The court held that (1) because the employee could not show that the hospital terminated her in violation of public policy or that it falsified or manipulated her record to create a fictitious ground for termination, and she failed to identify a specific defamatory communication, her claims for breach of the covenant of good faith and fair dealing and defamation could not be

sustained, but (2) because there was a factual dispute regarding the cause for the employee's termination, summary judgment on the claim for intentional interference was inappropriate.

**OUTCOME:** The court granted the hospital and doctor's motions for summary judgment on the employee's claims for breach of an implied covenant of good faith and fair dealing and defamation. The court denied the doctor's motion for summary judgment on the employee's claim for intentional interference with a contract.

**CORE TERMS:** summary judgment, termination, defamation, enema, chart, nurse, covenant, at-will, terminated, terminate, defamed, patient, admits, qualified privilege, defamatory, fair dealing, intentional interference, implied covenant, ingredient, mix, matter of law, manipulated, fictitious, dislike, documentation, wait, defamatory statement, employment contract, cause of action, misrepresentation

LexisNexis(R) Headnotes

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] A court grants summary judgment when there are no genuine issues of material fact so that the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that there are no issues of material fact present, and the record must be read in a light most favorable to the non-moving party. To overcome the moving party's motion, the opposing party must allege specific facts demonstrating a genuine issue of material fact. If, after discovery, the nonmoving party cannot make a sufficient showing of the existence

Case 1:04-cv-01278-KAJ   Document 265-2   Filed 11/29/2005   Page 28 of 34

Page 2

1997 Del. Super. LEXIS 472, *; 13 I.E.R. Cas. (BNA) 933

of an essential element of his or her case, then summary judgment must be granted.

*Labor & Employment Law > Employment Relationships > At-Will Employment*
*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN2] In Delaware, there is a heavy presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite. However, while at-will employment remains a heavy presumption, every employment contract, including an at-will contract, contains an implied covenant of good faith and fair dealing.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN3] The covenant of good faith and fair dealing is limited to the following narrowly defined categories, where: the termination violates public policy; the employer misrepresents an important fact and the employee relies thereon either to accept a new position or remain in a present one; the employer uses its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; or the employer falsifies or manipulate a record to create fictitious grounds to terminate the employee.

*Torts > Business & Employment Torts > Interference With a Contract*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN4] To succeed on a claim for intentional interference with a contract, a plaintiff must show that there is a contract, about which the defendant knows and an intentional act that is a significant factor in causing the breach of such contract without justification which causes injury. A defendant acts intentionally by desiring his act to cause the breach or by being substantially certain that the act will result in a breach. As a general rule, when an ultimate fact to be determined is one of intention, summary judgment is inappropriate.

*Torts > Business & Employment Torts > Interference With a Contract*

[HN5] While a corporate employee generally is not liable for inducing a breach of contract by his corporation, an employee may be liable when he acts as an individual, for his own advantage, outside his corporate role.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*

[HN6] In order to prevail on a claim for defamation, a plaintiff must show the defamatory character of the communication; publication; that the communication

refers to the plaintiff; the third party's understanding of the communication's defamatory character; and injury. It is essential for a plaintiff to identify the defamatory communication, otherwise, it is impossible to know whether the communication gives rise to a cause of action.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
*Torts > Defamation & Invasion of Privacy > Qualified Privileges*

[HN7] A qualified privilege shields communications made between persons who have a common interest for the protection of which the allegedly defamatory statements are made. However, the privilege may be forfeited if it is abused. To lose the privilege, a plaintiff must show that a defendant knows the matter to be false, or the defendant acts in reckless disregard as to the truth or falsity of the statement.

COUNSEL:

Teresa Fariss, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, DE., attorney for plaintiff.

Mark J. Swerdlin, Esquire, Shawe & Rosenthal, Baltimore, MD., attorney for defendant.

JUDGES: GRAVES, Judge.

OPINIONBY: GRAVES

OPINION:

MEMORANDUM OPINION

GRAVES, Judge

This is an action for breach of the implied covenant of good faith and fair dealing, intentional interference with a contract, and defamation which Cheryl Layfield ("Plaintiff") has filed against her former employer, Beebe Medical Center, Inc. ("Beebe"), and Douglas Allen, M.D. ("Dr. Allen"). Plaintiff alleges that Beebe violated the implied covenant of good faith and fair dealing by terminating her employment, and that it defamed her by leaking false information about her into the community and by filing a false complaint with the State Board of [*2] Nursing ("the Board"). Additionally, Plaintiff alleges that Dr. Allen intentionally interfered with her employment at Beebe, and defamed her by denying he gave her an order and then "permitting" Beebe to file a complaint with the Board. Beebe has moved for summary judgment on all of Plaintiff's claims.

PROCEDURAL AND FACTUAL HISTORY

1997 Del. Super. LEXIS 472, *; 13 I.E.R. Cas. (BNA) 933

Beebe employed Plaintiff as a nurse from September, 1980, until January 5, 1995, occasionally scheduling her to work at its Millville Clinic. Beebe's Employee Handbook explains the at-will nature of the employment relationship by disclaiming any express or implied guarantee of employment and by noting that either party can terminate the employment relationship at any time for any reason.

In July, 1994, Beebe gave Plaintiff two disciplinary warnings. Plaintiff denied both charges and obtained written statements from witnesses supporting her version of events. Although the warnings remained in Plaintiff's personnel file, she never asked Beebe to remove them.

On December 23, 1994, Ms. Newman entered Beebe's emergency room complaining of constipation. n1 At the time, Plaintiff and Dr. Allen were busy treating a trauma patient, and Plaintiff explained to [*3]   Ms. Newman that she might have to wait for some time before Dr. Allen could see her. Ms. Newman explained that she been to the hospital a couple nights before.

> n1 The events surrounding Plaintiff's treatment of Ms. Newman on December 23, 1994, will be referred to as "the Newman incident" elsewhere in this opinion.

After assessing Ms. Newman's condition, Plaintiff asked Dr. Allen what to do with her. Dr. Allen responded that he would not "do anything more for her now than was done Tuesday night." Plaintiff claims that she then asked Dr. Allen if she should try an enema solution, and that Dr. Allen responded by saying "Whatever". Plaintiff maintains that she interpreted Dr. Allen's comment as an order to give Ms. Newman the solution. By contrast, Dr. Allen claims that he said "Whatever" in response to Plaintiff's suggestion that Ms. Newman did not want to wait to be seen by a physician.

Under the belief that Dr. Allen had given her an order, Plaintiff started to mix the solution, but she could not remember [*4]   one of the ingredients. Plaintiff claims that she specifically asked Dr. Allen about the other ingredient, and that he told her the other ingredient was peroxide. Although Dr. Allen insists that he never formally ordered or authorized Plaintiff to dispense an enema, he admits that he may have told Plaintiff that the other ingredient was peroxide.

After mixing the solution, Plaintiff gave the bottle to Ms. Newman or her daughter, explained how to use the enema, and told Ms. Newman to follow up with her family doctor in the morning if she did not want to wait to be seen by Dr. Allen. Thereafter, Ms. Newman departed without signing the instruction sheet.

The following facts are undisputed. After Ms. Newman left, a clerk asked Plaintiff to diagnose Ms. Newman's condition on the chart for accounting purposes. In response, Plaintiff wrote "fecal impaction' and signed her initials. On the treatment section of Ms. Newman's chart, Plaintiff wrote an entry for the enema solution she had dispensed to Ms. Newman. Later that night, Dr. Allen refused to sign Ms. Newman's chart because he had never examined her.

The next morning, Ms. Newman's daughter filed a complaint with Beebe regarding her [*5]   mother's treatment ten hours earlier. Barbara Starr, Plaintiff's Nursing Supervisor, called Plaintiff to inform her about the complaint and to advise her that the Newmans were upset with Ms. Newman's treatment. In response, Plaintiff asserted that the Newmans never appeared upset to her, and that she would document her observations on the next shift.

On her next shift, Plaintiff added the following entry to Ms. Newman's chart:

> 0100 Family pleased that they didn't have to wait and appreciated the information from Dr. Allen and nurse.

Although Plaintiff made the entry at some time during her next shift, she failed to designate the entry as a "late" entry, which is an entry made after the time of treatment.

Several days later, Plaintiff met with Peg Garrett, the emergency room nurse supervisor, Dr. Allen, and Dr. Mike Sommer, the head of the emergency room at Beebe, at Beebe's request to discuss the Newman incident. At the meeting, Ms. Garrett informed Plaintiff that Dr. Allen did not remember instructing Plaintiff to mix an enema solution, to which she replied: "Yes, he does, because I had to ask him specifically what he wanted me to mix the mineral oil with." Although [*6]   he was present, Dr. Allen never denied Plaintiff's statement.

On January 5, 1995, Plaintiff met with Katie Halen, Human Resource Manager, and Colleen Wareing, Vice-President of Nursing, who told her that she was suspended pending further investigation. Ms. Wareing then asked Ms. Garrett to review Plaintiff's nursing charts for the past three months, and upon reviewing the charts, Ms. Garrett discovered that Plaintiff had made many documentation errors unrelated to the Newman incident which violated various hospital policies.

With respect to the Newman incident, Plaintiff admits that she failed to follow Beebe's documentation policies. For example, while Beebe's "Policy on Discharge" requires a physician to complete the discharge

Case 1:04-cv-01278-KAJ   Document 265-2   Filed 11/29/2005   Page 30 of 34

Page 4

1997 Del. Super. LEXIS 472, *; 13 I.E.R. Cas. (BNA) 933

instruction sheet, sign it, and provide a copy to the patient, Plaintiff acknowledges that she, and not a physician, completed Ms. Newman's discharge instructions. Additionally, while Beebe's "Policy on Emergency Department Record" requires a physician, not a nurse, to complete the diagnosis section of a patient's chart, Plaintiff admits that she diagnosed Ms. Newman's condition on the chart.

After finding Plaintiff's charting errors, Ms. Wareing contacted [*7] Iva Boardman, chairperson of the Board, to discuss the Newman incident, and Ms. Boardman instructed Ms. Wareing to file a complaint with the Board. On January 25, 1995, Beebe notified the Board about a "possible practice violation" involving Plaintiff, stating that it believed Plaintiff had falsified a record by failing to indicate a late entry, and had recorded a diagnosis without a physician assessment. On January 26, 1995, Beebe suspended Plaintiff without pay while the Board conducted its investigation. In April, 1995, the Board chose not to prosecute the case. On July 28, 1995, Beebe terminated Plaintiff from employment based upon "a lack of confidence in you due to your failure to comply with Beebe Medical Center policies, practices and procedures regarding patient treatment and medical documentation."

While she worked at Beebe, Plaintiff discussed the Newman incident with several other nurses. After her termination, Plaintiff discussed her termination with her nurse manager at Milford Memorial Hospital. Plaintiff concedes that she does not know whether anyone at Beebe, including Dr. Allen, ever discussed her case with anyone inside or outside the hospital.

On December 6, 1995, [*8] Plaintiff filed the present complaint against Beebe and Dr. Allen. Beebe and Dr. Allen subsequently moved for summary judgment on all of Plaintiff's claims. The issues have been briefed, and this is the Court's decision herein.

STANDARD OF REVIEW

[HN1] The Court will grant summary judgment when there are no genuine issues of material fact so that the moving party is entitled to judgment as a matter of law. *Moore v. Sizemore, Del. Supr., 405 A.2d 679 (1979)*. The moving party bears the burden of showing that there are no issues of material fact present, and the record must be read in a light most favorable to the non-moving party. *Alabi v. DHL Airways, Inc., Del. Super., 583 A.2d 1358 (1990)*. To overcome the moving party's motion, the opposing party must allege specific facts demonstrating a genuine issue of material fact. *E.K. Geyser Co. v. Blue Rock Shopping Center, Inc., Del. Super., 229 A.2d 499 (1967)*. If, after discovery, the nonmoving party cannot make a sufficient showing of the existence of an essential element of his or her case,

then summary judgment must be granted. *Burkhart v. Davies, Del. Supr., 602 A.2d 56, 59 (1991)*, cert. den., *504 U.S. 912, 112 S. Ct.* [*9] *1946, 118 L. Ed. 2d 551 (1992)*.

DISCUSSION

I. Implied Covenant of Good Faith and Fair Dealing

In its motion, Beebe first argues that it did not terminate Plaintiff in violation of the implied covenant of good faith and fair dealing ("the covenant"). [HN2] In Delaware, there is a "heavy presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite." *E.I. Dupont de Nemours & Co. v. Pressman, Del. Supr., 679 A.2d 436, 440 (1996)* (hereinafter "Pressman"); *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96, 101 (1992)* (hereinafter "Merrill"). However, while at-will employment remains a heavy presumption in this State, every employment contract, including an at-will contract, contains an implied covenant of good faith and fair dealing. *Merrill v. Crothall-American, Inc., 606 A.2d at 101.*

In Merrill, an employer breached the covenant by deceptively inducing an employee to leave his previous position based upon a fraudulent promise of indefinite employment, when in reality, the employer wanted to hire the employee on a temporary basis. Id. (stating that an "employer may not in good faith knowingly allow [*10] an employee to assume that the duration of an employment contract is indefinite, when it is, in secret contemplation of the employer, of limited duration.") The Court noted that the employers' bad faith was analogous to a charge of fraud in the inducement, as opposed to a charge of wrongful termination. *Id. at 102.*

In Pressman, an employer intentionally manipulated an employee's personnel record to create fictitious grounds for his termination. More specifically, the employee's supervisor engaged in a retaliatory campaign against him by misrepresenting his responsibilities and by understating his accomplishments. While the Court permitted the employee to sue for the employer's deceitful acts in manufacturing materially false grounds to cause the employee's dismissal, the Court limited [HN3] the covenant to the following narrowly defined categories, where: (1) the termination violated public policy; (2) the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one"; (3) the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past [*11] service; or, (4) the employer falsified or manipulated a record to create fictitious grounds to terminate the employee. *679 A.2d at 442-444.*

Case 1:04-cv-01278-KAJ    Document 265-2    Filed 11/29/2005    Page 31 of 34

Page 5

1997 Del. Super. LEXIS 472, *; 13 I.E.R. Cas. (BNA) 933

In addition to these limitations, the Court noted that nothing was "to be construed as limiting an employer's freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons." *Id. at 441*. Importantly, the Court stated that "dislike, hatred or ill will, alone, cannot be the basis for a cause of action for termination of an at-will employment." *Id. at 444* (stating that the personal nature of employment relationships "counsels caution about creating causes of action based solely on personal motivations"). Thus, in order to claim a breach of the covenant, the employer's conduct "must constitute 'an aspect of fraud, deceit or misrepresentation.'" *Id. at 440*. Based on the foregoing language, I conclude that Pressman does not stand for the proposition that whenever an employer terminates an at-will employee in the context of a factually disputed work incident, as here, the employer exposes itself to a lawsuit for breach of the covenant.

In this case, Plaintiff contends that the [*12] facts could be construed to show that Beebe breached the covenant by misrepresenting the Newman incident as part of a "bad faith plan" to terminate her. In response, Beebe denies that it terminated Plaintiff in bad faith and argues that there is no evidence of deceit, fraud, or misrepresentation in the record.

In order to succeed on her claim for breach of the covenant under the facts of this case, Plaintiff must show either that Beebe terminated her in violation of public policy or that Beebe falsified or manipulated her record to create fictitious grounds for termination. n2 *Pressman, 679 A.2d at 442-444*. Here, the record shows that Plaintiff's claim does not fall within either of these narrow exceptions to her at-will employment.

> n2 The second and third limitations of the covenant outlined in Pressman do not apply to the facts of this case. Plaintiff has not alleged, and the facts do not show, that Beebe induced Plaintiff to change her job based upon a misrepresentation or deprived Plaintiff of past compensation.

[*13]

Plaintiff has not identified, and the facts do not show, that Beebe violated public policy. Moreover, while Plaintiff argues that Beebe misrepresented the Newman incident and manipulated her record in bad faith to justify her termination, there is no evidence that Beebe created fictitious grounds to terminate her, or that Beebe acted fraudulently or deceitfully. In fact, Beebe terminated Plaintiff with full knowledge that she contested the prior warnings, that she and Dr. Allen disputed the Newman incident, and that the Board investigated the incident and dropped the case.

Here, the record shows that Beebe terminated Plaintiff based on a "lack of confidence" in her nursing abilities due to Plaintiff's "failure to comply with Beebe Medical Center policies, practices, and procedures regarding patient treatment and medical documentation". n3 The record also shows that Plaintiff admits that she: (1) dispensed medication to Ms. Newman without a physician assessment and without a written order; (2) diagnosed Ms. Newman's with "fecal impaction" without a diagnosis from a physician; (3) entered a late entry on Ms. Newman's chart without identifying it as such; and, (4) completed Ms. Newman's [*14] discharge instructions without a physician's signature - all in violation of Beebe's policies and procedures. Thus, viewing the record in a light most favorable to Plaintiff, I conclude that Beebe did not violate the covenant, and accordingly, I grant Beebe summary judgment on this issue.

> n3 Even if the Court accepts Plaintiff's allegations that Beebe terminated her based on jealousy and resentment, Plaintiff's claim fails on this basis because "dislike, hatred, or ill-will, alone, cannot be the basis for a cause of action for termination of an at-will employment." *Pressman, 679 A.2d at 444*.

II. Intentional Interference With a Contract

Plaintiff also alleges that Dr. Allen intentionally interfered with her employment at Beebe by denying that he ordered her to give Ms. Newman an enema, thereby shifting the blame to her for dispensing medication without his evaluation. In response, Dr. Allen denies that he intentionally interfered with Plaintiff's employment, and argues that Beebe terminated Plaintiff for [*15] her poor charting practices.

[HN4] To succeed on her claim for intentional interference with a contract:

> There must be (1) a contract, (2) about which the defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.

*Irwin & Leighton, Inc. v. W.M. Anderson Co., Del. Ch., 532 A.2d 983, 992 (1987)*. A defendant acts intentionally by desiring his act to cause the breach or by being substantially certain that the act will result in a breach. *Restatement (Second) of Torts, § 8A, § 766, cmt. j (1977)*.

As a general rule, when an ultimate fact to be determined is one of intention, summary judgment is inappropriate. *Murphy v. Godwin, Del. Super., 303 A.2d 668 (1973)* (citing *Continental Oil Co. v. Pauley Petroleum, Inc., Del. Supr., 251 A.2d 824 (1969)*).

Plaintiff argues that Dr. Allen interfered with her employment by dishonestly denying that he gave Plaintiff an order to mix an enema. Plaintiff contends that Dr. Allen denied he gave her an order to protect himself from disciplinary action, and that he should have known that Plaintiff would suffer adverse consequences, [*16] including dismissal. On this issue, the record shows that Dr. Allen admits that he may have told Plaintiff that the other ingredient for the enema was peroxide and said "Whatever" while Ms. Newman was being treated by Plaintiff. Plaintiff asserts that Dr. Allen said "Whatever" after she asked him if she should give Ms. Newman the enema. Dr. Allen later denied that he ordered Plaintiff to give Ms. Newman an enema in an administrative meeting attended by the parties.

[HN5] While a corporate employee generally is not liable for inducing a breach of contract by his corporation, an employee may be liable when he acts as an individual, for his own advantage, outside his corporate role. *Shearin v. E.F. Hutton Group, Inc., Del. Ch., 652 A.2d 578 (1994)*. Dr. Allen argues that the Court should find that he acted within his corporate role when he denied he gave Plaintiff an order to mix an enema. However, viewing the facts in the light most favorable to Plaintiff, it is possible to draw the inference that Dr. Allen intended to protect himself, to Plaintiff's detriment, when he denied he gave her an order. In other words, there is a factual dispute regarding the causation of Plaintiff's termination [*17] which could give rise to an inference of intent sufficient to go to the jury, thereby precluding summary judgment on this issue. *Bobson v. Lifestyle Resorts, Inc., Del. Supr., 599 A.2d 411 (1991)* (ORDER); *Murphy, supra*. Accordingly, I deny Dr. Allen summary judgment on Plaintiff's claim for intentional interference with a contract.

### III. Defamation

Finally, Plaintiff asserts that Beebe defamed her by filing a false report with the Board and by leaking false rumors "to the public at-large". Plaintiff also contends that Dr. Allen defamed her by denying that he gave her an order and by then "permitting" Beebe to "base an unfounded complaint to the Delaware Board of Nursing." In response, Beebe argues that Plaintiff fails, as a matter of law, to establish a claim for defamation.

[HN6] In order to prevail on a claim for defamation, Plaintiff must show the following:

(1) the defamatory character of the communication; (2) publication; (3) that the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury.

*Los v. Davis, 1991 Del. Super. LEXIS 122*, Del. Super., C.A. No. 89C-OC-122, Goldstein, J. (April [*18] 9, 1991). It is essential for Plaintiff to identify the defamatory communication, otherwise, "it is impossible to know whether the communication gives rise to a cause of action . . . ." *Heying v. Simonaitis, Ill. Ct. App., 126 Ill. App. 3d 157, 466 N.E.2d 1137, 81 Ill. Dec. 335 (1984)*. See also *McCullough v. Visiting Nurse Serv. of Maine, Me. Supr., 1997 Me. 55, 691 A.2d 1201, 1204 (1997)* (stating that an "essential element of a claim for defamation is the existence of a false and defamatory statement concerning the plaintiff.").

Turning first to Plaintiff's claim that Beebe defamed her by leaking false information "to the public-at-large", Plaintiff fails to identify a specific false or defamatory communication made by any Beebe employee to a third party. Instead, Plaintiff simply alleges that "there is circumstantial evidence that one or more Beebe Hospital employees [] spread false information about Ms. Layfield in the community . . . ." However, simply alleging that there is circumstantial evidence of defamation is insufficient to overcome Beebe's motion for summary judgment, because Plaintiff must allege specific facts which demonstrate a genuine issue of material fact. [*19] *E.K. Geyser Co. v. Blue Rock Shopping Center, Inc., Del. Super., 229 A.2d 499 (1967)*. The fact that several members of the community may have heard something about Plaintiff's termination is not evidence of defamation. *Stafford v. Air Products and Chemicals, Inc., 1985 Del. Super. LEXIS 1232*, Del. Super., C.A. No. 84C-JL-85, O'Hara, J. (September 5, 1985). Thus, Plaintiff's claim against Beebe for defaming her in the community necessarily fails as a matter of law because she cannot identify the alleged defamatory communication. *McCullough, supra*.

Even if the Court assumed that a defamatory statement existed, Plaintiff fails to establish that Beebe's officials or Dr. Allen published the alleged defamatory communication because Plaintiff admits that she does not know whether anyone at Beebe ever discussed the matter with a third party. In this case, the information could have come from Plaintiff herself, because she concedes that she discussed the incident with several nurses at Beebe before her termination, and with her nurse manager at Milford Memorial Hospital after her termination.

Thus, because Plaintiff cannot establish that Beebe or Dr. Allen published the alleged defamatory statement to the [*20] community, the Court grants Beebe summary judgment on Plaintiff's claim for defamation to members of the community.

Next, Plaintiff claims that Beebe defamed her by filing a complaint with the Board, and that Dr. Allen defamed her by "permitting Defendant Beebe Medical Center, Inc. to base an unfounded complaint to the Delaware Board of Nursing . . . ." As an initial matter, the Court grants Dr. Allen summary judgment on this issue because there is no evidence in the record that Dr. Allen had any involvement with Beebe's decision to file a complaint with the Board.

Additionally, Plaintiff's claim for defamation against Beebe for filing a complaint with the Board fails as a matter of law because in Delaware, [HN7] a qualified privilege shields "communications made between persons who have a common interest for the protection of which the allegedly defamatory statements are made." *Pierce v. Burns, Del. Supr., 55 Del. 166, 185 A.2d 477, 479 (1962)*. In this case, Beebe's complaint to the Board is protected by a qualified privilege because both Beebe and the Board share a common interest in the competence and professionalism of nurses who practice in this State. See *Hainer v. American* [*21] *Medical Intern., Inc., S.C. App. Ct., 320 S.C. 316, 465 S.E.2d 112 (1995)* (explaining that a hospital is protected by the qualified privilege for reporting a nurse to the Board of Nursing).

However, the privilege may be forfeited if it is abused. *Battista v. Chrysler Corp., Del. Super., 454 A.2d 286 (1982)*. To lose the privilege, Plaintiff must show that: "(a) defendant knew the matter to be false, or (b) defendant acted in reckless disregard as to the truth or falsity of the statement." *Heller v. Dover Warehouse Market, Inc., Del. Super., 515 A.2d 178 (1986)*.

In this case, there is no evidence in the record that Beebe abused its qualified privilege to report the Newman incident to the Board. Here, Beebe reported Plaintiff to the Board at the instruction of Iva Boardman, the Board's executive director, for diagnosing a patient without a physician assessment and for failing to report a late entry on a patient's chart, both of which Plaintiff admits doing. There is simply no evidence that Beebe knew that these matters were false or acted in reckless disregard for the truth or falsity of the complaints it made to the Board. In fact, Beebe interviewed Dr. Allen and Plaintiff [*22] together to obtain their versions of the incident before filing its report. Finally, even if Beebe had been motivated by resentment or dislike when it filed the complaint, this sentiment does not constitute abuse of a qualified privilege. *Battista v. Chrysler Corp., 454 A.2d at 291; Stafford v. Air Products and Chemicals, Inc., 1985 Del. Super. LEXIS 1232, *10, Del. Super., C.A. No. 84C-JL-85, O'Hara, J. (September 5, 1985)* (stating that "the presence of critical, disparaging statements and the fact they may have been inspired in part by resentment or dislike does not constitute abuse of a qualified privilege.") Accordingly, I grant Beebe and Dr. Allen summary judgment on Plaintiff's claim for defamation to the Board.

Conclusion

For the foregoing reasons, I grant Beebe summary judgment on Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and defamation. Additionally, I grant Dr. Allen summary judgment on Plaintiff's claim for defamation. I deny Dr. Allen summary judgment on Plaintiff's claim for intentional interference with a contract.

IT IS SO ORDERED.

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on November 18, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such document is available for viewing and downloading to the following counsel of record:

N. Richard Powers, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P. O. Box 2207
Wilmington, DE 19899

I further certify that I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

**BY E-MAIL**

Steven R. Trybus, Esquire
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
Michele Sherretta (No. 4651)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
jshaw@ycst.com

Attorneys for Plaintiff Cryovac, Inc.