PUBLICLY FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CRYOVAC, INC., )
)
    Plaintiff/Counter-Defendant, )
)
vs. )  C.A. No.: 04-1278 (KAJ)
)
PECHINEY PLASTIC PACKAGING, )
INC., )  **CONFIDENTIAL –**
)  **FILED UNDER SEAL**
    Defendant/Counter-Plaintiff. )

## CRYOVAC'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Michele Sherretta (No. 4651)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
    Attorneys for Cryovac, Inc.

Of Counsel:
Ford F. Farabow, Jr.
Joann M. Neth
Martin I. Fuchs
Courtney B. Meeker
Mark J. Feldstein
Rebecca D. Hess
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, D.C.  20001-4413
(202) 408-4000

Dated:  November 18, 2005

# TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ........................................................................................... iii

I.     NATURE AND STAGE OF THE PROCEEDINGS ................................. 1

II.    SUMMARY OF ARGUMENT ................................................................. 1

III.   STATEMENT OF FACTS ........................................................................ 3

    1.   The Shah Invention ...................................................................... 3

    2.   Orientation According to the Shah '419 patent ............................. 3

    3.   Layer Arrangement According to the Shah '419 Patent ................. 5

IV.    CONSTRUCTION OF TERMS ................................................................ 6

  A.   "Oriented" and "Oriented Coextruded Film" ........................................ 6

    a.   The express definition in the specification is controlling ............. 8

    b.   Pechiney's definition would read on disclaimed subject matter ...... 9

    c.   Pechiney's construction is grammatically unsound ...................... 10

    d.   Pechiney's 'product by process' argument is contrary to law and
      internally inconsistent ................................................................ 11

  B.   "Film" ................................................................................................ 14

  C.   "Coextruded Film" ............................................................................ 16

  D.   "Layer(s)" .......................................................................................... 18

  E.   "At Least Seven Layers" .................................................................... 19

  F.   "Arranged Symmetrically" and "At Least Seven Layers Arranged
    Symmetrically" .................................................................................. 21

    a.   Pechiney's false dilemma ............................................................ 22

b.    Pechiney's non-analogous "analogy" reads in unstated limitations............... 23

c.    The intrinsic record requires variability in layer thickness, composition, and a geometric center.................................................................................... 24

d.    Pechiney improperly relies upon cropped statements from the prosecution history ................................................................................................................ 28

e.    Cryovac's definition is not superfluous........................................................ 31

f.    Pechiney's definition of "arranged symmetrically" is inconsistent with its definitions of clauses (b), (c), and (d)............................................................ 32

G.    "Comprising"............................................................................................................ 33

H.    "Layer Comprising" or "Layers Each Comprising" or "Layers, Each Comprising" ............................................................................................................. 33

I.    "(a) A Core Layer Comprising an Ethylene Vinyl Alcohol Copolymer"............ 34

J.    Clauses (b), (c), and (d)........................................................................................... 36

a.    Legally, "a" does not equate with "any" ....................................................... 37

b.    Pechiney's proposal conflicts with both the common meaning of "a" and the context of the patent................................................................................... 38

V.    CONCLUSION.................................................................................................................. 39

## TABLE OF AUTHORITIES

*ACCO Brands, Inc. v. Micro Security Devices, Inc.,*
   346 F.3d 1075 (Fed. Cir. 2003).................................................................9

*ADE Corp. v. KLA-Tencor Corp.,*
   252 F. Supp. 2d 40 (D. Del. 2003)..........................................................14

*Autogiro Co. of America v. United States,*
   384 F.2d 391 (Ct. Cl. 1967) .....................................................................9

*Aventis Pharms., Inc. v. Barr Laboratoriess, Inc.,*
   335 F. Supp. 2d 558 (D.N.J. 2004) .........................................................13

*CVI/Beta Ventures v. Tura LP,*
   112 F.3d 1146 (Fed. Cir. 1997)...............................................................27

*Catalina Marketing International, Inc. v. Coolsavings.Com, Inc.,*
   289 F.3d 801 (Fed. Cir. 2002)................................................................20

*CollegeNet, Inc. v. ApplyYourself, Inc.,*
   418 F.3d 1225 (Fed. Cir. 2005)...............................................................38

*Control Resources, Inc. v. Delta Electrics, Inc.,*
   133 F. Supp. 2d 121 (D. Mass. 2001) .........................................15, 16, 20

*Dynacore Holdings Corp. v. U.S. Phillips Corp.,*
   363 F.3d 1263 (Fed. Cir. 2004).........................................................27, 28

*Ekchian v. Home Depot,*
   104 F.3d. 1299 (Fed. Cir. 1997)..............................................................12

*Free Motion Fitness, Inc. v. Cybex International,*
   423 F.3d 1343 (Fed. Cir. 2005)...............................................................38

*Genentech Inc. v. Chiron Corp.,*
   112 F.3d 495 (Fed. Cir. 1997).................................................................33

*In re Hyatt,*
   708 F.2d 712 (Fed. Cir. 1983).................................................................11

*IMS Tech., Inc. v. Haas Automations, Inc.,*
   206 F.3d 1422 (Fed. Cir. 2000)...............................................................29

*Johnson Worldwide Associate, Inc. v. Zebco Corp.,*
   175 F.3d 985 (Fed. Cir. 1999)............................................................22, 24

*KCJ Corp. v. Kinetic Concepts, Inc.,*
   223 F.3d 1351 (Fed. Cir. 2000)..................................................................................38

*Lucent Techs., Inc. v. Extreme Networks, Inc.,*
   367 F. Supp. 2d 649 (D. Del. 2005)..............................................................................8

*Markman v. Westview Instruments,*
   517 U.S. 370 (1996)..................................................................................................32

*Medtronic Minimed, Inc. v. Smiths Medical MD, Inc.,*
   2005 U.S. Dist. LEXIS 10583 (D. Del. June 1, 2005)...........................................12, 13

*In re Moeller,*
   117 F.2d 565 (CCPA 1941) ........................................................................................12

*Omega Engineering, Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003)...................................................................................30

*Pause Tech. LLC v. TiVo Inc.,*
   419 F.3d 1326 (Fed. Cir. 2005)...................................................19, 20, 32, 34, 35, 37

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005)......................................................8, 9, 14, 15, 34, 38

*Rexnord Corp. v. Laitram Corp.,*
   274 F.3d 1336 (Fed. Cir. 2001).....................................................................................8

*S3 Inc. v. Nvidia Corp.,*
   259 F.3d 1364 (Fed. Cir. 2001)...................................................................................27

*Scripps Clinic & Research Foundation v. Genetech, Inc.,*
   927 F.2d 1565 (Fed. Cir. 1991)...................................................................................13

*Sulzer Textil A.G. v. Picanol N.V.,*
   358 F.3d 1356 (Fed. Cir. 2004)........................................................................15, 16, 20

*Teleflex, Inc. v. Ficosa N. America Corp.,*
   299 F.3d 1313 (Fed. Cir. 2002)..........................................................................9, 10, 28

*Terlep v. Brinkmann Corp.,*
   418 F.3d 1379 (Fed. Cir. 2005)...............................................................................12, 20

*In re Thorpe,*
   777 F.2d 695 (Fed. Cir. 1985).....................................................................................13

iv

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................................3, 26, 28

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*,
    520 U.S. 17 (1997)................................................................................................................13

DB01:1910645.1                                                                                                063527.1001

## I.    NATURE AND STAGE OF THE PROCEEDINGS

In this action, plaintiff Cryovac, Inc. ("Cryovac") has asserted, *inter alia*, that defendant Pechiney Plastic Packaging, Inc. ("Pechiney") has infringed claim 11 of the U.S. Patent No. 4,755,419 ("Shah '419 patent," Ex. 1).[1]   Relevant discovery has been completed and the issue of claim construction is before the Court.  Pursuant to paragraph 12 of the Scheduling Order (DI-22), Cryovac submits this reply brief in opposition to Pechiney's proposed construction.  The parties' Joint Claim Construction Chart, pursuant to paragraph 11 of the Scheduling Order, is also attached as Ex. 2.

## II.   SUMMARY OF ARGUMENT

Focusing  primarily  on  the  constructions  of  "oriented"  and  "arranged symmetrically," Pechiney ignores the prosecution history in its entirety with respect to "oriented" and misreads it in the case of "arranged symmetrically."  In both cases, Pechiney's proposed constructions are inconsistent with the inventor's claimed and disclosed invention.  Although these two arguments are central to Pechiney's substantive defenses (P.Br. at 6), that does not justify its inconsistent and outcome driven constructions.

The term "oriented" is used in claim 11 of the Shah '419 patent as part of the phrase "oriented coextruded film" and should be interpreted in that context to mean: "A film formed by coextrusion that is then heated to its orientation temperature range and stretched to realign the molecular configuration, this stretching accomplished by a

---

[1] References to "Ex. __" refer to the appended exhibits; "C.Br." refers to Cryovac's Initial Brief on Claim Construction (DI-203); "P.Br." refers to Pechiney's Memorandum in Support of its Proposed Claim Constructions (DI-204); and "P.S.J." refers to Pechiney's Memorandum in Support of its Motion for Summary Judgment on Patent Issues (DI-195).

1

racking or blown bubble process." This definition comes from the specification (Ex. 1, col. 3, lns. 45-49) and is consistent with the prosecution history and the cited references that make up the intrinsic record.

In contrast, the construction urged by Pechiney crops the specification's definition (*i.e.*, by leaving out the words "this stretching accomplished by a racking or blown bubble process") and would impermissibly cover materials expressly distinguished in the prosecution history as being "unoriented." Pechiney's sole justification is that "oriented" is a product by process limitation that should be wholly disregarded. But, "oriented" is a property, not a product by process limitation. Even if "oriented coextruded film" as was a product by process limitation, it cannot be simply ignored as proposed by Pechiney.

The context, grammar, specification, and prosecution history together indicate that the term "arranged symmetrically" in the phrase "at least seven layers arranged symmetrically" means that corresponding pairs of layers defined in the body of the claim are arranged in a symmetric order on opposite sides of the core layer. That is, the claimed layers are arranged such that one layer (b), one layer (c) and one layer (d) are in the same order on each of the opposite sides of the core layer (a). Beyond the required arrangement or ordering of the claimed layers, the phrase does not provide any further implied or express limitations.

Specifically, "at least seven layers arranged symmetrically" does not require the added limitations proposed by Pechiney that there is (1) mirror image identity in layer thickness, (2) mirror image identity in precise chemical composition, and (3) a geometric center line in the core layer. (P.Br. at 7.) Contrary to Pechiney's contentions, none of

2

these three limitations were addressed in the prosecution history. To the contrary, the specification and the prosecution both revolved around layer arrangement and general chemical compositions. If Pechiney's additional limitations were read into claim 11, the claim would exclude the inventor's preferred embodiments, a construction the Federal Circuit has characterized as "rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

## III.    STATEMENT OF FACTS

The Shah '419 patent issued from the United States Patent and Trademark Office ("USPTO") on July 5, 1988, based on Application Serial No. 06/842,600, filed March 21, 1986. The sole inventor is Gautam P. Shah. The Shah '419 patent was originally assigned to W.R. Grace & Co., Cryovac Div., and is now assigned to Cryovac, Inc. A more detailed statement of facts, including the full scope of the specification and the prosecution history (Ex. 3), is provided in Cryovac's Initial Brief (C.Br., Section III), with the following issues being particularly pertinent to the arguments in Pechiney's Brief.

### 1.    The Shah Invention

The invention of the Shah '419 patent provides "[a] multilayer film with a combination of oxygen barrier properties, toughness, shrinkability, and good optical properties... " (Ex. 1, Abstract.) The objectives of Shah's invention are achieved by an oriented multilayer film having at least seven layers arranged in the following order:

polymeric material/adhesive/polyamide/EVOH/polyamide/adhesive/polymeric material.

(Ex. 1, col. 3, lns. 22-29, col. 4, ln. 60 - col. 6, ln. 64.)

### 2.    Orientation According to the Shah '419 patent

In the section titled "Definitions," the term "oriented" is defined as

3

> a polymeric material which has been heated and stretched
> to realign the molecular configuration, this stretching
> accomplished by a racking or blown bubble process.

(Ex. 1, col. 3, lns. 45-49.)  The term "racking," referenced in the definition of oriented, is further defined as "a well-known process for stretching coextruded and reheated multilayer film by means of tenterframing or blown bubble processes." (Ex. 1, col. 3, lns. 63-66.)  "Blown bubble" is later characterized as entailing a process where "the coextruded and cooled tube is heated to its orientation temperature range to orient the film." (Ex. 1, col. 8, lns. 60-62.)  The blown bubble process is also explained in the context of the detailed Example 1, where a solid tube formed by the cooling of a melt-state multilayer coextrusion was heated to a temperature below its melting point and "blown into a bubble" to stretch it about 3.3 times its original dimension in one direction, and about 3.5 times in the perpendicular direction.  (Ex. 1, col. 7, lns. 14-26; Ex. 4, Expert Report of Garth L. Wilkes, June 17, 2005 ("Wilkes Rep."), at 9.)  In all cases, "oriented" is disclosed as entailing the reheating of a previously coextruded and cooled solid film, and the stretching of the reheated film by a racking or blown bubble process.

Among the materials brought to the attention of the USPTO by the Applicant was information about a certain seven layer film (the "Fant film"), which was distinguished as being an "unoriented" film having a structure of:

> 90% LLDPE,[2] 10% antiblock/ LLDPE-based tie/ nylon 6/
> EVOH/ nylon 6 /LLDPE-based tie /90% LLDPE,
> 10% antiblock.

---

[2] "LLDPE" is one abbreviation for linear low density polyethylene copolymers. (Ex. 1, col. 4, lns. 3-5.)

4

(Ex. 3, CR056-000160 to 161.) The Fant film was further explained as being the subject matter of copending U.S. Patent Application Serial No. 834,694, filed February 28, 1986 (now U.S. Patent No. 4,746,562, Ex. 5). (*Id.*)

### 3.    Layer Arrangement According to the Shah '419 Patent

The background section of the specification provides context for the invention, addressing the layer arrangement and general compositions of multilayer films according to twelve different references. (Ex. 1, col. 1, ln. 48 - col. 3, ln. 5.) Layer thicknesses in the cited prior art references are not addressed in the background section as being of interest or otherwise relevant. (*Id.*) Similarly, minor components and other additives in the film layers of the prior art are not discussed as being important to the background or context of the Shah '419 patent's invention. (*Id.*)

Thicknesses of the various layers are addressed within the specification, and several preferred embodiments are discussed. For instance, the specification provides a range of thicknesses for each of the outer layers, stating that "preferably each comprise from about 20% to 40%" of the total film thickness. (Ex. 1, col. 5, ln. 42-45.) The two intermediate polyamide containing layers are disclosed as each being between 5% and 25% of the total film thickness (Ex. 1, col. 5, lns. 20-22), and the adhesive layers are disclosed as each being between about 5% and about 15% of the total film thickness (Ex. 1, col. 6, lns. 65-68).

During prosecution, in response to a rejection based on U.S. Patent No. 4,284,674 to Sheptak ("Sheptak," Ex. 6; Ex. 3, CR056-000142 to 144), prosecution claim 1 was amended to the wording of present claim 11. In particular, the preamble was amended to recite "having at least seven layers arranged symmetrically" and the body of the claim was amended to affirmatively recite that the film included "two layers, each comprising

an adhesive polymeric material, which adhere each of said intermediate layers to a respective outer layer." (Ex. 3, CR056-000152 to 153.)[3] At the same time, prosecution claim 1 was amended to delete a limitation in the body of the claim stating "said layers of the multilayer films forming a symmetrical heat-shrinkable structure." (Id.)[4] Applicant explained that these amendments were to clarify that "(1) at least seven layers are claimed, and that (2) these layers are symmetrically arranged." (Ex. 3, CR056-000155.) No references or representations were made during prosecution concerning the thickness or exact composition of any layer of the claimed film or those of the cited prior art.

## IV. CONSTRUCTION OF TERMS

### A. "Oriented" and "Oriented Coextruded Film"

**Cryovac's Proposed Definition: The term "oriented" is used in the claim as part of the phrase "oriented coextruded film," and should be interpreted in that context to mean:**

> **A film formed by coextrusion that is then heated to its orientation temperature range and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process.**

The specification expressly provides the definition that "[t]he term 'oriented' and the like is used herein to define a polymeric material which has been heated and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process." (Ex. 1, col. 3, lns. 45-49.) The term "racking" is then defined as a "process for stretching coextruded and reheated multilayer film by means of tenterframing or blown bubble processes" (Ex. 1, col. 3, lns. 63-66), and blown bubble is

---

[3] Pursuant to USPTO convention, this added limitation to the preamble of the claim is underscored.

[4] Pursuant to USPTO convention, this limitation deleted from paragraph d) of the claim is in brackets.

063527.1001

further explained as entailing a process where "the coextruded and cooled tube is heated to its orientation temperature range to orient the film" (Ex. 1, col. 8, lns. 60-62).

Based on these express definitions, an "oriented coextruded film" denotes a product (coextruded film) that is previously formed, cooled to a solid, and then subsequently treated by processes (heating to its orientation temperature range and stretching accomplished by a racking or blown bubble process) to yield a new product (oriented coextruded film) where the molecular configuration has been realigned. Logically and temporally, there must first be a coextruded film that is then oriented by heating and stretching with a racking or blown bubble process to provide the claimed property of being an oriented coextruded film.

Pechiney's definition crops the express definition from the specification. Pechiney proposes that the definition should be: "A polymeric material which has been heated and stretched to realign the molecular configuration," thereby expressly and intentionally ignoring, among other things, the remainder of the specification's definition that "this stretching accomplished by a racking or blown bubble process." (Ex. 2 at 1; P.Br. at 20-21.) There is no valid justification for Pechiney to crop out elements of the definition that it happens not to like.

Moreover, Pechiney violates multiple key principles of claim construction with its cropped definition. First, Pechiney violates the principle that an express definition in the specification is controlling. Second, Pechiney does not consider the prosecution history, and violates the principle that claims cannot be construed to cover disclaimed subject matter. Third, Pechiney's proposal is grammatically incorrect and ignores the context and meaning of "oriented" as part of the phrase "oriented coextruded film." Fourth,

Pechiney's sole justification, based on arguments concerning product by process limitations, is factually and legally incorrect, and also internally inconsistent. Finally, Pechiney's short-sheeted construction is at odds with the meaning of "oriented" provided in the references cited in the intrinsic record.

Accordingly, for at least these reasons, as discussed further below, Pechiney's overbroad and imprecise constructions of "oriented" and "oriented coextruded film" should both be rejected. Cryovac's proposed constructions, being based on the full definition in the specification, the context and grammar of the phrase, and the clear disclaimer during prosecution, should be adopted.

### a. The express definition in the specification is controlling

Pechiney's selective reliance on some parts of the definition of "oriented" to the exclusion of others violates the claim construction principle that when "the specification [reveals] a special definition given to a claim term by the patentee... the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (citations omitted); *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342-43 (Fed. Cir. 2001). The priority of the inventor's definition is violated by Pechiney's use of only a partial definition. Indeed, a similar attempt to select parts of a definition to the exclusion of the definition as a whole was just recently considered and rejected. *Lucent Techs., Inc. v. Extreme Networks, Inc.*, 367 F. Supp. 2d 649, 668 (D. Del. 2005).

Although not addressed by Pechiney, the prior art cited in the file wrapper also demonstrates that an "oriented coextruded film" is a film formed by coextrusion that is then heated to its orientation temperature range and stretched to realign the molecular configuration, this stretching accomplished by a racking or blown bubble process.

8

*Phillips,* 415 F.3d at 1317, citing *Autogiro Co. of Am. v. United States,* 384 F.2d 391, 399 (Ct. Cl. 1967) ("[The file wrapper can be used], like the specification and drawings, to determine the scope of the claims. For example, the prior art cited in the file wrapper is used in this manner." (footnote omitted)). As discussed in Cryovac's Initial Brief (C.Br. at 14-16), the cited references make particularly clear that the stretching, accomplished by a racking or blown bubble process, does not include stretching that occurs with molten polymers, *i.e.,* polymers that are still above their melting point, as is the case with the pre-heated coextruded material exiting the coextrusion die. (Ex. 7, Rebuttal Expert Report of Dr. Robert M. Kimmel, June 17, 2005 ("Kimmel Reb."), at 11-12; Ex. 4, Wilkes Rep. at 11-12.) In other words, the cited references make it clear that Pechiney's overbroad construction is incorrect.

### b. Pechiney's definition would read on disclaimed subject matter

The prosecution history is, of course, especially pertinent to claim construction where an applicant has distinguished the claimed invention from the prior art. *ACCO Brands, Inc. v. Micro Security Devices, Inc.,* 346 F.3d 1075, 1078 (Fed. Cir. 2003); *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1326 (Fed. Cir. 2002). Having ignored the prosecution history (P.Br. at 20-22), it is not surprising that the definition put forth by Pechiney would read on subject matter expressly disclaimed during prosecution. In particular, as explained below, Pechiney's definition of "oriented" reads on melt-state stretching that was expressly disclaimed. Of course, although intentional on Pechiney's part (P.Br. at 6), this is not permissible. *Teleflex,* 299 F.3d at 1326.

As detailed in Cryovac's Initial Brief (C.Br. at 13-14), a certain seven layer film (the Fant film) was disclosed but distinguished as "unoriented." (Ex. 3, CR056-000160

to 161.) The Fant film was explained as being the subject matter of copending, U.S. Patent Application Serial No. 834,694 to Ennis Fant, filed February 28, 1986, now U.S. Patent No. 4,746,562 to Ennis Fant ("Fant patent," Ex. 5). (*Id.*) As exemplified in the Fant patent, the films of that invention are coextruded in tubular form with no disclosure of any further processing (*e.g.*, heating or stretching) after the cooling of the coextruded film. (Ex. 5, col. 5, lns. 3-22; Ex. 7 at 18-19.) Instead of being oriented by reheating and stretching, Pechiney's expert, Dr. Mount, has opined that stretching during the Fant film's coextrusion *with the extruded material still in the molten state* (*i.e.,* before solidification) yielded molecular orientation. (Ex. 8, Mount Depo. Tr. 40:3-19.)

Since the prosecution history shows that the Fant film was disclaimed and distinguished as "unoriented," the definition of "oriented coextruded film" in claim 11 of the Shah '419 patent cannot be construed so broadly as to encompass the Fant film. *E.g., Teleflex*, 299 F.3d at 1327. It cannot be construed, therefore, to encompass "molecular orientation" (Ex. 8 at 40:3-19) resulting from just any heating and stretching not entailing a racking or blown bubble process. And it cannot be construed to encompass mere drawing or stretching of a hot melt before the coextruded polymers are solidified. However, by intentionally eliminating the clause "this stretching accomplished by a racking or blown bubble process," this is exactly what Pechiney proposes its construction covers. (*E.g.*, P.Br. at 6; P.S.J. at 3, 33.)

### c. Pechiney's construction is grammatically unsound

Pechiney seeks to reverse, or at least ignore, the grammatical order and construction of the phrase "oriented coextruded film" by implying that a coextrusion process forms an oriented film (*i.e.*, "[a]n oriented film *formed by* coextrusion" (P.Br. 20 (emphasis added)), rather than the orientation being an additional property added to a

10

previously coextruded film as provided by the intrinsic record. Based on the grammar and context, however, "oriented" modifies "coextruded film" by defining a particular set of properties added to the coextruded film. *In re Hyatt,* 708 F.2d 712, 714 (Fed. Cir. 1983) (stating that "[a] claim must be read in accordance with the precepts of English grammar"). Consistent with the proper grammar, the Shah '419 patent similarly provides that a film is first coextruded before being cooled and then reheated to its orientation temperature and stretched by a racking or blown bubble process to provide orientation. (*E.g.,* Ex. 1, col. 7, lns. 14-34.)

### d. Pechiney's 'product by process' argument is contrary to law and internally inconsistent

Pechiney's sole justification for cropping the express definition of oriented to exclude portions that conflict with its equally improper validity arguments is that "[t]he additional language requiring the stretching to be 'accomplished by a racking or blown bubble process' imposes a 'product-by-process' limitation into claim 11 that should not be incorporated into the claim." (P.Br. at 21.) The facts and the law, however, do not support Pechiney's proposition, which is also internally inconsistent.

First, "oriented" and "oriented coextruded film" are not product by process limitations. Rather, what is referenced is a property of the claimed film: the film is "An oriented coextruded film..." The processes by which a multilayer film is made do affect its properties, and thus, as recognized by the express definition in the specification, it does matter what process is used to provide orientation. (Mount Rep. at 17; Ex. 8, Mount Depo. Tr. 58:9-59:19; Ex. 10, Wilkes at ¶6.) However, neither this fact nor Cryovac's proposed construction converts "oriented" and "oriented coextruded film" into product by process limitations. Pechiney's argument to the contrary rests on the false premise that

11

an explanation or construction of a term can change its scope or meaning by converting the descriptive adjective "oriented" into a process limitation. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005) ("The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.") (citations and quotations omitted).

Second, there is nothing improper or uncommon in defining a product feature or property based on the process by which it was formed. To the contrary, this is both permissible and common. For example, "where it is not possible to define the characteristics which make it inventive except by referring to the process by which the article is made, [the inventor] is permitted to so claim his article..." *In re Moeller*, 117 F.2d 565, 568 (CCPA 1941). In the present case, as noted above, both parties' experts agree that the method of producing a film, including the methods by which it is oriented, "would have affected its final property profile...." (Mount. Rep. at 17; *see also* Ex. 8, Mount Depo. Tr. at 58:9-59:19; Ex. 10, Wilkes Affidavit at ¶6.) In other words, defining a multilayer film by the properties resulting from its method of production is entirely proper.

Pechiney cites *Ekchian v. Home Depot*, 104 F.3d. 1299, 1303 (Fed. Cir. 1997) and this Court's opinion in *Medtronic Minimed, Inc. v. Smiths Med. MD, Inc.*, 2005 U.S. Dist. LEXIS 10583, at *72 (D. Del. June 1, 2005) (Ex. 9) as the bases for its argument that claim scope should not be limited by process language. (P.Br. at 21.) However, both cases relate to attempts to read limitations from the examples to the claims. Unlike the present case, there were no express definitions of the contested terms. *Ekchian*, 104 F.3d at 1302-1303 (construing "conductive" not to require the specific levels of conductivity

in the examples); *Medtronic Minimed,* 2005 U.S. Dist. LEXIS 10583, *71-72 (construing "indication device" as not requiring a location as provided in certain examples). These cases are simply not on point, and do not support the exclusion of process limitations.

Pechiney's citations to *Scripps Clinic & Research Found v. Genetech, Inc.,* 927 F.2d 1565, 1583 (Fed. Cir. 1991) and decisions of this court citing thereto also do not support its proposal to selectively read "this stretching accomplished by a racking or blown bubble process" out of the express definition of oriented (P.Br. at 21-22). *Scripps* does not allow process limitations to be completely ignored. Rather, the principles of *Scripps* still require the characteristics of the prior art or accused product to be the same as those of the claimed product by process. *See, e.g.,* the early precedent of *In re Thorpe,* 777 F.2d 695, 698 (Fed. Cir. 1985). More recently, the Supreme Court has stated that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention[.]" *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29 (1997). Thus, "process steps may establish product characteristics which are claim limitations." *Aventis Pharms., Inc. v. Barr Labs., Inc.,* 335 F. Supp. 2d 558, 582 (D.N.J. 2004).

In the present case, both parties' experts agree that the process by which the film is oriented affects the final characteristics of the film. (Ex. 13, Mount. Rep. at 17; Ex. 8, Mount Depo. Tr. at 58:9-59:19; Ex. 10, Wilkes Affidavit, at ¶6.) Thus, in view of the fact that the process by which a multilayer polymeric film is oriented does affect its final properties, there is no basis, under *Scripps* or otherwise, to ignore the component of the express definition of oriented that requires that the "stretching [be] accomplished by a racking or blown bubble process." (Ex. 1, col. 3, lns. 45-49.)

13

In addition, Pechiney contends that the term "oriented" means a "[a] polymeric material which *has been heated and stretched to realign the molecular configuration...*" (P.Br. at 20 (emphasis added).) The "heat[ing] and stretch[ing]" in Pechiney's proposed definition also seeks to incorporate process-derived properties into the claim. Its argument that the same type of limitation expressly used in the specification should be ignored is internally inconsistent.

### B.    "Film"

### Cryovac's Proposed Definition:  A thin, flexible, packaging material.

"Films" according to the specification of the Shah '419 patent and consistent with the extrinsic evidence are thin, flexible, packaging materials, as explained in detail in Cryovac's Initial Brief. (C.Br. at 18-21; Ex. 2 at 3). While Pechiney agrees that the term "film" has some specific meaning in the context of the Shah '419 patent, and that it does not refer to photographic film, Pechiney nevertheless treats the term as "a general and generic term," merely "a physical construct," such that it means "a web of material(s), often plastic." (P.Br. at 22.) The rationale behind Pechiney's attempt to ignore the context of the specification is not entirely clear, but it is clearly improper. *Phillips,* 415 F.3d at 1321; *ADE Corp. v. KLA-Tencor Corp.*, 252 F. Supp. 2d 40, 58 (D. Del. 2003) ("A dictionary, encyclopedia, or treatise may also contain several definitions for the same word. In short, context is critical, and the import of the intrinsic record cannot be ignored.") (citations omitted).

Pechiney first argues that "films" according to claim 11 of the Shah '419 patent are not inherently used for packaging applications. (P.Br. at 23.) Surprisingly, the basis for its position is the disclosure that the "invention relates to oriented thermoplastic films *for packaging applications...*" (Ex. 1, col. 1, lns. 5-6 (emphasis added).) Pechiney's

14

further characterization of a film as "often plastic" again demonstrates Pechiney's failure to consider the term in context of the claim and record as a whole where the films necessarily comprise plastic polymers (*e.g.*, Ex. 1, col. 1, lns. 5-6 ("This invention relates to oriented *thermoplastic* films for packaging applications..." (emphasis added)). Thus, Pechiney misses the point of this disclosure and the purpose of claim construction. While all films may not be plastic or for packaging applications, the Shah '419 patent could not be more clear that the inventive film "relates to oriented thermoplastic films for packaging applications." (Ex. 1, col. 1, lns. 5-6.) Thus, the problem with Pechiney's position "is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Phillips,* 415 F.3d at 1321.

In addition, as explained in Cryovac's Initial Brief (C.Br. at 20-21), the use of an even less common term "web" within Pechiney's definition of film ("[a] web of material(s), often plastic" (Ex. 2 at 3; P.Br. at 22)) will provide no useful guidance to the fact finder, and therefore is not appropriate for this additional reason. *E.g.*, *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[The court should] ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims."); *Control Resources, Inc. v. Delta Elecs., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass. 2001) ("The claims must be translated into plain English so that a jury will understand.").

Because Pechiney's proposed definition of a film as being "[a] web of material(s), often plastic" is vague and inaccurate, it should be rejected. Instead, Cryovac's definition, which tracks the context of the Shah '419 patent and which would be an aid to the fact finder, should be adopted.

15

C.    "Coextruded Film"

**Cryovac's Proposed Definition:** A film formed by coextrusion in which the layers of the film are extruded together simultaneously.

Consistent with the patent specification, a "coextruded film," according to Cryovac's proposed definition, is a film formed by coextrusion in which the layers of the film are extruded together simultaneously. As explained in Cryovac's Initial Brief (C.Br. at 21-22), a coextruded film, where all the layers are extruded together simultaneously, can be contrasted with films formed by other methods, such as lamination, where at least some layers are formed separately and then subsequently joined together.

Pechiney's circular definition of a "coextruded film" as being "[a] film formed by coextrusion" (P.Br. at 23), is imprecise and unhelpful. *Sulzer Textil*, 358 F.3d at 1366; *Control Resources*, 133 F. Supp. 2d at 127. First, Pechiney contends that "[t]o one of skill in the art, 'coextruded film' was a well-known concept." (P.Br. at 24.) However, Pechiney fails to provide in its proposed construction any explanation as to the scope of this concept. Unless the fact finders happen to be the hypothetical person of ordinary skill in the art, they will need guidance, but not have any from Pechiney's proposed definition. *Control Resources*, 133 F. Supp. 2d at 127.

The only limitation Pechiney provides is that coextrusion is not lamination. (P.Br. at 24.) This limitation, which is not provided in its proposed construction, is insufficient and imprecise. Whether by intention or inattention, Pechiney's definition is potentially loose enough for them to argue that films, such as the laminated films of U.S. Patent No. 4,421,823 to Theisen (Ex. 11, col. 2, lns. 19-28, cited in the intrinsic record at Ex. 3, CR056-000036, 46), where some of the layers are coextruded together and other layers are subsequently added by lamination in an overall two-step process, are

16

coextruded. However, the Theisen film, *as a whole*, is not a coextruded film. The vagary in Pechiney's construction is improper, and could result in substantial confusion and erroneous findings.

Second, Pechiney relies on an explanation in the Expert Report of Dr. Kimmel that coextrusion is a process in which layers are extruded together in "*a single process*." (P.Br. at 24 (emphasis added).) While extrusion "in a single process" already parallels Cryovac's recognition that "the layers of the film are extruded together simultaneously," Pechiney fails to mention the even more specific deposition testimony of Dr. Kimmel on this point.

> [T]here are various ways of assembling a multilayer film. Coextrusion is one of those ways in which, as described in my report and in Dr. Mount's report, and it involves *extruding all of the material simultaneously.*

(Ex. 12, Kimmel Depo. Tr. 35:19 - 36:3 (emphasis added.)) Pechiney also fails to mention the similar explanation of its expert, Dr. Mount, that "the polymer [layer] combinations [in coextruded films] were produced in a single operation rather than by combining materials produced in multiple operations...." (Mount Rep., Ex. 13 at 5.) Accordingly, in contrast to Pechiney's position, the experts agree that coextrusion involves "a single process" where the materials are coextruded "simultaneously" and not "by combining materials produced in multiple operations."

Pechiney's circular definition should be rejected, as it is unhelpful and imprecise. Cryovac's proposed definition should be adopted.

D.    "Layer(s)"

Cryovac's Proposed Definition:  A thickness of material adhered to
another thickness of material.

Cryovac's proposed definition of "layer(s)" tracks the express definitions in the
Shah '419 patent specification, which states that "'[i]ntermediate layer', 'interior layer',
and the like are used herein to define a layer in a multilayer film *adhered* on both sides to
other layers." (Ex. 1, Shah '419 patent, col. 3, lns. 42-44 (emphasis added).) Based on
this express definition, Cryovac's proposed definition provides that "layer" means "[a]
thickness of material *adhered* to another thickness of material," such that one layer in a
multilayer film is adhered to another.

In contrast, Pechiney's proposed definition, "[o]ne thickness of material *laid or
lying over or under* another" (Ex. 2 at 6-7 (emphasis added)), fails to provide that layers
are actually adhered to one another.  In support, Pechiney's offers no basis from the
intrinsic record, instead relying on a declaration that merely parrots back, without
explanation of any basis, Pechiney's wording.  (P.Br. at 30.)  Further, Pechiney
simultaneously offers the inconsistent construction that a "core layer" is "[a] central layer
that is *adhered* on both sides to other layers and whose composition includes an ethylene
vinyl alcohol copolymer but may also include other material(s)." (P.Br at 28-29
(emphasis added).)

Pechiney's attempted explanation that "some layers adhere to other layers based
primarily upon their composition, and some do not" (P.Br. at 30) is either a non sequitur
or an agreement that layers in a multilayer film are adhered to other layers (just not
necessarily based primarily upon their composition).  If, as Pechiney contends, layers are
not necessarily adhered to another, they could simply be layers from different films that

18

happen, even transiently, to be "laid or lying over or under another." For example, a page in this Brief or any piece of paper temporarily dropped on top of another (*i.e.,* "laid or lying over or under another") would not be distinguished in any way from a layer in a multilayer film. In this regard, Pechiney's proposal renders the term essentially meaningless.

Accordingly, at least because it is inconsistent with the specification, essentially meaningless, and internally inconsistent, Pechiney's proposed definition for "layer(s)" should be rejected.

E.    "At Least Seven Layers"

> **Cryovac's Proposed Definition:  At least the seven layers recited in subparagraphs (a), (b), (c) and (d) of claim 11.**

Based on the context, it is clear that the "at least seven layers" recited in the preamble of claim 11 of the Shah '419 patent are not arbitrary or undefined layers. Rather, they necessarily encompass the layers recited in subparagraphs (a), (b), (c) and (d) of claim 11. Cryovac thus construes the clause "at least seven layers" in context of the claim as a whole. *Pause Tech. LLC v. TiVo Inc.,* 419 F.3d 1326, 1331 (Fed. Cir. 2005) (citations omitted).

In contrast, Pechiney argues that the phrase "at least seven layers" should be construed without regard to the context of the claim. (P.Br. at 31.) Specifically, Pechiney wants no mention of the seven layers defined in the body of the claim. (P.Br. at 31.) The motivation for this position is unclear, but it clearly violates the Federal Circuit's instructions that "proper claim construction... demands interpretation of the entire claim in context, not a single element in isolation.... There is no basis for us to ignore [the] language [appearing later in the claim] in properly construing the claim

language in dispute." *Pause Tech.,* 419 F.3d at 1331 (citations and quotations omitted). Indeed, the preamble often provides antecedent basis for elements in the body of the claim. *Catalina Mktg. Int'l, Inc. v. Coolsavings.Com, Inc.,* 289 F.3d 801, 808 (Fed. Cir. 2002).

To construe "at least seven layers" in a vacuum according to Pechiney's proposal without reference to the layers defined in the body of the claim provides a meaningless and inconsistent construction. If the "at least seven layers" do not include the seven layers identified in the body of the claim, there is no connection between the preamble and the rest of the claim.

Pechiney's rhetoric (P.Br. at 31) that Cryovac's construction improperly complicates the claim construction obfuscates the purpose of claim construction. The purpose is not to consider terms in the abstract. *Pause Tech.,* 419 F.3d at 1331. The purpose of claim construction is not simply to recite back the words of the claim arranged differently. *See Sulzer Textil,* 358 F.3d at 1366. The purpose is to explain the meaning of the terms based on the context of the claim, the specification, and the intrinsic record as whole such that a fact finder has a definitive meaning in plain English. *Terlep,* 418 F.3d at 1382; *Pause Tech.,* 419 F.3d at 1331, *Control Resources,* 133 F. Supp. 2d at 127. Pechiney's proposal conflicts with all of these functions.

For at least these reasons, Pechiney's proposed construction should be rejected and Cryovac's construction should be adopted.

20

F.    "Arranged Symmetrically" and "At Least Seven Layers Arranged Symmetrically"

**Cryovac's Proposed Definition: The term "arranged symmetrically" is used in the claim as part of the phrase "at least seven layers arranged symmetrically" and should be interpreted in that context to mean:**

**At least the seven layers recited in subparagraphs (a), (b), (c) and (d) of claim 11 arranged such that one layer (b), one layer (c) and one layer (d) are in the same order on each of the opposite sides of the core layer (a), for example, c/d/b/a/b/d/c. This claim phrase limits the arrangement of the layers. It does not limit the thickness of the layers. Nor does it limit the amounts of recited components or additives that may be included in the layers.**

As explained in Cryovac's Initial Brief (C.Br. at 24-31), the context, grammar, specification, and prosecution history of claim 11 of the Shah '419 patent uniformly indicate that the phrase "at least seven layers arranged symmetrically" means that corresponding pairs of layers, as they are defined in the body of the claim, are arranged in a symmetric *order* on opposite sides of the core layer. That is, the claimed layers are arranged such that one layer (b), one layer (c) and one layer (d) are in the same order on each of the opposite sides of the core layer (a), for example, c/d/b/a/b/d/c. Beyond the required arrangement or ordering of the claimed layers, the clause does not provide any further implied or express limitations.

Pechiney urges the Court to read in additional limitations to the meaning of "arranged symmetrically" and "at least seven layers arranged symmetrically." (P.Br. at 7.) Pechiney's construction seeks to add to the claim three unstated and unsupported requirements to these terms:

1.    "the geometrical center line of the core layer is in the geometrical center line of the film;"

2. "there is a correspondence in size (thickness)" of layers on opposite sides of the core layer, such that they are a mirror image of each other with respect to thickness; and

3. "there is a correspondence in... composition of layers on opposite sides of the core layer," such that they are a mirror image of each other with respect to composition.

(*Id.*)  In essence, Pechiney wants to impose mathematical rigor on the claim terms, seeking for the Court to read in "mirror image" or "absolute symmetry" requirements that are both unstated and inconsistent with the intrinsic record.  A construction requiring mathematically rigid "absolute symmetry" would also be contrary to the cannons of claim construction that prohibit reading in narrowing modifiers and limitations from preferred embodiments. *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).   Here the preferred embodiments defined in the specification refute Pechiney's proposed constructions.

### a.  Pechiney's false dilemma

Pechiney's argument is premised on a false dilemma:  a film is either perfectly symmetric or absolutely asymmetric.  (*E.g.*, P.Br. at 16.)  In furtherance of this fallacy, Pechiney improperly equates the clause "arranged symmetrically" with the distinct terms "symmetric" and "symmetrical" (P.Br. 13-14) that appear nowhere in the claim.[5]

---

[5] Pechiney seeks to rely on statements made during depositions concerning the meaning of the terms "symmetric" and "symmetrical" in support of its proposed construction. (P.Br. 13-14.)  However, these terms do not appear in the claims, and their meanings, therefore, do not limit the claim.  Pechiney also does not cite testimony from the same deponents expressly distinguishing "symmetric" from "arranged symmetrically." (*E.g.*, Ex. 23, Quatt Depo. Tr. at 116:16-117:10.)  In fact, given that during prosecution claim 11 was amended to delete reference to a "symmetrical ... structure," the prosecution history, properly interpreted, shows that claim 11 is not limited to being "symmetrical." (C.Br. at 30.)

22

Symmetry and asymmetry are not generally used as rigidly as contended by Pechiney. For example, "[i]n art and design, [symmetry] is often used in a somewhat loose sense, to mean a kind of balance in which the corresponding parts are not necessarily alike but only similar." (Ex. 14, *Columbia Encyclopedia*, 2673 (5th ed. 1993).) Thus, symmetry and asymmetry can have various meanings based on the context and usage, and are not prisoners of rigid dictionary definitions that consider only abstract meanings. Indeed, one dictionary defines "symmetrical" based on possible correspondence of various features considered in the alternative: "having or showing symmetry, or correspondence in form, size, *or* arrangement of parts...." (Ex. 15, *Webster's New World Dictionary*, 1477 (1968) (emphasis added) (cited in Pechiney's Rebuttal Expert Report of E. Mount (June 17, 2005), Ex. 16, pg. 9.) For example, in the context of multilayer films, layers of a film could be symmetric in surface texture but asymmetric in layer numbers or some other parameter. (*E.g.,* Ex. 17, Ahlgren Depo. Tr. 87:14-95:3.) They could be asymmetric in color but symmetric in tackiness.

In the present case, as discussed further below, the layer *arrangement* was the property considered relative to the prior art in the specification and prosecution history. It is this property (layer *arrangement*), not any other hypothesized consideration, that is important. Pechiney's assertions of a false duality, whereby everything is either perfectly symmetric or absolutely asymmetric, can not override the context of the Shah '419 patent concerning the arrangement of the layers.

### b. Pechiney's non-analogous "analogy" reads in unstated limitations

Pechiney's first basis for its position is not from the intrinsic record, expert testimony, or even case law. Instead of evidence, Pechiney proffers an analogy of

colored        circles,        concluding        that        an        arrangement        of
blue/green/purple/red/purple/green/blue    cannot    be    described    as    being    arranged
symmetrically.   (P.Br. 9-10.)   This argument is surprising since, with respect to color,
blue/green/purple/red/purple/green/blue is certainly arranged symmetrically.   One blue,
one green, and one purple circle are in the same order on each of the opposite sides of the
red circle.   In this regard, the at least seven colors arranged symmetrically does parallel
the claimed "at least seven layers arranged symmetrically."

Pechiney's analogy breaks down, however, because Pechiney tosses in additional
considerations with no parallels in claim 11.   First, Pechiney adds circle diameter,
contending that this is analogous to layer thickness.   But, thickness is not mentioned in
the claim.   Second, Pechiney adds shading, contending this is analogous to "specific
chemical composition."   But, "specific chemical composition" is not mentioned in the
claim.   Presumably, Pechiney could go on and add additional parameters to its cartoon,
perhaps texture, gloss, or ellipticity.   Yet, since claim 11 only refers to the arrangement of
the layers, these or other additional limitations are not applicable and Pechiney's cartoon
is not relevant.   As explained in *Johnson*, "[g]eneral descriptive terms will ordinarily be
given their full meaning; modifiers will not be added to broad terms standing alone."   175
F.3d at 989 (Fed. Cir. 1999).

### c. The intrinsic record requires variability in layer thickness, composition, and a geometric center

Contrary to Pechiney's position, the intrinsic record requires a construction
encompassing layer pairs having different thicknesses and compositions.   For instance,
the specification of the Shah '419 patent teaches that the thicknesses of opposite pairs of
layers may vary independently.   (*E.g.,* Ex. 1, col. 5, lns. 42-45 "preferably *each* comprise

24

from about 20% to 40% and more preferably from about 25% to about 35% of the total thickness of the multilayer film" (emphasis added); C.Br. at 26). When discussing the thicknesses of the two intermediate polyamide layers, the Shah '419 patent also distinguishes in its references and grammar between the thickness of the layers considered together (*e.g.*, "*total thickness* of the polyamide layers may vary widely" (Ex. 1, col. 5, lns. 19-20) (emphasis added)) and thicknesses of the individual layers, where each independently falls within an exemplary range (*e.g.*, "*each layer* can form between 5% and 25% of the total thickness of the multilayer film" (Ex. 1, col. 5, lns. 20-22 (emphasis added)).

Although at one point Pechiney quotes the specification's statement concerning the two polyamide layers that "*each layer* can form between 5% and 25% of the total thickness of the multilayer film," Pechiney tries to avoid the plain meaning of this disclosure by simply ignoring the clear reference to "each layer." (P.Br. at 12 (citing Ex. 1, col. 5, lns. 19-22.) Of course, the definition of "each," used in its common sense without specialized technical meaning or disclaimer, is "every one of two or more considered individually." (Ex. 18, *Webster's New Twentieth Century Dictionary*, 568 (2nd ed. 1983) (emphasis added).) Pechiney does not provide another meaning for "each," and does not argue a contrary interpretation.[6] Instead, as noted above, Pechiney simply tries to ignore the disclosure. Nevertheless, the plain meaning of the intrinsic

---

[6] Pechiney's only attempt to rationalize its position with the disclosure that "each layer" may vary independently is its argument that "nothing in that passage is *inconsistent*" with having identical polyamide layer thicknesses. (P.Br. at 12 (emphasis added).) This negative argument, however, has no weight. The possibility of layers having the same thickness does not mean that they must always have the same thickness. To the contrary, as shown herein, according to certain preferred embodiments, layer thicknesses must be different.

disclosure is that, according to a preferred embodiment, the thickness of *each* of the two outer layers may vary independently.

Furthermore, as explained in Cryovac's Initial Brief (C.Br. at 27), Pechiney's absolute symmetry requirement for identical thicknesses would convert Shah's preferred embodiments of the at least *seven* layer film to a film allowing no thickness for the EVOH core layer, which would have to be missing in its entirety. Pechiney's proposed "geometrical center line" requirement also would exclude preferred embodiments recited in the Shah '419 specification. (C.Br. at 28.) However, as explained in *Vitronics*, a claim interpretation that excludes the inventor's preferred embodiment from the scope of the claim "is rarely, if ever, correct." 90 F.3d at 1583.

Pechiney's proposal to require mathematical rigor for identical thicknesses is also improper since it is generally not possible to get perfectly identical thicknesses. (Cryovac's Rule 26(a)(2) Expert Report of Dr. Robert Kimmel (May 19, 2005), Ex. 19 at 11; Ex. 20, Stringer Depo. Tr. 116:4-117:3.) In fact, exemplary films of Examples 1 and 2 of the Shah '419 patent did not have identical thicknesses or a geometric centerline corresponding to the geometric center of the core. (Ex. 21, Shah Depo. Tr. 150:3-15 (films FDX1570 and FDX1572 are the example films of the Shah '419 patent); Ex. 22, CR013-000091; C.Br. at 27-28.)

Reading in an "absolute symmetry" limitation requiring mirror image compositions also would be inconsistent with the intrinsic record. For example, consistent with the specification, and as explained by Pechiney's expert, Dr. Mount, at the time the application for the Shah '419 patent was filed, one of ordinary skill in the art would have already and independently understood that the two outer layers of a

26

multilayer film will generally have different levels of slip and antiblock to provide the different properties necessary for processing. (Ex. 8 at 242:4 - 245:12 (referring to the outer layers as an "inner" and "outer" surfaces).) Thus, even without the disclosure in the specification (*see, e.g.,* Ex. 1, col. 5, lns. 29-30), one of ordinary skill in the art would have already understood that layer pairs may, and in some cases must, differ in terms of composition, particularly with respect to slip and antiblock agents. *S3 Inc. v. Nvidia Corp.,* 259 F.3d 1364, 1371 (Fed. Cir. 2001) ("The law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention. To hold otherwise would require every patent document to include a technical treatise for the unskilled reader.") (citations omitted). However, the Shah '419 specification also makes it clear that varying levels of these minor additives can be used. (*E.g.,* Ex. 1, col. 5, lns. 35-40; col. 6, lns. 3-14.)

Pechiney's citations (P.Br. at 11-12) to *CVI/Beta Ventures v. Tura LP*, 112 F.3d 1146, 1155 (Fed. Cir. 1997) and *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1276 (Fed. Cir. 2004) also do not support reading in an absolute symmetry requirement. Pechiney wrongly argues, based on these cases, that claim 11 can be limited to preferred embodiments because the limitation "at least seven layers arranged symmetrically" was added during prosecution. (P.Br. at 11-12.) First, *CVI/Beta* is cited for the proposition that arguments made during prosecution are relevant to claim construction. (P.Br. at 11-12). However, *CVI/Beta* does not support Pechiney's goal of reading in unstated limitations, as no arguments addressing mirror image thicknesses, mirror image compositions, or a geometric center line were made during prosecution.

27

(*See* section d, below.)  Second, *Dyancore* did not hold, as contended by Pechiney (P.Br. at 12), that claims can be limited to preferred embodiments.  Rather, in affirming summary judgment of non-infringement, *Dyancore*, which found no error in the decision that the claim limitation "equal peers" required a particular network connectivity pattern as a necessary consequence of having "equal peers," cannot be read apart from its intricate facts.  363 F.3d at 1278 (citing *Datapoint Corp. v. Std. Microsystems Corp.*, 31 Fed. Appx. 685, 689 (Fed. Cir. 2002)).  Moreover, claims are not properly limited "simply by pointing to the preferred embodiment." 299 F.3d at 1327.

In this present case, Pechiney points to nothing (indeed there is nothing to point to) to suggest that the films of Examples 1 and 2, or any other preferred embodiments, in the Shah '419 patent should limit the scope of the claims to identical thicknesses and compositions.  To the contrary, as discussed above, other preferred embodiments contemplated variability in layer thickness and compositions and these would be excluded by Pechiney's proposal.  *Vitronics* teaches that a claim interpretation that excludes the inventor's preferred embodiment from the scope of the claim "is rarely, if ever, correct" 90 F.3d at 1583, and this is not one such rare event.

### d. Pechiney improperly relies upon cropped statements from the prosecution history

Although Pechiney seeks to require "mirror image" symmetry for thickness and composition and a geometric center, these issues were never addressed during prosecution of the Shah '419 patent.  Indeed, the references considered during prosecution by the USPTO do not teach or suggest films having at least seven layers where opposite layers have identical thicknesses and compositions.

28

Pechiney argues that Applicant "distinguish[ed] the claimed film from the structure in Sheptak which was described as 'asymmetric.'" (P.Br. at 16.) However, Pechiney has cropped the full remarks concerning Sheptak. Sheptak was distinguished because "[it] only teaches [1] five layers, symmetrically arranged (14) and [2] the overall eight layer structure (S) of the reference is <u>asymmetric</u>." (Ex. 3, CR0056-000155.) No reference was made to the thickness, geometric center, or precise composition of any Sheptak layer. For structure [2], the eight layer Sheptak structure having a layer arrangement of

PO / PA / EVOH / PA / PO / LDPE / Pri / polymer,[7]

the layer arrangement is indeed asymmetric, lacking layer pairs arranged in the same order on opposite sides of a core. (Ex. 6, col. 4, lns. 15-26.) However, its asymmetry has nothing to do with identical thickness, precise composition, or a geometric center.

The context of remarks and the history of the exchange between the Applicant and USPTO are also relevant. *IMS Tech., Inc. v. Haas Automations, Inc.*, 206 F.3d 1422, 1433-34 (Fed. Cir. 2000). In particular, the purpose of the amendment filed concurrently with the quoted remarks was "to clarify that: (1) at least seven layers are claimed, and that (2) these layers are symmetrically arranged." (Ex. 3, CR056-000155.) Pechiney tries to twist these clarifying amendments into narrowing amendments (P.Br. at 16-17), but this was not the case. (Ex. 23, Quatt Depo. Tr., 126:2 - 128:3.) Clarification, the expressly stated purpose of the amendment, of some sort was evidently necessary. Although Applicant's claimed film always comprised at least seven layers, the USPTO was relying on Sheptak which only disclosed a symmetrically arranged five layer

---

[7] "PO" indicates polyolefin, "PA" indicates polyamide, LDPE indicates low density polyethylene, and "Pri" indicates primer.

29

substructure or eight layers asymmetrically arranged. Thus, the USPTO had misapprehended the invention. Clarification (not narrowing) was necessary and clarification (not narrowing or disclaimer) was provided.

Pechiney's attempts to rely on Applicant successfully overcoming the rejection based on U.S. Patent No. 4,398,635 to Hirt ("Hirt," Ex. 24) are also misplaced. (P.Br. at 15.) As evidently recognized by the USPTO in withdrawing the rejection, there are, in fact, a large number of reasons why the rejection based on Hirt was flawed. Specifically, the exemplary films in Hirt, which are not even disclosed to be oriented, have general layer arrangements of

nylon/EVOH/nylon/tie/EVA/tie/surlyn

and

nylon/plexar/EVA/PE/nylon/EVOH/nylon/tie/EVA/tie/surlyn.[8]

(Ex. 24, col. 5, lns. 35-52) Except for these two, no other layer arrangements are disclosed by Hirt. Thus, as is evident from even cursory inspection of Hirt's layer arrangements, there are a host of reasons distinguishing Hirt from the claimed invention. However, layer thicknesses, precise chemical compositions, and geometric center lines were not addressed with respect to Hirt. Even Pechiney's expert has not offered the opinion that Hirt supports an anticipation or obviousness position of any kind.

No disclaimer was made with respect to layer thicknesses, specific compositions, or the film's geometric center, and there was certainly no unambiguous surrender of that subject matter. *See., Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1325-26 (Fed.

---

[8] "EVA" is an abbreviation for ethylene vinyl acetate copolymer, "PE" is an abbreviation for polyethylene, "plexar" is an anhydride modified polyolefin, and "surlyn" is an ionomer modified polyolefin. (Ex. 24, col. 5, ln. 40-52.)

30

Cir. 2003) ("[W]e have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope... Consequently, for prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.")

Here claim 11 was amended during prosecution to delete language requiring "said layers of the multilayer film forming a **symmetrical** heat-shrinkable **structure**." (Ex. 3, CR056-000152 to 153 (emphasis added).)   Because this claim language requiring a "symmetrical... structure" was **deleted**, the prosecution history does not clearly and unmistakably support the symmetrical structure disclaimer Pechiney urges here.  To the contrary, this prosecution history supports the opposite.  That is, because the claim language requiring a symmetrical structure was deleted, the prosecution history makes clear and unmistakable that there was no disclaimer of such subject matter.

### e.  Cryovac's definition is not superfluous

Pechiney suggests that Cryovac's construction of "arranged symmetrically" would render the preamble superfluous. (P.Br. at 18-20.)  Not true.  The limiting effect of the recitation "at least seven layers arranged symmetrically" in the preamble serves to exclude, for example, an eight layer film having the layer arrangement of

[1] PE/ [2] tie/ [3] nylon/ [4] EVA/ [5] EVOH/ [6] nylon/ [7] tie/ [8] PE.

Due to the presence and location of the EVA layer (layer 4), there are not an equal number of layers arranged on either side of the EVOH layer, and thus the hypothetical film does not have "at least seven layers arranged symmetrically."  Many other examples could be given.

31

### f. Pechiney's definition of "arranged symmetrically" is inconsistent with its definitions of clauses (b), (c), and (d)

Pechiney argues that "arranged symmetrically" requires, among other things, "mirror image[]" identity in precise chemical composition of layers on opposite sides of the core. (P.Br. at 7.) Inconsistently, Pechiney also argues that pairs of layers according to each of clauses (b), (c), and (d) need not even share a common component. (P.Br. at 26-28.) The internal inconsistency in Pechiney's construction contravenes the requirement that "proper claim construction... demands interpretation of the entire claim in context, not a single element in isolation...." *Pause Tech.,* 419 F.3d at 1331. Indeed, claim construction should "fully comport[] with the specification and claims and so will preserve the patent's internal coherence." *Markman v. Westview Instruments,* 517 U.S. 370, 390 (1996).

Related to this point, Pechiney also misstates Cryovac's position, incorrectly contending that Cryovac's construction permits opposing layers to have totally different compositions. (P.Br. at 8.) While sometimes Pechiney contends that layer pairs must be identical (P.Br. at 7) and other times contends that they can be totally different (P.Br. at 25-28), Cryovac's consistent position is that layer pairs are required to have a common recited component (*e.g.,* the same polymeric component in both layers (c)) but each may contain additional components as well. Thus, each layer may contain different types or amounts of additional components. The additional components expressly identified in the specification include, for example, slip and antiblock additives in the outer layers. (Ex. 1, col. 5, lns. 29-30.)

32

G.    "Comprising"

**Cryovac's Proposed Definition: "'Comprising' is a term of art used in [patent] claim language which means that the named elements are essential, but other elements may be added and still form a [product] within the scope of the claim."** *Genentech Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997).

Cryovac's definition above is based on the well settled meaning of "comprising" as a term of art in patent claims. Pechiney does not disagree with Cryovac's proposed construction. (P.Br. at 31-32.)

H.    "Layer Comprising" or "Layers Each Comprising" or "Layers, Each Comprising"

**Cryovac's Proposed Definition: These are open transition phrases that require the presence of the named elements and permit the inclusion of additional unnamed components in each of the layers recited in subparagraphs (a), (b), (c) and (d) of claim 11.**

As explained in Cryovac's Initial Brief, in addition to being based on the undisputed meaning of "comprising" as a term of art in patent claim language as an open transition term, the intrinsic record further shows that a "layer comprising" or "layers each comprising" or "layers, each comprising" require the presence of the named elements and permit the inclusion of additional unnamed components in each of the layers recited in subparagraphs (a), (b), (c) and (d) of claim 11. (C.Br. at 31-32.)

Pechiney does not provide any arguments concerning either its proposed construction or Cryovac's construction of these terms. (P.Br. at 32.) Additionally, Pechiney appears to generally agree with Cryovac's proposals. (C.Br. at 31-32)

Accordingly, Cryovac's proposed constructions are substantially undisputed and should be adopted.

33

I.       "(a)  A Core Layer Comprising an Ethylene Vinyl Alcohol
         Copolymer"

         Cryovac's Proposed Definition:  A layer that must contain ethylene
         vinyl alcohol copolymer but may also contain other components,
         which is located between the two intermediate layers (b) of claim 11.

As provided in the specification, the core layer is the EVOH containing layer located between two intermediate layers containing a polyamide.  The relationship of the core layer being located between the two intermediate polyamide layers is addressed in the text of the specification and illustrated in Figure 1.  (Ex. 1, col. 5, lns. 6-9; pg. 2.)  As explained in Cryovac's Initial Brief, in the intrinsic record the term "core" is also used to refer to the layer in a multilayer film surrounded by an equal number of layers on both sides.  (C.Br. at 32-34.)  That the composition of the core layer contains ethylene vinyl alcohol copolymer and possibly other components is undisputed.  (P.Br. at 28.)

Pechiney's proposed construction, "a central layer that is adhered on both sides to other layers...," ignores the context of the claim as a whole by failing to recognize that the core layer is located between the intermediate layers.  (P.Br. at 28-29.)  This is improper.  *E.g., Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."); *Pause Tech.*, 419 F.3d at 1331 ("[P]roper claim construction... demands interpretation of the entire claim in context, not a single element in isolation.").

Beyond merely failing to recognize the context, Pechiney goes as far as saying that "[t]here is *nothing* in the specification of the '419 patent or the prosecution history that would require a core layer to be between the two intermediate layers (b)."  (P.Br. at 29 (emphasis added)).  This is not the case.  As noted above, both the text of the specification and the figure provide the relationship of the core layer located between the

34

polyamide layers. (Ex. 1, col. 5, lns. 6-9; pg. 2.) Indeed, the full weight of the intrinsic evidence provides that a "core layer" is arranged between an equal number of layers on either side. (C.Br. at 32-34.)

Further, in view of the context of the claim as a whole, including its definitions of layers (b), (c), and (d) together with their interrelationships, the core is necessarily located between the two intermediate polyamide layers. Although Pechiney recognizes this fact (P.Br. at 29 ("Such a location for the core layer is the inevitable result of the combination of subparagraphs (a), (b), (c), and (d)...")), Pechiney nevertheless seeks a claim construction that would withhold this explanation from the jury. Not only is it unhelpful to provide a half definition that obfuscates the scope of the claim, it is legally improper to ignore the context of the claim, including "that language [appearing later in the claim] in properly construing the claim language in dispute." *Pause Tech.*, 419 F.3d at 1331.

Accordingly, Pechiney's proposed definition should be rejected to the extent it fails to recognize the position of the layer as being between intermediate polyamide layers. Cryovac's proposed definition should be adopted.

35

J.    Clauses (b), (c), and (d)

"(b)    Two Intermediate Layers Each Comprising a Polyamide;"

**Cryovac's Proposed Definition:** Two layers in a multilayer film, each adhered on both sides to other layers. Each must contain a common polyamide component but each may also contain other components as well.

"(c)    Two Outer Layers Each Comprising a Polymeric Material or Blend of Polymeric Materials;"

**Cryovac's Proposed Definition:** The two outer layers of a multilayer film. Each must contain a common polymeric component but each may also contain other components as well.

"(d) Two Layers, Each Comprising an Adhesive Polymeric Material, Which Adhere Each of Said Intermediate Layers to a Respective Outer Layer."

**Cryovac's Proposed Definition:** Two layers of a multilayer film, which each adhere one of the intermediate layers to a respective outer layer. Each must contain a common adhesive polymeric material but each may also contain other components as well.

Clause (b), "two intermediate layers each comprising a polyamide," requires that each of the two intermediate layers must contain a common polyamide[9] component but each may also contain other components as well. Clauses (c) and (d) similarly provide that the outer layers comprise a common polymeric material (clause (c)) and that the adhesive layers comprise a common adhesive material (clause (d)), but each layer may comprise additional components as well. These definitions are based on the ordinary and legal meanings of "comprising" and the indefinite article "a" that precedes the recited

---

[9] "The term 'polyamide' refers to high molecular weight polymers having amide linkages along the molecular chain, and refers more specifically to synthetic polyamide such as various nylons. This term also refers to copolymers of polyamides such as nylon 6 and nylon 12." (Ex. 1, col. 4, lns. 32-37.)

36

component (*e.g.,* polyamide), and is consistent with the use of "a" throughout the specification.[10]

In contrast, Pechiney seeks to construe clauses (b), (c), and (d) such that pairs of layers do not require a common component. (P.Br. 25-28.) In clause (b), for example, Pechiney construes the indefinite article "a" to transform the claim phrase "two outer layers *each* comprising *a* polymeric material or blend of polymeric materials" (emphasis added) to a construction having the meaning "two outer layers each comprising *any* polymeric material or blend of polymeric materials." (*See id.*) That is, by Pechiney's construction, the phrase "each comprising a" become equivalent to "each comprising any," such that layers in a pair need not share a common component. (*Id.*) Pechiney repeats this proposal with respect to clauses (c) and (d) as well. There is, however, no justification for this misconstruction.

As explained below, Pechiney's position conflicts with the case law it relies upon, has been previously rejected by the Federal Circuit, and should be rejected by this Court as well. Cryovac's proposed construction of clauses (b), (c), and (d) as commonly requiring the recited component should be adopted.

### a. Legally, "a" does not equate with "any"

Pechiney contends that case law supports its transmutation of "a" to "any." (P.Br. at 27-28.) However, this is not accurate. The common and well accepted holding of the cases cited by Pechiney is that the term "a" in the context of open-ended transition

---

[10] As also reflected in Cryovac's proposed construction, the specification defines an "intermediate layer" as "a layer in a multilayer film adhered on both sides to other layers." (Ex. 1, col. 3, lns. 42-44.) Similarly, the respective locations of layers (c) and (d) are provided in the claims, and are generally undisputed by Pechiney (P.Br. 25-28.)

"comprising" allows for components *additional* to the recited component.[11]  *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).  For example, claims reciting "comprising... a chamber" read on an accused device having three chambers. *KCJ Corp.*, 223 F.3d at 1357.  In fact, the proposal to construe "a" to mean "any" has been addressed by the Federal Circuit and soundly rejected.  *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1232-33 (Fed. Cir. 2005) ("The district court also overlooked this court's precedent on the meaning of 'a' ... [by] replac[ing] 'a' with 'any.' ...  [The district court] erroneously imported the term 'any' into the claim language, ignoring the ordinary meaning of the term 'a.'")

The only other thread to Pechiney's position is its reliance on the deposition testimony of Dr. Kimmel, who was responding to and attempting to interpret various newly presented hypotheticals posed by Pechiney's counsel.  (P.Br. at 28.)  Legally, Pechiney's reliance on Dr. Kimmel to provide claim constructions is improper.  While an expert may be relied upon to help understand technical terms or the state of the art, *Phillips,* 415 F.3d at 1317-1319, "comprising" and "a" are not technical terms of art, and expert testimony on claim construction is not proper in this context.

### b. Pechiney's proposal conflicts with both the common meaning of "a" and the context of the patent

Pechiney does not address that according to the dictionary, "a" is "[u]sed before nouns and noun phrases that denote *a single* but unspecified person or thing."  (Ex. 25, American Heritage College Dictionary, 3rd ed. (2000) (emphasis added).)  This common

---

[11] Pechiney (P.Br. at 27) also cited to the dissenting opinion in *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1355-56 (Fed. Cir. 2005), but this opinion, like *KCJ Corp.* to which it cites, provides that "a" in the context "comprising" allows for components *additional* to the recited component.

meaning, of course, conflicts with Pechiney's proposal to equate "a" with "any." Pechiney also does not address the context of the Shah '419 specification, where the indefinite article "a" is used consistent with its ordinary meaning, but inconsistently with Pechiney's strained usage. (*See* C.Br. at 35-37.)

## V.    CONCLUSION

For the reasons set forth here, the Court should construe claim 11 of the Shah '419 patent according to Cryovac's proposed definitions and should, accordingly, reject Pechiney's inconsistent proposals.

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Michele Sherretta (No. 4651)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600

Of Counsel:
Ford F. Farabow, Jr.
Joann M. Neth
Martin I. Fuchs
Courtney B. Meeker
Mark J. Feldstein
Rebecca D. Hess
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, D.C.  20001-4413
(202) 408-4000

Attorneys for Cryovac, Inc.

Dated:  November 18, 2005

DB01:1910645.1                                                                          063527.1001

## CERTIFICATE OF SERVICE

I, Michele Sherretta, hereby certify that on November 29, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such document is available for viewing and downloading to the following counsel of record:

> N. Richard Powers, Esquire
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 North Orange Street
> P. O. Box 2207
> Wilmington, DE  19899

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> *Michele Sherretta*
> _____
> John W. Shaw (No. 3362)
> jshaw@ycst.com
> Michele Sherretta (No. 4651)
> msherretta@ycst.com
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
>
> Attorneys for Plaintiff Cryovac, Inc.