## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYOVAC, INC.,           )
           )
    Plaintiff/Counter-Defendant.  )
           )
        vs.        )
           )
PECHINEY PLASTIC PACKAGING, INC.,  )
           )
    Defendant/Counter-Plaintiff.  )
           )

Civil Action No. 04-1278-KAJ

Hon. Kent A. Jordan

**REDACTED**

## PECHINEY'S REPLY MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
## JUDGMENT ON TORTIOUS INTERFERENCE

N. Richard Powers (#494)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: (302) 888-6266

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350

Dated:  December 5, 2005

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   ARGUMENT ................................................................................................................. 2

   A.  Cryovac's Tortious Interference Claims Are Preempted ............................................. 2

       1.  Cryovac's claims are preempted because Pechiney's only alleged wrongful conduct
           is patent infringement. ....................................................................................... 3

       2.  Cryovac's Tortious Interference Claims Pose An Insurmountable Obstacle to the
           Policies and Objectives of Federal Patent Laws. ................................................. 6

   B.  Cryovac's Failure to Identify Sufficient Evidence Of Any Bad Faith Misconduct By
       Pechiney Is Relevant To Whether Cryovac Can Defeat Summary Judgment on Its
       Tortious Interference Claims. ................................................................................... 7

   C.  Cryovac Has Not Produced Any Evidence That Pechiney Had Knowledge of a Binding
       Contract Between Cryovac and National Beef. .......................................................... 8

   D.  Cryovac Cannot, as a Matter of Law, Meet its Burden of Establishing a Binding Contract
       with National Beef. ................................................................................................ 11

   E.  There are No Provisions in the Cryovac-National Beef Agreements that Even
       Tangentially Require National Beef To Buy all of its Required Packaging from Cryovac........... 14

III.  CONCLUSION ............................................................................................................ 19

## TABLE OF AUTHORITIES

### Cases

*Abbott Labs. v. Brennan,*
   952 F.2d 1346 (Fed. Cir. 1991) ................................................................. 4

*Alaska Ind. Fisherman's Mkt. Assoc. v. New England Fish Co.,*
   548 P.2d 348 (Wash. Ct. App. 1976) ......................................................... 13

*Alvord-Polk, Inc. v. F. Schumacher & Co.,*
   37 F.3d 996 (3d Cir. 1994) ........................................................................ 2

*Am. Orig. Corp. v. Legend, Inc.,*
   652 F. Supp. 962 (D. Del. 1986) ................................................................ 14

*Aronson v. Quick Point Pencil Co.,*
   440 U.S. 257 (1979) ................................................................................... 6

*Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.,*
   328 S.E.2d 426 (Ct. App. Ga. 1985) .......................................................... 8

*Bonito Boats, Inc. v. Thunder Craft Boats*
   *Inc.,* 489 U.S. 141 (1989) .......................................................................... 6

*CLI Corp. v. Ludowici USA,*
   2001 U.S. Dist. LEXIS 23374 (W.D. Pa. Nov. 14, 2001) ......................... 5, 6

*Concrete Unlimited Inc. v. Cementcraft, Inc.,*
   776 F.2d 1537 (Fed. Cir. 1985) ................................................................. 4

*Dow Chem. Co. v. Exxon Corp.,*
   139 F.3d 1470 (Fed. Cir. 1998) ................................................................. 4, 6

*Fast v. Kahan,*
   481 P.2d 958 (Kan. 1971) .......................................................................... 14

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.,*
   362 F.3d 1367 (Fed. Cir. 2004) ................................................................. 3, 4

*Gull Labs., Inc. v. Diagnostic Tech., Inc.,*
   695 F. Supp. 1151 (D. Utah 1988) ............................................................. 11

*Hunter Douglas, Inc. v. Harmonic Design, Inc.,*
   153 F.3d 1318 (Fed. Cir. 1998) ................................................................. 4, 7

*Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.,*
   329 S.E.2d 554 (Ct. App. Ga. 1985) .......................................................... 12

*Kline, Inc. v. Lorillard, Inc.,*
   878 F.2d 791 (4th Cir. 1989) ..................................................................... 13, 14

*Marshall v. Pyramid Dev. Corp.,*
   855 S.W.2d 403 (Mo. Ct. App. 1993) ........................................................ 14

*Omega Eng'g, Inc. v. Eastman Kodak Co.,*
   908 F. Supp. 1084 (D. Conn. 1995) ........................................................... 13

*Orchard Group, Inc. v. Konica Med. Corp.,*
   135 F.3d 421 (6th Cir. 1998) ..................................................................... 12

*Panduit v. Stahlin Bros.,*
    575 F.2d 1152 (6th Cir. 1978) ........................................................................... 6

*Pfaff v. Wells Elecs. Inc.,*
    525 U.S. 55 (1998) ............................................................................................ 6

*PMC Corp. V. Houston Wire & Cable Co.,*
    797 A.2d 125 (N.H. 2002) ............................................................................... 13

*Preston v. Preston,*
    823 S.W. 2d 48 (Mo. Ct. App. 1991) .............................................................. 11

*Rodime PLC v. Seagate Tech., Inc.,*
    174 F.3d 1294 (Fed. Cir. 1999) ......................................................................... 4

*Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc.,*
    270 F.3d 723 (8th Cir. 2001) ........................................................................... 13

*Tersco, Inc. v. E.I. DuPont de Nemours & Co.,*
    879 F. Supp. 445 (E.D. Pa. 1992) ...................................................................... 2

*U.S. v. United States Gypsum Co.,*
    438 U.S. 422, 459 (1978) ................................................................................. 10

*United Servs. Auto Ass'n v. Schlang,*
    894 P.2d 967 (Nev. 1995) ........................................................................... 15, 16

*Waner v. Ford Motor Co.,*
    331 F.3d 851 (Fed. Cir. 2003) ........................................................................... 4

*Zayre Corp. v. S.M. & R. Co., Inc.,*
    882 F.2d 1145 (7th Cir. 1989) .................................................................... 15, 16

*Zenith Elecs. Corp. v. Exzec, Inc.,*
    182 F.3d 1340 (Fed. Cir. 1999)) ........................................................................ 4

## Other Authorities

1 White & Summers,
    *Uniform Commercial Code* § 3-9, p. 157 (4th ed.) ............................................ 8

*Antitrust Compliance,*
    2005, at 68 ....................................................................................................... 10

Section 2-201 of the UCC .................................................................................. 12

Section 2-204 of the UCC .................................................................................. 12

## I.     INTRODUCTION

In its response to Pechiney's motion for summary judgment on Cryovac's tortious interference claims, Cryovac has misstated the burden of proof, misapplied the standard for contract formation under the UCC and mischaracterized Pechiney's arguments.   To prevail on its tortious interference claims, it is ultimately Cryovac's burden to prove three key elements:  (1) a binding contract for the sale of goods with National Beef, (2) Pechiney's knowledge that Cryovac had a binding contract with National Beef and (3) Pechiney's wrongful interference with that binding contract.  Cryovac has failed to identify evidence in its opposition brief sufficient to defeat summary judgment as to any of these three elements.

First, Cryovac's tortious interference claims are preempted by federal patent law because Cryovac's only ground for claiming that Pechiney committed an actionable tort by competing with Cryovac for National Beef's business is its allegation that Pechiney's ClearShield product infringes Cryovac's '419 patent.  Because patent infringement is the only wrongful conduct Cryovac alleges to support its tortious interference claims, these claims are preempted, as a matter of law.  For the same reason, if Pechiney's summary judgment of non-infringement or invalidity is granted, summary judgment must also be granted on Cryovac's tortious interference claims.

Second, Cryovac has introduced no evidence that Pechiney ever had reason to believe that Cryovac had a binding supply agreement with National Beef.  Cryovac and National Beef were the only two entities that knew the nature of their commercial relationship.

**REDACTED**

Third, neither of the two purported "requirements contracts" between National Beef and Cryovac contain language requiring National Beef to buy *any* goods from Cryovac.[1] Indeed, there are no terms in these documents that mention either quantity or exclusivity, and there is, therefore, no proper basis for considering extrinsic evidence to find that National Beef was required to buy all its requirements from Cryovac.

Finally, Cryovac has failed to identify evidence to avoid summary judgment on its claim for tortious interference with a prospective contractual relationship because (1) Cryovac had no valid expectation of retaining National Beef's business when Cryovac knew that National Beef was engaged in competitive negotiations with Pechiney for this business; (2) Pechiney had no knowledge that Cryovac had any valid expectation of retaining National Beef's business; and (3) Cryovac's claim is preempted because it is based entirely on its allegation of patent infringement.[2]

Pechiney is therefore entitled to partial summary judgment on Cryovac's tortious interference claims because Cryovac's tortious interference claims rest on, and are preempted by, its federal patent-law claims, and because Cryovac has failed to raise a genuine issue of material fact as to any of the elements that Cryovac must prove to prevail on these claims.

## II.    ARGUMENT

### A.    Cryovac's Tortious Interference Claims Are Preempted

As Pechiney established in its opening brief, Cryovac's tortious interference claims are preempted by federal patent law because (1) patent infringement is the only "improper, unjustified"

---

[1]

**REDACTED**

*See Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014-15 (3d Cir. 1994); *Tersco, Inc. v. E.I. DuPont de Nemours & Co.*, 879 F. Supp. 445, 449 (E.D. Pa. 1992) (holding that a tortious interference plaintiff "must at least identify the specific contractual relations which defendant allegedly interfered with") (citation omitted).

[2]  Because Cryovac has not addressed its claim for tortious interference with a prospective contractual relationship in any substantive way in its brief, there is no need for Pechiney to add to its prior discussion of this claim.

conduct Cryovac has alleged to support its tortious interference claims; and (2) permitting parties to recover based on tortious interference claims without first alleging some specific wrongful conduct other than patent infringement would undermine the policies of the patent laws. In response, Cryovac argues that its tortious interference claims are not preempted because (1) state-law claims based on violations of federal patent laws are not preempted unless there is an exact, one-to-one, correspondence between the elements required for the patent offense and the elements required for the state-law claim; and (2) its tortious interference claims do not pose any insurmountable obstacles to the policies of federal patent law because tortious interference claims are devoted to the protection of contractual rights, rather than to the protection of patent rights. (D.I. 250, Cryovac Tortious Interference Opposition Brief ("Cryovac Br.") at 9-12.) As shown below, Cryovac is wrong on both counts.

1.   **Cryovac's claims are preempted because Pechiney's only alleged wrongful conduct is patent infringement.**

Cryovac argues that the elements of tortious interference differ from the elements of patent infringement because, unlike tortious interference, patent infringement does not require proof that (1) "Cryovac was selling or had an expectation of selling any product;" (2) "Pechiney had any knowledge of those sales and expectations;" (3) "Pechiney acted with intent while interfering with Cryovac's existing or expected business;" or (4) "Pechiney acted wrongfully or lacked justification for the conduct." (Cryovac Br. at 9-10.) Based on the Federal Circuit precedent discussed below, however, Cryovac's tortious interference claims are preempted because patent infringement is the only allegation Cryovac has made that would convert Pechiney's perfectly legal competitive activities into an actionable tort under state law. Where a state law claim does not contain any allegation of wrongful conduct other than conduct that would establish a patent offense, the state law claim is collateral to, and preempted by, federal patent law. Thus, Cryovac's tortious interference claims are preempted because the only wrongful conduct Cryovac alleges to support these claims is willful patent infringement.

A recent Federal Circuit decision on patent law preemption, *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367 (Fed. Cir. 2004), establishes that Cryovac's ill-conceived

"elements" test for preemption is contrary to the case law. In *Globetrotter*, the court affirmed a summary

judgment which dismissed a claim for tortious interference with prospective economic advantage on

preemption grounds, despite the fact that the elements of tortious interference do not correspond to the

elements for the alleged patent law offense. 362 F.3d at 1374 n.6. The court specifically held that "to

avoid preemption, 'bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an

element of the tort claim.'" *Id.* at 1374 (citing *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355

(Fed. Cir. 1999)). The Federal Circuit cases decided before *Globetrotter* also hold that a state law claim

will be preempted unless the plaintiff can prove that the defendant engaged in actual bad faith misconduct

in addition to the wrongful conduct required to prove the alleged patent law violation.[3]

It is well-established that state laws are preempted if they provide rights and remedies that are

merely collateral to the rights and remedies provided under federal patent laws. As the Federal Circuit

held in *Waner v. Ford Motor Co.*, 331 F.3d 851 (Fed. Cir. 2003), "[a]bsent [proof of] secrecy [in a trade-

secrets claim], state law cannot create a collateral set of rights available as an adjunct or expansion of

patent rights." *Id.* at 856. The court in *Waner* further held that "ideas can only be protected under

intellectual property law by the patent system." *Id.* at 857. Similarly here, Cryovac cannot assert state

---

[3]  *See Zenith Elecs. Corp.* 182 F.3d at 1355 ("[W]e hold that bad faith is a prerequisite to [defendant's]
state-law tortious interference [with prospective economic advantage] claim; without it, the claim is
preempted by patent law."); *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306 (Fed. Cir. 1999)
(stating that "Inducement requires no proof that the acts underlying the inducement are 'wrongful' by
some measure other than the fact of the inducement itself" and that the unfair competition claim was
not preempted because this claim, unlike inducement, required plaintiff to prove that defendant
engaged in a "business practice that is immoral, unethical, oppressive, unscrupulous, or substantially
injurious."); *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336-37(Fed. Cir. 1998)
(claim for intentional interference with prospective economic advantage based on patentee's allegedly
false patent claims would be preempted without proof of additional bad faith misconduct); *Dow Chem.
Co. v. Exxon Corp.*, 139 F.3d 1470, 1477 (Fed. Cir. 1998) (unfair competition claim was not
preempted because claim alleged "bad faith misconduct in the marketplace"); *Abbott Labs. v.
Brennan*, 952 F.2d 1346, 1356-57 (Fed. Cir. 1991)(abuse of process claim for inequitable conduct was
preempted because appellant had not established that the entire PTO proceeding was a "sham");
*Concrete Unlimited Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985) (unfair
competition claim was preempted because the patentee had not acted wrongfully in "taking business
away from the Defendant by threats and infringement actions" based on an invalid patent).

law claims as a vehicle for expanding the rights already granted to it as the owner of the '419 patent for patent infringement under federal patent law.[4]

Cryovac attempts to distinguish its tortious interference claims from its claim of willful patent infringement by arguing that tortious interference requires proof of intentional, improper and unjustified conduct, while patent infringement is a "'strict liability offense,' in which 'a court must award damages adequate to compensate for infringement, regardless of the intent, culpability or motivation of the infringer.'" (Cryovac Br. at 9.)   The problem for Cryovac is that its brief does not identify any evidence of intentional, improper or unjustified conduct that would subject Pechiney to liability other than willful patent infringement. This complete lack of any evidence that Pechiney engaged in any wrongful conduct apart from willful patent infringement is fatal to Cryovac's tortious interference claims.

Finally, contrary to Cryovac's claim, the holding in *CLI Corp. v. Ludowici USA*, 2001 U.S. Dist. LEXIS 23374 (W.D. Pa. Nov. 14, 2001), is entirely consistent with Federal Circuit precedent, which provides that state law claims are preempted unless the plaintiff can establish bad faith misconduct other than the misconduct required to establish the patent law offense. The court in *CLI Corp.* found that the patentee's tortious interference claim was preempted because, as is the case here, the only ground alleged in the complaint to satisfy the "'absence of privilege or justification' prong of the test" for tortious interference was patent infringement. Thus, the tortious interference claim was preempted because the "state tort claim is based on the same conduct that is governed by federal patent law." *Id.* at *2. The holding in *CLI Corp.* is of particular significance here because it is the *only* case identified by either party where the "improper, unjustified" conduct element required to establish tortious interference was alleged patent infringement, and only alleged patent infringement.

---

[4]   In addition to using state claims to expand the rights and remedies available for patent infringement, Cryovac also argues that it is entitled to lost profits damages on the patent infringement count of its complaint based on its tortious interference damages theories. (Cryovac Br. at 10-12.)   Neither approach is supported by federal case law.

Accordingly, none of the Federal Circuit patent preemption cases discovered by the parties' research support Cryovac's tortious interference claims, because Cryovac admits that the only wrongful conduct it has alleged to support these claims is patent infringement. (Cryovac Br. at 37-39.)

### 2. Cryovac's Tortious Interference Claims Pose An Insurmountable Obstacle to the Policies and Objectives of Federal Patent Laws.

Cryovac's tortious interference claims are incompatible with the accomplishment and execution of the patent laws. First, they permit Cryovac to obtain lost-profits damages for patent infringement, without satisfying the patent law requirements for lost profits under the *Panduit* test. *Panduit v. Stahlin Bros.*, 575 F.2d 1152, 1156 (6th Cir. 1978). Second, the patent laws represent a careful balance between the interests of the patent owner in protecting its disclosed inventions and the interests of others in inventing and using non-infringing products that compete with the patent owner's invention. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151-52 (1989); *Pfaff v. Wells Elecs. Inc.*, 525 U.S. 55, 63-64 (1998).This balance would be destroyed if patent owners were able to obtain punitive damages for infringement under state laws that exceed the damages allowable under federal patent laws.

In response, Cryovac relies on *Dow Chemical*, a case that dealt with a *patent owner's* conduct, not an alleged infringer's conduct. As noted above, the only case the parties have found in which a tortious interference claim was based on the alleged patent infringer's conduct is *CLI Corp.*, a case holding that the claim was preempted. The cases Cryovac relies on, and the policies Cryovac discusses, relate solely to the interests of patent owners, such as the incentive to invent and the full disclosure of ideas, while ignoring the policies of the patent laws regarding alleged infringers. (Cryovac Br. at 12.)[5]

As explained in *Bonito Boats*, the patent laws represent a "carefully crafted bargain" that encourages creation and disclosure of new useful technology, but "[t]he attractiveness of such a bargain, and its effectiveness in inducing creative effort and disclosure of the results of that effort, depend almost

---

[5]   Cryovac's reliance on *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979) (Cryovac Br. at 12) is also misplaced. In *Aronson*, the Court upheld a claim for breach of a royalty contract for a *non-patented* invention, but the only wrongful conduct Cryovac alleges to support its state law claim is patent infringement.

entirely on a backdrop of free competition in the exploitation of unpatented designs and innovations." 489 U.S. at 150-51.  In addition, "[t]he offer of federal protection from competitive exploitation of intellectual property would be rendered meaningless in a world where substantially similar state law protection were [sic] readily available."  *Id.* at 151.  *See also Pfaff*, 525 U.S. at 63 (holding that "[t]he balance between the interest in motivating innovation and enlightenment by rewarding invention with patent protection on the one hand, and the interest in avoiding monopolies that unnecessarily stifle competition on the other, has been a feature of the federal patent laws since their inception.").  It is these interests of alleged infringers that are undermined by Cryovac's tortious interference claims.

Cryovac's state-law tortious interference claims conflict with these policies and objectives of federal patent law because the only wrongful conduct Cryovac has alleged is patent infringement.  As the Federal Circuit noted in *Hunter Douglas*, fraud or bad faith must be pled and proved to avoid preemption because, "[t]o require less would impermissibly alter the balance between the competing purposes of federal patent law that Congress has prescribed." 153 F.3d at 1337.

**B.**    **Cryovac's Failure to Identify Sufficient Evidence Of Any Bad Faith Misconduct By Pechiney Is Relevant To Whether Cryovac Can Defeat Summary Judgment on Its Tortious Interference Claims.**

Cryovac also argues that "Pechiney's alleged good faith is not relevant to whether it acted wrongfully" for purposes of Cryovac's tortious interference claims.  (Cryovac Br. at 37-39.)  Cryovac contends that tortious interference can be established, "*even though innocent means are employed.*"  (*Id.* at 38.) (emphasis in original).  Based on its claim that an innocent statutory violation is sufficient to establish tortious interference, Cryovac argues that, "where, as here, the conduct that constitutes the interference is independently wrongful -- e.g. in violation of federal patent law -- that in and of itself is enough to constitute wrongful interference."  (*Id.*)  All of these arguments lead, however, directly to the conclusion that Cryovac's tortious interference claims are preempted by federal patent law because they demonstrate that the only wrongful conduct Cryovac alleges to support its state law claims is willful infringement, conduct that is already covered by the federal practice laws.

7

**C.**     **Cryovac Has Not Produced Any Evidence That Pechiney Had Knowledge of a Binding Contract Between Cryovac and National Beef.**

Even if Cryovac's tortious interference claims were not preempted, in order to defeat Pechiney's motion for summary judgment, Cryovac would have to have established at least *some* genuine issue of material fact that, if resolved in Cryovac's favor, would show that Pechiney had knowledge of a binding requirements contract between Cryovac and National Beef. Because Cryovac has failed to do so, Pechiney is entitled to summary judgment dismissing Cryovac's claim for tortious interference with contract.

Cryovac's *sole* evidence to prove Pechiney's knowledge of a binding agreement between Cryovac and National Beef consists

# REDACTED

(Cryovac Br. at 35-37.) But knowledge that a buyer is in fact buying its packaging needs from one seller is not the equivalent of knowledge that that buyer is *contractually obligated* to buy its packaging requirements from that seller. 1 White & Summers, *Uniform Commercial* Code § 3-9, p. 157 (4th ed.) ("Further, the omission of exclusivity in the agreement cannot be cured by subsequent 'bootstrapping' purchases solely from the seller. Where an agreement does not establish exclusivity and is otherwise silent as to quantity, the agreement is treated as an open offer to sell."); *see also Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.,* 328 S.E.2d 426, 429-30 (Ct. App. Ga. 1985) (holding that "[t]here can be no partial performance in the context of a requirements contract . . . for without exclusivity the purchaser's promise is merely to buy when he wants and the promise of the seller becomes merely an invitation for orders").

# REDACTED

**REDACTED**

(C5143, 5145, Ex. 228,

Wilkerson Dep. Tr. at 31, l. 19 – 32 l. 25; 79, ll. 17-19

**REDACTED**

(C5141, Ex. 227, Taylor Dep. Tr.

at 195, ll. 17-20; 197, ll. 15-22.)

**REDACTED**

**REDACTED**

By contrast

**REDACTED**

In short, this is not a situation in which there is a legitimate factual dispute over whether Pechiney's inquiry was reasonable or not.

**REDACTED**

---

6    Legitimate antitrust considerations relieved Pechiney of any duty to go further and ask *Cryovac* for *its* permission to bid for the National Beef business. *See* A.B.A. Section of Antitrust Law, *Antitrust Compliance,* 2005, at 68 (advising that, in order to avoid allegations of an illegal market allocation agreement, companies should "[n]ever discuss with competitors the terms on which the Company is dealing with a particular customer or plans to do so in the future"); *see also U.S. v. United States Gypsum Co.,* 438 U.S. 422, 459 (1978) (concluding that "exchanges of price information" between competitors "must remain subject to close scrutiny under the Sherman Act").

7

**REDACTED**

**REDACTED**

Cryovac cannot now legitimately argue that Pechiney was in fact on notice of the binding nature of that contract. *See Preston v. Preston*, 823 S.W. 2d 48, 49-50 (Mo. Ct. App. 1991) (affirming summary judgment on tortious interference with contract where plaintiff produced no evidence showing knowledge of a contract).

> **D.    Cryovac Cannot, as a Matter of Law, Meet its Burden of Establishing a Binding Contract with National Beef.**

In arguing that there are material facts that prevent the Court from concluding as a matter of law that Cryovac and National Beef did not have a binding contract for the sale of packaging, Cryovac makes a number of critical analytical errors. Because its analysis is wrong, Cryovac conjures up a binding contract out of thin air, when the uncontradicted evidence shows that none exists.

Cryovac's first error is to overstate Pechiney's burden of proof.[8] If Pechiney establishes that, based on the evidence properly considered, there is no genuine issue of material fact to support Cryovac's claim that it had a binding contract with National Beef, then Pechiney is entitled to summary judgment that it did not tortiously interfere with a Cryovac-National Beef contract as a matter of law. *Gull Labs., Inc. v. Diagnostic Tech., Inc.,* 695 F. Supp. 1151, 1153-55 (D. Utah 1988) (granting summary judgment dismissing a tortious interference with contract claim where the alleged contract was illusory and lacked the requisite mutuality because it did not obligate the buyer to purchase a single product); *Integrated*

---

8   Cryovac erroneously asserts that "Pechiney is entitled to summary judgment on the non-existence of an agreement between Cryovac and National Beef only if it can be said, as a matter of law, based on all of the record evidence, that the contract unambiguously is not a requirements contract and that no writing reflects the quantity agreed by the parties." (Cryovac Br. at 15-16.)

*Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.*, 329 S.E.2d 554, 557 (Ct. App. Ga. 1985) (affirming summary judgment and finding that "absent an enforceable contract between the parties . . . [plaintiff] could not recover against [defendant] for tortious interference with [plaintiff's] contractual relations"). As the discussion herein shows, Pechiney has met its burden of proof on the absence of a binding contract between Cryovac and National Beef, and Pechiney is therefore entitled to summary judgment on Cryovac's tortious interference with contract claim.

Cryovac's second error is to argue that Pechiney is barred from arguing that the Cryovac-National Beef agreement is non-binding for want of a quantity term, because (1) that is an argument that can only be made in the context of a statute-of-frauds argument and (2) Pechiney, as a non-party to the Cryovac-National Beef agreement, lacks standing to bring a statute-of-frauds argument. However, Pechiney has never argued that Cryovac and National Beef entered into an oral agreement that should not be enforced because of the statute of frauds, which is the situation addressed by Official Comment 4 to Section 2-201 of the UCC. Instead, Pechiney is raising the defense that Cryovac's alleged agreements with National Beef do not constitute binding contracts because they do not contain a quantity term or an exclusivity provision, and are therefore illusory and lack mutuality.

As set forth in Section 2-204 of the UCC, which addresses the formation of contracts for the sale of goods, the contract terms must be sufficiently definite that "there is a reasonably certain basis for giving an appropriate remedy." Without a quantity term (or an exclusivity term, in the case of a requirements contract), the contract fails for indefiniteness, because there is no way for the court to calculate the losses resulting from a breach of the agreement. *See, e.g., Orchard Group, Inc. v. Konica Med. Corp.*, 135 F.3d 421, 429 (6th Cir. 1998) (holding that a letter that did not require the buyer to purchase a single unit to be "in compliance with its terms" was unenforceable); *Integrated Micro Sys., Inc.*, 329 S.E.2d at 556 (holding that alleged requirements contract was too indefinite where the "agreement disclose[d] nothing which contractually obligated" the buyer to purchase anything from the seller). Thus, an alleged contract for the sale of goods that lacks a quantity term or an exclusivity term

12

fails because it is indefinite, illusory, and lacks mutuality. As a result, such a contract cannot serve as the basis for a tortious interference with contract claim.

Cryovac's next, and most significant, analytical error is to argue that even though its alleged agreements with National Beef lack a specific quantity or exclusivity term, they are nonetheless binding, because "[a]ll the statute of frauds requires is something that evidences quantity, *and that something need not be in the agreement itself.*" (Cryovac Br. at 29.) To the extent that Cryovac is suggesting by this statement that Section 2-202 permits the Court to look to extrinsic evidence such as course of dealing and usage of trade to supply a quantity term that is missing from the parties' written agreement, Cryovac is clearly wrong.

As Pechiney noted in its initial brief, the case law is clear that extrinsic evidence is *never permitted to supply a missing quantity term* (or a missing exclusivity term, in the case of a requirements contract). (D.I. 197, Pechiney's Opening Br. at 24-27.) *See also Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc.,* 270 F.3d 723, 726-27 (8th Cir. 2001) (applying Missouri and Kansas law) ("Where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term.") (citations omitted); *Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 794-95 (4th Cir. 1989) (same); *Omega Eng'g, Inc. v. Eastman Kodak Co.,* 908 F. Supp. 1084, 1091 (D. Conn. 1995) (finding that the plaintiff "cannot cure the lack of a written, requirements-related quantity term by reference to parol evidence of the parties' course of dealing"); *Alaska Ind. Fisherman's Mkt. Assoc. v. New England Fish Co.,* 548 P.2d 348, 352 (Wash. Ct. App. 1976) (holding that "where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term").

Not a single case cited by Cryovac in its brief is inconsistent with this fundamental proposition, and many of the cases cited by Cryovac explicitly reaffirm it. *See, e.g., PMC Corp. V. Houston Wire & Cable Co.,* 797 A.2d 125, 129 (N.H. 2002) (holding that "where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term) (cited by Cryovac at 23); *Am. Orig. Corp. v. Legend, Inc.,* 652 F. Supp. 962, 968 (D. Del.

1986) ("*Once a writing contains some indication of quantity, such as the word 'all,'* the contract is valid and courts may accept parol evidence. . . .") (emphasis added) (cited by Cryovac at 16).  As the chart attached as Exhibit 35 in the Appendix shows, in each and every case cited by Cryovac for the proposition that it is permissible to supply a missing quantity or exclusivity term from extrinsic evidence, there was at least an ambiguous quantity or exclusivity term in the parties' written agreement.

As demonstrated in the next section, the alleged agreements between Cryovac and National Beef, by contrast, have no terms that purport to address *any quantity at all* that National Beef is required to buy from Cryovac or to even suggest an obligation by National Beef to buy exclusively from Cryovac. Cryovac's attempted resort to extrinsic evidence to supply that missing quantity term is therefore impermissible.  As a result, the extrinsic evidence Cryovac relies on is barred under the parol evidence rule, as uniformly applied to UCC contracts for the sale of goods.

> **E.     There are No Provisions in the Cryovac-National Beef Agreements that Even Tangentially Require National Beef To Buy all of its Required Packaging from Cryovac.**

In construing a contract, the court is to discern the parties' contractual intent from the language they use in their written agreement, and in doing so, words should be given their plain meaning, unless the parties clearly define the words to have some other meaning.  *Marshall v. Pyramid Dev. Corp.,* 855 S.W.2d 403, 407-08 (Mo. Ct. App. 1993) ("In interpreting contracts, courts presume that the words used are intended to have their natural and ordinary meaning."); *Fast v. Kahan,* 481 P.2d 958, 961 (Kan. 1971) (holding that the contractual term at issue meant "just what it says").  In arguing that the two letters attached to its brief as contracts sufficiently allude to even ambiguous terms relating to quantity or exclusivity to permit the introduction of extrinsic evidence of quantity, Cryovac relies on only four clauses from those letters.  There is, however, no fair way to read the language from these clauses as creating an ambiguous reference to either quantity or exclusivity.[9]  (*See infra* at 15-19.)

---

[9]   In *Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791 (4th Cir. 1989), for instance, the plaintiff claimed that the terms "direct basis" and "Full Line" in the alleged agreement "created an obligation" for the defendant "to supply {the plaintiff} with all of his tobacco requirements." *Id.* at 793-94.  Rejecting the plaintiff's contention, the court stated: "Precisely how one converts 'direct basis' into some variety of amount is

For example

**REDACTED**

[10] *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1155 (7th Cir. 1989) (holding mere allegations that a party agreed to supply requirements is insufficient because "the *writing* must indicate that the contract is one for requirements"); *United Servs. Auto Ass'n v. Schlang,* 894 P.2d 967, 971-72 (Nev. 1995) (holding that although the plaintiff did "all that he could do" to try to enter into an enforceable contract, the "real issue is whether the alleged agreement satisfied the elements of a valid requirements contract" and finding that the agreement at issue was not binding contract).

Cryovac next argues

**REDACTED**

not adequately explained. There is simply no arguable connection in the law or in the English language between 'direct basis' and 'amount.'" *Id.* at 795. Curiously, Cryovac cites this case multiple times in its brief, quoting the language that the court will not consider parol evidence without evidence of "something, anything, in the writing that might evidence the quantity dimension." (Cryovac Br. at 15, 22, 27). In fact, as discussed above, the court expressly rejected the plaintiff's contention that the court should depart from the ordinary meaning of the words used in the contract to find evidence of quantity.

10

**REDACTED**

11

**REDACTED**

*See Zayre Corp.* and *Schlang*, cited *supra* pg. 15.

Second, Cryovac

**REDACTED**

---

**REDACTED**

**REDACTED**

Cryovac admits

**REDACTED**

---

[12] *Porous Media Corp. v. Midland Brake, Inc.,* 220 F.3d 954 (8th Cir. 2000) does not hold to the contrary. In *Porous Media,* the parties' contract contained a clause expressly granting the buyer the right to seek another source for the goods it was purchasing should the seller fail to satisfy the quality or delivery requirements under the contract. The court concluded that the contract's explicit statement that the buyer "reserves the right to resource" to a different seller under certain conditions was sufficient to raise a reasonable interpretation that the contract was intended to be exclusive. *Id.,* at 960.

**REDACTED**

[13] Cryovac relies on *Kansas Power & Light* to argue that a volume incentive program is sufficient to establish a requirements contract, but in that case the court found that the alleged contract "refers specifically to quantity," citing contract language stating that where the buyer's "coal *requirements* from [seller] became less than 2,000,000" the minimum quantity could be reduced, "but not [to] less than 1,500,000 tons." 740 F.2d at 788-89. (emphasis added).

**REDACTED**

They are not enough.  The Code and the case law clearly require that the parties' written agreement must contain at least *some* term -- even an ambiguous one -- that objectively indicates that the buyer intended to be bound to buy either a specific quantity or all of its requirements exclusively from the seller. Without such a term in the parties' written agreement, no extrinsic evidence, including course of dealing and usage of trade, can supply the missing quantity or exclusive-dealing term.  Because there is not a single clause in either agreement that even purports to address any quantity of products that National Beef was required to buy from Cryovac, those agreements are not binding contracts, and Cryovac cannot succeed as a matter of law in proving otherwise.  As a result, Pechiney is entitled to summary judgment on this ground, as well.

III.    **CONCLUSION**

For all of the foregoing reasons and for the reasons set forth in its Memorandum in Support (D.I.

197), Pechiney respectfully requests that this Court grant Pechiney's Motion for Partial Summary

Judgment on Tortious Interference Claims.

Respectfully submitted,

PECHINEY PLASTIC PACKAGING, INC.

Dated: December 5, 2005

N. Richard Powers (#494)
Rudolf E. Hutz (#484)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: (302)888-6266

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312)222-9350

By:    /s/ N. Richard Powers
      N. Richard Powers

19

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2005 I electronically filed a copy of the foregoing with the Clerk of the Court using CM/ECF and served the following individuals in the manner indicated:

**BY HAND DELIVERY**
John W. Shaw, Esquire
Karen E. Keller, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

**BY FEDERAL EXPRESS**
Ford F. Farabow, Jr., Esquire
Mark J. Feldstein, Esquire
Finnegan, Henderson, Farabow,
  Garrett & Dunner, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001

/s/ N. Richard Powers
N. Richard Powers