# EXHIBIT 1

## Exhibit 1: Uncontested Facts

1.     U.S. Patent No. 4,755,419 ("the '419 patent") titled "Oxygen Barrier Oriented Shrink Film" issued from the United States Patent and Trademark Office ("USPTO") on July 5, 1988.

2.     The '419 patent was based on U.S. Patent Application Serial No. 06/842,600, which was filed March 21, 1986.

3.     The named inventor of the '419 patent is Gautam P. Shah.

4.     The '419 patent was originally assigned to "W.R. Grace & Co., Cryovac Div." and is now assigned to Cryovac, Inc.

5.     Mr. Shah was an employee of "W.R. Grace & Co., Cryovac Div." when his patent application was filed.

6.     Mr. Shah now works for Cryovac, Inc.

7.     Cryovac is a Delaware corporation with a place of business at 100 Rogers Bridge Road, Duncan, South Carolina 29334.

8.     Pechiney Plastic Packaging, Inc. is a Delaware corporation having its principal place of business at 8770 West Bryn Mawr Avenue, Chicago, Illinois 60631.

9.     Pechiney designed, manufactures and sells various products under the trademark "ClearShield®."

Exhibit 1 of the Pretrial Order
Page 1 of 2

10.    ClearShield®    REDACTED

11.    ClearShield®    REDACTED

12.    Pechiney has sold ClearShield® products to meat-packing customers, including National Beef and Packerland (now a division of Smithfield), in the United States.

13.    Cryovac sells a product commonly known as Boneguard or TBG® patch bags.

14.    ClearShield® products compete with Boneguard and/or TBG® patch bags made by Cryovac.

15.    REDACTED

16.    REDACTED

17.    REDACTED

18.    "Ethylene vinyl alcohol" is commonly abbreviated as "EVOH."

19.    Nylon is a "polyamide."

20.    "PA" is often used in the industry as an abbreviation for "polyamide."

21.    Claim 11 is the only claim of the '419 patent being asserted by Cryovac against Pechiney in this lawsuit.

22.    The '419 patent expired March 21, 2006.

Exhibit 1 of the Pretrial Order
Page 2 of 2

# EXHIBIT 2

**Exhibit 2:  Essential Facts in Issue and Cryovac's Expected Proofs Thereon**

**Issues on Which Cryovac Bears the Burden of Proof**

I.    **Infringement of Claim 11 of Cryovac's U.S. Patent 4,755,419:**

One fact in issue is:  Whether Pechiney infringed claim 11 of Cryovac's U.S. Patent 4,755,419 ("the '419 patent").  In that regard, Cryovac expects to prove:  The products Pechiney has sold under the trademark "ClearShield™" literally infringe claim 11 of the '419 patent.  That is, the products Pechiney has sold under the trademark "ClearShield™" contain every claim limitation of claim 11--as those claim terms are construed by this Court.  Specifically, Cryovac expects to prove that the film Pechiney has sold under the trademark "ClearShield™" is a seven-layer oriented coextruded film containing "a core layer comprising an ethylene vinyl alcohol copolymer," "two intermediate layers each comprising a polyamide," "two outer layers each comprising a polymeric material or blend of polymeric materials," and "two layers, each comprising an adhesive polymeric material, which adhere each of said intermediate layers to a respective outer layer."

II.    **Pechiney's Willful Infringement of the '419 Patent:**

Another fact in issue is:  Whether Pechiney's infringement of the '419 patent was willful.  In that regard, Cryovac expects to prove:  Pechiney's infringement of claim 11 of the '419 patent was willful, since Pechiney did not satisfy its affirmative duty to exercise due care to avoid Cryovac's known patent rights.  Many people at Pechiney, including employees in Research and Development and the Legal Department, knew about the existence of Cryovac's '419 patent

Exhibit 2 of the Pretrial Order
Page 1 of 33

before Pechiney began selling the infringing ClearShield™ product. Pechiney executives, employees, and lawyers also recognized that the '419 patent posed an infringement problem for Pechiney because of the very close similarity between the films disclosed in Cryovac's '419 patent and claimed in claim 11 of that patent, and Pechiney's ClearShield™ films. Pechiney executives readily acknowledged the need to obtain opinions of counsel. Nonetheless, Pechiney did not obtain a competent opinion of counsel or rely in good faith on a competent opinion of counsel before Pechiney began its infringing activity.

Cryovac also expects to prove: The only opinion of counsel that Pechiney received before it began selling ClearShield™ film was an April 28, 2003 opinion letter from McDermott Will & Emery that was, on its face, inadequate, contradictory, improperly conclusory, and therefore legally incompetent. The April 28, 2003 opinion did not discuss the specification of the '419 patent, and did not interpret the claims in light of the '419 specification, as required by Federal Circuit case law when interpreting patent claims. Rather, what limited discussion there was of the '419 patent, was based on words that do not even appear in the claims. The opinion was also internally inconsistent.

Cryovac further expects to prove: Pechiney also did not rely in good faith on the inadequate April 28, 2003 opinion before it began selling its ClearShield™ product. Pechiney proceeded with developing and selling the infringing ClearShield™ product, despite its knowledge of Cryovac's patent rights to the subject matter disclosed and claimed in the '419 patent, and despite its knowledge that Cryovac would likely sue Pechiney for infringement,

REDACTED

Exhibit 2 of the Pretrial Order
Page 2 of 33

REDACTED

Later opinions obtained long after ClearShield™ was on the market and this lawsuit had been filed were not timely and do not avoid willful infringement. An *in limine* request is being filed concurrently to exclude these later opinions.

## III. Tortious Interference:

As set forth below, Cryovac will prove the facts necessary to establish that Pechiney tortiously interfered with Cryovac's contractual and prospective economic relations with National Beef.

### A. Existence of a Contract and/or Reasonable Expectation of a Contractual Relationship

#### 1. Contract Formation

Cryovac will prove that two requirements contracts were formed between Cryovac and National Beef as to which Pechiney tortiously interfered. The first requirements contract was formed when National Beef emailed Cryovac on March 20, 2003 notifying Cryovac of its intent to enter into a contract. This requirements contract is also evidenced by letter documentation signed on March 25, 2003. The second requirements contract was formed when National Beef objectively manifested its assent to be bound in the form of an email dated January 14, 2004.

Throughout the relevant time period, the parties' objective manifestations of assent can also be seen in the parties' use of words of commitment and legal terms of art such as the use of the word "agreement" in the correspondence between the parties, as well as the presence of the word "agreement" in the Cryovac/National Beef requirements contracts and Pechiney/National Beef contracts, and National Beef's signature under the phrase "Your signature here indicates

Exhibit 2 of the Pretrial Order
Page 3 of 33

acceptance of the terms above." The parties' objective agreement to be bound is also shown by the parties negotiations leading up to the two requirements contracts.

 2. Contract Terms

Both contracts are unambiguous requirements contracts that do not need extrinsic evidence for interpretation, as set forth in D.I. 250 at 17-21. The March 2003 Requirements Contract requires Cryovac to sell and National Beef to purchase all of National Beef's requirements of the specified products and not less than $25 million of such products per year, until December 31, 2005. The 2004 Requirements Contract contains the same purchase requirements and extends the contract through December 31, 2007. Both contracts contain within their four corners express provisions that objectively demonstrate National Beef's commitment to purchase its requirements of the identified products exclusively from Cryovac, such as a "new technology release," a price renegotiation provision, a rebate provision, and provisions regarding minimum purchase levels.

Should, however, the Court determine that one or both of the Cryovac/National Beef contracts are ambiguous, Cryovac will present at least the following extrinsic evidence of contractual meaning:

 i. The Parties' Negotiations

Cryovac will set forth much evidence of the parties' negotiation history to show the meaning of the contract terms. For example, prior to finalizing the March 2003 Requirements Contract,

REDACTED

Exhibit 2 of the Pretrial Order
Page 4 of 33

REDACTED Further communications between the parties demonstrate that both parties made financial plans based on National Beef purchasing 100% of its beef plant requirements for the specified goods from Cryovac.

### ii.    Course of Dealing

Cryovac will further prove the terms of the contracts by reference to the parties' course of dealing which will demonstrate the exclusive nature of the parties' long-term contractual relationship and how the parties operated under this and previous similar contracts.

This evidence starts with the January 21, 1998 requirements contract between Cryovac and National Beef which contains a provision requiring National Beef to give 30 days notice before canceling the contract instead of technology and price release provisions. The writing also memorialized Cryovac's obligation to participate in studies over the three year contract period to improve certain processes within the National Beef plants, contained a *force majeure* provision, and contained minimum purchase numbers that represented essentially all their materials. National Beef purchased all of its requirements for the listed packaging needs from Cryovac, and held at least one meeting during which National Beef characterized its relationship with Cryovac as "single sourcing," while operating under this contract.

REDACTED

National Beef and Cryovac then entered into further requirements contracts before the March 2003 Requirements Contract.

This course of dealing extended to joint planning between the companies that reflected Cryovac's sole supplier status. For example, when exchanging financial data before execution of the March 2003 requirements contract, Cryovac sent spreadsheets to National Beef depicting National Beef purchasing 100% of its requirements from Cryovac. National Beef never told

Exhibit 2 of the Pretrial Order
Page 5 of 33

Cryovac that these estimates were wrong, but **REDACTED**

Similar communications occurred in 2003 relating to the March 25, 2003 Requirements Contract and in the fall of 2003 relating to the January 2004 Requirements Contract. National Beef in fact continued to purchase all of its requirements from Cryovac until Pechiney induced the breach. National Beef also asked Cryovac to provide in depth technical services for National Beef that Cryovac did not provide to other customers.

National Beef's conduct in the period leading up to the January 2004 Requirements Contract likewise demonstrates that the Cryovac contracts were exclusive requirements contracts. For example, **REDACTED**

In negotiations with Pechiney, National Beef told Pechiney to base its prices on receiving 100% of National Beef's business. Pechiney, in turn, communicated its understanding to National Beef that its supply proposals were predicated on receiving 100% of National Beef's business. National Beef's contract with Pechiney reflects these communications and understandings.

Finally, National Beef continued to purchase all of its requirements from Cryovac up to the time Pechiney used its infringing ClearShield product to induce National Beef to switch suppliers. **REDACTED**

### iii.    Course of Performance

National Beef purchased its flexible packaging requirements exclusively from Cryovac until Pechiney induced the breach of contract. In other words, National Beef performed as if it were required to purchase its packaging needs from Cryovac until it decided to breach.

Exhibit 2 of the Pretrial Order
Page 6 of 33

iv.    Trade Usage

Finally, to prove the terms of the contract, Cryovac will offer trade usage evidence to prove that, in the industry at issue, the phrase "supply contract" is equivalent to the term "requirements contract" as used by National Beef and as in the March 25, 2003 Requirements Contract and the January 14, 2004 Requirements Contract.

3.    Reasonable Business Expectancy

To the extent Cryovac is not able to prove the existence of a valid requirements contract with National Beef, Cryovac will prove that it had a reasonable probability of a business opportunity with National Beef by offering evidence that National Beef stated it intended to sign a requirements contract with Cryovac, but for Pechiney's wrongful offer to sell its infringing ClearShield product.

**B.    Pechiney's Knowledge of the Requirements Contract**

Cryovac will present evidence from multiple sources demonstrating that Pechiney knew that Cryovac had a contract with National Beef for 100% of National Beef's supply or knew that Cryovac had a reasonable expectation of entering into such a contract. Pechiney was told by a National Beef General Manager that Cryovac was National Beef's 100% supplier. Pechiney also asked about and was told specific terms of Cryovac's March 2003 Requirements Contract and January 2004 Requirements Contract and National Beef's supply arrangements with Cryovac. Pechiney employees admitted to knowing that Cryovac's pricing to National Beef was contingent on having 100% of National Beef's business. These conversations resulted in a letter from Pechiney to National Beef that also acknowledged that Pechiney knew Cryovac was National Beef's existing 100% supplier. Pechiney's testimony and internal documents also show that Pechiney knew National Beef was planning to and did award a contract to a single company

Exhibit 2 of the Pretrial Order
Page 7 of 33

to supply 100% of National Beef's packaging needs. When discussing other negotiations with National Beef, Pechiney confirmed that proposals like this would have obligated National Beef to purchase the entire quantity under discussion. Pechiney also based its internal profit projections, in evaluating how much it could lower its prices, on the basis of National Beef purchasing 100% of its requirements from a single supplier. Communications between National Beef and Pechiney also demonstrate National Beef's plan to make either Cryovac or Pechiney its sole supplier.

### C. Pechiney's Intentional Interference with the Requirements Contract or Cryovac's Business Expectancy

Another issue is whether Pechiney performed an intentional act that was a significant factor in causing the breach of the Cryovac/National Beef requirements contract, or alternatively the breach of the expectancy of such a contract. Cryovac will prove that Pechiney manufactured its ClearShield product with the intent of gaining 100% of National Beef's business or, at the very least, was substantially certain that manufacturing ClearShield would bring about that result. Prior to developing ClearShield, Pechiney was unable to sell to accounts like National Beef because Pechiney did not have a bone-in product to allow it to compete with Cryovac.

### D. Pechiney's Interference with the Requirements Contract or Cryovac's Business Expectancy was Improper

Cryovac intends to prove that Pechiney's infringement of the '419 patent, regardless of whether that infringement was intentional, was improper and independently wrongful because it violates federal patent laws. Additionally, Cryovac may prove, if necessary, that Pechiney's conduct was improper because it did not act in good faith in developing its product, notwithstanding its knowledge of the '419 patent. Pechiney, moreover, decided to embark on

Exhibit 2 of the Pretrial Order
Page 8 of 33

commercialization of the infringing product with the plan that profits from sales of the infringing product would outweigh the costs of litigation if sued by Cryovac.

## IV.    Damages Adequate to Compensate Cryovac for Patent Infringement

Another fact in issue is:  What are the damages adequate to compensate Cryovac for Pechiney's infringement of the '419 patent.  In regard to that fact, Cryovac expects to prove the amount of profits Cryovac lost because Pechiney made sales of its infringing ClearShield™ product that Cryovac would have otherwise made.  Specifically, Cryovac will show:  Cryovac would have made sales of its BoneGuard™ bags but for Pechiney's sales of the infringing ClearShield™ product.

In that regard, Cryovac will show that there was demand for Cryovac's BoneGuard™ bags.  Cryovac will also show that is has the manufacturing and marketing capability to meet that demand.

Cryovac will further show that there were no acceptable noninfringing alternatives for Cryovac's BoneGuard™ bags.  In proving this, Cryovac expects to show that neither Pechiney nor Curwood sold acceptable noninfringing alternatives.  Specifically, Cryovac will show:  Prior to the launch of Pechiney's infringing product, Cryovac and Curwood were the only two competitors selling bone-in packaging products, and Curwood was a negligible participant in this bone-in packaging product business.  Cryovac's BoneGuard™ bags were the standard in the industry.  Prior to the launch of its infringing product, Pechiney did not sell a bone-in bag product, and there is no evidence that Pechiney has developed a commercially viable bone-in packaging product that would provide the cost and profitability benefits and other attributes offered by the patented technology at issue without infringing the patent-in-suit.  On the other

Exhibit 2 of the Pretrial Order
Page 9 of 33

hand, Curwood's bone-in packaging products were not acceptable noninfringing alternatives because they do not have the same advantages and performance capabilities of Cryovac's BoneGuard™ bag products such that purchasers would be satisfied. Further, Curwood had never sold significant quantities of its bone-in packaging product and could not have supplied the sales Cryovac lost to Pechiney's infringing ClearShield™ product.

Additionally, Cryovac will show the amount of profit it would have made, absent Pechiney's infringement. In proving this, Cryovac will show: Cryovac had a longstanding exclusive supply relationship for bone-in meat packaging products with both National Beef and Packerland (now a division of Smithfield), including contracts with National Beef running until December 31, 2007. Cryovac lost those accounts to Pechiney when Pechiney introduced its infringing product sold under the name of ClearShield™. Pechiney was targeting Cryovac's bone-in meat packaging business with its ClearShield™ product, and the ClearShield™ product directly competes with Cryovac's BoneGuard™ bags. But for Pechiney's sales of its infringing product, Cryovac would have continued to make sales of its BoneGuard™ bags to customers at levels consistent with its past history. REDACTED

Thus, even if Curwood's product is found to be an acceptable noninfringing alternative, at a minimum, Cryovac would have made about 90 percent of the sales Pechiney made.

To the extent lost profits are not awarded for particular infringing sales, Cryovac expects to prove that it is entitled to damages of a reasonable royalty rate in the range of 17% to 20% applied to those infringing sales. Specifically, Cryovac expects to prove that Cryovac is entitled

Exhibit 2 of the Pretrial Order
Page 10 of 33

to this royalty rate in view of the *Georgia Pacific* factors, as explained in the expert reports and depositions of James Nawrocki.

Cryovac also expects to prove that, because Pechiney willfully infringed the '419 patent, Cryovac's damages should be trebled or otherwise enhanced and Cryovac is entitled to attorneys' fees and costs. Furthermore, Cryovac expects to show the prejudgment and/or post-judgment interest on the awarded damages to which Cryovac is entitled.

### V.     Damages Adequate to Compensate Cryovac for Tortious Interference

Another fact in issue is:  What are the damages adequate to compensate Cryovac for Pechiney's tortious interference with Cryovac's contractual and/or prospective contractual relationship with National Beef.  In regard to the fact, Cryovac expects to prove the amount of lost profits for the damages is sustained and the unjust enrichment obtained by Pechiney as a result of Pechiney's tortious interference.  Specifically, Cryovac expects to prove:  National Beef committed to purchasing all of its bone-in packaging requirements as set forth in the March 25' 2003 Requirements Contract which ran through December 31, 2005 and January 14, 2004 Requirements Contract which ran through December 31, 2007.  Through the use of its infringing product, Pechiney was able to induce National Beef to breach these requirements contracts and cause Cryovac to lose its sales of products under the March 25, 2003 Requirements Contract and the July 14, 2004 Requirements Contract.  Cryovac would have retained its historical sales levels with National Beef if Pechiney had not tortiously interfered.

Exhibit 2 of the Pretrial Order
Page 11 of 33

**Cryovac's Counterstatement and Expected Proofs**

**Issues on Which Pechiney Bears the Burden of Proof**

**VI.    Anticipation of Claim 11 of the '419 patent:**

Another fact at issue is:  Whether any prior art reference, publicly available before Mr. Shah's date of invention, disclosed every claim limitation in claim 11 of the '419 patent and contained a disclosure that would enable one of ordinary skill in the art to make and use the invention of claim 11.

Despite the Court's instructions in the Trial Management Order paragraph 1(b), and Delaware local rule 16.4(d), Pechiney failed to set forth in the Pretrial Order its "expected proof" to be offered at trial  and "what it intends to prove in support of its claims or defenses.  (D.I. 23, ¶ 1(b).)  "Those summaries should be sufficient to…fairly put the other party on notice as to what each party expects to prove at trial."  Id.  This statement of the issues of fact to be decided should be "as detailed as circumstances permit."  Del. L.R. 16.4(d)(4).  Thus, Cryovac objects to Pechiney's vague statements that Pechiney "will provide evidence that claim 11 is anticipated by [unspecified] prior art patents and publications, as well as by [unidentified] public use, knowledge and prior invention," because Pechiney has not provided any guidance in the Pretrial Order on what it plans to argue at trial, or the "expected proofs" it plans to offer to satisfy its burdens of proof on the invalidity issues.

Cryovac also objects to Pechiney's similarly general statements that Pechiney will provide testimony by Dr. Mount "as outlined in his reports," two of which were 40 and 32 pages single spaced, as well as Pechiney's nebulous statement that claim 11 of Cryovac's '419 patent is anticipated "by prior art patents and publications," when Pechiney has not specified which

Exhibit 2 of the Pretrial Order
Page 12 of 33

patents or publications Pechiney intends to argue at trial anticipate claim 11 of the '419 patent. Indeed, Pechiney's response to Cryovac's contention interrogatory regarding proof supporting Pechiney's anticipation allegation cited *over 140 patents and publications* as potentially anticipating claim 11 of the '419 patent. Thus, Pechiney's indefinite suggestion that at trial it "will provide relevant factual testimony regarding this issue" unfairly prejudices Cryovac and vitiates the very purpose of each party identifying in the Pretrial Order *prior to trial* the issues of fact to be litigated *and the party's expected proofs* on those issues.

Nonetheless, regarding the factual issue of whether any reference publicly available at Mr. Shah's date of invention actually anticipated claim 11 of the '419 patent, Cryovac expects to prove: None of the prior art references (or alleged public use) that Pechiney cited in its summary judgment motion, <u>or</u> in Dr. Mount's expert reports, discloses in a single film every claim element of claim 11 in the '419 patent in an enabling disclosure that would teach one of ordinary skill in the art to make and use the invention described in claim 11.

In its summary judgment briefs on anticipation, Pechiney argued that claim 11 was anticipated by two films: the Allied film[1] and the Allied News Release Film C.[2] Based on these arguments, Cryovac expects to prove: No evidence shows that those two films contained <u>all</u> the claim 11 limitations. Neither the Allied Film (which Pechiney claims was made in the early 1980s) nor the Allied News Release Film C (which was disclosed in an undated news release), were *oriented*. That these two films were not oriented is shown by persuasive evidence (1) within the four corners of the references themselves, (2) in publications such as the non-prior-art

---

[1] This is a film allegedly made my Mr. Hatley at Allied and allegedly sent to Dr. Seymour Gilbert for testing.

[2] The Allied News Release is sometimes referred to by Pechiney as "the article by Earl Hatley." However, it is undated and does not appear to have been published in the form of an article.

Exhibit 2 of the Pretrial Order
Page 13 of 33

*Journal of Food Science* article, (3) in confidential internal Allied company documents authored

by the alleged producer of the Allied Film and produced from Honeywell to Cryovac *after* the

close of discovery, and (4) through expert testimony. Furthermore, the actual structure of the

Allied News Release Film C is ambiguous and therefore does not clearly disclose every element

of the films in claim 11.

Moreover, if Pechiney is allowed to present testimony by Drs. Gilberts or Dimas

regarding the Allied Film, or testimony by Dr. Mount *regarding* testimony by Dr. Gilberts or

Dimas,[3] then Cryovac will prove that: The uncorroborated recollections of Drs. Gilbert and

Dimas are contradicted by the contemporaneous documents and do not establish that the Allied

Film anticipated claim 11 of the '419 patent.

Also based on arguments asserted by Pechiney in its summary judgment brief on

anticipation, Cryovac expects to prove: Neither the Allied News Release Film C nor the alleged

public knowledge and use of the Allied Film predated Mr. Shah's date of invention. In that

regard, Cryovac will show Mr. Shah made two embodiments of the claim 11 films in April 1985.

Those two films were shown to work for their intended purpose at least by August 30, 1985

when the test results and laboratory analysis of the two films were reported back to Mr. Shah.

These events all occurred before September 5-6, 1985, the earliest possible publication date for

the undated Allied News Release.

Finally, if necessary, Cryovac will show: The Allied News Release also did not enable

one of ordinary skill in the art to orient the Film C described therein, and therefore the Film C

cannot anticipate claim 11 of the '419 patent. In addition, prior art cited by Dr. Mount also

---

[3] Cryovac has sought to exclude this testimony in a pending *Daubert* motion and an *in limine* request filed concurrently.

Exhibit 2 of the Pretrial Order
Page 14 of 33

provides no instruction on how to orient films with the structure of the Allied Film or the Allied News Release Film C.

Based on statements made by Pechiney in the Nature of the Case section of the Pretrial Order Form, Cryovac further expects to prove: U.S. Patent No. 4,746,562 ("the '562 patent") to Ennis Fant and the film made by Mr. Fant that was the subject matter of the '562 patent are not prior art to the invention of claim 11 according to the '419 patent.

Cryovac further expects to prove that the '562 patent and the film made by Mr. Fant do not contain all the elements of claim 11 of the '419 patent. Specifically, the film made by Mr. Fant and the films disclosed in the '562 patent were *not oriented*. Pechiney deposed Mr. Fant and asked him whether the films he made which became the subject of the '562 patent were oriented. Mr. Fant testified that they were *not*. In fact, as Mr. Fant explained, he never made oriented films during his career at Cryovac and would not have known how to orient this film. He explained further that the machinery used to make the '562 films did not make oriented films. *Nothing* in the '562 patent specification, including the description of how the films were made, indicates that the films disclosed therein were oriented. The '562 patent specification also would not have enabled one of ordinary skill in the art to orient the films disclosed therein, and, in fact, teaches away from orientation of such films. The Fant film and the '562 patent also did not predate Mr. Shah's date of invention.

In addition, Cryovac expects to prove: U.S. Patent No. 5,055,355 ("the '355 patent") to DeAntonis also does not disclose a film containing every claim limitation in claim 11 of the '419 patent. The only films possibly disclosed in the '355 patent which contain both nylon and EVOH are a **two-layer** film comprised **only** of nylon and EVOH, and hypothetical three- and five-layer films with alternating layers of **only** nylon and EVOH. It does not appear the '355

Exhibit 2 of the Pretrial Order
Page 15 of 33

inventor actually attempted to make the hypothetical three- and five-layer films, as there is no

disclosure of how to make such films. These hypothetical films are also not indicated (or

suggested) as being either coextruded or oriented. Indeed, the '355 patent expressly discloses

that films may be formed by various processes distinct from coextrusion, in particular

lamination. The '355 patent likewise references the disclosure of U.S. Patent No. 4,058,647 to

Inoue patent, where layers are added not by coextrusion but by lamination.

There is no teaching in the '355 patent to modify either the expressly disclosed two layer

film or any hypothetical film to be a structure according to claim 11 of the '419 patent. Further,

even if one had tried to add additional layers to the hypothetical three- and five-layer film, doing

so would not have converted it to a film covered by claim 11 of the '419 patent. There would

have been no motivation to make an oriented coextruded film having at least seven layers

arranged symmetrically as provided in claim 11 of the '419 patent, and no reasonable

expectation of success in doing so, based on the disclosure of the '355 patent.

Furthermore, one of ordinary skill in the art at the time of Mr. Shah's invention would not

have "cherry-picked" several elements of distinct, functional films disclosed in the '355 patent to

arrive at Mr. Shah's invention, since there was no suggestion, teaching, or motivation to do so

and no reasonable expectation that doing so would have been successful. Equally, there would

have been no motivation or reasonable expectation of success that one of ordinary skill in the art

would have taken a single element from a film (not made by coextrusion) disclosed in one of the

many patents mentioned within the '355 disclosure, and incorporated that element into another

combination of elements--especially when the patent from which the element was extracted

teaches against the use of that element and is addressed to another method of manufacturing.

Exhibit 2 of the Pretrial Order
Page 16 of 33

Additionally, the '355 patent would not have enabled a person of ordinary skill in the art to make the film of claim 11 of the '419 patent.

Cryovac notes further that Pechiney added the issue of anticipation by Dallmann and the Japanese Utility Model Application to the Nature of the Case section of the Pretrial Order at 6:20 pm the night before the Pretrial Order was to be filed with the Court. If these arguments are made at trial, than Cryovac will show that Dallmann and the Japanese Utility Model Application do not anticipate claim 11 of the '419 patent for the reasons set forth in Cryovac's expert Dr. Wilkes' expert report.

To the extent Pechiney is permitted to argue at trial that claim 11 is anticipated by other prior art cited in Dr. Mount's reports but not discussed in Pechiney's summary judgment brief or in this Pretrial Order, Cryovac expects to prove: None of the prior art references which Dr. Mount suggested in his expert reports anticipated claim 11 of the '419 patent actually contained every element of Mr. Shah's invention as described in claim 11. All of the references Dr. Mount opined anticipated claim 11 (1) failed to disclose at least one of the claim 11 limitations or features of Mr. Shah's invention, and/or (2) the reference did not contain an enabling disclosure that would enable a person of ordinary skill in the art to make and use the invention disclosed in claim 11 of the '419 patent, and/or (3) the reference was not prior art because it was not prior to Mr. Shah's date of invention.

## VII.    The Non-Obviousness of the Subject Matter of Claim 11 of the '419 Patent:

Another issue to be determined is: Whether the subject matter of claim 11 would have been obvious to one of ordinary skill in the art to which the invention pertains at the time of Mr. Shah's invention. As with Pechiney's general statement regarding anticipation, Cryovac

Exhibit 2 of the Pretrial Order
Page 17 of 33

objects that Pechiney did not set forth in the Pretrial Order, as required by the Court's Trial

Management Order paragraph 1(b) and Delaware local rule 16.4(d), what Pechiney intends to

argue at trial (or its expected proofs) in order to meet its burden of proof on the factual issue

regarding whether claim 11 was obvious.   Pechiney only states that Dr. Mount will provide

testimony regarding the obviousness of claim 11 "as outlined in his reports," which themselves

discuss at least fourteen different references as rendering claim 11 obvious either individually or

by some unspecified combination of references.

Furthermore, although Pechiney's expert Dr. Mount obviously cannot offer any opinions

at trial not already set forth in his timely-filed expert reports,[4] Pechiney's other vague comment

that it will also "provide relevant <u>factual</u> testimony regarding this issue," also unfairly prejudices

Cryovac.  In Pechiney's responses to Cryovac's contention interrogatory regarding obviousness,

Pechiney cited over 140 patents and publications as potentially rendering claim 11 obvious either

individually or in some combination.  Obviously, Pechiney knows it will not have time at trial in

front of the jury (in its 22 allotted hours) to cover over 100 prior art references, or even the 14+

references discussed by Dr. Mount.   Since Pechiney chose not to disclose in the Pretrial Order

what arguments it plans to make at trial regarding obviousness or what expected proofs Pechiney

plans to offer to support its obviousness contentions, it is difficult for Cryovac to set forth here

everything Cryovac will prove to refute Pechiney's obviousness arguments.

Nonetheless, whichever prior art references Pechiney may use from Dr. Mount's expert

reports to argue that Mr. Shah's invention was obvious, Cryovac expects to prove:   <u>None</u> of the

prior art references Dr. Mount cited in his expert reports (either individually or in any

---

[4] In a *Daubert* motion which is pending before the Court, Cryovac has sought to exclude Dr.
Mount's Second Supplemental Expert Report because it was served nearly a month after the
close of discovery and was not timely filed.

Exhibit 2 of the Pretrial Order
Page 18 of 33

combination suggested by Dr. Mount) would have rendered the subject matter of claim 11 obvious to one of ordinary skill in the art to which the invention pertains before Mr. Shah's date of invention, for the reasons set forth below.[5]

### A.    The Scope and Content of the Prior Art

Cryovac further expects to prove:  Prior to Mr. Shah's date of invention, many different types of multilayer films, designed for different purposes or end uses, had been made and disclosed using different manufacturing processes to produce films with different layer arrangements, different layer compositions, and different numbers of layers, resulting in multilayer films with different physical characteristics and different beneficial properties. However, no films with all the claim limitations described in claim 11 of the '419 patent had been disclosed in the prior art until Mr. Shah invented such a film.  Thus, *none* of the prior art cited by Dr. Mount disclosed and enabled one of ordinary skill to make a film with at least seven layers which has Mr. Shah's novel, specific combination of layer types, in the particular layer arrangement set forth in subparagraphs (a) through (d) of claim 11, with all the layers coextruded and oriented.   Nor would any of the references in the prior art cited by Dr. Mount suggest, teach, or motivate one to modify existing films *into* films described in claim 11.  For example, the prior art existing before Mr. Shah's date of invention indicated that it was quite difficult to successfully orient a multilayer film containing nylon or EVOH in the film layers.   (Mr. Shah's films have *both* nylon- and EVOH-containing layers.)

---

[5] To the extent Pechiney attempts to offer at trial testimony regarding references not previously discussed by its expert Dr. Mount, Cryovac will object to such testimony as being unduly prejudicial and confusing to the jury, since Pechiney decided not to specify which of the over 140 references it intended to use to prove its obviousness allegation, and Dr. Mount only opined on about a dozen of those references.

Exhibit 2 of the Pretrial Order
Page 19 of 33

**B.    The Differences Between the Prior Art and the Claimed Invention**

Cryovac also expects to prove:  There are clear differences between all the prior art

references cited and discussed by Dr. Mount in his expert reports and Mr. Shah's invention, as

claimed in claim 11 of the '419 patent.  For example, some references cited by Dr. Mount as

rendering claim 11 obvious disclose multilayer films that are *not oriented*.  Other references

cited by Dr. Mount disclose films in which some of the layers of the multilayer film are *not*

*coextruded*, but instead are made by laminating additional layers together to make a film.  Other

references cited by Dr. Mount only disclose films with *fewer than seven layers,* or they disclose

films which *do not contain all the types of layers described in subparts (a) - (d)* in claim 11.  For

example, some films in the prior art cited by Dr. Mount do not have any nylon-containing layers

at all, or do not have any EVOH-containing layers.  In addition, films disclosed in some of the

references cited by Dr. Mount do *not have at least seven layers arranged symmetrically,* as

claimed in claim 11 of the '419 patent.   Most of the references cited by Dr. Mount disclose films

which are missing *several* of the claim 11 limitations; for example, the films disclosed in the

reference may not be oriented as defined in the '419 patent *and* the films do not contain

intermediate nylon-containing layers on either side of an EVOH-containing core.  The extent of

the differences between the prior art and Mr. Shah's invention vary from reference to references,

but every one of the references cited by Dr. Mount as making claim 11 obvious *differs* from the

invention Mr. Shah claimed in the '419 patent in one or more significant ways.

**C.    The Level of Ordinary Skill in the Art
to Which Mr. Shah's Invention Pertains**

Regarding the proper definition of "one of ordinary skill in the art," Cryovac expects to

prove: A person of ordinary skill in the art to which Mr. Shah's patented invention pertains, is a

scientist with at least a bachelor's degree in chemical engineering, chemistry, material or

Exhibit 2 of the Pretrial Order
Page 20 of 33

polymer science, or a related discipline and two to five years experience in the area of film research and development in the packaging industry or consulting thereon.

**D.    No Reason, Suggestion, or Motivation to Modify or Combine References**

In connection with the non-obviousness issue, Cryovac also expects to prove:  There would have been no reason, suggestion, or motivation for one of ordinary skill in the art in 1985 to modify or combine any of the prior art films discussed by Dr. Mount in his expert reports in order to make a film as claimed in claim 11 of the '419 patent.  Some of the prior art references cited by Dr. Mount (and some references ignored by Dr. Mount) contain teachings *against* making films with all the characteristics set forth in claim 11.   It is contrary to how people ordinarily design, develop and make packaging films to "pick and choose" different film elements or characteristics from many different prior art references, which describe different kinds of films made for different purposes and uses by different manufacturing methods and comprised of different materials.  It is also without foundation and illogical to assume that one of ordinary skill would simply combine all those individual elements from many different films, when there would have been no motivation for one to do so--*especially* when those same references actually contain teachings *against* the combination of elements which were "cherry picked" from various references.  Likewise, other prior art references cited by Dr. Mount *already* had good barrier properties; one of ordinary skill would therefore not be motivated to make those thin films even thinner (e.g., by orientation described in the '419 patent) or otherwise modify a film that (according to the reference) works very well already, since such changes would likely detrimentally *decrease* the film's barrier properties or the film's other beneficial characteristics. People of ordinary skill in the art in 1985 would have needed to balance many competing

Exhibit 2 of the Pretrial Order
Page 21 of 33

considerations when designing a film, e.g., the known drawbacks of using nylon in film layers and the known difficulty in orienting films containing either EVOH or nylon.

If Pechiney asserts the same arguments at trial that it did in its summary judgment brief regarding obviousness, then Cryovac expects to prove: There would have been no motivation for one of ordinary skill in 1985 to orient the Gilbert Film (assuming such a film existed) or to orient the "Film C" in the Allied News Release, in an attempt to obtain the film claimed in claim 11 of the '419 patent.

### E.    No Reasonable Expectation of Success

Regarding the nonobviousness of Mr. Shah's invention, Cryovac also expects to prove: A person of ordinary skill in the art in 1985 would not have had a reasonable expectation of success in modifying (or combining) any of the prior art films proposed or discussed by Dr. Mount in his expert reports. The scope and content of the prior art as a whole did not suggest to one of ordinary skill in the art that one would be successful in making the films of Mr. Shah's invention. Rather, prior art taught *against* orienting films with layer arrangements and layer compositions similar to those in claim 11 of the '419 patent. For example, it was known in the art that it was difficult to orient both nylon-containing films and EVOH-containing films. Mr. Shah's invention, however, contained *both* nylon-containing layers *and* EVOH-containing layers. Even patents Pechiney's expert Dr. Mount identified as providing some motivation to modify other prior art films *into* a film covered by claim 11, contain statements that teach *against* making an multilayer oriented coextruded film with the layers arranged symmetrically and having the layer compositions set forth in claim 11 of the '419 patent.

If Pechiney asserts the same arguments at trial that it did in its summary judgment brief regarding obviousness, then Cryovac expects to prove: Based on the prior art as a whole, a

Exhibit 2 of the Pretrial Order
Page 22 of 33

person of ordinary skill would not have had the requisite expectation of success in orienting either the Allied Film or the Allied News Release Film C. In fact, two of the few patents Pechiney cited (the Dallmann patent and the DeAntonis patent) as providing either a motivation to orient those films or as providing an expectation of success in orienting those two films, actually contain teachings *against* orienting a film with the structure of the Allied Film or the Allied News Release Film C. In addition, the Dallmann and DeAntonis patents disclose significantly different films than those claimed in claim 11 of the '419 patent. They describe films, for example, with a different number of layers, in different layer arrangements, using different layer compositions, and adding additional types of layers by different manufacturing processes.

Also regarding the nonobviousness of Mr. Shah's invention described in claim 11, Cryovac expects to prove: Since packaging films are normally designed, developed and made with particular end uses, packing equipment and packaging product protection targets in mind, developments and modifications of new film structures and the obviousness of those structures cannot be considered in the abstract. Without actual testing, there would have been no reasonable expectation of success that changing the order of the layers of a film, introducing new layers, or changing processing conditions could be successfully achieved or would result in a successful product.

### F.    Objective Evidence of the Non-Obviousness of the Claimed Invention

Another fact in issue with respect to the question of nonobviousness is: Whether there is objective evidence of the nonobviousness of the claimed invention.[6] In this regard, Cryovac

---

[6] Pechiney claims it will provide evidence of *obviousness* through secondary considerations by providing "evidence of independent invention by others." However, Pechiney does not specify

(continued on next page)

Exhibit 2 of the Pretrial Order
Page 23 of 33

expects to prove: There is a nexus or relevance between the merits of Mr. Shah's claimed

invention and the objective evidence of nonobviousness. Specifically, Cryovac will show: Two

embodiments of Mr. Shah's invention--Cryovac's own LID 1050 film and Pechiney's

ClearShield film--have both been commercially successful, and the success of those two

products is due to the merits of Mr. Shah's invention. The nexus between the claimed invention

and the objective evidence of nonobviousness is also evidenced by Pechiney's own documents,

which show the benefits of the claim 11 film and how the superior performance thereof allowed

Pechiney to provide a product for an application, bone-in meat packaging, for which it had not

previously been able to supply a product.

Cryovac further expects to prove the unexpected superiority of the invention of claim 11 of

the '419 patent. In that regard, Cryovac will show: Despite Pechiney's extensive research and

development efforts 16 years <u>after</u> Mr. Shah's invention, the subject matter set forth in claim 11 of

the '419 patent was <u>still not obvious</u> to the research and development department at Pechiney in

<u>2001</u>--much to the disappointment of Pechiney's management, which continued to look for an

acceptable, marketable product as a solution to a problem solved by Mr. Shah's '419 patent some 15

years earlier. Indeed, Pechiney and its consultants and suppliers conducted 18 months of detailed

investigation of over 150 individual trial variables that encompassed 12 different manufacturing

---

(continued from previous page)

invention *by whom*. Pechiney only states that Dr. Mount and "fact witnesses" will offer
testimony "relating to this issue" without indicating what it intends to prove regarding the
"invention by [unidentified] others." Dr. Mount should be limited at trial to offering only those
opinions already set forth in his timely-filed expert reports, and Cryovac does not believe Dr.
Mount ever opined on "evidence of independent invention by others" in any of his expert reports.
Pechiney also claims it will provide evidence to *negate* any inference of nonobviousness offered
by Cryovac. Specifically, Pechiney states it will prove the lack of a nexus between Cryovac's
evidence of secondary considerations of nonobviousness and the subject matter of claim 11.
Again, Pechiney only states that Dr. Mount and "fact witnesses" will offer evidence on the issue,
but does not indicate what arguments it will make or what Pechiney specifically intends to prove.

Exhibit 2 of the Pretrial Order
Page 24 of 33

technologies before Pechiney "rediscovered" that the best product--the structure needed to provide all the desired properties--was one that fell squarely within claim 11 of the '419 patent: an oriented coextruded film having seven layers arranged symmetrically as provided in claim 11 of Mr. Shah's '419 patent. Pechiney's own protracted efforts and large resources necessary to develop a film that was actually covered by claim 11 of the '419 patent demonstrate the unexpected superiority of Mr. Shah's invention. Indeed, prior to Pechiney's development of its ClearShield product--a product containing all the claim limitations of claim 11--Pechiney was precluded from participating in the lucrative market segment because they lacked the technology to impart puncture resistance into their marketed products.

In addition, Cryovac expects to prove: Cryovac's LID 1050 film is a commercial embodiment covered by claim 11 of the '419 patent. Cryovac's LID 1050 film is a commercial success. Between 1997 and 2005, Cryovac had sold well over $45 million dollars of LID 1050 film. LID 1050 film was one of the winners of the Flexible Packaging Association's 1996 Top Packaging Awards. LID 1050 film extended shelf life of fresh ground beef by as much as eight to ten days-- triple the life of traditionally trayed and stretch-wrapped meat. It provides good visibility and is considerably thinner than traditional stretch wrap. The product provides superior product properties that allow the retailer to provide packed ready-for-display fresh ground beef available twenty-four hours a day. The technical superiority of Cryovac's LID 1050 is due to the merits of Mr. Shah's invention and further indicates the nonobviousness thereof.

## VIII.  The Enablement of Claim 11 of the '419 Patent:

Another fact in issue with respect to the question of enablement is: Whether one skilled in the art to which the invention pertains would have been able to make and use the films

Exhibit 2 of the Pretrial Order
Page 25 of 33

described in claim 11 of the '419 patent without undue experimentation, based on the '419 specification and the knowledge of one skilled in the art.

The only "expected proof" Pechiney sets forth in the Pretrial Order to carry *Pechiney's burden* on issue of enablement is that "Dr. Mount will provide testimony that claim 11 is not enabled as outlined in his reports." However, Dr. Mount did not opine in his expert reports that one skilled in the art to which the invention pertains would have been unable to make and use the films described in claim 11 of the '419 patent without undue experimentation, based on the '419 specification and the knowledge of one skilled in the art. Pechiney also adds that it "will provide relevant factual testimony on this issue," but does not specify at all what its arguments are or what its expected proofs will be--as required by the Court's Trial Management Order paragraph 1(b) and by Delaware local rule 16.4(d).[7]  Indeed, Pechiney has not provided any credible or relevant evidence to prove lack of enablement--even when it moved for summary judgment on the issue.[8]

Under Pechiney is permitted to come forward with any evidence or arguments not identified in the pretrial order which it believes prove a lack of enablement argument, Cryovac expects to prove: At the time Mr. Shah's patent application was filed in March 1986, a person skilled in the

---

[7] If Pechiney tries to rely, as it did in its summary judgment brief, on the deposition testimony of fact witness and Cryovac technician, Mr. Kay, Cryovac will object to such testimony as irrelevant and lacking personal knowledge. Mr. Kay gave no testimony regarding the adequacy of the disclosure in the '419 patent, and had not even read the '419 patent when he was deposed. Moreover, Mr. Kay does not qualify as "one of ordinary skill in the art" under either party's definition because Mr. Kay does not have the requisite education; Mr. Kay does not even have a Bachelors degree. Dr. Mount has also never commented on Mr. Kay's testimony.

[8] When Pechiney moved for summary judgment that claim 11 was not enabled, Cryovac pointed out that Pechiney cited no evidence or expert testimony from Dr. Mount (Pechiney's only technical expert) that claim 11 was not enabled; Pechiney did not attempt to refute that fact in its reply brief.

Exhibit 2 of the Pretrial Order
Page 26 of 33

art reading the '419 patent specification would have been able to make and use films covered by claim 11 without undue experimentation.

In that regard, Cryovac further expects to prove: The '419 specification provides detailed guidance concerning how to make oriented coextruded multilayer films covered by claim 11 of the '419 patent. For example, the '419 specification provides detailed guidance on possible polymer components for the various layers, the inclusion of additives (*e.g.*, slip and antiblock agents), as well as two working examples making films covered by claim 11. The examples in the '419 patent also provide specific layer compositions and detailed formation methods (e.g., operating parameters), including temperature and stretch conditions used to orient the coextruded and cooled multilayer films which fall within the scope of claim 11. Thus, when Mr. Shah's application was filed in March 1986, the '419 disclosure would have enabled a person of ordinary skill in the art to make and use embodiments of Mr. Shah's invention as described in claim 11.

## IX.    Satisfying the Written Description Requirement:

Another fact in issue is: Whether the specification of the '419 patent contains a written description of Mr. Shah's invention with sufficient information to show a person skilled in the art that Mr. Shah was in possession of the invention described by claim 11 at the time Mr. Shah's patent application was filed.

Again, the only proof Pechiney identified in the Pretrial Order to support its allegation that the written description requirement was not met, is a general statement that Pechiney "will provide testimony from Dr. Mount as outlined in his reports and from fact witnesses on this issue." However, the actual opinion Dr. Mount gave in this regard was a claim construction

Exhibit 2 of the Pretrial Order
Page 27 of 33

opinion with respect to the claim term "arranged symmetrically." In this regard, Dr. Mount should not be permitted at trial to present any opinions inconsistent with the Court's claim construction. (See Cryovac's *in limine* request no. 3.) Additionally, Pechiney does not specify what arguments it intends to make or what proofs it will offer based on unknown testimony of "fact witnesses" in order to meet its burden regarding written description.

Nevertheless, if Pechiney presents evidence arguing that the '419 specification does not satisfy the written description requirement, Cryovac expects to prove: The specification of the '419 patent makes clear to one skilled in the art that Mr. Shah had possession of the invention described in claim 11 of the '419 patent at the time his application was filed March 21, 1986.

If necessary, in response to evidence presented by Pechiney, Cryovac also expects to prove: The claim terms and phrases in claim 11 have clear support in the '419 patent specification, as well as the knowledge of one skilled in the art. For example, if Pechiney is permitted to argue to the jury that there is no support in the '419 specification for films with different layer thicknesses in "corresponding" layer types (e.g., the two outer layers comprising a polymeric material may each vary in thickness), Cryovac will show: There is clear support in the '419 specification that the thickness of the individual layers in the films of Mr. Shah's invention <u>may</u> differ or vary independently (e.g., different outer layer thicknesses). Likewise, if Pechiney is permitted to argue to the jury that there is no support in the '419 specification for films with slightly different processing aid and additive amounts, Cryovac will show it was understood by one of ordinary skill in the art (and indicated in the '419 specification) that outer layers of Mr. Shah's invention may contain differing amounts of slip and antiblock additives or processing aids.

Exhibit 2 of the Pretrial Order
Page 28 of 33

## X.    The Enforceability of Claim 11 of the '419 Patent:

### A.    The Immateriality of the Dallmann Reference

One fact at issue regarding the enforceability of the '419 patent is:  Whether U.S. Patent

4,572,854 to Dallmann was material to the patentability of Mr. Shah's invention set forth in

claim 11 of the '419 patent.  In that regard, Cryovac expects to prove:  The '854 Dallmann patent

was not material to the patentability of the '419 patent, and that a reasonable examiner would not

have considered it important in deciding whether to allow the '419 patent to issue.

Cryovac also expects to prove:  The Dallmann patent is merely cumulative or less

material than references before the Patent Office during prosecution of the Shah '419 patent.  In

particular, there were numerous references before the Examiner at least as pertinent as the

Dallmann patent, and the features of Dallmann film(s) were already available in the record

before the Patent Office.  In addition, the Dallmann reference does not include any intermediate

polyamide layers (while Mr. Shah's invention does).  Furthermore, instead of establishing (either

by itself or in combination with other information), the unpatentability of the '419 patent, the

Dallmann patent actually teaches away from Mr. Shah's invention.

Cryovac also expects to show:  The Dallmann patent does not refute, and is not

inconsistent with, applicant's positions in opposing an argument of unpatentability relied on by

the Office, or asserting an argument of patentability.  In particular, the Examiner's consideration

of the Dallmann reference would not have prevented Mr. Quatt from properly distinguishing

over the combination of the Sheptak reference in view of the Mueller reference.  That is,

Cryovac could have made the same arguments it made in the May 22, 1987 Amendment even if

Dallmann had been considered.

In this regard, Cryovac expects to prove:  Mr. Quatt's response in May 1987 to the

Examiner's rejection based on the Sheptak and Mueller patents would <u>still</u> have been accurate if

Exhibit 2 of the Pretrial Order
Page 29 of 33

the Dallmann patent had been cited during prosecution of the '419 patent. In particular,

Dallmann would not have affected Mr. Quatt's explanation that "[i]n either hypothetical

[combination of Sheptak in view of Mueller posed by the Examiner] an oriented coextruded film

having at least seven layers arranged symmetrically is not achieved." This is an accurate

statement. The Examiner's rejection and Mr. Quatt's response expressly addressed the Sheptak

reference in view of the Mueller reference; the disclosure of Dallmann (or any other reference)

does not affect the accuracy of Mr. Quatt's statement to the Patent Office.

Cryovac also expects to prove: Consideration of Dallmann would not have enabled the

Examiner to make any stronger rejections against the patentability of Mr. Shah's invention.

Specifically, there was no teaching, suggestion, or motivation in the record to modify Sheptak in

view of Dallmann, and with or without Mueller, to achieve a structure within the scope of claim

11 of the Shah '419 patent. In addition to the fact that the features of Dallmann were already

available in the record before the Patent Office, Dallmann does not include intermediate

polyamide layers and teaches away from the Shah invention. Thus, Mr. Quatt could have made

the same distinguishing remarks for Mr. Shah's invention even in view of the Dallmann

reference.

Cryovac further expects to prove: Even if the Examiner had made a rejection based in

part on the Dallmann reference, Mr. Quatt could have made *additional arguments* to distinguish

the Dallmann reference from Mr. Shah's invention. Cryovac could have properly argued that

that (1) Dallmann did not have or suggest using intermediate polyamide layers, (2) Dallmann

taught *away from* modifying the Dallmann structure because it taught that its specific structure

was critical for achieving the desired goal of orienting all layers by stretching under identical

Exhibit 2 of the Pretrial Order
Page 30 of 33

conditions, and (3) the only use for polyamide, according to Dallmann, is that it could be blended with (into) the EVOH in the EVOH layer, not used as distinct layers.

**B.     Lack of Intent to Deceive the U.S. Patent and Trademark Office**

Another fact at issue regarding the enforceability of the '419 patent is: Whether Mr. Quatt, the Cryovac patent attorney who prosecuted the application that resulted the '419 patent, possessed the necessary intent to deceive the U.S. Patent and Trademark Office to allow Mr. Shah's application. In that regard, Cryovac expects to prove: Mr. Quatt did not have any intent to deceive the Patent Office when he did not disclose the Dallmann patent to the Patent Office during prosecution of the application that led to the '419 patent. During the prosecution of Mr. Shah's application, Mr. Quatt did not recognize the '854 Dallmann patent as being relevant or material to Mr. Shah's application, and Mr. Quatt, therefore, had no intent to deceive the Patent Office by not specifically citing that reference during prosecution of the '419 patent.

In mid-1987, Mark Quatt had been prosecuting patent applications for about five years. At that time, he was prosecuting approximately 25-50 patent applications on behalf of Cyrovac, including the application for Mr. Shah's invention and three patent applications related to an invention by Ennis Fant. The three Fant applications included the Fant "parent application" no. 06/834,694 (i.e., first of the three Fant applications to be filed) ("Fant '694 parent application"). There were also two divisional applications filed from that '694 parent application, application no. 06/938,945 ("Fant '945 divisional application") and application no. 07/051,100 ("Fant '100 divisional application").[9] )

---

[9] The Fant '694 parent application and the '945 and '100 divisional applications disclosed exactly the same subject matter. The Fant '694 parent application issued as U.S. Patent No. 4,746,562; the Fant '945 divisional application issued as U.S. Patent No. 4,753,700; the Fant '100 application was abandoned and never issued as a patent.

Exhibit 2 of the Pretrial Order
Page 31 of 33

During prosecution of the Fant '945 divisional application, in an Office Action, dated May 12, 1987, a Patent Office Examiner cited the '854 Dallmann patent along with three other references. Unlike the other three references cited by the Examiner, the Dallmann patent was not discussed in the Office Action at all, and did not serve as the basis for any rejection. Mr. Quatt has no recollection of having substantively considered the disclosure of the Dallmann patent when it was cited by the Examiner in the Fant '945 divisional application or at any other time. Due to the volume of prosecution in which he was involved, it was also not Mr. Quatt's practice to independently study references cited by an Examiner if those references were not the basis of any rejection or if the references were never discussed by the Examiner. The Dallmann patent was not the basis of any rejection and was not discussed by the Examiner.

Cryovac will further show: Subsequent to the citation of the '854 Dallmann reference in the Fant '945 divisional application, on January 12, 1988, Mr. Quatt cited the Dallmann patent and thirteen other references to the Examiner in the Fant '694 parent application. Mr. Quatt cited the fourteen references because they were cited in the co-pending Fant '945 or Fant '100 divisional applications. Thus, the fourteen references, including the Dallmann patent, were brought to that Examiner's attention during prosecution of the '694 parent application simply because these references had been cited in the two co-pending divisional applications (the Fant '945 and '100 applications) which had a common chain of priority to the '694 parent application. Citation of the references, including the Dallmann patent, was not, therefore, based on any independent review of the references by Mr. Quatt. It was no more than a ministerial act of ensuring that the same references had been cited in all the related cases. Indeed, Mr. Quatt does not remember reviewing or otherwise considering the Dallmann patent or its materiality to the

Exhibit 2 of the Pretrial Order
Page 32 of 33

Fant applications when he included it in the list of cited patents for the Examiner of the Fant applications.

Cryovac also expects to prove: Mr. Quatt prosecuted the application leading to the Shah '419 patent with good faith. He filed *five* information disclosure statements during the prosecution of the '419 patent. In these information disclosure statements, Mr. Quatt brought to the Examiner's attention all of the prior art of which he was aware that was possibly relevant to the patentability of the '419 patent.

Exhibit 2 of the Pretrial Order
Page 33 of 33

PESTALOZZI LACHENAL PATRY
ATTORNEYS AT LAW

CH-8001 ZURICH · LOEWENSTRASSE 1
TEL. +41 1 217 91 11 · FAX +41 1 217 92 17 · zrh@plplaw.ch · www.plplaw.ch

# Memorandum

### Necessity of the Shareholders' Approval for the Sale of the Assets of GMT Fine Chemicals SA? If to answer in the positive: Legal Consequences, if the Sale of the Assets is based on a Board of Directors' Resolution only?

**1.    Necessity of the Shareholders' Approval for the Sale of the Assets of GMT**

Neither in the Swiss Code of Obligation (CO) nor in the Articles of Incorporation of GMT exist regulations which explicitly stipulate that the shareholders respectively the shareholders' meeting have/has to approve the sale of the assets of the company respectively pass a resolution on it.

The board of directors can pass resolutions in all matters, which are not, neither by law nor by the articles of incorporation, explicitly reserved to the shareholders' meeting (art. 716 para. 1 CO). Furthermore, the board of directors has the competence to act for the company in all matters which the purpose of the company implicates (art. 718a para. 1/art. 716 para.2 CO).

Notwithstanding, according to the jurisprudence of the Swiss Federal Court and the main doctrine, the sale of the sum of the facilities of a company (without a resolution on liquidation) respectively the sale of the whole business is not covered by the purpose of the company (BGE 116 II 320, C. 3a).

**Subsequently, the sale of almost 100% of the GMT's assets would fall into the competence of the shareholders' meeting to decide, because the sale would imply change of the company's purpose.** Exceptions can only be made, if the matter is urgent and special circumstances make it impossible to pass a shareholders' meeting's resolution in time.

**2.    Legal Consequences, if the Sale of the Assets is based on a Board of Directors' Resolution only**

The shareholders' meeting can approve the board of directors' resolution on the sale of the assets ex post with a 2/3 majority (art. 704 para. 1 ciph. 1 CO/14 ciph. 1 of the Articles of Incorporation of GMT). The shareholders cannot (according to the main doctrine) appeal against a board of directors' resolution, but they can claim the nullity of the same (art. 714 CO). A null and void resolution would never have been effective, subsequently there is no limitation to the assertion of its nullity.

Zurich, 23 January 2004