# TAB F
# TO EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CRYOVAC, INC.,
      Plaintiff and Counter-Defendant,

    v.

PECHINEY PLASTIC PACKAGING, INC,
      Defendant and Counter-Plaintiff.

Civil Action No. 04-1278

Hon. Kent A. Jordan

## Declaration of Stratos Dimas

I, Stratos Dimas, declare as follows:

1.    I received my B.S. degree in Chemistry from Ioannina University, Greece, in 1982. I received my M.Sc. degree in Food Science from Rutgers University, New Brunswick, New Jersey in 1984 and my Ph.D. degree in Food Science from Rutgers University in 1986.

2.    I am presently employed at Welch Food Inc. in Concord, MA.

3.    I changed my name from Efstratios Hatzidimitriu to Stratos Dimas in 1993.

4.    I visited Professor Seymour G. Gilbert at Rutgers University in 1981 at the recommendation of Michael Kontominas. Michael Kontominas was a professor of mine at Ioannina University who received his doctorate under Professor Gilbert. Professor Gilbert encouraged me to enter into the graduate program in Food Science at Rutgers University after working for him for three months in 1981.

5.    I enrolled in the graduate program in Food Science at Rutgers University in 1982. Starting in 1982, Professor Gilbert hired me as part of a group working on testing films provided by Allied Chemicals. I conducted tests on the films provided by Allied Chemicals for 2 to 3 years. Among the films that I tested were films having layers of nylon and EVOH.

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER

PPPI 013833

DTX0688

6.        I started the Ph.D. program at Rutgers University in 1985 after I was admitted to candidacy for the program. I did not conduct any tests on the films provided by Allied Chemicals after starting the Ph.D. program. During the Ph.D. program, I concentrated my efforts on a study on polyamide which resulted in my dissertation entitled "Polyamide Interactions with Organic Solutes: Effect of Structure and Water."

7.        I co-authored a number of scientific articles with Professor Gilbert including the article entitled "Odor Barrier Properties of Multi-Layer Packaging Films at Different Relative Humidities." This article is directed to the tests performed on the films provided by Allied Chemicals. The article was submitted for publication in 1986 and was published in the March-April 1987 Edition of Journal and Food Science.

I declare under penalty of perjury that the foregoing is true and correct.

Stratos Dimas

Date: August 15, 2005

_____
Stratos Dimas

CONFIDENTIAL SUBJECT
TO PROTECTIVE ORDER

PPPI 013834

# TAB G
# TO EXHIBIT 14

LEXSEE 1996 DEL CH LEXIS 112

WILLIAM C. DEMETREE and JACK C. DEMETREE, Plaintiffs, v.
COMMONWEALTH TRUST CO., Trustee of Trust 896 U/A dated November 29, 1962,
Defendant.

Civil Action No. 14354

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1996 Del. Ch. LEXIS 112*

August 13, 1996, Date Submitted
August 27, 1996, Date Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court September 20, 1996.

**DISPOSITION:**

Demetrees entitled to summary judgment as matter of law and order granting above stated appropriate specific performance.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sublessees and defendant lessor cross-appealed for summary judgment in plaintiff's action for specific performance of a contract for the continued lease of defendant's property.

**OVERVIEW:** Plaintiff sublessees subleased property from a third party lessee and entered into a triparty agreement with defendant lessor and the third party under which plaintiffs had a conditional right to enter into a direct lease with defendant if the third party terminated its prime lease with defendant. The third party eventually filed for bankruptcy and terminated its renewal rights with defendant, without informing plaintiffs. When defendant notified plaintiffs that both the prime lease and sublease would terminate, plaintiffs sought to renew and filed an action seeking specific performance when defendant refused. The court granted plaintiffs' motion for summary judgment and denied defendant's motion. The court held that the triparty agreement obligated defendant to enter into a direct lease with plaintiffs, as provided by the terms of the sublease. The interpretation of a provision in the sublease was subjectively shared by the parties and was well within the bounds of a commercially reasonable agreement. Therefore, specific performance was an appropriate remedy for enforcement.

**OUTCOME:** The court granted plaintiff sublessees' motion for summary judgment and denied defendant lessors' motion for summary judgment, because specific performance was the proper remedy to enforce a term of the parties' agreement that permitted plaintiffs to renew their lease with defendant.

**CORE TERMS:** lease, sublease, prime, new lease, option to renew, renewal, terminated, renew, right to enter, terminate, specific performance, motel, year term, renewal option, lessee, lessor, default, extrinsic evidence, plain meaning, expiration, execute, notice, set forth, renewed, italics, parol evidence rule, legal obligation, unambiguous, subjective, termination date

LexisNexis(R) Headnotes

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN1] The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN2] Under the plain meaning rule of contract construction, if a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words. Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

1996 Del. Ch. LEXIS 112, *1

*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN3] In cases where the language of a contract is clear and unambiguous, the court may not consider parol evidence to interpret the intent of the parties. Deviation from this rule is only required where a literal reading of a contractual provision would be clearly unreasonable and yield an arbitrary result. The parol evidence rule is based on the principle that the dear meaning of the language of a written agreement most accurately reflects the understanding of the parties at the time, of their contract; extrinsic evidence reflecting a different potential meaning should not be considered.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN4] If there is uncertainty concerning the meaning of contractual language, the court should consider the context and circumstances in which the words were used in order to determine the intended meaning. When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

*Contracts Law > Remedies > Specific Performance*
[HN5] Specific performance is appropriate where a clear and definite agreement can be enforced without requiring the court to supply essential additional or inconsistent contractual terms.

COUNSEL:

Richard A. Levine, Esquire, Richard H. Morse, Esquire and Janet Z. Charlton, Esquire, of YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware; Attorneys for Plaintiffs.

Richard P. Beck, Esquire and Barbara MacDonald, Esquire, of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware; Attorneys for Defendant.

JUDGES: ALLEN, Chancellor

OPINIONBY: ALLEN

OPINION:

MEMORANDUM OPINION

ALLEN, Chancellor

Pending are cross–motions for summary judgment in this action for specific performance of a contract. The determination of these motions requires an interpretation of two contracts executed contemporaneously on July 22, 1966. Summary judgment has been requested on the basis of those contracts and other documents executed by and between the parties, as well as affidavits and deposition testimony.

The first contract ("Sublease"), entered into between plaintiffs, William C. Demetree and Jack C. Demetree ("Demetrees"), and Horne's Enterprises, Inc. ("Horne's"), granted the Demetrees a Sublease for a portion [*2] of a parcel of land leased by Horne's from defendant, Commonwealth Trust Co. ("Commonwealth"), in a prior contract ("Prime Lease"). The Prime Lease provided for an initial term of fifteen years and granted Horne's an option to renew for four additional successive ten year periods. As contemplated under the Prime Lease, the subsequent Sublease required the Demetrees to construct a motel on the premises and granted a conditional option to renew the Sublease in the event that the Prime Lease had been renewed as well.

The second contract ("Triparty Agreement"), executed contemporaneously by the Demetrees, Horne's, and Commonwealth, both extended the initial termination date of the Prime Lease from 1981 to 1985, and granted the Demetrees a conditional right to enter into a direct lease with Commonwealth if the Prime Lease were terminated by Horne's "prior to the expiration of the four renewal periods" provided for in the Prime Lease. An interpretation of this right to enter into a new direct lease "on the same terms, provisions, and conditions" *as the Sublease* is the subject of this dispute.

In 1985 the original term of the Prime Lease expired and the Prime Lease was extended until [*3] 1995. In 1990 Horne's sought protection of the bankruptcy court and in that connection entered into a release with Commonwealth in which it waived its right to extend the Prime Lease. The Demetrees did not learn of this at the time; they continued to occupy the premises pursuant to their Sublease. On May 18, 1995, the Demetrees received notice that both the Prime Lease and Sublease would terminate on December 31, 1995. Commonwealth informed the Demetrees that, in its view, the Demetrees had no right to renew the Sublease or require Commonwealth to enter into a new direct contract.

The Demetrees disagree and here seek specific performance compelling Commonwealth to enter into a new lease term which the Demetrees contend is required by

the Triparty Agreement. According to the Demetrees' interpretation of the Triparty Agreement, Commonwealth is contractually obligated to enter into a direct lease for a term ending December 31, 2005, with an option to renew for two additional ten year terms.

For the following reasons, I conclude that the Triparty Agreement did not create a legal obligation for Commonwealth to enter into the demanded new direct lease. The Triparty Agreement, however, [*4] obligates Commonwealth to enter into a direct lease with the Demetrees for a single seventeen year term, without an option to renew, as provided by the terms of the Sublease. n1 The Demetrees' motion for summary judgment should be granted as a matter of law pursuant to Court of Chancery Rule 56 since there is no dispute as to the material facts set forth below. *See Moore v. Sizemore, 405 A.2d 679, 680 (Del. 1979).* Commonwealth's motion for summary judgment is denied because the Demetrees are entitled to the above stated specific performance.

> n1 Although neither of the parties argued that the contracts entitle the Demetrees to a direct lease with a seventeen year non-renewal term, as will be discussed below, this is the most objectively reasonable construction of the literal meaning of the contractual language used by the parties.

## I. FACTS

### 1. THE PRIME LEASE

On September 3, 1963, Commonwealth, a Delaware corporation and trustee of Trust 896, leased then undeveloped trust property along [*5] Route 896, in Newark, Delaware, to Horne's to be used as the site of a motel and restaurant. The Prime Lease provided for an initial term of fifteen years, commencing January 1, 1964, and an option to renew for four successive ten year terms under the same terms and conditions.

### 2. THE SUBLEASE

On July 22, 1966, with Commonwealth's consent, Horne's subleased a portion of the property to the Demetrees for an initial seventeen year term, ending December 31, 1985, on the condition that Demetree construct and operate a Horne's Franchise Motor lodge on the subleased premises. n2 The Sublease granted the Demetrees a right to renew the Sublease upon the same terms and conditions only if the Prime Lease was renewed for such period. Under the Sublease, Horne's was under no legal obligation to renew the Prime Lease.

Section 18 of the Sublease stated that:

> in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term . . . [the] Sublease shall terminate at the end of the then existing term, notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option.

The Sublease [*6] specified rents payable for the initial period and four renewal periods.

> n2 Construction of the motel was to be completed within eighteen months. At the time of this contract, the Demetrees planned to sub-sublease the property to Scott-Douglas Corporation to operate the motel once it was constructed.

### 3. THE TRIPARTY AGREEMENT

Contemporaneously, on July 22, 1966, Commonwealth, Horne's, and the Demetrees entered into the Triparty Agreement. n3 The Triparty Agreement extended the initial term of the Prime Lease to twenty-two years so that it would end on the same day as the Sublease, December 31, 1985, unless renewed. In addition, paragraphs 4 and 5 of the Triparty Agreement granted the Demetrees a right to enter into a direct lease with Commonwealth if the Prime Lease were terminated under specified circumstances.

> n3 Benjamin Vinton, Jr., Commonwealth's president at the time of the Triparty Agreement, signed the contract on behalf of Commonwealth, but it appears from his January 3, 1996 deposition testimony that he was not involved in the negotiations or drafting of the clause at issue.

[*7]

Paragraph 4 of the Triparty Agreement provided that Commonwealth would notify the Demetrees of "any default or breach" by Horne's. In the event of such a default or breach, the Demetrees would be entitled either to cure such default or breach to avoid termination of the Prime Lease by Commonwealth or enter into a new direct lease with Commonwealth on specified terms. Paragraph 4 stated that "in event said Prime Lease is terminated for any reason" the Demetrees have the right to:

> execute *a new lease with Lessor on the same terms, provisions and conditions as set forth*

1996 Del. Ch. LEXIS 112, *7

*in said sublease* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable, and except that the terms of paragraph 3(a) of [the Triparty Agreement] shall be incorporated in any new lease. (italics added)

Paragraph 5 provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees have a right to:

execute *a new lease with Lessor on the same terms, provisions and conditions as set forth in said sublease,* except that [*8] all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. n4 (italics added)

n4 According to Jack Demetree's Affidavit, when he signed the Triparty Agreement he understood this paragraph to gave the Demetrees a "right to lease the property through 2025, whether or not Horne's continued to lease the property from Commonwealth."

Paragraph 3(a) of the Triparty Agreement, referred to above, stipulated conditions concerning the execution of a mortgage on the subleased premises. Among other things, the Demetrees agreed that any mortgage on the premises would have a final maturity date not exceeding December 31, 1985, the termination date for the initial term of the Sublease. On October 11, 1966, Chase Manhattan Bank extended a $500,000 loan to the Demetrees to construct the motel on the premises. n5 In addition to the $500,000 loan, the Demetrees invested approximately $275,000 for the construction of the motel.

n5 The loan had an "interest only" clause applicable to the eighteen month motel construction period, to be followed by a fifteen year term to pay down the principal and interest together. The Triparty Agreement extended the initial term of the Prime Lease, preventing it from expiring during the term of the Demetrees' construction loan. After such extension, the loan would be paid off approximately three years before the end of the initial term of the Prime Lease and Sublease.

An assignment of the sub-sublease agree-

ment with Scott-Douglas Corporation, dated July 29, 1966, was accepted as collateral to secure such loan. After Scott-Douglas defaulted in 1969, the Demetrees entered into a new sub-sublease agreement with Albright and Chason Motels of Delaware, Inc., with an initial term of five years and options for renewal terms expiring December 31, 1985.

[*9]

### 4. *SUBSEQUENT EVENTS*

On March 25, 1977, Horne's assigned its interest in the Prime Lease and Sublease to Wayanne, Inc., ("Wayanne"), a Delaware corporation. Wayanne subsequently exercised its option to renew the Prime Lease for an additional ten year term, and the Demetrees did the same, extending the termination date of both the Prime Lease and Sublease to December 31, 1995.

On March 10, 1990, Wayanne and Commonwealth entered into an agreement of "Release, Accord and Satisfaction" to resolve issues in connection with Wayanne's alleged default under the Prime Lease. The agreement released both parties from potential claims arising out of the Prime Lease and included a statement by Wayanne that it would not exercise the renewal option for a second ten year term, which would cause the Prime Lease to expire on December 31, 1995. The Demetrees were not informed about this agreement until May 18, 1995. n6 During this time period, there were other communications between the parties concerning the property. n7

n6 Commonwealth's attorney asked Wayanne's attorney to "maintain confidentiality" concerning the agreement, despite Demetree's right to receive notice of termination of the Prime Lease. According to Commonwealth, confidentiality concerning the agreement was required due to ongoing litigation to quiet title on the property. Title was cleared March 2, 1994. *Commonwealth Trust Co. v. Ferry,* C.A. No. 12714 (Del.Ch. Mar. 2, 1994) Judgment Order).

[*10]

n7 In 1991, the Demetrees discussed the property with Vinton during a telephone conversation. According to them, Vinton suggested joint redevelopment of the property since they would be "in it for a long time." Vinton denies ever having made that statement. As will become clear, however, neither this fictual dispute nor the no-

tice issue is relevant to the determination of this contract construction action.

In June 1992, the Demetrees executed an Agreement of Non-Disturbance and Entitlement with a subtenant Marinor Corp., Marinor's subtenant, MSL Motel Corporation, and Commonwealth. The agreement provided that if the Demetrees' Sublease were terminated by Commonwealth or the Demetrees or should "expire prior to December 31, 2025," for reasons other than MSL's default, then Commonwealth and the Demetrees agreed MSL's possession, use and enjoyment would not be disturbed.

On May 18, 1995, Commonwealth gave the Demetrees notice for the first time that the Prime Lease and Sublease would expire on December 31, 1995. Subsequent to receiving this notice, the Demetrees initiated this action requesting [*11] specific performance of paragraphs of the Triparty Agreement, construed by the Demetrees to provide a right to enter into a new lease directly with Commonwealth.

## II RULES OF CONTRACT CONSTRUCTION

[HN1] The primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract. *See* CORBIN ON CONTRACTS § 1 (1960); *Bell Atlantic Meridian Systems v. Octel Communications Corp., 1995 Del. Ch. LEXIS 156,* C.A. No. 14348 (Del.Ch. Nov. 28, 1995), Mem. Op. at 12. This process often requires courts to engage in an analysis of the intent or shared understanding of the parties at that time. *See* WILLISTON ON CONTRACTS § 601 (1961); *RESTATEMENT (SECOND) OF CONTRACTS § 201* cmt. c (1981); *Burge v. Fidelity Bond & Mortgage Co., 648 A.2d 414, 420 (Del. 1994); Klair v. Reese, 531 A.2d 219, 223 (Del. 1987).*

[HN2] Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear, literal meaning of the words. *See Myers v. Myers, 408 A.2d 279, 281 (Del. 1979).* Where parties have entered into an unambiguous integrated written contract, the contract's construction should [*12] be that which would be understood by an objective reasonable third party. *See City Investing Co. v. Continental Cas. Co., 624 A.2d 1191, 1198 (Del. 1993); US West, Inc. v. Time Warner Inc., 1996 Del. Ch. LEXIS 55,* C.A. No. 14555 (Del.Ch. May 6, 1996), Mem. Op. at 21. An inquiry into the subjective unexpressed intent or understanding of the individual parties is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable

persons from disagreeing as to their meaning. *See Bell Atlantic,* Mem. Op. at 13, n.4.

[HN3] In cases where the language of a contract is clear and unambiguous, this Court may not consider parol evidence to interpret the intent of the parties. n8 *Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992); Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991).* Deviation from this rule is only required where a literal reading of a contractual provision would be "clearly unreasonable and yield an arbitrary result." *Citadel Holding, 603 A.2d at 822.* The parol evidence rule is based on the principle that the clear meaning of the language of a written agreement most accurately reflects the understanding of the parties at [*13] the time, of their contract; extrinsic evidence reflecting a different potential meaning should not be considered. *See Mesa Partners v. Phillips Petroleum Co., 488 A.2d 107, 113 (Del.Ch. 1984).* The theoretical underpinnings of the parol evidence rule are particularly applicable in cases such as this one where a very long period has passed since the execution of the contract, making oral testimony concerning expectations of the parties at the time potentially less reliable. *See* 32A C.J.S., EVIDENCE § 851, p.216 (1964) (the parol evidence rule is founded on the maxim that "written evidence is so much more certain and accurate than that which rests in fleeting memory only, that it would be unsafe, when parties have expressed the terms of their contract in writing, to permit weaker evidence to control").

> n8 A preliminary assessment of extrinsic evidence may be necessary in certain cases in order to determine whether any ambiguities exist. *See U.S. West* at n.10; *Bell Atlantic* at n.5; WILLISTON ON CONTRACTS § 601 (1961).

[*14]

Of course, [HN4] if there is uncertainty concerning the meaning of contractual language, the Court should consider the context and circumstances in which the words were used in order to determine the intended meaning. *Klair, 531 A.2d at 223.* n9 When faced with contract language reasonably susceptible to two possible constructions, this Court has long followed the principle that the:

> one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable

agreement must be preferred to that which makes it an unusual, unfair, or improbable contract.

*Holland v. National Automotive Fibres, 194 A. 123, 127 (Del. Ch. 1937).* As will be discussed below, however, this is not such a case because the Triparty Agreement is capable of a literal and sensible interpretation, even if there remains doubt that it is an interpretation that the parties subjectively shared. That interpretation, which is well within the bounds of a commercially reasonable agreement, should be enforced.

> n9 Relevant extrinsic evidence could include statements made during negotiations of the contract, prior dealing evidence, or relevant trade or industry practices. In this action, the depositions and affidavits presented to this Court did not contain any statements made at the time of negotiations. Instead, the submitted evidence merely contained recent testimony concerning memories of what the subjective expectations of the parties were at the time the contract was executed in 1966. Even if extrinsic evidence were considered in this action, these statements would not aid the Court in construing a reasonable objective meaning of the contract.

[*15]

### III. PLAIN MEANING ANALYSIS

The Triparty Agreement can be read in conjunction with the Sublease to have one clear, unambiguous meaning. Consequently, none of the extrinsic evidence offered by the parties need be analyzed to interpret the contracts. Since Wayanne terminated the Prime Lease as of December 31, 1995, instead of extending the Prime Lease by exercising its option to renew, paragraph 5 is the principal relevant provision of the Triparty Agreement. As stated above, paragraph 5 of the Triparty Agreement provided that "in the event Lessee [Horne's] shall terminate said prime lease prior to the expiration of the four renewal periods," the Demetrees would have a right to:

> execute a new lease with Lessor on the *same terms, provisions and conditions as set forth in said sublease,* except that all provisions in said sublease referring to the construction and operation of a 'Horne's Franchise Motor Lodge' shall not be applicable. (italics added)

As the prime lessee did, by its waiver, terminate its rights under the prime lease "prior to the expiration of the four renewal periods," the literal command of Section 5 is that by reason of that fact, [*16] the Demetrees have a right "to execute a new lease with lessor." What are the terms of the new lease to which they are entitled? They are, again literally, "the same terms, provisions and conditions as set forth in said Sublease." As to term, the Sublease referred to *seventeen* "remaining years" of rental payments under the Sublease. In light of that fact and the fact that the Sublease did not contain any other provisions that could be construed as providing the Demetrees an independent right to renew the lease, it is not possible to conclude that the Demetrees have a right to a new lease with renewal rights. The plain meaning of the Sublease was that it would terminate at the end of the seventeen year term unless the Prime Lease had been renewed. Thus, paragraph 5 provided the Demetrees in the event that Horne's lease terminated at any time prior to expiration of the four renewal period with a right to enter into a direct lease with Commonwealth for a non-renewable seventeen year lease term. n10 If the parties had wanted the Demetrees to have the alleged renewal option, it could have been easily written into the contract. n11

> n10 Paragraph 4 granted the Demetrees a similar right to enter into a direct lease with Commonwealth in the event that Commonwealth, not Wayanne, terminated the Prime Lease prematurely due to default, breach, or any other reason. This construction of the two paragraphs does not cause them to be redundant, as argued by the Demetrees, because they are applicable under different circumstances.

[*17]

> n11 Paragraph 5 only refers to the four renewal periods in the context of when the Prime Lease might be terminated by the prime lessee. This provision recognizes that the Prime Lease had an option to renew. Paragraphs, however, does not create a right to enter into a direct lease with a right to renew. The Demetrees have a right to a direct lease on the same terms as the Sublease, not the Prime Lease.

In resisting any claimed right to a further lease under paragraph 5, Commonwealth asserts that paragraph 18 of the Sublease specifically precludes such a right. Section 18 provided that:

in the event that Lessor fails to renew the prime lease beyond its initial term or any renewal term . . . *[the] Sublease shall terminate at the end of the then existing term,* notwithstanding the fact that Lessee may have prior to receipt of this notice indicated its desire to exercise the renewal option. (italics added)

This argument is not sound however. The right created by paragraph 5 of the Triparty Agreement is a right to a new lease on terms of the Sublease. That new lease itself will contain [*18] a provision in the form of Section 18. (That such a provision will be surplusage at this stage creates no legal difficulty). But as the right to the new lease does not arise out of the Sublease, the provision of the Sublease that terminates it is not fatal to the right to get a new lease on the terms reflected in paragraph 5.

An option to renew for forty years is a material term that reasonable parties would spell out clearly in such an agreement if it were an intended, agreed upon term. n12 It would be inappropriate for this Court to read in such a term to this contract which can be interpreted in accord with its plain meaning. If the parties had intended to create such an option to renew, it would have been objectively unreasonable for paragraphs to state that the lease would be on the same terms as the Sublease which contains no such right. Since paragraph 5 does not grant the Demetrees a right to enter into a direct lease with an option to renew for future terms, this Court will not create such a right.

> n12 Demetree cites *Wilgus v. Salt Pond Inv. Co.* for the proposition that a requirement that a contract be on the 'same terms and conditions' requires only that it be upon 'the same material terms and conditions.' *498 A.2d 151, 159 (1985).* While this may be true, it does not help Demetree in this matter because the renewal option would appear

to be a highly material term in this context.

[*19]

Similarly, it would be incorrect for this Court to ignore the plain language of paragraph 5 affording the Demetrees a right to a direct lease on substantially the same terms as the Sublease in the event that the Prime Lease was terminated prior to the four renewal periods. The material sections of the Sublease set out a seventeen year term lease with no option to renew. This is exactly what the Demetrees are entitled to demand from Commonwealth at this time and Commonwealth is obligated to grant. The public policy interest in commercial certainty will be best served by adhering to the plain meaning of the agreement entered into between the parties, even if the parties' differing subjective expectations at the time were different, as may have been true in this action.

## IV. CONCLUSION

The Demetrees are not entitled to their requested specific performance because there is no legal obligation for Commonwealth to enter into a ten year direct lease with a right to renew for two successive ten year periods according to the plain meaning of the Triparty Agreement. Nonetheless, the Triparty Agreement, read in conjunction with the Sublease, entitles the Demetrees to specific [*20] performance requiring Commonwealth to enter into a direct lease for a seventeen year term, with no renewal option. [HN5] Specific performance is appropriate in this type of action where a clear and definite agreement can be enforced without requiring the Court to supply essential additional or inconsistent contractual terms. *MF v. F, 172 A.2d 274, 176 (Del. Ch. 1961).* Since there are no disputes as to material facts controlling the resolution of this action, the Demetrees are entitled to summary judgment as a matter of law and an order granting the above stated appropriate specific performance.

# TAB H
# TO EXHIBIT 14

LEXSEE 1997 DEL CH LEXIS 180

**SBC INTERACTIVE, INC., Plaintiff, v. CORPORATE MEDIA PARTNERS,
AMERITECH MEDIA VENTURES, INC., BELLSOUTH INTERACTIVE MEDIA
VENTURES, INC., GTE MEDIA VENTURES INCORPORATED, DISNEY MEDIA
VENTURES, INC., and SNET PERSONAL VISION, INC., Defendant.**

Civil Action No. 15987

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1997 Del. Ch. LEXIS 180*

December 22, 1997, Date Submitted
December 24, 1997, Date Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court January 16, 1998.

**DISPOSITION:**

Defendant's motion for summary judgment granted, and plaintiff's motion for summary judgment and for a preliminary injunction denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff withdrawing partner filed an action seeking a declaration that it was not bound to arbitrate its dispute with the defendant remaining partners. The parties filed cross motions for summary judgment on the arbitrability issue.

**OVERVIEW:** A partnership agreement required that any claim arising out of the agreement and any claim dealing with the determination of the partnership's or a partner's rights or obligations was to be arbitrated. The withdrawing partner claimed that it had a valid reason to withdraw, and the remaining partners disputed the withdrawing partner's right to leave the partnership. The court held that the dispute was governed by the arbitration clause. Because the parties agreed to a broad arbitration clause, the only role for the court was to determine whether the contract could have been reasonably interpreted so as to require arbitration. The court ruled that there was a broad arbitration clause and that the only reasonable interpretation of the clause was that the dispute was covered by arbitration. Because the language of the clause was clear, the court refused to consider as evidence the affidavit of an involved individual who claimed that arbitration was not required with respect to the withdrawing partner's action.

**OUTCOME:** The court found that arbitration was required in the withdrawing partner's action for a declaration that it was not bound to arbitrate a dispute, granted the summary judgment motion of the remaining partners, and remitted the case to arbitration. The withdrawing partner's summary judgment motion was denied.

**CORE TERMS:** partner, withdrawal, partnership, arbitration, arbitration clause, summary judgment, arbitrable, arbitrate, withdraw, arbitrator, arbitrability, contractual, effective, arbitration provision, material change, negotiation, strategic, unchallengeable, preliminary injunction, capital contribution, right to arbitrate, right to challenge, sole discretion, matter of law, forceful, waived, duty, broad arbitration clause, favoring arbitration, strong public policy

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Under Delaware law, summary judgment must be granted where no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN2] Because the obligation or right to arbitrate is contractual, the starting point of any analysis of whether a dispute is arbitrable must be the parties' contract to arbitrate.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*

1997 Del. Ch. LEXIS 180, *1

[HN3] The question of arbitrability is generally for the courts rather than the arbitrators. In an action to compel arbitration, the only issues are whether (i) an agreement to arbitrate exists, (ii) a party has a duty to arbitrate under the agreement, and (iii) that party has breached its duty.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN4] Where the contract contains a broad arbitration clause, the role of the court in resolving that issue is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN5] In determining whether the dispute is one that on its face is covered by the arbitration provision of the contract, all the court need decide is whether the contract may reasonably be interpreted to require arbitration. That narrow scope of review results from the strong public policy favoring arbitration and from the corollary principle that any doubts as to whether a particular issue is arbitrable must be decided in favor of arbitration. Of such force is that principle that the United States Supreme Court and the Delaware courts have held that the presumption of arbitrability can be overcome only if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN6] Where the meaning of the arbitration clause is clear from its plain language, then a court can decide the issue as a matter of law without looking at any other evidence of the parties' intent.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN7] A party's subjective, undisclosed understanding of a contract's meaning is not legally effective to prove contractual intent.

*Civil Procedure > Alternative Dispute Resolution >*

*Judicial Review*
[HN8] Although arbitrability is an issue to be decided by the court, once the court determines that the dispute falls within the scope of a valid agreement to arbitrate, it may not then determine the merits of the claims, however frivolous the claims might appear.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN9] In the face of a valid agreement to arbitrate, a court is expressly prohibited by statute from entertaining arguments that go to the merits of the underlying dispute.

*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
[HN10] Where an arbitration clause is broad, a contention that a party waived arbitration because it failed to commence arbitration by a prescribed period is generally an issue for the arbitrator. The proper method of initiating arbitration under a contract is a matter for the decision of the arbitrator.

COUNSEL:

Michael D. Goldman, Stephen C. Norman and Kevin R. Shannon, Esquires, of POTTER, ANDERSON & CORROON, Wilmington, Delaware; Attorneys for Plaintiff SBC Interactive, Inc.

A. Gilchrist Sparks, III and Jon E. Abramczyk, Esquires, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; and Kenneth Conboy, James V. Kearney and James E. Brandt, Esquires, LATHAM & WATKINS, New York, NY; Attorneys for Defendants Corporate Media Partners, Ameritech Media Ventures, Inc., BellSouth Interactive Media Services, Inc., Disney Media Ventures, Inc., and SNET Personal Vision, Inc.

Lawrence C. Ashby, Esquire, ASHBY & GEDDES, Wilmington, Delaware; Attorneys for Defendant GTE Media Ventures Incorporated.

JUDGES: JACOBS, VICE CHANCELLOR.

OPINIONBY: JACOBS

OPINION:

OPINION

JACOBS, VICE CHANCELLOR

The plaintiff, SBC Interactive, Inc. ("SBC" a gen-

eral partner in Corporate General Partners, which is a Delaware partnership doing business as "Americast" (the "Partnership"), withdrew from the Partnership [*2] effective July 28, 1997. The remaining ("non-SBC") partners took the position that SBC's withdrawal constituted a breach of the Partnership Agreement. On October 7, 1997, the non-SBC partners formally demanded arbitration of their claims pursuant to the arbitration clause of the Partnership Agreement. One week later, SBC commenced this proceeding against the Partnership and the non-SBC partners (collectively, "defendants") for a declaration that the defendants are not entitled to arbitrate the "invalid withdrawal" claim because (i) that issue is not arbitrable, (ii) once the withdrawal became "effective" that issue was no longer subject to legal challenge, and (iii) even if the claim is arbitrable, the defendants waived their right to arbitrate by failing to demand arbitration in a timely manner. Shortly thereafter, the defendants moved to dismiss the complaint The Court denied that motion in a bench ruling on November 12, 1997, and expedited discovery ensued thereafter.

Now pending before the Court are cross motions for summary judgment and SBC's motion for a preliminary injunction to halt the arbitration. The issue, simply stated, is whether the dispute over the contractual validity [*3] of SBC's withdrawal from the Partnership must be resolved in arbitration. For the reasons that follow, I conclude that it must. Accordingly, the defendants' motion for summary judgment will be granted and SBC's cross motion for summary judgment and a preliminary injunction will be denied.

I. FACTS

The Partnership was formed in April, 1995 for the purposes of assembling and marketing certain video programing through an advanced broadband telecommunication network, creating a unique navigator to help consumers select the programming they wish to view, and developing new programming devices. The general partners are SBC, Ameritech Media Ventures, Inc., BellSouth Interactive Media Ventures, Inc., Disney Media Ventures, Inc., GTE Media Ventures, Incorporated and SNET Personal Vision, Inc.

At the time the Partnership was formed, the partners' mutual expectation was that all partners would continue as partners, and not withdraw from the Partnership or exercise their power to dissolve the partnership for a period of five years, without the unanimous consent of the remaining partners. n1 The partners did agree, however, and the Partnership Agreement was drafted to so provide, that in [*4] limited circumstances, a partner would be allowed to withdraw without the consent of the remaining partners. Those circumstances are set forth in

various subparts of § 7.3 of the Partnership Agreement. One of those subparts, § 7.3(e), indicates that a partner may withdraw in its sole discretion at any time after five years (and before seven years) from the date of the Partnership Agreement. In that event, the partner's interest in the Partnership would be redeemed for $10 and the withdrawing partner would be liable to contribute the balance of its aggregate capital contribution required by the Partnership Agreement for the first five years. n2 The other subsections authorized early withdrawal as a partner only upon the happening of a specified event. One of those "nondiscretionary" subsections, § 7.3(d), permits a partner to withdraw if the parent of that partner engages in a transaction that represents a material change in the parent's strategic direction. In that case, the withdrawing partner's interest in the Partnership would be redeemed for a nominal $10, but, in contrast to § 7.3(e), no additional capital contribution would be required.

n1 Second Amended and Restated Partnership Agreement ("Ptp. Agt.") § 7.3(a).

[*5]

n2 The Court is informed that that latter amount would be $100 million. Another subpart, § 7.3(f), also authorizes a partner to withdraw in its sole discretion after seven years. In that circumstance the redemption price would be significantly greater than under § 7.3(e), because there would be no penalty or forfeiture for early withdrawal.

On May 28, 1997, SBC sent a letter to the non-SBC partners and to the management committee of the Partnership, giving notice of its withdrawal under § 7.3(d) of the Partnership Agreement on the ground that its parent had engaged in a transaction that represented a material change in the parent's strategic direction. Under § 7.3(d), the withdrawal would become effective on the "Withdrawal Date," which is defined as sixty days following the receipt of the withdrawal notice. In response, the defendants took the position that SBC's withdrawal was in breach of the Partnership Agreement, because its parent had not engaged in a transaction representing a material change in the parent's strategic direction.

Between June 5 and October 7, 1997, the parties [*6] exchanged correspondence and held meetings in an effort to resolve the dispute, but those efforts were unsuccessful. On October 7, 1997, the non-SBC partners formally demanded arbitration of their claim that SBC's withdrawal constituted a breach of the Partnership Agreement. One week later, on October 15, 1997, SBC filed this action seeking a declaration that the defendants

1997 Del. Ch. LEXIS 180, *6

are not entitled to arbitrate the issue of whether SBC's withdrawal was a breach of the Partnership Agreement. Both pending cross motions for summary judgment, and SBC's motion for an order preliminarily enjoining the defendants from pursuing the arbitration process, depend critically upon whether the § 7.3 withdrawal dispute is arbitrable.

II. ANALYSIS

[HN1] Under Delaware law, summary judgment must be granted where no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. n3 As will become apparent from the discussion that follows, given the legal standard that governs arbitrability, there is no genuine issue of material fact that precludes summary judgment.

> n3 Del. Ch. Ct. R. 56; accord, *Tanzer v. International General Indus., Inc., Del. Ch., 402 A.2d 382, 385 (1979); Nash v. Connell, Del. Ch., 34 Del. Ch. 20, 99 A.2d 242, 243 (1953).*

[*7]

A. The Applicable Standard of Arbitrability

[HN2] Because the obligation or right to arbitrate is contractual, the starting point of any analysis of whether a dispute is arbitrable must be the parties' contract to arbitrate. In this case that agreement is found in Article 9, the "Dispute Resolution" provision of the Partnership Agreement Section 9.1 of that provision requires that any dispute arising out of or relating to the Agreement must be the subject of negotiations intended to reach an amicable resolution of the dispute. If the dispute is not resolved during the negotiation period prescribed by § 9.1, then under § 9.2 the parties "shall resolve such Dispute through final and binding arbitration . . .," and the "sole procedure for resolving Disputes shall be through use of the negotiation and arbitration procedures described [in Article 9]." n4 Section 9.1 defines the "Disputes" that (if negotiation fails) must be arbitrated in the broadest terms, as:

> ... any controversy, claim or dispute of whatever nature arising out of or relating to this Agreement, the determination of the Partnership's or a Partner's rights or obligations hereunder or the existence [*8] of a breach or the termination hereof...

> n4 Ptp. Agt. § 9.2(k) (emphasis added).

Where our courts are called upon to determine whether a given dispute is arbitrable, the relevant legal analysis is well established and straightforward. [HN3] The question of arbitrability is generally for the courts rather than the arbitrators. n5 In an action to compel arbitration, the only issues are whether (i) an agreement to arbitrate exists, (ii) a party has a duty to arbitrate under the agreement, and (iii) that party has breached its duty. n6

> n5 *United Engineers & Constructors, Inc. v. IMO Industries, Inc., 1993 Del. Ch. LEXIS 27, *14, Del. Ch., C.A. No. 12611, Hartnett, V.C. (Feb. 11, 1993); Action Drug Company v. R. Baylin Company, 1989 Del. Ch. LEXIS 74, *7, Del. Ch., C.A. No. 9383, Berger, V.C. (June 19, 1989); Falcon Steel Co. v. Weber Engineering Co., Del. Ch., 517 A.2d 281, 287 (1986); AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986).*

[*9]

> n6 *Pettinaro Construction Co., Inc. v. Harry C. Partridge, Jr. & Sons, Inc., Del. Ch., 408 A.2d 957, 962 (1979).*

In this case, the issue is whether SBC has a duty to arbitrate under the Partnership Agreement. [HN4] Where, as here, the contract contains a broad arbitration clause, the role of the Court in resolving that issue

> ... is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator ... The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim... n7

> N7 *United Engineers & Constructors, Inc., supra, n.5, 1993 Del. Ch. LEXIS 27, *16* (quoting United *Steelworkers of America v. Warrior Gulf Navigation Co., 363 U.S. 574, 582-83, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960).*

[*10]

[HN5] In determining whether the dispute is one that on its face is covered by the arbitration provision of the contract, all the Court need decide is whether the contract may reasonably be interpreted to require arbitration. That narrow scope of review results from the strong public policy favoring arbitration and from the corollary principle that any doubts as to whether a particular issue is arbitrable must be decided in favor of arbitration. n8 Of such force is that principle that the United States Supreme Court and our Delaware Courts have held that the presumption of arbitrability can be overcome only if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." n9 That presumption is particularly powerful where, as here, the contract contains a broad arbitration clause. In those cases, such "positive assurance" requires that there be an "express provision" excluding the dispute from the coverage of the arbitration clause, or that "the most forceful evidence of a purpose to exclude" be presented. n10

n8 *Pettinaro Construction Co., Inc., supra, n. 6, 408 A.2d at 962; Action Drug Company v. R. Baylin Company, supra, n. 5, 1989 Del. Ch. LEXIS 74, *7; James Julian, Inc. v. Raytheon Service Co., Del. Ch., 424 A.2d 665, 667 (1980).*

[*11]

n9 *United Steelworkers of America, supra, n. 7, 363 U.S. at 582–83 (1960)* (cited and quoted with approval in *United Engineers & Constructors, Inc., supra, n. 5, 1993 Del. Ch. LEXIS 27, *15,* and in Action Drug Company v. R. Baylin Company supra, n. 5, *1989 Del. Ch. LEXIS 74, *8.*

n10 *United Engineers & Constructors, Inc., supra, n. 5, 1993 Del. Ch. LEXIS 27, *15* (citing *United Steelworkers, 363 U.S. at 584–85).*

B. Application of the Arbitrability Standard to the Present Dispute

As applied to the instant facts, the above standards lead swiftly and inexorably to the conclusion that the arbitration provision of the Partnership Agreement covers the underlying dispute that divides the parties. That dispute, to reiterate, is whether SBC's withdrawal from the Partnership constituted a breach of the covenant not to withdraw contained in § 7.3(a) of the Partnership Agreement. Here, the arbitration provision can not only be reasonably read to cover that dispute, but also that interpretation is the only one to which the operative con-

tract language is reasonably susceptible.

The arbitration clause [*12] of the Partnership Agreement defines an arbitrable dispute as "any controversy, claim or dispute of whatever nature arising out of or relating to this Agreement, the determination of the Partnership's or a Partner's rights or obligations hereunder or the existence of a breach or the termination hereof." n11 The non-SBC partners claim that SBC's withdrawal was unauthorized, because SBC's parent had not engaged in a transaction amounting to a material change in the parent's strategic direction, as § 7.3(d) of the Partnership Agreement required. Therefore, the non-SBC partners contend, that withdrawal breached the § 7.3(a) covenant not to withdraw and as a consequence, SBC is obligated to the Partnership for the $100 million balance of the capital contribution it would have made had it remained a partner for five years. n12 Manifestly, that is a "claim ... arising out of or relating to [the] Agreement, the determination of the Partnership's ... rights" and to "a Partner's ... obligations," and to "the existence of a breach" of the Agreement. There is, moreover, no "express provision" in the Partnership Agreement that excludes from coverage disputes about a partner's right to withdraw [*13] from the Partnership. Nor has SBC presented any evidence, let alone "the most forceful evidence" of a purpose to exclude this category of disputes from the scope of the arbitration provision. n13 Accordingly, the Court must—and does—conclude that the dispute over SBC's withdrawal rights must be remitted to arbitration.

n11 Ptp. Agt. § 9.1.

n12 Although the defendants (apparently) contended initially that SBC remained a partner as a consequence of its invalid withdrawal, the defendants now concede that SBC was entitled to exit the Partnership, but claim that SBC remains liable on its Partnership Agreement obligation to contribute $100 million.

n13 SBC argues that the Affidavit of Steve McGaw—who states that it was the intent of the contracting parties that a withdrawal under § 7.3(d) would be unchallengeable and nonarbitrable—constitutes such "forceful evidence," because Mr. McGaw's affidavit testimony is uncontroverted. The flaw in that argument is that that affidavit is not admissible evidence. There is no ambiguity about the scope of or the meaning of the terms used in the arbitration clause, and as this Court has held, [HN6] where "...the meaning of the arbitration clause is clear from its plain language, then [the Court] can decide this issue

as a matter of law without looking at any other evidence of the parties' intent." *Wolf v. Magness Construction Company, 1994 Del. Ch. LEXIS 214, *5–6,* Del. Ch., C.A. No. 13004, Chandler, V.C. (Dec. 20, 1994). That principle applies here, and bars consideration of the McGaw affidavit. Moreover, even if the arbitration clause were ambiguous, that affidavit is not competent evidence of contractual intent, because Mr. McGaw never asserted that he communicated his understanding to the other partners or that they otherwise were aware of his interpretation. [HN7] A party's subjective, undisclosed understanding of a contract's meaning is not legally effective to prove contractual intent. See *Bell Atlantic Meridian Sys. v. Octel Communications Corp., 1995 Del. Ch. LEXIS 156, *20,* Del. Ch., C.A. No. 14348, Allen, C. (Nov. 28, 1995).

[*14]

C. SBC's Non–Arbitrability Arguments

Under the circumscribed form of inquiry that governs arbitrability disputes, the foregoing analysis should be—and in my view is—dispositive, and should end there. Nonetheless, SBC advances three reasons why (it insists) the Court is required to reach the opposite conclusion. First, SBC argues that the Partnership Agreement does not permit arbitration of the validity of a withdrawal under § 7.3(d), because as a matter of law and fact, the parties' contractual intent was that withdrawals under § 7.3(d) would be unchallengeable and in the withdrawing partner's sole discretion. Second, SBC contends that even if a § 7.3(d) withdrawal could be challenged, the defendants' right to challenge SBC's withdrawal vanished once the withdrawal became "effective" on July 28, 1997. Third, SBC advances the related argument that even if the withdrawal issue could be arbitrated and the right to challenge survived the effective date of its withdrawal, the defendants nonetheless "waived" their right to arbitrate because they were contractually required to, but did not, demand arbitration before July 28, 1997.

SBC's contentions must be rejected because [*15] they are utterly extraneous and not responsive to the analysis that this Court is mandated to employ. As the applicable case law establishes, SBC's arguments go to the merits of the underlying claim and must be addressed and determined in the arbitration.

[HN8] Although arbitrability is an issue to be decided by the Court, once the Court determines that the dispute falls within the scope of a valid agreement to arbitrate, it may not then determine the merits of the claims, however frivolous the claims might appear. As this Court stated in United Engineers & Constructors, Inc. v. IMO Industries, Inc., Delaware's strong public policy favoring arbitration "would be vitiated if [our] courts ... under the guise of defining the scope of the arbitration agreement, in effect decided the dispute." n14 Indeed, [HN9] in the face of a valid agreement to arbitrate, this Court is "expressly prohibited by statute" from entertaining arguments that "... [go] to the merits of [the underlying] dispute." n15

n14 *1993 Del. Ch. LEXIS 27, *18,* Del. Ch., C.A. No. 12611, Hartnett, V.C. (Feb. 11, 1993); see also, *Falcon Steel, supra, 517 A.2d at 287* ("The merits of the claim itself and of any defenses thereto are for the arbitrator, not the court, to evaluate."); *United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 568, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960)* ("The courts, therefore, have no business weighing the merits of the grievance...").

[*16]

n15 Id.

SBC's arguments all go to the merits of the underlying dispute. The argument that under the Partnership Agreement a § 7.3(d) withdrawal is unchallengeable, goes to whether the defendants have any cognizable legal claim for damages. That argument concerns SBC's obligations and the non–SBC partners' rights under the Partnership Agreement, which that contract expressly remits to arbitration under § 9.1 and § 9.2. The argument that even if such a withdrawal is challengeable any right to challenge evaporated on July 28, 1997, amounts essentially to a procedural defense to the non SBC partners' claim, as does SBC's argument that the defendants were required to, but did not, commence arbitration before July 28, 1997. The merits of the underlying claim, and of any defenses to the claim, are for the arbitrator, not this Court, to decide. n16

n16 *Falcon Steel, supra, 517 A.2d at 287, 288* (also holding that [HN10] where the arbitration clause is broad, a contention that a party" waived" arbitration because it failed to commence arbitration by a prescribed period, is generally an issue for the arbitrator); see also *Pettinaro Construction Co., Inc., supra, 408 A.2d at 963* ("The proper method of initiating arbitration under the contract is a matter for the decision of the Arbitrator.")

1997 Del. Ch. LEXIS 180, *17

[*17]

### III. CONCLUSION

For the reasons discussed, the defendants' motion for summary judgment is granted, and the plaintiff's motions for summary judgment and for a preliminary injunction are denied. IT IS SO ORDERED.

# TAB I

# TO EXHIBIT 14

LEXSEE 1996 DEL CH LEXIS 39

CARLTON INVESTMENTS, derivatively on behalf of TLC Beatrice International Holdings, Inc., Plaintiff, v. TLC BEATRICE INTERNATIONAL HOLDINGS, INC., et al., Defendants.

Civil Action No. 13950

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1996 Del. Ch. LEXIS 39*

March 15, 1996, Decided

NOTICE: [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

CASE SUMMARY:

PROCEDURAL POSTURE: Four motions to compel discovery under Del. Ch. Ct. R. Civ. P. 37 were filed in a stockholders' derivative action. One motion was brought by plaintiff stockholder. The others were brought by one or more of the defendant directors and corporations. The suit challenged the propriety of a $22.1 million compensation package to a deceased defendant director, arguing that the payments triggered a right to proportionate payments to the stockholder.

OVERVIEW: The complaint alleged, among other things, that fiduciary duties were breached to minority stockholders, and corporate assets were misappropriated and wasted. The court held (1) the minority stockholder demonstrated good cause for overriding the attorney-client privilege and was entitled to the production of documents, (2) the stockholder was not obligated to examine the files of its former general partners nor of its current and former limited partners, (3) interrogatories of the stockholder was not the appropriate method of getting information from entities or people who were not agents of the stockholder or within its control for purposes of discovery, (4) the stockholder was required to supplement its answers to the interrogatories asking for a statement of facts supporting the allegations in its complaint, and (5) in its response to a request to admit, the stockholder was not deemed to admit the requests when it failed to initially allege that it had made a reasonable inquiry to obtain information not within its control, then subsequently acknowledged this error and supplemented its responses to describe its reasonable inquiry.

OUTCOME: The court ruled on various motions to compel discovery and threatened to impose sanctions if the parties behavior fell below the high standards for discovery conduct expected by the Delaware courts.

CORE TERMS: partner, interrogatory, discovery, privileged, memorandum, deposition, entity, admit, log, advice, notice, motion to compel, stockholder, good cause, knowledgeable, indirect, withheld, asking, attorney-client, disclosing, designee, production of documents, reasonable inquiry, former counsel, reimbursement, obligated, scheduled, complains, advisor, facts underlying

LexisNexis(R) Headnotes

*Civil Procedure > Discovery Methods > Interrogatories*
*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Legal Ethics > Client Relations > Attorney-Client Privilege*
[HN1] Documents as well as advice given by counsel may qualify for protection from discovery as privileged, but the attorney-client privilege may not properly be invoked in a shareholder derivative action if the shareholders demonstrate good cause not to do so.

*Civil Procedure > Discovery Methods > Interrogatories*
[HN2] Contention interrogatories are specifically permitted by Del. Ch. Ct. R. Civ. P. 30(b) and serve the useful purpose of narrowing issues for trial. Such interrogatories, courts held that these interrogatories are an appropriate means for obtaining a specification of the facts upon which a claim is founded.

*Civil Procedure > Discovery Methods > Interrogatories*

1996 Del. Ch. LEXIS 39, *1

[HN3] A party should not be precluded from presenting a claim at trial because that party could not set forth facts underlying such a claim in response to a contention interrogatory served upon that party before he has had a chance to conduct his own discovery to determine the facts. Thus, Del. Ch. Ct. R. Civ. P. 30(b) specifically permits the court to defer the answer to such an interrogatory until sufficient discovery has been completed. A court might also permit a party to answer such an interrogatory based only upon its present knowledge.

*Legal Ethics > Client Relations > Attorney-Client Privilege*
[HN4] Communications with accountants who were working with a plaintiff's attorneys and occurred after the commencement of the litigation are protected by the work product doctrine.

*Civil Procedure > Discovery Methods > Requests for Admission*
[HN5] In its response to a Request to Admit, a party that fails to initially allege that it has made a reasonable inquiry, then subsequently acknowledges this error and supplements its responses to describe its reasonable inquiry, is not deemed to admit the requests.

*Civil Procedure > Sanctions > Discovery Misconduct*
[HN6] The standards for discovery conduct expected by the Delaware courts are high and in the proper circumstances the court will not hesitate to impose sanctions, including non-monetary sanctions. Counsels' obligations of zealous protection of clients' interests does not relieve them of their professional obligations to the court and to the judicial system.

JUDGES: William T. Allen, Chancellor

OPINIONBY: William T. Allen

OPINION:

MEMORANDUM OPINION AND ORDER

I am here required to call the balls and strikes of multiple discovery disputes in an apparently hard-fought litigation. Presented for decision are four motions to compel discovery under Rule 37 of our rules. One motion is brought by plaintiff, Carlton Investments. The others are brought by one or more of the defendants. All four motions along with Carlton's motion to amend the complaint were presented on March 11, 1996. This memorandum opinion and order reports my decision on the pending discovery motions. I continue to reserve decision on plaintiff's motion to amend.

I. Background

Carlton Investments, which allegedly owns approximately 22 percent of the outstanding common stock of TLC Beatrice, filed this stockholders' derivative action on January 4, 1995, seeking recovery of amounts allegedly paid by TLC Beatrice to or on behalf of the late Reginald Lewis, who is alleged to have been a controlling shareholder of TLC Beatrice. The defendants are the Estate of Reginald Lewis; various [*2] individuals who serve or served as directors of TLC Beatrice; TLC Transport, Inc., a wholly owned subsidiary of TLC Beatrice; several companies owned by Lewis but alleged to have participated in or benefitted from the misappropriation and waste; and TLC Beatrice, the beneficiary of the action.

The complaint alleges, among other things, that Lewis breached his fiduciary duties to TLC Beatrice and its minority stockholders, and misappropriated and wasted corporate assets by causing the company to enter into certain transactions between 1988 and 1992. As alleged, these transactions include causing the company to:

> (1) pay him, weeks before his death from a known but undisclosed brain tumor, $22.1 million, which included the reimbursement of $2.6 million for legal fees incurred by Lewis in an action unrelated to TLC Beatrice;

> (2) pay him millions of dollars in undocumented "living expenses";

> (3) make improper payments to TLC Group, L.P., a limited partnership owned by Lewis and his daughters' trust, including the payment of salaries, bonuses, and severances for employees of TLC Group, L.P., the reimbursement of TLC Group, L.P. for various expenses, including payments [*3] of taxes and governmental levies for other Lewis-owned entities, payments to trusts for the benefit of Lewis' daughters, payments to affiliated law firms on matters unrelated to TLC Beatrice, and payments to McCall Pattern Holdings;

> (4) pay rent for office facilities for Lewis-owned entities;

> (5) lease, purchase, and maintain a corporate jet largely for the personal use of Lewis; and

1996 Del. Ch. LEXIS 39, *3

(6) redeem the company's preferred stock so Lewis could cash out his shares.

This suit follows Carlton's filing of an individual action in the state of New York against TLC Beatrice and the Lewis Estate that sought recovery of approximately $11 million for alleged breaches of a stockholder agreement signed by Lewis, Carlton, and TLC Beatrice. In particular, Carlton challenged, in that suit, the propriety of the $22.1 million compensation package, arguing that under the stockholders' agreement the payments to Lewis trigger a right to proportionate payments to Carlton.

Shortly after this Delaware litigation was initiated, TLC Beatrice filed a motion to dismiss or stay the litigation and to stay discovery on several grounds, including the existence of the prior pending New York suit. [*4] Defendants' motion to stay discovery was granted only in part and Carlton continued its discovery efforts. On November 21, 1995, the court issued an opinion denying defendants' motion to dismiss or stay and shortly thereafter defendants began their discovery.

II. Carlton's motion to compel

On December 21, 1995, plaintiff Carlton filed a motion to compel discovery. First, plaintiff seeks to compel TLC Beatrice and the Lewis Estate to produce certain documents that TLC Beatrice identified on its privilege logs as withheld on the grounds of privilege. Second, plaintiff seeks an order overruling defendants' objection to certain questions asked of Thomas Lamia, former counsel for defendants TLC Beatrice and Reginald Lewis, on lawyer–client privilege grounds. Specifically, plaintiffs want Mr. Lamia to answer questions regarding any advice he or his law firm gave to TLC Beatrice concerning: (i) the Stockholders' Agreement between Lewis, Carlton, and TLC Beatrice; (ii) Lewis' compensation; (iii) reimbursement of Lewis' expenses in the McCall litigation; and (iv) the stock appreciation rights awarded to TLC Beatrice's directors.

Carlton concedes that most of the requested [HN1] documents as well [*5] as the advice given by Mr. Lamia qualify for protection as privileged at the behest of TLC Beatrice, but claims that TLC Beatrice's attorney–client privilege may not properly be invoked in this derivative action as plaintiff has demonstrated good cause not to do so. *See Garner v. Wolfinbarger*, 430 F.2d 1093 *(5th Cir. 1970), cert. denied,* 401 U.S. 974 (1971); *Valente v. Pepsico, Inc.,* 68 F.R.D. 361 (D. Del. 1975); *Deutsch v. Cogan, Del. Ch.,* 580 A.2d 100 (1990). In the event the court determines that there is not good cause to overcome the attorney–client privilege, Carlton suggests that by

selectively disclosing some of the advice they received from counsel, the defendants waived the privilege with respect to all advice received regarding the compensation of Lewis.

As an initial matter, with respect to Mr. Lamia's advice, defendants claim that Mr. Lamia represented TLC Group, L.P., not TLC Beatrice, at the time the Stockholder's Agreement was negotiated. Also, at argument the Estate of Lewis argued that some of Lamia's communications with Lewis may have been made in connection with his personal representation of Lewis. To the extent that either of these situations [*6] may have been the case, defendants say that Carlton cannot argue good cause to invade a privilege not belonging to TLC Beatrice.

Nonetheless, the record indicates that Lamia did not represent Lewis as an individual after 1980. Moreover, during the time of the alleged transactions it is not clear which exact entities Mr. Lamia was representing and which entities were paying him at what times. His retention agreement was with TLC Beatrice. I cannot conclude that any advice Lamia gave during the time period of the acquisition of the international assets of Beatrice was presumptively as advisor to TLC Group.

In comparison to the uncertainty as to who, other than TLC Beatrice, Lamia might have been representing, the shareholders of TLC Beatrice, on whose behalf this action was brought, have a legitimate interest in access to the information sought here. Consideration of the factors spelled out in *Garner v. Wolfinbarger* convince me that it is not appropriate here to preclude Mr. Lamia from disclosing relevant information; Carlton owns approximately 22% of TLC Beatrice's stock; at least its main claim appears colorable; the discovery it seeks does not relate to advice concerning the [*7] litigation itself; the information is not available from other sources; and there is no risk that trade secrets or other proprietary business information would be revealed. Thus, defendants' objection to certain questions asked of Mr. Lamia on privilege grounds is overruled. Likewise, Carlton has shown good cause for overriding the attorney–client privilege in this derivative litigation with respect to the documents it has requested on TLC Beatrice's privilege log and is entitled to the production of those documents. n1

n1 Some of these documents reflect business dealings of TLC Transport, Inc., a wholly-owned subsidiary of TLC Beatrice, and therefore arguably the privilege could run to TLC Transport rather than TLC Beatrice. However, defendants have made no claim that these documents are priv-

ileged documents of any entity other than TLC Beatrice. It is also questionable whether these documents could even be subject to a privilege of TLC Transport because to the extent these documents reflect privileged communications they are communications to or from Kevin Wright, counsel to TLC Beatrice. For these purposes, and without addressing whether TLC Beatrice's maintenance of these documents could constitute a waiver of the privilege, I simply note that, even if some of these documents could be considered privileged documents of TLC Transport, the Garner factors as applied to the particulars of this case convince me that it would be appropriate to allow Carlton access to such documents.

[*8]

III. Defendants' first motion to compel

On February 13, 1996, defendant TLC Beatrice filed a motion to compel seeking: 1) to compel Carlton to supplement its responses to TLC Beatrice's First Set of Interrogatories; 2) to compel Carlton to produce all non-privileged documents responsive to TLC's First Request for Production of Documents; 3) to deem as admitted Request Nos. 15, 19, 20, 21 and 28 of TLC Beatrice's First Request to Admit; and 4) to compel Carlton to provide a log of documents withheld on the basis of privilege. Carlton's privilege log was subsequently provided to the defendants, but some of the documents listed are now the subject of a subsequent motion to compel discussed in Part V.

*1. The responses to TLC Beatrice's interrogatories*

Through interrogatories served upon Carlton on December 8, 1995, TLC Beatrice sought to determine, *inter alia:* (1) the basis and factual support for Carlton's claims; (2) when and to what extent Carlton and its partners had knowledge of the challenged transactions; (3) the basis for Carlton's claimed ownership interest in TLC Beatrice; and (4) what oral and written communications transpired between the partners of Carlton, [*9] Carlton, and Mr. Lewis related to the challenged transactions.

First, TLC Beatrice claims that Carlton's responses to these interrogatories were inadequate because they did not even purport to set forth facts within the knowledge of *Carlton's former general partners* and *its current and former limited partners* relating to the issues in the lawsuit. Some of Carlton's former general partners, it is claimed, are now on the board of directors of Carlton's current general partner, CS Manager, Corp. Defendant TLC Beatrice surmises that Carlton "made

no effort whatsoever to examine the files of its former general partners (most of whom are now limited partners or on the Board of Directors of CS Manager) or the files of its current and former limited partners, or to consult those individuals regarding its responses to the Interrogatories."

It is acknowledged that Carlton has searched its files and the files of its sole general partner, CS Manager, and has provided TLC Beatrice with all the information within the knowledge of CS Manager. In my opinion, Carlton is not obligated to examine the files of its *former* general partners nor its current and former limited partners. These [*10] entities or people are simply not agents of Carlton or within the control of Carlton for purposes of discovery—even if some of them are directors on the board of CS Manager. Under these circumstances, asking interrogatories of Carlton is not the appropriate method of getting this information, there are other direct processes available and, in fact, defendants have already noticed these former general partners for depositions.

TLC Beatrice next claims that Carlton's responses to certain interrogatories (interrogatories asking about the factual bases for Carlton's claims and the oral communications that took place between Carlton, its partners, and Lewis) were inadequate because, in lieu of providing specific answers, the responses referred TLC Beatrice indiscriminately to the entire production of documents as well as to depositions taken and to be taken.

With respect to the factual bases underlying the allegations of the complaint, Carlton says that its complaint specifies which documents pertain to which claims. TLC Beatrice, on the other hand, admits that it is familiar with the universe of documents, but contends that the documents contain no information responsive to the interrogatories. [*11]

This is therefore not a situation, as contemplated in Rule 30(c), in which one party would be burdened with sifting through a mass of documentation when the other party could easily direct them to particular documents. Rather, defendants here admit familiarity with the documents but contend there is no support for Carlton's allegations in those documents. In these circumstances, these interrogatories are the equivalent of contention interrogatories to which a blanket reference to the documents produced is not sufficient. [HN2] Contention interrogatories are specifically permitted by Court of Chancery Rule 30(b) and serve the useful purpose of narrowing issues for trial. Even before the Federal Rules of Civil Procedure were amended in 1970 to specifically allow such interrogatories, courts held that these interrogatories were "an appropriate means for obtaining a specification of the facts upon which a claim . . . is

founded." *See Hartsfield v. Gulf Oil Corp.*, 29 F.R.D. 163, 164 (D.C. Pa. 1962). The only problems normally associated with answering these types of interrogatories relate to their timing and the effect given to the answer. That is, [HN3] a party should not be precluded from presenting [*12] a claim at trial because that party could not set forth facts underlying such a claim in response to a contention interrogatory served upon that party before he has had a chance to conduct his own discovery to determine the facts. *See 8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure* § 2167 (1994). Thus, Rule 30(b) specifically permits the court to defer the answer to such an interrogatory until sufficient discovery has been completed. A court might also permit a party to answer such an interrogatory based only upon its present knowledge.

Here, Carlton has apparently completed more than twenty depositions and has had an opportunity to ascertain whether there are indeed facts supporting the allegations in its complaint. Carlton therefore must supplement its answers to the interrogatories asking for a statement of such facts.

As to its interrogatories asking for identification of all oral communications between Carlton, its affiliates, and TLC Beatrice which relate to the challenged transactions, defendant complains that Carlton only identified three such oral communications and stated that any relevant information with respect to other oral communications [*13] was contained in the documents already produced and in the depositions taken and scheduled to be taken.

To the extent the *officers and employees of Carlton and CS Manager* have personal information of the oral communications that defendant has requested, the answers to the interrogatories should identify such communications, even if those officers are scheduled for future depositions. If Carlton's current answers do not reflect all such information it must supplement its answers. However, Carlton is not required to make inquiry of its former general partners and limited partners to elicit such information. Thus, to the extent it is these former general partners which have knowledge of the bulk of these communications, TLC Beatrice will have to obtain that information by deposing those persons.

Lastly, in relation to Carlton's answers to interrogatories, TLC Beatrice asserts that Carlton's refusal to respond to Interrogatory No. 37 on privilege grounds is not justified. That interrogatory asked Carlton to identify the parties to, or the substance of, its communications with its accountants concerning the challenged transactions.

In its brief, Carlton represented that each such [*14]

communication was with accountants who were working with Carlton's attorneys and each such communication occurred after the commencement of this litigation and was made for purposes of this litigation. Accepting this representation, [HN4] I find that these communications are protected by the work product doctrine.

### 2. Non-privileged documents Carlton has withheld on grounds of relevance

TLC Beatrice contends that in response to its Request for Production on December 8, 1995, Carlton unjustly withheld certain categories of documents on relevancy grounds. Those categories include all documents concerning: 1) Carlton's non-TLC Beatrice investments and business dealings, 2) the identity of the beneficial owners of entities that are limited partners of Carlton, and 3) the relationship between Carlton and its financial advisors, Drexel, Burnham, Lambert.

With respect to documents concerning Carlton's non-TLC Beatrice investments, TLC Beatrice suggests that such documents are relevant because evidence of other shareholder agreements entered into by Carlton, particularly if those agreements contain similar terms to the agreement between Carlton, Lewis, and TLC Beatrice, may shed light [*15] on the parties' intent as to similar provisions here. I find this argument simply too strained. In my judgment such documents are not relevant and not reasonably calculated to lead to admissible evidence.

I do not reach the same conclusion, however, for the identification of the indirect limited partners of Carlton. TLC Beatrice asserts that discovery of the indirect limited partners of Carlton may be relevant to its defenses of acquiescence, waiver, and estoppel. It speculates that these people may have had knowledge of the challenged transactions from their inception or shortly thereafter.

Carlton, on the other hand, claims that the identity of these people is irrelevant because legally if any such people had knowledge it could not be imputed to Carlton. I do not consider this Rule 26 context an appropriate context, however, in which to determine the substantive legal issue of whether knowledge on the part of a limited partner could be imputed to Carlton. Moreover, although the identity of these persons may only be marginally relevant, counsel for Carlton represented at argument that Carlton had a list of these limited partners and indirect limited partners and therefore the burden [*16] of producing this information is minimal. Carlton must therefore identify its direct and indirect limited partners.

Finally, as to the documents concerning Carlton's relationship with Drexel. TLC Beatrice seeks these doc-

uments for two reasons. First, it suggests that there is evidence that Drexel may have been the original owner of the shares of TLC Beatrice common stock that Carlton now claims to own. Thus, discovery of this information is said to be directly relevant to Carlton's standing to pursue its claims. Carlton has indicated to the court that it has already produced all documents in its possession related to its acquisition of TLC Beatrice common stock.

Second, TLC Beatrice contends that Carlton may have been an "affiliate" of Drexel's and that because most of Carlton's partners at the time were employees of Drexel, notice to Drexel employees of the facts underlying the challenged transactions constitutes notice to Carlton, as Carlton and Drexel were functioning as a single entity. Thus, the relevancy of TLC Beatrice's request for production of documents concerning Carlton's relationship with Drexel goes to TLC Beatrice's theory that Carlton and Drexel were so intertwined [*17] that they were in reality a single entity. This is a large inquiry to undertake and perhaps a time-consuming matter to try with so modest a claim to legal relevance. Indeed in requiring the disclosure of the names of investors and officers, etc., the court affords defendants the opportunity to establish, if it is the case, that some of these persons had notice of some of these acts and to establish the relationship of such persons to the Carlton entity. This is sufficient in my judgment.

### 3. The requests to admit

TLC Beatrice has requested that an order be entered deeming as admitted Request Nos. 15, 19, 20, 21, & 28 of TLC Beatrice's First Request to Admit. [HN5] In its response to the Request to Admit, Carlton stated that it could neither admit nor deny these requests because the information required to do so was not in its possession. While Carlton did not initially allege that it had made a reasonable inquiry, it subsequently acknowledged this error and supplemented its responses to describe its reasonable inquiry. Nonetheless, TLC Beatrice suggests that Canton's initial failure to allege reasonable inquiry is grounds to deem these requests as admitted. Carlton should not be [*18] given leave to amend, it says, because Carlton has come forward with no evidence contrary to the assertions in these requests and all available information supports the truth of the requests.

Carlton is not obligated to admit the truth of these facts, in my opinion. These requests are largely based on facts within the exclusive control of TLC Beatrice and the evidence of the truth of such matters is dependant upon defendant's witnesses. The motion for an order deeming these requests admitted is denied.

IV. Defendants' second motion to compel

On December 8, 1995, TLC Beatrice served Rule 30(b)(6) deposition notices on Carlton requesting that it designate for deposition the "partner(s), agent(s), or representative(s) most knowledgeable about the allegations in [Carlton's complaint] and the relationship between TLC Beatrice International Holdings, Inc., Reginald F. Lewis, and Carlton." On that same date, TLC Beatrice served a similar notice on CS Manager, requesting that it designate for deposition "the officer(s), director(s) or managing agent(s) most knowledgeable about the allegations" in Carlton's complaint and the relationship between Carlton, Lewis, and TLC Beatrice. Both Carlton [*19] and CS Manager designated Kevin Madigan, Secretary, Treasurer, and General Counsel of CS Manager since March 1992.

On February 26, 1996, defendants TLC Beatrice and TLC Transport, Inc. moved this court for an order compelling Carlton to redesignate other individuals who, they surmise, would have more knowledge than Mr. Madigan of the matters identified in their Rule 30(b)(6) deposition notices. TLC Beatrice complains that Madigan was not affiliated with Carlton prior to March 1992 and has no firsthand knowledge of the allegations in the complaint. It also complains that what little knowledge Madigan has about the allegations was gained from communications with Carlton's counsel and privileged communications with former general partners of Carlton or the board of directors of CS Manager. Apparently, TLC Beatrice believes that certain *former general partners* of Carlton, one of whom is now a director of CS Manager, are more knowledgeable and should have been designated instead.

At least with respect to former general partners of Carlton who do not serve on the board of CS Manager, they are simply not proper 30(b)(6) designees of Carlton or CS Manager. As for Peter Ackerman, a director [*20] of CS Manager and former general partner of Carlton, TLC Beatrice and Carlton dispute whether he has more or less comprehensive knowledge of the relationship between TLC Beatrice, Lewis, and Carlton than Mr. Madigan. I of course do not know whether Mr. Madigan has more or less knowledge than Mr. Ackerman but in any event Carlton is not rigidly obligated to produce the "most knowledgeable" person. *See Hoechst Celanese Corp. v. National Union Fire Ins. Co., Del. Super., 623 A.2d 1099, 1113 (1991).* n2 I also note that, as with much of the other discovery defendants seek directly from Carlton, any information within the knowledge of these former general partners can be obtained directly from them in their depositions, which defendants have already scheduled. Defendants' motion to have Carlton redesignate is therefore denied.

1996 Del. Ch. LEXIS 39, *20

n2 TLC Beatrice also alleges that Carlton and CS Manager did not adequately prepare Mr. Madigan to testify on the subject areas requested. However, it is apparent that the current officers and personnel of Carlton and CS Manger were not present during the time periods in which most of the challenged transactions took place. In preparing a 30(b)(6) designee, Carlton is not required to inquire of its former general partners and limited partners. Understandably, the defendants would like to discover this information through a Carlton designee so that it might be treated as an admission, but Carlton has no such obligation.

[*21]

V. Defendants' third motion to compel

On February 26, 1996, after receiving Carlton's log of privileged documents, certain defendants filed a motion seeking to compel Carlton to produce four categories of documents which they claim Carlton wrongfully withheld on privilege grounds. I address each of these categories of documents seriatim.

*1. 1990 and 1991 memorandums prepared by former counsel*

The defendants first object to various memorandums prepared in 1990 and 1991 by Catherine Taylor and David Losito, Carlton's former counsel, "regarding [their] analysis of TLC Beatrice's Company performance." Defendants suspect that these memorandums may be business analysis rather than legal advice.

An in camera inspection of these memorandums reveals that, in fact, these communications were solely business related. Not every document created by an attorney is privileged and here the documents appear to be communications regarding solely business matters from one business person to another through an attorney. Defendants' motion to compel the production of these memorandums is granted with the exception that the last sentence of the last paragraph of the April 4, 1991 memorandum, [*22] which arguably constitutes legal analysis, may be redacted by Carlton.

*2. Memorandum from Harch Capital to CS Manager*

Also identified on Carlton's privilege log was a document sent from Harch Capital to CS Manager in June of 1993 regarding unspecified negotiations with TLC Beatrice. Because Harch Capital is obviously not a law firm, the defendants contend that this document cannot be privileged.

In its brief, Carlton states that Harch Capital was

employed by Carlton and functioned as an agent of Carlton's attorneys in connection with certain negotiations with TLC Beatrice. It also says that the document was drafted in connection with work performed by Carlton's legal counsel concerning potential litigation with TLC Beatrice.

For these purposes I assume that Harch Capital was part of Carlton's team of advisors with respect to litigation with TLC Beatrice. The document reflects that Harch Capital was serving as a conduit from Carlton's outside counsel to Carlton in this instance on matters related to the legal representation. As such, Carlton had a legitimate expectation of confidentiality. On the assumption I make here, the document is privileged and Carlton is not required [*23] to produce it.

*3. Documents sent from Carlton to Michael Lewitt, attorney for Harch Capital*

Defendants next argue that Carlton should be compelled to produce all of the documents on Carlton's privilege log that were sent or copied to Michael Lewitt, an attorney who worked for Harch Capital. By disclosing documents to Mr. Lewitt, whether privileged or not, defendants' say that Carlton has waived any claims of privilege it may have had. This contention again rests on defendants' conclusion that Lewitt was serving as a financial advisor to Carlton. Again I assume for these purposes that Harch Capital was part of Carlton's advisory team with respect to the litigation against TLC Beatrice. A review of these documents confirms this view and all of these documents are privileged with one exception; a March 18, 1994 memorandum to Carlton from Anne Sargent, whose role is not known to me. Assuming that Anne Sargent is an attorney for Carlton, this document is also privileged.

*4. Communication to Carlton concerning a conversation with Carl Brody*

The final document on Carlton's privileged log which the defendants seek is a memorandum from an unidentified individual to Carlton [*24] concerning a telephone conversation with Carl Brody, Carlton's senior tax advisor in 1991. Carlton admits that it does not know the origin of this memorandum but argues that because it bears a stamp indicating it is "confidential" and "attorney work product" it should not have to produce the document.

Carlton has not adequately shown that this document should be privileged. The memorandum itself appears to be solely business information and even if it was prepared by an attorney one cannot know who may have seen it. Carlton must therefore produce this document.

1996 Del. Ch. LEXIS 39, *24

Finally, I briefly address Carlton's December 21, 1995 motion for an order governing discovery conduct. Although I will decline to act at this time, I caution counsel that [HN6] the standards expected by the Delaware courts are high and that in the proper circumstances I will not hesitate in this case henceforward to impose sanctions, including non-monetary sanctions. It is not necessary to remind counsel that their obligations of zealous protection of clients' interests does not relieve them of their professional obligations to the court [*25] and to the judicial system.

William T. Allen

Chancellor

March 15, 1996

# TAB J
# TO EXHIBIT 14

6 of 6 DOCUMENTS

Inspiration Leasing, Inc., Plaintiff, v. US West Financial Services, Inc. Successor by merger to US West Capital Corporation, Defendant

No. 86 Civ. 6287 (CSH)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1988 U.S. Dist. LEXIS 6272

June 24, 1988, Decided; June 27, 1988, Filed

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff filed a motion to compel production of documents.

OVERVIEW: Plaintiff sought discovery of certain documents. Defendant resisted. Plaintiff filed a motion to compel, which the court granted in part. The court ruled that insofar as the requested documents specifically related to, and were generated by, the transaction at issue, they were discoverable under *Fed. R. Civ. P. 26(b)(1)*. The limitations defendant sought to place on the relevance of its net economic return calculations were not realistic. Nor were they mandated by the court's prior memorandum rejecting plaintiff's motion for summary judgment. The court ruled that plaintiff was not entitled to discovery of documents relating to transactions other than the one at bar. The transaction was discrete. The court found that it was doubtful that defendant's calculations in respect of unrelated transactions would lead to the discovery of evidence admissible in the current litigation. The court directed the parties to negotiate in good faith with respect to the terms and conditions of a confidentiality order.

OUTCOME: The court granted the motion in part.

CORE TERMS: discovery, calculations, relevance, unrelated, confidentiality, completion, scheduling

OPINIONBY: [*1]

HAIGHT

OPINION:

MEMORANDUM OPINION AND ORDER

CHARLES S. HAIGHT, JR. U.S.D.J.

This Memorandum Opinion resolves plaintiff's motion to compel production of certain documents. It also deals with requests contained in the most recent correspondence of counsel with respect to deadlines contained in the initial scheduling order. There is also a Rule 11 application lurking in the background. As to that, decision will be deferred until the completion of the case.

Plaintiff's motion for production of documents is granted in part. I address the merits of the issue, rejecting the plaintiff's threshold argument that defendant lacks standing to complain because it did not make a motion for a protective order under *Rule 26(c), F.R.Civ.P. Penthouse International, Ltd., v. Playboy Enterprises, 663 F.2d 371 (2d Cir. 1981),* upon which plaintiff relies, speaks to motions for protective orders in respect of concededly relevant documents. But the present defendant's initial objection is one of relevance, which may be made by timely written objection under Rule 34(b). See also 4 Moore's Federal Practice (2nd ed. 1987) at 26-430.

I agree with plaintiff that insofar as the requested documents [*2] specifically relate to, and were generated by, the transaction at issue, they are discoverable under Rule 26(b)(1). The limitations defendant seeks to place upon the relevance of its " net economic return" calculations are not realistic; nor are they mandated by this Court's prior memorandum rejecting plaintiff's motion for summary judgment.

However, I am not satisfied that plaintiff is entitled to discovery of documents of this nature relating to transactions other than the one at bar. This was a discrete transaction. Under the order I make today, defendant's documentation relating to that transaction will be disclosed. The parties' rights and obligations arise out of the four corners of the contract at issue. It seems

1988 U.S. Dist. LEXIS 6272, *2

to me very doubtful that defendant's calculations in respect of unrelated transactions would lead to the discovery of evidence admissible in this litigation. At least, I decline to order such discovery on the present record. The case plaintiff relies upon, *Leucadia, Inc. v. Reliance Insurance Company, 101 F.R.D. 674 (S.D.N.Y. 1983),* was an entirely different sort of case. Plaintiff claimed against an insurance company which allegedly covered plaintiff against losses [*3] resulting from dishonestly and fraud on the part of a former employee. A series of investigations by the corporation and outside counsel had been conducted; Judge Leval held that one of those reports, although not directly concerning the transactions at issue, "may be relevant to show the practice of plaintiff in other transactions and the results of an earlier investigation." *Id. at 677.* The facts of Judge Leval's case do not support broad disclosure of the present defendant's calculations or policies in unrelated transactions.

Accordingly I strike plaintiff's demands 6 and 7 to the extent that they seek to reach documents relating to transactions other than the one at issue. With those exceptions, defendant's objects are overruled and discovery is directed.

After completion of the transaction-related document discovery directed herein, plaintiff may if so advised move to expand it. But plaintiff will bear a heavy burden of persuasion.

I accept that defendant is entitled to an order of confidentiality. I do not accept defendant's contention that no such order will suffice. Counsel are directed to negotiate in good faith with respect to the terms and conditions of a confidentiality [*4] order. If they cannot agree, cross-orders may be settled on notice and the Court will resolve the issue.

As for further scheduling, I grant plaintiff's letter application of May 25, 1988. Accordingly discovery and the filing of discovery related motions must be completed by September 28, 1988; motions to join parties or to amend pleadings must be made by August 31, 1988; and motions not related to discovery, joinder of parties or amendment of pleadings must be made by October 19, 1988.

The foregoing is SO ORDERED.

Dated: New York, New York June 24, 1988

# TAB K
# TO EXHIBIT 14

LEXSEE 1989 US DIST LEXIS 5970

MII EXPORTS, INC., Plaintiff, v. LEYDEN SHIPPING CORP., Defendant

No. 87 Civ 3352 (LBS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1989 U.S. Dist. LEXIS 5970*

May 31, 1989, Decided and Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff exporter sued defendant freight forwarder for breach of contract. The exporter moved to compel the forwarder to disclose certain customers' identity and to modify the court's prior order restricting discovery and investigation concerning service contracts involving nonparties. The matter had been referred to a magistrate.

**OVERVIEW:** The exporter contracted with the forwarder for its services. It then sued the forwarder for breach of contract. The forwarder had previously moved for summary judgment, although that motion had not been resolved. The exporter moved under *Fed. R. Civ. P. 37(a)* to compel the forwarder to disclose the identity of certain customers and to modify a prior order restricting discovery and investigation relating to service contracts. The matter was referred to a magistrate, who denied the motion. The magistrate held that the forwarder's dealings with other companies had no bearing on whether there was a contractual or a legal duty by the forwarder to advise the exporter concerning service contracts. The exporter was inexperienced with shipping; the basis of its complaint was that the forwarder was supposed to give it business advice. The discovery was intended to find out whether the forwarder had helped other customers. The magistrate found no basis for a finding that the exporter's motion was substantially justified and was prepared to award expenses and attorneys' fees to the forwarder under *Fed. R. Civ. P. 37(a)(4)*. She gave the exporter a chance to request a hearing to prove otherwise.

**OUTCOME:** The magistrate denied the motion to compel discovery. She indicated that she would award costs, including attorneys' fees, to the forwarder, finding that the exporter's motion was not substantially justified, but

gave the exporter the chance to ask for a hearing to prove its justification.

**CORE TERMS:** discovery, customers, ocean, summary judgment, carriers, substantially justified, unjust, freight forwarder, instant motion, recommendation, contractual, competitors, non-party, shipments, sworn

LexisNexis(R) Headnotes

*Civil Procedure > Sanctions > Discovery Misconduct*
*Civil Procedure > Costs & Attorney Fees > Litigation Costs*
[HN1] *Fed. R. Civ. P. 37(a)(4)* requires an award of expenses, including reasonable attorneys' fees, after opportunity for hearing unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

**OPINIONBY:** [*1]

LEE, Magistrate

**OPINION:**

MEMORANDUM OPINION AND ORDER

BARBARA A. LEE, UNITED STATES MAGISTRATE

This is a diversity action for breach of contract by an exporter of scrap metal against a freight forwarder. It was referred to me for pretrial supervision by the Hon. Leonard B. Sand by Order of Reference entered March 30, 1988. By separate Order of Reference entered July 18, 1988, defendant's motion for summary judgment was referred for report and recommendation. Presently before me is plaintiff's motion pursuant to Rule 37(a), Fed. R. Civ. P., to compel defendant to disclose the identity of certain of its customers and to modify a prior

1989 U.S. Dist. LEXIS 5970, *1

order restricting discovery and investigation relating to "service contracts." For the reasons hereinafter stated, plaintiff's motion is denied and defendant is awarded its reasonable costs and expenses, including attorneys' fees, pursuant to Rule 37(a)(4).

The background of the matter, and the procedural history to date, are discussed in my Report and Recommendation, dated May 31, 1989 pursuant to the July 11 Order of Reference, familiarity with which is assumed. With the consent of plaintiff, defendant's papers in opposition to the instant motion have been [*2] deferred pending decision on defendant's motion for summary judgment. Because plaintiff has failed to demonstrate that the discovery sought on this motion is relevant to the subject matter of this action within the meaning of Rule 26(b), Fed. R. Civ. P., there is no need for further papers.

Although plaintiff in its Amended Complaint has asserted four alternative theories of liability arising out of the same facts, they all turn on a single key issue: did plaintiff and defendant have a relationship that gave rise to a duty (either contractual or legal) on defendant's part to advise plaintiff concerning "service contracts" and/or obtain the "lowest possible rates" for plaintiff's export shipments? Whether there was a contractual duty depends solely upon the terms of the contract between plaintiff and defendant. Whether there was a duty arising by operation of law likewise depends upon the nature of the relationship between plaintiff and defendant. Defendant's dealings with its other customers have no bearing on either of those questions. The terms of non-party customers' "service contracts" with ocean carriers are even more remote.

The affidavit of plaintiff's attorney submitted in [*3] support of the instant motion is entirely conclusory with respect to the relevance of the discovery sought. It alleges that plaintiff "needs" to examine its competitors who are defendant's customers on such questions as "Why did Leyden assist these customers and competitors of MII in obtaining advantageous freight rates and not MII? What were the relationships and dealings between Leyden and these parties which resulted in the Service Contracts?" (Affidavit of Donald F. Mooney sworn to June 24, 1988, p. 6.). Plaintiff also seeks broad document discovery from the non-party ocean carriers ("any communications, drafts, negotiations, etc.") on the general theory that they "would bear on Leyden's knowledge of Service Contracts, their availability, etc." (Id., p. 7.)

Plaintiff's president admitted upon his deposition

that he "wasn't aware of shipping contracts" until he had been dealing with defendant for more than three years (Ex. C to Affidavit of Brian Leyden sworn to June 30, 1988, pp. 66–67 submitted in support of defendant's motion for summary judgment) and plaintiff's traffic manager seems to have been a complete neophyte with respect to ocean shipments (see Ex. G to Mooney [*4] Aff.) Having failed to negotiate a contract by which the freight forwarder agreed to arrange "service contracts" on plaintiff's behalf, plaintiff now complains that defendant should have volunteered business advice that plaintiff never requested and that defendant was under no contractual or legal obligation to give. On this untenable foundation, plaintiff seeks to conduct a wide-ranging inquiry into the use and profitability of "service contracts" by shippers and ocean carriers who have no connection with this case. What plaintiff is trying to do is to use the discovery rules to do the business investigation it should have undertaken before entering into the transactions sued upon. That it may not do. The motion is denied.

Rule 37(a)(4), Fed. R. Civ. P., [HN1] requires an award of expenses, including reasonable attorneys' fees, after opportunity for hearing "unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust." There is no basis, on this record, for a finding that the motion was "substantially justified." If plaintiff contends that other circumstances make an award of expenses unjust, it may request [*5] a hearing. Defendant may serve and file affidavits evidencing its expenses by June 15, 1989. Attorneys' fees will not be awarded unless documented in accordance with the requirements of *New York State Ass'n for Retarded Children v. Carey, 711 F. 2d 1136, 1147–48 (2d Cir. 1983)*. Plaintiff may serve and file opposing papers, including a written request for a hearing, by June 30, 1989. If a hearing is requested, plaintiff must specify the disputed issues of fact to be heard.

It is so ordered.

The foregoing determination is made pursuant to *28 U.S.C. § 636*(b)(1)(A). Any party may object to this determination by filing written objections in accordance with the procedure specified in *Fed. R. Civ. P. 72(a)* and *Rule 7* of the local Rules for Proceedings before Magistrates.

Dated: New York, New York
May 31, 1989

# TAB L

# TO EXHIBIT 14

LEXSEE 2004 DEL SUPER LEXIS 259

DONALD MELL, III, v. NEW CASTLE COUNTY, Defendant,

C.A. No. 03M-06-030 (JRS)

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*2004 Del. Super. LEXIS 259*

May 10, 2004, Submitted
August 4, 2004, Decided

**PRIOR HISTORY:** *Mell v. New Castle County, 835 A.2d 141, 2003 Del. Super. LEXIS 315 (Del. Super. Ct., 2003)*

**DISPOSITION:** [*1] Plaintiff's Motion to Enforce Settlement Agreement GRANTED in part and DENIED in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action by plaintiff private citizen to compel production by defendant county of certain information under the Delaware Freedom of Information Act, *Del. Code Ann. tit. 29, § 10001 et seq.* (2004), the citizen sought a writ of mandamus compelling the county to comply with a settlement agreement previously reached between the parties regarding production of the materials.

**OVERVIEW:** A federal investigation of certain county officials prompted the citizen to seek information regarding the defense of those persons at public expense. The parties announced that they had settled their dispute about access to information, but the citizen brought a mandamus action when little information was actually released. The county claimed that because of ongoing litigation in another state court, some information relating to another civil case involving the citizen and the county was exempt from disclosure under *Del. Code Ann. tit. 29, § 10002(g)(9)* (2004) as relating to pending litigation. The court held that the agreement was unambiguous, and made no reference to any exemptions. The exemption under § 10002(g)(6) for matters exempt by statute or common law was more serious, however, because the parties could not agree to violate the law. *Fed. R. Crim. P. 6(e)*, providing for secrecy of many matters presented before grand juries, was recognized in Delaware case law as codifying the common law policy of preserving secrecy. Therefore, the settlement agreement could not be enforced with regard to grand jury

information, including information that might identify witnesses.

**OUTCOME:** The court granted mandamus relief as to those documents that the county claimed pertained to pending or potential litigation, but denied it as to those documents that related to federal grand jury proceedings. It also redacted information as needed to protect work product.

**CORE TERMS:** grand jury, secrecy, disclosure, settlement agreement, invoices, settlement, common law, attorney-client, summary judgment, work product, immunity, pending litigation, redacted, public disclosure, specifically exempted, legal services, motion to enforce, redactions, jurors, Federal Rules of Criminal Procedure, disclosure of information, records pertaining, in camera, revelation, exemption, encompasses, misplaced, barring, exempt, parties contemplated

LexisNexis(R) Headnotes

*Administrative Law > Governmental Information > Freedom of Information*
[HN1] See *Del. Code Ann. tit. 29, § 10002(g)(9)* (2003).

*Administrative Law > Governmental Information > Freedom of Information*
[HN2] *Del. Code Ann. tit. 29, § 10002(g)(6)* (2003).

*Criminal Law & Procedure > Grand Juries > Secrecy*
[HN3] *Fed. R. Crim. P. 6(e)* prohibits disclosure of certain matters presented before a grand jury.

*Civil Procedure > Settlements > Settlement Agreements*
[HN4] An agreement entered into by an attorney is presumed to have been authorized by his client.

*Contracts Law > Contract Interpretation >*

2004 Del. Super. LEXIS 259, *1

*Interpretation Generally*
*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN5] When interpreting contracts, the Delaware Superior Court must strive to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted. In so doing, the court looks first to the entire agreement of the parties to determine if their intent can be discerned from the contract language. In this regard, the court will interpret the terms of the agreement according to the meaning that would be ascribed by a reasonable third party. Where the language is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids. If, however, the terms are fairly susceptible of different interpretations, they are ambiguous.

*Contracts Law > Contract Interpretation > Parol Evidence Rule*
*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN6] Ambiguity may exist if the terms of a contract are inconsistent or when there is a reasonable difference of opinion as to the meaning of words or phrases. When ambiguity exists, the court may use extrinsic evidence to ascertain the parties' intent at the time of contracting. "Extrinsic evidence" includes overt statements and acts of the parties, the business context, prior dealings between the parties, business custom, and usage in the industry.

*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN7] Extrinsic evidence has no place in a court's analysis of a contract when the terms of the agreement are clear and unambiguous.

*Contracts Law > Defenses > Illegal Bargains*
[HN8] Parties cannot, as a matter of law, agree that one of them will take actions it is statutorily precluded from taking.

*Criminal Law & Procedure > Grand Juries > Secrecy*
[HN9] It is widely recognized that *Fed. R. Crim. P. 6(e)* codifies an important policy at common law: the secrecy of grand jury proceedings protects the confidentiality of grand jury proceedings. First, if pre–indictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There

also would be a risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, preserving the secrecy of the proceedings assures that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Criminal Law & Procedure > Grand Juries > Secrecy*
[HN10] Delaware case law interpreting *Fed. R. Crim. P. 6(e)* is clear that it encompasses not only the direct revelation of grand jury transcripts but also the disclosure of information which would reveal the identities of witnesses.

*Civil Procedure > Disclosure & Discovery > Work Product*
[HN11] The attorney–client privilege is defined in Del. R. Evid. 502 as a confidential communication made in furtherance of the rendition of professional legal services to the client. The work product doctrine protects the privacy of lawyers in their work and encourages freedom from interference in the task of preparing their clients' cases for trial.

COUNSEL: Richard H. Cross, Jr., Esquire, Wilmington, Delaware. Attorney for the Plaintiff.

Timothy P. Mullaney, Sr., Esquire, New Castle, Delaware. Attorney for Defendant.

JUDGES: Judge Joseph R. Slights, III.

OPINIONBY: Joseph R. Slights, III

OPINION:

MEMORANDUM OPINION

SLIGHTS, J.

*I. Introduction*

This matter is before the Court on a complaint for a writ of mandamus. Plaintiff, Donald C. Mell, III ("Mell"), seeks to compel New Castle County ("the County") to respond to his Freedom of Information Act ("FOIA") request. n1 On September 9, 2003, the Court granted in part the County's motion for summary judgment on all but one of the claims raised in Mell's complaint. The Court concluded that many of the documents Mell sought were the subject of pending litigation in the Court of Chancery and, therefore, not available under FOIA. n2 The Court denied the motion, however, with respect to Mell's request for information regarding specifically identified funds (S 230,000) allegedly

2004 Del. Super. LEXIS 259, *1

earmarked by the County for the payment of legal fees. n3 As to the documents related to those [*2] funds, the Court concluded that the record was inadequate to determine whether the funds were related to the subject matter of the Chancery litigation. The Court ordered discovery to proceed on this issue. Mell did not seek to appeal the Court's interlocutory order and the matter remained pending in this Court.

> n1 *DEL. CODE ANN. tit. 29, § 10001, et seq.* (2004) (hereinafter, all references to FOIA shall be "Section ___").

> n2 *See Mell v. New Castle County, 835 A.2d 141 (Del. Super. Ct. 2003). See also Section 10002(g)(9)* (2003) [HN1] ("any records pertaining to pending or potential litigation . . . shall not be deemed public.").

> n3 *Id.*

In December, 2003, argument was scheduled on the County's second motion for summary judgment regarding the only issue remaining in the case — the propriety of the County's refusal to respond to Mell's FOIA request regarding the $230,000. Immediately prior to the argument, the parties purportedly negotiated a settlement [*3] of the entire controversy. When the Court took the bench, the parties took advantage of the Court's record to memorialize the terms of their settlement. In February, 2004, the Court was advised by Mell that the County was not performing its obligations under the settlement and this motion to enforce settlement followed.

The motion requires the Court to determine whether there was a meeting of the minds between the parties when they negotiated the terms of the settlement, and whether the secrecy that cloaks a grand jury investigation necessarily will modify the County's responsibilities under the settlement agreement by limiting the information it may produce to Mell *vel non* the parties contemplated such limitations at the time the agreement was reached.

For the reasons that follow, Mell's motion to enforce the settlement agreement is GRANTED in part and DENIED in part.

## II. Facts

This litigation began in June of 2003 when Mell filed a complaint for a writ of mandamus that would compel the County to comply with his March, 2003 FOIA requests. Mell requested that the County produce: (1) invoices of legal counsel that represented County employees in connection with [*4] a Federal Investigation, and (2) documents related to a $230,000 transfer of funds

from the County's Executive Contingency Fund to the County's Legal Department ("the $230,000 transfer"). The County responded with a motion to dismiss for failure to state a claim, which the Court converted into a motion for summary judgment. The County argued that documents related to the legal invoices and the $230,000 transfer requested by Mell both were the subject of pending litigation in the Court of Chancery and, therefore, not accessible through FOIA.

In September, 2003, the Court granted in part and denied in part the County's motion for summary judgment. The Court determined that invoices of legal counsel that represented County employees in a Federal Investigation were the subject of pending litigation in the Court of Chancery in which the plaintiffs sought, *inter alia*, to enjoin the payment of these fees. Consequently, the Court concluded that the invoices were not subject to FOIA. The record as it existed at the time, however, was not adequate to allow the Court to conclude, as a matter of law, that the documents related to the $230,000 transfer were also related to the Chancery [*5] litigation. As to these requests, the County's motion for summary judgment was denied with leave to re-file after discovery.

In October, 2003, the County renewed its motion for summary judgment. Oral argument was scheduled for December 3, 2003. At the start of the proceedings, the parties stated that they had reached a settlement agreement. The terms of that agreement are now in dispute and give rise to this controversy.

The County maintains that it agreed to produce only the documents related to the $230,000 transfer as these were the only documents still in dispute after the Court's decision on the first dispositive motion. The County also maintains that its agreement to produce this information was subject to all available privileges and other limitations on disclosure (*e.g.* attorney-client privilege, work product immunity, exceptions to FOIA and the Federal Rules of Criminal Procedure governing grand jury secrecy). With respect to the FOIA exceptions, the County has identified two: *Section 10002(g)(9)*, which states that "any records pertaining to pending or potential litigation . . . shall not be deemed public;'" and *Section 10002(g)(6)*, which states that [HN2] "any records specifically [*6] exempted from public disclosure by statute or common law . . . shall not be deemed public." With respect to grand jury secrecy, the County cites *Rule 6(e) of the Federal Rules of Criminal Procedure ("Rule 6(e)")* n4, which [HN3] prohibits disclosure of certain matters presented before a grand jury.

> n4 *FED. R. CRIM. P. 6(e)*(2004) (barring disclosure of grand jury matter by certain parties

# TAB M
# TO EXHIBIT 14

LEXSEE 2004 DEL LEXIS 492

SUSSEX EQUIPMENT COMPANY, a Delaware corporation and GEORGE M. ANDERSON, Plaintiffs Below, Appellants, v. BURKE EQUIPMENT COMPANY, a Delaware corporation and MARK BABBITT, Defendants Below, Appellees.

No. 75, 2004

SUPREME COURT OF DELAWARE

*2004 Del. LEXIS 492*

September 22, 2004, Submitted
October 26, 2004, Decided

NOTICE: [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

PRIOR HISTORY: Court Below: Superior Court in and for New Castle County, No. 02C-11-152.

DISPOSITION: Affirmed.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiffs, a seller corporation and its principal (seller corporation), appealed from a decision of the Superior Court in and for New Castle County (Delaware) granting summary judgment to defendants, a buyer corporation and its principal (buyer corporation), in a breach of contract suit arising out of the sale of the seller corporation.

OVERVIEW: The seller corporation argued that the buyer corporation breached a letter of intent to purchase the seller corporation. The appellate court noted that the letter of intent stated that it was an agreement in principle, subject to final negotiations. Thus, the language of the letter of intention clearly indicated that the document was not intended to be a contract. The language was plain, and the placement of the agreement in principle language as the last paragraph of the document, as well as the underlining of the agreement in principle language, emphasized the fact that the parties did not intend for the documents to be a binding contract.

OUTCOME: The judgment was affirmed.

CORE TERMS: negotiations, issues of material fact, letter of intent, last paragraph, matter of law, legal error, manifestations, out-of-trust, unambiguous, franchise, genuine, assent

LexisNexis(R) Headnotes

*Contracts Law > Formation > Formation Generally*
*Civil Procedure > Appeals > Standards of Review > Issues of Fact & Law*
[HN1] Contract interpretation is a question of law. The appellate court therefore reviews a trial judge's decision on the existence of a contract for legal error.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN2] Under Delaware law, purported contracts are to be construed as a whole, to give effect to the intentions of the parties. If the contract language is clear and unambiguous, then the parties' intent is ascertained by a reasonable reading of the plain language of the policy.

*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN3] In construing a contract, extrinsic evidence is only used if the parties' intent cannot be derived from the plain meaning of the contract.

JUDGES: Before HOLLAND, JACOBS and RIDGELY, Justices. Henry duPont Ridgely, Justice.

OPINIONBY: Henry duPont Ridgely

OPINION:

ORDER

This 26th day of October, 2004, on consideration of the parties' briefs, it appears that:

(1) Sussex Equipment Company and George M. Anderson ("Sussex") appeal from a decision of the

2004 Del. LEXIS 492, *1

Superior Court granting summary judgment to Burke Equipment Company and Mark Babbitt ("Burke"). The trial judge determined that as a matter of law, the letter of intent executed by the parties on November 16, 1999 was not a valid contract. Sussex appeals the trial judge's decision arguing that the letter of intent was a contract, and that genuine issues of material fact exist as to the parties' intent and objective manifestations of assent. We have examined the record and conclude that the trial judge committed no legal error. Accordingly, the decision of the Superior Court is affirmed.

(2) In August or September 1999, Mark Babbitt approached George Anderson [*2] about acquiring Sussex Equipment Company after learning that Sussex was having financial difficulties. Sussex was in the business of selling Bobcat and Kubota agricultural, construction and commercial mowing equipment. Babbitt owned similar businesses in New Castle and Kent Counties and was seeking to expand his business into Sussex County.

(3) In the Spring of 1999, Anderson learned that Sussex was "out-of-trust" with Bobcat and Kubota because his former partner had been selling equipment without forwarding any proceeds to Bobcat and Kubota. Prior to the commencement of their negotiations, Anderson informed Babbitt that Sussex was out-of-trust with Bobcat and Kubota and that its franchise was in jeopardy. For this reason, Anderson allowed Babbitt to inspect the books, premises and inventory of Sussex.

(4) On or about November 16, 1999, Anderson and Babbitt executed a document regarding the terms of the sale of Sussex to Burke. The last paragraph of the document, paragraph fourteen, provided, "This is an agreement in principle, subject to final negotiations." n1 In January 2000, Bobcat and Kubota revoked Sussex's franchise. As a result, Babbitt broke-off negotiations with Anderson. [*3]

n1 Appendix to Appellants' Opening Brief at A-12.

(5) Sussex filed a lawsuit in Superior Court on November 19, 2002 against Burke for breach of contract. The trial judge granted summary judgment to Burke on the basis that as a matter of law, the parties did not have a contract. Sussex appeals the decision of the Superior Court, arguing that formation of a contract should be determined by analyzing extrinsic evidence to determine whether the parties intended to enter a contract, and whether there were objective manifestations of assent. Sussex maintains that there are genuine issues of mate-

rial fact that should be decided by the trier of fact.

(6) [HN1] Contract interpretation is a question of law. n2 We therefore review the trial judge's decision for legal error. n3 [HN2] Under Delaware law, purported contracts are to be "construed as a whole, to give effect to the intentions of [[the parties."]] n4 If the contract language is clear and unambiguous, then the parties' intent is ascertained by "'a reasonable reading [*4] of the plain language [[of the policy.'"]] n5 [HN3] Extrinsic evidence is only used if the parties' intent cannot be derived from the plain meaning of the contract. n6

n2 *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992)* (citing *Aetna Cas. and Sur. Co. v. Kenner, 570 A.2d 1172, 1174 (Del. 1990)*).

n3 *Kenner, 570 A.2d at 1174.*

n4 *Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996)* (citing *E.I. duPont de Nemours and Co., Inc. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985)*).

n5 *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co., 686 A.2d 152, 156 (Del. 1996)* (quoting *Kenner, 570 A.2d at 1174*).

n6 *See Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991)* (citing *Hibbert v. Hollywood Park, Inc., 457 A.2d 339, 343 (Del. 1983)*). *See also Cleveland Trust Co. v. Wilmington Trust Co., 258 A.2d 58, 65 (Del. 1969)* ("Parol evidence may not be admitted to vary or contradict a plain and unambiguous provision of a trust agreement.") (citations ommitted).

[*5]

(7) The language of the letter of intention in this matter clearly indicates that the document was not intended to be a contract. The language in paragraph fourteen is plain, and its placement as the last paragraph of the document and emphasis by underlining emphasizes the fact that the parties did not intend for the documents to be a binding contract. No further analysis of the parties' intention is therefore required.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is *AFFIRMED.*

BY THE COURT:

/s/Henry duPont Ridgely

Justice