LEXSEE 1997 DEL. CH. LEXIS 180

**SBC INTERACTIVE, INC., Plaintiff, v. CORPORATE MEDIA PARTNERS, AMERITECH MEDIA VENTURES, INC., BELLSOUTH INTERACTIVE MEDIA VENTURES, INC., GTE MEDIA VENTURES INCORPORATED, DISNEY MEDIA VENTURES, INC., and SNET PERSONAL VISION, INC., Defendant.**

Civil Action No. 15987

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1997 Del. Ch. LEXIS 180*

December 22, 1997, Date Submitted
December 24, 1997, Date Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court January 16, 1998.

**DISPOSITION:**

Defendant's motion for summary judgment granted, and plaintiff's motion for summary judgment and for a preliminary injunction denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff withdrawing partner filed an action seeking a declaration that it was not bound to arbitrate its dispute with the defendant remaining partners. The parties filed cross motions for summary judgment on the arbitrability issue.

**OVERVIEW:** A partnership agreement required that any claim arising out of the agreement and any claim dealing with the determination of the partnership's or a partner's rights or obligations was to be arbitrated. The withdrawing partner claimed that it had a valid reason to withdraw, and the remaining partners disputed the withdrawing partner's right to leave the partnership. The court held that the dispute was governed by the arbitration clause. Because the parties agreed to a broad arbitration clause, the only role for the court was to determine whether the contract could have been reasonably interpreted so as to require arbitration. The court ruled that there was a broad arbitration clause and that the only reasonable interpretation of the clause was that the dispute was covered by arbitration. Because the language of the clause was clear, the court refused to consider as evidence the affidavit of an involved individual who

claimed that arbitration was not required with respect to the withdrawing partner's action.

**OUTCOME:** The court found that arbitration was required in the withdrawing partner's action for a declaration that it was not bound to arbitrate a dispute, granted the summary judgment motion of the remaining partners, and remitted the case to arbitration. The withdrawing partner's summary judgment motion was denied.

**CORE TERMS:** partner, withdrawal, partnership, arbitration, arbitration clause, summary judgment, arbitrable, arbitrate, withdraw, arbitrator, arbitrability, contractual, effective, arbitration provision, material change, negotiation, strategic, unchallengeable, preliminary injunction, capital contribution, right to arbitrate, right to challenge, sole discretion, matter of law, forceful, waived, duty, broad arbitration clause, favoring arbitration, strong public policy

LexisNexis(R) Headnotes

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Under Delaware law, summary judgment must be granted where no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*

1997 Del. Ch. LEXIS 180, *

[HN2] Because the obligation or right to arbitrate is contractual, the starting point of any analysis of whether a dispute is arbitrable must be the parties' contract to arbitrate.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN3] The question of arbitrability is generally for the courts rather than the arbitrators. In an action to compel arbitration, the only issues are whether (i) an agreement to arbitrate exists, (ii) a party has a duty to arbitrate under the agreement, and (iii) that party has breached its duty.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN4] Where the contract contains a broad arbitration clause, the role of the court in resolving that issue is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN5] In determining whether the dispute is one that on its face is covered by the arbitration provision of the contract, all the court need decide is whether the contract may reasonably be interpreted to require arbitration. That narrow scope of review results from the strong public policy favoring arbitration and from the corollary principle that any doubts as to whether a particular issue is arbitrable must be decided in favor of arbitration. Of such force is that principle that the United States Supreme Court and the Delaware courts have held that the presumption of arbitrability can be overcome only if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN6] Where the meaning of the arbitration clause is clear from its plain language, then a court can decide the

issue as a matter of law without looking at any other evidence of the parties' intent.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN7] A party's subjective, undisclosed understanding of a contract's meaning is not legally effective to prove contractual intent.

*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
[HN8] Although arbitrability is an issue to be decided by the court, once the court determines that the dispute falls within the scope of a valid agreement to arbitrate, it may not then determine the merits of the claims, however frivolous the claims might appear.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
[HN9] In the face of a valid agreement to arbitrate, a court is expressly prohibited by statute from entertaining arguments that go to the merits of the underlying dispute.

*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
[HN10] Where an arbitration clause is broad, a contention that a party waived arbitration because it failed to commence arbitration by a prescribed period is generally an issue for the arbitrator. The proper method of initiating arbitration under a contract is a matter for the decision of the arbitrator.

**COUNSEL:**

Michael D. Goldman, Stephen C. Norman and Kevin R. Shannon, Esquires, of POTTER, ANDERSON & CORROON, Wilmington, Delaware; Attorneys for Plaintiff SBC Interactive, Inc.

A. Gilchrist Sparks, III and Jon E. Abramczyk, Esquires, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; and Kenneth Conboy, James V. Kearney and James E. Brandt, Esquires, LATHAM & WATKINS, New York, NY; Attorneys for Defendants Corporate Media Partners, Ameritech Media Ventures, Inc., BellSouth Interactive Media Services, Inc., Disney Media Ventures, Inc., and SNET Personal Vision, Inc.

Lawrence C. Ashby, Esquire, ASHBY & GEDDES, Wilmington, Delaware; Attorneys for Defendant GTE Media Ventures Incorporated.

1997 Del. Ch. LEXIS 180, *

**JUDGES:** JACOBS, VICE CHANCELLOR.

**OPINIONBY:** JACOBS

**OPINION:**

OPINION

JACOBS, VICE CHANCELLOR

The plaintiff, SBC Interactive, Inc. ("SBC" a general partner in Corporate General Partners, which is a Delaware partnership doing business as "Americast" (the "Partnership"), withdrew from the Partnership [*2] effective July 28, 1997. The remaining ("non-SBC") partners took the position that SBC's withdrawal constituted a breach of the Partnership Agreement. On October 7, 1997, the non-SBC partners formally demanded arbitration of their claims pursuant to the arbitration clause of the Partnership Agreement. One week later, SBC commenced this proceeding against the Partnership and the non-SBC partners (collectively, "defendants") for a declaration that the defendants are not entitled to arbitrate the "invalid withdrawal" claim because (i) that issue is not arbitrable, (ii) once the withdrawal became "effective" that issue was no longer subject to legal challenge, and (iii) even if the claim is arbitrable, the defendants waived their right to arbitrate by failing to demand arbitration in a timely manner. Shortly thereafter, the defendants moved to dismiss the complaint The Court denied that motion in a bench ruling on November 12, 1997, and expedited discovery ensued thereafter.

Now pending before the Court are cross motions for summary judgment and SBC's motion for a preliminary injunction to halt the arbitration. The issue, simply stated, is whether the dispute over the contractual validity [*3] of SBC's withdrawal from the Partnership must be resolved in arbitration. For the reasons that follow, I conclude that it must. Accordingly, the defendants' motion for summary judgment will be granted and SBC's cross motion for summary judgment and a preliminary injunction will be denied.

I. FACTS

The Partnership was formed in April, 1995 for the purposes of assembling and marketing certain video programing through an advanced broadband telecommunication network, creating a unique navigator to help consumers select the programming they wish to view, and developing new programming devices. The general partners are SBC, Ameritech Media Ventures, Inc., BellSouth Interactive Media Ventures, Inc., Disney Media Ventures, Inc., GTE Media Ventures, Incorporated and SNET Personal Vision, Inc.

At the time the Partnership was formed, the partners' mutual expectation was that all partners would continue as partners, and not withdraw from the Partnership or exercise their power to dissolve the partnership for a period of five years, without the unanimous consent of the remaining partners. n1 The partners did agree, however, and the Partnership Agreement was drafted to so provide, that in [*4] limited circumstances, a partner would be allowed to withdraw without the consent of the remaining partners. Those circumstances are set forth in various subparts of § 7.3 of the Partnership Agreement. One of those subparts, § 7.3(e), indicates that a partner may withdraw in its sole discretion at any time after five years (and before seven years) from the date of the Partnership Agreement. In that event, the partner's interest in the Partnership would be redeemed for $ 10 and the withdrawing partner would be liable to contribute the balance of its aggregate capital contribution required by the Partnership Agreement for the first five years. n2 The other subsections authorized early withdrawal as a partner only upon the happening of a specified event. One of those "nondiscretionary" subsections, § 7.3(d), permits a partner to withdraw if the parent of that partner engages in a transaction that represents a material change in the parent's strategic direction. In that case, the withdrawing partner's interest in the Partnership would be redeemed for a nominal $ 10, but, in contrast to § 7.3(e), no additional capital contribution would be required.

n1 Second Amended and Restated Partnership Agreement ("Ptp. Agt.") § 7.3(a).

[*5]

n2 The Court is informed that that latter amount would be $ 100 million. Another subpart, § 7.3(f), also authorizes a partner to withdraw in its sole discretion after seven years. In that circumstance the redemption price would be significantly greater than under § 7.3(e), because there would be no penalty or forfeiture for early withdrawal.

On May 28, 1997, SBC sent a letter to the non-SBC partners and to the management committee of the Partnership, giving notice of its withdrawal under § 7.3(d) of the Partnership Agreement on the ground that its parent had engaged in a transaction that represented a material change in the parent's strategic direction. Under § 7.3(d), the withdrawal would become effective on the "Withdrawal Date," which is defined as sixty days following the receipt of the withdrawal notice. In response, the defendants took the position that SBC's withdrawal was

1997 Del. Ch. LEXIS 180, *

in breach of the Partnership Agreement, because its parent had not engaged in a transaction representing a material change in the parent's strategic direction.

Between June 5 and October 7, 1997, the parties [*6] exchanged correspondence and held meetings in an effort to resolve the dispute, but those efforts were unsuccessful. On October 7, 1997, the non-SBC partners formally demanded arbitration of their claim that SBC's withdrawal constituted a breach of the Partnership Agreement. One week later, on October 15, 1997, SBC filed this action seeking a declaration that the defendants are not entitled to arbitrate the issue of whether SBC's withdrawal was a breach of the Partnership Agreement. Both pending cross motions for summary judgment, and SBC's motion for an order preliminarily enjoining the defendants from pursuing the arbitration process, depend critically upon whether the § 7.3 withdrawal dispute is arbitrable.

II. ANALYSIS

[HN1] Under Delaware law, summary judgment must be granted where no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. n3 As will become apparent from the discussion that follows, given the legal standard that governs arbitrability, there is no genuine issue of material fact that precludes summary judgment.

n3 Del. Ch. Ct. R. 56; accord, *Tanzer v. International General Indus., Inc., Del. Ch., 402 A.2d 382, 385 (1979); Nash v. Connell, Del. Ch., 34 A.2d Ch. 20, 99 A.2d 242, 243 (1953).*

[*7]

A. The Applicable Standard of Arbitrability

[HN2] Because the obligation or right to arbitrate is contractual, the starting point of any analysis of whether a dispute is arbitrable must be the parties' contract to arbitrate. In this case that agreement is found in Article 9, the "Dispute Resolution" provision of the Partnership Agreement Section 9.1 of that provision requires that any dispute arising out of or relating to the Agreement must be the subject of negotiations intended to reach an amicable resolution of the dispute. If the dispute is not resolved during the negotiation period prescribed by § 9.1, then under § 9.2 the parties "shall resolve such Dispute through final and binding arbitration . . .," and the "sole procedure for resolving Disputes shall be through use of the negotiation and arbitration procedures described [in Article 9]." n4 Section 9.1 defines the "Disputes" that (if negotiation fails) must be arbitrated in the broadest terms, as:

... any controversy, claim or dispute of whatever nature arising out of or relating to this Agreement, the determination of the Partnership's or a Partner's rights or obligations hereunder or the existence [*8] of a breach or the termination hereof...

n4 Ptp. Agt. § 9.2(k) (emphasis added).

Where our courts are called upon to determine whether a given dispute is arbitrable, the relevant legal analysis is well established and straightforward. [HN3] The question of arbitrability is generally for the courts rather than the arbitrators. n5 In an action to compel arbitration, the only issues are whether (i) an agreement to arbitrate exists, (ii) a party has a duty to arbitrate under the agreement, and (iii) that party has breached its duty. n6

n5 *United Engineers & Constructors, Inc. v. IMO Industries, Inc., 1993 Del. Ch. LEXIS 27, *14, Del. Ch., C.A. No. 12611, Hartnett, V.C. (Feb. 11, 1993); Action Drug Company v. R. Baylin Company, 1989 Del. Ch. LEXIS 74, *7, Del. Ch., C.A. No. 9383, Berger, V.C. (June 19, 1989); Falcon Steel Co. v. Weber Engineering Co., Del. Ch., 517 A.2d 281, 287 (1986); AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986).*

[*9]

n6 *Pettinaro Construction Co., Inc. v. Harry C. Partridge, Jr. & Sons, Inc., Del. Ch., 408 A.2d 957, 962 (1979).*

In this case, the issue is whether SBC has a duty to arbitrate under the Partnership Agreement. [HN4] Where, as here, the contract contains a broad arbitration clause, the role of the Court in resolving that issue

... is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator ... The

courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim... n7

N7 *United Engineers & Constructors, Inc., supra, n.5, 1993 Del. Ch. LEXIS 27,* *16 (quoting *United Steelworkers of America v. Warrior Gulf Navigation Co., 363 U.S. 574, 582-83, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960).*

[*10]

[HN5] In determining whether the dispute is one that on its face is covered by the arbitration provision of the contract, all the Court need decide is whether the contract may reasonably be interpreted to require arbitration. That narrow scope of review results from the strong public policy favoring arbitration and from the corollary principle that any doubts as to whether a particular issue is arbitrable must be decided in favor of arbitration. n8 Of such force is that principle that the United States Supreme Court and our Delaware Courts have held that the presumption of arbitrability can be overcome only if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." n9 That presumption is particularly powerful where, as here, the contract contains a broad arbitration clause. In those cases, such "positive assurance" requires that there be an "express provision" excluding the dispute from the coverage of the arbitration clause, or that "the most forceful evidence of a purpose to exclude" be presented. n10

n8 *Pettinaro Construction Co., Inc., supra, n. 6, 408 A.2d at 962; Action Drug Company v. R. Baylin Company, supra, n. 5, 1989 Del. Ch. LEXIS 74,* *7; *James Julian, Inc. v. Raytheon Service Co., Del. Ch., 424 A.2d 665, 667 (1980).*

[*11]

n9 *United Steelworkers of America, supra, n. 7, 363 U.S. at 582-83 (1960)* (cited and quoted with approval in *United Engineers & Constructors, Inc., supra, n. 5, 1993 Del. Ch. LEXIS 27,* *15, and in *Action Drug Company v. R. Baylin Company supra, n. 5, 1989 Del. Ch. LEXIS 74,* *8.

n10 *United Engineers & Constructors, Inc., supra, n. 5, 1993 Del. Ch. LEXIS 27,* *15 (citing *United Steelworkers, 363 U.S. at 584-85).*

B. Application of the Arbitrability Standard to the Present Dispute

As applied to the instant facts, the above standards lead swiftly and inexorably to the conclusion that the arbitration provision of the Partnership Agreement covers the underlying dispute that divides the parties. That dispute, to reiterate, is whether SBC's withdrawal from the Partnership constituted a breach of the covenant not to withdraw contained in § 7.3(a) of the Partnership Agreement. Here, the arbitration provision can not only be reasonably read to cover that dispute, but also that interpretation is the only one to which the operative contract language is reasonably susceptible.

The arbitration clause [*12] of the Partnership Agreement defines an arbitrable dispute as "any controversy, claim or dispute of whatever nature arising out of or relating to this Agreement, the determination of the Partnership's or a Partner's rights or obligations hereunder or the existence of a breach or the termination hereof." n11 The non-SBC partners claim that SBC's withdrawal was unauthorized, because SBC's parent had not engaged in a transaction amounting to a material change in the parent's strategic direction, as § 7.3(d) of the Partnership Agreement required. Therefore, the non-SBC partners contend, that withdrawal breached the § 7.3(a) covenant not to withdraw and as a consequence, SBC is obligated to the Partnership for the $ 100 million balance of the capital contribution it would have made had it remained a partner for five years. n12 Manifestly, that is a "claim ... arising out of or relating to [the] Agreement, the determination of the Partnership's ... rights" and to "a Partner's ... obligations," and to "the existence of a breach" of the Agreement. There is, moreover, no "express provision" in the Partnership Agreement that excludes from coverage disputes about a partner's right to withdraw [*13] from the Partnership. Nor has SBC presented any evidence, let alone "the most forceful evidence" of a purpose to exclude this category of disputes from the scope of the arbitration provision. n13 Accordingly, the Court must--and does--conclude that the dispute over SBC's withdrawal rights must be remitted to arbitration.

n11 Ptp. Agt. § 9.1.

n12 Although the defendants (apparently) contended initially that SBC remained a partner as a consequence of its invalid withdrawal, the defendants now concede that SBC was entitled to

exit the Partnership, but claim that SBC remains liable on its Partnership Agreement obligation to contribute $ 100 million.

n13 SBC argues that the Affidavit of Steve McGaw--who states that it was the intent of the contracting parties that a withdrawal under § 7.3(d) would be unchallengeable and nonarbitrable--constitutes such "forceful evidence," because Mr. McGaw's affidavit testimony is uncontroverted. The flaw in that argument is that affidavit is not admissible evidence. There is no ambiguity about the scope of or the meaning of the terms used in the arbitration clause, and as this Court has held, [HN6] where "...the meaning of the arbitration clause is clear from its plain language, then [the Court] can decide this issue as a matter of law without looking at any other evidence of the parties' intent." *Wolf v. Magness Construction Company, 1994 Del. Ch. LEXIS 214, *5-6, Del. Ch., C.A. No. 13004, Chandler, V.C. (Dec. 20, 1994).* That principle applies here, and bars consideration of the McGaw affidavit. Moreover, even if the arbitration clause were ambiguous, that affidavit is not competent evidence of contractual intent, because Mr. McGaw never asserted that he communicated his understanding to the other partners or that they otherwise were aware of his interpretation. [HN7] A party's subjective, undisclosed understanding of a contract's meaning is not legally effective to prove contractual intent. See *Bell Atlantic Meridian Sys. v. Octel Communications Corp., 1995 Del. Ch. LEXIS 156, *20, Del. Ch., C.A. No. 14348, Allen, C. (Nov. 28, 1995).*

[*14]

C. SBC's Non-Arbitrability Arguments

Under the circumscribed form of inquiry that governs arbitrability disputes, the foregoing analysis should be--and in my view is--dispositive, and should end there. Nonetheless, SBC advances three reasons why (it insists) the Court is required to reach the opposite conclusion. First, SBC argues that the Partnership Agreement does not permit arbitration of the validity of a withdrawal under § 7.3(d), because as a matter of law and fact, the parties' contractual intent was that withdrawals under § 7.3(d) would be unchallengeable and in the withdrawing partner's sole discretion. Second, SBC contends that even if a § 7.3(d) withdrawal could be challenged, the defendants' right to challenge SBC's withdrawal vanished once the withdrawal became "effective" on July 28, 1997. Third, SBC advances the related argument that even if the withdrawal issue could be arbitrated and the right to challenge survived the effective date of its withdrawal,

the defendants nonetheless "waived" their right to arbitrate because they were contractually required to, but did not, demand arbitration before July 28, 1997.

SBC's contentions must be rejected because [*15] they are utterly extraneous and not responsive to the analysis that this Court is mandated to employ. As the applicable case law establishes, SBC's arguments go to the merits of the underlying claim and must be addressed and determined in the arbitration.

[HN8] Although arbitrability is an issue to be decided by the Court, once the Court determines that the dispute falls within the scope of a valid agreement to arbitrate, it may not then determine the merits of the claims, however frivolous the claims might appear. As this Court stated in United Engineers & Constructors, Inc. v. IMO Industries, Inc., Delaware's strong public policy favoring arbitration "would be vitiated if [our] courts ... under the guise of defining the scope of the arbitration agreement, in effect decided the dispute." n14 Indeed, [HN9] in the face of a valid agreement to arbitrate, this Court is "expressly prohibited by statute" from entertaining arguments that "... [go] to the merits of [the underlying] dispute." n15

n14 *1993 Del. Ch. LEXIS 27*, *18, Del. Ch., C.A. No. 12611, Hartnett, V.C. (Feb. 11, 1993); see also, *Falcon Steel, supra, 517 A.2d at 287* ("The merits of the claim itself and of any defenses thereto are for the arbitrator, not the court, to evaluate."); *United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 568, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960)* ("The courts, therefore, have no business weighing the merits of the grievance...").

[*16]

n15 Id.

SBC's arguments all go to the merits of the underlying dispute. The argument that under the Partnership Agreement a § 7.3(d) withdrawal is unchallengeable, goes to whether the defendants have any cognizable legal claim for damages. That argument concerns SBC's obligations and the non-SBC partners' rights under the Partnership Agreement, which that contract expressly remits to arbitration under § 9.1 and § 9.2. The argument that even if such a withdrawal is challengeable any right to challenge evaporated on July 28, 1997, amounts essentially to a procedural defense to the non SBC partners' claim, as does SBC's argument that the defendants were required to, but did not, commence arbitration before

1997 Del. Ch. LEXIS 180, *

July 28, 1997. The merits of the underlying claim, and of any defenses to the claim, are for the arbitrator, not this Court, to decide. n16

> n16 *Falcon Steel, supra, 517 A.2d at 287, 288* (also holding that [HN10] where the arbitration clause is broad, a contention that a party" waived" arbitration because it failed to commence arbitration by a prescribed period, is generally an issue for the arbitrator); see also *Pettinaro Construction Co., Inc., supra, 408 A.2d at*

*963* ("The proper method of initiating arbitration under the contract is a matter for the decision of the Arbitrator.")

[*17]

III. CONCLUSION

For the reasons discussed, the defendants' motion for summary judgment is granted, and the plaintiff's motions for summary judgment and for a preliminary injunction are denied. IT IS SO ORDERED.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 305502 (Del.Super.)

(Cite as: Not Reported in A.2d)

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Carl W. SOWELL, Appellant,
v.
TOWNSENDS, INC., Appellee.
No. C.A. 99A-01-001.

Jan. 26, 2000.

Appeal from decisions of Industrial Accident Board-Affirmed.

David J. Ferry, Jr., and Rick S. Miller, Ferry & Joseph, P.A., Wilmington, Delaware, for the Appellant.
Jeffrey M. Austin, and Scott A. Simpson, Elzufon & Austin, P.A., Wilmington, Delaware, for the Appellee.

MEMORANDUM OPINION

GRAVES, J.

*1 This matter is before the Court on appeal from a decision of the Industrial Accident Board ("the Board"). Appellant, Carl W. Sowell("Appellant") appeals both the Board's decision regarding Appellant's contention the parties settled the case and the Board's decision on his claims. For reasons set forth below, the Board's decisions are affirmed.

FACTS

I. STATEMENT OF FACTS RELATING TO SETTLEMENT CLAIM

On August 19, 1998, the Board was scheduled to hear the Appellant's Petition for Additional Compensation Due. This hearing did not take place because Townsends, Inc. ("Appellee") counsel notified the Board that the two parties had settled this matter. Subsequent thereto, Appellee's counsel maintained that a settlement was not reached. Thus, Appellant requested a legal hearing to enforce the settlement agreement. The Board held a hearing thereon, and the following evidence was presented at the hearing.

The Appellee, through its counsel, made an offer to settle the matter on August 17, 1998. Appellant was not satisfied

with the offer. So Appellant, through his counsel, made a counteroffer. During this time the prospect of commutation was brought up. Negotiations went back and forth until both sides agreed on $61,985.04 for permanency, $45,000.00 for commutation, one $2,250.00 attorney's fee, and the expert witnesses fees and deposition costs. Appellee's counsel indicated that the commutation was subject to the approval of the Board. Appellant accepted these terms and an agreement was reached.

Appellant's counsel testified he believed the commutation applied only to temporary total disability and that Appellee's counsel said nothing which would have led him to believe that permanency benefits were meant to be included in the commutation. Appellee's counsel testified that he had a specific recollection of telling Appellant's counsel at least two times that the commutation would include everything but medical expenses and of telling Appellant's counsel that perhaps a complete commutation might result in the employer giving the claimant the money he claimed he needed. Appellee's counsel testified he told opposing counsel commutation would be in Appellant's best interests because it would put the worker's compensation claim behind him and Appellant could get on with his life.

The next day, Appellant's counsel sent a letter confirming the commutation was for permanent impairment and temporary total disability. When Appellee's counsel received the letter, he called opposing counsel and stated that he believed the commutation was for all future benefits, except for medical expenses. By letter dated August 20, 1998, Appellee's counsel stated in pertinent part:

As you know, my understanding of the settlement was different than yours. As a result, I contacted you immediately after receiving your letter. Specifically, in paragraph two of your letter you indicated that the commutation of $45,000.00 is for total disability benefits only. During the course of our negotiations, it was my client's intention to commute the claimant's right to any future benefits not just total disability benefits. Indeed, based on the claimant's relatively low rate, and the abundance of sedentary jobs available, I could foresee no reason why the claimant could not have returned to work even if one accepts his subjective complaints especially since he does have experience as a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

communicator. This being the case, the amount of partial disability benefits owed would have been relatively nominal, if anything at all, and would have been limited to 300 weeks maximum. To pay $45,000.00 based on the claimant's relatively low wage at the time of his accident would have made no sense.

*2 In any event, my client is insistent upon the commutation of all worker's compensation benefits; not just disability. From a practical standpoint, it is hard for me to believe that the claimant would ever be able to come back and argue that his permanency increased since he is currently complaining subjectively of having severe aches and pains.

I apologize for any misunderstanding that you have had regarding the commutation but I think that you know me well enough to know that if anything, this is simply a failure to accurately communicate the settlement to each other. Since there is no meeting of the minds, there can be no settlement.

Appellee's counsel also sent to Appellant's counsel a copy of a letter to the Board which he had prepared on August 19, 1998. That letter provided:In addition, the parties were able to reach an agreement to commute all of the claimant's future rights to worker's compensation benefits with the exception of medical expenses causally related to the claimant's industrial accident. As a result, I enclose herewith a Petition to Commute the claimant's benefits. It is not necessary for the Board to schedule a Read-In Termination Hearing, because the employer had not filed a Petition to Terminate. However, because the claimant had been released to return to work by the IME physician, a petition to Terminate would have been filed had I not reached an agreement to commute the claimant's benefits as a by-product of the settlement for permanency benefits.

Appellee's counsel testified that although he might not have stated specifically that the proposed settlement would include any right Appellant would have for an increase in permanency and disfigurement in the future there was a reason he did not do this. Appellee's counsel thought that Appellant's counsel understood exactly what he meant when he stated that the settlement offer included everything but medical. Appellant's counsel testified the first time he heard of commutation of all future benefits was when Appellee's counsel phoned him and informed him there was a misun-

derstanding about the agreement.

Appellant filed a motion with the Board to enforce the settlement agreement on August 24, 1998 and a hearing was held September 3, 1998. The Board's order was issued September 17, 1998. The order stated in part:
Claimant argues that Mr. Austin's intent does not matter in making a determination as to whether there was an enforceable agreement between the parties and that the Board should look at what was said by Mr. Austin during negotiations. In support of his position claimant relies upon the following *dicta* in the *Kaiser Aluminum v. Matheson,* "the true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." Del.Supr., 681 A.2d 392 (1996) (citation omitted).
The *Kaiser* decision is inapplicable to the present case. *Kaiser* involved the interpretation of an ambiguity in a written agreement. In the present case, there was never an agreement. As soon as Mr. Austin received Mr. Ferry's letter he notified Mr. Ferry that there was a misunderstanding as to the terms of the agreement. Both Mr. Austin and Mr. Ferry agreed that neither spelled out the complete terms of the settlement agreement during negotiations. Furthermore, there was no evidence offered by Claimant that Mr. Austin specifically indicated that the settlement was only for total disability and permanent impairment benefits and then changed his mind.

*3 It is clear to the Board that there was no "meeting of the minds" between Mr. Austin and Mr. Ferry during the negotiation process and therefore no valid settlement agreement was reached. The evidence showed that Mr. Ferry labored under the assumption that the settlement involved total disability and permanent impairments benefits only and Mr. Austin labored under the assumption that the settlement involved all benefits except medical expenses.

Based on the foregoing, Claimant's Motion to Enforce Settlement is DENIED and the Board asks that the Department of Labor set a hearing date on the Petitions, which had been scheduled for August 19, 1998.

## II. STATEMENT OF FACTS RELATING TO THE PERMANENCY CLAIM

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                          Page 3
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

On March 9, 1998, Appellant filed a Petition to Determine Additional Compensation Due. In the petition, Appellant sought worker's compensation benefits for permanent injuries to his back, lower extremities, bowel, bladder and sexual function. The hearing was held December 21, 1998.

Appellant testified at the hearing that since his compensable work accident at Appellee's chicken plant in April of 1992, where he was electrocuted and suffered an injury to his lumbar spine, he has undergone approximately seven back surgeries. Since that time, Appellant has received total disability benefits, except for a short time when benefits were terminated. Appellant returned to light-duty work on May 26, 1992, and experienced back pain. In April of 1994, Appellant and Appellee agreed to a 23-1/2% permanency rating and award regarding Appellant's back.

Appellant testified that when he takes higher doses of medication, he is able to function for a fairly short period of time. On a bad day, he just lies in bed because of the excruciating pain. Appellant uses catheters and enemas supplied by the worker's compensation insurance carrier; his wife testified he must use them because she always sees these items in the bathroom trash.

Appellant testified that his bladder problems and sexual problems worsened after fusion surgery in September 1996. After this surgery he started using a catheter three times a day. He used MUSE therapy, which allowed him to have an erection. About six months before the hearing, Appellant started using Viagra. Appellant and his wife testified that the most severe sexual problems occurred after the 1996 operation. Appellant testified he was unable to have any sexual relations like he was able to before the accident.

It was revealed through the testimony of Appellant and his wife that Appellant had made the same sexual complaints before the 1996 operation; in fact he made these complaints right after the initial industrial accident. Appellant complained that he was unable to maintain an erection to have sexual relations with his wife. This was the reason why he went on MUSE therapy and later used Viagra after the 1996 operation.

Appellant testified he underwent a bladder test and a sleep study. The three-night sleep study was to determine his ability to obtain an erection. He testified that during this sleep study, the staff would not let him keep the TV on or let him take his pain medication and that made it harder to fall asleep. Appellant testified he cooperated with the people administering the bladder test.

*4 Appellant was questioned about surveillance videotapes taken by Stephen Greylock, a private investigator hired by Appellee. When questioned about a November 1997 videotape of him walking into the post office, Appellant responded that his spouse was bedridden and he was forced to undertake more household responsibilities. He had increased his medication and that allowed him to go to the post office without a cane. When questioned about an April 1998 videotape of him placing a post in the ground, Appellant stated that he had hired someone to build a fence around his trashcans. Appellant was asked by the fence builder, since Appellant was not going to be home, to put in one post to mark where the fence was going to go. Appellant increased his medication that day to put the one post in, not the four Mr. Greylock saw.

Randy Davis, M.D., a board-certified orthopedic surgeon, testified by deposition on behalf of Appellant. Dr. Davis has seen Appellant seven times, beginning January 6, 1997. Dr. Davis, with Dr. Long attending as neurosurgeon, performed surgery in December of 1997 to remove hardware, which previously had been placed in Appellant. In February of 1998, Appellant had a CAT scan which showed scarring near the area of the L 4-5 level. Dr. Davis stated that this kind of scarring is usual for someone who has had multiple surgeries.

The last time Dr. Davis saw Appellant was on March 23, 1998, and at that time, Appellant continued to report chronic lower back pain. Dr. Davis diagnosed Appellant's injury as post-laminectomy syndrome with cauda equina syndrome. Cauda equina syndrome involves a dysfunction of the nerve roots in the lower spine that help control bowel, bladder and sexual function. Dr. Davis said this diagnosis is consistent with Appellant's injuries and subjective complaints.

Dr. Davis stated the most serious objective findings were decreased reflexes and a neurogenic bladder. He also stated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 4
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

that Appellant's bowel and bladder problems are likely permanent. Significantly, Dr. Davis testified that although Appellant's bowel and bladder problems are likely permanent, this opinion is based on the truthfulness of what Appellant has told him. Dr. Davis referred to the spastic bladder test, which he used to determine Appellant had a neurogenic bladder, as highly subjective because of the different interpretations among urologists. Appellant has asserted that this test is objective in nature.

Dr. Davis testified that he did not believe Appellant's symptoms were psychogenic in nature. Regarding the surveillance videotapes, Dr. Davis remarked that a person's ability to function depends heavily on their intake of pain medication and he had advised Appellant to do as much as he could. Dr. Davis stated that when Appellant visited his office, during this same time period, he would use a four-point cane and move very slowly in the office. Dr. Davis did not doubt Appellant's subjective complaints, even after seeing the videotapes.

*5 Don Long, M.D., a board-certified neurosurgeon who is the chief of neurosurgery at John Hopkins and who helped write the AMA Guides to the Evaluation of Permanent Impairment ("AMA Guidelines"), testified by deposition on behalf of Appellant. While Appellant was under the care of Dr. Davis, Dr. Long performed surgery on Appellant on two separate occasions, March 5, 1997 and December 10, 1997. When Dr. Long operated on Appellant in December, he performed a poramanotomy at L5-S1, which involves decompression of the affected nerve. Dr. Long, at that time, diagnosed Appellant with cauda equina syndrome and failed back syndrome.

Dr. Long testified, based entirely on subjective complaints, that under Table 17 of the AMA Guidelines Appellant's bladder dysfunction is 40%, under Table 18 Appellant's bowel dysfunction is at least 50%, and under Table 19 Appellant's sexual dysfunction is 50%. If Appellant were able to stop the narcotic medication, his bowel and bladder function would improve. Dr. Long testified that at the time of his deposition there was no documented objective basis for the problems Appellant is having and if Appellant was not truthful, it is possible he might not have any impairment to his bowel, bladder and sexual function. He also had no reason to believe that Appellant is faking his symptoms.

Dewey Nelson, M.D., a board-certified urologist, testified by deposition on behalf of the Appellant. Dr. Nelson examined Appellant and reviewed his medical records on July 16, 1998. Using the AMA Guidelines, Dr. Nelson rated Appellant's bowel dysfunction as 50%, assigned a 70% rating for bladder dysfunction and found Appellant's sexual function to be 30%.

Dr. Nelson observed the videotapes and stated he is not an expert on surveillance and if a patient is taking narcotics he can do almost anything. Dr. Nelson stated that he believed Appellant was truthful regarding his complaints and discounted the possibility that Appellant's complaints were psychogenic. He believed there was ample neurological evidence to support Appellant's subjective complaints.

Lenny Edelsohn, M.D., a board-certified neurologist, testified by deposition on behalf of Appellee. Dr. Edelsohn first examined Appellant on May 7, 1996 in order to determine whether a proposed second fusion surgery was reasonable. Appellant had normal strength bulk tone throughout, which could mean he did not have an injury to the motor nerves. Dr. Edelsohn stated that the first fusion surgery might not have been needed. Dr. Edelsohn approved the second fusion surgery based on Appellant's subjective complaints and on x-rays that suggested a nonunion. At this time, Dr. Edelsohn stated he had not reviewed certain medical records relating to Appellant's propensity to exaggerate his complaints.

Dr. Edelsohn did a full neurological exam on December 4, 1997, during which Appellant continued to complain of low back pain going down through his legs, upper back pain, bowel dysfunction, bladder incontinence and impotence. When Dr. Edelsohn reviewed the records, he diagnosed the Appellant with chronic pain secondary to failed low back syndrome and cauda equina syndrome and he stated that the September 1996 surgery accomplished its purpose. Dr. Edelsohn also reviewed Dr. Long's report, stating there was a severe abnormality with Appellant's L-5 nerve root, which was an objective finding. On December 10, 1997, Appellant had the hardware from his lower back removed along with some scar tissue. Appellant continued to have the same complaints as before.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                Page 5
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

*6 Dr. Edelsohn was asked during his deposition about Appellant's records regarding his medical and psychological history. Specifically, Dr. Edelsohn was asked about Dr. Volatile's report after the first surgery. This report stated that Appellant had a very strange neurological examination for someone with only a small disc bulge at the L5-S1 level, and reoperating on Appellant would have an extremely low yield in regard to relief of pain and return to motor strength. He was asked about the social worker's report in 1992 which stated Appellant's primary focus was on seeking legal representation and acquiring food and money assistance and Dr. Rudin's notes taken January of 1997, stating Appellant relates at this point that he is not able to obtain an erection. Dr. Rudin's notes show that when Appellant questioned him whether something could have happened at the surgery that could have been responsible for that, Dr. Rudin reminded him that within several weeks post-operatively, he came in and stated that he had an erection but he had difficulty ejaculating, so that would be unlikely. Dr. Edelsohn stated this note makes it unlikely that the cause of the problem, if it exists, could be related to anything that was done at the time of the second surgery and these records draw Appellant's credibility into question.

Dr. Edelsohn, basing his permanent impairment estimates on objective findings only, stated the Appellant did not qualify for permanent impairment ratings to his bladder, bowel and sexual function. Dr. Edelsohn testified when considering subjective complaints based on AMA Guidelines, he rated Appellant's permanent impairment as 28% for his bladder dysfunction, 50% for his bowel and 40% for his sexual function. If Appellant's bowel, bladder and sexual function were caused by his medication, Dr. Edelsohn stated the dysfunction would not be considered permanent.

At both examinations by Dr. Edelsohn, Appellant walked into the office slowly with significant limitations in the movement of his back and used a four point cane on his second visit to the office. This was in stark contrast to what Dr. Edelsohn viewed on the surveillance tapes. Dr. Edelsohn testified that when he saw the surveillance tapes he saw a man that had no difficulty walking and he would not have felt that there was anything wrong with this man. Taking into account the medical records and the surveillance

tapes, Dr. Edelsohn had grave reservations about the credibility of the Appellant. Dr. Edelsohn did state that medications could be the reason Appellant looked so good in the videotapes.

Terrence Malloy, M.D., a board certfied urologist, testified by deposition on behalf of Appellee. Dr. Malloy examined Appellant and reviewed his medical records on May 28, 1998. He issued a report dated June 1, 1998, stating that he could not make a permanency opinion without a urodynamics test and a sleep study and noted that Appellant's success in obtaining an erection with the MUSE therapy indicates that his nerve roots are working.

*7 Appellant underwent a three night sleep study, which Dr. Joanne Getsy conducted at Hahnemann University Hospital. Dr. Getsy issued a report dated August 4, 1998, that stated she considered the tests non-diagnostic because Appellant did not sleep well. Appellant did not achieve an erection during the study and complained of being hungry through the nights and having generalized pain. Dr. Getsy did not state that she believed that Appellant was manipulating or intentionally avoiding the tests.

A video urodynamics test was conducted at Jefferson Hospital by Dr. Patrick Shenot, a urologist, on August 6, 1998 to determine whether Appellant's urinary symptoms were based on nerve damage or whether these symptoms arose from an emotional basis. Dr. Shenot concluded that Appellant had a dysfunctional bladder and he had stress urinary incontinence with leak pressure of 29 cm. Dr. Shenot did not state in his report that Appellant was attempting to manipulate the examination.

Dr. Malloy testified relying solely on his review of the two test reports. The urodynamics test showed that Appellant had normal sensations when his bladder was filled, indicating no nerve damage. In addition, EMG activity was normal, which showed Appellant had use of his sphincter. When Appellant was asked to try his hardest to urinate, he produced 25 centimeters of pressure, which is less than a paraplegic with a severed spine can produce. Dr. Malloy's opinion was this indicated that Appellant did not give full effort. Dr. Malloy stated that because of the results of the objective testing, Appellant has no ratable permanent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 6
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

impairment to his bladder or his bowels and the cause of his gastrintestinal tract problems could be the medications he takes.

Dr. Malloy testified that the three night sleep study was to determine whether there was an organic basis for Appellant's impotence. An organic basis exists If a patient does not obtain an erection during REM sleep. Dr. Malloy stated that Appellant's actions such as getting out of bed frequently, demanding that the television remain on and generally not cooperating with the sleep center staff rendered the sleep study invalid. When Appellant did sleep he did not achieve an erection. Appellant was Dr. Malloy's first patient in twenty-six years who refused to cooperate with the study. Based on Appellant's refusal to cooperate and his ability to obtain an erection with MUSE, Dr. Malloy concluded that Appellant has no sexual dysfunction.

Dr. Malloy testified that when Appellant came to see him, he used a four-point cane, moved slowly and deliberately and was in considerable pain. When Dr. Malloy testified about the surveillance tapes, he stated the tapes were extremely significant because the person he saw on the tapes was an entirely different person than the one he saw in his office. Dr. Malloy stated that if Appellant had neurological damage with continued problems, he would not be able, on one day, to dig holes and lift fence posts and then, the next day, have to walk with a cane.

*8 Wolfram Rieger, M.D., a board-certified psychiatrist, testified by deposition on behalf of Appellee. Dr. Rieger examined Appellant on March 12, 1993 and was deposed on September 30, 1993, over five years before the time of the hearing. Appellant's counsel objected to this testimony on the grounds it was irrelevant because Dr. Reiger examined Mr. Sowell for wholly unrelated matters at the very beginning of Appellant's treatment and it was highly prejudicial. The Board overruled this objection.

Dr. Rieger did not perform a physical examination of Appellant, only a psychiatric analysis. He administered to Appellant the MMPI-2, which tests the credibility of the patient. The MMPI-2 profile is not a valid indication of the individual's personality or symptoms; it can just help to determine credibility. Dr. Rieger concluded Appellant responded to test items in an exaggerated manner and endorsed a wide variety of inconsistent symptoms and attitudes. Dr. Rieger further concluded that, although he cannot say that Appellant does not have pain, he can state unequivocally that he exaggerated whatever pain he has.

Stephen Greylock, a licensed private investigator, testified on behalf of the Appellee. Mr. Greylock showed videotapes that he had taken of Appellant on November 22, 1997 and on April 27, 1998. Mr. Greylock had observed Appellant for around 26 hours over this period of time. The two snippets of videotape amounted to approximately two minutes.

The first videotape showed Appellant driving to the post office, walking without difficulty across the street with his daughter, up the steps into the post office and back to his car. The second videotape, to which Appellant's attorney objected because of camera difficulties, showed what appeared to be three posts in the ground, Appellant tamping the dirt around one post in the ground and walking without difficulty while carrying a 4 x 4 fence post.

Mr. Greylock testified that on April 27, 1998, for about 39 minutes he observed Appellant digging holes with a shovel, lifting and carrying 4 by 4 by 8 posts, placing the posts in the holes and packing dirt around the posts. Mr. Greylock was able to videotape only about two minutes of Appellant's activities because he was shooting through some branches and had camera difficulties.

In its decision of January 4, 1999, the Board made the following findings and conclusions:
Based on the testimony of Dr. Long, Dr. Edelsohn, Dr. Malloy, Dr. Rieger, Mr. Grelock [sic], and the surveillance tape, the Board finds that claimant is not credible. The MMPI-2 personality test results from 1993 showed exaggeration and inconsistency that Dr. Rieger attributed to Claimant purposely fabricating symptoms for secondary gain. Each of the other listed doctors, surveillance tape, expressed serious concerns regarding Claimant's credibility. In addition, based on Dr. Malloy's testimony, Claimant invalidated the sleep study by refusing to cooperate and he failed to put forth his best effort during the urodynamics test.
*9 In April 1998, Mr. Grelock [sic] witnessed Claimant digging holes and placing fence posts for nearly forty minutes,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 7
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

with no observable difficulty. The surveillance tapes sup-
ported Mr. Grelock's [sic] testimony. Furthermore, claimant
testified that he placed only one post in the ground to mark
the location of the fence, but the videotape showed that at
least three posts had been placed. If Claimant truly were
simply marking the location of the fence for someone else,
he could have driven a stake into the ground or made some
other mark that would not have required so much physical
exertion. For these reasons the Board does not find Claimant
credible.

Dr. Malloy, the only urologist to testify, found that Claimant
had no ratable permanent impairment to his bladder, bowel,
or sexual function. Dr. Long and Dr. Edelsohn agreed that,
based on objective findings only, Claimant has no perman-
ent impairment to these functions. Via the urodynamics test,
Dr. Malloy determined that Claimant's nerve roots were in-
tact and fully operative, which was supported by the fact
that Claimant was able, at times, to obtain an erection. Upon
examination, Dr. Malloy found no irritation on the penis,
normal rectal tone, and no fecal residue. Dr. Malloy dis-
missed the effect of "good days" versus "bad days" since
Claimant's type of injury is not susceptible to fluctuations in
the same way that arthritis or a muscle strain can be. Dr.
Malloy asserted that Claimant's dysfunction, if truly present,
could be a result of his medication. If so, Claimant does not
qualify for permanent impairment ratings, since the dys-
function would not be permanent. For these reasons, the
Board accepts Dr. Malloy's testimony and finds that
claimant has no ratable permanent impairment to his blad-
der, bowel, or sexual function.

### III. SUMMARY OF THE ARGUMENTS

Appellant appeals both the Board's decision regarding the
settlement agreement and the portion of the January 4, 1999
Board decision pertaining to the denial of permanency bene-
fits for his bowel, bladder and sexual functions.

With regard to the settlement issue, Appellant argues that
the Board should have used an objective test to determine
whether there was a contract to settle. Appellee maintains
that the Board did use the objective test of contract forma-
tion to decide there was no meeting of the minds as to the
terms of the settlement.

Appellant advances several arguments regarding the denial
of his claim for permanency benefits for his bowel, bladder
and sexual functions. Appellant argues that the Board ab-
used its discretion by admitting and considering the depos-
ition of Dr. Wolfram Rieger and the MMPI test conducted
by him in 1993. Appellant argues that this testimony was ir-
relevant, dated, and unduly prejudicial. Along with this Ap-
pellant also argues that they should have provided mental
health material earlier. That argument was not raised below;
consequently, it comes too late to be raised here. *Wilming-
ton Trust v. Connor,* Del.Supr., 415 A.2d 773, 781 (1980).
Appellant further argues that substantial evidence does not
support the Board's findings of fact that Appellant suffers no
permanent impairment to his bladder, bowel and sexual
function and that the Board ignored the objective findings
that supported his position.

**\*10** Appellee maintains the Board weighed the testimony at
the hearing and there was substantial evidence to support its
decision.

### DISCUSSION

### I. STANDARD OF REVIEW

The duty of this Court on an appeal from the Board is to de-
termine whether the Board's decision is supported by sub-
stantial evidence and is free from legal error. *Johnson v.
Chrysler Corp.,* Del.Supr., 213 A.2d 64, 66 (1965); *Devine
v. Advanced Power Control, Inc.,* Del.Supr., 663 A.2d
1205, 1209 (1995). Substantial evidence means such relev-
ant evidence as a reasonable mind might accept as adequate
to support a conclusion. *Oceanport Ind. v. Wilmington
Stevedores,* Del.Supr., 636 A.2d 892, 899 (1994); *Battista v.
Chrysler Corp.,* Del Super., 517 A.2d 295, 297 (1986), *app.
dism.,* Del.Supr., 515 A.2d 397 (1986). The Superior Court,
sitting as an appellate court, does not weigh the evidence,
determine questions of credibility, or make its own factual
findings. *Johnson v. Chrysler Corp.,* 213 A.2d at 66. It
merely determines if the evidence is legally adequate to sup-
port the agency's factual findings. *29 Del. C.* § 10142(d). In
reviewing the record for substantial evidence, the Court will
consider the record in the light most favorable to the party
prevailing below. *General Motors Corp. v. Guy,* Del.Super.,
C.A. NO. 90A-JL-5, Gebelein, J. (August 16, 1991). As to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

errors of law, the Court's review is plenary. *Brooks v. Johnson*, Del.Supr., 560 A.2d 1001, 1002 (1989).

### II. CONSIDERATION OF ISSUES ON APPEAL

A. Whether the Industrial Accident Board erred as a matter of law in denying the Appellant's motion to enforce the alleged settlement agreement between the two parties?

In *Anchor Motor Freight v. Ciabattoni*, Del.Supr., 716 A.2d 154 (1998), the Supreme Court reviewed the Industrial Accident Board's determination that an agreement had been reached in the context of a worker's compensation proceeding. Therein, the Court stated at page 156:

[T]he intent of the parties is generally a question of fact and in this case the Board was the fact finder. The Board evaluated the evidence and concluded that the parties had reached a meeting of the minds as to all material terms and had entered into a binding agreement notwithstanding the absence of a formal contract.

The Court concluded there was substantial evidence to support the Board's findings of fact that an agreement was reached.

In *Anchor Motor Freight v. Ciabattoni, supra,* the Supreme Court implicitly affirms that a "meeting of the minds" remains important in contract formation. Appellant, in his briefing, argues a meeting of the minds no longer is necessary, and cites to *Acierno v. Worthy Brothers Pipeline Corporation,* Del.Supr., 693 A.2d 1066, 1070 (1977), as support therefor. In *Acierno,* the Court states, with regard to an accord and satisfaction:

There is no requirement of an actual subjective meeting of the minds whether an accord and satisfaction is intended because a creditor's assent is imputed as a matter of law based upon its objective conduct.

*11 Obviously, a meeting of the minds remains important in the context of a contract other than an accord and satisfaction. *Anchor Motor Freight v. Ciabattoni,* 716 A.2d at 156.

When there is no meeting of the minds, there is no enforceable contract. *Middle States Drywall, Inc. v. DMS Properties-First, Inc .,* Del.Super., C.A. 95L-01-041, Del Pesco, J. (May 28, 1996) at 18.

In order for an express contract or legal obligation to arise and be legally enforceable it is necessary that there be mutual assent of the parties. [Citation omitted.] There must be common intention a meeting of the minds on all terms thereof. [Citation omitted.]

*Carradin v. Carradin,* Del. Ch., C.A. No. 5668, Harnett, V.C. (September 25, 1980) at 5. The burden is on the plaintiff "to prove by a preponderance of the evidence that there was such mutual assent that a legally binding contract arose." *Id.*

However, in determining if there has been a meeting of the minds, the Court looks to objective evidence, not subjective intent.

It is basic that overt manifestations of assent - not subjective intent-controls the formation of a contract; that the "only intent of the parties to a contract which is essential is an intent to say the words or do the acts which constitute their manifestation of assent"; that the "intention to accept is unimportant except as manifested. [Citations omitted.]"

*"Industrial America", Inc. v. Fulton Industries, Inc.,* Del.Super., 285 A.2d 412, 415 (1971). *Accord Norse Petroleum A/S v. LVO Intern, Inc.,* Del.Super., 389 A.2d 771, 775 (1978).

In the case at hand, the Board looked at whether the parties reached an agreement. The Board heard testimony from the attorneys. It also reviewed the letters, which the parties do not dispute reflect both parties' respective understandings of the agreement they thought they reached. The testimony and letters show that they did not agree on essential terms. They both thought different things. Appellant thought the agreement was for commutation of total disability benefits only while Appellee thought it was for commutation of all future benefits except medical expenses. [FN1] To employ Appellee's phrase, one was talking apples and another was talking oranges.

> FN1. Appellant argues that it is his version of the contract which should have been enforced. There is no reason why Appellee's version could not have been the enforceable version. That there are two potentially enforceable versions of the contract

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 9
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

evidences there was no meeting of the minds.

The mere fact the parties said they had an agreement does not make an agreement exist. There actually had to be an agreement on the essential terms. The objective evidence shows the parties never agreed to the basic and essential terms of the contract. Thus, there was substantial evidence to support the Board's finding that the parties never reached an agreement.

A. Whether the Board abused its discretion by admitting and considering the deposition of Dr. Wolfram Rieger and the MMPI test conducted by him in 1993.

Appellant argues the Board's admission of Dr. Rieger's deposition and the results of the MMPI test unfairly prejudiced him. Appellant claims he was prejudiced because the report was more than five years old, the testimony only dealt with Appellant's psychiatric ability and the MMPI test Dr. Rieger relied upon in his deposition is not a reliable indicator in diagnosing pain conditions. In a hearing to determine worker's compensation benefits, the Board is not strictly bound by the rules of evidence. Rule 14(B) of the Industrial Accident Board Rules states:

*12 The rules of evidence applicable to the Superior Court of the State of Delaware shall be followed insofar as practicable; however, that evidence will be considered by the Board which, in its opinion, possesses any probative value commonly accepted by reasonably prudent men in the conduct of their affairs. The Board may, in its discretion, disregard any customary rules of evidence and legal procedures so long as such a disregard does not amount to an abuse of discretion.

An abuse of discretion occurs where the Board exceeds "the bounds of reason in view of the circumstances and has ignored recognized rules of law or practice so as to produce injustice. Pitts v. White, Del.Super., 109 A.2d 786, 788 (1954)." McDowell v. State of Delaware, Del.Super., C.A. No. 88A-JN-3, Steele, J. (March 14, 1991) (ORDER) at 2. The Court must look to see if admitting Dr. Rieger's deposition produced an injustice; if an injustice occurred, the Board abused its discretion and the decision should be reversed.

The Board admitted Dr. Reiger's deposition because there were many questions about Appellant's credibility. The function of reconciling inconsistent testimony or determining credibility is exclusively reserved for the Board. Simmons v. Delaware State Hospital, Del.Super., 660 A.2d 384, 388 (1995). The Board is given substantial leeway in this task. Walbert v. General Metal Corp., Del.Super., C.A. No. 97A-04-003, Terry, J. (Nov. 26, 1997). The doctors that testified were deposed for this case based most of their diagnoses on Appellant's subjective complaints. This fact calls into question the credibility of Appellant because he is the source of the information. The evidence raising credibility issues were as follows: the urodynamic test, about which Dr. Malloy testified that Appellant did not use any more force than a paraplegic to urinate; the sleep study, during which Appellant did everything he could to make sure the study did not work out; and the surveillance tapes, which showed Appellant functioning normally. The Board admitted Dr. Reiger's deposition as secondary evidence to help them evaluate Appellant's credibility since the Board had legitimate reservations about his credibility.

Appellant argues that by admitting this dated, irrelevant deposition into evidence and relying on it to such an extent, an injustice was done. Dr. Reiger's deposition was not irrelevant because Appellant's ongoing problems are related to the prior procedures that were a result of Appellant's compensable work injury in 1993. Thus, under D.R.E. 403 this deposition was probative in nature and did not unduly prejudice the Appellant. Also, this deposition was just a little piece of the puzzle on which the Board relied to determine whether Appellant was credible. The MMPI-2 test on which Dr. Reiger relied in making his determination is talked about in one line of the decision. The Board, in its decision, focuses on the surveillance tapes and testimony of Mr. Greylock. Also, the Board used Appellant's lack of cooperation with the urodynamics test and sleep study to determine his credibility.

*13 The Court finds no error of law by the Board in admitting Dr. Rieger's deposition. The admission of this deposition was probative in nature and did not unduly prejudice Appellant nor was it an abuse of discretion by the Board. In fact, there was plenty of other testimony that called Appel-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 10
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
(Cite as: Not Reported in A.2d)

lant's credibility into question. His own actions were what prejudiced him.

B. Whether substantial evidence supports the Board's findings of fact that Mr. Sowell suffers no permanent impairment to his bladder, bowel and sexual function?

Appellant argues substantial evidence does not support the decision of the Board on the findings regarding impairment to his bladder, bowel and sexual function. Appellant argues that the Board ignored and disregarded testimony of Appellant's physicians and chose to believe Appellee's physicians. Appellant contends that the Board ignored the objective evidence presented by his experts, which was as follows: the evidence of scar tissue in Appellant's back, the need for medications to sustain an erection, and Appellant's use of catheters and enemas.

There was testimony that scar tissue in the back is not unusual for someone who has had multiple surgeries in that area. Appellant states that because there was scar tissue in his back, which led to a diagnosis of cauda equina syndrome, a neurologist would be more qualified to rate his impairment then a urologist. Appellant's diagnosis of cauda equina syndrome was based on subjective complaints, this is why Dr. Malloy ordered the video urodynamics test to determine if there was scarring of the end organ that would affect the nerve roots that go into the bowel, bladder and sexual function as opposed to the nerve roots at the surgical site. The roots at the surgical site were the only ones tested by the EMG dated January 7, 1997. Dr. Nelson, Appellant's expert witness, admitted these studies are performed by a urologist, not a neurologist and that a urologist deals with sexual and bladder dysfunction. Dr. Nelson found it significant that Appellant had a spastic neurogenic bladder and that, to him, indicated that Appellant has bladder problems. Dr. Davis, Appellant's expert witness, testified that most urologists believe that the spastic bladder test is somewhat of a subjective test. Dr. Long testified if Appellant were able to stop the narcotic medication, his bowel and bladder function would improve. Thus, there might not even be a need for a urologist or neurologist. Appellant seems to want the Court to overlook that the only objective tests performed were ordered by Dr. Malloy and that the majority of the doctors' diagnoses, which were based on subjective complaints, were

done before those doctors had the benefit of the results of these tests.

Appellant argues the need for medications to sustain an erection meant he had a loss of sexual function. Dr. Malloy ordered a sleep test study to see if there was an organic basis for Appellant's loss of sexual function. Appellant did not cooperate with the three night sleep test study. Dr. Malloy testified that it does not take a very sophisticated person to realize that if you do not sleep and if you move around a lot, you are probably not going to get to the stage where the spontaneous erection will happen. Since Appellant did not cooperate with the sleep study and the use of MUSE therapy indicates his nerve roots are working, the Board could only find there was not an organic basis for Appellant's lack of sexual function. Even Appellant's own expert witnesses based their diagnoses on Appellant's subjective complaints. Dr. Davis testified that his opinion about Appellant's sexual function, bowel and bladder is based on the truthfulness of what Appellant has told him. Dr. Long testified that if Appellant was not truthful, it is possible he might not have any impairment to his bowel, bladder and sexual function.

*14 Appellant wants the Court to believe that because he used catheters and enemas he had bowel and bladder problems. There was evidence of irritation at the penis tip indicating catheter use. That finding only indicated Appellant used them, not that he needed them. Again, doctors, prescribed the catheters and enemas based on Appellant's subjective complaints.

When an expert's opinion of the causality of the injury is based in large part on the patient's recital of subjective complaints and the trier of facts finds the underlying facts to be different, the trier is free to reject the expert's conclusion. *Breeding v. Contractors-One-Inc.,* Del Supr., 549 A.2d 1102, 1104 (1998). It is entirely proper and appropriate for the Board to accept the medical testimony of one expert witness over that of another. *Simmons v. Delaware State Hosp.,* Del.Supr., 660 A.2d 384, 388 (1995). The record in this case was fully developed. The record shows the opinions rendered of Appellant's injuries were mostly based on his subjective complaints. Thus, the Board could reject those opinions based on Appellant's subjective complaints when it found the underlying facts to be different from those upon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                          Page 11
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

which the opinions were based. Furthermore, the Board ac-
cepted Dr. Malloy's testimony, and that acceptance was
within the Board's purview. *See Simmons v. Delaware State
Hosp.,* 660 A.2d (proper and appropriate for the Board to
accept the medical testimony of one expert witness over that
of another); *General Motors Corp. v. McNemar,* Del.Supr.,
202 A.2d 803 (1964)(where conflicting expert medical opin-
ions are presented, it is within the province of the Board to
weigh the medical testimony and to resolve the conflicting
opinions).

The Board, as the finder of fact, performed its duties as re-
quired by statute. The Court will not substitute its judgment
for the Board's and make its own factual findings and con-
clusions as to this case. A review of the entire record indic-
ates there was substantial evidence for the Board to decide
there was no permanent impairment to Appellant's bladder,
bowel, and sexual function

### CONCLUSION

The Court concludes as follows. The Board did not commit
an error of law when it refused to enforce the settlement
agreement. The Board did not abuse its discretion by admit-
ting Dr.Reiger's deposition. Finally, there is substantial
evidence in the record to support the Board's conclusion that
the Appellant suffers no permanent impairment to his blad-
der, bowel and sexual function. The decision of the Board is
affirmed.

IT IS SO ORDERED

Del.Super.,2000.
Sowell v. Townsends, Inc.
Not Reported in A.2d, 2000 WL 305502 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.