IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED

APR 17 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CRYOVAC INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1278-KAJ |
| | ) | |
| PECHINEY PLASTIC PACKAGING, | ) | |
| INC., | ) | REDACTED |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM OPINION

John W. Shaw, Esq., Karen E. Keller, Esq., Michele Sherretta, Esq., Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, 1000 West St.,
Wilmington, Delaware 19801; Counsel for Plaintiff.
    Of Counsel: Ford F. Farabow, Jr., Esq., Joann M. Neth, Esq., Courtney B.
    Meeker, Esq., Mark J. Feldstein, Esq., Rebecca D. Hess, Esq., Finnegan,
    Henderson, Farabow, Garrett & Dunner, L.L.P., 901 New York Avenue, NW,
    Washington, D.C. 20001.

N. Richard Powers, Esq., Connolly Bove Lodge & Hutz, 1007 North Orange St., P.O.
Box 2207, Wilmington, Delaware 19899; Counsel for Defendant.
    Of Counsel: Donald P. Cassling, Esq., Steven R. Trybus, Esq., Shelley Smith,
    Esq., Brian P. O'Donnell, Esq., Jenner & Block LLP, One IBM Plaza, Chicago, IL
    60611.

Wilmington, Delaware
April 17, 2006

JORDAN, District Judge

## I.   INTRODUCTION

This patent infringement case is set to be tried to a jury beginning on June 12, 2006. Plaintiff Cryovac, Inc. ("Cryovac") has accused defendant Pechiney Plastic Packaging, Inc. ("Pechiney") of willfully infringing claim 11 of U.S. Patent No. 4,755,419 (issued July 5, 1988) (the "'419 patent"), and of tortious interference with contract and prospective business relations. (Docket Item ["D.I."] 185, the "Second Amended Complaint.") Pechiney has denied infringement and tortious interference, and has counter-claimed that the patent is invalid and unenforceable. (D.I. 260, Amended Answer to the Second Amended Complaint at 11-15.)

Presently before me are six motions filed by Cryovac and Pechiney. Pechiney has filed a Motion for Summary Judgment on Patent Issues (D.I. 195), a Motion for Summary Judgment on Lost Profits (D.I. 193), a Motion for Partial Summary Judgment on Tortious Interference Claims (D.I. 197), and a Motion to Strike an affidavit submitted by Cryovac (D.I. 281). Cryovac has filed a Motion for Summary Judgment that Pechiney Infringes Claim 11 of the '419 Patent (D.I. 201), and a Motion to Exclude Expert Testimony (D.I. 199). Jurisdiction is appropriate under 35 U.S.C. §§ 1331 and 1338. For the reasons that follow, Cryovac's Motion for Summary Judgment (D.I. 201) will be granted as to literal infringement. Pechiney's Motion for Summary Judgment on Patent Issues (D.I. 195) will be granted as to infringement under the doctrine of equivalents, and denied in all other respects. Cryovac's Motion to Exclude Expert Testimony (D.I. 199) will be granted to the extent that Pechiney's experts will not be

1

permitted to provide legal opinion or argument, and denied in all other respects. All of

the other motions will be denied.

## II.    BACKGROUND

### A.    The '419 Patent

The '419 patent discloses "[a] multilayer film with a combination of oxygen barrier

properties, toughness, shrinkability, and good optical properties" ('419 patent, Abstract),

used "to package various articles, including perishable food products" (*id.* at col. 1, lns.

10-11). Claim 11, the only claim asserted, is for:

> An oriented coextruded film having at least seven layers arranged symmetrically
> comprising:
>     (a) a core layer comprising an ethylene vinyl alcohol copolymer;
>     (b) two intermediate layers each comprising a polyamide;
>     (c) two outer layers each comprising a polymeric material or blend of
>     polymeric materials; and
>     (d) two layers, each comprising an adhesive polymeric material, which
>     adhere each of said intermediate layers to a respective outer layer.

('419 patent, at col. 9, ln. 67 - col. 10, ln. 9).

The specification of the '419 patent defines various terms, including "oriented."

U.S. Patent No. 4,755,419 at col. 3, lns. 45-49. Additionally, the specification describes

suitable components for each of the layers, and gives a preferred total thickness for

each of the layers. (*See* '419 patent, at col. 5-6.) For example, the specification

indicates that intermediate layers 12 and 14 "comprise polyamide, and more preferably,

a copolymer of nylon 6 and nylon 12 ... each layer can form between 5% and 25% of

the total thickness of the multilayer film." (*Id.* at col. 5, lns. 7-22.) Similar examples are

given for each of the other layers of the film. (*See id.* at col. 5, ln. 23 - col. 6 ln. 34

2

(discussing components of outer layers 16 and 18); *id.* at col. 6 lns. 39-68 (discussing adhesive layers 20 and 22).)

## B.    Pechiney's ClearShield™ Product

Cryovac and Pechiney compete in the market for packaging materials for meat. Pechiney markets a product known as "ClearShield," which competes with Cryovac specifically in the bone-in, fresh, red meat packaging market. Cryovac alleges that Pechiney's ClearShield film infringes claim 11 of the '419 patent.

ClearShield is a coextruded seven layer film containing an ethylene vinyl alcohol copolymer core layer, two intermediate layers, each comprising a polyamide, two adhesive layers made of polymeric material, and two outer layers made of polymeric material. (Deposition of Dr. Eldridge Mount, III,[1] D.I. 202, Ex. 5 at 14:1-2; *id.* at 18:8-20:17.) The two outer layers of ClearShield, called the outer surface layer and outer sealant layer by Pechiney, have different thicknesses and chemical compositions. (Declaration of Michael Douglas,[2] D.I. 213 at ¶¶ 19, 21-29.) For all twenty-six different product specifications for ClearShield, the outer surface layer of ClearShield has a thickness▬▬▬▬ of the total thickness of the film, while the outer sealant layer has a total thickness ▬▬▬▬. (*Id.* at ¶ 19.) Additionally, for each of the twenty-six product specifications, the outer surface layer and the outer sealant layer contain different

---

[1] Dr. Eldridge Mount is an expert witness for Pechiney. (D.I. 213, Ex. 5 at ¶ 2.)

[2] Michael Douglas is an employee of Pechiney's successor, Alcan Packaging, Inc., who helped in the research and development of ClearShield. (D.I. 213, Ex. 3 at ¶¶ 1, 4.)

amounts of ███████, a slip and antiblock agent.[3]  (*Id.* at ¶¶ 21-24.)  For all of the

product specifications, the outer surface layer contains between ███████████

███████, and the outer sealant layer contains between ████████████████.  (*Id.* at

¶¶ 21-24.)

## C.    Prior Art Films

In making its invalidity argument, Pechiney focuses on two prior art films that it

alleges are "oriented" within the meaning of claim 11 of the '419 patent.

### 1.    *Allied Film*

Commencing around 1983, Dr. Seymour G. Gilbert[4] conducted a study for Allied

Chemicals ("Allied") on a seven layer film having the structure

HDPE/tie/nylon/EVOH/nylon/tie/HDPE (the "Allied Film").  (Declaration of Dr. Seymour

G. Gilbert, D.I. 213, Ex. 4 at ¶ 9.)  This study was described in at least one article that

was publicly available in December of 1984, and one news release from Allied.  (*Id.*)

Dr. Gilbert stated in his declaration that, based on his recollection of experiments

performed on the Allied Film on the Instron Tester, which "provides stress data relating

to orientation," and "Cross Polarization to visualize orientation," it was oriented.  (*Id.* at ¶

16.)  Dr. Gilbert's recollection provides the only evidence that this film was oriented, and

there are no test results or other laboratory data regarding the orientation of this film.

---

[3] The more ███████ that is added to a layer, the more slippery that layer
becomes.  (*See* D.I. 298 at 59:3-15.)

[4] Dr. Gilbert served as Professor of the Food Science Department at Rutgers
University from 1965-1988.  (D.I. 213, Ex. 4 at ¶ 4.)

4

2.    *ANR Film C*

Allied disclosed in a news release a nine-layer film with the structure

HDPE/tie/nylon/tie/EVOH/tie/nylon/tie/HDPE("ANR Film C"). (D.I. 216, Ex. 17 at

A0226.)  The results contained in that news release were presented to a regional

conference of The Society of Plastics Engineers, Inc. on September 5 and 6, 1985.

(*Id.*, Ex. 16.)  The news release disclosed that ANR Film C was 1.4 mils[5] thick, and had

certain barrier protection properties. (*Id.*, Ex. 17 at A0227-29.)  Pechiney asserts that

this shows that the news release "inherently disclosed that ANR Film C was oriented."

(D.I. 196 at 13.)  There is no statement in the news release, however, that expressly

indicates that ANR Film C was oriented.  Additionally, the news release stated that

"[c]ombinations of nylon and EVOH do not, Dr. Gilbert's tests showed, produce a

significant synergistic effect in terms of barrier properties compared to a nylon-only

coextrusion or an EVOH-only coextrusion." (D.I. 216, Ex. 17 at A0224.)

D.    **Cryovac's Relationship with National Beef**

Cryovac and National Beef Packing, LLC ("National Beef") had a business

relationship that began sometime in the late 1990s. (D.I. 251, Deposition of Terry L.

Wilkerson[6] at 110:25-111:10.)  During that period, National Beef purchased ▮▮▮ of its

packaging requirements for particular products from Cryovac. (*Id.* at 110:25-111:10,

---

[5] A mil is defined as "a unit of length equal to 1/1000 inch used esp. in measuring thickness (as of plastic films)".  Merriam-Webster's Collegiate Dictionary 736 (10th ed. 2002).

[6] Terry L. Wilkerson is the National Beef Executive Vice President of Strategic Business Growth, and the person at National Beef with whom Cryovac negotiated its contracts. (D.I. 250 at March 2003 Agreement, January 2004 Agreement.)

130:1-17, 131:12-133:12.)  In March of 2003 and January of 2004, Cryovac negotiated

agreements with National Beef that covered the periods from January 1, 2003 to

December 31, 2005, and January 1, 2004 to December 31, 2007, respectively.  (D.I.

250 at March 2003 Agreement, January 2004 Agreement.)  Both Agreements stated

that they would "serve as documentation of our current packaging agreement."  (*Id.* at

B001, B003.)  Additionally, both agreements provided discounts to National Beef on

various products sold by Cryovac, which discounts were "contingent upon combined

minimum annual purchases of Barrier Bags, TBG Bags, HS film and Case-Ready

lidding exceeding ███████████."  (*Id.*)  Both agreements also provided for cash rebates

based on the value of goods purchased by National Beef from Cryovac, starting at ████

██████.  (*Id.* at B001, B004.)  The January 2004 agreement further provided that, "[i]n

the event that National Beef's packaging purchases fall short of 2003 minimum volume

targets due to market conditions other than the use of competitive supply, Cryovac will

consider the minimum volume target to have been met."  (*Id.* at B003).

## III.    STANDARD OF REVIEW

### A.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary

judgment if a court determines from its examination of "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,"

that there are no genuine issues of material fact and that the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether there is a

genuine issue of material fact, a court must review the evidence and construe all

inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### 1. *Patent Infringement*

A patent infringement analysis involves two steps: claim construction and then the application of the construed claim to the accused process or product. *Markman*, 52 F.3d at 976. The first step, claim construction, has been held to be purely a matter of law. *Cybor*, 138 F.3d at 1454-56. The second step, application of the claim to the accused product, is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001) (Patent infringement, "whether literal or under the doctrine of equivalents, is a question of fact."). The patent owner has the burden of proving infringement by a preponderance of the evidence.

7

*Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984) (citing *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed. Cir. 1983)).  Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury.  *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).

      2.    *Patent Invalidity*

When a party challenges a patent's validity, the starting point for analyzing that challenge is the statutory presumption of validity.  *See* 35 U.S.C. § 282 ("A patent shall be presumed valid.").  Accordingly, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* Invalidity must be shown by clear and convincing evidence. *Robotic Vision Sys. v. View Eng'g, Inc.*, 189 F.3d 1370, 1377 (Fed. Cir. 1999).  This presumption of validity is never weakened, and the burden of proving invalidity does not shift from the party asserting invalidity. *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 745 F. Supp. 998, 1004 (D. Del. 1990) (citing *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1574-75 (Fed. Cir. 1984) (other citations omitted)).

**B.    Motion to Exclude Expert Testimony**

Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or to exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary

evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id.* at 750.

## IV.    DISCUSSION

### A.    Infringement

#### 1.    *Literal Infringement*

Cryovac and Pechiney have cross-moved for summary judgment on literal infringement. (D.I. 195; 201.) Both parties focus their arguments on their claim construction positions for the term "arranged symmetrically." (*See* D.I. 196 at 20-24; D.I. 202 at 13-17.) Essentially, both sides argue that they should win on claim construction, and thus on summary judgment as well. (*Id.*) I have construed the term "arranged symmetrically," largely as Cryovac advocated, to mean "putting the layers in a desired symmetrical order when the film is viewed in cross-section, so that the layers are in the same order on each side of the core of the film, for example c/d/b/a/b/d/c. This claim phrase limits only the arrangement of the layers, but does not require precise identity in the thickness of the layers or the amounts of recited components or additives that may be included in the layers." (*See* D.I. 304 at 13-15.) Thus, although I did not adopt Cryovac's construction in its entirety, I did not construe "arranged symmetrically" to mean that the film must have geometric symmetry with respect to the thickness and chemical composition of the layers, as Pechiney had urged.

9

Pechiney essentially conceded at oral argument that, if I accepted Cryovac's

proposed construction of the claim term "arranged symmetrically," then the ClearShield

product met that limitation.  (D.I. 298, Oral Argument Transcript, at 57:11-18.)[7]  Indeed,

the vast majority of Pechiney's arguments, both in its opposition to Cryovac's motion

and in its support of its own motion, rely on my adopting Pechiney's position on claim

construction.  (D.I. 196 at 20-24; D.I. 239 at 8-15; D.I. 280 at 2-4.)  As I have construed

the term "arranged symmetrically," there is effectively no dispute between the parties as

---

[7] As a good advocate must, Pechiney's attorney agreed when agreement was
essential, though he hedged where he could.  The exchange, in relevant part, was as
follows:

The Court: ... Assume for purposes of argument I were to accept Cryovac's
version of 'symmetrically arranged.'  Do you agree that there is infringement?

[Counsel]: Your Honor, I would agree if you accept [Cryovac's] definition of
'symmetrically arranged[,]' we meet symmetrically arranged.'  Depending on what
'simultaneously' means and 'coextruded,' we put forth affirmative proof that we don't do
'simultaneously,' if that is meant to indicate some simultaneous event taking place in
the coextrusion die.  So that issue would still be out there.

The Court: So really, the difference in the percentages there that were at least
alluded to here in the courtroom today along with differences in thickness.  It comes
down to and I view that as not a distinction in kind that would make it asymmetrically
arranged.

[Counsel]: Well, Your Honor, let me clarify what I meant.  If Your Honor adopts
what they propose, and all that needs to happen is the c/d/b/a/b/d/c order, it's true layer
one and layer seven meet C.  I think they are significantly different with the antiblock.
There are three times as much antiblock in layer seven as there is in layer one.  That is
done for a particular intentional reason and there is a dramatic difference between the
way those two layers react.

So, if Your Honor include (sic) in the definition something more than I can just
label this as something that has some at least polymeric material in it, which is all that C
requires.  If all you have to do is label it as C, then I would agree that it can be labeled
as C.

If 'arranged symmetrically' has some more meaning than that, then there is a
difference in kind between layer one and layer seven.
(D.I. 298 at 57:8-58:15.)

10

to whether Pechiney meets the terms of the claim,[8] and thus summary judgment of literal infringement will be granted to Cryovac.

Pechiney further argues, however, that Cryovac is, at most, entitled to summary judgment that one of Pechiney's twenty-six product specifications, Z-9001 F, infringes claim 11 of the '419 patent, because it is the only specification cited in Cryovac's briefing. (D.I. 239 at 18-19.) Cryovac responds by stating that it cited testimony about ClearShield film generally, that Z-9001 F is the product specification used to make the vast majority of ClearShield film on the market, that, at the very least, all of the films made by the same product specification as Z-9001 F infringe the '419 patent, and that Pechiney's expert witness testified that Z-9001 F was "representative of the class." (D.I. 278 at 16-19.)

Pechiney's argument has little merit. Although there are twenty-six different product specifications for ClearShield, those twenty-six specifications have been grouped by Pechiney into four "Composition Combinations." (*See* Declaration of Michael Douglas, D.I. 213, Ex. 3 at ¶¶ 21-24.) It therefore appears that different product specifications in the same Composition Combination have the same composition, at least with respect to the outer surface and outer sealant layers. (*Id.*)

Combination One applies to product specification Z-9001 F, as well as six other product specifications. (*Id.* at ¶ 21.) Because at least the outer surface and outer

---

[8] Pechiney's counsel also stated that there could still be an issue as to infringement with respect to the construction of the term "coextruded." (D.I. 298 at 57:13-18.) However, as I stated in my claim construction ruling (*see* D.I. 304 at note 1), the parties appear to agree on a key aspect of the meaning of this term, and Pechiney effectively conceded that the ClearShield product met the claim limitation "coextruded" under that agreed-to meaning. (D.I. 240 at 26-27; D.I. 239 at 15-16.)

sealant layers of these seven films share the same composition, films made under all of the product specifications identified under Combination One literally infringe claim 11 of the '419 patent. Additionally, Combinations Two and Three, which apply to two and sixteen product specifications, respectively, have only small differences from Combination One. The outer surface and outer sealant layers in films made under both Combinations Two and Three contain identical amounts of ████, which is identified as an antioxidant, in addition to the components of Combination One. (*Id.* at ¶¶ 22-23.) Combination Three also contains a higher percentage of ██████, the slip/antiblock agent, than Combinations One and Two in the outer surface layer. (*Id.* at ¶¶ 22-23.) Other than these minor differences, the outer surface and outer sealant layers of films made under Combinations Two and Three are identical to those made under Combination One. Thus, films made under the product specifications identified under Combinations Two and Three literally infringe claim 11 of the '419 patent under my construction of the term of that claim. Finally, Combination Four has only one product specification, DZ-9004-1, which Cryovac has agreed does not infringe claim 11 of the '419 patent. (D.I. 278 at 20.) Thus, summary judgment of literal infringement will be granted to Cryovac as to all ClearShield product specifications except DZ-9004-1.[9]

---

[9] Indeed, Pechiney's argument may be, for practical purposes, moot, as Pechiney's 30(b)(6) witness, Michael Douglas, testified that the "vast majority of [Pechiney's] production" was under product specification Z-9001 F, and that "there may be a small amount being run Z-9002 F [also made under Combination One], but I'm not sure about that." (D.I. 243, Ex. Z at 20:11-21:2.) Douglas further stated that, to his knowledge, none of the other product specifications currently accounted for films being sold in the market. (*Id.* at 21:3-5.)

2.    *Doctrine of Equivalents*

Pechiney has moved for summary judgment that there is no infringement under

the doctrine of equivalents. (D.I. 196 at 24-28.) Cryovac responds only by saying that

the doctrine of equivalents does not apply to this case. (D.I. 241 at 16.) Because

Cryovac is not asserting a case of infringement under the doctrine of equivalents,

summary judgment on this issue will be denied as moot.

**B.    Invalidity**

Pechiney has moved for summary judgment that the patent is invalid because it

is anticipated, obvious, and not enabled. Because there are genuine issues of material

fact with respect to each of these issues, summary judgment of invalidity will be denied.

1.    *Anticipation*

Pechiney argues that, under its construction of the term "oriented," both the

Allied Film and ANR Film C anticipate the invention disclosed in claim 11 of the '419

patent. (D.I. 196 at 30-31; D.I. 280 at 6-7, 11.) Pechiney makes no argument as to

whether claim 11 is anticipated by the Allied Film or ANR Film C when the term

"oriented" is construed to include the limitation "this stretching accomplished by a

racking or blown bubble process," as I have construed it.[10]  (*See* D.I. 304 at 9, 14.)

---

[10] There would be genuine issues of material fact as to Pechiney's evidence that
the Allied Film and ANR Film C are oriented under any definition of that term. With
respect to the Allied Film, Pechiney bases its assertion that the Allied Film was oriented
on the statement of Dr. Gilbert that "[i]t was [his] recollection that results of the Instron
Tester and the Cross Polarization tester showed that the [Allied Film] ... was oriented."
(D.I. 213, Ex. 4 at ¶ 16.) Cryovac disputes this conclusion, and notes that Dr. Gilbert
failed to cite "a single piece of data, laboratory notebook entry, notes, drawings, or other
evidence" that would corroborate Dr. Gilbert's recollection as to whether the Allied Film
was oriented. (D.I. 241 at 18.) Thus, even if Pechiney's definition of "oriented" were
still in play, there would be an issue of fact as to whether that film was oriented.

13

Therefore, given the construction I have arrived at, Pechiney's motion for summary judgment of anticipation must be denied.

2.    *Obviousness*

Pechiney argues that, even if the Allied Film and ANR Film C are not oriented, and thus do not anticipate the invention of claim 11 of the '419 patent, it would have been obvious to a person of ordinary skill in the art to orient those films. (D.I. 196 at 33-37.) Pechiney asserts that oriented films, and the particular processes used to orient films, were well known in the art, and that the advantages of oriented films were also well known, such that a person of ordinary skill in the art would have been motivated to orient a multilayer film such as the Allied Film or ANR Film C. (*Id.* at 35-37.) Cryovac, however, counters by arguing that there would not have been motivation to orient those films, and that a person of ordinary skill in the art would not have had an expectation of success in doing so. (D.I. 241 at 31-32.) Indeed, Cryovac claims that the prior art taught away from orienting those films. (*Id.* at 32.)

"While the ultimate question of patent validity is one of law, ... [obviousness] lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved ... . Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966). The legal question of obviousness is based on factual issues, and "when material facts are disputed, and testimonial, documentary, and expert

14

evidence are needed for their resolution, summary adjudication is not indicated." *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed. Cir. 1991).

There are genuine issues of material fact with respect to at least the scope and content of the prior art and the motivation to combine prior art references to produce the invention in claim 11 of the '419 patent. Pechiney argues, and cites prior art to support its argument, that the prior art taught the elements of claim 11 of the '419 patent and that a person of skill in the art would have been motivated to orient films such as the Allied Film or ANR Film C. (D.I. 196 at 33-37.) However, Cryovac cites the declaration of its expert, Dr. Garth L. Wilkes, who in turn cites prior art that would have taught away from orienting EVOH-containing multilayer films. (Affidavit of Garth Wilkes, D.I. 242 at ¶¶ 30-37.) More specifically, Dr. Wilkes cites to prior art showing the difficulty of orienting multilayer films (*Id.* at ¶ 30 (citing U.S. Patent No 4,501,797)) and the difficulty of orienting layers or films containing EVOH (*Id.* at ¶ 31 (citing U.S. Patent No. 4,610,914). This disagreement between the experts as to whether the prior art would have motivated one of ordinary skill in the art to make the invention of the '419 patent creates a genuine issue of material fact, and thus, summary judgment on obviousness must be denied.

3.    *Enablement*

Finally, Pechiney asserts that claim 11 of the '419 patent is invalid for lack of enablement. (D.I. 196 at 37-38.) Pechiney argues that the '419 patent teaches nothing new about how to orient a multi-layer film, and that if a person of ordinary skill in the art would not have been motivated to orient the films in the manner already known in the prior art, then the patent calls for a new but untaught type of orienting and is therefore

15

not enabled. (*Id.* at 38.) Cryovac responds that, based on the information in the patent specification and the prior art, one of ordinary skill in the art could have made and used the invention. (D.I. 241 at 35-37.) "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997). To prove that a patent claim is not enabled, the accused infringer must prove that "one of ordinary skill in the art would be unable to make the claimed invention without undue experimentation." *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360 (Fed. Cir. 1998).

Pechiney's argument essentially boils down to an assertion that if claim 11 is not invalid for obviousness, then it must be invalid for lack of enablement. Pechiney, however, has not presented evidence sufficient to show that there is no genuine issue of material fact as to whether one of ordinary skill in the art could have made the invention of claim 11 of the '419 patent without undue experimentation. Pechiney's assertions that the patent teaches nothing new about orientation are met by Cryovac's contention that the '419 specification provided "detailed formation methods" on how to orient the film in the patent. Because Pechiney has failed to meet its burden of showing that there is no genuine issue of material fact regarding enablement, summary judgment on this point must also be denied.

16

## C.    Tortious Interference

Pechiney has moved for partial summary judgment on Cryovac's tortious

interference claims.[11]  A plaintiff alleging a claim for tortious interference with contract

must prove: "(1) a valid contract; (2) about which the defendants have knowledge; (3)

an intentional act by the defendants that is a significant factor in causing the breach of

the contract; (4) done without justification; and (5) which causes injury."  *Gill v.*

*Delaware Park*, LLC, 294 F. Supp. 2d 638, 645 (D. Del. 2003).  "[T]o establish a claim

for tortious interference with a prospective contractual relationship, a plaintiff must

prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of

the relationship or expectancy on the part of the interferer; (3) intentional interference

which induces or causes a breach or termination of the relationship or expectancy; and

(4) resulting damages to the party whose relationship or expectancy has been

---

[11] The parties appear to dispute whether the law of Delaware, where both
Cryovac and Pechiney are incorporated, or the law of Kansas, the location of National
Beef's plants, or the law of Missouri, the location of National Beef's offices, or the law of
South Carolina, Cryovac's place of business, applies.  However, the parties apparently
agree (*see* D.I. 198 at 13-14; D.I. 250 at 9-10) that the law of tortious interference with
contract and tortious interference with prospective contractual relations is essentially
the same in all four states.  *See Dickens v. Snodgrass, Dunlap & Co.*, 872 P.2d 252,
257 (Kan. 1994) (stating elements of tortious interference with contract claim); *Turner v.
Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986) (stating elements of tortious
interference with prospective contractual relations claim); *Tri-Continental Leasing Co. v.
Neidhardt*, 540 S.W.2d 210, 212 (Mo. Ct. App. 1976) (stating elements of toritous
interference with contract claim); *Carter v. St. John's Regional Medical Center*, 88
S.W.3d 1, 13 (Mo. Ct. App. 2002) (stating elements of tortious interference with
prospective contractual relations claim); *DeBerry v. McCain*, 274 S.E.2d 293, 296 (S.C.
1981) (stating elements of tortious interference with contract claim); *Crandall Corp. v.
Navistar Int'l Transp. Corp.*, 395 S.E.2d 179, 180 (S.C. 1990) (stating elements of
tortious interference with prospective contractual relations claim).  Therefore, the
resolution of Pechiney's Motion for Partial Summary Judgment on the tortious
interference claims does not depend on a choice of law determination, and, for
convenience, I cite to precedent based on Delaware law.

disrupted." *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 5 F. Supp. 2d 238, 243 (D. Del. 1998).

Pechiney first claims that it should be granted summary judgment on Cryovac's tortious interference claims because the state law causes of action for tortious interference with contract and tortious interference with a prospective contractual relationship are precluded by federal patent law. (D.I. 198 at 14-19.) Pechiney further argues that, even if the claims are not precluded, Cryovac cannot establish that there was a valid contract between Cryovac and National Beef (*id.* at 20-28), nor can it establish that Pechiney knew about such a contract, if it existed (*id.* at 28-31), or that Pechiney's actions in dealing with National Beef were wrongful (*id.* at 31-33). Cryovac responds by arguing that the claims are not precluded (D.I. 250 at 9-13), that it did have a contract with National Beef (*id.* at 14-34), that there are genuine issues of material fact as to whether Pechiney knew or should have known about that contract (*id.* at 35-37), and that Pechiney's actions were wrongful because they involved willful infringement of the '419 patent (*id.* at 37-39). I address each of these arguments in turn.

### 1.    *Preemption*

Under the Supremacy Clause of the United States Constitution, art. IV, cl. 2, "state law that conflicts with federal law is 'without effect.'" *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1331 (Fed. Cir. 1998) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).[12]  A law can be preempted in one of

_____

[12] Hunter-Douglas was later overruled on a point not pertinent here. *See Midwest Industries, Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1358-59 (Fed. Cir.

18

three ways: by explicit Congressional statement, by field preemption, or by an actual

conflict between the state and federal laws. *Hunter Douglas*, 153 F.3d at 1332. There

is no explicit preemption of state law tortious interference claims in the patent statute,

*see* 35 U.S.C. §§1-376, and the Federal Circuit Court of Appeals has ruled that "there is

no field preemption of state unfair competition claims that rely on a substantial question

of federal patent law." *Hunter Douglas*, 153 F.3d at 1333. Thus, a state law claim is

preempted by federal patent law only in the third instance, i.e., when the state law

"stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (analyzing

question of preemption of a state statute requiring aliens to register with the state); *see*

*also Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964) (finding that state

unfair competition law cannot "give protection of a kind that clashes with the objectives

of the federal patent laws").

The Federal Circuit appears to have addressed the issue of whether a state law

tortious interference with contract claim conflicts with federal patent law on two separate

occasions. *See Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998);

*Hunter Douglas*, 153 F.3d 1318. In *Dow Chemical*, the Court found that a state law

claim for tortious interference with actual and prospective contractual relations was not

preempted by federal patent law, even where it requires the adjudication of a question

1999) (holding that Federal Circuit would henceforth apply its own law rather than
regional circuit law to "questions involving the relationship between patent law and other
federal and state law rights.").

19

of federal patent law. *Dow Chem.*, 139 F.3d at 1473. In *Dow Chemical,* the plaintiff
sued the defendant-patentee for a declaratory judgment that the patent was not
infringed, was invalid for inequitable conduct before the Patent & Trademark Office, and
for state law claims of unfair competition based on the defendant-patentee's threats to
sue the plaintiff and the plaintiff's customers for patent infringement. *Id.* at 1471-72.
Similarly, in *Hunter Douglas*, the plaintiff sought a declaratory judgment that the
defendant-patentee's patent was not infringed, was invalid, and was unenforceable due
to inequitable conduct. *Hunter Douglas*, 153 F.3d at 1321-22. The plaintiff further
sought various state law remedies based on the defendant-patentee's actions in telling
the plaintiff's customers that the plaintiff did not have the right to sell its products
because they were covered by the defendant's patent. *Id.* at 1322. However, the Court
in *Hunter Douglas* found that the state law claims were preempted by federal patent law
using an "as-applied" approach, finding that the plaintiff's tort action was based on
conduct that was protected by federal patent law. *Id.* at 1335-36 (citing *Sears*, 376 U.S.
at 231.).

Naturally, Cryovac relies on *Dow Chemical*, while Pechiney relies on *Hunter
Douglas.* It is unnecessary for me to harmonize those cases or to decide which case to
apply, since this case presents a totally dissimilar factual scenario. In both of those
cases, the accused infringer attempted to use state law unfair competition claims,
based on the patentee's allegedly inequitable conduct in front of the Patent &
Trademark Office, to limit the right to assert the patent. *See Dow Chem.*, 139 F.3d at
1471-72; *Hunter Douglas*, 153 F.3d at 1321-22. Thus, in both *Dow Chemical* and

20

*Hunter Douglas*, the state law unfair competition claim presented at least some conflict with a patent owner's right under the patent statute to exclude others from making, using, or selling a patented product. Here, however, there is no such conflict. Cryovac, the patent owner, is asserting that Pechiney willfully infringed the '419 patent, and that Pechiney, partially through that infringement, tortiously interfered with Cryovac's relationship with National Beef. The unfair competition claims here are being used in conjunction with and not in opposition to the patent rights.

Furthermore, the tortious interference claims, even though they are based in part on Cryovac's assertion that Pechiney willfully infringed claim 11 of the '419 patent, require Cryovac to prove a number of things in addition to willful infringement, including the existence of a contract or a valid business relationship or expectancy and the knowledge Pechiney allegedly had of the contract or the relationship (*see supra* at 16). *See Dow Chem.*, 139 F.3d at 1477 ("a tort claim for intentional interference with contractual relations requires elements entirely different to those required for inequitable conduct"). Therefore, Cryovac's tortious interference claim is not preempted by patent law. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306 (Fed. Cir. 1999) (holding that a patentee could sue for tortious interference along with its claims of infringement).

### 2.    *Existence of a Contract*

Pechiney asserts that it should be granted summary judgment on Cryovac's tortious interference claims because Cryovac cannot show that it had a contract with National Beef. (D.I. 198 at 20-28.) In particular, Pechiney argues that the document Cryovac alleges was a contract contains no quantity term, and additionally cannot be

viewed as a requirements contract. (*Id.*) Pechiney further argues that National Beef did

not intend to be bound by any agreement with Cryovac. (*Id.* at 27-28.) Cryovac

responds that it did have a requirements contract with National Beef (D.I. 250 at 17-32),

and that National Beef intended to be bound by that contract (*id.* at 16-17; 32-34).

Each party cites a number of cases which it claims supports its position on whether

there was a contract, and each argues that the facts of this dispute are similar to the

cases it puts forward. All of these arguments, however, essentially amount to factual

disputes over the meaning of the contract language and the intent of the parties. In

short, there are genuine issues of material fact with respect to whether Cryovac and

National Beef had a binding requirements contract.

      The documents that Cryovac alleges are contracts with National Beef each

contain a minimum purchase requirement of ▓▓▓▓▓▓▓▓ for National Beef to receive the

agreed on product discounts and cash rebates. (D.I. 250, March 2003 Agreement at

B001-02; *id.* at January 2004 Agreement at B003-04.) Additionally, the January 2004

Agreement contains a provision that states "[i]n the event National Beef's packaging

purchases fall short of 2003 minimum volume targets due to market conditions other

than the use of competitive supply, Cryovac will consider the minimum volume target to

have been met." (*Id.*, January 2004 Agreement at B003.) There are several courts that

have found, in situations similar to the instant dispute, that a requirements contract

either did exist or that there were issues of fact as to whether a requirements contract

existed. *See, e.g. Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817-

18 (7th Cir. 1999) (holding that, although the language of the contract was permissive

22

when it said the buyer could purchase "such quantities of the items listed herein as [it] might order or schedule" and that the "Buyer shall have the right at any time and from time to time to cancel, in whole or in part, the deliveries specified and the authorizations contained in any shipping schedule given to the Seller", "we must conclude that the contract, taken as a whole, is ambiguous and that further investigation as to whether the parties intended a requirements contract is required"); *Kansas Power & Light Co. v. Burlington N. Ry. Co.*, 740 F.2d 780, 788-89 (10th Cir. 1984) (finding that a requirements contract existed where the contract "provide[d] for an incentive pricing system based on tonnage shipped" and had a term that stated that in years where the buyer's requirements fell below a certain level, "carriers [would] seek to amend the tariff to reduce the annual minimum tonnage requirement" for the buyer); *O.N. Jonas Co., Inc. v. Badische Corp.*, 706 F.2d 1161, 1164-65 (11th Cir. 1983) (finding that the statement "[a] potential program utilizing our yarn was discussed in 1977 and we indicated that we would supply the yarn if we were provided a Heller guaranty on our form" was sufficient to show a requirements contract "in light of the business dealings" between the parties.) Thus, there are genuine issues of material fact as to whether Cryovac and National Beef had a binding requirements contract based on the March 2003 and January 2004 agreements and based on the course of dealing and performance between those parties.

3.     *Pechiney's Knowledge of the Alleged Contract*

Pechiney next claims that even if Cryovac and National Beef did have a contract, the undisputed facts show that Pechiney had no knowledge of the contract, and thus, that Cryovac's claim of tortious interference with contract must fail. (D.I. 198 at 28-31.)

23

Pechiney claims that National Beef did not believe that it had a binding contract with

Cryovac, and thus did not tell Pechiney about any contract. (*Id.* at 29-30.) Pechiney

also points to statements by its employees that they had no knowledge of any contract

between National Beef and Cryovac. (*Id.* at 30-31.) Cryovac contends, however, and

Pechiney does not dispute, that Pechiney knew that Cryovac supplied 100% of National

Beef's packaging products (*see* D.I. 251, Deposition of Thomas Grabowski[13] at 212:1-

8), that Cryovac's pricing was contingent on Cryovac continuing to be National Beef's

100% supplier (*id.*), and that National Beef was intending to award a contract in early

2004 for 100% of its packaging needs (D.I. 251, Ex. CC at B190). This evidence

creates a genuine issue of material fact as to whether Pechiney knew about the alleged

contract between Cryovac and National Beef.

        4.    *Pechiney's Wrongful Means*

      Finally, Pechiney asserts that it is entitled to summary judgment on Cryovac's

tortious interference with prospective contractual relations claim because Cryovac

cannot establish that Pechiney acted wrongfully. (D.I. 198 at 31-33.) Pechiney

essentially argues that, because it conducted research and got a non-infringement

opinion, it acted in good faith and cannot be held liable for tortious interference. (*Id.*)

However, "[s]ummary judgment is notoriously inappropriate for determination of claims

in which issues of intent, good faith, and other subjective feelings play dominant roles."

*Haft v. Dart Group Corp.*, 841 F.Supp. 549, 577 (D. Del. 1993) (quoting *DeLong Corp.*

*v. Raymond Int'l, Inc.*, 622 F.2d 1135, 1146 (3d Cir. 1980)). Additionally, Cryovac

---

[13] Thomas Grabowski is an employee of Pechiney who participated in
negotiations with National Beef. (D.I. 251, Ex. CC at B189-93.)

asserts that Pechiney's initial opinion, the only opinion it had before marketing

ClearShield, was insufficient because, among other things, it failed to analyze claim 11

of the '419 patent, the only claim in suit. (D.I. 250 at 39 (citing D.I. 251, Ex. G at

B113).) Thus, there are genuine issues of material fact with respect to whether

Pechiney acted wrongfully.

Accordingly, because Cryovac's tortious interference claims are not preempted,

and because there are genuine issues of material fact as to whether there was a

contract between Cryovac and National Beef, as to whether Pechiney knew about any

such contract, and as to whether Pechiney acted wrongfully, summary judgment on

Cryovac's tortious interference claims will be denied.

### D.     Lost Profits

Pechiney has moved for partial summary judgment that Cryovac is not entitled to

lost profits damages because of the existence of non-infringing alternatives, namely

products produced by Curwood, Inc. ("Curwood").[14]  (D.I. 193.)  Cryovac counters by

arguing that there are genuine issues of material fact as to whether the products

produced by Curwood were available non-infringing alternatives (D.I. 244 at 12-17), and

that, under *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573 (Fed. Cir. 1989),

Cryovac is entitled to lost profits based on the sales it would have made but for

Pechiney's sales of the ClearShield product.

_____

[14] The opinion in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978) sets forth a widely accepted test, although not an exclusive test, for lost profits.  The court there stated that, to get lost profits, "a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made."  *Id.*

In support of its argument that Curwood's products were not acceptable non-infringing alternatives, Cryovac asserts that its products outperformed Curwood's products. (*See* D.I. 244 at 13-14 (citing, *e.g.*, D.I. 246, Ex. A at CR014-000581 ("The Curwood package did not perform well at destination, defect rate of 19% vs. the Cryovac package of less than 5%").) Cryovac also argues that Curwood did not compete with Cryovac because it did not offer a complete line of packaging products. (D.I. 244 at 14.) Additionally, the evidence from an internal Pechiney document shows that, prior to Pechiney's entry into the market, Cryovac held ▬▬ of the market, while Curwood held only ▬. (D.I. 243, Ex. R at PPPI 0008241.) Thus, Cryovac has shown that there are genuine issues of material fact as to whether Curwood offered a non-infringing alternative.

Furthermore, damages for lost profits may be awarded, even where there are non-infringing alternatives, based on a patentee's previous share of the market. *See State Indus., Inc.*, 883 F.2d at 1580 ("[T]he district court acted well within its discretion when it awarded damages for [Defendant]'s infringing activity based on [Patentee]'s share of the market."). Thus, even if Curwood did produce a product that was a non-infringing alternative, it is possible for Cryovac to be awarded lost profits damages based on the market share it held prior to Pechiney's entrance into the market. The motion for partial summary judgment on lost profits must therefore be denied.

### E.    Cryovac's Motion to Exclude Expert Testimony

Cryovac has moved under Federal Rules of Evidence, 702, 703, and 403 to exclude the testimony of two of Pechiney's experts, Dr. Eldridge Mount and Mr. Larry

Evans. (D.I. 199.) Pechiney responds by arguing that Cryovac's assertions go to the weight the expert testimony should be given, not its admissibility (D.I. 252 at 2).

Federal Rule of Evidence 702 obligates judges to ensure that any scientific or technical testimony admitted is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...." The party offering the expert testimony has the burden of proving admissibility. *See Daubert*, 509 U.S. at 592 n. 10 (citation omitted). The expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. *See Joiner v. General Elec. Co.*, 522 U.S. 136, 144 (1997) (noting failure of plaintiffs to explain "how and why [they] ... could have extrapolated their opinions"); *Kumho Tire*, 526 U.S. at 152 (an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Daubert*, 509 U.S. at 590 (expert's testimony "must be supported by appropriate validation").

Further, Rule 702 requires that expert testimony assist the trier of fact. In other words, it must "fit" the issues in the case by having a valid connection to the pertinent inquiry. *Daubert*, 509 U.S. at 591-92. The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts

27

known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir.1999).

Federal Rule of Evidence 703 provides, in relevant part, that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Federal Rule of Evidence 403 provides that relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury... ."

### 1. *Dr. Mount*

Cryovac claims that the portions of Dr. Mount's opinion that deal with invalidity based on the Allied Film should be excluded under Federal Rules of Evidence 702, 703, and 403, and that Dr. Mount's opinion on non-infringing alternatives should be excluded because it lacks support. (D.I. 200 at 16-22.) Specifically, Cryovac asserts that Dr. Mount's opinion is inadmissible because it was not derived by a scientific method (*id.* at 16), it is not objectively verifiable (*id.* at 17), it will not assist the trier of fact (*id.* at 17-18), it does not rely on the type of data reasonably relied on by experts in the field (*id.* at 18-19), it is unfairly prejudicial (*id.* at 20-21), and it will confuse the jury (*id.* at 21). Each of these arguments, however, is simply an attack on Dr. Mount's reliance in his report on the statements of Dr. Gilbert regarding the Allied Film. (*Id.* at 16-22.) In forming his opinion on invalidity, Dr. Mount relied on, among other things, Dr. Gilbert's statement in his declaration that, based on his recollection of experiments

28

performed on the Allied Film on the Instron Tester and Cross Polarization testing, the Allied Film was oriented (Declaration of Dr. Seymour G. Gilbert, D.I. 213, Ex. 4 at ¶ 16). (Second Supplemental Report of Eldridge Mount, D.I. 213, Ex. 5 at Ex. D at 4-6.) Cryovac claims that Dr. Gilbert's statement in his declaration is uncorroborated and that Dr. Mount's reliance on it makes Dr. Mount's opinion inadmissible under Rule 702, 703, and 403. (D.I. 200 at 16-21.)

However, Cryovac does not contend that the tests performed by Dr. Gilbert are unreliable, but rather that it is improper to rely on Dr. Gilbert's uncorroborated memory. (*Id.*) Pechiney asserts that Dr. Gilbert's recollection is corroborated by an article entitled "Nylon Film Effective Packaging" published on December 14, 1984 in the Journal of Commerce (*See* D.I. 216, Ex. 18 at A0231-33), a news release presented at a regional conference of The Society of Plastics Engineers, Inc. on September 5 and 6, 1985 (D.I. 216, Ex. 16, 17), and an article published in a 1997 issue of the Journal of Food Science (D.I. 216, Ex. 19). (*See* D.I. 252 at 7-11.) It appears, therefore, that there is arguably some corroboration of Dr. Gilbert's recollection, and thus Dr. Mount's reliance on Dr. Gilbert's statements is an issue that can fairly be dealt with on cross-examination, as it goes to the weight, not the admissibility of Dr. Mount's testimony.

Having said that, though, I emphasize that I have defined the term "oriented" to include a process limitation, such that a film is "oriented" under my construction only if it is "accomplished by a racking or blown bubble process." (*See* D.I. 304 at 9, 14.) There is nothing in the declaration of Dr. Gilbert that indicates the process by which the Allied Film was oriented, if it was oriented. (D.I. 213, Ex. 4.) Accordingly, Dr. Mount's

29

testimony cannot include assertions about anticipation, since there is no evidence in the record that the Allied Film was oriented in the manner stated in the patent.

Cryovac also claims that Dr. Mount's opinion on non-infringing alternatives lacks support, and that it should thus be excluded. (*Id.* at 21-22.) Cryovac asserts that the documents that Dr. Mount attempted to rely on do not support his opinion, and that his opinion should thus be excluded. (*Id.* at 22.) Again, however, this argument goes to the weight that should be given to his expert testimony, not its admissibility. Cryovac's motion to exclude the testimony of Dr. Mount will therefore be denied.

        2.    *Mr. Evans*

Cryovac also asserts that the damages opinion of Mr. Evans should be excluded in its entirety. With respect to Mr. Evans' opinion regarding non-infringing alternatives, Cryovac claims that Mr. Evans is unqualified to testify on the existence of non-infringing alternatives (D.I. 200 at 23), that his opinion on non-infringing alternatives is based on evidence that does not meet the requirements of Rule 703 (*id.* at 23-24), and that the evidence he relies on would be unfairly prejudicial to Cryovac (*id.* at 24-25.) Further, Cryovac asserts that Mr. Evans' patent damages opinion should be excluded because there is no evidence to show the existence of acceptable non-infringing alternatives. (*Id.* at 25-26.) Pechiney responds by saying that Mr. Evans is not opining on non-infringing alternatives but is relying on the opinion of Dr. Mount in this matter in forming his opinion on damages in the form of lost profits. (D.I. 252 at 27-30.) While Cryovac is correct that Mr. Evans may not himself opine on whether there are acceptable non-

infringing alternatives, Mr. Evans may rely on the testimony of Dr. Mount in forming his

opinion on lost profits.

Cryovac has also moved to exclude Mr. Evans' opinions on the basis that they

contain improper opinions on patent and contract law. (D.I. 200 at 26-32.) Cryovac is

correct that Mr. Evans's opinions go beyond opining on what the appropriate measure

of damages should be, and make what amounts to legal argument on patent and

contract law. As just one example among many, Mr. Evans states:

> The alleged contracts with National Beef, i.e. Cryovac's and [Pechiney's], were not contracts at all. As I indicated in my Initial Report, they were no more than 'price sheets'. No quantities were stated. National Beef could switch suppliers at any time. If National Beef did so, it would only lose its price protection and the possibility of volume discounts. In my nearly 30 years of corporate management experience, I have negotiated more than 30 to 40 supply agreements. These agreements specified, inter alia, quantities to be purchased or 'requirements', price and allowable escalation and dispute resolution. The alleged 'agreements' cited by Mr. Nawrocki are not supply or requirements contracts nor are they fixed quantity contracts, and they do not obligate National Beef to purchase bags nor do they obligated Cryovac to supply bags.

(D.I. 207, Ex. 5 at ¶ 17; *see also* D.I. 207, Ex. 3 at ¶¶ 33-34, 41, 43; *id.*, Ex. 5 at ¶¶ 10,

12.) Such testimony on substantive areas of patent or contract law is impermissible.

*Revlon Consumer Prods. Corp. v. L'Oreal S.A.*, C.A. No. 96-192-MMS, 1997 WL

158281, at *3 (D. Del. Mar. 26, 1997) (stating that expert "may not testify as to

substantive issues of patent law"); *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.*, C.A.

No. 88C-JA-155, 1995 WL 628447, at *3 (Del. Super. Apr. 22, 1995) ("the proper scope

of expert testimony intersects with the law of contract interpretation, which firmly

prohibits expert testimony as to legal duties, standards or ramifications arising from a

contract. Such testimony is reversible error and is not repaired by cross-examination")

31

(citing *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 508 (2d Cir. 1977) ("the

District Court erred in permitting Friedman, an expert witness called by plaintiffs, to give

his opinion as to the legal obligations of the parties under the contract")).  Thus,

Cryovac's Motion to Exclude will be granted to the extent that Mr. Evans will be

confined at trial to opining on what the damages award in this case should be if

Pechiney's legal positions are accepted.  He will not be permitted to advocate legal

positions for Pechiney by opining on the substance of case law, or on the validity of any

contract between Cryovac and National Beef.  The Motion to Exclude will be denied in

all other respects.

### F.    Pechiney's Motion to Strike Deily Declaration

In support of its opposition to Pechiney's Motion for Partial Summary Judgment

on Lost Profits, Cryovac filed the Affidavit of Karl Deily.  (D.I. 245.)  Pechiney has

moved to strike that affidavit, contending that it is not made on personal knowledge,

lacks foundation, and is speculative and conclusory.  (D.I. 281.)  Because I did not rely

on that affidavit in deciding Pechiney's Motion for Partial Summary Judgment on Lost

Profits, the Motion to Strike will be denied as moot.

### V.    CONCLUSION[15]

Accordingly, Cryovac's Motion for Summary Judgment that Pechiney Infringes

Claim 11 of the '419 Patent (D.I. 201) will be granted as to all ClearShield product

---

[15] This Opinion is filed under seal because much of the parties' briefing was filed
under seal.  The parties are in the best position to suggest, in the first instance, what
redactions, if any, should be made in this opinion to preserve confidential information.
The parties should confer and agree upon redactions, and submit them within two
weeks of the date of this Opinion.

specifications except DZ-9004-1. Pechiney's Motion for Summary Judgment on Patent Issues (D.I. 195) will be denied as moot to the extent that it seeks a judgment that there is no infringement under the doctrine of equivalents, and it will be denied in all other respects. Cryovac's Motion to Exclude Expert Testimony (D.I. 199) will be granted to the extent that Mr. Evans is precluded from opining on the substance of case law or on the validity of any contract between Cryovac and National Beef, and to the extent that Dr. Mount will not be permitted to opine that prior art films are "oriented" as that term is used in the patent; that Motion will be denied in all other respects. Pechiney's Motion for Summary Judgment on Lost Profits (D.I. 193) and Motion for Partial Summary Judgment on Tortious Interference Claims (D.I. 197), will be denied, and Pechiney's Motion to Strike (D.I. 281) will be denied as moot. An appropriate order will follow.

33