# EXHIBIT A

LEXSEE 2005 U.S. DIST. LEXIS 5803

**ADVANCED MEDICAL OPTICS, INC., a Delaware corporation, Plaintiff, v. ALCON INC., a Swiss corporation, and ALCON LABORATORIES, INCORPORATED, a Delaware corporation, Defendants.**

**Civil Action No. 03-1095-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 5803*

**April 7, 2005, Decided**

**SUBSEQUENT HISTORY:** Findings of fact/conclusions of law at *Advanced Med. Optics, Inc. v. Alcon Labs., Inc., 2005 U.S. Dist. LEXIS 33369 (D. Del., Dec. 16, 2005)*

**PRIOR HISTORY:** *Advanced Med. Optics, Inc. v. Alcon Inc., 361 F. Supp. 2d 404, 2005 U.S. Dist. LEXIS 4897 (D. Del., 2005)*

**COUNSEL:** **[*1]** Richard L. Horowitz, Esq. and David E. Moore, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, for Plaintiff. Of Counsel: A. James Isbester, Esq. and Gillian W. Thackray, Esq., Isbester & Associates, Berkeley, California.

Josy W. Ingersoll, Esq. and Melanie K. Sharp, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Defendants. Of Counsel: Robert G. Krupka, Esq. and Erica S. Olson, Esq., Kirkland & Ellis, LLP, Los Angeles, California.

**JUDGES:** JORDAN, District Judge.

**OPINIONBY:** Kent Jordan

**OPINION:**

MEMORANDUM OPINION

Wilmington, Delaware
April 7, 2005

**JORDAN, District Judge**

**I. INTRODUCTION**

This is a patent infringement case. Presently before me are two *Daubert* motions n1 filed by defendants Alcon Laboratories, Inc. and Alcon Manufacturing, Ltd. (col-

lectively, "Alcon") seeking to exclude the testimony of two experts, Dr. Randall Olson (*see* Docket Item ["D.I."] 156) and Mr. Harold Walbrink (*see* D.I. 160), offered by Advanced Medical Optics, Inc. ("AMO") pursuant to *Federal Rule of Evidence 702.* Jurisdiction is proper under *28 U.S.C. § § 1331* and *1338.* For the reasons **[*2]** that follow, Alcon's motions will be granted in part and denied in part.

n1 The motions are based upon *Federal Rule of Evidence 702* and the Supreme Court's direction in *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, and later cases that district court judges are to perform a "gatekeeping" function when considering the admissibility of expert testimony. (D.I. 156; 160.)

**II. BACKGROUND**

The background related to the patents in suit is set forth in the Opinion construing the disputed claim terms. (D.I. 238 at 1-5.)

**III. STANDARD OF REVIEW**

Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 749 (3d Cir. 1994)* (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). n2 **[*3]** "When the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will

Case 1:04-cv-01278-KAJ    Document 327-2    Filed 05/12/2006    Page 3 of 21

Page 2
2005 U.S. Dist. LEXIS 5803, *

give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id. at 750.*

> n2 The Federal Circuit applies the law of the regional circuit in reviewing decisions on whether to admit expert testimony, and, therefore, the Third Circuit's holdings on the issue are binding precedent. *Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003)* ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we ... [apply] the law of the regional circuit... .").

## IV. DISCUSSION

*Federal Rule of Evidence 702* obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* **[*4]** *Rule 702* provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...." The party offering the expert testimony has the burden of proving admissibility. *See Daubert, 509 U.S. at 592 n. 10* (citation omitted). The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id. at 589-90.* Further, *Rule 702* requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id. at 591-92.*

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts at issue. *Id. at 592-93.* **[*5]** As part of that inquiry, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999).*

Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field. *See Redman v. John D. Brush & Co., 111 F.3d 1174,* *1179 (4th Cir. 1997)* (metallurgist not qualified to testify about industry standards for safes); *Barrett v. Atl. Richfield Co., 95 F.3d 375, 382 (5th Cir. 1996)* (expert not qualified to testify about correlation of chemical effects on rats and on humans). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder. *See McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir. 1987)* (expert permitted to testify as to the customary duty of factory representatives in the air compressor industry, but should **[*6]** not have been permitted to opine on breach of such duty because the jury was equally qualified to make that determination); *S.E.C. v. Lipson, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998)* ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

A. Dr. Olson

Pursuant to *Federal Rule of Evidence 702*, Alcon seeks to preclude Dr. Olson from testifying in regard to four categories of issues (D.I. 156), each of which will be discussed in turn.

1. General sales and market analysis

Alcon seeks to preclude Dr. Olson from testifying in regards to a general sales and market analysis of phacoemulsification devices. (D.I. 157 at 7-11.) Specifically, Alcon notes four opinions rendered by Dr. Olson on this topic:

> (1) "In regards to companies selling phacoemulsification equipment, I believe there is a competitive disadvantage for any company that does not have Occlusion Mode on its equipment. (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.)
>
> (2) "I think that [if] that information [on Occlusion Mode were] out there and appropriately marketed **[*7]** [it] would produce a huge competitive advantage for whoever had occlusion mode." (D.I. 158, Ex. 3 at A172, Dep. of Dr. Olson at 58:14-17, Oct. 11, 2004.)
>
> (3) "Fluidics drives sales, because removing the air reduces the post-occlusion surge and therefore allows high aspiration levels to be used safely." (D.I. 158, Ex. 1 at A022, Dr. Olson's Revised Expert Disclosure at 21.)

2005 U.S. Dist. LEXIS 5803, *

(4) General comments on Alcon's financial size and market strength. For example, "they're the 800 pound gorilla," (D.I. 158, Ex. 3 at A134, Dep. of Dr. Olson at 8:25, Oct. 11, 2004 ), "they're the biggest. They're the strongest." (*Id.* at A138, 12:12.)

(D.I. 157 at 8.) Alcon asserts that "these opinions venture outside Dr. Olson's general area of cataract surgery because they require specific knowledge about how the phacoemulsification market has responded to Occlusion Mode and the '765 patent, and should be excluded for that reason." (*Id.*) In support of its position, Alcon argues that Dr. Olson admitted during his deposition that he lacks specialized training in analyzing sales or market trends for phacoemulsification machines:

> Q. You don't claim to have any special knowledge or [*8]  training in the analysis of sales and market trends for phacoemulsification machines, right?
>
> A. *I'm not in sales and marketing,* but I do see sales and marketing figures. ... I think I have an interest, *but I don't claim any special expertise.*

(D.I. 158, Ex. 3 at A206-07, Dep. of Dr. Olson at 173:21-174:4, Oct. 11, 2004 (emphasis added).)

In response, AMO argues that Dr. Olson, as an "expert consumer" of phacoemulsification products, should be permitted to address the jury in regards to the competitive advantage that a phacoemulsification machine having the invention of each of the two patents in suit would have in the market. (D.I. 185 at 6.) For support, AMO asserts that Dr. Olson is a sophisticated consumer of phacoemulsification machines because he is familiar with various phacoemulsification machines, has been performing cataract surgery for thirty years, and because he approves all purchases by his department at the Moran Eye Center. (*Id.*) Additionally, AMO asserts that Dr. Olson provided four reasons why he believes Occlusion Mode offers a competitive advantage:

> 1) Alcon would not have added it to its systems if Alcon did not believe it was important [*9]  to do so, 2) his conversations and interactions with leading surgeons such as Bruce Wallace and Howard Fine led him to conclude that some sur-

geons would not purchase equipment that did not have occlusion mode, ... 3) [his] review of the trade literature regarding occlusion mode suggests that occlusion mode is an important feature to a number of leading surgeons, and 4) [his] own study of the problem of thermal injury leads him to conclude that the use of occlusion mode can reduce thermal injury eight fold.

(*Id.* at 8-9.)

Because Dr. Olson lacks expertise in the analysis of sales and market trends for phacoemulsification machines, he will be precluded from testifying on this topic. He has admitted that he has no expertise in this particular area. Being an "expert consumer," as AMO puts it, does not remedy this deficiency. Further, the "main basis" for Dr. Olson's opinions are "the fact that Alcon decided to put occlusion mode on its latest equipment." (D.I. 158, Ex. 3 at A169, Dep. of Dr. Olson at 55:12, 1-2, Oct. 11, 2004.) That reason, as AMO admits, is "more a matter of plain common sense than special expertise." (*See* D.I. 185 at 9.)

Additionally, Dr. Olson's [*10]  opinion regarding the general preferences of other surgeons is speculative and not supported by reliable data. The basis for his opinion on this point is that two of his colleagues have preferences for devices with Occlusion Mode, and even as to them, he testified that he could only be certain one of them would actually insist on buying a machine with Occlusion Mode. Dr. Olson testified during his deposition as follows:

> Q. Is there any other basis for your statement?
>
> A. I do feel there are people out there who use occlusion mode and feel its important, and I think that they -- I mean, the Alcon people know. You could ask them, but I'm sure they have surveys. And I'm sure there are people who would not buy the equipment without it, so I think that that's got to be it as well. But my main basis is the fact that Alcon put it in their equipment.
>
> Q. You say that you're sure that there were people who would not buy the equipment without it having occlusion mode. *Why are you sure that there are people who would not buy a phacoemulsification system if it didn't have occlusion mode?*

2005 U.S. Dist. LEXIS 5803, *

A. Because there are people talking about occlusion mode and how you should have it. **[*11]** There are many names listed there, Bruce Wallace most recently in the meeting I was just at, *so I know one, Bruce Wallace.* I mean, from what he said, I don't think Bruce Wallace would buy anything without an occlusion mode. He talked about the fact that occlusion-mode phaco was important. *So there have to be others. If there were none, why would Alcon add it to their equipment in face of a patent? It makes no sense.*

Q. Other than Bruce Wallace, can you identify anyone else who you believe would not purchase a phacoemulsification system if it didn't have occlusion mode?

A. *Not without talking to them.* There's others, who talk about it here, but I -- the only one I'm aware who's talked to very recently is Bruce Wallace. Whether Howard Fine still thinks it's important or not, he certainly in there will say he feels it's very important.

Q. And when you're saying in there, you're referring to the articles that Ms. Thackray sent to you, right?

A. Yes, that you now have, yes.

(D.I. 158, Ex. 3 at A169-70, Dep. of Dr. Olson at 55:6-56:13, Oct. 11, 2004 (emphasis added).)

In that testimony, Dr. Olson admits that he has not talked to any other surgeons, **[*12]** besides Bruce Wallace, about whether they would only buy machines with Occlusion Mode. The articles to which he refers do not support his opinion in this regard either, because as he admits, he cannot tell without talking to those surgeons whether they would only buy machines with the occlusion mode feature. His comments also reveal that he does not know whether other surgeons agree with Bruce Wallace's view, nor has he conducted a survey to find out. Thus, his testimony on the viewpoints of other surgeons is purely speculative.

Lastly, Dr. Olson testified that his opinion on the sales and marketing aspects of Occlusion Mode were based on extrapolations from a survey he conducted on wound burns. That survey, however, which was unpublished and not peer reviewed, did not ask its respondents whether Occlusion Mode was enabled during the surgery,

and did not even mention the Occlusion Mode feature. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; *see* D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004 ("Q. Now, the survey didn't ask whether the occlusion mode feature was active, correct? A. [It] did not. Q. So it could be that occlusion mode was **[*13]** enabled during some of the wound burns that the ... study found? A. It's possible.").) Thus, it is not a reliable basis from which an opinion on the general market and physician preferences could be based.

Therefore, because Dr. Olson does not have sufficient expertise in the sales and marketing of phacoemulsification devices, and his opinion on such matters is not supported by reliable bases, he will be precluded from testifying to any sales and market analysis of phacoemulsification devices, including testimony addressing the economic advantages of phacoemulsification devices incorporating Occlusion Mode and the '765 patent as they pertain to the market. Dr. Olson will be permitted, however, to testify about his own preferences for certain features in phacoemulsification machines and what he considers advantageous from his perspective, based on his many years of experience using such machines in the performance of cataract surgery, to the extent such opinions were disclosed in his expert report.

2. Infringement by Alcon of the '240 or '765 patent

Alcon seeks to preclude Dr. Olson from offering testimony relating to whether Alcon infringes either the '240 patent or the '765 patent. **[*14]** (D.I. 157 at 11-12.) According to Alcon, "Dr. Olson implied at numerous times throughout his deposition that Alcon's phacoemulsification systems infringed the '240 and '765 patents, and that Alcon's alleged infringement was knowing and deliberate." (*Id.* at 11.) Alcon argues that Dr. Olson "lacks the expertise that would enable him to perform a claim construction analysis of the patents to determine whether they are infringed by the Infiniti system ... [because he] admitted that he lacks specialized training in engineering and patents." (*Id.* (citing D.I. 158, Ex. 3 at A141, Dep. of Dr. Olson at 18:11-13, Oct. 11, 2004.))

AMO asserts that "Dr. Olson has not done an element-by-element analysis of the patents against the accused products and AMO has no intention of asking him to do so... ." (D.I. 185 at 9.) Rather, AMO argues that Dr. Olson's view that Alcon's device is so similar to AMO's device that it appears to have been copied is both competent and pertinent. (*Id.* at 10.)

Dr. Olson will not be permitted to testify in regards to infringement of either patent. *Federal Rule of Civil Procedure 26(a)(2)(B)* states, in relevant part, **[*15]** that "the [expert] report shall contain a complete statement of all opinions to be expressed... ." Dr. Olson did not disclose an opinion on infringement of either patent in his expert

report, and as such he may not offer one at trial. *See Fed. R. Civ. P. 26(a)(2)(B)*. Additionally, in its Answering Brief in Opposition to Alcon's Motion, AMO lists six things upon which Dr. Olson has been asked to opine, not one of which concerns infringement or copying. n3 (*See* D.I. 185 at 3.) Thus, it is clear that Dr. Olson may not properly offer an opinion on infringement, and it is equally clear that AMO did not intend for him to do so. Therefore, Dr. Olson will not be permitted to offer testimony relating to whether Alcon infringes either patent in suit.

> n3 AMO asserts that it asked Dr. Olson to provide expert testimony in the following six areas: "(i) a tutorial into the physiology and treatment of cataracts; (ii) the importance, from the surgeon's point of view, of each of the patents in suit; (iii) the problem of thermal injury; (iv) the difficulty in manual detection of occlusion; (v) the increased safety of the automatic response to occlusion of the system described in the '240 patent; and (vi) the inapplicability of the Shimizu reference to [the] invention of the '240 patent." (D.I. 185 at 3.)

[*16]

3. Occlusion Mode and Safety of Phacoemulsification

Alcon seeks to preclude Dr. Olson from offering testimony "relating to his opinion that Occlusion Mode made phacoemulsification safer, and consequently a mainstream procedure in cataract surgery because it enabled surgeons to rely on the Occlusion Mode feature to prevent the occurrence of thermal injury to the eye." (D.I. 156 at 1.) More specifically, Alcon objects to five opinions on this topic offered in Dr. Olson's report: (i) that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level" (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17); (ii) that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment" (*id.* at A019); (iii) that "the overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream (*id.* at A018); and, in the same vein, (iv) that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification [*17] widely available and used by most cataract surgeons in the United States today" (*id.* at A019); and again (v) that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification,

and so has made cataract surgery available for more patients" (*id.*).

Alcon asserts that these opinions rendered by Dr. Olson are "inadmissible because they lack adequate foundation, and therefore fail to 'assist the trier of fact.'" (D.I. 157 at 13.) Specifically, Alcon asserts that they are based in large part on "(1) biased information supplied almost exclusively by AMO attorneys, (2) materials that Dr. Olson himself labels as 'scanty,' (3) a partial analysis of an unpublished survey, and (4) unsupported assumptions that are speculative at best." (*Id.*)

AMO argues in response that Dr. Olson reviewed whatever publications were available, not merely those provided by AMO, concerning the use of Occlusion Mode in phacoemulsification, and that "Dr. Olson did not rely on peer-reviewed articles on occlusion mode because none existed." (D.I. 185 at 10, 12.) AMO asserts that reliance on peer-reviewed journals is not a prerequisite [*18] to admissibility and that the articles on which Dr. Olson relied were "written by respected and well-known practitioners in the field." (*Id.*) Further, AMO argues that "Dr. Olson is well qualified to survey fellow practitioners on the incidence of wound burn, and to opine on the value of occlusion mode in reducing it." (*Id.*)

"The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *Fed. R. Evid. 702* advisory committee's note. The main issue raised by Alcon is the reliability of the opinions offered by Dr. Olson. Alcon does not challenge Dr. Olson's expertise to offer such opinions, but rather challenges the bases upon which he relies to render them. (See D.I. 207 at 5.) Each challenged opinion is discussed below.

a. That the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level"

Alcon challenges Dr. Olson's opinion that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically [*19] shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level." (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson testified at his deposition that "occlusion mode *could* dramatically decrease wound burn... ." (D.I. 158, Ex. 3 at A183, Dep. of Dr. Olson at 77:5-6, Oct. 11, 2004 (emphasis added).) In his report, Dr. Olson was more emphatic, stating that Occlusion Mode actually did have that effect. (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson indicated that his opinion in this regard is largely based upon his survey. (*See* D.I. 158, Ex. 3 at A182-83, Dep. of Dr. Olson at 76:21-77:6, Oct. 11, 2004.)

2005 U.S. Dist. LEXIS 5803, *

As discussed earlier, however, *see supra* Part IV.A.1., Dr. Olson's survey did not inquire whether Occlusion Mode was enabled during the procedures being reported, nor did it mention Occlusion Mode at all. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; *see* D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004.) Thus, it is not a reliable basis of support for the type of definitive conclusion rendered in Dr. Olson's report. Dr. Olson will **[*20]** be permitted to testify as to whether he thinks Occlusion Mode "could" decrease wound burn, based on his years of experience n4 and the various articles he has reviewed, but he cannot testify that Occlusion Mode in fact decreases instances of wound burn because his survey does not provide a reliable basis for such a conclusion, and because, as he admits, "there's basically no studies on this subject or anything." (D.I. 158, Ex. 3 at A145, Dep. of Dr. Olson at 26:24-25, Oct. 11, 2004.)

> n4 Dr. Olson's experience with Occlusion Mode is apparently limited, however, because, as he admits, he does not use Occlusion Mode himself. (D.I. 158, Ex. 3 at A173-74, Dep. of Dr. Olson at 59:25-60:2, Oct. 11, 2004.)

b. "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment."

Alcon challenges Dr. Olson's opinion that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment." (D.I. 158, Ex. 1 at A019, **[*21]** Dr. Olson's Revised Expert Disclosure at 18.) Alcon asserts that Dr. Olson lacks a reliable basis to conclude what "many" feel about modern phacoemulsification equipment. (D.I. 157 at 18.) At his deposition, however, Dr. Olson testified that he based his opinion on the articles he reviewed in which various experts have stated preferences for Occlusion Mode. Although Dr. Olson has testified that he considers these articles to be "throw-away" articles, in that "you usually look at them, and [then] you throw them away" (D.I. 158, Ex. 3 at A146, Dep. of Dr. Olson at 27:11-12, Oct. 11, 2004), they do provide an adequate basis for this specific opinion. Alcon's citation to *Tuman v. Genesis Associates, 935 F. Supp. 1375, 1385 (E.D. Pa. 1996)*, is unavailing because, as that court held, the expert's opinion was not "fundamentally unsupported." Neither is Dr. Olson's in this instance, and, as such, Alcon's objections go to the weight of Dr. Olson's opinion, not its admissibility.

c. "The overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream."

Alcon's next challenge is to Dr. Olson's **[*22]** opinions that "the overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Alcon's main objection is that this particular conclusion is misleading "because he overstates his propositions." (D.I. 157 at 18.)

I agree with Alcon that, in light of his deposition testimony, Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today, Dr. Olson replied, "I think its one of the steps that has made the procedure safer. *There's others,* but in totality, *all of those different steps are the reason why it's the predominant procedure today.*" (D.I. 158, Ex. 3 at A167, Dep. of Dr. Olson at 53:10-13, Oct. 11, 2004 (emphasis added).) Dr. Olson clarifies that it is the totality of "all of those different steps" that has led to phacoemulsification being the predominant procedure today, not just Occlusion Mode.

In light of that **[*23]** qualification, I do not believe that his testimony will mislead the jury. He will be subject to cross-examination by Alcon, whose efforts will no doubt highlight the limitations Dr. Olson admitted on this point in his deposition. Alcon has not demonstrated that this opinion is inadmissible under *Federal Rule of Evidence 702* and, therefore, he will not be precluded from giving it at trial.

d. "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today."

Alcon makes the same challenge to Dr. Olson's opinion that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Again, I agree with Alcon that Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode made phacoemulsification safer and put the technology in the hands of surgeons who were previously afraid of using phacoemulsification, Dr. Olson replied that ". **[*24]** .. it is *one of many* features that have made phaco safer... ." (D.I. 158, Ex. 3 at A165, Dep. of Dr. Olson at 51:11-12, Oct. 11, 2004 (emphasis added).) Dr. Olson's testimony indicates that there are other features which contributed to the safety of phacoemulsification as well. However, for the same reasons discussed, *supra* Part IV.A.3.c., Alcon has not demonstrated that this opinion is

inadmissible under *Federal Rule of Evidence 702* and, therefore, he will not be precluded from giving it at trial.

e. "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients."

Dr. Olson also opined that Occlusion Mode "put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) When asked whether he was aware of any surgeons who were previously afraid of using phacoemulsification before they could use occlusion mode, Dr. **[*25]** Olson relied: "I don't have any survey. There's no study or published [sic], so this was just my opinion. I don't have anything other specifically than my opinion for that statement ... if there was scientific literature, if we had studies, if we had -- we don't. I mean, all we have is a few opinions, so therefore, when you have nothing else to depend upon, then you can only use your opinion." (D.I. 158, Ex. 3 at A166-67, Dep. of Dr. Olson at 52:12-53:3, Oct. 11, 2004.) Furthermore, Dr. Olson testified that he believes Occlusion Mode is not used by most surgeons (*id.* at A167, 53:20), but that, in fact, he doesn't "know how many use it and how many do not" (*id.* at A168, 54:17-18). Thus, Dr. Olson admits that he has no reliable basis for this opinion, and, he will be precluded from testifying to it at trial.

4. Maximizing Air Removal

Alcon seeks to preclude Dr. Olson from offering testimony "related to his opinion that [the '765 patent] disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg **[*26]** or higher while maintaining chamber stability." (D.I. 156 at 2.) Alcon asserts that Dr. Olson's opinions on the '765 patent are based on unsupported suppositions as opposed to facts (D.I. 157 at 19), and that he lacks the necessary experience to offer expert testimony on fluidics devices (D.I. 207 at 10-11).

In response, AMO asserts that Dr. Olson's opinions are based on his knowledge and experience of using phacoemulsification devices in the field of opthalmological surgery. (D.I. 185 at 12-13.) Thus, AMO argues that Dr. Olson's testimony meets the threshold of admissibility. (*Id.* at 13.)

In *Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 324 (3d Cir. 2003)*, the Third Circuit noted that although a proffered expert has "extensive experience with jet skis," his testimony on the safety of an accelerating

mechanism was properly excluded because the expert "had no education or experience in product design of jet skis or accelerating mechanisms; nor did he provide scientific, statistical or other evidence evaluating the relative safety of different jet ski models or the accelerating mechanisms." Similarly, Dr. Olson's qualifications as a renowned ophthalmologist **[*27]** are not questioned, but he is not qualified to render an opinion on fluidics systems or chamber stability. He is not an engineer and has not conducted any studies to analyze whether different systems can achieve an aspiration level of 500 mmHg while maintaining excellent chamber stability. (D.I. 158, Ex. 3 at A203, Dep. of Dr. Olson at 136:15, Oct. 11, 2004.) Thus, like the expert in *Calhoun,* Dr. Olson would be outside his area of expertise if permitted to testify in this regard. Accordingly, he will be precluded from so testifying. "While [his] . . . background, education, and training may provide [him] with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun, 350 F.3d at 322.*

B. Mr. Walbrink

Alcon seeks to exclude three discrete areas of testimony by Mr. Walbrink. (D.I. 160.)

1. Infringement Opinions

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on infringement of the '240 and '765 patents by Alcon's phacoemulsification systems, the Legacy with Advantec and the Infiniti. (D.I. 160 at 1.) Alcon argues that Mr. Walbrink's testimony contravenes *Rule* **[*28]** *702* because his opinions on infringement "are pulled directly from litigation positions crafted by AMO's attorneys, as opposed to conclusions drawn from his own independent assessment of the claims at issue." (D.I. 161 at 6.)

In response, AMO asserts that *Federal Rule of Civil Procedure 26(a)(2)(B)* "does not preclude counsel from providing assistance to experts in preparing [the expert's] report." (D.I. 186 at 4 (quoting *Fed. R. Civ. P. 26(a)(2)(B)* advisory committee's note).) Furthermore, AMO argues that Mr. Walbrink did not merely adopt the opinions of AMO's counsel, but rather "engaged in extensive telephone conversations with AMO counsel regarding claim interpretation" (*id.* at 13) and "participated in the compilation, drafting, editing, and organization of his report" (*id.* at 15).

Alcon's position is untenable. It admits that *Rule 26* does not preclude counsel from assisting an expert in preparing a report, but it argues that Mr. Walbrink's report merely represents the substantive conclusions of counsel. (D.I. 161 at 5-6.) Alcon's citations to cases in which expert reports were excluded are **[*29]** distinguishable from

2005 U.S. Dist. LEXIS 5803, *

the facts of this case because Mr. Walbrink did contribute his expertise to the drafting of the report. *See Crowley v. Chait, 322 F. Supp. 2d 530, 543 (D.N.J. 2004)* (noting that counsel may not draft the entire report without prior "substantive input" from the expert); *Stein v. Foamex Int'l, Inc., 2001 U.S. Dist. LEXIS 12211, No. CIV A. 00-2356, 2001 WL 936566, at \*5 (E.D. Pa. Aug. 15, 2001)* (the rules do not permit "blanket adoption of reports prepared by counsel") (internal citation omitted). Mr. Walbrink testified at his deposition as follows:

> Q. Would you describe for me the process that you went through to develop the report that we've marked as Exhibit 179.
>
> A. First, we discussed the issues at hand.
>
> Q. And when you say "we," you mean you and Ms. Thackray?
>
> A. And Jamie Isbester, as well, collectively. *I drafted some of it, worked on claim construction with one of their other associates* -- I believe his name is Bob -- then met with Gillian, Ms. Thackray, and Jamie Isbester at their facility in Berkeley, and worked for a day, I think, further drafting and pulling it together. And then over the course of several days after that, [\*30] there were multiple drafts and revisions, and then we submitted it.
>
> Q. Now, you said you drafted some of it. What parts did you draft?
>
> A. That would be hard because, I mean, *I was involved in most of it.* The claim construction was primarily done by -- I believe it was Bob. But as far as the content of the body of the report, it was a collaborative effort. It would be hard to single out what I did versus someone else.

(D.I. 162, Ex. 3 at A131-32, Dep. of Mr. Walbrink at 22:8-23:5, Oct. 19, 2004 (emphasis added).) The foregoing testimony supports AMO's contention that Mr. Walbrink collaborated with AMO's counsel and was involved in the creation of his expert report. Thus, Mr. Walbrink's testimony on infringement cannot be excluded as simply reflecting the opinions or work product of AMO's counsel.

2. Commercial success of AMO's systems

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on the commercial success of AMO's two phacoemulsification systems, the Diplomax and the Sovereign, because his opinion is based solely on what AMO's counsel has told him and is therefore unreliable. (D.I. 161 at 9.) Further, Alcon argues that *Rule 26(a)(2)(B)* [\*31] requires that an expert's report "contain a complete statement of all opinions to be expressed *and the basis and reasons thereof.*" (D.I. 208 at 9 (quoting *Fed. R. Civ. P. 26(a)(2)(B))* (emphasis added).) Thus, Alcon asserts that the four new bases for his opinion identified in the declaration he submitted after his deposition and after the close of discovery should not be considered because those reasons were not presented in his Rebuttal Report. (*Id.* at 9.)

In response, AMO asserts that "counsel for Alcon failed to develop further testimony regarding the content of Mr. Walbrink's discussions with AMO's counsel and failed to acknowledge the further bases set forth in Mr. Walbrink's Rebuttal Report... ." (D.I. 186 at 17.) AMO points to Mr. Walbrink's statement in his Rebuttal Report that "it would appear to me, as discussed in my opening report on infringement, that the Advantec upgrade to Alcon's Legacy model and the Infinity model of phacoemulsification machines have adopted the exact same technology" (D.I. 162, Ex. 2 at A99-100, Rebuttal Report of Mr. Walbrink at 14-15) as a basis for his opinion on commercial success. (D.I. 186 at [\*32] 17-18.) Additionally, AMO notes that Mr. Walbrink's declaration further discusses the bases for his opinion. (*Id.* at 18.)

Under *Rule 26(a)(2)(B)*, an expert's report must contain "the basis and reasons" for the expert's opinions. It is clear that none of Mr. Walbrink's Reports submitted during discovery contains the challenged reasons on which he now seeks to rely for his opinion on commercial success attributable to Occlusion Mode. Thus, based on *Rule 26(a)(2)(B)*, Mr. Walbrink's Rebuttal Report is critically deficient in this regard. At his deposition, Mr. Walbrink testified as follows:

> Q. Sure. It's at the bottom of page 14. You say, "it is my understanding that the occlusion mode has been an important feature of two successful phacoemulsification machines sold by AMO, the Diplomax line and the Sovereign line." Did I read that correctly?
>
> A. Yes.
>
> Q. What is the basis for that statement?

2005 U.S. Dist. LEXIS 5803, *

A. *Discussions with counsel. And I can't tell you what else may have been considered in that.*

Q. So the only basis, as you sit here today, that you can identify is that AMO's counsel told you that, right?

A. *That's all I can identify today, yes.*

(D. [*33] I. 162, Ex. 3 at A163-64, Dep. of Mr. Walbrink at 197:19-198:7, Oct. 19, 2004 (emphasis added).) The foregoing shows that the only disclosed basis Mr. Walbrink had for this opinion was the "discussions [he had] with [AMO's] counsel." (*See id.*) Therefore, Mr. Walbrink's deposition cannot cure the deficiency of his Rebuttal Report. n5 If there were other bases for Mr. Walbrink's opinion, they were not disclosed as required. Simply claiming to have an understanding, without providing the bases for that understanding, fails to meet the disclosure requirements of the Federal Rules of Civil Procedure.

> n5 This is not meant to say that if Mr. Walbrink had testified to other bases, such testimony would necessarily have been sufficient under *Rule 26(a)(2)(B)* to remedy his deficient expert report.

Mr. Walbrink's last ditch declaration (D.I. 189) does not remedy this deficiency, for at least two reasons. First, it was submitted long after the close of discovery, as an exhibit to AMO's Answering Brief on this motion. [*34] (D.I. 186.) I agree with Alcon that acceptance of such a late submission would be unfairly prejudicial and would make "a mockery of the Rules' requirements for discovery and expert disclosure." (See D.I. 208 at 9.) Second, Mr. Walbrink has admitted that he is "not versed in the financial aspects of these products," yet he purports to offer four reasons for his opinion, each of which relate to the financial aspects of AMO's products. He cannot disclaim expertise in an area and then opinion on it. Thus, for these independent reasons, Mr. Walbrink will be precluded from testifying on the issue of commercial success.

3. The '765 patent and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability

Alcon asserts that Mr. Walbrink should be precluded from testifying that "the Sovereign fluidics system, incorporating the invention of the '765 patent, was the first phacoemulsification system to achieve the 500 mg [sic] Hg aspiration level while maintaining excellent chamber stability" because his opinion is based solely on AMO's

brochures and promotional materials and Dr. Olson's opinion. (D.I. 161 at 9-10.)

In response, AMO asserts that Mr. Walbrink's opinion [*35] was based on his review of product brochures and promotional materials, the expert report of Dr. Olson, his background and experience, many hours of deliberation, and his examination of Alcon's Infiniti system. (D.I. 186 at 19.) AMO argues that these matters are the proper subject of cross-examination before the jury, not "the basis for a motion to exclude." (*Id.* at 21.) I disagree.

First, Alcon correctly notes that Mr. Walbrink's opinion is directed to AMO's Sovereign system, not Alcon's Infiniti system, and that Mr. Walbrink's examination of the Infiniti system does not provide a reliable basis for his conclusions regarding the Sovereign system. Second, Mr. Walbrink admitted in his deposition testimony that he "has not used the Sovereign." (D.I. 162, Ex. 3 at A154, Dep. of Mr. Walbrink at 142:6, Oct. 19, 2004.) Third, he testified that he only has "incidental knowledge" of the Sovereign system, which he gained by reading Dr. Olson's expert report and "brochures or promotional materials" provided exclusively by AMO. (*Id.* at A154, 142:13, 19.) But as earlier discussed, *supra* Part IV.A.4., Dr. Olson will be precluded from testifying about the invention in the '765 patent [*36] achieving an aspiration level of 500 mmHg while maintaining chamber stability. Thus, all that remains as Mr. Walbrink's basis for his opinion are the brochures or promotional materials provided exclusively by AMO. As noted in *Tuman,* an expert's testimony may be unreliable if the expert "relied almost exclusively on information from one source who was clearly biased." *Tuman, 935 F. Supp. at 1385* (internal citations omitted). This is such a case. The only remaining basis for this opinion from Mr. Walbrink is information that was provided exclusively by AMO, a party to the case. Thus, Mr. Walbrink will be precluded from testifying with regard to the achievement of an aspiration level of 500 mmHg while maintaining chamber stability.

## V. CONCLUSION

Based on the foregoing reasons and authorities, Alcon's motion to exclude the testimony of Dr. Olson (D.I. 156) will be granted in part and denied in part, and Alcon's motion to exclude the testimony of Mr. Walbrink (D.I. 160) will be granted in part and denied in part. An appropriate order will follow.

## ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED [*37] that the Defendants' motion to exclude the testimony of Dr. Olson (D.I. 156) is GRANTED IN PART, to the extent that Dr. Olson will not be permitted to offer testimony on the analysis of sales and market trends for

2005 U.S. Dist. LEXIS 5803, *

phacoemulsification machines, infringement by Defendants of the '240 or '765 patent, that Occlusion Mode in fact decreases instances of wound burn, that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients," and that the '765 patent disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg or higher while maintaining chamber stability, and DENIED IN PART, as to the remainder of Dr. Olson's opinions which have been challenged by Defendants.

Further, IT IS ORDERED THAT Defendants' motion to exclude the testimony of Mr. Walbrink (D.I. 160) is GRANTED IN PART, to the extent that Mr. Walbrink will not be permitted to offer testimony on the issue of commercial [*38]   success and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability, and DENIED IN PART, as to the remainder of Mr. Walbrink's opinions which have been challenged by Defendants.

Kent Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
April 7, 2005

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYOVAC, INC.,                                    )
                                                  )
            Plaintiff/Counter-Defendant.          )          Civil Action No. 04-1278
                                                  )
            vs.                                   )          Hon. Kent A. Jordan
                                                  )
PECHINEY PLASTIC PACKAGING,                       )
INC.,                                             )
                                                  )
            Defendant/Counter-Plaintiff.          )

## EXPERT REPORT OF ELDRIDGE M. MOUNT III

Dated:  May 19, 2005

Donald R. Cassling (Admitted *pro hac vice*)
Steven R. Trybus (Admitted *pro hac vice*)
Shelley Smith (Admitted *pro hac vice*)
Brian P. O'Donnell (Admitted *pro hac vice*)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: 312 222-9350

N. Richard Powers (#494)
Rudolf E. Hutz (#484)
CONNOLLY BOVE LODGE & HUTZ
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899-2207
Tel: 302.888.6266

Attorneys for Pechiney Plastic Packaging, Inc.

1.    An oriented

The 4,572,854 patent recites in col. 6, lines 48-51, "The film according to the present invention produced by coextruding layers…and then stretching, at least biaxially". Therefore the 4,572,854 patent specifically disclose an oriented film.

2.    Coextruded film

The 4,572,854 patent recites in col. 6, lines 48-50, "The film according to the present invention produced by coextruding layers B, C, D, C (B optional), or A, B, C, D, C, (B and A optional)…"

Therefore the 4,572,854 patent specifically disclose the a coextruded film.

3.    Having at least 7 layers

The 4,572,854 patent recites in col. 7, l. 10, "The production of a seven-layer film…" Therefore the 4,572,854 patent specifically disclose a 7 layer film.

4.    Arranged symmetrically

The 4,572,854 patent recites in col. 7, lines 10-16, "The production of a seven-layer film is appropriately carried out with the use of a three-layer die. In the case of a symmetric film structure, the melts of the polymers for layers B, C, and D may be extruded through the center channel and the melts for the outer sealing layers A simultaneously through the outer channels onto a chill rolines" Also figure 6 of the '854 illustrates a seven layer film with the layers arranged symmetrically.

Therefore the 4,572,854 patent specifically disclose a symmetric layer placement for a 7 layer film.

5.    A core layer comprising an ethylene vinyl alcohol copolymer

The 4,572,854 patent recites in col. 3, lines 65-67, "The barrier layer D serves as a gas barrier, in particular an oxygen or aroma barrier, and is comprised of an ethylene-vinyl alcohol copolymer…" Therefore the 4,572,854 patent specifically disclose the use of an EVOH copolymer as a barrier core layer.

6.    Two intermediate layers each comprising a polyamide

The '854 patent does not specifically disclose the presence of two intermediate nylon layers, however, there would have been motivation for one of ordinary skill in the art to replace the adhesive layers adjacent to the EVOH core with nylon containing layers for the purpose of improving the oxygen barrier properties as I note below in the section on the obviousness of using nylon as intermediate layers.

Furthermore, the '854 patent specifically discussed EP 0063006A1. This provides additional motivation to use the teachings of the '006 application which includes using nylon as the intermediate layers.

28

13, "As indicated previously, the EVOH copolymers are normally utilized in multilayer films including other components intended to impart toughness, structural integrity, water vapor barrier properties, tensile strength, and other characteristics. Typical of such companion layers are the film-forming polyamides,…, Because of the poor adhesion of EVOH compositions to most resins other than polyamides,…" and on page 15, "layers of nylon 6 on the opposite sides of a core of unmodified EVOH copolymer" and in example 4, p18 "the composite film product contains successive layers of nylon, modified EVOH copolymer, nylon, adhesive, SURLYN…"

The structure of the Japan application 60-27000 which exhibits improved flexibility due to the polypropylene [polyolefin] layers and pinhole resistance during deep drawing [orientation] when in combination with the nylon layers, Japan 60-27000, "… the polyamide resin layer – an intermediate layer used for improving the resistance to developing pinholes-…"

The English translation of Japan Utility Patent 60-27000 discloses the deep draw orientation of a 7 layer structure PP/tie/polyamide/EVOH/polyamide/tie/(PE, EVA, or ionomer) to improve its barrier property. It is understood by one of ordinary skill in the art that deep draw molding is a solid state orientation method and would have been capable of imparting both uniaxial and/or biaxial orientation to the drawn multilayer film or sheet.

The 4,361,628 patent discloses a 5 layer structure of:

a polymeric material/adhesive polymer/nylon/EVOH/nylon

and recites in:

> col. 1, lines 67-68, "Layer 16 is a polymer, copolymer, or blend thereof selected from the nylon family of polyamides" and in
>
> col. 3 lines 13-15, "Layer[ ] … 116 ha[s] the same composition [ ], and serve[s] the same function[ ] as layer[ ] … 16" and
>
> col. 3, lines 16-18, "Layer 120 is a layer of nylon, and may be any nylon which may be coextruded with the gas barrier layer",

Therefore the '628 patent clearly discloses the use of nylon adhered directly to both surfaces of an EVOH gas barrier layer and as shown in Figure 2 as an intermediate layer between an outer polymeric layer and an adhesive layer and the inner EVOH barrier layer.

It would have been obvious to one of ordinary skill in the art to substitute intermediate nylon layers attached directly to the EVOH layer to improve the films durability and pin hole resistance. As disclosed in the translation of Japan application 60-27000, and in US Patent 4,608,286 col. 3, lines 38-40, "..The EVOH resin films are all extremely poor in flexing endurance…", and in EP 0 063 006 A1, "… films made of EVOH tend to lack toughness and to be brittle." It is clear that one of ordinary skill in the art would have understood that the EVOH layer was sensitive to damage on flexing. However each of these disclosures disclose the incorporation of additional layers adhered to both surfaces of the EVOH core to improve durability, US Patent 4,608,286, col. 3, lines 60-62, "..the improvement of the flexing endurance is noticeable only when the linear low density polyethylenes is used as both surface

# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CRYOVAC, INC.,

   Plaintiff/Counter-Defendant,


   -vs-                        Civil Action

                              No. 04-1728-KAJ


PECHINEY PLASTIC PACKAGING, INC.,

   Defendant/Counter-Plaintiff.


   NOTE:  PORTIONS OF TEXT DEEMED CONFIDENTIAL -

   SUBJECT TO PROTECTIVE ORDER


     The videotaped deposition of ELDRIDGE MOUNT, III,

called by the Plaintiff/Counter-Defendant for examination,

pursuant to notice and pursuant to the Federal Rules of

Civil Procedure for the United States District Courts pertaining

to the taking of depositions, taken before Cynthia J. Conforti,

Certified Shorthand Reporter, at One IBM Plaza, Chicago, Illinois,

commencing at the hour of 9:02 a.m. on the 4th day of August, A.D., 2005.

Eldridge Mount, III CONFIDENTIAL PORTIONS (CLEARSHIELD DETAILS & EXHIBITS 21-22) SUBJECT TO THE PROTECTIVE ORDER    August 4, 2005

## Chicago, IL

110

1  D-A-L-L-M-A-N-N.
2      (Whereupon Exhibit 7 was
3      marked for identification.)
4  BY MR. FUCHS:
5      Q.  Now, the film described in the Dallmann    11:27AM
6  '854 patent does not include the presence of two
7  intermediate nylon layers; is that correct?
8      A.  Right.  There's no -- there's no direct
9  use of nylon.
10     Q.  And in Column 1 of the Dallmann '854    11:28AM
11 patent under the background of the invention
12 there's described a problem in the art, correct?
13     A.  What line?
14     Q.  Do you see at Column 1, line 48 where it
15 reads:
16         On the other hand, the existing sealable
17 multilayer films having a barrier layer comprised
18 of ethylene vinyl alcohol copolymers cannot be
19 produced by extruding all of the layers    11:28AM
20 simultaneously to obtain an orientation of all
21 layers by stretching under identical conditions.
22 Do you see that?

111

1      A.  Yes.
2      Q.  And that's reported in the Dallmann '854    11:29AM
3  patent which is dated February 25, 1986.  Do you
4  see that?
5      A.  The filing date?
6      Q.  Or the issue date.
7      A.  They're the same?    11:29AM
8          MR. TRYBUS:  Quick prosecution.
9  BY MR. FUCHS:
10     Q.  The issue date is February 25, 1986,
11 correct?
12     A.  Appears to be, yes, um-hmm.    11:29AM
13     Q.  That's your understanding as to when this
14 would have become available to the public,
15 correct?
16     A.  I'm not sure about that.
17     Q.  Okay.
18     A.  That's when it was printed.
19     Q.  Is it fair to say from your review of the
20 prior art that this problem that's referred to in
21 Column 1 of line 48 to 53 of the Dallmann '854    11:30AM
22 patent existed in the mid 1980s?

112

1      A.  Yeah, um-hmm.  Does it describe the film
2  above?
3      Q.  Well, it says:  The existing sealable
4  multilayer films.  In other words, all of them.    11:30AM
5  Do you see that?  Well, excuse me.  You're wrong
6  -- I'm wrong.
7          It says:  The existing sealable multilayer
8  films having a barrier layer comprised of ethylene
9  vinyl alcohol copolymers.  Do you see that's what    11:30AM
10 the prior films it's talking about?
11     A.  Okay.
12     Q.  The existing multilayer films with an EVOH
13 barrier layer, correct?
14     A.  That's what it says.    11:30AM
15     Q.  And it says, at this point in time in the
16 mid 1980s:  These films cannot be produced by
17 extruding all of the layers simultaneously to
18 obtain an orientation of all layers by stretching
19 under identical conditions.  Do you see that?
20     A.  I see it.
21         MR. TRYBUS:  Object to the form of the
22 question.

113

1          THE WITNESS:  Yeah, I see it, but I'm not    11:31AM
2  sure that I accept that.  There's other prior art
3  that orients multilayer sealable films with all
4  those things in it I think, '798.
5  BY MR. FUCHS:
6      Q.  What patent are you referring to?    11:31AM
7      A.  Well, I believe -- I think the -- let's
8  see.  I think some of the patents we already
9  talked about could be described as heat sealable.
10 I just -- well, I have a hard time accepting that
11 representation of the prior art.    11:31AM
12     Q.  Is Dallmann using a different definition
13 of "orientation" than you are?
14     A.  That I'm not sure right at this second.  I
15 don't -- I believe he's probably talking about
16 molecular orientation.    11:32AM
17     Q.  Well, at least his patent reported that
18 there was this problem in orienting multilayer
19 films comprising EVOH barrier layers, correct?
20     A.  Heat sealable, um-hmm.
21     Q.  When you said "um-hmm," that was a yes?
22     A.  Heat sealable films, yes.

Eldridge Mount, III CONFIDENTIAL PORTIONS (CLEARSHIELD DETAILS & EXHIBITS 21-22) SUBJECT TO THE PROTECTIVE ORDER    August 4, 2005

Chicago, IL

198

```
1    A.  Right.
2    Q.  And the other outer layer is made from a
3  polyethylene/EVA mixture, correct?
4    A.  I'm not sure if they're a mixture or
5  individuals, individual materials.          02:15PM
6    Q.  But, in any event, there's no common
7  polymeric component between the two outer layers,
8  correct?
9    A.  Well, they're both polymers.
10   Q.  Different polymers.               02:15PM
11   A.  Different polymers.
12       Which meet with Dr. Kimmel's description
13 of arranged symmetrically like I talked about here
14 when we did this.
15   Q.  If the Court concludes that "arranged    02:16PM
16 symmetrically" requires that the outer layers have
17 the same polymeric material, then the Japanese
18 patent publication that I've marked as Mount
19 Exhibit 13 would not meet that limitation,
20 correct?                              02:16PM
21   A.  If the Court decided that?
22   Q.  Yes.
```

199

```
1    A.  Ask that again.  I was a little confused
2  with the Court.  The Court -- if the Court
3  decided --
4    Q.  You're aware that there's going to be --
5  before trial the Court's going to decide what
6  these claims mean?
7    A.  Yes, in a Markman hearing?         02:16PM
8    Q.  Yeah.  And if the Court concludes that
9  layers arranged symmetrically requires that the
10 two outer layers be made from the same polymeric
11 materials or materials, then this would not meet
12 that claim limitation, correct?  By "this" I mean  02:17PM
13 the Japanese patent publication that I've marked
14 as Mount Exhibit 13.
15   A.  Is that the claim construction that you
16 use?
17   Q.  I'm asking you a hypothetical question,   02:17PM
18 and then I'm asking you to answer the hypothetical
19 question.  Do you need it repeated?
20   A.  Just read it back.  I don't believe so,
21 but go ahead and read it back.
22   Q.  Okay.  If the Court concludes that layers  02:17PM
```

200

```
1  arranged symmetrically requires that the two outer
2  polymeric layers be made from the same polymeric
3  materials, then the film described in the Japanese
4  patent publication would not meet that limitation;
5  isn't that correct?  Because the outer layers of
6  the film of the Japanese publication include
7  different polymeric materials.
8    A.  If that was their conclusion, right.
9    Q.  Now, in the -- this deep-drawer molding is  02:18PM
10 the orientation accomplished by reheating and
11 stretching?
12   A.  Yes.
13   Q.  And can you explain that to me?
14   A.  Sure.  You start with a sheet or a film of  02:18PM
15 the seven-layer structure that they show, you take
16 some sort of a piece of it, either in a continuous
17 sheet or an individual piece, you heat it up to a
18 temperature, usually below the melting point of
19 the materials, and then you can either vacuum form  02:19PM
20 it, you can pull on it with a vacuum, you can push
21 on it with a plug, but you're changing the shape
22 and the thickness of the material by applying a
```

201

```
1  force, so it's oriented, stretch oriented.
2    Q.  Before the deep-draw molding is the film  02:19PM
3  oriented?
4    A.  It might be depending on the way it was
5  produced.  Probably have some molecular
6  orientation, like I talked about before, from the
7  casting process.
8    Q.  Is the deep-draw molding process a blown
9  bubble process?
10       MR. TRYBUS:  Object to the form of the
11 question.                           02:19PM
12       THE WITNESS:  It's the same sort of
13 drawing mechanism.
14 BY MR. FUCHS:
15   Q.  But it's different.
16   A.  It's not a bubble.  It's an orientation   02:19PM
17 from the solid state.
18   Q.  And the deep-draw process is not a racking
19 process, is it?
20   A.  It's the same sort of orientation.  It's
21 not produced on a tenter.  It's produced by a plug  02:20PM
22 or an air pressure.
```

Eldridge Mount, III CONFIDENTIAL PORTIONS (CLEARSHIELD DETAILS & EXHIBITS 21-22) SUBJECT TO THE PROTECTIVE ORDER    August 4, 2005

Chicago, IL

202

1    Q. But it's not produced by racking, correct?
2    MR. TRYBUS: Object to the form of the
3  question.
4    THE WITNESS: It's not produced on a    02:20PM
5  tenter or it's not produced on a double bubble
6  process, but it's the same sort of orientation.
7  The molecules oftentimes don't know how they have
8  been stretched.
9  BY MR. FUCHS:
10    Q. Can there be differences if you orient in
11  a deep-draw molding process instead of orienting
12  in a double bubble process?
13    A. That, again, like we talked about before,    02:20PM
14  would depend upon the rate at which the drawing or
15  the double bubble process took place, the
16  temperatures and the quenching --
17    Q. So there can be differences.
18    A. There can be differences in the process    02:21PM
19  settings.
20    Q. And those differences in the process can
21  result in differences in the process, correct?
22    A. In both processes, you know, a lot of

203

1  orientation processes differences in the    02:21PM
2  conditions can result in differences in the final
3  orientation levels.
4    Q. In the product.
5    A. In the product.
6    Q. After thermoforming is the material a    02:21PM
7  plain or structure any more?
8    A. It's not flat. It has walls, pieces that
9  are films and plains.
10    MR. FUCHS: Okay. I'd like to now mark as
11  Mount Exhibit 14 European Patent Application 0 063
12  006 which sometimes I refer to as the '006
13  European patent application.
14    (Whereupon Exhibit 14 was
15    marked for identification.)    02:22PM
16  BY MR. FUCHS:
17    Q. And one of the references we looked at
18  earlier was a patent to Dallmann, and I think I've
19  marked it as Mount Exhibit 7. Can you find that?
20    And in Exhibit 7 of the Dallmann '854    02:23PM
21  patent, could you turn to Column 4, lines 38 to
22  43?

204

1    A. Okay.
2    Q. And do you see where in the Dallmann '854
3  patent Mr. Dallmann writes: Polyamides are    02:24PM
4  compatible with ethylene vinyl alcohol copolymers
5  over the entire admissibility range, and therefore
6  are readily worked in. Such mixtures, blends have
7  already been described in European Patent
8  Application Number 0 063 006. The films produced    02:24PM
9  from them, however, are not oriented. Do you see
10  that?
11    A. I see that.
12    Q. Do you have any dispute with Mr. Dallmann
13  as to whether the films described in the '006
14  European patent application are oriented or
15  unoriented?
16    A. If I remember correctly, I think that the
17  '006 patent has oriented structures.    02:24PM
18    Q. So you're using the term "orienting"
19  different than Dallmann did.
20    A. I'm not --
21    MR. TRYBUS: Object to the form of the
22  question.    02:25PM

205

1    THE WITNESS: I'm not sure.
2  BY MR. FUCHS:
3    Q. Take your time, and then give me an answer
4  to the question.
5    A. The films in the '006 patent are oriented    02:25PM
6  by thermoforming.
7    Q. So Dallmann, in his '854 patent, did not
8  consider that type of processing to produce an
9  oriented film, correct?
10    MR. TRYBUS: Object to the form of the    02:25PM
11  question.
12    THE WITNESS: Well, I'm not sure what
13  Mr. Dallmann thought. I know that thermoforming
14  creates orientation, and most people of ordinary
15  skill in the art would have known that as well.
16  BY MR. FUCHS:
17    Q. And Mr. Dallmann could tell from reading
18  the European patent application that it was made
19  from thermoforming, correct?    02:26PM
20    MR. TRYBUS: Object to the form of the
21  question.
22    THE WITNESS: He could have read that,

Henderson Legal Services
(202) 220-4158

Eldridge Mount, III CONFIDENTIAL PORTIONS (CLEARSHIELD DETAILS & EXHIBITS 21-22) SUBJECT TO THE PROTECTIVE ORDER     August 4, 2005

## Chicago, IL

206

1   yes.
2   BY MR. FUCHS:                          02:26PM
3       Q.  But he concluded the films produced in
4   this European patent application are not oriented
5   at Column 4, line 43, of his '854 patent, did he
6   not?
7       A.  He did, but I would have concluded that     02:26PM
8   they were oriented.
9       Q.  Does that suggest to you that you're using
10  a different meaning for the term "oriented" than
11  Mr. Dallmann?
12      MR. TRYBUS:  Object to the form of the        02:27PM
13  question.
14      THE WITNESS:  Well, he might have not
15  recognized that thermoforming created orientation,
16  I'm not sure, but orientation is the molecular
17  alignment of a polymer molecule.
18      In '006 on page 15, he's talking about how
19  the materials are treated.  Let's see.  He's
20  talking about, let's see, thermoforming of films
21  contained in a layer of modified EVOH copolymer.     02:27PM
22      In such procedures the film is heated to a

207

1   temperature below its melting point but above that
2   at which it can be permanently deformed, i.e., its
3   glass transition temperature, and it is subject to
4   either mechanical or fluid pressure so as to        02:28PM
5   modify its shape.
6       This is exactly what's happening in the
7   double bubble process where the film is produced
8   from a tube, and it takes on a three-dimensional
9   tubular shape, so it's not flat, and then later on   02:28PM
10  it's cut and laid flat.
11      The same would be true of a thermoformed
12  shape.  If it was say a Coke bottle, for instance,
13  or some other shape, the film is going to be cut
14  and laid flat into a film much like the bubble of   02:28PM
15  the double bubble process, so what he's describing
16  here is exactly the same sort of orientation
17  conditions that are described in the '419 patent.
18  BY MR. FUCHS:
19      Q.  And that's your opinion.
20      A.  That's what it says.
21      Q.  That's your opinion, correct?
22      A.  That's my opinion, yes.

208

1       Q.  And Mr. Dallmann obviously had a different   02:29PM
2   opinion, correct?
3       A.  Apparently, yes.
4       Q.  Okay.  Let's go mark as Mount Exhibit 15 a
5   U.S. Patent Number 4,680,286 to Motoishi.
6           (Whereupon Exhibit 15 was           02:29PM
7           marked for identification.)
8   BY MR. FUCHS:
9       Q.  Did I give you that one yet?  I apologize.
10  Here we go, Motoishi Exhibit 15.
11      Now, the packaging material described in       02:30PM
12  the Motoishi '286 patent is not oriented; is that
13  correct?
14      Have you refreshed yourself?
15      A.  Not completely, no.
16      Q.  You're still looking?                02:36PM
17      A.  I'm still looking.
18      MR. FUCHS:  Can we go off the record for a
19  second?
20      THE VIDEOGRAPHER:  Off the record at
21  2:39 p.m.
22      (Whereupon a recess was had.)

209

1       THE VIDEOGRAPHER:  On the record at
2   2:42 p.m.
3   BY MR. FUCHS:                            02:42PM
4       Q.  Have you had an opportunity to refresh
5   yourself with respect to the Motoishi '286 patent?
6       A.  Yes, sir, I have.
7       Q.  And do you have an answer to that first
8   question I asked, and let me reput the question     02:43PM
9   back on the record.
10      Is the packaging material described in the
11  Motoishi '286 patent oriented or not oriented?
12      A.  It's my opinion that it contains some
13  molecular orientation based upon the way it was     02:43PM
14  manufactured, which is described in Column 7, line
15  65 to Column 8, line six which says:
16      The multilayer packaging material of this
17  invention may be obtained by a conventional
18  process such as coextrusion, extrusion lamination,   02:43PM
19  dry lamination, et cetera, of which coextrusion is
20  preferred.
21      Further, where film formulation is
22  effected by the coextrusion, the use of air slit