# Unpublished Authority

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

H
(Pursuant to Kansas Supreme Court Rule 7.04(f), unpublished opinions are not precedential and are not favored for citation. They may be cited for persuasive authority on a material issue not addressed by a published Kansas appellate court opinion.)

Court of Appeals of Kansas.
DODSON AVIATION, INC. Appellant,
v.
RAYTHEON AIRCRAFT COMPANY, and
Raytheon Aircraft Services, Inc., Appellees.
**No. 93,731.**

Dec. 23, 2005.

**Background:** Airplane buyer brought action against aircraft company that sold it the airplane and against related aircraft repair company, alleging negligence and tortious interference with a business relationship or expectancy arising out of aircraft company's refusal to reconsider its conclusion that airplane required a particular repair, and repair company's refusal to perform maintenance on airplane. The Franklin District Court, James J. Smith, J., awarded summary judgment to aircraft company and repair company. Buyer appealed.

**Holdings:** The Court of Appeals held that:
(1) aircraft company did not violate its duty of ordinary care by refusing to reconsider its conclusion;
(2) repair company did not breach any duty to buyer by refusing to perform maintenance; and
(3) buyer failed to present any evidence that aircraft company or repair company were motivated by malice.
Affirmed.

**[1] Aviation** 🔑14

48Bk14 Most Cited Cases
Aircraft company that sold airplane to buyer, and that was the "type certificate holder" for the product line to which airplane belonged, did not violate its duty of ordinary care by refusing to reconsider its conclusion that airplane needed particular repair before it could be returned to service; buyer did not allege a breach of any duty imposed on type certificate holders, aircraft company formed its opinion that the repair was necessary before selling airplane to buyer, and aircraft company never wavered in its opinion that airplane required the repair.

**[1] Products Liability** 🔑34
313Ak34 Most Cited Cases
Aircraft company that sold airplane to buyer, and that was the "type certificate holder" for the product line to which airplane belonged, did not violate its duty of ordinary care by refusing to reconsider its conclusion that airplane needed particular repair before it could be returned to service; buyer did not allege a breach of any duty imposed on type certificate holders, aircraft company formed its opinion that the repair was necessary before selling airplane to buyer, and aircraft company never wavered in its opinion that airplane required the repair.

**[2] Aviation** 🔑238
48Bk238 Most Cited Cases
Aircraft repair company did not breach any duty to airplane buyer by refusing to perform maintenance on airplane based on buyer's refusal to perform a repair recommended by aircraft company that sold the airplane to buyer, which was a company related to repair company; repair company had the right to determine its own clientele, and there was no evidence its refusal to perform maintenance on airplane did not comply with company policies.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

**[3] Torts ☞241**
379k241 Most Cited Cases
Airplane buyer failed to present any evidence that aircraft company that refused to reconsider its opinion that airplane required a particular repair, or aircraft repair company that refused to perform maintenance on airplane due to buyer's refusal to perform the repair, were motivated by malice rather than by genuine safety concerns, for purposes of buyer's claims for tortious interference with a business relationship or expectancy relating to its inability to resell airplane; aircraft company compensated former owner of airplane based on its belief that the repair was necessary and always acted consistently with that belief, and repair company had no duty to work on airplane.

**[4] Torts ☞241**
379k241 Most Cited Cases
Refusal by aircraft company that was the type certificate holder for product line to which airplane belonged to reconsider its conclusion that airplane sold to buyer required particular repair before it could be returned to service was not malicious, for purposes of buyer's claim of tortious interference with a business relationship or expectancy, where buyer did not present any additional data to aircraft company to support reconsideration.

Appeal from Franklin District Court; James J. Smith, judge. Opinion filed on December 23, 2005. Affirmed.

Jill Iiams and Kirk Presley, of Monsees, Miller, Mayer, Presley & Amick, of Kansas City, Missouri, for the appellant.

Michael G. Jones and Teresa L. Mah, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for the appellees.

Before RULON, C.J., PIERRON and HILL, JJ.

MEMORANDUM OPINION

PER CURIAM.

**\*\*1** Dodson Aviation, Inc., (Dodson) purchased a used Hawker 700 business jet (Hawker) and refurbished it for resale. Dodson sued Raytheon Aircraft Company (RAC) and Raytheon Aircraft Services (RAS) claiming negligence and tortious interference with a business expectancy for their actions surrounding Dodson's attempted resale of the Hawker. The district court granted summary judgment to both RAC and RAS on all claims finding the facts did not support a duty on either RAC or RAS sufficient to maintain Dodson's claims. Dodson appeals.

Dodson is in the business of buying damaged or distressed business or corporate aircraft and then repairing and refurbishing the aircraft for resale. In 1999, Dodson purchased the Hawker for $1 .25 million and was aware of its history and damaged condition.

RAC is an airplane manufacturer. RAC did not manufacture the Hawker at issue, but it is the owner of the Hawker product line purchased from British Aerospace, Inc., in 1994 and was manufacturing newer Hawkers in the United States. Consequently, RAC is the "type certificate holder" for the Hawker product line. RAS is the sister company of RAC and provides maintenance and repair services for general aviation aircraft manufactured by RAC and other manufacturers. Both RAC and RAS are wholly owned subsidiaries of the Raytheon Company (Raytheon).

Raytheon had purchased the Hawker new from British Aerospace in 1980. Various Raytheon subsidiaries owned the Hawker prior to its purchase by Amana Company, L.P., (Amana) in 1995. In 1994, the Hawker was painted by Arkansas Aerospace, a Raytheon subsidiary, and the sealant between the lap seams was removed with a metal knife or scraper that damaged or scratched the "skin" compromising the integrity of the Hawker and the pressurization of the fuselage.

The scratch damage to the Hawker was not discovered until 1997 when Amana hired Aviation Maintenance and Technical Support (AVMATS) to perform a routine maintenance inspection. In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

January 1998, AVMATS sent RAC skin scratch depth measurements from the Hawker that AVMATS had conducted through Tailwind Aviation. On March 10, 1998, a repair engineer from RAC's repair design office determined, after assessment of the damage to the Hawker, and RAC recommended that the Hawker be reskinned. This report was transmitted to AVMATS. On January 11, 2000, AVMATS made an entry in the Hawker's logbook that the skin scoring was out of limits and that a RAC repair design officer recommended the scored skins be replaced. The entry also states that the owner (Amana) chose not to fix the skin scoring at that time, the Hawker was not approved for return to service, and the Hawker was later removed from AVMATS by Dodson.

Litigation ensued over liability for the scratching of the Hawker and one of the paint shops that had painted the Hawker, which by that time had been purchased by RAC. RAC and the paint shop insurers investigated the claim and settled with Amana for over $1 millon. Amana elected to keep the settlement proceeds and sold the Hawker to Dodson at a deep discount because of the scoring.

**2 Immediately after its purchase of the Hawker, Dodson began efforts to repair and refurbish the Hawker for resale. In February or March 2000, Dodson hired John Provorse, an independent design engineering representative (DER) to inspect the skin scoring damage and advise Dodson on the appropriate repairs in order to return the Hawker to service. A DER is an engineer who stands in the shoes of the Federal Aviation Administration (FAA) and is qualified to approve proposed repairs or refurbishing in order to return an aircraft to service. Dodson addressed the skin scoring damage by using a blending or buffing procedure to remove the scratches as recommended by Provorse. Provorse approved the scratch repair, Dodson's mechanic certified that the repairs were completed in accordance with specific procedures, and on May 15, 2000, all the necessary forms were filed with the FAA. The Hawker was returned to service.

In March 2000, Dodson sent RAC a fax requesting

that RAC dispatch RAC engineers to Dodson's facility in order to approve the blending repairs. The fax stated:

"We require the appropriate personnell [*sic* ] to travel to Olathe, KS. 'IXP' to inspect and verify that this aircraft does not have skin scoring beyond R.A.C. M.M. limits. We could have our company B58 pickup these people at the Beech facility tomorrow and return them after inspection. We have European purchasers on site awaiting this."

Several individuals at RAC reviewed the fax, reviewed the information that RAC had previously inspected the scratches and had recommended reskinning, and decided that unless Dodson complied with the repair design instructions to reskin the Hawker, no further action would be taken by RAC.

Robert Dodson, Jr., testified in a deposition that he contacted Wayne Wallace, RAC's vice president and general counsel, in late March and again requested that RAC send its engineers to Kansas to inspect the Hawker. He testified that Wallace told him, "you bought that fucking airplane cheap and I will be God damned if we do anything to help you make money." Wallace did not deny making this statement.

Dodson did not controvert the fact that neither Dodson nor Provorse ever submitted to RAC the thin-skin study completed by Provorse or the data on which it was based at any time from when the information was compiled in 2000 until the end of 2002 when RAC's engineers were asked to review that information during questioning at a bankruptcy hearing for Dodson.

Dodson claims that around the time it finished the blending and buffing repairs to the Hawker in March 2000, it had an agreement to sell the Hawker to Westair Aviation (Westair). Dodson states this agreement was evidenced by the fax sent to RAC indicating that Dodson was requesting inspection of the repairs because it had "European purchasers on site awaiting this [RAC's postblending inspection]." Dodson contends that Westair backed out of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

purchase agreement as a result of RAC's refusal to assist Dodson in reevaluating the skin thickness of the Hawker. In support of this claim, Dodson cites a letter date March 31, 2000, from Westair stating in part: "Your Hawker is a very nice machine, better-equipped than most we looked at, and we see no justification whatsoever for those [Hawker logbook entries], and you should look seriously about taking some action against AVMATS and Beech, as it will seriously reduce the value of your Aircraft and in many cases, as with ours, prevent the sale."

**\*\*3** RAC and RAS have always maintained that the letter from Westair was inadmissible hearsay because it does not fall within the business records exception. See K.S.A.2004 Supp. 60-460(m).

Dodson also claims it entered an agreement with Galles Racing in October 2000 to sell the Hawker for $3.8 million and that it was unable to consummate the sale because of RAC's failure to reevaluate the Hawker. We have not found this documentation in the record.

In December 2000, RAS issued a company maintenance alert directing RAS facilities to not service the subject Hawker. The alert stated:
  "RAC engineering made a determination not to return this aircraft to service due to excessive airframe scoring. A third party has determined that the aircraft is acceptable for return to service with a life limit. This Maintenance advisory is to inform all Raytheon Aircraft Service Facilities that no inspections, services or maintenance will be performed on this aircraft. Refueling only may be performed."
Dodson did not learn of the maintenance alert until the end of January 2001 when Ron Farish, an aircraft broker with O'Gara Aviation Company, received a copy of the maintenance alert after requesting it from Scott Sweeney at RAS.

Dodson claims it had an agreement to sell the Hawker to Aracel, Inc., for $3.25 million in February 2001, an agreement to sell the Hawker to Express Jets for $2.85 million in June 2001, and an

agreement to lease the Hawker to Million Air in September 2001. RAC and RAS countered these claims in their summary judgment motion by stating that it was uncontroverted that Dodson had no witnesses from Aracel, Express Jets, or Million Air that would testify that the purchase or lease would have been completed but for the actions of RAC or RAS. Dodson did not controvert these facts in its response to the motion for summary judgment.

Dodson alleges several other potential sales of the Hawker that did not go through because the buyers were only willing to pay an amount that was significantly less than what the Hawker was worth, but Dodson does not discuss these sales on appeal.

Dodson filed suit against RAC and RAS on February 12, 2003. Dodson alleged claims of negligence and intentional interference with business opportunity. Extensive discovery was done in this case, resulting in a voluminous record. Dodson later filed a motion to amend to add a claim for punitive damages alleging malicious intent in the actions of RAC and RAS.

After hearing arguments on summary judgment motions filed by RAC and RAS, the district court granted summary judgment to RAS finding it had no duty to work on the Hawker and it was within its rights to inform personnel within the company that they were not to work on the Hawker in question. The court dismissed RAS from the lawsuit. The court found RAC was the aircraft type certificate holder, had conducted previous investigations, had issued previous opinions, and had a duty to continue the process as it saw fit to make sure that its prior evaluations remained correct. The court stated there were sufficient factual matters still in dispute concerning RAC's acceptance of the duty and whether it continued to perform its obligations pursuant to its duty. The court denied Dodson's motion to amend to add a claim for punitive damages finding the case was not appropriate for punitive damages.

**\*\*4** Both parties filed motions for reconsideration. After hearing arguments on the motions, the district

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

court denied Dodson's motion for reconsideration of its decision granting summary judgment to RAS. The court reaffirmed its previous ruling that RAS had no particular duty to work on the Hawker, RAS could refuse to work on airplanes as it saw fit, the internal maintenance alert was appropriate company action, and disclosure of the alert was not tortious interference.

However, the district court reversed its prior ruling concerning RAC and granted summary judgment in favor of RAC. The court stated that it had previously considered RAC's position as the type certificate holder, that its original investigation of the Hawker did not create a duty to revisit the investigation when no additional information had been submitted to it.

The cornerstone of the district court's summary judgment rulings in this case is that RAC and RAS had no duty to Dodson. RAC, even as the type certificate holder, had no duty to reevaluate the Hawker because it had given a previous opinion that reskinning was necessary and Dodson had not provided any new information to RAC to necessitate a re-evaluation. RAS had no duty to service the Hawker, and it could properly issue internal maintenance alerts to inform company personnel to not service the Hawker.

Dodson contends the district court erred in granting summary judgment to RAC and RAS on the negligence claims.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be

material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]" *Bracken v. Dixon Industries, Inc.,* 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

Dodson argues the district court erred in granting summary judgment to RAC because RAC owed Dodson the duty to exercise ordinary care involving the special relationship between the two companies. Dodson cites *Boulanger v. Pol,* 258 Kan. 289, 304, 900 P.2d 823 (1995), for the general point of law that where parties are involved in a special relationship, a party must warn the other party to the relationship where a foreseeable peril is not readily discoverable. Dodson also cites *Michaud v. Fairchild Aircraft Incorporated,* 2001 WL 34083885 (Del.Super.2001), unpublished opinion filed November 16, 2001, and several provisions of the Code of Federal Regulations (CFR) concerning aircraft type certificates and the obligations of the type certificate owners. See 14 C.F.R. § 21.3(a) (2005) (report any failures, malfunctions and defects); 14 C.F.R. § 21.3(f) (2005) (report results of all investigations concerning service difficulty); 14 C.F.R. § 21.50(b) (2005) (furnish aircraft owners with instructions for continued airworthiness).

**\*\*5** Dodson claims that RAC, as holder of the type certificate, had a duty of ordinary care regarding airworthiness, that RAC created a foreseeable peril by not confirming its prior opinion of reskinning, and that it was not foreseeable that RAC would refuse to reconsider its opinion even after the DER and the FAA returned the Hawker to service. Dodson also states that RAC's refusal to reconsider its opinion is contrary to the company's advertised position to the general aviation public that it supports the type of aircraft that it manufactures.

RAC contends it was more than willing to analyze new data, which Dodson did not provide prior to the lawsuit, but that the crux of Dodson's complaint is that RAC would not conform its engineering

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

opinion to that held by Dodson. RAC states that Dodson agreed with this lack of conformity in its summary judgment response: "The defendant did not have to agree with the owners conclusions as to what repairs that data necessitated, but Defendant Raytheon did have a duty to reasonably and objectively consider it."

RAC states that it did not deviate from its policies and procedures because it did not have a duty to accept all aircraft for which it held the type certificate and Dodson simply did not agree with RAC's opinion as to the appropriate repairs for the Hawker.

Dodson also argues RAC developed a special relationship between the parties because RAC had previously rendered services to the Hawker's prior owner which were necessary to protect the prior owner. See *Reynolds v. Kansas Dept. of Transportation,* 273 Kan. 261, 267, 43 P.3d 799 (2002) (KDOT failed to maintain a fence it installed and a cow slipped through the fence causing a fatal accident, KDOT had duty to maintain fence). Consequently, Dodson argues RAC undertook the act of providing engineering support for the Hawker before Dodson purchased it and it was reasonable for Dodson to rely on RAC's prior support after the purchase.

RAC denies a special relationship based on previous opinions or support provided to the previous owners of the Hawker. RAC states Dodson was not the owner of the Hawker when it rendered its opinion, the opinion was limited to what repairs were necessary, and its undertaking of issuing the opinion was complete prior to Dodson's purchase of the Hawker. RAC states that it has never deviated from its opinion that the Hawker needed to be reskinned.

Dodson makes the same arguments regarding a special relationship with RAS. Dodson argues RAS created a foreseeable peril for Dodson by issuing the maintenance alert. Dodson contends it was not foreseeble that RAS would issue the alert even after the DER and the FAA had already returned the

Hawker to service, but it was extremely foreseeable that if RAS issued this alert, it would greatly harm Dodson's chances for sale of the Hawker. Similarly, Dodson argues the issuance of the alert was contrary to RAS's procedure and company policies and that, at the very least, RAS owed Dodson a duty to physically inspect the Hawker prior to issuing the alert.

**\*\*6** Dodson sets forth the analogy that its situation is similar to the owner of the Mercedes line of cars alerting all Mercedes dealerships not to work on a specific Mercedes automobile. Dodson claims the value of the car would be greatly diminished by the fact that no Mercedes dealership would work on the car if there was a problem.

RAS maintains the district court correctly found RAS had no duty to service, support, or repair the Hawker. RAS states that it is uncontroverted that RAS facilities are not the only facilities authorized to service, support, or repair Raytheon's airplanes. RAS claims that in Dodson's Mercedes example, if the car owner had an independent repair shop replace the brake pads instead of replacing the entire brakes as previously recommended by the Mercedes dealership, then the dealership would not be obligated to revisit its opinion regarding the entire brake replacement. In turn, Mercedes should not be penalized because it refuses to work on the car, the marketplace might agree with its repair opinion, and that potential buyers may find out about the Mercedes' repair opinion and refuse to purchase the car in deference to that opinion.

The necessity of proving the existence of a duty is based on the requirements of establishing negligence. In *Williamson v. City of Hays,* 275 Kan. 300, 311, 64 P.3d 364 (2003), the court said: " 'In order to establish negligence, a plaintiff must prove the existence of a duty, a breach of that duty, an injury, and proximate cause, that is, a causal connection between the duty breached and the injury suffered.' [Citation omitted.]" The necessity of establishing the existence of a duty is essential, for without a duty there can be no breach to support Dodson's claim. See *Hackler v. U.S.D. No. 500,* 245

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

Kan. 295, 297, 777 P.2d 839 (1989).

A fundamental rule of tort analysis is that actionable negligence must be based on a breach of duty. *Calwell v. Hassan,* 260 Kan. 769, 777, 925 P.2d 422 (1996). The plaintiff is required to prove the existence of a duty owed to him or her by the defendant. *P.W. v. Kansas Dept. of SRS,* 255 Kan. 827, 831, 877 P.2d 430 (1994). The existence of a legal duty is a question of law to be determined by the court. *McGee v. Chalfant,* 248 Kan. 434, 437, 806 P.2d 980 (1991).

The question of negligence is very fact sensitive. Each case's facts must be examined in context to determine if they are sufficient to prove negligence. However, the ultimate determination of the presence or absence of negligence is left to the trier of fact. See *Sterba v. Jay,* 249 Kan. 270, 278, 816 P.2d 379 (1991). However, where no evidence is presented on a particular issue or the evidence presented is undisputed and it is such that the minds of reasonable persons may not draw differing inferences and arrive at opposing conclusions with reason and justice, the matter becomes a question of law for the court's determination. *Sampson v. Hunt,* 233 Kan. 572, 578, 665 P.2d 743 (1983).

**\*7** RAC correctly states that *Michaud* did not recognize any "special relationship" between the holder of an aircraft's type certificate and the dealers of that type of aircraft. Indeed, such language is not even used in the opinion. "A type certificate is a certificate issued by a government agency to an aircraft or component part manufacturer to reflect the agency's determination that the aircraft or component part meets applicable regulatory standards. [Citation omitted.]" *Bain v. Honeywell Intern.,* 167 F.Supp.2d 932, 939 (E.D.Tex.2001). In explaining the type certificate owners duties, the *Michaud* court explained, "A duty of ordinary care arises from ownership of the type certificate. [Fairchild Aircraft's] conduct will be measured by what it knew or should have known from the time it acquired the type certificate and thereafter."

[1] The district court did not err in granting summary judgment to RAC based on RAC's failure of its duty of ordinary care by not reevaluating the Hawker or RAS's refusal to service the Hawker and its issuance of the maintenance alert. As evidenced by the CFR, duties arise from ownership of the type certificate, regardless of whether the type certificate holder manufactured the alleged aircraft, but Dodson does not allege RAC or RAS failed in any duty under the CFR. Under products liability theory, RAC has the duty to make reasonable efforts to warn the consuming public of newly discovered, serious hazards in its product line. See, *e.g., Patton v. Hutchinson Wil- Rich Mfg. Co.,* 253 Kan. 741, 861 P.2d 1299 (1993). The manufacturer's duty is to warn of risks that arise from the product as originally designed and manufactured. See 253 Kan. at 755-56, 861 P.2d 1299. RAC exercised its duty of reasonable care in requesting that in order to obtain RAC's approval, Dodson needed to reskin the Hawker. During the time prior to Dodson's purchase of the Hawker and the time of Dodson's alleged failed resales of the plane, RAC never waivered in its opinion. It can hardly be argued that RAC did not exercise a duty of reasonable care by ordering a higher level of repair and safety than that obtained by Dodson when RAC had given this recommendation throughout the duration of the relevant time period.

[2] Similarly, RAS did not have a duty to be the only facility for repair of the Hawker. It was fully within its rights as a business owner to determine its clientele. There is no evidence the issuance of the maintenance alert did not comply with company policies and was probably sound advice considering the potential liability for RAS when RAC did not agree with the repairs completed by Dodson, had no new information to change its opinion, and the Hawker had been cleared for flight by the DER.

For the most part, the district court did not address the substance, or the traditional elements, of Dodson's claims for tortious interference with a prospective business advantage or relationship. In fact, the court's ruling on the tort claim against RAC is almost inferred. The district court's holding was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

that RAC had no duty to reevaluate the Hawker without new information submitted by Dodson and without a duty the failure to reevaluate was not tortious. The court also stated that RAS had no duty to work on the Hawker and the issuance of the maintenance alert was proper; consequently, neither the failure to work nor the maintenance alert was tortious.

**8 [3] Dodson argues there were genuine issues of material facts, such that summary judgment was improper on the claims that RAC and RAS tortiously interfered with a prospective business advantage or relationship. Our standard of review for issues decided on summary judgment is the same as previously stated, and we must determine whether there are no genuine issues of material fact that would prevent judgment as a matter of law. See *Bracken,* 272 Kan. at 1274-75, 38 P.3d 679.

Kansas recognizes a cause of action for tortious interference with a prospective business advantage or relationship. See *Burcham v. Unison Bancorp, Inc.,* 276 Kan. 393, 424-25, 77 P.3d 130 (2003). A plaintiff may recover damages from a defendant for tortious interference with a prospective business advantage or relationship provided the plaintiff establishes:

"(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct." *Turner v. Halliburton Co.,* 240 Kan. 1, 12, 722 P.2d 1106 (1986).

The lines of demarcation between tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage or relationship are sometimes blurred, but both torts are predicated on malicious conduct by the defendant. While these torts tend to merge somewhat in the ordinary course, tortious interference with a contract is generally aimed at preserving existing contracts, and tortious interference with prospective business advantage or relationship is aimed at protecting future or potential contractual relations. See 240 Kan. at 12, 722 P.2d 1106.

Dodson must prove malicious conduct on the part of the RAC and RAS. See *Turner,* 240 Kan. at 12, 722 P.2d 1106; PIK Civ.3d § 124.92. Summary judgment is not appropriate in a claim for tortious interference with contract when material facts giving rise to the alleged interference and possible justification for the alleged interference are controverted. *Reebles, Inc. v. Bank of America, N.A.,* 29 Kan.App.2d 205, Syl. ¶ 4, 25 P.3d 871, *rev. denied* 272 Kan. 1419 (2001).

"[M]alice is a predicate for tortious interference and is not limited to cases involving allegations of defamatory conduct." *L & M Enterprises Inc. v. BEI Sensors & Systems Co.,* 231 F.3d 1284, 1288 (10th Cir.2000); See *Burcham,* 276 Kan. 393, 77 P.3d 130 (court found tortious interference predicated upon malicious conduct in a case not involving defamatory conduct, by adopting shareholder's rights plan and making unauthorized threats and demands; court remanded however on factual issues on defendant's motive and causation).

**9 Requiring a finding of malice necessitates a standard of review on summary judgment similar to cases where defamation was the underlying tortious conduct.

" 'In general, the question of actual malice in a defamation action is a question of fact for the jury. However, under certain circumstances, a motion for summary judgment and the granting of that motion are appropriate. If the plaintiff fails to offer clear and convincing evidence of an extrinsic character to prove actual malice on the part of the defendant in the publication of a slander on a qualifiedly privileged occasion, there is no issue of material fact to be determined, and it is the duty of the trial court to grant the defendant's motion for summary judgment."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 P.3d 1083 (Table)                                    Page 9

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

*Davis v. Hildyard,* 34 Kan.App.2d 22, 29, 113 P.3d 827 (2005)(quoting *Knudsen v. Kansas Gas & Electric Co.,* 248 Kan. 469, 480-81, 807 P.2d 71 (1991). Under this standard, we must determine whether Dodson has offered clear and convincing evidence of an extrinsic character to prove malice on the part of RAC. If Dodson fails to present any material fact to be determined, then there is no error on the part of the district court in granting summary judgment.

The tort claims against RAC and RAS vary only slightly and can be addressed to together. Dodson's underlying claim of malice is that reskinning the Hawker only became necessary because Dodson bought the Hawker cheap. Since RAC paid a significant amount of money to the prior owner of the Hawker because of the damage at issue in this case, allegedly RAC refused to change its engineering opinion and RAS issued the maintenance alert only for the purpose of interfering with potential sales of the Hawker.

Dodson argues summary judgment was improperly granted to RAC on the claim of tortious interference because there were genuine issues of material fact as to RAC's motives as the holder of the type certificate in refusing to support the Hawker and whether those motives constituted malice. Dodson claims it is controverted whether RAC's motives were actually based on safety and liability concerns. It claims RAC's refusal to reevaluate the Hawker, its refusal to support a used Hawker, and its communications indicating a refusal to help Dodson make any money from the resale of the Hawker were to interfere with potential sales of the Hawker and prevented Dodson from profiting from the sale of the Hawker.

Dodson's claim against RAS is different in that RAS's issuance of the maintenance alert allegedly constituted malice. Dodson claims it was unprecedented for RAS to issue this type of maintenance alert on an aircraft that RAS had never worked on and that the alert should have been communicated solely with the owner, not potential buyers. Dodson alleges the maintenance alert was

not issued until after the scoring damage was blended, after the measurements showed the Hawker was within standards set by RAC, and after the FAA officially approved the Hawker for return to service.

**\*\*10** The district court's ruling and Dodson's arguments at the district court level and on appeal concern Dodson's failure to establish the fourth element of a cause of action for tortious interference with a business relationship or expectancy, namely intentional misconduct by the defendant. The court did not address any of the other elements; consequently, it is only necessary to address those elements if the court erred in finding RAC and RAS did not violate any duty to Dodson. We find no such error.

From the beginning, when RAC paid over $1 millon to Amana because it believed the Hawker needed reskinning, RAC's actions were consistent with a bona fide belief that the Hawker was not safe without reskinning. Dodson has not established malice by clear and convincing evidence under these facts except through rank speculation. The fact that RAC's beliefs probably made it more difficult to sell the Hawker does not convert the situation into a tortious interference with a business expectancy.

[4] The district court did not err in granting summary judgment to RAC and RAS on the claims of tortious interference with a business relationship or expectancy. Dodson has failed to establish any misconduct on the part of RAC or RAS that could be termed malicious. RAS had no particular duty to work on the Hawker in question and, as stated previously, the issuance of the internal maintenance alert was appropriate company action considering RAC's opinion with regard to the necessary repairs. Further, RAC's actions of failing to reevaluate the Hawker were anything but malicious, even as type certificate holder, where RAC had no duty to revisit its original investigation of the Hawker when no additional information had been submitted to it.

Last, Dodson argues the district court abused its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.)
**Unpublished Disposition**

**(Cite as: 124 P.3d 1083, 2005 WL 3527064 (Kan.App.))**

discretion in refusing to grant its motion to amend its petition to add a claim for punitive damages. Contemplation of this issue is moot due to our ruling above.

Affirmed.

124 P.3d 1083 (Table), 2005 WL 3527064 (Kan.App.), Unpublished Disposition

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 1

Not Reported in F.Supp.2d, 2004 WL 2758672 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H** Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

INTEGRAL RESOURCES (PVT) LIMITED, a Pakistani corporation, Plaintiff,

v.

ISTIL GROUP, INC., a Delaware corporation, Defendant.

**No. 03-904 (GMS).**

Dec. 2, 2004.

Joseph S. Naylor, Pepper Hamilton LLP, Wilmington, DE, for Plaintiff.

Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, Wilmington, DE, for Defendant.

*MEMORANDUM*

SLEET, J.

## I. INTRODUCTION

**\*1** The plaintiff, Integral Resources (PVT) Limited ("Integral"), filed the above-captioned action against ISTIL Group, Inc. ("ISTIL") on September 24, 2003. In its complaint, Integral alleges that ISTIL interfered with its contractual relationship with the Progress Agency ("Progress"), a Ukranian Republic foreign trade firm and agency of the government of Ukraine, by inducing Progress to terminate its contract with Integral. Integral further alleges that ISTIL interfered with prospective contractual relations arising from Integral's long-term business relationship with Progress.

Presently before the court is ISTIL's renewed motion to dismiss Integral's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons that follow, the court will grant ISTIL's motion.

## II. BACKGROUND

Integral, a military equipment consultant, is incorporated under the laws of Pakistan, with its principal place of business in Pakistan. ISTIL is a Delaware corporation, with its principal place of business in West Linn, Oregon. footnote.reference ISTIL is engaged in the business of manufacturing and trading steel products.

> FN1. ISTIL disputes this allegation, asserting that it is not registered to do business in Oregon and that its principle place of business is Ukraine. However, he court must accept as true the well-pleaded allegations of the complaint. *See Doug Grant Inc. v. Great Bay Casino Corp.,* 232 F.3d 173, 183-84 (3d Cir.2000). Thus, the court will consider Oregon as ISTIL's principle place of business for purposes of this motion.

Integral alleges that, on November 4, 1995, it entered into a contract with Progress (the "Progress Contract") to assist Progress in developing, marketing, and implementing the sale of military equipment-initially the T-80 UD tank-for the government of Pakistan. The Progress Contract was allegedly amended several times after its execution, enlarging the scope of Integral's business relationship with Progress. Specifically, Integral was to be the sole and exclusive commercial consultant on all projects between Progress and the Pakistani government, including, but not limited to, the A1-Kahlid tank project. Additionally, Integral and Progress agreed by amendment that the contract between them would remain in effect as long as the T-80 UD tank remained in service for the Pakistani government.

Integral further alleges that, in 2001, ISTIL embarked on a mission to usurp the economic benefits of the Progress Contract and to disrupt

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2758672 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Integral's business relationship with Progress. According to Integral, ISTIL, with the aid of its Ukrainian lawyers, specifically Volodymyr Petryna ( "Petryna"), formed Reventox Consulting Limited (" Reventox"), a company incorporated under the laws of Cyprus. ISTIL then had Petryna approach and falsely advise Progress that it would be permissible to breach the Progress Contract in order to enter into a new agreement with Reventox.

According to the complaint, at the time that ISTIL and Petryna induced Progress to terminate the Progress Contract, they knew that the termination would violate the terms of the contract, and that their efforts to interfere with the contract were unlawful. Petryna allegedly advised ISTIL that there was a need for secrecy and that it should devise a plan to avoid suspicions concerning its actions.

As a result of ISTIL's and Petryna's efforts, Progress allegedly terminated the Progress Contract, entered into a new contract with Reventox (the "Reventox Contract"), and severed its long-standing business relationship with Integral.

**\*2** Integral additionally alleges that the Reventox Contract was a fraud at its inception because it violated a contract between the Pakistani and Ukranian governments. According to Integral, the terms of the Reventox Contract authorized the payment of millions of dollars of commissions to Reventox for Progress. ISTIL then used these " secret commissions" to pay kickbacks to, among others, the representatives of Progress who allegedly participated in and authorized ISTIL's efforts to steal the Progress Contract.footnote.reference

> FN2. ISTIL's alleged criminal conduct is not at issue in the present case. Thus, the court will not address Integral's allegations of fraud with respect to the Reventox Contract.

On September 24, 2003, Integral filed its complaint, alleging tortious interference with a contract and tortious interference with prospective contractual

relations. On November 10, 2003, ISTIL filed a motion to dismiss under the doctrine of *forum non conveniens,* arguing that the case should be heard in Ukraine, not in Delaware. Alternatively, ISTIL moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that Integral had failed to state a claim for which relief could be granted under Ukranian law.

On January 5, 2004, the court issued an order denying ISTIL's motion to dismiss, without prejudice, on the ground of *forum non conveniens.* The court declined to issue a ruling on ISTIL's Rule 12(b)(6) motion because the factual record on the choice-of-law issue was not yet fully developed. The court subsequently ordered the parties to conduct limited discovery and requested further briefing on the choice-of-law issue. On April 2, 2004, ISTIL filed a renewed Rule 12(b)(6) motion to dismiss.

### III. STANDARD OF REVIEW

ISTIL moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal is appropriate pursuant to this Rule if the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In this inquiry, the court must accept as true and view in the light most favorable to the non-movant the well-pleaded allegations of the complaint. *Doug Grant, Inc. v. Great Bay Casino Corp.,* 232 F.3d 173, 183-84 (3d Cir.2000). The court 'need not accept as true " unsupported conclusions and unwarranted inferences." ' *Id.* (quoting *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 n. 13 (3d Cir.1998)) (quoting *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.,* 113 F.3d 405, 417 (3d Cir.1997)). However, it is the duty of the court " 'to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable." ' *Id.* at 184 (quoting *City of Pittsburgh,* 147 F.3d at 263).

### IV. DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2758672 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

A. Choice of Law

Before the court addresses the sufficiency of Integral's complaint, it must determine whether Delaware or Ukranian law applies to Integral's allegations. footnote.reference Delaware courts apply the "most significant relationship test" of the Second Restatement of Conflicts. *See Travelers Indemnity Co. v. Lake,* 594 A.2d 38, 47 (Del.1991) (adopting the most significant relationship test from the Second Restatement of Conflicts). Section 145 of the Restatement directs the court to apply the law of the state that "has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 145. After applying the factors set forth in Sections 145 and 6 and evaluating the contacts according to their relative importance with respect to the alleged tortious acts, the court concludes that Ukraine, not Delaware, has the most significant relationship to the acts. Thus, Ukranian law applies to the claims asserted by Integral.footnote.reference

FN3. The court will apply Delaware choice of law rules to determine what law governs Integral's claims. *See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Brown v. SAP America, Inc.,* No. C.A. 98-507-SLR, 1999 WL 803888, at *4 (D.Del. Sept.13, 1999).

FN4. Indeed, the only reference to Delaware in the complaint is in paragraph two, which alleges that ISTIL is a corporation organized and existing under the laws of Delaware.

1. Section 145 Factors

**\*3** Section 145 sets forth the relevant contacts that the court should consider when applying the principles of § 6 to determine the law applicable to an issue. These factors include: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicil,

residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Id.* The court should evaluate the contacts according to their relative importance with respect to the particular issue. *Id.; see also Travelers Indemnity,* 594 A.2d at 48 ("[T]he Restatement test does not authorize a court to simply add up the interests on both sides of the equation and automatically apply the law of the jurisdiction meeting the highest number of contacts listed in sections 145 and 6. Section 145 has a qualitative aspect.").

The complaint alleges that ISTIL, with the aid of its Ukrainian lawyers, more specifically Petryna, orchestrated a scheme to usurp from Integral the economic benefits of the Progress Contract and its business relationship with Progress. The Progress Contract that is the subject of ISTIL's alleged unlawful conduct was negotiated and performed in Ukraine and Pakistan. The places of injury are, therefore, Ukraine and Pakistan.footnote.reference

FN5. Neither party has argued that the court should apply Pakistani law.

The place where the conduct causing the injury occurred is Ukraine. Integral alleges that ISTIL and Petryna induced Progress to breach the Progress Contract. ISTIL's wrongful conduct includes placing Petryna at Progress' disposal in Ukraine. As previously discussed, Petryna then allegedly advised Progress that it would be permissible to terminate the Progress Contract and enter into the Reventox Contract. In addition, Integral accuses Petryna of preparing the termination letter that Progress sent to Integral. Furthermore, Petryna allegedly advised ISTIL that it should proceed with secrecy and avoid starting a scandal. Lastly, Integral alleges that Progress ended its business relationship with Integral as a result of ISTIL's and Petryna's interference. Progress is an agency of the Ukraine government. Petryna and his associates were advising Progress and ISTIL from the Yuris Law Offices, located in Ukraine. ISTIL committed the alleged unlawful acts in Ukraine. Thus, the conduct causing the injury occurred in Ukraine.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2758672 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

The third factor the court must consider is the place of incorporation and place of business of the parties. In the present case, this factor does not point to any one location. Integral's place of incorporation and principal place of business is Pakistan. ISTIL's place of incorporation is Delaware. According to the complaint, ISTIL's principal place of business is Oregon. Comment e to § 145 is instructive on the importance that the court should afford this factor when evaluating it in light of the other § 145 factors: the "relative importance [of place of incorporation and place of business of the parties] varies with the nature of the interest affected." Restatement (Second) of Conflicts of Laws § 145 cmt. e. In the case of some torts, "the importance of these contacts depends largely upon the extent to which they are grouped with other contacts. The fact, for example, that one of the parties is domiciled or does business in a given state will usually carry little weight of itself." *Id* Given the foregoing, the court concludes that this factor does not favor Delaware. At most, it is neutral.

**\*4** The last element of § 145, the place where the relationship between the parties is centered, is inapplicable because Integral and ISTIL did not have an existing relationship.

When deciding a choice of law issue such as that before the court, "Delaware courts place considerable emphasis on 'the place where the injury occurred' and 'the place where the conduct causing the injury occurred." ' *Rudisill v. Sheraton Copenhagen Corp.,* 817 F.Supp. 443, 448 n. 7 (D.Del.1993) (citations omitted). Ukraine is one of the places where the injury occurred and the place where the conduct causing the injury occurred. In addition, the place of incorporation and place of business are neutral, and the place where the relationship between the parties is centered is inapplicable. Given its analysis of the § 145 factors, the court concludes that Ukraine has the most significant relationship to the conduct about which Integral complains. Thus, the court will apply Ukrainian law. The inquiry does not end with § 145, however, as the court must also evaluate ISTIL's acts with regard to the § 6 factors.

### 2. Section 6 Factors

Section 6 of the Restatement provides the following choice of law considerations: (a) the needs of the interstate and international systems (e.g., choice of law rules should seek to further harmonious relations and facilitate intercourse between states); (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of the result; and (g) ease in determination and application of the law to be applied. Restatement (Second) of Conflicts of Laws § 6. Given the principles set forth in § 6, the court finds that Ukranian law applies to Integral's claims.

The needs of the interstate and international systems favor application of Ukranian law. The Progress Contract was formed in order to facilitate the sale of military equipment by Progress to the Pakistani government. Ukraine has an interest in overseeing the negotiation and performance of its military contracts. Delaware has no such interest in the subject matter of the present case.

The relevant policies of the forum also favor Ukraine. Comment e to § 6 states that a court should not apply a forum state's law "where the state of the forum has no interest in the case apart from the fact that it is the place of the trial of the action." Restatement (Second) of Conflicts of Laws § 6 cmt. e. Integral has not alleged that any of ISTIL's wrongful conduct occurred in or affected Delaware. Thus, Delaware's only interest in the case is that it is the place of trial. As previously discussed, Ukraine has an interest in overseeing its military contracts. In addition, Ukraine has a criminal interest in the case-in June 2003, the Attorney General of Ukraine instituted a criminal investigation relating to the termination of the Progress Contract and related criminal acts by Progress and its director.

**\*5** The third factor, the relevant policies and relative interests of the other interested states, favors Ukraine. While the forum should give

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2758672 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

consideration to its own relevant policies and the relevant policies of all other interested states, the forum should also appraise the relative interests of the states involved in the determination of the particular issue. *Id.* cmt. f. The state whose interests are most deeply affected should have its local law applied. *Id.* Integral alleges that ISTIL interfered with its contract and its business relationship with Progress. Integral asserts further that this interference occurred in Ukraine and that Progress is an agency of the Ukrainian government. Furthermore, Integral has sought relief in Ukraine by filing a complaint with the Attorney General of Ukraine and demanding an investigation into ISTIL's and Progress' conduct. *See* Def.'s Br. at 22-23; Berman Dec. Exh. L, at 2; *id.* Exh. M, at 1. In contrast, the policies of the other interested states, particularly Delaware, are not affected. Thus, Ukraine's interests are most deeply affected, and it should have its local law applied.

The protection of justified expectations as well weighs in favor of applying Ukranian law. "[I]t ... [is] unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." Restatement (Second) of Conflicts of Laws § 6 cmt. g. Assuming, as the court must, that ISTIL's conduct occurred in Ukraine, it is reasonable for the court to conclude that ISTIL had justifiably molded its conduct to conform to the requirements of Ukranian, not Delaware, law.

The next factor the court must consider is the basic policies underlying the particular field of law. This factor is most important when differences between the policies of the interested states are not minor. The policies of Delaware and Ukraine, however, are significantly different (*i.e.* Delaware recognizes claims for tortious interference with contract and tortious interference with prospective contractual relationships, while Ukraine does not). Thus, this factor is inapplicable.

Predictability and uniformity of result favor the court's application of Ukranian law. These factors are intended to prevent forum shopping. Integral's decision to pursue this case in Delaware, despite the fact that ISTIL's only alleged connection to the state is that Delaware is its place of incorporation, suggests that Integral is forum shopping. Moreover, as previously discussed, Integral has filed several complaints with the Attorney General in Ukraine and demanded an investigation into ISTIL's conduct in Ukraine-further evidence that Integral is forum shopping.

The final § 6 factor serves as a guideline for courts and addresses the application of choice of law rules. It states that the rules should be simple and easy to apply. The Delaware rules are simple and easy to apply because the court only needs to determine which interested state has the most significant relationship to the issue. In the present case, pursuant to the principles enunciated in § 6, the court concludes that Ukraine has the most significant relationship to ISTIL's conduct. The court, therefore, will apply Ukrainian law to Integral's tort claims.

### B. Integral's Tort Claims

**\*6** Integral's complaint alleges violations of two common law precepts: (1) tortious interference with contract; and (2) tortious interference with prospective contractual relations. As discussed above, the court will apply Ukranian law to Integral's claims. The law of Ukraine, however, does not recognize Integral's claims. Accordingly, the court must dismiss Integral's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) because it does not state a cause of action under Ukranian law. *See MM Global Serv., Inc. v. Dow Chem. Co.,* 283 F.Supp.2d 689, 704 (D.Conn.2003) (dismissing common law claims alleging tortious interference with business expectancies, Tortious interference with contractual relationships, and unfair competition because they were not actionable under Indian law); *Atlantic Richfield Co. v. ARCO-Globus Int'l Co.,* No. 95 Civ. 6361, 1996 WL 742863, at \*5 (S.D.N.Y. Dec.31, 1996).

### *ORDER*

For the reasons stated in the court's Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 2758672 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Renewed Motion to Dismiss
(D.I.47) is GRANTED.

D.Del.,2004.
Integral Resources (PVT) Ltd. v. Istil Group, Inc.
Not Reported in F.Supp.2d, 2004 WL 2758672
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03cv00904 (Docket) (Sep. 24, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

155 Fed.Appx. 69                                                              Page 1

155 Fed.Appx. 69, 2005 WL 3134068 (C.A.3 (Del.))
**(Cite as: 155 Fed.Appx. 69)**

**H**

Briefs and Other Related Documents
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please
use FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
INTEGRAL RESOURCES (PVT) LIMITED, a
Pakistani Corporation, Appellant
v.
ISTIL GROUP, INC., a Delaware Corporation.
**No. 05-1054.**

Argued Sept. 29, 2005.
Decided Nov. 23, 2005.

**Background:** Pakistani corporation alleged
corporation chartered in Delaware and having its
principal place of business in Ukraine tortiously
interfered with its contract with corporation owned
by government of Ukraine under which Pakistani
corporation was to act as exclusive commercial
consultant in connection with sale of Ukranian
battle tanks to Pakistani military. The United States
District Court for the District of Delaware, 2004
WL 2758672,Gregory M. Sleet, J., applied
Ukrainian law and granted defendant's motion to
dismiss. Plaintiff appealed.

**Holdings:** The Court of Appeals, Weis, Circuit
Judge, held that:

1(1) that English common law recognized the
common law tort of interference with contractual
relations was insufficient to support selection of
English law as governing dispute;

2(2) District Court was not required to consider
Pakistani law sua sponte in determining whether
Pakistan had the most significant relationship to

dispute; and

3(3) Ukraine had most significant contacts with
dispute, such that its law should govern the merits.

Affirmed.

West Headnotes

**[1] Torts 379 ⟡⟿202**

379 Torts
   379III Tortious Interference
     379III(A) In General
       379k202 k. What Law Governs. Most
Cited Cases
That English common law recognized the common
law tort of interference with contractual relations
was insufficient to support selection of English law
as governing dispute between a Ukraine-based
company and a Pakistan-based company over
contract to be performed in those two countries.

**[2] Torts 379 ⟡⟿202**

379 Torts
   379III Tortious Interference
     379III(A) In General
       379k202 k. What Law Governs. Most
Cited Cases
District Court was not required to consider
Pakistani law sua sponte in determining whether,
for choice of law purposes, Pakistan had the most
significant relationship to private dispute between a
Ukraine-based company and a Pakistan-based
company over contract to be performed in those two
countries. Restatement (Second) of Conflict of
Laws, §§ 6, 145.

**[3] Torts 379 ⟡⟿202**

379 Torts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

155 Fed.Appx. 69, 2005 WL 3134068 (C.A.3 (Del.))
**(Cite as: 155 Fed.Appx. 69)**

379III Tortious Interference
   379III(A) In General
      379k202 k. What Law Governs. Most
Cited Cases
Ukraine, and not Delaware, had most significant
contacts with private dispute between a
Ukraine-based company that was chartered in
Delaware and a Pakistan-based company over an
agreement regarding sale of Ukranian battle tanks to
Pakistani military, such that Ukranian law should
govern the merits; alleged plotting, conspiracy, and
machinations that gave rise to Pakistan-based
company's tortious interference with contract claims
occurred in Ukraine. Restatement (Second) of
Conflict of Laws, §§ 6, 145.

**\*69** Appeal from the United States District Court
for the District of Delaware. (D.C.Civ. No.
03-cv-00904). District Judge: Honorable Gregory
M. Sleet.

**\*70** Jeremy D. Frey, (Argued), Matthew J. Hank,
Pepper Hamilton LLP, Philadelphia, PA, Sean
Donahue, Donahue & Associates, Portland Oregon,
for Appellant.
Steven C. Berman, (Argued), Keith A. Ketterling,
Stoll, Stoll, Berne, Lokting & Shlachter PC,
Portland, Oregon, for Appellee.

Before RENDELL, FUENTES, and WEIS, Circuit
Judges.

OPINION

WEIS, Circuit Judge.
**\*\*1** This appeal is from a judgment in favor of the
defendant in a suit for tortious interference with a
contract. The primary issue is the choice of law to
be used in resolving the dispute. We agree with the
District Court that the place where the conduct
causing the injury occurred provides the applicable
law. We will affirm the judgment of the District
Court.

In November 1995, plaintiff Integral Resources
(PVT) Limited ("Integral"), a Pakistani corporation,
entered into a contract with Progress, a corporation
owned by the government of Ukraine. The
agreement provided that Integral would act as the

exclusive commercial consultant to Progress in
connection with its sale of battle tanks to the
Pakistani military. The contract further stated that
the law of England would apply and any disputes
would be resolved by arbitration.

In a complaint filed in the United States District
Court for the District of Delaware, Integral alleged
that, in 1992, defendant ISTIL Group, Inc. ("ISTIL
"), wrongfully induced Progress to terminate the
contract and transfer the work to Reventox
Consulting Limited, a Cyprus corporation owned by
ISTIL. Integral asserted causes of action in
tortious interference with a contract and tortious
interference with prospective contractual relations.
ISTIL is chartered in Delaware, but has its principal
place of business in Ukraine.

Integral contends that ISTIL's Ukrainian lawyer,
Volodymyr Petryna, who also represented Progress,
negotiated the termination of the contract and
arranged for Reventox to be substituted. The case
is rife with allegations of illegal payments to
corporate and government officials in Ukraine,
leading Integral to complain to the Ukrainian
Attorney General.

The District Court denied ISTIL's motion for
transfer pursuant to *forum non conveniens* and, after
receipt of the parties' briefs on choice of law,
determined that Ukrainian law applied.

Observing that the law of the forum dictates the rule
of law to be applied in a conflicts case, the District
Court held that Delaware applies the "most
significant relationship test" of the Restatement
(Second) of Conflicts of Laws. In *Travelers
Indemnity Co. v. Lake,* 594 A.2d 38 (Del.1991), the
Supreme Court of Delaware wrote, "the local law of
the state which 'has the most significant
relationship to the occurrence and the parties under
the principles stated in § 6 [of the Restatement]'
will govern the rights of litigants in a tort suit." *Id.*
at 47 (quoting Restatement (Second) of Conflict of
Laws § 145(1)).

After reviewing the factors discussed in section 6 of
the Restatement, the District Court determined that
in the circumstances here, the law of Ukraine should

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

155 Fed.Appx. 69, 2005 WL 3134068 (C.A.3 (Del.))
**(Cite as: 155 Fed.Appx. 69)**

apply because the conduct causing the injury occurred in that country. The District Court also found that because the contract was negotiated and performed in Ukraine and Pakistan, those two countries were the places of injury. The site of incorporation and principal places of business factors were found to be neutral. The District Court also found that the policy considerations and other aspects cited*71 in the Restatement favored the choice of Ukrainian law. The Court noted, " Neither party has argued that the court should apply Pakistani law."

**\*\*2** Moving then to ISTIL's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court stated that Ukrainian law "does not recognize Integral's claim" of tortious interference with contract and prospective contract relations. Accordingly, ISTIL's motion to dismiss was granted because the complaint did not state a cause of action upon which relief could be granted.

Integral has appealed contending that the District Court erred in designating the law of Ukraine as applicable and granting the 12(b)(6) motion to dismiss.

Preliminarily, we note that the grant of the 12(b)(6) motion hinges on the choice of law determination. Integral takes the position in its brief that "the law of the Ukraine does not recognize the torts set forth in the Complaint as causes of action." In its brief in support of its motion to dismiss, ISTIL argued, " Under the law of Ukraine, there is no common law claim for tortious interference with economic relations." Therefore, in the parties' view if Ukraine furnished the source of applicable law, the 12(b)(6) motion was properly granted.

Choice of law is a purely legal question which we review *de novo. See Robeson Indus. Corp. v. Hartford Accident & Indem. Co.,* 178 F.3d 160, 164-65 (3d Cir.1999) (citing *General Ceramics Inc. v. Fireman's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995)). We also apply *de novo* review to a District Court's decision to grant a Rule 12(b)(6) motion to dismiss. *Herring v. United States,* 424 F.3d 384, 390 (3d Cir.2005) (citing *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 273 (3d

Cir.2004)).

Section 145 of the Restatement (Second) of Conflict of Laws provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."

Section 6 identifies the following factors to be considered by a court in determining the applicable law:
"(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum;
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
(d) the protection of justified expectations;
(e) the basic policies underlying the particular field of law;
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied."

*Id.* at § 6.

Further, section 145 lists the following relevant contacts a court may consider when applying section 6:
"(a) the place where the injury occurred;
(b) the place where the conduct causing the injury occurred;
(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and
(d) the place where the relationship, if any, between the parties is centered."

**\*\*3** *Id.* at § 145.

In the District Court, Integral contended that the law of Delaware or England **\*72** should be applied. Delaware is the state where ISTIL is incorporated, but it does not have its principal business office there. To overcome this minimal contact, Integral posits that Delaware has an interest in having its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

155 Fed.Appx. 69, 2005 WL 3134068 (C.A.3 (Del.))
**(Cite as: 155 Fed.Appx. 69)**

corporations act in accordance with the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq.* That statute, however, is a United States criminal statute, not particularly relevant to the policies underlying Delaware corporation law. We agree with the District Court that Delaware would have minimal, if any, interest in a private dispute between a Ukraine-based company and a Pakistan-based company over an agreement to be performed in those two countries.

[1] According to Integral, Pakistan's law on torts is based on English common law and the Pakistan Civil Procedure Code requires Pakistani courts to enforce rulings and decrees of designated English courts. Integral contended in the District Court that "English law would be applied in the place where the injury occurred (Pakistan), the place where some of the conduct causing the injury occurred (Pakistan and the United Kingdom), where plaintiff is located (Pakistan) and the place where the relationship between Progress and Integral is centered (England).... Either Delaware or English law, but certainly not Ukrainian law, governs plaintiff's claims." (Integral Brief in the District Court at 21), A. 177.

For clarification, we observe that English law may, or may not, provide a rule of decision for Pakistani courts. Whatever the decision of a Pakistani court may be, it is the ruling of a court of that country, not England. Integral cites section 44A of the 1908 Pakistani Civil Procedure Code, but that reference is inapposite, addressing as it does the enforcement of judgments originally entered in courts of the United Kingdom. That is quite different from the adoption of a rule of law issued by those courts.

Moreover, Pakistan's legal system is a combined system of common law and Islamic Sharia law. *See* Pakistani Constitution, Part IX, Art. 227(1) ("All existing laws shall be brought in conformity with the Injunctions of Islam as laid down in the Holy Quran and Sunnah, in this Part referred to as the Injunctions of Islam, and no law shall be enacted which is repugnant to such Injunctions."); U.S. Department of State, *2005 Investment Climate Statement-Pakistan,* available at http://www.state.gov/e/eb/ifd/2005/43044.htm

(noting that in Pakistan, "Commercial law follows British and British-Indian precedents").

Integral did not furnish the District Court or this Court with even a general summary of Pakistani tort law. In its brief to the District Court, Integral did not cite any Pakistani statute or court rulings establishing that country's interest in the tort of interference with contract.

Nor is it pertinent to the controversy before us that the contract required the application of English law and the resolution of disputes by arbitration in London. ISTIL is a stranger to that contract and is not bound by its terms on selection of law and remedy.

**\*\*4** We are not persuaded that the record contains factual support for the selection of English law other than it recognizes the common law tort of interference with contractual relations. That is not enough.

Having lost in its choice of "English" law in the District Court, Integral now shifts its ground and contends that the District Court erred in failing to consider the other jurisdictions in accordance with Restatement sections 145 and 6, particularly Pakistan, which assertedly has a more significant**\*73** relationship to the claim than the Ukraine. Integral's brief in the District Court on this point is confusing and the district judge justifiably interpreted it as not advocating adoption of Pakistani law.

The most significant relationship test of the Restatement provides that a court "should" consider all "interested states" and all "potentially interested states" in conducting a choice of law analysis. *See* Restatement (Second) of Conflict of Laws § 6, cmt. f ("In determining a question of choice of law, the forum *should* give consideration not only to its own relevant policies ... but also to the relevant policies of all other interested states.") (emphasis added); Restatement (Second) Conflict of Laws § 145, cmt. e. Although the District Court could have considered whether Pakistan had the most significant relationship to the case, it was not bound to do so in the absence of an adequate presentation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

155 Fed.Appx. 69, 2005 WL 3134068 (C.A.3 (Del.))
**(Cite as: 155 Fed.Appx. 69)**

by Integral.

[2] The District Court was not required to consider Pakistani law *sua sponte.* Obviously, a Restatement cannot dictate the duty of a federal district judge, a function that is reserved for constitutional, statutory and judicial process. Moreover, the parties bear the burden of presenting the applicable law to the court. *See Bel-Ray Co., Inc. V. Chemrite (Pty) Ltd.,* 181 F.3d 435, 440-41 (noting that "[t]he parties ... generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case."). It is in that light that the Restatement admonitions must be read.

[3] On another tack, Integral asserts that Pakistan is the place of injury and that factor should predominate over the site of the tortious conduct. The argument is that Integral's principal place of business is in Pakistan and it is there that the loss of profits from interruption of the contract has the most impact. However, the complaint also seeks damages for loss of goodwill caused by the tortious interference, a detriment that would affect Integral in Ukraine. Integral's claim of the loss of a longstanding and profitable relationship with Progress speaks more to injury in the Ukraine than Pakistan. Therefore, injury would be felt in both countries, and thus the importance of the place of injury factor is diluted.

The harm factor's site is of lesser significance in tortious interference with contractual relations cases. The Restatement discusses the relative importance of the location of the pecuniary loss in analogous claims of unfair competition by false advertising and misappropriation of values. In these cases, the place of injury is less significant: ".. . [T]he principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from false advertising and misappropriation of trade values." Restatement (Second) of Conflict of Laws, § 145, cmt. f.

**5 Integral also contends that the District Court should have grouped the contacts with all of the states that recognize tortious interference with contractual relations-Delaware, Pakistan, Oregon (where ISTIL allegedly has a place of business) and England-together to determine which state had the most significant relationship. In support of this position, Integral cites a comment to Restatement section 145, which provides that "when certain contacts involving a tort are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice of law purposes as if these contacts were grouped in a single state." Restatement (Second) of Conflict of Laws § 145, cmt. i.

*74 The grouping argument must be viewed against the background of a bitter internal corporate dispute between ISTIL's two principal shareholders, a pending breach of contract arbitration proceeding in London between Integral and Progress, litigation before the Chancery Division of the High Court in London, and a prior suit in the Delaware District Court arising out of the intra-corporate struggle. Some of these events were battles in ISTIL's corporate civil warfare or the pending breach of contract litigation not involving the tort of interference with the Progress agreement.

Even if somehow these incidents were considered to be applicable contacts, they are so negligible as not to be helpful in the choice of law determination. As we have also pointed out, the evidence as to the content of Pakistani law that has been presented is inadequate to justify including that country in the group.

Integral also asserts that Ukrainian law should not be applied because the Ukrainian courts are corrupt and therefore are unsatisfactory venues. It offers no support for this argument other than an isolated sentence in an opinion of the Court of Human Rights in Strasbourg. We note first that the assertion is completely irrelevant to a case to be tried in Delaware. Furthermore, the Court of Human Rights opinion was delivered in French and no translation has been furnished to us or the District Court. Instead, Integral produced a press release which is hardly adequate for our review of the adverse comment in context.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

155 Fed.Appx. 69, 2005 WL 3134068 (C.A.3 (Del.))
**(Cite as: 155 Fed.Appx. 69)**

Fundamental to Integral's approach to this case seems to be the theory that its choice to seek a common law cause of action somehow militates against applying the precepts of a civil law jurisdiction. If that is Integral's understanding, it is not correct. *Phoenix-Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466 (3d Cir.1988), applied the code of a civil law country in connection with claims for breach of contract and in addition looked to Delaware law on certain phases of the case as well. In that case, we noted that although one issue (of many) might have been determined under the civil law, we found no reason to disturb the parties' choice of Delaware law as to that one phase. *Id.* at 1477, n. 4.

Ukraine is a civil law jurisdiction and therefore does not recognize common law causes of action as such. However, the record contains an affidavit from a Ukrainian lawyer to the effect that under the Ukrainian Law on Protection Against Unfair Competition, Integral might be eligible for some relief. According to the affidavit, that law provides that "it is illegal for a third-party to persuade a party to breach an existing contract through bribery or other offers of material reward. The wrongdoer can be required to indemnify the party that lost the benefit of the actual or potential conflict." A445. *See also,* Law of Ukraine, *On Protection Against Unfair Competition,* July 6, 1996, ch. III, art. 12, 20, 24 *available in English at* http://www.welcometo.kiev.ua /pls/ili/ilic.frame_law_resul t2.show?p_arg_names=law_ id & p_arg_values=131 (making it unlawful for a party to instigate another business to abrogate a contract with a rival business and providing for civil damages to injured parties); Oleksandr Padalka and Igor Svechar, *Ukraine,* http://www.globalcompetitionr eview.com/ear/52_ukraine.cfm (last visited November 14, 2005) (noting that under Ukrainian law, "Any person who has suffered a loss or damage as a result of unfair competition may recover pecuniary and moral damages by filing a civil lawsuit.").

**\*\*6** Integral maintains that no remedy is available under Ukrainian law and has not **\*75** commented on the lawyer's affidavit. We question whether the law of Ukraine denies a remedy comparable to that of the common law, but the District Court was justified in accepting Integral's position that no such remedy was available. The parties having agreed upon a (questionable) interpretation of the law in this private controversy, we find no reason to disturb it. *See Phoenix Canada Oil Co.,* 842 F.2d at 1466. That being so, it was proper to grant the motion under Fed.R.Civ.P. 12(b)(6).

Our review of the record persuades us that the plotting, conspiracy and machinations in this case as alleged by Integral occurred in Ukraine. That country has the most significant contacts with this dispute and its law should govern the merits.

Accordingly, the Judgment of the District Court will be affirmed.

C.A.3 (Del.),2005.
Integral Resources (PVT) Ltd. v. Istil Group, Inc.
155 Fed.Appx. 69, 2005 WL 3134068 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

• 05-1054 (Docket) (Jan. 07, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.